# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| _____ ) | **Case No.  1:08-cv-02364** |
| IN RE: AQUA DOTS PRODUCTS ) | **MDL 1940** |
| LIABILITY LITIGATION ) | **Hon. David H. Coar** |
| _____ ) | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by and through their attorneys, bring this nationwide class action against defendants Spin Master, Limited ("Spin Master, Ltd."), and Spin Master, Incorporated ("Spin Master, Inc.") (collectively "Spin Master"); Moose Enterprise Pty Ltd. ("Defendant Moose"); Toys "R" Us, Inc.; Wal-Mart Stores, Inc.; and Target Corp. ("Target") (collectively, "Defendants"), on their own behalf and on behalf of a class of all others similarly situated, including all persons who purchased and/or acquired Aqua Dots toys – the children's craft kit (hereafter referred to as "Aqua Dots" or the "Hazardous Toys") – manufactured, sold and/or distributed by Defendants that contained a butanediol coating ("Class").  Plaintiffs bring this action for damages and for equitable, injunctive, and declaratory relief against Defendants, who designed, manufactured, marketed, sold and/or distributed the Hazardous Toys.  Plaintiffs allege the following upon their own knowledge, or where there is no personal knowledge, upon information and belief and the investigation of their counsel as to Defendants' actions and misconduct, as follows:

## NATURE OF THE CASE

1.      As detailed below, Defendants manufactured, distributed, marketed and/or sold approximately 4.2 million Aqua Dots toys manufactured in China and sold during the class period.  Aqua Dots were subsequently recalled in the United States, because the toy's beads contain 1,4 butanediol, an industrial solvent that the body converts into gamma-hydroxy butyrate ("GHB").  GHB is commonly known as the "date-rape" drug because of the depressive effects it has on the central nervous system.

2.      Defendants did not adequately monitor the manufacturing and design of their toy products in China and allowed the Hazardous Toys to be sold in the United States with toxic chemicals which are extremely dangerous and potentially lethal.

3.      Additionally, Defendants failed to adequately monitor and inspect the quality of the Hazardous Toys when they were imported from China to the United States, thereby allowing dangerous toys to be used by children.  Indeed, Defendants knew, or should have known, that these toys were intended for children who could and would handle, lick, taste, bite or swallow the toys, and that the toys contained hazardous chemicals that could be easily ingested.  Defendants knew, or should have known, that these toys were intended for children, who lick or put their hands in their mouths.  The toys are designed to be used with water and cause children to touch and potentially ingest the toxic coating.

4.      On November 7, 2007, the United States Consumer Product Safety Commission ("CPSC") announced a recall of the approximately 4.2 million Aqua Dots. In the recall notice dated November 7, 2007, Spin Master Ltd. stated that the Aqua Dots kits contain beads that, when swallowed, can cause children to become ill or possibly die. Children who swallow the beads become dizzy and can slip into a coma.  According to

the CPSC recall, the Aqua Dots recall is one of the most serious announced by CPSC in recent years, which advised that the toys were to be taken away from children immediately.

5.      Although Defendants have recalled the Hazardous Toys due to the extreme danger that they pose to children, Defendants have not offered to reimburse Plaintiffs and the Class for the cost of the Hazardous Toys.  Nor have many retailers offered a refund to consumers who returned the product as part of the recall.  Moreover, the recall is complicated and fraught with hurdles.  Defendants' recall fails to compensate Plaintiffs and the Class for their damages.

6.      Rather, Defendants merely offer to replace the toxic beads with other beads or another toy.  At the time of the recall, Defendants failed to assure consumers that the replacement beads were manufactured and distributed with proper quality control measures and safety inspections.

7.      Because of Defendants' failure to use proper quality control measures and to exercise sufficient control over their operations in China, Plaintiffs and the Class have suffered injury-in-fact and have lost money and/or property.  Additionally, Plaintiffs and the Class seek equitable relief, including permanently enjoining Defendants from engaging in the unlawful activities and practices complained of herein; an order requiring Defendants to implement safety systems, such as third-party laboratory testing of all products imported from China, and requiring Defendants to disclose the identity of the supplier responsible for coating Aqua Dots with the chemical that converts to GHB; an order requiring Defendants to stop their current recall and to implement a full recall with reasonable procedures that allow Plaintiffs and the Class to easily participate in the recall;

injunctive relief as described herein; and disgorgement of profits as described herein on behalf of Plaintiffs and the Class.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964(a) and (c) and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because Plaintiffs and Class members are of diverse citizenship from one or more Defendants; there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000.00).

9.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendants engaged in substantial conduct relevant to Plaintiffs' claims within this District and have caused harm to Plaintiffs and Class members residing within this District.  Additionally, Spin Master, Ltd. and Defendant Moose are foreign corporations.

10.      Finally, the class action lawsuits referenced in the caption above have been transferred to this Court per the Transfer Order of the Judicial Panel on Multi-District Litigation dated April 9, 2008.  Plaintiffs in the transferred actions reserve their rights of remand to the districts from which they were transferred at or before the conclusion of the pre-trial proceedings.[1]

## THE PARTIES

### I.  Plaintiffs

11.      Plaintiffs Simon and Sarah Bertanowski ("Bertanowski Plaintiffs") purchased Aqua Dots product #78 988 743 at a Target store in Miami, Florida for their

---

[1] *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

grandson, Samuel White.  The Bertanowski Plaintiffs live in Miami Beach, Florida.

Plaintiff Anthony B. White ("Plaintiff White") is the father of minor child Samuel White.

Plaintiff White and his son are residents of Coral Gables, Florida.  The Bertanowski

Plaintiffs would not have purchased the Aqua Dots had they known that their grandchild

would be exposed to hazardous chemicals.  The Bertanowski Plaintiffs have been injured

as a result of the unlawful conduct alleged herein.

12.     Plaintiff Erick K. Botsch ("Plaintiff Botsch") purchased Aqua Dots from Toys

"R" Us for his three children on November 2, 2007.  He is a resident of Dallas County,

Texas.  Plaintiff Botsch would not have purchased the Aqua Dots had he known that his

children would be exposed to hazardous chemicals.  Plaintiff Botsch has been injured as a

result of the unlawful conduct alleged herein.

13.     Plaintiff Michael J. Burgess ("Plaintiff Burgess") purchased Aqua Dots from a

Wal-Mart as a gift for his child in September 2007.  He is a resident of Barton County,

Missouri.  Plaintiff Burgess would not have purchased the Aqua Dots had he known that

his child would be exposed to hazardous chemicals.  Plaintiff Burgess has been injured as

a result of the unlawful conduct alleged herein.

14.     Plaintiff Kim A. Cosgrove's ("Plaintiff Cosgrove") son Christopher Cosgrove,

received the Aqua Dots Starter set and "Glow in the Dark" refill beads as a gift from his

uncle, Kevin Cosgrove, who purchased the gift from Toys "R" Us on September 8, 2007.

Plaintiff Cosgrove additionally purchased the Aqua Dots' Dinosaur and Rescue refill

beads from Target for her son, in or around early October 2007.  Plaintiff Cosgrove is a

resident of Massapequa, New York.  Plaintiff Cosgrove would not have accepted the gift

or purchased the Aqua Dots refills had she known that her child would be exposed to

hazardous chemicals.  Plaintiff Cosgrove has been injured as a result of the unlawful

conduct alleged herein.

15.     Plaintiffs Donald C. Erbach, Jr. and Stephanie S. Streett ("Plaintiffs Erbach

and Streett") purchased Aqua Dots Super Studio from Wal-Mart as a gift for their five-

year old daughter, Olivia Erbach, and four-year old daughter, Katherine Erbach, in the

summer of 2007.  Plaintiffs Erbach and Streett are residents of Little Rock, Arkansas.

Plaintiffs Erbach and Streett would not have purchased the Aqua Dots had they known

that their children would be exposed to hazardous chemicals.  Plaintiffs Erbach and

Streett have been injured as a result of the unlawful conduct alleged herein.

16.     Plaintiff Samantha Ford ("Plaintiff Ford") purchased Aqua Dots Super Studio

on September 27, 2007, from Toys "R" Us as a gift for her son, Declan Ford, who was

four years old at the time of the purchase.  Plaintiff Ford is a resident of Cook County,

Illinois.  Plaintiff Ford would not have purchased the Aqua Dots had she known that her

child would be exposed to hazardous chemicals.  Plaintiff Ford has been injured as a

result of the unlawful conduct alleged herein.

17.     Plaintiff Sandra Irene Soderstedt ("Plaintiff Soderstedt") purchased Aqua Dots

Super Studio, Model #70557, as a Christmas gift for her minor child, Conner Soderstedt,

on October 17, 2007, from Toys "R" Us.  She is a resident of Lebanon County in

Palmyra, Pennsylvania.  Plaintiff Soderstedt would not have purchased the Aqua Dots

had she known that her child would be exposed to hazardous chemicals.  Plaintiff

Soderstedt has been injured as a result of the unlawful conduct alleged herein.

18.     Plaintiff Marilyn W. Walker ("Plaintiff Walker") purchased Aqua Dots from

Wal-Mart as a gift for her grandchild on or about November 1, 2007.  She is a resident of

Murray, Calloway County, Kentucky.  Plaintiff Walker would not have purchased the

Aqua Dots had she known that her grandchild would be exposed to hazardous chemicals.

