# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

IN RE AQUA DOTS PRODUCTS
LIABILITY LITIGATION

Case No. 08 CV 2364

THE HONORABLE DAVID H. COAR
MAGISTRATE JUDGE SUSAN E. COX

**MEMORANDUM OF LAW IN SUPPORT OF SPIN MASTER LTD.,
SPIN MASTER, INC. AND TARGET CORPORATION'S MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page

OVERVIEW ......................................................................................................... 1

FACTUAL ALLEGATIONS ................................................................................ 1

STANDARD OF DECISION AND GOVERNING LAW ..................................... 3

I.   PLAINTIFFS' CLAIMS FAIL BECAUSE THEY SUFFERED NO INJURY ..................... 4

 A.   Plaintiffs' Aqua Dots Exhibited No Manifest Defect. ....................................... 5

 B.   Plaintiffs' Additional Injury Theories Are Too Vague And Speculative To Stand. .......... 7

II.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER FEDERAL LAW ............................... 8

 A.   Plaintiffs Fail To Allege That Spin Master Violated A Consumer Product Safety Rule.... 8

 B.   Plaintiffs Fail To Allege That Spin Master Violated A CPSA Rule Knowingly. ............. 9

III. PLAINTIFFS FAIL TO STATE A CLAIM UNDER STATE LAW .................................. 10

 A.   Plaintiffs' State-Law Claims Are Preempted By The CPSA. ......................................... 10

  1.   The CPSA And Its Implementing Regulations Establish Spin-Master's Right To Choose A Remedy. ......................................................................................... 10

  2.   Any State Law Requirement That Spin-Master Provide A Cash Refund Would Directly Conflict With The CPSA And Its Implementing Regulations, And Is Therefore Preempted. ....................................................................................... 11

 B.   Plaintiffs' Contract Claims Fail On Their Own Terms. .................................................. 14

  1.   Warranty Claims Fail For Lack Of Notice. ....................................................... 14

  2.   The Implied Warranty Claims Fail Because The Products Are Fit For Their Ordinary Purpose. ............................................................................................. 16

  3.   The Express Warranty Claims Fail Because The Scope Of An Express Warranty Is Limited To The Product's Intended Use. ..................................................... 17

  4.   The Warranty Claims Fail Because Plaintiffs Do Not Plead Any Express Warranty That Was Made To Them And Upon Which They Relied. .................................... 18

   (a) No Express Warranty Pled ....................................................................... 18

   (b) No Reliance Pled ...................................................................................... 19

  5.   The Warranty Claims Fail For Lack Of Privity In Florida, Illinois, Kentucky, And New York. ...................................................................................................... 21

 C.   Plaintiffs' Tort Claims Fail On Their Own Terms. ........................................................ 22

  1.   The Economic Loss Doctrine Precludes Tort Claims. ........................................ 22

  2.   Plaintiffs' Statutory Tort Claims Fail And Must Be Dismissed. .......................... 24

   (a) Plaintiffs' Claims Fail To Comply with Federal Rule 9(b) ........................ 24

   (b) Plaintiffs Fail To State A Claim Under Their Respective Statutes ............. 25

Table of Contents
(cont.)

(i)   Illinois ................................................................................................ 25

(ii)   Arkansas ............................................................................................. 27

(iii)  Florida ................................................................................................ 28

(iv)  Kentucky ............................................................................................ 29

(v)   Missouri .............................................................................................. 29

(vi)  New York ............................................................................................ 30

(vii) Oklahoma ........................................................................................... 31

(viii)Pennsylvania ...................................................................................... 32

(ix)  Texas .................................................................................................. 33

(c)  Plaintiffs' Strict Liability Claims Fail To Allege Physical Harm And Should Be
      Dismissed ................................................................................................... 33

IV. Unjust Enrichment Claim Fails ................................................................................ 34

A.   Claims Fails Because Plaintiffs Fail To Plead That It Would Be "Unjust" "Inequitable" or
      "Unconscionable" For Defendants To Retain Any Money. ........................................ 34

B.   Claim Fails Because Plaintiffs Have An Adequate Remedy At Law. ............................ 35

C.   No Cause Of Action In Texas ................................................................................. 36

V.  "Innocent Non-Manufacturer" Acts In Select States Separately Preclude the Claims of
     Plaintiffs Who Reside In Those States ..................................................................... 37

A.   Plaintiff Botsch's Product Liability Claims Against Spin Master Must Be Dismissed
      Pursuant To Section 82.003 Of The Texas Civil Practices and Remedies Code. ........... 37

B.   Plaintiff Ford's Strict Liability Claims Against Spin Master Should Be Dismissed
      Pursuant To 735 ILCS 5/2-621 .............................................................................. 38

C.   Plaintiff Burgess' Strict Product Liability Claims Against Spin Master Should Be
      Dismissed Pursuant To § 537.762 Of The Missouri Revised Statutes. ......................... 39

CONCLUSION .......................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams. v. Wacaster Oil Co., Inc.*,
   98 S.W.3d 832 (Ark. App. 2003) ................................................. 15

*AKV Auto Transp., Inc. v. Syosset Truck Sales, Inc.*,
   806 N.Y.S.2d 254 (N.Y. App. Div. 3 Dist. 2005) .............................. 23

*Alonso v. Maytag Corp.*,
   356 F. Supp. 2d 757 (S.D. Tex. 2005) ......................................... 37

*American Standard Ins. Co. v. Bracht*,
   103 S.W.3d 281 (Mo. App. 2003) .............................................. 34

*Andre Strishak & Assocs. v. Hewlett Packard Co.*,
   300 752 N.Y.S.2d 400, 400 (N.Y. App. Div. 2002) ........................... 31

*Ark. State Med. Bd. v. Schoen*,
   1 S.W.3d 430 (Ark. 1999) ..................................................... 35

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   835 N.E.2d 801, 296 Ill. Dec. 448 (Ill. 2005) .................................. 25

*Barton Brands, Ltd. v. O'Brien & Gere, Inc. of N. Am.*,
   Civ. No. 3:07-CV-78-H, 2008 WL 819068 (W.D. Ky. March 25, 2008) ........... 23

*Baryo v. Philip Morris USA, Inc.*,
   435 F. Supp. 2d 961 (W.D. Mo. 2006) ......................................24, 30

*Bd. of Educ. v. A,C & S, Inc.*,
   546 N.E.2d 580, 137 Ill. Dec. 635 (Ill. 1989) .................................. 18

*Bell Atlantic Corp. v. Twombly*,
   127 S. Ct. 1955 (2007).......................................................3, 7, 10

*Bennett v. Crane*,
   289 S.W. 26 (Mo. App. 1926) .................................................. 36

*Berkebile v. Brantly Helicopter Corp.*,
   337 A.2d 893 (Pa. 1975) ....................................................... 19

*Bilt-Rite Contractors, Inc. v. The Architectural Studio*,
   866 A.2d 270 (Pa. 2005) ....................................................... 23

*Blagg v. Fred Hunt Co., Inc.*,
  612 S.W.2d 321 (Ark. 1981) ................................................................ 23

*Blue v. Envtl. Eng'g, Inc.*,
  828 N.E.2d 1128, 293 Ill. Dec. 630 (Ill. 2005) .................................... 34

*Bogan v. Finn*,
  298 S.W.2d 311 (Ky. 1957) .................................................................. 34

*Boshears v. Certainteed Corp.*,
  No. 4:05CV01052, 2007 WL 1381652 (E.D. Ark. May 10, 2007)..................................27, 28

*Brazier v. Hasbro, Inc.*,
  No. 99 Civ. 11258 (MBM), 2004 WL 515536 (S.D.N.Y. March 16, 2004) ........................ 16

*Brewer v. Portfolio Recovery Assoc.*,
  Civ. No. 1:07CV-113-M, 2007 WL 3025077 (W.D. Ky. Oct. 15, 2007)............................ 29

*Briehl v. Gen. Motors Corp.*,
  172 F.3d 623 (8th Cir. 1999)............................................................. 5, 6

*Brooks v. Midas-Int'l Corp.*,
  361 N.E.2d 815, 5 Ill. Dec. 492 (Ill. App. 1st Dist. 1977)................................... 27

*Carolina Casualty Ins. Co. v. KLLM, Inc.*,
  No. CIV. A. 3:00CV-199-S, 2001 WL 1776754 (W.D. Ky. Aug. 1, 2001) ........................ 35

*Casas v. The Tire Corral, Inc.*,
  Civ. No. M-04-123, 2005 U.S. Dist. LEXIS 42108 (S.D. Tex. Mar. 31, 2005) ..............37, 38

*Catalano v. Heraeus Kulzer, Inc.*,
  759 N.Y.S.2d 159 (N.Y.A.D. 2d Dept. 2003)................................................... 21

*Cement Kiln Recycling Coal. v. EPA*,
  493 F.3d 207 (7th Cir. 2007).............................................................. 9

*Chase Resorts, Inc. v. Johns-Manville Corp.*,
  476 F. Supp. 633 (E.D. Mo. 1979) ....................................................... 19

*Ciba-Geigy Corp. v. Alter*,
  834 S.W.2d 136 (Ark. 1992).............................................................. 19

*City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc.*,
  736 S.W.2d 247 (Tex. App. 1987) ....................................................... 37

*Collegiate Enterp., Inc. v. Otis Elevator Co.*,
  650 F. Supp. 116 (E.D. Mo. 1986) ...................................................... 20

*Connick v. Suzuki Motor Co.*,
  675 N.E.2d 584, 221 Ill. Dec. 389 (Ill. 1997) ................................................... 14, 15, 24, 26

*Connolly v. Reliastar Life Ins. Co.*,
  No. 03-5444, 2006 WL 3355184 ................................................................................. 32

*Davis v. G.N. Mortgage Corp.*,
  396 F.3d 869 (7th Cir. 2005) ..................................................................................... 24

*Day v. Case Credit Corp.*,
  No. 5:01CV00304-WRW, 2007 WL 604636 (E.D. Ark. Feb. 22, 2007) ........................... 34

*Dealers Transp. Co. v. Battery Distrib. Co.*,
  402 S.W.2d 441 (Ky. 1965) ........................................................................................ 34

*Dileo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) ..................................................................................... 24

*Dollar Rent-a-Car Sys., Inc. v. P.R.P. Enter., Inc.*,
  No. 01 CV 698, 2006 WL 1266515 (N.D. Okla. May 8, 2006) ...................................... 34

*Everett v. TK-Taito, L.L.C.*,
  178 S.W.3d 844 (Tex. Ct. App. 2005) ......................................................................... 33

*Farm Bureau Ins. Co. v. Case Corp.*,
  878 S.W.2d 741 (Ark. 1994) ..................................................................................23, 24

*Feinstein v. Firestone Tire & Rubber Co.*,
  535 F. Supp. 595 (S.D.N.Y. 1982) ................................................................................ 6

*Frank v. Daimler Chrysler Corp.*,
  741 N.Y.S.2d 9 (N.Y. App. Div. 2002) ......................................................................... 31

*Gade v. Nat'l Solid Waste Mgt. Ass'n*,
  505 U.S. 88 (1992) ..................................................................................................... 13

*Gannon Joint Venture Ltd. P'ship v. Masonite Corp.*,
  No. 4:07 CV 1242 JCH, 2008 WL 2074107 (E.D. Mo. 2008) ...................................... 20

*Garcia v. Nissan Motor Co., Ltd.*,
  Civ. No. M-05-59, 2006 U.S. Dist. LEXIS 20165 (S.D. Tex. Mar. 30, 2006) ...................... 38

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) .............................................................................................11, 12, 13

*Goodwin v. Durant Bank & Tr. Co.*,
  952 P.2d 41 (Okla. 1998) ........................................................................................... 20

*Greenberg v. United Airlines*,
  563 N.E.2d 1031, 150 Ill. Dec. 904 (Ill. App. 1st Dist. 1990) .............................. 27

*Guinn v. Hoskins Chevrolet*,
  836 N.E.2d 681, 296 Ill. Dec. 930 (Ill. App. 1st Dist. 2005) ................................. 35

*Harrison v. Leviton Mfg. Co., Inc.*,
  No. 05-CV-0491, 2006 WL 2990524 (N.D. Okla. Oct. 19, 2006) ................................6, 7, 32

*Harvell v. Goodyear Tire & Rubber Co.*,
  164 P.3d 1028 (Okla. 2006) ..................................................................... 35

*Hatchell v. Wren*,
  211 S.W.3d 516 (Ark. 2005) .................................................................... 34

*Hayna v. Arby's, Inc.*,
  425 N.E.2d 1174, 55 Ill. Dec. 1 (Ill. App. 1st Dist. 1981) .................................. 27

*Hays v. Western Auto Supply Co.*,
  405 S.W.2d 877 (Mo. 1966)...................................................................... 17

*Heil Co. v. Polar Corp.*,
  191 S.W.3d 805 (Tex. App. Fort Worth 2006) .................................................... 23

*Henry v. Rehab Plus Inc.*,
  404 F. Supp. 2d 435 (E.D.N.Y. 2005) ........................................................... 17

*Hess v. Chase Manhattan Bank*,
  220 S.W.3d 758 (Mo. 2007) (en banc) ........................................................... 30

*HPI Health Care Servs., Inc. v. Mt. Vernon. Hosp., Inc.*,
  545 N.E.2d 672, 137 Ill. Dec. 19 (Ill. 1999) ................................................ 34

*Hubbard v. Gen. Motors Corp.*,
  No. 95 Civ. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996) ..................................... 15

*In re Balko*,
  348 B.R. 684 (W.D. Pa. 2006) ................................................................... 24

*In re Bridgestone/Firestone Inc. Tires Prod. Liab. Litig.*,
  288 F.3d 1012 (7th Cir. 2002).................................................................... 6

*In re Gen. Motors Type III Door Latch Litig.*,
  Nos. 98 C 5836, 99 C 2566, 2001 WL 548755 at *1 (N.D. Ill. May 21, 2001)........................ 6

*In re Jeter*,
  178 B.R. 787 (W.D. Mo. 1995).................................................................... 36

*In re Managed Care Litig.*,
    185 F. Supp. 2d 1310 (S.D. Fla. 2002) ..........................................................35, 36

*Indeck Power Equip. Co. v. Jefferson Smurfit Corp.*,
    881 F. Supp. 338 (N.D. Ill. 1995) .................................................................. 3, 38

*Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*,
    891 So.2d 532 (Fla. 2004).............................................................................. 23

*Ingersoll v. Klein*,
    46 Ill. 2d 42, 262 N.E.2d 593 (1970) ............................................................ 4

*Kansas City v. Keene Corp.*,
    855 S.W.2d 360 (Mo. 1993).......................................................................... 15

*Keener v. Dayton Elec. Mfg. Co.*,
    445 S.W.2d 362 (Mo. 1969).......................................................................... 34

*Killingsworth v. HSBC Bank Nevada, N.A.*,
    507 F.3d 614 (7th Cir. 2007) ........................................................................ 3

*Kirkland v. Gen. Motors. Corp.*,
    521 P.2d 1353 (Okla. 1974) .......................................................................... 34

*Ky. Laborers Dist. Council v. Hill & Knowlton, Inc.*,
    24 F. Supp. 2d 755 (W.D. Ky. 1998) ............................................................ 29

*Lake Minnewaska Mountain Houses, Inc. v. Rekis*,
    686 N.Y.S.2d 186 (N.Y. App. Div. 1999) .................................................... 34

*Lantz v. American Honda Motor Co., Inc.*,
    No. 06 C 5932, 2007 WL 1424614 (N.D. Ill. May 14, 2007).......................28, 29

*LaRoe v. Cassens & Sons, Inc.*,
    472 F. Supp. 2d 1041 (S.D. Ill. 2006) .......................................................... 38

*Lava Trading Inc. v. Hartford Fire Ins. Co.*,
    326 F. Supp. 2d 434 (S.D.N.Y. 2004) .......................................................... 24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...................................................................................... 4

*Macias v. HBC of Florida, Inc.*,
    694 So.2d 88 (Fla. App. 3d Dist. 1997)........................................................ 28

*Malone v. Schapun, Inc.*,
    965 S.W.2d 177 (Mo. Ct. App. 1997)........................................................... 39

*McManus v. Fleetwood Enterp., Inc.*,
   320 F.3d 545 (5th Cir. 2003) ............................................................... 20

*Miller v. Long-Airdox Co.*,
   914 F.2d 976 (7th Cir. 1990) ................................................................. 4

*Moorman Mfg. Co. v. Nat'l Tank Co.*,
   435 N.E.2d 443, 61 Ill. Dec. 746 (Ill. 1982) ................................... 22, 23

*Mt. Lebanon Personal Care Home v. Hoover*,
   276 F.3d 845 (6th Cir. 2002) ............................................................... 23

*Murrin v. Ford Motor Co.*,
   756 N.Y.S.2d 596 (N.Y. App. Div. 2003) .......................................... 19

*O'Neil v. Simplicity, Inc.*,
   No. Civ. 07-4070, 2008 WL 2042609 (D. Minn. May 12, 2008) ............... 5, 6, 7

*Oliveira v. Amoco Oil Co.*,
   776 N.E.2d 151, 267 Ill. Dec. 14 (Ill. 2002) ................................... 25, 26

*Overstreet v. Norden Lab., Inc.*,
   669 F.2d 1286 (6th Cir. 1982) ........................................................ 17, 20

*Oxford v. Williams Cos., Inc.*,
   137 F. Supp. 2d 756 (E.D. Tex. 2001) ................................................ 36

*Parkinson v. Guidant Corp.*,
   315 F. Supp.2d 741 (W.D. Pa. 2004) ................................................... 19

*Perona v. Volkswagen of America, Inc.*,
   684 N.E.2d 859, 225 Ill. Dec. 868 (Ill. App. 1st Dist. 1997) ................ 15

*Pfizer v. Farsian*,
   682 So.2d 405 (Ala. 1996) .................................................................... 8

*Pioneer Res. Corp. v. Nami Res. Co., LLC*,
   No. 6:04-465-DCR, 2006 WL 1778318 (E.D. Ky. June 26, 2006) ............ 34

*Plas-Tex, Inc. v. U.S. Steel Corp.*,
   772 S.W.2d 442 (Tex. 1989) ................................................................ 16

*Pritchard v. Liggett & Myers Tobacco Co.*,
   350 F.2d 479 (3d Cir. 1965) ................................................................ 16

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ........................................................ 3, 7, 10

*R.E.M. Coal Co., Inc. v. Clark Equip. Co.*,
    563 A.2d 128 (Pa. Super. 1989) ........................................................ 23

*Ragland Mills, Inc. v. Gen. Motors Corp.*,
    763 S.W.2d 357 (Mo. App. S.D. 1989) ............................................. 15

*Rivera v. Wyeth–Ayerst Labs.*,
    283 F.3d 315 (5th Cir. 2002) ......................................................5, 6, 7

*Rockford Mem'l Hosp. v. Havrilesko*,
    858 N.E.2d 56, 306 Ill. Dec. 611 (Ill. App. 2nd Dist. 2006).............. 26

*Rothe v. Malone Cadillac, Inc.*,
    518 N.E.2d 1028, 116 Ill. Dec. 207 (Ill. 1988) ............................... 21

*Rubin v. DaimlerChrysler Corp.*,
    Civ. No. H-04-4021, 2005 U.S. Dist. LEXIS 42102 (S.D. Tex. May 20, 2005) ................. 37

*Rush-Presbyterian-St. Luke's Medical Center v. Gould, Inc.*,
    No. 93 C 1661, 1995 U.S. Dist. LEXIS 7686 (N.D. Ill. June 2, 1995) ................................ 4

*Sharp Bros. Contracting Co. v. Am. Hoist & Derrick Co.*,
    703 S.W.2d 901 (Mo. 1986)............................................................. 23

*Signal Oil & Gas Co., v. Universal Oil Prod.*,
    572 S.W.2d 320 (Tex. 1978) ........................................................... 34

*Small v. Lorillard Tobacco Co.*,
    720 N.E.2d 892 (N.Y. 1999) .......................................................30, 31

*Smith v. Hennessey & Assocs., Inc.*,
    103 S.W.3d 567 (Tex. App. 2003) .................................................... 33

*Snawder v. Cohen*,
    749 F. Supp. 1473 (W.D. Ky. 1990).................................................. 21

*Stamm v. Wilder Travel Trailers*,
    358 N.E.2d 382, 3 Ill. Dec. 215 (Ill. App. Ct. 1976) ......................... 20

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ....................................................................... 4, 5

*T.W.M. v. Am. Med. Sys., Inc.*,
    886 F. Supp 842 (N.D. Fla. 1995) .................................................... 21

*Tallon v. Lloyd & McDaniel*,
    497 F. Supp. 2d 847 (W.D. Ky. 2007)............................................... 29

*Thursby v. Reynolds Metals Co.*,
466 So.2d 245 (Fla. App. 1st Dist. 1984) ........................................................ 20

*Torchia v. Torchia*,
499 A.2d 581 (Pa. Super. Ct. 1985).................................................................. 35

*Tudor Dev. Group, Inc. v. U.S. Fid. Guar. Co.*,
968 F.2d 357 (3d Cir. 1992) .....................................................................35, 36

*U.S. Tire-Tech v. Boeran*,
110 S.W.3d 194 (Tex. App. 1st Dist. 2003)..................................................... 15

*Verb v. Motorola, Inc.*,
672 N.E.2d 1287, 220 Ill. Dec. 275 (Ill. App. 1st Dist. 1996) ............................. 8

*Viene v. Concours Auto Sales, Inc.*,
787 S.W.2d 814 (Mo. App. 1990) .................................................................... 30

*Voss v. Black & Decker Mfg. Co.*,
450 N.E.2d 204 (N.Y. 1983) ............................................................................ 34

*Waggoner v. Town & Country Mobile Homes, Inc.*,
808 P.2d 649 (Okla. 1990) ............................................................................... 23

*Wallis v. Ford Motor*,
362 Ark. 317 (Ark. 2005)................................................................................... 7

*Wallis v. Ford Motor Co.*,
208 S.W.3d 153 (Ark. 2005) ............................................................................ 28

*Walls v. American Tobacco Co.*,
11 P.3d 626 (Okla. 2000) ................................................................................. 32

*Weaver v. Chrysler Corp.*,
172 F.R.D. 96 (S.D.N.Y. 1997)......................................................................... 24

*Webb v. Zern*,
220 A.2d 853 (Pa. 1966) .................................................................................. 34

*West v. Caterpillar Tractor Co., Inc.*,
336 So.2d 80 (Fla. 1976)................................................................................... 34

*Whitman Realty Group, Inc. v. Galano*,
838 N.Y.S.2d 585 (N.Y. App. Div. 2007) ......................................................... 35

*Whitmore v. Arkansas*,
495 U.S. 149 (1990)........................................................................................... 7

*Wilcox v. Hillcrest Mem'l Park of Dallas*,
    696 S.W.2d 423 (Tex. App. 5th Dist. 1985) ........................................ 15

*Zepik v. Tidewater Midwest, Inc.*,
    856 F.2d 936 (7th Cir. 1988) ................................................................ 9


**STATUTES**

735 ILL. COMP. STAT. 5/2-621 ................................................................. 38

810 ILL. COMP. STAT. 5/2-607(3)(a) ............................................ 14, 16, 18, 19

15 OKLA. STAT. § 751 *et seq.* ................................................................. 31

13 PA. CONS. STAT. § 2313(a) ................................................................. 19

13 PA. CONS. STAT. § 2313(b) ................................................................. 18

13 PA. CONS. STAT. § 2314(b)(3) ............................................................ 16

13 PA. CONS. STAT. § 2607(c)(1) ............................................................ 14

73 PA. CONS. STAT. § 201-1 *et seq.* ....................................................... 32

15 U.S.C. § 1261 ....................................................................................... 8

15 U.S.C. § 1397(k) ................................................................................ 13

15 U.S.C. § 2064(c) ................................................................................ 11

15 U.S.C. § 2064(d) ...................................................................... 10, 12, 13

15 U.S.C. § 2072(a) ............................................................................ 8, 9

15 U.S.C. § 2074(a) ................................................................................ 13

28 U.S.C. § 1746 ..................................................................................... 38

ARK. CODE ANN. § 4-2-313(1) ................................................................ 19

ARK. CODE ANN. § 4-2-313(2) ................................................................ 18

ARK. CODE ANN. § 4-2-314(2)(c) ............................................................ 16

ARK. CODE ANN. § 4-2-607(3)(a) ............................................................ 14

ARK. CODE ANN. § 4-88-101 *et seq.* ...................................................... 27

FLA. STAT. § 501.201 *et seq.* ................................................................................................ 28

FLA. STAT. § 672.313(1) ......................................................................................................... 19

FLA. STAT. § 672.313(2) ......................................................................................................... 18

FLA. STAT. § 672.314(2)(c) .................................................................................................... 16

FLA. STAT. § 672.607(3)(a) .................................................................................................... 14

KY. REV. STAT. ANN. § 355.2-313(1) ..................................................................................... 19

KY. REV. STAT. ANN. § 355.2-313(2) ..................................................................................... 18

KY. REV. STAT. ANN. § 355.2-314(2)(c) ................................................................................ 16

KY. REV. STAT. ANN. § 355.2-607(3)(a) ................................................................................ 14

KY. REV. STAT. ANN. § 367.170(1) ........................................................................................ 29

MO. REV. STAT. § 400.2-313 ................................................................................................... 20

MO. REV. STAT. § 400.2-313(1) .............................................................................................. 19

MO. REV. STAT. § 400.2-313(2) .............................................................................................. 18

MO. REV. STAT. § 400.2-314(2)(c) ......................................................................................... 16

MO. REV. STAT. § 400.2-607(3)(a) ......................................................................................... 14

MO. REV. STAT. § 537.762(3) .................................................................................................. 39

N.Y. GEN. BUS. LAW § 349 *et seq.* ....................................................................................... 30

N.Y. UCC LAW § 2-607(3)(a) ................................................................................... 14, 16, 18, 19

OKLA. STAT. 12A ....................................................................................................... 14, 16, 18, 19

TEX. BUS. & COM. CODE § 2.313(a) ....................................................................................... 19

TEX. BUS. & COM. CODE § 2.313(b) ....................................................................................... 18

TEX. BUS. & COM. CODE § 2.314(b)(3) .................................................................................. 16

TEX. BUS. & COM. CODE § 2.607(c)(1) ................................................................................. 14

TEX. BUS. & COM. CODE § 17.41 *et seq.* ............................................................................ 33

UCC § 2-313(1) ....................................................................................................................... 19

UCC § 2-313(2) ............................................................................................ 18

UCC § 2-314(2)(c) ....................................................................................... 16

UCC § 2-607(3)(a) ....................................................................................... 14


**OTHER AUTHORITIES**

16 C.F.R. § 1117.1 *et seq* ............................................................................ 8

16 C.F.R. § 1500.18(a)(2) ............................................................................ 9

62 Fed. Reg. 39,828 ..................................................................................... 12

62 Fed. Reg. 39,827 ................................................................................ 11, 12

62 Fed. Reg. 39,827-39,828 (1997) ............................................................ 11

*Restatement (Second) of Conflicts of Laws* § 188 (2) .............................. 4

*Restatement (Second) of Torts* § 402 (1965) ........................................... 33

**OVERVIEW**

On November 7, 2007, the Consumer Product Safety Commission ("CPSC") announced a voluntary recall of an arts and crafts toy called Aqua Dots. Aqua Dots were distributed in the United States by Spin Master, Inc., a subsidiary of Spin Master Ltd., and sold at retail stores such as Target. There is no allegation that these Defendants knew about the chemical make-up of Aqua Dots prior to the recall, or that they did not fully cooperate with the CPSC in terminating any further sales and carrying out the recall.

Plaintiffs in this case are purchasers of Aqua Dots who never ingested the product, never attempted to return the product, and never notified any of Defendants they were dissatisfied in any way. They never suffered any injury. For these and numerous claim-specific reasons, this lawsuit serves no good purpose and should be dismissed in its entirety.

**FACTUAL ALLEGATIONS**

Plaintiffs allege that between August and November 2, 2007, each of them either purchased or received Aqua Dots, a children's toy. ¶¶ 11-19.[1] The Aqua Dots allegedly contain the chemical 1,4 butanediol, which when combined with water can form gamma-hydroxy butyrate, also known as the "date-rape" drug because it has depressive effects on the human nervous system. ¶ 1. None of Plaintiffs allege that they or their children ingested the Aqua Dots or suffered any personal injury. ¶¶ 11-19.

In announcing the voluntary recall of all Aqua Dots in the United States on November 7, 2007, the CPSC stated that it had "received two reports over the past several days of children swallowing Aqua Dots" and that "consumers should immediately take the recalled toy away

---

[1]    All paragraph citations are to the Consolidated Amended Class Action Complaint. Pursuant to this Court's Standing Order on Motion Practice, Briefs and Protective Orders, at ¶ 4, copies of cited authority found only on electronic databases, the Code of Federal Regulations, and Bankruptcy Reporter are attached hereto as Exhibit A.

from children and contact Spin Master to return for free replacement beads or a toy of equal value." ¶¶ 4, 61-62.[2]  Plaintiffs do not allege that any of them notified any Defendant regarding their purchase of Aqua Dots, nor did any of them attempt to return their Aqua Dots, as part of the product recall or otherwise, to any of Defendants.

Plaintiffs allege that the Aqua Dots were manufactured in China by Moose Enterprise Pty Ltd. ("Moose"), and that the Spin Master Defendants distributed Aqua Dots in North America. ¶ 45.  (Plaintiffs' decision to refer to the Spin Master Defendants collectively with Moose as "Manufacturer Defendants" thus is not only factually unsupported but contrary to the allegations in paragraph 45.)  Plaintiffs include as Defendants three retailers of Aqua Dots:  Target Corporation, Toys "R" Us, Inc., and Wal-Mart Stores, Inc. (collectively, the "Retailer Defendants").

Plaintiffs allege that Moose was contacted in Australia on October 8, 2007, by a doctor who had found in the Australian version of Aqua Dots a "substance he didn't recognize." ¶ 52.  Plaintiffs do not plead that Moose learned prior to November 2007 that the unidentified substance was 1,4 butanediol, and indeed they plead that when the doctor contacted the manufacturing plant in China he learned that the plant "was very keen that Moose not know what was in them" so that Moose could not retain a different plant. ¶ 53.

Plaintiffs do not plead that the Spin Master Defendants or any of the Retailer Defendants, including Target, were aware of 1,4 butanediol in Aqua Dots prior to the November 7, 2007 voluntary recall.  *See, e.g.*, ¶ 61.  Plaintiffs claim that on November 4, 2007, unidentified "Defendants" were notified by the Australian Ministry of Fair Trading of dangers posed by Aqua Dots, but in addition to not identifying either of the Toronto-based Spin Master Defendants or

---

[2]        *See also* Recall Notice, *available at*:  http://www.cpsc.gov/cpscpub/prerel/prhtml08/08074.html

any of the Retailer Defendants (the allegation apparently refers only to Moose), Plaintiffs provide no facts supporting this assertion.  ¶ 75.

## STANDARD OF DECISION AND GOVERNING LAW

To state a claim in federal court, a plaintiff must "give the defendant . . . the grounds upon which it rests." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quotation omitted).  This "requires more than labels and conclusions . . . .  Factual allegations must be enough to raise a right to relief above the speculative level." *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).  Stating a claim also requires "more than . . . merely creat[ing] a suspicion of a . . . cause of action," and more than stating "a legal conclusion couched as a factual allegation." *Twombly*, 127 S. Ct. at 1965 (citations omitted).  At the same time, "a plaintiff can plead himself out of court by alleging facts that show there is no viable claim." *Pugh*, 521 F.3d at 699.

The Consolidated Complaint suffers from all of these flaws:  it fails to allege actual grounds for relief; it demands speculation; it trades on the suspicion of a cause of action; it couches legal conclusions as facts; and it pleads facts showing there is *no* viable claim.  It should therefore be dismissed in its entirety.

Federal courts sitting in Illinois follow Illinois' choice-of-law rule for contract and warranty claims, which is the "most significant relationship" test of the Restatement (Second) of Conflicts of Laws.  *See, e.g.*, *Indeck Power Equip. Co. v. Jefferson Smurfit Corp.*, 881 F. Supp. 338, 341 (N.D. Ill. 1995).  This test considers the following factors: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation

and place of business of the parties." *Restatement (Second) of Conflicts of Laws* § 188 (2). Each Plaintiff in this case purchased Aqua Dots in the state where they reside, so those respective state's laws will govern. *See, e.g.*, *Rush-Presbyterian-St. Luke's Medical Center v. Gould, Inc.*, No. 93 C 1661, 1995 U.S. Dist. LEXIS 7686, at *10 (N.D. Ill. June 2, 1995). The law applying to each Plaintiff's claim is as follows:

| PLAINTIFF | STATE |
|---|---|
| Bertanowski, White | Florida |
| Botsch | Texas |
| Burgess | Missouri |
| Cosgrove | New York |
| Erbach, Streett | Arkansas |
| Ford | Illinois |
| Walker | Kentucky |
| Williams | Oklahoma |

For tort claims, federal courts sitting in Illinois follow the "most significant contacts" analysis of Section 145 of the Restatement (Second) of Conflicts of Laws, which considers the following factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties, if any, is centered. *See Ingersoll v. Klein*, 46 Ill. 2d 42, 47, 262 N.E.2d 593, 596 (1970); *Miller v. Long-Airdox Co.*, 914 F.2d 976, 978 (7th Cir. 1990). Under this analysis, Plaintiffs' tort claims are governed by the same law as their warranty claims.

## I.     PLAINTIFFS' CLAIMS FAIL BECAUSE THEY SUFFERED NO INJURY

In order for Article III standing to be conferred, Plaintiffs bear the burden of establishing: (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

103 (1998). Failure to establish any one of these elements deprives the Court of jurisdiction to hear the suit. *Id.* Here, Plaintiffs fail to plead they or their children were injured by Aqua Dots, thus their Complaint must be dismissed.

**A.      Plaintiffs' Aqua Dots Exhibited No Manifest Defect.**

No Plaintiffs, or their children, actually ingested Aqua Dots and became ill. As to Plaintiffs, Aqua Dots never exhibited the defect which Plaintiffs recount in the complaint. "Where . . . a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." *Briehl v. Gen. Motors Corp.,* 172 F.3d 623, 628 (8th Cir. 1999) (affirming dismissal of class action asserting claims for express and implied warranty). In *Briehl*, the plaintiffs claimed their vehicles were defective because the manner in which their anti-lock brakes performed caused drivers to perceive actual brake failure and misapply the brakes. *Id.* at 626. But because the plaintiffs never experienced this problem, they could not state a cause of action. *Id.* at 628. *See also Rivera v. Wyeth–Ayerst Labs.,* 283 F.3d 315 (5th Cir. 2002) (dismissing suit where plaintiffs alleged injuries suffered by others taking drug, but did not allege they were so injured).

Likewise, the court in *O'Neil v. Simplicity, Inc.,* No. Civ. 07-4070, 2008 WL 2042609 (D. Minn. May 12, 2008), dismissed a contract-style class action based on a defective crib because none of the plaintiffs' children were injured by the defect. The crib at issue was alleged to be defective because the "drop side" could separate from the crib frame, creating a gap between the frame and the drop side in which children could fall and suffocate. Because none of the plaintiffs' children were injured, however, the Court found that plaintiffs' case was a "no injury" products liability case "where the plaintiff alleges a defect that could cause injury or might create a safety hazard, but failed to allege any actual harm." *Id.* at *1, *3 (citation omitted).

5

The *Simplicity* plaintiffs tried to plead around this flaw by arguing they had bought cribs that were unsafe for their children to sleep in. *Id*. at *5. The court rejected that theory, however, holding that ***"[i]t is simply not enough for a plaintiff to allege that a product defect suffered by others renders his or her use of the same product unsafe;*** the plaintiff must instead allege an actual manifestation of the defect that results in some injury in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment." *Id*. (emphasis added) (citation omitted).[3]

The same result should apply here. Plaintiffs fail to plead that the alleged "defect" in Aqua Dots manifested itself in a personal injury. No Plaintiff and no Plaintiff's children ever ingested the Aqua Dots, causing the 1,4 butanediol to metabolize and convert to gamma-hydroxy butyrate. As in *Briehl*, *Rivera*, and *Simplicity*, Plaintiffs attempt to hide their lack of injury by grounding their claims in contract. But as the court in *Rivera* observed:

> The confusion arises from the plaintiffs' attempt to recast their product liability claim in the language of contract law. The wrongs they allege—failure to warn and sale of a defective product—are product liability claims. Yet the damages they assert—benefit of the bargain, out of pocket expenditures—are contract law damages. ***The plaintiffs apparently believe that if they keep oscillating between tort and contract law claims, they can obscure the fact that they have asserted no concrete injury. Such artful pleading, however, is not enough to create an injury in fact.***

---

[3]    *See also In re Bridgestone/Firestone Inc. Tires Prod. Liab. Litig.*, 288 F.3d 1012, 1017 (7th Cir. 2002) (citing *Briehl* in noting that "if tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly means excess compensation"); *In re Gen. Motors Type III Door Latch Litig.*, Nos. 98 C 5836, 99 C 2566, 2001 WL 548755 at *1 (N.D. Ill. May 21, 2001) (dismissing case requesting benefit of the bargain damages where alleged defect had not manifested itself); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 603 (S.D.N.Y. 1982) (holding no cause of action for defect which never manifests itself); *Harrison v. Leviton Mfg. Co., Inc.*, No. 05-CV-0491, 2006 WL 2990524 at *4 (N.D. Okla. Oct. 19, 2006) (dismissing case for lack of standing where allegedly dangerous electrical receptacles had not malfunctioned as to plaintiff).

*Rivera,* 283 F.3d 315 (emphasis added) (citation omitted). *See also Wallis v. Ford Motor*, 362 Ark. 317, 324 (Ark. 2005) (affirming dismissal of class action where plaintiff had alleged a dangerous design defect, because plaintiff had not experienced a cognizable injury as a result of the defect, only a diminution in value); *Simplicity,* 2008 WL 2042609 at *7 (plaintiffs could not complain they received less than what they bargained for when they purchased their drop-side cribs because their drop sides never malfunctioned).

### B.    Plaintiffs' Additional Injury Theories Are Too Vague And Speculative To Stand.

Plaintiffs cannot subvert the injury-in-fact requirement by making general references to "exposure to toxic chemicals, increased risk of serious health problems, and the associated costs of diagnostic screening."   ¶¶ 148, 166.   First, Plaintiffs do not (and cannot) explain how "exposure" to the Aqua Dots beads—without any ingestion—has injured *them* or *their* children. To establish an injury in fact, the injury must be "particularized" to Plaintiffs.  *Rivera*, 283 F.3d at 319 (citing *Defenders of Wildlife*, 504 U.S. at 560).  This test "'requires that the party seeking review be *himself* among the injured.'"   *Id*. at 320 (emphasis added) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972); *accord Defenders of Wildlife*, 504 U.S. at 563).  Plaintiffs fail to plead personal injury because "factual allegations must be enough to raise a right to relief *above* the speculative level."   *Pugh*, 521 F.3d at 699 (emphasis added) (citation omitted); *Twombly*, 127 S. Ct. at 1966 (plaintiffs must allege "something beyond the mere possibility of loss causation" (citation omitted)).  This Court should reject Plaintiffs' attempt merely to "create the suspicion of a cause of action."  *Twombly*, 127 S. Ct. at 1965.

Second, even if Plaintiffs had plead a threat of harm from ingestion of Aqua Dots in the *future*, "[a] threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted).  *See also Harrison,* 2006

WL 2990524 at *4 (dismissing case because threat of future malfunctioning was insufficient to confirm standing); *Verb v. Motorola, Inc.*, 672 N.E.2d 1287, 1295, 220 Ill. Dec. 275, 283 (Ill. App. 1st Dist. 1996) (dismissing claims because "plaintiffs' future personal injury and damages claims constitute conjecture and speculation"); *Pfizer v. Farsian*, 682 So.2d 405, 407 (Ala. 1996) (plaintiff's belief that product could fail in future was not a cognizable legal injury). Any suggestion that Plaintiffs or their children might be harmed by unknown, future events would be insufficient to satisfy the injury-in-fact requirement.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER FEDERAL LAW

According to Plaintiffs, the Consumer Product Safety Act ("CPSA") affords them relief because they "sustain[ed] injury by reason of [a] knowing (including willful) violation of a consumer product safety rule." ¶ 151 (quoting 15 U.S.C. § 2072(a)). But the Consolidated Complaint fails to allege facts supporting *any* aspect of this assertion: in addition to failing to assert that Plaintiffs "sustain[ed] injury," Plaintiffs do not allege that Spin Master violated a "consumer product safety rule," or that Spin Master violated any such rule "knowingly."

### A.    Plaintiffs Fail To Allege That Spin Master Violated A Consumer Product Safety *Rule*.

Plaintiffs acknowledge that to prevail on a claim under the CPSA, they must identify a "consumer product safety rule" that Spin Master knowingly violated, *see* 15 U.S.C. § 2072(a). The provisions they cite, however, are either not rules or are not enforceable.

First, Spin Master could not have "violat[ed]" 15 U.S.C. § 1261, which is the CPSA's "definitions" provision. Plaintiffs do not explain how one can violate a definition. Second, Spin Master could not have violated 16 C.F.R. § 1117.1 *et seq.* "The purpose of [that] part" "is to set forth the [CPSC's] interpretive regulations for reporting of choking incidents," *id.* § 1117.1, and "[c]hok[ing] means suffer[ing] an obstruction of the airways," *id.* § 1117.2(c). Plaintiffs never

allege that those for whom they purchased Aqua Dots suffered an obstruction of the airways.

Third, Spin Master could not have violated 16 C.F.R. § 1500.18(a)(2). That provision bans "any

toy having noisemaking components or attachments capable of being dislodged . . . or removed"

and the potential for "causing laceration, puncture wound injury, aspiration, ingestion, or other

injury." *Id*. But Plaintiffs do not allege that Aqua Dots have "noisemaking components or

attachments." *Cf. id*. § 1500.18(a)(1) (preceding provision banning certain "toy rattles"). And

even if they had, Plaintiffs never allege that they, their relatives, or anyone else suffered any

injury caused by a physical impact of the broken-off piece. Further, although the regulation

covers "other injury" from a toy's "noisemaking components or attachments," because "any

information requested under the regulation's [fifth listed injury] must be "similar in nature" to

that identified in the first [four]," any injury from toxicity does not fall within this list. *Cement

Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 221 (7th Cir. 2007).[4]

### B.    Plaintiffs Fail To Allege That Spin Master Violated A CPSA Rule Knowingly.

Plaintiffs' failure to allege any "violation of a consumer product safety rule" means they

*cannot* have alleged that Spin Master violated such a rule "knowingly." 15 U.S.C. § 2072(a).

Spin Master cannot "knowingly" violate a rule that does not exist. Separately, Plaintiffs do not

plead that the Spin Master Defendants or Target had knowledge. Rather, they claim only that:

(1) nearly a month before the recall, Moose (not Spin Master) was told by a doctor that there was

an unidentified element in Aqua Dots (¶¶ 51-52) and (2) there have been "numerous recalls of

---

[4]    Even if Plaintiffs could allege that Spin Master knew of the problem with Aqua Dots before the recall, the Seventh Circuit has "den[ied] the existence of a private cause of action for violations of [CPSA] reporting requirements." *Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 941 (7th Cir. 1988). Plaintiffs also do not state a claim by alleging that "Defendants represent and market that their toys . . . comply with international safety and quality standards." ¶¶ 85-89. Plaintiffs ultimately cite no "consumer product safety rule" enforcing such representations (*see* ¶¶ 154-156), however, because there is none.

toys manufactured in China." ¶¶ 63-73. Here again, vague suggestions of knowledge do not "rise above the speculative level," *Pugh*, 521 F.3d at 699; they merely attempt to "create the suspicion of a cause of action," *Twombly*, 127 S. Ct. at 1965, and fail as a matter of law.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER STATE LAW

### A.    Plaintiffs' State-Law Claims Are Preempted By The CPSA.

#### 1.    The CPSA And Its Implementing Regulations Establish Spin-Master's Right To Choose A Remedy.

Under the CPSA, "[i]f the Commission determines . . . that a product . . . presents a substantial product hazard . . . it may order the manufacturer or distributor . . . to take *whichever of the following actions the person to whom the order is directed elects*." 15 U.S.C. § 2064(d) (emphasis added). The "following actions" from which regulated parties may choose include three remedies: (1) "repair" the product; (2) "replace" it; or (3) "refund the purchase price." *Id*. Plaintiffs' request under state law for a refund, as opposed to the product replacement approved by the CPSC as part of the recall, is preempted by the CPSA and its implementing regulations. *See, e.g.*, ¶¶ 168-173 (Count 9) (Unjust Enrichment); Prayer for Relief ¶¶ B, E, G, I.

The Commission may (but is not required to) oversee the exercise of these options by requiring the manufacturer or distributor to "submit a plan, satisfactory to the Commission, for taking action under whichever of the [three options] which such [manufacturer or distributor] has elected to act." *Id*. Thus Congress requires that, where the CPSC orders a manufacturer or distributor to take action to remedy the existence of a substantial product hazard, it must allow the regulated entity to choose from a menu of three remedies—repair, replacement, or refunds.

Pursuant to these and other provisions of the CPSA, the CPSC has adopted a "fast-track product recall program." Under that program, "[i]f a company reports a potential product defect and, within 20 working days of filing the report, implements with CPSC a consumer-level

voluntary recall that is satisfactory to the staff, the staff will not make a preliminary determination that the product contains a defect which creates a substantial product hazard." Recall Handbook, U.S. Consumer Prod. Safety Comm'n, IV (1999) (emphasis added); *accord* 62 Fed. Reg. 39,827-39,828 (1997). The purpose of this program is to "promote quicker recalls" by reducing Commission staff-time (which otherwise would be spent making "preliminary determination[s] of substantial product hazard") and to "reduce any disincentive to companies that want to report and undertake corrective action, but fear the consequences of a staff preliminary determination." 62 Fed. Reg. at 39,827. Acting under this program, Spin Master and the CPSC publicly announced a recall of Aqua Dots. ¶¶ 61-62.

> **2.    Any State Law Requirement That Spin-Master Provide A Cash Refund Would Directly Conflict With The CPSA And Its Implementing Regulations, And Is Therefore Preempted.**

The CPSA and its implementing regulations guarantee Spin Master the right to elect whether to provide repairs, replacements, or refunds. 15 U.S.C. § 2064(c). Permitting Plaintiffs to demand a refund (rather than replacement) under state law would deprive Spin Master of that federal right, presenting a direct "obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and "upset[ting] the careful regulatory scheme established by federal law." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870, 873 (2000). Plaintiffs' claim for a refund (or similar relief) is therefore preempted by "ordinary conflict preemption principles." *Id.* at 871.

That Plaintiffs' claim for a refund is preempted follows directly from *Geier*. There, the plaintiffs invoked state tort law to require car manufacturers to install airbags in all vehicles. A federal regulation, however, "deliberately . . . allow[ed] manufacturers to choose among different passive restraint systems, such as airbags, automatic belts, or other passive restraint technologies." *Id.* at 878. Because imposing a state tort rule *requiring* airbags would have

deprived the manufacturer of the choice deliberately provided by federal law, the Court held that such a rule "conflict[ed] with [the regulation, and] hence with the [statute] itself." *Id.* at 867, 886. So too here. Like the regulation at issue in *Geier*, which gave car manufacturers "a range of choices," the CPSA provides that the CPSC may order the manufacturer or distributor "to take *whichever of the following actions the person to whom the order is directed elects.*" 15 U.S.C. § 2064(d) (emphasis added).

Even apart from the CPSA itself, any state law refund requirement is preempted by the CPSC's approval of Spin Master's corrective action plan under the fast-track regulatory program. Under that program, the CPSC "will consider whether the corrective action plan adequately addresses the *risk of injury presented by the product and whether the notice and corrective action plan are designed to make the plan as effective as is reasonably possible given the nature of the product and risk.*" 62 Fed. Reg. at 39,828 (emphasis added). Such an approach "allows the staff and company to work together on a corrective action plan almost immediately, rather than spending the time and other resources necessary to investigate the reported defect further to determine whether it rises to the level of a substantial product hazard." CPSA Recall Handbook 11 (1999).

As the CPSC has declared, the purpose of the fast-track program is to "promote quicker recalls" and to "reduce any disincentive to companies that want to report and undertake corrective action, but fear the consequences of a staff preliminary determination." 62 Fed. Reg. at 39,827. By diminishing the incentive to take proactive measures to remove unsafe products from the market, allowing end-of-the-line litigation over remedies would directly frustrate the agency's purpose in promoting the fastest possible recalls and the greatest possible cooperation from industry. *See Geier*, 529 U.S. at 874.

The preemptive force of the CPSA and its implementing regulations is not diminished by the CPSA provision stating that "[c]ompliance with consumer product safety rules or other rules or orders under this Act shall not relieve any person from liability at common law." 15 U.S.C. § 2074(a). The statute in *Geier* contained a similar provision,[5] and the Court there recognized that "savings" clauses that focus on the effect of "compliance" with federal rules may not relate to the scope of preemption at all; they "sound as if they simply bar a special kind of defense, namely, a defense that compliance with a federal standard automatically exempts a defendant from state law, whether the Federal Government meant that standard to be an absolute requirement or only a minimum one." 529 U.S. at 869. But in any event, such a "savings" clause "does *not* bar the ordinary working of conflict pre-emption principles." *Id.* In fact, the Court "has repeatedly 'decline[d] to give broad effect to savings clauses where doing so would upset the careful regulatory scheme established by federal law.'" *Id.* at 870 (collecting cases).

The factors supporting preemption here are even stronger than those present in *Geier*. Spin Master's election of a remedy (repair, replace, or refund) is established not only by agency regulation, but by statute. While the Court in *Geier* relied on a regulation to determine the policy of the "agency, and therefore Congress," 529 U.S. at 885, here *Congress itself* has provided that a manufacturer or distributor may "take whichever of the [remedial] actions the [party] . . . elects." 15 U.S.C. § 2064(d). *See also Gade v. Nat'l Solid Waste Mgt. Ass'n*, 505 U.S. 88, 96 (1992) ("the purpose of Congress" is the "ultimate touchstone" in preemption cases).

---

[5]    *Cf.* 15 U.S.C. § 1397(k) (1988) ("Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law."); *see Geier*, 529 U.S. at 868.

B.    **Plaintiffs' Contract Claims Fail On Their Own Terms.**

1.    **Warranty Claims Fail For Lack Of Notice.**

In order to assert a claim for breach of an implied or express warranty, the Uniform Commercial Code ("UCC") requires that a buyer give notice to the seller of the seller's breach "within a reasonable time after he discovers or should have discovered any breach."  UCC § 2-607(3)(a).[6]  Plaintiffs assert that they need not comply with the UCC's notice requirement because Defendants had "actual knowledge" of the alleged defects as demonstrated by the Aqua Dots recall; in the alternative, they assert that the notice requirement was satisfied by the filing of the Plaintiffs' lawsuits.  ¶ 138.  Both arguments fail.

In *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 221 Ill. Dec. 389 (Ill. 1997) (applying Illinois and Pennsylvania law), the plaintiffs claimed that Suzuki Samurais were defective and thus breached an implied warranty.  The plaintiffs further argued that they were excused from the UCC's notice requirements because "Suzuki had actual knowledge of the breach and because notice was given by the filing of plaintiffs' breach of warranty complaint."  *Id.* at 589, 221 Ill. Dec. at 394.  The court, however, held that such knowledge was insufficient to provide notice: the plaintiff had to allege that Suzuki knew not only of the trouble with that particular product, but also with *that particular buyer's transaction.  Id.* at 590, 221 Ill. Dec. at 395.  As the court explained, the filing of a complaint is sufficient to put a defendant on notice only in cases where the plaintiff alleges a personal injury.  *Id.* at 590-91, 221 Ill. Dec. at 395-96.  "[W]here the breach has not resulted in personal injury," the court explained, "the UCC indicates a preference that the breach be cured without a lawsuit."  *Id.*

---

[6]    *See also* Ark. Code Ann. § 4-2-607(3)(a); Fla. Stat. § 672.607(3)(a); 810 Ill. Comp. Stat. 5/2-607(3)(a); Ky. Rev. Stat. Ann. § 355.2-607(3)(a); Mo. Rev. Stat. § 400.2-607(3)(a); N.Y. UCC Law § 2-607(3)(a); Okla. Stat. 12A. § 2-607(3)(a); 13 Pa. Cons. Stat. § 2607(c)(1); Tex. Bus. & Com. Code § 2.607(c)(1).

Here, Plaintiffs have not alleged that they notified Spin Master or Target that they had purchased Aqua Dots, much less that their particular transactions were troublesome.  Neither knowledge about safety concerns nor "a federally mandated recall notice" fulfills the UCC's notice requirement.  *Perona v. Volkswagen of America, Inc.*, 684 N.E.2d 859, 863-64, 225 Ill. Dec. 868, 872-73 (Ill. App. 1st Dist. 1997) (affirming dismissal of warranty claims where the plaintiffs failed to allege that the manufacturer had "actual knowledge of the alleged breach of the particular automobiles purchased by the named plaintiffs" and holding that notice by filing the plaintiffs' complaint was inadequate to fulfill the UCC notice requirement where plaintiffs had not suffered personal injury).  In an action (like this one) alleging economic loss rather than physical injury, the filing a lawsuit does not satisfy the UCC's notice requirement.  *Connick*, 675 N.E.2d at 590-91, 221 Ill. Dec. at 395-96.[7]

Even in jurisdictions where notice to a remote manufacturer or distributor is not required, the buyer nonetheless has a duty to notify at least its immediate seller.  *See Kansas City v. Keene Corp.*, 855 S.W.2d 360, 369 (Mo. 1993).  In such a case, the notice to the immediate seller "inures to the benefit of the manufacturer and is sufficient to serve the policy of the notice requirement."  *Ragland Mills, Inc. v. Gen. Motors Corp.*, 763 S.W.2d 357, 361 (Mo. App. S.D. 1989).  *See also Hubbard v. Gen. Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, *5 (S.D.N.Y. May 22, 1996) (warranty claims dismissed where the complaint lacked "any allegation that plaintiff notified GM, or the dealer from which he purchased the vehicle, of the

---

[7]      *See also Adams. v. Wacaster Oil Co., Inc.*, 98 S.W.3d 832, 836 (Ark. App. 2003) ("the giving of notice must be more than a complaint, and [] the giving of notice must be alleged in the complaint itself."); *U.S. Tire-Tech v. Boeran*, 110 S.W.3d 194, 201-202 (Tex. App. 1st Dist. 2003) (neither notice to the immediate seller nor the commencement of litigation satisfies the buyer's notice requirement towards the manufacturer); *Wilcox v. Hillcrest Mem'l Park of Dallas*, 696 S.W.2d 423, 423 (Tex. App. 5th Dist. 1985) (under Texas law, a buyer must notify "a *remote* seller of an alleged breach of warranty or be barred from any remedy for breach of warranty under the Code.").

claimed defect."). Plaintiffs, however, did not notify either their immediate sellers or the Spin

Master Defendants of any breach, thus, their claims fail.

2.    **The Implied Warranty Claims Fail Because The Products Are Fit For Their Ordinary Purpose.**

To recover for a breach of implied warranty of merchantability, a plaintiff must show that

that the product at issue is not "fit for the ordinary purposes for which goods of that description

are used." UCC § 2-314(2)(c).[8]  In *Brazier v. Hasbro, Inc.*, No. 99 Civ. 11258 (MBM), 2004

WL 515536, *4 (S.D.N.Y. March 16, 2004), for example, the court dismissed an implied

warranty claim involving a toy ball that caused a child to choke.  Because "the ordinary and

expected purposes" of toy balls included "being thrown, caught, bounced and rolled" and did

"not include a warranty that the product is fit for safe insertion into a child's mouth," the plaintiff

could not "maintain a cause of action for breach of implied warranty based on the contention that

the ball was not minimally safe for this purpose." *Id*. *See also Plas-Tex, Inc. v. U.S. Steel Corp.*,

772 S.W.2d 442, n.5 (Tex. 1989) ("proper use of the goods" required for implied warranty

claim); *Pritchard v. Liggett & Myers Tobacco Co.*, 350 F.2d 479, 485 (3d Cir. 1965)

(Pennsylvania law) ("[I]f a person uses a product for a purpose not intended by the manufacturer

and suffers an injury as a result, he may not recover because such misuse is beyond the scope of

the warranty."). So too here: because ingesting Aqua Dots is not one of its "ordinary and

expected purposes," Plaintiffs cannot recover for breach of an implied warranty.

---

[8]      *See also* ARK. CODE ANN. § 4-2-314(2)(c);  FLA. STAT. § 672.314(2)(c); 810 ILL. COMP. STAT. 5/2‑314(2)(c); KY. REV. STAT. ANN. § 355.2-314(2)(c); MO. REV. STAT. § 400.2-314(2)(c); N.Y. UCC LAW § 2-314(2)(c); OKLA. STAT. 12A. § 2-314(2)(c); 13 PA. CONS. STAT. § 2314(b)(3); TEX. BUS. & COM. CODE § 2.314(b)(3).

**3.    The Express Warranty Claims Fail Because The Scope Of An Express Warranty Is Limited To The Product's Intended Use.**

A "condition precedent" to a claim for breach of express warranty is "[s]ubstantial compliance with the directions" for the product's use. *Overstreet v. Norden Lab., Inc.*, 669 F.2d 1286, 1290 (6th Cir. 1982) (Kentucky law) (citing *Elanco Prod. Co. v. Akin-Tunnell*, 516 S.W.2d 726 (Tex. App. 1974) (Texas law)).  As the Sixth Circuit has explained, the "scope of a product warranty is limited to the product's intended use.  Use of a product contrary to its directions will preclude recovery for breach of an express warranty." *Id.*[9]

Although Plaintiffs allege that Aqua Dots are "hazardous" and "unreasonably dangerous" when ingested, they do not allege that they are unfit for their intended use.  The Consolidated Complaint admits, as it must, that the ordinary purpose of Aqua Dots is to be arranged in a design on a plastic tray:  "Children are instructed to spray their designs with water to fuse the beads together.  Once sprayed with water, the beads become adhesive and fuse together on a plastic tray.  Once the design becomes fixed, it can be removed from the tray."  ¶ 40.  Because Plaintiffs do not allege that the Aqua Dots craft kits they purchased are unfit for this purpose, their express warranty claims fail.

---

[9]    *See also Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 444 (E.D.N.Y. 2005) ("To recover under a theory of breach of express warranty the plaintiff must prove first, that the express warranty was included in the contract, and second, that the product was being used for the purpose and in the manner intended."  (citations and quotations omitted)); *Hays v. Western Auto Supply Co.*, 405 S.W.2d 877, 883 (Mo. 1966) ("Breach of warranty is shown by proof of the failure of a product when the product is being put to its normal, intended use.  Thus, liability on the ground of breach of a manufacturer's express warranty does not exist where it appears that the warranted product was being used, at the time of the injury in suit, for a purpose different from that for which the manufacturer intended it to be used." (quotation omitted)).

**4.    The Warranty Claims Fail Because Plaintiffs Do Not Plead Any Express Warranty That Was Made To Them And Upon Which They Relied.**

**(a)    No Express Warranty Pled**

Plaintiffs fail to properly plead any warranty that was expressly made to them. An express warranty is an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." UCC § 2-313(2).[10] Invoking the term "express warranty" is insufficient; the plaintiff must set forth the specific terms of the warranty or attach advertising, a label, or other document setting forth those exact terms. *Bd. of Educ. v. A,C & S, Inc.*, 546 N.E.2d 580, 595, 137 Ill. Dec. 635, 650 (Ill. 1989) ("To state a claim, the terms of the express warranty must be stated or attached to the complaint, and failure to do so renders the claim invalid." (internal citations omitted)).

The Consolidated Complaint does not set forth the terms of any express warranty made by Spin Master to Plaintiffs. Plaintiffs broadly state that "Defendants expressly warranted that the Hazardous Toys were manufactured to conform with all safety requirements under U.S. federal and other applicable laws and regulations, and industry developed standards and product specific standards, and that they were periodically reviewed and approved by independent safety testing laboratories." ¶ 130. But Plaintiffs must allege with specificity the terms of the warranty, either by reproducing the language or attaching the warranty, in order to state a claim. *See id*. at 595, 137 Ill. Dec. at 650. Or, if these broad statements themselves were to be pled as the "representations" made to Plaintiffs, the claim would fail because such vague and general statements would be mere puffing—and it is not reasonable, as a matter of law, to rely on such

---

[10]    *See also* ARK. CODE ANN. § 4-2-313(2); FLA. STAT. § 672.313(2); 810 ILL. COMP. STAT. 5/2‑313(2); KY. REV. STAT. ANN. § 355.2-313(2); MO. REV. STAT. § 400.2-313(2); N.Y. UCC LAW § 2-313(2); OKLA. STAT. 12A. § 2-313(2); 13 PA. CONS. STAT. § 2313(b); TEX. BUS. & COM. CODE § 2.313(b).

statements.  *See, e.g., Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 903 (Pa. 1975) (advertising statement that helicopter was "safe", "dependable" and "easy to operate" constituted mere puffing, not an express warranty); *Chase Resorts, Inc. v. Johns-Manville Corp.*, 476 F. Supp. 633, 638 (E.D. Mo. 1979) (statement that irrigation system "would provide years of trouble free service" did not create an express warranty because the length and parameters of the trouble free service were not "susceptible of exact knowledge").

### (b)    No Reliance Pled

Plaintiffs also fail to allege that they relied upon any warranty or that it otherwise formed part of the basis of their bargain.  Under the UCC, an express warranty is created only when a seller's "affirmation of fact or promise" "becomes part of the basis of the bargain."  UCC § 2-313(1).[11]  Some jurisdictions describe this requirement in terms of the "basis of the bargain" and others in terms of "reliance."  In either instance, the requirement is essential to a claim for breach of express warranty.  *See Ciba-Geigy Corp. v. Alter*, 834 S.W.2d 136, 146-47 (Ark. 1992) (an affirmation of fact contained in advertising materials cannot be a part of the basis of the parties' bargain where the plaintiff "did not recall reading any of the advertising material."); *Murrin v. Ford Motor Co.*, 756 N.Y.S.2d 596, 597 (N.Y. App. Div. 2003) (express warranty claim dismissed where the plaintiff failed to allege that "he was even aware" of the defendant's representations "before his purchase," which was "an essential element of the formation of an express warranty."); *Parkinson v. Guidant Corp.*, 315 F. Supp.2d 741, 752 (W.D. Pa. 2004) (holding that statements on the defendant's website cannot become "part of the basis of the bargain" absent proof "that anyone read, heard, saw or knew of the statements made on

---

[11]    *See also* ARK. CODE ANN. § 4-2-313(1); FLA. STAT. § 672.313(1); 810 ILL. COMP. STAT. 5/2‑313(1); KY. REV. STAT. ANN. § 355.2-313(1); MO. REV. STAT. § 400.2-313(1); N.Y. UCC LAW § 2-313(1); OKLA. STAT. 12A. § 2-313(1); 13 PA. CONS. STAT. § 2313(a); TEX. BUS. & COM. CODE § 2.313(a).

defendants' website prior to the purchase of the guidewire at issue in this case or that they were induced to buy the guidewire based on these statements.")[12]

Thus, the law of the states in which each named Plaintiff resides requires the buyer, at a minimum, to have seen, read or heard the statements that allegedly form the basis of an express warranty. The named Plaintiffs here have failed to satisfy even that minimal requirement. The Consolidated Complaint alleges representations the Defendants made in their websites, marketing and packaging. *See* ¶¶ 78-89. Yet Plaintiffs do not allege that they ever saw, read or heard these representations. And even if Plaintiffs saw such a representation prior to purchase, they do not claim that they relied on any such representation. To the contrary, Plaintiffs claim to have "relied upon the skill, superior knowledge and judgment of Defendants to sell toys that were reasonably safe for use by young children"—not upon any express warranty. *See* ¶ 136. Accordingly, this Court should dismiss all Plaintiffs' claims for breach of express warranty.

---

[12]    *See also* **Florida**: *Thursby v. Reynolds Metals Co.*, 466 So.2d 245, 250 (Fla. App. 1st Dist. 1984) (express warranty claim fails without affirmations of particular facts regarding the product's safety features); **Illinois**: *Stamm v. Wilder Travel Trailers*, 358 N.E.2d 382, 385, 3 Ill. Dec. 215, 218 (Ill. App. Ct. 1976) ("cases under the present day Commercial Code require a reliance by the buyer upon the promise, affirmation or description"); **Kentucky**: *Overstreet v. Norden Lab., Inc.*, 669 F.2d 1286 (6th Cir. 1982) (interpreting Kentucky law) (holding that "reliance is an element of the breach of an express warranty"); **Missouri**: *Collegiate Enterp., Inc. v. Otis Elevator Co.*, 650 F. Supp. 116, 118 (E.D. Mo. 1986) (holding that "claim for breach of an express warranty under the Uniform Commercial Code as adopted by Missouri, Mo.Rev.Stat. § 400.2-313, fails to state a claim because there is no allegation that [the buyer] was aware of or made any decision on the basis of such a warranty"); *Gannon Joint Venture Ltd. P'ship v. Masonite Corp.*, No. 4:07 CV 1242 JCH, 2008 WL 2074107, *3 (E.D. Mo. 2008) (dismissing breach of warranty claim because where the "Plaintiffs do not allege they read the Advertising at issue prior to purchasing the Siding, they cannot demonstrate the Advertising constituted a material factor inducing Plaintiffs to purchase the goods."); **Texas**: *McManus v. Fleetwood Enterp., Inc.*, 320 F.3d 545, 550 (5th Cir. 2003) (noting that although, under Texas law, the extent of the reliance requirement is unclear, plaintiffs "who did not read or consider" an alleged express warranty "cannot be said to have relied on [it] to *any* extent" such that it cannot be a "part of the 'basis of the bargain.'"); *cf.* **Oklahoma**: *Goodwin v. Durant Bank & Tr. Co.*, 952 P.2d 41, 43 (Okla. 1998) (an "affirmation" can be considered to have been "part of the basis of the bargain," when a buyer "seriously consider[ed]" the express warranty "in deciding whether to buy" and "at what price.").

**5.     The Warranty Claims Fail For Lack Of Privity In Florida, Illinois, Kentucky, And New York.**

Where (as here) a party sues for economic loss, privity of contract is an essential element to the implied warranty claim under Florida (Plaintiffs Bertanowski and White), Illinois (Ford), Kentucky (Walker) and New York (Cosgrove) law, as well as the express warranty claim under Florida (Bertanowski and White) and Kentucky (Walker) law.  *See T.W.M. v. Am. Med. Sys., Inc.*, 886 F. Supp 842, 844 (N.D. Fla. 1995) ("The law of Florida is that to recover for the breach of a warranty, either express or implied, the plaintiff must be in privity of contract with the defendant"); *Rothe v. Malone Cadillac, Inc.*, 518 N.E.2d 1028, 1029-30, 116 Ill. Dec. 207, 208-09 (Ill. 1988) ("[W]ith respect to purely economic loss, the UCC article II implied warranties give a buyer of goods a potential cause of action only against his immediate seller."); *Snawder v. Cohen*, 749 F. Supp. 1473, 1481 (W.D. Ky. 1990) (privity is a required element under Kentucky law for breach of express or implied warranty); *Catalano v. Heraeus Kulzer, Inc.*, 759 N.Y.S.2d 159 (N.Y.A.D. 2d Dept. 2003) (absent privity, a purchaser cannot recover economic loss against a distributor under a theory of breach of implied warranty.).

Here, there is no privity of contract between the Plaintiffs and Spin Master.  Plaintiffs' claim that "Defendants have brought themselves into privity with Plaintiffs and Class members by warranting the Aqua Dots toys to them directly and/or through the agency doctrine" is without merit.  ¶ 121.  Plaintiffs have set forth no facts establishing a contractual relationship between them and Spin Master as required under Florida, Illinois, Kentucky and New York law. The implied warranty claims of those Plaintiffs residing in these states fail.   The express warranty claims of the Florida and Kentucky Plaintiffs fail for the same reasons.

C.    **Plaintiffs' Tort Claims Fail On Their Own Terms.**

1.    **The Economic Loss Doctrine Precludes Tort Claims.**

The economic loss doctrine precludes recovery in tort for economic damages, without accompanying personal injury or damage to other property. The rule preserves the distinct functions of tort and contract law by permitting products liability claims for personal injury and damage to separate property in tort, while restricting claims for purely economic loss to the carefully drafted warranty provisions of the Uniform Commercial Code. *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 451-53, 61 Ill. Dec. 746, 754-56 (Ill. 1982).

In *Moorman*, the Illinois Supreme Court held that the plaintiff could not recover for purely economic loss resulting from an alleged crack in a grain storage tank under the tort theories of strict liability and negligence. Reasoning that such qualitative defects are best handled by contract law, rather than by tort theories, the Court explained:

> where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery.

*Id*. at 451, 61 Ill. Dec. at 745 (quoting *Prosser on Torts* § 101-665 (4th ed. 1971)). By contrast, contract law, "which protects expectation interests, provides the proper standard when a qualitative defect is involved, i.e., when a product is unfit for its intended use." *Id*. Observing that the vast majority of cases and commentators support disallowing recovery in strict liability or negligence for economic losses, the court held that "plaintiff cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Id*. at 446-47, 451, 61 Ill. Dec. at 749-50, 754.

The economic loss doctrine prevents Plaintiffs from recovering in tort here. Eight of the nine states in which Plaintiffs reside have adopted the economic loss doctrine.[13] The damages these Plaintiffs have suffered, if any, are purely economic. Plaintiffs have not alleged personal injuries or injuries to property. Rather, their damages are limited to "direct economic losses" based on disappointed expectations for the product, and they seek refunds to remedy that alleged injury. *See id.* at 449, 61 Ill. Dec. at 752. Accordingly, Plaintiffs' negligence and strict liability claims must be dismissed.

Arkansas, the exception, has permitted the recovery of economic loss where a defect in a product has manifested itself, thereby damaging the product. *See Blagg v. Fred Hunt Co., Inc.*, 612 S.W.2d 321 (Ark. 1981); *Farm Bureau Ins. Co. v. Case Corp.*, 878 S.W.2d 741 (Ark. 1994). But Arkansas Plaintiffs Erbach and Streett have failed to allege the manifestation of a defect in the specific Aqua Dots they purchased, let alone resulting damage to the Aqua Dots themselves. Further, to succeed in their claim for strict liability, the Arkansas Plaintiffs must also allege that

---

[13]        **Florida**: *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So.2d 532, 538-41 (Fla. 2004) (citing *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So.2d 899, 901 (Fla. 1987)); **Kentucky**: *Barton Brands, Ltd. v. O'Brien & Gere, Inc. of N. Am.*, Civ. No. 3:07-CV-78-H, 2008 WL 819068, *2-*8 (W.D. Ky. March 25, 2008); *see also Mt. Lebanon Personal Care Home v. Hoover*, 276 F.3d 845 (6th Cir. 2002); **Missouri**: *Sharp Bros. Contracting Co. v. Am. Hoist & Derrick Co.*, 703 S.W.2d 901, 903 (Mo. 1986) ("Missouri prohibits a cause of action in tort where the losses are purely economic. Recovery in tort is limited to cases in which there has been personal injury, or property damage either to property other than the property sold, or to the property sold when it [i]s rendered useless by some violent occurrence.) (internal quotations omitted); **New York**: *AKV Auto Transp., Inc. v. Syosset Truck Sales, Inc.*, 806 N.Y.S.2d 254, 255 (N.Y. App. Div. 3 Dist. 2005) ("The economic loss rule provides that where only economic loss with respect to a product itself is alleged and the underlying transaction is a sale of goods, the purchaser is limited to its contractual remedies and may not maintain the traditional tort causes of action of negligence or strict products liability."); **Oklahoma**: *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 653 (Okla. 1990) ("no action lies in manufacturers' products liability for injury only to the product itself resulting in purely economic loss"); **Pennsylvania**: *R.E.M. Coal Co., Inc. v. Clark Equip. Co.*, 563 A.2d 128, 133-34 (Pa. Super. 1989); *see also Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005); **Texas**: *Heil Co. v. Polar Corp.*, 191 S.W.3d 805, 815 (Tex. App. Fort Worth 2006) ("When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone…Thus, tort damages are generally not recoverable unless the plaintiff suffers an injury that is independent and separate from the economic losses recoverable under a breach of contract claim.")

the product at issue was not only in a defective condition but "unreasonably dangerous" during normal operation. *Farm Bureau Ins. Co.*, 878 S.W.2d at 744 ("There is no reasonable argument to be made that a tractor which suddenly catches fire during normal operation is not 'unreasonably dangerous.'").   The Consolidated Complaint contains no such allegations. Accordingly, Arkansas Plaintiffs' tort claims fail under Arkansas law.

### 2.     Plaintiffs' Statutory Tort Claims Fail And Must Be Dismissed.

### (a)     Plaintiffs' Claims Fail To Comply with Federal Rule 9(b)

Federal Rule 9(b) applies to claims under state consumer fraud and protection statutes. [14] *See, e.g., Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 883 (7th Cir. 2005); *Connick*, 675 N.E.2d at 593, 221 Ill. Dec. at 395 (same); *Baryo v. Philip Morris USA, Inc.*, 435 F. Supp. 2d 961, 968 (W.D. Mo. 2006) (citing Mo. Rev. Stat. § 407.020); *In re Balko*, 348 B.R. 684, 696-97 (W.D. Pa. 2006); *Dileo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).   Moreover, "in a case involving multiple defendants, the complaint should inform each defendant of the nature of his alleged participation in the fraud, and should not vaguely attribute allegedly fraudulent statements simply to all 'defendants.' . . . Consequently, 'lumping' multiple defendants in a group (e.g., 'defendants misled the plaintiff by stating . . . .') defeats this notice objective and is therefore improper under Rule 9(b)."   *In re Balko*, 348 B.R. at 694 (quotations and citations omitted).   Counts One, Two, and Three, however, attribute misleading or deceptive conduct and non-disclosure of facts to "Defendants" without specifying any defendant that made or failed to

---

[14]     Even if the statutory claims did not trigger the particularity requirements for pleading fraud, the Plaintiffs must still plead "with some specificity the allegedly deceptive acts or practices that form the basis for the claim." *Lava Trading Inc. v. Hartford Fire Ins. Co.*, 326 F. Supp. 2d 434, 438-39 (S.D.N.Y. 2004) (dismissing claim under New York Consumer Protection Act prohibiting deceptive trade practices). Thus, "conclusory allegations" of the sort set forth in Counts One, Two, and Three "are not sufficient to state a claim" "in the absence of factual allegations in support thereof." *Id. See also Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y. 1997) ("In pleading a claim under the Consumer Protection Act, a Plaintiff is required to set forth specific details regarding the allegedly deceptive acts or practices" and cannot rely "on information and belief." (citation omitted)).

make a particular representation.  These claims fail to satisfy the heightened pleading standards of Rule 9(b).

Further, although Plaintiffs make a conclusory allegation that misrepresentations were made, they fail to identify a specific misrepresentation or to allege which, if any, Plaintiffs actually saw, heard, or were otherwise aware of such a particular representation.  Perhaps this is due to the fact that the bulk of the representations cited by Plaintiffs actually post-date each named Plaintiff's purchase or receipt of Aqua Dots products.

### (b)    Plaintiffs Fail To State A Claim Under Their Respective Statutes

In addition to these pleading deficiencies, Plaintiffs' statutory consumer fraud and deceptive practices claims fail on substantive grounds.

### (i)    Illinois

As the Illinois Supreme Court has explained, in order "to adequately plead a private cause of action" for a violation of the Illinois Consumer Fraud Act, a plaintiff must allege:  "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception."  *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 161-62, 267 Ill. Dec. 14, 24-25 (Ill. 2002).  Named plaintiff Ford, who resides in Illinois, has failed to allege with specificity how Spin Master's alleged misrepresentations are false or deceptive.  For example, Plaintiffs claim that "Defendants market and advertise that their toys are safe for children."  ¶ 80.  Even if this statement were a misrepresentation, it is not sufficiently factual to be actionable under the ICFA.  *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 847, 296 Ill. Dec. 448, 494 (Ill. 2005) (general and "subjective characterizations" have repeatedly been held "to be mere puffing" and "as a

matter of law" cannot "be considered deceptive under the Consumer Fraud Act."). Ford also fails to allege with specificity how these and similar representations are false or deceptive. *See Connick*, 675 N.E.2d at 593, 221 Ill. Dec. at 395 ("Plaintiffs' complaint fails because it did not allege with specificity how the manual's guidelines were false or deceptive. Specifically, the complaint failed to allege how the [Suzuki] Samurai was unsafe where a driver followed the manual's guidelines. Without such specificity and particularity, the complaint fails to state a violation of consumer fraud."). For example, Plaintiffs claim that Defendants made representations about compliance with standards, yet fail to allege that Defendants did not test Aqua Dots pursuant to ASTM standards.

Nor does Ford allege an actionable omission on the part of Spin Master. Under the ICFA, the omission of a material fact is actionable only if it was knowingly concealed. *See Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 62-63, 306 Ill. Dec. 611, 617-18 (Ill. App. 2nd Dist. 2006) (omission claim properly dismissed where the plaintiffs failed to establish that the fact concealed was known to the defendant at the time of the concealment). In this case, Ford fails to allege that Spin Master was aware of the safety concern regarding Aqua Dots craft kits prior September 27, 2007, the date on which she purchased Aqua Dots Super Studio. ¶ 16. *See Connick*, 675 N.E.2d at 594, 221 Ill. Dec. at 396 ( "plaintiffs can state a valid claim of consumer fraud only where premised upon statements made prior to their dates of purchase.").

Ford's ICFA claim also fails because she does not claim that she was actually deceived by any misrepresentations, which would be required to establish proximate causation. *See Oliveira*, 776 N.E.2d at 161-62, 267 Ill. Dec. at 25-25. Where a plaintiff does not allege that "he saw, heard or read any of defendant's ads," the plaintiff cannot allege that he was deceived by them. *Id*. at 163, 267 Ill. Dec. at 26. Here, Plaintiffs allege that by "advertising and marketing

Aqua Dots in various media, including broadcasts, website, and written promotional materials," Defendants misled consumers about the safety of Aqua Dots craft kits. ¶ 101. Plaintiffs not only fail to specify what advertising and marketing material they are referring to, but also that they saw, heard, or read any such material.

Ford also fails to state a claim under the Illinois Deceptive Trade Practices Act. Although the Act was primarily intended to protect business people, a consumer may bring a private cause of action for injunctive relief "if the consumer can allege facts which would indicate he is likely to be damaged in the future." *Greenberg v. United Airlines*, 563 N.E.2d 1031, 1036-37, 150 Ill. Dec. 904, 909-10 (Ill. App. 1st Dist. 1990) (quotations omitted). However, "the problem inherent in such consumer actions is the inability to allege facts which would indicate that the plaintiff is 'likely to be damaged'" in the *future* as a result of a deceptive act that they allege has already taken place and they have sued over. *Brooks v. Midas-Int'l Corp.*, 361 N.E.2d 815, 821, 5 Ill. Dec. 492, 498 (Ill. App. 1st Dist. 1977); *see also Hayna v. Arby's, Inc.*, 425 N.E.2d 1174, 1185-86, 55 Ill. Dec. 1, 12-13 (Ill. App. 1st Dist. 1981) (affirming dismissal where restaurant customer was aware of the allegedly misleading advertising regarding the composition of sandwiches and could not show Arby's practices were likely to damage her in the future). Here, Ford's claims under the Illinois Deceptive Trade Practices Act fail because Ford has not alleged how any particular misrepresentation Spin Master has made as to the recalled Aqua Dots has deceived her, much less how she could be deceived by it in the future.

### (ii)    Arkansas

Named plaintiffs Erbach and Streett, who purchased Aqua Dots and reside in Arkansas, have failed to state a claim under the Arkansas Deceptive Trade Practices Act ("ADTPA"). ARK. CODE ANN. § 4-88-101, *et seq*. Under Arkansas law, a plaintiff alleging violations of the ADTPA must establish that the defendant acted "knowingly." *Boshears v. Certainteed Corp.*,

No. 4:05CV01052, 2007 WL 1381652, at *5 (E.D. Ark. May 10, 2007). Accordingly, Plaintiffs must show that Spin Master "knew that its product was defective and made material misrepresentations in order to induce Plaintiffs to buy a faulty product. A good-faith belief in a product is not a basis for a finding of fraud or deception." *Id*. The Arkansas Plaintiffs, however, have failed to point to any evidence that Spin Master knowingly deceived them when they purchased Aqua Dots Super Studio in the summer of 2007. *See* ¶ 15.

Second, a private cause of action is only afforded under the ADTPA to a person who suffers "actual damage or injury." As a matter of law, "actual damage or injury is sustained when the product has actually malfunctioned or the defect has manifested itself. Where the only alleged injury is the diminution in value of the product, a private cause of action is not cognizable under the ADTPA." *Wallis v. Ford Motor Co*., 208 S.W.3d 153, 161 (Ark. 2005).

### (iii)    Florida

Named plaintiffs Simon and Sarah Bertanowski and White, Florida residents, have likewise failed to state a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). FLA. STAT. § 501.201, *et seq*. In order to recover under the FDUTPA, a plaintiff "must not only plead and prove that the conduct complained of was unfair and deceptive but . . . also . . . that he or she was aggrieved by the unfair and deceptive act." *Macias v. HBC of Florida, Inc*., 694 So.2d 88, 90 (Fla. App. 3d Dist. 1997). Plaintiffs do not allege any unfair or deceptive conduct by Spin Master or Target, let alone how they have been injured.

This Court has dismissed claims under the FDUTPA where, as here, plaintiffs fail to allege the "who, what, when, and where' of the fraud 'sufficient to reasonably notify the defendant of its purported role in the scheme.'" *Lantz v. American Honda Motor Co., Inc*., No. 06 C 5932, 2007 WL 1424614, at *9 (N.D. Ill. May 14, 2007) (interpreting Florida law). In order to state a claim, Plaintiffs must "indicate[] if or when they saw any misleading statements

before purchasing [the product], or that such statements induced them to make these purchases." *Id*. at *10. The Florida Plaintiffs here do not indicate if or when they saw, heard or read any misleading statements made by Spin Master or Target, or that such statements induced them to purchase Aqua Dots. Accordingly, they have failed to state a claim under the FDUTPA.

### (iv)    Kentucky

Named plaintiff Walker, a Kentucky resident, has failed to state a claim under the Kentucky Consumer Protection Act ("KCPA"). KY. REV. STAT. ANN. § 367.170(1). In order to recover under the KCPA, the plaintiff must establish privity of contract between the plaintiff and the defendant. *See Tallon v. Lloyd & McDaniel*, 497 F. Supp. 2d 847, 854 (W.D. Ky. 2007) ("The language of the [KCPA] 'plainly contemplates an action by a purchaser against his immediate seller.'") (quoting *Skilcraft Sheetmetal v. Ky. Machinery, Inc*., 836 S.W.2d 907, 909 (Ky. App. 1992)). Plaintiff Walker allegedly purchased an Aqua Dots craft kit from Wal-Mart, (¶ 18), but there is no allegation that she is in privity with any defendant other than Wal-Mart, the immediate seller. Accordingly, her KCPA claim must be dismissed against Spin Master and Target, with whom privity is lacking. *See Ky. Laborers Dist. Council v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 772-73 (W.D. Ky. 1998) (dismissing plaintiffs' claims under KCPA for lack of privity); *Brewer v. Portfolio Recovery Assoc.*, Civ. No. 1:07CV-113-M, 2007 WL 3025077, at *3 (W.D. Ky. Oct. 15, 2007) (same).

### (v)    Missouri

Named plaintiff Burgess, a Missouri resident, fails to state a claim under the Missouri Merchandising Practices Act ("MMPA"). "The private right of action created by the MMPA requires proof of, among other things, an 'act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or

29

advertisement of any merchandise.'" *Baryo v. Philip Morris USA, Inc.*, 435 F. Supp. 2d 961, 968 (W.D. Mo. 2006) (quoting Mo. Rev. Stat. § 407.020). Thus, "fraudulent conduct of some sort is an element of Plaintiffs' MMPA claims and must be plead with particularity"; "conclusory allegations" are insufficient. *Id.*

To state a claim based upon concealment or omission of a material fact, the MMPA requires proof that the defendant failed "to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." *See Hess v. Chase Manhattan Bank*, 220 S.W.3d 758, 774 (Mo. 2007) (en banc) (quoting omitted). Knowing misrepresentations are also actionable under the MMPA. *See Viene v. Concours Auto Sales, Inc.*, 787 S.W.2d 814, 815 (Mo. App. 1990) (dealer's knowing misrepresentation regarding the inspection status of a vehicle was "exactly the kind of conduct that is prohibited by the Missouri Merchandising Practices Act"). As Plaintiff Burgess has failed to allege that Spin Master concealed or misrepresented facts known to Spin Master about the safety of Aqua Dots, his claim must be dismissed.

### (vi)    New York

Named plaintiff Cosgrove, a New York resident, has failed to state a claim under New York's Deceptive Business Acts and Practices statute. N.Y. GEN. BUS. LAW § 349, *et seq*. First, under New York's statute, plaintiff must establish that "a material deceptive act or practice *caused actual, although not necessarily pecuniary, harm*." *See Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999) (emphasis in original) (quotation omitted). In *Small*, the plaintiffs argued that defendants' conduct in not disclosing the addictive qualities of nicotine prevented plaintiffs from making free and informed choices as consumers. *Id.* They sought recovery of the purchase price of their cigarettes, reasoning that "had they known that nicotine was addictive, they never would have purchased cigarettes." *Id.* at 898. The Court of Appeals affirmed the dismissal of this claim, reasoning that it impermissibly "set[s] forth deception as

both act and injury." *Id*. Absent a claim that the deception caused their addiction, injured their health, or perhaps inflated the cost of their cigarettes, the Court explained, plaintiffs could not allege the type of actual harm recoverable under New York's statute. *Id*. Here, plaintiff Cosgrove's claim suffers from the same fatal flaw. Like the plaintiffs in *Small*, she alleges that she would not have purchased Aqua Dots refills but for Defendants' alleged deceptive conduct but she can point to no pecuniary or actual harm caused by the alleged deceptive conduct. ¶ 14.

Further, the injury requirement is even more difficult to satisfy where, as here, there is no allegation that the product at issue malfunctioned or that the defect ever manifested itself. Indeed, courts have consistently held that there is no cause of action under New York's consumer protection statute where "a product performs satisfactorily and never exhibits the alleged defect." *See Frank v. Daimler Chrysler Corp*., 741 N.Y.S.2d 9, 17 (N.Y. App. Div. 2002) (dismissing a class action brought by car owners whose cars were allegedly defective but never malfunctioned).

Finally, plaintiff Cosgrove cannot maintain an action based on Spin Master or Target's allegedly false or deceptive advertising and marketing efforts when she has not alleged that she was aware of their advertising. *See, e.g.*, *Andre Strishak & Assocs. v. Hewlett Packard Co*., 300 752 N.Y.S.2d 400, 400 (N.Y. App. Div. 2002) (affirming dismissal of a consumer protection claim where "plaintiffs failed to show that they . . . were aware of the allegedly false advertisement when purchasing the printers").

### (vii)    Oklahoma

Named plaintiff Williams, an Oklahoma resident, has failed to state a claim under the Oklahoma Consumer Protection Act ("OCPA"). 15 OKLA. STAT. § 751 *et seq*. A consumer pursuing a private right of action under the OCPA "must suffer some detriment or loss as a result of a violation of the OCPA" *beyond* the "payment of the purchase price for that product." *See*

*Walls v. American Tobacco Co.*, 11 P.3d 626, 630 (Okla. 2000).  Plaintiff Williams has not alleged that she suffered any such injury.

Moreover, Williams has also failed to allege that the Aqua Dots craft kit she purchased malfunctioned or that the alleged defect otherwise manifested itself.  The absence of such allegations is fatal to Williams' claim under the OCPA.  In *Harrison v. Leviton Mfg. Co., Inc.*, No. 05-CV-0491-CVE-FHM, 2006 WL 2990524, at *4-5 (N.D. Okla. Oct. 19, 2006), the district court dismissed a similar claim, reasoning that where a defect has not manifested itself, the plaintiff "is seeking money damages for a product that will only hypothetically cause him harm. This is not the type of 'actual or threatened distinct injury' required to bring a claim under the OCPA, as plaintiff must allege actual damages to qualify as an 'aggrieved consumer' under the Act."

### (viii)   Pennsylvania

Named plaintiff Soderstedt, a Pennsylvania resident, fails to state a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  73 PA. CONS. STAT. § 201-1, *et seq*.  To state a claim under the UTPCPL, plaintiffs must satisfy "the traditional common law elements of fraud."  *Connolly v. Reliastar Life Ins. Co.*, No. 03-5444, 2006 WL 3355184, at * 11 (E.D. Pa. Nov. 13, 2006) (citing *Piper v. American Nat'l Life Ins. Co. of Texas*, 228 F. Supp. 2d 553, 560 (M.D. Pa. 2002)).  These include: "(1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the defrauded party; and (5) damages proximately caused by the fraud."  *Id*.  Dismissal is appropriate where the plaintiff fails to set forth evidence in support of UTPCPL allegations, such as specific terms of the misrepresentation, the nature of the misrepresentation, how the plaintiff relied upon the misrepresentations or the damages that resulted from the reliance.  *Id*.  Plaintiff Soderstedt has not identified the specific terms of Spin Master's alleged misrepresentations;

scienter; how, if at all, she relied upon them; or how damages resulted from that reliance.  Thus, she has failed to satisfy the stringent requirements of common law fraud.

### (ix)     Texas

Named plaintiff Botsch, a Texas resident, fails to state a claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("TDTPA").  TEX. BUS. & COM. CODE § 17.41, *et seq*. Under the TDTPA, consumers do not have cognizable injuries where, as here, "although allegedly defective," the products "have apparently functioned as represented."  *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 858 (Tex. Ct. App. 2005) (affirming dismissal of TDTPA claim over unmanifested defect).  In such a case, "potential loss-of-benefit-of-the-bargain injuries and potential cost-of-repair or replacement injuries from a defect that has not manifested itself simply become too remote in time to constitute an 'injury' for statutory standing purposes under the DTPA."  *Id*.  Plaintiff Botsch has not alleged that a defect manifested itself during the Aqua Dots' usable life.  *Id*.  Accordingly, he has not been injured within the meaning of the TDTPA, and his claim must be dismissed.  Moreover, "proof of causation is essential for recovery" in a claim under the TDTPA.  *Smith v. Hennessey & Assocs., Inc.*, 103 S.W.3d 567, 569 (Tex. App. 2003).  In this case, Botsch has failed to allege that he saw, heard, or relied upon any alleged misrepresentations made by Spin Master, and this failure provides an independent ground for dismissal of his claim.

### (c)     Plaintiffs' Strict Liability Claims Fail To Allege Physical Harm And Should Be Dismissed

Plaintiffs' strict liability claim fails for an independent reason:  they have failed to allege any physical harm.  The majority of the jurisdictions in which the Plaintiffs reside have adopted § 402 of the Restatement (Second) of Torts, which requires "physical harm to the user or consumer or to his property" as an element for recovery in strict liability.  *Restatement (Second)*

*of Torts* § 402 (1965).[15]    Even in New York, where the Restatement has not been explicitly

adopted, an actual injury is required.  *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 209

(N.Y. 1983).    Plaintiffs have alleged no physical harm to themselves or their property.

Accordingly, the Plaintiffs have failed to state a claim for strict liability, and Count Eight should

be dismissed.

## IV.    UNJUST ENRICHMENT CLAIM FAILS

### A.    Claims Fails Because Plaintiffs Fail To Plead That It Would Be "Unjust" "Inequitable" or "Unconscionable" For Defendants To Retain Any Money.

Although the formulations of a claim for unjust enrichment vary in the states in which

Plaintiffs reside, each state's law in some form requires that a defendant retain some benefit

unjustly, inequitably, or unconscionably.[16]    As set forth above, however, Plaintiffs have failed to

---

[15]    **Florida**: *West v. Caterpillar Tractor Co., Inc.*, 336 So.2d 80, 87 (Fla. 1976); **Illinois**: *Blue v. Envtl. Eng'g, Inc.*, 828 N.E.2d 1128, 1138, 293 Ill. Dec. 630, 640 (Ill. 2005); **Kentucky**: *Dealers Transp. Co. v. Battery Distrib. Co.*, 402 S.W.2d 441, 446-47 (Ky. 1965); **Missouri**: *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362, 364 (Mo. 1969); **Oklahoma**: *Kirkland v. Gen. Motors. Corp.*, 521 P.2d 1353, 1358 (Okla. 1974); **Pennsylvania**: *Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966); **Texas**: *Signal Oil & Gas Co., v. Universal Oil Prod.*, 572 S.W.2d 320, 325 (Tex. 1978).

[16]    **Arkansas**: *Hatchell v. Wren*, 211 S.W.3d 516, 522 (Ark. 2005) (to state a claim for unjust enrichment there "must also be some operative act, intent, or situation to make the enrichment unjust and compensable.  One who is free from fault cannot be held to be unjustly enriched merely because he or she has chosen to exercise a legal or contractual right.  In short, an action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain.") (citation omitted); *Day v. Case Credit Corp.*, No. 5:01CV00304-WRW, 2007 WL 604636, at *3 (E.D. Ark. Feb. 22, 2007) ("Simply put, equity does not prohibit enrichment alone-the enrichment must have come about from unjust events or motives."); **Illinois**: *HPI Health Care Servs., Inc. v. Mt. Vernon. Hosp., Inc.*, 545 N.E.2d 672, 679, 137 Ill. Dec. 19, 26 (Ill. 1999) (unjust enrichment occurs when "the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience"); **Kentucky**: *Pioneer Res. Corp. v. Nami Res. Co., LLC*, No. 6:04-465-DCR, 2006 WL 1778318, at *10 (E.D. Ky. June 26, 2006) (a "viable" claim for unjust enrichments requires "an inequitable retention of the benefit without payment for its value"); *Bogan v. Finn*, 298 S.W.2d 311, 314 (Ky. 1957) (affirming dismissal of unjust enrichment claim because "the element of injustice is lacking"); **Missouri**: *American Standard Ins. Co. v. Bracht*, 103 S.W.3d 281, 291 (Mo. App. 2003) ("The most significant requirement is that the enrichment be unjust."); **New York**: *Lake Minnewaska Mountain Houses, Inc. v. Rekis*, 686 N.Y.S.2d 186 (N.Y. App. Div. 1999) (unjust enrichments requires that plaintiff prove "that it is against equity and good conscience to permit . . . defendant to retain what is sought to be recovered") (quotation omitted); **Oklahoma**: *Dollar Rent-a-Car*

allege facts establishing Spin Master's knowledge of Aqua Dots safety issues, "unconscionable wrongdoings," impropriety, or any other facts demonstrating that the Spin Master Defendants and Target have benefited unjustly, inequitably, or unconscionably at the Plaintiffs' expense.  To the contrary, the Consolidated Complaint asserts that Spin Master has promptly initiated a voluntary, nationwide recall in order to replace consumers' Aqua Dots and further concedes that some retailers have also offered full refunds.  Accordingly, Plaintiffs' unjust enrichment claim fails.

Moreover, any "benefit" that Spin Master or Target conceivably could have retained at the Plaintiffs' expense is based on *Plaintiffs'* own choice because they, presumably, have failed to take advantage of the recall (or even to request a refund from the Retailer Defendants).  There is no presumption that purchasers of Aqua Dots want to return their product but have been refused.  Because Plaintiffs have not set forth facts establishing that Spin Master or Target have retained any benefit unjustly, inequitably, or unconscionably, their claims fail.

### B. <u>Claim Fails Because Plaintiffs Have An Adequate Remedy At Law</u>.

Plaintiffs' unjust enrichment claims also fail because equitable relief will not be granted where an adequate remedy at law is available.  *See generally In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337 (S.D. Fla. 2002); *Guinn v. Hoskins Chevrolet,* 836 N.E.2d 681, 705, 296 Ill. Dec. 930, 954 (Ill. App. 1st Dist. 2005); *Tudor Dev. Group, Inc. v. U.S. Fid. Guar. Co.*, 968 F.2d 357, 364 (3d Cir. 1992) (Pennsylvania law).[17]

---

*Sys., Inc. v. P.R.P. Enter., Inc.*, No. 01 CV 698, 2006 WL 1266515, at *26-27 (N.D. Okla. May 8, 2006); **Pennsylvania**: *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985) (defendant either "wrongfully secured or passively received a benefit that it would be unconscionable for her to retain") (quotation omitted).

[17]     *See also Ark. State Med. Bd. v. Schoen*, 1 S.W.3d 430, 433 (Ark. 1999); *Carolina Casualty Ins. Co. v. KLLM, Inc.*, No. CIV. A. 3:00CV-199-S, 2001 WL 1776754, at*3 (W.D. Ky. Aug. 1, 2001); *Whitman Realty Group, Inc. v. Galano*, 838 N.Y.S.2d 585, 588 (N.Y. App. Div. 2007); *Harvell v.*

Plaintiffs' claim of "unjust enrichment" is duplicative of the tort and warranty causes of action. It does not allege any distinct impropriety, but depends entirely on the theory that Defendants benefited from actions that are allegedly unlawful under other theories of liability in their complaint. Because there is adequate legal recourse for these claims, equitable relief in the form of unjust enrichment is not available. *See In re Managed Care Litig.*, 185 F. Supp. 2d at 1337 (court dismissed plaintiffs' unjust enrichment claim because plaintiffs' inclusion in their complaint of RICO claims entitling successful plaintiffs to treble damages, as well as ERISA-based claims, constituted evidence of potential, alternative remedies).

The fact that Plaintiffs have failed to state a claim under these other theories of recovery does not diminish their adequacy. "In determining whether a remedy is 'adequate,'" courts "must look to its availability and not to the likelihood of its success." *Tudor Dev. Group*, 968 F.2d at 364. "Thus the fact that the remedies set forth" in the Consolidated Complaint "might not make [Plaintiffs] whole does not mandate a finding that such remedies are inadequate, thereby requiring this court to grant equitable relief." *Id*. Moreover, Plaintiffs here do have an available self-help remedy that will make them whole: they can return the Aqua Dots they purchased to the stores where they bought them.

C.    **No Cause Of Action In Texas.**

Finally, under Texas law, unjust enrichment does not provide an independent basis for a cause of action. Accordingly, Count Nine of the Consolidated Complaint must be dismissed with respect to named Plaintiff Bosch, a Texas plaintiff. *See Oxford v. Williams Cos., Inc.*, 137 F. Supp. 2d 756, 762 (E.D. Tex. 2001) ("Unjust enrichment is not an independent cause of action but is instead a measure of damages which places the aggrieved plaintiff in the position he

---

*Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1035 (Okla. 2006); *Bennett v. Crane*, 289 S.W. 26, 28 (Mo. App. 1926); *In re Jeter*, 178 B.R. 787 (W.D. Mo. 1995).

occupied prior to dealing with the defendant."); *see also City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc*., 736 S.W.2d 247, 250 (Tex. App. 1987).

## V.    "INNOCENT NON-MANUFACTURER" ACTS IN SELECT STATES SEPARATELY PRECLUDE THE CLAIMS OF PLAINTIFFS WHO RESIDE IN THOSE STATES

### A.    Plaintiff Botsch's Product Liability Claims Against Spin Master Must Be Dismissed Pursuant To Section 82.003 Of The Texas Civil Practices and Remedies Code.

Section 82.003 of the Texas Civil Practices and Remedies Code ("Texas Code") protects non-manufacturing sellers from liability for injuries caused by a defective product. Section 82.003 applies to *all products liability actions*, defined to include actions against a manufacturer or seller for damages arising out of a defective product "based on strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." Tex. Civ. Prac. & Rem. § 82.001(3); *see also Casas v. The Tire Corral, Inc.*, Civ. No. M-04-123, 2005 U.S. Dist. LEXIS 42108, at *7 (S.D. Tex. Mar. 31, 2005). Section 82.003 applies not only to retailers, but also to other non-manufacturers. *See Alonso v. Maytag Corp.*, 356 F. Supp. 2d 757, 761 (S.D. Tex. 2005) ("[S]ection 82.003 denies ... recovery from a product seller who merely distributes a defective product."). Plaintiff Botsch understands that Spin Master is a non-manufacturer that merely markets and distributes Aqua Dots, while Moose manufactures them. ¶¶ 20, 22, 45.

Plaintiff Botsch does not and cannot argue that Spin Master falls within any exception to § 82.003. He does not claim that he actually relied on any express factual representation made by Spin Master. *See Rubin v. DaimlerChrysler Corp*., Civ. No. H-04-4021, 2005 U.S. Dist. LEXIS 42102, at *24-25 (S.D. Tex. May 20, 2005). Nor does Botsch claim that Spin Master had actual knowledge of the defect in Aqua Dots. *Id.* at *19 ("liability [under § 82.003] cannot be based on an allegation that a seller *should have known* of a defect in a product") (emphasis in

original and citation omitted).   The seller must have known about the defect "*at the time the seller supplied the product*," *i.e.*, at the initial point of sale.   *See Casas*, 2005 U.S. Dist. LEXIS 42108 at *18-19 (emphasis in original).   Moreover, even a non-manufacturing seller's knowledge of a condition in a product without actual knowledge that the condition renders the product defective is insufficient for purposes of this exception.   *See Garcia v. Nissan Motor Co., Ltd.*, Civ. No. M-05-59, 2006 U.S. Dist. LEXIS 20165, at *12-16 (S.D. Tex. Mar. 30, 2006).

### B.    Plaintiff Ford's Strict Liability Claims Against Spin Master Should Be Dismissed Pursuant To 735 ILCS 5/2-621.

Illinois law provides that strict product liability claims may be dismissed against a non-manufacturing defendant once it provides an affidavit certifying the correct identity of the manufacturer.[18]   *See* 735 Ill. Comp. Stat. 5/2-621.   A motion to dismiss pursuant to this statute is "most akin to a Rule 12(b) motion to dismiss" and thus the motion should test the sufficiency of the complaint, not the merits of the claim.   *See Indeck Power Equip.*, 881 F. Supp. at 342 (citation omitted).

Defendant Spin Master has attached to this Motion to Dismiss a declaration, signed by its COO, certifying Defendant Moose as the company that manufactured Aqua Dots.[19]   Declaration attached hereto as Exhibit B.   Further, Plaintiff Ford has already acknowledged that Defendant Moose, not Spin Master, was involved in the design and manufacture of Aqua Dots (¶¶ 20, 22) and has appropriately named Moose as a defendant herein.   Moreover, Plaintiff Ford has alleged that Spin Master was a mere distributor of Aqua Dots.   ¶ 20.   These facts independently foreclose Plaintiff Ford's strict liability claim.

---

[18]    Although procedural in nature, Illinois courts have determined that the statute "constitutes state substantive law so as to authorize dismissal of non-manufacturing defendants in federal court."   *See LaRoe v. Cassens & Sons, Inc.*, 472 F. Supp. 2d 1041, 1046 (S.D. Ill. 2006); *see also Indeck Power Equip.*, 881 F. Supp. 338, 341 (N.D. Ill. 1995).

[19]    The use of this declaration is permissible and has the same force and effect as an affidavit.   *See* 28 U.S.C. § 1746.

**C.    Plaintiff Burgess' Strict Product Liability Claims Against Spin Master Should Be Dismissed Pursuant To § 537.762 Of The Missouri Revised Statutes.**

Section 537.762 of the Missouri Revised Statutes ("Missouri Code") provides for dismissal of a defendant in a products liability action where that defendant's liability is based solely on his status as a seller in the stream of commerce and where another defendant (including a manufacturer or other upline supplier) from whom total recovery may be had, is before the court.  § 537.762 (1- 2); *see also Malone v. Schapun, Inc.*, 965 S.W.2d 177, 182 (Mo. Ct. App. 1997) (one of the purposes of § 537.762 is to "protect a seller from becoming principally liable when there is a culpable manufacturer or other culpable upline supplier").   Section 537.762 requires the defendant seeking dismissal to file with the court an affidavit stating that the defendant is aware of no circumstances upon which it may be liable other than as a seller in the stream of commerce.  *See* Mo. Rev. Stat. § 537.762(3).  Defendant Spin Master has filed such an affidavit herewith.  Plaintiff Burgess recognizes that Spin Master was a mere distributor of Aqua Dots and that Defendant Moose designed and manufactured Aqua Dots.  ¶¶ 20, 22.  Further, Plaintiff Burgess has named Moose as a Defendant herein, and can obtain full recovery from Moose.  These facts independently foreclose Plaintiff Burgess from recovering in strict liability.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Consolidated Amended Class Action Complaint should be dismissed in its entirety.

Dated: June 27, 2008

Respectfully submitted,

SPIN MASTER LTD.,
SPIN MASTER, INC. and TARGET
CORPORATION

By: /s/ Thomas J. Wiegand
   One of their attorneys

Ronald Y. Rothstein
Thomas J. Wiegand
Bryna J. Dahlin
Joanna E. Clarke-Sayer
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone (312) 558-5600
Facsimile (312) 558-5700

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that on June 27, 2008, I filed the above and foregoing with the

Court's ECF system and by doing so served a copy on all the parties.


/s/ Thomas J. Wiegand
ATTORNEY FOR SPIN MASTER LTD.,
SPIN MASTER, INC. AND

\\

# EXHIBIT A

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.))**

Page 1

**C**

Barton Brands, Ltd. v. O'Brien & Gere, Inc. of North America
W.D.Ky.,2008.
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
at Louisiville.
BARTON BRANDS, LTD., Plaintiff
v.
O'BRIEN & GERE, INC. OF NORTH AMERICA,
et al., Defendant.
Civil Action No. 3:07-CV-78-H.

March 25, 2008.

**Background:** Owner of distillery and bottling plant brought claims against winning bidder for design and installation of baghouse pollution control system for coal-fired boiler at plaintiff's facility, for breach of contract, breach of express and implied warranty, negligence, negligent misrepresentation, and declaratory relief, and brought claims against company retained by winning bidder to design and manufacture the baghouse system, for negligence and negligent misrepresentation. Winning bidder cross-claimed against company for indemnification.

**Holdings:** On company's motion to dismiss, the District Court, John G. Heyburn II, Chief Judge, held that:
(1) owner stated a claim against company for negligent misrepresentation, and
(2) owner did not state a claim against company for negligence.

Motion granted in part and denied in part.

**[1] Federal Courts 170B ☞383**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as Authority
            170Bk382 Court Rendering Decision
                170Bk383 k. Inferior State Courts.

Most Cited Cases

**Federal Courts 170B ☞390**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as Authority
            170Bk388 Federal Decision Prior to State Decision
                170Bk390 k. Anticipating or Predicting State Decision. Most Cited Cases
When applying state law, the district court must predict how the state's highest court would rule, and may disregard an intermediate state court decision if convinced that the highest court would decide otherwise.

**[2] Products Liability 313A ☞17.1**

313A Products Liability
    313AI Scope in General
        313AI(A) Products in General
            313Ak17 Nature of Injury or Damage
                313Ak17.1 k. In General. Most Cited Cases
The economic loss rule bars recovery in tort for "economic loss," which is both substantive loss in the value of a product caused by a defect in that product, and consequential loss flowing from the defect, such as lost profits.

**[3] Products Liability 313A ☞17.1**

313A Products Liability
    313AI Scope in General
        313AI(A) Products in General
            313Ak17 Nature of Injury or Damage
                313Ak17.1 k. In General. Most Cited Cases

**Torts 379 ☞118**

379 Torts
    379I In General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)
(Cite as: --- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.))

379k116 Injury or Damage from Act
    379k118 k. Economic Loss Doctrine.
Most Cited Cases
Underlying policy objectives of applying the eco-
nomic loss doctrine to commercial transactions are:
(1) it maintains the historical distinction between
tort law and contract law; (2) it protects parties'
freedom to allocate economic risk by contract; and
(3) it encourages the party best situated to assess
the risk of economic loss, typically the purchaser,
to assume, allocate, or insure against the very risk.

**[4] Fraud 184 €⟹30**

184 Fraud
    184I Deception Constituting Fraud, and Liabil-
ity Therefor
      184k30 k. Persons Liable. Most Cited Cases

**Fraud 184 €⟹32**

184 Fraud
    184II Actions
      184II(A) Rights of Action and Defenses
        184k32 k. Effect of Existence of Remedy
by Action on Contract. Most Cited Cases
Under Kentucky law as predicted by district court,
defendant company retained by winning bidder for
design and installation of baghouse pollution con-
trol system for coal-fired boiler at distillery and
bottling plant owned by plaintiff, which company
designed and manufactured the baghouse system,
had affirmative duty, even in absence of contractual
relationship with owner and independent of con-
tractual relationship between company and winning
bidder, to not supply false information to owner, so
that lack of privity between company and owner,
and Kentucky's economic loss rule, did not pre-
clude owner from bringing claim against company
for negligent misrepresentation resulting in eco-
nomic loss, based on allegations that company
made false statements concerning cause of fires in
baghouse system after installation, and that owner,
in reliance on such statements, decided to continue
to operate the system.

**[5] Negligence 272 €⟹481**

272 Negligence
    272XV Persons Liable
      272k481 k. Privity. Most Cited Cases
Duty owed, by defendant company retained by win-
ning bidder for design and installation of baghouse
pollution control system for coal-fired boiler at dis-
tillery and bottling plant owned by plaintiff, which
company designed and manufactured the baghouse
system, to determine the cause of fires in baghouse
system after installation, arose from contract
between company and winning bidder, which duty
did not support a negligence claim by owner
against company under Kentucky law.

**[6] Products Liability 313A €⟹17.1**

313A Products Liability
    313AI Scope in General
      313AI(A) Products in General
        313Ak17 Nature of Injury or Damage
          313Ak17.1 k. In General. Most Cited
Cases

**Products Liability 313A €⟹62**

313A Products Liability
    313AI Scope in General
      313AI(B) Particular Products, Application to
        313Ak62 k. Miscellaneous Products. Most
Cited Cases
Baghouse bags, purchased by plaintiff owner of
distillery and bottling plant from third parties, but
stored in baghouse pollution control system for
coal-fired boiler at plant, did not constitute property
other than the allegedly defective product, i.e., the
baghouse system, and thus, Kentucky's economic
loss rule precluded recovery in tort for allegedly
negligent design of baghouse system.

Donald L. Best, Jr., Dibella, Geer, McAllister &
Best P.C., Pittsburgh, PA, Janet P. Jakubowicz,
William Edward Skees, Greenebaum Doll & Mc-
Donald PLLC, Louisville, KY, Frank A. Bersani,
Jr., Syracuse, NY, John L. Demarcop, Phillips Lytle

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)

**(Cite as: --- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.))**

Page 3

LLP, Rochester, NY, for Plaintiffs.

Shea W. Conley, Robert W. Hojnoski, Reminger & Reminger CO., LPA, Cincinnati, OH, Carolyn G. Nussbaum, Nixon Peabody LLP, Rochester, NY, Barbara B. Edelman, Dinsmore & Shohl LLP, Lexington, KY, John G. Jackson, Richard W. Bethea, Chambliss, Bahner & Stophel, P.C., Chattanooga, TN, Matthew J. Hallingstad, Mary Ross Terry, Dinsmore & Shohl LLP, Louisville, for Defendants.

## MEMORANDUM OPINION

JOHN G. HEYBURN, II, Chief Judge.

**\*1** Plaintiff Barton Brands, Ltd. ("Barton Brands") filed suit alleging breach of contract, breach of express and implied warranty, negligence, negligent misrepresentation and seeks declaratory relief against Defendants O'Brien & Gere Engineers, Inc., O'Brien & Gere Inc., of North America (collectively "O'Brien & Gere"). The claims arise out of a contract in which O'Brien & Gere agreed to design and install a baghouse and ash handling system at Barton Brand's Bardstown facility. Barton Brands blames O'Brien & Gere for various problems which arose after installation.

On January 8, 2008, Barton Brands amended its complaint to add claims for negligence and negligent misrepresentation against Astec, Inc. ("Astec"). O'Brien & Gere has also filed a cross-claim against Astec, seeking complete indemnity. Astec has now moved to dismiss Barton Brands' claims and O'Brien & Gere's cross-claim against it. For the reasons discussed below, the Court will sustain the motion to dismiss Barton Brands' claim for negligence against Astec, but will deny the motions to dismiss Barton Brands' negligent misrepresentation claim and O'Brien & Gere's cross-claim for indemnity.

I.

For purposes of the pending motions, a brief review of the facts will suffice. Barton Brands owns and operates a distillery and bottling plant in Bard-

stown, Kentucky. On or about November 7, 2005, Barton Brands issued a request for bid, design, fabrication and installation of a coal-fired boiler Baghouse System at the distillery.[FN1] O'Brien & Gere submitted the winning written proposal for the Baghouse System design and installation at a total cost of $1,250,928.00 and was awarded the contract in early 2006. In conjunction with its proposal to Barton Brands, O'Brien & Gere asked Astec to provide O'Brien Gere a proposal and quotation for the design, manufacture, fabrication, installation, and start up of the baghouse and ash handling system at Barton Brands' facility. Astec submitted two proposals to O'Brien & Gere on December 14, 2005 and January 16, 2006 and, according to Barton Brands, Astec "manufactured, ... fabricated ... installed and/or set up" the baghouse, dust storage, and dry scrubbing systems at the Barton Brands facility.

Barton Brands says that during fall 2006 the Baghouse System experienced four separate small fires and, on each occasion, it notified O'Brien & Gere and Astec of the situation and provided each an opportunity to inspect the system and its operations. Barton Brands also says that O'Brien & Gere and Astec denied that the fires were caused by the Baghouse System's installation or design. On December 5, 2006, there was a much bigger fire inside the Baghouse System, which rendered it "totally inoperable." Barton Brands completely shut down its coal-fired boiler and the Baghouse System due to the damage and switched to natural gas in order to continue operating the distillery. According to Barton Brands, an independent expert, Amerex Environmental Systems ("Amerex") conducted an operational review and field inspection audit and determined that the cause of the fires was the "numerous design, manufacture, fabrication, and installation deficiencies by O'Brien & Gere and Astec."Pl.'s Am. Compl. ¶ 26.

**\*2** As a result of O'Brien & Gere's and Astec's alleged "wrongful actions," Barton Brands claims to have incurred property damage, increased operating

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.))**

Page 4

costs and other related out-of-pocket costs. Additionally, Barton Brands claims that its new coal-fired boiler baghouse may not be operational in time to "cap out" of the Industrial Boiler MCAT Standard, which is effective September 2007.

Count VII ("Negligence") of the Amended Complaint alleges that Astec breached its duty to Barton Brands "to provide a properly designed and fabricated, fully operational, defect free Baghouse System which was compatible with Barton Brands' existing coal-fired boiler."Count VII also claims that Astec was also negligent in "failing to determine the cause of the fires ... representing to Barton Brands that the cause of the fires was the operating conditions of Barton Brands' coal-fired boiler ... failing to warn Barton Brands ... and misleading Barton Brands concerning the cause of the fires."

Count VIII ("Negligent Misrepresentation") alleges that "Astec made negligent, false, statements to Barton Brands concerning its experience, the capabilities of the Baghouse System and the compatibility of the Baghouse System with Barton Brands' existing coal-fired boiler and related equipment" and made such statements to induce Barton Brands to select Astec's system. Count VIII also alleges that Astec "made additional false statements to Barton Brands concerning the cause of the fires occurring in [sic] within the Baghouse System," and that Barton Brand relied on such statements in deciding to continue to operate the system.

### II.

Astec asks the Court to dismiss the negligence and negligent misrepresentation claims against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Such a motion requires this Court to construe the complaint in the light most favorable to Plaintiff, *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir.1998), and to accept all the complaint's factual allegations as true.*Id.* The Court may not grant such a motion to dismiss based on disbelief of a complaint's factual allegations. *Miller v. Currie,* 50 F.3d

373, 377 (6th Cir.1995). Rather, the Court must liberally construe the complaint in favor of the party opposing the motion, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."*Bell Atl. Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007).

[1] To determine whether Barton Brands has stated a claim, this Court must apply Kentucky law. *Erie Ry. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Ultimately, this Court must predict how Kentucky's highest court would rule and may disregard an intermediate state court decision if convinced that the highest court would decide otherwise. *See Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178, 1181 (6th Cir.1999).

### III.

[2] At the heart of the parties' disagreement is the operation how two inextricably intertwined concepts-the economic loss doctrine and privity of contract. As the Sixth Circuit has explained:

> **\*3** The economic loss rule bars recovery in tort for economic loss. Economic loss is both substantive loss in the value of a product caused by a defect in that product (direct economic loss) and consequential loss flowing from the defect, such as lost profits (consequential economic loss). The economic loss rule marks the border between tort and contract law. Where tort law, primarily out of concern for safety, fixes the responsibility for a defective product directly on the parties responsible for placing the product into the stream of commerce, contract law gives the parties to a venture the freedom to allocate risk as they see fit. Were there no economic loss rule, 'contract law might drown in a sea of tort.'

*Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002)(quoting *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.))**

Page 5

S.Ct. 2295, 90 L.Ed.2d 865 (1986)) (citations omitted). As Justice Keller of the Kentucky Supreme Court has noted, the economic loss rule "is stated with ease but applied with great difficulty."*Presnell Constr. Managers, Inc. v. EH Constr., LLC,* 134 S.W.3d 575, 584 (Ky.2004) (Keller, J., concurring)(quoting *Sandarac Ass'n, Inc. v. W.R. Frizzell Architects, Inc.,* 609 So.2d 1349, 1352 (Fla.Dist.Ct.App.1992)).

The Court's consideration of these issues, and in particular the negligent misrepresentation claim, is guided by the Kentucky Supreme Court's recent decision in *Presnell.*In that case, a project owner entered into separate contracts with a contractor and a construction manager for work on a building project. There was no contract between the contractor and the construction manager. The contractor sued the construction manager for negligent misrepresentation and negligent supervision. With respect to these tort actions, the court explained that, "although privity is no longer required ...'one who is not a party to the contract or in privity thereto may not maintain an action for negligence which consists merely in the breach of the contract.'"*Id.* (quoting *Penco, Inc. v. Detrex Chem. Indus., Inc.,* 672 S.W.2d 948, 951 (1984)). Noting the lack of privity between the parties, the court observed that:

> unless [the construction manager] breached some duty to [the contractor] apart from its duties to [the project owner] under the contract-*i.e.* an independent duty-[the contractor], who was, at the most, an incidental beneficiary of the contract between [the project owner] and [the construction manager], cannot maintain an action in negligence against [the construction manager].

*Id.* at 579-80.In considering the contractor's negligent misrepresentation claim, the court adopted the standards set out in RESTATEMENT (SECOND) OF TORTS § 552 (1977)[FN2] and concluded that "privity is not necessary," because "the tort of negligent misrepresentation defines an *independent duty* for which recovery in tort for *economic loss* is available."*Id.* at 582 (emphasis added). Notably, in

*Presnell,* the contractor claimed "exclusively economic loss," which, in the context of a services contract, the court defined as, "a monetary loss such as lost wages or lost profits."*Id.* at 577 (quoting BLACK'S LAW DICTIONARY 530 (7th ed.1999)). The adoption of § 552 was consistent with the earlier prediction of Federal District Judge Reed of the Eastern District of Kentucky in the context of a services contract. *See Ingram Indus., Inc. v. Nowicki,* 527 F.Supp. 683, 684 (E.D.Ky.1981)(considering "the scope of liability of an accountant for negligence causing loss to a third party" and concluding that "Kentucky would adopt the standards set out in [§ 552]").[FN3]

**\*4** Barton Brands argues that because *Presnell* held that "privity is not necessary to maintain a tort action, and by adopting § 552, we agree that the tort of negligent [mis]representation defines an *independent duty for which recovery in tort for economic loss is available,*" 134 S.W.3d at 582-83 (emphasis added), Barton Brands should be allowed to pursue such a claim against Astec. Astec counters that *Presnell's* adoption of negligent misrepresentation in the context of a personal services contract does not mean that Kentucky courts would also recognize the claim in the context of a product liability case against a manufacturer. Astec directs the Court's attention to several cases outside the Sixth Circuit where state courts have rejected negligent misrepresentation claims in the context of defective products, as opposed to in the rendering of services. *See, e.g.Maynard Coop. Co. v. Zeneca, Inc.,* 143 F.3d 1099, 1102-03 (8th Cir.1998)(finding that the distinction between the "*advice* given by [Defendant] and the *product* about which the advice is given is ... a distinction without a difference."). And, as Astec points out, *Presnell* limited its holding to "the pleadings in this case and the limited facts developed to this point."*Id.* at 582.

[3][4] The question that inevitably follows is whether *Presnell* signals that Kentucky courts would now also recognize negligent misrepresentation in the products liability context and in so doing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)
(Cite as: --- F.Supp.2d ——, 2008 WL 819068 (W.D.Ky.))

Page 6

would permit recovery for "purely economic loss" limited to "lost profits." Although the Court finds no Kentucky case which considers the viability of a negligent misrepresentation claim in the context of a products liability case, it is helpful to review the underlying policy objectives of applying the economic loss doctrine to commercial transactions. As this Court has previously observed:

> 1) it maintains the historical distinction between tort and contract law; 2) it protects parties' freedom to allocate economic risk by contract; and 3) it encourages the party best situated to assess the risk of economic loss, typically the purchaser, to assume, allocate, or insure against the very risk.

*Vermeer,* 298 F.Supp.2d at 578 (citing *Hoover,* 276 F.3d at 848). Significantly, *Presnell* focused on the specific duties arising under § 552 and concluded that those existed independent of contractual obligations. Moreover, the type of misrepresentation alleged by Barton Brands is factually distinguishable from simple fraudulent inducement, which as this Court has previously observed, is "essentially the defendant failing to meet the plaintiff's commercial expectations."*Vermeer,* 298 F.Supp.2d at 579.True, part of the Barton Brands misrepresentation claims could be framed as fraudulent inducement claims ("Astec made negligent, false, statements to Barton Brands concerning its experience ... intending to induce Barton Brands to select the Baghouse"). Indeed if the allegations were so limited, the Court would have a more difficult time concluding that the claim satisfied the elements of § 552. However, Count VIII also alleges that Astec "made additional false statements to Barton Brands concerning the cause of the fires occurring in [sic] within the Baghouse System," and that Barton Brand relied on such statements in deciding to continue to operate the system. Such a statement looks less like fraudulent inducement, which would be inseparable from the essence of the parties' agreement. Astec's affirmative duty under § 552 not to supply *false information* would not lend itself as readily to resolution through contract negotiation.

*5 For these reasons, many of the policy reasons for invoking the economic loss doctrine would not seem to apply because the Kentucky Supreme Court has recognized the existence of a duty of care *independent* of contractual obligations. Specifically, here Barton Brands' complaint alleges that Astec made "false statements ... concerning the cause of the fires."The Court therefore concludes that under *Presnell,* such an allegation is sufficient to avoid dismissal for failure to state a claim for relief for negligent misrepresentation.[FN4]

IV.

[5] In contrast to its treatment of the negligent misrepresentation claim, the *Presnell* court affirmed the lower court's dismissal of the contractor's negligent supervision claim, saying that tort "does not articulate a claim that [was] independent of [the construction manager's] contractual duties."*Id.* at 582-83.Notably, the *Presnell* court rested the dismissal on the lack of privity between the parties and avoided mention or discussion of the economic loss rule, despite urging by Justice Keller in his concurring opinion. As a threshold matter, Astec argues that Barton Brands cannot bring a claim for negligence because, as in *Presnell,* the allegations do not "articulate a claim that is independent of" Astec's contractual duties to O'Brien & Gere. *See Presnell,* 134 S.W.3d at 582.This Court must therefore determine whether Barton Brands' negligence claim describe duties that are "independent" of Astec's contract with O'Brien & Gere or if the alleged "negligence ... consists merely in the breach of the contract."*Id.* at 579-80.

Among the allegations described in its negligence claim, Barton Brands says that Astec "breached its duty to Barton Brands by failing to determine that the cause of the fires in the baghouse was the improper and defective design and construction of the baghouse."Absent a contract with Barton Brands, Astec did not owe Barton Brands an affirmative duty to determine the cause of fires. Such an obligation, if it existed at all, would have arisen from the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 7
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.))**

contractual relationship between Astec and O'Brien & Gere, to which Barton Brands was not a party. Therefore, Barton Brands may not pursue a negligence claim against Astec based solely on its failure to determine the cause of the fires in the baghouse since Astec was under no contractual duty to Barton Brands to provide this service. Thus, to the extent that Barton Brands makes such a claim, that allegation fails under *Presnell* since it does not articulate an duty independent any contract with O'Brien & Gere to which Barton Brands was not a party.

The Court now turns its attention to the remaining allegations in Barton Brands' negligence claim. Although it does not purport to bring its claim pursuant to the Kentucky Product Liability Act, the Court agrees with Astec that the remaining allegations of the negligence claim are most properly characterized as a "products liability for the alleged negligent design, fabrication and supplying of the Baghouse System" and as a "products liability claim for the alleged negligent failure to warn that the design and construction of the Baghouse System could result in fires."

**\*6** [6] In a non-commercial transaction this Court has recognized that under Kentucky product liability law, a manufacturer "has a non-delegable duty to provide a product reasonably safe for its foreseeable uses, a duty not abrogated by warning to the immediate purchaser."*Weixler v. Paris Co., Inc.* 2003 WL 105503 (W.D.Ky.2003)(quoting *Montgomery Elevator Co. v. McCullough,* 676 S.W.2d 776, 782 (Ky.1984)). Thus, the question presented here is whether *Presnell* (a services contract case) should cause this Court to reconsider its and the Sixth Circuit's prior predictions that the economic loss doctrine would bar a claim for a negligence claim in a *commercial* products liability case. *See, e.g. Hoover,* 276 F.3d at 848;*Miller's Bottled Gas, Inc. v. Borg-Warner Corp.,* 955 F.2d 1043, 1049-50 (6th Cir.1992); *Vermeer,* 298 F.Supp.2d at 577;*see also Falcon Coal Co. v. Clark Equip. Co.,* 802 S.W.2d 947, 948-49 (Ky.App.1990)(not permitting

recovery against a manufacturer for the economic loss cause when a front-end loader caught fire and destroyed itself).

Here, the Court finds Justice Keller's concurrence in *Presnell* helpful in understanding how the reasoning in the majority *Presnell* opinion would apply to the commercial products liability context. Justice Keller wrote:

> The question, thus, is not whether the damages are physical or economic. Rather the question of whether the plaintiff may maintain an action in tort for purely economic loss turns on the determination of the source of the duty [the] plaintiff claims the defendant owed. A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of duty *arising independently* of any contract duties between the parties, however, may support a tort action.... The phrase "economic loss rule" necessarily implies that the focus on the inquiry under its analysis is on the type of damages suffered by the aggrieved party. However, the relationship between the type of damages suffered and the availability of a tort action is inexact at best ... confusion can be avoided, however, by maintaining the focus on the source of the duty alleged to have been violated.

*Presnell,* 134 S.W.3d at 589 (Keller, J., concurring). Justice Keller's explanation is consistent the earlier prediction of the Sixth Circuit that, although Kentucky has declined to extend the economic loss rule to consumer purchases, *see, e.g. Real Estate Mktg.. Inc. v. Franz,* 885 S.W.2d 921 (Ky.1994), the economic loss rule would "bar a tort claim in a case that involves a business purchase."*Hoover,* 276 F.3d 845, 849 (6th Cir.2002). The "source of the duty" would not lie in common law or under statute, but rather as a result of a contract. Therefore, because the economic loss rule would bar a tort claim based on destruction to a defective product, there could be no "duty" existing independent of contractual obligations.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)                                    Page 8
**(Cite as: --- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.))**

**\*7** Next the Court addresses Barton Brands' argument that because it is claiming damage to property other than defective product (the baghouse bags purchased from third parties), the economic loss rule should not bar recovery. In the context of products liability, prior to *Presnell,* the Sixth Circuit had described economic loss as "both loss in the value of a product caused by a defect in the product (direct economic loss) and consequential loss flowing from the defect, such as lost profits (consequential economic loss)".*Hoover,* 276 F.3d at 848 (citing Louis R. Frumer & Melivn I. Friedman, Products Liability, § 13.11[1] (2000)). In its Amended Complaint, Barton Brands seeks compensation from O'Brien & Gere for "lost profits, damages, increased production costs, replacement costs and expenses, prejudgment interest, out-of-pocket expenses."Barton Brands also says that the final catastrophic fire "damaged thousands of dollars in the bags in the baghouse which Barton Brands had purchased from third parties, all property separate from the product itself."Pl.s' Resp. to Astec's Mot. to Dismiss 11. With the possible exception of the bags, all of the damage Barton Brands claims appears to fall within the *Hoover* definition of economic loss. But, as noted above, in *Presnell,* the Kentucky Supreme Court allowed recovery for economic loss for a negligent misrepresentation claim, which it defined to include "a monetary loss such as lost wages or lost profits."134 S.W.3d at 577.However, the Court is convinced that the differences between which damages are recoverable under a claim for negligence as opposed to negligent misrepresentation depends on the source of the duty. It is therefore not inconsistent to find that the economic loss doctrine would bar recovery in negligence but not negligent misrepresentation.

Recovery, in this case turns on "what, exactly, constitutes property 'other' than the defective product."*Bowling Green Mun. Util. v. Thomasson Lumber Co.,* 902 F.Supp. 134, 138 (W.D.Ky.1995). The Sixth Circuit faced the question of whether component parts constituted part of a product and

concluded "the Kentucky Supreme Court would hold that the product for economic loss rule purposes includes the entire unit for which a party to a complex commercial transaction has the ability to distribute risk by contract and insure against loss."*Hoover,* 276 F.3d at 849.Here, because the baghouse bags were stored inside the baghouse, the Court agrees with Astec that they were not separate from the Baghouse System, but rather constituted components, recovery of which would be barred by the economic loss rule.

Barton Brands' negligence claim seeks lost expectancy which arises "merely in the breach of a contract."Under *Presnell* and consistent with prior predictions of this Court and the Sixth Circuit, such a claim is not actionable under Kentucky law. While Barton Brands' claim for negligence against Astec fails, as noted above, the negligent misrepresentation claim survives.

### V.

**\*8** Finally, the Court considers Astec's motion to dismiss the cross-claim against it by O'Brien & Gere, which seeks complete indemnity from Astec in the event that liability is assessed against it by Barton Brands. Because the Court finds that Barton Brands' negligent misrepresentation claim survives, Astec does not cease to be a "co-party" and its Fed.R.Civ.P. 13(g) argument is inapplicable.

The Court further agrees with O'Brien & Gere, that liability to a plaintiff is not a prerequisite for a viable indemnity claim against the ultimate responsible party. *See, e.g. Degener v. Hall Contracting Corp.,* 27 S.W.3d 775, 782 (Ky.2000); *see also Affholder v. Preston Carroll Co., Inc.,* 27 F.3d 232, 234 (6th Cir.1994). The Court has found that the economic loss doctrine does not bar Barton Brands' claim for negligent misrepresentation, and therefore Astec, as the common law indemnitee, could conceivably be held liable for O'Brien & Gere's negligence. *See, e.g. Hutt v. Gibson Fiber Glass Prods., Inc.,* 914 F.2d 790, 794 (6th Cir.1990).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                        Page 9
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.))**

The Court will enter an order consistent with this Memorandum Opinion.

> FN1. According to Barton Brands' Amended Complaint, "A baghouse is a pollution control device used to control particulate and other emissions."The Baghouse System consists of a baghouse, a dust storage and ash handling system for the collection and disposal of ash from the baghouse, a dry scrubbing additive silo system, draft fan and discharge stack, and related electrical components, controls, monitors, and ductwork. Pl.'s Resp. to Mot. to Dismiss Astec 11.

> FN2. Quoting § 552"Information Negligently Supplied for the Guidance of Others,"*Presnell* defined negligent misrepresentation as follows:

> (1) One who, in the course of his business profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so in-

> tends or in a substantially similar transaction.

> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefits the duty is created, in any of the transactions in which it its intended to protect them.

> *Id.* at 580 (quoting RESTATEMENT (SECOND) OF TORTS § 552 (1977)).

> FN3. By contrast, in *Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 955 F.2d 1043, 1053 (6th Cir.1992), a products liability case, the Sixth Circuit had concluded that Kentucky "would not allow recovery under a theory of negligent misrepresentation."Similarly, prior to *Presnell*, this Court had concluded that a negligent misrepresentation claim would be precluded, as a matter of Kentucky law, by the economic loss doctrine.*Ohio Cas. Ins. Co. v. Vermeer Mfg. Co.*, 298 F.Supp.2d 575, 579 (W.D.Ky.2004).

> FN4. Astec argues that the negligent representation claim should fail because it has not been pled with particularity. Def.'s Mot. to Dismiss. Am. Compl. 11. The Court disagrees and finds that Astec has provided fair notice of its claim and the grounds on which it rests.

W.D.Ky.,2008.
Barton Brands, Ltd. v. O&apos;Brien &amp; Gere, Inc. of North America
--- F.Supp.2d ----, 2008 WL 819068 (W.D.Ky.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 1381652 (E.D.Ark.)
**(Cite as: 2007 WL 1381652 (E.D.Ark.))**

Page 1

Boshears v. Certainteed Corp.
E.D.Ark.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Arkansas,Western
Division.
Gaylon W. BOSHEARS, as Trustee of the Gaylon
W. Boshears Revocable Trust, Caroline B. Bos-
hears, as Trustee of the Caroline B. Boshears Re-
vocable Trust, and Wanda Menasco, as Trustee of
the Frankie Boshears Marital Trust and Boshears
Family Trust, Plaintiffs
v.
CERTAINTEED CORPORATION, Defendant.
**No. 4:05CV01052-WRW.**

May 10, 2007.

Albert Janney Thomas, III, Rose Law Firm, Little
Rock, AR, for Plaintiffs.
Kyle Ray Wilson, Wright, Lindsey & Jennings,
Little Rock, AR, for Defendant.

### ORDER

WM. R. WILSON, JR., United States District
Judge.
*1 Pending is Defendant's Motion for Summary
Judgment,[FN1] to which Plaintiffs have
responded.[FN2] Defendant replied to Plaintiffs' re-
sponse,[FN3] and Plaintiffs filed a surreply.[FN4]

> FN1. Doc. No. 15.

> FN2. Doc. No. 20.

> FN3. Doc. No. 23.

> FN4. Doc. No. 28.

Plaintiffs, the owners of a shopping center-Trellis
Square-brought this case against Defendant, Cer-
tainTeed Corporation, a roofing material manufac-
turer, alleging negligence, product liability, breach
of implied warranties, fraud, and deceptive trade

practices.

Plaintiffs are seeking compensatory and punitive
damages. According to the Complaint,[FN5] Defend-
ant supplied defective roofing materials to
Plaintiffs, which leaked and caused damage to the
building's interior. Plaintiffs assert that Defendant
knew that the material was defective and, therefore,
engaged in fraud and deceptive trade practices.

> FN5. Doc. No. 1.

For its motion for summary judgment, Defendant
argues that Plaintiffs cannot present sufficient evid-
ence to establish the essential elements of their
causes of action.

### I. Background

Plaintiffs own a shopping center comprised of three
separate buildings-identified as buildings A,
B/C,[FN6] and D. Roofing materials were purchased
by Robert Hall Roofing in January, August, and
September 2001 on behalf of Plaintiffs. Materials
manufactured by Defendant were installed on build-
ings B/C and D. Materials from another manufac-
turer were installed on building A.

> FN6. Building B/C was originally two sep-
> arate buildings that were joined together
> before the installation of the new roof in
> 2001.

Soon after the new roofs were installed, Plaintiffs
began having problems with the roofs on buildings
B/C and D. In contrast, they had no complaints
about building A's roof. The problems increased to
such a degree that, by 2003, Plaintiffs asked De-
fendant about its warranty. In response, Defendant
delivered a warranty to Plaintiffs that included a
provision which expressly limited any implied war-
ranties of merchantability or fitness for a particular
purpose.[FN7] The roofs on buildings B/C and D
continued to deteriorate.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN7. Doc. No. 20.

In 2005, Plaintiffs made a complaint to Defendant because of "leaking and laps pulling apart." [FN8] In response, Defendant asked Plaintiffs to provide a roof sample. [FN9] After delivering the sample, Plaintiffs received a letter from Defendant's quality manager, who informed them that the problems resulted from poor installation, and was not the result of granule loss. [FN10] The quality manager mentioned that he examined the sample. [FN11] However, no attempt was made to test the sample, and it was eventually lost. [FN12]

FN8. Doc. No. 15-3.

FN9. Doc. No. 15-11.

FN10. Doc. No. 20-7.

FN11. *Id.*

FN12. Doc. No. 20-8.

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. [FN13] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

FN13. *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); Fed R. Civ. P. 56.

The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. [FN14]

FN14. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

**\*2** The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme

remedy that should only be granted when the movant has established a right to the judgment beyond controversy. [FN15] Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains. [FN16] I must view the facts in the light most favorable to the party opposing the motion. [FN17] The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

FN15. *Inland Oil & Transport Co. v. United States,* 600 F.2d 725, 727 (8th Cir.1979).

FN16. *Id.* at 728.

FN17. *Id.* at 727-28.

[T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.,* "[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted. [FN18]

FN18. *Counts v. MK-Ferguson Co.,* 862 F.2d 1338, 1339 (8th Cir.1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.,* 838 F.2d 268, 273-74 (8th Cir.1988) (citations omitted)).

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. [FN19]

FN19. *Anderson,* 477 U.S. at 248.

## III. Authority

Slip Copy                                                                                           Page 3
Slip Copy, 2007 WL 1381652 (E.D.Ark.)
(Cite as: 2007 WL 1381652 (E.D.Ark.))

## A. Products Liability

To recover under a strict-liability theory, a plaintiff must prove that the defendant supplied a product in a defective condition that rendered it unreasonably dangerous and that the defective condition was the proximate cause of harm to a plaintiffs' property.[FN20] Plaintiffs must produce sufficient evidence to raise an inference that the product was not only defective, but was also unreasonably dangerous.[FN21]

> FN20. Ark.Code Ann. § 4-86-102(a) (Repl.1996) (Amended by 2007 Arkansas Laws, Act 316 (S.B.906)); *E.I. Du Pont de Nemours & Co. v. Dillaha*, 280 Ark. 477 (1983).

> FN21. *Farm Bureau Ins. Co. v. Case Corp.*, 317 Ark 467 (1994).

Strict liability is applied where there is damage to the *product itself* or to *other property* of the consumer.[FN22] The Arkansas Supreme Court, in *Blagg v. Fred Hunt Co.*, stated that "there is no valid reason for holding that strict liability should not apply to property damage."[FN23]

> FN22. *Id.* (citing *Alaskan Oil, Inc. v. Central Flying Service*, 975 F.2d 553 (8th Cir.1992); and *Blagg v. Fred Hunt Co., Inc.*, 272 Ark. 185 (1981)).

> FN23. *Blagg*, 272 Ark. at 190.

For a product to be unreasonably dangerous under Arkansas law, the product failure must be something that a reasonable buyer or user did not expect.[FN24] Unreasonably dangerous includes posing a risk not only to the consumer, but to the product itself or to a consumer's property.[FN25]

> FN24. Ark.Code Ann. § 16-116-102(7) (Repl.1996) (Amended by 2007 Arkansas Laws Act, 315 (S.B.905)); *Purina Mills, Inc. v. Askins*, 317 Ark. 58 (1994); *Berkeley Pump Co. v. Reed-Joseph Land Co.*,

> 279 Ark. 384 (1983).

> FN25. *Berkeley Pump*, 279 Ark. at 390 (stating that the Restatement of Torts limits its recovery in strict liability to physical harm to persons or property).

The doctrine of strict liability does not change the burden of proof as to the existence of a flaw or defect in a product, but it does do away with the necessity of proving negligence in order to recover for injuries resulting from a defective product.[FN26]

> FN26. *Williams v. Smart Chevrolet Co.*, 292 Ark. 376 (1987).

The fact that a defective condition was discovered after an incident is not sufficient proof that a product is defective.[FN27] Expert testimony is not essential to the claim: "proof of a specific defect is not required when common experience teaches that the accident would not have occurred in the absence of a defect."[FN28] Moreover, if a plaintiff excludes other possible causes of product failure, then a defect can be properly inferred.[FN29]

> FN27. *Id.*

> FN28. *Dancy v. Hyster Co.*, 127 F.3d 649, 653 (8th Cir.1997).

> FN29. *Id.*

## B. Negligence

*3 Proof of an accident is not sufficient to make out a claim for negligence.[FN30] In order to prove negligence, there must be a failure to exercise proper care in performing a duty of care that is owed to others.[FN31] Applying these standards, Plaintiffs must raise an inference that Defendant failed to do what a reasonable person would do or did what a reasonable person would not have done under the circumstances. Proof of negligence can be established by showing that a manufacturer failed to use due care in discovering an obvious defect.[FN32]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1381652 (E.D.Ark.)
(Cite as: 2007 WL 1381652 (E.D.Ark.))

Page 4

> FN30.*Coca-Cola Bottling Co. v. Gill,* 352 Ark. 240 (2003).

> FN31.*Costner v. Adams,* 82 Ark.App. 148 (2003).

> FN32.*Stalter v. Coca-Cola Bottling Co. of Arkansas,* 282 Ark. 443, (1984) (citing *Kraft-Phenix Cheese Corp. v. Spelce,* 195 Ark. 407, 409 (1938) (holding that proof of an obvious defect was sufficient to make a *prima facie* case, and warranted submitting question of negligence to jury)).

Whether a duty is owed is a question of law, but the question of foreseeability and causation are usually questions of fact.[FN33] A manufacturer has a duty to consumers to exercise reasonable care in the adoption of a safe plan or design, and to protect against an unreasonable and foreseeable risk.[FN34] A manufacturer must use care in selection of materials, testing, and inspection.[FN35]

> FN33.*Gill,* 352 Ark. at 254.

> FN34.*International Harvester Co. v. Land,* 234 Ark. 682, 688 (1962) (holding that a manufacturer must use reasonable care and skill in designing a product that is safe for its intended purpose)).

> FN35. Arkansas Model Jury Instruction 1001 (2006) (citing *Green v. Equitable Powder Mfg. Co.,* 95 F.Supp. 127 (D.C.Ark.1951)).

A negligent act is one from which a person should have foreseen a risk, and should have either chosen not to act, or chosen to act carefully.[FN36] Plaintiffs must establish an inference that Defendant should have foreseen a risk of damage.[FN37]

> FN36.*Ethyl Corp. v. Johnson,* 345 Ark. 476, 481 (2001).

> FN37.*Wallace v. Broyles,* 331 Ark. 58 (1998).

**C. Implied Warranties of Merchantability and Fitness for a Particular Purpose**

To recover for breach of an implied warranty of merchantability, a plaintiff must prove that (1) he sustained damages; (2) the product was not merchantable, i.e., not fit for the ordinary purpose for which such goods are used; (3) this unmerchantable condition was a proximate cause of the damages; and (4) he was a person whom the defendant might reasonably expect to use or be affected by the product.[FN38]

> FN38.*F.L. Davis Builders Supply, Inc. v. Knapp,* 42 Ark.App. 52 (1993).

"The implied warranty of fitness for a particular purpose merges with the warranty of merchantability when the particular purpose for which the goods are used coincides with their general functional use ."[FN39] In other words, if the particular purpose of the product is roofing, then Plaintiffs only need to prove the elements for breach of the implied warranty of merchantability.[FN40]

> FN39.*Great Dane Trailer Sales, Inc. v. Malvern Pulpwood, Inc.,* 301 Ark. 436, 443 (1990) (citing *Beech Aircraft Corp. v. Flexible Tubing Corp.,* 270 F.Supp. 548 (D.Conn.1967)).

> FN40.*Id.*

"An implied warranty of merchantability arises by operation of law when a purchaser and merchant enter into a contract unless the warranty is *effectively* disclaimed."[FN41] Disclaiming implied warranties is governed by Ark.Code Ann. § 4-2-316. Under this section, all implied warranties are excluded by expressions of "as is," "with all faults," or "other plain language which calls the buyer's attention to the exclusion of warranties and makes clear that there is no implied warranty."[FN42] The disclaimer clause must be conspicuous so that a reasonable person could notice it, and it must be brought to the attention of the buyer at the time of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1381652 (E.D.Ark.)
(Cite as: 2007 WL 1381652 (E.D.Ark.))

Page 5

the sale.[FN43]

> FN41.*LeSueur Creamery, Inc. v. Haskon, Inc.,* 660 F.2d 342, 352 (8th Cir.1981) (emphasis added).

> FN42.*O'Mara v. Dykema,* 328 Ark. 310, 319 (1997).

> FN43.*Mack Truck of Arkansas, Inc. v. Jet Asphalt & Rock Co.,* 246 Ark. 101, 108-09 (1969).

**D. Deceptive Trade Practices**

To be liable under the Arkansas Unfair and Deceptive Trade Practices Act,[FN44] Defendants must have "knowingly" engaged in "deceptive and unconscionable trade practices."[FN45] The Act also imposes a causation element by requiring, "actual damage or injury as a result of the offense or violation."[FN46] Deceptive conduct includes making a false representation about the characteristics or certification of goods.[FN47] There is also a catch-all provision which prohibits "any other unconscionable, false, deceptive act or practice."[FN48]

> FN44.Ark.Code Ann. §§ 4-88-101-115.

> FN45.Ark.Code Ann. § 4-88-107(a).

> FN46.Ark.Code Ann. § 4-88-113(f).

> FN47.Ark.Code Ann. § 4-88-107(a)(1).

> FN48.Ark.Code Ann. § 4-88-107(a)(10).

**E. Fraud**

**\*4** In order to establish fraud, Plaintiffs must present sufficient evidence to raise an inference that Defendant (1) made a false representation of material fact; (2) knew that the representation was false or that there was insufficient evidence upon which to make the representation; (3) intended to induce action or inaction by Plaintiffs in reliance upon the representation; (4) Plaintiffs justifiably relied on the representation; and (5) Plaintiffs suffered dam-

age as a result of the false representation.[FN49]

> FN49.*Wal-Mart Stores, Inc. v. Coughlin,* No. CV-2005-1342-3, 2007 WL 1098162 (April 12, 2007).

**IV. Discussion**

All reasonable inferences are given to Plaintiffs' evidence, and the evidence establishes the following facts: (1) Plaintiffs purchased roofing material from Defendant in 2001; (2) by 2003, the roof on buildings B/C and D had deteriorated at a much greater rate than the roof on building A; (3) visual inspection of Defendant's roofing material revealed obvious imperfections including excessive granule loss on large sections of the roof; (4) Defendants delivered a warranty to Plaintiffs' representative two years after the roof was installed.

Defendant contends that Plaintiffs have not submitted sufficient proof to create a reasonable inference that its product was defective, that it was manufactured in a negligent manner, and that it is subject to implied warranties. I disagree.

**A. Product Liability**

Plaintiffs presented testimony from experts that there are large areas of the roof where roofing granules are worn away, leaving the underneath layer exposed to the elements, susceptible to damage, and to early depreciation.[FN50] According to the experts, the proportion and pattern of the granule loss is consistent with a manufacturing defect.[FN51] This testimony eliminates other causes of granular loss,[FN52] and Plaintiffs have presented sufficient evidence to create a reasonable inference that Defendant's roofing material was defective.

> FN50. Doc. No. 20-2, pp. 51-53; 20-3, p. 16.

> FN51. Doc. No. 20-3, p. 11; 20-2, p. 51.

> FN52. Doc. No. 20-2, pp. 53-55.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 6
Slip Copy, 2007 WL 1381652 (E.D.Ark.)
**(Cite as: 2007 WL 1381652 (E.D.Ark.))**

Finally, it is within common understanding that, when the composition of a roof begins to wear away in large sections, this would not have occurred unless there is a defect. A jury could reasonably conclude that, when a roof's protective layer prematurely falls off, the roofing material was defective.

## B. Negligence

Manufacturers owe a duty to their customers to provide functional products. To conform to this duty, a manufacturer must use care in selection of materials, testing, and inspection. Proof of negligence can be established by showing that a manufacturer failed to use care in discovering an obvious defect.

Plaintiffs' evidence shows that there is an obvious glitch in large areas of the roofs on buildings B/C and D. The thinning of the granules was apparent to the Plaintiffs' expert on simple visual inspection.[FN53]Moreover, Plaintiffs began to notice missing granules just two years after the roof was installed.[FN54]

> FN53. Doc. No. 20-2, p. 55.

> FN54. Doc. No. 20-5.

From this evidence, a reasonable inference is raised that Defendant failed to use care in testing and inspecting their product. Otherwise, Defendant would have noticed that the granules came loose much too easily.[FN55]Moreover, when Plaintiffs sent a sample of the product to Defendant in 2005, no tests were performed, and the sample was discarded.[FN56]From this evidence, a reasonable juror could conclude that Defendant was lackadaisical in testing its products.

> FN55. Doc. No. 20-3, p. 11 (testimony that any manufacturing process will have defects-the goal is not to let them through).

> FN56. Doc. No. 20-8.

## C. Implied Warranties

**\*5** The implied warranty of fitness for a particular purpose merges with the warranty of merchantability when the product is used in a manner for which it was designed. In this case-the product is used to install roofs and Plaintiffs used it for that purpose. Therefore, Plaintiffs need only show that Defendant breached the implied warranty of merchantability.

The evidence supporting Plaintiffs' products claim and negligence claim is also sufficient to create an inference that Defendant breached an implied warranty of merchantability.

Defendant argues that its limited warranty expressly excludes implied warranties of merchantability. However, in order for an exclusion to be effective, it must be brought to the buyer's attention at the time of purchase.

Defendant asserts that the warranty was given to the roofing company when the material was purchased. Plaintiffs' representative affirms that he did not see a warranty until two years after the product was purchased.[FN57]Moreover, the limited warranty submitted into evidence has a notation at the bottom indicating that the warranty was revised in 2003. This presents a problem for Defendant's proof, since the roof was installed in 2001.[FN58]There is enough evidence to create a disputed material fact, and it is up to the jury to decide if proper notice was given at the time of purchase.

> FN57. Doc. No. 20-5.

> FN58. Doc. No. 20-6.

## D. Fraud and Deceptive Trade Practices

Plaintiffs have a higher burden to establish a case for fraud and deception. The common law tort of fraud and the Deceptive Trade Practice Act require that a defendant act "knowingly." The Arkansas Supreme Court recognized a close connection between fraud and deceptive trade practices allegations.FN59

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN59.*FMC Corp., Inc. v. Helton,* 360 Ark. 465, 490 (2005).

Under both claims, Plaintiffs must show that Defendant knew that its product was defective and made material misrepresentations in order to induce Plaintiffs to buy a faulty product.[FN60] A good-faith belief in a product is not a basis for a finding of fraud or deception.[FN61] Therefore, Plaintiffs failed to produce any evidence that Defendant knowingly deceived and defrauded them.

> FN60.*McAnally v. Gildersleeve,* 16 F.3d 1493 (8th Cir.1994) (applying Arkansas common law and holding that plaintiff must demonstrate that a defendant knew the misrepresentation was false when made).

> FN61.*Delta School of Commerce, Inc. v. Wood,* 298 Ark. 195 (1989).

**V. Conclusion**

Plaintiffs have produced sufficient evidence to create a jury question on its theories of strict product liability, negligence, and implied warranty. These claims do not require proof of intentional conduct. But, there is not enough evidence to support Plaintiffs' claims of fraud and deceit.

Defendant's Motion for Summary Judgment is DENIED in part and GRANTED in part. Plaintiffs' claims of fraud and violation of the Arkansas Deceptive Trade Practice Act are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

E.D.Ark.,2007.
Boshears v. Certainteed Corp.
Slip Copy, 2007 WL 1381652 (E.D.Ark.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

▷
Brazier v. Hasbro, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
Kevin BRAZIER, individually and as personal rep-
resentative of the Estate of Robert J. Brazier, de-
ceased, known as "Robbie," Plaintiffs,
v.
HASBRO, INC. and Toys "R" US, Inc., Defend-
ants.
**No. 99 Civ.11258(MBM).**

March 16, 2004.

**Background:** Personal representative of child's es-
tate brought diversity action against toy manufac-
turer claiming strict product liability, breach of
warranty, negligence, and punitive damages.

**Holdings:** On manufacturer's motion for summary
judgment, the District Court, Mukasey, J., held that:
(1) negligence and breach of warranty claims
against toy manufacturer were preempted by Child
Safety Protection Act (CSPA) to extent that they al-
leged warning defects;
(2) breach of warranty claim against toy manufac-
turer was not preempted by CSPA to extent that it
was based upon allegation that manufacturer
breached implied warranty of merchantability by
marketing toy that was not fit for ordinary use;
(3) breach of warranty claim against toy manufac-
turer was preempted by CSPA to extent that it was
based upon breach of express warranty;
(4) breach of implied warranty of merchantability
cause of action could not be maintained against toy
manufacturer under New York law based upon
claim that ball was not minimally safe for its pur-
pose;
(5) strict product liability cause of action could not
be maintained against toy manufacturer under New
York law based upon foreseeable misuse of ball;
(6) negligence claim against toy manufacturer was
not preempted by CSPA on theory that manufac-

turer was liable for distributing and selling defect-
ively designed product; and
(7) appearance of ball or product's packaging was
not substantial factor in causing child to die from
asphyxiation.

Motion granted in part and denied in part.

West Headnotes

**[1] Products Liability 313A ⟐60**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
            313Ak60 k. Toys, Games, and Athletic or
Recreational Equipment. Most Cited Cases

**Sales 343 ⟐427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for
Breach of Warranty
            343k427 k. Right of Action. Most Cited
Cases

**States 360 ⟐18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemp-
tion or Supersession. Most Cited Cases

**States 360 ⟐18.65**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.65 k. Product Safety; Food and
Drug Laws. Most Cited Cases
Negligence and breach of warranty claims against
toy manufacturer were preempted by Child Safety
Protection Act (CSPA), to extent that they alleged

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

warning defects, in lawsuit brought by personal representative of child's estate under New York law after child died due to asphyxiation caused by ball, since manufacturer's warnings complied with federal labeling requirements for toys containing small balls, and such claims effectively sought to impose additional labeling requirements upon manufacturer above and beyond what was required by CSPA. 15 U.S.C.A. § 1278.

**[2] Sales 343 €══427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k427 k. Right of Action. Most Cited Cases

**States 360 €══18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Breach of warranty claim against toy manufacturer was not preempted by Child Safety Protection Act (CSPA), to extent that it was based upon allegation that manufacturer breached implied warranty of merchantability by marketing toy that was not fit for ordinary use, in lawsuit brought by personal representative of child's estate under New York law after child died due to asphyxiation caused by ball. 15 U.S.C.A. § 1278.

**[3] Sales 343 €══427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k427 k. Right of Action. Most Cited Cases

**States 360 €══18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Breach of warranty claim against toy manufacturer was preempted by Child Safety Protection Act (CSPA), to extent that it was based upon breach of express warranty, in lawsuit brought by personal representative of child's estate under New York law after child died due to asphyxiation caused by ball. 15 U.S.C.A. § 1278.

**[4] Sales 343 €══284(1)**

343 Sales
    343VI Warranties
        343k281 Breach
            343k284 Warranty of Quality, Fitness, or Condition
                343k284(1) k. In General. Most Cited Cases
Breach of implied warranty of merchantability cause of action could not be maintained against toy manufacturer under New York law, based upon claim that ball was not minimally safe for its purpose, in lawsuit brought by personal representative of child's estate after child died due to asphyxiation caused by ball, since purpose of ball was for throwing, catching, bouncing, and rolling, but purpose did not include warranty that ball was fit for safe insertion into child's mouth. McKinney's Uniform Commercial Code § 2-314(2)(c).

**[5] Products Liability 313A €══60**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
            313Ak60 k. Toys, Games, and Athletic or Recreational Equipment. Most Cited Cases
Strict product liability cause of action could not be maintained against toy manufacturer under New York law, based upon foreseeable misuse of ball, in lawsuit brought by personal representative of child's estate after child died due to asphyxiation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

caused by ball, since child was not using ball for normal purpose or in normal manner.

**[6] Products Liability 313A ⊱60**

313A Products Liability
   313AI Scope in General
      313AI(B) Particular Products, Application to
         313Ak60 k. Toys, Games, and Athletic or
Recreational Equipment. Most Cited Cases

**States 360 ⊱18.65**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.65 k. Product Safety; Food and
Drug Laws. Most Cited Cases
Negligence claim against toy manufacturer was not preempted by Child Safety Protection Act (CSPA), on theory that manufacturer was liable for distributing and selling defectively designed product, in lawsuit brought by personal representative of child's estate under New York law after child died due to asphyxiation caused by ball. 15 U.S.C.A. § 1278.

**[7] Products Liability 313A ⊱60**

313A Products Liability
   313AI Scope in General
      313AI(B) Particular Products, Application to
         313Ak60 k. Toys, Games, and Athletic or
Recreational Equipment. Most Cited Cases
Personal representative failed to show, on design defect claim against toy manufacturer under New York law, that appearance of ball or product's packaging was substantial factor in causing child to die from asphyxiation, on theory that child was inspired to put ball in his mouth in misguided attempt to access character suspended within; although mother asserted that child did not put non-food items into his mouth, occupational therapist reported that child had history of putting non-food items in his mouth.

**[8] Evidence 157 ⊱474.5**

157 Evidence
   157XII Opinion Evidence
      157XII(A) Conclusions and Opinions of Witnesses in General
         157k474.5 k. Subjects of Opinion Evidence in General. Most Cited Cases
Opinion of mother, as lay witness, was not admissible, as to why her child put ball into his mouth, in lawsuit against toy manufacturer after child died due to asphyxiation caused by ball, since mother did not have any actual knowledge or information about how ball came to be placed in child's mouth. Fed.Rules Evid.Rule 701, 28 U.S.C.A.

**[9] Evidence 157 ⊱537**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
         157k537 k. Bodily and Mental Condition.
Most Cited Cases

**Evidence 157 ⊱555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and Sufficiency. Most Cited Cases
In lawsuit against toy manufacturer after child died due to asphyxiation caused by ball, opinion of expert in engineering and quality assurance in toy design was not admissible, that child was inspired to put ball in his mouth in misguided attempt to access character suspended within, since engineer did not have any expertise in child psychology or behavior that would have rendered him specially qualified to discern child's personal motivation, and opinion lacked factual basis. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[10] Damages 115 ⊱91.5(4)**

115 Damages
   115V Exemplary Damages

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

115k91.5 Grounds for Exemplary Damages
    115k91.5(4) k. Products Liability. Most
Cited Cases
  (Formerly 115k91(1))
Toy manufacturer was not liable for punitive dam-
ages under New York law, in lawsuit brought by
personal representative of child who died due to as-
phyxiation caused by ball, since personal represent-
ative failed to show that manufacturer acted with
conscious indifference by marketing toy with
knowledge that product posed risk of potentially
catastrophic harm to children, or that manufacturer
had knowledge about any potential danger from
that product.

Jay W. Danker, Danker & Milstein, P.C., New
York, NY, for Plaintiffs.
Gerald Neal Swartz, New York, NY, for Defend-
ants.

OPINION & ORDER

MUKASEY, J.
*1 Plaintiff Kevin Brazier ("Brazier"), acting indi-
vidually and as personal representative of the estate
of his son Robert J. Brazier ("Robert"), sues de-
fendants Hasbro, Inc. ("Hasbro"), and Toys "R" Us,
Inc. ("Toys "R" Us"), to recover for Robert's death,
which resulted from choking on a Pokemon Power
Bouncer-a toy ball-that was imported and distrib-
uted by Hasbro and sold by Toys "R" Us. Brazier
asserts claims against both defendants for strict
products liability, breach of warranty, negligence,
and punitive damages.[FN1] Defendants move for
summary judgment on all claims, and Brazier
moves for an order pursuant to Rule 11 of the Fed-
eral Rules of Civil Procedure imposing sanctions
against defendants for filing this summary judg-
ment motion. For the reasons set forth below, de-
cision will be deferred on that part of Brazier's neg-
ligence claim which asserts that the Pokemon
Power Bouncer was defectively designed because
of its size so as to give the parties the chance to
submit additional papers relating to the admissibil-
ity of Brazier's experts' testimony. Defendants'
summary judgment motion is granted as to other

claims, and Brazier's Rule 11 motion is denied.

> FN1. Brazier also asserted claims for neg-
> ligent infliction of emotional distress, but
> has since stipulated to the dismissal of
> these claims.

I.

The following facts are either undisputed or presen-
ted in the light most favorable to Brazier.

On January 11 and January 29, 1999, Adrienne Bra-
zier purchased a total of four Pokemon Power
Bouncers from Toys "R" Us [FN2] for her three sons,
Daniel, Robert, and Michael. (Deposition of Ad-
rienne Brazier ("A. Brazier Dep.") at 38-39, 44, 46)
A Pokemon Power Bouncer is a toy ball with a
1.72" diameter; it is made of translucent rubber and
has a figure of a Pokemon character suspended in-
side. (Deposition of Defendant Hasbro, Inc., by
Malcolm Denniss at 26; Defendants' Motion Exhib-
it ("Def.Ex.") B) When Adrienne Brazier purchased
the Pokemon Power Bouncers, the following warn-
ing appeared on the bottom left corner of the
product's packaging: "WARNING: CHOKING
HAZARD-Toy contains small ball. Not for children
under 3 years."(Def.Ex. C) The bottom right corner
of the packaging contained the statement, "AGES 4
AND UP." (Id.) Adrienne Brazier read all of these
statements before purchasing the balls. (A. Brazier
Dep. at 61-62)

> FN2. Hasbro distributed the Pokemon
> Bouncer to retailers in the United States.
> (Deposition of Defendant Hasbro, Inc., by
> Malcolm Denniss at 24, 33)

Between January 11 and January 30, 1999, Daniel,
Robert, and Michael played with the Pokemon
Power Bouncers once or twice a day by bouncing,
rolling, and catching them. (Id. at 53-54) Robert
Brazier, who was born on March 31, 1991, suffered
from a form of autism known as Pervasive Devel-
opmental Disorder, and as of January 30, 1999, he
spoke only a few words. (Id. at 6-7, 55-56; Affi-

Not Reported in F.Supp.2d                                                        Page 5
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

davit of Kevin Brazier ¶ 6) Robert's toys included assorted balls of different sizes, including some that were smaller than the Pokemon Power Bouncer. (A. Brazier Dep. at 65-68) Adrienne Brazier said she never saw Robert put any of these balls in his mouth, but she was told in spring 1998 by Robert's occupational therapist that Robert required close supervision during tabletop activities at school because he had a tendency to put non-food items in his mouth. (*Id.* at 77, 89-91, 94-96; Def. Ex. G)

**\*2** In the early afternoon of Saturday, January 30, 1999, Adrienne Brazier was at home with Daniel, Robert, and Michael. (A. Brazier Dep. at 109-10) Daniel and Michael were talking on the stairs when they saw Robert enter from the living room, making hacking noises and pointing to his throat. (Deposition of Daniel Brazier at 8) When Robert opened his mouth, Daniel could see a Pokemon Power Bouncer inside. (*Id.* at 8) Daniel, who was one day shy of his tenth birthday, performed the Heimlich maneuver on Robert with no success.(*Id.* at 23; A. Brazier Dep. at 6) Adrienne Brazier heard Daniel screaming that Robert was choking, and she found the boys in the dining room. (A. Brazier Dep. at 119-21) As Daniel went to call 911, Adrienne continued to perform the Heimlich maneuver on Robert. (*Id* . at 124-26) After Adrienne went outside and yelled for help, neighbors arrived and joined in the efforts to save Robert, and the Fire Department arrived as well. (*Id.* at 129-31, 136) Robert was rushed by ambulance to the hospital, where he arrived with the ball still lodged in his airway. (*Id.* at 144-46) He died shortly thereafter from asphyxiation. (*Id.* at 146)

Kevin Brazier filed the present action on November 12, 1999.[FN3] Because the Braziers reside in New York and neither defendant is a New York domiciliary, jurisdiction in this case is based on diversity of citizenship.

> FN3. On March 20, 2001, Brazier served an amended complaint on defendants. For reasons that are not clear, this amended complaint does not appear on the docket

for this case, but the docket does contain numerous copies of the amended complaint attached to assorted certificates of mailing and summons. Defendants filed an answer to the amended complaint, which is docketed, and have attached both the original complaint and the amended complaint to their summary judgment motion. The complaints are virtually identical in all respects that are relevant to this summary judgment motion. Accordingly, I will direct the amended complaint to be docketed, and I cite to both versions of the complaint throughout this opinion.

## II.

[1] Brazier's negligence and breach of warranty claims are based in part on the contention that the warnings on the packaging of the Pokemon Power Bouncer were inadequate. Specifically, Brazier alleges that defendants' warnings were defective because they: (1) stated that the Pokemon Power Bouncer was intended for "ages 4 and up," which implied that the toy was safe for children over the age of 3; (2) stated that the Pokemon Power Bouncer presented a choking hazard for "children under 3 years," which implied that children aged 3 and up were in no danger of choking; and (3) failed to warn purchasers and users of the risks presented by the Pokemon Power Bouncer. (*See* Complaint ("Compl.") ¶ 14a, 14e, 14f, 20; Amended Complaint ("Am.Compl.") ¶¶ 22a, 22e, 22f, 28) However, because defendants' warnings comply with the federal labeling requirements for toys containing small balls, Brazier's negligence and breach of warranty claims are preempted to the extent that they are based on a theory that these warnings are inadequate.

In 1994, Congress enacted the Child Safety Protection Act, Pub.L. No. 103-267, 108 Stat. 722, ("CSPA") which established requirements for products intended for children. Section 101(a) of the CSPA amended the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-1278

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 6
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

(2000), by adding a new section, codified at 15 U.S.C. § 1278, which listed requirements for labeling certain toys and games. The CSPA also included the following preemption provision:

[A] State or political subdivision of a State may not establish or enforce a requirement relating to cautionary labeling of small parts hazards or choking hazards in any toy, game, marble, small ball, or balloon intended or suitable for use by children unless such requirement is identical to a requirement established by amendments made by this section to the Federal Hazardous Substances Act or by regulations promulgated by the Commission.

**\*3** CSPA § 101(e), *reprinted at*15 U.S.C. § 1278 Note "Preemption". The language of this provision tracks the language of the preemption provision in the FHSA, which applies more generally to hazardous substances that are subject to cautionary labeling requirements pursuant to that statute.[FN4] *See*15 U.S.C. § 1261 Note "Effect upon Federal and State Law" at (b)(1)(A).

>    FN4. The preemption provision in the FHSA states:
>
>    [I]f a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) [of the FHSA] designed to protect against a risk of illness or injury associated with the substance, no State or political subdivision of a State may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under section 2(p) or 3(b) [of the FHSA].
>
>    15 U.S.C. § 1261 Note "Effect upon Federal and State Law" at (b)(1)(A)

Although no court in this Circuit has yet interpreted the CSPA's preemption provision, the Second Circuit analyzed the FHSA's preemption provision in *Milanese v. Rust-Oleum Corp.,* 244 F.3d 104 (2d Cir.2001). There, the Court concluded that "the FHSA preempts any state cause of action that seeks to impose a labeling requirement different from the requirements found in the FHSA and the regulations promulgated thereunder."*Id.* at 109.Accordingly, Milanese's claims for breach of express warranty, strict product liability, and negligence were preempted to the extent that they sought "to impose additional or more elaborate labeling requirements" than those required under the FHSA.*Id.*

The toy labeling requirements of the CSPA have been added to the FHSA, and the CSPA's own preemption provision uses the same language as the general preemption provision of the FHSA. Accordingly, I conclude that Congress intended the CSPA's toy labeling requirements have the same preemptive effect as the FHSA's other requirements. Therefore, any state cause of action that seeks to impose different or additional toy labeling requirements related to choking hazards is preempted by the CSPA. *Cf.West v. Mattel, Inc.,* 246 F.Supp.2d 640, 644 (S.D.Tex.2003) (holding that the CSPA preempts any common law claim predicated upon a theory that a CSPA-compliant warning label is inadequate).

In this case, Brazier does not allege that the warnings on the Pokemon Power Bouncer failed to comply with CSPA requirements. Under the CSPA, any ball with a diameter of 1.75 inches or less that is intended for children aged 3 and up must contain the following cautionary statement:

[symbol] [FN5] WARNING:

>    FN5. The required symbol is an exclamation point surrounded by a triangle.

CHOKING HAZARD-This toy is a small ball.

Not for children under 3 yrs.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 7
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))

15 U.S.C. § 1278(b)(2)(B). Essentially the same warning is required for any toy or game containing such a ball, except that the statement "This toy is a small ball" is replaced with "Toy contains a small ball." 15 U.S.C. § 1278(b)(2)(D). Brazier does not dispute that the packaging of the Pokemon Power Bouncer included the warning required for a toy or game that contains a ball with a diameter of 1.75 inches or less,[FN6] and he does not allege that the warnings otherwise failed to comply with the CSPA. Instead, Brazier argues that these warnings were defective because they did not adequately inform Adrienne Brazier of the dangers presented by the Pokemon Power Bouncer. Because Brazier's negligence and breach of warranty claims effectively seek to impose additional labeling requirements on defendants above and beyond what is required by the CSPA, these claims are preempted to the extent that they allege such warning defects.

> FN6. Although it is not clear why the packaging for the Pokemon Power Bouncer followed the labeling requirements for a toy containing a small ball instead of the requirements for a toy that was a small ball, there is no appreciable difference between the two required warnings.

*4 [2][3] Brazier's negligence and breach of warranty claims also allege that the Pokemon Power Bouncer is defectively designed; such allegations are not preempted by the CSPA, and accordingly I must determine whether defendants are entitled to summary judgment on this aspect of Brazier's claims. See Lopez v. Hernandez, 253 A.D.2d 414, 415, 676 N.Y.S.2d 613, 614-15 (2d Dep't 1998) (explaining that causes of action not premised on a failure to warn or inadequate labeling survive preemption by the FHSA). For Brazier's breach of warranty claim, the complaints suggest that this claim is based on theories of implied warranty of merchantability and breach of express warranty. (See Compl. ¶¶ 19-20; Am. Compl. ¶¶ 27-28) Because the only express warranty that Brazier alleges is the CSPA-compliant labeling on the product's

packaging, (see Compl. ¶ 20; Am. Compl. ¶ 28), the breach of warranty claim is preempted to the extent it is based on a breach of express warranty argument. See Milanese, 244 F.3d at 109 (upholding preemption of claim for breach of express warranty to the extent that plaintiff sought to impose labeling requirements that differed from FHSA requirements). However, Brazier's breach of warranty claim is not preempted to the extent that it is based on the argument that defendants breached the implied warranty of merchantability by marketing a toy that was not fit for ordinary use.

III.

[4] To recover on a breach of implied warranty of merchantability claim for a defectively designed product, a plaintiff must show that the product at issue does not satisfy the merchantability requirements of New York's version of the Uniform Commercial Code ("UCC"). See Denny v. Ford Motor Co., 87 N.Y.2d 248, 258-59, 639 N.Y.S.2d 250, 256, 662 N.E.2d 730 (1995). A product must be "fit for the ordinary purposes for which such goods are used" to be considered merchantable under the UCC. N.Y. U.C.C. § 2-314(2)(c) (McKinney 2003). Accordingly, an allegedly defective product gives rise to a breach of implied warranty claim when it is not fit for its ordinary purposes and causes injury as a result. See Denny, 87 N.Y.2d at 258-59, 639 N.Y.S.2d at 256, 662 N.E.2d 730. In determining whether a product is unmerchantable in this respect, "the ... inquiry focuses on the expectations for the performance of the product when used in the customary, usual, and reasonably foreseeable manners." 87 N.Y.2d at 258-59, 639 N.Y.S.2d at 256, 662 N.E.2d 730. "A warranty of fitness for ordinary purposes does not mean that the product will fulfill a buyer's every expectation." 87 N.Y.2d at 259 n. 4, 639 N.Y.S.2d at 256 n. 4, 662 N.E.2d 730 (internal quotation marks and alterations omitted). Rather, recovery for breach of implied warranty of merchantability is appropriate "upon a showing that the product was not minimally safe for its expected purpose ..." 87 N.Y.2d at 259, 639 N.Y.S.2d at 256,

Not Reported in F.Supp.2d                                                          Page 8
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

662 N.E.2d 730.

As a toy ball, the ordinary and expected purposes of the Pokemon Power Bouncer include being thrown, caught, bounced and rolled. Brazier does not argue that the product is unfit for these purposes, and he does not claim that Robert was using the Pokemon Power Bouncer for its ordinary purposes when he put it in his mouth. Instead, Brazier suggests that Robert's placement of the ball in his mouth was an unintended but foreseeable misuse of the product. (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Rule 56 Motion ("Pl.Memo.") at 4-5) Brazier is correct to concede this point; no reasonable jury could conclude that a toy ball is performing an ordinary purpose when a child inserts it into his mouth. Because the implied warranty of merchantability for the Pokemon Power Bouncer does not include a warranty that the product is fit for safe insertion into a child's mouth, Brazier cannot maintain a cause of action for breach of implied warranty based on the contention that the ball was not minimally safe for this purpose. Because Brazier does not allege that the Pokemon Power Bouncer is unfit for the ordinary purposes of a toy ball, defendants are entitled to summary judgment dismissing Brazier's breach of warranty claim. *SeeWhite v. ABCO Eng'g Corp.,* 221 F.3d 293, 300 (2d Cir.2000) (explaining that summary judgment should be granted if no reasonable trier of fact could find in favor of the nonmoving party).

IV.

**\*5** To prevail on a strict products liability action for design defect under New York law, a plaintiff must demonstrate that: (1) the product is defective because it is not reasonably safe as marketed; (2) the product was being used for a normal purpose at the time of the injuring occurrence; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff would not, by the exercise of reasonable care, have both discovered the defect and apprehended its danger; and (5) the plaintiff would

not otherwise have avoided the injury by the exercise of reasonable care. *Urena v. Biro Mfg. Co.,* 114 F.3d 359, 363 (2d Cir.1997) (citing *Fane v. Zimmer, Inc.,* 927 F.2d 124, 128 (2d Cir.1991) (citing *Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 95 (4th Dep't 1979), *aff'd,*52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980)).*See alsoVoss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 106, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204 (1983).

[5] Brazier argues that defendants can be held strictly liable for harm caused by a foreseeable misuse of the Pokemon Power Bouncer as well as for harm caused by use for a normal purpose. (*See* Pl. Memo. at 4-5) Although the cases that Brazier cites for this proposition all predate the Second Circuit's 1997 decision in *Urena,* some courts in this circuit have stated more recently that an action in strict products liability may lie for injuries that result from an unintended but reasonably foreseeable use of a product. *SeeBeneway v. Superwinch, Inc.,* 216 F.Supp.2d 24, 29 (N.D.N.Y.2002) (citing *Lugo by Lopez v. LJN Toys, Ltd.,* 75 N.Y.2d 850, 852, 552 N.Y.S.2d 914, 915, 552 N.E.2d 162 (1990)); *Anderson v. Hedstrom Corp.,* 76 F.Supp.2d 422, 455-56 (S.D.N.Y.1999) (citing *Voss,* 59 N.Y.2d at 110 n.\*, 463 N.Y.S.2d at 403 n. \*). The New York Pattern Jury Instructions (2004) also state that strict liability may attach "when the product is used for its intended or reasonably foreseeable purpose."*Id.* at 2:141, 463 N.Y.S.2d 398, 450 N.E.2d 204 (citing for this proposition, in the Comment, New York cases from 1992, 1990, and 1976). However, both these recent cases and the New York Pattern Jury Instructions are based on case law that predates the Second Circuit's decision in *Urena.*I have found no case decided after *Urena* by the New York Court of Appeals or the Second Circuit that explicitly discusses and rejects the requirement that a plaintiff must have been using a product for a normal purpose in order to prevail on a strict products liability claim. Accordingly, I must follow the Second Circuit's interpretation of New York law and conclude that Brazier can prevail on his strict products liabil-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

ity claim only upon a showing that the Pokemon Power Bouncer was being used for a "normal purpose" when Robert asphyxiated. *SeeSita v. Danek Medical, Inc.,* 43 F.Supp.2d 245, 252 (E.D.N.Y.1999) (stating that plaintiff can prevail on strict products liability claim only by showing that the product was being used for a normal purpose at the time of the injury); *Hamm v. Willamette Indus., Inc.,* 99 Civ. 5166(RCC), 2002 WL 342433, at *3 n. 5 (S.D.N.Y. Mar. 5, 2002) (same); *Faryniarz v. Nike, Inc.,* 00 Civ. 2623(NRB), 2002 WL 530997, at *2 (S.D.N.Y. Apr. 8, 2002) (same); *McEneaney v. Haywood,* 179 Misc.2d 1035, 687 N.Y.S.2d 547, 550 (Sup.Ct.App. Term 1999) (same).

*6 As discussed in Part III, *supra,* a toy ball is used for a normal purpose when it is thrown, caught, rolled, or bounced. Brazier does not argue, and no reasonable jury could find, that Robert Brazier was using the Pokemon Power Bouncer for a normal purpose when he put it in his mouth. Because the Pokemon Power Bouncer was not being used for a normal purpose or in a normal manner when Robert asphyxiated, Brazier cannot maintain a cause of action for strict products liability, and defendants' summary judgment motion is granted as to this claim.

## V.

[6] As discussed in Part II, *supra,* Brazier's negligence claim is preempted insofar as it is based on alleged defects in defendants' warnings, but it is not preempted to the extent that Brazier argues that defendants should be liable in negligence for distributing and selling a defectively designed product. Brazier alleges that the design of the Pokemon Power Bouncer was defective for two reasons: first, because a ball with a 1.72 diameter posed a serious choking hazard to children over the age of 3, particularly because the hazard was disguised by defectively designed packaging that made the ball appear larger than its actual size (Compl. ¶ 14d, 14e, 14i; Am. Compl. ¶ 22d, 22e, 22i); second the appearance of the Pokemon Power Bouncer, which fea-

tured a character suspended in a translucent sphere, was defective because it tempted children to place the ball in their mouths in an attempt to open the ball and "free" the character inside (Compl. ¶ 14g; Am. Compl. ¶ 22g). According to Brazier, this risk was enhanced by the toy's connection to the Pokemon line of products, which apparently features characters emerging from spheres. (Compl. ¶ 14h; Am. Compl. ¶ 22h; Pl. Memo. at 7; Affidavit of Bert L. Reiner ("Reiner Aff.") ¶ 7)

Defendants argue that they are entitled to summary judgment on the negligent design claim because Brazier has not offered evidence to show that the Pokemon Power Bouncer's alleged design defects caused Robert Brazier's injuries. In the alternative, defendants contend that they breached no duty by distributing and selling the Pokemon Power Bouncer because the toy was not defectively designed for its intended and reasonably foreseeable uses. As will be discussed in more detail below, Brazier cannot show that the ball's appearance played any role in Robert Brazier's death, and his inability to prove causation entitles defendants to summary judgment on that aspect of the negligent design claim As for Brazier's claim that the Pokemon Power Bouncer's size was a design defect, I will reserve judgment on this aspect of defendants' summary judgment motion until the parties have submitted more briefs and affidavits on the question of expert opinion admissibility.

### A.

[7] To prove a claim of negligent design, "it is a consumer's burden to show that a defect in the product was a substantial factor in causing the injury."*Clarke v. Helene Curtis, Inc.,* 293 A.D.2d 701, 701, 742 N.Y.S.2d 325, 326 (2d Dep't 2002) (quoting *Tardella v. RJR Nabisco, Inc.,* 178 A.D.2d 737, 737, 576 N.Y.S.2d 965, 966 (2d Dep't 1991)); *Fritz v. White Consol. Indus., Inc.,* 306 A.D.2d 896, 898, 762 N.Y.S.2d 711, 714 (4th Dep't 2003) (same). Defendants wisely do not argue that the size of the Pokemon Power Bouncer was not a sub-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

stantial factor in causing Robert Brazier to asphyxiate; based on the evidence, a reasonable jury could conclude easily that the 1.72 diameter of the ball-small enough to enter Robert's mouth and large enough to obstruct his airway-played an important role in his death. However, Brazier has not produced any evidence to suggest that the product's packaging contributed to the accident in any way,FN7 and therefore defendants are entitled to summary judgment to the extent that Brazier argues that the packaging of the Pokemon Power Bouncer was defectively designed. As will be discussed in more detail below, defendants are entitled to summary judgment also on Brazier's claim that the appearance of the Pokemon Power Bouncer was a design defect because no reasonable jury could find, by a preponderance of the evidence, that this alleged defect was substantial factor in causing Robert's death.

> FN7. Although the complaints allege that the packaging made the Pokemon Power Bouncer appear larger than its actual size (Compl. ¶ 14i; Am. Compl. ¶ 22i), the record contains no evidence to suggest that anyone in the Brazier family was actually misled about the size of the ball. In any event, the evidence shows that the Brazier children played with the four identical balls daily for almost three weeks before Robert's death. There was ample opportunity during that time to see the actual size of the balls.

**\*7** **[8]** Brazier alleges that the Pokemon Power Bouncer's appearance inspired Robert to put the ball in his mouth in a misguided attempt to access the Pokemon character suspended within. (Compl. ¶ 8; Am. Compl. ¶ 16) Although no one witnessed Robert placing the ball in his mouth, Brazier attempts to prove his theory by proffering the opinions of two people, Adrienne Brazier and engineering expert Bert L. Reiner.FN8 Neither opinion is admissible under the Federal Rules of Evidence. First, Adrienne Brazier, a lay witness, theorizes that

Robert put the ball in his mouth in an attempt to release the Pokemon character encased in the ball. (A. Brazier Dep. at 156-57) A lay witness may testify only about opinions or inferences that are "rationally based on the perception of the witness."Fed.R.Evid. 701 Because Adrienne Brazier concedes that she has no actual knowledge or information about how the ball came to be placed in Robert's mouth (A. Brazier Dep. at 155-56), her opinion about Robert's motivation is inadmissible under Rule 701 of the Federal Rules of Evidence.

> FN8. Defendants apparently believe that Brazier's other two experts, engineer Paul Doppelt and medical physician Dr. Frank L. Rimell, also provided opinions about Robert Brazier's motivation. (Memorandum of Law of Defendants in Reply at 11-14) I disagree and find that both experts merely offer opinions about the actions of children generally, not about the actions of Robert Brazier specifically. Doppelt simply states, "Since the Pokemon characters operate from within a spherical shell from which they hatch to do as they are trained to do, it is reasonable to foresee that a child might attempt to separate the ball, with his teeth if need be, in order to release the figurine."(Affidavit of Paul Doppelt ¶ 10) Dr. Rimell similarly opines, "[I]t is entirely foreseeable that a child who was the chronological age of Robert Brazier could attempt to remove the Pokemon figure from within the ball by placing it within his/her mouth in an attempt to break the ball and release the character."(Affidavit of Frank L. Rimell ¶ 10)

**[9]** Second, Reiner, one of plaintiff's three expert witness, opined that "it is reasonable to conclude that Robert's action of placing the Pokemon Power Bouncer of 1.72 inches in his mouth was a result of his intent to 'free' or 'hatch' the figure from inside the ball."(Reiner Aff. ¶ 8) In order for this opinion to be admissible expert testimony under Rule 702

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))

of the Federal Rules of Evidence, Reiner must be "qualified as an expert by knowledge, skill, experience, training, or education."Fed.R.Evid. 702. Although Reiner has 35 years of experience in engineering and quality assurance in toy design, his curriculum vitae reveals no expertise in child psychology or behavior that renders him specially qualified to discern Robert Brazier's personal motivation. See*Zaremba v. Gen. Motors Corp.*, No. 03-7565, 2004 WL 259254, at *4 (2d Cir. Feb.13, 2004) (suggesting that purported expert's meager qualifications in area of alleged expertise rendered further *Daubert* analysis almost superfluous). Even if Reiner were qualified to provide expert testimony about Robert's intent, his opinion would have to be unreliable and speculative because it lacks a factual basis. See*Fed.R.Evid. 702 (explaining that expert testimony "must be based upon sufficient facts or data"). In preparing his opinion, the only documents Reiner reviewed that pertained to Robert's asphyxiation, rather than to the design and manufacture of the Pokemon Power Bouncer, were the depositions in this case (Reiner Aff. ¶ 4), which reveal that no one witnessed Robert putting the ball in his mouth. Although Reiner contends that his opinion is supported by deposition testimony showing that other children, using various means, pried open Pokemon Power Bouncers to get the character inside (Reiner Aff. ¶ 8), the actions of other children cannot illuminate what was in Robert Brazier's mind when he put the ball in his mouth. Because Reiner is not qualified to provide an opinion about Robert's state of mind, and because his opinion is based on conjecture and speculation rather than facts, Reiner's testimony about Robert's intent is inadmissible under Rule 702 of the Federal Rules of Evidence.

**\*8** Apart from these two inadmissible opinions, the only evidence in the record that supports Brazier's theory of causation is Adrienne Brazier's testimony, taken at her deposition, that Robert had a tendency to open things with his mouth, such as potato chip bags and round, clear containers from vending machines. (A. Brazier Dep. at 158-59) She further test-

ified that, apart from this behavior, Robert had stopped putting non-food items in his mouth when he was 4 or 5 years old. (*Id.* at 164-5) However, Adrienne Brazier also admitted that an occupational therapist reported in spring 1998, when Robert was 7 years old, that Robert required close supervision during tabletop activities at school because he had a tendency to put non-food items in his mouth, such as Play-Doh, shaving cream, and uncooked beans and rice. (*Id.* at 89-91, 93-96; Def. Ex. G)

In order to prevail on a negligence claim based on a defect in the ball's appearance, Brazier would need to show that it is more likely or more reasonable to conclude that Robert put the Pokemon Power Bouncer in his mouth because of its appearance than for some other reason. See*Gayle v. City of New York*, 92 N.Y.2d 936, 937, 680 N.Y.S.2d 900, 901, 703 N.E.2d 758 (1998) (explaining that plaintiff must show that it is more likely or more reasonable that injury was caused by defendant's negligence than by some other agency). Although Brazier need not positively exclude every other possible cause for Robert's actions, "the proof must render those other causes sufficiently 'remote' or 'technical' to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence."*Id.* Because the record in this case reveals that Robert had a history of putting non-food items in his mouth even when he was not trying to open them, a jury would be forced to speculate about what motivated Robert to put the Pokemon Power Bouncer in his mouth on January 30, 1999. Because Brazier supports his theory of causation only with "speculation, guess, and surmise, which may not be substituted for competent evidence," defendants are entitled to summary judgment on Brazier's negligence claim insofar as it is based on alleged defects in the appearance of the Pokemon Power Bouncer. *Grob v. Kings Realty Assocs., LLC*, --- A.D.2d ----, 771 N.Y.S.2d 384, 385 (2d Dep't 2004) (internal brackets and quotation marks omitted).See also*Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir.2003) ("Mere conclusory allegations, speculation or conjecture

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))

will not avail a party resisting summary judgment.").

## B.

The only basis for a negligence claim that remains is Brazier's contention that the Pokemon Power Bouncer was defectively designed because of its size. Under New York law, the manufacturer of a product has "a duty to use reasonable care in designing its product so that it will be safe when 'used in the manner for which the product was intended, as well as [any] unintended yet reasonably foreseeable use." ' *Liriano v. Hobart Corp.,* 132 F.3d 124, 126 (2d Cir.1998) (quoting *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 385-86, 384 N.Y.S.2d 115, 121, 348 N.E.2d 571 (1976)). Although Hasbro and Toys "R" Us did not manufacture the Pokemon Power Bouncer, defendants do not argue that distributors and sellers are subject to a lesser duty of care when distributing and selling a product. Accordingly, defendants may have breached a duty if the Pokemon Power Bouncer was unsafe for an intended or reasonably foreseeable use, but defendants have breached no duty if the Pokemon Power Bouncer was unsafe only for uses that are unforeseeable. *See Pinero v. Rite Aid of New York, Inc.,* 294 A.D.2d 251, 252, 743 N.Y.S.2d 21, 22 (1st Dep't 2002), *aff'd,* 99 N.Y.2d 541, 753 N.Y.S.2d 805, 783 N.E.2d 895 (explaining that, in a negligence claim, duty arises only when the risk of harm is reasonably foreseeable); *Danielenko v. Kinney Rent A Car, Inc.,* 57 N.Y.2d 198, 204, 455 N.Y.S.2d 555, 557, 441 N.E.2d 1073 (1982) ("Whether a breach of duty has occurred, of course, depends upon whether the resulting injury was a reasonably foreseeable consequence of the defendants' conduct."). Because Brazier argues only that the Pokemon Power Bouncer was unsafe for insertion into a child's mouth, and not that it was unsafe for other possible uses, I must determine whether this particular "use" of the product was reasonably foreseeable. If not, defendants breached no duty by distributing and selling the Pokemon Power Bouncer and thus cannot be held liable in negligence.

\*9 Defendants argue that they breached no duty because they could not reasonably foresee that a child who was almost 8 years old would put the ball in his mouth. (Memorandum of Law of Defendants in Support of Motion for Summary Judgment ("Def.Memo.") at 17-18) Brazier disagrees and, relying in part on the opinions of his experts, claims that it was foreseeable that a child between the ages of 4 and 10 might place the ball in his or her mouth and choke. (Pl. Memo. at 4-5) Neither party suggests that the foreseeability calculus would be different for a 4-year-old child and a child who was nearly 8 years old. Under New York law, "foreseeability includes the probability of the occurrence of a general type of risk involving the loss, rather than the probability of the occurrence of the precise chain of events preceding the loss." *Parsons v. Honeywell,* 929 F.2d 901, 905-06 (2d Cir.1991) (quoting *Tucci v. Bossert,* 53 A.D.2d 291, 293, 385 N.Y.S.2d 328, 331 (2d Dep't 1976)). Although the precise chain of events in this case involved a 7-year-old boy, the general type of risk here is that a child for whom the Pokemon Power Bouncer was intended-a child aged 4 or older-would put the ball in his or her mouth and choke. Accordingly, the question I must answer is whether a reasonable jury could find it reasonably foreseeable that a child over the age of 3 would put the Pokemon Power Bouncer in his mouth and asphyxiate.

In support of his claim that defendants should have reasonably foreseen that a child over the age of 3 might place a Pokemon Power Bouncer in his mouth and choke, Brazier proffers affidavits from his three expert witnesses. First, physician Dr. Frank L. Rimell quotes a portion of an article he wrote, published in 1995 in the Journal of the American Medical Association, which states, "Although two thirds of children who choke to death on man-made objects are younger than 3 years, these objects pose a significant risk of asphyxiation to older children as well."(Affidavit of Frank L. Rimell ¶ 9) With respect to the Pokemon Power Bouncer, Dr. Rimell opines that "the diameter of this ball of 1.72 inches presents a choking

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))**

hazard in and of itself, given the anatomical sizes and dimensions of the pharynx of a young child."(*Id.* ¶ 10, 385 N.Y.S.2d 328) Second, toy safety consultant Paul Doppelt claims, "[C]hildren of *any* age will put things in their mouths," and states, "It is my professional opinion that the 1.72 inch (43.7 mm) diameter spherically shaped Pokemon Power Bouncer Ball presented a clear risk of a choking mishap for children of the intended and specified age of 4 years and above."(Affidavit of Paul Doppelt ¶¶ 8, 10) Finally, mechanical engineer and quality assurance consultant Bert L. Reiner states, "It is my opinion that a 'reasonably foreseeable abuse' would include a child placing this ball in his or her mouth, whether for sensory purposes or to remove the figurine, and that increasing the diameter of the ball would have greatly reduced or eliminated the present choking hazard."(Reiner Aff. ¶ 11)

**\*10** Defendants argue that this opinion testimony from Brazier's experts is not sufficiently reliable and thus inadmissible under Rule 702 of the Federal Rules of Evidence. According to defendants, these opinions do not satisfy the requirements of Rule 702 because they are not based upon sufficient data and because they are not the product of reliable principles and methods. (Memorandum of Defendants in Reply ("Def. Reply Memo.") at 20-24) Defendants also criticize these opinions because they are unpublished, expressed solely for the purpose of litigation, and allegedly contradict earlier opinions from the same experts. (*Id.* at 24-28,385 N.Y.S.2d 328) Because defendants raised all of these arguments for the first time in their reply, Brazier has not yet had an opportunity to respond with his own arguments and supplementary affidavits. Accordingly, Brazier has until April 28, 2004, to submit a response to defendants' attacks on his experts. This response should include a memorandum of law addressing defendants' arguments and supplementary affidavits from all three experts that provide more information about the data and methodology the experts employed to arrive at the conclusions listed in the previous paragraph. If defend-

ants then wish to submit a reply, they may do so by May 19, 2004. Upon receipt of these papers, I will determine the admissibility of Brazier's experts' testimony and, in turn, will rule on defendants' motion for summary judgment on the negligence claim insofar as it is based on an alleged design defect in the size of the Pokemon Power Bouncer.

### VI.

**[10]** Punitive damages are available in ordinary New York tort actions only if the plaintiff can show "the existence of circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton."*Carvel Corp. v. Noonan,* 350 F.3d 6, 24 (2d Cir.2003) (quoting *Prozeralik v. Capital Cities Communications, Inc.,* 82 N.Y.2d 466, 479, 605 N.Y.S.2d 218, 226, 626 N.E.2d 34 (1993)) (internal quotation marks omitted). In this case, Brazier alleges that defendants acted with conscious indifference to Robert Brazier by marketing the Pokemon Power Bouncer even though they knew that the product posed a risk of potentially catastrophic harm to children over 4. (Compl. ¶¶ 37-40; Am. Com pl. ¶¶ 48-51) However, Brazier has produced no evidence to support this allegation, and nothing in the record suggests that defendants had any knowledge about any potential danger from the Pokemon Power Bouncer. Because Brazier has failed to support his allegations with any evidence that could allow a reasonable jury to award punitive damages in this case, defendants are entitled to summary judgment dismissing this claim.

For the reasons stated above, defendants' summary judgment motion is granted for all claims except for the portion of Brazier's negligence claim that is based on alleged design defects in the size of the Pokemon Power Bouncer. Because I must determine the admissibility of Brazier's experts' testimony before deciding whether summary judgment is ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 14
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
(Cite as: Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.))

propriate on that remaining negligence claim, the parties are directed to submit additional briefs and affidavits in accordance with the instructions in Part V(B) of this opinion. Based on the foregoing discussion, Brazier's Rule 11 motion, which requests sanctions against defendants for filing a baseless summary judgment motion, is denied.

**\*11** SO ORDERED:

S.D.N.Y.,2004.
Brazier v. Hasbro, Inc.
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2001 WL 1776754 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1776754 (W.D.Ky.))**

**C**
Carolina Casualty Ins. Co. v. KLLM, Inc.
W.D.Ky.,2001.
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky.
CAROLINA CASUALTY INSURANCE CO.,
Plaintiff,
v.
KLLM, INC., Defendant.
**No. CIV. A. 3:00CV-199-S.**

*MEMORANDUM OPINION*

CHARLES R. SIMPSON III, Chief Judge.
*1 This matter is set for consideration of the parties'
cross motions for summary judgment. The motions
having been fully briefed, they are now ripe for our
review.

BACKGROUND

This dispute arises out of an automobile accident in
which a semi-tractor driven by David Boatwright
("Boatwright") collided with a car carrying two
people. Both individuals in the car were injured,
one fatally. Boatwright was driving the semi-tractor
as a "leased driver" for KLLM, Inc. ("KLLM").
The survivor filed suit against Boatwright and
KLLM.

Boatwright's nonbusiness use of the semi-tractor
was insured by a policy issued by the plaintiff, Car-
olina Casualty Insurance Co. ("CCIC"). At the time
of the above accident, Boatwright had just dropped
off a trailer in Louisville, Kentucky and was en
route to a motel where he planned to spend the
night. The following morning, Boatwright planned
on returning to the unloading dock in order to com-
plete delivery of the load.

CCIC defended Boatwright in the action brought by
the survivor of the collision, Nancy Greenwell
("Greenwell"). However, it did so under a reserva-

tion of rights. Specifically, a letter from CCIC to
Boatwright stated in relevant part that:

the purpose of this letter is also to put you on notice
that [CCIC] reserves any and all rights available to
the company, as provided under the terms and con-
ditions of the policy, and applicable state laws, in-
cluding but not limited to, any defense as to wheth-
er coverage is to be provided on any claim loss
arising out of this accident that is the subject matter
of this litigation.

Def.'s Reply (DN 22), Ex. B, at 3.

While Greenwell's action against KLLM and Boat-
wright was pending, CCIC intervened, asserting
that the nonbusiness use policy it had issued did not
cover the accident. CCIC argued that because Boat-
wright was still engaged in business on the way to
the motel, coverage under the policy was excluded.
On cross motions for summary judgment, the dis-
trict court disagreed and concluded that CCIC's
coverage was primary because at the time of the ac-
cident, Boatwright was engaged in a nonbusiness
use of the semi-tractor. Therefore, CCIC continued
to defend against Greenwell's claims.

A jury eventually concluded that neither KLLM nor
Boatwright was liable for the injuries sustained by
Greenwell. Greenwell appealed this jury verdict to
the United States Court of Appeals for the Sixth
Circuit, and CCIC appealed the district court's de-
cision on the issue of coverage. The Sixth Circuit
upheld the jury verdict in favor of Boatwright and
KLLM, but reversed the district court's grant of
summary judgment regarding the coverage issue.
The Sixth Circuit held that Boatwright was still en-
gaged in business at the time of the accident and
that this business use of the semi-tractor excluded
coverage under the CCIC policy.

CCIC now seeks to recover from KLLM the costs
of defending Boatwright under the theories of in-
demnity and unjust enrichment. Both CCIC and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 1776754 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1776754 (W.D.Ky.))**

KLLM have filed motions for summary judgment in support of their respective positions.

## STANDARD OF REVIEW

**\*2** When faced with cross motions for summary judgment, a district court is authorized to "assume that there is no evidence which needs to be considered other than that which has been filed by the parties."*Greer v. U.S.,* 207 F.3d 322, 326 (6th Cir.2000) (citing *Harrison Western Corp. v. Gulf Oil Co.,* 662 F.2d 690, 692 (10th Cir.1981)). However, the standards upon which the court evaluates the motions for summary judgment do not change. *See Taft Broadcasting Co. v. U.S.,* 929 F.2d 240, 248 (6th Cir.1991) (citing *Home for Crippled Children v. Prudential Ins. Co.,* 590 F .Supp. 1490, 1495 (W.D.Pa.1984)). Instead, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."*Id.* (citations omitted).

## DISCUSSION

Under Kentucky law, an insurer's contractual duty to defend its insured arises when "there is any allegation which potentially, possibly or might come within the coverage of the policy."*James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.,* 814 S.W.2d 273, 279 (Ky.1991) (citing *O'Bannon v. Aetna Casualty and Surety Co.,* 678 S.W.2d 390 (Ky.1984)). Whether such a duty exists must be determined at the outset of the litigation, and, if found to exist, the duty "continues to the point of establishing that liability upon which plaintiff was relying was in fact not covered by the policy...."*Brown Foundation, supra,* at 279.

CCIC clearly owed its insured, Boatwright, a contractual duty to defend against Greenwell's claims. Given the circumstances under which the accident occurred, Greenwell's claims were potentially within the nonbusiness use coverage provided by Boatwright's policy issued by CCIC. Therefore, CCIC

was required to defend Boatwright until it was established that coverage was excluded under the CCIC policy. CCIC contends that despite this contractual duty, it is nevertheless entitled to recover from KLLM the reasonable attorney fees and expenses it incurred by providing Boatwright's defense. CCIC's claims are based on the doctrines of indemnity and unjust enrichment.

### I. Indemnity

A right to indemnity "is of common law origin and is available to one exposed to liability because of the wrongful act of another with whom he/she is not *in pari delicto.*" *Degener v. Hall Contracting Corp.,* 27 S.W.2d 775, 780 (Ky.2000). This right arises only when the party seeking indemnity has been found liable to a third party for some injury. *See Rice v. Cincinnati, New Orleans & Pacific Ry. Co.,* 920 F.Supp. 732, 736 (E.D.Ky.1996). Where there has been a finding of liability, cases where indemnity is justified "are exceptions to the general rule, and are based upon principles of equity."*Degener* (citations omitted). In *Degener,* the court noted that:

[s]uch exceptions obtain in two classes of cases: (1) Where the party claiming indemnity has not been guilty of any fault, except technically, or constructively, as where an innocent master was held to respond for the tort of his servant acting within the scope of his employment; or (2) where both parties have been in fault, but not in the same fault, towards the party injured, and the fault of the party from whom indemnity is claimed was the primary and efficient cause of the injury.

**\*3** *Id.*

CCIC claims that having to incur costs in defending Boatwright is equivalent to incurring liability as a result of KLLM's failure to provide a defense. However, KLLM was not at fault by failing to provide Boatwright with a defense. To the contrary, CCIC had a duty to defend Boatwright under their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1776754 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1776754 (W.D.Ky.))**

insurance contract, a contract to which KLLM was not a party. Because of this contractual relationship between CCIC and Boatwright, KLLM's failure to provide Boatwright with a defense was not a wrongful act.

The Sixth Circuit's determination that CCIC's policy did not provide coverage for Greenwell's claims against Boatwright does not affect our conclusion. The Sixth Circuit merely determined that Boatwright "was certainly still using his semi-tractor in the business of KLLM...." This determination that there was no coverage under the CCIC policy has no bearing on CCIC's much broader contractual duty to defend Boatwright. *See Cincinnati Ins. Co. v. Vance,* 730 S.W.2d 521, 522-23 (Ky.1987) ("[T]he insurance company owes to its insured ... a duty to defend which is separate and apart, and in addition to, its duty to indemnify the insured to the extent of its policy limits."). CCIC owed such a duty to defend and is therefore not entitled to indemnity from KLLM.

II. Unjust Enrichment

The equitable doctrine of unjust enrichment is available only if CCIC shows that: (1) a benefit was conferred upon KLLM at CCIC's expense; (2) KLLM appreciated that such a benefit was being conferred by CCIC; and (3) KLLM's retention of the benefit conferred by CCIC without payment for its value would be inequitable. *See Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.,* 898 F.Supp. 1198, 1206 (W.D.Ky.1995) (citations omitted)."This ordinarily would require the plaintiff to allege that he has discharged some debt or legal obligation incurred by the defendant."*Id.*

CCIC claims that KLLM should have defended Boatwright against Greenwell's claims because, as the Sixth Circuit eventually determined, CCIC's policy did not cover the use to which Boatwright's semi-tractor was put at the time of the accident. However, as explained above, CCIC had a contractual duty to defend Boatwright separate and apart

from its duty to eventually provide coverage up to its policy limits. Because of this duty, and because CCIC has introduced no evidence of a superseding duty on the part of KLLM to defend Boatwright, we find that KLLM was not unjustly enriched by CCIC's defense of Boatwright. *Cf. Kentucky Laborers Dist. Council Health and Welfare Trust Fund v. Hill & Knowlton, Inc.,* 24 F.Supp.2d 755, 775 (W.D.Ky.1998) ("The fundamental flaw in the [plaintiffs'] claim is their conclusory allegation that they have paid claims which Defendants ought to have paid.").

CONCLUSION

Having found that there exists no genuine issue of material fact, and for the abovestated reasons, the plaintiff's claims will be dismissed with prejudice.

*ORDER*

**\*4** Motion having been made, and the court being otherwise sufficiently advised, and for the reasons set forth in the accompanying memorandum opinion, IT IS HEREBY ORDERED AND ADJUDGED that the motion for summary judgment of the plaintiff, Carolina Casualty Insurance Company ("CCIC"), is DENIED.

IT IS FURTHER ORDERED AND ADJUDGED that the motion for summary judgment of the defendant, KLLM, Inc. ("KLLM"), is GRANTED, and CCIC's complaint is DISMISSED WITH PREJUDICE.

IT IS FINALLY ORDERED AND ADJUDGED that KLLM's motion to set a hearing on the parties' cross motions for summary judgment is DENIED.

IT IS SO ORDERED this __ day of _____, 2001.

W.D.Ky.,2001.
Carolina Casualty Ins. Co. v. KLLM, Inc.
Not Reported in F.Supp.2d, 2001 WL 1776754
(W.D.Ky.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1776754 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1776754 (W.D.Ky.))**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2005 U.S. DIST. LEXIS 42108

**THELMA CASAS, LISA CASAS, RUBEN CASAS, JR., DANIEL CASAS, and ESTER LARA CASAS, individually and as representatives of the estate of RUBEN CASAS vs THE TIRE CORRAL, INC. and AMERICAN EA- GLE WHEEL CORPORATION**

**CIVIL ACTION NO. M-04-123**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, MCALLEN DIVISION**

*2005 U.S. Dist. LEXIS 42108*

**March 31, 2005, Decided**
**March 31, 2005, Filed**

**COUNSEL:** [*1] For Thelma Casas, Individually and as Representative of the Estate of Ruben Casas, Lisa Casas, Individually and as representative of the Estate of Ruben Casas, Ruben Casas, Jr., Individually and as representative of the Estate of Ruben Casas, Daniel Casas, Individually and as representative of the Estate of Ruben Casas, Ester Lara Casas, Individually and as representative of the Estate of Ruben Casas, Plaintiffs: Jose Joe Escobedo, Jr, David Hadden Hockema, Hockema Tippit and Escobedo, McAllen, TX; Luis M Cardenas, Hockema Tippit et al, Edinburg, TX.

For The Tire Corral, Inc., Defendant: Ricardo Antonio Garcia, Attorney at law, McAllen, TX.

For American Eagle Wheel Corporation, Defendant: Jose Eduardo, Francisco Rene Villarreal, Garcia, Garcia & Villarreal LLP, McAllen, TX; Jeffrey Dale Roerig, Roerig Oliveira and Fisher, Brownsville, TX; Victor Vincent Vicinaiz, Attorney at Law, McAllen, TX.

**JUDGES:** HON. RANDY CRANE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** RANDY CRANE

**OPINION**

**ORDER DENYING REMAND AND DENYING LEAVE TO AMEND**

**I. BACKGROUND**

Pending before this Court is Plaintiffs' First Amended Motion to Remand. (Doc. 7). In determining whether remand is appropriate, [*2] the Court must consider the claims in the state court petition as they existed at the time of removal. *E.g., Manguno v. Prudential Prop. and Cas. Ins. Co., 276 F.3d 720, 723 (5th Cir. 2002)*. Although Plaintiffs have moved for leave to file an Amended Complaint, the Court need not consider such request before ruling on Plaintiffs' Motion to Remand. (Docs. 15, 22).

Plaintiffs originally filed this action on September 3, 2003 in the 381st Judicial District Court of Starr County, Texas. (Doc. 1, Ex. A). Plaintiffs' Original Petition asserted claims against American Eagle Wheel Corporation ("American Eagle") and Tire Corral, Inc. ("Tire Corral") for strict products liability, negligence, negligence per se, gross negligence, breach of warranty, and misrepresentation arising from an automobile accident that resulted in the September 3, 2001 death of Ruben Casas. *Id.* According to Plaintiffs, the accident occurred when the right rear tire rim of the vehicle Ruben Casas was driving malfunctioned. *Id.* Plaintiffs claim that,

Case 1:08-cv-02364    Document 34-2    Filed 06/27/2008    Page 41 of 210

Page 2
2005 U.S. Dist. LEXIS 42108, *

due to this malfunction, the vehicle lost control and rolled, resulting in the death of Ruben Casas. *Id.* Plaintiffs are the wife, children, and [*3] mother of Ruben Casas. *Id.* Defendant American Eagle is the alleged manufacturer of the tire rim and Defendant Tire Corral is the alleged retailer of the American Eagle tire rim purchased by Ruben Casas in 1995 for the vehicle in question. *Id.*

On March 19, 2004, Plaintiffs amended their Original Petition. (Doc. 1, Ex. B). American Eagle removed to this Court on April 15, 2004 on the grounds that Plaintiffs' amended petition had raised jurisdictional facts sufficient to remove. (Docs. 1, 7). First, the amended petition alleged a jurisdictional amount above $ 75,000. (Doc. 1, Ex. B). In addition, Plaintiffs dropped their prior negligence and negligence per se allegations against Tire Corral but retained all other causes of action against said Defendant. *Id.* American Eagle alleges that, as a result of these amendments, it had grounds to assert that Tire Corral, a party non-diverse in citizenship from Plaintiffs, has been improperly joined to avoid federal diversity jurisdiction as Plaintiffs no longer plead any viable claim against them. (Doc. 1). [1] It is undisputed that American Eagle is diverse in citizenship from Plaintiffs and that Tire Corral is not diverse. (Docs. 1, 7). [*4]

> 1   The Fifth Circuit has adopted the term "improper joinder" "as being more consistent with the statutory language than the term 'fraudulent joinder,' which has been used in the past. Although there is no substantive difference between the two terms, 'improper joinder' is preferred." *Smallwood v. Illinois Cent. R.R. Co., 385 F.3d 568, 571 n.1 (5th Cir. 2004).*

Plaintiffs now move to remand on the grounds that no improper joinder has occurred and that the presence of a non-diverse defendant mandates remand. (Doc. 7).

## II. ANALYSIS

### A. Timeliness of removal

If a suit is removable at the time it was initially filed, the defendant must file the notice of removal within thirty days of the date the defendant receives both the summons and a copy of the initial plead-

ing. *28 U.S.C. § 1446(b).* An exception to the initial thirty day time limit exists where the plaintiff files an amended complaint that so changes the nature of the action as to constitute substantially [*5] a new suit which revives the defendant's right to remove. *Johnson v. Heublein, Inc., 227 F.3d 236, 239 (5th Cir. 2000).*

The record reveals that, after the initial filing of the suit in state court, American Eagle requested that Plaintiffs make more specific allegations against Tire Corral and specify the amount of damages claimed. (Doc. 1, Exs. C, D). Instead, the amended complaint *omitted* negligence and negligence per se allegations against Tire Corral and did not elaborate on Plaintiffs' other claims against Tire Corral. (Doc. 1, Ex. B). In view of American Eagle's requests for specificity in Plaintiffs' pleadings, such omissions from the pleadings no doubt raised a "red flag" as to the viability of claims against Tire Corral. In addition, American Eagle contends that it first became aware that Plaintiffs were pleading a jurisdictional amount above $ 75,000 when Plaintiffs filed their amended complaint. (Doc. 1). The Court notes that the thirty day time period for removal only starts to run when the pleading affirmatively reveals on its face that the plaintiff is seeking damages in excess of the minimum jurisdictional amount of the federal court. *See Chapman v. Powermatic, Inc., 969 F.2d 160, 163 (5th Cir. 1992).* [*6]  Plaintiffs filed their First Amended Original Petition-the first notice of the amount of damages claimed by Plaintiffs-on March 19, 2004. (Doc. 1, Ex. B). American Eagle removed to federal court on April 15, 2004 and therefore within thirty days of the filing of Plaintiffs' First Amended Original Petition. (Doc. 1). As such, this Court finds that American Eagle timely filed for removal.

### B. Improper joinder

Where the defendant alleges improper joinder, it faces a "heavy burden" of showing that "there is absolutely no possibility that the plaintiff will be able to establish a cause of action" against the defendant in state court. *Green v. Amerada Hess Corp., 707 F.2d 201, 205 (5th Cir. 1983).* The court must resolve contested facts, as well as ambiguities and uncertainties in controlling state law, in favor of the plaintiff. *Griggs v. State Farm Lloyds, 181 F.3d 694, 699 (5th Cir. 1999).* However, the possibility of recovery must be reasonable, not merely

theoretical. *Travis v. Irby, 326 F.3d 644, 648 (5th Cir. 2003)*. The district court must determine "whether there is any reasonable basis for predicting that [the plaintiff] [*7] might be able to establish [the defendant's] liability on the *pleaded* claims in state court." *Griggs, 181 F.3d at 699* (emphasis added). "Whether the plaintiff has stated a valid cause of action depends upon and is tied to the factual fit between the plaintiffs' allegations and the *pleaded* theory of recovery." *Id. at 701* (emphasis added).

It is undisputed that Plaintiffs' remaining claims against Tire Corral for strict products liability, gross negligence, breach of warranty, and misrepresentation constitute a products liability action-that is, "[an] action against a manufacturer or seller for the recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product, whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." (Doc. 1, Ex. B; Doc. 7); *Tex. Civ. Prac. & Rem. Code § 82.001.*

American Eagle claims that Plaintiffs' remaining causes of action are barred by the newly-enacted *§ 82.003 of the Texas Civil Practices and Remedies Code.* [*8] (Docs. 1, 11, 17). That section, which applies to actions filed on or after September 1, 2003, provides that "[a] seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant *proves . . .*" any one of seven exceptions. *Tex. Civ. Prac. & Rem. Code § 82.003(a)*(emphasis added). It is undisputed that *§ 82.003* applies to Plaintiffs' claims, as all of their claims are encompassed in the definition of a "products liability action" under *§ 82.001.* (Docs. 1, 7).

The Court first considers American Eagle's contention that Plaintiffs' amended petition does not allege that any of the exceptions apply, and therefore Plaintiffs cannot appeal to such exceptions to defeat American Eagle's claim of improper joinder. (Doc. 1). The Fifth Circuit has stated that, in determining whether improper joinder has occurred, "pleadings matter." *Great Plains Trust Co. v. Morgan Stanley Dean Witter, 313 F.3d 305, 329 (5th Cir. 2002)*. It is by referring to the allegations in the state court complaint that the Court assesses whether a reasonable theory, or merely a theoretical [*9] one, has been asserted. *Id.* Although the Court can consider summary judgment-type evidence and assertions when reviewing a claim for improper joinder, it may do so only so long as they do not present new claims or theories. *E.g., Skinner v. Cooper Tire & Rubber Co., 2004 U.S. Dist. LEXIS 9505, 2004 WL 1171201 at * 2 n.4 (N.D. Tex 2004)*(considering improper joinder in the context of *§ 82.003*). Although the Plaintiffs pleadings need not specifically cite to any of the seven exceptions to non-liability, so long as the Plaintiffs fairly state a claim that falls within any one or more of the exceptions, remand is appropriate. *See Brewer v. Porsche Cars North America, Inc., 2005 U.S. Dist. LEXIS 1759, 2005 WL 292417 at * 2 (N.D. Tex 2004)*(concluding that a particular DTPA allegation fell within an exception under *§ 82.003* and, therefore, a possibility of recovery existed against non-manufacturing seller), *but cf. Alonso v. Maytag Corp., 356 F. Supp. 2d 757 at 761-762 (S.D.Tex. 2005)*(concluding that "Plaintiffs failed to allege any facts establishing Defendants' liability under any of the seven exceptions" but concluding nonetheless that Plaintiffs could pursue a DTPA claim against the Defendants).

[*10] Here, in appealing to the exceptions listed in *§ 82.003* to overcome the general allegations against Tire Corral that are contained in their Amended Petition, Plaintiffs have attempted to insinuate entirely new theories of recovery into their case (*inter alia*, negligence) that are not contained in such petition and cannot reasonably be inferred. Even a cursory comparison of Plaintiffs' Original Petition with their Amended Petition reflects the dropping of Plaintiffs' negligence allegations against Tire Corral. The Court is not to consider these new theories of recovery raised in their subsequent briefing. *See Skinner, 2004 U.S. Dist. LEXIS 9505, 2004 WL 1171201 at * 2 n.4.* The Court does, however, consider Plaintiffs' arguments that the claims asserted in their Amended Petition fall within three separate exceptions to non-liability under *§ 82.003.* As discussed below, the Court concludes that Plaintiffs have failed to state a claim against Tire Corral in their Amended Petition that has any possibility of recovery against Tire Corral based on those exceptions.

**1. § 82.003(a)(3) Improper Installation**

In their briefing, Plaintiffs first appeal to *§ 82.003(a)(3)*, which creates [*11] an exception to immunity from liability where the nonmanufacturing seller "installed the product, or had the product installed, on another product and the claimant's harm resulted from the product's installation onto the assembled product." (Doc. 7); *Tex. Civ. Prac. & Rem. Code § 82.003(a)(3)*.

Plaintiffs argue and have submitted summary judgment type evidence indicating that, a few days after buying tires for his vehicle from Tire Corral in 1995, Ruben Casas noticed that the right rear tire on his vehicle was losing air. (Doc. 7, Ex. A at 45-47). Ruben Casas' wife, Thelma Casas, testified in deposition that at first Ruben Casas would take the vehicle to a service station about every two weeks to fill the tire with air. (Doc. 7, Ex. A at 51-52). However, "way later" than when Ruben Casas bought the tire, the Casas returned the vehicle to Tire Corral, where an employee allegedly confirmed that the tire rim had a hole. (Doc. 7, Ex. A at 50). Thelma Casas stated that Tire Corral did not replace the rim and she does not know if her husband or anyone else ever repaired it. (Doc. 7, Ex. A at 49-50). In a separate affidavit, Thelma Casas states that on the [*12] same day that Tire Corral identified the hole in the tire rim, Tire Corral represented to the Casas that "it was fine to drive away in [the vehicle]." (Doc. 7, Ex. B). According to Thelma Casas, she and her husband relied on that representation and would not have driven the car otherwise. *Id.*

Plaintiffs argue that Tire Corral is liable pursuant to *§ 82.003(a)(3)* because it installed the tires on Ruben Casas' vehicle and the alleged harm resulted from such installation. (Doc. 7). American Eagle, however, argues that the "clear intent" of *§ 82.003(a)(3)* is to preclude liability unless the non-manufacturing seller has committed an error independent from the manufacturer, such as selecting the wrong component for installation or misinstalling the components. (Doc. 17). In other words, that Tire Corral installed an allegedly defective tire does not trigger the exception. As cited herein, the few cases to have interpreted *§ 82.003* do not discuss the exceptions to *§ 82.003* nor the "clear intent" of its provisions. *See generally Skinner, 2004 U.S. Dist. LEXIS 9505, 2004 WL 1171201*. However, the Court finds that American Eagle's reading of *§ 82.003* clearly comports with

the language of the [*13] statute, as the claimant's harm must *result from* the installation itself, not the installation of an allegedly defective product. None of the evidence before this Court indicates that Tire Corral incorrectly installed the tire rim; therefore, *§ 82.003(a)(3)* does not provide an exception to Tire Corral's non-liability nor is there any allegation made in Plaintiffs' Amended complaint that Tire Corral improperly installed the rim in question.

### 2. § 82.003(a)(5)

Plaintiffs next appeal to *§ 82.003(a)(5)* to overcome Tire Corral's non-liability. That exception subjects a nonmanufacturing seller to liability if the seller made a factual representation about an aspect of the product; the representation was incorrect; the claimant relied on the representation in obtaining or using the product; and, if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm. *Tex. Civ. Prac. & Rem. Code § 82.003(a)(5)*. Plaintiffs argue that, based on the post-sale alleged misrepresentation by Tire Corral that "it was fine to drive away" in a vehicle with [*14] an allegedly defective tire, Plaintiffs have stated a claim for misrepresentation against Tire Corral pursuant to the *Restatement (Second) of Torts § 402B* (1965). Plaintiffs Amended Petition expressly pleads only a claim for misrepresentation under *§ 402B* and argue that *§ 82.003(a)(5)* provides an exception to Tire Corral's non-liability for Plaintiffs' *§ 402B* misrepresentation claim. (Doc. 7; Doc. 7, Ex. A at 45-52); *see Crocker v. Winthrop Lab. Div. of Sterling Drug, Inc., 514 S.W.2d 429, 431, 18 Tex. Sup. Ct. J. 4 (Tex. 1974)*(incorporating *§ 402B* into state's substantive law).

As noted *supra*, Plaintiffs have not pled with particularity any of the *§ 82.003* exceptions; however, the Court construes Plaintiffs' *§ 402B* misrepresentation claim as an attempt to appeal to *§ 82.003(a)(5)*. (Doc. 1, Ex. B). This Court concludes that any theories of recovery plead against a nonmanufacturing seller must fall within one of the seven exceptions to *§ 82.003*, regardless of whether such allegations otherwise state a viable claim under Texas law. This was the express purpose of the statue and would be rendered meaningless for the Court to conclude otherwise. [*15] To the extent *Alonso v. Maytag Corp., infra. at 761-762* states

otherwise, this Court respectfully disagrees. Plaintiffs must first establish the possibility of recovery under *§ 402B*, the pleaded cause of action for misrepresentation in the present action, in order to appeal to *§ 82.003(a)(5)*, as no other pleaded cause of action states the elements of such exception. *Id.*

*Section 402B* provides the following:

> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though
>
> (a) it is not made fraudulently or negligently, and
>
> (b) the consumer has not bought the chattel from or entered into any contractual relation with the seller.

Restatement (Second) of Torts: Negligence *§ 402B* (1965).

The Fifth Circuit recognized the American Law Institute's Comments to *§ 402B* in its decision in *Rehler v. Beech Aircraft Corp., 777 F.2d 1072, 1079 n.11 (5th Cir. 1985).* [*16] Comment "h" provides that *§ 402B* "'is limited to misrepresentations which are made by the seller *to the public at large,* in order to induce purchase of the chattels sold, or are intended by the seller to, and do, reach the public. The form of the representation is not important. It may be made by public advertising in newspapers or television, by literature distributed to the public through dealers, by labels on the product sold, or leaflets accompanying it, or in any other manner, whether it be oral or written.'" *Id.* (emphasis added). Comment "j" states that *§ 402B* "'does not apply where the misrepresentation . . . does not influence the purchase *or subsequent conduct.*'" *Id.* (emphasis added).

Here, it could be argued that Tire Corral, the seller of the chattel at issue at the time of the alleged misrepresentation, is subject to *§ 402B* for having made such misrepresentation to influence subsequent conduct-that is, Ruben Casas' driving on the tire. However, even were this theory to succeed, Tire Corral could not be liable under *§ 402B* because it did not make its alleged misrepresentation "to the public." *See* Restatement (Second) of Torts: Negligence *§ 402B* (1965). [*17] It is well-settled in Texas that a *§ 402B* misrepresentation must be to the public, not to a private party. *Chandler v. Gene Messer Ford, Inc., 81 S.W.3d 493, 499 (Tex.App.-Eastland 2002, rh'g overruled, review denied)* (*§ 402B* does not apply to private misrepresentations); *Lewis & Lambert Metal Contractors, Inc. v. Jackson, 914 S.W.2d 584, 590 (Tex.App.-Dallas 1994), vacated per settlement, 938 S.W.2d 716 (Tex. 1997)* (*§ 402B* applies only to misrepresentations made to public); *Malek v. Miller Brewing Co., 749 S.W.2d 521, 526 (Tex.App.-Houston 1988, writ denied)*(misrepresentation must be "advertised"). Clearly, the alleged misrepresentation-that is, Tire Corral's statement that "it was fine to drive away in [the vehicle]," was not made to the public at large. (Doc. 7, Ex. A at 50). As such, Plaintiffs have no possibility of succeeding in their appeal to *§ 82.003(a)(5)* as they have no possibility of recovering on their misrepresentation claim under *§ 402B* against Tire Corral. More simply, however, Plaintiffs' Amended Petition expressly limits its allegations against Tire Corral to conduct surrounding the "sale" [*18] of the allegedly defective tire rim in question and offered no summary judgement type evidence to support a claim in connection with the "sale" of the rim in question. To the contrary, all of the summary judgement type evidence reflects that the basis for Plaintiffs' misrepresentation theory arises out of the "way later" servicing of this tire rim -- a matter never pled in the Amended Petition.

### *§ 82.003(a)(6)*

Finally, Plaintiffs argue that *§ 82.003(a)(6)* provides an exception to Tire Corral's non-liability. (Doc. 7). That section provides that a nonmanufacturing seller may be liable where "the seller actually knew of a defect to the product *at the time the seller supplied the product* . . . and . . . the claimant's harm resulted from the defect." *Tex. Civ. Prac. & Rem. Code § 82.003(a)(6)*(emphasis added). Plaintiffs claim that Tire Corral's knowledge of the hole in the tire at the time of the post-sale inspection triggers the exception under *§ 82.003(a)(6). Id.*

American Eagle, however, argues that the term "supplied" as used in *§ 82.003(a)(6)* means "sold for cash or credit, rented, leased, or traded, but . . . not . . . 'returned [*19] to the owner after a service call way later than the purchase.'" (Doc. 11). The Court agrees that confining the application of the term "supplied" to the initial point of sale comports with the clear intent of the statute. As the record contains no evidence that Tire Corral knew of a defect in the tire rim at the time of sale, Plaintiffs cannot possibly appeal to *§ 82.003(a)(6)* to overcome Tire Corral's non-liability. The Court would also note that nowhere in Plaintiffs First Amended Original Petition do they allege that Tire Corral had knowledge of a hole in the tire or any other specific defect at the time of sale or otherwise. Plaintiffs claims raised in their briefing to the Court might support an independent claim for negligence against Tire Corral, not as a seller but as someone later servicing the product, had the negligence claims not been omitted from the Amended Petition. However, the Court cannot ignore the obvious -- the Amended Petition contains no allegations of negligence and contains no allegations outside the "sale" of the product in question against Tire Corral.

### III. CONCLUSION DENYING REMAND

As the Court finds that Plaintiffs cannot possibly recover [*20] for strict liability, gross negligence, breach of warranty, and/or misrepresentation against Tire Corral, who under the present pleadings is alleged to be a non-manufacturing seller and, therefore, immune from liability pursuant to *Tex. Civ. Prac. & Rem. Code § 82.003*, the Court finds that Tire Corral has been improperly joined. Accordingly, Plaintiffs' First Amended Motion to Remand (Doc. 7) is hereby **DENIED**. Because Plaintiffs have failed to plead any possible theory of recovery against Defendant Tire Corral, said Defendant is hereby **DISMISSED** from this suit.

### IV. AMENDMENT OF COMPLAINT

Also before this Court is Plaintiffs' Motion for Leave to File First Amended Complaint. (Doc. 15). Plaintiffs seek to amend their Complaint so as to add a cause of action for negligence against Tire Corral. *Id.* The Court is cognizant that such amendment to Plaintiffs' Complaint would again raise the claim of improper joinder by the Defendant and a request to remand by Plaintiff. With the substantial briefing that has already occurred on this issue, it is likely that Plaintiffs can state a negligence claim against Tire Corral in connection [*21] with the post-sale servicing of the rim that would survive the improper joinder analysis. However, were the Court to permit this Amendment, the Court would be divested of its jurisdiction. *See Cobb v. Delta Exports, Inc., 186 F.3d 675 (5th Cir. 1999)*("The court may not permit joinder of non-diverse defendants but then decline to remand"). In considering the *Hensgens* factors, the Court concludes that amendment should not be allowed. *Hensgens v. Deere & Co., 833 F.2d 1179, 1182 (5th Cir. 1987) cert denied, 493 U.S. 851, 110 S.Ct. 150, 107 L. Ed. 2d 108 (1989)*. The court finds that the purpose of the amendment is to defeat federal jurisdiction, observes that the jury trial in this case is scheduled to begin in approximately one month, that the failure to add Tire Corral will not significantly injure Plaintiffs whose claims of a defective rim remain against the solvent manufacturer and, finally, the court observes that other filings in this case reflect that the opinions of Plaintiffs' experts place complete liability upon the manufacturer and none on Tire Corral. (Docs. 28, 30, 31, 33, concluding "manufacturing defects") Accordingly, the Court hereby [*22] **DENIES** Plaintiffs' Motion for Leave to File First Amended Complaint. (Doc. 15).

**SO ORDERED** this 31st day of March, 2005 at McAllen, Texas.

HON. RANDY CRANE

UNITED STATES DISTRICT JUDGE



Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
**(Cite as: 2006 WL 3355184 (E.D.Pa.))**

**c**

Connolly v. Reliastar Life Ins. Co.
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Frances CONNOLLY
v.
RELIASTAR LIFE INS. CO., Inc. and Madison
National Life Ins. Co. and Leonard Conrad c/o Re-
liastar Life Ins. Co., Inc.
**Civil Action No. 03-5444.**

Nov. 13, 2006.

Michael O. Pansini, Philadelphia, PA, for Frances
Connolly.
Mark C. Stephenson, Margolis Edelstein, Phil-
adelphia, PA, for Reliastar Life Ins. Co., Inc.

### *MEMORANDUM AND ORDER*

JOYNER, J.
**\*1** Presently before the Court is Defendants Re-
liastar Insurance Company, Inc.'s ("ReliaStar"),
Madison National Life Insurance Company's
("Madison"), and Leonard Conrad' s ("Conrad")
(collectively "Defendants") Motion for Summary
Judgment ("D.Mot.") (Doc. No. 12), Plaintiff Dr.
Frances Connolly's ("Dr.Connolly") response
("Pl.Mot.") (Doc. No. 13), and Defendants' reply
thereto ("D.Rep.") (Doc. No. 14). For the reasons
below, the Court GRANTS Defendants' Motion.

**Background**[FN1]

>  FN1. The factual background is drawn
>  primarily from Defendants' Memorandum
>  of Law in Support of Summary Judgment
>  ("D.Memo.") and supporting materials.
>  Plaintiff offered little by way of factual
>  background and in most instances does not
>  contest the events occurred in the manner
>  and order as Defendants describe. Where

the parties disagree, the Court aptly makes
note.

This is a dispute between an insurer and an insured.
But this is not an insurance dispute in the typical
sense. Nor is it a contract dispute (though Plaintiff
suggests that). Dr. Frances Connolly, Ph.D. is not
claiming that her insurer (ReliaStar) or its adminis-
trator (Madison) or collection agent (Conrad) failed
to pay her any benefits due or investigate her claim
to coverage in a timely manner. Dr. Connolly does
not allege that Defendants owe *her* any benefits. In-
deed, it is ReliaStar who has claimed (in a separate
action) that Dr. Connolly must reimburse it for re-
ceiving excess benefits. And it is Defendants' ef-
forts to collect these alleged excess benefits that
has led to this lawsuit.[FN2]

>  FN2. It shortly will become clear that Dr.
>  Connolly did in fact receive excess bene-
>  fits.

Dr. Connolly claims that Defendants' conduct to
collect these monies has been "outrageous, harass-
ing and [in] bad faith."Plaintiff's Memorandum of
Law in Opposition ("P.Memo.") at 1. Specifically,
her complaint alleges that Defendants' conduct con-
stitutes: (1) breaches of fiduciary, contractual and
statutory duties (Count I); (2) violations of
Pennsylvania's Unfair Trade Practices and Con-
sumer Protection Law ("UTPCPL"), 73 P.S. §
201*et seq.*, Unfair Insurance Practices Act
("UIPA"), 40 P.S. § 1171.1*et seq.*, Unfair Claims
Settlement Practices Regulation ("UCSPR"), 31
Pa.Code § 146.1 *et seq.* (Count II);(3) deceit (Count
III); and (4) bad faith in violation of 42 Pa. Con.
Stat. Ann. § 8371 (Count IV).[FN3]

>  FN3. Plaintiff originally filed this action
>  on September 8, 2003 in Philadelphia
>  County Common Pleas Court. Defendants
>  removed it to this Court on September 29,
>  2003. *See* Doc. No. 1. This Court has juris-
>  diction pursuant to 28 U.S.C. § 1332(a)(1).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
**(Cite as: 2006 WL 3355184 (E.D.Pa.))**

Page 2

Until August 1999, Dr. Connolly was Director of Personnel for the William Penn School District ("William Penn").*See* D. Memo. at 5. That month she left her employment after becoming highly distressed emotionally and filed a claim for long-term disability benefits. *See id.*ReliaStar was William Penn's long-term disability insurance carrier. Madison was the long-term disability plan's ("Policy") administrator. Madison granted Dr. Connolly's claim and paid her full benefits for nearly 24 months. *See* D. Memo., Ex. 3 ("Butters' Decl."), at ¶ 3. Dr. Connolly does not contest that ReliaStar or Madison promptly investigated, processed and paid her claim.

Under the Policy, covered employees who become disabled because of mental illness-the basis of Dr. Connolly's claim-are entitled up to 24 months of benefits. *See* D. Memo, Ex. 2 ("ReliaStar Plan") at Page 1-Special Provisions. But these benefits are reduced if the beneficiary receives certain "Other Income Benefits." *See* ReliaStar Plan at p. 4. Included as "Other Income Benefits" is any income received from the Social Security Administration or state retirement fund. *See* ReliaStar Plan at p. B(1) (defining "Other Income Benefits"). Because the Policy presumes that a claimant will receive "other income" in the form of Social Security disability income ("SSDI") and state teachers' retirement benefits, the Policy's administrator (Madison) is permitted to reduce benefits owed under the Policy by the estimated amount of these presumed benefits.[FN4]

> FN4. PRESUMPTION OF CERTAIN COVERAGES. It is presumed that all of the following are true:
>
> 1. You are covered under the Federal Social Security Act, and a state teachers retirement fund or a state retirement fund.
>
> 2.You agree to apply for those benefits and/or any income benefit to which you may be entitled.
>
> 3. You are getting periodic cash pay-

ments under such programs in an amount equal to the amount you or your dependents would receive were they receiving such payments.

> If for any reason you are not eligible for Social Security, state teachers, or state retirement benefits, you must give notice with evidence of this at the time you file a claim. ReliaStar Plan at p. 5

**\*2** To avoid this difficulty, Dr. Connolly entered into a Reimbursement Agreement with ReliaStar on December 14, 1999. *See* D. Memo. at 3; Ex. 1 ("Reimbursement Agreement").[FN5] This agreement was advantageous to Dr. Connolly because it allowed her to receive more than the Policy's minimum benefit of $100 per month in advance of receiving SSDI and state teachers' benefits. *See* D. Memo. at 4; Butters Decl. at ¶ 15. Once she received those "other income" benefits, Dr. Connolly was to reimburse ReliaStar/Madison for any overpayment of benefits. Dr. Connolly subsequently did receive SSDI and state teachers' retirement benefits.[FN6]When Madison learned that Dr. Connolly had received these other benefits it naturally sought reimbursement of the excess benefits per the Reimbursement Agreement. Madison informed Dr. Connolly by letter on three separate occasions that she needed to remit overpaid benefits based on her SSDI income. *See* D. Memo. at 6; Ex. 7 ("Sept. 10, 2001 letter"); Ex. 8 ("Oct. 2, 2001 letter"); Ex. 9 ("Feb. 5, 2002 letter").[FN7] Defendants claim that Dr. Connolly refused to do so without justification. *See* D. Memo. at 6. Having been unsuccessful in obtaining reimbursement directly from Dr. Connolly, Madison put the claim in collection with LHC Enterprises ("LHC") in March 2002 and directed Defendant Conrad to determine if the debt could be collected.[FN8]

> FN5. The Reimbursement Agreement states in full:
>
> I, Frances T. Connolly, hereby agree to reimburse ReliaStar Life Insurance

Slip Copy                                                                    Page 3
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

Company for any overpayment of my claim that may result from retroactive benefits received from Federal Social Security Benefits, State Retirement Benefits, or other income benefits that may be due me as described on Page B1 of my Certificate of Insurance. My spouse, heirs, or assignees agree to reimburse the Company for retroactive benefits in the event of my death.

FN6. Dr. Connolly was (and continues to be) a participant in the Pennsylvania Pubic School Employee Retirement System ("PSERS").

FN7. Defendants apparently did not learn the exact amount of benefits PSERS paid Dr. Connolly until subpoenaing her records directly from the PSERS in October 2003. Nevertheless, in their Delaware County Common Pleas action (filed September 17, 2002), Defendants sought damages for unjust enrichment on the belief that Dr. Connolly received benefits from PSERS in addition to SSDI. *See* D. Memo, Ex. 11 ("Delaware Co. Compl."); *see also* D. Memo, Ex. 5 (Record of Dr. Connolly's PSERS benefits).

FN8. LHC is not a defendant in this action. Defendant Conrad is a principal of LHC. *See* D. Memo, Ex. 4 ("Conrad Decl."), at ¶ 2.

Conrad first tried contacting Dr. Connolly on March 14, 2002. *See* Conrad Decl. ¶ 5. Over the next week or so Conrad spoke or left messages for Dr. Connolly several times until March 19th when Michael Pansini, Esq. ("Pansini") then informed him by voice mail that Dr. Connolly had retained his services and to contact him regarding Madison's claim. *See id.* ¶ 6. That same day Conrad called Pansini to discuss the reimbursement demand, explaining among other things that the demand amount was uncertain and might be more than indicated by Madison's letters.[FN9] *See id.* ¶ 7. He also informed Pansini that he would be in Philadelphia in two days and would like to meet to resolve Madison's claim. *See id.* ¶ 8. Dr. Connolly describes the calls from Defendants as being threatening and harassing. *See* P. Memo., Ex. A ("Connolly Aff."), at ¶¶ 5-9 (Defendants would call before 7:30 a.m. and as late as 10:30 p.m., and threatened "to come to her residence to collect the money," "to have [her] arrested," "to seize her bank account," and "to impose liens against [her] property and assets.").

FN9. Dr. Connolly points to Defendants' uncertainty as to the ultimate reimbursement amount as evidencing that they pursued their claim against her in bad faith. *See* P. Memo at 5 ("Indeed, Defendants admit that they continued to change the amount they sought from her.") (citing Conrad's declaration).

The next day (March 20th) Conrad called Pansini's law office several times trying to schedule a meeting with Dr. Connolly and Pansini for March 21st. *See id.* ¶ 9. These calls were unsuccessful. A paralegal in Pansini's office informed Conrad that Pansini was going on vacation the next day and would likely not return his calls. *See id.* ¶ 10.Conrad informed her that if he did not hear from Pansini or one of his associates he would be forced to conclude that Pansini did not actually represent Dr. Connolly. *See id.* ¶¶ 10, 11.He also immediately faxed a letter to Pansini's law office to confirm this conversation. *See* D. Memo, Ex. 10 ("Conrad Letter"); *see also* Conrad Decl. ¶¶ 10, 11. This too went nowhere and Conrad again contacted Dr. Connolly, explaining that he had been unable to reach Pansini. Dr. Connolly, however, represented that Pansini was her attorney, and Conrad returned the reimbursement demand to Madison. ReliaStar (c/o Madison) then filed a collection action against Dr. Connolly on September 17, 2002 in Delaware County Common Pleas Court. *See* Delaware Co. Compl.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

Page 4

*3 Complaint filed, Defendants [FN10] proceeded with discovery in their suit against Dr. Connolly. And, as it often is, discovery turned out to be a contentious affair between the parties. Defendants offer that it was Dr. Connolly's strategy to take the position that would "make life hardest" on them to complete discovery. *Id.; see also* D. Memo, Ex. 12 ("10/22/03 Stephenson Letter"). Plaintiffs, of course, dispute this characterization and in the interim filed this suit.[FN11] *See* P. Memo, Ex. C, p. 5 ("10/23/03 Pansini Letter"). At the heart of the discovery dispute was scheduling Dr. Connolly's deposition.

> FN10. With, of course, the exception of Defendant Conrad.

> FN11. As noted earlier, Dr. Connolly filed suit on September 8, 2003 in Philadelphia County Court of Common Pleas, and Defendants removed the case to this Court on September 29, 2003.

Defendants claim that "Dr. Connolly made herself unavailable for discovery requests, and in particular for [her] deposition." D. Memo. at 8. They attempted to depose Dr. Connolly twice in October and November 2003 but each time she claimed to be unavailable for unspecified medical reasons. *See* D. Memo. at 8. Defendants had asked Dr. Connolly for medical evidence to justify her refusals in order to have a demonstrable basis to reschedule their impending November 25, 2003 trial date. *See id.; see also* D. Memo, Ex. 14 ("Oct. 7, 2003 Stephenson letter"). Defendants never received any such evidence. Dr. Connolly claims that she had made an offer to being deposed at her counsel's office but Defendant's rejected this offer. *See* P. Memo at 5; *see also* Oct. 23, 2003 Pansini Letter.[FN12]

> FN12. Plaintiff's characterization of this letter in their memorandum of law is misleading. The October 23, 2003 letter does not say that Dr. Connolly *will be* available for a deposition at Pansini's office. Rather, it provides: "I [Pansini] will suggest to her

that she *attempt* to make herself available if the deposition would be conducted in my office." (emphasis added). Plaintiff does not offer any evidence, however, that she in fact agreed to being deposed at Pansini's office. Indeed, Defendants indicate that on October 30, 2003, Pansini notified them that Dr. Connolly would not appear at a scheduled November 12, 2003 deposition. *See* D. Memo. at 9. Plaintiff does not contest this fact.

Undeterred by Dr. Connolly's refusal to provide medical evidence, Defendants proceeded to obtain video surveillance of her in early November 2003-about the time of her scheduled deposition. *See* D. Memo. at 9; Ex. 15 (DVD containing surveillance video). In the video, Dr. Connolly can be seen shopping without difficulty at a B.J. Club outlet store and leaving her home readily. *See id.* The Delaware County Common Pleas Court (Burr, J.) accepted this surveillance evidence and ordered Dr. Connolly to appear for a deposition no later than January 5, 2004. Although Plaintiff's counsel communicated his "outrage" over Defendants' decision to videotape Dr. Connolly, there is no evidence in the record that Plaintiff actually sought discovery sanctions in the Delaware County proceeding. *See* P. Memo, Ex. C at 2 ("Nov. 25, 2003 Pansini Letter").

On July 9, 2004, Dr. Connolly-*in open court*-settled for the *full amount* ReliaStar/Madison demanded. *See* P. Memo, Ex. D ("Del.Co. Tr.") at 3 ("The Court: I understand the parties have agreed to settle this case for the total amount [.]"); *see also* D. Memo. at 9. Nevertheless, Plaintiff contends that Defendants behavior during this proceeding-seeking to have a judgment entered against Dr. Connolly-was further evidence of their bad faith.

### Discussion

### I. Is Summary Judgment Premature?

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

Page 5

Dr. Connolly argues that ruling on Defendants' motion for summary judgment is premature because a stay in this case "has just recently been lifted and no time has been permitted for the parties to engage in any discovery."Pl. Memo. at 10. With an opportunity to conduct further discovery, Plaintiff believes that she will uncover additional "facts of bad faith behavior" on the part of Defendants to support her claims. Pl. Memo. at 10. Defendants argue that Dr. Connolly is not entitled additional time for discovery because she has failed to meet the requirements of Fed.R.Civ.P. 56(f).*See* D. Rep. at 8.[FN13] Defendants are correct; plaintiff will not have more time for discovery.

> FN13. Plaintiff neither filed a separate motion pursuant to Rule 56(f) nor cited it in her memorandum of law.

**\*4** Federal Rule of Civil Procedure 56(f) provides:

Should it appear **from the affidavits** of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f) (emphasis added).

The rule's language is clear. The party opposing summary judgment *must* file with the district court an affidavit detailing the reasons why it requires a continuance to conduct additional discovery. The Third Circuit has interpreted Rule 56(f) to require an affidavit that specifies: (1) the particular information sought; (2) how the information, if uncovered, would preclude summary judgment; and (3) why this information has not been previously obtained. *See Pastore v. Bell Telephone Co. of Penn.,* 24 F.3d 508, 511 (3d Cir.1994) (citing *Dowling v. City of Philadelphia,* 855 F.2d 136, 140 (3d Cir.1988)).

In the ordinary case, which this is, failure to comply with Rule 56(f) is fatal to a party's claim for additional discovery. *See Bradley v. United States,* 299 F.3d 197, 206 (3d Cir.2002) ("We have made clear that, in all but the most *exceptional* of cases, failure to comply with Rule 56(f) is fatal to a claim of insufficient discovery on appeal.") (emphasis added, citations omitted).[FN14] "Constructively complying" with Rule 56(f) is insufficient to meet the affidavit requirement of the rule. In other words, raising a Rule 56(f) objection in a memorandum opposing summary judgment does not satisfy its affidavit requirement. The rule demands an affidavit and the district courts will only accept an affidavit in support of a Rule 56(f) motion. *See Pastore,* 24 F.3d at 511 ("Rule 56(f) clearly requires that an affidavit be filed. The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition. An unsworn memorandum opposing a party's motion for summary judgment is not an affidavit.") (citation and internal quotes omitted). Because no affidavit accompanies Dr. Connolly's opposition, the Court rejects her vague and generalized request for additional time to complete discovery.[FN15]Defendants' motion for summary judgment is properly before this Court.

> FN14. In *Miller v. Beneficial Management Corp.,* the Court of Appeals concluded that the district court prematurely granted summary judgment and exempted plaintiffs from Rule 56(f)'s affidavit requirement because they had relied detrimentally on the Magistrate Judge's ruling waiving the requirement. 977 F.2d 834, 846 (3d Cir.1992). Application of that case has been limited to its facts, however. *See Pastore,* 24 F.3d at 511 n. 4;*see also Bates v. Tandy Corp.,* No. 05-3851, 2006 U.S.App. LEXIS 16284, at *7 n. 2 (3d Cir. June 27, 2006) (non-precedential) (noting that the applicability of *Miller* has been limited to its facts).*Miller* is the lone case in which the Third Circuit has excused a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

party for failing to file an affidavit when moving pursuant to Rule 56(f).

FN15. Even if this were the "exceptional case" in which the Court could excuse submission of an affidavit, Dr. Connolly's memorandum of law lacks the necessary specificity to justify a continuance. More damning to the Plaintiff, and troubling to the Court, however, is her outright misrepresentation that a court-issued stay prevented her from undertaking discovery until recently. *See* P. Memo. at 10 ("[D]espite the fact that this case was filed in 2003, it was placed in a stay pending the outcome of Defendants' [Delaware County Common Pleas Court] action against Plaintiff. The stay has just recently been lifted and no time has been permitted for the parties to engage in any discovery."). Judge Weiner never stayed discovery, however, while the case was pending before him. And this Court has not done so either. Indeed, Judge Weiner's April 29, 2004 order (Doc. No. 4) stated explicitly that: **"This matter remains ACTIVE.**It is further ordered that **all discovery** and settlement discussions **will continue** and if intervention by the Court is needed or desired, the parties may ask...." D. Rep., Ex. A ("Judge Weiner's Order) (emphasis in original and added). Plaintiff has had more than two years since Judge Weiner's order to conduct the necessary discovery for evidence supporting her claims. But she failed to do so. For her to now ask the Court to delay consideration of Defendants' motion is farcical.

## II. Standard of Review

In deciding a motion for summary judgment under Fed.R.Civ.P. 56, a court must determine "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law."*Medical Protective Co. v. Watkins,* 198 F.3d 100, 103 (3d Cir.1999) (internal citation

omitted).Rule 56(c) provides that summary judgment is appropriate:

... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*5 A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). On a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Upon such a showing, the burden shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial."Fed.R.Civ.P. 56(e). In doing so, the party opposing summary judgment cannot simply rest on the allegations contained in its pleadings and must establish that there is more than a "mere scintilla of evidence in its favor."*Anderson,* 477 U.S. at 249. Showing "that there is some metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. *Matsushita Elec. Indus. Co.,* 475 U.S. at 586. If the non-moving party fails to create "sufficient disagreement to require submission [of the evidence] to a jury," the moving party is entitled to judgment as a matter of law. *Anderson,* 477 U.S. at 251-52.

## III. Dr. Connolly's Claims

## A. Count I-Breach of Contractual, Fiduciary, and Statutory Obligations to Dr. Connolly

Under Pennsylvania law,[FN16] a plaintiff success-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
**(Cite as: 2006 WL 3355184 (E.D.Pa.))**

fully states a claim for breach of contract by demonstrating:(1) the existence of a valid and binding contract; (2) that she has complied with the contract and performed all of her own obligations under it; (3) fulfillment with all conditions precedent; (4) breach of the contract; and (5) damages. *See, e.g., Gundlach v. Reinstein,* 924 F.Supp. 684, 688 (E.D.Pa.1996).

> FN16. The parties agree that Pennsylvania contract law governs this dispute.

To succeed there first then must be a contract. And so often the dispute is over whether a written agreement (or other communications) between the parties created a contract. This issue is not present, however. Dr. Connolly never took the first step of identifying any agreement, yet alone contract, that Defendants breached.

Count I states that Defendants breached contractual obligations. *See* Compl. ¶¶ 20-22.But which obligation(s) of which contract(s) is not clear from either Plaintiff's Complaint or her opposition to summary judgment.[FN17] Although the parties entered into two separate contracts (the Policy and Reimbursement Agreement), Dr. Connolly does not allege that Defendants breached their obligations under either. The Complaint does make mention of the long-term disability plan, noting that Plaintiff was entitled to benefits under the Policy and that all premiums were paid in full. *See* Compl. ¶¶ 8-10.But Plaintiff does not allege (or more importantly proffer any evidence) that Defendants failed to perform their obligations under the Policy. As for the Reimbursement Agreement, the Complaint is silent.[FN18] Defendants' obligation under this agreement was to advance Dr. Connolly disability benefits in exchange for the promise that she would repay those benefits upon receipt of her SSDI and PSERS income. Plaintiff does not allege that Defendants failed to do so. In sum, Dr. Connolly's breach of contract claim cannot be premised on Defendants' failure to perform their obligations under either of these contracts.

> FN17. Plaintiff's response did not address Defendants' arguments for dismissing the breach of contract claim. For this reason alone the Court could dismiss Count I.

> FN18. Plaintiff acknowledges that Defendants seek reimbursement payments but not that the Reimbursement Agreement is the basis for their claim. *See* Compl. ¶ 11.

**\*6** But there is possible recourse for Plaintiff. Elsewhere in her Complaint, Dr. Connolly broadly asserts that Defendants were dilatory and abusive in their claim handling and did not "provide a reasonable factual explanation" for their actions. Compl. ¶ 18. She claims that this conduct constitutes a breach of Defendants' duty of good faith and fair dealing. *See id.* ¶ 16-18.[FN19]

> FN19. Defendants did not breach either contract, so it might seem logical that Dr. Connolly could not successfully maintain a breach of the implied duty of good faith and fair dealing claim. Yet, from reviewing cases decided in this district, there is some indication that this is not a settled issue of Pennsylvania contract law-especially in cases of insurers dealing with insureds. *Compare Comcast Spectator L.P. v. Chubb & Son, Inc.,* No. 05-1507, 2006 U.S. Dist. LEXIS 55226, at \*67 (E.D.Pa. Apr. 8, 2006) ("Comcast does not dispute that we must dismiss the claim for breach of implied duty of good faith and fair dealing if we dismiss the breach of contract claim.") *with Berks Mut. Leasing Corp. v. Travelers Property Cas.,* No. 01-6784, 2002 U.S. Dist. LEXIS 23749, at \*11 n. 6 (E.D.Pa. Dec. 9, 2002) ("[D]efendant asserts that plaintiff's claim for breach of the covenant of good faith must fail because 'Pennsylvania does not allow for a separate cause of action for a breach of an implied duty absent a breach of the underlying contract.'...[I]t is not entirely clear to me that this proposition is an accurate statement of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the law[.]") (citations omitted). Because the Court concludes that Dr. Connolly cannot show that Defendants breached the implied duty of good faith and fair dealing, it does not decide the issue of whether this claim is unavailable, as a matter of law, absent a breach of the underlying contract.

Pennsylvania law likely implies the duty of good faith and fair dealing into every contract. *See, e.g., Onal v. BP Amoco Corp.,* 275 F.Supp.2d 650, 659 (E.D.Pa.2003) (citing *Kaplan v. Cablevision of Pa., Inc.,* 671 A.2d 716, 721-22 (Pa.Super.1996)).[FN20] And it certainly does in the case of an insurance policy. *See Berks Mut. Leasing Corp.,* 2002 U.S. Dist. LEXIS 23749, at * 7 (citing *Fedas v. Insurance Co. of State of Pennsylvania,* 151 A. 285, 286 (Pa.1930)). But Pennsylvania does not allow parties to enforce this duty in all cases. *See Parkway Garage, Inc. v. City of Philadelphia.* 5 F.3d 685, 701 (3d Cir.1993). Insureds may do so against insurers, however. *See id.*

> FN20.*Kaplan* cites *Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Trust Co.,* 560 A.2d 151, 153 (Pa.Super.1989), as its principal authority for the proposition that Pennsylvania has implied the duty of good faith into every contract by adopting Restatement (Second) of Contracts § 205. The *Creeger Brick* court did no such thing. Rather, it only noted that § 205 *"suggests* that '[e]very contract imposes upon each party a duty of good faith and fair dealing....."560 A.2d at 153 (emphasis added). The court then observed that Pennsylvania has recognized this duty in "limited situations." *Id.* at 153-54 (cataloguing the few instances). But no language in *Creeger Brick* embraces the sweeping conclusion that every contract under Pennsylvania law contains the implied duty of good faith and fair dealing. Nevertheless, a majority of Pennsylvania and federal courts have interpreted *Cree-*

*ger Brick* as going this far and this Court will as well with these observations in mind. *See also Acad. Indus. v. PNC Bank, N.A.,* 2002 Phila. Ct. Com. Pl. LEXIS 94, at *17-22 (May 20, 2002) (observing the lack of consensus on the issue of whether every contract under Pennsylvania law contains an implied duty of good faith and fair dealing).

An insurer breaches its duty of good faith, for example, by: (1) failing to investigate claims in a fair and objective manner and denying the claim without good cause; or (2) failing to inform the insured, in certain instances, of all benefits and coverages. *See Berks Mutual Leasing Corp.,* 2002 U.S. Dist. LEXIS 23749, at *8 (collecting cases). Because the Policy required Defendants to handle Dr. Connolly's disability claim, allegations that they were dilatory and unreasonable in doing so would breach the duty of good faith and fair dealing.

Plaintiff's claim nevertheless fails. Were the Court considering a motion to dismiss, Dr. Connolly's bare allegations would suffice. But on summary judgment, Plaintiff must introduce evidence that supports her claim. And she has not. There is nothing in the record even hinting that Defendants failed to promptly investigate, process and pay her disability benefits. The record is clear; Defendants fulfilled their contractual obligations under the Policy. *See* Butters Decl. ¶¶ 10-12.

But any party (insurer or insured) may also breach the implied duty of good faith "if it evades the spirit of the bargain, acts with a lack of diligence, wilfully renders imperfect performance, or exercises contractually authorized discretion in an unreasonable manner."*Berks Mutual Leasing Corp.,* 2002 U.S. Dist. LEXIS 23749, at *8-9 (citing *Somers v. Somers,* 613 A.2d 1211, 1213 (Pa .Super.Ct.1992)). So quite possibly, Plaintiff is claiming that Defendants efforts to recover the excess payments breached the duty of good faith. Plaintiff's opposition to summary judgment supports this view as it focuses exclusively on Defendants' collection ef-

forts. And if this is the case, then the contract at is-sue is the Reimbursement Agreement.

This raises an interesting question, however. While it is clear that all Pennsylvania insurance contracts contain an implied duty of good faith, it is not en-tirely clear whether every contract entered into between an insurer and insured must as well. The Reimbursement Agreement was not an insurance policy but was Defendants' means of ensuring that it was reimbursed for paying excess benefits. Should the fact that one of the parties to the Reim-bursement Agreement was an insurer covert it auto-matically into an insurance contract? The cases sug-gest that it is the relationship (insurer-insured), rather than the nature of the contract that gives rise to this duty.

*7 But resolving this issue here is ultimately unne-cessary. Defendants' efforts to enforce the Reim-bursement Agreement did not breach their duty (if any) of good faith and fair dealing. Given Dr. Con-nolly's refusal to reimburse Defendants in accord-ance with the Reimbursement Agreement, the only reasonable expectation (and outcome) was that De-fendants would eventually file suit to collect back the excess payments. This was absolutely their right.

One party to a contract may, unless limited by the contract itself, always sue another for breach of that contract.[FN21] Dr. Connolly's implication otherwise is preposterous. That she disputes Defendants' claim (or the amount) does not automatically imbue their efforts to collect it (directly, through a collec-tion agency or litigation) with bad faith. The parties entered into a Reimbursement Agreement, and Dr. Connolly has never contested its validity. Because the Reimbursement Agreement expressly obligates Dr. Connolly to repay excess benefits, it should have come as no surprise that Defendants would hold her to the agreement. Her claims then that "Defendants acted frivolously and with reckless disregard" and "Defendants did not have a reason-able basis for harassing and threatening Plaintiff under the policy" are implausible. Compl. ¶ ¶ 13,

14.[FN22] Defendants did not breach the duty of good faith and fair dealing by initiating collection pro-ceedings.

> FN21. Pennsylvania also permits insurers to "recover payments under a mistake of fact or as the direct result of fraud or mis-representation." *Pappas v. UNUM Life Ins. Co.,* 2000 U.S. LEXIS 11309, at *8 (E.D.Pa. Aug. 10, 2000) (citing *Van Riper v. The Equitable Life Assur. Soc.,* 561 F.Supp. 26, 33 (E.D.Pa.1982), *aff'd* 707 F.2d 1397 (3d Cir.1983). Because Defend-ants had a good faith basis to sue Dr. Con-nolly for breach of contract, the Court does not consider whether her actions may have constituted fraud or misrepresentation as an alternative basis for Defendants' collec-tion action.

> FN22. These allegations also make little sense in light of the fact that Defendants brought their collection action on the basis of the Reimbursement Agreement and not the Policy. Moreover, Dr. Connolly's affi-davit contradicts these allegations. *See* Connolly Aff. at ¶¶ 17, 18 ("The reason that I did not pay Defendants right away for the money that I allegedly owed was because the figures communicated by De-fendants were wrong. Once Defendants got the numbers correct, I agreed to pay the full amount."). Dr. Connolly cannot seri-ously contend that Defendants did not have a "reasonable basis" for their claim if she was only disputing the amount owed and in the end agreed to pay the full amount de-manded by Defendants. *See* Del. Co. Tr. at 3. This is not a minor inconsistency and raises significant questions as to the over-all credibility of Dr. Connolly's allega-tions.

Dr. Connolly also alleges, however, that Defend-ants's investigative methods before and during the litigation in pursuit of the excess benefits breached

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

their duty of good faith and fair dealing. *See* Compl. ¶¶ 15, 16, 18(a); P. Memo. at 4, 9. Pennsylvania courts have recognized this as a viable theory of recovery for statutory bad faith claims. *See O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa.Super.1999) ("[T]he broad language of Section 8371 was to remedy all instances of bad faith conduct by an insurer whether occurring before, during or after litigation."); *accord Hollock v. Erie Ins. Exch.,* 842 A.2d 409 (Pa.Super.2004); *Ridgeway v. United States Life Credit Life Ins. Co.,* 793 A.2d 972 (Pa.Super.2002). There is no apparent reason, however, why this theory of recovery should be limited to statutory bad faith claims. Bad faith is after all bad faith regardless of whether the theory of recovery is tort or contract.[FN23] But of course stating a claim and succeeding on it are not the same thing. And Dr. Connolly's bad faith claim fails under an investigative bad faith theory as well.

> FN23. The Court notes that the Supreme Court of Pennsylvania has yet to decide whether statutory claims of bad faith under 42 Pa. Cons.Ann. § 8371 sound in tort or contract. *See Mishoe v. Erie Ins. Co .,* 824 A.2d 1153, 1161 n. 11 (Pa.2003) ("Proper characterization of section 8371 claims is a matter that is unsettled.") (citations omitted).

Dr. Connolly's allegations of bad faith investigative conduct encompass mainly two sets of events.[FN24] The first occurred in March 2002 when Conrad contacted her; the second in October and November 2003 when Defendants attempted to depose her. The Court addresses the latter (the alleged discovery abuses) first.

> FN24. There are other more minor incidents that Dr. Connolly points to as evidencing Defendants' bad faith: (1) ReliaStar's claim that Conrad was a contractor and therefore not liable for his actions; and (2) Defendants' alleged varying of the amount that Plaintiff owed. *See* Pl. Memo. at 5, 8; Ex. C at p. 1 ("Aug. 12, 2003 Letter").

Neither of these allegations support Dr. Connolly's bad faith claim. Plaintiff has offered no evidence that Defendant ReliaStar's position in August 2003 regarding Conrad's status was not made in good faith. Whether Conrad was or was not an agent of ReliaStar was a legally debatable proposition (perhaps he was acting outside the scope of his employment), and regardless ReliaStar was under no obligation to concede the issue of Conrad's status especially before Dr. Connolly filed suit. Moreover, Defendants have not "attempted to wash their hands clean from their own devious actions" because they do not advance the position that they were not subject to liability for Conrad's actions in their motion for summary judgment. P. Memo. at 8.

As for the allegation that Defendants "continued to represent that she owed differing amounts of money," Dr. Connolly cites two pieces of evidence to support this claim: (1) Conrad's declaration and (2) a July 2, 2004 letter from Pansini, Plaintiff's attorney. Conrad admits that he advised Pansini that the amount demanded was uncertain. *See* Conrad Decl. at ¶ 7. And this makes perfect sense. In March 2002, Defendants had yet to learn exactly how much in PSERS benefits Dr. Connolly had received. It is therefore clear that the total reimbursement amount she might owe could increase. The fact that Defendants gave notice of this to Plaintiff's attorney is not evidence of bad faith conduct. It's the exact opposite. Plaintiff's second piece of evidence-the July 2, 2004 letter-is equally unhelpful to this allegation. This was a letter from Pansini to Defendants disputing the claim amount. *See* P. Memo.; Ex. C, at p. 3 ("7/2/04 Pansini Letter"). Nowhere in the letter, however,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
**(Cite as: 2006 WL 3355184 (E.D.Pa.))**

does Plaintiff identify when Defendants specifically made different representations about the amount Dr. Connolly owed. It is merely a letter from *Plaintiff's attorney* challenging the amount Dr. Connolly owed. There is an obvious difference between Plaintiff's counsel disagreeing with Defendants' demand and Defendants actually varying the demand amount. Dr. Connolly's insinuation that Defendants were manipulating the claim amount or otherwise is disingenuous at best.

Without question, attempting to depose Dr. Connolly-*the defendant* in the collection action-was at the heart of the discovery process. Since this conduct was clearly part of Defendants' discovery practices, it cannot be used as "evidence of bad faith ... because these practices [are] subject to an exclusive remedy under the [Pennsylvania] Rules of Civil Procedure."*Hollock,* 842 A.2d at 415 (citing *O'Donnell,* 734 A.2d at 909). If Dr. Connolly questioned Defendants' discovery tactics, the appropriate response was to file a motion for a protective order in the Delaware County Court of Common Pleas proceeding. *See Hollock,* 842 A.2d at 415. It was not to pursue a collateral remedy in a separate civil action. Not only did Dr. Connolly never ask the Court of Common Pleas for relief, but Judge Burr in fact relied upon the video surveillance of Dr. Connolly in ordering her deposition. Dr. Connolly's allegations of discovery abuse are therefore not germane to her bad faith claim.[FN25]

> FN25. Dr. Connolly's Complaint *does not* contain these allegations of discovery abuse. And she never amended her Complaint to incorporate these events. Dr. Connolly filed her Complaint in September 2003 but the alleged discovery abuses did not take place until October and November 2003. It would have been proper for the Court to ignore these allegations entirely. But because this conduct is not, as a matter

of law, relevant evidence to establish bad faith the point is academic. *Compare with Hollock,* 842 A.2d at 415 (holding that conduct during discovery gives rise to a bad faith claim only if the conduct amounts to a blatant attempt to undermine the truth finding process by, for example, intentionally concealing, hiding or otherwise covering-up the insurer's conduct) (citation and quotes omitted).

**\*8** As to Conrad's communications with her, these are the *only* specific allegations of bad faith conduct in Dr. Connolly's Complaint. *See* Compl. ¶ 15 ("On several occasions in March of 2002, Defendant Leonard Conrad ... made several threatening and harassing phone calls to Plaintiff[.]"). The Complaint also includes vague (and repeated) allegations that Defendants made threats to collect the excess benefits but offers nothing by way of who made them or when they occurred.

In her response, however, Dr. Connolly provides a bit more color. She claims that Defendants (without specifically saying Conrad) would call her before 7:30 a.m. and as late as 10:30 p.m., and threatened "to come to her residence to collect the money," "to have [her] arrested," "to seize her bank account," and "to impose liens against [her] property and assets."Connolly Aff. at ¶¶ 5-9. She also claims that Defendants attempted to continue to contact her even after explaining she was represented by counsel. *See id.* at ¶ 10.She never specifies when these threatening calls occurred, however. Between her Complaint and affidavit, the only specific time she claims Defendants threatened her was on "several occasions" in March 2002.

Conrad does not deny speaking with Dr. Connolly several times between the 14th and 19th in March 2002 before receiving a message from Pansini that he was representing Dr. Connolly and to contact him regarding Madison's claim. *See* Conrad Decl.. at ¶¶ 5-6. Conrad asserts that only after he failed to reach Pansini (after several attempts) did he again contact Dr. Connolly. *See id.* at ¶¶ 10-14.Indeed, he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

even faxed a letter to Pansini's law office informing him of his intention to contact Dr. Connolly if he did not receive confirmation that Pansini or one of his associates actually represented her. *See id.* at ¶ 14; Conrad Letter. Conrad admits that he contacted Dr. Connolly after not hearing from Pansini (or his firm) about representing her but that he returned the claim demand to Madison after Dr. Connolly told him that Pansini did in fact represent her. *See Conrad Aff.* at ¶ 17. Dr. Connolly does not allege that any Defendant contacted her again after March 2002.[FN26] Notably, this alleged conduct did not occur during a pending litigation-Defendants did not sue her until September 17, 2002.

> FN26. Not, of course, until Defendants filed their collection action.

On summary judgment, the Court must view the evidence and draw all inferences therefrom in the light most favorable to the non-moving party-Dr. Connolly. But even applying this favorable standard to her claims, she does not, as a matter of law, demonstrate that Defendants breached the implied duty of good faith and fair dealing (i.e. acted in bad faith) in their investigation and prosecution of Madison's claim. The March 2002 threats and harassment cannot be viewed in isolation but must be considered in the entirety of Defendants' efforts to collect the excess benefits. And viewed from this perspective, these threats alone do not establish bad faith conduct on the part of Defendants.

**\*9** Defendants initially sent three letters to Dr. Connolly seeking reimbursement. This effort was unsuccessful-the record is unclear why-either Dr. Connolly refused to honor Defendants' repeated demands without justification or she simply ignored the letters. It was only after the letters did not persuade Dr. Connolly that Defendants placed her claim with a collection agency. And it was then, and only then, that Dr. Connolly says she received any phone calls-threatening or otherwise-from Defendants.

But Conrad did not contact Dr. Connolly without

good reason; he was collecting a debt on behalf of Madison. And even if he was overzealous in his efforts to collect the debt as Dr. Connolly claims, these isolated and few instances of threats or harassment do not rise to the level of bad faith on the part of Defendants. Conrad's contact with Dr. Connolly was limited to one week of telephone calls in March 2002. Dr. Connolly emphasizes that Conrad not only harassed her with phone calls but contacted her after she retained counsel. But on the record before the Court this overstates Conrad's actions. He decided to contact Dr. Connolly after learning she had retained an attorney only when Pansini did not return his phone calls and his office would not acknowledge representing Dr. Connolly. It was simply not bad faith for Conrad to contact Dr. Connolly after receiving no further acknowledgment from Pansini that he represented her. That Conrad then ceased contact with Dr. Connolly when she informed him that Pansini was in fact her attorney further militates against finding that Defendants acted in bad faith. Dr. Connolly has offered no evidence to discredit or refute Conrad's explanation of these events. She also does not allege that Defendants threatened her again after March 20, 2002.

And while her affidavit suggests that Conrad may have violated Pennsylvania's Fair Credit Extension Uniformity Act ("FCEUA"),[FN27] the Court holds that violating those statutes does not *per se* establish that Defendants acted in bad faith. The Third Circuit has already observed that violations of the UIPA or UCSPR do not establish *per se* bad faith conduct. *See Diner v. United Services Automobile Assoc. Cas. Ins. Co.,* 29 Fed. Appx. 823, 827 (3d Cir. Jan. 24, 2002) (non-precedential). The *Diner* court explained that the UIPA (and UCSPR) "prohibit[ ] unfair methods of competition" or "deceptive acts or practices" in the insurance industry. But that violations of these statutes "did not have relevance to the question of whether or [not] the insurer had a reasonable basis for denying benefits," i.e. act in bad faith with respect to the insured. *Id.* Similarly, the FCEUA establishes "what shall be considered unfair methods of competition and un-

fair or deceptive acts or practices with regard to the collection of debts."73 Pa. Stat. Ann. § 2270.2. The structure of the FCEUA and the UIPA/UCSPR therefore parallel one another. And if violations of the UIPA/UCSPR do not *per se* establish bad faith in the context of satisfying claim demands, likewise technical violations of the FCEUA do not establish *per se* bad faith investigative conduct. That Defendants might have violated the FCEUA on isolated occasions during a nearly three year effort to recoup the excess benefits does not mean that Defendants overall pursuit of their claim was not reasonable and in good faith.

> FN27. The FCEUA delineates the type of conduct that constitutes unfair or deceptive acts or practices with regard to debt collection. *See*73 Pa. Stat. Ann. §§ 2270.2, 2270.4. Dr. Connolly does not allege that Defendants violated the FCEUA.

**\*10** Defendants aggressively pursued their claim against Dr. Connolly. They filed suit against her in September 2002. And after nearly three years, Defendants were willing to go to trial to recoup the overpaid benefits. At no point did Defendants abandon their claims against Dr. Connolly. Bad faith is such conduct that "imports a *dishonest purpose* and means a breach of a known duty (i.e., good faith and fair dealing), *through some motive* of self-interest or ill will."*Terletsky v. Prudential Property and Casualty Ins. Co .,* 649 A.2d 680, 688 (Pa.Super.1994) (citing Black's Law Dictionary 139 (6th ed.1990)) (emphasis added). Defendants did not act with a dishonest purpose or ill will toward Dr. Connolly. She owed them a debt and they pursued the recovery through diligent and legal means for nearly three years. It is inconceivable on this record to conclude that Defendants breached the implied duty of good faith and fair dealing-acted in bad faith-while investigating and prosecuting their claim against Dr. Connolly.FN28

> FN28. Pennsylvania's law of bad faith in the insurance context unfortunately lacks clarity and is not the straightforward in-

quiry one might hope for. There are three considerations that arguably pull in different directions. First, Pennsylvania recognizes the implied duty of good faith in all insurance contracts. As such, insureds may bring a contract-based cause of action for breach of this duty. Second, Pennsylvania has a statutory cause of action for bad faith in the insurance context (42 Pa. Cons.Stat. Ann. § 8371) ("Section 8371"). Third, Pennsylvania courts disfavor allowing "an implied duty of good faith claim to proceed where the allegations of bad faith are identical to a claim for relief under an established cause of action."*Northview Motors, Inc. v. Chrysler Motors Corp.,* 227 F.3d 78, 92 (3d Cir.2000) (citing *Parkway Garage, Inc.,* 5 F.3d at 701-702) (internal quotes omitted)). Thus, the apparent dilemma is whether a court should allow an contract-based good faith claim to proceed when the allegations supporting that claim mirror those supporting a statutory bad faith cause of action. And this is more than just semantics; for example, courts have consistently interpreted Section 8371 as limited to causes of action arising out of an insurer's denial of a claim or benefit. *See, e.g.,. See Ridgeway,* 793 A.2d at 976. The burden of proof for each might also differ. Section 8371 requires clear and convincing evidence. *See Keefe v. Prudential Prop. & Cas. Ins. Co.,* 203 F.3d 218, 227 (3d Cir.2000) (citing *Cowden v. Aetna Cas. & Surety Co.,* 134 A.2d 223, 229 (Pa .1957). But a bad faith claim sounding in contract (i.e. breach of the implied duty of good faith and fair dealing) might only require a preponderance of evidence to succeed. *See Snyder v. Gravell,* 666 A.2d 341, 343(Pa.Super.1995) (burden of proof for contract claims is by a preponderance of the evidence). The Court has not found a single case explicitly stating whether the burden of proof for a breach of the implied

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
**(Cite as: 2006 WL 3355184 (E.D.Pa.))**

duty of good faith and fair dealing claim is by a preponderance of the evidence (because it is a contract claim) or by clear and convincing evidence (because it is essentially a bad faith claim). And further confusing the situation is the Supreme Court of Pennsylvania's holding in *Birth Center v. St. Paul Caompanies, Inc.,* 787 A.2d 376 (Pa.2001), that an insured may bring a bad faith action against the insurer as *both* a Section 8371 claim *and* a contract cause of action. The Court believes it is necessary to highlight these issues because of the frequency with which insureds bring bad faith claims in both federal and Pennsylvania courts.

Plaintiff claims that Defendants violated fiduciary obligations as well. An insurer does not automatically owe a fiduciary duty to the insured under Pennsylvania law, however. *See, e.g., Belmont Holdings Corp. v. Unicare Life & Health Ins. Co.,* No. 98-2365, 1999 U.S. Dist. LEXIS 1802, at *10 (E.D.Pa. Feb. 5, 1999) ("Under Pennsylvania law, 'the mere fact that an insurer and an insured enter into an insurance contract does not automatically create a fiduciary relationship.'") (citation omitted). This duty only arises in limited circumstances such as where the insurer asserts a right to defend claims against the insured. *See Smith v. Berg,* No. 99-2133, 2000 U.S. Dist. LEXIS 4513, at * 15 (E.D.Pa. Apr. 10, 2000) (citation and quotes omitted). Because Defendants are in an adversarial position to their insured, Dr. Connolly, that type of limited circumstance does not present itself and Defendants do not owe Plaintiff a fiduciary duty in this case. With no duty, there is nothing to breach, and the Court dismisses this claim.

Plaintiff has also alleged that Defendants breached statutory obligations. But like her breach of contract claim, this too lacks a key element-a statute. With that piece missing, the Court accordingly dismisses her Count I statutory claim.

**B. Count II-Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, Unfair Insurance Practices Act, and Unfair Claims Settlement Practice Regulations**

*1. Unfair Trade Practices and Consumer Protection Law ("UTPCPL")*

As a fraud prevention statute, the UTPCPL proscribes a wide range of "unfair or deceptive acts or practices.".73 Pa. Cons.Stat. § 201-2(4)("Section 201-2(4)") (defining "Unfair Methods of Competition and "Unfair or Deceptive Acts or Practices"); *see also*73 Pa. Cons.Stat. § 201-3; *Weinberg v. Sun Co. Ins.,* 777 A.2d 442, 446 (Pa.2001). Its "purpose is to ensure fairness in market transactions and to place sellers and consumers on equal footing."*Baker v. Family Credit Counseling Corp.,* 440 F.Supp.2d 392, ----, No. 04-5508, 2006 U.S. Dist. LEXIS 51833, at *49 (E.D.Pa.2006) (citing *Pennsylvania v. Monumental Properties., Inc.,* 329 A.2d 812, 816 (Pa.1974)). And to effectuate this purpose, Pennsylvania courts interpret it liberally. *See, e.g., Cavallini v. Pet City & Supplies, Inc.,*949 A.2d 1002, 1004 (Pa.Super.2004) (citations omitted).

**\*11** Dr. Connolly did not identify which provisions of Section 201-2(4) Defendants allegedly violated. Courts find this a helpful and necessary detail because Section 201-2(4) prohibits varying forms of fraudulent behavior, including for example, false or misleading advertising (§ 201-2(4)(ii, ix, x, xii)), improper solicitations (§ 201-2(4)(xvii)), and certain incomplete disclosures in the sale of new motor vehicles (§ 201-2(4)(xx)). And ordinarily which provision(s) of Section 201-2(4) a plaintiff alleges that a defendant violated informs a court as to the facts a plaintiff needs to advance in order to maintain a UTPCPL claim. Instead, here the Court must go the other way-first review Dr. Connolly's allegations and then decide if Section 201-2(4) reaches them.

Dr. Connolly makes a number of allegations that sound in fraud. She alleges that Defendants:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                Page 15
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

(1) acted with the motive of self interest by enga-
ging in improper insurance practices toward
Plaintiff by engaging in behavior which includes ...
[k]nowingly and intentionally having and/or per-
mitting its employees, agents, representative and/or
assigns to lie and use falsehood when attempting to
collect monies allegedly due from their insureds,
including Plaintiff (Compl.¶¶ 18(f), 26(ix));

(2) [m]isrepresented pertinent facts, policy or con-
tract provisions relating to disputes at issues
(Compl.¶ 26(i)); and

(3) willfully and/or recklessly misrepresented ... the
nature and extent, terms, conditions and duration of
the coverage (Compl.¶ 28).

These allegations could fit either section (v), which
prohibits "represent [ations] that goods or services
have ... benefits ... that they do not have," or section
(xxi), which acts as a catch-all anti-fraud provision
and prohibits "any fraudulent or deceptive conduct
which creates a likelihood of confusion or misun-
derstanding."73 Pa. Cons.Stat. § 201-2(4)(v), (xxi).

But whichever section (if not both) applies has no
substantive bearing on the Court's analysis, because
to successfully state a claim under either requires
satisfying the traditional common law elements of
fraud. *See Piper v. American National Life Ins. Co.
of Texas,* 228 F.Supp.2d 553, 560 (M.D.Pa.2002)
(section (xxi) (citation and internal quotes omitted);
*Weisblatt v. The Minnesota Mutual Life Ins. Co.,* 4.
Supp.2d 371, 385 (E. D.Pa.1998) (section (v)). And
Dr. Connolly cannot do this.

In Pennsylvania, the elements of common law fraud
are: (1) misrepresentation of a material fact; (2) sci-
enter; (3) intention by the declarant to induce ac-
tion; (4) justifiable reliance by the defrauded party;
and (5) damages proximately caused by the fraud.
*See, e.g.,Piper,* 228 F.Supp.2d at 560 (citing *Prime
Meats v. Yochim,* 619 A.2d 769, 773
(Pa.Super.1993)). A plaintiff must establish each
element with clear and convincing evidence. *See, e
.g., Weisblatt,* 4 F.Supp.2d at 378 (citations omit-

ted).

Dr. Connolly has offered no evidence supporting
her allegations. She does not identify which terms
Defendants allegedly misrepresented. She does not
describe the nature of these alleged misrepresenta-
tions. She does not explain how she relied upon
these alleged misrepresentations (which are never
revealed to Defendants or the Court) when either
signing up for the Policy or agreeing to the terms of
the Reimbursement Agreement. She also alleges no
damages that resulted from her reliance on these
unidentified misrepresentations made by Defend-
ants. In a word her claim is meritless. Plaintiff has
not made the slightest effort to proffer any evidence
to support these very serious allegations. The Court
therefore dismisses Dr. Connolly's frivolous UTP-
CPL claim.

*2. Unfair Insurance Practices Act ("UIPA") and
Unfair Claims Settlement Practice Regulations*

**\*12** Dr. Connolly also claims Defendants' actions
violated Pennsylvania's UIPA, Pa. Stat. Ann. §§
1171.1, *et. seq.,* and Unfair Claims Settlement Prac-
tices Regulations ("UCSPR"), 31 Pa.Code §§ 146,
*et. seq.* The case law is abundantly clear that there
is no private cause of action under the UIPA or UC-
SPR. *See, e.g., Kornafel v. United States Postal
Service,* No. 99-6416, 2000 U.S. Dist. LEXIS 711,
at *11-12 (E.D.Pa. Jan. 28, 2000) (citing *Smith v.
Nationwide Mutual Fire Ins. Co.,* 935 F.Supp. 616,
619-20 (W.D.Pa.1996). The Court accordingly dis-
misses Plaintiff's UIPA and UCSP claims.[FN29]

> FN29. It perplexes the Court why Plaintiff
> continued to pursue direct relief under the
> UIPA and UCSPR even after Defendants'
> memorandum of law indicated (with cita-
> tion) that no private cause of action exists.
> Indeed, Judge McLaughlin made the point
> of observing (as of *1996* ) the large number
> of federal and Pennsylvania decisions
> holding that there was no private right of
> action under the UIPA or UCSPR. *See*

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
**(Cite as: 2006 WL 3355184 (E.D.Pa.))**

*Smith,* 935 F.Supp. at 620 (citing *Leo v. State Farm Mut. Automobile Ins. Co.,* 908 F.Supp. 254(E.D.Pa.1995); *MacFarland v. U.S. Fidelity & Guarantee Co.,* 818 F.Supp. 108, 110 (E.D.Pa.1993); *Lombardo v. State Farm Mut. Auto Ins. Co.,* 800 F.Supp. 208, 212 (E.D.Pa.1992); *Henry v. State Farm Ins. Co.,* 788 F.Supp. 241, 245 (E.D.Pa.1992); *Williams v. State Farm Mut. Auto Ins. Co.,* 763 F.Supp. 121, 124 (E.D.Pa.1991); *Romano v. Nationwide Mut. Fire Ins. Co.,* 646 A.2d 1228, 1232 (Pa.Super.1994); *Strutz v. State Farm Mut. Ins. Co.,* 609 A.2d 569, 571 (Pa.Super.1992), appeal denied, 615 A.2d 1313 (Pa.1992); *Gordon v. Pennsylvania Blue Shield,* 548 A.2d 600, 603 (Pa.Super.1988); *Hardy v. Pennock Ins. Agency, Inc.,* 529 A.2d 471, 475, 478 (Pa.Super.1987)).

**C. Count III-Deceit**

The elements of deceit mirror those of common law fraud in Pennsylvania. *See Brickman Group, Ltd. v. CGU Ins. Co.,* 865 A.2d 918, 929 (Pa.Super.2004) ( "The essential elements of a cause of action for fraud or deceit are a misrepresentation, a fraudulent utterance thereof, an intention to induce action thereby, justifiable reliance thereon and damage as a proximal result.") (quoting *Wilson v. Donegal Mut. Ins. Co.,* 598 A.2d 1310, 1315 (Pa.Super.1991)). Because Dr. Connolly did not establish fraud for her UTPCPL claim, she obviously cannot prove deceit either, and the Court dismisses this claim.

**D. Count IV-Bad Faith under 42 Pa. Cons.Stat. Ann. § 8371 ("Section 8371")**

Dr. Connolly's final cause of action is for statutory bad faith under Section 8371. For several reasons, this claim too fails.[FN30] Section 8371 provides:

    FN30. The Court has already concluded

that Defendants' conduct with respect to the Policy and Reimbursement Agreement did not breach the implied duty of good faith and fair dealing. And without breaching this duty, it is for all intents and purposes impossible to show that Defendants acted in bad faith. But rather than simply resting on that analysis, the Court offers here additional reasons why Plaintiff's *statutory* claim must fail as a matter of law.

In an action arising *under an insurance policy,* if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons.Stat. Ann. § 8371 (emphasis added).

Section 8371 claims therefore require an insurance policy. Dr. Connolly's allegations of bad faith conduct, however, focus squarely on Defendants' efforts to enforce the Reimbursement Agreement. But this was not an insurance policy. It required Defendants to neither investigate claims nor provide any benefits or coverages to Dr. Connolly. It was a contract that required Defendants to advance benefits owed under the Policy (which they did) and Dr. Connolly to in turn reimburse these advanced benefits upon receiving SSDI and state retirement benefits (which she eventually did after litigation). Because the Reimbursement Agreement was not an insurance policy, Dr. Connolly cannot state a Section 8371 claim based on Defendants' conduct to enforce it. *See Ridgeway,* 793 A .2d at 976 ("[T]he phrase 'in an action arising under an insurance policy' means that the insured's cause of action must originate from a writing setting forth an agree-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

ment between the insured and insurer that the insurer would pay the insured upon the happening of certain circumstances.") (citing Black's Law Dictionary 1157 (Sixth Ed.1990)).FN31

> FN31. Because Section 8371 does not define the term "insurance policy," the *Ridgeway* court employed the plain meaning and ordinary usage method of statutory interpretation to settle on a definition. *See*793 A.2d at 796;1 Pa. Cons.Stat. Ann. § 1903(a).

**\*13** As to the Policy-Dr. Connolly has introduced no evidence that Defendants acted in bad faith in investigating, processing and satisfying her disability claim. She has pointed to no instances in which Defendants refused to recognize her claim or delayed her disability insurance benefits. Without evidence of bad faith conduct, the Policy can also not form the basis of a Section 8371 claim.

And, in any event, to succeed on a Section 8371 claim, a plaintiff must establish an insurer's bad faith with clear and convincing evidence. *See, e.g., Northwestern Mut. Life Ins. Co. v. Babayan,* 430 F.3d 121, 137 (3d. Cir.2005) (citing *Terletsky,* 649 A.2d at 688. Clear and convincing evidence is that which is " 'so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.' " *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 367 (3d Cir.2004) (quoting *Bostick v. ITT Hartford Group, Inc.,* 56 F.Supp.2d 580, 587 (E.D.Pa.1999)). Plaintiff has certainly not met this evidentiary standard. She has proffered scant evidence of Defendants' conduct to leave this Court with a "clear conviction" that the Defendants acted in bad faith. More accurately, the record reflects a desire by Plaintiff to avoid her obligations under the Reimbursement Agreement. That Plaintiff capitulated in open court and paid Defendants the full amount they demanded further belies her claim that they acted in bad faith.FN32

> FN32. Plaintiff also introduced an affidavit

from Barbara Sciotti in support of her bad faith claim. *See* P. Memo, Ex. B ("Sciotti Aff."). She presents Sciotti as a "highly recognized expert in the field of bad faith."P. Memo. at 6. Assuming, without deciding, that Sciotti qualifies as a "bad faith expert," the Court concludes that her opinion is insufficient to either create a genuine issue of material fact as to whether Defendants' conduct was in bad faith or establish by clear and convincing evidence that they in fact did.

First, Sciotti improperly describes Defendants' collection action as a subrogation action. *See* Sciotti Aff. ("By way of a preliminary opinion ... the defendants have demonstrated bad faith conduct in the handling of this subrogation action."). It was in fact not. As is crystal clear from the record, Defendants sued Dr. Connolly for breach of contract and unjust enrichment for her refusal to honor the Reimbursement Agreement. That Plaintiff's so-called expert completely misapprehends the nature of the litigation between Defendants and Dr. Connolly casts doubt on whether she carefully reviewed the factual record before rendering an opinion. Second, and equally problematic, is Sciotti's improper (and inadmissible) opinion on the ultimate legal issue of whether Defendants acted in bad faith. *See id.*It is well settled that this type of expert opinion is inadmissible. *See, e.g., Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.,* 410 F.Supp.2d 417, 422 (E.D.Pa.2006) (citing *Kubrick v. Allstate Ins. Co.,* No. 01-6541, 2004 U.S. Dist. LEXIS 358, at \*53-54 (E.D.Pa. Jan. 7, 2004), *aff'd,*121 Fed. Appx. 447 (3d Cir.2005) (nonprecedential)). Third, she opines that Defendants violated the UIPA (§ 1171.5(a)(10)(i)) and UCSPR (§

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                              Page 18
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
(Cite as: 2006 WL 3355184 (E.D.Pa.))

146.4(b)) as evidence that Defendants pursued their claim in bad faith. This is, of course, improper because Sciotti is here too merely stating a legal conclusion. But equally questionable about this particular conclusion is the lack of any factual support or analysis. For example, Section 146.4(b) requires "[a]n insurer or agent ... to fully disclose to first-party claimants benefits, coverages or other provisions of an insurance policy or insurance contract when the benefits, coverages or other provisions are pertinent to a claim."31 Pa.Code § 146.4(b). Sciotti, however, never identifies any benefits, coverages or other provisions that Defendants failed to inform Dr. Connolly about with respect to the Policy. This is not surprising because Defendants provided Dr. Connolly with all appropriate disclosures. Sciotti therefore offers only a fact-starved conclusion rather than a reasoned opinion. And since an expert's opinion "does not necessarily defeat a summary judgment motion when it is unsupported by sufficient facts," it certainly will not when it is not supported by a single fact. *Kosierowski v. Allstate Ins. Co.*, 51 F.Supp.2d 583, 595 (E.D.Pa.1999). Fourth, Sciotti's opinion as to the appropriateness of Defendants' discovery efforts is irrelevant. Because Sciotti's alleged expertise is in neither legal ethics nor discovery practices, the Court is not interested in her thoughts on the subject. While it would have been appropriate for Sciotti to opine on Defendants' methods in the context of generally accepted insurance industry standards and practices, her affidavit fails to provide this necessary context to make her opinion helpful or relevant. Whether or not Defendants' discovery practices were unreasonable (or sanctionable) was for a trial court to

decide. Finally, Sciotti does not take into consideration Dr. Connolly's relevant conduct of not responding or acknowledging Defendants' attempts to collect the excess benefits. *See Leo v. State Farm Mut. Auto Ins. Co.*, 939 F.Supp. 1186, 1192 n. 9 (E.D.Pa.1996) (discounting expert report because opinion ignored the reasons presented by the insurer for its actions in bad faith claim).

The net effect of Sciotti's affidavit is zero-at best. It consists of generally inadmissible or factually unsupported conclusions, as well as fails to consider Plaintiff's own conduct in this matter. In short, Sciotti's opinion is insufficient to advance Dr. Connolly's claim of bad faith past summary judgment.

### Conclusion

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment and DISMISSES Plaintiff's Complaint with PREJUDICE.

### *ORDER*

AND NOW, this 13th day of November, 2006, upon consideration of Defendants Reliastar Insurance Company, Inc.'s ("ReliaStar"), Madison National Life Insurance Company's ("Madison"), and Leonard Conrad's ("Conrad") (collectively "Defendants") Motion for Summary Judgment ("D.Mot.") (Doc. No. 12), Plaintiff Dr. Frances Connolly's ("Dr.Connolly") response ("Pl.Mot.") (Doc. No. 13), and Defendants' reply thereto ("D.Rep.") (Doc. No. 14), the Court GRANTS Defendants' Motion for Summary Judgment and DISMISSES Plaintiff's entire complaint (Counts I, II, III, IV) with PREJUDICE.

E.D.Pa.,2006.
Connolly v. Reliastar Life Ins. Co.
Slip Copy, 2006 WL 3355184 (E.D.Pa.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355184 (E.D.Pa.)
**(Cite as: 2006 WL 3355184 (E.D.Pa.))**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 604636 (E.D.Ark.)
(Cite as: 2007 WL 604636 (E.D.Ark.))

Page 1

Day v. Case Credit Corp.
E.D.Ark.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Arkansas,Pine
Bluff Division.
Raymond DAY, et al., Plaintiffs
v.
CASE CREDIT CORPORATION, Defendant.
No. 5:01CV00304-WRW.

Feb. 22, 2007.

Charles S. Gibson, II, Gibson Law Office Post Office Drawer, Dermott, AR, for Plaintiffs.
John V. Phelps, Lucinda McDaniel, James Rogers McNeil, Womack, Landis, Phelps, Mcneill & McDaniel, Jonesboro, AR, for Defendant.

### ORDER

WM. R. WILSON, JR., United States District Judge.
**\*1** Pending is Defendant /Counter-Plaintiff Case Credit Corporation's ("Case") Motion for Summary Judgment on the Issue of Unjust Enrichment.[FN1] The Plaintiff /Counter-Defendants Raymond Day, Boren Holtoff, Mike Moreland, and Steve Ross ("the farmers") responded,[FN2] and Defendant/Counter Plaintiff replied.[FN3]

FN1. Doc. No. 187.

FN2. Doc. No. 191.

FN3. Doc. No. 195.

### I. Background

This case originated in the Desha County Circuit Court, when the farmers filed suit against Ron Kaufman ("Kaufman") and Case for fraud. Case answered and counter-claimed for breach of contract. Later, Kaufman was dismissed from the suit, and the case was removed to federal court based on diversity of citizenship.

The farmers were Kaufman's customers between 1996 and 1998. During this time, they agreed to purchase or lease various items of farm equipment from Kaufman. In each case, the farmers and Kaufman orally negotiated the terms of the lease and purchase agreements. Kaufman entered into agreements with Case, agreeing to pay off the farm equipment Kaufman sold or leased to the farmers, in exchange for an assignment of rights to Case.

The agreements between Case and Kaufman were unknown to the farmers and did not reflect the terms of their oral contracts with Kaufman. For instance, the purchase agreements misrepresented lease agreements as outright sales, and inflated the sales price of equipment actually purchased by the farmers. In addition, Kaufman assigned Case forged "purchase agreements" that covered equipment that the farmers never possessed or agreed to purchase. Kaufman hid his schemes from Case and the farmers by giving Case phony addresses. Case's monthly statements were mailed to these addresses and never reached the farmers.

Eventually Case discovered Kaufman's activities, and its representatives met with the farmers. According to the farmers' joint affidavit, Case representatives engaged in the following conduct: a Case representative presented the farmers with forms entitled "account verifications" and asked each farmer to sign these forms; after the farmers pointed out that the forms contained erroneous terms, they were assured that the forms would only be used to verify their possession of the equipment; when the farmers met with Case representatives David Harris, Carey Yokum, and Mr. Rosenbaum, they refused to cure the "account verifications," and told the farmers that they would enforce the invalid terms in those documents; these representatives indicated that they were aware of the fraud committed by Kaufman, but refused to settle with the farmers or change the "account verification" terms.[FN4]Case did not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provide affidavits or testimony from David Harris, Carey Yokum, or Mr. Rosenbaum contradicting the farmers' version of events. Moreover, in its response to the farmers' Statement of Undisputed Facts, Case admitted its awareness of Kaufman's wrongful conduct, and also admitted that the farmers attempted to settle based on the terms in the oral agreements.[FN5]

> FN4. Doc. No. 191, Ex. 1 (the farmers do not know Mr. Rosenbaum's first name).

> FN5. Doc. No. 196, ¶ 1, 2, and 3.

**\*2** Because settlement failed, the farmers filed a Complaint alleging that Kaufman was Case's agent and should be accountable for fraud. An Order granting Partial Summary Judgment found no agency relationship between Case and Kaufman.[FN6]

> FN6. Doc. No. 21.

Case's second Motion for Partial Summary Judgment on the issue of the farmers liability for breach of contract was granted.[FN7] Specific damages were determined in a later Order,[FN8] and a Judgment FN9 was entered.

> FN7. Doc. No. 44.

> FN8. Doc. No. 108.

> FN9. Doc. No. 109.

The farmers appealed. The Eighth Circuit affirmed the finding that Case was not an agent of Kaufman, but reversed the finding in favor of Case's breach of contract claim.[FN10] The Court held that the forged "purchase agreements" between Kaufman and the farmers were void and unenforceable, and that Case was not an assignee under any contract, including the oral contracts negotiated by the farmers and Kaufman.[FN11]

> FN10. Doc. No. 173; *Day v. Case Credit Corp.*, 427 F.3d 1148, 1153 (8th Cir.2005).

> FN11. *Id.*

According to the Eighth Circuit, two issues remain-will the farmers be unjustly enriched if they are excused from an obligation to Case; and is Case barred from obtaining equitable relief under the "clean-hands doctrine," (the principle that denies remedy to a guilty party).[FN12]

> FN12. *Id.* at 1154.

Case contends that the farmers' possession of farm equipment for the last six years, without making rental or installment payments, unjustly enriched them. Case further argues that unjust enrichment is an equitable remedy and should be decided by a court, not a jury. The farmers contend that Case has "unclean hands" and is not entitled to equitable relief. The farmers further contend that they did not act unjustly and had a right to possess the farming equipment. Finally, the farmers assert that they are entitled to a jury trial.

**II. Authority**

**A. Unjust Enrichment**

The doctrine of unjust enrichment is an equitable remedy.[FN13] "The remedy is neither given nor withheld automatically but is awarded as a matter of judgment."[FN14] The doctrine of unjust enrichment is connected to the doctrines of implied contract, quasi-contract, and restitution.[FN15]

> FN13. *Sparks Reg'l Med. Ctr. v. Blatt,* 55 Ark.App. 311, 316 (1996); *Klein v. Jones,* 980 F.2d 521, 527 (8th Cir.1992); *Pro-Camp Management, Inc. v. R.K. Enterprises, LLC,* 366 Ark. 463, (2006).

> FN14. *Friends of Children, Inc. v. Marcus,* 46 Ark.App. 57 (1994).

> FN15. *Larson Machine, Inc. v. Wallace,* 268 Ark. 192, 213-14 (1980) (holding that in the absence of an express contract the

Slip Copy
Slip Copy, 2007 WL 604636 (E.D.Ark.)
**(Cite as: 2007 WL 604636 (E.D.Ark.))**

basis for recovery is an implied contract or quasi-contract, which is founded on the equitable principles of restitution).

Unjust enrichment is based on the principle that "one person should not be permitted enrich himself at the expense of another, but should be required to make restitution for property or benefits received, retained, or appropriated, when it is just and equitable that such restitution be made."[FN16]In such circumstances, "a court may imply a contract that is dictated by reason and justice."[FN17]To find unjust enrichment, "a party must have received something of value *to which he was not entitled* and which he should restore."[FN18]

> FN16.*Adkinson v. Kilgore,* 62 Ark.App. 247, 254 (1998).

> FN17.*Sparks Reg'l Med. Ctr.,* 55 Ark.App. at 316.

> FN18.*Duckworth v. Poland,* 30 Ark.App. 281, 283 (1990) (emphasis added).

In order to create an obligation for restitution, it is not necessary that an unjustly enriched party is guilty of a wrongful act.[FN19]However, "there must be some operative act, intent, or situation to make the enrichment unjust and compensable."[FN20]For instance, an individual will be liable for unjust enrichment if he requested a valuable service or voluntarily accepted a benefit that he knew required payment under the circumstances.[FN21]In such a case, even though a party is innocent, he may be compelled to surrender benefits to another, more deserving person if he gained something of value to which he was not entitled.[FN22]

> FN19.*Frigillana v. Frigillana,* 266 Ark. 296 (1979).

> FN20.*Dews v. Haliburton Industries, Inc.,* 288 Ark. 532 (1986).

> FN21.*Deanna Construction Company v. Sarasota Entertainment Corp.,* 563 So.2d

150 (Fla.Ct.App.2d Dist.1990)

> FN22.*Smith v. Whitener,* 42 Ark.App. 225, 228 (1993).

*3 However, there are instances when a defendant receives benefits from another that do not trigger entitlement to unjust enrichment.[FN23]An individual will not be forced to pay for something he did not request, and did not know was valuable.[FN24]Moreover, "[o]ne who is free from fault cannot be held to be unjustly enriched merely because he has chosen to exercise a legal right."[FN25]Simply put, equity does not prohibit enrichment alone-the enrichment must have come about from unjust events or motives.

> FN23.*Childs v. Adams,* 322 Ark. 424, 435 (1995).

> FN24.*Credit Bureau Enterprise, Inc. v. Pelo,* 608 N.W.2d 20, 25 (Iowa 2000) (holding that one will not have to pay for a benefit forced upon one against one's will) (overturned on other grounds).

> FN25.*Merchants & Planters Bank & Trust Co. v. Massey,* 302 Ark. 421, 424 (1990).

The goal of restitution is to prevent injustice by making a defendant give up what he *wrongfully* received from a plaintiff. Damages for unjust enrichment are measured by the defendant's gain and not by the plaintiff's loss.[FN26]

> FN26.*Smith v. Walt Bennett Ford, Inc.,* 314 Ark. 591, 602 (1993) (emphasis added).

**B. Clean-Hands Doctrine**

The clean-hands doctrine bars relief to guilty parties,[FN27] because "equity will not intervene on behalf of a party whose conduct in connection with the same matter has been unconscientious or unjust."[FN28]To decide if the clean-hands doctrine should be applied, the equities are weighed.[FN29]

Slip Copy
Slip Copy, 2007 WL 604636 (E.D.Ark.)
(Cite as: 2007 WL 604636 (E.D.Ark.))

Page 4

Application of this doctrine is discretionary.[FN30]

> FN27.*Wesley v. Estate of Bosley,* 81 Ark.App. 468, 478 (2003).

> FN28.*Id.* (citing *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Servs., Inc.* 336 Ark. 143 (1999)).

> FN29.*Estate of Houston v. Houston,* 31 Ark.App. 218 (1990).

> FN30.*Laroe v. Laroe,* 48 Ark.App. 192 (1995)

## III. Discussion

The Eighth Circuit found that there was neither a contract between the farmers and Case, nor a legitimate assignment of rights to Case from Kaufman. The Court described Case as an "unprotected incidental beneficiary with no enforcement rights."[FN31] So, Case has no contract rights and is seeking an equitable remedy based on "unjust enrichment."

> FN31.*Day,* 427 F.3d at 154.

Case maintains that because the farmers have retained possession of the farm equipment, it is entitled to the equipment's full value according to the oral purchase agreements. Therefore, Case alleges that Mr. Day has been unjustly enriched in the sum of $137,500.00, Mr. Ross has been unjustly enriched in the sum of $47,326.67, and Mr. Holthoff has been unjustly enriched in the sum of $59,162.18. I disagree with Case's damages allegations.

Case is attempting to obtain contract damages under the guise of unjust enrichment. The monetary value of the equipment is not the correct measurement of damages-*quantum meruit* is the remedy for unjust enrichment.[FN32] The literal translation of *quantum meriuit* is "as much as he has deserved."[FN33]

> FN32.*Crawford v. Lee County School District,* 64 Ark.App. 90, 97 (1998).

> FN33. Blacks's Law Dictionary 1277 (8th ed.2004).

In Arkansas, "[t]he measure of damages for unjust enrichment is the amount of unfair gain received by those unjustly enriched."[FN34] If personal property is detained, the measure of damage is the fair market rental value of the property during the time it is detained.[FN35] If the farmers were unjustly enriched, they are liable for the value of benefits received by possessing the equipment, not the full monetary value of the equipment.[FN36]

> FN34.*Klein v. Arkoma Production Co.,* 73 F.3d 779, 786 (8th Cir.1996).

> FN35.*White v. Gladden,* 6 Ark.App. 299 (1982); *see also, Garoogian v. Medlock,* 592 F.2d 997 (8th Cir.1979) (holding that measure of damages is fair market rental value, plus any damage to the property).

> FN36.*Smith,* 314 Ark. at 602;*see also, Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748 (8th Cir.2006) (applying Nebraska law and holding that a defendant will be liable for the unjust benefit it receives, and not the harm sustained by the plaintiff).

Case alleges that the farmers were unjustly enriched because they continued to possess the equipment without remuneration. However, this fact, standing alone, does not automatically entitle Case to a remedy for unjust enrichment.[FN37]

> FN37.*Friends of Children, Inc.,* 46 Ark.App. at 61.

**\*4** To find that the farmers were unjustly enriched, it must be shown that they possessed the equipment under circumstances that made it inequitable. The circumstances would be inequitable if the farmers acquired the benefit without justification, or

Slip Copy
Slip Copy, 2007 WL 604636 (E.D.Ark.)
(Cite as: 2007 WL 604636 (E.D.Ark.))

Page 5

demonstrated an intent to unfairly gain something for nothing.[FN38]

> FN38.*Dews,* 288 Ark. at 532.

## A. Inequitable Circumstances

Case was largely responsible for leaving the equipment in the possession of the farmers. The farmers were cooperative, and voluntarily signed forms verifying that they possessed equipment that Case financed through Kaufman. Instead of attempting to settle the matter with the farmers, or to bring a replevin action, Case's representatives tried to enforce Kaufman's forged contracts, and refused to negotiate.[FN39] Case never filed an action to recover the equipment, but pursued a contract claim against the farmers. Case now wants restitution for losses connected to its own mistakes.

> FN39. Doc. No. 191, Ex. 1 and Doc. No. 196.

This is similar to a request for restitution in *Childs v. Adams* .[FN40] The Arkansas Supreme Court refused to provide relief to a property owner who made valuable improvements on property after he reneged on a contract for sale. When he was ordered to perform the contract, the owner asked for restitution for his home improvements. The Supreme Court affirmed the trial court's ruling that the improvements could have been postponed and were undertaken at the owner's risk.[FN41] Like the property owner in *Childs,* Case is requesting restitution for damages that were incurred because Case sought contract relief from the farmers, instead of filing an *in rem* action against the property.[FN42] Case made this decision at its own risk. Generally, a party cannot recover damages resulting from consequences that he could reasonably have avoided by reasonable care, effort, or expenditure.[FN43] Case could have reasonably avoided the losses incurred over the last six years. Moreover, Case presents no evidence that the farmers had an avenue through which they could divest themselves of the equipment. Finally, the farmers

cannot be unjustly enriched by holding property to which they are legally entitled.[FN44]

> FN40.*Childs,* 422 Ark. at 434.

> FN41.*Id.*

> FN42.77 C.J.S. *Replevin* § 5 (1994) (explaining that replevin is a mixed action, being partly *in rem* and partly *in personam;* it is *in rem* as far as specific recovery of the property is concerned, and *in personam* as to the damages).

> FN43.*Lake Village Implement Co. v. Cox,* 252 Ark. 224, 231 (1972); *Bill C. Harris Const. Co., Inc. v. Powers,* 262 Ark. 96, 104-05 (1977).

> FN44.*Merchants & Planters Bank & Trust Co.,* 302 Ark. at 424.

## B. Legal Entitlement

There is an old saying that "Possession is nine-tenths of the law." The Oxford Dictionary of Proverbs dates this saying back to 1616, and it means that a person who possesses property has a clear advantage.[FN45] The common law makes this old saying more than just a proverb-it is a rule of law that still holds sway.

> FN45. Barbara Wallraff, www. word-court.com/archives.php?show=2006-01-04 (explaining that in early use, the satisfaction of ten points was commonly asserted to show full entitlement or ownership-so, the original saying was "possession is nine points of the law").

Possession of personal property is *prima facie* evidence of ownership.[FN46] The common law has long recognized this principle, as evidenced by Supreme Court holdings that date back to the early nineteenth and twentieth centuries.[FN47] The Supreme Court held: "If there be no evidence to the contrary, proof of possession, at least under a color of right,

is sufficient proof of title."[FN48]*Prima facie* evidence is deemed sufficient to establish a given fact if not contradicted, rebutted or explained by other evidence.[FN49]The farmers possessed the farm equipment under a contract with Kaufman which constituted *prima facie* evidence that they were entitled to continued possession. Case has the burden of proving otherwise.[FN50]Thus, until Case proves that it has a superior claim to the equipment possessed the farmers, the farmers were not unjustly enriched by keeping what they had a colorable right to keep.

> FN46.*Golenternek v. Kurth,* 213 Ark. 643 (1948); *Norton v. McNutt,* 55 Ark. 59 (1891); *see also, Kurrle v. Helvering,* 126 F.2d 723, 724-25 (8th Cir.1942).

> FN47.*Ricard v. Williams,* 20 U.S. (7 Wheat.) 59 (1822) (holding that if a person be found in possession it is *prima facie* evidence of his ownership); *Bradshaw v. Ashley,* 180 U.S. 59, 63 (1901).*See also,* Oliver Wendell Holmes, *The Common Law* 241 (1881) (stating that the consequences attached to possession are substantially those attached to ownership).

> FN48.*Bradshaw,* 180 U.S. at 63.

> FN49.*Velder v. Crown Exploration Co.,* 10 Ark.App. 273, 274-75 (1984).

> FN50.*Williams v. Harrell,* 226 Ark. 115 (1956) (holding that the burden of proof in a replevin action is on the plaintiff to prove he is the owner and entitled to possession of the items in litigation).

**IV. Conclusion**

**\*5** Case filed a motion for summary judgment, alleging that it was entitled to a remedy based on unjust enrichment. I find that Case is not entitled to summary judgment, and based on the undisputed facts, is not entitled to an equitable remedy.

Case presented no evidence that the farmers acquired use of the farming equipment under inequitable circumstances. If Case had settled with the farmers at the outset, or pursued an *in rem* action against the property, it would have been able to obtain either monthly payments under the terms of the oral agreements, or take control of the farming equipment. Case chose to claim breach of contract based on void contracts, and also chose to leave the farm equipment in the possession of the farmers. Because I find that there is no unjust enrichment, the clean-hands doctrine need not be addressed.

In view of the above, the Motion for Summary Judgment is DENIED. Case is ordered to file a brief by 5:00 p.m., Friday, March 16, 2007 explaining what material facts remain in dispute that would prevent a dismissal of this case with prejudice. A response is due by 5:00 p.m., Friday, March 30, 2007.

IT IS SO ORDERED dated this 22nd day of February 2007.

E.D.Ark.,2007.
Day v. Case Credit Corp.
Slip Copy, 2007 WL 604636 (E.D.Ark.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

**H**

Dollar Rent A Car Systems, Inc. v. P.R.P. Enter-
prises, Inc.
N.D.Okla.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Oklahoma.
DOLLAR RENT A CAR SYSTEMS, INC., an Ok-
lahoma corporation, Plaintiff,
v.
P.R.P. ENTERPRISES, INC., a Florida corpora-
tion, Pedro R.P. Demoraes, an individual resident
of Florida, Rubens P. Taddei, an individual resident
of Florida, P.R.T. Enterprises, Inc., a Virginia cor-
poration, and Rosana Taddei, an individual resident
of Florida, Defendants.
No. 01 CV 698 JHP FHM.

May 8, 2006.

J. Kevin Hayes, Sarah Jane Gillett, Hall Estill
Hardwick Gable Golden & Nelson, Tulsa, OK, for
Plaintiff.
James David Bryant, William S. Dorman, William
S. Dorman & Assoc., Tulsa, OK, for Defendants.

*FINDINGS OF FACT AND CONCLUSIONS OF
LAW*

PAYNE, J.

*FINDINGS OF FACT*

A. *Parties*

**\*1** 1. Dollar is an Oklahoma corporation having its
principal place of business in Tulsa, Oklahoma.
(Agreed Pretrial Or., 4, ¶ A(1) (Sept. 13, 2004).)

2. Defendants are P.R.P. Enterprises, Inc.
("P.R.P."), a Florida corporation formerly having
its principal place of business in Pensacola, Florida;
P.R.T. Enterprises, Inc. ("P.R.T."), a Virginia cor-
poration formerly having its principal place of busi-
ness in Norfolk, Virginia (collectively, the

"Corporate Defendants"); Pedro R.P. De Moraes
("Moraes"), an individual resident of Pensacola,
Florida; Rubens P. Taddei ("Mr.Taddei"), an indi-
vidual resident of Tampa, Florida; and Rosana Tad-
dei ("Mrs.Taddei"), an individual resident of
Tampa, Florida (collectively, the "Individual De-
fendants") (Corporate Defendants and Individual
Defendants, collectively, the "Defendants".)
(Agreed Pretrial Or., 4, ¶¶ A(2)-(6).)

3. Moraes owns P.R.P. and has a fifty-one percent
(51%) ownership interest in P.R.T. (Tr. Transcr.,
vol. 1, 56 (Nargi Direct)(Sept. 13, 2004), vol. 3,
375-376 (Taddei Direct)(Sept. 15, 2004); Pl.'s Ex.
8, Attach. E.) Mr. Taddei owns the remaining forty-
nine percent (49%) of P.R.T. (Tr. Transcr., vol. 3 at
375-376 (Taddei Direct).)

B. *Agreements*

1. The Corporate Defendants each entered into two
License Agreements with Dollar during the 1990s
(all four such agreements hereinafter collectively
referred to as the "License Agreements".) (Pl.'s
Exs. 8, 14, 29 & 35.) Pursuant to these License
Agreements, as of September 2001, P.R.P. operated
Dollar franchises in Pensacola, Florida; Mobile,
Alabama; and Birmingham, Alabama; and P.R.T.
operated Dollar franchises in Norfolk, Virginia and
Richmond, Virginia.(Id.; Tr. Transcr., vol. 1, 55,
58, 61-63 (Nargi Direct).)

2. In connection with the execution of each of these
License Agreements, Dollar and the Corporate De-
fendants also entered into a Master Lease Agree-
ment for each franchise location, whereby Dollar
leased or subleased vehicles to the Corporate De-
fendants (all four such agreements hereinafter col-
lectively referred to as the "Master Lease Agree-
ments".) (Pl.'s Exs. 9, 15, 19, 30 & 36.)

3. Performance of the License Agreements and
Master Lease Agreements by the Corporate De-
fendants was further secured by guarantees ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

ecuted by the Individual Defendants, pursuant to which Moraes personally guaranteed all obligations of P.R.P. and P.R.T. to Dollar, Mr. Taddei personally guaranteed all obligations of P.R.T. to Dollar, and Mrs. Taddei, Mr. Taddei's wife, personally guaranteed the obligations of P.R.T. to Dollar with respect to the Richmond License and Master Lease Agreements (all such guarantee agreements hereinafter collectively referred to as the "Guarantee Agreements").[FN1] (Pl.'s Exs. 10, 16-17, 20, 31-33 & 37.)

> FN1. The License Agreements, Master Lease Agreements and Guarantee Agreements being sometimes referred to herein collectively as the "Agreements".

4. On October 3, 1991, Dollar and P.R.P. entered into a License Agreement permitting P.R.P. to operate a vehicle rental business in the City of Pensacola in the State of Florida, using the Dollar trade name, service marks, and methods of operation in exchange for payment of certain fees and charges, including systems fees, and with interest and late charges incurred for overdue amounts (the "Pensacola License Agreement".) (Agreed Pretrial Or., 4, ¶ B (1); Pl.'s Ex. 8.)

*2 5. Mr. Moraes personally guaranteed the performance by P.R.P. of all of its duties and obligations to Dollar under the Pensacola License Agreement. (Agreed Pretrial Or., 5, ¶ 3; Pl.'s Ex. 10.)

6. On October 8, 1992, Dollar and P.R.T. entered into a License Agreement permitting P.R.T. to operate a vehicle rental business in the Cities of Norfolk, Virginia Beach, Newport News and Hampton in the State of Virginia, using the Dollar trade name, service marks, and methods of operation, in exchange for payment of certain fees and charges, including systems fees, and with interest and late charges incurred for overdue amounts (the "Norfolk License Agreement".) (Agreed Pretrial Or., 5, ¶ 4; Pl.'s Ex. 14.)

7. Mr. Moraes and Mr. Taddei personally guaran-

teed, jointly and severally, the performance by P.R.T. of all of its duties and obligations to Dollar under the Norfolk License Agreement. (Agreed Pretrial Or., 5, ¶¶ 5-6; Pl.'s Exs. 16 & 17.)

8. On October 9, 1992, in connection with the Norfolk License Agreement, Dollar and P.R.T. entered into a Master Lease Agreement allowing P.R.T. to lease vehicles from Dollar at certain specified locations upon payment to Dollar of a monthly lease rate for each vehicle included under the lease (the "Norfolk Master Lease Agreement".) (Agreed Pretrial Or., 5, ¶ 7; Pl.'s Ex. 15.)

9. On October 9, 1992, Mr. Moraes and Mr. Taddei personally guaranteed, jointly and severally, the obligations of P.R.T. to Dollar under the Norfolk Master Lease Agreement. (Agreed Pretrial Or ., 5, ¶¶ 8-9; Pl.'s Exs. 16 & 17.)

10. On October 9, 1992, Dollar and P.R.P. amended the Pensacola License Agreement, to insert cross-default provisions with reference to P.R.T and its contractual obligations to Dollar. (Agreed Pretrial Or., 5, ¶ 10.)

11. On September 20, 1993, in connection with the Pensacola License Agreement, Dollar and P.R.P. entered into a Master Lease Agreement allowing P.R.P. to lease vehicles from Dollar at certain specified locations upon payment to Dollar of a monthly lease rate for each vehicle included under the lease (the "Pensacola Master Lease Agreement".) (Agreed Pretrial Or., 6, ¶ 11; Pl.'s Ex. 19.)

12. On September 20, 1993, Mr. Moraes personally guaranteed the obligations of P.R.P. to Dollar under the Pensacola Master Lease Agreement. (Agreed Pretrial Or., 6, ¶ 12; Pl.'s Ex. 20.)

13. On April 9, 1999, Dollar and P.R.T. entered into a License Agreement, permitting P.R.T. to operate a vehicle rental business in Henrico and Chesterfield Counties and the City of Richmond in the State of Virginia, using the Dollar trade name, service marks, and methods of operation, in ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

change for payment of certain fees and charges, including systems fees, and with interest and late charges incurred for overdue amounts (the "Richmond License Agreement".) (Agreed Pretrial Or., 6, ¶ 13; Pl.'s Ex. 29.)

14. Mr. Moraes, Mr. Taddei and Mrs. Taddei personally guaranteed, jointly and severally, the performance by P.R.T. of all of its duties and obligations to Dollar under the Richmond License Agreement. (Agreed Pretrial Or., 6, ¶¶ 14-16; Pl.'s Exs. 31-33.)

*3 15. On April 9, 1999, in connection with the Richmond License Agreement, Dollar and P.R.T. entered into a Master Lease Agreement allowing P.R.T. to lease vehicles from Dollar at certain specified locations upon payment to Dollar of a monthly lease rate for each vehicle included under the lease (the "Richmond Master Lease Agreement".) (Agreed Pretrial Or., 6, ¶ 17; Pl.'s Ex. 30.)

16. On April 9, 1999, Mr. Moraes, Mr. Taddei and Mrs. Taddei personally guaranteed, jointly and severally, the obligations of P.R .T. to Dollar under the Richmond Master Lease Agreement. (Agreed Pretrial Or., 7, ¶¶ 18-20; Pl.'s Exs. 31-33.)

17. On September 15, 1999, Dollar and P.R.P. entered into a License Agreement, permitting P.R.P. to operate a vehicle rental business in the Counties of Mobile, Baldwin, Jefferson, Walker, Blount, Saint Clair and Shelby in the State of Alabama, using the Dollar trade name, service marks, and methods of operation, in exchange for payment of certain fees and charges, including systems fees, and with interest and late charges incurred for overdue amounts (the "Alabama License Agreement".) (Agreed Pretrial Or., 7, ¶ 21; Pl.'s Ex. 35.)

18. Mr. Moraes personally guaranteed the performance by P.R.P. of all of its duties and obligations to Dollar under the Alabama License Agreement. (Agreed Pretrial Or., 7, ¶ 22; Pl.'s Ex. 37.)

19. On September 15, 1999, in connection with the Alabama License Agreement, Dollar and P.R.P. entered into a Master Lease Agreement allowing P.R.P. to lease vehicles from Dollar at certain specified locations upon payment to Dollar of a monthly lease rate for each vehicle included under the lease (the "Alabama Master Lease Agreement".) (Agreed Pretrial Or., 7, ¶ 23; Pl.'s Ex. 36.)

20. On September 15, 1999, Mr. Moraes personally guaranteed the obligations of P.R.P. to Dollar under the Alabama Master Lease Agreement. (Agreed Pretrial Or., 7, ¶ 24; Pl.'s Ex. 37.)

C. *Defendants' Review of Agreements and Prior Business Experience*

1. Prior to entering into each License Agreement with Dollar, P.R .P. or P.R.T., as was the case, received a Franchise Offering Circular, advising them that "THIS OFFERING CIRCULAR AND ALL CONTRACTS AND AGREEMENTS SHOULD BE READ CAREFULLY IN THEIR ENTIRETY FOR AN UNDERSTANDING OF ALL RIGHTS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE."(Agreed Pretrial Or., 8, ¶ 26.)

2. On August 26, 1991, Dollar sent a letter to P.R.P. regarding closing on the Pensacola franchise. That letter provided, "The Purchaser [P.R.P.] hereby confirms that he has read the Dollar offering circular and License Agreement."(Agreed Pretrial Or., 8, ¶ 27; Pl.'s Ex. 5.)

3. Mr. Moraes, on behalf of P.R.P., accepted the Pensacola closing letter on August 27, 1991. (Agreed Pretrial Or., 8, ¶ 28; Pl.'s Ex. 5.)

4. On September 24, 1992, counsel for Dollar sent a letter to Mr. Taddei and Mr. Moraes enclosing certain documents in connection with P.R.T.'s acquisition of the Norfolk franchise. That letter advised Mr. Taddei and Mr. Moraes to "review the enclosed documents and to consult with your legal counsel."(Agreed Pretrial Or., 8, ¶ 29.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

Page 4

*4 5. In Brazil, Mr. Moraes worked for IBM for five years in a sales role, starting as a sales trainee and leaving as a regional manager. (Tr. Transcr., vol. 4, 528 (Moraes Cross) (Sept. 16, 2004).)

6. Subsequent to his employment with IBM in Brazil, Mr. Moraes ran a retail fashion business, opening four stores and operating a small manufacturing company. While running the fashion business, Mr. Moraes had occasion to read and enter into contracts. (Tr. Transcr., vol. 4, 529-530 (Moraes Cross).)

7. After the fashion business, Mr. Moraes was hired by Nobre rental car company to develop a nationwide car rental system. He was very successful, as Nobre became the largest car rental company in Brazil. (Tr. Transcr., vol. 4, 530-531 (Moraes Cross).)

8. While employed by Nobre, Mr. Moraes was in charge of franchising, sales, and operations. Nobre had approximately 40 car rental franchisees, and Mr. Moraes was familiar with the terms of Nobre's franchise agreements. (Tr. Transcr., vol. 4, 531-532 (Moraes Cross).)

9. Mr. Moraes was also responsible for the negotiation of acquisition agreements dealing with car rental locations. (Tr. Transcr., vol. 4, 534-535 (Moraes Cross).)

10. After Mr. Moraes left Nobre, he was the master franchisee for Budget Rent A Car in Brazil. He was responsible for overseeing approximately 40 franchise locations and owned 38% of the company. He frequently signed agreements on behalf of the company. (Tr. Transcr., vol. 4, 535-536 (Moraes Cross).)

11. When Mr. Moraes left Budget, he became the head of Dollar Rent A Car in Brazil. (Tr. Transcr., vol. 4, 537 (Moraes Cross).)

12. Mr. Moraes was a sophisticated businessman, with years of experience in the vehicle rental business gained while living in Brazil, when he ex-

ecuted the Pensacola License Agreement on behalf of P.R.P. with Dollar in 1991. (Tr. Transcr., vol. 1, 54 (Nargi Direct); Tr. Transcr., vol. 4, 528-538 (Moraes Cross).)

13. Mr. Moraes had 15 days to review the Pensacola license agreement and master lease agreement. (Tr. Transcr., vol. 4, 538 (Moraes Cross).)

14. Dollar provided Mr. Moraes with a franchise offering circular disclosure at least a month prior to executing any agreements. (Tr. Transcr., vol. 4, 538-539 (Moraes Cross).)

15. In every significant conversation Mr. Moraes had with Dollar concerning negotiations, an interpreter was present for Mr. Moraes. Moreover, Mr. Nargi was personally involved in negotiations with Mr. Moraes in connection with the Pensacola location and he was able to communicate with him. Mr. Moraes never stated to Mr. Nargi that he did not understand the agreements. (Tr. Transcr., vol. 4, 540-543 (Moraes Cross); Tr. Transcr., vol. 5, 877-878 (Nargi Rebuttal).)

16. Prior to acquiring the Pensacola Dollar franchise, Mr. Moraes had enough money to hire someone to translate the acquisition documents into Portugese. (Tr. Transcr., vol. 4, 543-544 (Moraes Cross).)

17. When Mr. Moraes had his initial discussions with Dollar in 1991, he advised Dollar of his previous experience in the car rental business. (Tr. Transcr., vol. 4, 553 (Moraes Cross); Pl.'s Ex. 1.)

*5 18. Mr. Moraes paid an attorney to review the Pensacola License Agreement, three months after he signed it. (Agreed Pretrial Or., 8, ¶ 30; Tr. Transcr., vol. 4, 546 (Moraes Cross).)

19. Mr. Moraes subsequently executed the Norfolk and Richmond License Agreements, on behalf of P.R.T., and the Alabama License Agreement, on behalf of P.R.P. He reviewed these agreements before signing them. He chose not to hire an attorney to review these Agreements, in reliance on the prior

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

legal review of the Pensacola License Agreement and the similarities among the License Agreements. (Agreed Pretrial Or., 8, ¶ 31; Tr. Transcr., vol. 4, 414-415 (Moraes Direct), 547-550 (Moraes Cross); Pl.'s Exs. 14, 29 & 35.)

20. No one with Dollar ever misrepresented to Mr. Moraes that the license agreements did not contain a provision dealing with consequential damages. (Tr. Transcr., vol. 4, 550 (Moraes Cross).)

21. When negotiating the various agreements with Dollar, the only modification Mr. Moraes ever requested dealt with the computer system. (Tr. Transcr., vol. 4, 551-552 (Moraes Cross).)

22. In the Pensacola License Agreement and the Master Lease Agreement, the consequential damages provision is in the same size print as the rest of the contracts and is no darker or lighter than the rest of the contracts. Mr. Moraes does not believe that Dollar had any intent to hide the consequential damages provision from him. Mr. Moraes does not believe that Dollar had any intent to hide any provisions of the contracts from him. (Tr. Transcr., vol. 4, 552-553 (Moraes Cross).)

23. Mr. Taddei was a sophisticated businessman with experience operating Texaco franchises when he became involved with Dollar through P.R.T. (Tr. Transcr., vol. 1, 59 (Nargi Direct).)

24. Currently, Mr. Taddei operates eight Texaco franchises pursuant to license agreements. Prior to entering into the Texaco franchises, Mr. Taddei had the opportunity to consult with an attorney but chose not to. He never uses an advisor, consultant, or attorney. (Agreed Pretrial Or., 9, ¶ 33-34.)

25. Mr. Moraes was a "hands-on" business owner, who kept strict control of the Corporate Defendants' cash. Mr. Moraes was responsible for the financing of the businesses and most negotiations with creditors. (Agreed Pretrial Or., 9, ¶ 35.)

D. *General Terms of Agreements*

1. Because the Corporate Defendants entered into the License Agreements on different dates, the License Agreements and the Master Lease Agreements vary slightly in certain respects. The general provisions set forth in the Pensacola and the Norfolk License Agreements are the same but differ slightly from the general provisions used in the Richmond and Alabama License Agreements. (Agreed Pretrial Or., 7-8, ¶ 25; See Pl.'s Exs. 8, 14, 29 & 35.) Similarly, the general provisions of the Pensacola and Norfolk Master Lease Agreements are the same but differ slightly from the general provisions used in the Richmond and Alabama Master Lease Agreements. (Agreed Pretrial Or., 7-8, ¶ 25; See Pl.'s Exs. 9, 15, 19, 30 & 36.)

*6 2. Any legal action or proceeding arising out of the Agreements is governed by Oklahoma law. (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.1; Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 14.)

3. According to the terms of the License Agreements and Master Lease Agreements, the Corporate Defendants may not seek consequential damages or lost profits from Dollar in the event of any termination of the License Agreements. (Tr. Transcr., vol. 1, 85-86 (Nargi Direct); Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.8, and Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 12.)

4. According to the terms of the License Agreements and Master Lease Agreements, the Corporate Defendants must bear the costs of actual attorneys' fees together with court costs and expenses of any action Dollar institutes to enforce the terms of such Agreements or any other agreement that is part of the franchise relationship. (Tr. Transcr., vol. 1, 204-205 (Manning Direct); Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.7.)

5. According to the terms of the License Agreements and Master Lease Agreements, the parties to the License Agreements are independent contractors and any assistance provided by Dollar to the Corporate Defendants will not defeat such status. (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.11, and Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 12(B) .)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

6. According to the terms of the License Agreements, the Corporate Defendants stated that, under the License Agreements, they "do not expect that the relationship created by [each License Agreement] is a relationship between principal and agent, or that it is a fiduciary relationship."(Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.11)

7. According to the terms of the License Agreements and the Master Lease Agreements, waiver by Dollar of any breach or series of breaches by the Corporate Defendants, or failure by Dollar to insist upon full compliance with the Corporate Defendants' obligations, does not constitute waiver of any subsequent breach or waiver of the performance of any of the Corporate Defendants' obligations. (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.4, and Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 15(A).)

E. *Payment Obligations*

1. Pursuant to the License Agreements, the Defendants are obligated to pay Dollar System Fees, which are monthly non-refundable license fees calculated as a percentage of the Corporate Defendants' gross receipts. The System Fees are calculated based on monthly revenue reports (self-reporting) prepared by the Corporate Defendants and delivered to Dollar. (Agreed Pretrial Or., 9, ¶ 37; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 5.1.)

2. Pursuant to the License Agreements, the Defendants are obligated to pay Dollar Reservations charges for car rental reservation services provided by Dollar. (Agreed Pretrial Or., 9, ¶ 38; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 9.)

3. Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for costs of Supplies, which are costs incurred by Dollar for shipping supplies and materials to the Corporate Defendants for use in the licensed business. (Agreed Pretrial Or., 9, ¶ 39; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 5.4.)

*7 4. Pursuant to the License Agreements, the De-

fendants are obligated to reimburse Dollar for Travel Agent Commissions paid by Dollar on behalf of the Corporate Defendants, which commissions were paid to travel agents for booking reservations that resulted in actual car rentals with the Corporate Defendants. (Agreed Pretrial Or., 9-10, ¶ 40; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 11.20.)

5. Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Override Commissions paid to preferred travel agents for booking reservations that resulted in actual car rentals with the Corporate Defendants. (Agreed Pretrial Or., 10, ¶ 41; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 11.20.)

6. Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Frequent Flyer payments made by Dollar on behalf of the Corporate Defendants. (Agreed Pretrial Or., 10, ¶ 42; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 11.23.)

7. Pursuant to the License Agreements, the Defendants are obligated to pay Dollar Revenue Management charges for the Corporate Defendants' subscription to Rate Management Analyst Support services and information provided by Dollar. (Agreed Pretrial Or., 10, ¶ 43 .)

8. Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Customer Adjustments, which represent amounts paid by Dollar on behalf of the Corporate Defendants in connection with complaints, overcharges by the Corporate Defendants, or similar claims by the Corporate Defendants' customers. (Agreed Pretrial Or., 10, ¶ 44.)

9. Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Goodwill Certificates provided by Dollar on behalf of the Corporate Defendants in connection with complaints, overcharges by the Corporate Defendants, or similar claims by the Corporate Defendants' customers. (Agreed Pretrial Or., 10, ¶ 45.)

10. Pursuant to the License Agreements, the De-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

Page 7

fendants are obligated to reimburse Dollar for inter-city payments made by Dollar on behalf of the Corporate Defendants. A credit in favor of the Corporate Defendants may result if the Corporate Defendants accepted return of vehicles rented from Dollar licensees in other cities. (Agreed Pretrial Or., 10, ¶ 46.)

11. Pursuant to the License Agreements, the Defendants may be entitled to Product Promotion Allowance ("PPA") Credits, which represent payments from DaimlerChrysler, received by Dollar on behalf of the Corporate Defendants, for advertisements by the Corporate Defendants that include, among other things, reference to DaimlerChrysler vehicles. (Agreed Pretrial Or., 11, ¶ 47.)

12. Pursuant to the License Agreements, the Defendants are obligated to pay Dollar a Finance Charge, whereby all overdue payments accrue interest at the rate of two percent (2%) per month or the highest rate permitted by law, whichever is less. (Agreed Pretrial Or., 11, ¶ 48; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 5.2.) Although the License Agreements permit Dollar to assess interest at the rate of two percent (2%) per month, Dollar has only assessed interest on the Corporate Defendants' overdue payments at the rate of one and one-half percent (1 1/2 %) per month. (Agreed Pretrial Or., 11, ¶ 48.)

*8 13. Pursuant to Master Lease Agreements, the Defendants are obligated to pay Dollar Fleet charges (which include monthly lease charges based on a specified rate for each vehicle leased or subleased by the Corporate Defendants from Dollar, fleet program debit memos), costs incurred in connection with auction of the Corporate Defendants' leased vehicles at the end of the lease term, invoices for any leased vehicles rejected at auction (typically due to damage), and miscellaneous charges related to fleet (e.g., repossession expenses.) (Agreed Pretrial Or., 11, ¶ 49; Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 1(C) & 8(A).)

14. Pursuant to the Master Lease Agreements, the Defendants are obligated to pay Dollar a Finance

Charge, whereby all overdue payments accrue interest at the rate of eighteen percent (18%) per annum or the highest rate permitted by law, whichever is less. (Agreed Pretrial Or., 11, ¶ 50; Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 15(D).)

15. Pursuant to the Master Lease Agreements, the Defendants are obligated to pay Dollar a Late Charge equal to five percent (5%) on any amounts not paid when due under the Master Lease Agreements. (Agreed Pretrial Or., 11-12, ¶ 51; Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 1(C).) Notwithstanding the fact that the Master Lease Agreements permit Dollar to assess this Late Charge on all overdue amounts, Dollar has only assessed the Late Charge on the monthly fleet lease rental payments which were not paid when due by the Corporate Defendants prior to termination of the Master Lease Agreements. (Agreed Pretrial Or., 11-12, ¶ 51.)

16. The Defendants are entitled to Unapplied Credits for any amounts paid by or on behalf of the Corporate Defendants for which amounts the Corporate Defendants have failed to specify how such payments should be applied towards amounts owed. (Agreed Pretrial Or ., 12, ¶ 52.)

*F. Franchise Statements of Account*

1. Pursuant to the License Agreements, the Corporate Defendants operated Dollar franchises in five cities, Pensacola, Florida; Norfolk, Virginia; Richmond, Virginia; Mobile, Alabama; and Birmingham, Alabama. (Agreed Pretrial Or., 12, ¶ 53; Pl.'s Exs. 8, 14, 29 & 35, Attachment A.) In two of these cities, Pensacola and Norfolk, the Corporate Defendants operated both on-airport and off-airport locations. The accounting system utilized by Dollar maintains the accounts of the Corporate Defendants electronically by location; therefore, there are seven accounts (four for P.R.P. and three for P.R.T.) (Agreed Pretrial Or., 12, ¶ 53; Tr. Transcr., vol. 1, 170-171 (Manning Direct).)

2. Because the Corporate Defendants operated sev-

Not Reported in F.Supp.2d

Page 8

Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

en licensed locations (five on-airport and two off-airport), Dollar sent seven Franchise Statements of Account to the Corporate Defendants on a monthly basis in the ordinary course of business. (Agreed Pretrial Or., 12-13, ¶ 57; Tr. Transcr., vol. 1, 170-171 (Manning Direct).) The monthly Franchise Statements of Account delivered by Dollar apprise each licensee of the status of its Dollar account(s) and notify each licensee of due and/or past due payments. (Agreed Pretrial Or., 12-13, ¶ 57; Tr. Transcr., vol. 1, 173-177 (Manning Direct); Pl.'s Ex. 75)

**\*9** 3. The Franchise Statements of Account contain a line-by-line identification of each charge or credit applied to the licensee's account during the relevant time period. The Franchise Statements of Account also contain detailed information with respect to each charge that remains outstanding and unpaid on the account. (Agreed Pretrial Or., 12, ¶ 55; Pl.'s Exs. 75 & 76.)

4. The Franchise Statements of Account identify, by invoice number and invoice date, the invoice pertaining to each separate charge or credit. (Agreed Pretrial Or., 12, ¶ 56; Pl.'s Exs. 75 & 76.) Most of the invoices that underlie the Statements of Account are provided separately to Dollar licensees. (Agreed Pretrial Or., 12, ¶ 56; Tr. Transcr., vol. 1, 169 -170.) Additionally, Dollar Credit and Collections employees will fax invoices to licensees upon request. (Agreed Pretrial Or., 12, ¶ 56.)

### G. *Default Provisions*

1. According to the Master Lease Agreements, an "Event of Default" exists if the Corporate Defendants fail to pay in full any lease payments on the date they are due. (Tr. Transcr., vol. 1, 74 (Nargi Direct); Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 9(A).)

2. According to the Master Lease Agreements, Dollar may terminate the Master Lease Agreements without prior notice upon the occurrence of an "Event of Default." (Tr. Transcr., vol. 1, 75 (Nargi

Direct); Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 9(C).)

3. According to the Pensacola and the Norfolk License Agreements, Dollar may terminate these Agreements for "good cause." "Good cause" includes, but is not limited to, the specific defaults listed in such Agreements. (Tr. Transcr., vol. 1, 80-81 (Nargi Direct); Pl.'s Exs. 8 & 14 at ¶ 18.3.)

4. According to the Pensacola and the Norfolk License Agreements, Dollar may terminate these Agreements, effective upon delivery of notice, if, *interalia,* any of the following occur: (a) the failure of the Corporate Defendants to cure a default under a collateral agreement with Dollar, such as the Master Lease Agreement; (b) the insolvency of the Corporate Defendants or the inability of the Corporate Defendants to pay their debts as they come due; or (c) the failure of the Corporate Defendants, on three or more separate occasions during any twelve-month period, to comply with provisions of these Agreements, including the obligations to pay various fees when due. (Tr. Transcr., vol. 1, 81-82 (Nargi Direct); Pl.'s Exs. 8 & 14 at ¶ 18.4(c), (l) & (m).)

5. According to the Pensacola and the Norfolk License Agreements, Dollar may also terminate these Agreements, effective upon expiration of the cure period, if, *inter alia,* the Corporate Defendants fail to pay any monies due under these Agreements or under any collateral agreement within three days after written notice. (Pl.'s Exs. 8 & 14 at ¶ 18.4(p).)

6. According to the Richmond and the Alabama License Agreements, Dollar may terminate these Agreements for "cause," which includes, but is not limited to, the specific defaults set forth in these Agreements. (Pl.'s Exs. 29 & 35 at ¶ 18.2.)

**\*10** 7. According to the Richmond and the Alabama License Agreements, in certain specified circumstances, the Richmond and the Alabama License Agreements terminate automatically and without notice to the Corporate Defendants. For instance, automatic termination occurs if the Corporate De-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

fendants become insolvent or are unable to pay their debts as they come due. (Tr. Transcr., vol. 1, 83-84 (Nargi Direct); Pl.'s Exs. 29 & 35 at ¶ 18.3.)

8. According to the Richmond and the Alabama License Agreements, Dollar may terminate these Agreements for cause, effective upon delivery of notice, if, *interalia*, any of the following occurs: (a) a default under any other agreement between the Corporate Defendants and Dollar, such as the Master Lease Agreement; or (b) the failure of the Corporate Defendants to comply with these Agreements on three separate occasions during any 12-month period, including a failure to pay when due, license fees, advertising assessments, reservation fees or other payments. (Tr. Transcr., vol. 1, 84-85 (Nargi Direct); Pl.'s Exs. 29 & 35 at ¶ 18.4(b) & (f).)

9. According to the Richmond and the Alabama License Agreements, Dollar may terminate these Agreements for cause, effective upon expiration of the cure period, if *interalia*, the Corporate Defendants fail to pay Dollar any monies due under these Agreements or any collateral agreement within three (3) days after written notice to the Corporate Defendants. (Pl.'s Exs. 29 & 35 at ¶ 18.4(i).)

10. According to the Richmond and the Alabama License Agreements, any description of default in any notice provided by Dollar to the Corporate Defendants does not preclude Dollar from specifying additional or supplemental defaults in any action, hearing, or suit relating to the Richmond and the Alabama License Agreements or their termination. (Pl.'s Exs. 29 & 35 at ¶ 18.4.)

H. *Defendants' Financial Condition in 2001*

1. The revenue generated by the Corporate Defendants was generally cyclical throughout their ten year relationship with Dollar. Usually, revenue was down in the winter, and the Corporate Defendants would "catch up" on payments to Dollar over the summer. (Tr. Transcr., vol. 1, 64-65, 69-70 (Nargi

Direct); Tr. Transcr., vol. 5 673-674 (Moraes Redirect) (Sept. 17, 2004); Transcr. Depo. Charles Bratcher, 123-124 (Nov. 26, 2002); [FN2] Pl.'s Ex. 46.) Throughout its relationship with the Corporate Defendants, Dollar attempted to work with the Corporate Defendants and their cash flow cycles. (Pl.'s Exs. 38, 39, 41 & 43.) On several occasions, in response to a request from Moraes, Dollar extended credit to the Corporate Defendants, in effect, funding the businesses. (Pl.'s Exs. 22 & 43.)

> FN2. The testimony of Tara Doerr, Charles Bratcher, Wayne Shank, Steven Owen, Alice Madison, Mary Mindingall, Thomas Borzilleri, Cheryl Helfricht and Steve Ganas was presented to the Court by way of deposition designation because the witnesses were not "available" for trial within the meaning of Fed.R.Evid. 804.

2. In March of 2001, Mr. Moraes offered to sell his Virginia territories to Dollar for $2,200 per car. (Tr. Transcr., vol. 1, 67-68, 71-72 (Nargi Direct); Pl.'s Exs. 40 & 235.) Dollar turned the offer down primarily because (1) the businesses were losing money; and (2) acquiring the Virginia territories was not part of Dollar' strategies (airports were not large enough). (Tr. Transcr., vol. 1, 67-69 (Nargi Direct); Pl.'s Ex. 42.)

*11 3. Also, in the Spring of 2001, P.R.P. and P.R.T. fell behind in their payments due under the License Agreements. Dollar required Mr. Moraes to work out a payment plan to force P.R.P. and P.R.T. to get and keep their obligations to Dollar current. (Tr. Transcr., vol. 1, 66 (Nargi Direct); Tr. Transcr., vol. 5, 590-591, 658 (Moraes Cross), 703-704 (Moraes Recross); Tr. Transcr., vol. 6, 881-883 (Nargi Rebuttal) (Sept. 23, 2004); Pl.'s Ex. 43.) Through June of 2001, the Corporate Defendants managed to pay the amounts agreed to under the plan; however, they fell behind again during the Summer of 2001-missing June, July, and August payments due under the License Agreements. (Tr. Transcr., vol. 1, 131-132 (Davis Direct), 177-178 (Manning Direct); Tr. Transcr., vol. 5, 591 (Moraes

Not Reported in F.Supp.2d                                                                     Page 10
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

Cross); Pl.'s Exs. 76 & 128.)

4. By September 1, 2001, the Corporate Defendants owed Dollar approximately $560,000 for payments due under the License Agreements. (Pl.'s Ex. 53 & 54.) Dollar's concerns over this debt were heightened due to the cyclical nature of the business and the fact that the summer months were typically the greatest revenue-generating months. (Tr. Transcr., vol. 1, 69-70 (Nargi Direct); Tr. Transcr., vol. 5, 878-879 (Nargi Direct); Pl.'s Ex. 41, 46.)

5. Mr. Moraes put together a plan the day after September 11, 2001. In this plan, he describes the elimination of certain employees, getting rid of a lot of cars, and taking advantage of "the moment" to get concessions from vendors and financial sources. (Tr. Transcr., vol. 4, 555-556, 559-560 (Moraes Cross); Pl.'s Ex. 215.)

6. As of September 12, 2001, Mr. Moraes' companies were 3 months late paying some bills to Dollar. (Tr. Transcr., vol. 4, 560 (Moraes Cross).)

7. After September 11, 2001, with respect to past due amounts owed to Dollar, Mr. Moraes decided to "wait and see" what Dollar would be offering in terms of deferring payments. (Tr. Transcr., vol. 4, 560-561 (Moraes Cross); Pl.'s Ex. 215.)

8. As of September 21, 2001, the Corporate Defendants, and Mr. Moraes and Mr. Taddei, as guarantors, owed Capital Auto Rental Services $1,675,921.24, as a result of selling cars at auction that were out of trust and depositing the proceeds in the Corporate Defendants' bank account. In Mr. Moraes' September 12, 2001 plan, he stated the following intent with respect to Capital Financial Services: "to squeeze them just enough to keep them without do any hard movement since we are not going to use them anymore."At trial, he explained that statement by saying "we were playing hard." (Tr. Transcr., vol. 4, 561-565 & vol. 5, 641 (Moraes Cross); Pl.'s Exs. 205, 215.)

9. Another one of the Corporate Defendants' loans

was with Manheim Financial Services. Mr. Moraes also planned to squeeze Mannheim a little bit, if they allowed him to do so. (Tr. Transcr., vol. 4, 567 (Moraes Cross); Pl.'s Ex. 215.) Steve Ganas, inventory control manager of Manheim Automotive Financial Services, Inc., testified that Manheim provided floor plan financing to PRP/PRT and that PRP owed approximately $17,000 plus accrued interest to Manheim as of September 15, 2001 on the basis of a prior workout agreement and that PRT owed approximately $14,000 to Manheim as of September 15, 2001 for actual fleet and that these September 15 payments were not made. (Transcr. Depo. Ganas, 4, 8-9, 14, 29-31, 33-34 (Dec. 12, 2002).)

*12 10. Thomas Borzilleri, chief executive officer of Fleetplan Capital (successor-in-interest to Signature Automotive Group and Prime One Capital), testified that Signature Automotive Group provided vehicles to PRP and that, prior to May, 2001, PRP never made any payments late. (Transcr. Depo. Borzilleri, 7-8, 10, 32-33 (Dec. 30.2002); Pl.'s Ex. 201.) However, as of September 19, 2001, the total overdue amount owed by PRP to Signature Automotive Group was in the range of $150,000 to $180,000. (Transcr.Depo.Borzilleri, 37.)

11. Cheryl Helfricht, lease administrator of Rosedale Leasing, Walden Leasing, and Walden Fleet Services II, Inc., testified that these entities leased fleet to PRP and PRT. (Transcr. Depo. Helfricht, 7, 9-10, 13 (Dec. 23, 2002).) PRP and PRT never missed a payment until the one due on September 15, 2001 in the amount of approximately $120,000. (Transcr. Depo. Helfricht, 22-26; Pl.'s Ex. 203.) PRP and PRT did not dispute the amount owed to these entities. (Transcr.Depo.Helfricht, 26-27.)

12. In July, 2001, the Corporate Defendants were in default to Finova and owed $327,000. (Tr. Transcr., vol. 5, 599-600 (Moraes Cross); Pl.'s Ex. 204.)

13. After September 11, 2001, Mr. Moraes intended to pay the airport bills late because all the airports,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

with the exception of Pensacola, would allow late payments. (Tr. Transcr., vol. 4, 567-568 (Moraes Cross); Pl.'s Ex. 215.)

14. Alice Madison, financial administrator for the Mobile Airport Authority, testified that PRP had a car rental agreement with the airport and that, as of August 31, 2001, PRP owed over $56,000 to the airport, which amount was never paid. (Transcr. Depo. Madison, 7, 12-13, 19, 29-30, 35-36 (Dec. 10, 2002); Pl.'s Ex. 191.)

15. Wayne Shank, deputy executive director of the Norfolk Airport Authority, testified that PRT had a rental car concessionaire agreement with the Authority and had the worst delinquent payment history of any operator at the Airport, requiring collection notices and threat of legal action before PRT would respond. (Transcr. Depo Shank, 3, 7, 15, 19-21, 23-25 (Dec. 4, 2002).) As of September 19, 2001, certain amounts were past due and owing by PRT to the Authority and PRT was in default of its agreement with the Authority. (Transcr. Depo Shank, 19, 32-36.) Mr. Moraes admitted that, from April, 2001 through September, 2001, the Corporate Defendants owed past due amounts to the Norfolk Airport Authority ranging from $107,000 to $134,000. (Tr. Transcr., vol. 5, 592-594 (Moraes Cross); Pl.'s Exs. 181-184.)

16. Mary Mindingall, director of properties and administration for the Birmingham Airport Authority, testified that PRP owed at least $28,533.58 to the airport on September 10, 2001 and that the debt was never paid. (Transcr. Depo. Mindingall, 34-35, 38-39 (Dec. 11, 2002); Tr. Transcr., vol. 5., 596-597 (Moraes Cross); Pl.'s Exs. 185-187.)

17. Stephen C. Owen, director of finance at the Capital Region Airport Commission, the owner and operator of the Richmond International Airport, testified that PRT had both a concessionaire agreement and a customer facility charge agreement with the Airport. (Transcr. Depo. Owen, 3, 7, 15-17 (Dec. 5, 2002).) As of September 19, 2001, PRT owed the Airport approximately $245,000, for

amounts, some of which related back to May, 2001. (Transcr. Depo. Owen, 24-27, 29; Tr. Transcr., vol. 5, 597-98 (Moraes Cross).)

*13 18. PRP failed to pay rent owed to the City of Pensacola for July, 2001, as stipulated under the terms and conditions of the Rental Car Concession Agreement between PRP and the City. Mr. Moraes was sent written notice of the default on July 5, 2001; Dollar received notice as well. (Pl.'s Ex. 179.)

19. Mr. Moraes testified that there were a lot of debts past due that needed to be paid on September 18 and that the amount of past due monies owed was a lot more than $400,000. (Tr. Transcr., vol. 5, 626 (Moraes Cross).

20. Mr. Moraes estimated that the Corporate Defendants needed $600,000 additional capital to stay in business for the next 90 days. (Tr. Transcr., vol. 4, 570-71 (Moraes Cross).)

21. Mr. Wilsey testified that the Corporate Defendants needed a capital infusion of at least $3 million in September, 2001 to have survived. (Tr. Transcr., vol. 6, 904-905 (Wilsey Rebuttal).)

22. As of September 18, 2001, Mr. Moraes did not have any loan applications pending with banks on behalf of the Corporate Defendants. (Tr. Transcr., vol. 5, 601-602 (Moraes Cross); Tr. Transcr., vol. 2, 250-251 (Wilsey Direct).)

23. The negative equity position of the Corporate Defendants throughout the summer of 2001, the revenue lost as a result of September 11, the lack of investment in the Corporate Defendants by the Individual Defendants, and the Corporate Defendants' accumulation of non-Dollar related debt (the largest amounts were owed to other fleet vendors and airport authorities) were disastrous for P.R.P. and P.R.T. (Tr. Transcr., vol. 2, 252-253, 256-260, 266-267, 300 (Wilsey Direct) (Sept. 14, 2004); Pl.'s Ex. 136, 141, 143, 144.)

24. By September of 2001, the accounts payable of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

PRP had risen from $200,197 (in January, 2001) to $1,405,000. In addition, the payables over 60 days old in January of 2001 were $35,000, as compared to payables over 60 days old in September of 2001 of $620,418. (Tr. Transcr., vol. 2, 260-261 (Wilsey Direct); Pl.'s Ex. 145.)

25. By September of 2001, the accounts payable of PRT had risen from $470,000 (in January, 2001) to $902,000. (Tr. Transcr., vol. 2, 261 (Wilsey Direct); Pl.'s Ex. 147.)

26. As of September 19, 2001, the Corporate Defendants were insolvent, did not have the ability to continue as a going concern, and were not able to pay their debts as they became due. (Tr. Transcr., vol. 2, 247, 266-267, 275-276 (Wilsey Direct).)

I. *Termination*

1. The Corporate Defendants' fleet payments to Dollar were due on the 15th day of each month, but, since September 15, 2001, fell on a Saturday, the September fleet payment was due on Monday, September 17, 2001. (Tr. Transcr., vol. 1, 136-137 (Davis Direct), 178-179 (Manning Direct); Tr. Transcr., vol. 4, 561, 651 (Moraes Cross); Pl.'s Ex. 216.)

2. On September 17, 2001, the same day that the fleet payment was due, Mr. Moraes called Mr. Nargi to discuss selling to Dollar certain of his vehicle rental locations. (Tr. Transcr., vol. 5, 618-619 (Moraes Cross).) This was the same offer that Mr. Moraes had made to Dollar in March, 2001 and that had been rejected by Dollar then. Dollar again rejected Mr. Moraes' offer. (Tr. Transcr., vol. 1, 71-72 (Nargi Direct); Pl.'s Ex. 235.)

**\*14** 3. Also, on September 17, 2001, Mr. Moraes spoke with Troyce Davis, a Dollar collector, concerning his financial situation. He told her that he was applying for a loan from his bank, that everything has not been completed, but he should know something by tomorrow. He also stated that he could not make his fleet payment on September

17, 2001. Ms. Davis told Mr. Moraes that a repo letter would go out if he did not make the fleet payment that day. Ms. Davis took contemporaneous notes of her conversation and recorded her notes on a phone log. (Tr. Transcr., vol. 1, 133-134, 136-138 (Davis Direct); Pl.'s Ex. 108.)

4. Also, on the afternoon of September 17, 2001, Linda Adair, a Dollar collector, spoke to Pedro Moraes. Mr. Moraes told her that he was having cash flow problems; he was meeting with his bankers; and that he didn't have enough money to make the fleet payment and pay his taxes. Mr. Moraes was aware that if he didn't send the fleet payment, then he would receive a repo letter. (Tr. Transcr., vol. 1, 159-160 (Adair Direct).)

5. On September 17, 2001, the Corporate Defendants failed to pay their September fleet payment (in the amount of $273,570.25) to Dollar, for vehicles leased during the month of August 2001, and, unlike prior occasions, the Corporate Defendants could not provide Dollar evidence that the fleet payment had been sent to Dollar. (Agreed Pretrial Or., 13, ¶ 60; Tr. Transcr., vol. 1, 73 (Nargi Direct), 159 (Adair Direct), 168-169 (Manning Direct); Tr. Transcr., vol. 5, 625-626 (Moraes Cross).)

6. It is uncommon for licensees to miss fleet payments, because licensees obviously need vehicles for operation of their business. Additionally, a missed fleet payment triggers immediate concern by Dollar about its collateral-vehicles leased by the licensees. (Tr. Transcr., vol. 1, 165-167 (Manning Direct).)

7. Therefore, missing the fleet payment in September 2001 was an extraordinary occurrence in the parties' relationship. (Tr. Transcr., vol. 1, 168-169 (Manning Direct).)

8. Mr. Moraes testified that the reason he did not pay the Dollar fleet bill on September 18 (and, presumably, on September 17) was to "improve his forecast for the month."(Tr. Transcr., vol. 5, 626 (Moraes Cross).)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

9. On September 18, 2001, Troyce Davis spoke to Tara Doerr, the PRP/PRT bookkeeper and Ms. Doerr told her that Mr. Moraes let the entire accounting staff go on September 17. (Tr. Transcr., vol. 1, 140 (Davis Direct); Pl.'s Ex. 108.)

10. On September 18, 2001, Dollar notified the Corporate Defendants in writing that the Master Lease Agreements would terminate on September 21, 2001, unless outstanding invoices were paid in full. (Agreed Pretrial Or., 15, ¶ 75.) Cathy Manning waited until she had spoken with Mr. Moraes by phone to fax the standard letter, so it was sent after that phone call, around 6:30 in the evening. (Tr. Transcr. vol. 1, 182-183 (Manning Direct).) Dollar was not required to offer this three-day cure period in the letter because the Master Lease Agreements permitted Dollar to terminate them immediately upon the Corporate Defendants' failure to make a fleet payment when due. (Tr. Transcr., vol. 1, 73-76 (Nargi Direct); Pl.'s Ex. 48.)

*15 11. Dollar's representation in its September 18, 2001 letter, that a three-day cure period would be allowed for the Defendants to remit past due payments owed under the Master Lease Agreements, was true when made. (Tr. Transcr., vol. 1, 73-76 (Nargi Direct); Pl.'s Ex. 48.)

12. On the morning of September 19, 2001, Mr. Moraes left a voice mail for Troyce Davis before she got to work. He stated that he was on his way to the office, would check his bank balance, and call her back and that he was planning to send payment today for the fleet and possibly part of the system fees; he claimed he was working with his bank to secure a loan to pay the entire amount. (Tr. Transcr., vol. 1, 141 (Davis Direct); Pl.'s Ex. 108.)

13. On the morning of September 19, 2001, Mr. Moraes spoke by phone with Cathy Manning, Dollar Director of Credit and Collections, concerning the outstanding indebtedness to Dollar. Mr. Moraes told Ms. Manning that the Defendants were unable to pay past due amounts to Dollar unless Dollar bought his locations. (Tr. Transcr., vol. 1, 76 (Nargi

Direct); Tr. Transcr., vol. 2, 192-195 (Manning Direct); Pl.'s Exs. 55 & 62.)

14. After Ms. Manning's conversation with Mr. Moraes, Ms. Davis told Ms. Davis that Mr. Moraes was not going to be able to send the money and that a termination letter would be prepared. (Tr. Transcr., vol. 1, 142 (Davis Direct); Tr. Transcr., vol. 2, 195 (Manning Direct).)

15. Mr. Nargi also spoke with Mr. Moraes on the morning of September 19, 2001 concerning the outstanding indebtedness to Dollar. Mr. Moraes told Mr. Nargi that Defendants were unable to pay and that he needed to speak with his lawyer. (Tr. Transcr., vol. 1, 76-77 (Nargi Direct); Pl.'s Ex. 55.) If, on September 19, 2001, Mr. Moraes had told Mr. Nargi that the fleet bill would be paid by September 21, 2001, then Dollar would not have terminated the License Agreements. (Tr. Transcr., vol. 6, 885 (Nargi Rebuttal).)

16. Mr. Nargi also received a call from Mr. Taddei on September 19, 2001, wherein Mr. Taddei stated that "he didn't realize how bad it was until recently" and the Corporate Defendants would probably have to file for bankruptcy. (Tr. Transcr., vol. 1, 77-78 (Nargi Direct); Pl.'s Ex. 55.)

17. Dollar delivered its September 18, 2001 letter (allowing a three-day period) to the Defendants pursuant to Dollar's then-standard practice. (Tr. Transcr., vol. 1, 73-76 (Nargi Direct), 162 (Adair Cross), 166 (Manning Direct).) Dollar subsequently withdrew the three-day cure period in response to Mr. Moraes' statements that the Defendants could not pay all amounts owed to Dollar and Mr. Taddei's indication that the Corporate Defendants' dire financial condition might force them into bankruptcy. (Agreed Pretrial Or., 15, ¶ 76; Tr. Transcr., vol. 1, 76-79 (Nargi Direct), 98, 106 (Nargi Cross), 143-144 (Davis Direct); Tr. Transcr., vol. 2, 192-194 (Manning Direct); Pl.'s Exs. 49 & 55.)

18. In addition, on September 19, 2001, Dollar notified the Corporate Defendants in writing of the im-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 14
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

mediate termination of the License Agreements, due to termination of the Master Lease Agreements. These notifications were specifically made without prejudice to Dollar's right to take action upon defaults not listed or upon defaults occurring after the date of the letters. (Agreed Pretrial Or., 15, ¶ 77; Tr. Transcr., vol. 1, 79-80 (Nargi Direct); Pl.'s Exs. 50-51.)

*16 19. After receiving the termination notices on September 19, 2001, Mr. Moreas did not call Dollar and offer to pay the amounts owed; instead, he consulted his attorney. (Tr. Transcr., vol. 5, 646 (Moraes Cross).)

20. Mr. Moraes sent Dollar a letter on September 19, 2001; the letter was drafted with the help of his financial adviser; in the letter, Mr. Moraes disputed the termination but did not state that he would pay amounts owed to Dollar. (Tr. Transcr., vol. 5, 646-648 (Moraes Cross).)

21. Due to termination of the Master Lease Agreements, Dollar commenced repossession of its collateral (i.e., vehicles leased to the Corporate Defendants pursuant to the Master Lease Agreements) on September 19, 2001. (Agreed Pretrial Or., 15, ¶ 80; Tr. Transcr., vol. 1, 88-89 (Nargi Direct).)

22. On September 20, 2001, Ms. Davis talked with Tara Doerr, who told her that Mr. Moraes asked her to make out a check to a bankruptcy attorney. (Tr. Transcr., vol. 1, 143-144 (Davis Direct); Pl.'s Ex. 108.)

23. On September 20, 2001, Dollar notified the Corporate Defendants in writing that Dollar considered its September 19, 2001, termination notices to be appropriate and valid. Dollar also set forth additional grounds for termination of the License Agreements. Dollar stated that the Corporate Defendants' failure to pay amounts due within three days would constitute additional grounds for the immediate termination of the License Agreements. (Agreed Pretrial Or ., 15, ¶ 78; Tr. Transcr., vol. 1, 88-89 (Nargi Direct); Pl.'s Exs. 53 & 54.) The De-

fendants did not cure or offer to cure their defaults within, or at any time after, this additional cure period. (Tr. Transcr., vol. 1, 86-89 (Nargi Direct); Tr. Transcr., vol. 3, 392-393 (Taddei Recross).)

24. During a phone conversation among Mr. Moraes, Mr. Nargi, and Bill Walker on September 20, Mr. Moraes did not offer to make any payments to Dollar. (Tr. Transcr., vol. 5, 648-649 (Moraes Cross).)

25. The Corporate Defendants did not have sufficient funds in their operating accounts in mid-September, 2001, to pay Dollar the amounts due under the License Agreements and Master Lease Agreements. (Tr. Transcr., vol. 2, 255-256 (Wilsey Direct) (Sept. 14, 2004).) On September 19, 2001, the Corporate Defendants' operating accounts had a combined balance of less than $300,000.00. (Tr. Transcr., vol. 2, 304-305 (Wilsey Cross); Tr. Transcr., vol. 4, 439-441 (Moraes Direct); See also Pl.'s Ex. 136.)

26. In light of the economic conditions of the travel industry after September 11, 2001 and the heavy debt load of the Corporate Defendants, there was no realistic possibility that the Corporate Defendants would have secured a loan or received additional financing in an amount necessary to cure the defaults with Dollar or to continue their business for any length of time. (Tr. Transcr., vol. 6, 903-906 (Wilsey Rebuttal).)

27. Subsequent to termination, Dollar drew upon the Corporate Defendants' $422,000 letter of credit required by Dollar to secure the obligations of the Corporate Defendants. (Agreed Pretrial Or., 15, ¶ 80.) The Corporate Defendants' failure to pay amounts due under the License Agreements and the Master Lease Agreements permitted Dollar to draw on the letter of credit, thereby reducing the Defendants' overall debt to Dollar by $422,000. (Tr. Transcr., vol. 1, 108 (Nargi Cross); Tr. Transcr., vol. 2, 195-197 (Manning Direct).)

*17 28. Dollar did not prevent Corporate Defend-

Not Reported in F.Supp.2d                                                             Page 15
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

ants from making their payments during the three-day period by commencing repossession of vehicles because the fleet that Dollar was repossessing was less than 50 percent of the fleet that the Corporate Defendants had on hand. (Tr. Transcr., vol. 1, 90 (Nargi Direct).)

29. Dollar terminated the License Agreements and Master Lease Agreements in accordance with their express terms and conditions. (Tr. Transcr., vol. 1, 74-76, 80-82 (Nargi Direct).)

30. Dollar did not terminate the License Agreements and Master Lease Agreements pursuant to a plan to force the Corporate Defendants out of business in order to take over their locations. (Tr. Transcr., vol. 1, 93 (Nargi Direct); Tr. Transcr., vol. 6, 878 (Nargi Rebuttal).)

31. None of the Corporate Defendants' rental locations were at the top 50 airports based on reported revenues, according to a report from Auto Rental News covering 2000-2001. (Tr. Transcr., vol. 1, 72-73 (Nargi Direct); Pl.Ex. 237.)

32. After termination of the License Agreements and Master Lease Agreements, Dollar's corporate operations group became aware that all of the Corporate Defendants' locations were available and determined to try and operate in two (i.e., Norfolk and Pensacola) of the five cities previously operated by the Corporate Defendants. For both cities, Dollar submitted bids to enter into new concession agreements with the airport authorities, and operations did not commence until 2002. Additionally, Dollar did not receive any assistance, assets, facilities or contract assignments from the Defendants at any of the locations. (Tr. Transcr., vol. 1, 92-93 (Nargi Direct); Tr. Transcr., vol. 6, 766-767 (Moraes Direct).)

*J. Breach of Contract by Defendants*

1. The parties do not dispute the existence or validity of the Agreements. (Agreed Pretrial Or., 4, ¶¶ (B)(1) & (2); 5, ¶¶ 4 & 7; 6, ¶¶ 11, 13, 17; 7, ¶¶ 21,

23.) In fact, the only affirmative defense pled by Defendants in response to Dollar's breach of contract claims is improper venue, which defense has been waived. (Def. Ans. & Counterclaim, 10 (Nov. 6, 2001).)

2. Defendants have neither paid nor attempted to pay Dollar past due amounts under the Agreements and have failed to cure such defaults. (Tr. Transcr., vol. 1, 88-89 (Nargi Cross); Tr. Transcr., vol. 3, 392-393 (Taddei Recross); Def. Ans. & Counterclaim, ¶ 27.)

3. Dollar made it clear to Mr. Moraes that he was not permitted to make late payments in March of 2001 at a meeting among Mr. Moraes, Mr. Nargi, and Wayne Choisnet. Neither was Mr. Moraes told subsequently to that meeting that he could submit late payments to Dollar in June, July, or August of 2001. (Tr. Transcr., vol. 6, 881-883 (Nargi Rebuttal).)

4. Mr. Moraes admitted that he was bound by the terms of the Master Lease Agreements and that, under the Master Lease Agreements, Dollar had the right to terminate the agreement and repossess his cars as soon as a payment was missed. Mr. Moraes also admitted that he failed to pay the August fleet bill on the day it was due-September 17, 2001. (Tr. Transcr., vol. 5, 651-652 (Moraes Cross).)

*18 5. Defendants' failure to pay their August 2001 fleet payments due under the Master Lease Agreements constituted material breach under the Master Lease Agreements and the Guarantee Agreements and constituted an "Event of Default" permitting Dollar to immediately terminate the Master Lease Agreements. (Tr. Transcr., vol. 1, 74-76 (Nargi Direct); Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 9(A); Pl.'s Ex. 48.)

6. Defendants' failure to pay amounts due under the License Agreements in June, July, and August of 2001, including multiple other months within the twelve-month period preceding Dollar's termination, constituted material breach under the License

Not Reported in F.Supp.2d                                                                Page 16
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

Agreements and the Guarantee Agreements and constituted "good cause" permitting Dollar to terminate the License Agreements upon notice. (Tr. Transcr., vol. 1, 80-84 (Nargi Direct), 131-132 (Davis Direct); Tr. Transcr., vol. 1, 173-174, 178 (Manning Direct); Tr. Transcr., vol. 2, 197 (Manning Direct); Tr. Transcr., vol. 5, 652-654 (Moraes Cross); Pl.'s Exs. 8 & 14 at ¶ 18.3; Pl.'s Exs. 29 & 35 at ¶ 18.2; Pl's Exs. 54 75 & 76.)

7. In addition, the Corporate Defendants were unable to pay their debts as they became due in September of 2001. (Tr. Transcr., vol. 1, 84 (Nargi Direct), 168-169 (Manning Direct); Tr. Transcr., vol. 5, 625-626 (Moraes Cross); Tr. Transcr., vol. 2, 247, 275-276 (Wilsey Direct).) The Corporate Defendants' former Chief Financial Officer, Charles Bratcher, testified that the Corporate Defendants were insolvent when he left his position with the Corporate Defendants at the end of August 2001. (Transcr.Depo.Bratcher, 125-126.)

8. Defendants owed many other creditors who were critical to the Corporate Defendants' vehicle rental business, among the largest being fleet providers and airports, over $1,115,000.00 in past due debt as of September 15, 2001. (Tr. Transcr., vol. 2, 258 (Wilsey Direct); Pl.'s Ex. 143.)

9. Such insolvency and inability to pay debts constituted material breach and "good cause" permitting Dollar to terminate the Pensacola and Norfolk License Agreements upon notice and causing automatic termination of the Richmond and Alabama License Agreements. (Tr. Transcr., vol. 1, 84 (Nargi Direct); Pl.'s Exs. 8 & 14 at ¶ 18.3; Pl.'s Exs. 29 & 35 at ¶ 18.2.)

10. Also, the Corporate Defendants' failure to cure their non-payment of amounts due under the Master Lease Agreements represented defaults under collateral agreements with Dollar. (Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 9(A).) Such failure constituted material breach under the License Agreements and constituted "good cause" permitting Dollar to terminate the License Agreements upon notice. (Tr. Transcr.,

vol. 1, 80-81 (Nargi Direct); Pl.'s Exs. 8, 14, 29 & 35 at ¶ 18.3.)

11. Mr. Moraes admitted that Dollar had the right to terminate the License Agreements if he defaulted on the Master Lease Agreements. (Tr. Transcr., vol. 5, 652 (Moraes Cross).)

K. *Amounts Owed by Defendants to Dollar as of June 30, 2003*

*19 1. Dollar continued to deliver Franchise Statements of Account to the Defendants through their attorney of record on a monthly basis in the ordinary course of business. The most recent Franchise Statements of Account reflect all amounts still due and owing from the Defendants to Dollar to the date of such Statements. (Agreed Pretrial Or., 13, ¶ 58.)

2. Mr. Moraes is familiar with the Franchise Statements of Account and reviewed them frequently in his capacity as President of the Corporate Defendants. (Agreed Pretrial Or., 13, ¶ 61.)

3. Mr. Moraes is aware that the Corporate Defendants received monthly Franchise Statements of Account and has reviewed these Statements. (Agreed Pretrial Or., 13, ¶ 62.)

4. Charles Bratcher, the Chief Financial Officer of the Corporate Defendants from July, 1999 until August 26, 2001, has reviewed many Dollar Franchise Statements of Account over the past seven years. (Agreed Pretrial Or., 13, ¶ 62; Transcr. Depo Bratcher, 50-51.)

5. During that time, Mr. Bratcher has never found a Statement to be wrong. He has discovered only minor discrepancies. (Agreed Pretrial Or., 13, ¶ 63; Transcr. Depo Bratcher, 50-51.)

6. Tara Doerr was the Staff Accountant of the Corporate Defendants from May, 2000 through October, 2001. (Agreed Pretrial Or ., 14, ¶ 65; Transcr. Doerr Depo., 9-11 (Nov. 19, 2002).) Her responsib-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

ilities included reconciliation of the Dollar Franchise Statements of Account. (Agreed Pretrial Or., 14, ¶ 65; Transcr. Doerr Depo., 30-32.)

7. According to Ms. Doerr, the amounts on the Dollar Franchise Statements of Account were basically correct. (Agreed Pretrial Or., 14, ¶ 66; Transcr. Doerr Depo., 43-46.)

8. The only "large" discrepancy (over $1,000) Ms. Doerr recalls is one involving advertising in late 2000. Ms. Doerr does not recall any such discrepancies in 2001. (Agreed Pretrial Or., 14, ¶ 67; Transcr. Doerr Depo., 45-46.)

9. The last set of Statements Ms. Doerr reconciled for the Corporate Defendants were the August 31, 2001 Franchise Statements of Account. She believes the systems fees amounts on these Statements are correct and does not recall any major discrepancies with these Statements. (Agreed Pretrial Or., 14, ¶ 68; Transcr. Doerr Depo., 57-60.)

10. Dollar's current Statements, rather than those issued near the time of termination of the License Agreements and the Master Lease Agreements in September 2001, most accurately identify amounts owed by the Defendants at present, as many charges and credits do not appear immediately on a monthly Statement due to such matters as slow billings by third parties, assessment of certain charges in arrears, and adjustments to lease rates based on interest rate changes. (Tr. Transcr. vol. 2, 199-201 (Manning Direct); Tr. Transcript, vol. 7, 965-968 (Manning Rebuttal) (Oct. 28, 2004); Pl.'s Ex. 92.5.)

11. All charges and credits, with the exception of interest on the unpaid amounts which continues to accrue, have now posted to the Corporate Defendants' seven accounts. (Agreed Pretrial Or., 14, ¶ 69; Tr. Transcr., vol. 2, 199-201 (Manning Direct); Pl.'s Ex. 92.5.)

*20 12. Dollar has processes whereby licensees can dispute or make inquiries about charges that appear on an invoice or a Franchise Statement of Account. (Agreed Pretrial Or., 14, ¶ 70; Tr. Transcr., vol. 2, 197-199 (Manning Direct); Pl.'s Ex. 61.)

13. With respect to fleet-related charges, the licensee must submit an Invoice Dispute Form within thirty (30) days from the date of the disputed invoice. Fleet-related disputes are logged by Dollar, in the ordinary course of Dollar's business, on a Vehicle Dispute Log. (Agreed Pretrial Or., 14, ¶ 71; Tr. Transcr., vol. 2, 197-199 (Manning Direct); Pl.'s Ex. 61.)

14. With respect to non-fleet-related charges, there are various processes outlined in Dollar's Operations Guide that the licensee must follow. (Agreed Pretrial Or., 14, ¶ 72.)

15. The Corporate Defendants are aware of the rules concerning dispute or inquiry about charges. They have utilized these rules previously to dispute charges. (Agreed Pretrial Or., 14, ¶ 73; Tr. Transcr., vol. 2, 197-199 (Manning Direct); Pl.'s Ex. 61.)

16. Although the Corporate Defendants continued to receive monthly Franchise Statements of Account from Dollar, they did not notify Dollar, pursuant to any of the processes outlined in the preceding paragraphs, of any dispute with respect to any of the amounts remaining unpaid. (Agreed Pretrial Or., 13, ¶ 58 and at 14, ¶ 73.)

17. Dollar has determined to seek damages from Defendants through June 30, 2003. As a result, Dollar is not seeking to collect interest that has continued to accrue on the PRP/PRT account since June 30, 2003. (Tr. Transcr., vol. 2, 201 (Manning Direct); Pl.'s Ex. 92.5 & 246.)

18. As of June 30, 2003, P.R.P. has a credit of $229,152.04 for amounts owed to Dollar under the Pensacola License and Master Lease Agreements with respect to P.R.P.'s Pensacola on-airport franchise location. This credit includes a $422,000 letter of credit Dollar drew upon and previously applied in favor of Defendants against amounts owed

Not Reported in F.Supp.2d                                            Page 18
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

on this account. (Tr. Transcr., vol. 2, 196-197 (Manning Direct), 230 (Manning Cross); Pl.'s Ex. 246.)

19. As of June 30, 2003, P.R.P. owes Dollar $15,542.45 under the Pensacola License and Master Lease Agreements with respect to P.R.P.'s Pensacola off-airport franchise location. (Pl.'s Ex. 246.)

20. As of June 30, 2003, P.R.P. owes Dollar $306,417.99 under the Birmingham License and Master Lease Agreements. (Id.)

21. As of June 30, 2003, P.R.P. owes Dollar $200,562.77 under the Mobile License and Master Lease Agreements. (Id.)

22. As of June 30, 2003, P.R.T. owes Dollar $663,210.76 under the Norfolk License and Master Lease Agreements with respect to P.R.T.'s Norfolk franchise location. (Id.)

23. As of June 30, 2003, P.R.T. owes Dollar $15,379.150 under the Norfolk License and Master Lease Agreements with respect to P.R.T.'s Norfolk off-airport franchise location. (Id.)

24. As of June 30, 2003, P.R.T. owes Dollar $373,852.79 under the Richmond License and Master Lease Agreements. (Id.)

**\*21** 25. As of June 30, 2003, P.R.P. owes Dollar a total of $293,371.17, plus attorneys' fees, litigation costs, and interest. (Id., Tr. Transcr., vol. 2, 204 (Manning Direct).)

26. As of June 30, 2003, P.R.T. owes Dollar a total of $1,052,442 .70, plus attorneys' fees, litigation costs, and interest. (Id.)

27. As of June 30, 2003, Moraes owes Dollar $1,345,813.87, plus attorneys' fees, litigation costs, and interest, with respect to his guarantee of all amounts owed to Dollar by the Corporate Defendants. (Tr. Transcr., vol. 2, 203-204 (Manning Direct); Pl.'s Ex. 246.)

28. As of June 30, 2003, Mr. Taddei owes Dollar $1,052,442.70, plus attorneys' fees, litigation costs, and interest, with respect to his guarantee of all amounts owed to Dollar by P.R.T. (Tr. Transcr., vol. 2, 204 (Manning Direct); Pl.'s Ex. 246.)

29. As of June 30, 2003, Mrs. Taddei owes Dollar $373,852.79, plus attorneys' fees, litigation costs, and interest, with respect to her guarantee of all amounts owed to Dollar by P.R.T. in relation to the Richmond franchise location. (Id.)

*L. Damages*

1. The License Agreements contain provisions prohibiting the Corporate Defendants from recovering consequential damages or lost profits from Dollar. (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.8.)

2. The waiver of consequential damages provisions in the License Agreements are enforceable with respect to the Corporate Defendants, due to the significant experience and sophistication of Mr. Moraes and Mr. Taddei. (Tr. Transcr., vol. 1, 59 (Nargi Direct); Tr. Transcr., vol. 4, 528-538, 550 (Moraes Cross); (Agreed Pretrial Or., 9, ¶ 33-34.)

3. The Corporate Defendants were insolvent in September, 2001 and they were not a going concern. When Dollar terminated the License Agreements of the Corporate Defendants, Dollar did not cause the Corporate Defendants to suffer damages. (Tr. Transcr., vol. 2, 249 (Wilsey Direct).)

4. In September, 2001, the Corporate Defendants' failure was imminent with or without the termination of the License Agreements by Dollar. (Id.)

5. Given the financial condition of PRP and PRT in September of 2001, the poor historic profit and loss performance of the Corporate Defendants, and the Corporate Defendants' high costs in an industry that is performing poorly in September, 2001, it would be unreasonable and extremely speculative even to compute future lost profits for the Corporate Defendants. (Tr. Transcr., vol. 6, 900 (Wilsey Rebut-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

tal); Pl.Ex. 274.)

6. In the year 2000, the Corporate Defendants had a combined loss of $791,000. Tr. Transcr., vol. 6, 906 (Wilsey Rebuttal).)

7. The lost profit calculation offered by Mr. Moraes is speculative, unreliable, and not grounded in fact. It fails to explain satisfactorily how the Corporate Defendants are able to survive from September, 2001, in their insolvent condition, to 2002 in the face of declining industry revenues after September 11, 2001. It also contains a mismatch between revenues and costs (fleet and staff), an extremely low discount rate for the ten-year projection, and overstated revenues. (Tr. Transcr., vol. 6, 901-902, 907-922 (Wilsey Rebuttal).)

**\*22** 8. Mr. Moraes' lost profits calculation is contrary to actual industry performance in 2002. (Tr. Transcr., vol. 1, 70-71 (Nargi Direct); Tr. Transcr., vol. 6, 906-907 (Wilsey Rebuttal); Pl.'s Ex. 254 & 274.)

9. According to generally accepted valuation theory, a business must be a going concern (have a predictable, projectable future income stream to be discounted by a willing buyer) in order to have a value. (Tr. Transcr., vol. 6, 922 (Wilsey Rebuttal)

10. There is no evidence that Defendants had a willing buyer for their locations. (Tr. Transcr., vol. 6, 923 (Wilsey Rebuttal); see generally, Tr. Transcr., vol. 3, 373-395 (Taddei Testimony); Tr. Transcr., vol. 4, 412-584 (Moraes Testimony); Tr. Transcr., vol. 5, 590-753 (Moraes Testimony); Tr. Transcr., vol. 6, 759-846 (Moraes Testimony).)

11. Lost profits and fair market value of a company are mutually exclusive damage awards. (Tr. Transcr., vol. 6, 923 (Wilsey Rebuttal).)

12. Ana Moraes is not a party to this lawsuit. (Agreed Pretrial Or., 4, ¶ IV(A).)

13. Neither Mr. Moraes nor Mr. Taddei have asserted a counterclaim against Dollar in this lawsuit.

(Agreed Pretrial Or., 29, ¶ 46.)

## CONCLUSIONS OF LAW

### Dollar's Breach of Contract Claims

1. A breach of contract is a material failure of performance of a duty arising under or imposed by agreement. See *Angier v. Matthews Exploration Corp.,* 905 P.2d 826, 831 n. 2 (Okla.Ct.App.1995). To prevail on a claim for breach of contract, the party asserting the claim must establish:

(1) the existence of a contract between the claimant and the adverse party;

(2) an obligation on the adverse party to perform under the contract;

(3) failure by the adverse party to perform the contractual obligation; and

(4) damages suffered by the claimant as a direct result of the breach.

See *Bohm, Inc. v. Michael,* 46 P.3d 1286, 1288-89 (Okla.Ct.App.2002) (citing *Thompson v. Phillips Pipe Line Co.,* 200 Kan. 669, 438 P.2d 146 (Kan.1968)); *see also* Oklahoma Uniform Jury Instruction-Civil No. 23.1.

2. Determination of materiality generally focuses upon whether or not the nonperformance defeats the object of the parties in forming the contract. See 14 Richard A. Lord, *Williston on Contracts,* § 43:6 (4th ed.2000). Multiple factors may be considered, but, "if the [breaching] party has also breached other contracts, either with the promisee or with third parties, or has become financially weak or unstable, it is more likely that any breach will be deemed material."*Id.*

3. Contractual "non-waiver" provisions, such as those included in the License Agreements and the Master Lease Agreements, are enforceable under Oklahoma law. See *generally, Gordon v. Continental*

Not Reported in F.Supp.2d                                          Page 20
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

*Ins. Co.,* 182 Okla. 240, 76 P.2d 1055, 1059 (Okla.1938); *Scottish Union & National Ins. Co. v. Cornett Bros.,* 42 Okla. 645, 142 P. 315, 317 (Okla.1914).

4. "A guarantor is liable immediately to the guarantee upon the default of the principal without demand or notice."*Federal Deposit Ins. Corp. v. Casey,* 741 P.2d 463, 465 (Okla.1987). The Guarantee Agreements are collateral obligations, which are independently and separately enforceable from that of the principal debtors (i.e., the Corporate Defendants.) *SeeRiverside Nat'l Bank v. Manolakis,* 613 P.2d 438, 441 (Okla.1980); *Janeway v. Vandeventer,* 172 Okla. 379, 45 P.2d 79, 82-83 (Okla.1935).

**\*23** 5. Even if a franchisee prevails against the franchisor on a claim of wrongful termination of the franchise, the franchisee remains liable for non-payment of amounts owed to the franchisor prior to termination. *SeeBoyers v. Texaco Ref. & Mktg., Inc.,* 848 F.2d 809 (7th Cir.1988); *see also* Howard S. Wolfson, "One Royalty Strike and You're Out!": A Franchisor's Independent Right to Terminate a Franchise Agreement for Nonpayment of Royalties and the Remedies Available Under the Lanham Act," 17 Franchise L.J. 1 (Summer, 1997) ("The franchisor's right to receive royalties pursuant to the franchise agreement is wholly distinct from any claim the franchisee may have against the franchisor and comparing the two is like comparing apples and oranges.").

6. The elements required for Dollar's breach of contract claims have been met, in that the Agreements were existing and valid, the Defendants were obligated under such Agreements to remit payments to Dollar, the Defendants failed to remit such payments and, as a result, Dollar incurred significant damages in the amount of such non-payments, plus interest. Dollar did not waive the Defendants' obligations to timely pay amounts due under the Agreements, and, regardless of whether or not the Defendants can prevail on their claims of wrongful termination, the Defendants remain liable for

amounts owed under the Agreements which do not arise from termination. *Seesupra* at ¶¶ 4-23, 56-75, 89, 92, 116, 145-146, 155-183 & 197-201.

7. The party terminating a contract need not explain the reason(s) for termination at the time of termination, as long as a legally adequate reason exists. *SeeCollege Point Boat Corp. v. U.S.,* 267 U.S. 12, 15-16, 45 S.Ct. 199, 69 L.Ed. 490 (1925); *Hoffman v. General Motors Acceptance Corp.,* 814 F.2d 1385, 1388 (9th Cir.1987); *First Commodity Traders v. Heinold Commodities,* 766 F.2d 1007, 1013 (7th Cir.1985). Dollar was not required to specify its grounds for termination in its September 2001 termination letters and, therefore, is not precluded from subsequently raising reasons for termination that were not expressed in such letters but were existing at the time of termination. *See* Pl. Exs. 50-51.

*B. Defendants' Breach of Contract Claims and Dollar's Defenses*

1. Under well established common law rules, a party in material breach of a contract cannot enforce or recover on the contract. *SeeOwens v. Automotive Engineers, Inc.,* 208 Okla. 251, 255 P.2d 240, 247 (Okla.1953); *Camp v. Black Gold Petroleum Co.,* 195 Okla. 30, 154 P.2d 769, 771 (Okla.1944); *Messick v. Johnson,* 167 Okla. 463, 30 P.2d 176, 178 (Okla.1934); *Robberson Steel Co. v. Harrell,* 177 F.2d 12, 17 (10th Cir.1949); 17B C.J.S. *Contracts* § 503 (1999); Restatement (Second) of Contracts § 237 (1981.)

2. Additionally, repudiation of a contract by a party excuses the other party to the contract from performing. *SeeHidalgo Properties, Inc. v. Wachovia Mortg. Co.,* 617 F.2d 196, 199 (10th Cir.1980); *Bu-Vi-Bar Petroleum Corp. v. Krow,* 40 F.2d 488, 491 (10th Cir.1930.) The Oklahoma Supreme Court has described the doctrine of anticipatory repudiation as follows:

**\*24** It is a well-established rule that the declaration

Not Reported in F.Supp.2d                                                                    Page 21
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

on the part of one party to a bilateral, executory contract, of his intention not to perform it, thus making the other party's tender of performance futile, relieves the latter of the necessity of making the idle gesture of a formal tender.

*Bushey v. Dale,* 181 Okla. 481, 75 P.2d 193, 196 (Okla.1937).*See also**EKE Builders, Inc. v. Quail Bluff Assoc.,* 714 P.2d 604, 608 (Okla.Ct.App.1985) ("The [Defendant]'s declarations and actions amounted to a repudiation of the contract justifying plaintiff to treat the contract as totally breached and to immediately sue for damages."); *Bu-Vi-Bar,* 40 F.2d at 491-93 (holding that plaintiffs were excused from performing under contract when defendant failed to retract repudiation prior to plaintiffs' election to treat repudiation as breach and change of position to their detriment.)

3. Under Oklahoma law, "where the original contract does not contemplate the making of a subsequent agreement, the original consideration will not support the subsequent agreement; and therefore a subsequent agreement not forming a part of the original contract, or supported by the original consideration thereof or by any new consideration, is without binding effect."*Robberson Steel,* 177 F.2d at 15 (applying Oklahoma law); *accord**State v. City of Sapulpa,* 58 Okla. 550, 160 P. 489, 491 (Okla.1916.)

4. The elements of estoppel under Oklahoma law are (1) a false representation or concealment of facts, (2) made with actual or constructive knowledge of the fact, (3) to a party without knowledge of, or the means of knowing, those facts, (4) with the intent that it be acted upon, and (5) the party to whom it was made acted in justified reliance upon it to its detriment. *See**Indiana Natl. Bank v. State Dept. of Human Services,* 857 P.2d 53, 64 (Okla.1993 .)

5. In Oklahoma, waiver consists of (1) the knowledge of existence of a right and (2) an intention to relinquish such right. *See**Barringer v. Baptist Healthcare of Okla.,* 22 P.3d 695, 700-01

(Okla.2001); *Robberson Steel,* 177 F.2d at 15. Waiver can be express or implied. *See**Barringer,* 22 P.3d at 701. Implied waiver may be established by action or conduct warranting an inference of intent to relinquish. See, *Id.*

6. The elements required for the Defendants' breach of contract claims have not been met. The Agreements did not obligate Dollar to allow the Defendants any opportunity to cure their defaults under the circumstances. Given that the Defendants materially breached the Agreements by failing to pay significant amounts when due, the Defendants cannot seek to enforce and recover on the Agreements and argue that Dollar subsequently breached the Agreements. *Seesupra* at ¶¶ 112-143, 197-208.

7. Alternatively, the Defendants repudiated the Agreements through Moraes' statements to Dollar that the Corporate Defendants were unable to pay amounts due under the Master Lease Agreements, thereby excusing Dollar from performing under the Agreements, because "[t]he law does not require a vain and idle ceremony."*Bu-Vi-Bar,* 40 F.2d at 491.

*25 8. Dollar's offer of a three-day cure period in its September 18, 2001, letter lacked consideration and was non-binding, because Dollar merely offered to allow the Defendants additional time to do what they were already obligated to do (i.e., remit payments under the Agreements); due to Mr. Moraes' representations on September 19, 2001, that the Corporate Defendants were unable to pay amounts due to Dollar, the Defendants are estopped from now asserting that they actually could have remitted such payments; and, likewise, by virtue of Mr. Moraes' representation of inability to pay, the Defendants waived any right to cure their defaults under the Master Lease Agreements. *Seesupra* at ¶¶ 76-85, 112-154, 204-210.

*C. Breach of Implied Covenant of Good Faith and Fair Dealing*

1. The common law of Oklahoma implies in all

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contracts a mutual covenant that the parties will act towards each other in good faith. See *Beshara v. Southern Natl. Bank,* 928 P.2d 280, 288 (Okla.1996); *First Natl. Bank & Trust Co. of Vinita v. Kissee.* 859 P.2d 502, 509 (Okla.1993); *Rodgers v. Tecumseh Bank,* 756 P.2d 1223, 1227 (Okla.1988); *Hall v. Farmers Ins. Exchange,* 713 P.2d 1027, 1029 (Okla.1985). However, "[a]s a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract."23 Samuel Williston, *A Treatise on the Law of Contracts,* § 63:22, 516 (4th ed.2002); *see also Big Yank Corp. v. Liberty Mut. Fire Ins. Co.,* 125 F.3d 308, 313 (6th Cir.1997); *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1318 (11th Cir.1999).

2. Additionally, "without 'gross recklessness or wanton negligence on behalf of a party' to a commercial contract, a breach of the implied covenant of good faith and fair dealing merely results in a breach of contract."*Kissee,* 859 P.2d at 509 (quoting *Rodgers,* 756 P.2d at 1227).

3. Dollar did not breach the implied covenant of good faith and fair dealing, as Dollar terminated the License Agreements and Master Lease Agreements in accordance with the provisions of such Agreements. See *supra* at ¶¶ 139-140, 209-210.

D. *Fraudulent Misrepresentation*

1. Under Oklahoma law, the elements for fraudulent misrepresentation are:

(1) The defendant made a material representation that was false;

(2) The defendant knew when he made the representation that it was false or he made it recklessly, without any knowledge of its truth and as a positive assertion;

(3) The defendant made the misrepresentation with the intention that it should be acted upon by the plaintiff;

(4) The plaintiff acted in reliance upon the misrepresentation; and

(5) The plaintiff thereby suffered injury.

See *Gay v. Akin,* 766 P.2d 985, 989 (Okla.1988); *Silk v. Phillips Petroleum Co.,* 760 P.2d 174, 176-77 (Okla.1988). The Defendants, as the parties asserting the claim of fraud in this case, have the burden of proving each of these elements by clear and convincing evidence in this case. See *Silk,* 760 P.2d at 177.

**\*26** 2. The elements for fraudulent misrepresentation have not been proven by the Defendants. There is no evidence that Dollar's allowance of a three-day cure period was false at the time it was made or that Dollar knew the allowance was false when made. See *supra* at ¶¶ 122, 215.

E. *Tortious Interference with Contract and Business Expectations*

1. Oklahoma law recognizes claims for both tortious interference with contractual relations and tortious interference with prospective economic advantage. See *Overbeck v. Quaker Life Ins. Co.,* 757 P.2d 846, 847-48 (Okla.Ct.App.1984) (citing Oklahoma Supreme Court cases recognizing tortious interference with a business or contractual relationship); *McNickle v. Phillips Petroleum Co.,* 23 P.3d 949, 953 (Okla.Ct.App.2001) (citing *Overbeck* as recognizing tortious interference with prospective economic advantage).

2. The party asserting a claim of tortious interference bears the burden of proving the following elements:

(1) The claimant had a business or contractual right with which there was interference;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 23
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))

(2) The interference was malicious and wrongful;

(3) The interference was neither justified, privileged nor excusable; and

(4) Damage was sustained as a proximate result of the interference.

*See* *Morrow Dev. Corp. v. American Bank & Trust Co.*, 875 P.2d 411, 416 (Okla.1994).

3. Both of these interference torts require an "intentional" interference. The "interference is intentional if the interferer acted with the purpose to interfere with the relationship or expectancy." *Boyle Services, Inc. v. Dewberry Design Group, Inc.*, 24 P.3d 878, 880 (Okla.Ct.App.2001) (emphasis added).

4. Privilege is a complete defense to a claim of tortious interference. *See* *Morrow*, 875 P.2d at, 417. Interference is privileged if the interfering party's primary focus was protection of legitimate economic interests, rather than interference. *See* *Green Bay Packaging, Inc. v. Preferred Packaging, Inc.*, 932 P.2d 1091, 1096 (Okla.1996); *Morrow*, 875 P.2d at 416.

5. The elements for tortious interference with contract and with business expectations have not been proven by the Defendants. Dollar terminated the License Agreements and Master Lease Agreements in accordance with its express rights under such Agreements. Dollar did not terminate the License Agreements and Master Lease Agreements pursuant to a plan to force the Corporate Defendants out of business to take over their locations. *See* *supra* at ¶¶ 140-141, 217-220.

6. If there were interference, then that interference by Dollar was privileged because it was done by fair means, with honest intent, and for the purpose of furthering Dollar's own legitimate economic interest rather than principally to harm the Corporate Defendants. *See* *supra* at ¶¶ 220-221.

F. *Unjust Enrichment*

1. In conformance with principles expressed under Oklahoma law, the elements for unjust enrichment have been enumerated as:

**\*27** (1) an enrichment to the adverse party;

(2) an impoverishment to the claimant;

(3) a connection between the enrichment and impoverishment;

(4) an absence of justification; and

(5) an absence of remedies at law.

*See* 66 Am.Jur.2d *Restitution and Implied Contracts* § 12 (2001.)

2. Unjust enrichment is an equitable doctrine and is recognized in Oklahoma as a basis for recovery when a party fails to make restitution under circumstances equitably requiring restitution. *See* *N.C. Corff Partnership, LTD. v. OXY USA, Inc.*, 929 P.2d 288, 295 (Okla.Ct.App.1996.) The party asserting a claim for unjust enrichment must show that the adverse party received money or other benefit, at the expense of the claimant, that in equity and good conscience should not be retained by the adverse party. *See* *French Energy, Inc. v. Alexander*, 818 P.2d 1234, 1237 (Okla.1991); *Lapkin v. Garland Bloodworth, Inc.*, 23 P.3d 958, 961 (Okla.Ct.App.2001); *N.C. Corff*, 929 P.2d at 295.

3. A party must come before the court with "clean hands" to obtain equitable relief. *See* *State, ex rel. Dept. of Human Services, ex rel. Jones v. Baggett*, 990 P.2d 235, 244 (Okla.1999); *Story v. Hefner*, 540 P.2d 562, 567 (Okla.1975.) Under the "clean hands" doctrine, a party cannot invoke the equitable powers of the court when guilty of unlawful or inequitable conduct in relation to the matter for which relief is sought. *See* *Baggett*, 990 P.2d at 244; *Leathers v. Commercial Natl. Bank in Muskogee*, 410 P.2d 541, 546 (Okla.1965) (quoting *Camp v. Camp*, 196 Okla. 199, 163 P.2d 970, 972 (Okla.1945).)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 24
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

4. The Defendants have not proven that Dollar was unjustly enriched. Dollar was justified in terminating the License Agreements and Master Lease Agreements, and no evidence exists that Dollar was unjustifiably enriched, at the Defendants' expense, through its termination of the License Agreements and Master Lease Agreements. Further, the Defendants come before this Court with "unclean hands," having breached the Agreements first by failing to timely pay amounts due, and, therefore, cannot obtain equitable relief. Finally, the Corporate Defendants have an adequate legal remedy. *Seesupra* at ¶¶ 112-143, 155-183, 223-225.

### G. Damages

1. The Corporate Defendants are contractually precluded from recovering lost profits or consequential damages from Dollar. *Fretwell v. Protection Alarm Co.,* 764 P.2d 149, 151 (Okla.1988); *Phillips Machinery Co. v. LeBlond, Inc.,* 494 F.Supp. 318 (N.D.Okla.1980); *Elsken v. Network Multi-Family Sec. Corp.,* 838 P.2d 1007 (Okla.1992); *Vails v. Southwestern Bell Tel. Co.,* 504 F.Supp. 740 (W.D.Okla.1980); *Tulsa Trailer & Body, Inc. v. Trailmobile, Inc.,* 1986 U.S. Dist. LEXIS 26395 at *14 (N.D.Okla.1986).

2. The Corporate Defendants are precluded from seeking recovery for damages not disclosed during discovery such as "lost value of the businesses" and "amounts owed to other creditors." Minute Order, dated Oct. 7, 2003 (granting Dollar's motions in limine); Fed.R.Civ.P. 26; *Digital Design Group, Inc. v. Information Builders, Inc.,* 24 P.3d 834, 844 & n. 28 (Okla.2001).

**\*28** 3. The Defendants have failed to meet their burden to prove that the limitation of damages clauses in the License Agreements are unconscionable."[I]n a commercial setting, the burden of proving unconscionability is on the party seeking to invalidate the contract or clause."*Phillips Machinery Co. v. LeBlond,* 494 F.Supp. 318, 323 (N.D.Okla.1980) (applying Oklahoma law.) Where

"the loss is commercial" there is "no prima facie unconscionability." *See id.*In determining unconscionability, "[t]here is no requirement that there be equality of bargaining power," and a clause will not be invalidated simply because it "allocate[s] risks to the party having less bargaining power. There must be, in addition, some element of deception or substantive unfairness."*Id.* (discussing more restrictive requirements of Uniform Commercial Code .) "In addition, ... the party challenging the clause must show that there is no reasonable relation to the risks involved and that the terms are so one-sided as to be oppressive."*Id.* at 323-24.The evidence does not support their argument of unconscionability. *Seesupra* at ¶¶ 24-48.

4. The Corporate Defendants may not recover both lost profits and lost value of the businesses. *SeeProtectors Ins. Serv., Inc. v. U.S. Fidelity & Guar. Co.,* 132 F.3d 612, 617 (10th Cir.1998).

5. The Corporate Defendants may not recover from Dollar amounts owed and unpaid to other creditors. *See*Okla. Stat. tit. 23, § 21 (2001) (measure of damages for breach of contract is detriment proximately caused by breach).

6. Mr. and Mrs. Moraes and Mr. Taddei cannot recover damages from Dollar, as they have asserted no claim against Dollar in this lawsuit. *Seesupra* at ¶¶ 195-196.

### H. Costs

1. As the prevailing party, Dollar will additionally be entitled to recover its litigation costs and expenses, including attorneys' fees, in accordance with the terms and conditions of the Agreements. *See*Finnell v. Seismic, 67 P.3d 339, 343 (Okla.2003) (noting Oklahoma follows the American Rule, under which litigation expenses are recoverable by a prevailing party when authorized by contract or statute); *Morgan v. Galilean Health Enter., Inc.,* 977 P.2d 357, 362 (Okla.1998) (same); *see also*Okla. Stat. tit. 12, § 936.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1266515 (N.D.Okla.))**

Page 25

IT IS SO ORDERED.

N.D.Okla.,2006.
Dollar Rent A Car Systems, Inc. v. P.R.P. Enter-
prises, Inc.
Not Reported in F.Supp.2d, 2006 WL 1266515
(N.D.Okla.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                          Page 1
Slip Copy, 2008 WL 2074107 (E.D.Mo.)
**(Cite as: 2008 WL 2074107 (E.D.Mo.))**

**H**
Gannon Joint Venture Ltd. Partnership v. Masonite
Corp.
E.D.Mo.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. Missouri,Eastern
Division.
GANNON JOINT VENTURE LIMITED PART-
NERSHIP, et al., Plaintiff(s),
v.
MASONITE CORPORATION, et al., Defendant(s).
**No. 4:07CV1242 JCH.**

May 14, 2008.

Terry L. Pabst, Terry L. Pabst, P.C., Creve Coeur,
MO, for Plaintiffs.
Michael E. Wilson, Charles R. Vantine, Greensfeld-
er And Hemker, PC, St. Louis, MO, for Defendants.

### *MEMORANDUM AND ORDER*

JEAN C. HAMITON, District Judge.
**\*1** This matter is before the Court on Defendants
Masonite Corporation ("Masonite") and Interna-
tional Paper Company's ("International Paper")
Motion to Dismiss Count VI of the First Amended
Complaint or, in the Alternative, Motion for More
Definite Statement ("Motion to Dismiss"), filed
March 28, 2008. (Doc. No. 54). The matter is fully
briefed and ready for disposition.

### *BACKGROUND*

Plaintiff Gannon Joint Venture Limited Partnership
("GJVLP"), a Missouri limited partnership with its
principal place of business in the State of Missouri,
currently owns the Cedar Run apartment complex
("Cedar Run") in St. Louis, Missouri. (First
Amended Complaint ("Complaint" or "Compl."),
¶¶ 1, 8). Plaintiff West Pointe Apartments, L.L.C.
("WPA"), a Missouri limited liability company
with its principal place of business in the State of
Missouri, currently owns the West Pointe apartment

complex ("West Pointe") in St. Louis, Missouri.
(*Id.,* ¶¶ 2, 9). WPA acquired its interest in West
Pointe from Plaintiff Gannon Partnership 19, L.P.
("GP 19"), a Missouri limited partnership with its
principal place of business in the State of Missouri,
on March 11, 2002. (*Id.,* ¶¶ 3, 9).[FN1]

> FN1. GP19 owned West Pointe from June
> 22, 1992, to March 11, 2002. (Compl., ¶
> 10).

Defendant Masonite, a Delaware corporation au-
thorized to do business in the State of Missouri, has
manufactured and distributed a hardboard siding
product known as "Stuccato" ("the Siding").
(Compl., ¶¶ 5, 12).[FN2] According to Plaintiffs,
Masonite failed adequately to design, formulate,
and/or test its hardboard Siding before distributing
it as a purportedly durable and suitable residential
siding product, and further failed to remove the
Siding from the marketplace or take other remedial
action in a timely manner upon learning of its de-
fective nature. (*Id.,* ¶ 12).[FN3]

> FN2. From approximately November,
> 1988, through August, 2001, Masonite was
> a wholly owned subsidiary of Defendant
> International Paper, a New York corpora-
> tion authorized to do business in the State
> of Missouri. (Compl., ¶¶ 6, 20).

> FN3. Plaintiffs allege that beginning in
> 1980 or soon thereafter, Masonite was
> aware the Siding was subject to moisture
> invasion problems and premature failure
> due to its defective design. (Compl., ¶ 13).
> Plaintiffs maintain that despite this know-
> ledge, Masonite continued to sell the Sid-
> ing without correction, and in fact con-
> cealed the Siding's defective nature from
> the public. (*Id* .).

Plaintiff The Gannon Development Company
("Gannon Development"), a Missouri corporation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2074107 (E.D.Mo.)
**(Cite as: 2008 WL 2074107 (E.D.Mo.))**

Page 2

with its principal place of business in Missouri, provides general contracting construction services, among other services. (Compl., ¶¶ 4, 11). Non-party Charlie's Lumber & Supply, L.L.C., d/b/a O'Neil Lumber and Millwork ("O'Neil Lumber"), is an Illinois limited liability company authorized to do business in the State of Missouri. (*Id.,* ¶ 7). At various times between approximately October, 1997, and December, 2000, Gannon Development purchased certain Siding from O'Neil Lumber on behalf of GJVLP, and installed the Siding on fifteen separate buildings in Phase II at Cedar Run. (*Id.,* ¶ 22). Furthermore, at various times between approximately July, 1999, and November, 2000, Gannon Development purchased certain Siding from O'Neil Lumber on behalf of GP19, and installed the Siding on fourteen separate buildings in Phase III at West Pointe. (*Id.,* ¶ 24).

Plaintiffs allege that in or around June, 2005, the Siding at Cedar Run began to fail, as follows: swelling; deterioration of joint and ends; soft areas; and warping. (Compl., ¶ 23). Plaintiffs further allege the Siding at West Pointe began to fail in or around April, 2004, as follows: swelling; deterioration of joint and ends; and soft areas. (*Id.,* ¶ 25). Plaintiffs filed their original Petition in this matter in Missouri State Court on January 23, 2007. (Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss Count VI or, in the Alternative, Motion for More Definite Statement ("Plaintiffs' Opp."), P. 8). Defendants removed the action to this Court on July 9, 2007. (Doc. No. 1). In the instant Complaint, filed January 3, 2008, Plaintiffs assert the following claims for relief: Pre-Sale Intentional Suppression (Count II [FN4]); Post-Sale Intentional Suppression (Count IV [FN5]); Breach of Express Warranty (Count VI); Breach of Implied Warranty-Merchantability (Count VII); Breach of Implied Warranty-Fitness for Particular Purpose (Count VIII); Unfair Trade Practices under Mo.Rev. Stat. § 407.020 (Count IX); Negligence (Count X); and Declaratory Judgment (Count XI). (Doc. No. 17, ¶¶ 30-64).

FN4. Count I of Plaintiffs' Complaint was intentionally omitted. (Doc. No. 17, P. 12).

FN5. The parties stipulated to the dismissal with prejudice of Counts III and V of Plaintiffs' Complaint. (Doc. No. 41).

**\*2** As stated above, Defendants filed the instant Motion to Dismiss Count VI of the First Amended Complaint or, in the Alternative, Motion for More Definite Statement, on March 28, 2008. (Doc. No. 54).

### STANDARD FOR MOTION TO DISMISS

In ruling on a motion to dismiss, the Court must view the allegations in the Complaint in the light most favorable to Plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Additionally, the Court, "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-moving party."*Coons v. Mineta,* 410 F.3d 1036, 1039 (8th Cir.2005) (citation omitted). A motion to dismiss must be granted if the Complaint does not contain, "enough facts to state a claim to relief that is plausible on its face."*Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007) (abrogating the "no set of facts" standard for Fed.R.Civ.P. 12(b)(6) found in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Stated differently, to survive a motion to dismiss, the Complaint's factual allegations, "must be enough to raise a right to relief above the speculative level."*Id.* at 1965 (citations omitted).

### DISCUSSION

As stated above, in Count VI of their Complaint, Plaintiffs allege Breach of Express Warranty. (Compl., ¶¶ 42-45). Under Missouri law, express warranties by the seller are created in relevant part as follows:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                             Page 3
Slip Copy, 2008 WL 2074107 (E.D.Mo.)
(Cite as: 2008 WL 2074107 (E.D.Mo.))

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Mo.Rev.Stat. § 400.2-313(1)(a), (b) (1994).[FN6] Thus, "[t]o prevail on a claim of breach of express warranty, plaintiffs must demonstrate: 1) that there was a sale of goods; 2) the seller made a statement of fact about the kind or quality of [ ] those goods; 3) the statement of fact was a material factor inducing the buyer to purchase the goods; 4) the goods did not conform to that statement of fact; 5) the nonconformity injured the buyer; and 6) the buyer notified the seller of the nonconformity in a timely fashion."*Mouser v. Caterpillar, Inc.*, 2000 WL 35552637 at *18 (E.D.Mo. Oct.6, 2000), citing *Stefl v. Medtronic, Inc.*, 916 S.W.2d 879, 882-83 (Mo.App.1996).

> FN6. The Official Comment to Section 2-313 notes that, " 'express' warranties rest on 'dickered' aspects of the individual bargain."*See* Official Comment, ¶ 1.

### I. *Limited Warranty*

In their Complaint, Plaintiffs first aver the limited warranty set forth in a publication entitled "Masonite Hardboard Siding Limited Warranties" (the "Limited Warranty"), attached to Plaintiffs' Complaint as Exhibit 1, created an express warranty running from Defendants to Plaintiffs. (Compl., ¶¶ 17, 43A). Upon consideration, the Court finds that with this claim, Plaintiffs fail to establish the elements of a claim for breach of express warranty, as they cannot demonstrate the Limited Warranty was a material factor inducing Plaintiffs to purchase the goods. Rather, in their response to Defendants' Motion to Dismiss, Plaintiffs

admit they received no written warranty at the time they purchased and installed the Siding, and in fact only attempted to locate warranty information in 2005, after the Siding began to fail at Cedar Run. (Plaintiffs' Opp., PP. 1, 7, 13).[FN7] Defendants' Motion to Dismiss Plaintiffs' claim of breach of express warranty with respect to the Limited Warranty must therefore be granted, as Plaintiffs cannot establish that any affirmation of fact, promise, or description of the Siding contained therein became a "part of the basis of the bargain."*See*Mo.Rev.Stat. § 400.2-313(1)(a), (b) (1994).*See also Collegiate Enterprises, Inc. v. Otis Elevator Co.*, 650 F.Supp. 116, 118 (E.D.Mo.1986) ("Similarly [Plaintiff's] claim for breach of an express warranty under the Uniform Commercial Code as adopted by Missouri, Mo.Rev. Stat. § 400.2-313, fails to state a claim because there is no allegation that [Plaintiff] was aware of or made any decision on the basis of such a warranty given by [Defendant]."); *Amato v. Mapei Corp.*, 2005 WL 3406417 at *6 (M.D.Pa. Dec.12, 2005) (finding it incongruous to allow a remote consumer to benefit from an express warranty of which it was unaware); *Goodman v. PPG Industries, Inc.*, 849 A.2d 1239, 1246 (Pa.Super.2004) (same).[FN8]

> FN7. Plaintiffs assert they were unable to locate warranty information at that time, and only received the written warranty in November, 2006, just prior to the filing of their Petition in Missouri State Court. (Plaintiffs' Opp., PP. 7, 13).

> FN8. The case cited by Plaintiffs, *Groppel Co., Inc. v. U.S. Gypsum Co.*, 616 S.W.2d 49 (Mo.App.1981), is distinguishable, as it concerned an implied warranty of merchantability, not an express warranty.

### II. *Advertising*

*3 In their Complaint, Plaintiffs further allege an express warranty was created by Masonite siding advertising (the "Advertising"), in particular, promotional materials found in the 1980 and 1990 edi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2074107 (E.D.Mo.)
**(Cite as: 2008 WL 2074107 (E.D.Mo.))**

tions of Sweet's Catalogue. (Compl., ¶¶ 15, 43A).FN9 Plaintiffs continue to allege as follows:

> FN9. Under Missouri law, "[a] brochure, catalogue or advertisement may constitute an express warranty."*Interco Inc. v. Randustrial Corp.,* 533 S.W.2d 257, 262 (Mo.App.1976) (citations omitted).

43B. Plaintiffs properly stored, handled, installed and maintained the Siding.

43C. Following the failure of the Siding at Cedar Run and West Pointe, Plaintiffs notified Masonite in writing of said failure. To the extent that Plaintiffs failed to provide said written notice to Masonite within 60 days as contemplated in Exhibit 1, Masonite has excused and/or waived such purported condition, and/or Masonite is estopped from relying on any such purported material condition precedent, by reason of its acts and/or omissions set forth herein.

43D. Plaintiffs have satisfied all material conditions precedent on their part to be performed under the Express Warranty, or in the alternative, Masonite has excused and/or waived all such conditions, and/or Masonite is estopped from relying on any such material conditions precedent, by reason of its acts and/or omissions set forth herein.

44. Masonite materially breached the Express Warranty, as the Siding was defective, in that the Siding is not durable and long lasting, will rot, buckle, discolor, delaminate, is not sturdy, is not low maintenance, is not cost effective, and otherwise does not perform as represented and warranted by Masonite, resulting in the following conditions:

a. Swelling;

b. Deterioration of joint and ends;

c. Soft areas; and

d. Warping.

45. Masonite's material breach of the Express Warranty proximately caused actual damages to Plaintiffs, in amounts to be established at trial, but in any event in excess of the jurisdictional minimum.

(Compl., ¶¶ 43-45).

Upon consideration, the Court finds Plaintiffs' claim of breach of express warranty with respect to the Advertising suffers from the same infirmity as the Limited Warranty claim. In other words, because Plaintiffs do not allege they read the Advertising at issue prior to purchasing the Siding, they cannot demonstrate the Advertising constituted a material factor inducing Plaintiffs to purchase the goods. *See Interco,* 533 S.W.2d at 262 (holding that in order to become part of the basis of the bargain for purposes of § 400.2-313, the catalogue, advertisement, or brochure must at least have been read). Plaintiffs do not include assertions disproving their claim regarding the Advertising, however, and so the Court will grant Plaintiffs until *Friday, May 30, 2008,* within which to file a Second Amended Complaint adding the proper allegations, if appropriate.FN10

> FN10. The Court finds the remainder of Plaintiffs' allegations of breach of express warranty with respect to the Advertising sufficient for notice pleading purposes.

### CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Count VI of the First Amended Complaint or, in the Alternative, Motion for More Definite Statement (Doc. No. 54) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.

**\*4 IT IS FURTHER ORDERED** that Plaintiffs are granted until *Friday, May 30, 2008,* within

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2074107 (E.D.Mo.)
**(Cite as: 2008 WL 2074107 (E.D.Mo.))**

Page 5

which to file a Second Amended Complaint, curing
the deficiency described in Section II, *supra.*

E.D.Mo.,2008.
Gannon Joint Venture Ltd. Partnership v. Masonite
Corp.
Slip Copy, 2008 WL 2074107 (E.D.Mo.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 of 39 DOCUMENTS

**JESUS GARCIA v. NISSAN MOTOR CO., LTD., NISSAN NORTH AMERICA, INC., BERT OGDEN MCALLEN MOTORS, INC.**

**CIVIL ACTION NO. M-05-59**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, MCALLEN DIVISION**

*2006 U.S. Dist. LEXIS 20165*

**March 30, 2006, Decided**
**March 30, 2006, Filed**

**COUNSEL:** [*1] For Jesus Garcia, as Guardian of the person and and estate of Jonathan Garcia, an Incapacitated Peson, Plaintiff: Michael Raphael Cowen, Cowen & Bodden, Brownsville, TX.

For Nissan Motor CO., LTD., Nissan North America, Inc., Defendants: Gary W Davis, Jr, Clark Thomas et al, Austin, TX.

For Bert Ogden McAllen Motors, Inc., Defendant: Christiana Dijkman, Phillips & Akers, Houston, TX; Gary W Davis, Jr, Clark Thomas et al, Austin, TX.

**JUDGES:** Randy Crane, United States District Judge.

**OPINION BY:** Randy Crane

**OPINION**

**ORDER DENYING PLAINTIFF'S MOTION TO REMAND**

This is a products liability case arising out of an automobile accident that occurred on January 24, 2003. On February 18, 2005, Defendant Nissan North America, Inc. removed this case to the Southern District of Texas based on diversity jurisdiction. Now pending before this Court is Plaintiff's motion to remand (Doc. 10). For the reasons stated below, Plaintiff's motion to remand is DENIED.

**I. BACKGROUND**

Plaintiff Jesus Garcia ("Plaintiff") sues for injuries his son, Jonathan Garcia, sustained from an automobile accident while driving a 2002 Nissan Altima 2.5S. [1] Plaintiff sues Nissan Motor Co., LTD ("Defendant [*2] Nissan LTD."); Nissan North America, Inc. ("Defendant Nissan North America"); and Defendant Bert Odgen McAllen Motors ("Local Defendant"). Plaintiff seeks recovery based on theories of strict liability and negligence. [2] Specifically, Plaintiff argues that the Altima in question was defective in that: (1) the vehicle did not have electronic stability control; (2) it was not crashworthy in foreseeable side impact collisions; (3) it lacked a side-curtain airbag; (4) its seat back was defectively designed and was too weak; and (5) the seat lacked a shoulder bolster. (Doc. 4 at 6).

1    On November 16, 2001 Plaintiff purchased a 4-cylinder 2002 Nissan Altima 2.5 S from Local Defendant. (Doc. 4 at 6). On January 24, 2003, Plaintiff's son, Jonathon Garcia, while driving the car in San Antonio, lost control of the vehicle. The vehicle went into a skid, sliding into a utility pole with the passenger-side rear door hitting the pole. *Id.* at 7. The pole intruded into the backseat area of the vehicle. *Id.* Although Jonathan Garcia was wearing his seat belt, the seat back in his driver's seat yielded rearward, allowing his head to move into the back seat area, where he sustained a severe brain injury from hit-

side-curtain airbag would have prevented his brain injury. *Id.*

[*3]

2 Plaintiff is Jonathon Garcia's legal guardian.

Plaintiff originally filed suit on January 5, 2005, in the 93rd Judicial District Court of Hidalgo County, Texas. *Id.* On February 18, 2005 Defendant Nissan North America, claiming improper joinder of Local Defendant, removed the case pursuant to diversity jurisdiction (*28 U.S.C. § 1332 and 28 U.S.C. 1441*). (Doc. 1). Plaintiff disputes improper joinder of Local Defendant and now moves to remand. (Doc. 10). In determining whether there is diversity jurisdiction, the only issue before this Court is whether the local Defendant, Bert Ogden McAllen Motors, has been improperly joined. [3]

3 It is undisputed that all other requirements of diversity jurisdiction have been met.

## II. ANALYSIS

### A. Improper joinder

In order to establish that an in-state defendant has been fraudulently joined, the removing [*4] party must show either that there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or that there has been outright fraud in the plaintiffs pleadings of jurisdictional facts. *B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir.1981)*. This is a "heavy" burden and the court must resolve contested facts, as well as ambiguities and uncertainties in controlling state law, in favor of the plaintiff. *Griggs v. State Farm Lloyds, 181 F.3d 694, 699 (5th Cir. 1999)*. It is well established in the Fifth Circuit that it is "insufficient that there be a mere theoretical possibility of recovery;" to the contrary, there must "at least be arguably a reasonable basis for predicting that state law would allow recovery in order to preclude a finding of improper joinder." *Travis v. Irby, 326 F.3d 644, 648 (5th Cir. 2003)*. Accordingly, if there is any possibility that the plaintiff has stated a cause of action against the non-diverse defendant, this Court must conclude that joinder of the non-diverse defendant was and is proper and the case must be remanded to state court. [*5] *Sid Richardson Carbon and Gasoline*

*Company v. Interenergy Resources, Ltd., 99 F.3d 746, 751 (5th Cir.1996)*.

A court may resolve the issue of whether a plaintiff has a reasonable basis for recovery under state law in one of two ways. The court may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant. Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder. Furthermore, there are cases, in which a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder. In such cases, the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry. *See Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 573 (5th Cir. 2004)*(citations omitted). A summary inquiry is appropriate only to identify the presence of discrete and undisputed facts that would preclude plaintiffs recovery against the in-state defendant. *Id.* A court may not use improper joinder as an excuse to pre-try the merits of the case. *Id.*

### [*6] B. Plaintiff's Claims Against Local Defendant

Plaintiff alleges three claims against Local Defendant. First, Plaintiff alleges that Local Defendant sold the vehicle without side-curtain airbags despite "knowing the dangers inherent in vehicles that lacked side-curtain airbags." (Doc. 4 at 6). Second, Plaintiff alleges that Local Defendant sold the car without electronic stability control, despite its knowledge of the availability and benefits of electronic stability control. *Id.* Lastly, Plaintiff argues that Local Defendant failed to train its salespersons to educate consumers regarding these issues, and failed to point out the dangers inherent in the Altima, or to recommend the purchase of a vehicle equipped with side-curtain airbags and electronic stability control. *Id.*

### C. Texas Tort Reform Act

Plaintiff's action is governed by recently-enacted chapter 82 of the Texas Civil Practices and Remedies Code. [4] In 2003, the Texas Legislature added *section 82.003*, which limits the ability of a plaintiff to recover against a nonmanufacturing seller in a products liability action. *Section 82.003(a)* provides that "[a] seller that [*7] did not

manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves . . ." any one of several enumerated exceptions. *See TEX. CIV. PRAC. & REM. CODE § 82.003(a).*

4   The aforementioned section applies to actions filed on or after September 1, 2003.

Chapter 83 of the Code defines a "products liability action," as: "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." *TEX. CIV. PRAC. & REM. CODE § 82.001(2).* It is undisputed that Plaintiff's strict liability and negligence causes of action against the Local Defendant are subject to the Texas Tort Reform Act. *See TEX. CIV. PRAC. & REM. CODE § 82.001(3)* [*8] ('Seller' means a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component or part thereof.). Accordingly, the Local Defendant has no liability absent Plaintiff pleading and, ultimately, proving one or more of the applicable exceptions. 5 Plaintiff claims two exceptions, §§ *82.003(a)(6)* and *82.003(b)*, that provide grounds for Plaintiff's strict liability claim against Local Defendant. If Plaintiff has a possibility of recovery under either theory, then this Court must remand. *See e.g. Gray v. Beverly Enterprises-Mississippi, Inc., 390 F.3d 400, 412 (5th Cir. 2004).*

5   In addition to arguing two exceptions to *82.003*, Plaintiff also argues that he has pled claims or theories against Local Defendant not covered by *Section 82.003* but which would provide him a remedy against said Defendant. However, the plain language of *82.003* precludes these "extra-82.003" claims as it applies to "any action" under "any . . . theory".

[*9]  *(i). Section 82.003(a)(6)*

Plaintiff argues that he has a possibility of recovery under *TEX. CIV. PRAC. & REM. CODE §*

*82.003(a)(6)*. That section provides that a non-manufacturing seller may be liable when "the seller actually knew of a defect to the product at the time the seller supplied the product and the claimant's harm resulted from the defect." *TEX. CIV. PRAC. & REM. CODE § 82.003(a)(6)*. The language of *section 82.003(a)(6)* clearly requires actual knowledge of the defect on the part of the seller. *Reynolds v. Ford Motor Co., 2004 U.S. Dist. LEXIS 27106, *8 (N.D. Tex. 2004)*. Plaintiff's original petition asserts that the Local Defendant had actual knowledge of two defects in the 2002 Altima at the time it supplied the product and that the defects resulted in harm to Plaintiff's son First, the lack of a side-curtain air-bag and, second, the lack of electronic stability control. Specifically, Plaintiff claims that when the Local Defendant sold the vehicle, it knew that side-curtain airbags were available on some vehicles but not on others, and knew that vehicles with these features were [*10] much safer, and further knew about the dangers inherent in vehicles that lacked side-curtain airbags; further, Plaintiff claims that Local Defendant also knew the benefits of electronic stability control. In addition to these two alleged defects, Plaintiff claims that the Local Defendant failed to train its salespersons to educate consumers regarding these issues, and failed to point out the dangers without such features, or recommend the purchase of a vehicle with these features. (Doc. 10 at 5).

Plaintiff provides evidence of a press release on Nissan's website that states the 2002 Nissan Altima had available "side-impact supplemental airbags and side curtain supplemental airbags for head protection" and claims this is evidence that Local Defendant was aware that the vehicle sold to Plaintiff was not equipped with the safer side-curtain airbags. Plaintiff also offers the affidavit of Michael R. Cowen showing that Nissan put information on its website that side-curtain airbags were an available option in the 2002 Nissan. Plaintiff asserts that the fact that side-curtain airbags were an available safety option, and that the vehicle in question was not equipped with side-curtain airbags [*11] is evidence that Local Defendant knew that the vehicle was defective and lacked side curtain airbags when it sold the vehicle. The Court disagrees.

This Court concludes that a nonmanufacturing seller's knowledge of a condition in or of a product

without actual knowledge that the condition renders the product defective is insufficient to satisfy the Section 82.003(a)(6) exception. A nonmanufacturing seller is not liable for a product's defects simply because it could have or should have known that a product was defective. *See Reynolds v. Ford Motor Co., 2004 U.S. Dist. LEXIS 27106, *8 (N.D. Tex. 2004).*

Plaintiff claims Local Defendant "actually knew of defects in the 2002 Altima at the time it supplied the [sic] product; *it knew that the vehicle lacked electronic stability control and a side-curtain airbag.*" (Doc. 4 at 9)(emphasis added). While it is undisputed that Local Defendant knew the vehicle lacked side-curtain airbags and electronic stability control, Plaintiff has failed to show that Local Defendant knew that lack of these features rendered the vehicle defective. The latter does not follow, *a priori*, from the former. Under Texas Law, a product is not [*12] defective merely because it could be safer. *Weakley v. Fischbach & Moore, Inc,*515 F.2d 1260, 1267 (5th Cir. 1975). It is one thing to show that the defendant might have designed a safer product; quite another to show that the product he did design was unreasonably dangerous. The defendant is not obliged to design the safest possible product, or one as safe as others make or a safer product than the one he has designed, so long as the design he has adopted is reasonably safe. *Id;* citing *W. Prosser,* The Law of Torts § 96 at 645 (4th ed. 1971). While Local Defendant certainly had knowledge that a car with side-impact airbag or stability control could or would be safer than a car without these features, this is not equivalent to knowing that the lack of these features rendered the product defective.

Defendant Nissan North American offers the Court the affidavit of Mario Bonaccorso ("Mr. Bonaccorso"), the general manager for Local Defendant. Mr. Bonaccorso states that he was unaware that the lack of side curtain air bags or electronic stability control made a vehicle unsafe or unreasonably dangerous. (Doc. 28 at 4). [6] In addition, Defendant Nissan North America [*13] offers the affidavit of Mike Kennedy, the chief financial officer of Local Defendant, as evidence that Local Defendant did not have actual knowledge of any alleged defect in the 2002 Altima. [7] Plaintiff does not claim to have any evidence which would refute or

cast doubt on either Mr. Bonaccorso's or Mr. Kennedy's affidavits. [8]

6    Mr. Bonaccorso states:

As the General Manger for Bert Odgen McAllen Motors, Inc, it is my job to train and supervise the salesman. I was the General Manager for Bert Odgen McAllen Motors, Inc. in November 2001, when Jesus Garcia purchased his Nissan Altima. As General Manager, I am generally familiar with our inventory of vehicles, as well as the options available on different models. Bert Odgen McAllen Motors, Inc. sells vehicles manufactured by BMW, in addition to vehicles manufactured by Nissan.

In November 2001, many of the vehicles our customers purchased lacked side curtain air bags and electronic stability control. I was not aware then, and have no reason to believe now, that a vehicle is unsafe or unreasonably dangerous merely because it lacks side curtain airbags and electronic stability control. I was not aware in November 2001 that anyone even claimed that a vehicle is defective simply because it lacks side curtain air bags or electronic stability control. (Doc. 28 at 4).

[*14]

7    Mr. Kennedy states:

Bert Ogden McAllen Motors, Inc. did not know of any alleged defect to the product at the time it supplied the subject 2002 Nissan Altima. At the time Bert Ogden McAllen Mo-

tors, Inc. sold the subject 2002 Nissan Altima, it had no actual knowledge of the defect alleged in the Plaintiff's original petition to have caused harm to Plaintiff. (Doc. 4, att. 4 at 4).

8

In analyzing whether a party has been improperly joined, a court has discretion to pierce the pleadings and look to undisputed summary judgment-type evidence. *See Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd., 99 F.3d 746, 751 (5th Cir. 1996); Smallwood v. Ill. Cent. R.R. Co., 352 F.3d 220 (5th Cir. 2003).*

Plaintiff relies on *Reynolds v. Ford Motor Co., 2004 U.S. Dist. LEXIS 27106, 2004 WL 2870079, *3 (N.D. Tex. 2004)* and *McDonald v. Ford Motor Co., 2004 U.S. Dist. LEXIS 27252 (S.D. Tex. 2004)* to show that the case must be remanded. *Reynolds* and *McDonald* both involved Ford SUV rollover cases. In *McDonald*, the Plaintiff alleged "that the [*15] failure of Defendants, with full knowledge of the design defects of the Ford Explorer, to give adequate warning and instructions rendered the Explorer unreasonably dangerous as marketed." *McDonald v. Ford Motor Company, 2004 U.S. Dist. LEXIS 27252 at *5.* While Plaintiff did not use the terms "actually knew" or "actual knowledge," the court construed the factual allegations in Plaintiff's favor. *2004 U.S. Dist. LEXIS 27252, at *7.* Since the defendant did not offer an affidavit or other summary judgment type evidence denying actual knowledge, the *McDonald* court understandably refused to exercise its discretion in piercing the pleadings pursuant to *Smallwood.* The case was remanded as Defendant had failed to met the "heavy burden"of proving improper joinder. In *Reynolds,* which relies upon *McDonald,* Ford and the local seller defendant removed the case to federal court arguing diversity jurisdiction and claiming improper joinder. The district court remanded the case back to state court because there was competing evidence that the local defendant had actual knowledge that the vehicle was prone to roll over. The Court could not conduct a *Smallwood* inquiry

as there were disputed [*16] facts of material importance and the Court is not permitted to pre-try these disputed facts. Accordingly, remand was required.

The Court does not find Plaintiff's arguments compelling. In the present case, Plaintiff has not produced any evidence to controvert the affidavits of Local Defendant averring that it had no actual knowledge of a defect in the product at the time it supplied the product. As stated above, Plaintiff has only shown what is undisputed -- that Local Defendant knew the vehicle lacked side-curtain airbags and electronic stability control. This is not enough. Were the Court to accept Plaintiff's reasoning, a nonmanufacturing seller such as a car dealership would be strictly liable anytime technology existed to make the product safer, without any further showing. This is inconsistent with the Texas statutory scheme that imposes liability against a non-manufacturing seller only when there is some some additional culpability on of the part of the non-manufacturing seller. Even viewed in a light most favorable to the Plaintiff, Plaintiff has failed to carry its burden as to the applicability of 82.003(a)(6). Therefore, the Court finds that Plaintiff has no reasonable expectation [*17] of recovery against Local Defendant Bert Odgen McAllen pursuant to *82.003(a)(6).*

(ii). Section 82.003(b)

Plaintiff also alleges that Local Defendant may be liable under *TEX. CIV. PRAC. & REM. CODE 82.003(b). Section 82.003(b)* states:

> This section [referring to *Section 82.003* generally] does not apply to a manufacturer or seller whose liability in a products liability action is governed by *Chapter 2301, Occupations Code.* In the event of a conflict, *Chapter 2301, Occupations Code,* prevails over this section.

*TEX. CIV. PRAC. & REM. CODE § 82.003(b)* (2005). Plaintiff correctly notes that *Section 2301.461(b)* of the Occupations Code provides:

> (b) Notwithstanding the terms of any franchise or any other law, a manufacturer or distributor shall re-

imburse the dealer for any loss incurred by the dealer, including legal fees, court costs, and damages, as a result of the dealer having been named a party in a product liability action, except for a loss caused by the dealer's:

> (1) failure to comply with an obligation described by Subsection (a);

> (2) negligence or intentional misconduct; [*18] or

> (3) modification of a product without the authorization of the manufacturer or distributor.

*TEX. OCC. CODE § 2301.461* (2005). Plaintiff argues that the Local Defendant's liability is governed by Chapter 2301 of the Texas Occupations Code and is, therefore, not subject to the limitation of § 82.003. In support of his argument, Plaintiff offers the Court legislative history as well as various statements made by Texas State Senator Armbrister interpreting the statute. (Doc. 10).

The Court concludes however that Plaintiff's argument that the Legislature chose to single out otherwise innocent franchised automobile dealers for strict liability for selling defective automobiles is unpersuasive. The plain reading of the relevant statutes does not support Plaintiff's argument. The Court agrees with Defendant Nissan North American that nothing in § 2301.461 purports to govern the liability of a franchised automobile dealer to a retail customer. This section merely governs the liability of a manufacturer or distributor to a franchise dealer. *See TEX. GOV'T CODE § 312.002* (words generally shall be given their ordinary [*19] meaning).

Although Plaintiff cites to some arguably favorable legislative history, Texas law provides that unless a statute is ambiguous, courts must follow the meaning of the statute's clear language. *See Facility Ins. Corp. v. Employers Ins. of Wausau, 357 F.3d 508, 516 (5th Cir. 2004)*; *In re Universal Seismic Assocs., Inc., 288 F.3d 205, 207 (5th Cir. 2002)*(When the plain reading of a statute precludes a party's interpretation, no amount of legislative history, be it ever so favorable, can redeem it.). Accordingly, the Court concludes that Plaintiff has no reasonable possibility of recovery against the Local Defendant under *Section 82.003(b)*.

**(iii). Alleged Causes of Action Outside of § 82.003 Exceptions**

Plaintiff also alleges that Local Defendant was negligent in selling the 2002 Altima when it knew it lacked electronic stability control and side-curtain airbags and was further negligent by failing to warn Plaintiff that he could purchase vehicles that contained these features. In addition, Plaintiff claims Local Defendant was further negligent in failing to train and educate its salespersons regarding the benefits and necessity [*20] of side-curtain airbags and electronic stability control (Doc. 4 at 6). Plaintiff alleges that Local Defendant voluntarily undertook to provide safety-related information regarding the Altima to Jesus Garcia. *Id.* This voluntary undertaking created a duty of care under *Restatement (Second) of Torts §§ 323* and *324A*. According to Plaintiff, Local Defendant negligently breached this duty by failing to provide information regarding side-curtain airbags and electronic stability control and failing to recommend that Jesus Garcia purchase a vehicle with such safety features. *Id.* at 8-9.

This Court has previously concluded that any theories of recovery plead against a nonmanufacturing seller must fall within one of the seven exceptions to § 82.003, regardless of whether such allegations otherwise state a viable claim under Texas law. See *Casas v. The Tire Corral, Inc., 2005 U.S. Dist. LEXIS 42108, *7 (March 31, 2005)*; *Alonso v. Maytag Corp., 356 F. Supp. 2d 757, 2005 WL 405295, *3 (S.D. Tex. 2005)*(Because § 82.001 specifically includes strict products liability and negligence causes of action as products liability actions, both causes [*21] of action are governed by the provisions set forth in Chapter 82.). Construing *section 82.003 (b)*'s reference to the Texas Occupational Code as a "mechanism for negligence claims" would be inconsistent with the statute.

*Rubin v. Daimlerchrysler Corp., 2005 U.S. Dist. LEXIS 42102, 2005 WL 1214605, \*10 (S.D. Tex. 2005)*. The statute defines "products liability action" specifically to include negligence theories. *TEX. CIV. PRAC. & REM. CODE § 82.001(2)*. The Court therefore concludes that Plaintiff's negligence claims are precluded by the plain meaning of *§ 82.003*.

## D. Other Considerations

Plaintiff cites *Smallwood* for the proposition that if the Court, in connection with its determination on the remand issues, were to determine that the automobile was not defective due to the lack of certain safety features, then that defense would inure to all defendants, and must be resolved at the state court level. (Doc. 10 at). The Court does not make such a determination. Accordingly, the *Smallwood* "common defense" remand is not triggered. *See Rainwater v. Lamar Life Ins. Co., 391 F.3d 636, 638 (5th Cir. 2004)*.

## III. CONCLUSION

[*22] The Court concludes that *section 82.003 of the Texas Civil Practices and Remedies Code* precludes Plaintiff's recovery on his claims of strict liability and negligence against Local Defendant Bert Ogden McAllen. The Court therefore holds that Local Defendant has been improperly joined and such defendant is hereby **DISMISSED.** Because all remaining parties are diverse and the requisite amount in controversy has been satisfied, this Court has subject matter jurisdiction in this present case. Plaintiff's motion to remand for lack of jurisdiction is therefore **DENIED.** (Doc. 10).

**SO ORDERED** this 30th day of March, 2006, at McAllen, Texas.

Randy Crane

United States District Judge



Slip Copy

Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30

(Cite as: 2006 WL 2990524 (N.D.Okla.))

Page 1

**C**

Harrison v. Leviton Mfg. Co., Inc.

N.D.Okla.,2006.

United States District Court,N.D. Oklahoma.

Lee Roy HARRISON, Plaintiff,

v.

LEVITON MANUFACTURING COMPANY, INC., Defendant.

No. 05-CV-0491-CVE-FHM.

Oct. 19, 2006.

Andrew P. Bell, Seth R. Lesser, Locks Law Firm PLLC, New York, NY, Charles William Shipley, Shipley & Kellogg PC, Tulsa, OK, Hugh P. Lambert, Linda Nelson, Lambert & Nelson, New Orleans, LA, for Plaintiff.

Scott Alan Law, Pierce Couch Hendrickson Baysinger & Green LLP, Oklahoma City, OK, Carey Cobb Calvert, Pierce Couch Hendrickson Baysinger & Green, Tulsa, OK, for Defendant.

### OPINION AND ORDER

CLAIRE V. EAGAN, Chief District Judge.

**\*1** Now before the Court is defendant's Motion to Dismiss Plaintiff's Amended Class Action Complaint and Brief in Support (Dkt.# 25). Defendant asks the Court to dismiss the amended complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

### I.

Leviton Manufacturing Company, Inc. ("Leviton") designs and manufactures backwire push-in electrical receptacles. A receptacle is a device intended to provide a temporary electrical connection with a fixed electrical plug, and such devices are commonly used in residential homes. A receptacle does not generate its own electrical power but, instead, each receptacle contains terminals on the back that are connected to wires or electrical equipment. Receptacles are normally attached to wiring or electrical equipment within a wall and are concealed, so that most homeowners are not aware of the receptacle. The two most commonly used types of receptacles are set-screw terminals and backwire push-in terminals. Plaintiff alleges that backwire push-in terminals are fundamentally unsafe and increase the risk of electrical fires. In particular, plaintiff claims that backwire push-in terminals degrade quickly due to environmental factors and have a higher resistance to electrical flow, which creates excessive heat at the point of contact. Plaintiff alleges that Leviton has been aware, or should have been aware, of this danger since at least 1989.

Plaintiff's theory seems to be that increased heat from use of these plugs causes wiring to melt, which can result in short circuits or electrical fires. The amended complaint contains general allegations that backwire push-in receptacles have damaged wiring in residential homes and started electrical fires, but it is not clear from the amended complaint that plaintiff has personally been injured in this way. Plaintiff alleges that he is "informed and believes that the defects in the particular receptacles of Defendant ... that are the subject of Plaintiff's claims have resulted in residential homes sustaining physical injury to tangible property...." Dkt. # 13, Amended Class Action Complaint, at 5-6. Defective push-in receptacles allegedly require homeowners to repair or replace wiring, but the amended complaint does not contain any allegations that plaintiff has discovered damaged wiring in his home. Instead, plaintiff states the he intends to replace all push-in receptacles in his home, and that he anticipates incurring expense or inconvenience from this process. *Id.* at 9.

Plaintiff alleges five claims for relief in his amended complaint: (1) violations of the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 751*et seq.* ("OCPA"); (2) breach of implied warranties of merchantability and fitness for a particular purpose; (3) unjust enrichment; (4) negligence;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
**(Cite as: 2006 WL 2990524 (N.D.Okla.))**

and (5) strict products liability.[FN1] Defendant filed a motion to dismiss the amended complaint, or in the alternative, requests that the Court dismiss specific claims. The thrust of defendant's argument is that plaintiff has not suffered a legally cognizable injury and, therefore, there is no case or controversy before the Court. Plaintiff responds that his complaint sufficiently alleges that class members have incurred economic injuries from using defendant's product and face a risk of imminent danger from use of defendant's product.

> FN1. The original complaint alleged claims for violations of the OCPA and breach of implied warranties of merchantability and fitness for a particular use only.

## II.

**\*2** When reviewing a motion to dismiss under Rule 12(b)(6), the court must construe the allegations of the complaint as true and view the allegations in the light most favorable to the nonmoving party. *Moffett v. Halliburton Energy Services, Inc.,* 291 F.3d 1227, 1231 (10th Cir.2002). A Rule 12(b)(6) motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Sutton v. Utah State School for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999).

## III.

Defendant argues that plaintiff lacks standing to pursue any of his claims under Article III of the federal constitution, because he has not suffered an injury-in-fact. Defendant raises issues of constitutional standing based on plaintiff's failure to allege that use of defendant's product has caused a concrete injury. Plaintiff responds that he has alleged property damage and an increased risk of personal harm, and that these allegations are sufficient to create a justiciable case or controversy.

Plaintiff does not address the issue of constitutional standing, but even if defendant had not raised the

issue, the Court has a duty to consider whether plaintiff satisfies the three-part test for standing under Article III of the United States Constitution. *United States v. Parker,* 362 F.3d 1279, 1284 (10th Cir.2004); *People for the Ethical Treatment of Animals v. Rasmussen,* 298 F.3d 1198, 1203 (10th Cir.2002). The Supreme Court has recognized three elements for standing under Article III:

First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). The standing requirement ensures that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982)."Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact."*Nova Health Systems v. Gandy,* 416 F.3d 1149, 1155 (10th Cir.2005) (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (2005)). In the context of a potential class action, the named representative of the class must have standing to bring a claim, or the class action may not proceed. *Sosna v. Iowa,* 419 U.S. 393, 398-99 (1975); *James v. City of Dallas, Texas,* 254 F.3d 551, 562-63 (5th Cir.2001).

**\*3** The amended complaint contains conflicting statements regarding the type of injury plaintiff is

Slip Copy

Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30

(Cite as: 2006 WL 2990524 (N.D.Okla.))

alleging. Contrary to plaintiff's assertions, the amended complaint does not state that plaintiff has actually been harmed by Leviton's product, but he states that he believes he may incur expense in the future to remove defendant's product from his home. For example, plaintiff states that

[he] must now, at considerable time and expense, remove and replace every one of the push-in receptacles installed in his house or which came with the house when Plaintiff purchased the house. Such a project also includes consequential inconveniences and expenses, such as loss of time, having to shut off all of the power in the house for the period of time necessary for the work to be completed.

Dkt. # 13, Amended Class Action Complaint, at 9. The alleged need to replace the push-in receptacles in his home has not arisen because plaintiff has not actually discovered any damage to the wiring in his home. He merely seeks to prevent any damage from occurring, based on his theory that increased heat caused by the receptacle will eventually cause the wiring to deteriorate.[FN2] In the first paragraph of the amended complaint, plaintiff clearly states that the putative class specifically excludes any "consumers who have sustained personal injury and/or property damage (other than damage to the receptacle and/or wire/insulation in the vicinity of the receptacle termination) as a result of Defendant's practices."Id. at 1. If this is true, plaintiff's concern over the increased risk of electrical fires and resulting personal injury are irrelevant to the Court's consideration. Plaintiff limits his claim for damages to the replacement cost of the defective product and related electrical equipment, but he does not allege that he has suffered any harm that would fall into this category.

FN2. Plaintiff points to a "general trend of increased current loading of household receptacle circuits" due the increased number of electrical devices in the average home. Plaintiff claims that he has alleged an injury because he states that "[d]efective Leviton backwire push-in re-

ceptacles damage the fixed wiring in homes, which is part of the residential structure and separate from the receptacle itself, thereby causing damages requiring the rewiring and/or replacement" of electrical wiring and equipment. However, plaintiff does not actually allege that wiring in his home has been damaged.

The primary focus for any analysis of standing under Article III"is whether plaintiff has suffered a present or imminent injury, as opposed to a mere possibility, or even probability, of future injury ."Morgan v. McCotter, 365 F.3d 882, 888 (10th Cir.2004). In cases where the plaintiff alleges an increased risk of injury, the plaintiff must show a risk of serious future harm and some tangible present injury. Sutton v. St. Jude Medical S.C., Inc., 419 F.3d 568 (6th Cir.2005) (patient that received allegedly defective aortic connector faces substantial risk of future harm and current injury of increased medical monitoring sufficiently alleged injury-in-fact); Rivera v. Wyeth-Ayerst Laboratories, 283 F.3d 315, 321 (5th Cir.2002) (plaintiffs that purchased allegedly defective prescription drug but did not allege any present harm did not have standing to sue). Plaintiff's amended complaint specifically states that he is not seeking to bring a claim for the risk of future personal injury or property damage, and there is no indication that plaintiff will suffer an immediate injury. The amended complaint also does not contain any allegations that plaintiff has suffered a tangible present injury to accompany his claims for potential future harm. Plaintiff has not carried his burden to demonstrate that he has standing under Article III, because he can not show that he has suffered or will immediately suffer a concrete injury-in-fact.

*4 Even though this is a putative class action, plaintiff may not base his right to sue on an injury allegedly suffered by other class members. Plaintiff may not represent a putative class if he has not actually suffered the injury for which the class seeks redress. The named representative of the class must

have standing to bring a lawsuit or the court must dismiss the proposed class action. *Rector v. City & County of Denver,* 348 F.3d 935, 946 (10th Cir.2003) (dismissing class action brought under section 1983 challenging procedure assessing late fees for parking tickets because defendants did not assess or attempt to collect a late fee from class representatives). The named class representative can not base his standing to sue on the alleged injuries suffered by potential class members. *Allen v. Medrano,* 416 U.S. 802, 828-29 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 675 (1974). Plaintiff must identify an independent basis for standing beyond the alleged injuries suffered by putative class members. Plaintiff's argument that members of the proposed class have replaced wiring in their homes will not suffice to save plaintiff's amended complaint from dismissal.

The Court finds that plaintiff's vague allegations related to an increased risk of injury are insufficient to meet the injury-in-fact requirement for standing under Article III. Accepting plaintiff's allegations as true, he had not suffered any economic or personal injury at the time he filed his lawsuit. Plaintiff's statements that he will suffer future economic harm and potential inconvenience from replacing any of defendant's receptacles in his home do not presently create a justiciable case or controversy. Therefore, plaintiff's amended complaint must be dismissed due to his lack of Article III standing.

## IV.

Even if the Court assumes that plaintiff meets the standing requirements of Article III, plaintiff has not alleged the type of injury that may be redressed by his legal claims. Plaintiff has alleged five claims, and each of those claims requires that plaintiff demonstrate an injury that was caused by defendant's conduct.

## A.

Plaintiff alleges that he has suffered economic injuries because of Leviton's unfair or deceptive conduct in violation of the OCPA. In order to state a prima facie case under the OCPA, plaintiff must allege four elements:

(1) that the defendant engaged in an unlawful practice as defined at 15 O.S. (1991), § 753; (2) that the challenged practice occurred in the course of defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury.

*Patterson v. Beall,* 19 P.3d 839, 846 (Okla.2000). Defendants focus on the third and fourth elements and assert that plaintiff's amended complaint contains no allegations that he was injured by Leviton's allegedly unlawful business practices. *See* Okla. Stat. tit. 15, § 761.1. A person does not qualify as an aggrieved consumer under section 761.1 simply because he paid the purchase price for a product; he must have "suffered some detriment to successfully pursue a private right of action under § 761.1A." *Walls v. American Tobacco Co.,* 11 P.3d 626, 629 (Okla.2000). In order to show that he has a personal stake in the litigation, plaintiff must identify an "actual or threatened distinct injury which has a causal connection between the alleged wrong and the actions challenged." *Id.*

*5 Plaintiff alleges that he purchased a home that contained push-in receptacles and that he believes he must replace every such receptacle. Based on plaintiff's amended complaint, this injury could include the cost of replacing a defective receptacle or repairing melted wiring, or even an electrical fire. However, there are no allegations that he has actually suffered this type of injury from using the product or that has an imminent apprehension that these injuries will occur. It appears that members of the putative class may have incurred expense or even had an electrical fire, but that plaintiff has not personally been the victim of these adverse circumstances. Courts do not allow consumers to bring claims against manufacturers for products that are perceived to be harmful, but that have not actually

Slip Copy
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
**(Cite as: 2006 WL 2990524 (N.D.Okla.))**

cause an identifiable injury. *See Coker v. Daimler-Chrysler Corp.*, 617 S.E.2d 306, 313-14 (N.C.App.Ct.2005) (dismissing claim under North Carolina Unfair Trade and Deceptive Trade Practices Act for failure to show risk of immediate injury from product defect); *Verb v. Motorola, Inc.*, 672 N.E.2d 1287, 1295 (Ill.App.Ct.1996) (dismissing consumer fraud claims based on allegations that cellular telephone might increase risk for certain heath problems); *Ziegelmann v. Daimler-Chrysler Corp.*, 649 N.W.2d 556 (N.D.2002) (dismissing proposed class action regarding allegedly defective brakes because no class member had actually been harmed by product defect).

As a consumer, plaintiff has not incurred any additional expense because defendant's product was installed in his home. Plaintiff claims that he is threatened by "the risk of fire and death as a result of the manifest defects in Leviton's receptacles."Dkt. # 28, at 16. However, his amended complaint disclaims that he is seeking relief for this type of injury, because he excludes any person from the putative class who has "sustained personal injury and/or property damage (other than damage to the receptacle and/or wire/insulation in the vicinity of the receptacle termination). Dkt. # 13, at 1. Plaintiff is seeking money damages for a product that will only hypothetically caused him any harm. This is not the type of "actual or threatened distinct injury" required to bring a claim under the OCPA, as plaintiff must allege actual damages to qualify as an "aggrieved consumer" under the act. *Walls*, 11 P .3d at 629. Such allegations are conspicuously absent from the amended complaint, and the Court finds that plaintiff's claim under the OCPA must be dismissed for failure to state a claim.

### B.

Plaintiff alleges that Leviton's push-in receptacles are defective, and fail to meet the applicable consumer safety codes regarding fire protection. He claims that product defects "have resulted in residential homes sustaining physical injury to tangible property including, but not limited to, damage to the wiring, electricity, and electrical systems of these homes which have incorporated" defendant's allegedly defective product. Defendant argues that plaintiff fails to allege that the product is presently defective but, instead, that plaintiff has merely stated his belief that the product is likely to cause an injury.

*6 Under Oklahoma law, a warranty of merchantability is implied in every contract for the sale of goods. Okla. Stat. tit. 12A, § 2-314. A consumer may bring a claim for breach of warranty against the retailer and the manufacturer to recover the benefit of the bargain. *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 652 (Okla.1990). The consumer has the burden to prove that the product was defective at the time it left the manufacturer's possession or control. *Thompson v. Trane Co.*, 500 P.2d 1329, 1333 (Okla.1972). The implied warranty of merchantability is not indefinite, but lasts for a reasonable time only. *Hoort v. Oklahoma Truck Parts, Inc.*, 650 P.2d 71, 73 (Okla.Civ.App.1981). A necessary part of every breach of warranty claim is that plaintiff suffer an actual loss that was proximately caused by defendant's breach of warranty. *American Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592, 595 (Okla.1981); *Collins Radio Co. of Dallas, Texas, v. Bell*, 623 P.2d 1039, 1052 (Okla.Civ.App.1980). Plaintiff must also allege that he has suffered an injury and damages when claiming a breach of the implied warranty of fitness for a particular purpose under Okla. Stat. tit. 12A, § 2-315. *Collins Radio Co.*, 623 P.2d at 1052.

Based on the amended complaint, it is not apparent that plaintiff has suffered a manifestation of the alleged defect or that the push-in receptacles in his home are actually defective. Plaintiff cites *Seely v. White Motor Co.*, 403 P.2d 145 (Cal.1965), for the proposition that the risk of physical injury is compensable in a breach of warranty action, because the plaintiff should not have to wait for a physical injury to occur before bringing suit. *Id.* at 155. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
(Cite as: 2006 WL 2990524 (N.D.Okla.))

holding of *Seely* was that purely economic loss for an intrinsic product defect can not be recovered with a tort claim, and that plaintiff's economic injury was compensable through a breach of warranty claim only. *See Sharon Steel Corp. v. Lakeshore, Inc.,* 753 F.2d 851, 854 (10th Cir.1985). However, the economic loss doctrine does not create an injury where none exists. Plaintiff argues that Leviton's products are continuously malfunctioning, consequently causing an ongoing injury.

This case is analogous to *Briehl v. General Motors Corp.,* 172 F.3d 623 (8th Cir.1999), where the Eighth Circuit dismissed a putative class action based on a claim that defendants designed an inherently defective anti-lock braking system. *Id.* at 626. The case was dismissed because the plaintiffs did not allege that the defect had actually caused any plaintiff an injury, and none of the plaintiffs could show he or she was entitled to damages. The plaintiffs amended their complaint to include allegations that proposed class members had suffered an accident that was caused by the defective brakes, but also continued to pursue a class action based on a theory that putative class members could recover for an unmanifested injury. *Id.* at 629. The court stated that "[w]here, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies."*Id.* at 628. Plaintiff attempts to distinguish this case without success. He alleges that Leviton's receptacles are inherently defective and are likely to cause an injury, but he does not affirmatively state that he has suffered an injury. Therefore, plaintiff can not show that he is entitled to damages, which is a necessary element of any breach of warranty claim. *Id.* at 628-30; *Carlson v. General Motors Corp.,* 883 F.2d 287, 297 (4th Cir.1989).

**\*7** There is no possibility, based on the allegations of the amended complaint, that plaintiff will be entitled to recover for breach of an implied warranty of merchantability or fitness for a particular purpose and this claim should be dismissed.

## C.

Plaintiff has pled tort claims for unjust enrichment, negligence, and manufacturer's products liability. The Court finds that, absent any claim of current injury, plaintiff's tort claims can not survive a motion to dismiss for failure to state a claim. Plaintiff's vague references to potential harm, such as personal injury and fire loss, are negated by his stated intent to exclude any person from the putative class that has suffered a personal injury or property damage from using Leviton's receptacles.

Plaintiff's claim for unjust enrichment is based on the theory that Leviton has wrongfully retained a benefit by selling a product it should have known was defective. Under Oklahoma law, unjust enrichment "describes a condition resulting from the failure of a party to make restitution in circumstances where it is inequitable."*Lapkin v. Garland Bloodworth, Inc.,* 23 P.3d 958 (Okla.Div.App.2000)."A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."*N.C. Corff Partnership, Ltd. v. OXY USA, Inc.,* 929 P.2d 288, 295 (Okla.Civ.App.1996). However, a necessary element of this claim is that the unjust enrichment must be connected to a resulting injustice. *Teel v. Public Service Co. of Oklahoma,* 767 P.2d 391, 398 (Okla.1985). Plaintiff provides the following argument in support of his unjust enrichment claim:

Leviton next argues that, until this point of time, Mr. Harrison's push-in receptacles have been functioning properly so no unjust enrichment remedy is be [sic] available. Whether or not M. Harrison's receptacles have malfunctioned to date, he has become aware of the imminent harm and will replace the unsafe receptacles. Leviton's refusal to reimburse him the cost of safe replacements amounts to an inequitable and unjust retention of a benefit.

Dkt. # 28, at 20. If plaintiff believes a product in his home creates an increased risk of danger, he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
**(Cite as: 2006 WL 2990524 (N.D.Okla.))**

may remove the product from his home. That does not automatically create an equitable right to recovery if he has not suffered a manifestation of the potential harm. Plaintiff is currently receiving the benefit of a product that is functioning as the manufacturer intended, but has not suffered any injury. *See Teel,* 767 P.2d at 398-99 (no finding of injustice when plaintiff received the benefit of the bargain). Without an accompanying injury, there is no injustice. Plaintiff has specifically limited his claim to economic injuries, which precludes him from asserting an injustice based on an increased risk of personal injury.

**\*8** Plaintiff's claims for strict product liability and negligence are not barred by the economic loss rule stated in *Wagonner,* but by something more fundamental. In negligent or defective design cases, plaintiff's alleged injury must be something more than the defective design; he must have suffered injury caused by the defective design of the product. *Burton v. R.J. Reynolds Tobacco Co.,* 397 F.3d 906 (10th Cir.2005); *Prince v. B.F. Ascher Co., Inc.,* 90 P.3d 1020 (Okla.Civ.App.2004). The allegations of the amended complaint establish that receptacles are functioning as intended, but that plaintiff believes there is an increased risk of harm. In order succeed on a claim for negligence or products liability, plaintiff must be able to prove that he suffered an injury caused by defendant's defective design. *Seay v. General Elevator Co.,* 522 P.2d 1022 (Okla.1974); *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1360-61 (Okla.1974). These kinds of claims were not meant to preemptively prevent injury but, rather, they are designed to provide a legal theory to address injuries that have already occurred. Plaintiff's claim that he may have to expend money in the future to replace a product, or that he faces an increased risk of personal injury, can not be adjudicated as a strict products liability or negligence claim until the product has caused an injury. If the Court were to adopt plaintiff's theory, plaintiff could pursue these claims merely for owning a product that is allegedly defective, but that has not caused any actual harm. Neither a strict

products liability claim nor a negligence claim is available in this situation.

**IT IS THEREFORE ORDERED** that defendant's Motion to Dismiss Plaintiff's Amended Class Action Complaint and Brief in Support (Dkt .# 25) is **granted.**The Amended Class Action Complaint (Dkt.# 13) is hereby **dismissed.**

N.D.Okla.,2006.
Harrison v. Leviton Mfg. Co., Inc.
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.), 39 UCC Rep.Serv.2d 83

**(Cite as: Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.))**

Page 1

**H**
Hubbard v. General Motors Corp.
S.D.N.Y.,1996.

United States District Court, S.D. New York.
Stephen L. HUBBARD, on behalf of himself and
all others similarly situated, Plaintiff,
v.
GENERAL MOTORS CORPORATION, Defendant.
**No. 95 Civ. 4362.**

May 22, 1996.

*OPINION & ORDER*

SCHWARTZ, District Judge:
**\*1** This matter is before the Court upon defendant's motion to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim. Plaintiff requests that, if the Court finds plaintiff's Complaint deficient, he be granted leave to file an Amended Complaint. For the reasons stated below, defendant's motion to dismiss is granted; plaintiff is granted leave to file an Amended Complaint asserting a cause of action for breach of implied warranty.

*BACKGROUND*

Plaintiff Stephen L. Hubbard is a purchaser and current owner of a Chevrolet "Suburban" automobile, manufactured by defendant General Motors Corporation ("GM"). Hubbard brings this action on behalf of himself and a putative class consisting of "all persons in the United States who purchased or leased a model-year 1992, 1993, 1994 or 1995 Chevrolet Suburban vehicle."[FN1] Compl. ¶ 5. Plaintiff asserts that the Court has jurisdiction over this action pursuant to Title 28, United States Code, Section 1332 (diversity), since "plaintiff and defendant are citizens of different States and the matter in controversy exceeds the sum or value of

$50,000, exclusive of interest and costs."Compl. ¶ 1.

Plaintiff alleges that GM has outfitted the Suburbans with "a defective braking system", which causes the vehicles not to stop properly upon application of the brakes. Compl. ¶ 11. Plaintiff claims that the National Highway Traffic Safety Administration ("NHTSA") commenced an investigation of poor brake performance on 1992-1995 Suburbans, following the receipt of 141 complaints concerning the vehicles' brakes.

According to Hubbard, GM knew of the alleged product defect when it began to offer the Suburbans for sale and "spent millions of dollars in deceitfully advertising the purported quality and dependability" of the vehicles. Compl. ¶ 12. Plaintiff claims that GM ran an advertisement in the June 13, 1994 issue of *Newsweek* that stated, "Small surprise that Chevy Suburban, Blazer and S-Blazer are the most popular family of their kind anywhere. Or that they're from Chevrolet, the most dependable, long-lasting trucks on the planet," and that the vehicles are "Like a Rock".*Id.* Plaintiff alleges that he and the other members of the class he seeks to represent "reasonably relied upon the representations of GM and its agents and the advertisements disseminated by GM," and that such reliance was "fraudulently induced" by GM. Compl. ¶ 15.

The claimed damages of plaintiff and the putative class members are stated to be "performance problems with the vehicle's braking system, as well as a reduction in the resale value and the trade-in value of the vehicles."Compl. ¶ 15. Specifically excluded from the reputed class are "any persons who have suffered personal injury as a result of defects" in the Suburbans. Compl. ¶ 5.

Plaintiff asserts a cause of action for common law fraud, alleging that GM's representations and advertisements for the Suburbans were deceptive and misleading and were accompanied by a "wanton

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.), 39 UCC Rep.Serv.2d 83
**(Cite as: Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.))**

and willful disregard of the rights of others or were motivated by malice, with the intent to defraud and induce plaintiff's and the class members' reliance."Compl. ¶ 18. In addition, plaintiff asserts claims for breach of express and implied warranty and negligent misrepresentation of fact.

**\*2** On behalf of himself and the alleged class, plaintiff seeks rescission, actual damages, punitive damages and interest, as well as injunctive relief in the form of a court order requiring GM to issue corrective disclosures and take corrective actions with respect to the alleged brake defect and imposing a constructive trust upon monies obtained by GM as a result of the alleged wrongful conduct.

*DISCUSSION*

*I. Subject Matter Jurisdiction*

Defendant moves to dismiss the Complaint for lack of subject matter jurisdiction on the ground that the amount in controversy does not, as a matter of law, meet the $50,000 jurisdictional amount requirement.[FN2]GM argues that plaintiff must allege that the amount in controversy exceeds $50,000 *for each purported class member.*

In order for a complaint to be dismissed for failure to satisfy the amount in controversy requirement of diversity jurisdiction, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount."*St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288-89, 58 S.Ct. 586, 590 (1938)."Unless the law gives a different result, the sum claimed by the plaintiff controls if the claim is apparently made in good faith."*Id.; see also Ochoa v. Interbrew America, Inc.,* 999 F.2d 626, 628-29 (2d Cir. 1993).

If punitive damages are permitted under the controlling law, "the demand for such damages may be included in determining whether the jurisdictional amount is satisfied."*A.F.A. Tours. Inc. v. Whitchurch,* 937 F.2d 82, 87 (2d Cir. 1991); *see also*14A Charles A. Wright, Arthur R. Miller & Edward H.

Cooper, Federal Practice and Procedure § 3702 (1985) ("Exemplary or punitive damages, if permitted under the governing law, can be included in determining whether the amount in controversy requirement has been met"). Moreover, it is well established that "when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount."*Zahn v. Intern'l Paper Co.,* 414 U.S. 291, 294, 94 S.Ct. 505, 508 (1973).

Under New York law, a plaintiff may recover punitive damages on a fraud claim if the defendant's conduct constituted a harm aimed at the public generally, or is shown to be willful and wanton, outrageously immoral or criminal in nature.*Giblin v. Murphy.* 536 N.Y.S.2d 54, 56, 73 N.Y.2d 769, 772 (1988); *Sforza v. Health Ins. Plan of Greater New York,* 619 N.Y.S.2d 734, 736, 210 A.D.2d 214 (N.Y.A.D. 1994). However, the Court finds that the Complaint fails to state a claim for fraud, and, therefore, for punitive damages. *See infra* at 15-16.Thus, the demand for punitive damages may not be included in the computation of the jurisdictional amount.

Nevertheless, it does not appear to a legal certainty that the claim is for an amount less than $50,000. If plaintiff and the alleged class members were merely seeking monetary damages, which they could do as well on an individual basis, they could not aggregate their claims in order to gain federal jurisdiction. *Zahn,* 414 U.S. at 301, 94 S.Ct. at 512. However, plaintiff and the alleged class members seek injunctive relief in the form of an order requiring GM to issue corrective disclosures and take corrective actions, such as a recall of the vehicles, and imposing a constructive trust upon monies obtained by GM from selling the Suburbans. In *Gibbs v. E.I. DuPont De Nemours & Co., Inc.,* 876 F.Supp. 475 (W.D.N.Y. 1995), the court held that the class action plaintiffs had a common and undivided interest in the injunctive relief sought because "[i]n a suit for injunctive or declaratory relief, the amount in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.), 39 UCC Rep.Serv.2d 83
(Cite as: Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.))

controversy is measured by the value of the object of the litigation," in that case a constructive trust. *Id.* at 479 (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 346-47, 97 S.Ct. 2434, 2443-44 91977)); *see also A.F.A. Tours, Inc.,* 937 F.2d at 87.

**\*3** The Court finds that plaintiff and the alleged class members have a common and undivided interest in the injunctive and declaratory relief sought herein. Therefore, the jurisdictional amount requirement is satisfied if their interests collectively exceed $50,000. It is not clear, to a legal certainty, that the cost of instituting a recall program for the vehicles affected by the alleged defect and/or of making corrective disclosures would be less than $50,000. Accordingly, the Court may exercise diversity jurisdiction over this action. Defendant's motion to dismiss for lack of subject matter jurisdiction is, therefore, denied.

## II. *Sufficiency of Plaintiff's Claim*

Defendant moves to dismiss the Complaint for failure to state a claim, arguing that plaintiff has failed to plead the requisite elements of any cause of action. In ruling on a motion to dismiss, "a court must construe in plaintiff's favor any well-pleaded factual allegations in the complaint.... Dismissal of the complaint is proper only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991).

### A. *Damages*

Defendant contends that plaintiff has failed to plead any damages, and that damages are an essential element of claims for breach of express or implied warranty, fraud and negligent misrepresentation. GM states that, fatal to plaintiff's claims is the absence of an allegation that Hubbard himself has experienced performance problems or has attempted to resell his Suburban only to discover that its value

has decreased. It is plaintiff's position that he and the putative class members were damaged at the moment they purchased their Suburban vehicles, for they would not have made such a purchase had they known of the alleged defect.

Purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own. *See Feinstein v. Firestone Tire and Rubber Co.,* 535 F.Supp. 595, 603 (S.D.N.Y. 1982) ("Plaintiff's bald assertion that a 'common' defect *which never manifests itself 'ipso facto* caused economic loss' and breach of implied warranty is simply not the law"); *Yost v. General Motors Corp.,* 651 F.Supp. 656, 657 (D.N.J. 1986) (alleged design defect in Cadillacs which is "likely" to cause damage and "may" create potential safety hazards did not support a claim for breach of warranty or fraud); *Barbarin v. General Motors Corp.,* 84 Civ. 0888 (TPJ) (D.D.C. Sept. 22, 1993) 1993 WL 765821 at \*2 (dismissing "the claims of all plaintiffs whose X-cars never experienced the phenomenon of 'premature rear wheel lock-up'"). Thus, a Suburban that performs satisfactorily and never exhibits the alleged braking system defect is fit for the purposes intended and does not give rise to a breach of warranty claim or any other.

**\*4** It is unclear from plaintiff's complaint whether Hubbard claims that the alleged defect has manifested itself in his Suburban. Rather than dismissing the Complaint outright on this ground, the Court convened a conference on May 15, 1996, at which it inquired on the record as to whether plaintiff had experienced the alleged defect in operating his automobile. Plaintiff stated that the alleged defect had in fact manifested itself in his Suburban, which caused him to take the vehicle to an authorized dealer for repair. Accordingly, the Court grants defendant's motion to dismiss the Complaint for failure to plead damages but, in addition, grants plaintiff leave to file an amended complaint that shall include this information.[FN3]The Court further instructs plaintiff to identify the alleged brake de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.), 39 UCC Rep.Serv.2d 83
**(Cite as: Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.))**

fect in greater detail in the Amended Complaint, so as to give defendant satisfactory notice of the substance of his claims. *See Duncan v. AT&T Communications, Inc.,* 668 F.Supp. 232, 234 (S.D.N.Y. 1987).

### B. *Breach of Warranty Claims*

Defendant argues that plaintiff's breach of warranty claims must be dismissed because plaintiff failed to allege that GM has been notified of the breach and resultant damages. Section 2-607(3) of the New York Uniform Commercial Code provides that, "[w]here a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."N.Y. U.C.C. § 2-607(3) ( McKinney's 1993).

Plaintiff points out that several courts in other states have ruled that § 2-607(3)(a) requires a buyer to give notice only to his or her immediate seller, not a remote manufacturer.[FN4] *See Cipollone v. Liggett Group, Inc.,* 683 F.Supp. 1487, 1498 (D.N.J. 1988); *Sullivan v. Young Brothers and Co. Inc.,* No. Civ. 93-271-P-C (D.Me. July 26, 1995) 1995 WL 455749 at *11 ("The Court concludes that the Maine Law Court would follow the reasoning of the majority of courts and conclude that for purposes of a breach of warranty claim, it is not necessary to give notice to remote sellers").

While notice is a requirement under New York law for a breach of warranty claim, *Burns v. Volkswagen of America Inc.,* 468 N.Y.S.2d 958, 959 (A.D. 4th Dep't 1983), the sufficiency and timeliness of the notice is generally a question for the jury. *Mendelson v. General Motors Corp.,* 432 N.Y.S.2d 132, 136 (N.Y. Sup. 1980), *aff'd,*441 N.Y.S.2d 410 (A.D. 2d Dep't 1981). One New York court has noted that "(a) notice need only be given to the dealer; (b) the content of the notification need merely be sufficient to let the seller know of the nature of the defect; (c) oral notice satisfies the notice requirement of 2-607(3)(a)."*Hyde v. General*

*Motors Corp.,* 1982 Trade Cases ¶64,595 (N.Y. Sup. Oct. 16, 1981), 1981 WL 11468 at *2. In *Mendelson, supra,* an action brought by purchasers against the manufacturer, the court noted that the complaint contained a general allegation of notice and held that the sufficiency and timeliness of notice of a breach of warranty was a question of fact to be determined by the jury. *Id.* at 136.

*5 Plaintiff's Complaint lacks any allegation that plaintiff notified GM, or the dealer from which he purchased the vehicle, of the claimed defect. Accordingly, the Court grants defendant's motion to dismiss plaintiff's claims for breach of express and implied warranty for failure to allege notice. Plaintiff, however, is granted leave to replead.[FN5]

Defendant further submits that plaintiff's claims for breach of implied warranty must be dismissed because plaintiff lacks privity with GM. It is undisputed that Hubbard did not purchase his Suburban directly from GM.

Section 2-318 of the Uniform Commercial Code provides as follows:

A seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of warranty. A seller may not exclude or limit the operation of this section.

N.Y. U.C.C. § 2-318 (McKinney's 1993). The court in *Mendelson,* referring to Section 2-318, stated, [a]lthough the section removes the privity bar only where the plaintiff is "injured in person", it has been said that it does not prevent the courts from abolishing the vertical privity requirement when a nonprivity buyer seeks recovery for direct *economic loss.*However, the courts in New York have not done so.

432 N.Y.S.2d at 134 (citations omitted) (emphasis supplied).

Thus, "[u]nder New York law, absent privity of

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.), 39 UCC Rep.Serv.2d 83
(Cite as: Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.))

contract, a purchaser cannot recover mere economic loss against a manufacturer under a theory of breach of implied warranty."*Westchester County v. General Motors Corp.*, 555 F.Supp. 290, 294 (S.D.N.Y. 1983); *see also Rosen v. Hyundai Group (Korea)*, 829 F.Supp. 41, 49-50 (E.D.N.Y. 1993) (only "sellers" are liable for breach of warranty under N.Y. U.C.C.). Citing this rule, defendant urges that plaintiff's claim for breach of implied warranty must be dismissed.

However, New York recognizes an exception to this principle where the product in question is a "thing of danger". So that,

where an article is of such a character that when used for the purpose for which it is made it is likely to be a source of danger to several or many people if not properly designed and fashioned, *the manufacturer as well as the vendor* is liable, for breach of law-implied warranties, to the persons whose use is contemplated.[FN6]

*Goldberg v. Kollsman Instrument Corp.*, 12 N.Y.2d 432, 436-37 (1963) (emphasis supplied); *see also All-Tronics, Inc. v. Ampelectric Co.*, 354 N.Y.S.2d 154, 156 (A.D. 2d Dep't 1974) ("a defect in a potentially hazardous product subjects the distributor-vendor *and the manufacturer* to liability to a purchaser for breach of implied warranties").

The purchaser of an automobile is certainly a person whose use of the product is contemplated by the manufacturer. Moreover, a vehicle equipped with a defective braking system is likely to be a source of danger when driven.[FN7] *See Comstock v. General Motors Corp.*, 99 N.W.2d 627, 632 (Mich. 1959). Therefore, the Court finds that plaintiff may assert a claim for breach of implied warranty against GM, even though Hubbard is not in privity with GM.

*6 Defendant further urges the Court to dismiss plaintiff's claim for breach of express warranty on the ground that the only allegation of language that, according to plaintiff, constitutes an express warranty from GM -- *i.e.* the June 1994 *Newsweek* advertisement calling Suburbans "popular", "dependable" and "like a rock" -- is mere puffery, which does not constitute an express warranty. "Puffing" has been described as "making generalized or exaggerated statements such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely."*In re All Terrain Vehicle Litigation*, 771 F.Supp. 1057, 1061 (C.D.Cal. 1991).

In *In re All Terrain Vehicle Litigation*, the court found that the defendant's advertising statements claiming that the "all terrain vehicles" were "precisely balanced in the frame for superb handling," and "the ultimate recreational vehicle," which would "embarrass the wind" were mere puffery, which did not support the plaintiff's claim. 771 F.Supp. at 1061;*see also Falcon Equip. Corp. v. Courtesy Lincoln Mercury, Inc.*, 536 F.2d 806, 809 (8th Cir. 1976) (advertisement comparing Mark IV with Cadillac products in areas concerning comfort and riding characteristics were "merely puffing" and did not give rise to an express warranty); *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 903 (Pa. 1975) (advertising statement that helicopter was "safe", "dependable" and "easy to operate" constituted mere puffing as a matter of law); *The Sample Inc. v. Pendleton Woolen Mills, Inc.*, 704 F.Supp. 498, 505 (S.D.N.Y. 1989) (retailer could not reasonably rely on manufacturer's advertisements about "relationships that last a lifetime" to conclude that its account would not be terminated without good cause because statements were "puffing"); *Groden v. Random House, Inc.*, No. 94 Civ. 1074 (JSM)(S.D.N.Y. Aug. 23, 1994), 1994 WL 455555 at *5 (dismissing false advertising claim, holding that an allegedly misleading statement was mere "puffing").

Plaintiff points out that, under New York law, the question of whether representations made in advertisements are "warranties and, therefore, a part of the bargain, or merely expressions of the seller's opinion, or mere 'puffing', is almost always a ques-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.), 39 UCC Rep.Serv.2d 83
**(Cite as: Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.))**

tion of fact for a jury's resolution," as is the question of whether and to what extent the consumer relied upon the representations at issue. *Yuzwak v. Dygert,* 534 N.Y.S.2d 35, 36 (A.D. 4th Dep't 1988); *but see Simon v. Cunard Line Ltd.,* 428 N.Y.S.2d 952 (A.D. 1st Dep't 1980) (advertising statements that the cruise ship QUEEN ELIZABETH II was "the greatest ship in the world" and that "everything about the Queen lives up to the high standards you would expect aboard the greatest ship in the world" determined to be "mere puffing and not actionable"). In *Yuzwak v. Dygert, supra,* the Appellate Division reinstated the plaintiff's claims for breach of warranty and fraud based on oral and written statements that a horse was quiet, easy to handle, did not kick and would make a fine show horse for children. Plaintiff in that case purchased the horse for her children, one of whom was injured when the horse kicked her. The court held that the seller's statements were "not so obviously 'puffing' that their significance should be determined as a matter of law."534 N.Y.S.2d at 36.

\*7 In contrast, the advertising proclamations that Suburbans are "like a rock", "popular" and "the most dependable, long-lasting trucks on the planet", *see* Compl. at ¶ 12, are generalized and exaggerated claims, which a reasonable consumer could not rely upon as statements of fact. Moreover, these statements make no reference whatsoever to the type or quality of the vehicles' braking system. In short, the Court finds that defendant's alleged advertising statements constitute mere puffing and do not create an express warranty upon which plaintiff could reasonably rely. Accordingly, defendant's motion to dismiss plaintiff's second cause of action for breach of express warranty is granted.

### C. *Fraud and Negligent Misrepresentation Claims*

Defendant moves to dismiss plaintiff's claims for fraud and negligent misrepresentation on the grounds that, *inter alia,* the alleged statements made by GM are not sufficiently material or factual to give rise to such claims.[FN8] In order to state a claim for fraud or negligent misrepresentation, plaintiff must allege, *inter alia,* the misrepresentation *of a material fact. See Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir. 1980), *cert. denied,*449 U.S. 1123, 101 S.Ct. 938 (1981) (stating elements of fraud claim under New York law).

Plaintiff's claims for fraud and negligent misrepresentation are based on defendant's advertisement that Suburbans are "like a rock", "popular" and "dependable", *see supra.*As stated above, the Court finds that these statements are puffery, upon which a purchaser could not reasonably rely. As mere puffery, such statements are not actionable as fraudulent or negligent misrepresentations of fact. *See Metzner v. D.H. Blair & Co.,* 689 F.Supp. 262, 263-64 (S.D.N.Y. 1988). Accordingly, defendant's motion to dismiss plaintiff's first and fourth causes of action for common law fraud and negligent misrepresentation, respectively, is granted.

The Court denies plaintiff leave to replead claims for relief sounding in breach of express warranty, common law fraud and negligent misrepresentation. The underlying facts and circumstances relied upon by plaintiff are not a proper subject for such relief; therefore, an amended complaint asserting these claims would be without merit and futile. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962).

### CONCLUSION

Defendant's motion to dismiss the Complaint for failure to state a claim is granted. Plaintiff is granted leave to file an Amended Complaint asserting a cause of action for breach of implied warranty within 30 days of the date of this Order.

SO ORDERED.

> FN1. Plaintiff has not moved to certify the class.
>
> FN2. Although not stated by either party, presumably, the value of a Suburban is less

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.), 39 UCC Rep.Serv.2d 83

**(Cite as: Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.))**

than $50,000.

FN3. The Court notes as well that the alleged class is overly broad. All members of the putative class must have experienced the alleged brake defect in their Suburbans in order to have legally recognizable claims.

FN4. Plaintiff also points out that several courts have held that the filing of a complaint may constitute sufficient notice under this provision. *See Cipollone,* 683 F.Supp. at 1498;*Graham v. Wyeth Labs.,* 666 F.Supp. 1483, 1499-1500 (D.Kan. 1987). However, the only New York case cited by plaintiff, or found by the Court, as authority for this proposition pre-dates the Uniform Commercial Code. *See Silverstein v. R.H. Macy & Co.,* 40 N.Y.S.2d 916, 920 (A.D. 1st Dep't 1943).

FN5. Plaintiff has indicated that some form of notice may have occurred. At the conference held on May 15, 1996, the following colloquy took place:

Plaintiff: ... The vehicle had been brought into the dealer on several occasions complaining of the brake failure.

The Court: And so you gave notice to GM of that defect before you filed the complaint here of a breach of warranty?

Plaintiff: They had notice because they obviously brought it into their authorized dealer.

Transcript of May 15, 1996 Conference at 8.

FN6. Defendant argues that the court in *Goldberg* waived the privity requirement only because the plaintiff sought recovery for personal injury, which plaintiff in this case does not seek. There is no reason to find that the *Goldberg* holding is limited to such a circumstance. Although the plaintiff in *Goldberg* was the administratrix of the estate of a passenger killed in an airplane crash, the Court of Appeals stated that it was answering the broad question: "does a manufacturer's implied warranty of fitness of his product for its contemplated use run in favor of all its intended users, despite lack of privity of contract?"12 N.Y.2d at 434-35.

FN7. In *Mendelson, supra,* the plaintiffs alleged that the defendant substituted an inferior transmission for the one that should have been installed in its 1979 Oldsmobiles. The plaintiff in *Westchester County, supra* claimed that the defendant had manufactured defective air conditioners, which were installed in the buses it purchased; and the claim in *Rosen, supra,* was for defective pianos. The Court finds that plaintiff's claim alleging a defective braking system is qualitatively different from claims against an automobile manufacturer alleging the use of inferior transmissions or the design of defective air conditioners, in that a vehicle with defective brakes is a thing of danger.

FN8. Defendant also argues that (1) GM had no duty to disclose and (2) plaintiff failed to allege reliance on the advertisement. The Court need not reach these issues.

S.D.N.Y.,1996.

Hubbard v. General Motors Corp.

Not Reported in F.Supp., 1996 WL 274018 (S.D.N.Y.), 39 UCC Rep.Serv.2d 83

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

348 B.R. 684                                   Page 1
348 B.R. 684
**(Cite as: 348 B.R. 684)**

**H**
In re Balko
Bkrtcy.W.D.Pa.,2006.

United States Bankruptcy Court,W.D. Pennsylvania.
In re Gilbert BALKO and Anne Balko, Debtors.
Gilbert Balko and Anne Balko, Plaintiffs,
v.
Carnegie Financial Group Inc., Paragon Home Lending,
Chet Underhill, Allegheny Appraisals, J.P. Morgan
Chase Bank, n.a., as Trustee, and Joseph Behrens, Defendants.
**Bankruptcy No. 05-30667-JAD.**
**Adversary No. 06-02001-JAD.**

Aug. 24, 2006.

**Background:** Chapter 13 debtors brought adversary proceeding against mortgage brokerage company, mortgage broker, appraisers, mortgage lender, and trustee holding securitized note and mortgage, objecting to proof of claim filed by trustee and asserting claims for alleged common-law fraud and violations of Truth in Lending Act (TILA) and Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL). Trustee, lender, and mortgage brokerage company moved to dismiss.

**Holdings:** The Bankruptcy Court, Jeffery A. Deller, J., held that:
(1) yield spread premium to be paid to mortgage brokerage company by lender could not be included in calculation of points and fees paid used to determine whether mortgage loan was subject to Home Ownership and Equity Protection Act (HOEPA) and its special disclosure requirements;
(2) debtors failed to plead their common-law fraud claims against lender and trustee with requisite particularity; and
(3) complaint failed to state claim against lender and trustee under Pennsylvania's Credit Services Act and UTPCPL.

Motion to dismiss granted in part and denied in part.

West Headnotes

**[1] Consumer Credit 92B ⬤⟲33.1**

92B Consumer Credit
    92BII Federal Regulation
        92BII(A) In General
            92Bk33 Persons, Businesses, and Transactions Subject to Regulations
                92Bk33.1 k. In General. Most Cited Cases
Yield spread premium to be paid to mortgage brokerage company by lender refinancing borrowers' mortgage could not be included in calculation of points and fees paid used to determine whether mortgage loan was subject to Home Ownership and Equity Protection Act (HOEPA) and its special disclosure requirements, even though implementing regulation expressly stated that term "points and fees" included all compensation paid to mortgage brokers, given that HOEPA applied to mortgage transactions in which total points and fees payable by consumer at or before closing exceeded designated amount, whereas yield spread premium was to be paid and derived from stream of interest generated over life of loan, and was not payable at or before closing. Truth in Lending Act, § 103(aa)(1)(B), 15 U.S.C.A. § 1602(aa)(1)(B); 12 C.F.R. § 226.32(b)(1)(ii).

**[2] Consumer Credit 92B ⬤⟲52**

92B Consumer Credit
    92BII Federal Regulation
        92BII(B) Disclosure Requirements
            92Bk52 k. Price, Balance, Rate, and Charges in General. Most Cited Cases
Mortgage lender did not have duty under Truth in Lending Act (TILA) to separately disclose to borrowers yield spread premium to be paid to mortgage brokerage company, which was included in finance charge assessed by lender against borrowers. Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.

**[3] Consumer Credit 92B ⬤⟲61.1**

92B Consumer Credit
    92BII Federal Regulation

92BII(C) Effect of Violation of Regulations

92Bk61 Civil Liabilities and Penalties for Violations

92Bk61.1 k. In General. Most Cited Cases

(Formerly 13k3)

Real Estate Settlement Procedures Act (RESPA) does not provide a private right of action to remedy violations of provision requiring that borrower be timely provided with accurate good faith estimate of settlement charges. Real Estate Settlement Procedures Act of 1974, § 5, 12 U.S.C.A. § 2604.

**[4] Bankruptcy 51 ⟜2162**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases

Heightened standard for allegations of fraud and mistake established by federal pleading rule is inherently applicable when dealing with federal statutory claims, such as securities fraud and racketeering allegations. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[5] Bankruptcy 51 ⟜2162**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases

Although factors pertaining to state common-law fraud claim are derived from state law principles and jurisprudence, the requirement under federal rule that allegations of fraud be pleaded with particularity applies equally to common-law fraud claims being heard in federal court. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[6] Bankruptcy 51 ⟜2162**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases

Rule requiring that averments of fraud be pleaded with particularity requires plaintiff to specify the time, place, and substance of defendant's alleged fraudulent conduct. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[7] Bankruptcy 51 ⟜2162**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases

Under rule requiring that averments of fraud be pleaded with particularity, fraud claimant must allege more than mere conclusory allegations of fraud or the technical elements of the same, and, in a case involving multiple defendants, complaint should inform each defendant of the nature of his alleged participation in the fraud, and should not vaguely attribute allegedly fraudulent statements simply to all defendants. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[8] Bankruptcy 51 ⟜2162**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases

Borrowers failed both to plead fraud with requisite particularity and to state claim upon which relief could be granted in asserting common-law fraud claims against mortgage lender and trustee holding borrowers' securitized note and mortgage, where borrowers did not allege any specific fraudulent conduct attributable to lender or trustee, but merely made general accusations of fraud and conspiracy to defraud and listed generic misdeeds allegedly committed by unidentified actors, and complaint was devoid of any allegations of wrongful conduct committed by lender and trustee. Fed.Rules Civ.Proc.Rules 8(a), 9(b), 28 U.S.C.A.

**[9] Bankruptcy 51 ⟜2162**

51 Bankruptcy
   51II Courts; Proceedings in General

51II(B) Actions and Proceedings in General
51k2162 k. Pleading; Dismissal. Most Cited Cases

Claim of conspiracy to defraud is subject to rule requiring that averments of fraud be pleaded with particularity. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[10] Bankruptcy 51 ⟜2162**

51 Bankruptcy
51II Courts; Proceedings in General
51II(B) Actions and Proceedings in General
51k2162 k. Pleading; Dismissal. Most Cited Cases

Dismissal with prejudice was warranted as to common-law fraud claim asserted by borrowers against trustee that held borrowers' securitized note and mortgage, given that trustee had no involvement in solicitation, underwriting, or closing of loan and could not have participated, caused, encouraged, aided, or solicited alleged fraudulent activities undertaken in connection with loan, and that none of other defendants in borrowers' action were acting in agency capacity vis-a-vis trustee with respect to loan transaction, such that no relief could be granted against trustee under any set of facts that could be proved consistent with complaint's allegations.

**[11] Bills and Notes 56 ⟜315**

56 Bills and Notes
56VIII Rights and Liabilities on Indorsement or Transfer
56VIII(C) Assignment or Sale
56k314 Equities and Defenses Against Assignee
56k315 k. In General. Most Cited Cases

Provision of Pennsylvania's version of Uniform Commercial Code (UCC) allowing certain types of fraud to be used as defense, under some circumstances, against right of payee or transferee to enforce negotiable instrument does not provide for recovery of affirmative damages against assignee of such instrument. 13 Pa.C.S.A. § 3305.

**[12] Bankruptcy 51 ⟜2162**

51 Bankruptcy
51II Courts; Proceedings in General
51II(B) Actions and Proceedings in General
51k2162 k. Pleading; Dismissal. Most Cited Cases

Heightened pleading standard for averments of fraud established by federal rule applied to claims alleging violations of Pennsylvania's Credit Services Act and Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), given that such statutes provided for cause of action in some instances of fraudulent and/or deceptive conduct. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; 73 P.S. §§ 201-1 et seq., 2181 et seq.

**[13] Bankruptcy 51 ⟜2162**

51 Bankruptcy
51II Courts; Proceedings in General
51II(B) Actions and Proceedings in General
51k2162 k. Pleading; Dismissal. Most Cited Cases

Borrowers' complaint alleged no facts which actively placed either mortgage lender or trustee holding borrowers' securitized note and mortgage in marketing or solicitation of mortgage loan, and thus failed both to adequately plead purported fraud with particularity, as required by rule, and to state claim against lender and trustee under Pennsylvania's Credit Services Act and Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL). Fed.Rules Civ.Proc.Rules 8(a), 9, 28 U.S.C.A.; 73 P.S. §§ 201-1 et seq., 2181 et seq.

**[14] Consumer Credit 92B ⟜4**

92B Consumer Credit
92BI In General
92Bk3 License and Regulation in General
92Bk4 k. Particular Businesses or Transactions. Most Cited Cases

Trustee holding borrowers' securitized note and mortgage, which was either a bank or trust company, was not "credit services organization" or "loan broker" and was not involved with loan until well after loan was closed, and thus could not be held liable to borrowers

under Pennsylvania's Credit Services Act, which regulated activities of credit service organizations and loan brokers. 73 P.S. § 2182.

**[15] Bills and Notes 56 497(1)**

56 Bills and Notes
    56XI Actions
        56k490 Presumptions and Burden of Proof
        56k497 Good Faith and Payment of Value
            56k497(1) k. Presumptions as to Bona Fides in General. Most Cited Cases
Under Pennsylvania law, every holder of a negotiable instrument is deemed, prima facie, a holder in due course subject to a rebuttable presumption to the contrary.

**[16] Bills and Notes 56 103(1)**

56 Bills and Notes
    56I Requisites and Validity
        56I(F) Validity
        56k100 Validity of Assent
            56k103 Fraud and Misrepresentation
                56k103(1) k. In General. Most Cited Cases
Fraud in the factum, also known as real or essential fraud, is a defense to enforcement of obligation to pay negotiable instrument under Pennsylvania's version of Uniform Commercial Code (UCC), while fraud in the inducement is not. 13 Pa.C.S.A. § 3305.

**[17] Bankruptcy 51 2162**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
        51k2162 k. Pleading; Dismissal. Most Cited Cases
Borrowers' fraud allegations, which alleged fraud in the consideration for, or in negotiations leading up to, execution of negotiable instrument, failed to plead fraud in execution of note required for defense against enforcement of obligation to pay negotiable instrument under Pennsylvania's version of Uniform Commercial Code (UCC), and thus did not support claim that borrowers

had right of recoupment against trustee holding their securitized note and mortgage to the extent that mortgage brokerage firm, broker, mortgage lender, or appraisers involved in underlying loan transaction were found to have engaged in alleged fraud. 13 Pa.C.S.A. § 3305.

**\*687** David A. Colecchia, Esq.-Counsel to Debtors/ Plaintiffs.

Lyle D. Washowich, Esq., Reed Smith LLP-Counsel to J.P. Morgan Chase Bank, N.A., as Trustee.

Peter Nicholas Pross, Esq., Eckert Seamans Cherin & Mellott LLC-Counsel to Paragon Home Lending.

Charles E. Bobinis, Esq., The Bernstein Law Firm-Counsel to Carnegie Financial Group, Inc.

### *MEMORANDUM OPINION*

JEFFERY A. DELLER, Bankruptcy Judge.
The matter before the Court is a Motion to Dismiss filed by defendant, J.P. Morgan Chase Bank, N.A., as Trustee ("J.P. Morgan"), along with joinders to the same filed by defendants Carnegie Financial Group, Inc. ("Carnegie Financial") and Paragon Home Lending ("Paragon"). Pursuant to the Motion to Dismiss, these defendants ask that the Court dismiss various lender liability and fraud-like causes of action filed by the debtors against the defendants. For reasons set forth more fully in this Memorandum Opinion, the Court concludes that the Motion to Dismiss is, in part, well founded and, as a result: (1) Count 1 of the Complaint (as it relates to the debtors' objection to claim and purported claim sounding in recoupment) against J.P. Morgan shall be dismissed without prejudice; (2) Count 2 of the Complaint (Truth in Lending Act claims) shall be dismissed as to all defendants for failure to state a claim upon which relief may be granted; (3) Count 3 (common-law fraud claims) shall be dismissed as to J.P. Morgan and Paragon for lack of specificity in pleading and for failure to state a claim upon which relief could be granted; said dismissal shall be with prejudice as to J.P. Morgan and without prejudice as to the claims against Paragon; and (4) Count 4 (Pennsylvania Unfair Trade Practices and Consumer Protection Act claims) shall be dismissed as to J.P. Morgan and Paragon for lack of specificity in pleading and failure to state a claim upon which relief could be granted; said dismissal shall be with prejudice

as to J.P. Morgan and without prejudice as to the claims against Paragon. The Court denies the Motion to Dismiss with respect to the causes of action asserted in Counts 3 and 4 against defendants Carnegie Financial, Joseph Behrens, Allegheny Appraisals, and Chet Underhill.

### I. BACKGROUND

The plaintiffs, Gilbert and Anne Balko filed for bankruptcy protection under Chapter 13 of the United States Bankruptcy Code on August 18, 2005. On January 3, 2006, the plaintiffs filed the instant adversary proceeding against the defendants.

The complaint filed by the plaintiffs is not a model of clarity. It is 30 pages in length, contains in excess of 230 paragraphs (including sub-parts), and has attached to it at least 30 exhibits. The gravamen of plaintiffs' complaint is lender liability.

In a nutshell, plaintiffs have asserted four causes of action against some or all of the defendants. Count 1 is an objection to the claim filed by J.P. Morgan in the Balko's bankruptcy case, (See Plaintiff's Objection to Claim Combined With Complaint for Fraud and Violation of the Truth in Lending Act (the "Complaint") at ¶¶ 70-*688 74); Count 2 is a cause of action asserted by the plaintiffs against certain of the defendants (Carnegie Financial, Paragon, J.P. Morgan, and Joseph Behrens) under the Truth-In-Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., as amended by the Home Ownership and Equity Protection Act, Pub.L. 103-325 ("HOEPA"), (See Id. at ¶¶ 75-82); Count 3 is a common-law fraud cause of action asserted by the plaintiffs against all defendants, (Id. at ¶¶ 83-81); FN1 and Count 4 is a cause of action by plaintiffs against all defendants under Pennsylvania's Unfair Trade Practices Act and Consumer Protection Law, 73 P.S. §§ 201-1, et seq. (See Id. at ¶¶ 82-91).

> FN1. The Complaint filed by plaintiffs is misnumbered, contains several duplicately numbered paragraphs, and the error in paragraphing permeates Counts 3 and 4 of the

Complaint.

The material allegations against the defendants are as follows:

1. Defendant Carnegie Financial is a mortgage brokerage company, and one of its mortgage brokers was defendant Joseph Behrens. (Id. at ¶¶ 10, 11, 12, 21, 22).

2. In January of 2003, the Balkos responded to a newspaper advertisement and contacted Carnegie Financial regarding the possible re-finance of their home mortgage and various credit card obligations. (Id. at ¶ 35).

3. During ensuing conversations and/or communications between the Balkos and Mr. Behrens, the plaintiffs advised Carnegie Financial that the plaintiffs sought to refinance their mortgage due to, inter alia, the fact that the Balkos were having difficulty paying various credit card debt occasioned by Mr. Balko's unemployment and/or underemployment. (Id. at ¶¶ 36 and 37).

4. In response to the Balko's inquiry, Mr. Behrens advised the Balkos that the Balkos needed a "band-aid" loan, which was allegedly described by Behrens as "a loan to last for two years and then be refinanced at a lower rate with no closing costs." Mr. Behrens allegedly further explained "that this loan was needed to improve Plaintiffs' credit score and lower Plaintiffs' debt to income ratio." Mr. Behrens also allegedly explained that "the interest rate for the band-aid loan would be two percentage points lower than Mr. Balko's current interest rate." (Id. at ¶¶ 39-41).

5. Mr. Behrens allegedly promised the Balkos that the "band-aid" loan was "feasible and affordable, there would be no problems in refinancing two years [sic] so long as Plaintiffs made timely monthly payments, and the interest rate two years from then would be lower than the eight percent Mr. Behrens offered." Mr. Behrens also allegedly "assured the Plaintiffs that if [the Plaintiffs] made timely payments their payment would not change." (Id. at ¶¶ 42 and 43).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6. As a result of Mr. Behrens' alleged representations, the Balkos agreed to pursue the proposed refinancing. Ultimately Carnegie Financial procured a lender who was willing to refinance the Balkos. The lender who ultimately refinanced the Balkos' mortgage was Paragon. (*Id.* at ¶¶ 44, 52, 69, and Exhibit D).[FN2]

> FN2. At the May 26, 2006, no party disputed the fact that J.P. Morgan had no involvement whatsoever with the solicitation, underwriting, or closing of the March 2003 loan. In fact, J.P. Morgan's involvement in this case merely arises as a result of the fact that Paragon had, subsequent to closing of the loan, pooled and securitized the note and mortgage executed by the Balkos. As of the petition date, J.P. Morgan, as trustee, was the holder of the note and mortgage, and for this reason the Balkos named J.P. Morgan as a defendant to this action.

**\*689** 7. In connection with the underwriting of the refinancing, defendant Carnegie Financial allegedly procured a false appraisal (from defendants Allegheny Appraisals and Chet Underhill) which overstated the value of the Balkos home[FN3] and, as a result, allegedly placed the loan with Paragon with the knowledge that Paragon would not "verify the information in the Balkos' application especially since Carnegie advertises loans at 100% equity with no income verification." (*Id.* at ¶¶ 46, 47 and 69).

> FN3. The fair market of the home is allegedly $154,000 to $157,000 (depending on the appraisal methodology used), while the appraisal obtained by the lender during the course of underwriting the March 2003 loan valued the home at $300,000. (*See* Complaint at ¶ 88, Exhibit A, and Exhibit BB).

8. The closing on the loan occurred on March 24, 2003, and the amount financed by the Balkos was $222,840.33. (*Id.* at ¶ 52 and Exhibit J). In the complaint, the Balkos do not dispute that they received the benefit of the $222,840.33 loan; but they do allege that when the March 24, 2003 refinancing was com-

pleted, defendant Carnegie Financial allegedly failed to completely pay off numerous credit card balances held by the Balkos, despite "promising" to do so. (*Id.* at ¶¶ 65-68).

9. Approximately two years after the closing of the refinancing, the Balkos attempted to again refinance the loan through Carnegie Financial. In response to their request, the Balkos were informed that the Balkos "owed too much on their home compared to what it was worth" and, despite making several improvements to their home, the Balkos could not refinance their loan. (*Id.* at ¶ 55, 57 and 58).

10. Finally, the Balkos allege that due to the various purported acts of the several defendants, the Balkos were left with no equity remaining in their home and were forced to file for bankruptcy protection under the United States Bankruptcy Code in order to deal with claims of creditors.

## II. *STANDARD FOR MOTION TO DISMISS*

Fed.R.Civ.P. 12 ("Rule 12") is incorporated into the Federal Rules of Bankruptcy Procedure by operation of Fed.R.Bankr.P. 7012. In evaluating a motion to dismiss pursuant to Rule 12(b)(6) and Fed.R.Bankr.P. 7012(b)(6), the court must assume the facts alleged in the Complaint to be true and draw all factual inferences in favor of the nonmoving party, which in this case is the Balkos. *In re Loranger Mfg. Corp.,* 324 B.R. 575, 577-78 (Bankr.W.D.Pa.2005)*citing Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). In order for a motion to dismiss to be successful, it must be clear that no relief could be granted to the plaintiff under any set of facts that could be proved consistent with the allegations in the complaint. *Lum v. Bank of America,* 361 F.3d 217, 223 (3d Cir.2004)*citing Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

## III. *DISCUSSION AND ANALYSIS*

The Balkos' Complaint contains four counts. Count 1 is an objection to the **\*690** claim filed by J.P. Morgan.

Count 2 is an affirmative cause of action under the Truth-in-Lending Act filed by the Balkos against all of the defendants, with the exclusion of Chet Underhill and Allegheny Appraisals. Counts 3 and 4 are affirmative causes of action sounding in fraud and for violation of Pennsylvania's Unfair Trade Practices Act and Consumer Protection Law, respectively, against all defendants. Because the predicate to the Balkos' objection to J.P. Morgan's claim in Count 1 are the substantive causes of action asserted by the Balkos in Counts 2 through 4, the Court will first analyze the merits of Counts 2 through 4 before addressing the Balkos' objection to the claim of J.P. Morgan.

## Count 2

### Violation of TILA and HOEPA

Count 2 of the plaintiffs' Complaint alleges that defendants Carnegie Financial, Paragon, J.P. Morgan and Joseph Behrens committed violations of TILA (as supplemented by HOEPA) in connection with the March 2003 refinancing. Specifically, the plaintiffs allege that the March 2003 loan received by the Balkos was a "high cost" closed-end [FN4] consumer transaction falling within the heightened disclosure provisions of HOEPA, and that certain disclosures required by HOEPA were not made to the plaintiffs. In their prayer for relief, the Balkos ask for, among other things, rescission of the loan instrument, statutory damages, attorney's fees and an injunction against all defendants precluding any activity regarding foreclosure of the property securing the loan. J.P. Morgan, Paragon, and Carnegie Financial counter these allegations by claiming that the loan in question is not governed by HOEPA and therefore no disclosures beyond those required under TILA itself were necessary. As discussed in greater detail below, the Court agrees with the defendants that the loan agreement entered into by the plaintiffs does not fall within the purview of HOEPA and therefore Count 2 of the Complaint fails to state a claim upon which relief may be granted.

FN4. "Closed-end" credit is defined as con-

sumer credit "other than open-end credit as defined in this section." See 12 C.F.R. § 226.2(a)(10), "Open-end" credit is defined in 12 C.F.R. § 226.2(a)(20) as consumer credit extended by a creditor under a plan in which: (i) the creditor reasonably contemplates repeated transactions; (ii) the creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) the amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid. An example of an "open-end" consumer credit transaction would be a revolving loan obtained by an individual consumer in the form of the use of a credit card.

TILA was enacted by Congress in 1968. Its declared purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him [or her] and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a); see Beach v. Ocwen Federal Bank, 523 U.S. 410, 412, 118 S.Ct. 1408, 1409-1410, 140 L.Ed.2d 566 (1998). To achieve this goal, TILA requires creditors (as defined in 15 U.S.C. § 1602) to provide borrowers with clear and accurate disclosures of certain material terms. See 15 U.S.C. §§ 1631, 1632, 1635, 1638.[FN5]

FN5. TILA vests the Board of Governors of the Federal Reserve System with the power to promulgate regulations for the interpretation and implementation of the statute. See 15 U.S.C. § 1640(a). "Regulation Z," 12 C.F.R. Part 226, sets forth the various disclosure requirements imposed upon creditors covered by TILA. Such disclosure requirements include the requirement that creditors disclose the cost of credit as a dollar amount (i.e., the finance charge) and as an annual percentage rate. Other disclosures required by Regulation Z include the obligation of a creditor to provide a borrower with clear

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and conspicuous notice of the borrower's right to rescind the transaction in accordance with the provisions of 15 U.S.C. § 1635(a).

**\*691** HOEPA is an amendment to TILA, enacted by Congress in 1994 in response to increasing reports of abusive practices in home mortgage lending. *Cooper v. First Gov't Mortgage and Investors Corp.,* 238 F.Supp.2d 50, 55 (D.D.C.2002). At its core, HOEPA "creates a special class of regulated loans that are made at higher interest rates or with excessive costs and fees." *In re Cmty. Bank of N. Virginia,* 418 F.3d 277, 304 (3d Cir.2005). As such, Congress has determined that HOEPA loans are subject to special disclosure [FN6] requirements above and beyond the disclosure requirements of TILA, and the statute imposes liability (upon creditors and assignees of creditors making such loans) in instances where material disclosures compliant with HOEPA are not timely made. [FN7] *See* 15 U.S.C. §§ 1639, 1641.

> **FN6.** Some of the additional disclosures required by HOEPA include the language "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application" and "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan" in conspicuous type size. *See* 15 U.S.C. § 1639(a)(1).

> **FN7.** As to assignee liability, HOEPA provides that "[a]ny person who purchases or is otherwise assigned a mortgage referred to in § 1602(aa) of this title shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage." 15 U.S.C. § 1641(d).

There are two alternative statutory tests to determine whether or not a closed-end credit transaction qualifies as a HOEPA loan. *See* 15 U.S.C. § 1602(aa)(1). Under the first test (the "Annual Percentage Test"), a loan is subject to HOEPA if the annual percentage rate payable

on the loan exceeds by more than 10 percentage points the yield on Treasury securities having a comparable period of maturity (as measured on the fifteenth day of the month immediately preceding the month in which the application for the loan was received by the creditor). 15 U.S.C. § 1602(aa)(1)(A). As an alternative, the second test (the "Points and Fees Test") provides that a transaction will be governed by HOEPA if the total "points and fees" payable by the consumer at or before closing exceed the greater of (a) 8 percent of the total loan amount or (b) $400. 15 U.S.C. § 1602(aa)(1)(B). A determination under the Annual Percentage Test is rather simple; a court need do no more than peruse a copy of the Wall Street Journal in order to find the applicable rate(s) and perform the comparison. The Points and Fees Test, however, consists of a more in-depth analysis.

The plaintiffs in this case do not dispute that the annual percentage rate payable on the March 2003 loan does not exceed by more than the 10 percentage points the yield on applicable Treasury securities having comparable maturity. Therefore, the March 2003 loan fails the Annual Percentage Test and HOEPA cannot be invoked on this basis.

[1] The Balkos do allege that the "points and fees" [FN8] charged by the lender at closing of the March 2003 loan were in **\*692** excess of 8% of the total amount financed, and therefore the Balkos allege that HOEPA has been implicated by operation of the Points and Fees Test. The defendants dispute the Balkos calculation of "points and fees" and suggest that the plaintiffs, in order to gerrymander the loan into HOEPA, have miscalculated the "points and fees" paid under the loan at issue. Specifically, the defendants allege that the Balkos improperly included a "yield spread premium" [FN9] earned by the mortgage broker in the Points and Fees Test. The Court agrees with the defendants.

> **FN8.** "Points and fees" is a term of art used in 15 U.S.C. § 1602(aa)(1)(B). Regulation Z at Section 226.32(b)(1) defines the term "points and fees" and states, in pertinent part:

>> (b) Definitions. For purposes of this subpart,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the following definitions apply:

(1) For purposes of paragraph (a)(1)(ii) of this section, points and fees means:

(i) All items required to be disclosed under § 226.4(a) and § 226.4(b) [*i.e.,* the "Finance Charge"], except interest or the time-price differential;

(ii) All compensation paid to mortgage brokers;

(iii) All items listed in § 226.4(c)(7)[i.e., real estate related fees such as appraisal fees, fees for title examination, etc.] (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and

(iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for can- cellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

*See* 12 C.F.R. § 226.32(b)(1).

FN9. A yield spread premium is a "bonus paid to a broker when it originates a loan at an interest rate higher than the minimum interest rate approved by the lender for a particular loan." *In re Bell,* 309 B.R. 139, 153 n. 9 (Bankr.E.D.Pa.2004). A yield spread premium is not paid at closing of the loan. Rather, during the term of the loan the lender rewards the broker each month by paying the broker a percentage of the yield spread earned by the lender. *Id.*

The exhibits attached to the Balkos' Complaint reflect that the following "points and fees" paid by the debtors at closing of the March 2003 loan consisted of the following:

| | | |
|---|---|---|
| Loan Origination Fee | - | $ 9,588.00 |
| Wire Fee | - | $ 30.00 |
| Mortgage Broker Fee | - | $ 6,010.00 |
| Flood Certification Fee | - | $ 20.00 |
| Processing Fee | - | $ 495.00 |
| Underwriting Fee | - | $ 391.00 |
| Tax Service Fee | - | $ 84.00 |
| Settlement Fee | - | $ 300.00 |
| Courier Fee (Paragon) | - | $ 25.00 |
| Total | - | $16,943.00 10 |

FN10. Counsel for the plaintiffs' acknowledged

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that this total was accurate, stating to the Court at the May 26, 2006 hearing: "These [the fees encompassed within §§ 226.4(a) and (b) of Regulation Z as listed above] are all detailed, and I compliment Mr. Washowich [counsel for J.P. Morgan] in his brief ... those are all detailed in his brief and they run to about $16,000."

*See* (Complaint Exhibit C [HUD-1A Settlement Statement] ). These charges, totaling $16,943.00, equate to 7.6% of the total amount financed ($222,840.33). These amounts fall below the 8% threshold set forth in 15 U.S.C. § 1602(aa)(1)(B) and consequently the March 2003 loan transaction fails to qualify as a transaction covered by HOEPA. It is for this reason that the Balkos contend that the "yield spread premium" to be paid to the broker in this case should be included in the Points and Fees Test calculation.

[2][3] It is understandable why the plaintiffs contend that the yield spread premium is included in the Points and Fees Test calculation. Section 226.32(b)(1)(ii) of Regulation Z expressly states that the term "points and fees" includes "All compensation paid to mortgage brokers,"12 C.F.R. § 226.32(b)(1)(ii), which on its face includes any yield spread premium paid to Carnegie Financial. However, the answer to the question of whether or not a yield spread premium is included in the definition of "points and fees" does not end the matter. HOEPA unequivocally states that the statute applies to certain mortgage transactions when "the total points and fees payable by the consumer *at or before closing* exceed *693 the greater of-(I) 8 percent of the loan amount; or (ii) $400." 15 U.S.C. § 1602(aa)(emphasis added). In the matter *sub judice,* the payment of the yield spread premium to the broker-Carnegie Financial-is paid and derived from the stream of interest generated *over the life of the loan,* and is not "payable by the consumer at or before the time of closing." Accordingly, the yield spread premium is not includned the Points and Fees Test calculation set forth in 15 U.S.C. § 1602. *See Noel v. Fleet Finance, Inc.,* 971 F.Supp. 1102, 1106-07 (E.D.Mich.1997).FN11 The disclosure requirements of HOEPA were therefore not implicated in the transaction

at issue. For this reason, the Balkos' Complaint fails to state a claim under TILA (as modified by HOEPA) and Count 2 of the Complaint must be dismissed.FN12

FN11. The Court rejects the Balkos' contention that the lender had a duty to separately disclose the yield spread premium. The Court rejects such a theory because the premium is included in the finance charge assessed by the lender against the borrower. *In re Bell,* 309 B.R. at 153("Even if the yield spread premium in this case is part of the finance charge, it clearly was not paid by the Debtor at or before closing. Therefore, the yield spread premium is not included in the points and fees calculation"); *Stump v. WMC Mortgage Corp.,* No. Civ.A.02-326, 2005 WL 645238 (E.D.Pa. March 16, 2005)(because yield spread premiums are paid out as interest over the course of the life of the mortgage, they are already included in the total finance charge as a higher interest rate and should not be "double-counted" by being listed as a separate itemized finance charge); *Strang v. Wells Fargo Bank, N.A.,* No. Civ.A. 04-CV-2865, 2005 WL 1655886 (E.D.Pa. July 13, 2005)(yield spread premiums are incorporated into higher interest rates and therefore should not be double-counted).

FN12. The debtors acknowledged at the hearing on this matter that they hold no garden variety TILA claims if the heightened disclosure requirements of HOEPA do not apply. For example, counsel for the Balkos acknowledged to the Court at the May 26, 2006 hearing that "I believe that if you rule against me on the HOEPA issue, that is really the crux of our TILA claim," and "I believe that material disclosures [under TILA] were given." The debtors do appear to allege in their papers that some sort of violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.,* occurred in this case. The pleadings filed by the debtors are not entirely clear, but they seem

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to suggest that a RESPA violation occurred as a result of the alleged failure of Carnegie Financial and/or Paragon to timely provide an accurate "good faith estimate" required by RESPA. 12 U.S.C. § 2604. Case law makes clear that RESPA does not provide a private right of action to remedy violations of 12 U.S.C. § 2604. *See Brophy v. Chase Manhattan Mortgage Co.,* 947 F.Supp. 879, 881-83 (E.D.Pa.1996).

### Count 3

#### Common Law Fraud

Count 3 of the plaintiffs' Complaint alleges "fraud" against all of the named defendants. While the Complaint filed by the Balkos is convoluted, their claim for "fraud" seems to revolve around generic allegations that all defendants acted in concert to defraud the Balkos by inducing the Balkos to procure a loan that they could not afford. The defendants have objected to Count 3 of the Complaint citing the lack of specificity and particularity of such claims. The Court finds that the objections of the defendants in this regard do have merit with respect to J.P. Morgan and Paragon.

As a general matter, Federal Courts of the United States adhere to "notice pleading." Fed.R.Civ.P. 8(a)(2). This system of pleading merely requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* There are certain times however, when the Federal Rules require more specific pleading on the part of a complainant. Titled "Pleading Special Matters," Fed.R.Civ.P. 9 deals with such **\*694** instances. These "special matters" include, among other things, averments of fraud or mistake. Fed.R.Civ.P. 9(b). In pleading these claims, "the circumstances constituting fraud or mistake shall be stated with particularity." *Id.* There are several sound reasons for such a particularity requirement, the most important being to provide defendants with proper notice of the claims against them and to provide increased protection for their reputations. *In re Burlington Coat*

*Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997). Also, such a particularity requirement helps to reduce the number of frivolous lawsuits brought solely to extract settlements. *Id.*

[4][5] The Federal Rules' heightened pleading standard regarding fraud and mistake is inherently applicable when dealing with federal statutory claims, such as securities fraud and racketeering allegations. *Id.* Quite often, however, in such circumstances the court is called upon to also analyze ancillary claims for common law fraud under the laws of the various states. While the factors pertaining to such a cause of action may be derived from state law principles and jurisprudence, the particularity requirement contained within Rule 9(b) applies equally to common law fraud claims as well. *See Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177 (5 th Cir.1997)(finding no principled reason why state law fraud claims should escape pleading requirements of federal rules), *cert. denied,*522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997). For this reason, a claim of common law fraud founded upon state law must be addressed with Rule 9(b) in mind.

[6][7] When pleading a claim for fraud, the particularity language in Rule 9(b) requires a plaintiff to specify the time, place and substance of the defendant's alleged fraudulent conduct. *See U.S. ex. rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.,* 149 F.3d 227, 234 (3d Cir.1998)*citing Cooper v. Blue Cross & Blue Shield of Florida,* 19 F.3d 562, 567 (11 th Cir.1994). The claimant must allege more than mere conclusory allegations of fraud or the technical elements of the same. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1418. In a case involving multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud," and should not vaguely attribute allegedly fraudulent statements simply to all "defendants." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993); *see also Balabanos v. North American Inv. Group, Ltd.,* 708 F.Supp. 1488, 1493 (N.D.Ill.1988)(stating that in cases involving multiple defendants "the complaint should inform each defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ant of the specific fraudulent acts that constitute the basis of the action against the particular defendant"). This "fair notice" to defendants is "perhaps the most basic consideration underlying Rule 9(b)." *See Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1381 (11 th Cir.1997)*citing Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 778 (7 th Cir.1994). Consequently, "lumping" multiple defendants in a group (*e.g.,* "defendants misled the plaintiff by stating ...") defeats this notice objective and is therefore improper under Rule 9(b).

[8] Count 3 of Plaintiffs' Complaint is styled as "Fraud" against "All Defendants." The various "fraud claims" alleged by the plaintiffs fail to allege any specific fraudulent conduct attributable to J.P. Morgan and/or Paragon. Indeed, upon several readings of the document, the Court cannot discern any.

[9] At its most basic level, the Complaint alleges that a conspiracy of some sort was perpetrated by the various defendants in order to defraud the Balkos. **\*695** Similar to claims of fraud, a claim of conspiracy to defraud is also subject to the particularity requirements of Rule 9(b). *See Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985) (applying Rule 9(b) particularity requirements to claim for conspiracy to defraud); *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972) (same); *Klein v. Council of Chem. Ass'ns,* 587 F.Supp. 213, 226-27 (E.D.Pa.1984) (same); *but see U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.,* No. Civ.A. 94-7316, 2000 WL 1207162 (E.D.Pa. August 24, 2000).

To use the term "lumping" to describe the allegations against all defendants in Count 3 of the Complaint would be a generous characterization. By way of example, paragraph 84 of the Complaint begins: "The Defendants conspired together and acted in concert to defraud the Plaintiffs in some or all of the following particulars:" and then proceeds to set forth various generic misdeeds committed by unidentified actors.[FN13] In doing so, the plaintiffs have miscarried their burden to state a claim for fraud with particularity required under Rule 9(b) against J.P. Morgan and/or Paragon.

FN13. The catch-all contentions of "fraud" and

"conspiracy" *appear* to be that: (1) "the defendants" used a fraudulent appraisal in order to obtain an unaffordable loan for the plaintiffs, the ultimate goal being to "flip" the defendants house and "reap profits and fees and costs," [*see* Complaint at ¶¶ 84(B) and (E)]; (2) "the defendants" misled the plaintiffs "as to the true nature" of the financing, including switching the interest rate "at the last minute," [*Id.* at ¶¶ 84(A) and (D)]; (3) "the defendants" each "committed fraud by breaching their fiduciary duty to the Plaintiffs," misled the plaintiffs as to the "necessity" and "benefits" of refinancing their home, and represented to the plaintiffs that they were receiving credit "under the most favorable conditions" when there was in fact credit available "under more favorable conditions," [*Id.* at ¶¶ 84(C), (G), (H), (I), and (J)]; and (4) "the defendants" each "padded" the loan fees "to maximize profits for the broker and lender at the expense of the borrower," [*Id.* at ¶ 84(F)]. Nowhere in the Complaint, however, do the Balkos specifically spell out what role each defendant played in the "scheme" or identify any specific employees (other than Mr. Behrens of Carnegie Financial) of each defendant who participated in the alleged "schemes." In fact, at its most basic level, the Balkos complain that Mr. Behrens failed to honor his alleged promises. Nothing in the Complaint ties Mr. Behrens alleged promises to the remaining defendants, including J.P. Morgan or Paragon. Nor does the Complaint indicate the legal basis on which the Balkos claim the defendants were fiduciaries of the plaintiffs. Nor does the Complaint identify how the Balkos could have detrimentally relied upon an appraisal provided by Allegheny Appraisals and Chet Underhill, when the Balkos received the benefit of the March 2003 loan and nothing in the Complaint indicates that the appraisal was actually provided to the Balkos before the closing of the loan. In fact, the documents attached to the Complaint reflect that the appraisal was provided to Carnegie Financial

for the purpose of underwriting the loan. *See Id.* at Exhibit A. Therefore, it appears that the lender who ultimately made the loan was the person or entity that relied on the appraisal.

Indeed, it appears to the Court that plaintiffs' cause of action against J.P. Morgan and Paragon in Count 3 even fails to adhere to the more relaxed notice pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure. The Court reaches this conclusion because the Complaint is devoid of any allegations of wrongful conduct committed by Paragon and/or J.P. Morgan.

[10][11] Because plaintiffs have failed to adequately plead their fraud cause of action, Count 3 against Paragon will be dismissed without prejudice. With respect to the fraud claim against J.P. Morgan, the Court dismisses Count 3 with prejudice. Dismissal of Count 3 with prejudice as to J.P. Morgan is appropriate because counsel to the Balkos acknowledged at the hearing on this matter that J.P. Morgan had no involvement whatsoever with the **696** solicitation, underwriting, or closing of the March 2003 loan. In fact, it was acknowledged that J.P. Morgan's involvement in this case merely arises as a result of the fact that Paragon had, subsequent to closing of the loan, pooled and securitized the note and mortgage executed by the Balkos. Consequently, as of the date the Balkos commenced this bankruptcy, J.P. Morgan, as trustee, was the holder of the note and mortgage and for this reason the Balkos named J.P. Morgan as a defendant to this action. Under these circumstances, it is undisputed that J.P. Morgan neither participated, caused, encouraged, aided and/or solicited any of the alleged fraudulent activities complained by the Balkos. It is also undisputed that none of the defendants were acting in an agency capacity vis-a-vis J.P. Morgan. FN14 For these reasons, the Court finds that no relief could be granted under Count 3 in favor of the plaintiffs against J.P. Morgan under any set of facts that could be proved consistent with the allegations in the complaint. As such, Count 3 must be dismissed with prejudice insofar as the claims asserted against J.P. Morgan. FN15

FN14. Counsel to the plaintiffs acknowledged at the May 26, 2006 hearing that J.P. Morgan

asserted absolutely no control over the activities of the other defendants.

FN15. The Court is mindful that at the hearing on the Motion to Dismiss plaintiffs contended that Article 3 of the Uniform Commercial Code (the "UCC") allows the Balkos to pursue affirmative fraud claims against J.P. Morgan. When pressed for authority supporting this proposition, counsel for the Balkos offered none. The Court submits that the Balkos reading of Article 3 of the UCC is somewhat misguided. While UCC § 3-305 provides that certain types of fraud may, under some circumstances, be a defense against the right of a payee or transferee to enforce a negotiable instrument (see footnote 18, infra), UCC § 3-305 does not provide for the recovery of *affirmative damages* against the assignee of such an instrument. *See In re Grayboyes,* Civ. A. 05-1780, 2006 WL 437546 at *3 (E.D.Pa.Feb.22, 2006) (stating that there are "several requirements" to the applicability of the equitable doctrine of recoupment under Pennsylvania law, one being that it "must be asserted defensively"). For this reason, the Court also rejects the Balkos' affirmative claim for fraud against J.P. Morgan.

With respect to the remaining defendants, Carnegie Financial, Joseph Behrens, Allegheny Appraisals, and Chet Underhill, the Court will not dismiss the common-law fraud claim located at Count 3 at this time. The Court recognizes that some of these defendants have asserted various theories as to why the fraud claims contained in Count 3 of the lawsuit should be dismissed (such as by reason of passing of statute of limitations, the "gist of the action doctrine," etc.). The Court, however, declines to accept the arguments of the remaining defendants at this early stage of the case. It is the Court's opinion that the Complaint adequately puts Carnegie Financial, Joseph Behrens, Allegheny Appraisals and Chet Underhill on notice of the sort of claims asserted by the Balkos against them. The remaining defendants can assert such defenses either at summary judgment or at trial.

Count 4

*Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Act*

[12][13][14] Count 4 of the plaintiffs' Complaint alleges various violations of 73 P.S. § 2181 *et seq.* (the "Credit Services Act") and 73 P.S. § 201-1*et seq.* (the "Unfair Trade Practices and Consumer Protection Law-UT-PCPL"). (*See* Complaint at ¶¶ 84-91). As these statutes provide for a cause of action in some instances of fraudulent and/or deceptive conduct, this Court determines the heightened pleading standards of Rule 9(b) are applicable. *See e.g. In re Suprema Specialties, Inc.,* 438 F.3d 256, 270-272 (3d Cir.2006)(holding that **\*697** causes of action sounding fraud like are subject to the heightened pleading requirements of Rule 9(b)); *Learning Express, Inc. v. Ray-Matt Enterprises, Inc.,* 74 F.Supp.2d. 79, 87 (D.Mass.1999) (holding that the pleading requirements of Rule 9(b) are required with respect to an action based on the New Jersey Consumer Fraud Act); *see also Fass v. State Farm Fire and Casualty Company,* C.A. No. 06-02398, 2006 WL 2129098 at *2 (E.D.Pa. July 26, 2006). This conclusion is consistent with the fact that Rule 9(b) serves several purposes, including, to place defendants on fair notice of the claims made against them, to safeguard defendants against spurious accusations and to enable defendants to protect themselves from the resulting reputational harm. *See* Baicker-McKee et al., *Federal Civil Rules Handbook* at 258 (Thomson West, 2003).[FN16] For the reasons discussed above relating to the fraud claims, it appears that the Balkos have not adequately pled violations of the Unfair Trade Practices Act and Credit Services Act against Paragon and J.P. Morgan. In fact, it appears to the Court that even under the more liberal pleading requirements of Rule 8(a), the Balkos have not adequately plead a cause of action against Paragon and J.P. Morgan. The Court reaches this conclusion because there are no facts alleged in the Complaint which actively place Paragon and J.P. Morgan in the marketing or solicitation of the March 2003 loan. The Court therefore dismisses Count 4 against Paragon without prejudice, and dismisses Count 4 against J.P. Morgan with preju-

dice.[FN17]

FN16. Some courts have concluded that since various unfair trade practices statutes regulate deceptive conduct, as well as fraudulent conduct, claims made merely on deceptive practices need not be plead with specificity. *See e.g. Christopher v. First Mutual Corp.,* No. Civ.A. 05-01149, 2006 WL 166566 at *3 (E.D.Pa. Jan.20, 2006). This Court declines to follow such decisions, and holds that there is no material pleading difference between "deceptive" conduct and "fraudulent" conduct. Indeed, the term "deception" is very similar to fraud, and is defined as "intentional misleading by falsehood spoken or acted." *Id.* (citing *Black's Law Dictionary* 406 (6th ed.1990)). *Cf. U.S. ex rel. Clausen v. Lab. Corp. of America, Inc.,* 290 F.3d 1301, 1308-09 (11th Cir.2002)(holding that Rule 9(b) applies to claims made under the False Claims Act).

FN17. The Credit Services Act regulates activities of "credit service organizations" and "loan brokers." Dismissal of the Credit Services Act claim against J.P. Morgan also appears appropriate because J.P. Morgan is not a "credit services organization" under the statute. Specifically, the statute, at 73 P.S. § 2182, expressly excludes any bank or trust company from being a "credit services organization" under the statute. No party to the litigation disputes the fact that J.P. Morgan is either a bank or trust company. In addition, the plaintiffs Complaint fails to allege that J.P. Morgan is a "loan broker," and plaintiffs made no averment or argument at the May 26, 2006 hearing to the effect that J.P. Morgan is a "loan broker" for purposes of the Credit Services Act. Moreover, because J.P. Morgan had no involvement in this case until well after the closing of the March 23, 2006 loan, the Court is unable to discern any colorable claim that the Balkos may have against J.P. Morgan under the Credit Services Act.

With respect to the remaining defendants, Carnegie Fin-

348 B.R. 684

**(Cite as: 348 B.R. 684)**

ancial, Joseph Behrens, Allegheny Appraisals, and Chet Underhill, the Court will not dismiss the state law consumer protection causes of action located at Count 4 at this time. Each of these defendants may renew their defenses at appropriate stages later in this litigation (i.e., at summary judgment or at trial).

### Count 1

### *Objection to Claim/Request for Recoupment*

[15][16][17] Count 1 of the plaintiffs' Complaint is captioned as an objection to the claim of J.P. Morgan and is in the nature **\*698** of a "request for recoupment." The plaintiffs allege in their Complaint that the proof of claim filed by J.P. Morgan "does not accurately reflect the proper amounts due as it does not account for the Plaintiffs' common law recoupment rights especially due to the original fraud and truth-in-lending violations by the mortgagor [sic]." (Complaint at ¶ 72). Because the legal predicate(s) for the Balkos' recoupment claims appear to be the substantive claims for relief contained in Counts 2, 3 and 4 of their Complaint, and because Counts 2, 3 and 4 of the Complaint are dismissed as to J.P. Morgan, the Court concludes that the Balkos' objection to the J.P. Morgan claim is without merit.FN18 Consequently, the Court overrules the objection.FN19

> FN18. The Court recognizes that in their Response Memorandum to Defendant J.P. Morgan's Motion to Dismiss (Document No. 26), the plaintiffs have asserted recoupment rights against J.P. Morgan under Article 3 of the UCC. The Balkos contend in their Response Memorandum that if any of the defendants are found to have defrauded the Balkos, Article 3 of the UCC may provide the Balkos with recoupment rights against J.P. Morgan "because they [the Balkos] have made allegations of fraud in the inducement." The Balkos further allege that "Pennsylvania law provides that a holder in Due Course [sic] is not protected against an allegation of fraud in the inducement made by the maker of the note. **13 Pa.C.S.A.**

**3305.**[sic]" The Balkos, however, misconstrue Article 3 of the UCC. According to Pennsylvania law, every holder of a negotiable instrument is deemed, *prima facie,* a holder in due course subject to a rebuttable presumption to the contrary. *See Morgan Guaranty Trust Co. of New York v. Staats,* 428 Pa.Super. 479, 631 A.2d 631, 636 (1993). Therefore, without specific allegations to the contrary, J.P. Morgan, as holder of the note, is a holder in due course. It is well-established that fraud in the factum is a defense under § 3-305 of the UCC, while fraud in the inducement is not. *See Exchange International Leasing Corp. v. Consolidated Business Forms Co., Inc.,* 462 F.Supp. 626, 628 (W.D.Pa.1978). Fraud in the factum, also known as "real" or "essential" fraud, is commonly depicted in terms of "a maker who is tricked into signing a note in the belief that it is merely a receipt or some other document. The theory of the defense is that the signature on the instrument is ineffective because the signer did not intend to sign such an instrument at all." *See* 13 Pa.C.S.A. § 3305, Comment 1. The fraud in this case, as alleged by the plaintiffs, consists of fraud in the consideration for, or in negotiations leading up to, the execution of a negotiable instrument; not in the execution of the note itself in favor of the lender. The Balkos' Complaint therefore fails to adequately plead fraud in the factum, and their reliance on UCC § 3-305 is misplaced.

> FN19. Having dismissed Counts 1 through 4 of the Complaint against both J.P. Morgan and Paragon, the Court does not at this time address any of the various other defenses asserted by these parties in this proceeding.

### IV. *CONCLUSION*

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052. For reasons set forth more fully in this Memorandum Opinion, the Court concludes that the Motion to Dismiss, in part, is well founded and, as a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

result: (1) Count 1 of the Complaint (as it relates to the debtors' objection to claim and purported claim sounding in recoupment) against J.P. Morgan shall be dismissed without prejudice; (2) Count 2 of the Complaint (Truth in Lending Act claims) shall be dismissed as to all defendants for failure to state a claim upon which relief may be granted; (3) Count 3 (common-law fraud claims) shall be dismissed as to J.P. Morgan and Paragon for lack of specificity in pleading and for failure to state a claim upon which relief could be granted; said dismissal shall be with prejudice as to J.P. Morgan and without prejudice as to Paragon; and (4) Count 4 (Pennsylvania Unfair Trade Practices and Consumer Protection Act claims) shall be dismissed as to J.P. Morgan**699** and Paragon for lack of specificity in pleading and failure to state a claim upon which relief could be granted; said dismissal shall be with prejudice as to J.P. Morgan and without prejudice as to Paragon. The Court denies the Motion to Dismiss with respect to the causes of action asserted in Counts 3 and 4 against defendants Carnegie Financial, Joseph Behrens, Allegheny Appraisals, and Chet Underhill. An Order consistent with this Memorandum Opinion shall be issued.

Bkrtcy.W.D.Pa.,2006.
In re Balko
348 B.R. 684

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Slip Copy

Slip Copy, 2007 WL 1424614 (N.D.Ill.)
**(Cite as: 2007 WL 1424614 (N.D.Ill.))**

Page 1

**H**
Lantz v. American Honda Motor Co., Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Ron LANTZ, Dennis Gribbins, Richard Allen and
Clarence Alvord, individually and on behalf of all
others similarly situated, Plaintiffs,
v.
AMERICAN HONDA MOTOR COMPANY, INC.,
Defendant.
No. 06 C 5932.

May 14, 2007.

Elizabeth A. Fegan, Hagens Berman Sobol Shapiro
LLP, Oak Park, IL, Timothy Patrick Mahoney,
Daniel J. Kurowski, Hagens Berman Sobol Shapiro
LLP, Chicago, IL, Steve W. Berman, Hagens &
Berman, Seattle, WA, for Plaintiffs.
Charlene M. Yaneza, David Brian Johnson, Mi-
chael Christian Andolina, Sidley Austin LLP,
Chicago, IL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

NAN R. NOLAN, United States Magistrate Judge.
**\*1** Plaintiffs Ron Lantz, Dennis Gribbins, Richard
Allen, and Clarence Alvord filed a class action
complaint against Defendant American Honda Mo-
tor Company, Inc. ("Honda"), alleging a variety of
state law claims arising from Honda's deceptive and
unlawful conduct in designing, manufacturing, mar-
keting, distributing, selling, servicing and/or failing
to service, GL1800 Gold Wing Motorcycles. The
parties have consented to the jurisdiction of the
United States Magistrate Judge pursuant to 28
U.S.C. § 636(c). Honda now moves to dismiss all
of Plaintiffs' claims. For the reasons set forth here,
the motion is granted in part and denied in part.

### *BACKGROUND*[FN1]

FN1. In reviewing this motion to dismiss,
the court accepts all well-pleaded factual
allegations in the complaint. *Richards v.
Kiernan*, 461 F.3d 880, 882 (7th Cir.2006).

**A. The Parties**

Honda is a California corporation with its principal
place of business in Torrance, California. Honda
designs, manufactures, markets, distributes, sup-
plies, sells, and services motorcycles and other
vehicles in the United States. (Cmplt.¶ 10.)[FN2]In
1975, Honda produced a Gold Wing GL1000 model
motorcycle and became a front-runner in the manu-
facture of "luxury touring motorcycles." These mo-
torcycles are designed for ultimate comfort and
convenience, and usually have "the biggest engines;
great acceleration and cruising speed; lots of stor-
age including top trunks and saddlebags; amenities
like cruise control, stereo radios, CB communica-
tions, large windshields, heated seats and grips; and
high reliability."(*Id.* ¶¶ 11, 12.)In 2001, Honda in-
troduced a new Gold Wing GL1800 model. (*Id.* ¶
13.)Honda advertised the new motorcycle as being
perfect for touring long distances, and capable of
handling on highways across America, whether
straight, curvy, flat, or mountainous. (*Id.* ¶ 14.)

FN2. The Class Action Complaint is cited
as "Cmplt. ¶ ----."

Ron Lantz is a citizen of Florida who purchased a
2002 Gold Wing GL1800 in September 2002 from
an authorized Honda dealership in Leesburg, Flor-
ida.(*Id.* ¶¶ 6, 23.)Dennis Gribbins, a citizen of
Illinois, purchased his 2002 Gold Wing GL1800AZ
from an authorized Honda dealer in Bradley,
Illinois on November 15, 2001. (*Id.* ¶¶ 7,
27.)Richard Allen is a citizen of Florida who pur-
chased a pre-owned 2002 Gold Wing GL1800 from
an authorized Honda dealership in Leesburg, Flor-
ida in August 2006. (*Id.* ¶¶ 8, 31.)Clarence Alvord,
also a citizen of Florida, purchased a 2005 Gold
Wing GL1800 from an authorized Honda dealer-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)
(Cite as: 2007 WL 1424614 (N.D.Ill.))

ship in Venice, Florida on March 3, 2005. (*Id.* ¶¶ 9, 35.)

## B. The Gold Wing Wobble

Plaintiffs allege that the Gold Wing GL1800 model has a design defect that causes it to wobble at low speeds between 25 and 40 mph. As a result, Gold Wing GL1800 owners are not able to use the motorcycle for touring at higher speeds and long distances, as advertised and intended. (*Id.* ¶¶ 15, 16.)According to Plaintiffs, "[a] wobble should be corrected immediately as it can cause a serious accident and even death."(*Id.* ¶ 15.)Honda, however, has concealed the design defect, describing it as merely a "characteristic" of the Gold Wing GL1800 model. As a result, Honda has consistently declined to recall the motorcycle or to pay for needed repairs. (*Id.* ¶¶ 17, 22, 41.)

*2 Frustrated consumers have turned to the internet, where they post complaints and seek to share and obtain information about the wobble problem.(*Id.* ¶ 18.)In addition, Wing World magazine, which bills itself as the world's largest monthly magazine specifically targeted to the interests of the Honda Gold Wing and Valkyrie motorcyclist, has featured two articles in March and June 2006 discussing the low speed wobble. (*Id.* ¶¶ 19, 20.)

## C. Plaintiffs' Experiences

Plaintiffs claim that they have all personally experienced the wobble problem with their Gold Wing motorcycles. After riding his new Gold Wing for approximately 3,000 miles, for example, Ron Lantz noted a severe wobble at speeds between 25 and 40 miles per hour ("mph").(*Id.* ¶¶ 6, 25.)Lantz took the motorcycle back to the dealership and was told that the wobble stemmed from faulty tires. Lantz replaced the tires several times and added a Super-Brace fork stabilizer, but none of these efforts fixed the wobble. Finally, Lantz solved the problem by replacing the steering head bearings with tapered bearings. (*Id.* ¶ 25.)In all, Lantz spent in excess of

$2,500 to fix his Gold Wing, but Honda refused to pay for any of the repairs. (*Id.* ¶ 26.)

Dennis Gribbins rode his new motorcycle only 5,978 miles before it, too, developed a wobble on July 27, 2002 at speeds of approximately 35 to 45 mph. Over the next four years, Gribbins took his Gold Wing to numerous dealers and repair shops, but none was able to fix the wobble. Throughout this period, Gribbins also complained about the problem to Honda and its authorized dealers, and asked the Company to reimburse him for the repair expenses. (*Id.* ¶¶ 27-29.)In May 2006, Gribbins finally fixed the wobble by installing new tapered steering head bearings. (*Id.* ¶ 30.)

Richard Allen first noticed a severe wobble on his pre-owned Gold Wing while riding the motorcycle home from the dealership in August 2006. The wobble occurred at speeds between 30 and 40 mph, and Allen feared losing control of the motorcycle. He contacted the Honda dealership and was informed that they knew about the problem but could not fix it. When Allen contacted Honda's TechLine, however, he was told to contact his dealer. Allen has since replaced the Gold Wing's tires, but this has not eliminated the wobble. (*Id.* ¶¶ 32-34.)

Clarence Alvord's Gold Wing developed a wobble in May 2005, with only 2,000 miles on the motorcycle. The wobble was significant at speeds of 35 to 40 mph, and somewhat lesser at speeds of 10 to 20 mph. (*Id.* ¶ 35.)Alvord spent the next year taking his motorcycle to authorized dealerships in Florida and Ohio, but none could fix the wobble. At the suggestion of the dealerships, Alvord changed the tires twice and installed a fork brace, but these efforts failed. Throughout this time, Alvord complained about the problem to Honda and its authorized dealerships, but Honda refused to help or reimburse Alvord for his expenses in attempting to fix the wobble. (*Id.* ¶¶ 37-40.)

## D. Plaintiffs' Lawsuit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)
(Cite as: 2007 WL 1424614 (N.D.Ill.))

**\*3** Plaintiffs filed this federal class action diversity jurisdiction lawsuit on November 1, 2006. Counts I through VI seek recovery under a variety of California state laws, including the California Business and Professions Code, Cal. Bus. & Prof.Code §§ 17200 *et seq.* (Count I) and §§ 17500*et seq.* (Count II); the California Civil Code, Cal. Civ.Code §§ 1750*et seq.* (Count III); the California Commercial Code, Cal. Comm.Code §§ 2313 and 2314 (Counts IV and V); and California's common law of unjust enrichment. In these counts, Plaintiffs allege that Honda has violated California's unfair competition law; utilized untrue and misleading advertising; violated the California Consumers Legal Remedies Act; breached express and implied warranties; and unjustly benefitted from its unlawful conduct at Plaintiffs' expense.

Plaintiffs also allege four alternative counts in the event the court finds that class-wide application of California law is inappropriate. Each of these counts alleges violations of the laws of the District of Columbia and every state except California. Specifically, Alternate Count I alleges violation of state consumer protection laws; Alternate Counts II and III allege breach of state express and implied warranties, respectively; and Alternate Count IV alleges claims for common law unjust enrichment.

On December 18, 2006, Honda moved to dismiss the Complaint in its entirety for failure to state a claim. Shortly thereafter, on December 28, 2006, the parties consented to the jurisdiction of the United States Magistrate Judge. On January 8, 2007, Honda moved to stay discovery pending a ruling on the motion to dismiss, and the court granted the stay on March 7, 2007. (Minute Order of 3/7/07, Doc. 35.) The court now addresses Honda's motion to dismiss.

### DISCUSSION

The purpose of a motion to dismiss is to test the sufficiency of plaintiffs' complaint, not to decide its merits. *Gibson v. City of Chicago,* 910 F.2d 1510,

1520 (7th Cir.1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the plaintiffs' complaint and draws all reasonable inferences in their favor.*Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 770 (7th Cir.2002).

Honda argues that Counts I through VI must be dismissed because Illinois conflict of laws principles do not support the application of California law. Honda claims that Alternate Counts I through IV must also be dismissed with respect to all states except Illinois and Florida, which are the only states in which Plaintiffs reside. As for the Illinois and Florida state law claims, Honda argues that they all fail because Plaintiffs have not pled fraud with particularity; the statute of limitations has run on the warranty claims; and Plaintiffs have an adequate remedy at law precluding any recovery for unjust enrichment. The court considers each argument in turn.

### A. The California Law Counts

**\*4** Honda argues that Illinois conflict of law principles require that the California state law counts be dismissed. Before assessing the merits of this argument, the court first addresses Plaintiffs' assertion that it is premature to consider the choice-of-law issue prior to class certification.

### 1. Timing of Conflicts Analysis

Plaintiffs seek certification of a nationwide class under Rule 23(b)(2) and (b)(3). Plaintiffs note that "choice-of-law issues in nationwide class actions are rarely so uncomplicated that one can delineate clear winning and losing arguments at an early stage in the litigation."*Mirfasihi v. Fleet Mortg. Corp.,* 450 F.3d 745, 750 (7th Cir.2006). None of Plaintiffs' cited cases, however, stands for the pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)
(Cite as: 2007 WL 1424614 (N.D.Ill.))

position that choice-of-law issues must await a determination as to class certification. In *Mirfasihi*, for example, the court considered whether to approve a proposed class action settlement, noting that "it would seem that the legal uncertainty resulting from the complicated choice-of-law issues in this case should not cut solely against the value of plaintiff's claims here, but should also be a factor in considering the value of Fleet's defenses."*Id.* Nowhere in the case does the Seventh Circuit address the timing of choice-of-law determinations relative to motions to dismiss.

In *Spence v. Glock, Ges.m.b.H.,* 227 F.3d 308 (5th Cir.2000), and *In re St. Jude Med., Inc. Silzone Heart Valve Prod. Liab. Litig.,* 425 F.3d 1116 (8th Cir.2005), the Fifth and Eighth Circuits rejected nationwide class certifications where the district court adopted one state's consumer protection law without conducting a proper choice-of-law analysis. 227 F.3d at 313-14, 425 F.3d at 1120. The Eighth Circuit expressly relied on the Seventh Circuit's pronouncement in *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012 (7th Cir.2002), that "[s]tate consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules."*Id.* (quoting *In re Bridgestone/Firestone,* 288 F.3d at 1018). Neither of these cases requires that the court delay a choice-of-law analysis to the time of class certification. Indeed, both cases undermine the theory that a nationwide California class will be appropriate at all. The court thus turns to the merits of Honda's conflicts argument.

**2. Conflicts Analysis**

It is well-established that in a diversity suit such as this, "the federal court applies the conflicts principles of the state in which it sits."*Carris v. Marriott Int'l, Inc.,* 466 F.3d 558, 560 (7th Cir.2006). Illinois conflicts principles "require the court to select the law of the jurisdiction that has the 'most significant relationship' to the events out of which the suit arose, and to the parties."*Id.* (citing *Esser v.*

*McIntyre,* 169 Ill.2d 292, 297-98, 214 Ill.Dec. 693, 661 N.E.2d 1138, 1141 (1996)). For tort claims, courts look to (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *Tanner v. Jupiter Realty Corp.,* 433 F.3d 913, 916 (7th Cir.2006)."[T]he law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties."*Id.* at 915-26 (quoting *Esser,* 169 Ill.2d at 298, 214 Ill.Dec. 693, 661 N.E.2d at 1141). For contract claims, courts consider (1) the place of contracting; (2) the place of the negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile and nationality of the parties. *Curran v. Kwon,* 153 F.3d 481, 488 (7th Cir.1998).

**\*5** In this case, Plaintiffs purchased and used their Gold Wing motorcycles in Florida and Illinois, the states in which they reside. Any alleged fraud made in connection with the purchases occurred at the points of purchase in those two states. Assuming Plaintiffs allege fraud or misrepresentations originating in California, moreover, Plaintiffs received and acted on the representations in Florida and Illinois, and that is where the parties' relationships are centered. *See, e.g., Clark v. Experian Info. Solutions, Inc.,* No. 03 C 7882, 2005 WL 1027125, at \*3 (N.D.Ill. Apr.26, 2005) (quoting *In re Bridgestone/Firestone,* 288 F.3d at 1017) ("The Seventh Circuit has unequivocally held that in a consumer fraud case, 'the injury is decidedly where the *consumer* is located.'") (emphasis in original). In addition, Plaintiffs negotiated and contracted to buy the motorcycles in Florida and Illinois, and that is where delivery occurred and where the motorcycles are located. It is true that Honda is domiciled in California, but this is the least significant factor and does not suffice to establish a more significant relationship with that state.FN3 *See CSX Transp., Inc. v. Chicago and North Western Transp. Co.,* 62 F.3d 185, 189 (7th Cir.1995) (citing Restatement (Second) of Conflicts § 188(3)) (noting that if the

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)
(Cite as: 2007 WL 1424614 (N.D.Ill.))

place of contract negotiation and performance are the same, that state's law usually will apply).

> FN3. Plaintiffs allege that Mr. Gribbins, Mr. Allen, and Mr. Alvord communicated with Honda, but all such communications occurred after the men purchased their motorcycles and cannot form the basis of the fraud claims.

Plaintiffs nonetheless argue that California law should apply based on an Illinois Appellate Court's decision in *Barbara's Sales, Inc. v. Intel Corp.,* 367 Ill.App.3d 1013, 306 Ill.Dec. 318, 857 N.E.2d 717 (5th Dist.2006). The plaintiffs in *Barbara's Sales* filed a nationwide class action lawsuit on behalf of purchasers of computers containing Intel Pentium 4 computer processors. *Id.* at 1014, 306 Ill.Dec. 318, 857 N.E.2d at 718. The plaintiffs alleged that Intel engaged in unfair business practices by concealing information that the Pentium 4 processor "does not perform to the expectations of a reasonable consumer."*Id.* The court determined that all 50 states and the District of Columbia "bear some relationship to this litigation by virtue of the nationwide sales of computers containing Pentium 4 processors."*Id.* at 1019, 306 Ill.Dec. 318, 857 N.E.2d at 722. The court held, however, that California had the most significant relationship to the litigation. In reaching this conclusion, the court noted that (1) Intel is headquartered in California; (2) Intel's corporate marketing and press relations groups are located in California; (3) Intel launched a billion-dollar marketing strategy based upon putting forth a consistent message across all 50 states; (4) the Intel group responsible for the design of the Pentium 4 processor was located in California; and (5) Intel tested the Pentium 4 processor in California and disseminated the results from that state. *Id.* at 1015, 1019, 306 Ill.Dec. 318, 857 N.E.2d at 719, 722.

The court also found it significant that "[t]he needs of the interstate system and the basic policies of predictability and uniformity of result require one forum with one result rather than results in 51 jurisdictions with the distinct possibility of conflicting

decisions."*Id.* at 1019, 306 Ill.Dec. 318, 857 N.E.2d at 722. The court cautioned, however, that "[o]ur decision today should not ... be considered a new rule requiring courts to always apply the consumer fraud law of a foreign state to adjudicate the claims of Illinois residents for products purchased in Illinois if the defendant's place of business is outside Illinois and the alleged misconduct originated from the defendant's place of business."*Id.* at 1020, 306 Ill.Dec. 318, 857 N.E.2d at 723. The court described its decision as "a narrow one" and acknowledged that "in another factual situation, this analysis might very well produce a different result."*Id.* at 1020-21, 306 Ill.Dec. 318, 857 N.E.2d at 723.

\*6 The court is not persuaded that the narrow holding in *Barbara's Sales* is applicable here. Plaintiffs have not alleged that Honda engaged in a billion-dollar marketing campaign for its Gold Wing GL1800 model. Rather, the Complaint states only that Honda has generally "advertised and marketed the Gold Wing," including posting stories and maintaining a video on the Honda website. (Cmplt.¶¶ 12-14.) *Compare Huthwaite, Inc. v. Randstad General Partner (US), L.L.C.,* No. 06 C 1548, 2006 WL 3065470, at \*3 (N.D.Ill. Oct.24, 2006) (following *Barbara's Sales* in case involving "a broad campaign involving many companies.") Nor are there any allegations regarding the testing of the motorcycles or the dissemination of any related results.

Even assuming Plaintiffs could add such allegations, moreover, the court finds the analysis contrary to established Illinois and Seventh Circuit case law. *See, e.g., Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 489, 221 Ill.Dec. 389, 675 N.E.2d 584, 588 (1996) (applying Illinois law to consumer fraud claims asserted by Illinois residents under "most significant relationship" test); *Nicholson v. Marine Corps West Fed. Credit Union,* 953 F.Supp. 1012, 1015-16 (N.D.Ill.1997) (dismissing claim under California Business and Professions Code, even though defendant's principal place of business was in California, where the plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)
(Cite as: 2007 WL 1424614 (N.D.Ill.))

resided in Illinois, the parties' relationship was centered in Illinois, and the injury occurred in Illinois). Notably, the decision in *Barbara's Sales* is currently on appeal to the Illinois Supreme Court. 222 Ill.2d 567, 861 N.E.2d 653 (2006).

Plaintiffs have failed to demonstrate that California law should apply in this case, and their claims under California state law (Counts I through VI) are all dismissed.

**B. The Alternate Counts**

Plaintiffs have asserted four alternative claims under the laws of the District of Columbia and all 50 states except California. Specifically, Plaintiffs allege violations of state consumer protection laws; breach of state express and implied warranties; and claims for common law unjust enrichment.

As a preliminary matter, the court agrees with Honda that Plaintiffs cannot assert claims under the laws of any state except Florida and Illinois, the two states in which they reside. None of the Plaintiffs alleges any connection whatsoever between his claims and the other jurisdictions. As discussed above, Illinois choice-of-law principles require application of Florida and Illinois law. Plaintiffs do not argue otherwise.

Honda contends that the Florida and Illinois claims all fail because Plaintiffs have not pled fraud with particularity; the statute of limitations has run on the warranty claims; and Plaintiffs have an adequate remedy at law precluding any recovery for unjust enrichment. The court considers each in turn.

**1. The Consumer Fraud Claims**

The Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1*et seq.*, prohibits deceptive acts or practices that occur in the course of conduct involving trade or commerce, and that proximately cause damage to the plaintiff. *See Geschke v. Air Force Ass'n,* 425 F.3d 337, 345 (7th Cir.2005). The Flor-

ida Deceptive and Unfair Trade Practices Act ("DUTPA"), Fl. Stat. §§ 501.201*et seq.,* similarly prohibits deceptive acts or unfair practices that cause actual damage to the plaintiff. *See Marino v. Home Depot U.S.A., Inc.,* No. 06-80343-CIV., 2007 WL 201260, at *7 (S.D.Fla. Jan.24, 2007). Honda argues that the claims of several Plaintiffs are barred by the applicable statutes of limitations, and that none of the Plaintiffs has alleged a fraud claim with the particularity required by FED. R. CIV. P. 9(b) in any event.

**a. Statutes of Limitations**

*7 Honda argues that Mr. Gribbins' ICFA claim and Mr. Lantz's DUTPA claim are both time-barred. The statute of limitations for ICFA claims is three years. 815 ILCS 505/10a(e). A claim accrues under the ICFA "when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused."*Tammerello v. Ameriquest Mortg. Co.,* No. 05 C 466, 2006 WL 2860936, at *7 (N.D.Ill. Sept. 29, 2006). Mr. Gribbins purchased his Gold Wing on November 15, 2001 and became aware of the wobble on July 27, 2002. (Cmplt.¶ 27.) Mr. Gribbins did not file this lawsuit, however, until November 1, 2006, more than three years later.

Plaintiffs do not dispute these dates, but argue that Mr. Gribbins "exercised due diligence in interacting with Honda and its dealers in attempting to remedy the wobble," and should not now be penalized for "dealing with Honda in Honda's suggested manner."(Pl. Resp., at 9.) The Illinois doctrine of equitable estoppel can toll the running of the statute of limitations, but only where the defendant took "active steps to prevent the plaintiff from suing in time, ... such as by hiding evidence or promising not to plead the statute of limitations."*Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.,* 11 F.Supp.2d 1006, 1011 (N.D.Ill.1998) (internal quotations omitted); *Ruffin v. Kane County Sheriff Dep't,* No. 01 C 4898, 2006 WL 2088186, at *23 (N.D.Ill. July 21, 2006). Plaintiffs "must plead spe-

cific facts to support the court's tolling of the statute of limitations."*Ogilvie v. Beale*, No. 93 C 2934, 1994 WL 33972, at *6 (N.D.Ill. Feb.4, 1994).

Plaintiffs' allegations that Mr. Gribbins contacted Honda but found the representatives to be unhelpful and rude are not sufficient to plead estoppel. Plaintiffs do not allege that Honda made any representations with the specific intent to prevent Plaintiffs from filing suit within the limitations period, or that they would have filed suit earlier had they not relied on such representations. *See National Black Expo v. Clear Channel Broadcasting, Inc.*, No. 03 C 2751, 2007 WL 495307, at *7 (N.D.Ill. Feb.8, 2007) (equitable estoppel did not apply where the plaintiff "has not alleged sufficient facts, nor plead th[at] theor[y] with the required specificity.") Thus, Mr. Gribbins' ICFA claim is untimely and must be dismissed.

The Florida DUTPA does not have an express statute of limitations. Courts thus apply Florida's general four year statute of limitations for unfair and deceptive trade practices claims. *See* Fla. Stat. § 95.11(3)(f); *Yusuf Mohamed Excavation, Inc. v. Ringhaver Equip. Co.*, 793 So.2d 1127, 1128 (Fla.Dist.Ct.App.2001). Mr. Lantz purchased his Gold Wing in September 2002, and discovered the wobble after putting some 3,000 miles on the motorcycle. The court cannot discern from these allegations exactly when Mr. Lantz's claim accrued. Assuming it accrued within the four-year limitations period, Honda argues that the court should apply Illinois' three-year limitations period instead.

**\*8** The Seventh Circuit has stated that "[a] federal court sitting in diversity must follow the statute of limitations that the state in which it is sitting would use."*Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707 (7th Cir.2004).*See also Hollander v. Brown*, No. 05 C 57, 2005 WL 1563125, at *2 (N.D.Ill. June 28, 2005) ("Statutes of limitation are governed by the law of the forum state.") Honda argues that this precedent mandates that the court apply Illinois' three year statute of limitations to Mr. Lantz's DUTPA claim. (Def. Mem., at 11.)

Plaintiffs disagree, arguing that "because such claims are not based on common law, but were instead created by Florida's legislature," Florida's statute of limitations must apply. (Pl. Resp., at 8 (citing *Cox v. Kaufman*, 212 Ill.App.3d 1056, 156 Ill.Dec. 1031, 571 N.E.2d 1011 (1st Dist.1991).) This argument misses the point.

The *Cox* court confirmed that "where the cause of action is created by statute and a time is fixed within which the cause of action must be asserted, the law of the state where the action occurred must govern."212 Ill.App.3d at 1062, 156 Ill.Dec. 1031, 571 N.E.2d at 1015. In such circumstances, the limitations period is not merely procedural, but a fundamental component of the right itself. *Kalmich v. Bruno*, 553 F.2d 549, 553 (7th Cir.1977) ("[W]here (a) statute creates a right that did not exist at common law and restricts the time within which the right might may be availed of, or otherwise imposes conditions, such statute is not a statute of limitation (in the normal sense) but the time element is an integral part of the enactment.") As noted, the DUTPA does not have a statute of limitations. Thus, the court must apply Illinois' three year statute of limitations to Mr. Lantz's claim.

All we know at this point is that Mr. Lantz purchased his Gold Wing in September 2002, and discovered the wobble after putting some 3,000 miles on the motorcycle. Though it is probable that Mr. Lantz discovered the wobble prior to November 1, 2003, absent further information, the court cannot say that Mr. Lantz's DUTPA claim is absolutely time-barred. The court therefore declines to dismiss Mr. Lantz's claim on this basis.

**b. Pleading Requirements**

Defendants argue that even if Mr. Lantz's claim is not time-barred, both his and Mr. Gribbins' claims must be dismissed for failure to plead fraud with particularity. Plaintiffs dispute that their ICFA and DUTPA claims must in fact comply with Rule 9(b). According to Plaintiffs, "because state consumer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

protection statutes are not specifically mentioned in Rule 9(b), they are not subject to heightened pleading standards in federal court."(Pl. Resp., at 10-11.) In support of this contention, Plaintiffs cite *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), in which the Supreme Court held that Rule 8(a)'s notice pleading standard applied to a claim for age discrimination. *Id.* at 512-13.*See also Educadores Puertorriquenos En Accion v. Hernandez,* 367 F.3d 61, 66-67 (1 st Cir.2004) ("We join several of our sister circuits in holding that there are no heightened pleading standards for civil rights cases.") The Supreme Court expressly confirmed, however, that Rule 9(b)"provides for greater particularity in all averments of fraud or mistake."*Id.* at 513.

**\*9** One Massachusetts district court has interpreted *Swierkiewicz* as "sound[ing] the death knell for the imposition of a heightened pleading standard" in a fraud claim under the Massachusetts Consumer Protection Act, Ch. 93A. *Lawson v. Affirmative Equities Co., L.P.,* 341 F.Supp.2d 51, 67 n. 25 (D.Mass.2004) (quoting *Hernandez,* 367 F.3d at 66). The *Lawson* court offers no clear explanation for this conclusion, however, which is at odds with precedent in Illinois and Florida. *See Costa v. Mauro Chevrolet, Inc.,* 390 F.Supp.2d 720, 731 (N.D.Ill.2005) ("A complaint alleging a violation of the Illinois [Consumer] Fraud Act must be pled with the same particularity and specificity as that required under common law fraud under Rule 9(b)."); *Zlotnick v. Premier Sales Group, Inc.,* 431 F.Supp.2d 1290, 1295 (S.D.Fla.2006) (noting that fraud claim under the Florida DUTPA must be pled "with the level of particularity required under FED. R. CIV. P. 9(b)."); *Florida Digital Network, Inc. v. Northern Telecom, Inc.,* No. 6:06-CV-889-Orl-31-JGG, 2006 WL 2523163, at \*5 (M.D.Fla. Aug.30, 2006) ("[C]laims arising under the FDUTPA must be pled with particularity.") The court does not find the reasoning of *Lawson* persuasive and declines to follow it here.

Having concluded that claims under both the

Illinois and Florida consumer fraud statutes must be pled with particularity in accordance with FED. R. CIV. P. 9(b), the court next considers whether Plaintiffs have alleged the "who, what, when, and where" of the fraud "sufficient to reasonably notify the defendant[ ] of [its] purported role in the scheme."*IFC Credit Corp. v. Aliano Bros. General Contractors, Inc.,* No. 04 C 6504, 2007 WL 164603, at \*3 (N.D.Ill. Jan.12, 2007) (internal quotations omitted).*See also American United Life Ins. Co. v. Martinez,* 480 F.3d 1043, 1064 (11th Cir.2007) (quoting *Cooper v. Blue Cross & Blue Shield of Florida, Inc.,* 19 F.3d 562, 568 (11th Cir.1994)) ("[T]he plaintiff's complaint must allege the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.")

Plaintiffs' Complaint is deficient on several grounds. Plaintiffs allege that Honda "advertised and marketed the Gold Wing as being a luxury motorcycle perfect for touring long distances and capable of handling on highways across the United States," but that the motorcycle actually has a defect that limits riders' ability to travel in comfort and safety. (Cmplt.¶¶ 14-16.) Plaintiffs also allege that they each purchased Gold Wing motorcycles that had the stated defect. (*Id.* ¶¶ 23, 27, 31, 35.)It is not clear that advertising a product as a luxury motorcycle perfect for long-distance touring constitutes an actionable misrepresentation. *See, e.g., Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 173-74, 296 Ill.Dec. 448, 835 N.E.2d 801, 846-47 (2005) (statement by automobile insurer that it sold "quality replacement parts" that were subject to "very high performance criteria" was mere puffing and not actionable under the ICFA); *Breckenridge v. Cambridge Homes, Inc.,* 246 Ill.App.3d 810, 823, 186 Ill.Dec. 425, 616 N.E.2d 615, 623-24 (2d Dist.1993) (vendor's statements that home would be built with "expert workmanship" and "custom quality," and delivered to plaintiffs in "perfect" condition constituted puffing and did not violate the ICFA).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)
(Cite as: 2007 WL 1424614 (N.D.Ill.))

**\*10** In any event, none of the Plaintiffs indicates if or when they saw any misleading statements before purchasing their motorcycles, or that such statements induced them to make these purchases. To the extent Plaintiffs allege that Honda promised but failed to deliver a luxury motorcycle, such a claim is not actionable under the ICFA or DUTPA. *Avery,* 216 Ill.2d at 169, 296 Ill.Dec. 448, 835 N.E.2d at 844 (a "deceptive act or practice" requires "more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract.") (internal quotations omitted); *Haun v. Don Mealy Imports, Inc.,* 285 F.Supp.2d 1297, 1307 (M.D.Fla.2003) ("[B]ecause Plaintiff fails to allege *how* he was 'aggrieved by' Defendant's acts, he fails to state the elements of harm and causation, essential to his [DUTPA] claim."). Thus, Plaintiffs' consumer fraud claims must all be dismissed.

### 2. The Warranty Claims

Honda next seeks dismissal of Plaintiffs' claims for breach of express and implied warranties. Honda argues that the claims are time-barred, fail to allege any defect within the scope of the express warranty, and/or fail to allege the requisite privity.

### a. Statute of Limitations

In Alternate Counts II and I I I of the Complaint, Plaintiffs allege that Honda violated express and implied warranties under the Illinois and Florida Uniform Commercial Codes. 810 ILCS 5/2-725; Fla. Stat. § 672.313. The limitations period for a breach of warranty action in Illinois is four years from the date of breach. 810 ILCS 5/2-725(1). A breach occurs when "tender of delivery is made" or "when the breach is or should have been discovered."810 ILCS 5/2-725(2); *Bethlehem Steel Corp. v. Chicago Eastern Corp.,* 863 F.2d 508, 511 n. 3 (7th Cir.1988); *Thorogood v. Sears, Roebuck & Co.,* No. 06 C 1999, 2006 WL 3302640, at \*3

(N.D.Ill. Nov.9, 2006). Mr. Gribbins discovered the Gold Wing's wobble on July 27, 2002, more than four years before he filed suit on November 1, 2006. Mr. Gribbins' claims are time-barred and, for the reasons stated above, he has not alleged any facts supporting equitable estoppel sufficient to avoid dismissal.

Honda argues that Mr. Lantz's warranty claims are similarly time-barred. The court agrees with Honda that Illinois' four-year statute of limitations applies because the Florida statute does not contain a limitations period on such claims. *See*Fla. Stat. §§ 672.313, 672.314. *See also Thomas,* 381 F.3d at 707 ("[a] federal court sitting in diversity must follow the statute of limitations that the state in which it is sitting would use.") Plaintiffs' argument for application of Florida's five-year limitations period as set forth in Fla. Stat. § 95.11(2)(b) is rejected. (Pl. Resp., at 8.) As with Mr. Lantz's consumer fraud claim, however, the court declines to dismiss the warranty claims on statute of limitations grounds absent further information as to the date he discovered the wobble in his motorcycle.

### b. Defects

**\*11** Honda seeks dismissal of Mr. Allen's and Mr. Alvord's express warranty claims for failure to allege any defect within the scope of the warranty. (Def. Mem., at 12.) The warranty states that "the motorcycle is free from defects in materials and workmanship."(Ex. 1 to Def. Mem., at 6.) *See also Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) (Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") Honda argues that neither Mr. Allen nor Mr. Alvord has alleged any such defect. To the contrary, "the so-called 'wobble' was not remedied by any change to their motorcycle."(Def. Mem., at 12.) Plaintiffs disagree, noting their allegations that the Gold Wing has a design defect that is eliminated by replacing the steering head bearings. (Pl. Resp., at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)
(Cite as: 2007 WL 1424614 (N.D.Ill.))

Page 10

14.) Honda responds that these allegations are made only by the other two Plaintiffs, Mr. Gribbins and Mr. Lantz. (Def. Reply, at 14-15.)

The court declines to dismiss the express warranty claims of Mr. Allen and Mr. Alvord. It is true that both men rely on statements made by the other two Plaintiffs. However, the court cannot say that Mr. Allen and Mr. Alvord will be unable to present any facts that will entitle them to relief under this claim. *See Sanville v. McCaughtry,* 266 F.3d 724, 732 (7th Cir.2001) (quoting *Veazey v. Communications & Cable of Chicago, Inc.,* 194 F.3d 850, 854 (7th Cir.1999)) ("[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate.")

**b. Privity**
Honda argues that regardless of any statute of limitations, each Plaintiffs' implied warranty claim fails to allege sufficient privity between Plaintiffs and Honda. Plaintiffs all purchased their Gold Wing motorcycles from Honda dealers which, Honda contends, is not sufficient to allege any statements or representations on the part of Honda. (Def. Mem., at 9.) *See Rothe v. Maloney Cadillac, Inc.,* 119 Ill.2d 288, 292, 116 Ill.Dec. 207, 518 N.E.2d 1028, 1029 (1988) ("UCC article II implied warranties give a buyer of goods a potential cause of action only against his immediate seller."); *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.,* 347 Ill.App.3d 828, 832, 283 Ill.Dec. 324, 807 N.E.2d 1165, 1169 (1st Dist.2004) ("[O]ur supreme court still requires privity even where the manufacturer issues a written warranty."); *Weiss v. Johansen,* 898 So.2d 1009, 1012 (Fla.Dist.Ct.App.2005) (requiring privity of contract for breach of implied warranty claims).

Plaintiffs direct the court to their allegations that they purchased motorcycles from authorized Honda dealers, and argue that the dealers are Honda's agents "for purposes of warranty implementation." (Pl. Resp., at 12.) The Complaint, however, sets

forth no allegations suggesting that any such agency relationship exists. Nor is it clear that any dealers were in fact Honda's agents in connection with the motorcycle sales *See Hood v. Dryvit Sys., Inc.,* No. 04 C 3141, 2005 WL 3005612, at *5 (N.D.Ill. Nov. 8, 2005) (quoting *Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 498, 221 Ill.Dec. 389, 675 N.E.2d 584, 592 (1996)) ("A complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship. It is insufficient to merely plead the legal conclusion of agency.") Plaintiffs attempt to rely on *Mydlach v. DaimlerChrysler Corp.,* 364 Ill.App.3d 135, 301 Ill.Dec. 164, 846 N.E.2d 126 (1st Dist.2005), for the proposition that privity exists where a manufacturer extended a written warranty to the consumer. *Mydlach,* however, involved a claim brought pursuant to the federal Magnuson-Moss Act, 15 U.S.C. §§ 2301*et seq.,* which is not at issue here. Honda's motion to dismiss the implied warranty claims for lack of privity is granted.

**3. The Unjust Enrichment Claims**

*12 Honda finally argues that Plaintiffs' unjust enrichment claims must be dismissed because they have an adequate remedy at law under the warranty provisions of their purchase agreements. (Def. Mem., at 9-10, 12.) It is undisputed that "where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application."*People ex rel. Hartigan v. E & E Hauling, Inc.,* 153 Ill.2d 473, 497, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (1992) (internal quotations omitted).*See also Bowleg v. Bowe,* 502 So.2d 71, 72 (Fla.Dist.Ct.App.1987) ( "Bowleg's second count fails because the theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy here, an action on the presumably valid Final Contract.") Mr. Gribbins' unjust enrichment claim is therefore dismissed.

The Florida Plaintiffs argue that their claims must nonetheless stand because under Florida law,

"unjust enrichment claims may be pursued until it is proven that an express contract applies."(Pl. Resp., at 15 (citing *Williams v. Bear Stearns & Co.*, 725 So.2d 397, 400 (Fla.Dist.Ct.App.1998) ("Until an express contract is proven, a motion to dismiss a claim for ... unjust enrichment on these grounds [the existence of an adequate remedy at law] is premature.").) According to Plaintiffs, dismissal of the unjust enrichment claims is premature, "particularly where Honda argues that its express written warranties do not apply to Plaintiffs' claims."(*Id.*) Defendants insist that the claims are properly dismissed now as "[t]here is no dispute that a contract of warranty exists," regardless of whether the warranty will provide Plaintiffs with a "successful" remedy. (Def. Reply, at 15.)

It does appear that Plaintiffs agree that they have express written warranties in this case. In addition, Plaintiffs nowhere allege that they do not in fact have an adequate remedy at law. Thus, Plaintiffs' unjust enrichment claims under Florida law must be dismissed. *See In re Managed Care Litig.*, 185 F.Supp.2d 1310, 1337 (S.D.Fla.2002) ("The Plaintiffs have not explicitly alleged that an adequate remedy at law does not exist, and the failure to do so is fatal.")

### CONCLUSION

For the reasons stated above, Honda's motion to dismiss [Doc. 15] is granted in part and denied in part. The court will grant Plaintiffs leave to file an amended complaint consistent with this opinion by June 8, 2007. *See Collins v. Prater*, No. 06-396-GPM, 2007 WL 490971, at *1 (S.D.Ill. Feb.9, 2007) ("Federal Rule of Civil Procedure 15(a) dictates that leave to amend a pleading 'shall be given whenever justice so requires,'... and, indeed, the rule expressly grants a plaintiff one opportunity to amend her complaint as a matter of course before a responsive pleading is served."

N.D.Ill.,2007.
Lantz v. American Honda Motor Co., Inc.

Slip Copy, 2007 WL 1424614 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000          Page 1

**(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))**

**C**

O'Neil v. Simplicity, Inc.

D.Minn.,2008.

Only the Westlaw citation is currently available.

United States District Court,D. Minnesota.

John O'NEIL and Jill O'Neil, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

SIMPLICITY, INC., and Graco Children's Products, Inc., Defendants.

No. Civ. No. 07-4070 (RHK/JJG).

May 12, 2008.

**Background:** Buyers of recalled children's crib brought action against manufacturer and licensee. Defendants moved to dismiss.

**Holding:** The District Court, Richard H. Kyle, J., held that buyers failed to state cognizable claims for breach of warranties and violation of Minnesota's Deceptive Trade Practices Act, Minnesota's False Statement in Advertising Act, Minnesota's Consumer Fraud Act, and unjust enrichment where they failed to allege an actual manifestation of a defect that resulted in some injury.

Motions granted.

**Products Liability 313A ⊂══0**

313A Products Liability

Buyers of children's crib failed to state cognizable claims against manufacturer and licensee for breach of warranties and violation of Minnesota's Deceptive Trade Practices Act, Minnesota's False Statement in Advertising Act, Minnesota's Consumer Fraud Act, and unjust enrichment where they failed to allege an actual manifestation of a defect that resulted in some injury or that they had encountered any problems with their crib's functionality; mere fact that manufacturer had recalled the cribs, based on others encountering problems, did not mean that their crib had a "manifest" defect. Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, § 101 et seq., 15 U.S.C.A. § 2301 et seq.; M.S.A. §§ 325D.44, 325F.67, 325F.68.

Elizabeth C. Pritzker, Eric H. Gibbs, Geoffrey A. Munroe, Girard Gibbs LLP, Charles C. Kelly, II, Amy Eskin, Nancy Hersh, Hersh & Hersh, San Francisco, CA, Renae D. Steiner, Lori A. Johnson, Heins Mills & Olson, PLC, Michael K. Johnson, Goldenberg & Johnson, PLLC, Minneapolis, MN, for Plaintiffs.

William K. Hill, Scott N. Wagner, Bilzin Sumberg Baena Price & Axelrod LLP, Miami, FL, Blake Shepard, Todd A. Noteboom, Leonard, Street and Deinard, PA, Minneapolis, MN, for Defendant Simplicity, Inc.

Joseph J. Krasovec, III, Heidi Dalenberg, Holly A. Podulka, Schiff Hardin LLP, Chicago, IL, John Edward Connelly, Jesseca R.F. Cockson, Faegre & Benson LLP, Minneapolis, MN, for Defendant Graco Children's Products, Inc.

**MEMORANDUM OPINION AND ORDER**

RICHARD H. KYLE, District Judge.

**INTRODUCTION**

*1 This action arises out of a recall of children's cribs by Defendant Simplicity, Inc. ("Simplicity"). Plaintiffs John and Jill O'Neil purchased a Simplicity crib in 2003, which bears the name and logo of Defendant Graco Children's Products, Inc. ("Graco"). The crib was recalled in September 2007 due to problems with its "drop side"; this action was commenced shortly thereafter, asserting a litany of claims. Simplicity and Graco now move to dismiss. For the reasons set forth below, the Court will grant the Motions.

**BACKGROUND**

Simplicity has manufactured cribs since 1998. (Second Amended Complaint ("SAC") ¶ 9.) Simplicity sells its cribs under its own name and under

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000

(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))

Page 2

those of several licensees, including Graco. (*Id.* ¶ 10.)Many of Simplicity's cribs (including the crib at issue here) include a "drop side," which allows one side of the crib to be raised and lowered to more easily place a child into (or remove a child from) the crib. (*Id.* ¶ 11.)

In 2003, a consumer filed a complaint with the Consumer Product Safety Commission ("CPSC") concerning the drop side of a Simplicity crib. (*Id.* ¶ 20.)In February 2004, another consumer reported to the CPSC and Simplicity that the drop side of a Simplicity crib had separated from the crib frame, creating a gap between the frame and the drop side. Simplicity allegedly told this consumer that "it was no big deal" and that "there were no problems with the crib."(*Id.* ¶ 21.)Then, on April 11, 2005, a nine-month-old boy suffocated while sleeping in a Simplicity crib when he slipped into a gap between the crib's drop side and its frame. (*Id.* ¶ 22.)The boy's parents reported the problem to the CPSC and sued Simplicity, which resolved the matter in a confidential settlement. (*Id.*) The problem kept recurring, however; at least two more infants suffocated while sleeping in Simplicity cribs due to gaps between the drop sides and the cribs' frames, and the CPSC received reports of at least 63 "incidents" with Simplicity cribs, seven of which involved injuries suffered when infants became trapped between a crib's frame and its drop side. (*Id.* ¶¶ 23-24.)

In 2007, the Chicago Tribune commenced an investigation into Simplicity's cribs and shared the results of its investigation with the CPSC and with Simplicity and Graco. (*Id.* ¶ 25.)On September 21, 2007, the cribs were recalled by the CPSC and Simplicity. (*Id.*) As part of the recall, Simplicity is not accepting returns of the cribs. Rather, it is offering to send new hardware (the "Retrofit Kit"), along with instructions explaining how to install it, which can be used to immobilize the drop sides of the cribs.(*Id.* ¶ 30.)

This purported class action was originally filed by Amber Spitzer on September 24, 2007, three days after the recall was announced. Spitzer alleged that

she had bought a defective crib manufactured by Simplicity and bearing the Graco name and logo at a Target store in April 2006. She named as Defendants Simplicity, Graco, and Target, and asserted claims arising under contract law (breach of warranty, unjust enrichment) and tort law (negligence). She also asserted claims under several Minnesota consumer-protection statutes, alleging that the Defendants were aware of the defects in the cribs but nevertheless continued to market them as "safe." After Target and Simplicity moved to dismiss, Spitzer moved for and was granted leave to file a Second Amended Complaint.[FN1] The Second Amended Complaint differed greatly from the original Complaint-the O'Neils took Spitzer's place as the named plaintiffs, and Target was dismissed as a Defendant.

\*2 The O'Neils purchased an "Aspen 3 in 1" crib manufactured by Simplicity and bearing the Graco name and logo from a Target store in Virginia, Minnesota in 2003. (*Id.* ¶ 33.)They purchased the crib for the use of their grandchildren during visits to their home. (*Id.*) The O'Neils used the crib without problems until September 2007, when they learned of the recall. (*Id.* ¶ 34.)They have stopped using the crib altogether, and they have not ordered the Retrofit Kit because "the crib is useless to them without a functional drop side. Ms. O'Neil cannot lift an infant up and over the side of the crib without first lowering the drop side, so could not use the Crib with the retrofit kit installed and the drop side immobilized." (*Id.* ¶¶ 35-36.)

Like Spitzer, the O'Neils claim that Defendants were aware that their cribs were unsafe but continued to market and sell them. They also claim that Defendants unlawfully marketed their cribs as having a functional drop side when they knew that the cribs could not safely function without the drop side immobilized. They assert eight claims in the SAC: (1) declaratory judgment, seeking a judicial determination that the cribs are defective and that Simplicity must repair or replace them with cribs having fully functional drop sides; (2) violation of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000
**(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))**

the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* ("MMWA"); (3) breach of express warranty; (4) breach of the implied warranty of merchantability; (5) violation of Minnesota's Deceptive Trade Practices Act ("DTPA"), Minn.Stat. § 325D.44; (6) violation of Minnesota's Consumer Fraud Act ("CFA"), Minn.Stat. § 325F.68; (7) violation of Minnesota's False Statement in Advertising Act ("FSAA"), Minn.Stat. § 325F.67; and (8) unjust enrichment. The O'Neils purport to represent a class of "all persons in Minnesota who purchased" a Simplicity/Graco crib in several different crib lines manufactured by Simplicity. (*Id.* ¶ 37.)The class expressly *excludes* any individual who suffered a personal injury while using an allegedly defective crib. (*Id.* ¶ 38.)

Simplicity and Graco now move to dismiss.[FN2]

## STANDARD OF DECISION

The recent Supreme Court case of *Bell Atlantic Co. v. Twombly,* ---U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), sets forth the standard to be applied when evaluating a motion to dismiss under Rule 12(b)(6). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face."*Id.* at 1974.Stated differently, a plaintiff must plead sufficient facts "to provide the 'grounds' of his 'entitle[ment] to relief,' [which] requires more than labels and conclusions, and [for which] a formulaic recitation of the elements of a cause of action will not do."*Id.* at 1964-65 (citation omitted). Thus, a complaint cannot simply "le[ave] open the possibility that a plaintiff might later establish some 'set of undisclosed facts' to support recovery."*Id.* at 1968 (citation omitted). Rather, the facts set forth in the complaint must be sufficient to "nudge the[ ] claims across the line from conceivable to plausible."*Id.* at 1974.

*3 When reviewing a motion to dismiss, the complaint must be liberally construed, assuming the facts alleged therein as true and drawing all reason-

able inferences from those facts in the plaintiff's favor. *Id.* at 1964-65.A complaint should not be dismissed simply because a court is doubtful that the plaintiff will be able to prove all of the factual allegations contained therein. *Id.* Accordingly, a well-pleaded complaint will survive a motion to dismiss " 'even if it appears that a recovery is very remote and unlikely.' " *Id.* at 1965 (citation omitted).

## ANALYSIS

Simplicity and Graco raise a host of arguments in support of their Motions, but the Court need only address one, which it finds dispositive: have the O'Neils asserted a legally cognizable injury? The Court concludes that they have not.[FN3]

The crux of Defendants' argument is that the O'Neils' crib has never malfunctioned. There is no allegation in the SAC indicating that the O'Neils' crib has ever had a problem with its drop side or that it has ever failed to work as intended; they simply point to the fact that the crib has been recalled because some consumers owning the same model (or similar models) have experienced dropside problems. According to Defendants, these facts bring this case within the line of "no injury" product-liability cases "where the plaintiff alleges a defect that *could* cause injury or might create a safety hazard, but fails to allege any actual harm."(Simplicity Mem. at 7 (emphasis in original).) In the absence of any such harm, Defendants argue that the O'Neils cannot state a claim under any legal theory advanced in the SAC.[FN4]

Several cases have adopted the argument pressed by Defendants. For example, in *Rivera v. Wyeth-Ayerst Laboratories,* 283 F.3d 315 (5th Cir.2002), the plaintiff had ingested Duract, a prescribed non-steroidal anti-inflammatory drug manufactured by the defendant. Although the plaintiff had used Duract without problems, and although the plaintiff had nowhere argued that Duract was ineffective as a pain killer or caused future health consequences for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000
(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))

users, she sued the defendant after it removed the drug from the market due to reports of liver failures among some users. The class-action plaintiff-who, like the O'Neils here, expressly disclaimed representing any individuals who had suffered personal injuries from Duract-alleged violations of the Texas Deceptive Trade Practices Act and the implied warranty of merchantability, as well as a claim for unjust enrichment. The district court certified the case as a class action under Federal Rule of Civil Procedure 23, and the defendant took an interlocutory appeal of that decision to the Fifth Circuit. The appellate court reversed and remanded with instructions to dismiss the case because the plaintiff had not pleaded damages sufficient to support her claims:

Notably, the wrongs Rivera and the class allege are those suffered by other, non-class member patients. The plaintiffs claim that Wyeth violated the implied warranty of merchantability by selling a defective drug, but then aver that the drug was not defective as to them. Similarly, the plaintiffs claim Wyeth violated the DTPA by failing to issue warnings sufficient to advise injured users, but then concede they were not among the injured. Such wrongs cannot constitute an injury in fact.

\*4 283 F.3d at 320.[FN5]

Similarly, in *Briehl v. General Motors Corp.*, 172 F.3d 623 (8th Cir.1999), the Eighth Circuit affirmed the dismissal of a multi-district litigation proceeding concerning anti-lock brakes on General Motors cars. The *Briehl* plaintiffs alleged that their brakes were defective because their brake pedals would fall completely to the floor in hard braking, which caused drivers to release the pedals due to a perception of total brake failure. The plaintiffs did not allege that the brakes were incapable of stopping their vehicles in emergencies, nor did they allege that their brakes had actually caused any accidents. Indeed, as in *Rivera* (and as in this case), the named plaintiffs did not seek to represent any individuals who had sustained personal injuries or

property damage as a result of the alleged defect.

General Motors moved to dismiss, arguing that the plaintiffs had not suffered any injuries sufficient to support their claims for breach of warranty, violations of various state consumer-protection statutes, and fraudulent concealment and misrepresentation. The district court granted that motion, and the Eighth Circuit affirmed, noting:

In this case, the Plaintiffs have not alleged that their ABS brakes have malfunctioned or failed. In fact, the Plaintiffs affirmatively state that their purported class excludes any claim for personal injury or property damage caused by brake failure. The Plaintiffs' ABS brakes have functioned satisfactorily and at no time have the brakes exhibited a defect. Under each of the theories the Plaintiffs invoke in the Original Complaint, damages constitutes an essential element of the cause of action. Where, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies. Since the Plaintiffs have failed to allege any manifest defect and their vehicles perform in a satisfactory manner, the District Court was correct when it dismissed the Plaintiffs' Original Complaint.

172 F.3d at 628 (citations omitted). Numerous other courts have adopted this "no injury" rationale and dismissed claims where a product defect was alleged to exist but had not manifested itself in the plaintiffs' products. *See, e.g., Harrison v. Leviton Mfg. Co.*, No. 05-CV-0491, 2006 WL 2990524, at \*4-7 (N.D.Okla. Oct. 19, 2006) (concerning defective electrical outlets that allegedly could overheat and cause fires; "Courts do not allow consumers to bring claims against manufacturers for products that are perceived to be harmful, but that have not actually cause[d] an identifiable injury."); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F.Supp. 595, 602-03 (S.D.N.Y.1982) (no claim under MMWA where alleged tire defect had not manifested itself; "Liability does not exist in a vacuum; there must be a showing of some damage"); *Carey v. Select Comfort Corp.*, No. 27CV 04-15451, 2006 WL 871619,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000
(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))

at *2-5 (Minn.Dist.Ct. Jan.30, 2006) (involving al-legedly defective bed that trapped moisture and caused mold growth; court dismissed plaintiff's claims for breach of express and implied warranties and violations of the DTPA, CFA, and FSAA be-cause no mold had grown on the plaintiff's bed).FN6

*5 The O'Neils attempt to evade these holdings by arguing that "the crib they purchased has a serious defect in that the original hardware sold with the crib renders it unsafe for their grandchildren to sleep in."(Mem. in Opp'n to Simplicity Mot. at 7-8.) This allegation parallels those made in *Briehl* (faulty brakes rendered cars unsafe), *Harrison* (faulty outlets made home unsafe), *Feinstein* (defective tires rendered cars unsafe), and the pleth-ora of other "no injury" cases set forth above and decided by courts across the country. It is simply not enough for a plaintiff to allege that a product defect suffered by others renders his or her use of that same product unsafe; the plaintiff must instead allege an *actual manifestation* of the defect *that results in some injury* in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment. *Briehl,* 172 F.3d at 628 ("Where ... a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies."); *In re Air Bag Prods. Liab. Litig.,* 7 F.Supp.2d 792, 803-04 (E.D.La.1998) (even where an alleged defect creates a "life-threatening condi-tion," the absence of a manifestation of that defect causing injury "is so fundamental a deficiency in tort or implied warranty claims that such claims are more appropriately dismissed than preserved").FN7

The O'Neils apparently believe that the mere fact Simplicity has recalled the cribs, based on *others* encountering problems, necessarily means that their crib has a "manifest" defect. (*See* Mem. in Opp'n to Simplicity Mot. at 6-7.) The Court does not agree with that supposition. In *Rivera, Harrison,* and *Feinstein,* for example, persons other than the plaintiffs had encountered problems with the products at issue. Yet, in each case the court con-

cluded that the plaintiff did not state a cognizable claim because the named plaintiff's own product had not manifested any defect resulting in an actual injury.FN8 The same is true here, where the O'Neils have not alleged that they have encountered any problems with their crib's functionality. That the crib has been recalled, therefore, does not *ipso facto* mean that the crib has a manifest defect suffi-cient to permit their claims to proceed.

The O'Neils next argue that they paid for a safe crib with a functioning drop side and instead got a crib with a drop side that must be locked into place in order to render the crib safe to use. (Mem. in Opp'n to Simplicity Mot. at 8-12.) In other words, they ar-gue that they have suffered "benefit-of-the-bargain" damages-that is, they were damaged in an amount equal to the difference between what they bar-gained for (a safe crib with a functioning drop side) and what they received (a crib without one). Al-though this argument has some superficial appeal, the Court finds that it, too, is unpersuasive.FN9

It is true that some courts have recognized "benefit-of-the-bargain" damages as sufficient to support deceptive-trade-practices and breach-of-warranty claims. For example, in *Coghlan v. Wellcraft Marine Corp.,* 240 F.3d 449 (5th Cir.2001), the plaintiffs had purchased a boat man-ufactured by the defendant. The plaintiffs' motiva-tion for the purchase, in part, was the defendant's advertising emphasizing that its boats were made completely of fiberglass, which were (1) more dur-able than boats made of a wood-fiberglass combin-ation and (2) perceived to hold their value better. A few months after the purchase, however, the plaintiffs discovered that their boat was actually made of both wood and fiberglass. They sued the manufacturer, asserting *inter alia* claims for viola-tions of the MMWA, breach of implied warranty, unfair and deceptive trade practices, and unjust en-richment. The defendant moved to dismiss certain of the claims in the complaint, but the district court dismissed the *entire* complaint for failing to allege any cognizable damages. The plaintiffs appealed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000
(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))

**\*6** The Fifth Circuit reversed. In the portion of its holding most pertinent here, the court stated:

> The key distinction between this case and a "no-injury" product[s] liability suit is that the Coghlans' claims are rooted in basic contract law rather than the law of product[s] liability: the Coghlans assert they were promised one thing but were given a different, less valuable thing. The core allegation in a no-injury product[s] liability class action is essentially the same as in a traditional products liability case: the defendants produced or sold a defective product and/or failed to warn of the product's dangers. The wrongful act in a no-injury products suit is thus the placing of a dangerous/defective product in the stream of commerce. In contrast, the wrongful act alleged by the Coghlans is Wellcraft's failure to uphold its end of their bargain and to deliver what was promised. The striking feature of a typical no-injury class is that the plaintiffs have either not yet experienced a malfunction because of the alleged defect or have experienced a malfunction but not been harmed by it. Therefore, the plaintiffs in a no-injury products liability case have not suffered any physical harm or out-of-pocket economic loss. Here, the damages sought by the Coghlans are not rooted in the alleged defect of the product as such, but in the fact that they did not receive the benefit of their bargain.

240 F.3d at 455 n. 4. Other courts have followed *Coghlan's* approach and permitted warranty and deceptive-trade-practices claims to proceed based on benefit-of-the-bargain damages. *See, e.g., In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,* 155 F.Supp.2d 1069, 1102-03 (S.D.Ind.2001); *Microsoft Corp. v. Manning,* 914 S.W.2d 602, 607-10 (Tex.App.1995), *abrogated on other grounds by Citizens Ins. Co. of Am. v. Daccach,* 217 S.W.3d 430 (Tex.2007); *Miller v. William Chevrolet/GEO, Inc.,* 326 Ill.App.3d 642, 260 Ill.Dec. 735, 762 N.E.2d 1, 10-11 (Ill.App.Ct.2001).

Yet, this approach has not been universally adopted-indeed, the Fifth Circuit rejected this theory of damages (and distinguished *Coghlan* ) in *Rivera.* Noting the difference between contract-law and tort-law damages discussed in footnote 4 in *Coghlan,* the *Rivera* court stated:

> Even if we were to ignore the fact that plaintiffs have no contract, the general principles they invoke do not help them. By plaintiffs' own admission, Rivera paid for an effective pain killer, and she received just that-the benefit of her bargain.... The confusion arises from the plaintiffs' attempt to recast their product liability claim in the language of contract law. The wrongs they allege-failure to warn and sale of a defective product-are products liability claims. Yet, the damages they assert-benefit of the bargain, out of pocket expenditures-are contract law damages. The plaintiffs apparently believe that if they keep oscillating between tort and contract law claims, they can obscure the fact that they have asserted no concrete injury. Such artful pleading, however, is not enough to create an injury in fact.

**\*7** 283 F.3d at 320-21 (citations omitted); *accord Carlson v. Gen. Motors Corp.,* 883 F.2d 287, 297-98 (4th Cir.1989) (affirming dismissal of MM-WA and breach-of-implied-warranty claims based on "lost resale value" of plaintiffs' vehicles); *Carey,* 2006 WL 871619, at \*3-5.

More importantly, the Eighth Circuit concluded in *Briehl* that benefit-of-the-bargain damages do not cut the mustard for the types of claims at issue here. In *Briehl,* the plaintiffs claimed that due to the alleged defect, they had overpaid for their vehicles when they purchased them. 172 F.3d at 626. The court concluded that such damages were "insufficient as a matter of law to plead a claim under any theory the Plaintiffs ha[d] advanced," including claims for breach of express and implied warranties and deceptive trade practices under several states' laws. *Id.* at 629.The Court is obliged to follow *Briehl* here.[FN10]

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000
(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))

An additional flaw is evident in the O'Neils' benefit-of-the-bargain damages theory. The purported benefit of the O'Neils' "bargain" was a crib with a functioning drop side. However, they cannot complain that they received less than what they bargained for-that is, they cannot claim they received a crib without a functioning drop side-when their drop side has functioned without incident since it was purchased over four years ago and they have opted not to install the Retrofit Kit to lock the drop side into place. Simply put, the O'Neils bargained for a crib with a functioning drop side, and that is precisely what they received. "[A] plaintiff who purchases a [crib] that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase."*In re Canon Cameras Litig.,* 237 F.R.D. 357, 360 (S.D.N.Y.2006). The O'Neils' benefit-of-the-bargain damages theory, therefore, does not aid their cause. And, having failed to allege any cognizable damages, their claims falter.FN11

It could be argued that the lack of cognizable damages is not fatal to certain of the O'Neils' claims-specifically, the DTPA, CFA, and FSAA claims-insofar as the O'Neils also seek injunctive relief on those claims. That is of no moment, however, because the O'Neils have not pleaded in the SAC any basis for an award of such relief.FN12 They argue that injunctive relief is proper to "prevent future child injuries or deaths" (Mem. in Opp'n to Simplicity Mot. at 26), but there are two flaws with this argument. First, the O'Neils have nowhere pleaded in the SAC that the allegedly defective cribs are still being marketed or sold. Indeed, the SAC's use of past tense in each of the O'Neils' claims suggests that Defendants' alleged misconduct is not ongoing. (*See, e.g.,* SAC ¶ 81 ("Defendants ...*made* misleading or deceptive representations concerning the Cribs, and *concealed* from or *failed* to disclose the fact that in order to be safe the consumer would have to lose drop-side functionality.") (emphasis added); *id.* ¶ 91 ("Defendants *used* misrepresentations, misleading statements, and deceptive prac-

tices ....") (emphasis added).) Were it otherwise, the O'Neils would have (and should have) alleged that "Defendants made *and are continuing to make* misleading or deceptive representations" or "Defendants used *and are still using* misrepresentations."FN13 Second, the O'Neils expressly disclaimed representing any person who has suffered a personal injury as a result of a "defective" crib. An injunction intended to prevent "future child injuries and death," therefore, is beyond the scope of the claims asserted in the SAC. Accordingly, the fact that the O'Neils seek injunctive relief on their consumer-protection claims does not save those claims from dismissal.

**8 For all the foregoing reasons, the Court concludes that the SAC must be dismissed. That leaves the Court with one additional question: should the dismissal be with or without prejudice? In answering that question, the Court notes that Plaintiffs' counsel have had three bites at the pleading apple: the original Complaint, followed by two subsequent Amended Complaints. Moreover, although the original Complaint was amended before any response was filed, Simplicity moved to dismiss the First Amended Complaint on the ground that there were no alleged cognizable damages. (*See* Doc. No. 18 at 7-13.) In other words, the defect that the Court has discussed above-which is fatal to the claims alleged in the SAC-was laid bare by Simplicity well before the SAC was filed.

The claims alleged in this case do not arise out of a complicated area of the law, such as securities litigation, where "the drafting of a cognizable complaint can be a matter of trial and error."*Eminence Capital v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003). Rather, this is a straight-forward product-defect case. The Court believes that there have been "ample opportunities to research and plead" sufficient claims here. *In re Career Educ. Corp. Sec. Litig.,* No. 03 C 8884, 2007 U.S. Dist. LEXIS 23635, at *36 (N.D.Ill. Mar. 29, 2007)."[A]t some point, a court must decide that a plaintiff has had fair opportunity to make his case; if, after that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000
**(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))**

time, a cause of action has not been established, the court should finally dismiss the suit."*Schiller v. Physicians Res. Group* Inc., 342 F.3d 563, 567 (5th Cir.2003) (citation omitted). This is such a case, and that time has come.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motions to Dismiss (Doc. Nos.56, 59) are **GRANTED** and Plaintiffs' Second Amended Complaint (Doc. No. 46) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

FN1. Spitzer previously had filed an Amended Complaint, which dropped the negligence claim.

FN2. Shortly before oral argument on the instant Motions, Simplicity's counsel informed the Court that (1) Simplicity had defaulted under a secured-credit agreement with its largest creditor, (2) the creditor had effected a sale of substantially all of Simplicity's assets, and (3) Simplicity has ceased all business operations. As a result, although the Court concludes that the O'Neils' claims must be dismissed, it appears that they (and the class they purport to represent) would be unlikely to recover from Simplicity even if their claims were able to survive Simplicity's and Graco's Motions.

FN3. Although it raised several arguments in support of its Motion, Graco did not expressly move to dismiss on this ground. Nevertheless, the Court's analysis applies with equal force with respect to Graco. Moreover, at the hearing on the instant Motions, Graco made clear that it was adopting all of Simplicity's arguments, and

the O'Neils responded to the no-cognizable-injury argument (at both the hearing and in their Motion papers) as if it had been brought by both Simplicity and Graco.

FN4. The O'Neils have nowhere argued that they need not prove legally cognizable damages as an element of each of their claims, and hence have conceded the point. Other than with respect to the declaratory-judgment claim and the DTPA claim, the case law supports the O'Neils' implicit concession. *See* 15 U.S.C. § 2310(d)(1) (MMWA requires plaintiff to be "damaged by the failure of a ... warrantor"); *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 393 (Minn.Ct.App.2004) (breach-of-warranty claim requires damages); *LensCrafters, Inc. v. Vision World, Inc.*, 943 F.Supp. 1481, 1491 (D.Minn.1996) (Davis, J.) (claim under FSAA requires damages); Minn.Stat. § 8.31, subd. 3a (private actions for violation of CFA and FSAA require a person to be "injured by a violation" thereof); *Park-Lake Car Wash, Inc. v. Springer*, 394 N.W.2d 505, 514 (Minn.Ct.App.1986) (unjust enrichment requires plaintiff to show defendant enriched himself "at the expense of another").

As for the declaratory-judgment claim, which seeks a determination that Simplicity "is obligated under its Limited Warranty to repair or replace Class members' unsafe and defective Cribs" (SAC ¶ 50), the Court concludes that the claim should be dismissed because it is duplicative of the breach-of-warranty claim. *See, e.g., Alsager v. Dist. Court of Polk County, Iowa (Juvenile Div.)*, 518 F.2d 1160, 1163 (8th Cir.1975) (district courts have discretion to decline to hear declaratory-judgment claims; claim

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000
(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))

should be entertained only "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue"); *Ticketmaster L.L.C. v. RMG Techs., Inc.,* 536 F.Supp.2d 1191, 1199 (C.D.Cal.2008) (dismissing as duplicative declaratory-judgment claim where issues raised therein would be resolved in other claims alleged in case). And, with respect to the DTPA claim, damages are not at issue because "the sole statutory remedy for deceptive trade practices is injunctive relief."*Gardner v. First Am. Title Ins. Co.,* 296 F.Supp.2d 1011, 1020 (D.Minn.2003) (Kyle, J.) (citing *Dennis Simmons D.D.S., P.A. v. Modern Aero, Inc.,* 603 N.W.2d 336, 339 (Minn.Ct.App.1999)).

FN5.*Rivera's* discussion of damages arose in the standing context, but the Court perceives no reason why its analysis is not equally apt here.

FN6.*See also Briehl,* 172 F.3d at 627-28 (collecting cases); *Heindel v. Pfizer, Inc.,* 381 F.Supp.2d 364, 379-81 (D.N.J.2004); *Williams v. Purdue Pharma Co.,* 297 F.Supp.2d 171, 176 (D.D.C.2003); *In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 68 (S.D.N.Y.2002).

FN7. The Court further notes that the "defect" in the O'Neils' crib is one of their own making. Simplicity has made a Retrofit Kit available to them, but they have opted not to install it. And, there is no allegation in the SAC that the Retrofit Kit would not completely "fix" the "problem" with their crib. The O'Neils *claim* that they have alleged that the "retrofit hardware prevents their safe use of the crib because consumers cannot safely and conveniently lift children over the full-height side of the crib once the retrofit kit is installed and in place."(Mem. in Opp'n to Simplicity Mot.

at 8 (citing SAC ¶¶ 34-36).) A careful review of the cited paragraphs of the SAC, however, reveals no such allegation.

The O'Neils also assert that the Retrofit Kit "replaces one defect with another: once the drop side is immobilized, [the] crib[ ] [will] no longer function as represented" because it will no longer include one of the main components of its functionality. (Mem. in Opp'n to Simplicity Mot. at 2.) Because the O'Neils have opted not to install the Retrofit Kit, however, they cannot assert a claim concerning the loss of drop-side functionality, nor would they be adequate class representatives for individuals claiming such a "defect."

FN8. Notably, the drug at issue in *Rivera* had been recalled by the defendant.

FN9. Although it is not germane to the Court's resolution of the instant Motions, the Court notes that, by seeking benefit-of-the-bargain damages, the O'Neils likely have rendered their case inappropriate for class-action treatment. In order to prove whether purchasers received the benefit of their bargains, individualized proof would be required concerning a host of issues, including whether, and to what extent, each purchaser chose a crib solely due to its use of a drop side, and the amount paid by each purchaser.

FN10. The O'Neils assert that "the plaintiffs in *Briehl* never alleged that [they] received less than they bargained for" (Mem. in Opp'n to Simplicity Mot. at 7), but that assertion is inaccurate. The *Briehl* plaintiffs specifically "claim[ed] damages ... for (1) lost resale value and (2) overpayment for the vehicles at the time of purchase."172 F.3d at 626. While perhaps not explicitly stating that they had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000

**(Cite as: --- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.))**

Page 10

"received less than they bargained for," the plaintiffs alleged substantively the same thing by asserting that they overpaid as a result of the alleged defect.

FN11. Notably, the Court does not believe *Briehl* stands for the proposition that benefit-of-the-bargain damages are *never* sufficient to state a claim under state consumer-protection statutes or for breach of warranty. For example, imagine a situation in which a seller fraudulently misrepresents that an object is a diamond when it is actually glass. The buyer in such a situation would have incurred only benefit-of-the-bargain damages-he thought he was buying a valuable diamond, and instead got something worthless-and he would likely be able to state a valid claim under the CFA or the FSAA in such a situation. What distinguishes the case at bar from this hypothetical is that, under the O'Neils' theory of damages, a functioning crib is worth less than anticipated *only if* its purchaser opts to lock the drop side into place. Insofar as the O'Neils have never done so, they cannot claim that they received less than what they bargained for.

FN12. It is not entirely clear in the first instance whether the O'Neils, as private parties, may seek injunctive relief under either the CFA or the FSAA, particularly where they have not suffered any cognizable damages. *See Lofquist v. Whitaker Buick-Jeep-Eagle, Inc. ..* No. C5-01-767, 2001 WL 1530907, at *1 (Minn.Ct.App. Dec.4, 2001) (expressly declining to answer this question under the CFA). The Court need not address this issue because even assuming *arguendo* that injunctive relief is available, Plaintiffs have not pleaded facts indicating that such relief would be appropriate.

FN13. The CPSC's recall notice-which the

Court may consider in ruling on Defendants' Motions because it is referenced throughout the SAC, *see Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.,* 406 F.3d 1052, 1063 n. 3 (8th Cir.2005)-also suggests that the cribs at issue are no longer being sold. *See http:// www.cpsc.gov/CPSCPUB/PREREL/prhtml 07/07307.html* (last visited May 8, 2008) (indicating that recalled cribs "were sold in department stores, children's stores and mass merchandisers nationwide from January 1998 *through May 2007"* ) (emphasis added). And, as noted above, Simplicity apparently is no longer in business.

D.Minn.,2008.

O&apos;Neil v. Simplicity, Inc.

--- F.Supp.2d ----, 2008 WL 2042609 (D.Minn.), Prod.Liab.Rep. (CCH) P 18,000

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))

Page 1

**H**

Pioneer Resources Corp. v. Nami Resources Co.,
LLC
E.D.Ky.,2006.
Only the Westlaw citation is currently avail-
able.PIONEER RESOURCES CORPORATION,
Plaintiff,
v.
NAMI RESOURCES COMPANY, LLC, Defend-
ant.
**Civil Action No. 6:04-465-DCR.**

June 26, 2006.

Bruce A. Claugus, Michael Davis Velasco, Claugus
& Mitchell, LLP, New York, NY, Darrell L. Saun-
ders, Darrell L. Saunders, PSC, Corbin, KY, for
Plaintiff.
George L. Seay, Jr., Wyatt, Tarrant & Combs, LLP,
Frankfort, KY, Howard O. Mann, Trimble & Mann,
Corbin, KY, Karen J. Greenwell, Richard C. Ward,
Ben T. Keller, Wyatt, Tarrant & Combs LLP, Lex-
ington, KY, Donald J. Kelly, Wyatt, Tarrant &
Combs, LLP, Louisville, KY, for Defendant.

**MEMORANDUM OPINION AND ORDER**

DANNY C. REEVES, District Judge.
*1 This matter is pending for consideration of the
Plaintiff's motion for leave to amend the Complaint
[Record No. 99] and the Defendant's motion for
partial summary judgment [Record No. 87]. For the
reasons discussed below, the Court will deny the
Plaintiff Pioneer Resources Corporation's
("Pioneer" or "the Plaintiff") motion for leave to
amend the Complaint and will grant the Defendant's
motion for partial summary judgment.[FN1]

> FN1. Although the Court will grant the De-
> fendant's motion for partial summary judg-
> ment, it will do so for the reasons dis-
> cussed below, not necessarily for the reas-
> ons raised in the Defendant's motion.

**I. Background**

Defendant Nami Resources Company, LLC
("NRC" or "the Defendant"), is a natural gas com-
pany that owns and operates more than 800 wells in
southeastern Kentucky. In February 2002, Shigemi
Morita, the principal of Pioneer, and NRC entered
into four separate Participation Agreements. Under
the agreements, Morita agreed to purchase a work-
ing and revenue interest in four wells that had not
yet been drilled. Specifically, the Participation
Agreements provided that Morita was required to
pay 50% of the "total cost" of the drilling and com-
pletion costs of the wells in exchange for a 50%
working interest and 40% revenue interest in each
well. Once Morita recouped his investment, the
agreements provided that his working interest
would be reduced to 25%.

Morita selected the following four wells for invest-
ment: (1) Barry Hembree, et al., # 1 well (the
"Hembree Well"), located in Knox County, Ken-
tucky; (2) Rondall Hamilton # 2 well (the
"Hamilton Well"), located in Knox County, Ken-
tucky; (3) SMEPA # 43 well (the "SMEPA # 43
Well"), located in Bell County, Kentucky; and (4)
SMEPA # 31-A well (the "SMEPA # 31 A Well"),
located in Clay County, Kentucky. The Participa-
tion Agreements explicitly set forth the "total"
drilling costs associated with each well. The agree-
ments provided that the "total cost" for drilling the
Hembree and Hamilton Wells was $308,000 and for
the SMEPA # 43-A and SMEPA 31-A Wells was
$320,000 and $392,500, respectively.

Section 1 of the Agreement relating to the Hamilton
Well is illustrative of the terms contained in each of
the Participation Agreements. It provides as fol-
lows:

*Drilling and Completion of the Wells*

NRC hereby grants to Morita, subject to the terms
and conditions of this Agreement, the right to parti-
cipate in the drilling and completion of Rondall

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))

Page 2

Hamilton # 2. Morita desires to contribute 50% of total cost of drilling, through completion, in exchange for 50% working interest and 40% net revenue interest. Total cost shall be $308,000 through completion. Morita will pay 50% of the total cost of the drill (sic) and will participate as a 50% working interest owner until total payout (dollar for dollar) which interest will then be reduced to 25% working interest.

[Record No. 87, Ex. 1 ] The aggregate total cost of drilling and completion of the four wells was $1,328,500. Therefore, Morita paid $664,250 (i.e., 50% of the total cost).

This action arises from the parties' Participation Agreements. The Plaintiff filed this action on September 21, 2004. Through the Complaint, it alleged, in relevant part, that:

*2 9. Nami has fraudulently overstated the cost of drilling all four (4) natural gas wells thereby charging Pioneer too much money for its participation interest.

10. Since the first sale of natural gas from the aforesaid four (4) natural gas wells, Nami has fraudulently, with malice, and in utter disregard of the rights of Pioneer, underpaid Pioneer in an exact amount as yet undermined, but in any event, far in excess of $75,000.00.

11. Nami has fraudulently, and without right to do so, converted to its own use funds to which Pioneer is entitled.

12. The fraudulent actions of Nami include, but are not necessarily limited to, the intentional overcharging of drilling and completion costs and the intentional withholding and retention of funds due Pioneer with full knowledge the it was not entitled to such funds and with the specific intent to defraud Pioneer.

[Record No. 1, Complaint ¶¶ 9-12] Based on these allegations, the Plaintiff seeks to recover compensatory and punitive damages as well as costs and at-

torney's fees.

The Defendant filed an answer and counterclaim on October 27, 2004. [Record Nos. 5, 7] Since that time, the parties have been involved in numerous discovery disputes and, based on those disputes, have sought extensions of various deadlines. On April 27, 2006, the Defendant filed a motion for partial summary judgment, seeking judgment in its favor on the Plaintiff's tort claims. On May 15, 2006, the Plaintiff filed a response in opposition to the motion and simultaneously filed a motion to amend the Complaint. These motions are now ripe for review by the Court.

**II. Plaintiff's Motion for Leave to Amend the Complaint**

As an initial matter, the Court must address the Plaintiff's motion for leave to amend its Complaint. Specifically, Pioneer has moved the Court to add additional claims and three additional parties. In support, it asserts that the preliminary accounting was not completed in this case until April 25, 2006, and that the information obtained from this accounting gives rise to the additional claims. More specifically, the Plaintiff asserts that:

the Accounting has provided the basis for Pioneer's allegations that NRC, Nami, and Guess fraudulently induced Morita to enter into Participation Agreements and defrauded Pioneer. Absent the Accounting, meaningful preparation of the Amended Complaint could not proceed and, in no case could the required elements of the scheme to defraud be satisfied.

[Record No. 98, p. 18]

NRC contends that the Court should deny the motion to amend because granting it at this late date will cause NRC to suffer prejudice inasmuch as it will have no time for discovery and, therefore, insufficient time to develop a defense to these additional claims. According to NRC, Pioneer's Amended Complaint raises ten new claims, includ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))**

ing claims under Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961*et seq.* ("RICO").

**A. Legal Standard**

*3 Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a pleading shall be "freely given when justice so requires."Fed.R.Civ.P. 15(a). The grant or denial of a motion to amend is within the sound discretion of the Court. *General Elec. Co. v. Sargent & Lundy,* 916 F.2d 1119, 1130 (6th Cir.1990). However, "when an amendment is sought at a late stage in the litigation there is an increased burden to show justification for failing to move earlier. *Wade v. Knoxville Utilities Board,* 259 F.3d 452, 459 (6th Cir.2001). The Supreme Court has identified several factors in deciding whether to allow an amendment of a complaint. These factors include, but are not limited to, the following: (1) whether there was undue delay in filing the motion; (2) whether the amendment would cause undue prejudice to adverse parties; (3) whether the movant is acting in bad faith; and (4) whether the amendment is futile. *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Robinson v. Michigan Consol. Gas Co.,* 918 F.2d 579, 591 (6th Cir.1990). In *Wade,* the Sixth Circuit held that "[n]otice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted."*Wade,* 259 F.3d at 458-59. Given that these factors are particularly relevant in the instant case, the Court will focus its inquiry on the undue delay and undue prejudice factors.

**B. Discussion**

**1. Undue Delay**

On March 30, 2006, the Plaintiff moved the Court to amend the Scheduling Order to: (1) complete pre-trial discovery; (2) identify expert witnesses; and (3) file dispositive motions. [Record No. 76] In support of the motion, Pioneer argued that the ex-

tension was necessary because the Defendant had failed to pay and provide the accountants with necessary information so that they could complete their work. At that time, Pioneer indicated that the accountants had informed counsel that a preliminary report would be issued on or about April 3, 2006. The Plaintiff further indicated that, after reviewing the report, it would be able to complete discovery, identify expert witnesses, and file dispositive motions. Pioneer stated that such extensions would not affect the deadline for the scheduled pretrial and trial dates. Notably, it did not give the Court any indication that the information obtained from the accounting might necessitate an amendment of the Complaint. To the contrary, it appears that Pioneer did not contemplate such action, given that it stated that the trial could proceed as scheduled.

In addition, at the April 10, 2006, hearing on the motion to amend the scheduling order, the Plaintiff made no mention of its discovery of additional information that would dictate amendment of the Complaint. Instead, it assured the Court of its intention to proceed to trial on the scheduled date.

While the Court cannot ascertain when the Plaintiff learned of the information giving rise to the claims asserted in the proposed Amended Complaint, it appears that Pioneer was aware of the basis for its claims several months prior to filing the motion to amend, if not earlier. Pioneer's Complaint asserts two primary factual allegations: (1) that NRC "fraudulently underpaid" Pioneer for its share of the well revenues by under reporting gas volumes and prices; and (2) that NRC "fraudulently overcharged" it for drilling costs. In the proposed Amended Complaint, Pioneer goes further in attempting to allege that NRC was engaged in an elaborate scheme to defraud. Pioneer claims the Defendant induced Morita to enter into these agreements, purposefully misrepresented the drilling costs, and systematically and fraudulently understated the monthly volumes of gas produced. Further, Pioneer claims that NRC underpaid it for its

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))**

working and revenue interest as required under the contract. Although more detailed in the proposed Amended Complaint, the factual basis giving rise to the claims sought to be asserted is the same as those factual allegations supporting the existing claims.FN2

> FN2. For example, Pioneer attempts to allege a fraudulent inducement claim in the Amended Complaint. However, contrary to the Plaintiff's assertions, the Complaint does not appear to contain such claim. It is apparent that fraudulent inducement claim shares the same factual basis as the claims set forth in the Complaint. Specifically, the Plaintiff contends that Morita was fraudulently induced to enter into the Participation Agreements because NRC perpetrated a fraud against him by overcharging him for the drilling costs and underpaying Pioneer for the working and revenue interests.

**\*4** Pioneer has indicated that, until it received the accounting report, it was unaware of the "extent of Nami's and Guess' involvement in the ... fraudulent activities."[Record No. 98, p. 18] However, regardless of whether Pioneer knew the *full extent* of their involvement, it could have asserted claims against them in the original Complaint. Nami is the person who Pioneer claims made misstatements to Morita during the negotiations concerning the wells. Certainly, Pioneer would have been aware of potential claims against Nami at the outset of this litigation. Likewise, Pioneer took Guess's deposition on August 29 and 30, 2005. Even if it was not fully aware of the claims against Guess at the outset of this litigation, it should have been able to ascertain any potential claims against her once it took her deposition, approximately eight (8) months prior to filing the motion to amend.

It is also worth mentioning that Pioneer did not file the motion to amend until after NRC filed its motion for summary judgment. In addition to adding new claims, including four RICO claims and three

additional parties, the proposed Amended Complaint contains significantly more detail than the original Complaint. The timing of the motion to amend gives the Court the distinct impression that Pioneer was attempting to cure the deficiencies outlined by the Defendant through its motion for summary judgment.

In summary, the Court finds that Pioneer has failed to offer an adequate justification for its failure to pursue the claims raised in its Amended Complaint in a more timely manner. Thus, the Court finds that there has been undue (and intentional) delay in the filing of the motion for leave to amend.

**2. Undue Prejudice**

Even if the Court assumes that Pioneer has not unduly delayed in the filing its motion to amend, an amendment of the Complaint to add new parties and a new significant number of new claims at this point in the proceedings will cause undue prejudice to the Defendant. The discovery and dispositive motion deadlines have passed. Therefore, NRC will be unable to conduct any further discovery regarding Pioneer's proposed claims. Further, it will be unable to file motions to dismiss or motions for summary judgment. *See e.g., Wade,* 259 F.3d at 459. Trial of this matter is scheduled to begin in less than two months.

While the Plaintiff suggests that this amendment would not delay the trial of this matter, the Court cannot agree. Certainly, in order to defend against the addition of new claims *and* new parties, the Defendant would need to be given the opportunity to engage in additional discovery. And as noted by the Defendant, re-opening discovery will result in additional expense to the Defendant based on the continued litigation. *See e.g., Feldman v. Allegheny Int'l, Inc.,* 850 F.2d 1217, 1225 (7th Cir.1988) (leave to amend may be denied when it would cause delay in litigation).

Again, while the Court cannot ascertain the date

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))**

Page 5

upon which the Plaintiff became aware of the basis of its additional claims, it is reasonably clear that the Plaintiff had an indication for several months prior to filing the motion to amend that it would request such relief. However, it delayed seeking to assert these claims until approximately two weeks before the close of discovery and the dispositive motion deadline and until after a motion for summary judgment had been filed. There appears to be no justification for the delay. Further, the Court finds that the Defendant would be substantially prejudiced by allowing Pioneer to amend its Complaint at this late stage of the litigation. Therefore, the Court will deny the Plaintiff's motion for leave to amend its Complaint.

### III. The Defendant's Motion for Partial Summary Judgment

*5 The Defendant has moved for partial summary judgment on Pioneer's tort claims. NRC has characterized these claims as "fraudulent underpayment," "fraudulent overcharging", and conversion. It asserts that the "fraudulent underpayment" and conversion claims fail as a matter of law because they are barred by Kentucky's economic loss doctrine. In support of the motion for summary judgment concerning Pioneer's "fraudulent overcharging" claim, NRC asserts that: (1) Pioneer was not a party to the Participation Agreements; (2) even if Pioneer was the real party in interest, it was charged only the costs agreed upon by the parties; and (3) as a matter of law, the representations concerning the costs of the wells were not fraudulent misstatements.

In response, Pioneer claims that the economic loss doctrine is not applicable in this case as NRC asserts. Alternatively, it argues that even if the economic loss doctrine is applicable, it will not bar a claim of fraudulent inducement. Further, Pioneer contends that it was the real party in interest and NRC's representations concerning the costs of the wells constituted fraudulent misstatements upon which it relied.

### A. The Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

"Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'"*Keeneland Ass'n, Inc. v. Earnes,* 830 F.Supp. 974, 984 (E.D.Ky.1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits to support its claims. *Celotex,* 477 U.S. at 324. In making this determination, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587. Ultimately, the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."*Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989) (quoting *Anderson,* 477 U.S. at 251-52).

### B. Discussion

### (1) The Economic Loss Doctrine

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))**

Page 6

**\*6** Under the economic loss doctrine, a plaintiff may only pursue tort claims which are independent from any claim for breach of contract. Tort claims cannot be maintained absent a showing of tortious conduct which is separate and independent from the alleged breach of contract. According to NRC, no separate and independent tortious conduct exists for Pioneer's alleged tort claims. In support of this argument, NRC relies primarily upon the holding in *General Elec. Co. v. Latin American Imports,* 214 F.Supp.2d 758 (W.D.Ky.2002). However, in that case, the court applied Florida law in dismissing the plaintiff's tort claims under the economic loss doctrine.

The economic loss rule is a judicially-created doctrine that has evolved through the years to preserve the distinctions between tort and contracts claims. *Ohio Casualty Ins. Co. v. Vermeer Manufacturing Co.,* 298 F.Supp.2d 575, 578 (W.D.Ky.2004). While the Supreme Court of Kentucky has never expressly adopted the economic loss rule, a number of appellate decisions have implicitly applied it in the past. *See Presnell Const. Mangers, Inc. v. EH Const., LLC,* 134 S.W.3d 575 (Ky.2004) (Keller, J., concurring). The rule has typically been applied in products liability cases to protect manufacturers from tort liability for damage that is limited to the product itself.

Notwithstanding the paucity of state authority on this issue, a recent opinion from the Western District of Kentucky has addressed Kentucky's application of the economic loss rule. In *Davis v. Siemens Medical Solutions USA, Inc.,* 399 F.Supp.2d 785, 801 (W.D .Ky.2005), the defendant moved for summary judgment regarding a misrepresentation claim, arguing that, because the misrepresentation claim was inseparable from the contract claim, the economic loss rule barred the tort claims and limited the Plaintiff's remedy to breach of contract. The court held that:

to date, no Kentucky court has held that the economic loss rule applies so expansively. Instead the economic loss rule has been limited to apply to

products liability cases, *see, e.g., Ohio Casualty Ins. Co.,* 298 F.Supp.2d at 577-78, to business purchases, *see, e.g., Mt. Lebanon Personal Care Home Inc. v. Hoover Universal Inc.,* 276 F.3d 845, 849 (6th Cir.2002), and to construction cases, *see, e.g., Bowling Green Municipal Utilities v. Thomasson Lumber Co.,* 902 F.Supp. 134 (W.D.Ky.1995). To expand the rule so as to bar a fraudulent inducement claim in an employment contract without further guidance from the Kentucky courts would eviscerate the claim of fraudulent inducement and would contravene contrary Kentucky case law. *See, e.g., Hanson v. American Nat'l Bank & Trust Co.,* 865 S.W.2d 302, 309 (Ky.1993) ( "The idea that any person or industry or enterprise would be immune from liability for fraud and deceit is not acceptable.")

*Davis,* 399 F.Supp.2d at 801.

The most recent discussion of the economic loss rule by the Kentucky Supreme Court occurred in *Presnell.* There, two justices acknowledged in a concurring opinion that the economic loss rule was originally rooted in products liability cases. Then-Justice Keller opined that the rule has "evolved into a modern, general prohibition against tort recovery for economic loss." *Presnell,* 134 S.W.2d at 583-84 (Keller, J., concurring). The Court's majority opinion, however, decided the case without any reference to the economic loss rule.

**\*7** Interestingly, in the instant case, the Defendant has not discussed the concurring opinion despite the fact that Justice Keller seems to embrace the Defendant's contention that the economic loss rule should be extended to cases outside the realm of products liability, business purchases and construction cases. This Court, however, cannot conclude that the concurring opinion from *Presnell* is persuasive evidence that the Kentucky Supreme Court will expand the applicability of the economic loss rule to all types of cases. As noted by a recent decision from the Western District of Kentucky, the "concurring opinion neither considered nor analyzed the difficulties of applying the rule to circum-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))

stances beyond the sale of goods."*Louisville Gas and Electric Co. v. Continental Field Systems, Inc.,* 420 F.Supp.2d 764 (W.D.Ky.2005).

In *Louisville Gas,* the court concluded that the economic loss rule did not apply to the providing of a service as opposed to the selling of a product. Thus, the court held that

[t]his Court believes that it is on sound ground in predicting that Kentucky court would apply the economic loss rule in its classic definition. However, it would be pure speculation to suggest that Kentucky courts would adopt the broader application of the rule discussed in the *Presnell* concurrence.

*Louisville Gas,* 420 F.Supp.2d at 770.

In light of prior Kentucky decisions, this Court finds that the Kentucky Supreme Court would likely not extend the economic loss doctrine outside the products liability, business purchases or construction cases. While the Defendant urges this Court to extend the economic loss doctrine to the facts presented in this case, arguing that the rationale and purpose of the doctrine is equally applicable, the role of this Court is to apply the economic loss doctrine in the same manner as it would be applied by the Supreme Court of Kentucky. It would be pure speculation for this Court to conclude that the Kentucky courts would adopt a broader application of the rule, given existing case authority. Therefore, the Court concludes that the economic loss rule is not applicable in this case.

**(2) The Plaintiff's Claims**

The Plaintiff has failed to specifically articulate the claims raised in its Complaint. Therefore, prior to addressing the Defendant's motion for summary judgment, the Court must identify the claims in order to determine which, if any, should survive summary judgment. Rule 8(f) of the Federal Rules of Civil Procedure requires the Court, when construing a complaint, to do so in a manner that will "do

substantial justice." Fed.R.Civ.P. 8(f). Under the liberal federal pleading rules, the Court must look to the substance of the *entire* complaint to determine the claims that have been properly asserted. In the present case, the Plaintiff's Complaint alleges, in relevant part, that:

9. Nami has fraudulently overstated the cost of drilling all four (4) natural gas wells thereby charging Pioneer too much money for its participation interest.

*8 10. Since the first sale of natural gas from the aforesaid four (4) natural gas wells, Nami has fraudulently, with malice, and in utter disregard of the rights of Pioneer, underpaid Pioneer in an exact amount as yet undermined, but in any event, far in excess of $75,000.00.

11. Nami has fraudulently, and without right to do so, converted to its own use funds to which Pioneer is entitled.

12. The fraudulent actions of Nami include, but are not necessarily limited to, the intentional overcharging of drilling and completion costs and the intentional withholding of and retention of funds due Pioneer with full knowledge the it was not entitled to such funds and with the specific intent to defraud Pioneer.

[Record No. 1, Complaint ¶¶ 9-12]

**(a) The Alleged Fraud Claims**

While the Defendant contends that the Plaintiff has alleged two fraud claims, *i.e.,* a "fraudulent underpayment" and a "fraudulent overcharging" claim, the Court notes that it has been unable to locate any cases in which the Kentucky courts have held a party liable in tort for "fraudulent underpayment" and/or "fraudulent overcharging." However, Kentucky law does recognize a claim for fraud, *i.e.,* fraudulent misrepresentation, and fraudulent inducement. Notwithstanding this fact, the allegations in the Complaint do not support a claim under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))

either theory.[FN3]

> FN3. Pioneer has attempted to allege a fraudulent inducement claim in the tendered Amended Complaint.

Under either theory, a plaintiff must allege that a declarant made a material misstatement of fact upon which the plaintiff relied and upon which the declarant knew (or should have known) the plaintiff would rely. As noted by the Sixth Circuit in *In re Sallee*, 286 F.3d 878 (6th Cir.2002),

[t]he proper distinction between fraudulent misrepresentation and inducement derives from the context in which the fraudulent misrepresentation occurred. If the misrepresentation occurred with the intention of inducing a party to act, the result is fraudulent inducement. If the misrepresentation did not occur within the context of inducing another to act, but instead was a misrepresentation for other purposes, the result is another form of fraud, for example, fraud in the factum, where the document signed was itself misrepresented.

*Id.* at 905 (Batchelder, J., concurring) (internal quotations omitted). Again, under either theory, a plaintiff must allege a material misrepresentation upon which it relied.

In paragraph 9 of the Complaint, the Plaintiff alleges that "Nami fraudulently overstated the cost of drilling all four (4) natural gas wells."Even if the Court assumes that the fraudulent overstatement of the cost was the alleged misstatement, the Plaintiff has not alleged that Morita relied on this statement and that such reliance resulted in damages. Therefore, based on the factual statements contained in the Complaint, Pioneer can prove no set of circumstances that would establish a viable claim.[FN4]

> FN4.Kentucky Civil Rule 9.02 requires that all allegations of fraud must be "stated with particularity." Under Kentucky law, an allegation of fraud in a pleading must set forth the time, place and substance of

the allegedly fraudulent statements. To the extent the Plaintiff is attempting to plead fraud, the Court finds that the Plaintiff has not complied with Rule 9.02 by setting forth "facts with sufficient particularity to apprise defendant fairly of the charges against him."*Scott v. Farmers State Bank,* 410 S.W.2d 717 (Ky.1966).

Rule 8(a) provides that the plaintiff's complaint must contain "a demand for judgment for the relief the pleader seeks."If the Plaintiff were to prevail on a fraudulent inducement claim, the relief would be recision of the Participation Agreements. Pioneer has not indicated in its Complaint, pleadings, or otherwise, that it seeks to set aside the Participation Agreements. To the contrary, the Plaintiff has clearly pled a breach of contract claim. The fact that the Plaintiff has not requested rescission is a further indication that Pioneer has not plead a claim for fraudulent inducement.

**(b) Breach of Contract**

**\*9** The alleged "fraudulent underpayment" claim is actually a claim for breach of contract. Under the contract, performance was required by both parities. Initially, Morita was required to perform by paying NRC 50% of the "total cost" to drill and complete the wells. Each Participation Agreement sets forth the "total cost" of drilling the well through completion. In exchange for contributing 50% of the "total cost" of the drilling and completion costs of the well, NRC was required to provide to Morita/Pioneer[FN5] a 50% working interest and 40% revenue interest until such time as he recouped his investment. At that point, the Participation Agreements provide that Morita/Pioneer's working interest in each well would be reduced to 25%.

> FN5. The real party in interest issue does not apply with respect to this claim because Morita's working and revenue interests subsequently were conveyed to Pioneer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))

The Complaint alleges that "Nami has fraudulently ... underpaid Pioneer." [Record No. 1, Complaint ¶ 10] According to Pioneer, NRC under reported the volume of gas produced by the wells and, therefore, failed to pay the amount of money it was owed. Inasmuch as the duty to pay Morita/Pioneer for the working and revenue interests arose by virtue of the Defendant's contracts with Morita, the Court finds that this is a classic breach of contract claim.

To recover for breach of contract under Kentucky law, "a plaintiff must show the existence and the breach of a contractually imposed duty."*See Lemming v. Commercial Union Ins. Co.,* 260 F .3d 574, 581 (6th Cir.2001). According to Pioneer, the Defendant breached the Participation Agreements because it under reported the volume of gas produced by the wells and, therefore, failed to pay Pioneer the amount of money as set forth under the Participation Agreements.

The Court acknowledges that Pioneer has alleged that NRC acted "fraudulently." Within every contract there is an implied covenant of good faith and fair dealing which encompasses an duty to act sincerely and without deceit or fraud. *See Pearman v. West Point Nat'l Bank,* 887 S.W.2d 366, 368, fn. 3 (Ky.App.1994). However, the tort itself arises from a violation of a duty to act in good faith that is imposed by common law, not by the terms of the contract. Not all contracts impose a duty that, if breached in bad faith, may be remedied in tort. Courts typically only find a breach of the duty to act in good faith in those contracts involving "special relationships," which are not found in ordinary commercial settings. The most notable are contracts between insurer and insured where distinct elements are present, such as unequal bargaining power, vulnerability and trust among the parties. *See e.g., Ennes v. H & R Block Eastern Tax Servs.,* --- F.Supp.2d ----, 2002 WL 226345 (W.D.Ky.2002). Those circumstances do not exist in this case.

Here, the record reflects that Morita was an experienced investor and solicitor of investments in natur-

al gas wells. [Morita Depo., p. 280] He had invested in more than a dozen wells before his investment with NRC. [Morita Depo., pp. 111-113] Further, Morita even served as director of a publicly-traded natural gas company (Tengasco) for a period of approximately four and one-half years. In the past, Kentucky courts have refused to extend the tort action for breach of the covenant of good faith and fair dealing to non-insurance contracts. The Court finds no trend in the law to abandon this limitation, nor any compelling policy reason to initiate a change of direction. Inasmuch as contract damages are available to make the Plaintiff whole for the alleged "underpayment" of the working and revenue interests, the Plaintiff may seek redress under a breach a contract theory. However, Pioneer may not pursue the same claim in tort as well.

*10 Recognizing that there are unresolved factual questions regarding Pioneer's breach of contract claim, NRC has not moved the Court for summary judgment on this issue. At trial, Pioneer will be permitted to present evidence and testimony relating to NRC's alleged under reporting of the volume of gas produced by each well and the alleged underpayment of the working and revenue interest as required under the terms of the contract.[FN6]

> FN6. However, Pioneer will not be allowed to present evidence on the issue of whether the Defendant overcharged Morita for the drilling costs of the four wells. As discussed below, this issue relates to Morita's (or the Plaintiff's) performance under the contract. There is no remedy for entering into a bad bargain.

### (c) Unjust Enrichment

Paragraph 9 of the Complaint provides that "Nami has fraudulently overstated the cost of drilling all four (4) natural gas wells thereby charging Pioneer too much money for its participation interest."[Record No. 1, Complaint ¶ 9] Further, in paragraph 12, the Plaintiff alleges that:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))

Page 10

[t]he fraudulent actions of Nami include, but are not necessarily limited to, the intentional overcharging of drilling and completion costs and the intentional withholding of and retention of funds due Pioneer with full knowledge that it was not entitled to such funds and with the specific intent to defraud Pioneer.

[Record No. 1, Complaint ¶ 12] The Defendant contends that these paragraphs constitute a "fraudulent overcharging" claim.[FN7] However, as noted above, the Court is unaware of any relevant authority that has recognized a tort cause of action for "fraudulent overcharging." In looking at the entirety of the Complaint, the Court will construe these allegations as a claim for unjust enrichment.

> FN7. In its brief, NRC raised an issue regarding whether Pioneer was a real party in interest on the "fraudulent overcharging" claim. Inasmuch as this Court has construed the "fraudulent overcharging" claim as an unjust enrichment claim and has found that it fails as a matter of law, it need not address the real party in interest issue.

Under Kentucky law, for an unjust enrichment claim to be viable, the Plaintiff must show that: (1) a benefit was conferred upon the Defendant at the Plaintiff's expense, (2) a resulting appreciation of the benefit by the Defendant, and (3) an inequitable retention of the benefit without payment for its value. *See Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.,* 898 F.Supp. 1198 (W.D.Ky.1995). Recovery under a claim for *quantum meruit* or a contract implied by law is distinguishable from an express or implied-in-fact contract. In *Perkins v. Daugherty,* 722 S.W.2d 907 (Ky.App.1987), the Kentucky Court of Appeals stated that:

[A] contract implied by law allows for recovery quantum meruit for another's unjust enrichment. It is not based upon a contract but a legal fiction invented to permit recovery where the law of natural justice says there should be a recovery as if promises were made. The courts supply the fiction to permit the recovery.

*Id.* at 909.

In essence, Pioneer claims that NRC was unjustly enriched by retaining the money it overcharged Morita for the drilling and completion costs of the wells. Pioneer acknowledges that, pursuant to the terms of the contract, Morita agreed to pay 50% of the "total cost" of the drilling and completion costs of the wells. However, it contends that inasmuch as the "total cost" of drilling was, in fact, substantially less than the amount set forth in the contracts, NRC was unjustly enriched by the excess money.

*11 In *Codell Construction Company v. Commonwealth,* the Kentucky Court of Appeals held that "the doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed."*Codell Constr. Co. v. Commonwealth,* 566 S.W.2d 161, 165 (Ky.Ct.App.1977). The benefit created by Pioneer was part of the performance required in the written contracts with the Defendant.[FN8] Pioneer was required to pay 50% of the "total cost" to drill the wells in exchange for a percentage of the revenue and working stream. The amount of "total cost" was explicitly set forth in the contract.[FN9] And although the Plaintiff now contends that Nami "overstated" and "charged [it] too much money for its participation interest," there is no basis to rework a contract that a party later determines to be a bad bargain. The fact that Pioneer "overpaid" for the ensuing working and revenue stream does not obligate NRC to return money to which it was entitled under the express terms of the contracts. NRC's retention of the "excess money" for the drilling costs of the wells does not rise to the level of inequitable conduct.

> FN8. The alleged conduct likewise cannot be construed as a breach of contract claim inasmuch as payment for the cost of drilling the wells was part of Pioneer's per-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))

formance under the contract. A party may not enforce a provision of a contract to which it bears the obligation or duty. *See Clark v. West*, 193 N.Y. 349, 358-59 (N.Y.1908). Morita was specifically required under the contracts to pay 50% of $1,328,500.00. Morita paid this amount. Thus, there is no breach of contract for the Defendant's alleged overstatement and overcharging of the drilling costs.

FN9. According to the Participation Agreements, the total cost of drilling the Hembree and Hamilton Wells was $308,000. The total drilling costs of the SMEPA # 43-A and SMEPA 31-A Wells were $320,000 and $392,500, respectively.

**(d) Conversion**

Finally, NRC alleges that Pioneer has asserted a claim for conversion. In paragraph 11 of the Complaint, Pioneer avers that "Nami has fraudulently, and without right to do so, converted to its own use funds to which Pioneer is entitled."[Record No. 1, Complaint ¶ 11] Further, paragraph 12 the Complaint provides that "[t]he fraudulent actions of Nami include ... the intentional withholding of and retention of funds due Pioneer with full knowledge that it was not entitled to such funds and with the specific intent to defraud Pioneer."[Record No. 1, Complaint ¶ 12] To plead a claim for conversion, a party must allege that: (1) it had ownership rights in a certain property; (2) that the Defendant wrongfully took or disposed of the property; and (3) that it suffered damages. *Davis*, 399 F.Supp.2d at 801;*Goss v. Bisset*, 411 S.W.2d 50, 53 (Ky.1967).

To the extent Pioneer is basing its conversion claim on the Defendant's failure to return the funds that Morita was allegedly overcharged for drilling the wells, the Court will grant the motion for summary judgment, inasmuch as Defendant rightly came into possession of these funds. Kentucky law recognizes that when a plaintiff consents to a transfer of property, he no longer has a cause of action for conver-

sion. *Gross v. Citizens Fidelity Bank Wnchester*, 867 S.W.2d 212, 214 (Ky.App.1993). In the present case, Morita and NRC agreed on an amount of money to drill the wells and included that amount in the express language of the contract. While Pioneer now contends that the "agreed total price" was not the "actual total price" and that NRC overcharged Morita to drill the wells, these allegations do not support a conversion claim. Morita and/or Pioneer agreed to pay the alleged excess amount. Therefore, the Court finds that Pioneer has failed to state claim for conversion.

**\*12** To the extent that Pioneer is alleging that NRC failed to pay the Plaintiff for the revenue and working interest of the wells, the Court must initially determine whether the Plaintiff may proceed with both a conversion and breach of contract claim. A conversion claim and a breach contract claim are not always incompatible. However, a conversion claim will not exist if the property right alleged to have been converted arises entirely from the contractual rights to compensation. *See Davis*, 399 F.Supp.2d at 801.

In the present case, Pioneer alleges that NRC systematically adjusted the volume of natural gas produced by the wells and wrongfully deprived Pioneer of the unreported natural gas and proceeds. The parties' contractual relationship defined their rights regarding the unreported natural gas and proceeds. Further, Pioneer seeks payment of the money (*i.e.*, damages) in an amount that he is due under the terms of the contracts. Therefore, the Court finds that Pioneer cannot maintain a conversion claim to the extent that it is based on this conduct.

**(e) Punitive Damage Claim**

Under Kentucky law, punitive damages are not available for breach of contract. *Federal Kemper Insurance Co. v. Hornback*, 711 S.W.2d 844 (Ky.1986); *Ford Motor Co. v. Mayes*, 575 S.W.2d 480 (Ky.App.1978). Further, K.R. S. § 411.184(4) explicitly provides that "[i]n no case shall punitive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.))

damages be awarded for breach of contract."K.R.S. § 411.184(4). Inasmuch as the Plaintiff's only remaining claim is a breach of contract claim, the punitive damage claim fails as a matter of law.

### IV. Conclusion

Pioneer's proposed Amended Complaint raises a number of new claims and attempts to add new parties. However, it has delayed pursuing these claims until after NRC filed a motion for summary judgment and only two weeks prior to the close of discovery and the dispositive motion deadline. For the reasons discussed above, the Court believes and finds that Pioneer's actions constitute undue and unacceptable delay. Further, the Court finds that NRC would be substantially prejudiced by allowing Pioneer to amend its Complaint at this stage of the litigation.

Through the pending motion, NRC has moved for judgment in its favor on Pioneer's tort claims. After reviewing the pleadings, the Court has concluded that Pioneer asserted breach of contract, unjust enrichment and conversion claims. Additionally, Pioneer seeks punitive damages. However, because the Court finds that NRC is entitled to judgment as a matter of law on the unjust enrichment and conversion claims, the Court will grant NRC's motion for summary judgment regarding these claims as well as the Plaintiff's request for punitive damages.

Accordingly, it is hereby **ORDERED** as follows:

1. The Plaintiff's motion for leave to amend its Complaint [Record No. 99] is **DENIED;**

2. The Defendant's motion for partial summary judgment [Record No. 87] is **GRANTED;**

3. The Plaintiff's tort claim, which the Court has construed as a claim for unjust enrichment, is **DISMISSED;**

*13 4. The Plaintiff's conversion claim is **DISMISSED;**

5. The Plaintiff's punitive damages claim is **DISMISSED.**

E.D.Ky.,2006.
Pioneer Resources Corp. v. Nami Resources Co., LLC
Not Reported in F.Supp.2d, 2006 WL 1778318 (E.D.Ky.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**MARIA L. RUBIN, Plaintiff, v. DAIMLERCHRYSLER CORP. et al, Defendants.**

**CIVIL ACTION NO. H-04-4021**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2005 U.S. Dist. LEXIS 42102*

**May 20, 2005, Decided
May 20, 2005, Filed**

**COUNSEL:** [*1] For Maria L Rubin, Plaintiff: Matthew J M Prebeg, Goldstein Faucett et al, Houston, TX.

For DaimlerChrysler Corporation, Defendant: G Robert Sonnier, Attorney at Law, Austin, TX; Ryan Brandon Bolling, Clark Thomas et al, Austin, TX.

For Shannon Automotive Ltd doing business as Crown Jeep Eagle Chrysler Plymouth, UAG Texas II Inc, Defendants: G Robert Sonnier, Attorney at Law, Austin, TX.

**JUDGES:** Lee H. Rosenthal, United States District Judge.

**OPINION BY:** Lee H. Rosenthal

**OPINION**

**MEMORANDUM AND ORDER**

Plaintiff, Maria L. Rubin, filed suit in Texas state court against Daimler Chrysler Corp., alleging that she was injured when a 1999 Jeep Grand Cherokee driven by her daughter moved backwards unexpectedly because although the gear shift appeared to be in the "park" position, it was in "reverse." Rubin also sued the in-state sellers of the Jeep, Shannon Automotive, Ltd. d/b/a Crown Jeep Eagle Chrysler Plymouth ("Crown Jeep") and UAG Texas II, Inc. ("UAG"). Chrysler removed on the basis of diversity jurisdiction, alleging improper joinder of the in-state defendants. *28 U.S.C. §§ 1332, 1441(b)*. Chrysler based its removal on a Texas statute that [*2] protects nonmanufacturing sellers from product liability suits. (Docket Entry No. 17). Rubin has moved to remand, asserting that she adequately pleaded exceptions to that statute. (Docket Entry No. 22).

Based on the pleadings, the motions and responses, the parties' arguments and submissions, and the applicable law, this court denies Rubin's motion to remand. The reasons are stated below.

**I. Removal Jurisdiction and Improper Joinder**

If federal jurisdiction is based on diversity, the action is "removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which [the] action is brought." *28 U.S.C. § 1441(b)*. Defendants assert that removal jurisdiction is present under *28 U.S.C. § 1441(b)* because diversity exists if the in-state defendants' citizenship is disregarded. Chrysler is a Delaware corporation with its principal place of business in Michigan. Crown Jeep is a Texas partnership. UAG, a Delaware corporation, is the managing partner of the partnership. (Docket Entry No. 10, Ex. 1). Rubin is a Texas oilman. The citizenship of an improperly joined defendant is irrelevant [*3] to diversity jurisdiction.

To establish improper joinder, the party seeking removal must demonstrate either "(1) actual fraud in the pleading of jurisdictional facts, or (2) inabil-

ity of the plaintiff to establish a cause of action against the non-diverse party in state court." *Travis v. Irby, 326 F.3d 644, 647 (5th Cir.2003)*. Under the second prong, the standard is whether the defendant has demonstrated that there is no reasonable basis to predict that the plaintiff might be able to recover against the in-state defendant. "[A] removing defendant [need not] demonstrate an absence of *any possibility* of recovery in state court, . . . the defendant must demonstrate only that there is no *reasonable basis* for predicting that the plaintiff will recover in state court." *Gray ex rel. Rudd v. Beverly Enterprises-Miss., Inc., 390 F.3d 400, 405 (5th Cir. 2004)*(emphasis in original). A "mere theoretical possibility of recovery under local law" will not preclude a finding of improper joinder. *See Badon v. RJR Nabisco, Inc., 236 F.3d 282, 286 n. 4. (5th Cir.2000); Ross v. Citifinancial, Inc., 344 F.3d 458, 462 (5th Cir.2003).* [*4]

The Fifth Circuit recently clarified the procedure for determining whether a removing party has shown that no reasonable basis for recovery against the in-state defendant exists. In *Smallwood v. Illinois Central Railroad Co., 385 F.3d 568 (5th Cir. 2004)*(en banc), *cert. denied, 544 U.S. 992, 125 S. Ct. 1825, 161 L. Ed. 2d 755 (2005)*, the court explained that two methods are available to a district court deciding a motion to remand based on improper joinder.

> The court may conduct a *Rule 12(b)(6)*-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant. Ordinarily, if a plaintiff can survive a *Rule 12(b)(6)* challenge, there is no improper joinder. That said, there are cases, hopefully few in number, in which a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder. In such cases, the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry. . . . We caution that a summary inquiry is appropriate only to identify the presence of discrete and undisputed facts that would pre-

clude [*5] plaintiff's recovery against the in-state defendant.

*Id. at 573-74*. If, after examining the pleadings, the district court determines that it is appropriate to pierce the pleadings and conduct a summary inquiry, discovery into jurisdictional facts might be appropriate. The *Smallwood* court emphasized that only limited discovery, on a showing of necessity, restrained by a tight "judicial tether," is appropriate. *Id.*

In determining whether the plaintiff has a reasonable basis for recovery on at least one claim under state law, the district court is limited to the causes of action and allegations asserted in the complaint. The removing party may not rely on causes of action or new theories of recovery not alleged in the latest petition that was on file in the state court when the case was removed. *Griggs v. State Farm Lloyds, 181 F.3d 694, 700 (5th Cir. 1999); Alonso ex. rel. Estate of Cagle v. Maytag Corp., 356 F. Supp.2d 757, 761 (S.D.Tex. 2005)*(noting that although a court may consider post-removal evidence, it may not consider new theories or causes of action).

The district court must resolve all factual disputes and [*6] ambiguities in state law in favor of the plaintiff. *Travis, 326 F.3d at 649; McKee v. Kan. City S. Ry. Co., 358 F.3d 329, 333 (5th Cir.2004)*. If the record reveals a reasonable basis of recovery on one cause of action, a court must remand the entire suit to state court. *Gray, 390 F.3d at 412* (presence of unavailing claims does not defeat remand); *Rainwater v. Lamar Life Ins. Co., 391 F.3d 636, 638 (5th Cir.2004)*.

## II. The Petition and the Jurisdictional Discovery

In her original state court petition, Rubin asserted what she described as "Facts Common to all Causes of Action." In this section of the petition, Rubin alleged that on September 6, 2002, Rubin and her daughter, Maria Roberts, were preparing to leave home. Roberts started the engine of the 1999 Jeep Grand Cherokee she had purchased in July 1999 to back out of her parking space. She tried to release the parking brake, without success. Rubin was standing beside the car when "the emergency brake finally released on its own. Although the

floor shifter transmission control indicated the transmission was in the 'Park' position, the car lunged backward [*7] and unexpectedly traveled several feet. The open door of the vehicle struck Rubin . . ." and caused her severe injury. Rubin alleged that Chrysler "designed and manufactured" the vehicle; that all three defendants "marketed" the vehicle; and that Crown Jeep and UAG "marketed and serviced" the vehicle." (Docket Entry No. 7, Ex. 1, p.3).

Rubin specifically alleged that when the vehicle was sold to Maria Roberts, defendants Crown Jeep and UAG "actually knew, or in the exercise of ordinary care should have known, . . . that the Jeep they were supplying was defective." Rubin alleged that when the vehicle was sold, defendants "were aware that Defendant Chrysler would recall 1993 through 1998 model year Jeep Grand Cherokees for a safety defect concerning the Jeep's floor shifter, which allowed inadvertent shifts into 'Reverse' when the vehicle was seemingly in the 'Park' position. Each of the Defendants also knew that the 1999 model Jeep was subject to inadvertent shift to reverse." (Docket Entry No. 7, Ex. 1, p. 4).

Rubin alleged that Crown Jeep and UAG were involved in the "actual design" of the 1999 Jeep by providing Chrysler with "input, information regarding consumer preferences, information [*8] concerning customers' complaints, and information concerning product deficiencies." (Id.). Rubin also alleged that when the vehicle was sold in July 1999, Crown Jeep and UAG were aware that Chrysler had issued a warning about the unintended rearward movement of 1999 through 2004 model year Jeep Grand Cherokees when the shift lever was apparently in the "park" position, making them aware of this defect in the vehicle sold to Roberts, which injured Rubin. (Id.). Although Rubin alleged that Crown Jeep had performed routine service on the 1999 Jeep, including on the gear system, she alleged that the vehicle was defectively designed and manufactured when sold; she did not allege that the dealership's servicing altered the gear shift or transmission so as to contribute to the accident. (Docket Entry No. 16, pp. 7-8).

Based on these factual allegations, Rubin asserted causes of action for strict liability based on the defective design and /or manufacture of the vehicle's floor gear shift lever that allowed inadvertent

shifts into reverse when the vehicle seemed to be in the "park" position. Rubin asserted that the defendants failed to warn drivers, owners, or passengers of the defect. [*9] Rubin asserted defective marketing in that the "advertising and marketing campaigns and programs" undertaken by Chrysler, Crown Jeep, and UAG misled consumers as to the safety features of the Jeep and failed to warn consumers of the dangerous condition of the Jeep. Finally, Rubin asserted that defendants negligently designed, manufactured, and marketed the Jeep. (Docket Entry No. 7, Ex. 1, pp. 4-5).

On October 15, 2004, Chrysler filed a notice of removal on the basis of improper joinder of the in-state defendants. Chrysler argues that the recent amendments to Chapter 82 of the Texas Civil Practices and Remedies Code ("TCPRC") preclude recovery against the in-state defendants. *Section 82.003* protects nonmanufacturing sellers from liability for injuries caused by a defective product unless one of the specified exceptions applies. [1]

> 1    *Section 82.003* was added by Texas House Bill 4 and applies to any action filed on or after July 1, 2003. Tex. H.B. 4, 78th Leg., R.S. (2003).

Chapter 82 applies in a "products liability [*10] action," defined as:

> any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories.

*TEX. CIV. PRAC. & REM. CODE ANN. § 82.001.* In 2003, the Legislature added *section 82.003*, which limits the ability of a plaintiff to recover against a nonmanufacturing seller in a products liability action. *Section 82.003* states:

> (a) A seller that distributes a product, without participating in its manufacture, is not liable for harm caused

to the claimant by that product unless the claimant proves:

(1) that the seller participated in the design of the product;

(2) that the seller altered or modified the product and the claimant's harm resulted from that alteration or modification;

(3) that the seller installed the product, or had the product installed, on another product and the claimant's harm resulted from the product's installation [*11] onto the assembled product;

(4) that:

(A) the seller exercised substantial control over the content of a warning or instruction that accompanied the product;

(B) the warning or instruction was inadequate; and

(C) the claimant's harm resulted from the inadequacy of the warning or instruction;

(5) that:
(A) the seller made an express factual representation about an aspect of the product;

(B) the representation was incorrect;

(C) the claimant relied on the representation in obtaining or using the product; and

(D) if the aspect of the product had been as represented, the claimant

would not have been harmed by the product or would not have suffered the same degree of harm;

(6) that:
(A) the seller actually knew of a defect to the product at the time the seller supplied the product; and

(B) the claimant's harm resulted from the defect; or

(7) that the manufacturer of the product is:
(A) insolvent; or

(B) not subject to the jurisdiction of the court.

(b) This section does not apply to a manufacturer or seller whose liability in a products liability action is governed by Chapter 2301, Occupations [*12] Code. In the event of a conflict, Chapter 2301, Occupations Code, prevails over this section.

*TEX. CIV. PRAC. & REM. CODE ANN. § 82.003.*

There are few cases decided under *section 82.003*. The few federal court cases involving cases removed under the statute have remanded based on Deceptive Trade Practices Act claims asserted in the plaintiff's state court petition. *See Alonso, 356 F. Supp.2d at 761* (concluding that sellers of allegedly defective product could not be liable under *section 82.003* but remanding on the basis of a DTPA claim); *Skinner v. Cooper Tire & Rubber Co., 2004 U.S. Dist. LEXIS 9505, 2004 WL 1171201, *2 n.3 (N.D. Tex. 2004)*(remanding on

basis of DTPA claim and noting that defendant did not argue that a DTPA claim is unavailable); *Brewer v. Porsche Cars North America, Inc., 2005 U.S. Dist. LEXIS 1759, 2005 WL 292417, *2 (N.D. Tex. 2005)*(remanding on basis of plaintiff's DTPA claim that alleged seller failed to disclosure information about the product which was known at the time of the sale); *see also Cooper v. Zimmer Holdings, Inc., 320 F. Supp.2d 1154, 1163 (D. Kan. 2004)*(remanding on basis of deceptive trade [*13] practice claim despite broad statutory definition of product liability claim).

No discovery had been conducted when Chrysler removed. Chrysler attached to its notice of removal an affidavit of Crown Jeep's former president, Rocky L. McCullough. In the affidavit, McCullough explained that none of the exceptions to *section 82.003* apply. In support of remand, Rubin submitted the affidavit of Roberts. In her affidavit, Roberts stated that on three different occasions, once at the time of the sale of the Jeep in July 1999 and twice following routine service inspections, Crown Jeep employees made representations about the transmission. (Docket Entry No. 7, Ex. 4, P 6). On November 3, 2000 and January 8, 2002, "Crown Jeep represented . . . that it had actually performed a proper transmission service and diagnostic inspection of the Jeep, and that the transmission was working properly." (*Id.* PP 7-8).

Rubin asserted that remand was proper under *section 82.003(a)* because she pleaded that the in-state defendants had actual knowledge of the transmission defect at the time of sale to Roberts; that the in-state defendants participated in the design of the product; and that the in-state defendants [*14] misrepresented the safety of the allegedly defective gear shift. Rubin also argued that remand was proper because she had pleaded an independent negligent misrepresentation claim for "false advertising" under the Texas Occupations Code, a claim explicitly excluded from the seller liability statute in *section 82.003(b)*. (Docket Entry No. 7).

Defendants responded that Rubin omitted specific undisputed facts and misstated other facts that undermine the only basis alleged in her petition to show that the in-state defendants had actual knowledge of the defect; that the allegations in the petition fail to provide a basis for holding Crown Jeep and UAG liable for participating in the design of

the vehicle; and that the allegations and evidence as to representations about the transmission do not fall within any exception to the Texas state law protecting nonmanufacturing sellers from liability. (Docket Entry No. 10).

On February 17, 2005, this court held a hearing on Rubin's motion to remand. In the hearing, Chrysler argued that although Rubin had alleged that the in-state defendants had actual knowledge of a gear shift defect at the time of the sale, she had omitted and misstated specific [*15] facts. Rubin alleged actual knowledge based on a recall that applied to the 1993 to 1998 Jeep Grand Cherokees ("the BO2 Recall") and a "warning" letter sent to owners of 1999 to 2004 year models. According to Chrysler, the BO2 Recall did not issue until 2002, three years after the sale of the Jeep to Roberts. Chrysler asserted that the 1999 Jeep was never included in a gear shift recall and that the "warning" letter was a safety reminder that did not issue until 2003, long after the sale of the Jeep to Roberts and, indeed, after the accident. Rubin did not include the issuance dates for either the BO2 Recall or the letter. She did not allege any other factual basis for the in-state defendants' knowledge of a "park to reverse" design or manufacturing defect in the 1999 Jeep. In the state court petition, Rubin alleged that the BO2 Recall applied to the 1993 to 1998 year models, but in her motion to remand, Rubin included the 1999 Jeep as among the year models included in the recall. Chrysler urged this court to conduct a summary inquiry under *Smallwood, 385 F.3d 568*. At the time of the hearing, the parties did not know whether Chrysler had informed the dealerships about [*16] the 1993 to 1998 BO2 Recall or the 1999 to 2004 letter before it released the information to consumers and were unsure about the exact dates either communication issued. (Docket Entry No. 16).

This court allowed limited discovery into discrete factual areas material to determining jurisdiction: the date of the BO2 Recall; the date of the warning letter; and any information the in-state defendants had received about an "inadvertent reverse" risk in the 1999 Jeep. The jurisdictional discovery shows that before July 1999, Chrysler did not send Crown Jeep any notices or information about inadvertent gear shift issues in Jeep Grand Cherokees. In September 2002, Chrysler issued the

BO2 Recall for 1993 to 1998 Jeep Grand Cherokees. The 1999 Jeep was not included. In February 2003, Chrysler issued the letter to owners titled "Recommendations For Avoiding Unintended Movement of Your 1999 to 2004 Model Year Jeep Grand Cherokee" ("Unintended Movement Letter"). In February 2003, Chrysler informed the dealers that the Unintended Movement Letter had been sent to all known owners and instructed the dealers to place a copy of the letter in 1999 to 2004 vehicles in their inventory. (Docket Entry No. [*17] 17, Exs. 1-4).

Rubin has alleged three grounds for holding the in-state seller defendants liable under Texas law for the park-to-reverse defect she asserts caused the accident: the in-state defendants had actual knowledge of the defect; the in-state defendants participated in designing the vehicle; and the in-state defendants negligently misrepresented the proper operation of the transmission. Each ground is examined below.

## IV. The In-State Defendants' Actual Knowledge of the Defect

A plaintiff may recover against a nonmanufacturing seller for injuries resulting from a defective product if that seller actually knew of a defect to the product when the seller supplied the product and the plaintiff's harm resulted from the defect. *TEX. CIV. PRAC. & REM. CODE. ANN. § 82.003(a)(6)*; *see Reynolds v. Ford Motor Co., 2004 U.S. Dist. LEXIS 27106, 2004 WL 2870079 (N.D. Tex. Dec. 13, 2004)* (remanding products liability suit for lack of diversity because the petition alleged that the in-state seller had actual knowledge of a product defect at the time of the sale). Rubin pleaded that the in-state defendants had actual knowledge of the transmission defect in the 1999 Jeep when it was sold to Roberts [*18] on July 27, 1999. Although the pleading states one of the exceptions to *section 82.003*, the only basis Rubin alleged for actual knowledge on the part of the in-state defendants was based on the communications sent by the designer and manufacturer, Chrysler. The jurisdictional discovery reveals undisputed facts that were omitted from or misstated in the petition that preclude a finding of actual knowledge on the only basis Rubin alleged.

Rubin alleged that in July 1999, the dealership had actual knowledge of the defect in the 1999 Jeep gear shift design on the basis of the BO2 Recall that applied to gear shift levers in the 1993 to 1998 Jeep Grand Cherokees and the Unintended Movement Letter that was directed to the 1999 to 2004 Jeep Grand Cherokees. The undisputed facts show that the BO2 Recall issued in 2002, three years after the sale of the Jeep at issue to Roberts, and the Unintended Movement Letter issued in 2003, almost six months after the date of Rubin's accident. [2] In response, Rubin argues that because the BO2 Recall had not issued at the time of the sale, Crown Jeep could not have ruled out the possibility that the 1999 Jeep might be included in a recall that might have [*19] been "brewing" as early as July 1999. (Docket Entry No. 22, p. 7). Under the Texas statute, however, liability cannot be based on an allegation that a seller *should have known* of a defect in a product. *See Reynolds, 2004 U.S. Dist. LEXIS 27106, 2004 WL 2870079 at *7 (N.D. Tex.)*("The language of *section 82.003* clearly requires actual knowledge of the defect on the part of the seller. . . . *Section 82.003* makes no reference to what a seller should have known or foreseen.").

> 2    Under the National Traffic and Motor Vehicle Safety Act, the manufacturer of a vehicle has a duty to notify dealers and purchases of a safety defect and remedy the defect without charge. *See 49 U.S.C.A. § 30118.*

In February 2003, Chrysler notified dealers about the Unintended Movement Letter. Chrysler stated in the dealer notice that it had sent the letter to all known owners of 1999 to 2004 Jeep Grand Cherokees and instructed the dealers to place a copy of the letter in the owner's manual or the glove box of all 1999 to [*20] 2004 year models in their inventories. Chrysler provided a copy of the letter and described the subject of the letter as follows:

> Unintended movement of a vehicle could occur if the automatic transmission shift lever is not engaged in the "Park" position. This could injure those in and/or near the vehicle. To help ensure continued safe vehicle operation, [Chrysler] is informing owners of some recommended steps to

Case 1:08-cv-02364    Document 34-2    Filed 06/27/2008    Page 188 of 210

2005 U.S. Dist. LEXIS 42102, *                                              Page 7

confirm the safe and proper engagement of the "Park" position on the vehicle's automatic transmission.

(Docket Entry No. 17, Ex. 4). Although Rubin alleged that this letter showed that the in-state dealership defendant had actual knowledge of the defect in the gear shift design before the vehicle was sold, the record is undisputed that Chrysler did not send this letter to the dealerships until well after the sale of the vehicle and after the accident.

In addition to the BO2 Recall Notice and the Unintended Movement Letter, this court instructed the defendants to provide Rubin with all internal memos, letters, and complaints that Crown Jeep sent or received concerning an inadvertent gear shift problem in the Jeep Grand Cherokee before July 1999. The jurisdictional [*21] discovery shows that Crown Jeep did not receive information about a gear shift defect or complaints from consumers about inadvertent gear shifts in the Jeep Grand Cherokees. (Docket Entry No. 17, Ex. 3). Based on Rubin's pleadings and the limited jurisdictional discovery, no reasonable factfinder could conclude that the in-state defendants had actual knowledge about a gear shift defect in the 1999 Jeep Grand Cherokees when the Jeep was sold to Roberts in July 1999.

**V. Participation in the Design of the 1999 Jeep Grand Cherokee**

A seller may be liable in a products liability action if the "seller participated in the design of the product." *TEX. CIV. PRAC. & REM. CODE. ANN. § 82.003(a)(1)*. Rubin alleged that the in-state defendants participated in the design of the Jeep by "providing [Chrysler] with input, information regarding customer preferences, information concerning customers' complaints, and information concerning product deficiencies." (Docket Entry No. 7, Ex. 1 p. 4). Rubin did not allege that Crown Jeep or UAG had substantive involvement in the actual design of the gear shift or that Chrysler relied on the "input" or "information" allegedly provided in making [*22] decisions about the design of the gear shift or any other aspect of the 1999 Jeep.

The allegations in Rubin's petition do not present any basis for finding the in-state dealership defendants liable for participating in the design of the 1999 Jeep. Texas law does not provide a reasonable basis for holding a dealership liable for a product's defective design because the dealership provided the manufacturer information about customer complaints and preferences. Under Rubin's argument, any consumer who writes to Chrysler to criticize a particular design feature, or responds to a survey soliciting consumer reaction to designs, participates in a future product's design. Such an expansive approach to "participating" in a product's design, makes the seller of a product liable for design defects without regard to whether that seller had any control over, direct involvement in, or knowledge about the design. Texas law does not support holding persons or entities with such indirect connection to the design process liable for design defects. *See Firestone Steel Products Co. v. Barajas, 927 S.W.2d 608, 616, 39 Tex. Sup. Ct. J. 848 (Tex. 1996)* (tire manufacturer's introduction of an intangible concept [*23] that was later used by designers and manufacturers was insufficient to trigger liability in a products liability action arising out of products that incorporated the design concept); *Bostrom Seating, Inc. v. Crane Carrier Co., 140 S.W.3d 681, 683, 47 Tex. Sup. Ct. J. 649 (Tex.2004)* (holding that a component-part manufacturer that does not participate "in the integration of the component into the final product" is not liable for defects in the final product). [3] Rubin cites no authority that extends liability for defective design to persons or entities based on the indirect and attenuated involvement of reporting information about products already on the market. As a matter of law, the allegations in the petition do not provide a reasonable basis to hold Crown Jeep and UAG liable for participating in the design of the 1999 Jeep sold to Roberts. [4]

3    In *Bostrom*, the Texas Supreme Court noted its adoption of *section 5(b)(l) of the Restatement (Third) of Torts: Products Liability*, to determine the design liability of a manufacturer who is involved in the design of a particular component, but not the product as a whole. Under the *Restatement*, such a manufacturer is liable as a designer of the product only when the manufacturer "substantially participates in the integration of the component into the design of the product."

Case 1:08-cv-02364   Document 34-2   Filed 06/27/2008   Page 189 of 210

Page 8
2005 U.S. Dist. LEXIS 42102, *

*Restatement (Third) of Torts: Products Liability § 5(b)(1).* "Providing mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation. . . ." *See Restatement (Third) of Torts: Products Liability § 5 Cmt. e.*

[*24]

> 4   In addition, the jurisdictional discovery shows that prior to the sale of the 1999 Jeep to Roberts, Crown Jeep did not provide input or information to Chrysler about "consumer preferences," "customers' complaints," or "product deficiencies" that relate to the design of the transmission or gear shift in the 1999 Jeep Grand Cherokee. (Docket Entry No. 17, Exs. 1-3).

## VI. Alleged Representations About the Transmission

A seller may be liable for an "express factual representation about an aspect of the product" if the representation was "incorrect; the claimant relied on the representation in obtaining or using the product; and if the aspect of the product had been as represented the claimant would not have been harmed by the product or would not have suffered the same degree of harm." *TEX. CIV. PRAC. & REM. CODE ANN. § 82.003(a)(5).* Defendants emphasize that Roberts, not Rubin, purchased the Jeep from the in-state defendants. As Rubin points out, the statute does not require that the representation be made directly to the injured claimant. However,   [*25] Rubin's argument does not provide a basis for remand because she did not allege either a factual or legal basis to support this theory of recovery in her state court petition.

Under *section 82.003 (a)(5)*, the claimant must rely on the incorrect representation in obtaining or using the product and the seller's representations must have increased the risk of harm caused by the defective product. Rubin did not allege that she or Roberts relied on any express factual representation about the transmission made by Crown Jeep employees when Roberts purchased the Jeep or after she took it in for routine service, that contributed to Rubin's injury. In the petition, Rubin alleged that in advertising and marketing campaigns and programs, "defendants" misled consumers about the safety features of the Jeeps and failed to warn about "dangerous conditions." In the petition, Rubin alleged that "at the time of sale to Maria Roberts, [the in-state defendants] were aware of serious safety problems with the floor shifter," (Docket Entry No. 7, Ex. 1, p. 4); "each of the defendants [knew] that the 1999 model Jeep Cherokee was subject to inadvertent shift to reverse. None of [the] defendants ever [*26] warned Maria Roberts or [Rubin] of this safety defect," (*Id.*, p. 4); "each of these defendants had actual awareness of this defect, had actual awareness of the [sic] Maria Robert's address, had a duty to ensure that Maria Roberts was made aware of this defect, and failed to take reasonable steps to warn Maria Roberts of this defect. . . ." (*Id.*, p. 4). Rubin did not allege that Crown Jeep made any specific express factual representations about the gear shift lever or that she relied on such representations. Such allegations are set out only in Roberts's post-removal affidavit filed in support of Rubin's motion to remand. In her affidavit, Roberts states that she relied on "representations" that the transmission was working properly. (Docket Entry No. 7, Ex. 4, PP 6-8). "Post-removal filings may not be considered . . . when or to the extent that they present new causes of action or theories not raised in the controlling petition filed in state court." *Griggs, 181 F.3d at 700*; *Cavallini v. State Farm Auto Mutual Ins. Co., 44 F.3d 256, 263 (5th Cir. 1995)* (plaintiffs "cannot rely on their affidavits" to establish a claim "against the nondiverse [*27] defendant under a legal theory not alleged in the state court complaint.").

*Section 82.003(a)(5)* permits recovery against a seller of a defectively designed or manufactured product if that seller made an "express factual representation about an aspect of the product" that was incorrect and independently contributed to the harm caused by the defective product. In her petition, Rubin made general "failure to warn" allegations. Because Rubin's state court petition fails to allege the specific actionable conduct required by *section 82.003(a)(5)*, this section does not provide a basis for remand.

## VII. The Negligence Claims

Rubin argues that remand is proper on the basis of the negligent repair and negligent misrepresentation claims she asserted in her state court petition.

Rubin argues that Crown Jeep may be independently liable under Texas law for negligently servicing the Jeep and negligently representing that the Jeep was safe. (Docket Entry No. 11, p.8).

In her state court petition, Rubin alleged that the vehicle was defectively designed, manufactured, and marketed when sold, specifically referring to marketing and advertising campaigns and programs and alleging that defendants [*28] failed to warn of the allegedly dangerous gear shift lever. During the jurisdictional discovery, Crown Jeep submitted a "New Vehicle Preparation" report. Rubin points to this report as evidence that Crown Jeep participated in manufacturing the vehicle or as evidence that it negligently serviced the Jeep after it was sold. (Docket Entry No. 22, p. 8; Ex. 3). Rubin's state court petition is limited to a strict liability and negligent design, manufacture, and marketing theory, based on allegations that the gear shift lever in the 1999 Jeep was defective at the time the vehicle was sold to Roberts. "Whether the plaintiff has stated a valid state law cause of action depends upon and is tied to the factual fit between the plaintiffs' allegations and the pleaded theory of recovery." *Griggs, 181 F.3d at 701*. Rubin did not allege that the in-state defendants "manufactured" the 1999 Jeep or that any of the service performed by Crown Jeep altered the vehicle so as to cause the accident. [5] Rather, Rubin alleged only that the routine service performed by the in-state defendants provided them an unused opportunity to warn about the propensity of the gear shift to appear to be in [*29] "park" when it was in "reverse." Rubin did not allege facts or a legal theory that would permit the in-state defendants to be liable under state law for negligently performing service work that altered the design on manufacture of the gear shift lever and contributed to cause the accident.

5   During the February 17, 2005 hearing on the motion to remand, Rubin acknowledged that her state court petition did not include negligent repair or service allegations.

The Court: Have you alleged that the dealership's servicing contributed to the accident?

A: I've alleged that they serviced the vehicle and

through their servicing, they should have warned her. They had a duty to warn her of the problem.

The Court: Have you alleged that the servicing work done on the vehicle in any way contributed to cause the accident?

A: I have not made that specific allegation.

The Court: Is the dealership's knowledge the primary basis on which assert remand in light of 82.003?

A: Their knowledge and their participation [in design and marketing].

(Docket Entry No. 16, pp. 7-8). Rubin state's court petition states in part as follows:

The Jeep Grand Cherokee was designed and manufactured by CHRYSLER. It was marketed by CHRYSLER, CROWN JEEP, and UAG, and was placed into the stream of commerce by CHRYSLER, CROWN JEEP, and UAG. Defendants CROWN JEEP and UAG marketed and serviced the vehicle.

(Docket Entry No. 7, Ex 1, p. 3).

[*30] Rubin's argument that Crown Jeep participated in the manufacture of the Jeep by completing the "New Vehicle Preparation" ("NVP") inspection does not provide a reasonable basis for liability under Texas law. Chrysler instructs dealers to complete the NVP inspection before selling one of its new vehicles and provides a preprinted NVP checklist. The inspection form states that "conditions which can be corrected by the minor adjustments specified below are considered part of normal new vehicle preparation. Items that require correction beyond the minor adjustments specified are eligible

for warranty reimbursement." (Docket Entry No. 17, Ex. 3). Under the heading "Transmission / Transfer Case Performance," the form lists four inspections for vehicles with automatic transmissions. Dealers are to check the operation of a gear shift lever to ensure that it "operates easily"; "shifts smoothly"; and "upshifts and downshifts properly"; and to ensure that the "park lock holds [the] vehicle." (Id.). The record shows that Crown Jeep performed these inspections on the 1999 Jeep sold to Roberts.

Checking the operation of a fully assembled product and making "minor adjustments" does not make [*31] Crown Jeep a "manufacturer" for the purpose of a product liability action under Texas law. A manufacturer is "a designer, formulator, constructor, rebuilder, fabricator, producer, compounder, processor, or assembler" of a product. *TEX. CIV. PRAC. & REM. CODE ANN. § 82.001*; cf *§§ 82.003(a)(2-3)* (a seller may be liable for a defective product if the seller "altered or modified the product" or the seller "installed the product, or had the product installed, on another product"). Rubin did not allege in her state court petition that the in-state dealership defendants altered or modified any part of the Jeep or otherwise participated in the manufacture of the 1999 Jeep. Rubin's reliance on the NVP inspection does not provide a reasonable basis for recovery against Crown Jeep and UAG as "manufacturers."

Rubin also argues that she has alleged facts to support a negligence claim for the "use of false, deceptive, or misleading advertising" under the *Texas Occupations Code, § 2301.351. Section 82.003(b)* states:

> This section does not apply to a manufacturer or seller whose liability in a products liability action is governed [*32] by Chapter 2301, Occupations Code. In the event of a conflict, Chapter 2301, Occupations Code, prevails over this section.

*TEX. CIV. PRAC. & REM. CODE ANN. § 82.003.* Because no Texas court has addressed the viability of negligent misrepresentation claims against a seller in a products liability action since *section*

*82.003* was enacted, Rubin contends that any ambiguity in Texas law must be resolved in her favor. Despite the recent enactment of *section 82.003*, Rubin's argument that the *subsection (b)* should be construed to allow a reasonable basis of recovery on negligent misrepresentation claims against the nonmanufacturing seller of the Jeep is unpersuasive. Under Rubin's proposed statutory construction, *section 82.003(b)* would operate as a general exception to *82.003(a)* and create an negligent misrepresentation cause of action under the Texas Occupations Code. Construing *section 82.003(b)*'s reference to the Texas Occupations Code as a "mechanism for negligence claims" would be inconsistent with the statute, which applies to all claims based on a defective product regardless of the legal theory asserted. The statute defines "products liability [*33] action" specifically to include negligence and misrepresentation theories. *See TEX. CIV. PRAC. & REM. CODE ANN. § 82.001* ("*any action* against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based is based on [strict liability, negligence, misrepresentation, breach of warranty] or *any other theory or combination of theories*")(emphasis added); *see also Alonso ex. rel. Estate of Cagle v. Maytag Corp., 356 F. Supp.2d at 761* (defective product claims based on strict liability and negligence are governed by Chapter 82). Rubin's proposed construction also eviscerates *section 82.003(b)*. Rubin's reliance on *section 82.003(b)* concedes that *section 82.003(a)* does not allow a plaintiff in a products liability suit to recover against a seller under a negligent misrepresentation theory. Negligent misrepresentation claims do not require actual knowledge of the falsity. *Section 82.003(a)(6)* is an exception that applies if the seller has actual knowledge of a defect when the product is sold. *Section 82.003(a)(5)* is [*34] an exception from the protection for nonmanufacturing sellers that applies if a plaintiff is harmed because of reliance on a seller's incorrect statements about an aspect of the product. *TEX. CIV. PRAC. & REM. CODE ANN. § 82.003(a).* The entire rule would be swallowed by allowing liability for negligent misrepresentations.

*Section 82.003(b)* does not refer to negligent misrepresentation claims and Chapter 2301 of the Texas Occupations Code, itself does not create such

a claim. Under the Code, the Texas Motor Vehicle Board has the authority to regulate and license manufactures, distributors, and dealers and to enforce warranty obligations in the sale of new cars. *TEX. OCC. CODE ANN. § 2301.001; see generally Internat'l Truck and Engine Corp. v. Bray, 372 F.3d 717, 722 (5th Cir.2004); BMW of N. Am., LLC v. Motor Vehicle Bd., 115 S.W.3d 722, 724-25 (Tex. App.-Austin 2003, pet. denied).* The Board has exclusive jurisdiction over matters governed by the Code. *See TEX. OCC. CODE ANN. § 2301.151; Subaru of America, Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212, 45 Tex. Sup. Ct. J. 907 (Tex. 2002);* [*35] *Williams v. Houston Firemen's Relief & Ret. Fund, 121 S.W.3d 415, 436 (Tex. App.-Houston [1st Dist.] 2003, no pet.).* [6] The Texas Occupations Code governs a "products liability action" to the extent that a plaintiff seeks to enforce a seller's warranty obligations. The exception in *section 82.003(b)* recognizes that an owner of a defective vehicle has a claim for statutory damages for defects covered by an express warranty agreement. Under the Code, the owner of a vehicle is entitled to a replacement vehicle or a refund if the manufacturer or responsible seller is unable to conform the vehicle to an express warranty by repairing or correcting a defect or condition that creates a "serious safety hazard" or "substantially impairs" the use or market value of the vehicle. *See TEX. OCC. CODE ANN. §§ 2301.604; 2301.461; 2301.607* (discussing administrative exhaustion requirement and a seller's opportunity to cure the defect). The Code does not provide a tort cause of action for a plaintiff injured by a motor vehicle. *See Sportscoach Corp. of Am., Inc. v. Eastex Camper Sales, Inc., 31 S.W.3d 730, 734-35 (Tex. App.-Austin 2000,* [*36] *no pet.)* (noting that the Motor Vehicle Board the power to assess civil penalties but not to award damages to private parties).

6  *Section 2301.151* of the Code states that:

> The board has the exclusive, original jurisdiction to regulate those aspects of the distribution, sale, and leasing of motor vehicles as governed by this Act and to do all things, whether specifically designated in this Act or implied herein, or

necessary or convenient to the exercise of this power and jurisdiction, including the original jurisdiction to determine questions of its own jurisdiction.

*TEX. OCC.CODE ANN. § 2301.151.*

Rubin correctly asserts that the Code prohibits false, deceptive, or misleading advertising by vehicle dealers. *TEX. OCC. CODE ANN. § 2301.351* (a dealer may not "(1) violate a board rule; (2) aid or abet a person who violates this chapter; or (3) use false, deceptive, or misleading advertising."). A consumer who is injured by a dealer or manufacturer's [*37] false or deceptive advertising, may either complain to the Board or sue under the Texas Deceptive Trade and Practices Act ("DTPA"). [7] *See TEX. OCC. CODE ANN. §§ 2301.204(a-d); 2301.801; TEX. BUS. & COM. CODE § 17.50(a)* (providing DTPA claim for economic damages and mental anguish damages for "false, misleading, or deceptive acts or practices"). Rubin has not alleged a DTPA claim. Her product liability claims are not governed by Chapter 2301 of the Texas Occupations Code.

7  *Section 2301.801* states:

> (a)  Notwithstanding any other law, including [the DTPA], in addition to the other remedies provided by this subchapter, a person may institute an action under [the DTPA] . . . if the person (1) has sustained damages as a result of a violation of *Sections 2301.351-2301.354* or *Section 2301.357.*
>
> (b)  In an action brought under this section, and in the interest of judicial economy and efficiency, a judgment entered in the action must give deference to the findings of fact and conclusions of law of the board contained in any final

order that is the basis of the action.

*TEX. OCC. CODE ANN. § 2301.801.*

[*38] This court concludes that on the facts and causes of action alleged in Rubin's state court petition, the removing defendants have shown that there is no reasonable basis of recovery against the in-state defendants.

**IV. Conclusion**

This court denies Rubin's motion to remand.

SIGNED on May 20, 2005, at Houston, Texas.

Lee H. Rosenthal

United States District Judge

LEXSEE 1995 US DIST LEXIS 7686

**RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER, an Illinois not-for-profit corporation, Plaintiff, v. GOULD INCORPORATED, a Delaware corporation, Defendant.**

No. 93 C 1661

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1995 U.S. Dist. LEXIS 7686*

**June 2, 1995, Decided
June 5, 1995, DOCKETED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff medical center filed an action against defendant corporation and asserted breach of contract, breach of warranty, and unjust enrichment. The corporation asserted that price quotations of the corporation constituted an offer. The medical center asserted that that its purchase order constituted an offer, which corporation accepted and that the corporation failed to meet the terms of the agreement.

**OVERVIEW:** The medical center agreed to purchase some medial equipment from the corporation, and after the 30-day period passed on the corporation's offer, the medical center submitted a purchase requisition at a lower cost. The corporation argued that its initial offer with its limitations constituted the offer, which the medical center accepted. The court found that the price quotation was not the offer and noted that in Illinois, where different terms were present in a acceptance and an offer, absent express provisions making acceptance conditional on assent to the different terms, the discrepant terms fell out and were replaced by the Uniform Commercial Code gap-fillers, *U.C.C. §§ 2-207(1)*, (2). The court also found that corporation accepted the purchase order without objection and that this constituted acceptance of an offer even though the purchase order contained terms differing from its quote regarding warranties. Although the medical center sought damages for unjust enrichment, the court found that it had not demonstrated it was entitled to an award for such based on the evidence, which was presented.

**OUTCOME:** The court granted the medical center summary judgment on its breach of contract and breach

of warranty claim. The court granted the corporation summary judgment on the unjust enrichment claim.

**LexisNexis(R) Headnotes**

*Commercial Law (UCC) > General Provisions (Article 1)*
[HN1] Both Illinois and Ohio have adopted the Uniform Commercial Code.

*Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview*
*Commercial Law (UCC) > Sales (Article 2) > Warranties > General Overview*
[HN2] Illinois adopts the majority view of the Uniform Commercial Code (UCC), which holds that where different terms are present in the acceptance and there has been no express provision by the parties to make acceptance conditional on assent to the different terms, the discrepant terms fall out and are replaced by suitable UCC gap-fillers.

*Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > Choice of Law > General Overview*
*Commercial Law (UCC) > Sales (Article 2) > Warranties > General Overview*
*Contracts Law > Breach > Causes of Action > Breach of Warranty*
[HN3] Illinois courts, in resolving conflict-of-law issues in actions for alleged breach of implied warranties under the Uniform Commercial Code apply three analyses: (1)

the traditional conflict-of-laws contract analysis; (2) the traditional conflict-of-laws tort analysis; and (3) the modern "center of gravity" analysis.

***Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > Choice of Law > General Overview***
***Contracts Law > Breach > Causes of Action > Breach of Warranty***
[HN4] Where an action is for an alleged breach of warranty in a sales transaction, the rule translates to that of the law of the place of the ultimate sale to a consumer.

***Contracts Law > Formation > Offers > General Overview***
[HN5] Price quotations are not offers, but rather are mere invitations to enter into negotiations or to submit offers. A buyer's purchase order submitted in response to a price quotation is ordinarily considered the offer. However, a price quotation, if sufficiently detailed, can amount to an offer creating the power of acceptance. It must reasonably appear from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract. A price quotation that is subject to the seller's confirmation is not an offer since the buyer's assent will not consummate the contract.

***Contracts Law > Formation > Acceptance > Methods of Acceptance > General Overview***
***Contracts Law > Formation > Offers > General Overview***
[HN6] A price quotation, if sufficiently detailed may constitute an offer. It does not follow that a price quotation which is not binding when accepted by a buyer but only becomes binding if and when accepted by seller (who is under no obligation to accept it) cannot by itself be treated as an offer.

***Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > Parol Evidence > Additional Terms***
***Contracts Law > Formation > Acceptance > Reasonable Time***
***Contracts Law > Formation > Offers > General Overview***
[HN7] *U.C.C. § 2-207(1)* provides that: a definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the

additional or different terms. *U.C.C. § 2-207(2)* provides that if additional terms in the acceptance are not materially different from those in the offer, then, subject to certain other qualifications, they become part of the contract. If the additional terms are materially different they operate as proposals and so have no effect unless the offeror agrees to them. If the offeror does not agree to them the terms of the contract are those in the offer. Illinois law recognizes that assent to the terms of an agreement will constitute the acceptance of a contract unless the party expressly makes acceptance conditional on assent to the additional or different terms. The existence of mutual assent or intent to accept is determined by an objective standard. Unexpressed intentions are of no consequence when the problem is to ascertain the legal relations, if any, between the parties.

***Commercial Law (UCC) > Sales (Article 2) > Remedies > Limitation & Modification > General Overview***
***Commercial Law (UCC) > Sales (Article 2) > Warranties > Exclusion & Modification***
***Contracts Law > Sales of Goods > Warranties > General Overview***
[HN8] Pursuant to the Uniform Commercial Code, a party who sells goods can limit warranties and remedies available to another.

***Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse > Acceptance of Goods > Notice Requirements > Notice of Breach***
***Commercial Law (UCC) > Sales (Article 2) > Remedies > General Overview***
***Contracts Law > Sales of Goods > Breach, Repudiation & Excuse > General Overview***
[HN9] In order to avail itself of remedies under the Uniform Commercial Code (UCC), a buyer who has accepted goods must notify the seller of any breaches within a reasonable time after it discovers or should have discovered such breach. *810, Ill. Comp. Stat. 5/2-607* (1993). The UCC does not require any particular type of notification in any particular words. *U.C.C. § 2-607* states that the content of the notification need merely be sufficient to let the seller know that the transaction is troublesome and must be watched. *U.C.C. § 2-714* allows a buyer who has accepted non-conforming goods and given notification to recover damages resulting from the breach. The measure of damages is the difference between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. *810 Ill. Comp. Stat. 5/2-714(2)*.

*Commercial Law (UCC) > Sales (Article 2) > Remedies > General Overview*
[HN10] A plaintiff is entitled to seek whatever damages it can prove.

*Civil Procedure > Remedies > Judgment Interest > Pre-judgment Interest*
*Torts > Damages > Interest > General Overview*
[HN11] Illinois law provides for prejudgment interest on ascertainable damages.

**COUNSEL:** [*1] FOR RUSH-PRESBYTERIAN-ST LUKES MEDICAL CENTER, an Illinois corporation, plaintiff: Jack Alan Rovner, Patricia Alice Pfister, Jack Rovner & Associates, Naperville, IL.

FOR GOULD INCORPORATED, a Delaware corporation, defendant: Paul W. Schroeder, Carol A. Ahern, Jones, Day, Reavis & Pogue, Chicago, IL.

**JUDGES:** Blanche M. Manning, United States District Court Judge

**OPINION BY:** Blanche M. Manning

**OPINION**

*MEMORANDUM AND ORDER*

This is an action for breach of contract, breach of warranty and unjust enrichment. The action was instituted by Rush-Presbyterian-St. Lukes Medical Center ("Rush"). Jurisdiction is invoked under *28 U.S.C. section 1332* and the amount in controversy exceeds $ 50,000, exclusive of interest and costs. The named defendant is Gould Incorporated ("Gould"). Gould raises numerous affirmative defenses alleging that Rush's warranty claims and unjust enrichment claim are time barred. On the day of trial, Gould sought leave to file a counterclaim setting forth a quantum meruit theory, which the court denied. The matter proceeded before the court without a jury. Having considered (1) the testimonial and other evidence presented; (2) assessed the credibility of the witnesses; (3) the written submissions of the parties; and (4) the legal arguments of counsel, the court grants judgment in favor of plaintiff and against defendant on the breach of contract claim, and breach of the warranties of merchantability and fitness for a particular purpose. The court grants judgment in favor of defendant [*2] and against plaintiff on the unjust enrichment claim.

*FACTUAL FINDINGS*

**1. Plaintiff Rush is an Illinois not-for-profit corporation that operates a tertiary care teaching hospital and medical education and research facilities in Chicago;**

2. Defendant Gould is an Ohio for-profit corporation that manufactures and sells electronic monitoring and recording equipment for use in medical applications;

3. About November of 1989 while attending the American Heart Association Convention, Dr. Thomas Buckingham, a cardiologist and the head of plaintiff's electrophysiology program, spoke with Howard Boyle, a senior sales engineer and Gould's sales representative, regarding the Cardiac Multichannel Recorder ("CMR") [1] manufactured by defendant;

> 1 The CMR is a medical system that is used to provide real-time monitoring and recording of electrophysiology procedures displaying the tracings of human heart pulses on a video monitor and recording those pulses on paper.

4. The CMR was displayed at the convention site [*3] and Boyle gave Buckingham a brochure which further described the CMR;

5. In the brochure there was a claim that the CMR "will yield the best return," and "that your instrumentation will perform to your expectations, case after case;"

6. After Boyle's initial contact with Dr. Buckingham, several additional meetings were held, and eventually three quotations were sent by defendant to plaintiff regarding the purchase of the CMR;

7. The first quotation was dated November 20, 1989; the second quotation was dated December 5, 1989; and the third quotation was dated January 3, 1990;

8. During the period from November 20, 1989 through January 3, 1990, negotiations took place between plaintiff and defendant regarding the price and type of equipment that was going to be purchased;

9. Although the price quotes were sent to Dr. Buckingham, once he selected the type of equipment which he believed would meet the needs of plaintiff, Julie Kuenn was responsible for negotiating the terms of the agreement;

10. In the January-3 "Requote" submitted by defendant to plaintiff, defendant quoted plaintiff a figure of $ 106,135 for the CMR;

11. In the top left hand corner of the quotation the following [*4] language appeared:

> "We are pleased to offer the following quotation for your consideration."

12. The top right hand corner of the January-3 quotation contained the following language:

> "TERMS AND CONDITIONS: Net 30 days. All orders are subject to acceptance at the home office of RECORDING SYSTEMS DIVISION. NOTE: IN-VOICES PAID LATE WILL CARRY A 1.1 1/2 % INTEREST CHARGE PER MONTH ON THE UNPAID BALANCE. PLEASE SEE REVERSE SIDE FOR ADDITIONAL TERMS AND CONDI-TIONS OF SALE;"

13. Under the "TERMS AND CONDITIONS OF SALE" portion of defendant's quotation were sub-headings "ACCEPTANCE" as well as "CLAIMS and REME-DIES;"

14. Under the "Acceptance" provision the quotation provided:

> "This acknowledgement shall constitute on [sic] acceptance of the provisions con-tained in the Buyer's purchase order only to the extent that such provisions are ex-pressly repeated herein. The entire agree-ment between Buyer and Seller shall con-sist of the provisions on the face hereof and these Terms and Conditions of Sale (herein referred to collectively as the "Provisions"). If Buyer objects to con-tracting with Seller on this basis, Buyer shall promptly notify Seller so that mutu-ally [*5] acceptable provisions can be worked out;"

15. The "CLAIMS and REMEDIES" provision provided that:

> "All claims*** which relate in any way to the merchandise or to the sale thereof; including ***any claims that merchandise does not conform to the contract of sale between the parties or is in any way de-fective (whether such defect is latent or patent), must be made promptly to Seller in writing upon discovery thereof and, in any event, within 6 months from the date of shipment;"

16. Plaintiff did not send defendant a purchase order for the CMR at the time it received the January-3 requote, nor was a purchase order sent before the expiration of the 30-day period set forth in the requote;

17. However, plaintiff contacted defendant some-time after expiration of the 30-day period and was ad-vised by letter dated February 14, 1990 that the January-3 price quote submitted by defendant was valid;

18. Subsequent to the telephone conversation be-tween the parties, defendant faxed plaintiff a second let-ter on February 23, 1990 advising plaintiff that it was reducing the January-3 quotation by $ 1,000, good until February 28, 1990;

19. On February 28, 1990, Julianne Kuenn contacted [*6] defendant to confirm that the price for the CMR was still valid, and after so doing, submitted the purchase requisition for the CMR to Mary Silver, the purchasing manager at Rush;

20. Ms. Silver contacted Christine Szymczyk at Gould and told her that plaintiff would be making an offer to purchase the CMR;

21. Ms. Szymczky advised Ms. Silver to fax a copy of the purchase order, which she did, to Howard Boyle;

22. Ms. Silver was also instructed by Ms. Szymczyk to mail a copy of the purchase order, and she did so;

23. The purchase order for the CMR was based on the February-23 reduced price quotation previously sent by defendant to plaintiff;

24. Rush purchased the 16 channel Cardiac Mul-tichannel Recorder from Gould for $ 108,095;

25. The front sheet of plaintiff's purchase order dated February 28, 1990, in the bottom left hand corner provided that:

> "YOUR ACCEPTANCE OF THIS ORDER IS ACKNOWLEDGEMENT OF YOUR UNDERSTANDING THAT SAME IS ENTERED SUBJECT TO THE CONDITIONS APPEARING ON RE-VERSE SIDE HEREOF."

26. Paragraph 2 on the reverse side of the purchase order provided that:

> "***The terms and conditions of sale as stated in this order, are not subject to change [*7] by reason of any written or verbal statements, by Seller or by any terms stated in Seller's acknowledgement unless the same be accepted in writ-ing***;"

27. Ms. Silver faxed the entire document and mailed the original;

28. Defendant processed plaintiff's purchase order on February 28, 1990 without inquiring as to any missing page or objecting to the language contained on the front page of plaintiff's purchase order;

29. The purchase order was then forwarded to defendant's home office in Ohio on February-28;

30. The CMR was shipped by defendant to plaintiff's facility on May 31, 1990 and installed on June 20, 1990;

31. After installation, Gould provided 4 days of onsite training on the operation and maintenance of the CMR to Dr. Buckingham and other Rush personnel;

32. The training took place on June 25 thru 28, 1990;

33. Additionally, Gould provided another three days of training at Rush's facilities on November 26 thru 28, 1990;

34. On May 31, 1991 Gould installed an EP Sense Selector on the CMR and instructed Rush Personnel on its use;

35. On October 14, 1991 Janet Haw began working as an electrophysiology nurse with Rush and Pamela Manin began employment that same date [*8] as an electrophysiology technician;

36. On November 12, 1991 they both received one-day of training on the use of the CMR;

37. Defendant's invoice, which contained essentially the same terms and conditions as did the quote sent to plaintiff, was sent to plaintiff on May 31, 1990, the same day the CMR was shipped;

38. The purchase order dated February 28, 1990 sent to defendant constituted the offer;

39. Defendant accepted the offer without objection to its terms;

*CONCLUSIONS OF LAW*

1. This court has jurisdiction of this matter pursuant to *28 U.S.C. Section 1332*;

2. Venue is proper pursuant to *28 U.S.C. Section 1391*;

3. [HN1] Both Illinois and Ohio have adopted the Uniform Commerical Code;

4. Gould's price quotation was not the offer;

5. The terms of Gould's quotation do not govern this action;

6. [HN2] Illinois adopts the majority view of the UCC which holds that where different terms are present

in the acceptance and there has been no express provision by the parties to make acceptance conditional on assent to the different terms, the discrepant terms fall out and are replaced by suitable UCC gap-fillers;

7. Under *Section 2-207(1) of the UCC*, Gould's acceptance of the purchase [*9] order without objection manifested a seasonable expression of acceptance, even though the purchase order contract terms differ from those in defendant's quote regarding warranties;

8. Gould and Rush had an express one-year warranty contract;

9. The discrepant terms in the parties' contract are those which deal with the exclusion of the warranties of merchantability and fitness for a particular purpose;

10. The contract was breached by Gould the first day after delivery of the CMR to Rush's premises in June 1990;

11. The four-year statute of limitations for breach of contract pursuant to Section 810 ILCS 725(1) applies to this action;

12. Gould's limitation of remedies are not applicable to this action;

13. Rush is entitled to damages of $ 69,436.40 plus prejudgment interest at the Illinois statutory rate.

*CHOICE OF LAW*

As a preliminary matter, [HN3] Illinois courts, in resolving conflict-of-law issues in actions for alleged breach of implied warranties under the Uniform Commercial Code, have applied three analyses: the traditional conflict-of-laws contract analysis; (2) the traditional conflict-of-laws tort analysis; and (3) the modern "center of gravity" analysis. [*10] See, *Hall v. Merck, Sharp & Dohme, Division of Merck & Co., 774 F. Supp. 601, 603 (D. Kan. 1991)* citing *Hardman v. Helene Curtis Industries, Inc., 48 Ill. App. 2d 42, 198 N.E.2d 681, 689 (1964)*.

Applying the traditional conflict-of-laws rule relating to contracts, the court concludes that Illinois law governs. [HN4] Where the action is for an alleged breach of warranty in a sales transaction, the rule translates to that of the law of the place of the ultimate sale to a consumer. *Hall, 774 F. Supp. at 603.* In the instant case, plaintiff purchased the CMR in Illinois.

Applying the modern "center of gravity" analysis the court concludes that Illinois law governs. According to this analysis, the court considers all acts of the parties touching the transaction in relation to the several states involved and applies as the law governing the transaction the law of the state with which the facts are in most inti-

mate contact. *Bowles v. Zimmer Manufacturing Co., 277 F.2d 868, 873 (7th Cir. 1960).*

Applying the criteria set forth in *Bowles,* the court concludes that Illinois has the more intimate, or substantial contact with the transaction in question. At the time plaintiff purchased [*11] defendant's equipment, plaintiff was a resident of Illinois and defendant was doing business in Illinois. The CMR was used in Illinois, the problems and repairs occurred in Illinois and it appears that the negotiations involving the purchase of the CMR all occurred in Illinois. The only connection to Ohio with the transaction is that defendant's home office is there. That is minimal. Further, Illinois has a compelling interest to adjudicate claims for damages arising out of allegedly defective equipment brought into its boundaries. Moreover, the instant action involves a commercial transaction which is governed by the Uniform Commercial Code. Both Illinois and Ohio have adopted the UCC. Hence, the court concludes that Illinois law governs this case. See, *Hall, 774 F. Supp. at 603;* See also, *Restatement (Second) of Conflict of Laws, section 6* (1969).

*FORMATION OF THE CONTRACT*

Defendant contends that its requote sent to plaintiff on January 3, 1990 constituted the offer, including the limitation of remedies provision provided within the requote. Defendant argues that plaintiff accepted the offer verbally and submitted a purchase order for the Gould CMR on February 28, [*12] 1990. Defendant's alternative contention is that even if its January-3 requote is not considered the offer, its invoice sent before delivery of the CMR to plaintiff constituted a counter-offer pursuant to *section 2-207 of the UCC,* and made acceptance by plaintiff conditional upon the terms contained in the invoice.

[HN5] The general rule is that price quotations are not offers, but rather are mere invitations to enter into negotiations or to submit offers. *Outboard Marine Corporation v. Babcock Industries, Inc., 1994 U.S. Dist. LEXIS 11998, No. 91 C 7247, 1994 WL 468796 at 6,* (N.D. Ill. Aug. 24, 1994). A buyer's purchase order submitted in response to a price quotation is ordinarily considered the offer. *Master Palletizer Systems, Inc. v. T.S. Ragsdale Co., 725 F. Supp. 1525, 1531 (D. Colo. 1989).* However, a price quotation, if sufficiently detailed, can amount to an offer creating the power of acceptance. *Quaker State Mushroom Co. Inc., v. Dominick's Finer Foods, Inc., 635 F. Supp. 1281, 1284 (N.D. Ill. 1986); McCarty v. Verson Allsteel Press Co., 89 Ill. App. 3d 498, 506, 411 N.E.2d 936, 44 Ill. Dec. 570 (1980).* But, it must reasonably appear from the price quotation that assent to that quotation is all [*13] that is needed to ripen the offer into a contract. See *Bergquist Company v. Sunroc Corporation, 777 F. Supp. 1236, 1248 (E.D. Pa.*

*1991).* A price quotation that is subject to the seller's confirmation is not an offer since the buyer's assent will not consummate the contract. See *McCarty, 89 Ill. App. 3d at 507-508.* See also *Quaker State, supra.*

In *McCarty v. Verson Allstate Press Co., 89 Ill. App. 3d 498, 411 N.E.2d 936, 44 Ill. Dec. 570 (1980),* the court addressed the issue of whether an offer had been made where the written document purporting to invite acceptance made acceptance conditional upon approval by the "offeror's" home office. In that case, the seller of a punch press machine entered into negotiations with the buyer of the machine, eventually submitting to the buyer a document entitled "Proposal No. 5575-1-RB Revised." At the base of the Proposal the document provided that "all quotations, orders and contracts are subject to acceptance of home office." No discussions were held during the negotiations by the parties regarding indemnification for injuries caused by defects in the seller's punch press, and the proposal provided no such provision. Contemporaneously [*14] with the prior proposals submitted by seller to buyer, a document entitled "Conditions of Sale-Machinery" was also provided; however, that document was not submitted with seller's final proposal to buyer. The "Conditions of Sale-Machinery" did set forth the limitations of liability and warranties.

In response to seller's proposal, buyer sent its form Purchase Order, which in pertinent part provided that:

> "***This order is an offer to purchase upon the conditions and terms below and on the reverse side hereof***No modifications of, or exceptions to, any of the terms, conditions, or provisions of this order***shall be of any effect unless and until accepted in writing by purchaser."

Seller responded to buyer's purchase order by returning a copy of the acknowledgement form which was signed by seller. Eventually, the machine was shipped.

In discussing the formation of the contract between seller and buyer, the court stated that [HN6] a price quotation, if sufficiently detailed may constitute an offer. The court made clear, however, that it does not follow that a price quotation which is not binding when accepted by a buyer but only becomes binding if and when accepted by seller [*15] (who is under no obligation to accept it) cannot by itself be treated as an offer. *McCarty, 89 Ill. App. 3d at 506.* The court analyzed a situation where a price quotation, sufficiently detailed to constitute an offer, but not accepted before the time had lapsed, would not constitute the offer. *Id. at 508.* The court stated that under those circumstances, the purchase order does not create an enforceable contract. The court

reasoned that there has been no operative "offer" where it is reasonably apparent that some further act of the "offeror" is necessary to consummate an enforceable contract. *Id. at 507.* The court further stated that a logical conclusion follows that where acceptance of a price quotation cannot (for some reason other than lapse of time) create an enforceable contract, the purchase order, not the price quotation, should be treated as the offer. *Id. at 508.*

The facts in *McCarty* are similar to the facts in the instant case. Here, the language in the Gould quotation provided that "all orders are subject to acceptance at the home office." Hence, a further act of Gould was necessary to create an enforceable contract. This is strong evidence that the price [*16] quotation was not an offer. See, *Bergquist Company v. Sunroc Corporation, 777 F. Supp. 1236, 1249 (E.D. Pa. 1991).* By reserving the right to have its home office approve plaintiff's purchase order, the "contract" would be indefinite--leaving open the possibility that home office could reject the purchase order. Gould's price quote did not create in Rush the power of acceptance where acceptance at the home office was a further act of Gould necessary to create an enforceable contract. Thus, Gould's price quotation did not create in plaintiff the power of acceptance sufficient to result in an enforceable contract. Therefore, following the persuasive authority set forth in *McCarty,* this court finds that defendant's price quotation was not the offer.

*DEFINITE AND SEASONABLE EXPRESSION OF ACCEPTANCE*

Even were this court to treat defendant's quote as the offer and plaintiff's purchase order as the acceptance, it does not follow that defendant's terms control. At common law, any discrepancy between the forms would prevent the offeree's response from operating as an acceptance so there would be no contract in such a case. *Northrop Corporation v. Litronic Industries, 29 [*17] F.3d 1173, 1174 (7th Cir. 1994).* This was the "mirror image" rule, which Article 2 of the Uniform Commercial Code abandoned. UCC, *810 ILCS 5/2-207(1);* also see *Union Carbide Corp. v. Oscar Mayer Foods Corp., 947 F.2d 1333, 1335-36 (7th Cir. 1991).*

[HN7] *Section 2-207(1) of the UCC* provides that:

"A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."

*Section 2-207(2)* provides that if additional terms in the acceptance are not materially different from those in the offer, then, subject to certain other qualifications, they become part of the contract. *Northrop, 29 F.3d at 1174.* If the additional terms are materially different they operate as proposals and so have no effect unless the offeror agrees to them. *Id. at 1174.* If the offeror does not agree to them the terms of the contract are those in the offer. *Id. at 1174.* Illinois law recognizes that assent to the terms of an agreement will [*18] constitute the acceptance of a contract unless the party "expressly makes acceptance conditional on assent to the additional or different terms." *Heritage Commons Partners v. Village of Summit, 935 F.2d 1489, 1494 (7th Cir. 1991).* The existence of mutual assent or intent to accept is determined by an objective standard. Unexpressed intentions are of no consequence when the problem is to ascertain the legal relations, if any, between the parties.

Viewing defendant's quote as the offer, had defendant expressly indicated in the quote that assent to additional or different terms in the acceptance was required before acceptance was effective, then the provision of the quote limiting warranties to a period of one-year and expressly disclaiming the warranty of merchantability and fitness for a particular purpose would have been part of the offer from its inception. However, defendant's quote does not contain such an express condition as the cases insist it must. See, e.g., *Northrop, 29 F.3d 1173, 1177; McCarty, 89 Ill. App. 3d 498, 44 Ill. Dec. 570, 411 N.E.2d 936; Clifford-Jacobs Forging Co. v. Capital Engineering & Manufacturing Co., 107 Ill. App. 3d 29, 62 Ill. Dec. 785, [*19] 437 N.E.2d 22; Union Carbide Corp. v. Oscar Mayer Foods Corp., 947 F.2d 1333 (7th Cir. 1991).* Moreover, assuming defendant was unwilling to proceed absent assent to the different terms, it did not object to the terms included in plaintiff's purchase order once same was received. In fact, defendant processed the order. Thus, under *section 2-207 (1) of the UCC,* defendant's acceptance of the purchase order without objection manifested a seasonable expression of acceptance, even though the purchase order contained terms different from those in defendant's quote regarding warranties.

Where the offeree's response contains different terms (rather than additional ones), the UCC does not explain what results and there is no consensus on that question. *Outboard Marine Corporation v. Babcock Industries, Inc., 1994 U.S. Dist. LEXIS 11998, No. 91 C 7247, 1994 WL 46856, at 5 (N.D. Ill. Aug. 26, 1994).* See also, James J. White & Robert S. Summers, Uniform Commercial Code 33-36 (3d ed. 1988); John E. Murray, Jr., "The Chaos of the 'Battle of the Forms': Solutions," *39 Vand. L. Rev. 1307, 1354-65 (1986).* One view is that

the discrepant terms in both the nonidentical offer and the acceptance drop out, and default terms [*20] found elsewhere in the UCC fill the resulting gap. *Northrop, 29 F.3d at 1175.* Another view is that the offeree's discrepant terms drop out and the offeror's terms become part of the contract. *Id. at 1175.* A third view, creates no distinction between "different" and "additional" terms and makes the outcome turn on whether the new terms in the acceptance are materially different from the terms in the offer. Under the third view, if the terms in the acceptance are found to be materially different, they operate as proposals, so that the offeror's terms prevail unless he agrees to the variant terms in the acceptance. If the acceptance terms are not materially different from the terms in the offer, they become part of the contract. *Northrop, 29 F.3d at 1175.* However, Illinois has adopted the majority view which is discussed below.

In *Northrop Corporation v. Litronic Industries, 29 F.3d 1173 (7th Cir. 1994),* a case similar to the instant case, the court addressed the issue of whether a 90-day warranty became part of a contract between buyer and seller where buyer's purchase order contained no provision for the length of the warranty. In that case, seller Litronic Industries, [*21] submitted to buyer Northrop Corporation, an offer to sell printed wire boards -- which offer contained a provision limiting the warranty on the boards to 90 days. The offer was made in response to buyer's request for bids and after numerous conversations were had between seller and buyer regarding buyer's specific needs relative to the boards. Buyer accepted seller's offer over the telephone and advised Seller that a purchase order would be forthcoming. Seller began production of the wire boards after that conversation. Buyer submitted its purchase order to seller, which order contained an unlimited warranty provision. Seller eventually shipped the boards without signing the acknowledgement form sent with buyer's purchase order, and without objecting to the terms in the purchase order, including the unlimited warranty. Buyer did not bring this omission to seller's attention and subsequently paid for the boards. About six months after delivery, buyer returned the boards to seller, claiming that they were defective. Seller refused to accept the returned boards, asserting that its 90-day warranty had lapsed. Buyer asserted that it had an unlimited warranty as stated in its purchase order.

[*22] The Seventh Circuit found that buyer did not purport to make the more extensive warranty (open-ended warranty) a condition of acceptance where there was no express condition of that intent in the purchase order. This was true even though the terms of the buyer's purchase order were different from those of seller's sale order. *Northrop, 29 F.3d at 1177.* However, the court further explained that both seller and buyer knew or should have known that buyer's purchase order contained

a different warranty from that contained in seller's sale order form. The court noted that while *section 2-207 of the UCC* provides direction for determining the terms of a contract when the offer and acceptance contain additional terms, no provision is made for a situation where the offer and acceptance contain different terms. The court held that the majority interpretation of the UCC, in that instance, applies in Illinois.

The majority view holds that where different terms are present in the acceptance and there has been no express provision by the parties to make acceptance conditional on assent to the different terms, the discrepant terms fall out and are replaced by suitable UCC gap-fillers. *Id.* [*23] *at 1178.* While the court expressed that its preferred view would be to assimilate "different" to "additional", so that the terms in the offer would prevail over the different terms in the acceptance only if the latter were materially different, the court acknowledged that this view remains a minority view -- having been adopted only by California. *Id. at 1178.*

In the instant case, the limitation of warranties on the back of defendant's quote is discrepant with the one-year express warranty in plaintiff's purchase order. Thus, this court, guided by the analysis set forth in *Northrop,* looks for UCC gap-fillers to govern the dispute in the instant case.

## PROBLEMS WITH THE CMR AND LEAD SELECTOR

It is undisputed that plaintiff purchased the CMR from defendant with the intent that it would be used reliably in performing electrophysiology testing and recording at the hospital. Dr. Buckingham testified in deposition that problems with the CMR began within the first six months of using the machine. The problems included: channels disappearing, noisy signals, key board lock-up and error codes appearing.

Robert Przybylski, a biomedical engineer in charge of the service department [*24] at Rush, testified that he was required to keep a repair log which he and his assistants used to record service calls where repairs were made to the equipment in the cardiology department. The CMR was delivered to plaintiff in June 1990. The first service entry was dated February 14, 1991. That problem involved a signal missing on channel 1 of the lead selector. After relocating the signal from channel one on the lead selector to channel five, the signal displayed properly on the Bard computer but not on the Gould. Mr. Przybylski testified that this indicated the signal went through the entire Gould system and out to the Bard, but that it did not appear in the right place on the Gould screen. After running a simulated signal through channel one of the lead selector and rebooting the system by turn-

ing it off for 10 seconds, the channel reappeared properly on both the Bard computer and the Gould screen.

The second entry reported in the log book was dated October 15 and 16, 1991. Dr. Buckingham contacted Przybylski regarding the appearance of noise and pulse signals on the CMR. Przybylski determined that he could not isolate the problem other than by manipulating the lead selector. He [*25] could vary this noise level by repositioning the lead selector box. Przybylski contacted Joe Hagstrom from Gould and Hagstrom brought a replacement lead selector box to Rush.

A third entry was reported on October 22, 1991. This involved the replacement lead selector box falling from its bracket on October 18, 1991. A Gould representative was notified and the original lead selector box was returned to Gould's office. A fourth entry was made on November 18 and 19, 1991. Dr. Buckingham called Mr. Przybylski regarding traces on the CMR system and asked that the Bard be checked. Mr. Przybylski checked the distribution box and discovered that the cable insulation from half of the 16 cables was pulling from the shield, indicating that the shield was coming loose. He testified that Rush decided to remake the cables because eventually the entire assembly would come apart.

On November 22, 1991 an entry was recorded indicating that Dr. Buckingham had lost channel nine on the screen. Mr. Przybylski testified that while working on the system to reassign the signal through the lead selector box, the top half of the screen disappeared leaving a black band across the screen. He testified that the [*26] keyboard locked up, eliminating the possibility of reassigning any channels or operating the recording device. On November 25, 1991, Jim Brophy from Gould came to Rush and told Przybylski that the telephone jacks were loose and repaired them. After Mr. Brophy left, Mr. Przybylski checked-out the system and discovered that channel 13 was not on the display. That channel was reassigned through the keyboard and after reassignment it worked fine.

The December 13, 1991 log entry indicated that channel 6 had been very noisy or not working. The signal was very small and kept dropping. An error code indicating "unknown device" and that no paper was in the machine was also displayed, although there was paper inside the machine. The system was temporarily shut down and rebooted, at which time all the data reappeared and the signal displayed on the screen. The December 16, 1991 entry indicated that Dr. Buckingham lost several channels on the CMR and placed a call to defendant that same day. Mr. Przybylski testified that after no one from Gould responded to the call, he made a follow-up call.

The entry dated January 2, 1992 indicated that a representative from defendant went out to Rush's premises

[*27] to install another loaner lead selector box while plaintiff's box was removed to determine the problem causing the loss of channels. Mr. Przybylski testified that on that day he repaired two cables and noted on the incident report that the cables from the Bard were in need of cleaning. He testified that the cleaning and repair of the cables had no relationship to the swap of the lead selector box that occurred on January 2, 1992. Gould returned the MILS box (525) and took the factory MILS box back on January 13, 1992. The January-20 entry indicated that Dr. Cunningham had lost channels on the Bard equipment, not the CMR.

There were several entries in February 1992. The February-3 entry reflected that again, the Bard equipment, not the CMR, had lost channels. The jacks were determined to have been partially out, and once they were pushed in, the channels came back on-line. On February-4, an entry was made indicating that one of plaintiff's technicians lost channels on the CMR screen. The signals returned once adjustments were made to the lead selector box. On February-6 channels were lost during a patient procedure. The channels were reassigned through the lead selector box. The February-13 [*28] entry indicated that a channel disappeared and that the lead selector box would be replaced. The February-14 entry indicated that Gould replaced the MILS box (525) with a factory loaner MILS box (555). The February 17, 1992 entry indicated that the factory loaner MILS box (555) fell from the IV pole to which it had been attached. The February-19 entry indicated that the lead selector keyboard was not working, and the February-20 entry indicated that the lead selector was replaced. On February 21, 1992, Gould shipped a second loaner MILS box (151) to Rush to replace the current loaner MILS box (555) which was there while the original box was being repaired. On March 17, 1992, Gould returned the original MILS box (525) to Rush and took back the loaner box (151).

The March-30 entry indicated that the CMR did not initialize when one of the technicians turned on the system. Mr. Przybylski testified that when you turn on the CMR it goes through a self-test, which did not occur on March-30. He testified that in response to the March-30 call, lie checked the system, attempted to reboot it but the system failed to start. He then contacted defendant regarding the problem and was told that they [*29] would attend to the problem. The March-31 entry indicated that the lead selector did not start on the first try, but did do so on the second try. However, when Mr. Przybylski arrived at the lab, the selector was out totally. Dr. Buckingham had to cancel patient procedures for that day.

The entry for April-2 indicated that the keyboard and lead selector were not working. A representative

from defendant went out and determined that either the cable was bad or the connector was bad. Defendant again replaced the original MILS box (525) with a loaner (551). On April 22, 1992, representatives from defendant met with Dr. Buckingham about "problems" with the CMR. On May 8, 1992, plaintiff replaced the Gould CMR with a Bard electrophysiology unit and discontinued its use of the Gould. On November 19, 1992, plaintiff's legal counsel sent a letter to defendant's counsel requesting a refund of the purchase price for the CMR. Plaintiff also offered to return the equipment to defendant.

Based on the above, it is clear that plaintiff experienced immediate and frequent problems with the CMR and lead selector it purchased from Gould. There is substantial evidence, which this court finds credible, [*30] that the problems with the CMR began from the first day it was delivered. Joe Hagstrom's incident report reflects that on the day the CMR was delivered to plaintiff a defective universal channel had to be replaced and a second channel had to be repaired. Additional credible evidence presented shows that other problems began occurring within six months after the equipment was delivered. The first entry noted in Mr. Przybylski's log was made on February 14, 1991. However, plaintiff presented evidence that not all of the problems were necessarily documented in the log book. Initially the problems were infrequent; however, plaintiff contends that the number of patient procedures at Rush and the frequency of the problems increased from June 1990 until Rush discontinued using the CMR in May 1992. The problems were often remedied by simply rebooting the system and/or replacing the lead selector box. The machine often malfunctioned during patient testing, and on at least two occasions noted in the incident report, Dr. Buckingham had to reschedule patients for testing because the system was not functioning. Dr. Buckingham testified that a 5% error rate for this type of medical equipment proved [*31] that the machine did not perform reliably from case to case, as the brochure had indicated.

Defendant intimates that the problems experienced by plaintiff were the result of inadequate training, negligent use and maintenance. This contention is rebutted by the credible evidence offered at trial. The technicians duties involved only minor procedure, i.e. "initializing" or starting the CMR by turning on the power button. Once the system was initialized the technician could select from among three pre-set testing procedures. The uncontroverted evidence proved that these pre-set procedures were seldom modified. Additionally, the key board was simply pulled from inside the CMR when used to input data.

This court finds that based on the credible evidence presented at trial, the equipment when delivered to plain-

tiff was defective, which defects were not cured by defendant's frequent repairs and adjustment of the equipment. Although the lead selector box was replaced numerous times and the cables repaired and replaced, plaintiff continued to experience loss of channels, keyboard lock-ups and noise interference. These problems interfered with plaintiff's ability to perform patient cases on [*32] a consistent basis; thereby, not complying with the express representation made in the brochure and in accordance with the needs expressed by plaintiff's representative to defendant. It was reasonable for Dr. Cunningham to rely on Gould's expertise as a merchant in the sale of CMR equipment to recommend a machine that would fit plaintiff's needs. Also, it was apparent by the continual loss of channels that the CMR and lead selector box were not fit for their ordinary purpose and had not been so from the beginning. This is particularly true where the defects existed on the date the equipment was delivered to plaintiff's premises. Thus, defendant breached the implied warranty of merchantability and fitness for a particular purpose. See *Heat Exchangers, Inc. v. Aaron Friedman, Inc.*, 96 Ill. App. 3d 376, 388, 421 N.E.2d 336, 51 Ill. Dec. 828 (1981).

## UCC GAP FILLERS

It is undisputed that, [HN8] pursuant to the UCC, a party who sells goods can limit warranties and remedies available to another. *Szajna v. General Motors Corp.*, 130 Ill. App. 3d 173, 474 N.E.2d 397, 85 Ill. Dec. 669 (1985); 810 ILCS 5/2-316(2). It is further true that in the instant case, defendant's warranty statement [*33] purported to disclaim both the warranty of fitness for a particular purpose and merchantability. Moreover, the warranty made revocation of acceptance conditional upon plaintiff returning the defective goods within six months from the delivery date. However, in light of the fact that this court has determined that under the UCC, these discrepant terms must drop out, their usefulness is limited solely to giving the court guidance in establishing reasonable gap-fillers.

First, as to the exclusion of the warranties of merchantability and fitness for a particular purpose, this court finds it highly improbable that plaintiff would have agreed to such terms had it read the fine print on the back of defendant's quote. Pursuant to *810 ILCS 5/2-316(2)* of the UCC, to exclude the warranties of merchantability or fitness the writing purporting to do so must be conspicuous. Not only does paragraph 8 of Gould's "Terms and Conditions" fail to use the word "merchantability" as required by statute, but there is also no display of the terms in bold or capital letters or other distinguishing print. The CMR was intended to be used to provide monitoring and recording of electrophysiology procedures. The [*34] evidence presented reveals that discus-

Case 1:08-cv-02364    Document 34-2    Filed 06/27/2008    Page 205 of 210

Page 11
1995 U.S. Dist. LEXIS 7686, *

sions were held between plaintiff and defendant relative to plaintiff's specific needs for the CMR. In fact, the CMR ordered by plaintiff was a result of those discussions. Certainly, plaintiff was entitled to rely upon, and did rely upon, defendant's knowledge of the CMR in determining that the equipment would reliably conduct electrophysiology procedures. Dr. Cunningham testified that he advised Mr. Boyle of what Rush's needs were and ordered a mobile CMR, instead of a stationary unit. The brochure sent by defendant to plaintiff represented that the CMR would perform to plaintiff's expectations case after case. Moreover, because of its expensive cost and the sensitive procedures to be performed using the equipment, the court is not convinced that a waiver of the warranties of merchantability and fitness for a particular purpose were intended by plaintiff.

The credible evidence presented at trial reveals that plaintiff experienced problems with the CMR from the first day of delivery until April 1992 when Dr. Buckingham orally notified defendant of plaintiff's rejection of the equipment. Defendant, unsuccessfully, attempted to cure the defects [*35] of the machine from the date of delivery. Plaintiff extended to defendant reasonable opportunities to correct what initially might have been considered "bugs" in the system. Not every electrophysiology test was claimed to be unreliable, nor does the evidence presented at trial prove that it was necessary to reschedule the majority of patients for testing. The evidence does show that plaintiff received some use from the CMR, intermittent as that might have been. Albeit, the evidence presented convinces this court that plaintiff acted reasonably and seasonably.

The fact that some of the problems occurred after the expiration of the express one-year warranty is of no effect. The discrepant terms here are those which deal with the exclusion of the warranty of merchantability and fitness for a particular purpose. As discussed previously, these terms drop out and are replaced by UCC gap-fillers. Pursuant to the UCC, *810 ILCS 5/2-725 (1)*, an action for breach of any contract for sale must be commenced within 4 years after the cause of action accrued. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *810 ILCS 5/2-725 (2)*. [*36] A breach of warranty occurs when tender of delivery is made. However, where there is a warranty which explicitly extends to future performance of the goods, the cause of action for breach, under those terms, occurs when the breach is or should have been discovered. *810 ILCS 5/2-725(2)*.

Applying the four-year statute to the instant case, it is uncontroverted that delivery of the CMR occurred in June 1990. Plaintiff filed the instant action on March 19, 1993. Therefore, the action was within the UCC limitations period. See, *Outboard Marine Corporation v. Babcock Industries, Inc., 1994 U.S. Dist. LEXIS 11998*, No. 91 C 7247, 1994 WL 468796 at 6, (N.D. Ill. Aug. 24, 1994).

Gould maintains that plaintiff's breach of contract and warranty claims are barred. It advances several arguments in support of that proposition. First, as to the breach of contract claim, Gould contends that paragraph eight of its Terms and Conditions required that Rush revoke its acceptance within six months from the date of shipment. Additionally, Gould argues that Rush did not comply with section *810 ILCS 5/2-608(2)* of the UCC which requires that a party revoke defective goods within a reasonable time after it discovers or should have discovered [*37] the defect. Further, Gould maintains that Rush materially altered the CMR before it notified Gould of revocation in violation of section *810 ILCS 5/2-608(2)*. Finally Gould maintains that Rush failed to meet its burden or proof that the CMR was defective.

As discussed earlier, Gould's terms and conditions did not control the agreement. Further, according to the UCC provisions, which this court found to be controlling, plaintiff's notice was reasonable under the circumstances. Moreover, the evidence presented at trial proved that the CMR delivered by Gould was defective and continued to malfunction over the two-year period from its delivery.

As to the breach of implied warranty claims, defendant again relies on its Terms and Conditions which expressly disclaimed the warranties of merchantability and fitness for a particular purpose, and limited Rush's remedies to repair and replacement of defective parts. Gould contends that the language in its Terms and Conditions was effective under the UCC to disclaim the two implied warranties. Alternatively, Gould maintains that any warranty given to Rush was limited to one-year and that Rush failed to bring a claim for breach of warranty before [*38] the one-year period expired. The arguments raised by Gould as to the breach of warranty claims rings with the same hollowness as do the arguments advanced in support of the breach of contract claim and are therefore rejected. Thus, the only issue that remains to be resolved is damages.

## DAMAGES

[HN9] In order to avail itself of remedies under the UCC, a buyer who has accepted goods must notify the seller of any breaches within a reasonable time after it discovers or should have discovered such breach. UCC, *810 ILCS 5/2-607* (West 1993). The UCC does not require any particular type of notification in any particular words. *Custom Automated Machinery v. Penda Corporation, 537 F. Supp. 77, 84 (N.D. Ill. 1982)*. Official Comment number 4 of 2-607 states that "the content of the

notification need merely be sufficient to let the seller know that the transaction is troublesome and must be watched." See also *Custom Automated Machinery, 537 F. Supp. at 84*.

*Section 2-714 of the UCC* allows a buyer who has accepted non-conforming goods and given notification to recover damages resulting from the breach. The measure of damages is the difference between the value of the goods accepted and [*39] the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. *810 ILCS 5/2-714(2)*. Plaintiff asserts that it paid $ 108,095 for the CMR, which was recorded on plaintiff's books as having a useful life of 10 years (120 months). Plaintiff used the CMR for 22 months and therefore argues that it is entitled to recover the difference between the value it would have received for the remainder of the useful life of the equipment minus the depreciation over the 22-month period. Plaintiff also requests incidental and consequential damages in the amount of $ 800 paid to defendant for service calls to repair the equipment, and $ 176.23 paid in freight charges for delivery of replacement equipment it purchased. Additionally, plaintiff seeks prejudgment interest of 10% on any award compounded annually from April 22, 1992 to the date of entry of the judgment. Hence, plaintiff requests $ 89,253.85, plus 10% prejudgment interest and attorney fees.

Defendant argues that any damages awarded plaintiff should be reduced by the fair rental value for the 22-month period plaintiff used the CMR. Defendant's exhibit 22 (Rental Agreement), [*40] which was admitted into evidence, showed that the monthly rental fee for the CMR was 10% of the total purchase price. Defendant argues that this method of calculation is an established procedure of setting off damages in the case of revocation of acceptance. Additionally, defendant maintains that it offered credible evidence that the useful life of the CMR was five years.

First, the court notes that neither side presented evidence of the difference in the value of the CMR as warranted versus its value at the time of tender in its defective condition. Such evidence would have given the court better guidance on the issue of damages. Nevertheless, [HN10] plaintiff is entitled to seek whatever damages it can prove. *Heat Exchangers, Inc., v. Aaron Friedman, Inc., 96 Ill. App. 3d 376, 388, 421 N.E.2d 336, 51 Ill. Dec. 828 (1981)*. Because plaintiff did receive some use from the CMR, it is certainly appropriate to reduce the value of that use from any recovery. Peter Winiarski, the vice president of finance and comptroller for Rush, proferred testimony that the CMR was a capital asset, recorded on Rush's books as having a 10-year useful life. Mr. Winarski admitted that he had no knowledge about

[*41] the technological obsolescence of the CMR, although that fact is considered a generally accepted accounting principle. On the other hand, Howard Boyle, a medical clinical specialist at Gould, provided more credible evidence that the CMR had a five-year useful life when technological obsolescence is considered. He testified that the life cycle of electronic products is getting shorter; and in fact, Gould introduced a new CMR in late 1990. Thus, this court concludes that the damages to which Rush is entitled is $ 69,436.40 The factors this court considered are: (1) the purchase price of $ 108,095; (2) the five-year useful life of the equipment; (3) plaintiff's use of the equipment for 22 months; (4) the difference between the useful life of the equipment and plaintiff's actual period of use of the equipment; (5) the $ 800 plaintiff paid in service calls; and (6) the $ 176.23 plaintiff paid in freight charges for delivery of replacement equipment it purchased. The rental formula that defendant would have this court adopt is unreasonable under the circumstance.

Plaintiff purchased the equipment and recorded it as an asset. This court is not persuaded that the purchase of a capital asset [*42] is the equivalent of receiving rental value for the use of an asset. To equate purchase of a capital asset to that of receiving only the rental value for the use of an asset is unreasonable, particularly where the rental fee over the 22 months Rush used the equipment would amount to $ 237,809, twice the original purchase price for the equipment.

As to plaintiff's claim for prejudgment interest, [HN11] Illinois law provides for prejudgment interest on ascertainable damages. See, *The Home Insurance Company v. Kresser Nationwide Truckload Services, Inc. et al.*, No. 92 C 1035, *1995 U.S. Dist. LEXIS 5863 at 2* (N.D. Ill. May 2, 1995); *Ash v. Georgia-Pacific Corp., 957 F.2d 432, 439 (7th Cir. 1992); 815 ILCS 205/2* (West 1993). Interest may be awarded although a good faith defense exists and even where the claimed right and the amount due require legal ascertainment. *Id. at 439*. However, that amount is fixed by statute. *815 ILCS 205/2* (West 1993). Therefore, plaintiff's claim for prejudgment interest will be granted in accordance with the statutory rate.

*CONCLUSION*

The court grants judgment in favor of plaintiff in the amount of $ 69,436.40 on the claims of breach of contract, [*43] implied warranty of merchantability and warranty of fitness for a particular purpose. The court grants judgment against plaintiff and in favor of defendant on the unjust enrichment claim. The court grants plaintiff's claim for prejudgment interest at the statutory rate from April 22, 1992.

1995 U.S. Dist. LEXIS 7686, *

Entered: Blanche M. Manning                    Date: JUN - 2 1995

United States District Court Judge

## CONSUMER PRODUCT SAFETY COMMISSION

**Conditions Under Which the Staff Will Refrain From Making Preliminary Hazard Determinations**

**AGENCY:** Consumer Product Safety Commission.

**ACTION:** Notice.

**SUMMARY:** The Consumer Product Safety Act requires manufacturers, distributors, and retailers of consumer products distributed in commerce to notify the Commission of certain defects, unreasonable risks, or non-compliance with voluntary or mandatory standards. The Commission has made permanent its "No PD" program: The staff refrains from making a preliminary hazard determination when firms report and, within 20 working days, implement an acceptable corrective action.

**DATES:** The Commission's revised procedures became permanent on March 27, 1997.

**FOR FURTHER INFORMATION CONTACT:**
Marc J. Schoem, Office of Compliance, Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814 (mailing address: Washington, DC 20207); telephone 301–504–0608, extension 1365; e-mail address "sect15@cpsc.gov."

**SUPPLEMENTARY INFORMATION:**

### A. Background

Under section 15(b) of the Consumer Product Safety Act (CPSA), 15 U.S.C. 2064(b), manufacturers, distributors, and retailers of consumer products must report certain potential product hazards to the Commission. They must report immediately if they obtain information which reasonably supports the conclusion that a product (1) fails to comply with certain mandatory or voluntary standards, (2) contains a defect which could create a substantial product hazard, or (3) creates an unreasonable risk of serious injury or death. 15 U.S.C. 2064(b).

If the Commission believes that a product presents a substantial product hazard under the CPSA, 15 U.S.C. § 2064 (c) and (d), or contains a defect which creates a substantial risk of injury to children under the Federal Hazardous Substances Act, 15 U.S.C. § 1274(a), (b) and (c), it may pursue corrective action.

After receiving a report, the Commission staff evaluates the hazard. If the available facts justify pursuing corrective action for the product, the staff generally makes a preliminary determination ("PD") of "substantial product hazard" or "substantial risk of

injury to children." *See* 16 CFR 1115.12(a).

### B. Initiation of "No PD" Pilot Program

On August 17, 1995, the Commission initiated a six-month pilot program in which, under certain conditions, the Office of Compliance would not make a preliminary determination. *See* 60 Fed. Reg. 42848 (Aug. 17, 1995). Later, the Commission extended the pilot program through March 1997.

The Commission initiated the pilot program to use staff resources more efficiently and to promote quicker recalls. In addition, the Commission hoped to reduce any disincentive to companies that want to report and undertake corrective action, but fear the consequences of a staff preliminary determination.

When the staff preliminarily determines that a product presents a substantial product hazard or creates a substantial risk of injury to children, it requests that the reporting company take corrective action. If a company acts promptly to correct a defective product, staff resources can be devoted to helping the company recall the product instead of investigating the defect and making the preliminary determination.

The Commission designed the pilot program to "reward" companies that acted quickly on a corrective action. The staff made no preliminary determination concerning the products of those companies.

### C. Results of Pilot Program

The pilot program was successful. During its first six months, companies participating in the program initiated 57 corrective action plans that affected approximately 3.5 million products. By the end of the pilot program's extension, companies had initiated 140 recalls of approximately 12.9 million products.

On average, companies in the pilot program took 14 working days to initiate corrective action plans. The staff sometimes granted an extension of time for issuance of a joint news release or final staff approval of an alternative notice program. In most of those cases, however, the firm's corrective action plan was underway within 20 working days.

During the pilot program, companies undertook corrective actions for a variety of products. They included children's articles with small parts that presented choking hazards, products that collapsed and presented impact hazards, bicycles and recreational vehicles that could cause falls or loss of control, products that presented the risk of carbon monoxide poisoning, electrical products that presented shock

and fire risks, and power tools that could cause serious lacerations.

Industry response to the pilot program was positive. During the program, more than one-third of the companies making section 15 reports initiated corrective actions under the "no preliminary determination" approach.

### D. Permanent Program

After reviewing the results of the pilot program, the Commission revised its procedures on a permanent basis effective March 24, 1997. The permanent program is governed by the following requirements and procedures:

1. If a company reports and implements within 20 working days after filing an initial report a corrective action that the staff believes will be effective, the staff will generally refrain from making a preliminary determination. "Implement" means issuance of a news release or other form of public notice approved by the staff commencing a consumer-level corrective action.

If the Commission believes that more than 20 working days is necessary, the Director of the Division of Corrective Actions may extend the time period for any appropriate reason, including that: (a) technically complex issues must be resolved to assure the staff that the company's action is adequate (for example, laboratory testing is necessary); (b) retailers and distributors must be notified in advance so that the plan will be effective; or (c) the news release must be scheduled for optimum coverage (for example, a video news release is necessary).

2. A company's reporting obligations remain unchanged. Specifically, companies that have an obligation to notify the Commission under section 15(b) or section 37 of the CPSA, or section 102 of the Child Safety Protection Act, must continue to do so even when they believe the risk does not warrant corrective action.

3. A company must file a full report under 16 CFR 1115.13(d). In particular, the report must include copies of complaints and claims, which is crucial for staff evaluation and which many companies currently omit.

4. A company must advise the staff that it wishes to participate in the program.

5. A company must submit a proposed corrective action plan in sufficient time for the staff to review and analyze it. In addition, the staff must have sufficient time to work out the details of the corrective action with the company. All of this must occur before the company initiates the plan

within 20 working days of filing its report.

6. A company's proposed corrective action plan must include:

(a) A description of the recall action (refund, repair, or replacement) that the company will take to eliminate the identified risk.

(b) Sufficient product design, incident, and testing information to allow the staff to determine whether the proposed action corrects the identified problem and the problem is limited to the model(s) and production dates identified by the company. Such information should include, but is not limited to: consumer complaints, test data, engineering drawings, material specifications, samples of product, and/or component parts, as needed. If the needed documentation and documentation is being compiled, but is not yet available, the company must provide the date it expects to forward the information to CPSC. CPSC staff must have sufficient time to review the information and respond within the 20 working day time limit.

(c) Usually, the company's proposed plan must include notice of the recall to distributors, retailers, and consumers of the subject product. The notice must describe the product, the hazard, the number and type of injuries that have been reported, the type of injury that can occur, and the action to be taken in plain language understandable to the people to whom the notice is directed. Generally, the plan must include a joint news release with the Commission announcing the recall, letters and instructions to retailers and distributors, point-of-purchase posters, and, depending upon the level of risk, the population at risk, age and number of products involved, additional notice. Supplementary notice may include a video news release, print and/or radio advertisements, incentives or bounties to encourage consumer response, posters for specific audiences, such as for posting in pediatricians' offices, medical clinics, national parks and campgrounds, and repair shops (see *Corrective Action Handbook*, available for CPSC Division of Corrective Actions). In those cases where all purchasers can be contacted directly, a news release may not be necessary.

(d) An agreement that the Commission may publicize the terms of the plan and inform the public of the nature and the extent of the alleged hazard. The consumer notice should be targeted to reach a significant portion of the public likely to have purchased the subject product. (See 16 CFR

§ 1115.20(a) and CPSC *Corrective Action Handbook*.)

7. The corrective action plan and notice must be acceptable to the staff. The staff will consider whether the corrective action plan adequately addresses the risk of injury presented by the product and whether the notice and corrective action plan are designed to make the plan as effective as is reasonably possible given the nature of the product and the risk.

8. The staff will provide expedited review of every proposal submitted and work with every interested company to develop an acceptable corrective action plan that can be implemented within 20 working days. However, there may be cases where the staff cannot evaluate and approve implementation of a corrective action plan within 20 working days, even though the company has submitted all the necessary information in a timely manner. Similarly, there may be cases where the staff and firm agree that notice and corrective action should occur after 20 working days have passed (for example, in the case of a seasonal product). So long as delay is not caused by or the fault of the company, the staff generally will not make a preliminary hazard determination.

9. If corrective action is implemented within 20 working days, staff will acknowledge in writing that the company has submitted information under section 15(b) of the CPSA and that, based on available information, the proposed corrective action plan is adequate. In addition, the staff will advise the company that it has a continuing obligation to report new or different information that may affect the scope, prevalence or seriousness of the defect or hazard. Once the company implements its corrective action plan, the staff will monitor its progress.

10. If the company does not implement a corrective action acceptable to the staff within 20 working days, the staff will continue its evaluation and will preliminarily determine whether the product contains a defect that creates a substantial risk of injury to children under the FHSA or presents a substantial product hazard under the CPSA. The staff will so inform the company.

11. A company should not delay its report under section 15(b) of the CPSA in order to prepare a corrective action plan. The staff will not refrain from making a preliminary determination if the information available suggests that a company did so.

Dated: July 21, 1997.

**Todd A. Stevenson,**

*Deputy Secretary, Consumer Product Safety Commission.*

[FR Doc. 97–19554 Filed 7–23–97; 8:45 am]

BILLING CODE 6355–01–M

---

## CORPORATION FOR NATIONAL AND COMMUNITY SERVICE

### Sunshine Act Meeting

Pursuant to the provisions of the Government in the Sunshine Act (5 U.S.C. 552(b)), notice is hereby given of the following meeting of the Board of Directors of the Corporation for National and Community Service (Corporation).

**DATE AND TIME:** Thursday, July 31, 1997, from 2 p.m. to 3:30 p.m.

**PLACE:** The meeting will be held via conference call.

**STATUS:** The meeting will be closed, pursuant to exemptions (4) and (9)(b) of the Government in the Sunshine Act. The basis for this closing has been certified by the Corporation's Acting General Counsel. A copy of the certification will be posted for public inspection at the Corporation's headquarters at 1201 New York Avenue NW, Suite 8200, Washington, DC 20525, and will otherwise be available upon request.

**MATTERS TO BE CONSIDERED:** This is a correction to the original **Federal Register** Notice, dated July 22, 1997, page 39214. The Board of Directors of the Corporation will meet to deliberate and make decisions on grant awards in the following areas. AmeriCorps*State formula programs, AmeriCorps Education Awards Program, and Learn and Service America fund for the advancement of service learning and local education agencies.

**FOR FURTHER INFORMATION CONTACT:** Rhonda Taylor, Associate Director of Special Projects and Initiatives, Corporation for National and Community Service, 1201 New York Avenue NW, 8th Floor, Washington DC 20525. Telephone (202) 606–5000, ext 282.

Dated: July 22, 1997.

**Stewart A. Davis,**

*Acting General Counsel.*

[FR Doc. 97–19707 Filed 7–22–97; 3:44 pm]

BILLING CODE 6050–28–P

\\

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| **In re: Aqua Dots Products** | ) | **Case No. 1:08-cv-02364** |
| **Liability Litigation** | ) | **MDL No. 1940** |
|  | ) | **Hon. David H. Coar** |
|  | ) |  |
|  | ) |  |

## DECLARATION OF IAIN KENNEDY

Iain Kennedy declares and states that the following is true and correct:

1.      I make this declaration based on my personal knowledge.  I am competent to testify to the matters stated herein and, if called to testify, I would testify consistent with this declaration.

2.      I am the Chief Operating Officer of Spin Master Ltd., a Canadian corporation.  In that role I also have knowledge of activities of Spin Master, Inc., a wholly-owned subsidiary of Spin Master Ltd.

3.      Neither Spin Master Ltd. nor Spin Master, Inc. manufactured Aqua Dots products. Moose Enterprise Pty Ltd. ("Moose"), an Australian company, is the company that had the Aqua Dots manufactured for sale in the United States.  Spin Master, Inc. distributed Aqua Dots products to retailers in the United States.

4.      Neither Spin Master Ltd. nor Spin Master, Inc. is aware of facts or circumstances upon which a verdict might be reached against it, because neither of them were involved in the manufacture of the Aqua Dots products and did nothing to alter the Aqua Dots products that were sold in the United States.

The undersigned hereby declares, certifies, verifies and states, under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: _June 26 2008_

_Iain Kennedy_
Iain Kennedy