UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re AQUA DOTS PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL No. 1940 Case Number 1:08-cv-02364 Honorable David H. Coar |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS | ) ) | |

**PLAINTIFFS' UNOPPOSED MOTION
FOR LEAVE TO FILE OVERSIZED MEMORANDUM AND MOTION FOR LEAVE
TO FILE MEMORANDUM AND EXHIBITS AS RESTRICTED DOCUMENTS**

Plaintiffs Simon and Sarah Bertanowski, Anthony B. White, Erick K. Botsch, Michael J. Burgess, Kim A. Cosgrove, Donald C. Erbach, Jr., Stephanie S. Streett, Samantha Ford, Sandra Irene Soderstedt, Marilyn W. Walker and Robyn Williams (collectively "Plaintiffs"), by their attorneys, respectfully request leave of the Court to file an oversized memorandum in opposition to Defendant Moose Enterprises Pty Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to FRCP 12(B)(2) and Failure to State a Claim Pursuant to FRCP 12(b)(6) ("Motion to Dismiss"), and in support thereof state as follows:

1.      On June 23, 2008, Defendant Moose Enterprises Pty Ltd. ("Defendant") filed a motion for leave to file an oversized memorandum in support of their Motion to Dismiss.  [D.E.# 26].  Thereafter, on June 27, 2008, Defendant filed its Motion to Dismiss and a memorandum of law in support, which was thirty-four pages in length.  [D.E. #29].  The Court granted the motion for leave to file an oversized memorandum on July 17, 2008.  [D.E.# 45]

2.      Defendant's thirty-four page brief raises numerous complex arguments.  Plaintiffs have made every to effort to address these arguments as concisely as possible to avoid burdening the Court.  Despite Plaintiffs' best efforts, Plaintiffs are unable to fully and meaningfully address Defendant's arguments within the fifteen pages permitted by Local Rule 7.1, and instead require a total of twenty–one (21) pages for their memorandum.

3.      As of the filing of this motion, Plaintiffs' counsel has conferred with Defendant's counsel, who have represented that they do not oppose this request.  This request is being made in good faith and not for any improper purpose.

4.      Plaintiffs therefore request that the Court grant them leave to exceed the fifteen-page limit set by Local Rule 7.1.  To comply with Local Rule 7.1, Plaintiffs' memorandum in opposition to Defendant Moose's Motion to Dismiss will include both a table of contents and a table of authorities. The proposed memorandum, which has been redacted as explained below, is attached hereto as Exhibit 1.

5.      Additionally, Plaintiffs seek leave, pursuant to the paragraph 7 of the Stipulated Protective Order entered by the Court on May 16, 2008 [D.E.#12] and Local Rule 26.2, to file their memorandum and certain exhibits thereto as restricted documents. The exhibits are documents produced in discovery that Spin Master and Moose have deemed confidential (the "confidential documents"). The proposed memorandum has been redacted where it references the confidential documents.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request leave to file an opposition to Defendant Moose's Motion to Dismiss that exceeds fifteen pages, requests that Plaintiffs be granted leave to file their memorandum and certain exhibits as restricted documents, and requests any further relief the Court deems appropriate.

DATED:  August 8, 2008                    Respectfully Submitted,


   s/Ben Barnow
                        BEN BARNOW

BEN BARNOW
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: 312/621-2000
312/641-5504 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
THOMAS J. O'REARDON II
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

KAPLAN FOX & KILSHEIMER LLP
FREDRIC S. FOX
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:  212/687-1980
212/687-7714 (fax)

KAPLAN FOX & KILSHEIMER LLP
LAURENCE D. KING
350 Sansome Street, Suite 400
San Francisco, CA  94104
Telephone:  415/772-4700
415/772-4707 (fax)

FINKELSTEIN THOMPSON LLP
BURTON H. FINKELSTEIN
MILA F. BARTOS
1050 30th Street, NW
Washington, D.C. 20007
Telephone: 202/337-8000
202/337-8090 (fax)

***Plaintiffs' Interim Co-Lead Class Counsel***

## <u>CERTIFICATE OF SERVICE</u>

I, Ben Barnow, hereby certify that **Plaintiff's Unopposed Motion For Leave To File Oversized Memorandum and Motion For Leave To File Memorandum And Exhibits As Restricted Documents**, was caused to be served electronically this 8th day of August 2008, pursuant to ECF as to Filing users and I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.

   s/Ben Barnow     

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re AQUA DOTS PRODUCTS LIABILITY LITIGATION | ) ) ) | MDL No. 1940 |
| ———————————————— | ) ) | Case Number 1:08-cv-02364 |
| This Document Relates To: | ) ) | Honorable David H. Coar |
| ALL ACTIONS. | ) ) ) | |
| ———————————————— | | |

**PLAINTIFFS' OPPOSITION TO MOOSE ENTERPRISES PTY LTD.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FRCP 12(B)(2) AND FAILURE TO STATE A CLAIM PURSUANT TO FRCP 12(B)(6).**

## TABLE OF CONTENTS

STATEMENT OF FACTS ..................................................................................................1

I.     THIS COURT HAS JURISDICTION OVER MOOSE. ......................................3

A.     Moose is Subject to the Applicable State Long Arm Statutes. .......................4

B.     The Exercise of Personal Jurisdiction Over Moose Comports with
Due Process Requirements. ..............................................................................5

     1.     Moose Possesses the Requisite Minimum Contacts with
Forum States. ........................................................................................5

     2.     Forums States' Exercise of Personal Jurisdiction Over Moose
is Reasonable. ........................................................................................8

II.     MOOSE'S 12(b)(6) MOTION IS WITHOUT MERIT. ..................................10

STANDARD OF REVIEW ............................................................................................10

A.     A Choice of Law Determination is Premature at this Juncture. ..................10

B.     Plaintiffs Properly State Claims for Breach of Warranty. ...........................11

     1.     Plaintiffs' Express Warranty Claims are Well-Pled. .......................11

          i.     The Hazardous Toys are Not Appropriate for Children. ..................11

          ii.     Express Warranty Terms Are Pled. .....................................................12

          iii.     Privity Exceptions Exist and/or is Not Required. ...............................12

     2.     Plaintiffs' Implied Warranty Claims are Properly Pled. .................12

C.     Plaintiffs' Tort Claims are Viable and Properly Pled. ................................13

     1.     Plaintiffs Have Adequately Alleged Moose's Negligence. ...............13

     2.     Plaintiffs Have Alleged a Viable Strict Liability Claim Against
Moose. ..................................................................................................13

     3.     Plaintiffs' Tort Claims Are Not Barred by the Economic Loss Doctrine. ......15

     4.     Plaintiffs Have Alleged Viable Claims Under the Consumer
Protection Statutes. .............................................................................15

|  |  | i. | The Complaint Sufficiently Alleges that Moose Violated the ICFA. | 15 |

|  |  | ii. | Plaintiffs' Claims Under the Illinois Deceptive Trade Practices Act Also Stand. | 18 |

| D. | Plaintiffs Properly Pled Unjust Enrichment. | | | 19 |

| E. | Plaintiffs State Valid Claims Under the Consumer Protection Safety Act. | | | 19 |

|  | 1. | Plaintiffs Allege A Valid Claim Under 16 C.F.R. §1500.18(a)(2) | | 20 |

|  | 2. | The Complaint Alleges that Moose Knowingly Violated 16 C.F.R. §1117.1. | | 21 |

| CONCLUSION | | | | 21 |

## TABLE OF AUTHORITIES

Cases

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC,*
499 F.3d 663 (7th Cir. 2007) ...................................................................................10

*Andersen v. Sportmart, Inc.*, 179 F.R.D. 236 (N.D. Ind. 1998)...................................6, 7

*Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102 (1987)......................7, 8

*Asch v. Teller, Levit & Silvertrust, P.C.*,
No. 00-3290, 2004 WL 2967441 (N.D. Ill. Nov. 24, 2004) .......................................18

*Barron v. Ford Motor Co.*, 965 F.2d 195 (7th Cir. 1992) ......................................10, 11

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .................................................10

*Boehm v. Fox*, 473 F.2d 445 (10th Cir. 1973) .....................................................11, 12

*Brazier v. Hasbro, Inc*, No. 99 Civ. 11258,
2004 WL 515536 (S.D.N.Y. March 16, 2004) ..........................................................12

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).................................................7

*Butcher v. Robertshaw Controls Co.*, 550 F. Supp. 692 (D. Md. 1981)..........................20

*Citadel Group Ltd. v. Washington Reg'l Med. Ctr.*,
No. 07-2638, 2008 WL 2971807 (7th Cir. Aug. 5, 2008) .............................................4

*Compliance Software Solutions, Corp. v. MODA Tech. Partners, Inc.*,
No. 07-CV-6752, 2008 WL 2960711 (N.D. Ill. July 31, 2008).......................................5

*Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584 (Ill. 1996) .................................16

*Consumer Prod. Safety Comm'n v. Chance Mfg. Co.*,
441 F. Supp. 228 (D.D.C. 1977)..............................................................................20

*Damian Serv. Corp. v. PLC Servs., Inc.*, 763 F. Supp. 369 (N.D. Ill. 1991) ..................4

*Dehmlow v. Austin Fireworks*, 963 F.2d 941 (7th Cir. 1992)....................................7, 9

*Dunham v. Vaughan & Bushnell Mfg. Co.*, 247 N.E.2d 401 (Ill. 1969)..........................14

*Fisher v. Quality Hyundai, Inc.*,
No. 01-3243, 2002 U.S. Dist. LEXIS 407 (N.D. Ill. Jan. 8, 2002).........................16, 17

iii

*Frederick v. Simmons*, 144 F.3d 500 (7th Cir. 1998) ...................................................................10

*Gavin v. AT&T Corp.*, 543 F. Supp. 2d 885 (N.D. Ill. 2008) ........................................................17

*Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990)............................................................10

*Giotis v. Apollo of Ozarks, Inc.*, 800 F.2d 660 (7th Cir. 1986).............................................3, 4, 6

*Gould v. Artisoft*, 1 F.3d 544 (7th Cir. 1993)................................................................................11

*Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897 (1963) .......................................................14

*Griggs v. Bic Corp.*, 981 F.2d 1429 (3d Cir. 1992) ......................................................................15

*Hyatt Int'l Corp. v. Coco*, 302 F.3d 707 (7th Cir. 2002) ................................................................3

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
174 F.R.D. 332 (D.N.J. 2001)........................................................................................................10

*In re Intel Corp. Microprocesor Antitrust Litig.*, 496 F. Supp. 2d 404 (D. Del. 2007) ................10

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).......................................................................5

*Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137 (7th Cir.1975) ........................................6

*Kaplan v. DaimlerChrysler, A.G.*, 99 F. Supp. 2d 1348 (M.D. Fla. 2000)....................................5

*Kelly v. Hanscom Bros, Inc.*, 331 A.2d 737 (Pa. Super. 1974)....................................................12

*Kelsey v. Muskin, Inc.*, 848 F.2d 39 (2d Cir. 1988) ......................................................................19

*Killingsworth v. HSBC Bank Nevada, N.A.*,
Nos. 06-161, 06-2178, 2007 WL 3307084 (7th Cir. 2007) ...........................................................10

*Kramer v. Weedhopper of Utah, Inc.*, 490 N.E. 2d 104 (Ill. 1986) ..............................................13

*Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523 (S.D.N.Y. 2007)......................................10

*Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49 (7th Cir.1996) ..................................................8

*Lohmann & Rausche, Inc. v. YKK (U.S.A.) Inc.*,
477 F. Supp. 2d 1147 (D. Kan. 2007)............................................................................................11

*Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857 (9th Cir. 2003) ......................................4

*Metzgar v. Playskool, Inc.*, 30 F.3d 463 (3d Cir. 1994)...........................................................14, 15

*McMurray v. Merck & Co., Inc.,*
No. C 07-1007, 2007 WL 1456042 (N.D. Cal. May 17, 2007) ....................................................12

*Miller v. Nippon Carbon Co., Ltd.,* 528 F.3d 1087 (8th Cir. 2008)..................................................4

*Nelson v. Park Industries, Inc.,* 717 F.2d 1120 (7th Cir. 1983)...................................................6, 7

*Oliveira v. Amoco Oil Co.,* 776 N.E.2d 151 (Ill. 2002). .........................................................16

*Pinney v. Nokia, Inc.,* 402 F.3d 430 (4th Cir. 2005)..........................................................11, 12

*Porter v. Berall,* 293 F.3d 1073 (8th Cir. 2002) ...............................................................4

*Purdue Research Foundation v. Sanofi-Synthelabo, S.A.,*
338 F.3d 773 (7th Cir. 2003) ...........................................................................1, 3, 7

*RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272 (7th Cir. 1997) .....................................................4

*Recreation Servs. v. Odyssey Fun World,* 952 F. Supp. at 594 (N.D. Ill. 1997) ...........................17

*Rios v. State Farm & Fire Cas. Co.,* 469 F. Supp. 2d 727 (S.D. Iowa 2007)................................10

*Smith v. BOC Group PLC,*
No. 00-C-7909, 2001 WL 477237 (N.D. Ill. May 4, 2001)........................................................12

*Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wine Distrib. Pty., Ltd.,*
647 F.2d 200 (D.C. Cir. 1981) ...............................................................................7

*State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami,*
557 So.2d 107 (Fla. App. 3 Dist. 1990)..................................................................11, 12

*Stroman Realty, Inc. v. Antt,* 528 F.3d 382 (5th Cir. 2008) ..........................................................4

*Sullivan v. Author Solutions, Inc.,*
No. 07-C-1137, 2008 WL 2937786 (E.D. Wis. July 23, 2008) ...................................................7

*Turnock v. Cope,* 816 F.2d 332 (7th Cir. 1987)..............................................................3, 7

*United States v. Lanzotti,* 205 F.3d 951 (7th Cir. 1999) ...................................................18

*United States v. One Hazardous Prod. Consisting of a Refuse Bin,*
487 F. Supp. 581 (D.N.J. 1980).............................................................................20

*Univ. of Colo. Foundation, Inc. v. Am. Cyanamid Co.,*
342 F.3d 1298 (Fed. Cir. 2003)..............................................................................19

*Williams v. Gerber Prods. Co.*, 523 F.3d 934 (9th Cir. 2008)...................................................11, 16

*Wilson v. Harris N.A.*,
No. 06-5840, 2007 U.S. Dist. LEXIS 65345 (N.D. Ill. Sept. 4, 2007) ..........................................16