Plaintiff Walker has been injured as a result of the unlawful conduct alleged herein.

19.    Plaintiff Robyn Williams ("Plaintiff Williams") purchased Aqua Dots "Glow

in the Dark" Kit from a Wal-Mart for her daughter, Alexis Gallup, in August 2007.

Plaintiff Williams is a resident of Grady County, Oklahoma.  Plaintiff Williams would

not have purchased the Aqua Dots had she known that her child would be exposed to

hazardous chemicals.  Plaintiff Williams has been injured as a result of the unlawful

conduct alleged herein.

## II. Defendants

### A.    Manufacturing Defendants

20.    Defendant Spin Master, Ltd., is a foreign business entity of unknown structure

having its principal place of business at 450 Front Street West, Toronto, ON M5V1B6

Canada with offices in Los Angeles, California; Bentonville, Arkansas; London,

England; Paris, France; and Hong Kong, China. [2]  The Chairman and CEO of Spin

Master, Ltd. is Ronnen Harary and the President and CEO of Spin Master, Ltd. is Anton

Rabie.  Spin Master, Ltd., distributes, markets, promotes and sells merchandise, including

Aqua Dots, in the State of Illinois and nationwide.  Spin Master, Ltd., conducts

substantial business in the State of Illinois.  According to Dunn & Bradstreet, Spin

Master, Ltd. had a projected 2007 revenue of $480 million.  Spin Master, Ltd. touts itself

as "a top ten toy company[y] … and has taken position of the fastest growing toy

---

[2] "Spin Master/About Us/Company Overview", http://www.spinmaster.com.

company in North America."[3]  Spin Master distributes such products as Air Hogs®TM, Aqua Doodle™, Bella Dancerella, Black Belts, Bounce 'Round™, 7-11™Slurpee Maker, McDonald's Flurry Maker, Shrinky Dinks, Mighty Beanz, Catch-A-Bubble and Moon Sand.  At all relevant times, Spin Master, Ltd., acted by and through its agents, servants, workers, employees, officers and directors, all of whom were acting through the course and scope of their actual and apparent authority, agency, duties or employment. Currently, Spin Master, Ltd. is a major distributor of Defendant Moose's products.  In 2008, Spin Master, Ltd. was awarded the Toy of the Year award by the Toy Industry Association, Inc. for its "Air Hogs Havoc Heli Laser Battle" toy.

21.    Defendant Spin Master, Inc., is a Delaware corporation with its principal place of business and headquarters located at 300 International Drive, Suite 300, Williamsville, New York 14221, with additional offices in Los Angeles, California, and Bentonville, Arkansas.  Spin Master, Inc., is a wholly-owned subsidiary of Defendant Spin Master, Ltd.  Ronnen Harary, the Chairman and CEO of Spin Master, Ltd., is also the CEO of Spin Master, Inc.  Anton Rabie, the President and CEO of Spin Master, Ltd. is also the President of Spin Master, Inc.  Upon information and belief, Defendant Spin Master, Inc., distributes, markets, promotes and sells merchandise including Aqua Dots in the State of Illinois and nationwide.  Spin Master, Inc., conducts substantial business in the State of Illinois.  At all relevant times, Spin Master, Inc., acted by and through its agents, servants, workers, employees, officers and directors, all of whom were acting through the course and scope of their actual and apparent authority, agency, duties or employment.

---

[3] "Spin Master/About Us/Company Overview", http://www.spinmaster.com.

22.    Defendant Moose is an Australian company with its principal corporate office at 7-13 Arena court, Bentleigh East, Victoria 3165, Australia.  Defendant Moose also maintains offices in Hong Kong, China and has a showroom in New York State.  Defendant Moose, founded in 1985, describes itself as "one of the top 10 toy distributors within Australia" and a "leader of innovative, quirky, fashion driven products designed to inspire and delight."[4]  Defendant Moose's principal activities are the design, manufacture and marketing of toys, including Bindeez (marketed as Aqua Dots in North America).  Defendant Moose currently exports its toys to more than forty-five countries including the USA, UK, Italy, Spain, France, as well as many nations in Asia, Scandinavia and Eastern Europe.  One of Defendant Moose's major export customers is Spin Master, Ltd.

23.    Spin Master, Ltd., Spin Master, Inc., and Defendant Moose are herein referred to collectively as "Manufacturer Defendants."

24.    Manufacturer Defendant Doe Nos. 1 through 10 are persons and/or entities that are or were complicit in the scheme alleged herein.  The true identities of Does are currently not known to Plaintiffs.  Plaintiffs seek to amend this complaint after the actual identities of Does are discovered.

**B. Retailer Defendants**

25.    Defendant Target Corporation ("Target") is a Minnesota corporation with its principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota.  Target Corporation operates Target and SuperTarget stores and Target.com.  Target has stores nationwide including in Illinois.  Defendants Spin Master, Ltd., Spin Master, Inc.,

---

[4] *See* http://www.mooseworld.com.au/content/corporate/AboutUs.aspx

and Defendant Moose distributed and sold the Hazardous Toys through Target during the class period.

26.    Defendant Toys "R" Us, Inc. ("Toys "R" Us") is one of the leading retailers of children's toys and baby products in the United States.  The company is owned by an investment group consisting of affiliates of Bain Capital Partners LLC, Kohlberg Kravis, Roberts & Co. (KKR), and Vorando Realty Trust (NYSE: VNO).  Toys "R" Us operates four divisions:  Toys "R" us, U.S.; Toys "R" Us, International; Babies "R" Us and Babiesrus.com; and Toysrus.com.  The company sells merchandise through approximately 850 toy stores in the U.S. as well as through its Internet sites.  Toys "R" Us is a Delaware corporation with its principal executive offices in Wayne, New Jersey.  Manufacturer Defendants distributed and sold the Hazardous Toys through Toys "R" Us during the Class Period.

27.    Defendant Wal-Mart Stores, Inc. ("Wal-Mart") is one of the world's largest retailers with $345 billion in sales for the fiscal year ending 2007.  Wal-Mart operates Wal-Mart Discount Stores, Wal-Mart Supercenters, Sam's Club warehouse stores, Neighborhood Markets, walmartsotres.com, and walmart.com.  Wal-Mart is a Delaware corporation with its principal executive offices in Bentonville, Arkansas.  Manufacturer Defendants distributed and sold the Hazardous Toys through Wal-Mart during the Class Period.

28.    Defendants Target, Toys "R" Us, and Wal-Mart are herein referred to collectively as "Retailer Defendants."

29.    Retailer Defendant Doe Nos. 1 through 10 are persons and/or entities that are or were complicit in the scheme alleged herein.  The true identities of Does are currently

not known to Plaintiffs.  Plaintiffs seek to amend this complaint after the actual identities

of Does are discovered.

**CO-CONSPIRATOR AND AGENCY ALLEGATIONS**

30.     Various other persons, firms, and corporations, the identities of which are

presently unknown, have participated as co-conspirators with Defendants in the

violations alleged herein and have performed acts and made statements in furtherance

thereof.

31.     The facts alleged herein have been committed by Defendants and their co-

conspirators, or were authorized, ordered, or done by their respective officers, agents,

employees, or representatives while actively engaged in the management of each

Defendant's business or affairs.

32.     Each of the Defendants named herein acted as the agent or joint venturer of or

for the other Defendants with respect to the acts, violations and common course of

conduct alleged herein for the purpose of enriching themselves at the expense of

consumers, resulting in damages to Plaintiffs and the Class.

**FACTUAL ALLEGATIONS**

I.     **DEFENDANTS' TOYS ARE HAZARDOUS TO CHILDREN'S HEALTH**

    A.     **It is Unlawful to Manufacture or Sell Toys Containing Butanediol**

32.     Butanediol is a solvent, commonly used as a raw material in factories to

manufacture some types of plastics and is converted into GHB.[5]

33.     The Food and Drug Administration ("FDA") in 1999 declared butanediol a

Class I Health Hazard, meaning it can cause life-threatening harm.[6]

---

[5] *See* http://www.cnn.com/2007/US/11/08/toys.daterapedrug.ap/index.html

34.     The FDA prohibited the sale and manufacture of GHB under the *Samantha Reid Date-Rape Prohibition Act of 2000*.  Since then, GHB is associated with a more clandestine popularity as an illicit drug, particularly in the Southeastern and Western U.S. It currently is prevalent in the dance music scene (at raves and nightclubs) as an alternative to "ecstasy" and amphetamines.  GHB often is used in conjunction with alcohol.  It has been implicated as a "date rape" drug.[7]

35.     The Federal Hazardous Substance Act, 15 U.S.C. §1261(f)(1), defines household products that are toxic as "hazardous substances".  Toys that are intended for use by children and that contain a hazardous substance in such a manner to be susceptible to access to children are automatically banned under 15 U.S.C. §1261(q).

**B.     Ingestion of Butanediol/GHB Has Harmful Effects on Young Children**

36.     When butanediol is metabolized, the body converts it into GHB, also known as the "date rape" drug or "liquid ecstasy."