*Wood v. City of Elgin*,
No. 07c 05418, 2008 WL 151382 (N.D. Ill. Jan. 14, 2008) ........................................................10

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) .............................................5, 6

*Worldtronics Int'l, Inc., v. Ever Splendor Enter. Co.*,
969 F. Supp. 1136 (N.D. Ill. 1997) ........................................................................................9, 10

<u>Statutes and Codes</u>

Fed. R. Civ. P. 8 ...................................................................................................................19

Fed. R. Civ. P. 12 ...................................................................................................................3

15 U.S.C. §2072(a) ...............................................................................................................19

Fla. Ann. Stat. § 48.193 .........................................................................................................4

735 ILCS 5/2-209(c) ..............................................................................................................4

815 ILCS § 505/1 *et seq.* ......................................................................................................15

815 ILCS § 505/2 ..................................................................................................................16

815 ILCS § 510/2 ..................................................................................................................17

16 C.F.R. §1500.18(a)(2) .................................................................................................19, 20

16 C.F.R. §1117.1, *et seq.* ...............................................................................................19, 21

<u>Other Authority</u>

Restatement, Torts (Second) § 402A .......................................................................................14

## STATEMENT OF FACTS

Defendant Moose Enterprise PTY Ltd. ("Moose") distributed over four (4) million hazardous, potentially lethal, Aqua Dots[1] toys ("Aqua Dots" or "Hazardous Toys") throughout the United States. Consolidated Amended Class Action Complaint ("CAC") ¶¶ 1, 22. Aqua Dots is a toy marketed to and intended for use by children that contains packets of small[2], brightly colored beads. *Id.* ¶¶ 40-42. The beads fuse together when sprayed with water allowing children to create multi-dimensional designs. *Id.*

On November 8, 2007, the Consumer Products Safety Commission ("CPSC") announced the recall of the approximately 4.2 million Aqua Dots sold within the United States after, *inter alia*, receiving notification that two young children had been hospitalized and rendered comatose as a result of ingesting the toxic Aqua Dots. *Id.* ¶ 4. The Aqua Dots, manufactured in China, were coated with 1,4 butanediol, a hazardous substance that converts into gamma-hydroxy butyrate ("GHB") (commonly referred to as the "date rape drug") when metabolized, and is capable of causing significant harm or even death when ingested. *Id.* ¶ 38. Ingestion of GHB can cause depression of the central nervous system, respiratory depression, unconsciousness, seizures, comas, and death. *Id.* These effects are magnified when GHB is ingested by small children. *Id.* ¶ 38. Plaintiffs each purchased or received Aqua Dots. *Id.* ¶¶ 11-19.

Moose manufactures, sells, and distributes Aqua Dots throughout the world ████ ████████████████ its Aqua Dots kits having been distributed internationally. *Id.* ¶ 22; (ME27.)[3] Moose currently has two (2) patent applications pending with the United States Patent and Trademark Office related to its Aqua Dots. *See* Patent Applications, attached hereto as Exhibit A. The toxic Aqua Dots were manufactured in China by JSSY Ltd, a Chinese company retained by Moose. CAC ¶ 45.

████████████████████████████████████████
████████████████████████████████████████

---

[1] Aqua Dots are also commonly referred to as Bindeez products or Bindeez toys outside the United States. CAC ¶ 57.

[2] The beads are approximately 5 millimeters in diameter. CAC ¶ 40.

[3] Plaintiffs look beyond the pleadings in this matter in rebutting Moose's personal jurisdiction argument as Moose submitted an affidavit in support of its claim. *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003) ("[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction.").



attached hereto as Exhibit B. Moose's records, attached hereto as Exhibit C ▮

Moose disclosed that Aqua Dots were coated with 1,4 butanediol, after receiving reports from physicians that children were becoming ill and comatose after swallowing the toys.(ME37-38), attached within Group Exhibit D. The FDA classifies butanediol as a Class I Health Hazard, meaning that it can cause life-threatening harm. CAC ¶ 33. ▮

attached within Group Exhibit D. Moose failed to conduct proper testing to ensure that ▮ Aqua Dots distributed throughout the world were not coated with toxic, potentially lethal chemicals, knowing that Aqua Dots were intended for use by children that would likely handle, lick, taste, bite, and/or swallow the toys.

Despite these facts, Moose maintains that Aqua Dots "were not defective or hazardous" and that it was foreseeable that Aqua Dots, marketed to children ages four (4) and older, contained "some type of chemical that could be dangerous to individuals who consumed such product." (Moose Br. ¶¶ 78, 80.) These absurd arguments do not comport with applicable law or the facts of this case.

Moose's failure to adequately test or inspect its Aqua Dots is particularly alarming considering the numerous recent, widely-publicized recalls involving products manufactured in China. CAC ¶ 63, 70. Further, Aqua Dots' packaging misrepresented that the toy complied with ASTM F963-03 and ASTM D-4236, and did not contain hazardous substances. CAC ¶ 86. In referencing ASTM D-4236, the packaging misrepresented that: (a) Aqua Dots had been examined by a toxicologist for acute and chronic toxicity; (b) the label named all ingredients identified as presenting a chronic health hazard, and; (c) the toy came with safe use instructions. *Id.* ¶ 87. In referencing ASTM F963, the packaging misrepresented that the Aqua Dots were tested for and free from banned toxic substances. *Id.* ¶ 88.

▮ Moose informed Spin Master that Aqua Dots were coated

with a hazardous substance. (ME42), attached within Group Exhibit D. On November 6, 2008, Moose ordered a recall of the Aqua Dots it had sold throughout Australia, offering a full-refund or safe replacement beads. CAC ¶ 57. On November 7, 2007, the CPSC announced the recall of approximately 4.2 million Aqua Dots, stating that the toys should be taken away from children immediately. *Id.* ¶ 4. However, the recall is woefully deficient as it is unduly complicated and fails to offer a full refund, merely offering to replace the toxic beads with other beads or another toy. *Id.* Further, the recall fails to ensure that the replacement beads were manufactured and distributed with proper quality control measures and safety inspections. *Id.* ¶ 6.

## I.    THIS COURT HAS JURISDICTION OVER MOOSE.

When a motion challenging personal jurisdiction under Fed. R. Civ. P. 12(b)(2) is raised, "the party asserting personal jurisdiction need only make out a *prima facie* case of personal jurisdiction." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). "In evaluating whether the prima facie standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citation omitted). As such, "[t]he allegations in [the] complaint are to be taken as true unless controverted by the defendants' affidavits; and any conflicts in the affidavits are to be resolved in [the plaintiffs] favor." *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987).

Plaintiffs have made a *prima facie* showing to support a finding for personal jurisdiction over Moose. Moose's argument that the Court does not have jurisdiction over Moose is erroneous. (Moose Br. at 2.) First, Moose is subject to jurisdiction under the applicable long-arm statutes of the states in which Plaintiffs filed cases: Arkansas, California, Florida, Illinois, Missouri and Texas (collectively, the "Forum States").[4] Moreover, the exercise of the long-arm statutes of the Forum States over Moose would not run afoul of the due process requirements of the Fourteenth Amendment.  Thus, personal jurisdiction exists over Moose in the Forum States.

---

[4] A federal district court in a diversity case has personal jurisdiction over a non-consenting, nonresident defendant if a court of the state in which the district court is sitting would have such jurisdiction. *See Giotis v. Apollo of Ozarks, Inc.*, 800 F.2d 660, 665 (7th Cir. 1986). This determination involves a two-step process. *Id.* First, the Court must determine whether the defendant is subject to jurisdiction under the applicable long-arm statute. *Id.* "If the answer to the first question is yes, however, then the [ ] court must determine whether the exercise of jurisdiction under the long-arm statute does not run afoul of the due process requirements of the Fourteenth Amendment." *Id.*

A.    **Moose is Subject to the Applicable State Long-Arm Statutes.**

Where states' long-arm statutes are intended to be co-extensive with the due process clause, a court need only address due process requirements. *Giotis*, 800 F.2d at 665. The long-arm statutes of Arkansas, California, Missouri and Texas authorize personal jurisdiction to the maximum extent permitted by the Constitution. *See Stroman Realty, Inc. v. Antt*, 528 F.3d 382, 385 (5th Cir. 2008) (Texas); *Miller v. Nippon Carbon Co., Ltd.*, 528 F.3d 1087, 1090 (8th Cir. 2008) (Arkansas); *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 863 (9th Cir. 2003) (California); *Porter v. Berall*, 293 F.3d 1073, 1075 (8th Cir. 2002) (Missouri). Thus, it is undisputed by Moose that the only relevant inquiry with respect to personal jurisdiction in these Forum States is whether due process requirements are satisfied. (Moose Br. at 3-4.) As detailed below, exercising jurisdiction over Moose comports with due process requirements.

Likewise, the Illinois long arm statute is co-extensive with federal constitutional requirements. It provides that an Illinois court "may . . . exercise jurisdiction on any basis . . . now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). Despite this, Moose argues that since it did not directly transact business within the state of Illinois, the Illinois long-arm statute does not extend jurisdiction over it. (Moose Br.. at 4-5.) This pertains only to one basis for jurisdiction and disingenuously ignores the clear language of the Illinois long-arm statute's "catch all" provision, which is "co-extensive with the state and federal constitutional requirements." *Citadel Group Ltd. v. Washington Reg'l Med. Ctr.*, No. 07-2638, 2008 WL 2971807, at *3 (7th Cir. Aug. 5, 2008).[5]

Florida state courts are authorized to assert personal jurisdiction over defendants that cause injury to persons within Florida "arising out of an act or omission by the defendant outside" of Florida, if at the time of injury, products processed or manufactured by the defendant were used or consumed in Florida within the "ordinary course of commerce, trade, or use." Fla. Ann. Stat. § 48.193(f)(2). Moose manufactured and/or processed the Hazardous Toys and

---

[5] As the Seventh Circuit has stated, since "no case has yet emerged where due process was satisfied under the federal constitution but not under the Illinois constitution," the only remaining inquiry is the federal due process analysis. *Citadel*, 2008 WL 2971807, at *3; *see also RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997) (holding that "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction."); *Damian Serv. Corp. v. PLC Servs., Inc.*, 763 F. Supp. 369 (N.D. Ill. 1991) (holding that under the statute, if the requirements of due process are satisfied, jurisdiction is met regardless of whether a defendant has performed any of the acts enumerated in the statute).

distributed them in Florida through the ordinary course of commerce. In so doing, Moose omitted that its Aqua Dots were coated with hazardous, potentially lethal chemicals. CAC ¶ 11.

Plaintiffs Simon and Sarah Bertanowski and Anthony B. White, residents of Florida, were injured as a result of their ordinary use or consumption of the Hazardous Toys in Florida and by Moose's omissions with respect to those Toys. Thus, Florida's state courts would be authorized to assert personal jurisdiction over Moose in this action. *See Kaplan v. DaimlerChrysler, A.G.*, 99 F. Supp. 2d 1348, 1351 (M.D. Fla. 2000) (holding that German manufacturer fell within Florida's long-arm statute where its defective car was sold and used in Florida in the ordinary course of commerce).

**B.    The Exercise of Personal Jurisdiction Over Moose Comports with Due Process.**

Each Forum State's assertion of personal jurisdiction over Moose in this action is reasonable and comports with Constitutional due process requirements. Federal due process requirements authorize district courts to exercise jurisdiction over a nonresident defendant if the defendant has certain minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Moose purposely availed itself of the benefits of Forum States by knowingly injecting millions of its Aqua Dots into the stream of commerce, fully aware that they would be distributed and sold in Forum States. Thus, the Court can exercise specific personal jurisdiction over Moose.

**1.    Moose Possesses the Requisite Minimum Contacts with Forum States.**

Moose argues that it does not have minimum contacts with the Forum States because the Court does not have general or specific jurisdiction over it. (Moose Br. at 7-8.)[6] In particular, Moose argues that the Court does not have specific jurisdiction over it because it did not purposefully direct its activities towards the Forum States and Plaintiffs' various causes of action do not arise from its contacts with the Forum States. *Id.* This argument fails in light of the stream of commerce theory established by the Supreme Court in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980). In *World-Wide Volkswagen*, the Supreme Court explained that "the forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of

---

[6] Under the "minimum contacts" test, a defendant may be subject to either specific or general jurisdiction. *See Compliance Software Solutions, Corp. v. MODA Tech. Partners, Inc.*, No. 07-CV-6752, 2008 WL 2960711 (N.D. Ill. July 31, 2008). Here, the Court has specific jurisdiction over Moose.

commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297-98.

The Seventh Circuit has taken a broad view of the "stream of commerce" theory. *See Andersen v. Sportmart, Inc.*, 179 F.R.D. 236, 239 (N.D. Ind. 1998). The Seventh Circuit has stated that:

> [M]anufacturers and distributors purposely conduct their activities to make their product available for purchase in as many forums as possible. For this reason, a manufacturer or primary distributor may be subject to a particular forum's jurisdiction when a secondary distributor and retailer are not, because the manufacturer and primary distributor have intended to serve a broader market and they derive direct benefits from serving that market.

*Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1125-26 (7th Cir. 1983).[7]

Due process does not "allow a manufacturer to insulate himself from the long arm of the courts by using an intermediary or by professing ignorance of the ultimate destination of his products." *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1144 (7th Cir.1975); *Giotis*, 800 F.2d at 667 ("A seller at the head of a distribution network thus satisfies the requisite foreseeability of due process where it 'delivers its products into the stream of commerce with the expectation that [these products] will be purchased by consumers in the forum state.'").

Here, Moose has established minimum contacts with the Forum States and thus purposefully availed itself of the benefits of the Forum States. First, Moose currently has two patent applications pending with the United States Patent and Trademark Office related to its Aqua Dots. Ex. A. ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ Moose intended to export Aqua Dots throughout the United States, including all the Forum States.  Indeed, Moose's website states that the "company currently exports to numbers of countries including the United States . . ." and that "[k]ey success has resulted through the vast expansion of its exports markets."[8]

---

[7] The Seventh Circuit also noted that "[a]lthough evidence that a defendant manages its own distribution system or engages in other contacts with a forum presents a stronger case for exercising personal jurisdiction, such conduct is not a minimal requirement for jurisdiction as long as it can be said that a defendant's conduct and connection with a particular forum are such that it should reasonably anticipate being haled into court in that forum." *Nelson*, 717 F.2d at 1126 n.6.

[8] As recent at June 6, 2008, Moose's website stated, "Moose has established Showrooms, dedicated to Moose products, in central toy and lifestyle districts in Hong Kong and New York." Exhibit E.