37.     GHB is an odorless, colorless liquid that acts on the central nervous system as a depressant/anesthesia.[8]

38.     Ingestion of GHB can have serious effects in humans, causing depression of the central nervous system, respiratory depression, unconsciousness, seizures, comas and even death.  These effects are likely to be particularly magnified in small children.[9]

---

[6] *See id.*

[7] *See* http://www.emedicine.com/emerg/topic848.htm

[8] *See* http://www.nida.nih.gov/Infofacts/RohypnolGHB.html

[9] *See* http://teenadvice.about.com/library/weekly/aa062502d.htm

39.    Specifically, the common side effects for "adults who ingested one-half to 4 teaspoonfuls of GHB are: headache, confusion, ataxia, urinary incontinence or urgency, difficulty breathing, bradycardia, uncontrollable shaking, and seizurelike activity (uncontrollable or unusual movements) and acidosis.  Hypothermia has been reported in adults and children following exposure."[10]  These side effects could be more intense for a child who ingests the same amount or less.

### C.    Aqua Dots Toys

40.    The Aqua Dots toy is a craft kit which allows children to create various multi-dimensional designs. Aqua Dots (also sold under the brand names Bindeez Beads and Aqua Beads) contain packets of small, brightly colored beads that children arrange into various multi-dimensional designs.  The beads are approximately 5 millimeters in diameter and come in a wide range of colors.  Children are instructed to spray their designs with water to fuse the beads together.  Once sprayed with water, the beads become adhesive and fuse together on a plastic tray.  Once the design becomes fixed, it can be removed from the tray.

41.    The product is available in various different kits with accessories such as a drying fan, applicator pen, design templates for the beads, and spray bottle.  All models of Aqua Dots were recalled.

42.    Aqua Dots are marketed to children ages 4 and over.

43.    The Aqua Dots toys were sold at prices ranging from $17 to as much as $30.

44.    Defendants manufacture, distribute, market, promote and sell Aqua Dots in the State of Illinois and nationwide.

---

[10]  *See "Gamma Hydroxybutryic Acid and Related Agents."  POISINDEX® System*.n.d. Thomson Healthcare *available at* http://www.thomsonhc.com

45.     Aqua Dots are manufactured in China by Defendant Moose and distributed throughout North America by Spin Master, Ltd. and Spin Master Inc. Defendant Moose outsourced production of the Toys to a factory in Shenzhen, which is in the Guangdong province of China.

46.     To create a coating that causes the beads to stick together when wet, the Aqua Dots Toys were supposed to be manufactured with 1,5 pentanediol, which is a nontoxic compound found in glue. Instead the Toys were made with 1,4-butanediol, a harmful toxin used in cleaners and plastics.[11] Although it is unclear why 1,4-butanediol was substituted, it may be due to the fact that 1,5 pentadediol can cost up to five times as much as 1,4 butanediol.[12] Butanediol is manufactured in China and elsewhere, including by major multinational companies, and is also marketed over the Internet.[13]

47.     Scientists have found that when the Hazardous Toy is ingested, the 1,4-butanediol coating converts into GHB once metabolized.[14]

48.     According to the CPSC, children that swallow the Hazardous Toy can become comatose, develop respiratory depression or have seizures.

49.     Aside from swallowing the beads, children are at risk from the 1,4-butanediol coating by putting their hands in their mouths, as children are apt to do, after playing with the Hazardous Toys. Children are actually instructed to use water in order to activate the Hazardous Toys' coating and seal their designs. Once children have the wet, 1,4-

---

[11] *See* http://www.cnn.com/2007/US/11/08/toys.daterapedrug.ap/index.html

[12] *See* http://www.cnn.com/2007/US/11/08/toys.daterapedrug.ap/index.html

[13] *See id.*

[14] *See* http://www.cpsc.gov/cpscpub/prerel/prhtml08/08074.html

butanediol coating on their hands, they could ingest the poison by licking or sucking their hands.

### D.    Defendants Failed to Timely Recall the Hazardous Toys

50.    In or around early October 2007, three Australian children were hospitalized after ingesting beads from the Bindeez toys, the Australian version of Aqua Dots and Australia's 2007 Toy of the Year.  Two of the children, a two-year old boy and 10-year old girl, swallowed the Hazardous Toy and both were admitted to a Sydney, Australia hospital.  The third child, a 19-month old, also received medical help after ingesting the Hazardous Toy.

51.    A biochemical geneticist, Dr. Kevin Carpenter in Sydney, Australia, identified the problem when the first Australian boy was hospitalized.  Originally, Australian doctors at Children's Hospital at Westmead thought the boy had a genetic disorder or was given illegal drugs by a family member.  But Dr. Carpenter, using a mass spectrometer, saw a large peak of a "substance [he] didn't recognize."[15]  The boy's urine test found GHB.  After two days, the compound dissipated from the boy's system, confirming that the symptoms were not genetic.

52.    On or around October 8, 2007, Dr. Carpenter contacted Defendant Moose in Australia regarding the Hazardous Toys, and was referred to the Hong Kong manufacturer.  The manufacturer provided Dr. Carpenter with a list of the Hazardous Toys' ingredients.  The list did not include the dangerous industrial chemical, 1,4-butanediol.

---

[15] Keith Bradsher, *Sleuthing for a Danger in Toy Beads*," N.Y. Times, November 7, 2008 *available at* http://www.nytimes.com/2007/11/08/business/worldbusiness/08recall.html?ex=1352264400&en=3f5ba1b256983b9e&ei=5088&partner=rssnyt&emc=rss

53.    Dr. Carpenter noted that the manufacturer was reluctant to provide details of how the beads were made.[16]  According to Dr. Carpenter, "the manufacturer was very keen that Moose not know what was in them," apparently to prevent Defendant Moose from ordering identical beads from another manufacturer.[17]

54.    Defendant Moose has failed at any point to identify its manufacturer.  Moose put Dr. Carpenter in touch with the manufacturer by e-mail during his investigation.[18] The e-mail addresses ended in @jssy.com.hk.[19]  Upon information and belief, based on Dr. Carpenter's investigation, the manufacturer is  JSSY Ltd.[20]  JSSY Ltd. has the web address with that name and the company's Web site describes it as a toy manufacturer with offices in Hong Kong and Taiwan and three factories in mainland China.[21]  Lavigne Law, a customer service representative at the JSSY office in Hong Kong, said she was not authorized to discuss Bindeez.[22]

55.    On November 2, 2007, Dr. Carpenter alerted the Ministry of Fair Trading of New South Wales in Sydney. [23] On the same day, the hospital's poison control center sent out a warning about the beads to poison centers around Australia.[24]

---

[16] *See id.*

[17] *Id.*

[18] *See id.*

[19] *See id.*

[20] *See id*

[21] *See id.*

[22] *See id.*

[23] *See id.*

[24] *See id.*

56.     On November 3, 2007, a mother living near Dr. Carpenter's hospital found her 10-year-old daughter motionless.[25]  Then the girl began vomiting beads.[26]  At the hospital's poison control center, doctors recognized the symptoms immediately.[27]  "Both the children presented with a coma and seizure-like movements," said Dr. Naren Gunja, the deputy director of the center.[28]

### 1.     Hazardous Toys Recalled In Australia

57.     On November 6, 2007, Defendant Moose ordered a recall in Australia of the Bindeez beads toy line, which included twenty-two different products sold in Australia since December 2006.  Bindeez beads were pulled from store shelves in Australia. Bindeez beads were made in the same factory as Aqua Dots.

58.     Defendant Moose offered Australian consumers a full refund for the recalled Bindeez.[29]

59.     After the Bindeez recall, Dr. Carpenter called upon safety regulators to look beyond Bindeez and conduct laboratory tests on all similar craft toys.[30]

60.     On November 7, 2007, Peter Mahon, a Defendant Moose spokesman, stated that the company had ordered safety tests on Bindeez beads, which were sold in more than 40 other countries, including the U.S., but that it was awaiting results before

---

[25] *See id.*

[26] *See id.*

[27] *See id.*

[28] *Id.*

[29] *See* http://www.mooseworld.com.au/content/bindeezrecall/returns.aspx

[30] *See id.*

deciding whether to expand its recall beyond Australia.[31]  But Amazon's British Web

site, www.Amazon.co.uk, abruptly stopped listing Bindeez products for sale.[32]  Toys

LiFung (Asia) of Hong Kong said that it had removed all Bindeez items from the Toys

"R" Us stores that it operates in Hong Kong, Singapore and Malaysia.[33]

###    2.    Aqua Dots Finally Recalled in the U.S.

61.    On November 7, 2007 - nearly a *month* after Dr. Carpenter warned

Defendants about the dangers of their product - Defendant Spin Master, Ltd., in

conjunction with the CPSC, announced a recall of approximately 4.2 million Aqua Dots

toys sold in the U.S. between April 2007 and November 2007.  Defendant Spin Master,

Ltd. acknowledged the dangers of the Toys in the recall notice, advising shocked parents

and guardians of young children to "immediately" take the recalled Toys away from

children.[34]

62.    In the November 7, 2007 recall announcement, the CPSC warned that children

that swallow the Hazardous Toy can become comatose, develop respiratory depression or

have seizures.[35]  The CPSC reported that there had been several cases of children in the

U.S. being injured from swallowing the Hazardous Toy.[36]  In one such case, a 20-month-

old child swallowed several dozen Aqua Dots beads.  The young child became dizzy,

---

[31] *See id.*

[32] *See id.*

[33] *See id.*

[34] *See "Spin Master Recalls Aqua Dots – Children Became Unconscious After Swallowing Beads"* United
States Consumer Product Safety Commission Press Release #08-074, November 7, 2007, *available at*
www.cpsc.gov/CPSCPUB/PREREL/prhtml08/08074.html

[35] *See id.*

[36] *See id.*

vomited several times, and then slipped into a comatose state for a period of time for which he was hospitalized.  In another case reported to the CPSC, a child vomited and slipped into a comatose state for which he/she was hospitalized for five days.[37]

## II.    Defendants Knew, Or Should Have Known, That Aqua Dots Were at Risk for Being Manufactured with GHB

### A.    Numerous Recalls of Toys Manufactured in China Put Defendants on Notice

63.    Recently, U.S. officials have raised alarm about products manufactured in China.  Seafood containing harmful drugs, toothpaste with an ingredient found in antifreeze, and pet food containing a chemical used to make plastic came from China to the United States and were the subject of recalls.  These reports followed a recall in November 2006 by Target and the CPSC of 190,000 toys and trucks made in China due to paint containing excessive lead, and a recall in 2005 by Dollar General involving similar circumstances.