In addition, Moose's internal documents state that ███████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████ Ex. E; CAC ¶ 22.[9]

The packaging on the Hazardous Toys acknowledges that they were distributed by Spin Master under a license from Moose, and the instruction manual that accompanies the Hazardous Toys also bears the Moose Enterprises trademark. As such, Moose delivered millions of its Aqua Dots products into the stream of commerce knowing that they would be sold in the Forum States bearing the Aqua Dots Trademark. Accordingly, Moose is subject to the jurisdiction of each and every Forum State because it knew that its distribution system shipped throughout the United States and it intended to serve the United States market and derive direct benefits from serving that market. *See Andersen*, 179 F.R.D at 239-240; *Nelson*, 717 F.2d at 1126.[10]

Moose's reliance on *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987), is misplaced. First, the *Asahi* Court split in its interpretation of the minimum contacts analysis, with neither analysis garnering the support of a majority of the Court, and as a result "the Seventh Circuit's broad stream of commerce theory of minimum contacts remains determinative in this circuit." *Andersen*, 179 F.R.D at 240. Indeed, in *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992), the Seventh Circuit refused to depart from the stream of commerce approach established in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-474 (1985), which did garner the support of a majority of the Court, "of a belief that present Supreme Court Justices would not readily agree with past [Seventh Circuit] decisions."

---

[9] The affidavit submitted by Moose fails to address, much less controvert, Plaintiffs' allegations that Moose export Aqua Dots to the United States. This allegation must be taken as true. *Turnook*, 816 F.2d at 333.

[10] *See Sullivan v. Author Solutions, Inc.*, No. 07-C-1137, 2008 WL 2937786, at *4 n.9 (E.D. Wis. July 23, 2008) (finding that defendant publisher had minimum contacts with the forum state where it placed its books into the stream of commerce by delegating its printing and sales functions to its printers and distributors); *Andersen v. Sportmart, Inc.*, 57 F. Supp. 2d 651 (N.D. Ind. 1999) (finding minimum contacts sufficient to support personal jurisdiction over Taiwanese distributor of defective products since distributor had placed defective products into stream of commerce); *Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wine Distrib. Pty., Ltd.*, 647 F.2d 200, 203 (D.C. Cir. 1981) (exercising personal jurisdiction over an Australian defendant who "arranged for introduction of their wine into the United States stream of commerce with the expectation . . . that their products will be shelved and sold at numerous local outlets in diverse parts of the country.").

**2.     Forum States' Exercise of Personal Jurisdiction Over Moose is Reasonable.**

Plaintiffs having established that Moose had the requisite minimum contacts with the Forum States, Moose "can only escape jurisdiction by making a 'compelling case' that forcing it to litigate in [the Forum States] would violate traditional notions of fair play and substantial justice." *Logan Prods., Inc. v. Optibase, Inc.,* 103 F.3d 49, 53 (7th Cir.1996).  Among the factors that courts may consider in making this determination are: (1) the burden on the defendant, (2) the Forum State's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Asahi,* 480 U.S. at 115.[11] When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant. *Id.* Here, Plaintiffs' strong interests in obtaining relief and the Forum States' interest in adjudicating this dispute outweigh any burden Moose will suffer through litigating in any Forum State.

In an attempt to convince the Court that it should not assert personal jurisdiction over it, Moose argues that it is "burdened" by having to travel from Australia to the United States and that none of its records, files or witnesses are located in the United States. (Moose Br. at 10.)  It is simply inequitable for Moose to collect millions of dollars from distributing Aqua Dots throughout the United States, while taking advantage of the protections offered by the United States judicial system, and then assert that it is too burdensome to defend itself in any Forum State ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████ Ex. G. Although some of the relevant evidence is located outside of the United States, this will not unduly burden Moose in this modern age where many documents can be compiled electronically. Indeed, Plaintiff has already received discovery from Moose without difficulty.

Further, Moose asserts that interests of the Forum States are not significant because "[a]lthough the forum states have an interest in protecting their citizens, they do not have an interest in a single contract between Moose and a Canadian Company." (Moose Br. at 10.) This argument is absurd and ignores the true nature of this action. This is not a minor contractual

---

[11] This section of *Asahi* garnered the support of a majority of the Court.

dispute, but a products liability class action against manufacturers, distributors and retailers of toys coated in a toxin which is classified as a Class I Health Hazard. The Forum States have a substantial interest in protecting their citizens from the distribution of harmful, potentially deadly toys intended for use by children. *See Dehmlow*, 963 F.2d at 945 (recognizing that forum states have strong interests in "assuring adequate remedial relief for [their] citizens who have been injured" and in applying their product liability laws).

Moose's argument that Plaintiffs have access to alternate forums is equally unavailing. Plaintiffs will be able to obtain convenient and effective relief if this case is located in the Northern District of Illinois, which is centrally located in the United States. There are multiple named Plaintiffs involved, who represent numerous Class members throughout the United States. Accordingly, this factor weighs heavily in favor of asserting jurisdiction over Moose in this Court, despite Moose's illogical suggestion that Australia or China might be a convenient alternate forum for Plaintiffs. (*See* Moose Br. at 11) ("Australian courts are equipped to handle the instant litigation.").

Moreover, the Court's assertion of jurisdiction over Moose would result in the most efficient resolution of this litigation. Although some of the relevant documents and witnesses are located outside of the Forum States, there is also much relevant evidence located inside them. The Hazardous Toys were entered into the stream of commerce in the Forum States and injured Plaintiffs in those states, and the Toys were recalled in the United States with the cooperation of the CPSC. Thus, there is much discovery to be taken here. As stated above, in this modern age, Plaintiffs will have ready access to the relevant discovery outside of the Forum States. The presence of discovery outside of the Forum States will not make this litigation inefficient. Rather, requiring Plaintiffs to participate in legal proceedings in Australia would hinder the efficient resolution of their claims.

Finally, the Forum States' interest in protecting its citizens from dangerous and defective products entered into the stream of commerce by an Australian manufacturer far outweighs any restrictions this might place on Moose's ability to do business in the United States. Moose availed itself of the benefits of conducting commerce in the United States and should also be subject to its laws. Accordingly, notions of fair play and substantial justice weigh in favor of the Court exercising jurisdiction over Moose. *See Worldtronics Int'l, Inc., v. Ever Splendor Enter. Co.*, 969 F. Supp. 1136, 1142 (N.D. Ill. 1997) (holding that it was reasonable to assert personal

jurisdiction over a Taiwanese defendant because the defendant's "mere foreign status" was outweighed by the plaintiff's and the forum state's interests).

## II.    MOOSE'S 12(b)(6) MOTION IS WITHOUT MERIT.

### STANDARD OF REVIEW

A court must accept a complaint's well-pleaded allegations as true and draw all favorable inferences for the plaintiff. *Killingsworth v. HSBC Bank Nevada, N.A.*, Nos. 06-161, 06-2178, 2007 WL 3307084, at *2 (7th Cir. 2007). "The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case." *Wood v. City of Elgin*, No. 07c 05418, 2008 WL 151382 at *1 (N.D. Ill. Jan. 14, 2008) (citing *Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990). A complaint should be dismissed only when the "factual detail in a complaint [is] so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964, (2007)).

### A.    A Choice of Law Determination is Premature at this Juncture.

Moose's attempt to force the Court to decide the substantive law to be applied to Plaintiffs' claims is premature. Class certification is the proper juncture at which this Court should engage in a choice of law analysis. *See In re Intel Corp. Microprocesor Antitrust Litig.*, 496 F. Supp. 2d 404, 411 (D. Del. 2007) (because the "litigation is still in its infancy," choice of law questions should be deferred until class certification); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007) (choice of law analysis more appropriate at class certification stage after discovery); *Rios v. State Farm & Fire Cas. Co.*, 469 F. Supp. 2d 727, 741-42 (S.D. Iowa 2007) (same). Accordingly, *In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 174 F.R.D. 332 (D.N.J. 2001), the class certification opinion cited by Moose, has little bearing on the choice of law analysis at this juncture.

However, if the Court should decide to conduct a choice-of-law analysis now, then it is appropriate to apply Illinois law to each of Plaintiffs' claims. "A federal court, sitting in diversity, applies the choice of law rules of the state in which it sits." *See Frederick v. Simmons*, 144 F.3d 500, 503 (7th Cir. 1998). In deciding a choice of law question, the Court first must determine whether there is actually a conflict between the laws. *See Barron v. Ford Motor Co.*, 965 F.2d 195, 197 (7th Cir. 1992). Moose failed to identify any actual conflict amongst the

various state laws. Yet in the Seventh Circuit, if parties have not identified an actual conflict between the states' laws, then the law of the forum applies. *See Gould v. Artisoft*, 1 F.3d 544, 549 n.7 (7th Cir. 1993). As such Illinois law should apply.

Regardless of whether the Court ultimately decides to apply the law of Illinois, or the law of each individual Plaintiff's home state, the Complaint states claims against Moose as explained herein.

**B.    Plaintiffs' Properly State Claims for Breach of Warranty.**

**1.    Plaintiffs Express Warranty Claims are Well-Pled.**

Moose argues that Plaintiffs' express warranty claim fails because no warranty is alleged to have been created nor breached. (Moose Br. at 19-20.) Not true. Moose represented that Aqua Dots were appropriate for certain ages (CAC ¶¶ 79, 129) and that the product complied with ASTM's product safety standards (CAC ¶¶ 86 – 89). In fact, Moose admits "they had asserted [ASTM compliance] on the packaging and the website" and the toys were "packaged, labeled and intended for children four years old and over." (Moose Br. at 20.)   Further, Moose's argument that the Hazardous Toys did not comply with ASTM standards, and were fit for their ordinary and reasonably foreseeable uses, is a question of fact not appropriate for dismissal. *State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami*, 557 So.2d 107, 108-09 (Fla. App. 3 Dist. 1990) (citing *Boehm v. Fox*, 473 F.2d 445 (10th Cir. 1973)); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 444 (4th Cir. 2005).

**i.    The Hazardous Toys are Not Appropriate for Children.**

Contrary to Moose's express warranties, the Hazardous Toys were not appropriate for children aged 4 and up (CAC ¶¶ 42, 79) and did not comply with applicable law and regulations, including ASTM F963-03 and ASTM D-4236.[12] CAC  ¶¶ 86-89.  It was reasonably foreseeable (and at the very least it is a question of fact) that pre-school-aged children would place Aqua Dots in their mouths or lick their fingers after wetting the beads according to the toy's instructions. *Id.*  ¶¶ 3, 49.  Because the Aqua Dots contain 1,4 butanediol, the toys are not appropriate for children.

---

[12] Actionable warranties are not limited to words written on the Aqua Dots packaging, but are also created by the pictures of children playing on the toy's packaging. *Williams v. Gerber Prods. Co.*, 523 F.3d 934 (9th Cir. 2008); *Lohmann & Rausche, Inc. v. YKK (U.S.A.) Inc.*, 477 F. Supp. 2d 1147, 1153 (D. Kan. 2007).

### ii.    Express Warranty Terms Are Pled.

Contrary to Moose's suggestion, express warranty allegations meet the notice pleading requirement if they are outlined or generally stated in the Complaint. *Smith v. BOC Group PLC*, No. 00-C-7909, 2001 WL 477237 at *6 (N.D. Ill. May 4, 2001).[13] And, in fact, the Complaint notes what is precisely on the packaging: the toys are appropriate for certain ages (CAC ¶ 79), the packages carry images of children playing with the Hazardous Toys (CAC ¶ 79), and the packaging states compliance with ASTM standards (CAC ¶ 86). *See also* CAC ¶¶ 129-30, 132-33. Nothing more is required at this stage.

### iii.    Privity Exceptions Exist and/or is Not Required.

Moose's privity argument fails. Besides the incorrect supposition that Plaintiffs sue only for economic loss, Moose's incorrect attempt to pick off individual plaintiffs based on state privity requirements for express and/or implied warranties fails. Moreover, Spin Master's actions have brought the company into privity with consumers. CAC ¶ 121. Plaintiffs incorporate pp. 19-20 of the Spin Master Oppos. Brierf addressing privity as if stated herein.

### 2.    Plaintiffs' Implied Warranty Claims are Properly Pled.

Plaintiffs allege that Moose's Aqua Dots – children's toys coated with 1,4 butanediol hazardous, potentially deadly substance – were not fit for their ordinary purpose. "The . . . inquiry focuses on expectations for the performance of the product when used in customary, usual, and reasonably foreseeable manners." *Brazier v. Hasbro, Inc*, No. 99 Civ. 11258, 2004 WL 515536 at *4 (S.D.N.Y. March 16, 2004); CAC ¶ 3 ("Defendants knew, or should have known, that these toys were intended for children, who lick or put their hands in their mouths."); CAC ¶ 49. Recognizing the reasonably foreseeable fact that children will put toys in their mouths, Defendant Wal-Mart tests parts that could end up in children's mouths. *Id.* ¶ 84.[14]

Further, whether the Aqua Dots toys were fit for their ordinary or reasonably foreseeable usage is a question of fact not appropriately resolved at this stage. *State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami*, 557 So.2d 107, 108-09 (Fla. App. 3 Dist. 1990) (citing *Boehm v. Fox*, 473 F.2d 445 (10th Cir. 1973)); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 444 (4th Cir. 2005)

---

[13] *See also McMurray v. Merck & Co., Inc.*, No. C 07-1007, 2007 WL 1456042 (N.D. Cal. May 17, 2007) (precise warranty language not required under the liberal pleading requirements).

[14] Indeed, the court in *Kelly v. Hanscom Bros, Inc.*, 331 A.2d 737 (Pa. Super. 1974), found sufficient evidence was presented whether defendant breached the implied warranty of merchantability because "[t]he toys which caused the death of [Plaintiff] was not fit as a plaything for infants, *considering infants' universal penchant for putting things into their mouths . . . .*" (emphasis added).

(question for fact-finder). Plaintiffs have alleged the Aqua Dots toys are unreasonably dangerous and not fit for reasonably foreseeable uses. Nothing more is required at this stage.