64.    Notwithstanding the delayed issuance of the recall, U.S. Customs and Border Protection officers in Seattle intercepted several large shipments of Aqua Dots toys in the early weeks of December 2007.  The Seattle seizure followed Aqua Dots seizures in International Falls, Minnesota, Norfolk, Virginia and Savannah, Georgia.[38]

65.    China's General Administration of Quality Supervision, Inspection and Quarantine (AQSIQ) said the Bindeez toys were manufactured by the Wangqi Product

---

[37] *See id.*

[38] *See* http://www.cpb.gov/xp/cgov/newsroom/news_releases/archives/2007_news_releases/122007/12212007_2.xml

Factory in China's southern city of Shenzhen.  Moose admits that Bindeez and Aqua Dots were made at this same factory.[39]

66.     Defendants, however, ignored recent reports of unsafe products imported from China and failed to adequately screen and test the Aqua Dots imported from China.

67.     Defendants knew, or should have known, that the coating on Aqua Dots converts to the ultra hazardous GHB substance and presented a serious risk to the health and safety of children.

68.     The Retailer Defendants independently failed to perform the necessary testing of these products before selling them at their retail stores and through their websites, despite representations that the toys were safe as playthings by children.  For instance, Defendant Wal-Mart had asked suppliers to document testing for lead paint, magnets, and small parts, but did not ask for tests for 1,4 butanediol.[40]  Defendants, including Wal-Mart, failed to adequately test for 1,4 butanediol despite decades of reports of poisoning events from consumer products containing toxic diols.[41]

69.     During the fiscal year of 2006, the CPSC announced a record number of recalls of defective products. Over two-thirds of these recalls were of imported products, primarily from China.

70.     Similarly, CPSC commissioner Thomas H. Moore testified that the CPSC reached a new record number of recalls "of hazardous imported products from China including a wide variety of toys and children's jewelry" in 2007.

---

[39] http://seattletimes.nwsource.com/html/nationworld/2004001167_toys08.html

[40] *See* http://www.physorg.com/news130523982.html

[41] *See id*.

71.    Since 2003, there have been over 100 recalls of toys manufactured in China as a result of design flaws or manufacturing defects.[42]  Many of these recalled products were sold by the Retailer Defendants.

72.    Defendants' previous recalls, along with the ongoing recalls of Chinese-made toys that contain hazardous chemicals by other retailers and manufacturers, put Defendants on notice that children's products manufactured in China could contain hazardous chemicals, and that their controls over production were not adequate.

73.    The Aqua Dots toys were supposed to be made using nontoxic 1,5-pentanediol, but instead contained the harmful 1,4-butanediol.[43]  A study, led by Dr. Jeffrey Suchard of the University of California, Irvine, confirmed that Aqua Dots had no 1, 5 pentanediol at all, which had been completely replaced by a high level of the toxic 1, 4 butanediol.[44]

**B.    Defendants Failed to Promptly Notify the CPSC Regarding the Unsafe Nature of Aqua Dots**

74.    Manufacturers, importers, distributors and retailers are required to notify the CPSC within 24 hours when they discover information relating to a dangerous defect in a product.

75.    Upon information and belief, Defendant Moose was notified of the potential dangers of the recalled product in early October by Dr. Carpenter.[45]  Upon information

---

[42]   Hari Bapuji and Paul W. Beamish, *Toy Recalls- Is China Really the Problem?*,  45 Canada-Asia Commentary (2007), *available at*  http://www.asiapacific.ca/analysis/pubs/pdfs/commentary/cac45.pdf

[43]  *See* http://www.cnn.com/2007/US/11/08/toys.daterapedrug.ap/index.html

[44]  *See* http://www.sciencedaily.com/releases/2008/05/080520175259.htm

and belief, Spin Master Inc. and Spin Master Ltd. were notified at that time of the

potential dangers of the recalled product.  On November 4, 2007, Defendants were

further notified of the dangers posed by the Hazardous Toys by the Ministry of Fair

Trading.

76.    Upon information and belief, Defendants notified U.S. retailers about the

problem on November 7, 2007, at least three days after discovering GHB in Aqua Dots or

Bindeez toys in Australia.

77.    There are mixed reports and Defendants still have not announced the name of

the supplier of the coating of Aqua Dots toys with butanediol that converts to GHB.

Defendants' actions to protect themselves, their manufacturers, and their supplier

continue to place children in danger around the world.

### III.    DEFENDANTS' MISREPRESENTATIONS REGARDING THE HAZARDOUS TOYS

#### A.    Defendants Untruthfully Represented that the Hazardous Toys are Safe, Quality Products and Are Age Appropriate

78.    Age grading practices are important to ensure that a toy is appropriate and

safe at particular stages of children's physical and mental development.[46]

79.    In their packaging of toys and elsewhere, the Manufacturer Defendants

represent that their toys are appropriate for certain ages.  Moreover, the packaging on the

Aqua Dots kits carries images of children playing with the hazardous toys.  Plaintiffs and

---

[45] See Keith Bradsher, *Sleuthing for a Danger in Toy Beads*," N.Y. Times, November 7, 2008, *available at* http://www.nytimes.com/2007/11/08/business/worldbusiness/08recall.html?ex=1352264400&en=3f5ba1b2 56983b9e&ei=5088&partner=rssnyt&emc=rss

[46] See ASTM F963-07e1, *Standard Consumer Safety Specification for Toy Safety,* at 44.

members of the Class purchased the Hazardous Toys believing that the toys were safe for children's foreseeable use.

80.    Defendants go to great lengths to market and advertise that their toys are safe for children.  In fact, Defendant Spin Master, Ltd. states the following on its website:

"The safety of the children who play with our products is our top priority…"[47]

"From the moment that we discovered there was a problem with the Aqua Dots toy, our primary concern and focus has been on protecting the well-being of the public."[48]

"Spin Master's decision to pursue this recall is grounded in our ongoing commitment to children's safety."[49]

"Spin Master has always been a trusted company and distributor of children's products and we have made the safety of children our foremost priority."[50]

81.    The Retailer Defendants further enabled Manufacturer Defendants to make representations concerning the quality of its toys.  The Retailer Defendants adopted, and are responsible for, the representations Manufacturer Defendants made on their packaging regarding the safety and age appropriateness of the toys, when it decided to sell such toys on its shelves.

---

[47] "Aqua Dot Bead Replacement Notification – Update", (March 7, 2008), *available at* http://www.aquadotsrecall.com/replacement_notification.html

[48] Press Release, "Spin Master Safety Recall Facts, Statement by Spin Master Regarding the Aqua Dots Toy Recall" (Nov. 9, 2007), *available at* http://www.aquadotsrecall.com/press_release.html#3

[49] Press Release, "Spin Master Safety Recall Facts, Distributor Announces Voluntary Recall of Aqua Dots Toys" (Nov. 7, 2007), *available at* http://www.aquadotsrecall.com/press_release.html#2

[50] Press Release, "Spin Master Safety Recall Facts; Distributor Requests Voluntary Removal of Aqua Dots Toys by Retail Stores.  Spin Master Ltd. Takes Precautionary Measures in Wake of Australian Recall" (Nov. 7, 2007), *available at* http://www.aquadotsrecall.com/press_release.html#3

82.     Additionally, Retailer Defendant Target has made representations to its trusted customers that the toys it sells are safe products.  Target states on its website, in relevant part:

> **Product Safety**
>
> Guest safety has and continues to be a top priority for Target.  We are working closely with our vendors, industry leaders and the Consumer Product Safety Commission (CPSC) on product safety issues and we can assure you that we are taking steps to ensure we have the best products -- in terms of safety and quality – on our store shelves.[51]

83.     Additionally, Retailer Defendant Toys "R" Us has made representations to its trusted customers that the toys it sells are safe products.  Toys "R" Us states on its website in relevant part:

> **How can you ensure the toys in your stores are safe for customers to purchase?**
>
> As the world's largest specialty toy retailer, we know that nothing is more important than the safety of children. Toys"R" Us safety standards require that our products meet or exceed federally mandated and industry-accepted standards.  As an added precaution, earlier this year, Toys"R" Us engaged Bureau Veritas, a world leader in independent testing, to re-test toys on our shelves and this has become part of our ongoing safety protocols.  If at any point we find that a product does not meet our high safety standards, we take immediate and decisive action to remove these products from our store shelves. When it comes to safety, the bar can never be too high.[52]

84.     Similarly, on its walmart.com website, Wal-Mart now states:

---

[51] Target – Product Recalls & Safety Information, http://www.target.com/Product-Recalls-Safety-Information-Shopping/b/ref=in_br_display-ladders/601-0191358-2414527?ie=UTF8&node=10173841

[52] http://www5.toysrus.com/safety/safetyFAQs.cfm

At Wal-Mart, we want you to feel comfortable giving the gifts that children love to receive. To ensure that our products are both enjoyable and safe, we have taken additional steps this year for toy safety.