**C.    Plaintiffs' Tort Claims are Viable and Properly Pled.**

**1.    Plaintiffs Have Adequately Alleged Moose's Negligence.**

Plaintiffs have adequately alleged Moose's negligence. Plaintiffs allege that Moose had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Hazardous Toys, including a duty to ensure that the Hazardous Toys did not contain butanediol. CAC ¶¶ 33, 143. Moose breached this duty by failing to exercise reasonable care in designing, manufacturing and distributing the Hazardous Toys, and in failing to conduct adequate quality testing. CAC ¶¶ 144-45. Moreover, when it became aware of the dangers the Hazardous Toys posed, Moose failed to accompany the toys with proper warnings and failed to act quickly to issue a recall and pull the Hazardous Toys from the shelves. CAC ¶ 145. Finally, Moose's negligence proximately caused Plaintiffs and the Class to be injured, through the out-of-pocket expenditures for the Hazardous Toys, exposure to toxic chemicals, increased risk of serious health problems and associated costs of diagnostic screening. CAC ¶ 148. Accordingly, Plaintiffs have set forth sufficient allegations to establish Moose's negligence.

**2.    Plaintiffs Have Alleged Viable Strict Liability Claims Against Moose.**

Plaintiffs have sufficiently alleged a strict liability claim against Moose with respect to the Hazardous Toys. *See Kramer v. Weedhopper of Utah, Inc.*, 490 N.E. 2d 104, 107 (Ill. 1986) (holding that "[t]o recover under strict liability in tort, plaintiff must prove that: (1) injury resulted from the condition of the product; (2) the condition was unreasonably dangerous; . . . (3) the condition existed when the product left defendant's control," and the defendant is "in the business of placing the product in the stream of commerce."). Moose designed, manufactured, sold and/or distributed defective Aqua Dots craft kits containing beads coated with butanediol. *See* CAC ¶¶ 32-35, 160. The Hazardous Toys were unreasonably dangerous, as their butanediol coating can cause serious health consequences in young children and reached Plaintiffs without a substantial change in condition. CAC ¶¶ 38, 160, 163.[15] Finally, Plaintiffs were injured by the defective and unreasonably dangerous Hazardous Toys, including exposure to toxic chemicals, increased risk of serious health problems and the associated costs of diagnostic screening. CAC ¶ 166.

---

[15] Plaintiffs have clearly alleged that Moose is engaged in the business of selling toys. CAC ¶ 22.

Despite this, Moose argues that Plaintiffs have not pled sufficient facts to establish that the Hazardous Toys were defective, were actually dangerous, or were unfit for their ordinary purposes or use. (Moose Br. at 29.)   A product is defective if it is "in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement, Torts (Second) § 402A, cmt. (g); *Dunham v. Vaughan & Bushnell Mfg. Co.*, 247 N.E.2d 401, 403 (Ill. 1969). The Hazardous Toys contained an extremely hazardous chemical that metabolizes into GHB when ingested. CAC ¶¶ 36-39.   Children who swallowed the beads (or licked the coating from their fingers) were exposed to GHB. As a result, children became seriously ill, some of whom required hospitalization. *See* CAC ¶¶ 50-62.   Moose acknowledges the dangers of Bindeez Beads, the exact same product as Aqua Dots sold in Australia under a different name, in its recall notice stating that:

> The recall follows information that some children who had swallowed the Beads became unconscious and required urgent medical attention. Parents and carers of children should IMMEDIATELY remove the product from the reach of children. No person should ingest Bindeez Beads. If the product is swallowed parents should seek immediate medical attention, even if no adverse symptoms are shown.

Voluntary Recall, Bindeez Toy Range, Mooseworld, http://www.mooseworld.com. au/content/bindeezrecall/recallnotice.aspx (last visited Jul. 22, 2008).[16] Moose has even admitted that an improper chemical was used in the manufacture of the Hazardous Toys. CAC ¶ 46. Thus, Plaintiffs have properly alleged that the Hazardous Toys were defective, in that they clearly were in an unreasonably dangerous condition not contemplated by Plaintiffs and were simply not fit for their ordinary use as toys for young children.[17]

Moose cites *Metzgar v. Playskool, Inc.*, 30 F.3d 463 (3d Cir. 1994), for the proposition that children under four "may be found to not be an intended user of the [Aqua Dots]."  Moose

---

[16] Aqua Dots presented the same hazards and were recalled by Spin Master who distributed the Hazardous Toys in the U.S. market.  CAC ¶¶ 61-62.

[17] Moose essentially argues that any toy intended for a young child that functions as it is supposed to is not defective, regardless of any danger it presents to the child. (Moose Br. at 29.) If this faulty logic is applied to the toy manufacturing process at large, it would mean that manufacturers could avoid all liability from the dangers imposed by their toys as long as they appear to function as the manufacturers represented they would.  This is a dangerous line of reasoning and runs contrary to the principles of strict liability. *See Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897, 901 (1963) ("The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.").

Br. at 29. But the Third Circuit actually noted that "the indications on the package refer more broadly to the physical and mental aptitude of small children and do not contain any strict chronological age implication." *Metzgar*, 30 F.3d at 464. In distinguishing its earlier decision in *Griggs v. Bic Corp.*, 981 F.2d 1429 (3d Cir. 1992), where a three year old child is clearly not the intended user of a BIC lighter, the Third Circuit found that "intended user' must be determined in the context of the knowledge and assumptions of the ordinary consumer in the relevant community ... absent[t] explicit warnings." *Id.*

Here, there is no issue concerning Hazardous Toys being used by unintended users. Despite Moose's concerted effort to ignore the undisputed facts in this case (in fact, the terms 1,4 butanediol and GHB fail to appear once in Moose's brief), Aqua Dots were coated in a chemical known to be a Class I Health Hazard, which metabolizes into the "date rape drug". Thus, the problem with the Aqua Dots was not that the Hazardous Toys were as "child proof" and safety compliant as possible, and only dangerous when played with without supervision. Rather, they were defective and unreasonably dangerous to all intended users for all intended uses. By placing these Hazardous Toys into the hands of children, Moose has exposed them to toxins through hand to mouth contact during ordinary use, regardless of whether they have swallowed them. No amount of parental supervision would have made the Hazardous Toys safe. Moose cannot avoid liability here by shifting the blame to parents and their children.

### 3.    Plaintiffs' Tort Claims Are Not Barred by the Economic Loss Doctrine.

Moose also argues that economic loss doctrine bars Plaintiffs' tort claims because they have not alleged that they suffered injury to person or property. (Moose Br. at 27-29.) As detailed above, Plaintiffs have suffered a compensable injury under Illinois law, thus the economic loss doctrine is inapplicable here. Even if the Court were to find that not all Plaintiffs have suffered injury, many of Plaintiffs' negligence and strict liability claims *are not* barred by applicable states' laws as detailed in the Spin Master Opp. Brief. Plaintiffs' incorporate herein these arguments located on pp. 20, 21 of the Spin Master Opp. Brief.

### 4.    Plaintiffs Have Alleged Viable Claims Under the State Consumer Protection Statutes.

#### i.    The Complaint Sufficiently Alleges that Moose Violated the ICFA.

Plaintiffs have adequately alleged a claim under the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS § 505/1 *et seq.* In order to bring a private cause of action under the ICFA, a plaintiff must allege the following elements: "(1) a deceptive act or practice by the defendant, (2)

the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002). The ICFA is to be construed "liberally." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593-94 (Ill. 1996). The ICFA was "intended to afford a broader range of protection than the common law" and accordingly, "Illinois courts have repeatedly stressed the 'broad protective philosophy' of this legislation." *Fisher v. Quality Hyundai, Inc.*, No. 01-3243, 2002 U.S. Dist. LEXIS 407, at *10 (N.D. Ill. Jan. 8, 2002).

Plaintiffs allege that Moose engaged in a deceptive act or practice by: (1) misrepresenting that the Hazardous Toys were safe and quality products, and (2) by failing to disclose that Aqua Dots were coated in a hazardous and toxic substance.[18] CAC ¶¶ 100-01. Moose provided the packaging for the Aqua Dots, which illustrates children playing with the Hazardous Toys. CAC ¶ 79. Such an illustration represents that the toys were safe as playthings for children, when clearly they were not. *See Williams v. Gerber Prods. Co.*, 523 F.3d 934, 939 (9th Cir. 2008) (finding that pictures of fruits on packaging of Gerber Fruit Juice Snack Products could likely deceive a reasonable consumer). Moreover, Moose represented through the Aqua Dots packaging that the Toys were compliant with ASTM standards, when clearly they were not. CAC ¶¶ 86-88. In light of this, Moose's argument that the Complaint does not attribute a misrepresentation to it is baseless. (Moose Br. at 23.)

Moreover, Moose ignores that Plaintiffs also allege that it engaged in deceptive conduct through omitting material facts. CAC ¶ 100. Moose suppressed, concealed and/or failed to disclose that the Hazardous Toys were coated with a hazardous substance that converted into GHB when ingested. *See* CAC ¶¶ 50-61. Further, Moose knew that its products were coated with toxic chemicals since early October 2007, but suppressed, concealed and/or failed to disclose this information to Plaintiffs and the Class. CAC ¶¶ 50-60, 100. These acts constitute deceptive or unfair practices under the ICFA. As a result of Moose's misrepresentations and concealment of

---

[18] *See* 815 ILCS § 505/2 ("Unfair methods of competition and unfair or deceptive acts or practices, include . . . misrepresentation or the concealment, suppression or omission of any material fact . . ."); *Wilson v. Harris N.A.*, No. 06-5840, 2007 U.S. Dist. LEXIS 65345, at *23 (N.D. Ill. Sept. 4, 2007) (in determining whether an act is unfair under the ICFA, courts consider: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes a substantial injury to consumers," although a plaintiff need not meet all three factors). Defendants' practices of selling toys covered in toxic butanediol are both immoral and have offended public policy of banning hazardous substances in children's products. *See* CAC ¶¶ 32-35.

material facts, Plaintiffs purchased the Hazardous Toys for their children. CAC ¶ 90. Plaintiffs allege that they would not have purchased the Aqua Dots had they known the toys were coated in hazardous butanediol which converts to GHB. CAC ¶¶ 11-19, 90. Moreover, Plaintiffs would not have allowed their children to continue to use or be exposed to the Hazardous Toys at great risk to their health if they had known the truth regarding the safety of these toys. *See id; Gavin v. AT&T Corp.*, 543 F. Supp. 2d 885, 909 (N.D. Ill. 2008) ("To withstand a motion to dismiss, the plaintiff must allege that defendants made a material omission and that the plaintiff would have acted differently had she known the omitted information.")

Plaintiffs also alleged that Moose intended that Plaintiffs rely on its deceptive acts. Allegations that Moose targeted its conduct towards the consuming public are sufficient to satisfy the intent requirement of the ICFA. *See Fisher*, 2002 U.S. Dist. LEXIS 407, at *11-12 (citing *Recreation Servs. v. Odyssey Fun World*, 952 F. Supp. at 594, 597 (N.D. Ill. 1997)); *Connick*, 675 N.E.2d at 503-04 (intent demonstrated through advertisements published in a magazine because defendant "undoubtedly knew that many prospective purchases would read the review and that information furnished to the magazine by [defendant] would be one basis of published review."). As discussed above, Moose misrepresented that its products were safe, quality products that met with ASTM standards in their packaging and advertising. *See* CAC ¶¶ 78-90. In so doing, Moose intended that Plaintiffs would rely on its misrepresentations and purchase the Hazardous Toys. This suffices to evidence intent under the ICFA.[19]

Moose argues that Plaintiffs cannot prove its intent because it had no knowledge that the "Chinese manufacturer of the Aqua Dots replaced the subject ingredient without Moose's knowledge." Moose's statement that it was unaware that the manufacturing process had been compromised is insufficient to nullify its intent. (Moose Br. at 23-24.) Moose knew that the manufacturing process had been compromised since at least early October, yet it did nothing to inform the public for at least a month. CAC ¶¶ 50-55. Moreover, during that time, Moose did not stop selling the Hazardous Toys. By failing to inform consumers of the hazards of the Aqua Dots and continuing to represent them as safe toys, Moose intended to deceive Plaintiffs as to the safety of the Hazardous Toys. Moreover, Moose's failure to change its practices immediately

---

[19] The third element required to maintain a cause of action under ICFA, "the occurrence of the deception in the course of conduct involving trade or commerce," is easily satisfied here, and not challenged by Moose. Moose's deceptive conduct occurred in conjunction with its sales of the Hazardous Toys to the public which clearly involved trade or commerce.

upon learning that Aqua Dots were hazardous demonstrates that Moose may have had knowledge of the defects in the products long before October 2007. Indeed, Moose recalled Bindeez Beads sold since December of 2006. If Moose has been testing its products in accordance with ASTM standards as it represented, it would have been aware of the problem with the toys long before October 2007. *See* CAC ¶¶ 50-57.

Finally, Plaintiffs have established that Moose's deceptive conduct proximately caused Plaintiffs' actual damages, and thus have alleged a viable claim under the ICFA. For the foregoing reasons, and as detailed in Plaintiffs' Oppos. to Spin Masters' Motion (pp. 22-28) incorporated by reference herein, Moose's cursory challenge to Plaintiffs' claims under the consumer protection statutes of their home states is also unpersuasive.

### ii.    Plaintiffs' Claim Under the Illinois Deceptive Trade Practices Act Also Stands.

Plaintiffs have also alleged a viable claim under the Illinois Deceptive Trade Practices Act ("Deceptive Practices Act"), 815 ILCS § 510/2. Plaintiffs have alleged that Moose engaged in deceptive acts and that they have been damaged by Moose's deceptive conduct. Moreover, Plaintiffs have alleged that Moose took actions to protect itself, which have continue to place children in danger. CAC ¶ 77. It is not clear that Moose has stopped manufacturing dangerous toys, has implemented better screening and testing procedures, or has even taken steps to ensure that its toys are safe. *See, e.g.,* CAC ¶ 64. Indeed, several large shipments of Aqua Dots were intercepted at U.S. Customs as late as December 2007. *Id.* If Defendants are not enjoined from misrepresenting the safety of their toys and their failure to properly test and screen their toys, Plaintiffs and the Class will continue to be deceived into purchasing toys from Defendant for their young children that they believe to be safe, but in reality are dangerous and hazardous to their health. *See Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00-3290, 2004 WL 2967441, at *4 (N.D. Ill. Nov. 24, 2004) (injunction under the Deceptive Practices Act was appropriate where a party has failed to remedy procedures that caused past failures, even if those failures were caused by error).[20]

---

[20] Moose's statement that Plaintiffs have not sufficiently pled violations of all states' consumer protection statutes is conclusory and without legal support. *See, e.g., United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 1999) ("a party urging relief must "cite appropriate authority to support [its] argument").