Wal-Mart's Toy Safety Net Program

Wal-Mart has heard parents' concerns over recent recalls and is committed to playing an active role in improving toy industry standards. As your advocate, we're working hard to get everyone in the toy industry involved and doing their part to improve standards. Last August, we launched our Toy Safety Net program to enhance ongoing safety efforts and provide reassurance to our customers.

The program includes:

- More checking: Wal-Mart has asked all toy suppliers to submit recent testing documentation for toys currently on Wal-Mart shelves or on their way to stores.
- Increased product testing: Wal-Mart secured testing capacity at independent labs to test for lead in product surface coating, magnets and removable parts on toys that could end up in a child's mouth. More than 12,000 products have passed multiple tests, by both suppliers and Wal-Mart, and testing will continue beyond this holiday season.
- Greater industry involvement: Wal-Mart is participating in discussions with toy industry organizations, Congress and the U.S. Consumer Product Safety Commission (CPSC) regarding proposed legislation to increase toy safety. We want to provide our knowledge and counsel, share our findings, and work together in hopes new legislation will bring about new safety standards and abilities to act quickly for children's safety.
- Larger selection: Wal-Mart has asked suppliers to look for additional opportunities to buy products made in North America and has ordered more North American-made toys for our customers.[53]

---

[53]     Information from Wal-Mart website *available at* http://www.walmart.com/catalog/catalog.gsp?cat=651279

**B.     Defendants Represented that the Hazardous Toys Complied with International Safety and Quality Standards**

85.     Defendants represent and market that their toys are safe for children and comply with international safety and quality standards.

86.     In their packaging of toys, Manufacturer Defendants represent that their toys are appropriate for certain ages.  Specifically, the Hazardous Toys' packaging represents that the toys comply with ASTM F963-03[54] and ASTM D-4236.  ASTM (originally known as the American Society for Testing and Materials), with over 30,000 members, is one of the largest voluntary standards development organizations in the world.[55]  ASTM developed and published these standards concerning consumer safety specifications and labeling for toys and art products such as the Hazardous Toys.  By selling the Hazardous Toys with such representations, the Retailer Defendants have adopted and represented to consumers that the Hazardous Toys complied with such standards.

87.     By representing that the Hazardous Toys complied with ASTM D-4236, Defendants represent that the Hazardous Toys had been examined by a toxicologist for acute and chronic toxicity, that the label named the ingredients identified as presenting a chronic health hazard, and that the Hazardous Toy comes with safe use instructions.

88.     By representing that the Hazardous Toys complied with ASTM F963, Defendants represent that the Hazardous Toys have been tested and are free from banned toxic substances.  Specifically, Section 4.3.1 of ASTM F963-07e1 discusses the ban on

---

[54]     This standard is issued under the fixed designation F 963; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision.

[55] *See About ASTM International,* http:///www. Astm.org

hazardous substances in toys, stating toys shall "conform to the FHSA and to the regulations promulgated under that act . . . The regulations define limits for substances that are toxic . . ."[56]

89.    Defendants misrepresented that they complied with ASTM standards and that their product did not contain hazardous substances when they distributed the butanediol-coated toy to the public.

90.    Plaintiff and the members of the Class purchased the Hazardous Toys believing that the toys were safe for their children to play with as children normally do.

## IV.    CLASS ACTION ALLEGATIONS

91.    This action is brought as a nationwide class action individually and on behalf of others similarly situated under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Class initially defined as:

> All persons throughout the United States and its territories who purchased or received one or more Aqua Dots toys, that were manufactured and/or distributed by Defendants subject to the recall announced by the CPSC on November 7, 2007.

Upon completion of discovery with respect to the scope of the Class, Plaintiffs reserve the right to amend the class definition. Excluded from the Class are Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors.  Also excluded from the Class is any judge to whom this action is assigned, together with any relative of such judge within the third degree of relationship, and the spouse of any such persons.

---

[56] *See id.* at 8.

92.　**Numerosity**: Membership in the Class is so numerous it is impractical to bring all Class members before the Court.  The identity and exact number of Class members is unknown but can be determined through appropriate discovery.  It is estimated to be tens of thousands or more.  Indeed, Defendants distributed and potentially sold over 4.2 million Hazardous Toys throughout the United States.

93.　**Commonality**:  There are numerous and substantial questions of law and fact common to all of the members of the Class which control this litigation and predominate over any individual issues pursuant to Rule 23(b)(3).  These common issues include, but are not limited to:

a.　Whether the Hazardous Toys are defective;

b.　Whether Defendants designed, manufactured, marketed and distributed toys containing 1,4-butanediol which can be converted to the toxin GHB when ingested;

c.　Whether Defendants advertised, represented or otherwise presented to the public, toys that it manufactures, distributes and sells, as safe and high quality;

d.　Whether Defendants negligently manufactured, distributed, marketed, tested and/or sold the Hazardous Toys;

e.　Whether Defendants falsely represented or omitted material information regarding the Hazardous Toys or their recall;

f.　Whether Defendants engaged in unfair or deceptive trade practices;

g.    Whether the Class has been injured by virtue of Defendants' negligence, carelessness, and/or deceptive business practices and conduct;

h.    Whether Defendants knowingly or negligently concealed or omitted material information concerning the safety of the Hazardous Toys;

i.    Whether Defendants disclaimed any implied warranties;

j.    Whether Defendants intended for the toys to be purchased by Plaintiffs and Class members, or other consumers for use by children;

k.    Whether discarding the toy or the inability to use the toy as intended caused loss and/or other financial damages to Plaintiffs and Class members;

l.    Whether the toys are inherently dangerous;

m.    Whether Defendants are refusing to adequately reimburse Plaintiffs and the members of the Class for the cost of the Hazardous Toys;

n.    Whether Plaintiffs and other members of the Class are entitled to injunctive relief; and

o.    Whether Defendants have been unjustly enriched.

94.    **<u>Typicality</u>**:  Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the Class sustained damages arising out of Defendants' wrongful conduct as detailed herein.  Specifically, Plaintiffs' claims and the Class

members' claims arise from Defendants' failure to disclose, during the Class Period, that the Hazardous Toys were not safe or appropriate as playthings because they were coated with the toxic chemical 1,4 butanediol, which converts to GHB when ingested.

95.     **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel that is competent and experienced in class action lawsuits.  Plaintiffs have no interests that are antagonistic to or in conflict with those of the Class members and therefore should be adequate representatives for the Class members.

96.     **Superiority**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual members of the Class may in some instances be relatively small, the expense and burden of individual litigation make it impossible for such Class members to individually redress the wrongs done to them.  Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

### V.  CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.*

97.     The preceding allegations are re-alleged and incorporated by reference as if fully set forth herein.

98.     Plaintiffs and the Class are consumers within the meaning and coverage of the

Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud

Act"),   815 ILCS 505/1, *et seq.*

99.     The Illinois Consumer Fraud Act provides:

> Unfair methods of competition and unfair or deceptive acts
> or practices, including but not limited to the use or
> employment of any deception, fraud pretense, false
> promise, misrepresentation or the concealment, suppression
> or omission of any material fact, with intent that others rely
> upon the concealment, suppression or omission of such
> material fact, or the use or employment of any practice
> described in Section 2 of the "Uniform Deceptive Trade
> Practices Act," approved August 5, 1965, in the conduct of
> any trade or commerce are hereby declared unlawful
> whether any person has in fact been misled, deceived or
> damaged thereby.

815 ILCS 505/2.

100.     Because of their non-disclosure of material facts alleged above, Defendants

deceived and may continue to deceive Plaintiffs and other members of the Class.

Defendants' deceptive conduct occurred in the course of engaging in trade or commence.

101.     By advertising and marketing Aqua Dots in various media, including

broadcasts, website, and written promotional and other materials, Defendants misled

consumers about the safety of the Hazardous Toys, as described above.  Defendants

intentionally engaged in these deceptive acts and made false or misleading

representations, capable of causing Plaintiffs and the Class members harm if relied upon.

102.     The unfair and deceptive trade acts and practices of Aqua Dots have directly,

foreseeably, and proximately caused damages to Plaintiffs and the Class members.

Plaintiffs and the Class' purchases occurred after Defendants' deceptive trade acts and

misleading representations.