**D.    Plaintiffs Properly Pled Unjust Enrichment.**

Plaintiffs pled with requisite specificity that Moose retained substantial compensation to the detriment of Plaintiffs as a result of selling millions of hazardous and defective Aqua Dots, which were subsequently sold to class members throughout the United States. To date, Moose has retained this benefit.[21]

The Complaint alleges a benefit to Moose at Plaintiffs' expense in violation of the fundamental principles of justice, equity, and good conscience, which Moose must disgorge under the doctrine of unjust enrichment. Specifically, the Complaint states:

> Defendants received from Plaintiffs and Class members certain monies from their purchase of Aqua Dots which are excessive and unreasonable, and are the result of Defendants' deceptive conduct . . . As a result, Plaintiffs and the Class have conferred a benefit on Defendants, without knowledge that the Hazardous Toys contained butanediol, payment for such toys, benefits that were non-gratuitous . . . Defendants accepted the non-gratuitous benefits conferred by Plaintiffs and the Class, and have retained those benefits by not providing an adequate refund or exchange remedy, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing . . . .

CAC ¶¶ 170- 171; *see also id.* ¶¶ 11-19 (stating Plaintiffs purchased Aqua Dots toys, but would not have purchased the toys had they known that children would have been exposed to hazardous chemicals); *Id.* ¶¶ 78-90 (stating Defendants misrepresented that the Hazardous Toys are safe, quality products and age appropriate). Plaintiffs' allegations are properly pled and sufficient pursuant to Rule 8 of the Federal Rules of Civil Procedure.

Additionally, unjust enrichment is based upon contracts implied in law, and as such, privity between parties is not required. *See, e.g., Univ. of Colo. Foundation, Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1309 (Fed. Cir. 2003).

**E.    Plaintiffs State Valid Claims Under the Consumer Protection Safety Act.**

Moose ignores that the CPSA provides "a private right of action to any person injured 'by reason of any knowing (including willful) violation of a consumer product safety rule, *or any other rule or order issued by the Commission.*'" *Kelsey v. Muskin, Inc.,* 848 F.2d 39, 42 (2d Cir. 1988) (quoting 15 U.S.C. §2072(a)) (emphasis added). And, they fail to explain why the rules alleged in the Complaint – 16 C.F.R. §1117.1, *et seq.* ("Reporting of Choking Incidents

---

[21] Moose concedes that the elements of Unjust Enrichment are similar, or the same, throughout the United States. (Moose Br. ¶ 82.)

Involving … Small Parts") and 16 C.F.R. §1500.18(a)(2) ("Banned Toys and Other Banned Articles Intended For Use By Children") – are not rules within the meaning of 15 U.S.C. §2072(a). As discussed below, the Complaint adequately alleges violations of rules issued by the Commission and the "knowing" conduct which forms the basis for those violations.

### 1.    Plaintiffs Allege A Valid Claim Under 16 C.F.R. §1500.18(a)(2) (Banned Toys Intended For Use By Children).

Plaintiffs allege that Moose knowingly violated 16 C.F.R. §1500.18(a)(2). CAC ¶¶ 152, 154. That Rule states that "the Commission has determined that [certain] types of toys or other articles intended for use by children present a mechanical hazard within the meaning of section 2(s) of the [Child Safety Act] because in normal use, or when subjected to reasonably foreseeable damage or abuse, the design or manufacture presents an unreasonable risk of personal injury or illness." 15 C.F.R. § 1500.18(a).  The banned toys include "[a]ny toy having noisemaking components or attachments capable of being dislodged by the operating features of the toy or capable of being deliberately removed by a child, which toy has the potential for causing laceration, puncture wound injury, aspiration, ingestion or other injury." 16 C.F.R. § 1500.18(a)(2).

The Complaint alleges the Aqua Dots are "attachments capable of being dislodged by the operating features of the toy or capable of being deliberately removed by a child."  The "attachments" consist of the fused together toxic beads attached to the plastic tray, and they are capable of being dislodged or deliberately removed by a child from the tray "[o]nce the design becomes fixed." CAC ¶ 40. Several children swallowed the toxic beads and required hospitalization (CAC ¶¶ 50, 52, 75-76) and at least one was discovered motionless, began vomiting beads, and presented with a coma and seizure-like movements. CAC ¶ 56.

The CPSA is intended for the protection of the public against unreasonable risks of injury associated with "consumer products," a term which is to be liberally construed in accordance with the statute's patently remedial purpose. *Butcher v. Robertshaw Controls Co.*, 550 F. Supp. 692, 695 (D. Md. 1981) (citing *United States v. One Hazardous Prod. Consisting of a Refuse Bin*, 487 F. Supp. 581 (D.N.J. 1980)); *Consumer Prod. Safety Comm'n v. Chance Mfg. Co.*, 441 F. Supp. 228 (D.D.C. 1977).

The consumer products at issue were intended for children who could and would handle, lick, taste, bite or swallow the poisonous toys and those toys contained hazardous chemicals that could be easily ingested. Moose does not dispute that the beads have the "potential for

20

causing…injury, aspiration, ingestion or other injury," and even admitted as part of the recall, that children who swallow the toxic beads can become comatose, develop respiratory depression or have seizures. CAC ¶ 62.

### 2.   The Complaint Alleges that Moose Knowingly Violated 16 C.F.R. §1117.1.

The Complaint alleges that Moose knowingly violated 16 C.F.R. §1117.1, *et seq.* Complaint, ¶ 154. The mandatory reporting requirements under Part 1117 provide, for example, that "[a] subject firm shall report any information it obtains which reasonably supports the conclusion that a reportable incident occurred." 16 C.F.R. §1117.3. Similarly, 16 C.F.R. §1117.4(a) provides that "[a] subject firm must report within 24 hours of obtaining information which reasonably supports the conclusion that an incident occurred in which a child (regardless of age) choked on … [a] small part contained in a toy or game and, as a result of that incident the child died, suffered serious injury, ceased breathing for any length of time, or was treated by a medical professional."

███████████████████, Moose obtained information that reasonably supports the conclusion that a reportable incident occurred. Three children choked on the Aqua Dots beads contained in the children's craft kit and, as a result of those incidents two who swallowed the Aqua Dots were hospitalized, and the third received medical help after ingesting the hazardous toy. CAC ¶¶ 50, 52, 75-76. Based upon these factual allegations, Moose was required to report within 24 hours of obtaining such information but they did not do so until almost a month later. Further, a recall of the poisonous toys did not occur until almost a month after a biochemical geneticist warned Moose about the dangers of their product. CAC ¶¶ 51-52; 61.

For all these reasons, Plaintiffs have stated a valid claim for violations of 16 C.F.R. §1117.1, *et seq.*

### CONCLUSION

For the foregoing reasons, Plaintiffs, by and through counsel, respectfully request that Moose's motion be denied.

DATED: August 8, 2008                    Respectfully submitted,


_____
                              s/ Ben Barnow

Ben Barnow
Barnow and Associates, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504


John J. Stoia, Jr.
Rachel L. Jensen
Thomas J. O'reardon II
Coughlin Stoia Geller
  Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)


Fredric S. Fox
Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:  212/687-1980
212/687-7714 (fax)


Burton H. Finkelstein
Finkelstein Thompson LLP
1050 30th Street, NW
Washington, D.C. 20007
Telephone: 202/337-8000
202/337-8090 (fax)

## Certificate of Service By Electronic Means

I, Ben Barnow, hereby certify that Plaintiffs' Response to Moose Enterprises PTY LTD.'s Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to FRCP 12(b)(2) and Failure to State a Claim Pursuant to FRCP 12(b)(6) was caused to be served electronically this 8th day of August, 2008, pursuant to ECF as to Filing users and I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.


/s/  Ben Barnow_____

23

Exhibit A



# US PATENT & TRADEMARK OFFICE
## PATENT APPLICATION FULL TEXT AND IMAGE DATABASE

| United States Patent Application | 20080011770 |
|---|---|
| Kind Code | A1 |
| Tobias; Jacquiline Hazel | January 17, 2008 |

## BEAD DISPENSING SYSTEM

### Abstract

A bead dispensing system including a storage device, a bead dispensing means which includes a bead release mechanism, a conduit for guiding beads from the storage device to the bead dispensing means and a related method of creating artwork.

| | |
|---|---|
| Inventors: | **Tobias; Jacquiline Hazel**; *(Caulfield South, AU)* |
| Correspondence Name and Address: | **KNOBBE MARTENS OLSON & BEAR LLP**<br>**2040 MAIN STREET, FOURTEENTH FLOOR**<br>**IRVINE**<br>**CA**<br>**92614**<br>**US** |
| Assignee Name and Adress: | ***MOOSE* ENTERPRISE PTY LTD**<br>**Bentleigh East**<br>**AU** |
| Serial No.: | **762544** |
| Series Code: | **11** |
| Filed: | **June 13, 2007** |

| | |
|---|---|
| **U.S. Current Class:** | **221/189** |
| **U.S. Class at Publication:** | **221/189** |
| **Intern'l Class:** | G07F 11/46 20060101 G07F011/46 |

### *Foreign Application Data*

| Date | Code | Application Number |
|---|---|---|

| Mar 23, 2007 | AU | 2007901540 |
|---|---|---|

## Claims

1. A bead dispensing system comprising:a storage device;a bead dispensing means that comprises a bead release mechanism; anda conduit for guiding beads from the storage device to the bead dispensing means.

2. A bead dispensing system according to claim 1 wherein the storage device has more than one compartment and beads may be dispensed selectively from either compartment.

3. A bead dispensing system according to claim 2 wherein the compartments are selected by rotating the storage device.

4. A bead dispenser according to claim 1 wherein the bead release mechanism is mechanically actuated.

5. A bead dispensing system according to claim 1 wherein the conduit is tubular.

6. A bead dispensing system according to claim 1 wherein the conduit is flexible.

7. A bead dispensing system according to claim 1 wherein a swivel lies between the storage device and the conduit.

8. A bead dispensing system according to claim 1 wherein the storage device is provided in an upper part of the system and the beads are dispensed under the force of gravity.

9. A bead dispensing system according to claim 1 further including a drying means which is operable to speed up the process of drying an artwork.

10. A bead dispensing system according to claim 1 further including a work area, the work area receives a tray for preparing an artwork and the tray is moveable from a working position to a drying position.

11. A bead dispensing system according to claim 10 wherein the storage device is mounted to a housing and the housing is disposed above the work area.

12. A bead dispensing system according to claim 1 wherein the dispensing means is hand held.

13. A method of creating an artwork comprising the steps of:releasing a sequence of beads from a storage means and into a dispensing means via a conduit; anddispensing the beads in sequence to form an arrangement of beads.

## Description

### FIELD OF THE INVENTION

[0001]The present invention relates to a bead dispensing system and particularly to a bead dispensing system that can be used to create an artwork using PVA beads.

## DESCRIPTION OF THE RELATED ART

[0002]Beads and other small objects, whether circular or irregular in shape, are used in arts and craft activities for both adults and children. Plastic, wooden, glass or metal beads are used in making jewelry or decorating articles including clothing and other fabrics. In a non-decorative sense beads, such as ball bearings, are used in machinery and other mechanical devices.

[0003]Polyvinyl acetate (PVA) in the form of solid round beads are also known to be used in children's artwork activities whereby beads are arranged by color on a tray (with or without a template beneath) to produce a pattern, picture or the like. Water is then sprayed onto the bead designs on the tray to meld the beads together and allow them to join into one another and create a picture.

[0004]One problem with using beads and bead like objects is that given their small size and often spherical nature they are difficult to handle and awkward to place and hold in position. One proposed solution is to provide a pen shaped bead dispenser wherein beads are stored in the body of the pen shaped dispenser. However, if the beads in the pen dispenser are used up, it can be inconvenient to dismantle the pen to refill the pen dispenser.

## SUMMARY OF THE INVENTION

[0005]In one aspect, the present invention provides a bead dispensing system including: a storage device; a bead dispensing means which includes a bead release mechanism; and a conduit for guiding beads from the storage device to the bead dispensing means.

[0006]The storage device may have more than one compartment and beads may be dispensed selectively from either compartment.

[0007]The compartments may be selected by rotating the storage device.

[0008]The bead release mechanism may be mechanically actuated.

[0009]The conduit may be tubular.

[0010]The conduit may be flexible.

[0011]A swivel may lie between the storage device and the conduit.

[0012]The storage device may be provided in an upper part of the system and the beads are dispensed under the force of gravity.

[0013]The system may further include a drying means which is operable to speed up the process of drying an artwork.

[0014]The system may further include a work area, the work area receives a tray for preparing an artwork and the tray is moveable from a working position to a drying position.

[0015]The storage device may be mounted to a housing and the housing is disposed above the work area.

[0016]The dispensing means may be hand held.

[0017]In a second aspect the present invention provides a method of creating an artwork including the steps of: releasing a sequence of beads from a storage means and into a dispensing means via a conduit; and dispensing the beads in sequence to form an arrangement of beads.

BRIEF DESCRIPTION OF THE DRAWINGS

[0018]An embodiment of the invention will now be described by way of example only with reference to the accompanying drawings in which:

[0019]FIG. 1 is a perspective view of a bead dispensing system according to the present invention;

[0020]FIG. 2A is an exploded view of the bead dispensing system of FIG. 1;

[0021]FIG. 2B is an exploded view of the main body of the bead dispenser of FIG. 1;

[0022]FIG. 2C is an alternative exploded view of the main body of the bead dispenser of FIG. 1;

[0023]FIG. 2D is another alternative exploded view of the main body of the bead dispenser of FIG. 1;

[0024]FIG. 3A is a front view of the bead dispensing system of FIG. 1;

[0025]FIG. 3B is a side view of the bead dispensing system of FIG. 1;

[0026]FIG. 3C is a rear view of the bead dispensing system of FIG. 1;

[0027]FIG. 3D is a top view of the bead dispensing system of FIG. 1; and

[0028]FIG. 4 illustrates step by step instructions for creating an artwork using the bead dispensing system of FIG. 1.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

[0029]Referring to FIG. 1, a bead dispensing system 10 is shown including a storage device in the form of hopper 12, a bead dispensing means in the form of hand held dispenser 14 and a conduit in the form of flexible tube 16 which guides beads from the hopper to the dispenser 14.

[0030]Referring to FIGS. 2A and 2B, hopper 12 is rotatably mounted to a housing in the form of main body 18 which includes an aperture 20. Hopper 12 includes six compartments, each of which is intended to hold beads of a particular color, and each of which has an aperture provided at the bottom of each compartment. By rotating hopper 12, different compartment apertures may be brought into line with aperture 20 depending upon the desired color of bead. Notches 22 align with a detent (not shown) to provide the user with an indication of the correct rotational position to align the apertures.