103.    Defendants' actions and omissions to act, including the false and misleading express and/or implied representations and the omission of material facts regarding the safety of Aqua Dots, constitute acts, uses, or employment by Defendants and their agents, of deception, unconscionable commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of a product, in violation of the Illinois Consumer Fraud Act, making such deceptive acts and practices illegal.

104.    The Defendants have thus engaged in unlawful, unfair and fraudulent business acts and practices and false advertising, entitling Plaintiffs to judgment and equitable relief against the Defendants, as set forth in the Prayer for Relief.

## COUNT TWO

### Damages Under the Illinois Uniform Deceptive Trade Practices Act ("Deceptive Practices Act")

105.    The preceding allegations are re-alleged and incorporated by reference as if fully set forth herein.

106.    Each Plaintiff, Class member, and Defendant is a "person" within the meaning of 815 ILCS 510/1.

107.    At all times relevant hereto, Defendants conducted trade and commerce within the meaning of 815 ILCS 510/2.

108.    Defendants' unlawful conduct as described herein arose, is directed, and emanates from Defendants' headquarters to the detriment of Plaintiffs and the Class throughout the United States.

109.    Defendants' actions and omissions to act, including the false and misleading express and/or implied representations and omissions of material fact regarding the safety of Aqua Dots, created an unfair competition and caused the public to be confused and/or deceived in violation of the provisions of the Illinois Deceptive Practices Act, 815 ILCS 510/2.

110.    Pursuant to Illinois Deceptive Practices Act, 815 ILCS 510/2, Plaintiffs and the Class seek a Court order enjoining the above-described wrongful acts and practices of the Defendants.

## COUNT THREE

## Alternative Claim for Relief Under The State Consumer Protection Laws[57]

111.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

112.    In the alternative to pleading the above nationwide class under Illinois' consumer protection and unfair and deceptive trade practices acts, Plaintiffs and the Class allege that Defendants violated the substantive consumer protection and unfair and deceptive trade practices acts or statutes of all 50 states and United States territories where their consumers reside.

113.    By reason of the conduct as alleged herein, by advertising and marketing Aqua Dots in various media, including broadcasts, website, and written promotional and other materials, Defendants misled consumers about the safety of the Hazardous Toys. Defendants intentionally engaged in these deceptive acts and made false or misleading

---

[57] This claim is plead in the alternative to the First and Second counts.

representations, capable of causing Plaintiffs and Class members harm if Plaintiffs and or the Class relied upon those acts or representations.

114. Defendants violated the laws prohibiting unfair and deceptive trade practices of the states and territories wherein Class members reside: Alaska Stat. § 44-1522, *et seq.*; Ariz. Rev. Stat. § 44-1522, *et seq.*; Ark. Code § 4-88- 101, *et seq.*; Cal. Bus. & Prof. Code § 17200, *et seq.*; Colo. Rev. Stat. § 6-1-105, *et seq.*; Conn. Gen. Stat. § 42-110b, *et seq.*; 6 Del. Code § 2511, *et seq.*; D.C. Code § 28-3901, *et seq.*; Fla. Stat. § 501.201, *et seq.*; Ga. Stat. §10-1-392, *et seq.*; Haw. Rev. Stat. § 480, *et seq.*; Idaho Code § 48-601, *et seq.*; Kan. Stat. § 50-623, *et seq.*; Ky. Rev. Stat. § 367.110, *et seq.*; La. Rev. Stat. § 51:1401, *et seq.*; Mass Gen L Ch. 93A, *et seq.*; Md. Com. Law Code § 13-101, *et seq.*; Mich. Stat. §445.901, *et seq.*; Minn. Stat. § 8.31, *et seq.*; Vernon's Missouri Stat. § 407.010, *et seq.*; Mont. Code §30-14-101, *et seq.*; Neb. Rev. Stat § 59-1601, *et seq.*; Nev. Rev. Stat. § 598.0903, *et seq.*; N.H. Rev. Stat. § 358-A:l, *et seq.*; N.J. Rev. Stat. § 56:8-1, *et seq.*; N.M. Stat. § 57-12-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; N.C. Gen. Stat. § 75-1.l, *et seq.*; N.D. Cent. Code § 51-15-01. *et seq.*; Ohio Rev. Stat. § 1345.01, *et seq.*; Okla. Stat. 15 § 751, *et seq.*; Or. Rev. Stat. § 646.605, *et seq.*; 73 Pa. Stat. § 201-1, *et seq.*; R.I. Gen. Laws. § 6-13.1-1, *et seq.*; S.C. Code Laws § 39-5-10, *et seq.*; S.D. Code Laws § 37-24-1, *et seq.*; Tenn. Code § 47-18-101, *et seq.*; Tex. Bus, & Com. Code § 17.41, *et seq.*; Utah Code. § 13-11-1, *et seq.*; 9 Vt. §2451, *et seq.*; Va. Code § 59.1-196, *et seq.*; Wash. Rev. Code. § 19.86.010, *et seq.*; West Virginia Code § 46A-6-l01, *et seq.*

115. As a direct and proximate result of Defendants' statutory violations, Plaintiffs and Class members have been injured and suffered damages, including but not limited to the value of the Hazardous Toys had they been safe and fit for their ordinary purposes,

have suffered an increased risk of serious health problems, and have incurred the cost of diagnostic screening.

116.    By reason of Defendants' violations, Plaintiffs and Class members are entitled to recover treble damages where available, including but not limited to all monies expended to purchase Aqua Dots toys and the cost of diagnostic screening.

## COUNT FOUR

## Breach of Implied Warranty

117.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

118.    The Uniform Commercial Code §2-314 provides that, unless excluded or modified, a warranty that goods shall be merchantable is implied in a contract for their sale if the seller with respect to goods of that kind.

119.    At all times, Illinois and the following 48 states listed below, including the District of Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability.

120.    As designers, manufacturers, producers, marketers and sellers of toys, Defendants Aqua Dots toys are "goods" as defined in the various states' commercial codes governing the implied warranty of merchantability. At the time Plaintiffs and the Class members purchased the Aqua Dots toys, Defendants represented that the toys would be safe for children's use, age appropriate, and in compliance with ASTM-963 and ASTMD-4236.  Pictures of certain of the Hazardous Toys of children playing with the products further support the representations that the toys were safe and age appropriate. Implied in Defendants' representations is that the Aqua Dots toys were of merchantable

quality, were free of defects and hazards, and were safe and fit for their ordinary purpose – as play toys for young children.

121.    Defendants have brought themselves into privity with Plaintiffs and Class members by warranting the Aqua Dots toys to them directly and/or through the agency doctrine.  Further, Manufacturer Defendants knew the identity, purpose and requirements of Plaintiffs and Class Members and manufactured the Hazardous Toys to meet their requirements.

122.    Defendants breached their implied warranties in connection with their sale of the Hazardous Toys to Plaintiffs and members of the Class.  The Hazardous Toys were not safe or fit for their ordinary purposes and intended uses and were not free of defects, such as being laden with butanediol or GHB, which are banned hazardous substances because of the extreme danger that results when ingested.

123.    As merchants of the Hazardous Toys, Defendants knew that purchasers relied upon them to design, manufacture and sell toy products that were reasonably safe and would not endanger their children's health.

124.    Defendants designed, manufactured and sold the Hazardous Toys to parents of young children, and they knew that such toys would be used by young children.

125.    Because Defendants announced the recalls of the Hazardous Toys, they had actual knowledge that the Hazardous Toys were not free from hazardous substances or manufacturing defects and that the Hazardous Toys were not fit for their ordinary purposes. Thus, Plaintiffs were not required to notify Defendants of their breach.  If notice is required, Plaintiffs and the Class have adequately provided Defendants such notice through the filing of this lawsuit.

126.     As a direct and proximate result of Defendants' practices, Plaintiffs and Class members have suffered or will suffer injuries, including, but not limited to, the purchase price of the Hazardous Toys, exposure to toxic chemicals, increased risk of serious health problems, and the cost of diagnostic screening.

## COUNT FIVE

### Breach of Express Warranty

127.     Plaintiffs repeat and allege each and every allegation contained above as if fully set forth herein.

128.     The Uniform Commercial Code § 2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the good and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise.

129.     Defendants manufactured, marketed and sold the Hazardous Toys and represented that the Hazardous Toys were safe and fit for use by children, were appropriate for certain age groups, complied with ASTM-963 and ASTMD-4236, and were free from hazardous substances. Further, certain of the Hazardous Toys contain pictures of children playing with the products.

130.     Defendants expressly warranted that the Hazardous Toys were manufactured to conform with all safety requirements under U.S. federal and other applicable laws and regulations, and industry developed standards and product specific standards, and that they were periodically reviewed and approved by independent safety testing laboratories.

131.    Contrary to such representations, Defendants failed to disclose that the Hazardous Toys were defective as they contained butanediol, a banned hazardous substance.

132.    Defendants also represented that the Hazardous Toys were appropriate for certain age groups.  Contrary to such representations, Defendants failed to disclose that the Hazardous Toys were not appropriate for young children, as they contained butanediol, a banned hazardous substance.