[0031]After the compartment containing beads of the desired color is aligned with aperture 20, beads held in the compartment may be released one at a time by pressing button 24. Pressing button 24 causes arm 26 to move to allow one bead to fall through aperture 28 and into channel 30 of swivel 32. The bead travels along channel 30 by way of gravity and out through spigot 34 to enter tube 14 (see FIG. 1). The bead then falls down tube 16 to dispenser 14. In this way, a sequence of several beads of particular colors may be released from hopper 12 and these beads may then be subsequently dispensed in sequence one at a time by pressing button 34 of dispenser 14.

[0032]Referring to FIGS. 1 and 3A, swivel 32 may be moved from side to side in the direction of arrows A. A user may move swivel 32 to a position that is comfortable for them to use dispenser 14. In particular, right and left handed users may prefer to move the swivel to the side which corresponds to their preferred side to comfortably hold dispenser 14.

[0033]Referring again to FIG. 1, main body is disposed above a work area 36 by being mounted on legs 39. Work area 36 is shaped to receive a tray 38 which is slidable from a working position as shown in FIG. 1, to a drying position (see FIG. 3 step 7). In the drying position, tray 38 lies below a drying means in the form of foam bladed fan 40 which includes an electric motor 42 which is mounted at the underside of main body 18. Fan 40 is actuated by pressing button 44 which closes an electrical switch. Motor 42 is powered by batteries 46.

[0034]Referring to FIG. 4, the steps for creating an artwork using dispensing system 10 are illustrated. First, the system 10 is assembled by assembling main body 18, legs 39 and base 37. A small spray bottle 48 is charged with water and inserted into well 50 provided in base 37. The compartments of hopper 12 are charged with beads of differing colors and lid 52 is applied to hopper 12.

[0035]At step 1, a template 54 is selected which provides a guide for producing an artwork of a desired appearance. Template is inserted into tray 38. At step 2, the tray is placed in the working position in work area 36.

[0036]At steps 3 and 4, hopper 12 is rotated to select a desired bead color and button 24 is pressed a number of times to release a desired number of beads from the hopper 12 which fall down into dispenser 14. The hopper 12 is rotated to desired positions for each color, and button 24 pressed in each position to load dispenser 14 and tube 16 with a desired sequence of different colored beads.

[0037]At step 5, the sequence of beads is dispensed into desired positions on tray 38 by following the template 54 as a guide. If necessary, more beads can be released into tube 16 as per steps 3 and 4 above.

[0038]At step 6, the pattern of beads is complete. Spray bottle 48 is then used to spray water over the arrangement of beads.

[0039]At steps 7 and 8, tray 38 is moved to the drying position and button 44 is pressed to turn on fan 40. After a period of 5 to 10 minutes, the design dries and beads have become stuck together. The finished artwork may then be removed from tray 38 and displayed.

[0040]It will be understood to persons skilled in the art of the invention that many modifications may be made without departing from the spirit and scope of the invention.

[0041]In the above described embodiment a hopper with six compartments was used. Similarly, other embodiments may have a greater or lesser number of compartments.

* * * * *





# US PATENT & TRADEMARK OFFICE
## PATENT APPLICATION FULL TEXT AND IMAGE DATABASE

( 4 of 5 )

| | |
|---|---|
| **United States Patent Application** | **20080011773** |
| Kind Code | **A1** |
| Tobias; Jacquiline Hazel | **January 17, 2008** |

## BEAD DISPENSER

### Abstract

A bead dispenser comprising an elongated housing in which beads are held in at least two separated bead columns, and a dispensing nozzle at one end of the elongated housing through which the beads are dispensed. A dispensing mechanism dispenses beads from a column, whereby one of the bead columns is selected from which to dispense a bead through the bead dispenser.

| | |
|---|---|
| Inventors: | **Tobias; Jacquiline Hazel**; *(Caulfield South, AU)* |
| Correspondence Name and Address: | **KNOBBE MARTENS OLSON & BEAR LLP**<br>**2040 MAIN STREET, FOURTEENTH FLOOR**<br>**IRVINE**<br>**CA**<br>**92614**<br>**US** |
| Assignee Name and Adress: | *MOOSE* **ENTERPRISE PTY LTD**<br>**BENTLEIGH EAST**<br>**AU** |
| Serial No.: | **762624** |
| Series Code: | **11** |
| Filed: | **June 13, 2007** |

| | |
|---|---|
| **U.S. Current Class:** | **221/264**; 221/276 |
| **U.S. Class at Publication:** | **221/264**; 221/276 |
| **Intern'l Class:** | B65H 3/00 20060101 B65H003/00 |

### *Foreign Application Data*

| Date | Code | Application Number |
|------|------|--------------------|
| Jul 14, 2006 | AU | 2006903817 |

## *Claims*

1. A bead dispenser comprising:an elongated housing in which beads are held in at least two separated bead columns, and a dispensing nozzle at one end of the elongated housing through which the beads are dispensed; anda dispensing mechanism to dispense beads from a column, whereby one of the bead columns is selected from which to dispense a bead through the dispensing nozzle.

2. The bead dispenser claimed in claim 1 whereby the elongated housing comprises a dispensing casing coaxially aligned with a storage casing, whereby the dispensing casing supports the dispensing mechanism and the storage casing holds beads, wherein the storage casing and dispensing casing are axially rotatable relative to one another so as to align a selected bead column or storage casing with the dispensing mechanism in the dispensing casing.

3. The bead dispenser claimed in claim 2 wherein the dispensing casing and storage casing are relatively rotatable over location points that urge the casings to stop rotating at the location points, the location points defining correct alignment of a bead column in a storage casing with the dispensing mechanism in the dispensing casing.

4. The bead dispenser claimed in claim 3 wherein the location points are defined by a node and recess engagement between the storage casing and the dispensing casing.

5. The bead dispenser claimed in claim 4 wherein a node is provided on the storage casing and recesses are provided on the dispensing casing, wherein each of the recesses are lined with a bead column.

6. The bead dispenser claimed in claim 1 wherein the beads are arranged in a single file within each bead column.

7. The bead dispenser claimed in claim 1 wherein the bead dispenser contains two, four or six bead columns.

8. The bead dispenser claimed in claim 1 wherein the dispensing mechanism is a biased movable body having a cavity through which at least one bead is adapted to pass through the dispensing nozzle.

9. The bead dispenser claimed in claim 7 wherein a trigger associated with the dispensing mechanism is activated to align the cavity with a bead column to allow a bead in that column to enter the dispensing mechanism.

10. The bead dispenser claimed in claim 8 wherein releasing the trigger moves the dispensing mechanism out of alignment with the bead column and into alignment with the dispensing nozzle to allow the bead to pass therethrough.

11. The bead dispenser claimed in claim 9 wherein the cavity of the dispensing mechanism may hold more than one bead for dispensing the more than one bead.

## *Description*

FIELD OF THE INVENTION

[0001]The present invention relates to a bead dispenser for holding and dispensing beads.

DESCRIPTION OF THE RELATED ART

[0002]Beads and other small objects, whether circular or irregular in shape, are commonly used in arts and craft activities for both adults and children. Plastic, wooden, glass or metal beads are used in making jewelry or decorating articles including clothing and other fabrics. In a non-decorative sense beads, such as ball bearings, are used in machinery and other mechanical devices.

[0003]Polyvinyl acetate (PVA) in the form of solid round beads are also known to be used in children's artwork activities whereby beads are arranged by color on a template to produce a pattern, picture or the like. Water is then sprayed onto the template to dissolve the beads and allow them to run into one another and create blocks of color separated by partitions in the template and thereby create a picture.

[0004]The problem with using beads and bead like objects, is that given their small size and often spherical nature they are difficult to handle and awkward to place and hold in position. This has brought about the present invention which addresses the difficulty in handling beads.

SUMMARY OF THE INVENTION

[0005]In accordance with the present invention there is provided a bead dispenser comprising:

[0006]an elongated housing in which beads are held in at least two separated bead columns, and a dispensing nozzle at one end of the elongated housing through which beads are dispensed; and

[0007]a dispensing mechanism to dispense beads from a bead column, whereby one of the bead columns is selected from which to dispense a bead through the dispensing nozzle.

[0008]Preferably, the bead dispenser dispenses at least two types of beads. In a preferred embodiment the bead dispenser includes four bead columns, and in another embodiment the dispenser may comprise six or more bead columns. The bead columns in the preferred embodiment are in the form of extruded or molded plastic tubes that may be held in position in the housing by gluing and/or retaining the tubes by molded partitions inside the housing.

[0009]The housing preferably comprises two co-axial components: a dispensing casing which houses the dispensing mechanism; and a storage casing which holds the beads. The storage casing and dispensing casing are rotatable relative to one another such that one casing may be twisted relative to the other casing about a common axis. This is to align one bead column with the dispensing mechanism thereby allowing beads to be individually dispensed from that selected column.

[0010]The storage casing and dispensing casing are preferably held in locked engagement in the axial direction but are permitted to relatively rotate around the common axis. Preferably, the casings are rotatable over location points which urge the casings to stop rotating at the location points whereby each location point corresponds with a bead column. The location points are preferably defined by a node and recess engagement between the storage casing and dispensing casing.

[0011]The beads are preferably arranged in a single file within each bead column. The beads are

typically of different colors and similar sizes.

[0012]The dispensing mechanism is preferably a biased mechanism including a moveable body having a cavity through which a bead is adapted to pass from an inlet to an outlet. A trigger associated with the dispensing mechanism is activated to align the inlet with a bead column to allow a bead in that column to enter the body. Releasing the trigger moves the dispensing mechanism body out of alignment with a bead column and into a position whereby the outlet is aligned with the dispensing nozzle to allow a bead in the dispensing mechanism to dispense through the nozzle.

[0013]A spring is preferably located between the body of the dispensing mechanism and the interior of the dispensing casing.

[0014]The storage casing preferably includes a moveable lid to allow for access for filling the storage casing with beads. The lid is preferably funnel shaped and contains a central hole through which a bead can pass. The lid is shaped to hold an amount of beads that is substantially equal to the number of beads required to fill a bead column.

[0015]The bead dispenser also preferably includes a removal tool for picking up a bead. The tool includes a stem and a portion of adhesive material on the end of the stem whereby the stem can be inserted into the hole of the lid. The adhesive material is preferably thermoplastic rubber (TPR).

BRIEF DESCRIPTION OF THE DRAWINGS

[0016]An embodiment, incorporating all aspects of the invention, will now be described by way of example only with reference to the accompanying drawings in which:

[0017]FIG. 1 is a side elevation of bead dispenser in accordance with an embodiment of the present invention;

[0018]FIG. 2 is a side sectional elevation of the bead dispenser;

[0019]FIG. 3 is a plan sectional view taken at section A-A of FIG. 2;

[0020]FIGS. 4(a), 4(b) and 4(c) illustrate a series of operational steps of the bead dispenser from a plan sectional view taken at section B-B of FIG. 2; and

[0021]FIG. 5 is a side elevation of the bead dispenser illustrating a bead removal tool separated from the bead dispenser.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

[0022]Illustrated in the drawings is a bead dispenser 10 for dispensing beads 12 from an interior of the bead dispenser 10. The bead dispenser provides a useful and manageable means for handling beads in a controlled manner. In the preferred embodiment shown the bead dispenser is used for dispensing beads used in arts and crafts, and more particularly dissolvable PVA beads.

[0023]The bead dispenser 10 comprises an elongated housing 14 wherein the housing 14 consists of an upper storage casing 16 co-axially connected to a lower dispensing casing 18. The beads 12 are stored in the storage casing 16 and are adapted to enter the dispensing casing through a dispensing mechanism 20 and to exit the bead dispenser 10 through a dispensing nozzle 15 located at a lower end of the dispenser 10. The storage casing 16 is elongated and adapted to hold at least two separated bead columns 30.

[0024] The storage casing 16 and dispensing casing 18 extend co-axially along a common axis 50. They are held in locked engagement in the axial direction and are rotatably engaged such that the casings are rotatable relative to each other about axis 50. The rotational relationship between the storage casing 16 and dispensing casing 18 allows one casing to be twisted relative to the other about the common axis so as to align a selected bead column 30 with dispensing mechanism 20 and allow a bead from that column to be dispensed.

[0025] Location points between the storage and dispensing casings urge the casings to stop rotating at the location points. The location points are aligned with each bead column and define correct alignment of each bead column with the dispensing mechanism 20 such that bead dispensing can occur.

[0026] The interaction between the location points and bead column is defined by a node and recess type engagement. Specifically, the storage casing 16 is provided with either a node or recess and the dispensing casing 18 is provided with corresponding recesses or nodes. Typically, and as shown in the drawings and in particular FIG. 3, a node 42 on the storage casing engages with a recess 44 provided on the dispensing casing. A recess 44 is provided with each bead column such that as the casings are rotated the node 42 will engage with a recess 44 corresponding to a bead column 30 and the user is made aware when a bead column is correctly aligned. The location points also hold the bead column correctly aligned during use. A further twisting force overcomes the node and recess engagement to allow the casings to rotate past a location point to the next location point.

[0027] Because the housing 14 includes at least two separated bead columns 30 the bead dispenser is capable of dispensing at least two types of beads, and usually similar shaped beads of different colors. In the preferred embodiment illustrated in the drawings the dispenser includes four bead columns 30 whereby four different beads may be dispensed. It is understood that larger versions of the bead dispenser may hold more than four bead columns, such as six bead columns.

[0028] The bead columns are in the form of extruded or molded plastic tubes 32 which are filled with beads 12. Tubes 32 are typically glued in position inside the storage casing 16 and may be further held in position in a separated manner from the other tubes by molded partitions 34 inside the storage casing 16. Partitions 34 have the effect of retaining tubes 32 in position before the glue used to position the tubes has set or if glue is not used.

[0029] It is understood that the bead columns may not be in the form of tubes but may simply be defined by the partitions 34 themselves or another arrangement for separating the beads, for example a hollow passage defined by the casing interior.

[0030] The beads 12 are preferably arranged in a single file within each column 30 although the columns may be wider to hold beads stacked randomly. In a preferred embodiment, the bead dispenser holds beads of different colors and of similar sizes.