133.    The Manufacturer Defendants intended to and did, by virtue of graphics and statements on their websites, marketing materials, press releases, toy packaging, and the toys themselves, expressly warrant the merchantability of the Hazardous Toys to Plaintiffs and Class Members as ultimate consumers, and made said express warranties part of the basis for the bargain.

134.    At all times, Illinois and the following 48 states listed below, including the District of Columbia, have codified and adopted the provisions the Uniform Commercial Code governing the express warranty of merchantability: Ala. Code 1975 § 7-2-313; Alaska Stat § 45.02.313; Ariz. Rev. Stat. § 47-2313; Ark. Stat. § 45.02.313; Cal. Com. Code § 2313; Co. Rev. Stat. Ann. § 4-2-313; Conn. Gen. Stat. Ann § 4-2-313; 6 Del. C. § 2-313; DC. Stat. § 28:2-313; Fla. Stat. Ann. § 672.314; Ga. Code Ann. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Id. Code § 28-2-313; Ill. Comp. Stat. Ann. Ch 810, 5/2-313; Ind. Code. Ann. § 26-1-2-313; Iowa Code Ann. § 554.2313; Kansas Stat. Ann. § 84-2-313; Ken Rev. Stat. Ann § 355.2-313; 11 Maine Rev. Stat. Ann. § 2-313; Md. Code Ann. § 2-313; Mass. Gen. Laws. Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2.313; Minn. Stat. Ann § 336.2-313; Miss. Code. Ann. § 75-2-313; Missouri Rev. Stat § 400.2-313;

Mont. Code. Ann § 30-2-313; Nev. Rev. Stat. U.C.C § 104.2313; N.H. Rev. Ann. § 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann § 55-2-313; N.Y. U.C.C. Law 2-313; N.C. Gen. Stat. Ann §  25-2-313; N.D. Stat § 41-02-313; Ohio Rev. Code Ann §1302.26; Okla. Stat. § 2-313; Or. Rev. Stat. §72.3130; Pa. Stat. Ann §2313; R.I. Gen Laws §6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Ut. Code Ann. §70A-2-313; VA. Code § 8.2-313; Vt. Stat. Ann § 9A-2-313; Rev. Code. Wash. Ann § 62A.2-313; W. VA. Code § 46-2-313; Wis. Stat. Ann § 402.313; Wyo. Stat. § 34.1-2-313.

135.    At the time that Defendants designed, manufactured, sold and/or distributed the Hazardous Toys, Defendants knew the purpose for which the Hazardous Toys were intended and expressly warranted that the Hazardous Toys were safe and fit for use as play toys by young children.

136.    Plaintiffs and other members of the Class relied upon the skill, superior knowledge and judgment of Defendants to sell toys that were reasonably safe for use by young children.  Plaintiffs could not have known about the risks associated with the Hazardous Toys until after Defendants issued a public notice recalling the Hazardous Toys announcing that the toys were not safe or fit for their ordinary purpose and intended use and were not free of manufacturing defects, but instead were potentially laden with butanediol, a banned hazardous substance because of its extreme danger.

137.    Defendants breached their express warranties in connection with the sale of the Hazardous Toys to Plaintiffs and other members of the Class.

138.    Because Defendants announced recalls of the Hazardous Toys, they had actual knowledge that the Hazardous Toys were not free from hazardous substances or

manufacturing defects, and that the Hazardous Toys were not fit for their ordinary purposes. Thus, Plaintiffs were not required to notify Defendants of their breach. If notice is required, Plaintiffs and the Class have adequately provided Defendants of such notice through the filing of this lawsuit.

139.    As a direct and proximate result of Defendants' practices, Plaintiffs and Class members have suffered or will suffer injuries, including, but not limited to, the purchase price of the Hazardous Toys, exposure to toxic chemicals, increased risk of serious health problems, and the cost of diagnostic screening.

## COUNT SIX

### Negligence

140.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

141.    Defendants designed, manufactured, sold and/or distributed Hazardous Toys to parents of young children.

142.    The Hazardous Toys contained butanediol, a dangerous chemical, when they left the hands of Defendants.

143.    Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Hazardous Toys, including a duty to assure that the Hazardous Toys did not contain butanediol, a banned substance, and a duty to warn consumers that the Hazardous Toys contained butanediol.

144.    Defendants failed to exercise reasonable care in the design, manufacture, sale, and/or distribution, of the Hazardous Toys.

145.    Specifically, Defendants were negligent in their design, manufacture, testing, inspection, sale and/or distribution of the Hazardous Toys in that they:

      a.    Failed to use reasonable care in designing and manufacturing the Hazardous Toys so as to avoid the harmful risks of putting dangerous substances disguised as toys in the hands of children.

      b.    Failed to conduct adequate quality testing of the Hazardous Toys in China and upon the Hazardous Toys' arrival in the United States to determine the safety of the Hazardous Toys prior to sale;

      c.    Failed to inquire about the safety of the Hazardous Toys as to Retailer Defendants;

      d.    Failed to accompany the Hazardous Toys with proper warnings regarding the possible effects associated with toxic chemicals in the Aqua Dots' chemical coating; and

      e.    Failed to act quickly to issue a recall and pull the Hazardous Toys from the shelves when they were notified of the dangers that the Hazardous Toys posed.

146.    Despite the fact that Defendants knew or should have known that the Hazardous Toys could cause adverse health effects to children, Defendants continued to market and sell the Hazardous Toys to consumers, including Plaintiffs and members of the Class, despite the reasonable possibility that the Hazardous Toys contained dangerous chemicals.

147.     Defendants knew or should have known that Plaintiffs and members of the Class would foreseeably suffer adverse health effects and injury as a result of Defendants' failure to exercise reasonable care in the design, manufacture, sale and/or distribution of the Hazardous Toys and as a result of Defendants' failure to give warning of the adverse effects associated with ingestion of butanediol.

148.     Defendants' negligence proximately caused Plaintiffs and the Class to be injured, including exposure to toxic chemicals, increased risk of serious health problems, and the associated costs of diagnostic screening.

149.     Plaintiffs do not allege negligence claims based on an injury to the Hazardous Toys themselves; Plaintiffs' negligence claims relate to injuries that they and Class members sustained as a result of the Hazardous Toys.

## COUNT SEVEN

**VIOLATION OF THE CONSUMER PRODUCT SAFETY ACT (15 U.S.C. §2072)
&
CONSUMER PRODUCT SAFETY RULES (15 U.S.C. §1261, 16 C.F.R. §1303,
16 C.F.R. §1117.1 *ET SEQ.*, 16 C.F.R. §1500.18 (A)(2))
(AGAINST ALL DEFENDANTS)**

150.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

151.     Section 2072 of the Consumer Product Safety Act provides as follows:

(a) Persons injured; costs; amount in controversy.

Any person who shall sustain injury ***by reason of any knowing (including willful) violation of a consumer product safety rule***, or any other rule or order issued by the Commission may sue any person who knowingly (including willfully) violated any such rule or order in any district court of the United States in the district in which the defendant resides or is found or has an agent, shall recover damages sustained, and may, if the court determines it to be in the interest of justice, recover the costs of suit,

including reasonable attorneys' fees (determined in accordance with section 11(f) [15 U.S.C.A. §2060(f)]) and reasonable expert witnesses' fees; *Provided*, That the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, unless such action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

*     *     *

(c) Remedies available.

The remedies provided for in this section shall be in addition to and not in lieu of any other remedies provided by common law or under Federal or State law.

(emphasis added).

152.   Also, through Consumer Product Safety rules, the CPSC has banned, as hazardous toys, "any toy having noisemaking components or attachments capable of being dislodged by the operating features of the toy or capable of being deliberately removed by a child, which toy has the potential for causing laceration, puncture wound injury, aspiration, ingestion, or other injury."  16 C.F.R. §1500.18(a)(2).

153.   The Hazardous Toys contained banned hazardous substances and unlawfully exposed children to toxic chemicals which can result in ingestion and injury, in violation of Consumer Product Safety rules.

154.   Defendants knowingly violated Consumer Product Safety rules, including, but not limited to, 15 U.S.C. §1261, 16 C.F.R. §1117.1 *et seq*., 16 C.F.R. §1500.18 (a)(2), and thus violated §2072(a) of the Consumer Product Safety Act.  Defendants failed to exercise due care to ascertain the safety and quality in the manufacturing of the Hazardous Toys before they marketed, sold and distributed them as safe and quality play toys for young children, and failed to institute quality-control measures and to inspect with due care the Hazardous Toys and their coating.

155.   Plaintiffs and other members of the Class reasonably relied upon Defendants' representations that the Hazardous Toys were safe for young children to use and play with.

156.    Plaintiffs and other members of the Class were reasonably deceived by Defendants' representations that the Hazardous Toys were safe and quality toys, when in fact the Hazardous Toys were hazardous, as they exposed children who played with them to hazardous chemicals.  Plaintiffs and other Class members would not have purchased the Hazardous Toys had they known of the presence of the toxic chemical coating and associated risk.

157.    As a direct and proximate result of Defendants' unlawful conduct and practices, Plaintiffs and the Class members have suffered or will suffer injuries, including, but not limited to, the purchase price of the Hazardous Toys, exposure to toxic chemicals, increased risk of serious health problems, and the cost of diagnostic screening.