[0031] The dispensing mechanism 20 is preferably a biased mechanism that includes a moveable dispensing body 22 having a cavity 24 where the body is moveable laterally across the width of the dispensing casing 18. An inlet aperture 26 is provided in the body 22 above the cavity 24 and an outlet aperture 28 is provided in the body 22 below the cavity 24. The apertures are offset such that the beads are made to follow a diverted path through the body from the inlet to the outlet and on through the dispensing nozzle. A sloping ramp 27 inside cavity 24 urges a bead entering through inlet aperture 26 towards outlet aperture 28 to place the bead in position at the outlet aperture 28 ready for dispensing when the mechanism is released.

[0032]The biased dispensing mechanism is activated by a trigger in the form of a push button 25 located on the exterior of the housing and forming an extension of the dispensing mechanism body. FIG. 4(a) illustrates the dispensing mechanism 20 in a rest/released position. The button 25 extends through an opening 19 in the dispensing casing and is pressed in order to move the dispensing mechanism body radially across the dispensing casing to a pressed position as illustrated in FIG. 4(b) to align the inlet aperture directly underneath a bead column. This allows access of a bead 12 in the column into the cavity 24.

[0033]Releasing the button 25 allows the dispensing mechanism body 22 to return back across the dispensing casing to the released position illustrated in FIG. 4(c) and thereby close the access of the bearing columns to the cavity. This in turn aligns the outlet aperture 28 with a corresponding aperture 29 in the dispensing casing 18. This allows access for beads in the body to pass under gravity through to and out of the dispensing nozzle.

[0034]When the mechanism is in a pushed position and the dispensing mechanism is ready to receive a bead, outlet aperture 28 is misaligned with its corresponding outlet 29 in the dispensing casing body so to prevent beads from escaping through the dispensing mechanism while the button 25 is pushed. In practice, the size and shape of cavity 24 may be such to hold two or more beads so that more than one bead is dispensed upon release of the button. Alternatively, the dispensing mechanism 20 may be structured to dispense only one bead with every press and release of the button.

[0035]The dispensing mechanism is spring biased towards the released/rest position illustrated in FIGS. 4(a) and 4(c). A spring 23 is located between the movable body 22 and the dispensing casing 18.

[0036]At the opposite end of the elongated housing to the dispensing nozzle there is provided a removable lid 35 which is removed to provide access to the storage casing 16 for refilling the bead columns. The lid is preferably shaped as a funnel and has a central hollow sleeve 36 through which a bead can pass. The amount of beads that can be held in the funnel of the lid is substantially equal to the number of beads required to fill a bead column. To assist a user with filling the bead columns the sleeve 36 is placed inside a bead column tube and the funnel lid filled with beads. The beads will then flow under gravity through the shaft 26 and into the tube.

[0037]As illustrated in FIG. 5 the bead dispenser 10 may also comprise a bead removal tool 52 which is used to pick up a stray or misplaced bead to replace the bead in the dispenser or elsewhere. Removal tool 52 comprises a stem 54 and an adhesive portion, or pad 56, which inserts into one end of stem 54. Adhesive pad 56 is made of a thermoplastic rubber or a similar material having adhesive and sticky qualities and to which a bead will attach for picking up.

[0038]Removal tool 52 may be stored in hollow sleeve 36 in the lid 35 with adhesive pad 56 exposed. Removal tool 52 may be used either on its own separated from the housing 14 of bead dispenser 10 as illustrated in FIG. 5 or may be used while stored in situ in lid 35. A cap (not shown) may cover adhesive pad 56 and protect it from dirt and the like.

[0039]The bead dispenser is similar in shape to a pen. It allows a user to easily manipulate a variety of bead types in a simple and effective manner. In terms of beads used for decorating the bead dispenser 10 reduces any difficulties and frustrations associated with handling and placing beads in position where required.

[0040]It will be understood to persons skilled in the art of the invention that many modifications may be made without departing from the spirit and scope of the invention.

* * * * *





# USPTO Patent Full-Text and Image Database

( **1** of **1** )

---

**United States Patent**                                                     **7,059,932**

**Tobias , et al.**                                                         **June 13, 2006**

---

Spinning toy

## Abstract

A spinning toy comprises a pair of spaced disc bodies connected by a transverse shaft forming a gap therebetween. A sting is attached to the shaft in the gap and the toy can be spun on the string. A release mechanism releases the attachment of the string on the shaft while the toy is spinning.

---

| | |
|---|---|
| Inventors: | **Tobias; Jacqui** (Bentleigh East, **AU**), **Charlwood; Paul** (Melbourne, **AU**) |
| Assignee: | *Moose Enterprise* **Pty Ltd** (Bentleigh East Victoria, **AU**) |
| Appl. No.: | **10/512,032** |
| Filed: | **April 27, 2004** |
| PCT Filed: | **April 27, 2004** |
| PCT No.: | **PCT/AU2004/000539** |
| 371(c)(1),(2), (4) Date: | **July 19, 2005** |
| PCT Pub. No.: | **WO20/04/091745** |
| PCT Pub. Date: | **October 28, 2004** |

---

| | |
|---|---|
| **Current U.S. Class:** | **446/250** |
| **Current International Class:** | A63H 1/30 (20060101) |
| **Field of Search:** | 446/247-254,235-236,259,261-263 |

---

## References Cited [Referenced By]

### U.S. Patent Documents

| | | |
|---|---|---|
| 2337334 | December 1943 | Lohr |
| 6354905 | March 2002 | Haines et al. |
| 6599165 | July 2003 | Van Dan Elzen |

**Foreign Patent Documents**

186281                          Sep., 1922                                    GB

*Primary Examiner:* Kim; Eugene
*Assistant Examiner:* Lowen; Alyssa M.
*Attorney, Agent or Firm:* The Webb Law Firm

---

### *Claims*

---

The invention claimed is:

1. A spinning toy comprising a pair of spaced disc bodies connected by a transverse shaft forming a gap therebetween, a string attached to a spindle wherein the spindle is coupled to the shaft in the gap such that the disc bodies can be spun relative to the string, and a release mechanism for uncoupling the spindle from the shaft while the toy is spinning thereby separating the string and spindle from the disc bodies.

2. The spinning toy claimed in claim 1, wherein the release mechanism protrudes radially from the circumference of one of the disc bodies and is activated to release the string from the shaft in response to a force on the release mechanism.

3. The spinning toy claimed in claim 1, wherein the string is affixed to the spindle through an aperture in the spindle.

4. The spinning toy claimed in claim 2, wherein the string is affixed to the spindle through an aperture in the spindle.

5. The spinning toy claimed in claim 1, wherein the release mechanism urges the shaft to move axially to release the spindle from the shaft and thereby allow the string to detach from the shaft.

6. The spinning toy claimed in claim 5, wherein one end of the shaft is spring mounted inside one of the disc bodies.

7. The spinning toy claimed in claim 5, wherein the spindle is captured between the disc bodies and held therebetween on the shaft, and whereby an axial movement of the shaft widens the gap between the disc bodies, hence releasing the spindle.

8. The spinning toy claimed in claim 7, wherein catches in the gap assist in holding the spindle on the shaft.

9. The spinning toy claimed in claim 5, wherein the shaft is provided with two different sized diameters, wherein the spindle is attached to the shaft at the larger diameter and axial movement of the shaft exposes the smaller diameter thereby allowing the spindle to detach from the shaft.

10. The spinning toy claimed in claim 1, wherein the release mechanism includes a trigger protruding from the circumference of one of the disc bodies and a biased tab moveable in response to movement of the trigger, whereby movement of the tab releases the shaft to axial movement.

11. The spinning toy claimed in claim 10, wherein the tab has an elongate or large round opening

through which the biased shaft extends and is held therein.

12. The spinning toy claimed in claim 10, wherein the trigger is a lever pivoted to the disc body containing the release mechanism.

13. The spinning toy claimed in claim 1, wherein the trigger is a lever pivoted to the disc body containing the release mechanism.

14. The spinning toy claimed in claim 1, further including a clutch engageable with the shaft that prevents axial movement of the shaft, and that disengages from the shaft, when the spinning toy achieves a predetermined centrifugal forces.

15. The spinning toy claimed in claim 14, wherein the clutch is weighted and spring mounted to an interior circumference of a disc body.

16. The spinning toy claimed in claim 15, wherein the clutch is an elongate arm that is spring mounted to the interior circumference of the disc body at an approximate center of the arm and has a lug at an approximate center that engages with a complementary slot in the shaft such that the clutch releases the shaft when centrifugal forces cause the clutch to move toward the interior circumference.

17. The spinning toy claimed in claim 12, wherein the trigger pivots approximately 90.degree. in either direction from an extended position to a down position.

18. The spinning toy claimed in claim 7, wherein the spindle is a part circular shape that encircles the shaft by approximately 180.degree..

19. The spinning toy claimed in claim 9, wherein the spindle is a part circular shape that encircles the larger diameter of the shaft by more than 180.degree. but less than 360.degree..

20. A method of using a spinning toy having a pair of spaced disc bodies connected by a transverse shaft forming a gap therebetween, and a string attached to a spindle wherein the spindle is coupled to the shaft in the gap, the method including: spinning the connected disc bodies relative to the string by unwinding the disc bodies from the string; lowering the spinning disc bodies towards a surface to activate a release mechanism that releases the string from the shaft thereby separating the string and spindle from the disc bodies; and retaining hold of the string while allowing the disc bodies to freely roll along a surface.

*Description*

BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a spinning toy, and particularly to a yo-yo type toy.

2. Description of Related Art

In their simplest form yo-yo's have been known since ancient times. The traditional yo-yo design comprises a spool where two disc bodies are attached by an axle. A length of string is securely tied to the axle or, in more modern designs, the string is looped around the axle to allow free movement of the

string relative to the spinning spool.

More sophisticated yo-yo designs aim to increase game flexibility and play `tricks` by reducing spinning friction and introducing `sleeping` action, which is where a user is able to make a yo-yo spin on the end of its string without winding back up. These designs may include mounting the axle on a ball bearing assembly or adding a centrifugal clutch that has the effect of automatically winding the string back onto the yo-yo.

The present spinning toy achieves an even greater flexibility of game playing.

SUMMARY OF THE INVENTION

In one aspect of the present invention there is a spinning toy comprising a pair of spaced disc bodies joined by a transverse shaft forming a gap therebetween, a string attached to the shaft in the gap whereby the toy can be spun on the string, and a release mechanism for releasing the attachment of the string on the shaft while the toy is spinning.

In a further aspect of the present invention there is a method of using a spinning toy having a pair of spaced disc bodies connected by a transverse shaft forming a gap therebetween, and a string attached to the shaft in the gap, the method including: spinning the connected disc bodies relative to the string by unwinding the disc bodies from the string; lowering the spinning disc bodies towards a surface to activate a release mechanism that releases the string from the shaft; and retaining hold of the string and allowing the disc bodies to freely roll along the surface.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is described further by way of example with reference to the accompanying drawings of which:

FIG. 1 is a perspective view of a spinning toy in accordance with a first embodiment of the present invention;

FIG. 2A is a front profile of the first embodiment of a spinning toy;

FIG. 2B is a side sectional view of the first embodiment;

FIG. 2C is a sectional view of the spinning toy taken at line B--B of FIG. 2B;

FIG. 3A is a perspective view of a spindle of the first embodiment;

FIG. 3B is a front sectional view of the spindle of FIG. 3A;

FIG. 4A is a side sectional view of a spinning toy according to a second embodiment of the invention;

FIG. 4B is a front sectional view of the second embodiment of the spinning toy;

FIG. 5A is a trigger of an embodiment of the spinning toy;

FIG. 5B is a front view of a tab of an embodiment of the spinning toy;

FIG. 5C is a side view of the shaft of an embodiment of the spinning toy;

FIG. 5D is an end view of the shaft of FIG. 5C;

FIG. 5E illustrates a front view of a spindle in accordance with the second embodiment of the invention;

FIG. 6 is an exploded perspective view of the major components forming the second embodiment of the spinning toy;

FIG. 7A is a side sectional view of an embodiment of the spinning toy spinning on the string;

FIG. 7B is a front sectional view showing the embodiment of FIG. 7A;

FIG. 8A is a side sectional view illustrating an embodiment of the spinning toy with string detached; and

FIG. 8B is a front sectional view of the embodiment of FIG. 8A.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The embodiments of a spinning toy 10 illustrated in the drawings shows a yo-yo type toy that can function as a regular yo-yo to spin away from and back to a user's hand, but which also has a release mechanism 17 that will detach the string from the yo-yo when the yo-yo closely approaches a surface. Once the string is detached the yo-yo assumes the characteristics of a spinning wheel and rolls along the surface.

In a preferred embodiment the toy may be used as a regular yo-yo but has the option of switching to a state whereby a force on the circumference of the yo-yo will cause the string to detach and allow the remaining body of the yo-yo to roll and run free across the surface while the string remains behind in the hands of the user.

FIGS. 1 to 3B illustrate a first embodiment of the spinning yo-yo toy 10. The yo-yo comprises a pair of spaced disc bodies 11,12, that are joined by a transverse shaft 13, wherein the spacing between the disc bodies forms a circumferential gap 14. A string 15 is detachably connected to the shaft by way of a spindle 16.

As illustrated more particularly in FIG. 2 each disc body 11,12 is a hollow housing consisting of an outer cap 20 and an inner housing plate 21. In the embodiment illustrated in FIGS. 2A to 2C shaft 13 is mounted transversely to span across central apertures 18,19 of both inner housing plates in disc bodies 11, 12 respectively. One end of the shaft 13 is spring mounted onto a boss 22 on the interior of one of the outer caps 20. At this end, shaft 13 contains an axial recess 24 which is mounted over boss 22 and into which spring 26 extends.

The other end of shaft 13 is provided with a flange 27 that prevents the shaft escaping from central aperture 18 in disc body 11. This end of the shaft 13 may be secured tightly in central aperture 18 such that disc body 11 jointly moves with this end of shaft 13. The shaft may be glued into the central aperture 18 or be made to fit tightly in the aperture.

Two catches 29 are located in concave indentations 30 at the center of each inner housing plate 21. Catches 29 can be fixed one to each inner housing plate 21 adjacent aperture 18 or 19, or the catches 29 are simply positioned above shaft 13. Catches 29 are designed to hold the spindle 16 to which the string

15 is attached. Hence, spindle 16 is able to freely rotate about shaft 13 and is prevented from slipping therefrom by catches 29.

In an alternative embodiment catches 29 are not necessary as the spindle 16 may be retained on shaft 13 simply by way of the concave indentations 30 at the center of each inner housing plate 21. As illustrated in FIG. 2B, gap 14 reduces as disc body 11 and 12 close so that the spindle 16 is retained between the two disc bodies but the string 15 can still pass through the gap 14.