## COUNT EIGHT

### Strict Liability

158.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

159.    Defendants designed, manufactured, sold and/or distributed Hazardous Toys to parents of young children.

160.    The Hazardous Toys that Defendants designed, manufactured, sold and/or distributed were defective in design and/or manufacturing. The Hazardous Toys were defective when they left the control of the Defendants such that: (1) the foreseeable risks of covering Aqua Dots with butanediol exceeded the benefits associated with the design or manufacturing with same, or (2) they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other toys.

161.    Defendants knew or should have known that the Hazardous Toys contained a non-obvious danger in their surface chemical.  Moreover, the presence of butanediol was a knowable danger.

162.    Defendants knew that Plaintiffs and the Class would use the products without first inspecting them for dangerous chemicals.  However, Defendants failed to inform Plaintiffs and members of the Class as to the adverse health effects that the Hazardous Toys could have on children.

163.    The Hazardous Toys were expected to and did reach Plaintiffs and other members of the Class without substantial change in condition.

164.    The Hazardous Toys that Defendants designed, manufactured, sold and/or distributed were defective due to inadequate warning, inadequate inspection and testing, and inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

165.    Had Plaintiffs and members of the Class been warned about the adverse health effects that the dangerous chemical butanediol on the Hazardous Toys posed to their children, or were warned that the Toys contained butanediol which converts to GHB when ingested and can cause unconsciousness, seizures, severe respiratory depression, coma or death, they would not have purchased, acquired or otherwise used the Hazardous Toys.

166.    As a direct and proximate result of the defective condition of the Hazardous Toys as designed, manufactured, sold and/or distributed by Defendants, Plaintiffs and other members of the Class have been injured through the exposure to the toxic chemicals

in the Hazardous Toys, the increased risk of serious health problems, and the associated costs of diagnostic screening.

167.    Plaintiffs do not allege strict liability claims based on an injury to the Hazardous Toys themselves; Plaintiffs' strict liability claims relate to injuries that they and Class members sustained as a result of the Hazardous Toys.

## COUNT NINE

### Unjust Enrichment

168.    Plaintiffs incorporate by reference and reallege paragraphs 1-126, and paragraphs 140-167, previously alleged herein.

169.    In the alternative to Count Five breach of express warranty claims, Plaintiffs and the Class plead unjust enrichment.

170.    Defendants received from Plaintiffs and Class members certain monies from their purchase of Aqua Dots which are excessive and unreasonable, and are the result of Defendants' deceptive conduct.  The Aqua Dots sold by Defendants were unreasonably dangerous and unfit for their intended purpose.  As a result, Plaintiffs and the Class have conferred a benefit on Defendants, without knowledge that the Hazardous Toys contained butanediol, through payment for such toys, benefits that were non-gratuitous.

171.    Defendants accepted the non-gratuitous benefits conferred by Plaintiffs and the Class, and have retained those benefits by not providing an adequate refund or exchange remedy, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoings, Plaintiffs and members of the Class were not receiving products of the high quality, nature, fitness or value that had been represented by Defendants and that reasonable consumers would have expected.

172.    Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

173.    Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and members of the Class is unjust and inequitable, Plaintiffs and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as follows:

A.    An order: 1) certifying the proposed nationwide Class herein under Federal Rule of Civil Procedure 23(a) and (b)(3) or 2) in the alternative, certifying an Illinois state class and other such sub-Classes under Federal Rule of Civil Procedure 23(a) and (b)(3) and applying the substantive consumer protection and unfair and deceptive acts or practices statutes of all 50 states and United States territories where the sub-Classes reside;  and 3) appointing Plaintiffs and Plaintiffs' counsel of record to represent said Class;

B.    Awarding declaratory and injunctive relief as permitted by law or equity to assure that the Class has an effective remedy, including: enjoining Defendants from continuing the unlawful practices as set forth herein and directing Defendants to identify, with Court supervision, victims of their conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

C.    Awarding the costs of initial diagnostic screening for Plaintiffs and members of the Class;

D.    Awarding the cost of appropriate treatment for those who screened positive for toxic chemical ingestion;

E    Awarding actual, compensatory and consequential damages;

F.    For an order requiring Defendants to implement safety systems such as third-party laboratory testing of all products imported from China and requiring Defendants to disclose the identity of the supplier responsible for coating Aqua Dots with the chemical that converts to GHB;

G.    For an order awarding restitution and disgorgement of all monies paid by Plaintiffs and the Class because of Defendants' unlawful, unfair, and/or fraudulent business practices complained of herein;

H.    For an order requiring Defendants to stop their current recall and implement a full recall with reasonable procedures that allow Plaintiffs and the Class to easily participate in the recall;

I.    Awarding punitive and treble damages as provided under relevant laws;

J.    For declaratory relief as this Court deems appropriate;

K.    For supplemental relief as available under the declaratory judgment laws of various states and as this Court deems appropriate;

L.    Awarding all costs, including experts' fees and attorneys' fees, of prosecuting this action;

M.    For an order awarding pre-judgment and post-judgment interest as prescribed by law; and

N.    For such other and further relief as this Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED:  May 30, 2008

Ben Barnow
Sharon Harris
Erich Schork
**Barnow and Associates, P.C.**
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 621-2000


            /s/
            Ben Barnow

John J. Stoia, Jr.
Rachel L. Jensen
Thomas J. O'Reardon II
**Coughlin Stoia Geller Rudman
    & Robbins LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  (619) 231-1058
Facsimile: (561) 750-3364


            /s/
            John J. Stoia, Jr.

Paul J. Geller
Jack Reise
Stuart A. Davidson
James L. Davidson
Elizabeth A. Shonson
**Coughlin Stoia Geller Rudman  &
Robbins LLP**
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432-4809
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

Frederic S. Fox
Donald R. Hall
**Kaplan Fox & Kilsheimer LLP**
850 Third Avenue, 14th Floor
New York, N.Y. 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714


_____/s/_____
Frederic S. Fox

Laurence D. King
**Kaplan Fox & Kilsheimer LLP**
350 Sansome Street, Suite 400
San Francisco, CA  94104
Telephone:    (415) 772-4700
Facsimile:    (415) 772-4707

Burton H. Finkelstein
Mila F. Bartos
Tracy D. Rezvani
Karen J. Marcus
Rosalee B. Connell
**Finkelstein Thompson LLP**
Duvall Foundry
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090


_____/s/_____
Burton H. Finkelstein

Rosemary M. Rivas
**Finkelstein Thompson LLP**
100 Bush Street, Suite 1450
San Francisco, California 94101
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

***Plaintiffs' Co-Lead Counsel***

Scott R. Tack
**Allen Allen & Tack**
P.O. Box 1409
210 Chickasha Avenue
Chickasha, OK 73023
Telephone: (405) 224-3111
Facsimile: (405) 224-8312

Adam Baklan
John Patterson
**Balkan & Patterson, LLP**
601 S. Federal Hwy, Suite 302
Boca Raton, FL 33432
Telephone: (561) 750-9191
Facsimile: (561) 750-1574

K. Bryan Ernstberger
**Gregory, Easly & Ernstberger**
204 South 6th Street
Murray, KY 42071
Telephone: (270) 753-2633
Facsimile: (270) 753-1825

Steve W. Berman
**Hagens Berman Sobol Shapiro LLP**
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Lance A. Harke, P.A.
Sarah Clasby Engel, P.A.
**Harke & Clasby LLP**
155 South Miami Avenue, Suite 600
Miami, Florida 33130
Telephone: (305) 536-8220
Facsimile: (305) 536-8229

David Spencer
**McGonagle Spencer, P.C.**
105 E. 5th Street, Suite 302
Kansas City, Missouri 64106
Telephone: (816) 221-2222
Facsimile: (816) 221-2245

William N. Riley
Christopher A. Moeller
Joseph N. Williams
**Price Waicukauski & Riley, LLC**
301 Massachusetts Avenue
Indianapolis, Indiana 46204
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

Ralph K. Phalen
**Ralph K. Phalen Atty. at Law**
1000 Broadway, Suite 400
Kansas City, Missouri 64105
Telephone: (816) 589-0753
Facsimile: (816) 471-1701

Keith E. Patton
**Schmidt & Clark**
2911 Turtle Creek Blvd, Suite 1400
Dallas, Texas 75219
Telephone: (214) 521-4898
Facsimile: (214) 521-9995

Alex G. Streett
James A. Streett
**Streett Law Firm, P.A.**
107 West Main
Russellville, AR 72811
Telephone: (479) 968-2030
Facsimile: (479) 968-6253

Aron D. Robinson
**The Law Office of Aron D. Robinson**
19 S. LaSalle Street, Suite 1300
Chicago, IL 60603
Telephone: (312) 857-9050
Facsimile: (312) 857-9054

William J. Harte
**William J. Harte Ltd.**
111 West Washington Street
Suite 1100
Chicago, Illinois 60602
Telephone: (312) 726-5015
Facsimile: (312) 641-2455

*Additional Plaintiffs' Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Ben Barnow, one of the attorneys for Plaintiffs, hereby certify that the above Consolidated Amended Class Action Complaint was caused to be served electronically this 30th day of May, 2008, pursuant to ECF as to Filing users and I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.


/s/  Ben Barnow_____