In the first embodiment, spindle 16 is a part circular clip with a semi-circular cut out center 32. The spindle encircles the shaft by approximately 180.degree. and semi circular centre 32 sits on shaft 13. Centre 32 has a smooth, low friction surface to enable the spindle 13 to rotate about the shaft. A small aperture 33 at the top center of the spindle 16 opens into a larger aperture 34, which opens into the cut out 32. This configuration allows a string to be securely tied and connected to the spindle by threading the string through small aperture 33 and forming a knot at the string end which abuts against the larger aperture but is too large to slip through the smaller aperture 33.

In this embodiment, the string 15 can only be detached from the shaft when the disc bodies 11,12 are separated far enough to allow the spindle 16 to slip away from the shaft through gap 14. Release mechanism 17 is responsible for sufficiently separating the two disc bodies 11,12 to allow the spindle to escape from therebetween. Release mechanism 17 includes a trigger 40 and a release tab 42 that engages with a circumferential groove 44 on shaft 13.

In the embodiment illustrated in FIGS. 2A to 2C, trigger 40 is a lever that extends radially from the circumference of disc body 12 and is retained in the walls of the disc body to pivot at the pivot point 43 located close to the circumference of the disc body. Specifically, the trigger 40 has a transversely extending short shaft 46 that is received to pivot at point 43 in aperture 48 in the outer cap 20 of disc body 12. Referring to FIG. 2C, the trigger 40 pivots from the outward position illustrated in solid lines by 90.degree. to one of the "down" positions illustrated by the dashed lines.

Release tab 42 lies in the same plane as trigger 40 and is biased to abut up against trigger 40 by tab spring 50 mounted in the interior circumference of disc body 12. Release tab 42 has a large rounded aperture 51 through which shaft 13 extends. A second smaller aperture 52 on the tab receives a screw 54 that fixes into inner housing plate 21 of disc body 12 to stably hold the release tab 42 in position. Release tab 42 is designed to shift in a planar direction against spring 50 in response to rotation of trigger 40. Apertures 51 and 52 are shaped so that release tab 42 can still move with respect to shaft 13 and screw 54.

The purpose of release tab 42 is to maintain shaft 13 in an axially restrained position against shaft spring 26. It does this by engaging an edge of aperture 51 in groove 44 of shaft 13 when the release tab is a rest position. The rest position is illustrated in FIGS. 2B and 2C where an edge of aperture 51 engages with groove 44 of the shaft to retain the shaft in the transverse position illustrated in FIG. 2B.

By pivoting trigger 40 lower shoulders 41 of trigger 40 are caused to push up against release tab 42 against the force of tab spring 50. This then moves aperture 51 relative to shaft 13 to disengage the release tab 42 from groove 44 of shaft 13. When release tab 42 has entirely disengaged from shaft 13 the potential force stored in shaft spring 26 will cause the shaft to move across laterally thereby moving disc body 11 away from disc body 12 and increasing the gap between two disc bodies. A widening of gap 14, as mentioned above, allows spindle 16 to be released from its position on shaft 13 and hence string 15 to be disconnected from the main disc body part of the spinning toy 10.

Trigger 40 is actuated when it encounters a force that causes it to pivot from its outwardly protruding

position. The start position is illustrated in FIG. 2C. When a user spins the yo-yo up and down on the string trigger 40 will pivot when the spinning discs 11,12 come close to or in contact with a surface. The angular force of the spinning trigger hitting the surface will cause the trigger to pivot to one of the "down" positions illustrated in dash lines in FIG. 2C.

As trigger 40 pivots one of the lower shoulders 41 will cause tab 42 to release the shaft and widen the gap 14 between the two bodies to release the spring. Typically, in a game play this is best achieved when the yo-yo is "sleeping". While "sleeping" the user moves the spinning yo-yo close to a surface, such as the floor. As the yo-yo approaches the floor the trigger 40 hits the floor before the peripheral circumference of disc bodies 11,12. The force of the contact with the floor causes the trigger to pivot thereby releasing the string from the shaft between the disc bodies. With the string released the yo-yo travels across the surface, and if performed skillfully, in the manner of a rolling wheel.

String detachment and re-attachment of the present toy provides an added dimension of play over a regular yo-yo. The present spinning toy may continue to be used solely as a regular yo-yo: the string detachment feature can be deactivated by manually pivoting trigger 40 to the "down" position where the trigger does not protrude from the circumference of the disc body 12. Lower shoulders 41 of trigger 40 are designed such that they only cause release tab 42 to shift when the trigger has pivoted approximately 45.degree. on either side of upright. At a pivoted movement of 90.degree. the trigger does not apply a force against release tab, and the tab remains in the rest position firmly engaging shaft 13. Hence, the yo-yo can be played as a regular yo-yo with trigger 40 safely positioned inside the circumference of the spinning disc bodies.

FIGS. 4A to 8B illustrate a second embodiment of the spinning toy 10. As illustrated in FIG. 6, this embodiment contains two disc bodies 11,12 consisting of an inner housing plate 92, and an outer rim 93 containing outer cap 94. A transverse shaft 59 extends transversely through the co-axial centres of discs 11 and 12.

However, shaft 59 in this embodiment is shaped differently from the first embodiment and the spindle 16 relies on a different technique for detachment from the shaft 59. Shaft 59 is illustrated in FIGS. 5C and 5D and spindle 16 is illustrated in FIG. 5E. At a main spinning portion 72 the shaft has a large diameter 60 adjacent a small shaft diameter 61.

In this embodiment shaft 59, during normal yo-yoing conditions, exposes the large shaft diameter 60 in gap 14. In order to release the spindle 16 from the shaft, the release mechanism activates to shift shaft 13 axially to expose the small shaft diameter 61 in gap 14. The spindle 16 is shaped such that when large shaft diameter 60 is exposed in the gap 14, the spindle maintains its attachment on the shaft. However, as the shaft is shifted to expose the small shaft diameter the spindle is freed from the shaft.

Turning to FIG. 5E, spindle 16 takes form of a "C" shaped circular member. The spindle encircles the shaft by more than 180.degree. but less than 360.degree. so that the large diameter 60 extends comfortably through an internal opening 63 of spindle 16 but a gap exists to allow the smaller diameter to slip out of the internal opening 63. On the large diameter 60 spindle 16 is unable to slip radially off the shaft. However, the small shaft diameter 61 is made smaller than the distance between the ends 64 of the spindle so that the spindle can slip radially off the small shaft diameter 61.

Turning back to FIG. 4A, in this embodiment shaft 59 is spring mounted on axle 66 that extends centrally from one disc body to the other. Spring 68 is mounted on axle 66 to abut against one end of shaft 59 in disc body 12. Extending into disc body 11, shaft 59 has a radial step 75 in a manner to continue extending shaft 59 along a secondary leg 70 that lies on an axis that is parallel to the axis of the main spinning portion 72 of the shaft 59. Secondary leg 70, being offset to the central axle 66, rotates

about the axle 66.

Release mechanism 100 as illustrated in FIG. 4B and in this embodiment operates along the same principles as with the first embodiment. All similar features are referenced using the same reference numerals as used for the first embodiment.

Release mechanism 100 includes a release tab 42 spring mounted on tab spring 50 against a circumferential interior of disc body 11. The aperture 51 of release tab 42 in this embodiment is oval (as illustrated in FIGS. 4B and 5B) and the edge of the aperture is designed to engage with a recess 74 of shaft 59. The top end of release tab 42 that abuts against trigger 40 has a projection 76 that complementary engages with a holding recess 77 in trigger 40.

Trigger 40 is illustrated in FIG. 5A and includes three such holding recesses 77 defined by two lower shoulders 41 at the pivot point 62 end of trigger 40. Recesses 77 are designed to maintain release tab 42 in a more stable rest position regardless of whether the trigger 40 is extending radially from the circumference of the yo-yo or is in a "down" position as illustrated by the dashed lines in FIG. 4B. As trigger 40 is rotated through 90.degree. from the extended position to the down position, one of the lower shoulders 78 will exert a force against release tab 42 pushing it against tab spring 50 in order to release tab 42 from recess 74 of shaft 59. Releasing the shaft 59 in this manner will cause the shaft to move axially under the force of shaft spring 68 and towards a direction to the left of the view illustrated in FIG. 4A.

However, in this embodiment even with the disengagement of shaft 59 from release tab 42 the shaft will not immediately shift axially because a clutch 80 is provided as a safety measure to prevent movement of the shaft 59 unless the correct conditions are achieved. The correct conditions to be achieved in order to release the string from the shaft are: (1) the disc bodies are spinning at a sufficiently high speed to reach a predetermined centrifugal force to release clutch 80; and (2) the trigger, when extended, encounters a force sufficient to make the trigger pivot.

Clutch 80 is best illustrated in FIG. 4B. It is defined by an elongated arm 82 that extends across a segment of the interior of one of the disc bodies 11,12, which in this case is disc body 11. Clutch arm 82 is spring mounted by clutch spring 83 at an approximate centre of the arm to an internal circumference of disc body 11. One end 84 of the arm is weighted with a metal weight or the like. Hence, as the yo-yo spins the centrifugal force inside disc body 11 causes clutch arm 82, and particularly weighted and 84, to move towards the circumference of the disc body. Clutch 80 engages with the secondary leg 70 of shaft 59 by way of a lug 86 located on one side of clutch arm 82. Lug 86 engages with a lug recess 88 in secondary leg 70. Lug 86 is positioned approximately on the other side of clutch arm 82 from clutch spring 83.

An opening 90 in the outer cap 94 of disc body 11 allows a user to manually push down clutch arm 82 to disengage clutch 80 from shaft 59. This feature may be useful, for example, where after string disconnection the shaft 59 is locked back into position but inadvertently without first placing the spindle on the shaft. By inserting a pointed object through cap opening 90 the clutch 80 can be disengaged from the shaft 59 and trigger 40 may be pivoted to allow the release mechanism to release shaft 59 thereby exposing the small shaft diameter 61 which will allow a user to reinsert spindle 16 onto the shaft 59. Without this feature it would be difficult to unlock shaft 59 and reinsert spindle 16.

As shaft 59 is released and shifts to reveal to the small diameter 61, the secondary leg 70 projects further out of a corresponding aperture 96 in outer cap 94 of disc body 11.

FIGS. 7A and 7B illustrate in front and side sectional views the spinning yo-yo toy 10 in a yo-yo

operating condition. In this condition the string 15 by way of spindle 16 is attached to shaft 59 to rotate relative to the shaft. Slowly spinning, the trigger 40 is illustrated in an extended position, release tab 42 is engaged with shaft 59 and clutch 80 is also engaged with shaft 59.

FIGS. 8A and 8B illustrate the yo-yo reaching a relatively high rotational speed and being lowered close to the ground. As the circumference of the yo-yo nears the ground trigger 40 comes into contact with the ground and pivots about pivot point 62 which causes lower shoulder 41 to move release tab 42 up against tab spring 50 thereby releasing from engagement shaft 59. Simultaneously, the centrifugal force created by the spinning disc bodies causes the weighted end 84 of clutch arm 82 to urge away from shaft 59 thereby disengaging clutch 80 from shaft 59.

When both the release mechanism 17 and clutch 80 are disengaged from shaft 59, the shaft is free to move under the force of shaft spring 68 to expose the small shaft diameter 61 from which spindle 16 can detach. To prevent complete separation of the disc bodies, shaft 59 is prevented from escaping entirely from disc body 12 by step 75.

Once detached from the string the yo-yo will continue to rotate under an inertia force and roll along the ground. To reassemble the yo-yo, the string on the spindle is mounted back onto the small shaft diameter 61 and in that position the secondary leg 70 of shaft 59 is pushed inward of disc body 11, in the direction opposite to the arrow illustrated in FIG. 8A, to mount the spindle back onto the large shaft diameter 60. In an alternative embodiment the two disc bodies may be entirely separable or manually pulled further apart to facilitate mounting of the spindle on the shaft.

While the present spinning yo-yo toy can operate without a clutch 80, a clutch is preferred for the sake of safety. Clutch 80 prevents shaft 59 from moving if release mechanism 100 is activated in a child's hand or while the yo-yo is not spinning.

The present spinning toy adds an extra playing dimension to yo-yo's as they are currently known. In addition to the normal versatility of yo-yo toys, the present spinning toy allows the creation of new tricks and raises the level of skill in commanding a yo-yo. One of the added game skills involves smooth and accurate release of the string to encourage the rolling discs to travel as far as possible.

Variations to the internal working mechanisms of the yo-yo are possible for achieving the same result of disconnecting the string while the yo-yo is in play. Two different embodiments have already been described and further variations conceivably fall within the spirit and scope of the spinning toy as defined by the claims.

* * * * *



Exhibits B through D are the subject of Plaintiffs' motion for leave to file certain documents as restricted and, thus, are not submitted herewith.

# Exhibit E



## DISTRIBUTION AND LOGISTICS



Moose's corporate office is located in East Bentleigh, Melbourne, Australia. As you would expect from a creative company that identifies so strongly with kids, the building itself is creative, fun and innovative. To accommodate the recent growth, Moose has taken over the next door premise to expand its warehouse and showroom capacity. It has a two bright, fun, vibrant showrooms – one dedicated to displaying the ever-growing Moose Toy Portfolio and the new second showroom to showcase the exciting new ranges of the Pet Accessory and Stationery Divisions.

It has a 44,000 square feet office/warehouse used to store Moose's product. The company has a computer stock control system. A fully integrated system with an EDI ordering system plus a scan pack operation is currently being used by all our majors' retail partners.

Moose Enterprise Pty Ltd has set up a Far East office in Hong Kong and China to streamline processes between the vendor, customers and factories. The move will enable Moose to react immediately to market trends, shorten product development timelines and accelerate future growth.

In addition to the Melbourne Showroom, Moose has established showrooms, dedicated to Moose products, in central toy and lifestyle districts both in Hong Kong and New York.

- **Company Overview**
- **Product Development**
- **Pet Moose**

- **Sales, Marketing and Promotion**
- **Awards**
- **Distribution and Logistics**
- **Websites**



ABOUT US | OUR BRANDS | WHAT'S NEW? | RETAILERS | INTERNATIONAL BUSINESS

home | contact us | where to buy | sitemap | privacy | terms of use | kids site

Website design and web content management by Seamless CMS

Moose World, Melbourne, Australia

Exhibit F is the subject of
Plaintiffs' motion for leave to file certain documents
as restricted and, thus, is not submitted herewith