UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| In re AQUA DOTS PRODUCTS LIABILITY LITIGATION | ) ) ) | MDL No. 1940 Case Number 1:08-cv-02364 Honorable David H. Coar |
| | ) | |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) | |

PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE
OVERSIZED MEMORANDUM

Plaintiffs Simon and Sarah Bertanowski, Anthony B. White, Erick K. Botsch, Michael J. Burgess, Kim A. Cosgrove, Donald C. Erbach, Jr., Stephanie S. Streett, Samantha Ford, Sandra Irene Soderstedt, Marilyn W. Walker and Robyn Williams (collectively "Plaintiffs"), by their attorneys, respectfully request leave of the Court to file an oversized memorandum in opposition to Defendants Spin Master Ltd., Spin Master, Inc., Target Corporation, Wal-Mart Stores East, LP, and Toys "R" Us–Delaware, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint ("Motion to Dismiss"), and in support thereof state as follows:

1.      On June 23, 2008, Defendants Spin Master Ltd., Spin Master, Inc. and Target Corporation ("Defendants") filed an unopposed motion for leave to file an oversized memorandum in support of their Motion to Dismiss.  (Docket No. 24.)  Thereafter, on June 27, 2008, Defendants filed their Motion to Dismiss and a memorandum of law in support, which was 40 pages in length. (Docket Nos. 33 and 34.)  The Court granted the motion for leave to file an oversized memorandum on July 17, 2008.  (Docket No. 45.)

2.      Defendants' 40-page brief raises numerous complex arguments.  Plaintiffs have made every to effort to address these arguments as concisely as possible to avoid burdening the Court. Despite Plaintiffs' best efforts, Plaintiffs are unable to fully and meaningfully address Defendants' arguments within the 15 pages permitted by Local Rule 7.1, and instead require a total of 32 pages for their memorandum.

3.      As of the filing of this motion, Plaintiffs' counsel has conferred with Defendants' counsel, who have represented that they do not oppose this request.  This request is being made in good faith and not for any improper purpose.

4.      Plaintiffs therefore request that the Court grant them leave to exceed the 15-page limit set by Local Rule 7.1 by 17 pages.  To comply with Local Rule 7.1, Plaintiffs' Memorandum in

Opposition to Defendant Spin Master Ltd., Spin Master, Inc., and Target Corporation's Motion to Dismiss would include both a table of contents and a table of authorities.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request leave to file a Memorandum in Opposition to Defendant Spin Master Ltd., Spin Master, Inc., and Target Corporation's Motion to Dismiss that exceeds 17 pages. *See* attached Exhibit A.

DATED:  August 8, 2008                    Respectfully submitted,

FINKELSTEIN THOMPSON LLP
BURTON H. FINKELSTEIN
MILA F. BARTOS
ROSALEE B. CONNELL


    s/ Rosalee B. Connell
            ROSALEE B. CONNELL

1050 30th Street, NW
Washington, D.C. 20007
Telephone: 202/337-8000
202/337-8090 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
THOMAS J. O'REARDON II
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)


BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
JACK REISE
ELIZABETH A. SHONSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504

KAPLAN FOX & KILSHEIMER LLP
FREDRIC S. FOX
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:  212/687-1980
212/687-7714 (fax)

KAPLAN FOX & KILSHEIMER LLP
LAURENCE D. KING
350 Sansome Street, Suite 400
San Francisco, CA  94104
Telephone:  415/772-4700
415/772-4707 (fax)

Plaintiffs' Interim Co-Lead Class Counsel

C:\PROGRA~1\DocsCorp\PDFDOC~3\users\Junel\Import\BRF 00053240.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 8, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 8, 2008.

s/ Rosalee B. Connell
ROSALEE B. CONNELL

FINKELSTEIN THOMPSON LLP
1050 30th Street, NW
Washington, D.C. 20007
Telephone: 202/337-8000
202/337-8090 (fax)

E-mail:  rconnell@finkelsteinthompson.com

# Mailing Information for a Case 1:08-cv-02364

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ben Barnow**
  b.barnow@barnowlaw.com,s.harris@barnowlaw.com

- **Joanna E. Clarke-Sayer**
  jsayer@winston.com,ECF_CH@winston.com

- **Rosalee B. Connell**
  rconnell@finkelsteinthompson.com

- **Bryna Joyce Roth Dahlin**
  bdahlin@winston.com,ECF_CH@winston.com

- **Dana Michele Gilreath**
  dgilreath@clinton-clinton.com

- **Laurence David King**
  kweiland@kaplanfox.com,agutierrez@kaplanfox.com,lking@kaplanfox.com

- **Jack Reise**
  jreise@csgrr.com,e_file_fl@csgrr.com

- **William N. Riley**
  wriley@price-law.com

- **Aron David Robinson**
  adroblaw@aol.com

- **Ronald Y Rothstein**
  rrothstein@winston.com,mconroy@winston.com,ECF_CH@winston.com

- **Thomas Joseph Wiegand**
  twiegand@winston.com,ECF_CH@winston.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Mila F. Bartos**
Finkelstein, Thompson & Loughran

1050 30th Street, NW
Washington, DC 20007

**Burton I Finkelstein**
Finkelstein, Thompson & Lougran
1050 30th Street, NW
Washington, DC 20007

**Frederic S. Fox**
Kaplan Fox and Kilsheimer
850 Third Avenue
14th Floor
New York, NY 10022

**Ralph K. Phalen**
Ralph K. Phalen, Attorney At Law
1000 Broadway
Suite 400
Kansas City, MO 64105

**John K Sherk**
Shook, Hardy & Bacon
2555 Grand Boulevard
Kansas City, MO 64108-2613

**John J. Stoia**                                              **, Jr**
Coughlin  Stoia Geller Rudman and Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**James A. Streett**
Streett Law Firm, PA
107 West Main
Russellville, AK 72811

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| In re AQUA DOTS PRODUCTS LIABILITY LITIGATION | ) ) ) | MDL No. 1940 Case Number 1:08-cv-02364 Honorable David H. Coar |
| This Document Relates To: ALL ACTIONS. | ) ) ) ) ) ) | |

PLAINTIFFS' OPPOSITION TO SPIN MASTER LTD., SPIN MASTER, INC.,
TARGET CORPORATION, WAL-MART STORES EAST, LP, AND TOYS "R"
US–DELAWARE, INC.'S MOTION TO DISMISS PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL ALLEGATIONS .................................................................................1

III.  LEGAL STANDARD.............................................................................................2

IV.   APPLICATION OF ILLINOIS LAW ...................................................................3

V.    ARGUMENT ........................................................................................................4

    A.    Plaintiffs Adequately Plead Article III Standing ......................................4

        1.    Plaintiffs' Economic Injuries Constitute Injury in Fact...............5

        2.    Exposure to the Hazardous Toys, Which Contain Toxins, Is
             Sufficient to Establish Standing....................................................7

    B.    Constructive Knowledge............................................................................8

    C.    Plaintiffs State a Valid Claim Under the CPSA.........................................9

        1.    Plaintiffs Allege Violations of the Banned Toys Regulation.......9

        2.    Plaintiffs Sufficiently State Violations of the Reporting Rules.............11

             a.    Defendants Knowingly Violated 16 C.F.R. §1117.1 ....................11

             b.    Defendants Knowingly Failed to Report .......................................11

        3.    A Private Right of Action Exists for Violations of CPSA's
             Reporting Requirements ................................................................12

    D.    The CPSA Does Not Preempt Plaintiffs' State Law Claims ...................13

    E.    Plaintiffs State a Claim for Breach of Warranty.....................................16

        1.    Defendants Had Notice of the Alleged Defect ...........................16

        2.    Aqua Dots Are Not Merchantable or Fit for Their Ordinary
             Purpose..........................................................................................17

        3.    Defendants Breached Their Express Warranties with Regards to
             the Toys' Intended and Reasonably Foreseeable Uses ...............18

        4.    Express Warranty Claims Are Properly Pled...............................18

**Page**

|  |  |  |  |
|---|---|---|---|
|  | a. | Warranty Terms Are Pled .................................................... | 18 |
|  | b. | Basis of the Bargain Is Pled ............................................... | 19 |
|  | 5. | Privity: Exceptions Exist and/or Is Not Required ....................................... | 19 |

F. Plaintiffs Have Alleged Viable Tort Claims ........................................... 20

    1. Plaintiffs State Claims for Negligence and Strict Liability ...................... 20

G. Plaintiffs Adequately Plead Their Statutory Consumer Claims ........................... 22

    1. Rule 9(b) Does Not Govern Plaintiffs' Consumer Protection Claims ................................................................ 22

    2. Plaintiffs State Claims Under Illinois' Consumer Protection Statutes ............................................................. 22

    3. Plaintiffs Sufficiently Alleged Claims Under the Various Consumer Protection Statutes of Their Home States ................................ 24

        a. Arkansas ............................................................... 24

        b. Florida .................................................................. 25

        c. Oklahoma .............................................................. 25

        d. Pennsylvania ........................................................... 26

        e. Texas .................................................................... 26

        f. Missouri ................................................................ 27

        g. New York ............................................................... 27

        h. Kentucky ............................................................... 28

H. Plaintiffs' Unjust Enrichment Claims Are Viable ..................................... 28

    1. Plaintiffs Adequately Plead Unjust Enrichment Under Illinois Law ......... 29

        a. Defendants' Retention Is Unjust, Inequitable, and Unconscionable ...................................................... 29

    2. Unjust Enrichment Claims Are Properly Plead in the Alternative and Under Texas Law ............................................................ 30

**Page**

I.     The "Innocent Non-Manufacturer Doctrine" Does Not Preclude Claims .............31

VI.    CONCLUSION...........................................................................................................32

# TABLE OF AUTHORITIES

Page

## CASES

*B & B Land Acquisition, Inc. v. Mandell*,
714 N.E.2d 58, 306 Ill. App. 3d 574 (Ill. App. Ct. 1999)..................................................28

*Adkinson v. Kilgore*,
970 S.W. 327 (Ark. Ct. App. 1998)......................................................................28

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*,
499 F.3d 663 (7th Cir. 2007) .............................................................................3

*AKV Auto Transp., Inc. v. Syosset Truck Sales, Inc.*,
806 N.Y.S .2d (N.Y. App. Div. 2005) ............................................................20

*Allen v. Wright*,
468 U.S. 737 (1984)........................................................................................4

*Allstate Ins. Co. v. Daimler Chrysler*,
No. 03 C 6107, 2004 WL 442679 (N.D. Ill. March 9, 2004) ...........................19

*Am. Fertilizer Specialists, Inc. v. Wood*,
635 P.2d 592 (Okla. 1981)...........................................................................16

*Am. Multi-Cinema, Inc. v. MCL REC, LLC*,
No. 06 C 0063, 2008 WL 1744426 (N.D. Ill. April 11, 2008) .....................8, 12

*API Enter., Inc. v. Am. Standard, Inc.*,
No. CIV-07-853-M, 2008 WL 819335 (W.D. Okla. March 25, 2008) ............25

*Arst v. Max Barken, Inc.*,
655 S.W.2d 845 (Mo. Ct. App. 1983)............................................................16

*Ass'n of Data Processing Serv. Org., Inc. v. Camp*,
397 U.S. 150 (1970)........................................................................................6

*Azimi v. Ford Motor Co.*,
977 F. Supp. 847 (N.D. Ill. 1997) .................................................................9

*Baker v. Family Credit Counseling Corp.*,
440 F. Supp. 2d 392 (E.D. Pa. 2006) ...........................................................26

*Barlow v. Collins*,
397 U.S. 159 (1970)........................................................................................5

*Barron v. Ford Motor Co.*,
965 F.2d 195 (7th Cir. 1992) ........................................................................3

**Page**

*Bell Atlanta Corp. v. Twombly,*
    127 S. Ct. 1955 (2007)..................................................................................2, 3

*Bic Pen Corp. v. Carter,*
    171 S.W. 3d 657 (Tex. App. 2005).............................................................15, 16

*Bittler v. White & Co., Inc.,*
    203 Ill. App. 3d 26, 560 N.E.2d 979 (Ill. App. Ct. 1990)..................................9

*Blackmon v. Am. Home Prods. Corp.,*
    346 F. Supp. 2d 907 (S.D. Tex. 2004) ..............................................................8

*Boehm v. Fox,*
    473 F.2d 445 (10th Cir. 1973) ........................................................................17

*Brazier v. Hasbro, Inc.,*
    No. 99 Civ. 11258, 2004 WL 515536 (S.D.N.Y. March 16, 2004)..................17

*Briehl v. GMC,*
    172 F.3d 623 (8th Cir. 1999) ............................................................................5

*Brown v. Daisy Mfg. Co.,*
    724 F. Supp. 44 (N.D.N.Y. 1989) ....................................................................14

*Brown v. R.J. Reynolds Tobacco Co.,*
    92-0836, 1992 WL 161128 (E.D. La. June 23, 1992) ........................................8

*Brown v. SBC Communications, Inc.,*
    No. 05-777, 2007 WL 684133 (S.D. Ill. March 1, 2007) ................................23

*Brownlee v. Conine,*
    957 F.2d 353 (7th Cir. 1992) ............................................................................3

*Butcher v. Robertshaw Controls Co.,*
    550 F. Supp. 692 (D. Md. 1981).........................................................10, 13, 14

*Carlough v. Amchem Prods.,*
    834 F. Supp. 1437 (E.D. Pa. 1993) ...............................................................4, 7

*Carroll Instrument Co., Inc. v. B.W.B. Control, Inc.,*
    677 S.W.2d 654 (Tex. App. 1984)...................................................................16

*CBS, Inc. v. Ziff-Davis Pub. Co.,*
    553 N.E.2d 997 (N.Y. 1990)............................................................................19

**Page**

*Cement Kiln Recycling Coal. v. EPA,*
    493 F.3d 207 (7th Cir. 2007) ........................................................................10

*Christensen v. Boone,*
    483 F.3d 454 (7th Cir. 2007) ........................................................................3

*Churchill Village, LLC v. GE,*
    169 F. Supp. 2d 1119 (N.D. Cal. 2000) ........................................................14

*City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc.,*
    736 S.W.2d 247 (Tex. App. 1987)..................................................................30

*Clayton v. Batesville Casket Co., Inc.,*
    No. 07-214, 2008 WL 1970312 (E.D. Ark. May 7, 2008)...............................25

*Clement v. St. Charles Nissan, Inc.,*
    103 S.W.3d 898 (Mo. App. 2003) ..................................................................27

*Cole v. GMC,*
    484 F.3d 717 (5th Cir. 2007) ........................................................................6

*Collins v. DaimlerChrysler Corp.,*
    894 So. 2d 988 (Fla. Dist. Ct. App. 5th Dist. 2004) .....................................25

*Colon v. Bic USA,*
    136 F. Supp. 2d 196 (S.D.N.Y. 2000)............................................................15

*Connick v. Suzuki Motor Co. Ltd.,*
    675 N.E.2d 584, 174 Ill. 2d 482 (Ill. 1990) ...................................16, 17, 23, 24

*Corley v. Rosewood Care Ctr., Inc.,*
    142 F.3d 1041 (N.D. Ill. 1998) ......................................................................22

*Crispin Co. v. Petrotub-S.A.,*
    No. CIV-05-159-C, 2006 WL 2812535 (W.D. Okla. September 28, 2006).....12

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo,*
    349 F.3d 376 (7th Cir. 2003) ........................................................................30

*Danvers Motor Co. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005).........................................................................5

*DeAngelis v. Timberpeg East, Inc.,*
    858 N.Y.S. 2d 410 (N.Y. App. 3rd Dep't Div. 2008).....................................27

**Page**

*Dillon v. Evanston Hosp.*,
    771 N.E.2d 357, 199 Ill. 2d 483 (Ill. 2002) ....................................................20

*Drake v. N. Am. Phillips Corp.*,
    204 F. Supp. 2d 1204 (E.D. Mo. 2002)....................................................31, 32

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*,
    438 U.S. 59 (1978)....................................................................................7

*Durove v. Fabian Transport, Inc.*,
    No. 04-7000, 2004 WL 2912891 (S.D.N.Y. December 14, 2004) ....................9

*Eberts v. Kawasaki Motors Corp., U.S.A.*,
    306 F. Supp. 2d 890 (D.N.D. 2004)..............................................................15

*Engelbecht v. Daimlerchrysler Corp.*,
    No. G-06-CV-800, 2007 WL 1040886 (S.D. Tex. April 2, 2007)....................31

*Everett v. TK Taito, L.L.C.*,
    178 S.W.3d 844 (Tex. Ct. App. 2005) ..........................................................26

*Farm Bureau Ins. Co. v. Case Corp.*,
    878 S.W.2d 741 (Ark. 1994)........................................................................21

*Felley v. Singleton*,
    705 N.E.2d 930 (Ill. App. Ct. 2d Dist. 1999)..................................................18

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.*,
    960 S.W.2d 41 (Tex. 1998)..........................................................................21

*Fortune Prod. Co. v. Conoco, Inc.*,
    52 S.W.3d 671 (Tex. 2000)..........................................................................30

*Frederick v. Simmons Airlines*,
    144 F.3d 500 (7th Cir. 1998) ........................................................................3

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
    528 U.S. 167 (2000)....................................................................................7

*Gastineau v. Fleet Mortg. Corp.*,
    137 F.3d 490 (7th Cir. 1998) ........................................................................3

*Gavin v. AT&T Corp.*,
    543 F. Supp. 2d 885 (N.D. Ill. 2008) ............................................................23

**Page**

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)........................................................................................14, 15, 16

*Gershengorin v. Vienna Beef, LTD.*,
    No. 06 C 6820, 2007 WL 2840476 (N.D. Ill. September 28, 2007).................................16

*Gibson v. Chicago*,
    910 F.2d 1510 (7th Cir. 1990) ........................................................................................2

*Giuffrida v. American Family Brands, Inc.*,
    Nos. 96-7062, 96-7256, 1998 WL 196402 (E.D. Pa. April 23, 1998).............................19

*Goss v. Schering-Plough Corp.*,
    No. 6:06-CV-251, 2006 WL 2546494 (E.D. Tex. August 30, 2006) ...............................31

*Gould v. Artisoft, Inc.*,
    1 F.3d 544 (7th Cir. 1993) .............................................................................................4

*Graves v. Berkowitz*,
    15 S.W.3d 59 (Mo. Ct. App. 2000 ................................................................................28

*Grove v. Manchester Tank & Equip. Co.*,
    Nos. 07-1263, 07-1268, 07-1280, 2008 WL 2626366
    (C.D. Ill. June 26, 2008) ..............................................................................................31

*Guarantee Elec. Co. v. Big Rivers Elec. Corp.*,
    669 F. Supp. 1371 (W.D. Ky. 1987 ..............................................................................28

*Haeberle v. McCall, Currens, Toper & Thompson, P.S.C.*,
    No. 05-2265, 2007 WL 1201587(Ky. Ct. App. April 20, 2007........................................28

*Harmon v. Plapao Labs.*,
    218 S.W. 701 (Mo. Ct. App. 1920)................................................................................8

*Harrison v. Leviton Mfg. Co., Inc.*,
    No. 05-0491, 2006 WL 2990524 (N.D. Okla. October 19, 2006) ....................................8

*Heil Co. v. Polar Corp.*,
    191 S.W.3d 805 (Tex. 3rd. Div. App. 2006) .................................................................20

*Henry v. Mylan Pharm., Inc.*,
    No. 05-CV-40092, 2005 WL 2101049 (W.D. Mo. August 31, 2005)..............................32

*Henry v. Rehab Plus Inc.*,
    404 F. Supp. 2d 435 (E.D.N.Y. 2005) ..........................................................................19

**Page**

*Hess v. Chase Manhattan Bank, USA, N.A.*,
  220 S.W.3d 758 (Mo. 2007) ...............................................................................27

*Hosp. Comp. Sys., Inc. v. Staten Island Hosp.*,
  788 F. Supp. 1351 (D.N.J. 1992) .......................................................................16

*Hyundai Motor Am., Inc. v. Goodin*,
  822 N.E.2d 947 (Ind. 2005) ...............................................................................19

*In re Diamond Mortg. Corp.*,
  118 B.R. 588 (Bankr. N.D. Ill. 1989) .................................................................23

*In re Genetically Modified Rice Litig.*,
  Nos. 06-1811, 07-825, 2007 U.S. Dist. LEXIS 76435
  (E.D. Mo. October 15, 2007) ..............................................................................21

*In re Intel Corp. Microprocesor Antitrust Litig.*,
  496 F. Supp. 2d 404 (D. Del. 2007).....................................................................3

*In re Managed Care Litig.*,
  185 F. Supp. 2d 1310 (S.D. Fla. 2002) ...............................................................29

*In re Terazosin Hydrochloride*,
  220 F.R.D. 672 (S.D. Fla. 2004)..........................................................................29

*Indem. Ins. Co. v. Am. Aviation, Inc.*,
  891 So. 2d 532 (Fla. 2004)............................................................................20, 21

*Int'l Union of Operating Eng'rs, Local 148  v. Ill. Dept. of Employment Sec.*,
  828 N.E.2d 1104, 215 Ill. 2d 37 (2005) ...............................................................5

*Jackson v. Swift-Eckrich*,
  830 F. Supp. 486 (W.D. Ark. 1993)....................................................................16

*Kasel v. Remington Arms Co.*,
  24 Cal. App. 3d 711 (1972) .................................................................................8

*Kelly v. Hanscom Bros, Inc.*,
  331 A.2d 737 (Pa. Super. Ct. 1974)....................................................................17

*Kelsey v. Muskin, Inc.*,
  848 F.2d 39 (2d Cir. 1988)...................................................................................9

*Killingsworth v. HSBC Bank Nev., N.A.*,
  507 F.3d 614 (7th Cir. 2007) ...............................................................................2

**Page**

*Labajo v. Best Buy Stores, L.P.,*
    478 F. Supp. 2d 523 (S.D.N.Y. 2007)..............................................................3

*LaChance v. Hollenbeck,*
    695 S.W.2d 618 (Tex. App. 1985).................................................................30

*Lapkin v. Garland Bloodworth, Inc.,*
    23 P.3d 958 (Okla. Civ. App. 2000...............................................................28

*Leal v. Weightman,*
    No. 01-03-01006-CV, 2004 WL 2251570
    (Tex. App. October 7, 2004).........................................................................30

*Leipart v. Guardian Indus.,*
    234 F.3d 1063 (9th Cir. 2000) ...........................................................13, 14, 15

*Limestone Dev. Corp. v. Lemont,*
    520 F.3d 797 (7th Cir. 2008) ..........................................................................2

*Lohmann & Rauscher, Inc. v. Ykk (U.S.A.) Inc.,*
    477 F. Supp. 2d 1147 (D. Kan. 2007)...........................................................18

*Los Angeles Nut House v. Holiday Hardware Corp.,*
    825 F.2d 1351 (9th Cir. 1987) ......................................................................16

*Loughridge v. Chiles Power Supply Co.,*
    431 F.3d 1268 (10th Cir. 2005) ......................................................................8

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)...........................................................................4, 6, 7

*Manheim v. Ford Motor Co.,*
    201 So. 2d 440 (Fla. 1967)............................................................................19

*Matagorda County v. Tex. Ass'n of Counties County Gov't Risk Mgmt. Pool,*
    975 S.W.2d 782 (Tex. App. 1998 .................................................................28

*McDonnell Douglas Corp. v. Thiokol Corp.,*
    124 F.3d 1173 (9th Cir. 1997) ......................................................................19

*McMurray v. Merck & Co., Inc.,*
    No. C 07-1007, 2007 WL 1456042 (N.D. Cal. May 17, 2007) ........................18

*Medtronic Inc. v. Lohr,*
    518 U.S. 470 (1996)......................................................................................14

**Page**

*Merkle v. Health Options, Inc.*,
    940 So. 2d 1190 (Fla. Dust, Ct, App. 4th Dist. 2006)......................................28

*Miller v. Horn*,
    254 S.W.3d 920 (Mo. Ct. App. 2008)................................................................28

*Mills v. Curioni, Inc.*,
    238 F. Supp. 2d 876 (E.D. Mich. 2002)...............................................................8

*Moorman Mfg. Co. v. Nat'l Tank Co.*,
    435 N.E.2d 443, 91 Ill. 2d 69 (Ill. 1982) .........................................................20

*Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*,
    276 F.3d 845 (6th Cir. 2002) ............................................................................21

*Muelhbauer v. GMC*,
    431 F. Supp. 2d 847 (N.D. Ill. 2006) ...................................................7, 28, 29, 30

*Mullins v. Wyatt*,
    887 S.W.2d 356 (Ky. 1994) ..............................................................................16

*Muncy v. Magnolia Chemical Company*,
    437 S.W.2d 15 (Tex. App. 1969) .........................................................................8

*N.C. Corff P'ship, Ltd. v. OXY USA, Inc.*,
    929 P.2d 288 (Okla. Ct. App. 1996) .................................................................28

*O'Neil v. Simplicity, Inc.*,
    553 F. Supp. 2d 1110 (D. Minn. 2008)................................................................6

*Oak Lawn Pavillion, Inc. v. United States Dept. of Health and Human Servs.*,
    No. 98 C 614, 1999 WL 1023920 (N.D. Ill. 1999)..............................................5

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    647 N.E.2d 741 (N.Y. 1995)..............................................................................28

*Oxford v. Williams Cos., Inc.*,
    137 F. Supp. 2d 756 (E.D. Tex. 2001)...............................................................30

*Peck v. Bridgeport Machs., Inc.*,
    237 F.3d 614 (6th Cir. 2001) ...............................................................................8

*Pelman v. McDonald's Corp.*,
    396 F.3d 508 (2d Cir. 2005)..............................................................................22

**Page**

*Perona v. Volkswagen of Am., Inc.*,
    684 N.E.2d 859, 292 Ill. App. 3d 59 (Ill. App. Ct. 1997)....................................17

*Pfizer, Inc. v. Farsian*,
    682 So. 2d 405 (Ala. 1996) ................................................................................8

*Pickler v. Fisher*,
    644 S.W.2d 644 (Ark. Ct. App. 1983) ..............................................................16

*Pinney v. Nokia, Inc.*,
    402 F.3d 430 (4th Cir. 2005) ............................................................................17

*Plas-Tex, Inc. v. United States Steel Corp.*,
    772 S.W.2d 442 (Tex. 1999).............................................................................17

*Popp v. Cash Station, Inc.*,
    244 Ill. App. 3d 87, 613 N.E.2d 1150 (Ill. App. 1 Dist. 1992)..........................24

*Post v. Am. Cleaning Equip. Corp.*,
    437 S.W.2d 516 (Ky. 1968) .............................................................................28

*Potter v. Electrolux Home Prod., Inc.*,
    No. 06-C- 4811, 2006 WL 2930972 (N.D. Ill. October 11, 2006) ....................31

*Presnell Managers, Inc. v. E.H. Const.*,
    134 S.W.3d 575 (Ky. 2004) .............................................................................20

*Pritchard v. Liggett & Myers Tobacco Co.*,
    350 F.2d 479 (3d Cir. 1965).............................................................................17

*Pro-Comp Mgmt, Inc., et al., v. R.K. Enter., LLC.*,
    366 Ark. 463 (Ark. 2006) ................................................................................28

*Prophet v. Myers*,
    No. 08-0492, 2008 WL 2328349 (S.D. Tex. June 4, 2008)..............................22

*Rape v. Medtronic, Inc.*,
    No. Civ.A. 9:04CV225, 2005 WL 147268 (E.D. Tex. January 11, 2005) ...................8, 14

*Rastelli v. Goodyear Tire & Rubber Co.*,
    79 N.Y.2d 289 (1992) ........................................................................................8

*Recreation Servs. Inc. v. Odyssey Fun World, Inc.*,
    952 F. Supp. 594 (N.D. Ill. 1997).....................................................................22

**Page**

*Redmac, Inc. v. Computerland of Peoria*,
    489 N.E.2d 380 , 140 Ill. App. 3d 741 (Ill. App. Ct. 3d Dist. 1986) ...............................18

*Rios v. State Farm & Fire Cas. Co.*,
    469 F. Supp. 2d 727 (S.D. Iowa 2007) .............................................................................3

*Rivera v. Wyeth-Ayerst Labs.*,
    283 F.3d 315 (5th Cir. 2002) ....................................................................................5, 6

*Rollins, Inc. v. Butland*,
    951 So. 2d 860 (Fla. Dist. Ct. App. 2006) .......................................................................28

*Romano v. Motorola, Inc.*,
    No. 07-60517, 2007 WL 4199781 (S.D. Fla. November 26, 2007) ...........................22, 25

*Royal Business Machs., Inc. v. Lorraine Corp.*,
    633 F.2d 34 (7th Cir. 1980) .............................................................................................19

*Royal Typewriter Co. v. Xerographic Supplies Corp.*,
    719 F.2d 1092 (11th Cir. 1983) .......................................................................................16

*Rush v. Whirlpool Corp.*,
    No. 07-2022, 2008 WL 509562 (W.D. Ark. February 22, 2008) ................................20, 24

*S.D.S. Autos, Inc. v. Chrzanowski*,
    982 So. 2d 1 (Fla. Dist. Ct. App. 1st Dist. 2007).............................................................25

*Salazar v. Merck & Co., Inc.*,
    No. 05-0445, 2005 WL 2875332 (S.D. Tex. November 2, 2005) .......................................8

*Saltzman v. Pella Corp.*,
    No.06-CV-04481, 2007 WL 844883 (N.D. Ill. March 20, 2007)....................................30

*Sanchez v. Wal-Mart Stores, Inc.*,
    No. 06-CV-2573, 2007 WL 1345706 (E.D. Cal. May 8, 2007) ......................................16

*Sappington v. Skyjack Inc.*,
    No. 04-5076-CV-SW-FJG, 2008 WL 795598 (W.D. Mo. March 20, 2008)...................32

*In re Sears, Roebuck & Co. Tools Marketing & Sales Practices Litigation*
    Nos. 05-4742, 05-2623, 2006 WL 3754823 (N.D. Ill. December 18, 2006)...................29

*Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*,
    199 S.W.3d 228 (Mo. Ct. App. 2006)..............................................................................27

**Page**

*Sharp Bros. Contracting Co. v. Am. Hoist & Derrick Co.*,
    703 S.W.2d 901 (Mo. 1986) .......................................................................20

*Sharp v. Kosmalski*,
    40 N.Y.2d 119 (N.Y. 1976) ......................................................................28

*ShopLocal LLC v. Cairo, Inc.*,
    No. Civ.A. 05-C-6662, 2006 WL 495942 (N.D. Ill. February 27, 2006) ........30

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)..................................................................................7

*Singer v. AT & T Corp.*,
    185 F.R.D. 681 (S.D. Fla.1998) ...............................................................29

*Small v. Lorillard Tobacco Co.*,
    720 N.E.2d 892 (N.Y. 1999)......................................................................27

*Smith v. BOC Group PLC*,
    No. 00-C-7909, 2001 WL 477237 (N.D. Ill. May 4, 2001)...............................18

*Smith v. Hennessey & Assocs.*,
    103 S.W.3d 567 (Tex. App. 2003)..............................................................26

*Solarz v. DaimlerChrysler Corp.*,
    No. 2033, 2002, 2002 WL 452218 (Pa.Com.Pl.) (March 13, 2002)................26

*Sollenbarger v. Mountain States Tel. & Tel. Co.*,
    121 F.R.D. 417 (D.N.M.1988)....................................................................29

*Soules v. Gen. Motors Corp.*,
    402 N.E.2d 599, 79 Ill. 2d 282 (Ill. 1980) ......................................................21

*Southern Broad. Group, LLC v. Gem Broad., Inc.*,
    145 F. Supp. 2d 1316 (M.D. Fla. 2001).........................................................19

*Spivack v. Berks Ridge Corp.*,
    586 A.2d 402 (Pa. Super. Ct. 1990)............................................................20

*State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami*,
    557 So. 2d 107 (Fla. Dist. Ct. App. 3d Dist. 1990)........................................17

*Stella v. LVMH Perfumes and Cosmetics ISA, Inc.*,
    No. 07 C 6509, 2008 WL 26696622 (N.D. Ill. July 8, 2008) ...........................16

**Page**

*Stevens v. Motorists Mut. Ins. Co.*,
    759 S.W.2d 819 (Ky. 1988) ........................................................................28

*Stoeckinger v. Presidential Fin. Corp. of Del. Valley*,
    948 A.2d 828 (Pa. Super. Ct. 2008) ...........................................................28

*Summerline v. Scott Petroleum Corp.*,
    324 F. Supp. 2d 810 (S.D. Miss. 2004) ................................................15, 16

*Sutton v. St. Jude Med. S.C., Inc.*,
    419 F.3d 568 (6th Cir. 2005) ...................................................................4, 6

*Swenson v. Emerson Elec. Co.*,
    374 N.W.2d 690 (Minn. 1985) ..............................................................13, 14

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) ......................................................................3

*Tober v. Graco Childrens' Prods.*,
    No. 02-1682, 2004 WL 1085178 (S.D. Ind. March 4, 2004) ..........................15

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
    475 F.3d 824 (7th Cir. 2007) .....................................................................21

*United States v. Atl. Research Corp.*,
    127 S. Ct. 2331 (2007) ..............................................................................10

*United States  v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
    412 U.S. 669 (1973) ....................................................................................4

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
    454 U.S. 464 (1982) ....................................................................................6

*Van Waters & Rogers, Inc. v. Quality Freezers, Inc.*,
    873 S.W.2d 460 (Tex. Ct. App. 1994) ........................................................27

*Verb v. Motorola, Inc.*,
    284 Ill. App. 3d 460, 672 N.E.2d 1287, Ill. Dec. 275 (Ill. App. Ct. 1996) ........7

*Waggoner v. Town & Country Mobile Homes, Inc.*,
    808 P.2d 649 (Okla. 1990) .........................................................................20

*Walker v. S.W.I.F.T. SCRL*,
    491 F. Supp. 2d 781 (N.D. Ill. 2007) ............................................................6

**Page**

*Walker v. Woolbright Motors, Inc.*,
620 S.W.2d 451 (Mo. Ct. App. 1981)............................................................19

*Wheeler v. Sunbelt Tool Co., Inc.*,
537 N.E.2d 1332, 181 Ill. App. 3d 1088 (Ill. App. 4 Dist. 1989)....................18

*Whitmore v. Arkansas*,
495 U.S. 149 (1990)..........................................................................................6

*Wiernik v. PHH US Mortgage Corp.*,
736 A.2d 616 (Pa. Super. Ct. 1999)...............................................................28

*Wikoff v. Vanderveld*,
897 F.2d 232 (7th Cir. 1990) ..........................................................................19

*Williams v. Gerber Prods. Co.*,
523 F.3d 934 (9th Cir. 2008) ..........................................................................18

*Windy City Metal Fabricators & Supply, Inco. v. CIT Technical Financing*,
No. 07-1567, 2008 WL 2941171 (7th Cir. August 1, 2008)............................22

*Wood v. City of Elgin*,
No. 07 C 05418, 2008 WL 151382 (N.D. Ill. January 14, 2008) ..................2, 3

*Woodill v. Parke Davis & Co.*,
58 Ill. App. 3d 349, 374 N.E.2d 683 (Ill. App. Ct. 1978)..................................8

*Worldwide Equip., Inc. v. Mullins*,
11 S.W.3d 50 (Ky. Ct. App. 1999) ...................................................................8

*Yates v. Clifford Motors, Inc.*,
423 A.2d 1262 (Pa. Super. 1980)....................................................................16

*Young v. Robertshaw Controls Co.*,
560 F. Supp. 288 (N.D.N.Y. 1983)..................................................................14

*Zepik v. Tidewater Midwest, Inc.*,
856 F.2d 936 (7th Cir. 1988) .....................................................................12, 13

*Zions First Nat. Bank v. Paul Green*,
No. 07-3760, 2007 WL 4109125 (N.D. Ill. November 16, 2007) ....................21

*Zwiercan v. Gen. Motors Corp.*,
No. 3232, 2002 WL 31053838 (Pa. Com. Pl. September 11, 2002)................26

**Page**

**STATUTES, RULES AND REGULATIONS**

15 United States Code
  §1261 ................................................................................................11
  §2051(b) ...........................................................................................15
  §2064(d) ...........................................................................................15
  §2072 .....................................................................................9, 11, 15
  §2072(a) .....................................................................................9, 13
  §2072(c) ...........................................................................................13
  §2074 ................................................................................................13
  §2074(a) ...........................................................................................13
  §2075 ................................................................................................13
  §2075(a) ...........................................................................................13

Arkansas Codes Annotated
  §4-88-101 .........................................................................................24
  §4-88-107 .........................................................................................24
  §4-88-107(10) ..................................................................................24

Fla. Stat.
  §501.201 ...........................................................................................25

735 ILCS
  5/1-621(c) ..................................................................................31, 32

815 ILCS
  §505/1 ...............................................................................................22

Ky. Rev. Stat. Ann.
  §411.340 .............................................................................................8
  §367.170(1) ......................................................................................28

Mo. Rev. Stat.
  §537.762 ....................................................................................31, 32
  §537.762(2) ......................................................................................32

New York's Deceptive Business Acts and Practices Statute,
  N.Y. Gen. Bus. Law
  §349 ..................................................................................................27

15 Okla. St.
  §751 ..................................................................................................25

73 Pa. Cons Stats.
  §201-1 ...............................................................................................26

**Page**

§201-2(4)(i)-(xxi) ..............................................................................26
§201-2(4)(v) ......................................................................................26

Tex. Bus. & Com. Code Ann.
§17.50(a) ...........................................................................................27
§171.41 .............................................................................................26

Tex. Civ. Pract. & Rem. Code
§82.003 ..........................................................................................8, 31
§82.003(a)(6) ....................................................................................31

Federal Rule of Civil Procedure
Rule 8 ..................................................................................................3
Rule 8(a) ...........................................................................................22
Rule 8(e)(2) .......................................................................................30
Rule 9(b) ...........................................................................21, 22, 25, 26
Rule 12 ..............................................................................................30

16 C.F.R.
§1500.18(a)(2) ................................................................................9, 10
§1117.1 ........................................................................................9, 11, 12
§1117.3 ..............................................................................................11
§1117.4(a) ..........................................................................................11
§1117.9(c) ..........................................................................................12

62 Fed. Reg. 39,827 (July 24, 1997) ..............................................................12

Mo. Code Regs.
§60-80.020(2) .....................................................................................27

**SECONDARY AUTHORITIES**

13 C.A. Wright & A. Miller,
*Federal Practice & Procedure* (2d ed. 2008)
§3531.4 .................................................................................................5

H.R. 4040, 110th Cong. §231(a) (2008) ...........................................................13

Restatement (First) of Restitution §1 (1937) ...................................................28

Am. Jur. *Restitution* §13 (2008) ..................................................................28

## I.    INTRODUCTION

Defendants Spin Master, Ltd, Spin Master, Inc. (collectively "Spin Master"), Target Corp. ("Target"), Wal-Mart Stores, Inc. ("Wal-Mart"), and Toys "R" Us, Inc. ("Toys "R" Us") (collectively "Retailer Defendants") exposed thousands of children to dangerous chemicals through Aqua Dots toys that were marketed directly for young children.[1]  Knowing that the toys were intended for use by small children likely to handle, lick, taste, bite, and/or swallow the toys, Defendants failed to conduct proper testing to ensure that the millions of Aqua Dots they distributed and/or sold throughout the United States were safe.  Yet Defendants would have this Court find that the parents that purchased the toxic toys and the children that played with the toxic toys have *no* remedy for a refund for the defective toys.  In fact, Defendants almost argue that such coatings do not make the product unfit as a child's toy.  Defendants' offer of replacement toys from the same unreliable source is no complete remedy.  The law does not intend that victims be left without a remedy while the wrongdoer reaps the benefits of the profits.  Rather, the law provides specific remedies to redress Defendants' misrepresentations and omissions, Defendants' sale of a toxic substance to which children were exposed, and the fact that consumers did not receive the benefit of their bargain.

## II.    FACTUAL ALLEGATIONS

Aqua Dots contains packets of small, brightly colored beads which fuse together when sprayed with water.  ¶¶40-42.[2]  On November 7, 2007, the Consumer Products Safety Commission ("CPSC") announced a recall of Aqua Dots toys (hereinafter referred to as the "Hazardous Toys").  The Hazardous Toys were found to be coated with 1,4 butanediol, a substance that metabolizes into gamma-hydroxy butyrate (known as "GHB" or the "date rape drug") and is capable of causing significant harm or even death when ingested.  *See* ¶¶1, 4.  Millions of potentially deadly Aqua Dots toys were distributed, marketed, and sold throughout the United States by Spin Master Ltd. and its wholly-owned subsidiary Spin Master Inc. (collectively "Spin Master").  ¶¶4, 45.  Plaintiffs each purchased or received the toxic Aqua Dots.  ¶¶11-19.

---

[1]    Plaintiffs name Wal-Mart, Inc. and Toys "R" Us, Inc. as Defendants, however, neither entity joins in the motion to dismiss.  Instead, for reasons not known to Plaintiffs, Wal-Mart Stores East, LP and Toys "R" Us–Delaware, Inc. seek dismissal.

[2]    All "¶" and "¶¶" references herein are to the Consolidated Amended Class Action Complaint.

In October 2007, Defendant Moose became aware of the hazardous 1,4 butanediol coating after children in Australia became ill from ingesting Aqua Dots. ¶50. In October 2007, Moose informed Spin Master that the Aqua Dots were coated with butanediol 1,4. ¶75. On November 6, 2007, Moose ordered a recall of the Aqua Dots it sold throughout Australia, offering a full-refund or safe replacement beads. ¶57. On November 7, 2007, the CPSC announced a recall of approximately 4.2 million Aqua Dots in the United States, and directed the toys to be removed from children immediately. ¶4. The recall was complicated, fraught with hurdles, and instead of offering a full refund to consumers, merely replaced the toxic beads with other beads from Defendants. ¶5. The recall failed to ensure the replacement beads were manufactured and distributed with proper quality and safety control measures. ¶6. It also required concerned parents, who rightfully lost trust in the safety of Defendants' products, to continue to deal with Defendants, rather than receive a refund. But Plaintiffs are not stuck with Defendants' take it or leave it offer of other potentially hazardous toys. As explained herein, Plaintiffs are entitled to damages, restitution, and the cost of diagnostic screening as remedies under applicable federal and state statues, regulations, and common law.

## III.    LEGAL STANDARD

A court must accept a complaint's well-pleaded allegations as true and draw all favorable inferences for the plaintiff. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). "The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case." *Wood v. City of Elgin*, No. 07 C 05418, 2008 WL 151382, at *1 (N.D. Ill. January 14, 2008) (citing *Gibson v. Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990)).[3] The Supreme Court in *Bell Atlanta Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007), made clear it was not imposing a heightened pleading standard: "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.*, at 1974; *see also Limestone Dev. Corp. v. Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) ("[*Twombly*] must not be over read. The Court denied 'requir[ing] heightened fact pleading of specifics.'"). Following *Twombly*, the Seventh Circuit has held that a complaint should be dismissed only when the "factual

---

[3]    All cited authority found on electronic databases, Bankruptcy Reporter and Code of Federal Regulations are attached as Exhibit 3 to the Declaration of Thomas J. O'Reardon II in Support of Plaintiffs' Opposition to Spin Master Ltd., Spin Master, Inc., Target Corporation, Wal-Mart Stores East, LP, and Toys "R" Us-Delaware, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("O'Reardon Decl."). All "Ex." and "Exs." references are to the O'Reardon Decl.

detail in a complaint [is] so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (*Twombly* "did not . . . supplant the basic notice-pleading standard."). Contrary to Defendants' suggestion, all Plaintiffs are required to do "is 'outline or adumbrate' a violation of the statute or constitutional provision upon which [they] rel[y], and connect the violation to the named defendants." *Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir. 1992).[4] Although Plaintiffs do in fact painstakingly detail their claims, a conclusory complaint does not necessitate automatic dismissal. *Id.* This ensures that "claims are determined on their merits rather than on pleading technicalities." *Christensen v. Boone,* 483 F.3d 454, 458 (7th Cir. 2007). Finally, "[a]ll reasonable inferences are to be drawn in favor of the plaintiff." *Wood*, 2008 WL 151382, at *1 (citing *Gastineau v. Fleet Mortg. Corp.*, 137 F.3d 490, 493 (7th Cir. 1998)). Thus, under any pleading standard, Defendants' motion should be denied.

## IV.    APPLICATION OF ILLINOIS LAW

Defendants' attempt to force this Court to decide the substantive law to be applied to Plaintiffs' claims is premature. Class certification is the proper juncture at which this Court should engage in a choice of law analysis. *See In re Intel Corp. Microprocesor Antitrust Litig.*, 496 F. Supp. 2d 404, 411 (D. Del. 2007) (because the "litigation is still in its infancy," choice of law questions should be deferred until class certification); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007) (choice-of-law analysis more appropriate at class certification stage after discovery); *Rios v. State Farm & Fire Cas. Co.*, 469 F. Supp. 2d 727, 741-42 (S.D. Iowa 2007) (same). However, if this Court should decide to conduct a choice of law analysis now, then it is appropriate to apply Illinois law to each of Plaintiffs' claims. "A federal court sitting in diversity, applies the choice of law rules of the state in which it sits." *Frederick v. Simmons Airlines*, 144 F.3d 500, 503 (7th Cir. 1998). In deciding a choice of law question, the Court first must determine whether there is actually a conflict between the laws. *See Barron v. Ford Motor Co.*, 965 F.2d 195, 197 (7th Cir. 1992). Defendants have failed to identify any actual conflict amongst the various state laws. Yet, in the Seventh Circuit, if parties have not identified an actual conflict between the states'

---

[4]       Here as elsewhere, all citations are omitted and all emphasis is added unless otherwise noted.

laws then the law of the forum applies. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993). As such, Illinois law should apply.

Regardless of whether this Court ultimately decides to apply the law of Illinois, or the law of each individual Plaintiff's home state, the Complaint states claims against each of the Defendants as explained herein.

## V.    ARGUMENT[5]

### A.    Plaintiffs Adequately Plead Article III Standing

Defendants' motion focuses primarily on the erroneous assertion that Plaintiffs lack standing to pursue their claims. Notably, Defendants' challenge is limited to whether Plaintiffs suffered an injury in fact. As explained below, Plaintiffs' well-pled allegations easily satisfy this low-threshold requirement.

Standing is satisfied if a plaintiff has a "'personal stake in the outcome of the controversy.'" *Carlough v. Amchem Prods.*, 834 F. Supp. 1437, 1446 (E.D. Pa. 1993). General factual allegations may be sufficient to show standing when assessing the issue on a motion to dismiss. *See Sutton v. St. Jude Med. S.C., Inc.,* 419 F.3d 568, 571 (6th Cir. 2005) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). The Supreme Court has repeatedly held that a plaintiff has the requisite personal stake if they can show: (1) a concrete injury in fact (2) traceability; and (3) redressability. *See Carlough*, 834 F. Supp. at 1446 (citing *Allen v. Wright,* 468 U.S. 737, 751 (1984)). The severity of the injury is immaterial; according to the Supreme Court, "'[t]hese injuries need not be large, an "'identifiable trifle' will suffice.'"" *Id.*; *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 (1973). Here, Defendants only challenge the first component of standing – injury in fact.

Plaintiffs have adequately alleged injuries sufficient to show injury in fact and to confer standing through: (1)economic harm from the purchase of a hazardous and defective product containing 1,4 butanediol, which was declared a health hazard by the FDA in 1999; and (2) costs for diagnostic testing. Defendants try to undercut Plaintiffs' claim of harm by suggesting a physical injury is necessary. However, Plaintiffs have not plead a personal injury case, but bring their claims

---

[5]    Plaintiffs' Opposition to Spin Master Ltd., Spin Master, Inc., Target Corporation, Wal-Mart Stores East, LP, and Toys "R" Us–Delaware, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint incorporates all relevant arguments made in Plaintiffs' Opposition to Moose Enterprise's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint.

to recover for their purchase price for the toys (¶¶7, 11-19) and out-of-pocket losses stemming from the exposure to the Hazardous Toys. ¶¶32-33, 36-39, 40-49.

### 1.    Plaintiffs' Economic Injuries Constitute Injury in Fact

Economic injuries are sufficient to show injury in fact for purposes of Article III. *See Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005); 13 C.A. Wright & A. Miller, *Federal Practice & Procedure* §3531.4 (2d ed. 2008). *Monetary* harm is a classic form of injury in fact. *Danvers Motor*, 432 F.3d at 293; *see also Oak Lawn Pavillion, Inc. v. United States Dept. of Health and Human Servs.*, No. 98 C 614, 1999 WL 1023920, at *5 (N.D. Ill. 1999) (citing *Barlow v. Collins*, 397 U.S. 159 (1970) (allowing standing for those suffering economic harms)); *Int'l Union of Operating Eng'rs, Local 148 v. Ill. Dept. of Employment Sec.*, 828 N.E.2d 1104, 1115, 215 Ill. 2d 37, 54 (2005). Defendants erroneously argue that Plaintiffs "attempt to hide their lack of injury by grounding their claims in contract". Defs' Mem. at 6. Here, all Plaintiffs have adequately alleged economic injuries in their purchase of defective and dangerous toys and/or diagnostic screening. ¶7. Plaintiffs define their economic injuries as the cost of the toy and/or any out-of-pocket expenses associated with diagnostic testing due to the exposure to the toxic substance. ¶115. This is more than sufficient to demonstrate Article III standing.

Defendants' cases are distinguishable. [6] Memorandum of Law in Support of Spin Master Ltd., Spin Master, Inc., Target Corporation, Wal-Mart Stores East, LP, and Toys "R" Us—Delaware, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("Defs' Mem.") at 4-7. In *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir. 2002), the plaintiffs alleged Wyeth failed to warn them its prescription painkiller could cause liver damage. The court held that plaintiffs did not have standing for their economic claim because they failed to allege that the drug was ineffective as a painkiller. *See id.* at 320. But *Rivera* involved a class that ***explicitly excludes any patient*** who was injured by the drug, and plaintiffs who claimed the drug "was ineffective as a pain killer or has any future health consequences." *Id.* at 317. Here, Plaintiffs have asserted in each

---

[6]    Defendants mistakenly cite to *Briehl v. GMC,* 172 F.3d 623, 628 (8th Cir. 1999), a decision holding that an allegation of economic harm based on the loss in resale value as a result of the defect is insufficient as a matter of law. Unlike the cars at issue in *Briehl*, which could still be used by the plaintiffs, the Plaintiffs have lost the complete use of the toy. In *Briehl*, the defect arises out of the *operation* of the product, whereas here, the defect arose out of the *character* of the toy. Plaintiffs wanted a toy safe for their children's use, not a toy coated with a toxic substance. Plaintiffs' loss of the benefit of the bargain arises out of the complete loss of the purchased/received toy's use.

claim for relief that they suffered injuries, including, *inter alia*, the purchase price of the Hazardous Toys and the cost of diagnostic screening.  ¶126.  Rather than the conclusory and undefined assertions of "economic injury" in *Rivera*, Plaintiffs in this case have sufficiently set forth the damages associated with their ownership of the Hazardous Toys.

Additionally, in *O'Neil v. Simplicity, Inc.,* 553 F. Supp. 2d 1110 (D. Minn. 2008), the plaintiffs were unable to allege an economic injury because plaintiffs failed to adequately allege that the crib was inoperable; and therefore, plaintiffs failed to prove loss of the benefit of their bargain. *Id.* at 1118.  Here, however, Plaintiffs expressly allege that the toys were worthless and defective at the time of purchase due to the dangers it poses if used in the foreseeable manner.  ¶¶7, 93, 171. Hence, Plaintiffs have lost the benefit of their bargain.

Instead, plaintiffs believe *Cole v. GMC*, 484 F.3d 717, 722 (5th Cir. 2007), is more instructive.  There, the Court rejected the argument that since the allegedly defective air bags in plaintiffs' vehicles never deployed inadvertently, they did not suffer an injury in fact.  *Id.*  Observing plaintiffs' allegations that the air bag components were defective at the moment of purchase, the Fifth Court held "it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered." *Id.*, at 723.  Similarly here, Plaintiffs received toxic toys that were not only worthless and defective, but dangerous and hazardous *at the moment of purchase*. ¶¶40, 45-49, 57, 61, 78-88.  Plaintiffs "would not have purchased the Aqua Dots had [they] known" their children "would be exposed to hazardous chemicals." ¶¶11-19.  As in *Cole*, Plaintiffs' factual allegations are not conclusory; Plaintiffs have specifically alleged that they were harmed because they bought toys that were defective at the time of purchase; they have also specifically alleged how and why the toys were defective; and that they would not have purchased the toys had they known they contained a hazardous chemical.  ¶¶1, 32-49-51, 56.  Nothing more is required at this stage in the proceedings.[7]  *Walker v. S.W.I.F.T. SCRL*, 491 F. Supp. 2d 781, 787-89

---

[7]    Defendants attempt to impose a non-existent evidentiary standard that Plaintiffs prove their claims. Defs' Mem. at 4-8.  However, since *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 152-53 (1970), in which it adopted the injury-in-fact test, the Supreme Court has repeatedly confirmed that standing focuses on the party "'seeking to get his [or her] complaint before a federal court and not on the issues [s/]he wishes to have adjudicated.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 484 (1982).  In other words, Article III standing "'in no way depends on the merits of the [plaintiff's claim].'"  *Whitmore v. Arkansas*, 495 U.S. 149, 155, (1990); *see Lujan*, 504 U.S. at 561 (holding that general factual allegations of injury resulting from the defendants suffice at the pleading stage); *Sutton*, 419 F.3d at 571 (general factual allegations may be sufficient to show standing when assessing the issue on a motion to dismiss).

(N.D. Ill. 2007); *see also Muelhbauer v. GMC*, 431 F. Supp. 2d 847, 849, 860, 868-69 (N.D. Ill. 2006).

### 2.    Exposure to the Hazardous Toys, Which Contain Toxins, Is Sufficient to Establish Standing

Further, Plaintiffs have suffered an injury due to their exposure to the hazardous chemicals in the Toys. Defendants do not, and cannot dispute, that Plaintiffs adequately allege that 1,4 butanediol is toxic and can lead to serious health problems. ¶¶32-49. Contrary to Defendants' "personal injury" requirement (Defs' Mem. at 7), courts have repeatedly held that exposure to toxins is sufficient to confer Article III standing, even without physical symptoms of injury. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 73-74 (1978); *Carlough v. Amchem Prods., Inc.*, 834 F. Supp. at 1446; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).

In *Carlough*, the plaintiffs filed a suit against a manufacturer for exposure to asbestos. *Carlough*, 834 F. Supp. 1437. The court certified, for settlement purposes, a class of those exposed to the products either themselves or through a spouse or household member. *Id.* at 1445. Certain objectors opposed on the grounds that some class members had not sustained an "'injury in fact'" in the form of an asbestos-related condition. *Id.*, at 1447. The court rejected this argument and found that exposure to a toxic substance constituted sufficient injury in fact, reasoning that the Class was "personally affected by defendants' conduct in a concrete and particular way whether or not they ever develop a serious medical condition." *Id.*, at 1455. Here, Plaintiffs have alleged that the Hazardous Toys have an actual, manifested defect, namely, every toy contains a poison that exposed children to immediate risk of "life-threatening harm." ¶¶32-33, 38. When children played with the beads, which were designed to be sprayed with water, it was foreseeable that children would ingest the poison by licking or sucking their hands, or inadvertently swallowing the beads. ¶49. The toys' condition *as sold* presented the risk of life-threatening harm to all children who played with the beads.

Defendants' authorities are inapposite and two are summary judgment opinions. Plaintiffs in those cases, did not have a personal stake in the litigation because they were not among those injured, *see Sierra Club v. Morton*, 405 U.S. 727, 741 (1972) (the club's members did not use the facilities); *Verb v. Motorola, Inc.*, 284 Ill. App. 3d 460, 469-71, 672 N.E.2d 1287, 1293-95, 220, Ill. Dec. 275, 281-83 (Ill. App. Ct. 1996) (failed to adequately allege his personal injury), or sought speculative and non-concrete injuries. *See Lujan*, 504 U.S. at 556, 561 (summary judgment granted

against plaintiffs with interest in protecting wildlife); *Harrison v. Leviton Mfg. Co., Inc.,* No. 05-0491, 2006 WL 2990524, *4-*5 (N.D. Okla. October 19, 2006) (a speculative potential *future* physical injury); *Pfizer, Inc. v. Farsian,* 682 So. 2d 405, 407 (Ala. 1996) (summary judgment granted where valves only had a potential to fail). Plaintiffs in this case are not merely "interested" parties with speculative potential future damages, but have been directly affected by a manifested defect resulting in current and concrete pecuniary loss. ¶¶7, 115. As such, Defendants' supporting case law is distinguishable and inapplicable.

### B.    Constructive Knowledge

Spin Master and the Retailer Defendants are deemed to have had constructive knowledge of the danger of the toys at the time that Moose knew of any dangers. *See Am. Multi-Cinema, Inc. v. MCL REC, LLC,* No. 06 C 0063, 2008 WL 1744426, at *6 (N.D. Ill. April 11, 2008) (defining constructive knowledge as "'knowledge that one using reasonable care or diligence should have'"). In fact, numerous courts have determined that sellers, just as manufacturers, have a duty to warn users of the dangers of products if they have actual or constructive knowledge.[8]

In fact, if a member of the distribution chain should have known of the defect in the exercise of reasonable care, they are deemed equally liable for damages.[9] Moreover, in Kentucky a seller or manufacturer may be held liable regardless of actual or constructive knowledge if the product is unreasonably dangerous. *Worldwide Equip., Inc. v. Mullings*, 11 S.W.3d 50, 55-56 (Ky. Ct. App. 1999). Courts have defined the term "seller" broadly in the context of strict products liability, extending a duty to warn to a party that has any "participatory connection, for his personal profit or other benefit, with the injury-causing product and with the enterprise that created consumer demand for and reliance upon the product." *Kasel v. Remington Arms Co.,* 24 Cal. App. 3d 711, 725 (1972);

---

[8]    *See, e.g., Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 617-18 (6th Cir. 2001); *Blackmon v. Am. Home Prods. Corp*., 346 F. Supp. 2d 907, 916 (S.D. Tex. 2004); *Mills v. Curioni, Inc*., 238 F. Supp. 2d 876, 887 (E.D. Mich. 2002); *Brown v. R.J. Reynolds Tobacco Co.*, 92-0836, 1992 WL 161128, at *1 (E.D. La. June 23, 1992); *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297 (1992); *Woodill v. Parke Davis & Co.*, 58 Ill. App. 3d 349, 352-53, 374 N.E.2d 683, 685-86 (Ill. App. Ct. 1978); *Muncy v. Magnolia Chemical Company*, 437 S.W.2d 15, 17 (Tex. App. 1969).

[9]    *Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1279-80 (10th Cir. 2005); Ky. Rev. Stat. Ann. §411.340 (West 2008); *Rape v. Medtronic, Inc.*, No. Civ.A. 9:04CV225, 2005 WL 147268, at *4-*5 (E.D. Tex. January 11, 2005) (citing Tex. Civ. Pract. & Rem. Code §82.003); *Salazar v. Merck & Co., Inc.*, No. 05-0445, 2005 WL 2875332, at *3 (S.D. Tex. November 2, 2005); *Harmon v. Plapao Labs.*, 218 S.W. 701, 703 (Mo. Ct. App. 1920).

*see also Bittler v. White & Co., Inc.,* 203 Ill. App. 3d 26, 30, 560 N.E.2d 979, 982 (Ill. App. Ct. 1990) (where exclusive sales representative derived economic benefit from sale of product in question, strict products liability claim for failure to warn survived motion to dismiss); *Durove v. Fabian Transport, Inc.*, No. 04-7000, 2004 WL 2912891, at *6 (S.D.N.Y. December 14, 2004). Thus, Defendants had constructive if not actual knowledge of the defect.

Defendants also have knowledge formed by the existence of an agency relationship between Moose and Spin Master and Spin Master and the Retailer Defendants. Although a question of fact for the jury, the Court has held that a dealer may be an agent of the manufacturer when one "'undertakes to manage some affairs to be transacted for [and] . . . on account of the . . . principal.'" *Azimi v. Ford Motor Co.*, 977 F. Supp. 847, 851 (N.D. Ill. 1997). An "apparent" agency exists where a reasonably prudent person exercising diligence and discretion, in the view of the principal's conduct, would naturally suppose the agent to possess the principal's authority. *Azimi*, 977 F. Supp. at 851. Here, Spin Master acted as an apparent agent of Moose because Spin Master undertook and managed the distribution of the Aqua Dots packages with Moose's logo and warranty representations. In the same respect, the Retailer Defendants acted as agents of Spin Master when they presented displays of the Aqua Dots packages with Spin Master's and Moose's logos and warranty representations. Hence, once Moose received knowledge of the Aqua Dots defect, as agents, Defendants also had knowledge of defect.

### C.    Plaintiffs State a Valid Claim Under the CPSA

In arguing that Plaintiffs have failed to allege a violation under the Consumer Product Safety Act (15 U.S.C. §2072) ("CPSA"), Defs' Mem. at 8-9, Defendants fail to address why the rules alleged to have been violated – including 16 C.F.R. §1117.1, *et seq*. and 16 C.F.R. §1500.18(a)(2) – are not rules within the meaning of 15 U.S.C. §2072(a). They also ignore that the CPSA provides "a private right of action to any person injured 'by reason of any knowing (including willful) violation of a consumer product safety rule, ***or any other rule or order issued by the Commission***.'" *Kelsey v. Muskin, Inc.,* 848 F.2d 39, 42 (2d Cir. 1988). Accordingly, Defendants' arguments fail.

### 1.    Plaintiffs Allege Violations of the Banned Toys Regulation

Plaintiffs allege that Defendants knowingly violated 16 C.F.R. §1500.18(a)(2) ("Banned Toys Intended For Use By Children"). ¶¶152, 154. That Rule bans, *inter alia*, any toy having "attachments capable of being dislodged by the operating features of the toy or capable of being deliberately removed by a child, which toy has the potential for causing … aspiration, ingestion or other injury." 16 C.F.R. §1500.18(a)(2). Plaintiffs allege the Aqua Dots themselves are

"attachments" as defined by the statute and thus fall under the purview of 16 C.F.R. §1500.18(a)(2). The "attachments" consist of the fused together toxic beads attached to the plastic tray, and they are capable of being dislodged or deliberately removed by a child from the tray "[o]nce the design becomes fixed." ¶40.

The toys were intended for children who could and would ingest the toys coated with hazardous chemicals. Defendants do not dispute that the beads have the "potential for causing . . . injury, aspiration, ***ingestion or other injury***," and admit in the recall notice, that children who swallow the toxic beads can become severely ill. ¶62. In fact, several children swallowed the toxic beads and required hospitalization. *See* ¶¶50, 52, 56, 75-76.

The CPSA is intended for the protection of the public against unreasonable risks of injury associated with "consumer products," a term which is to be liberally construed consistent with the statute's patently remedial purpose. *Butcher v. Robertshaw Controls Co.*, 550 F. Supp. 692, 695 (D. Md. 1981). The CPSA's express purposes would not be served under these circumstances, if the provisions of 16 C.F.R. §1500.18(a)(2) were narrowly construed to pure choking, as Defendants suggest.[10] The Aqua Dots toys fall squarely within the meaning of 16 C.F.R. §1500.18(a)(2).

Furthermore, when Spin Master announced the recalls of the Aqua Dots toys, it determined its toys had a potential to cause injury thereby requiring them to be recalled. The fact that the CPSC and Spin Master issued a recall on the Aqua Dots toys acknowledges that such toys created a potential to cause injury under the CPSA and/or were in violation of a consumer product safety rule. Indeed, one of the Defendants' recalls notice admits that children who swallow the toxic beads can become severely ill. ¶62. The recall and the language in the recall is an admission by Spin Master that the recalled toys had a potential to cause injury creating a substantial risk of injury to the public. Thus, the Plaintiffs have stated a claim under the CPSA.

---

[10]    Defendants, although admitting that 16 C.F.R. §1500.18 (a)(2) covers "other injury" (where Plaintiffs allege the injury from toxicity is considered "other injury" as defined by the regulation), rely on *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 221 (7th Cir. 2007), to incorrectly argue that the injury of toxicity is not "similar in nature" to those identified in the first [four] (laceration, puncture wound injury, aspiration, or ingestion), and therefore injury from toxicity does not fall within this list. Defs' Mem. at 9. In other words, Defendants would have the court render two forms of injury listed in the regulation ("ingestion or other injury") superfluous and only enforce the other four forms of injury. However, the Court has determined that a statute must be read as a whole. *See United States v. Atl. Research Corp.*, 127 S. Ct. 2331, 2336 (2007). *Cement Kiln* is not only distinguishable, the case is irrelevant, in that it analyzed an inapplicable Environmental Protection Agency regulation. *Cement Kiln*, 493 F.3d. at 211.

### 2.    Plaintiffs Sufficiently State Violations of the Reporting Rules

Section 102 of the Child Safety Protection Act (the "Child Safety Act"), 15 U.S.C. §1261, describes mandatory reporting requirements for manufacturers, distributors, retailers and importers of, *inter alia*, "a toy or game that contains" a "small part." This is the Commission's interpretative regulations for reporting of choking incidents required by the Child Safety Act. 16 C.F.R. §1117.1.

With respect to this reporting requirement, Defendants argue that in order to state a valid claim, Plaintiffs must allege "that those for whom they purchased Aqua Dots suffered an obstruction of the airways." Defs' Mem. at 8-9. Thus, again Defendants seek to impermissibly restrict the regulation to fit their purpose. The issue, however, is not whether Plaintiffs choked on the toys, but whether Defendants were aware of, and failed to timely report, a reportable incident. Indeed, Defendants were aware of several incidents and did not report them.

### a.    Defendants Knowingly Violated 16 C.F.R. §1117.1

The Complaint alleges Defendants knowingly violated 16 C.F.R. §1117.1, *et seq*. ¶154. "A subject firm ***shall*** report any information it obtains which reasonably supports the conclusion that a reportable incident occurred." 16 C.F.R. §1117.3. Section 1117.4(a) provides that "[a] subject firm ***must report within 24 hours*** of obtaining information which reasonably supports the conclusion that an incident occurred in which a child (regardless of age) choked on . . . [a] small part contained in a toy or game and, as a result of that incident the child died, suffered serious injury, ceased breathing for any length of time, or was treated by a medical professional." Defendants failed to meet these requirements. Thus, a firm has to report not only obstruction of airways but also other forms of serious injury or treatment by a medical professional.

### b.    Defendants Knowingly Failed to Report

On or about October 8, 2007, and again on November 4, 2007, Defendants obtained information that reasonably supported the conclusion that several reportable incidents occurred. Several children swallowed the tiny parts contained in the Aqua Dots toys and, as a result, children suffered serious injury, may have ceased breathing for any length of time, and/or were treated by a medical professional. ¶¶50, 52, 56, 75-76. Based upon these factual allegations, Defendants were required to report ***within 24 hours*** of obtaining such information but did not announce a recall of the poisonous toys until almost a month after a biochemical geneticist's warning of the dangers of

defendants' product. ¶¶51-52, 61. [11] Defendants also suggest the Complaint does not allege they knowingly violated the Commission-issued rules discussed herein.  Defs' Mem. at 9-10.  But, "[k]nowing means the having of actual knowledge or the presumed having of knowledge deemed to be possessed by a reasonable person who acts in the circumstances, including knowledge obtainable upon the exercise of due care to ascertain the truth of representations." 16 C.F.R. §1117.9(c).  Spin Master, as one of Moose's major export customers, cannot escape the knowledge assigned to Moose on October 8, 2007, when it was first contacted by Dr. Carpenter.  But, as set forth above, the recall did not occur until a month after Dr. Carpenter's warning.  ¶61.

Defendants are deemed to have had constructive knowledge of the danger of the toys at the time that Moose knew of any dangers.  *See Am. Multi-Cinema, Inc. v. MCL REC, LLC*, No. 06-0063, 2008 WL 1744426, at *6 (N.D. Ill. April 11, 2008) (defining constructive knowledge as "knowledge that one using reasonable care or diligence should have").  Both Defendants had a reasonable obligation to ensure that the toys they were distributing/selling for small children to play with were safe.  In fact, as early as November 2006 (¶63), Defendants were on notice that toys manufactured in China were at risk for containing toxins.  With this knowledge, Defendants should have exercised more reasonable care in the sale of toys manufactured in China.  *See Crispin Co. v. Petrotub-S.A.*, No. CIV-05-159-C, 2006 WL 2812535, at *9 (W.D. Okla. September 28, 2006) (negligence found where defendant had credible information alerting it to risks of the defective product which may have given rise to a duty to warn).  Because the Defendants either knew or should have known of the hazardous nature of the toys through their relationship with Moose and the alarming manufacturing processes in China, they had knowledge of the defect. [12]  ¶¶22, 50-55, 75, 154.  For all these reasons, Plaintiffs have stated a valid claim for violations of 16 C.F.R. §1117.1, *et seq*.

### 3.    A Private Right of Action Exists for Violations of CPSA's Reporting Requirements

Relying upon *Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 941 (7th Cir. 1988), Defendants argue that even if Plaintiffs could allege that they knew of a problem with Aqua Dots

---

[11]    Plaintiffs acknowledge that Defendants' reporting obligation under 16 CFR §1117.3 is different from Defendants' obligation to implement an acceptable corrective action under 62 Fed. Reg. 39,827 (July 24, 1997).  Upon information and belief, Defendants knowingly failed to timely file a report with the CPSC. ¶¶50-62, 74-76.  Plaintiffs will further support this allegation through evidence produced during discovery.

[12]    Again the allegations in Plaintiffs' complaint should be taken as true and Defendants' actual and constructive knowledge will be brought to light through the discovery process.

before the recall, there is no private cause of action for violations of CPSA reporting requirements. Defs' Mem. at 9, n.4. *Zepik* is distinguishable here because it is a summary judgment decision, in which there were no facts to support the cause of action.[13]

### D.    The CPSA Does Not Preempt Plaintiffs' State Law Claims

The CPSA contains an express preemption clause, section 2075, and two savings clauses, sections 2072(c) and 2074(a). Section 2075 states in pertinent part:

> Whenever a consumer product safety standard under this Act is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents, design, finish, construction, packaging, or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are ***identical*** to the requirements of the Federal standard.

15 U.S.C. §2075(a). Section §2072(c), however, provides that other remedies, including common law remedies, are not preempted by §2072(a). *See Leipart v. Guardian Indus.*, 234 F.3d 1063, 1067 (9th Cir. 2000). Section 2072(c) specifically provides that "[t]he remedies provided for in this section shall be in addition to ***and not in lieu of*** any other remedies provided by common law or under Federal or State law." 15 U.S.C. §2072(c). Section 2074 of the CSPA provides that common law and state statutory remedies are not pre-empted even when a defendant has complied with federal consumer product safety rules. 15 U.S.C. §2074(a) ("Compliance with consumer product safety rules or other rules or orders under this Act shall not relieve any person from liability at common law or under State statutory law to any other person."). Additionally, on July 31, 2008, Congress passed the Consumer Product Safety Improvement Act of 2006, which clarifies that, "[i]n accordance with the provisions of [the CPSA], the [CPSC] may not construe any such Act as preempting any cause of action under State or local common law or State statutory law regarding damage claims." H.R. 4040, 110th Cong. §231(a) (2008).

---

[13]    Several state and federal courts have held that section 23(a) permits private actions based on violations of reporting requirements. *See e.g., Swenson v. Emerson Elec. Co.*, 374 N.W.2d 690, 699 (Minn. 1985) (holding that based on the plain language of section 2072, the federal Consumer Product Safety Act provides for a private cause of action); *Butcher v. Robertshaw Controls Co.*, 550 F. Supp. 692, 700 (D. Md. 1981) (denying defendants' motions to dismiss and finding that it has federal question jurisdiction over the cause of action brought under the CPSA).

Furthermore, the Supreme Court addressed an analogous issue in *Medtronic Inc. v. Lohr*, 518 U.S. 470, 471 (1996), when it examined whether the Medical Device Amendments of 1976 ("MDA") preempted state common law actions against the manufacturer.  The MDA did not contain a savings clause such as the one in the CPSA, however.  The Court determined that common law remedies premised on violations of the federal requirement were not preempted.  *Id*. at 489.  The Supreme Court held that the presence of a damages remedy does not amount to the additional or different requirement that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing requirements under federal law.  *Id*.  Thus, following the guidance established in *Medtronic,* the state common law remedies do not amount to different or additional requirements and should not be preempted.

Defendants ignore the statute and a long line of federal case law holding that the CPSA ***does not preempt state law claims*** when arguing that the CPSA preempts Plaintiffs' "claim for a refund." Defs' Mem. at 11; *see*, *e.g., Swenson*, 374 N.W.2d at 699; *Young v. Robertshaw Controls Co*., 560 F. Supp. 288, 294 (N.D.N.Y. 1983); *Butcher*, 550 F. Supp. at 695; *Brown v. Daisy Mfg. Co*., 724 F. Supp. 44, 46-47 (N.D.N.Y. 1989).  Indeed, Defendants fail to cite *any* case law holding that the CPSA preempts Plaintiffs' state law claims and instead rely on conclusory self-serving arguments. Their contentions cannot trump the strong presumption against federal preemption.  *See Churchill Village, LLC v. GE*, 169 F. Supp. 2d 1119, 1127 (N.D. Cal. 2000).

Defendants' arguments are not clear and may only rely on the theory of conflict preemption principles.[14]  *See* Defs' Mem. at 11.  Conflict preemption occurs, *inter alia*, where "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Leipart,* 234 F.3d at 1069; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).  Defendants claim that Plaintiffs' "claim" for a refund would deprive Spin Master of its "federal right" to choose between providing repairs, replacements, or refunds, and would present an obstacle to Congress' 'full purposes and objectives.'"  Defs' Mem. at 11.  According to Defendants, Congress' purpose and objective for the election of remedies, appears to be no deeper than to relinquish the choice to the manufacturers.  *See id.*

---

[14]    Thus, Defendants have impliedly conceded that the CPSA does not expressly preempt state law claims.

However, Defendants focus on only a narrow portion of the Act instead of the overall scheme of the statute.[15]   The CPSA explicitly states that the purposes and objectives of the Act are: (1) to protect the public against unreasonable risks of injury associated with consumer products; (2) to assist consumers in evaluating the comparative safety of consumer products; (3) to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations; and (4) to promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries. 15 U.S.C. §2051(b).

Therefore, one of the "overarching goal[s] of the CPSA [is] to create a system in which federal standards and state common law requirements both have roles to play." *Leipart,* 234 F.3d at 1070.  Moreover, the CPSA creates only a "'minimum safety standard,' above which state common law requirements were permitted to impose further duties" and is not intended to preempt state law. *Id*; *see also Colon v. Bic USA*, 136 F. Supp. 2d 196, 208 (S.D.N.Y. 2000); *Summerline v. Scott Petroleum Corp.*, 324 F. Supp. 2d 810, 814 (S.D. Miss. 2004).  Thus, the election of a remedy does not create a ceiling and therefore does not preempt state law claims.

Given this statutory framework, Plaintiffs' claims are not preempted since state law does not "'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *See Leipart,* 234 F.3d at 1069; *Geier*, 529 U.S. at 881.  *Leipart* found that plaintiff's state law claims potentially premised on a different and higher standard of care than that imposed by the CPSA safety standard, did not interfere with the CPSA's stated goals.  234 F.3d at 1070; *see also Tober v. Graco Childrens' Prods.*, No. 02-1682, 2004 WL 1085178, at *11-*14 (S.D. Ind. March 4, 2004); *Eberts v. Kawasaki Motors Corp., U.S.A.,*, 306 F. Supp. 2d 890, 894 (D.N.D. 2004).[16]  The same is true here.

---

[15]    The regulation provides that the Commission "*may*" order the manufacturer to elect either a repair, recall, or refund. 15 U.S.C. §2064(d).  Therefore, the election is only at the Commission's *discretion* – not a "federal right" as Defendants contend – and cannot function as complete preemption of Plaintiffs' claims.

[16]    For this reason, *Geier*, the case on which Defendants principally rely, is inapposite.  In *Geier*, the Supreme Court evaluated federal preemption of state common law claims under the National Traffic and Motor Vehicle Safety Act of 1996 (the "Safety Act").  The Safety Act contained an express preemption and savings clause similar to those found in the CPSA.  The Court looked at those provisions and held that state requirements imposed under common law tort actions were distinct from state "standards" within the meaning of the Safety Act and thus held that common law tort actions were not preempted by the text of the statute. *Id*. at 868.  Here, just as in *Geier*, plaintiffs' state law claims will be excluded from the express preemption provision of the CPSA by its saving clauses.  *Id.*; *see also Tober*, 2004 WL 1085178, at *11 (holding that the "saving clause of the CPSA saves the tort claims from express preemption"); *Bic Pen Corp. v. Carter*, 171

Many other courts have concluded that state common law claims do not conflict with the CPSA. *Id.* at 894; *Summerline*, 324 F. Supp. 2d at 814; *Bic Pen*, 171 S.W.3d 657, 664.[17]  This Court should similarly hold Plaintiffs' state law claims are not pre-empted by the CPSA.

### E.    Plaintiffs State a Claim for Breach of Warranty

#### 1.    Defendants Had Notice of the Alleged Defect

Defendants had actual knowledge of the Hazardous Toys' defect on November 7, 2007, prior to the filing of any of the transferred actions when Spin Master issued a voluntary recall, after notice of numerous injuries and complaints. ¶4, 62.  In fact, Spin Master made an offer – albeit inadequate – to replace the toxic beads. ¶6.  Thus, at the very latest, by November 7, 2007, Defendants were on notice of the Aqua Dots toys' defect.

Even if notice is required, and in many states it is not, the filing of the Complaint or the seller's actual knowledge of the defect satisfies the notice requirement.[18]  *Stella v. LVMH Perfumes and Cosmetics ISA, Inc.*, No. 07 C 6509, 2008 WL 26696622, at *2-*3 (N.D. Ill. July 8, 2008).  In *Stella*, this Court cited *Connick v. Suzuki Motor Co. Ltd.*, 675 N.E.2d 584, 589, 174 Ill. 2d 482, 491 (Ill. 1990), and held that the actual knowledge exception where plaintiffs alleged defendant should

---

S.W. 3d 657, 663 (Tex. App. 2005) (stating that the parties' agree that the design defect claim was not expressly preempted by the CPSA).

[17]    Defendants unsupported contention that the CPSC's approval of Spin Master's corrective action plan preempts any state law refund requirement is easily rejected under a similar analysis. Defs' Mem. at 12.   It is dubious to suggest that requesting a refund as a remedy in a lawsuit would cause manufacturers to leave a dangerous product in the market given the CPSC's reporting requirements.  *Id.*

[18]    *See also* Illinois: *Gershengorin v. Vienna Beef, LTD.*, No. 06 C 6820, 2007 WL 2840476 at *4 (N.D. Ill. September 28, 2007) (actual knowledge alleged); Pennsylvania: *Yates v. Clifford Motors, Inc.*, 423 A.2d 1262, 1270 (Pa. Super. 1980) (complaint adequate notice); Kentucky: *Mullins v. Wyatt*, 887 S.W.2d 356 (Ky. 1994) (complaint adequate notice); Florida: *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1103 (11th Cir. 1983) (sufficiency of notice is a question of fact); Texas: *Carroll Instrument Co., Inc. v. B.W.B. Control, Inc.*, 677 S.W.2d 654, 657 (Tex. App. 1984) (notice is a question of fact); Missouri: *Arst v. Max Barken, Inc.*, 655 S.W.2d 845, 848 (Mo. Ct. App. 1983) (notice not required); New York: *Hosp. Comp. Sys., Inc. v. Staten Island Hosp.*, 788 F. Supp. 1351, 1360 (D.N.J. 1992) (applying NY law, notice satisfied where seller was informed of the defect through complaints made on a continuing basis); Arkansas: *Pickler v. Fisher*, 644 S.W.2d 644, 649 (Ark. Ct. App. 1983) (sufficiency of notice is a question of fact); Arkansas: *Jackson v. Swift-Eckrich*, 830 F. Supp. 486, 491-92 (W.D. Ark. 1993) (actual knowledge or reason to know of defect suffices); Oklahoma: *Am. Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592, 597 (Okla. 1981) (sufficiency of notice is a question of fact).  In California a Consumer's Legal Remedies Act notification letter puts defendants on notice for warranty claims.  *Cf. Sanchez v. Wal-Mart Stores, Inc.*, No. 06-CV-2573, 2007 WL 1345706 at *4 (E.D. Cal. May 8, 2007) *with* Exs. 1-2; *Los Angeles Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351, 1354 (9th Cir. 1987) (notice is question of fact).

have known the subject products did not meet its marketing representations. *Id.* Because Defendants knew or should have known of the defect, issued a voluntary (though inadequate) recall *and* offered to replace the Hazardous Toys *before* any complaint was filed, Defendants had the required "actual knowledge." ¶¶67, 125, 138, 146. Nothing more is required at this stage.[19]

### 2. Aqua Dots Are Not Merchantable or Fit for Their Ordinary Purpose

Defendants brazenly argue that because the Aqua Dots toys – children's toys laced with GHB – are fit for their ordinary purpose, Plaintiffs' implied warranty claims fail. Defs' Mem. at 16. Defendants' citation to *Brazier v. Hasbro, Inc.*, a summary judgment decision, leaves out the critical statement that "'the . . . inquiry focuses on expectations for the performance of the product when used in customary, usual, *and reasonably foreseeable manners*.'" *Brazier v. Hasbro, Inc.*, No. 99 Civ. 11258, 2004 WL 515536, at *4 (S.D.N.Y. March 16, 2004); ¶¶3, 49. Recognizing that children will put toys in their mouths, Defendant Wal-Mart tests for parts that could end up in children's mouths. ¶84. In fact, *Kelly v. Hanscom Bros, Inc.*, 331 A.2d 737 (Pa. Super. Ct. 1974), found sufficient evidence of defendant's breach of the implied warranty of merchantability because "[t]he toys which caused the death of [Plaintiff] was not fit as a plaything for infants, considering *infants' universal penchant for putting things into their mouths* . . ." *Id.* at 739.

Further, whether the Aqua Dots toys were fit for their ordinary or reasonably foreseeable usage is a question of fact not appropriately resolved at this stage. *State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami*, 557 So. 2d 107, 108-09 (Fla. Dist. Ct. App. 3d Dist. 1990) (citing *Boehm v. Fox*, 473 F.2d 445 (10th Cir. 1973)); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 444 (4th Cir. 2005).[20] Plaintiffs allege the Toys are unreasonably dangerous and not fit for reasonably foreseeable uses. This is sufficient at the pleading stage.

---

[19]     *Perona v. Volkswagen of Am., Inc.*, 684 N.E.2d 859, 863, 292 Ill. App. 3d 59, 63 (Ill. App. Ct. 1997), cited by Defendants, is distinguishable because plaintiffs there did not allege actual knowledge.

[20]     Defendants fail to cite a single case dismissing warranty claims at the motion to dismiss stage. *Brazier*, 2004 WL 515536, at *4 (summary judgment); *Plas-Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442 (Tex. 1999) (jury verdict); *Pritchard v. Liggett & Myers Tobacco Co.*, 350 F.2d 479 (3d Cir. 1965) (jury verdict).

### 3.    Defendants Breached Their Express Warranties with Regards to the Toys' Intended and Reasonably Foreseeable Uses

Defendants argue that Plaintiffs' express warranty claims fail because a "'condition precedent' to a claim for breach of express warranty is 'substantial compliance with the directions' for the product's use." Defs' Mem. at 17. Stating that the toys' intended use of the beads are to designed on a plastic tray, and not ingested, they argue that Plaintiffs' warranty claim fails because they did not allege that the toys they purchased were "unfit for *this* purpose." *Id.* But, contrary to Defendants' express warranties, the Aqua Dots toys were not appropriate for children aged 4 and up (¶¶42, 79) and did not comply with applicable law and regulations, including ASTM F963-03 and ASTM D-4236 (¶¶86-89).[21] The law is clear that a products warranty extends to "reasonably foreseeable uses," which is itself a jury question. *Wheeler v. Sunbelt Tool Co., Inc.*, 537 N.E.2d 1332, 1343, 181 Ill. App. 3d 1088, 1103-04 (Ill. App. 4 Dist. 1989). As discussed above, it was reasonably foreseeable (and at the very least a question of fact) that children would place Toys in their mouths or lick their fingers after wetting the beads according to the toy's instructions. ¶¶3, 49. Because the Toys contain GHB, the Toys are not appropriate for children.

### 4.    Express Warranty Claims Are Properly Pled

#### a.    Warranty Terms Are Pled

Contrary to Defendants' suggestion, express warranty allegations meet the notice pleading requirement if they are outlined or generally stated in the complaint. *Smith v. BOC Group PLC*, No. 00-C-7909, 2001 WL 477237, at *6 (N.D. Ill. May 4, 2001).[22] In fact, the Complaint notes what is precisely on the packaging: the toys are appropriate for certain ages (¶79), the packages carry images of children playing with the Hazardous Toys (¶79), and the packaging states compliance with ASTM standards (¶86). *See also* ¶¶129-30, 132-33. Nothing more is required.[23]

---

[21]    Actionable warranties are not limited to words written on the Aqua Dots packaging, but include pictures of children playing on the toy's packaging. *Williams v. Gerber Prods. Co.*, 523 F.3d 934 (9th Cir. 2008); *Lohmann & Rauscher, Inc. v. Ykk (U.S.A.) Inc.*, 477 F. Supp. 2d 1147, 1153 (D. Kan. 2007). As such, the depictions on the Toys' packages and labeling of children playing with the Toys are false and misleading. ¶79.

[22]    *See also McMurray v. Merck & Co., Inc.*, No. C 07-1007, 2007 WL 1456042 (N.D. Cal. May 17, 2007) (precise warranty language not required under the liberal pleading requirements).

[23]    Defendants argue the alleged warranty terms amount to mere puffery. Defs' Mem. at 18-19. But deciding whether statements are puffing (unverifiable boasts and exaggerations) or warranties is a question of

**b.    Basis of the Bargain Is Pled**

Contrary to Defendants' argument, Plaintiffs allege that they relied on the warranties and that they formed part of the basis of the bargain. *See* ¶¶11-19 ("Plaintiff [] would not have purchased the Aqua Dots had he known that his children would be exposed to hazardous chemicals."), ¶79 ("Plaintiffs and members of the Class purchased the Hazardous Toys believing that the toys were safe for children's foreseeable use."); ¶90, 155.[24]  Taking the allegations as true, Defendants' argument must be rejected.[25]

**5.    Privity: Exceptions Exist and/or Is Not Required**

Spin Master's privity arguments fail based on well-established privity exceptions.. [26] Moreover, Spin Master's own actions have brought the company into privity with consumers. ¶121; *see also supra* §V.B.

Spin Master's attempt to pick off the claims from certain states fails.  Illinois does not require privity for implied warranty claims where, as here, more than mere economic damages are alleged. *See Allstate Ins. Co. v. Daimler Chrysler*, No. 03 C 6107, 2004 WL 442679 at *2 (N.D. Ill. March 9, 2004); ¶¶126, 139 (injuries include "exposure to toxic chemicals, increased risk of serious health problems, and the cost of diagnostic screening").  Florida does not require privity for express or implied warranty claims. *Manheim v. Ford Motor Co.*, 201 So. 2d 440, 441-43 (Fla. 1967); *Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 957 n.8 (Ind. 2005).  Further, "in New York, privity is

---

fact. *Felley v. Singleton*, 705 N.E.2d 930, 935 (Ill. App. Ct. 2d Dist. 1999); *Redmac, Inc. v. Computerland of Peoria*, 489 N.E.2d 380, 382 , 140 Ill. App. 3d 741, 743 (Ill. App. Ct. 3d Dist. 1986).

[24]    Although reliance is alleged, reliance on express warranties is not required in most states.  Florida: *Southern Broad. Group, LLC v. Gem Broad., Inc.*, 145 F. Supp. 2d 1316, 1321-22 (M.D. Fla. 2001); Illinois: *Wikoff v. Vanderveld*, 897 F.2d 232, 240-41 (7th Cir. 1990); Pennsylvania: *Giuffrida v. American Family Brands, Inc.*, Nos. 96-7062, 96-7256, 1998 WL 196402 at *4 (E.D. Pa. April 23, 1998); New York: *CBS, Inc. v. Ziff-Davis Pub. Co.*, 553 N.E.2d 997, 1000-01 (N.Y. 1990); Missouri: *Walker v. Woolbright Motors, Inc.*, 620 S.W.2d 451, 453 (Mo. Ct. App. 1981).

[25]    Whether statements become part of the basis of the bargain is a question of fact. *See, e.g., Royal Business Machs., Inc. v. Lorraine Corp.*, 633 F.2d 34, 43 (7th Cir. 1980); *McDonnell Douglas Corp. v. Thiokol Corp.*, 124 F.3d 1173, 1176 (9th Cir. 1997).

[26]    Privity with Retailer Defendants is not challenged.  Privity for Plaintiff Botch, Burgess, Erbach, Streett, Soderstedt, and Williams' implied warranty claims and Plaintiff Botsch, Cosgrove, Erbach, Ford, Streett, Soderstedt, and Williams' express warranty claims against Spin Master are also not challenged.

no longer required for recovery under a theory of breach of implied warranty." *Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 443 (E.D.N.Y. 2005). Spin Master's privity arguments thus fail.

### F.    Plaintiffs Have Alleged Viable Tort Claims

#### 1.    Plaintiffs State Claims for Negligence and Strict Liability

Defendants do not, and cannot, dispute that they sold, and/or distributed toys for young children containing butanediol. *See* ¶¶140-49, 158. Defendants' only challenge to Plaintiffs' negligence and strict liability claims is Plaintiffs' injury. *See* Defs' Mem. at 22-23, 33-34. However, Plaintiffs allege cognizable injuries for their tort claims and, therefore, these claims must be upheld.

Defendants' conduct caused Plaintiffs to suffer a compensable injury, including exposure to a chemical defined as a Class I Health Hazard, thereby creating a risk of serious health problems and associated costs of diagnostic screening.[27]¶¶33, 148-49; *Dillon v. Evanston Hosp.*, 771 N.E.2d 357, 370, 199 Ill. 2d 483, 504 (Ill. 2002) (For negligence, "[a] plaintiff can obtain compensation for a future injury that is not reasonably certain to occur."). As such, the economic loss doctrine is inapplicable and does not defeat Plaintiffs' tort claims. Defs' Mem. at 22-23. Even assuming *arguendo*, the Court did not find each Plaintiff alleged an injury, their negligence and strict liability claims ***are not*** barred under Illinois law. Finally, even if the Court applies the law of the various states in which Plaintiffs reside, Plaintiffs' claims are not barred there either. For instance, the claims of Arkansas' Plaintiffs Erbach and Street are not barred by the economic loss doctrine.[28]

---

[27]    *See Spivack v. Berks Ridge Corp.*, 586 A.2d 402 (Pa. Super. Ct. 1990) (noting that economic loss doctrine does not bar recovery in tort where physical injury or other property damage is present); *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 91 Ill. 2d 69 (Ill. 1982) (same); *Indem. Ins. Co. v. Am. Aviation, Inc.*, 891 So. 2d 532 (Fla. 2004) (same); *Presnell Managers, Inc. v. E.H. Const.*, 134 S.W.3d 575 (Ky. 2004) (same); *Sharp Bros. Contracting Co. v. Am. Hoist & Derrick Co.*, 703 S.W.2d 901 (Mo. 1986) (same); *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649 (Okla. 1990) (same); *Heil Co. v. Polar Corp.*, 191 S.W.3d 805 (Tex. 3rd. Div. App. 2006) (same); *AKV Auto Transp., Inc. v. Syosset Truck Sales, Inc.*, 806 N.Y.S .2d 254 (N.Y. App. Div. 2005) (same).

[28]    As Arkansas does not apply the economic loss doctrine to strict liability and negligence claims, Defendants attempt to argue that Plaintiffs did not allege a defect in the toys or damage to the toys themselves. Defs' Mem. at 23-24. Not true. Plaintiffs allege that the Toys Defendants designed, marketed, and sold are defective, extremely dangerous and potentially lethal and seek damages to reimburse both the cost of the Toys and for medical screening. ¶¶2, 4, 46, 67, 115, 148; *Rush v. Whirlpool Corp.*, No. 07-2022, 2008 WL 509562, at *2-*3 (W.D. Ark. February 22, 2008).

While the Illinois Supreme Court recognized the economic loss doctrine in *Moorman Mfg. Co.*, 435 N.E.2d at 451-53, 91 Ill. 2d at 86-90, it made an exception for fraudulent misrepresentations. For this reason, Plaintiffs' tort claims are not barred by this doctrine.[29] *Id.* Plaintiffs allege that Defendants continued to market and advertise their toys as safe for children's playthings and that they had been adequately tested, when they were not. *See* ¶¶79-90. Defendants made these false statements with the full intent that consumers would rely on them. *See id.* Plaintiffs and the Class did rely on these representations; they would not have purchased the Toys had they known that they contained a toxic substance. *Id.*; *see also id.* at ¶¶11-19. Plaintiffs and the Class suffered substantial injuries as a result of purchasing the Toys. *Id.* As Defendants' false misrepresentations caused Plaintiffs' injuries here, the economic loss doctrine is inapplicable under Illinois law.

In the event that the Court finds the laws of Plaintiffs' home states apply, Plaintiffs' tort claims are not prohibited by the laws of those states either.[30] As Defendants acknowledge, Arkansas permits "the recovery of economic loss where a defect in a product has manifested itself, thereby damaging the product." Defs' Mem. at 23. Indeed, Arkansas upholds strict liability and negligence claims even where there is purely economic loss. *Farm Bureau Ins. Co. v. Case Corp.*, 878 S.W.2d 741, 743 (Ark. 1994); *In re Genetically Modified Rice Litig.*, Nos. 06-1811, 07-825, 2007 U.S. Dist. LEXIS 76435, at *11 (E.D. Mo. October 15, 2007) (interpreting Arkansas law). Moreover,

---

[29]    Under Illinois law, the elements for fraudulent misrepresentation are: "(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601, 79 Ill. 2d 282, 285-86 (Ill. 1980).

    Assuming *arguendo* the Court believes Rule 9(b) applies to Plaintiffs' negligence and strict liability count because they allege fraudulent misrepresentations, the expansive Complaint provides the requisite "who, what, when, where, and how." *Zions First Nat. Bank v. Paul Green*, No. 07-3760, 2007 WL 4109125 at *2 (N.D. Ill. November 16, 2007) (quoting *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007). As in *Zions*, Plaintiffs satisfy the requirements by alleging that between April 2007 and November 2007 (when), Defendants designed, manufactured, marketed, sold and/or distributed the Hazardous Toys (how) to consumers (who) throughout the United States (where) with misrepresentations that the toys were fit for children as playthings, compliant with all relevant laws, and free from any defect (what). *Zions*, 2007 WL 4109125 at *3.

[30]    Like Illinois, Florida and Texas recognize a fraudulent misrepresentation exception to the economic loss doctrine, which applies here. *See Indem. Ins. Co.*, 891 So. 2d at 543; *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.,* 960 S.W.2d 41, 47 (Tex. 1998).

Kentucky has not adopted this doctrine. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848-49 (6th Cir. 2002).

### G. Plaintiffs Adequately Plead Their Statutory Consumer Claims

#### 1. Rule 9(b) Does Not Govern Plaintiffs' Consumer Protection Claims

Defendants' bald assertion that Rule 9(b) applies to Plaintiffs' claims under state consumer fraud and protection statutes (Counts 1-3) is incorrect. Defs' Mem. at 24. Rule 9(b)'s pleading standard only applies to "circumstances constituting fraud or mistake," not to malice, intent, or knowledge. Fed. R. Civ. P. 9(b). Rule 9(b) is inapplicable to claims for violations of the states' consumer protection statutes; rather, Rule 8(a) notice pleading governs such claims.[31] Indeed, the Seventh Circuit recently held "[b]ecause neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices . . . need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal Fabricators & Supply, Inco. v. CIT Technical Financing*, No. 07-1567, 2008 WL 2941171, at *4 (7th Cir. August 1, 2008). Nevertheless, even if Rule 9(b) applies, Plaintiffs have pled their state consumer fraud claims with the requisite particularity to satisfy Rule 9(b).[32]

#### 2. Plaintiffs State Claims Under Illinois' Consumer Protection Statutes

Contrary to Defendants' assertion, Plaintiffs have adequately alleged claims under counts one and two, the Illinois Consumer Fraud Protection Act ("ICFA"), 815 ILCS §505/1 *et seq.*, and the Illinois Deceptive Trade Practices Act ("IDTPA"), respectively. Plaintiffs allege that Defendants engaged in a deceptive act or practice by: (1) misrepresenting on the packaging and labeling that the

---

[31]    *See Romano v. Motorola, Inc.*, No. 07-60517, 2007 WL 4199781, at *1-*2 (S.D. Fla. November 26, 2007) (Florida Deceptive and Unfair Trade Practices Act claims need not be pled with particularity, as statute creates a remedy outside the reach of common law fraud); *Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (New York's consumer fraud statute is not subject to Rule 9(b)); *Prophet v. Myers*, No. 08-0492, 2008 WL 2328349, at *3 (S.D. Tex. June 4, 2008) (Texas DTPA is governed by Rule 8(a), not Rule 9(b)).

[32]    Federal Rule 9(b) requires only: (1) "the identity of the person who made the misrepresentation;" (2) "the time, place and context of the misrepresentation;" (3) and the "method by which the misrepresentation was communicated to the plaintiff." *Recreation Servs. Inc. v. Odyssey Fun World, Inc.*, 952 F. Supp. 594 (N.D. Ill. 1997). The Complaint is replete with detail satisfying these criteria. Moreover, Plaintiffs need only plead information within their possession; 9(b) is relaxed where plaintiffs lack access to all facts necessary to detail their claims. *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (N.D. Ill. 1998).

Toys were safe, quality products that were age-appropriate and complied with safety and quality standards, and (2) failing to disclose the Toys were coated in a hazardous and toxic substance. ¶¶79, 80, 82, 86-88, 101, 103. Defendants' representations were false and deceptive as the Toys were covered in lethal butanediol. *See* ¶¶32-39.

First, Defendants callously mischaracterize their representations as "mere puffery." Defs' Mem. at 25-26. However, "[w]hile a seller has some latitude in 'puffing' the product being sold, the seller is not permitted to misrepresent the product or to assign to it benefits or virtues it does not possess." *In re Diamond Mortg. Corp.*, 118 B.R. 588, 595 (Bankr. N.D. Ill. 1989). Here, puffery cannot immunize Defendants from liability where they misrepresented that the products possess an important quality which they do not: safety compliance.[33] ¶¶79-80.

Second, Defendants argue Plaintiffs' allegations do not specify how the representations were false or deceptive. Defs' Mem. at 26. However, Plaintiffs allege the Toys were not safe or age-appropriate because it was reasonably foreseeable that children would ingest or come into contact with lethal butanediol and the contrary to Defendants' representations, the Toys did not comply with ASTM D-4236 and ASTM F963 because they were not adequately tested for toxicity, did not list ingredients presenting health hazards, and were not free from hazardous substances. ¶¶1-2, 5, 49, 86-89.

Third, Plaintiffs allege actionable omissions. "To withstand a motion to dismiss, the plaintiff must allege that defendants made a material omission and that the plaintiff would have acted differently had she known the omitted information." *Gavin v. AT&T Corp.*, 543 F. Supp. 2d 885, 909 (N.D. Ill. 2008). Plaintiffs allege Defendants omitted the material information that the Toys contained lethal butanediol and each allege they would not have purchased or accepted the Toys had they known their child would be exposed to hazardous chemicals.[34] ¶¶11-19.

Defendants' proximate causation argument fails. Defs' Mem. at 26. "At the pleading stage...all that is necessary to allege proximate causation is to assert . . . that after the alleged

---

[33]    In any event, puffery is a question of fact not appropriate at this stage. *Supra*, at 18 n.20.

[34]    Under Illinois law, "[a]n omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud." *Connick*, 675 N.E.2d at 595, 174 Ill. 2d at 504-05, 221 Ill. Dec. at 400. Moreover, "[a] material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Id.*

misrepresentations were made, the wrongful charges were paid." *Brown v. SBC Communications, Inc.*, No. 05-777, 2007 WL 684133 at *5 (S.D. Ill. March 1, 2007) (citing *Connick*, 675 N.E.2d at 595). Plaintiffs allege that the misrepresentations were stamped on the Toys each of them purchased. Plaintiffs would not have purchased the Toys had they known their children would be exposed to lethal butanediol. ¶¶11-19, 90. Thus, Plaintiffs properly allege proximate harm and Count One (IFCA) is properly plead.

Finally, Plaintiffs also properly allege claims under IDTPA which permits consumers to bring an action for injunctive relief where a defendant's unfair competition is likely to cause damage in the future. *Popp v. Cash Station, Inc.*, 244 Ill. App. 3d 87, 98-99, 613 N.E.2d 1150, 1156 (Ill. App. 1 Dist. 1992). Accordingly, Plaintiffs allege for example that Defendants' recall is inadequate, complicated and fraught with hurdles and fails to reasonably ensure that the lethal nature of the Toys are adequately publicized and ultimately removed from homes. ¶¶5, 7. Plaintiffs also allege that following the recall the misrepresented and lethal Toys continued to enter this country and the stream of commerce. ¶64. Thus, Plaintiffs seek an order requiring Defendants to implement a full and proper recall. ¶7. Such injunctive relief is within the scope of the DTPA. *See also generally* Pltfs' Opposition to Moose's Motion to Dismiss at 15-18.

### 3. Plaintiffs Sufficiently Alleged Claims Under the Various Consumer Protection Statutes of Their Home States

Even if the Court does not apply Illinois' consumer protection statutes to each of the Plaintiffs, Plaintiffs have state claims under the consumer protection and unfair and deceptive trade practices acts of all 50 states. For the same reasons that Plaintiffs' allegations demonstrate violations of the ICFA and IDTPA, they also support claims under the various state consumer protection laws. ¶114. Defendants' challenges to Plaintiffs' claims under the consumer protection statutes of their home states are mostly duplicative of earlier arguments, and are similarly unpersuasive.

#### a. Arkansas

Defendants challenge only the knowledge and injury elements for Plaintiffs' claims under the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code. Ann. §4-88-101, *et seq.* Defs' Mem. at 27. However, the ADTPA only requires knowledge with respect to some deceptive practices, not all conduct. Ark. Code Ann. §4-88-107. For instance, Defendants' violations of the ADTPA's prohibition of "any other unconscionable, false, or deceptive act" does not contain a knowledge requirement. Ark. Code Ann. §4-88-107(10). Regardless, Plaintiffs allege Defendants' knowledge. *See* ¶¶67, 146-147, 161; *see also supra* §V. Plaintiffs also allege actual injury and have

thus sufficiently alleged a claim under the ADTPA. *See* ¶115; *see also Rush*, 2008 U.S. Dist. LEXIS 17210, at *8-*9; *Clayton v. Batesville Casket Co., Inc.,* No. 07-214, 2008 WL 1970312, at *2 (E.D. Ark. May 7, 2008).

### b.    Florida

Likewise, Plaintiffs properly allege claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. §501.201, *et seq.* First, as explained above, Rule 9(b) ***does not*** apply to FDUTPA claims where, as here, Defendants' conduct is short of fraud. *See Romano*, 2007 WL 4199781, at *1. The Complaint details Defendants' deceptive conduct, including misrepresentations as to the safety of the Toys, their failure to disclose their inadequate testing or screening of the Toys, and their concealment as to their hazardous nature. ¶170. Second, Plaintiffs need not rely on specific statements or practices to allege a claim under FDUTPA "because an actionable trade practice is one which is "likely to deceive a consumer acting reasonably in the same circumstances," not one upon which any plaintiff "actually relied." *S.D.S. Autos, Inc. v. Chrzanowski*, 982 So. 2d 1 (Fla. Dist. Ct. App. 1st Dist. 2007). Thus, Plaintiffs' properly allege a FPUTPA violation.[35]

### c.    Oklahoma

Plaintiffs allege a viable claim under the Oklahoma Consumer Protection Statute, 15 Okla. St. §751, *et seq. See API Enter., Inc. v. Am. Standard, Inc.*, No. CIV-07-853-M, 2008 WL 819335 (W.D. Okla. March 25, 2008). Plaintiffs and members of the class allege they suffered actual injuries, in addition to the purchase price, in the form of diagnostic screening for the hazardous chemicals in the Toys.[36] *See* ¶¶116. As such, Plaintiffs are aggrieved consumers under the statute. Defendants' argument that Plaintiffs failed to allege the Toy malfunctioned or the defect manifested itself is baseless in light of Defendants' recall. Defs' Mem. at 31-32.

---

[35]    Plaintiffs also allege how they have been damaged. A diminution in the product's value (here to zero) constitutes damages. *Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 990-91 (Fla. Dist. Ct. App. 5th Dist. 2004); ¶7. Plaintiffs need not show "that a defect manifested itself by failing to operate in an emergency or by causing injury." *Id.*

[36]    Defendants argue that Plaintiff Williams cannot recover because he has not alleged that he has suffered some detriment or loss beyond the payment of the purchase price. Defs' Mem. at 31-32. However, this ignores the well-pleaded allegations of the Complaint. ¶116.

### d.    Pennsylvania

Defendants focus on a single subsection and wrongly argue that Plaintiffs must establish the elements of fraud to recover under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTP/CPL"), 73 Pa. Cons. Stat. §201-1, *et seq.* Defs' Mem. at 32-33.  The UTP/CPL specifically enumerates twenty prohibited practices – none of which require proving fraud's elements.  73 Pa. Cons. Stat. §201-2(4)(i)-(xxi).  Defendants' practices violate many of these provisions, including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have..." 73 Pa. Cons. Stat. §201-2(4)(v); *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392 (E.D. Pa. 2006).  In addition to these specifically enumerated acts, any "fraudulent or deceptive conduct which creates the likelihood of confusion or of misunderstanding" is actionable.[37] *Zwiercan v. Gen. Motors Corp.*, No. 3232, 2002 WL 31053838, at *2 (Pa. Com. Pl. September 11, 2002).  Under this "catchall provision," "a party must either prove the elements of common law fraud, *or* that Defendant's deceptive conduct caused harm to the Plaintiff." *Id.*  Nor is reliance a required element.[38] *Id.*  As such Rule 9(b) does not apply; however, even if it does, Plaintiffs plead with the requisite particularity and state a claim under the UTP/CPL.

### e.    Texas

Plaintiffs allege a viable claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("TDTPA"), Tex. Bus. & Com. Code §171.41, *et seq*.  Defendants mistakenly rely on *Everett v. TK Taito, L.L.C.*, 178 S.W.3d 844 (Tex. Ct. App. 2005), in arguing that Plaintiffs and members of the class have no cognizable injuries.  However, unlike that case, Plaintiffs and members of the class allege more than "potential loss-of-the-benefit-of-the-bargain injuries," *id.* at 858, they have alleged actual damages due to monetary expenditures.  *See* ¶115.  Moreover, unlike plaintiffs in *Everett* who did not allege their vehicles were not operational, Plaintiffs also allege their Aqua Dots were defective and worthless.  *Everett*, 178 S.W.2d at 859; ¶¶122, 125, 131, 160, 164,

---

[37]    The UTP/CPL "is to be construed liberally to effect its object of preventing unfair or deceptive practices."  *Solarz v. DaimlerChrysler Corp.*, No. 2033, 2002, 2002 WL 452218, at *6 (Pa.Com.Pl.) (March 13, 2002).

[38]    Although reliance is not a required element, reliance can be presumed by the materiality of the statement and the parties' relationship.  *Zweircan*, 2002 WL 31053838, at *2, *4.

166. In other words, the defect is not in the operation of the product (*i.e.* it does not work well) but in the very nature and character of the product (*i.e.*, it is poisonous).

Moreover, Plaintiffs adequately allege causation. A plaintiff need only show "producing cause," which is akin to causation in fact, not proximate cause to recover under TDTPA. *Smith v. Hennessey & Assocs.*, 103 S.W.3d 567, 569 (Tex. App. 2003) (citing Tex. Bus. & Com. Code Ann. §17.50(a)). Plaintiffs have alleged that Defendants' deceptive conduct was the cause-in-fact of their injuries. *See* ¶115; *Van Waters & Rogers, Inc. v. Quality Freezers, Inc.*, 873 S.W.2d 460 (Tex. Ct. App. 1994). Thus, Plaintiffs and members of the class have alleged a viable claim under TDTPA.

### f.    Missouri

Defendants attempt to paint Plaintiffs' Missouri Merchandising Practices Act ("MMPA") claim as a fraud claim. Defs' Mem. at 29-30. In so doing, they ignore that the MMPA "serves as a supplement to the definition of common law fraud; it eliminates the need to prove an intent to defraud or reliance." *Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 232 (Mo. Ct. App. 2006); *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. 2007) (noting that an MMPA claim "expressly" does not require intent that others rely); *Clement v. St. Charles Nissan, Inc.*, 103 S.W.3d 898, 899 (Mo. App. 2003); Mo. Code Regs. 15 §60-80.020(2).

Defendants' deceptive conduct falls within the broad definition of an unfair practice under the MMPA because it presented a risk of, and caused, substantial injury to consumers. *See Schuchmann*, 199 S.W.3d at 233. Moreover, Defendants' failure to disclose the hazards of the Toys and to adequately inspect the Toys amounts to actionable omissions of material fact under the MMPA. *See Hess*, 220 S.W.3d at 774; ¶¶3, 145.

### g.    New York

Plaintiffs state valid claims under New York's Deceptive Business Acts and Practices Statute, N.Y. Gen. Bus. Law §349, *et seq.* Plaintiffs must only allege "defendants engaged in consumer-oriented acts or practices that are 'deceptive or misleading in a material way and that plaintiff has been injured by reason thereof.'" *DeAngelis v. Timberpeg East, Inc.*, 858 N.Y.S. 2d 410, 414 (N.Y. App. 3rd Dep't Div. 2008).

While Defendants admit that Plaintiffs sufficiently allege that Defendants' deceptive conduct misled Plaintiffs, Defendants argue that Plaintiffs fail to identify the harm – pecuniary or otherwise – caused thereby. Defs' Mem. at 31. However, as explained above, in addition to economic damages, Plaintiffs and members of the class alleged actual harm in the form of exposure to the Toys. ¶115. Thus, the facts here are distinguishable from *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892 (N.Y.

1999), where plaintiffs did not plead facts showing actual injury. Finally, Defendants argue Plaintiffs fail to allege they saw or relied on the deceptive representations. Defs' Mem. at 31. However, reliance on the misrepresentations is not required and thus Plaintiffs properly state a claim under the GBL. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 647 N.E.2d 741, 745 (N.Y. 1995); ¶¶11-19, 79.

### h.    Kentucky

Plaintiffs properly allege claims under the Kentucky Consumer Protection Act ("KCPA"), Ky. Rev. Stat. Ann. §367.170(1). While Spin Master argues the KCPA requires privity of contract, the Kentucky legislature "created a statute which has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts." *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988). Thus, direct privity is relaxed in cases where an injury has occurred from an inherently dangerous product. *See Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 519 (Ky. 1968). The Kentucky Supreme Court has yet to determine this issue. Plaintiffs allege the Toys, children's toys containing the date rape drug, are an inherently dangerous product and thus properly plead claims under the KCPA. Plaintiffs allege that Moose manufactured them, Spin Master distributed them, and the Retailer Defendants sold them to Plaintiffs. This is sufficient for privity under Kentucky law.

### H.    Plaintiffs' Unjust Enrichment Claims Are Viable

Defendants concede that despite different "formulations,"[39] the unjust enrichment contains essentially the same elements in all jurisdictions, *i.e.*, a wrongly retained benefit conferred by the plaintiff.[40] Defs' Mem. at 34. Defendants essentially concede a benefit was in fact retained but only argue that Plaintiffs have not adequately plead that it is unjust for them to retain it. *Id.* at 34-35.

---

[39]    Despite the formulation, whether the word used is unjust, unfair, unconscionable or inequitable, the central purpose is to assign reproach for the retention of the benefit. Am. Jur. *Restitution* §13 (2008).

[40]    According to the Restatement, "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other. Restatement (First) of Restitution §1 (1937); *see, e.g.,* Illinois: *Muehlbauer v. General Motors Corp.,* 431 F. Supp. 2d 847, 851 (N.D. Ill. 2006); *see, e.g., Muehlbauer v. General Motors Corp.,* 431 F.Supp.2d 847, 851 (N.D. Ill. 2006); Arkansas: *Adkinson v. Kilgore*, 970 S.W. 2d 327, 330-31 (Ark. Ct. App. 1998); *Pro-Comp Mgmt, Inc., et al., v. R.K. Enter., LLC.,* 366 Ark. 463, 469 (Ark. 2006); Florida: *Rollins, Inc. v. Butland,* 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006); *Merkle v. Health Options, Inc.,* 940 So. 2d 1190, 1199 (Fla. Dust, Ct, App. 4th Dist. 2006); Illinois: *B & B Land Acquisition, Inc. v. Mandell,* 714 N.E.2d 58, 63, 306 Ill. App. 3d 574 (Ill. App. Ct. 1999); Kentucky: *Haeberle v. McCall, Currens, Toper & Thompson, P.S.C.,* No. 05-2265, 2007 WL 1201587, at *7 (Ky. Ct. App. April 20, 2007); *Guarantee Elec. Co. v. Big Rivers Elec. Corp.,* 669 F. Supp. 1371, 1380-81 (W.D. Ky. 1987); Missouri:

1.     **Plaintiffs Adequately Plead Unjust Enrichment Under Illinois Law**

a.     **Defendants' Retention Is Unjust, Inequitable, and Unconscionable**

Regardless of which state's law is viewed, the unjust enrichment claim elements are similar nationwide in that most courts have adopted the Restatement in the relevant and substantive respects.[41]

Plaintiffs adequately allege a benefit conferred upon Defendants at Plaintiffs' expense in violation of the fundamental principles of justice, equity, and good conscience, which Defendants must disgorge.  Plaintiffs allege that Defendants received monies and conferred a benefit from Plaintiffs and the Class, which were excessive and unreasonable, for the purchase of hazardous toys containing butanediol.  ¶¶170-71; *see also* ¶¶5,11-19, 78-90.  With full knowledge that their acts were unconscionable, Defendants accepted and retained these benefits by not providing an adequate refund or exchange remedy to Plaintiffs and the Class.  *Id.*

Defendants erroneously argue that the benefit that they have retained is due to a Hobson's choice they put to Plaintiffs to acquiesce to their inadequate recalls or request a refund.  *See* Defs'

---

*Miller v. Horn*, 254 S.W.3d 920, 924 (Mo. Ct. App. 2008); *Graves v. Berkowitz*, 15 S.W.3d 59, 61 (Mo. Ct. App. 2000); New York: *Sharp v. Kosmalski*, 40 N.Y.2d 119, 123 (N.Y. 1976); Oklahoma: *Lapkin v. Garland Bloodworth, Inc.*, 23 P.3d 958, 961 (Okla. Civ. App. 2000); *N.C. Corff P'ship, Ltd. v. OXY USA, Inc.*, 929 P.2d 288, 295 (Okla. Ct. App. 1996); Pennsylvania: *Stoeckinger v. Presidential Fin. Corp. of Del. Valley*, 948 A.2d 828, 833 (Pa. Super. Ct. 2008); *Wiernik v. PHH US Mortgage Corp.*, 736 A.2d 616, 622 (Pa. Super. Ct. 1999); Texas: *Matagorda County v. Tex. Ass'n of Counties County Gov't Risk Mgmt. Pool*, 975 S.W.2d 782, 785 (Tex. App. 1998).  For reasons unknown, Defendants ignore the Complaint and selected the unjust enrichment laws of the states in which *most* of the Plaintiffs reside and ignore Florida law (Plaintiff Bertanowski).  However, in doing so, Defendants also fail to acknowledge that Plaintiffs' Complaint alleges unjust enrichment applying Illinois law to a nationwide class.  A 50 state-by-state analysis is available to the Court upon request.

[41]     *See, e.g., In re Terazosin Hydrochloride*, 220 F.R.D. 672, 697, n.40 (S.D. Fla. 2004)( unjust enrichment claims "are materially the same throughout the United States." )(citing *Sollenbarger v. Mountain States Tel. & Tel. Co.,* 121 F.R.D. 417, 428 (D.N.M.1988)); *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1336 -1337 (S.D. Fla. 2002) (citing *Singer v. AT & T Corp.,* 185 F.R.D. 681, 692 (S.D. Fla.1998).  Although the Court in *In re Sears, Roebuck & Co. Tools Marketing & Sales Practices Litigation* held that an unjust enrichment claim could not be maintained by a nationwide class of purchasers, the instant case is distinguishable.  Nos. 05-4742, 05-2623, 2006 WL 3754823 (N.D. Ill. December 18, 2006).  The *Sears* court's rejection of plaintiffs' argument that all unjust enrichment laws are similar was not based on an inadequate legal theory, but based on an inadequate legal proof.  Namely, when invited to prove its similarity, plaintiffs in *Sears* failed to meet that burden by failing to submit *any* materials to the Court. *See id.*, at \*9 n.7.  In other words, *Sears* does not hold that the unjust enrichment laws are different but only that plaintiffs *there* failed to prove they were the same.  Plaintiffs here amply meet that burden.

Mem. at 35.  In *Muehlbauer*, the defendant also argued that its recall returned the benefit and mooted the unjust enrichment claim because the recall returned any benefit conferred to it by plaintiffs.  431 F. Supp. 2d at 854.  However, in rejecting that argument, the court held that an ***inadequate*** remedy (the recall), still supported the unjust enrichment claim since the defendant retained a benefit in the form of purchase price for the product.  *Id.*  Here, Plaintiffs allege that Defendants' recall and refusal to provide a return of monies paid for the Aqua Dots toy and that the offer of replacement beads that may or may not contain a hazardous substance are inadequate.  ¶¶6, 46, 171.  Under *Meuhlbauer*, this recall does not constitute a "return of the benefit."  *Meuhlbauer*, 431 F. Supp. 2d at 855.  More importantly, as the nature of the recall presents a question of fact, it is inappropriate to discuss it in a Rule 12 motion.  *Id.*

> **2.    Unjust Enrichment Claims Are Properly Plead in the Alternative and Under Texas Law**

Defendants' arguments that an adequate remedy at law exists, *see* Defs' Mem. at 35, fail to take note that Plaintiffs' unjust enrichment claims are pled in the alternative.  ¶169.  Alternative pleading is not only permitted under Federal Rule of Civil Procedure 8(e)(2), but it is common.  *See, e.g., Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003).  Hence, the Complaint sufficiently pleads the unjust enrichment claim in the alternative.[42]  Moreover, dismissal of the unjust enrichment claims based on the existence of (disputed) contract (the warranty) would be premature.  *Saltzman v. Pella Corp.,* No.06-CV-04481, 2007 WL 844883, at *6 (N.D. Ill. March 20, 2007).

Finally, if Illinois law does not apply nationwide, Texas does recognize a claim for unjust enrichment as a separate cause of action.[43]  *See Leal v. Weightman*, No. 01-03-01006-CV, 2004 WL 2251570, at *4 (Tex. App. October 7, 2004); *compare* Defs' Mem. at 36-37, *with Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 683-85 (Tex. 2000).

_____

[42]    The Illinois Courts also hold that when an unjust enrichment claim is based on a tort, plaintiff need not plead the unjust enrichment claim in the alternative.  *See ShopLocal LLC v. Cairo, Inc.,* No. Civ.A. 05-C-6662, 2006 WL 495942, at *2 (N.D. Ill. February 27, 2006).

[43]    Defendants' citations mainly apply Texas appellate court decisions analyzing claims under an implied quasi-contract or quantum meruit theory rather than an unjust enrichment principle.  *See Oxford v. Williams Cos., Inc.,* 137 F. Supp. 2d 756, 762 (E.D. Tex. 2001) (citing *LaChance v. Hollenbeck,* 695 S.W.2d 618, 620 (Tex. App. 1985)); *City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc.,* 736 S.W.2d 247, 250 (Tex. App. 1987).  Thus, *Oxford and City of Corpus Christi* are irrelevant and do not conflict with binding Texas Supreme Court case law that recognizes a claim for unjust enrichment.

I.    **The "Innocent Non-Manufacturer Doctrine" Does Not Preclude Claims**

Spin Master lastly argues it is not liable under the "innocent non-manufacturer" doctrine in Texas, Illinois and Missouri.  Plaintiffs allege that Defendants knew, or should have known, that the Aqua Dots were hazardous.  *See* ¶¶3, 67, 142-143, 156, 161.  At this stage, these allegations must be taken as true, given that Spin Master's[44] knowledge is a question of fact yet to be determined.[45]  In Texas and Illinois, knowledgeable non-manufacturing defendants are held strictly liable.[46]  For the Texas exceptions to apply, Plaintiffs need only show that they *may* prove Spin Master was knowledgeable of the hazard.[47]  The Illinois and Missouri law exceptions are not defeated by Defendant's declaration attesting to its distributor role either.[48]  Plaintiffs have alleged that Spin Master is much more than a "seller in the stream of commerce" or distributor and should have the opportunity to prove their allegations.  *See* ¶¶21, 79.  Moreover, any financial instability of the manufacturer, any hint at the Plaintiffs' ability to recover from it, such as a small foreign corporation

---

[44]    Defendants' innocent non-manufacturer argument only addresses the dismissal of claims against Spin Master – not Target or the other Retailer Defendants.

[45]    *See Goss v. Schering-Plough Corp.*, No. 6:06-CV-251, 2006 WL 2546494, at *3 (E.D. Tex. August 30, 2006) (allowing claim to proceed under §82.003 exceptions where defendant's knowledge of the defect is "ambigu[ous] or contested issue of fact"); *Potter v. Electrolux Home Prod., Inc.*, No. 06-C- 4811, 2006 WL 2930972, at *1-2 (N.D. Ill. October 11, 2006) (upholding plaintiff's strict liability claim when complaint alleged defendant had knowledge of product defect); *Grove v. Manchester Tank & Equip. Co.*, Nos. 07-1263, 07-1268, 07-1280, 2008 WL 2626366, at *2 (C.D. Ill. June 26, 2008) ("it is unclear without further discovery whether plaintiffs could show that [defendant] satisfies one of the exceptions to dismissal. Because that material issue of fact remains to be resolved in this case, a judgment on the pleadings is inappropriate").

[46]    Texas Civil Practices and Remedies Code §82.003(a)(6)'s exception to §82.003 deems non-manufacturer sellers strictly liable when "(A) the seller actually knew of a defect to the product at the time the seller supplied the product; and (B) the claimant's harm resulted from the defect."; 735 ILCS 5/1-621(c) (non-manufacturing defendants are strictly liable if they "exercised some significant control over the design or manufacture of the product, "provided instructions or warnings to the manufacturer relative to the alleged defect," or "had actual knowledge of the defect"); *see Grove*, 2008 WL 2626366 at *1.

[47]    *See Engelbrecht v. Daimlerchrysler Corp.*, No. G-06-CV-800, 2007 WL 1040886, at *2 (S.D. Tex. April 2, 2007).

[48]    Under §537.762 of Missouri Revised Statutes ("Missouri Code"), dismissal of a non-manufacturer is only proper when the defendant's liability is based solely on its status as a seller in the stream of commerce. *Drake v. N. Am. Phillips Corp.*, 204 F. Supp. 2d 1204, 1206 (E.D. Mo. 2002).

like Moose, allows Plaintiffs' claims against Spin Master to survive.[49]  Additionally, Missouri's statute does not apply to actions against sellers that include independent negligence claims, as brought by Plaintiffs here.[50]  Lastly, §537.762 of the Missouri Code does not affect the substantive liability of a seller, thus Plaintiffs may still hold Spin Master strictly liable.[51]

## VI.    CONCLUSION

For these reasons, Defendants' motion to dismiss should be denied in its entirety.[52]

DATED:  August 8, 2008                    Respectfully submitted,

                                          FINKELSTEIN THOMPSON LLP
                                          BURTON H. FINKELSTEIN
                                          MILA F. BARTOS
                                          ROSALEE B. CONNELL


                                          _____
                                                s/ Rosalee B. Connell
                                              ROSALEE B. CONNELL

                                          1050 30th Street, NW
                                          Washington, D.C. 20007
                                          Telephone: 202/337-8000
                                          202/337-8090 (fax)

---

[49]    *See* 735 Ill. Comp. Stat. 5/2-621(b)(4)-(5) (preventing dismissal of claims against distributor/retailer if "manufacturer is unable to satisfy any judgment as determined by the court; or . . . the manufacturer would be unable to satisfy a reasonable settlement or other agreement with plaintiff."); Mo. Rev. Stat. §537.762(2) (2000) (forbidding dismissal of distributor/retailer when manufacturer would be unable to provide a "total recovery . . . for plaintiff's claims").

[50]    *Sappington v. Skyjack Inc.,* No. 04-5076-CV-SW-FJG, 2008 WL 795598, at *3 (W.D. Mo. March 20, 2008).

[51]    *Drake*, 204 F. Supp. 2d at 1206 (holding "by its very terms, does not change the substantive law relating to an innocent seller's liability; *as its effect is only procedural*") (emphasis in original); *see also Henry v. Mylan Pharm., Inc.,* No. 05-CV-40092, 2005 WL 2101049, at *5 (W.D. Mo. August 31, 2005).

[52]    Should the Court dismiss any of Plaintiffs' claims, Plaintiffs should be granted leave to amend their Complaint.

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
THOMAS J. O'REARDON II
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)


BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JACK REISE
ELIZABETH A. SHONSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504

KAPLAN FOX & KILSHEIMER LLP
FREDRIC S. FOX
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone: 212/687-1980
212/687-7714 (fax)

KAPLAN FOX & KILSHEIMER LLP
LAURENCE D. KING
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415/772-4700
415/772-4707 (fax)

Plaintiffs' Interim Co-Lead Class Counsel

S:\CasesSD\Aqua Dots\BRF 00053244.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 8, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 8, 2008.

s/ Rosalee B. Connell
ROSALEE B. CONNELL

FINKELSTEIN THOMPSON LLP
1050 30th Street, NW
Washington, D.C. 20007
Telephone: 202/337-8000
202/337-8090 (fax)

E-mail:  rconnell@finkelsteinthompson.com

# Mailing Information for a Case 1:08-cv-02364

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ben Barnow**
  b.barnow@barnowlaw.com,s.harris@barnowlaw.com

- **Joanna E. Clarke-Sayer**
  jsayer@winston.com,ECF_CH@winston.com

- **Rosalee B. Connell**
  rconnell@finkelsteinthompson.com

- **Bryna Joyce Roth Dahlin**
  bdahlin@winston.com,ECF_CH@winston.com

- **Dana Michele Gilreath**
  dgilreath@clinton-clinton.com

- **Laurence David King**
  kweiland@kaplanfox.com,agutierrez@kaplanfox.com,lking@kaplanfox.com

- **Jack Reise**
  jreise@csgrr.com,e_file_fl@csgrr.com

- **William N. Riley**
  wriley@price-law.com

- **Aron David Robinson**
  adroblaw@aol.com

- **Ronald Y Rothstein**
  rrothstein@winston.com,mconroy@winston.com,ECF_CH@winston.com

- **Thomas Joseph Wiegand**
  twiegand@winston.com,ECF_CH@winston.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Mila F. Bartos**
Finkelstein, Thompson & Loughran

1050 30th Street, NW
Washington, DC 20007

**Burton I Finkelstein**
Finkelstein, Thompson & Lougran
1050 30th Street, NW
Washington, DC 20007

**Frederic S. Fox**
Kaplan Fox and Kilsheimer
850 Third Avenue
14th Floor
New York, NY 10022

**Ralph K. Phalen**
Ralph K. Phalen, Attorney At Law
1000 Broadway
Suite 400
Kansas City, MO 64105

**John K Sherk**
Shook, Hardy & Bacon
2555 Grand Boulevard
Kansas City, MO 64108-2613

**John J. Stoia**                                        **, Jr**
Coughlin  Stoia Geller Rudman and Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**James A. Streett**
Streett Law Firm, PA
107 West Main
Russellville, AK 72811

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| In re AQUA DOTS PRODUCTS LIABILITY LITIGATION | ) ) ) | MDL No. 1940 Case Number 1:08-cv-02364 Honorable David H. Coar |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) | |

DECLARATION OF THOMAS J. O'REARDON II IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO SPIN MASTER LTD., SPIN MASTER, INC.,
TARGET CORPORATION, WAL-MART STORES EAST, LP, AND TOYS "R"
US-DELAWARE, INC.'S MOTION TO DISMISS PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

I, THOMAS J. O'REARDON, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California.  I am associated with the law firm of Coughlin Stoia Geller Rudman & Robbins LLP, one of the counsel of record for plaintiffs in the above-entitled action.  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      I submit this declaration in Support of Plaintiffs' Opposition to Spin Master Ltd., Spin Master, Inc., Target Corporation, Wal-Mart Stores East, LP, and Toys "R" Us-Delaware, Inc.'s' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint.

3.      Attached hereto as Exhibit 1 is a true and correct copy of Plaintiffs' CLRA notification letter from Rosemary M. Rivas to Spin Master, Inc., dated January 16, 2008.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on a Rule 12(b)(6) motion to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

4.      Attached hereto as Exhibit 2 is a true and correct copy of Plaintiffs' CLRA notification letter from Rosemary M. Rivas to Spin Master, Ltd., dated January 16, 2008.  *Id.*

5.      Pursuant to this Court's Standing Order on Motion Practice, Briefs and Protective Orders, attached as Exhibit 3 are copies of cited authority found only on electronic databases, Bankruptcy Reporter and Code of Federal Regulations.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 8th day of August, 2008, at San Diego, California.

                                        s/  Thomas J. O'Reardon II
                                        THOMAS J. O'REARDON II

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 8, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 8, 2008.

s/ Rosalee B. Connell
ROSALEE B. CONNELL

FINKELSTEIN THOMPSON LLP
1050 30th Street, NW
Washington, D.C. 20007
Telephone: 202/337-8000
202/337-8090 (fax)

E-mail:  rconnell@finkelsteinthompson.com

- 2 -

# Mailing Information for a Case 1:08-cv-02364

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ben Barnow**
  b.barnow@barnowlaw.com,s.harris@barnowlaw.com

- **Joanna E. Clarke-Sayer**
  jsayer@winston.com,ECF_CH@winston.com

- **Rosalee B. Connell**
  rconnell@finkelsteinthompson.com

- **Bryna Joyce Roth Dahlin**
  bdahlin@winston.com,ECF_CH@winston.com

- **Dana Michele Gilreath**
  dgilreath@clinton-clinton.com

- **Laurence David King**
  kweiland@kaplanfox.com,agutierrez@kaplanfox.com,lking@kaplanfox.com

- **Jack Reise**
  jreise@csgrr.com,e_file_fl@csgrr.com

- **William N. Riley**
  wriley@price-law.com

- **Aron David Robinson**
  adroblaw@aol.com

- **Ronald Y Rothstein**
  rrothstein@winston.com,mconroy@winston.com,ECF_CH@winston.com

- **Thomas Joseph Wiegand**
  twiegand@winston.com,ECF_CH@winston.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Mila F. Bartos**
Finkelstein, Thompson & Loughran

```
1050 30th Street, NW
Washington, DC 20007
```

**Burton I Finkelstein**
```
Finkelstein, Thompson & Lougran
1050 30th Street, NW
Washington, DC 20007
```

**Frederic S. Fox**
```
Kaplan Fox and Kilsheimer
850 Third Avenue
14th Floor
New York, NY 10022
```

**Ralph K. Phalen**
```
Ralph K. Phalen, Attorney At Law
1000 Broadway
Suite 400
Kansas City, MO 64105
```

**John K Sherk**
```
Shook, Hardy & Bacon
2555 Grand Boulevard
Kansas City, MO 64108-2613
```

**John J. Stoia**                                         **, Jr**
```
Coughlin  Stoia Geller Rudman and Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
```

**James A. Streett**
```
Streett Law Firm, PA
107 West Main
Russellville, AK 72811
```

EXHIBIT 1


# FINKELSTEIN THOMPSON LLP

January 16, 2008

**VIA REGISTERED MAIL**

Spin Master, Inc.
11878 La Grange Avenue
Los Angeles, California 90025

> Re:   *Soderstedt v. Moose Enterprise PTY Limited, et al., Case No.* CV07-07546 PA
> JWJx

To Whom It May Concern:

On behalf of Plaintiff Sandra Irene Soderstedt and all others similarly situated, this letter is to notify Spin Master, Incorporated ("Spin Master, Inc.") that it has violated the California Legal Remedies Act ("CLRA") by employing or committing methods, acts, or practices declared unlawful by Cal. Civ. Code § 1770. *See* Cal. Civ. Code § 1782(a) and (b). Pursuant to Cal. Civ. Code § 1780, Plaintiff Soderstedt will initiate an action for actual damages, punitive damages, and any other appropriate relief against Spin Master, Inc. thirty (30) days from the date this notice is served on Spin Master, Inc., unless Spin Master, Inc. makes an appropriate remedy to Plaintiff Soderstedt and members of the proposed Class, as defined in Plaintiff Soderstedt's Class Action Complaint, enclosed with this letter.

The unlawful acts committed by Spin Master, Inc., in violation of the CLRA, include: (1) marketing and selling products without disclosing and/or inadequately disclosing material facts, namely, that the products contained a design flaw and were excessively and unreasonably dangerous; and (2) marketing and selling products without disclosing and/or inadequately disclosing material facts, namely, that the products were unsafe and posed health risks to children.

Spin Master, Inc.'s actions violate Sections 1770(a)(5), (7), and (9) of the CLRA, which prohibit representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have; representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising goods with intent not to sell them as advertised. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff Soderstedt and members of the proposed Class have suffered damages in the form of money paid for the Aqua Dots Toys, as defined in Paragraphs 16 through 21 of the Complaint.

Pursuant to Cal. Civ. Code § 1782(b), Spin Master, Inc. may, within thirty (30) days of the date of this letter, avoid an action for damages under the Consumers Legal Remedies Act

1050 30TH STREET, NW • WASHINGTON, DC 20007 • PHONE: 202.337.8000 • FAX: 202.337.8090 • TOLL-FREE: 877.337.1050

100 BUSH STREET • SUITE 1450 • SAN FRANCISCO, CA 94104 • PHONE: 415.398.8700 • FAX: 415.398.8704 • TOLL-FREE: 877.800.1450

WWW.FINKELSTEINTHOMPSON.COM



brought by Plaintiff Soderstedt by agreeing to correct, repair and rectify its unlawful acts by: (1) providing all members of the proposed Class as defined in Paragraph 62 of the Complaint with notice of this action and the name of Plaintiff Soderstedt's attorneys; (2) restoring to Plaintiff and all members of the proposed Class the monies collected for Aqua Dots Toys; and (3) implementing policies, procedures and practices to prevent the marketing and sale of toys that are unsafe for children.

Sincerely,

Rosemary M. Rivas

Enc.:    Class Action Complaint

Cc:    Spin Master, Inc. (Via Registered Mail w/Enclosure)
       11872 La Grange Avenue
       Los Angeles, California 90025

       Spin Master, Inc. (Via Registered Mail w/Enclosure)
       5250 W. Century Blvd., Suite 501
       Los Angeles, California 90025

       Spin Master, Inc. (Via Registered Mail w/Enclosure)
       300 International Dr., Suite 100
       Williamsville, New York 14221

       Ronald Y. Rothstein (Via U.S. Mail w/o Enclosure)
       Bryna Joyce Roth Dahlin
       Thomas Joseph Wiegand
       WINSTON & STRAWN LLP
       35 W. Wacker Driver
       Chicago, Illinois 60601-9703

# EXHIBIT 2



# FINKELSTEIN THOMPSON LLP

January 16, 2008

**VIA INTERNATIONAL REGISTERED MAIL**

Spin Master, Ltd.
450 Front Street West
Toronto, ON
M5V 1B6 Canada

      Re:    *Soderstedt v. Moose Enterprise PTY Limited, et al.,* Case No. CV07-07546 PA JWJx

To Whom It May Concern:

      On behalf of Plaintiff Sandra Irene Soderstedt and all others similarly situated, this letter is to notify Spin Master, Limited ("Spin Master, Ltd.") that it has violated the California Legal Remedies Act ("CLRA") by employing or committing methods, acts, or practices declared unlawful by Cal. Civ. Code § 1770. *See* Cal. Civ. Code § 1782(a) and (b). Pursuant to Cal. Civ. Code § 1780, Plaintiff Soderstedt will initiate an action for actual damages, punitive damages, and any other appropriate relief against Spin Master, Ltd. thirty (30) days from the date this notice is served on Spin Master, Ltd., unless Spin Master, Ltd. makes an appropriate remedy to Plaintiff Soderstedt and members of the proposed Class, as defined in Plaintiff Soderstedt's Class Action Complaint, enclosed with this letter.

      The unlawful acts committed by Spin Master, Ltd., in violation of the CLRA, include: (1) marketing and selling products without disclosing and/or inadequately disclosing material facts, namely, that the products contained a design flaw and were excessively and unreasonably dangerous; and (2) marketing and selling products without disclosing and/or inadequately disclosing material facts, namely, that the products were unsafe and posed health risks to children.

      Spin Master, Ltd.'s actions violate Sections 1770(a)(5), (7), and (9) of the CLRA, which prohibit representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have; representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising goods with intent not to sell them as advertised. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff Soderstedt and members of the proposed Class have suffered damages in the form of money paid for the Aqua Dots Toys, as defined in Paragraphs 16 through 21 of the Complaint.

1050 30TH STREET, NW • WASHINGTON, DC 20007 • PHONE: 202.337.8000 • FAX: 202.337.8090 • TOLL-FREE: 877.337.1050

100 BUSH STREET • SUITE 1450 • SAN FRANCISCO, CA 94104 • PHONE: 415.398.8700 • FAX: 415.398.8704 • TOLL-FREE: 877.800.1450
WWW.FINKELSTEINTHOMPSON.COM



Pursuant to Cal. Civ. Code § 1782(b), Spin Master, Ltd. may, within thirty (30) days of the date of this letter, avoid an action for damages under the Consumers Legal Remedies Act brought by Plaintiff Soderstedt by agreeing to correct, repair and rectify its unlawful acts by: (1) providing all members of the proposed Class as defined in Paragraph 62 of the Complaint with notice of this action and the name of Plaintiff Soderstedt's attorneys; (2) restoring to Plaintiff and all members of the proposed Class the monies collected for the Aqua Dots Toys; and (3) implementing policies, procedures and practices to prevent the marketing and sale of toys that are unsafe for children.

Sincerely,

Rosemary M. Rivas

Enc.:   Class Action Complaint

Cc:     Ronald Y. Rothstein (Via U.S. Mail w/o Enclosure)
        Bryna Joyce Roth Dahlin (Via U.S. Mail w/o Enclosure)
        Thomas Joseph Wiegand (Via U.S. Mail w/o Enclosure)
        WINSTON & STRAWN LLP
        35 W. Wacker Driver
        Chicago, Illinois 60601-9703

# EXHIBIT 3

## Part 1 of 5

Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 442679 (N.D.Ill.), 53 UCC Rep.Serv.2d 226, Prod.Liab.Rep. (CCH) P 16,947
**2004 WL 442679 (N.D.Ill.)**

**H** Allstate Ins. Co. v. Daimler Chrysler
N.D.Ill.,2004.

United States District Court,N.D. Illinois, Eastern
Division.
ALLSTATE INSURANCE COMPANY, as subrogee
of David and Theresa Wells, and State Farm
Insurance Company, as subrogee of Anthony and
Laurie Taylor, Plaintiffs,
v.
DAIMLER CHRYSLER, a foreign corporation,
Defendant.
**No. 03 C 6107.**

March 9, 2004.

Patrick Raymond Gareis, Grotefeld & Denenberg,
L.L.C., Chicago, IL, for Plaintiffs.
Timothy V. Hoffman, Anne Cote Fung, Sanchez &
Daniels, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

LEFKOW, J.
*1 Plaintiffs, Allstate Insurance Company
("Allstate") and State Farm Insurance Company
("State Farm"), both Illinois corporations, filed a
four-count complaint against defendant, Daimler
Chrysler ("Chrysler"), alleging negligence (Count I),
strict liability (Count II), breach of implied warranty
of merchantability and fitness for a particular purpose
(Count III), and breach of express warranty (Count
IV). Plaintiffs plead more than $75,000 in
controversy, invoking the jurisdiction of this court
under 28 U.S.C. § 1332(a)(2). Chrysler moves to
dismiss Counts III and IV under Federal Rule of Civil
Procedure 12(b)(6). For the reasons stated below, the
court grants the motion.

MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(6) challenges the sufficiency of the
complaint for failure to state a claim upon which
relief may be granted. *General Elec. Capital Corp. v.
Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th

Cir.1997). Dismissal is appropriate only if it appears
beyond a doubt that the plaintiff can prove no set of
facts in support of his claim that would entitle him to
relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct.
99, 2 L.Ed.2d 80 (1957); *Kennedy v. Nat'l Juvenile
Det. Ass'n,* 187 F.3d 690, 695 (7th Cir.1999). In ruling
on the motion, the court accepts as true all well
pleaded facts alleged in the complaint, and it draws
all reasonable inferences from those facts in favor of
the plaintiff. *Dixon v. Page,* 291 F.3d 485, 486 (7th
Cir.2002); *Jackson v. E.J. Brach Corp.,* 176 F.3d
971, 977 (7th Cir.1999).

ALLEGATIONS OF THE COMPLAINT

This action arises out of property losses to the homes
of David and Theresa Wells ("the Wells") and
Anthony and Laurie Taylor ("the Taylors") resulting
from a fire that began in the engine compartment of a
2000 model Dodge Caravan. Allstate was the
property insurer of the Wells at all times relevant to
this proceeding. State Farm was the property insurer
of the Taylors at all times relevant to this proceeding.

Prior to October 4, 2000, the Wells purchased or
leased a 2000 Dodge Caravan. Daimler Chrysler
designed, manufactured, fabricated, inspected, tested,
supplied, distributed, and/or sold the Dodge Caravan
with the expectation that it would reach the Wells
without substantial change to its condition, and the
vehicle did, in fact, reach the Wells without
substantial change.

On October 4, an electrical short or other failure in
the vehicle's engine compartment caused a fire when
the vehicle was not being operated. The fire caused
property damage to the Wells and their neighbors, the
Taylors. Pursuant to their insurance policies, Allstate
paid the Wells an amount in excess of $235,489.80 as
reimbursement for property damage caused by the
fire, and State Farm paid the Taylors an amount in
excess of $105,687.43. In consideration for these
payments, the Wells and the Taylors subrogated to
Allstate and State Farm all rights, claims, and
interests that they may have against any person or
entity that may be liable for the damages to their
properties. Allstate and State Farm are now seeking
to recover damages from Chrysler in excess of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 442679 (N.D.Ill.), 53 UCC Rep.Serv.2d 226, Prod.Liab.Rep. (CCH) P 16,947
**2004 WL 442679 (N.D.Ill.)**

$341,176.43.

## DISCUSSION

### I. Breach of Implied Warranty of Merchantability and Fitness for a Particular Purpose

*2 In Count III, plaintiffs allege that Chrysler breached implied warranties of merchantability and fitness for a particular purpose. Plaintiffs do not indicate whether they bring this count under the Illinois Uniform Commercial Code ("UCC"), 810 ILCS 5/2-314, or the federal Magnuson-Moss Warranty Act ("the Act"), 15 U.S.C. § 230 et seq. Thus, the court addresses the issue under both state and federal law respectively.

With respect to claims for purely economic losses, the Illinois UCC article II implied warranties give a buyer of goods a potential cause of action only against the immediate seller of the goods. Rothe v. Maloney Cadillac, Inc., 119 Ill.2d 288, 292, 116 Ill.Dec. 207, 518 N.E.2d 1028, 1029 (1988); Szajna v. General Motors Corp., 115 Ill.2d 294, 311, 104 Ill.Dec. 898, 503 N.E.2d 760, 767 (1986)(affirming the applicability of "the privity requirement in implied-warranty economic-loss cases."). Plaintiffs allege only economic losses. Thus, plaintiffs can only maintain a cause of action against the immediate seller of the vehicle. Though plaintiffs do not allege who sold the Dodge Caravan to the Wells, it could not have been Chrysler. Under the Illinois Franchise Act, 815 ILCS 710/1 et seq., a manufacturer cannot sell a vehicle directly to the public; only a franchised dealer can. Thus, plaintiffs fail to state a claim under Illinois law.

Plaintiffs also fail to state a claim under the Magnusson-Moss Act, and for the same reason. Section 2310(d) of the Act allows for suits based on breach of implied warranties. Section 2301(7) defines implied warranties as "an implied warranty arising under State law (as modified by section 2308 and 2304(a) of this title)." 15 U.S.C. § 2301(7). As explained above, the Illinois Supreme Court has squarely held that privity is required for an implied warranty in an economic loss case. Because plaintiffs cannot state a claim for breach of "an implied warranty arising under State law," they cannot state a claim under the Act. See Voelker v. Porsche Cars North America, Inc., 353 F.3d 516, 525 (7th

Cir.2003)(holding that a valid claim for breach of implied warranty under the Act "must allege privity in accordance with applicable state law.").

### II. Breach of Express Warranty

Chrysler has moved to dismiss plaintiffs claim for breach of express warranty because the complaint fails to allege that plaintiffs notified Chrysler of the alleged breach. Section 2-607 of the UCC requires that "a buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy." 810 ILCS 5/2-607(3)(a). This notice requirement will only be excused if (1) the seller already has actual knowledge of the defect of the particular product, or (2) a consumer plaintiff suffers a personal injury, in which case the notice requirement could be satisfied by filing a lawsuit against the seller. Connick v. Suzuki Motor Co. Ltd., 174 Ill.2d 482, 492, 221 Ill.Dec. 389, 675 N.E.2d 584, 589 (Ill.1990). Here, plaintiffs may not rely on either exception. They do not allege that defendant has actual knowledge of the vehicle's defect nor do they allege any personal injury. Because plaintiffs fail to allege that they complied with the notice requirement under section 2-607 of the UCC, their claim for breach of express warranty is dismissed.

### CONCLUSION

*3 For the reasons stated above, Chrysler's Motion to Dismiss Counts II and IV is granted (# 8).

N.D.Ill.,2004.
Allstate Ins. Co. v. Daimler Chrysler
Not Reported in F.Supp.2d, 2004 WL 442679 (N.D.Ill.), 53 UCC Rep.Serv.2d 226, Prod.Liab.Rep. (CCH) P 16,947

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

United States District Court,
N.D. Illinois,
Eastern Division.
AMERICAN MULTI-CINEMA, INC., Plaintiff,
v.
MCL REC, LLC and Intercontinental River East, LLC., Defendant.
No. 06 C 0063.
April 11, 2008.

Robert Andrew Chapman, Attorney at Law, Chicago, IL, Michael J. Abrams, Lathrop & Gage, L.C., Kansas City, MO, for Plaintiff.

Daniel Charles Curth, Freeborn & Peters, Theodore John Koerth, Barnes & Thornburg LLP, Jack J. Carriglio, James Gregory Argionis, Sharon E. Ferguson, Meckler, Bulger & Tilson, Chicago, IL, for Defendant.

### MEMORANDUM AND ORDER

BLANCHE M. MANNING, District Judge.
*1 Cross-claim defendant MCL REC, L.L.C. ("MCL") moves for summary judgment against cross-claim plaintiff Intercontinental River East, L.L.C. ("Intercontinental"). In addition, Intercontinental seeks to strike portions of MCL's Local Rule 56.1 statement. For the reasons stated below, the motion for summary judgment is granted in part and denied in part and Intercontinental's motion to strike is denied.

## I. Facts[FN1]
FN1. The court notes that MCL filed a bound document including its statement of uncontested facts with relevant exhibits attached behind the statement of facts. *See* Dkt. # 64. MCL, however, failed to provide a tabbed version of this bound document and also failed to provide an index to the attached exhibits as required under Local Rule 5.2(c). While such details may seem insignificant to a party, they are critical to this court's ability to quickly locate documents and, indeed, can directly hinder the court's ability to provide a speedy resolution to the motion pending before it.

*General Background*
American Multi-Cinema, Inc. ("AMC") is a Missouri corporation in the business of theatrical film exhibition. In July 1999, AMC leased retail space at the River East Center in Chicago. From April 2004 to January 8, 2006, AMC's landlord at River East was MCL REC, L .L.C. ("MCL"). On January 9, 2006, MCL sold the River East property to cross-claimant Intercontinental, which then became AMC's landlord.

The instant dispute surrounds who must pay for the hot and cold water used by AMC. The hot and cold water provided to the retail tenants in the River East Center, including AMC, is produced by a central system that is owned by Embassy Suites Hotel ("Hotel").

The retail tenant's landlord pays a monthly charge to the Hotel for the hot and cold water that is produced by the central system and delivered to the retail tenants, including AMC. The landlord then sends monthly invoices to the retail tenants for their respective hot and cold water usage.

AMC disputes its obligation to pay its hot and cold water charges, and made payments to MCL under protest. The dispute about the payment of hot and cold water charges has spawned at least two separate lawsuits and several claims, counterclaims and cross-claims as described below.

*Litigation Regarding the Water Charges*

AMC initiated this diversity action on January 6, 2006, by filing a one-count complaint for declaratory judgment against MCL regarding interpretation of the AMC lease.[FN2] Specifically, AMC's lawsuit seeks a judicial determination that Section 12(A) of its lease does not require it to separately pay for its hot and cold water charges. MCL filed a counterclaim against AMC alleging that while it was AMC's landlord, it regularly paid for hot and cold water. The counterclaim alleges that despite repeated demands by MCL, AMC failed to pay the invoices for such charges as issued by MCL, requiring MCL to declare AMC in default before it would tender payment. AMC ultimately paid MCL over $340,000 as "payments under protest" for the hot and cold water invoices from MCL.

FN2. Westwacker, the initial landlord who ultimately sold River East Center to MCL, had previously filed a lawsuit against AMC seeking $233,340.33 plus fees and costs in unpaid hot and cold water charges. That suit by Westwacker, case no. 05 C 7042, was consoli with the instant case and has settled.

On January 9, 2006, MCL sold certain property at Chicago's River East Center to Intercontinental ("Sale"); so, on that date, Intercontinental became AMC's landlord at the River East Center. The Sale was accomplished pursuant to a written Agreement of Purchase and Sale ("Sale Agreement"). Intercontinental did not become a party to the lease with AMC until the closing occurred on Since being assigned the lease on that date, Intercontinental has taken the position, like MCL, that AMC is obligated to pay a separate charge for hot and cold water pursuant to the lease with AMC. In that vein, Intercontinental has issued invoices to AMC pursuant to the lease for AMC's monthly utility charges, but AMC has refused to pay. While Intercontinental inherited the lease with AMC from MCL when it purchased the River East Center, MCL did not tell Intercontinental how to interpret the lease and, in fact, Intercontinental reviewed the lease and made its own interpretations as to what the lease means.

*2 On February 1, 2006, more than three weeks after the closing date of the sale, AMC filed its First Amended Complaint, reasserting its prior claims against MCL and adding a claim for declaratory judgment on the same basis against Intercontinental. On March 30, 2006, Intercontinental filed its answer, affirmative defenses and cross-claim against MCL. The cross-claim seeks indemnification and to be held harmless as well as an award of attorneys' fees, expenses, and costs it incurs in defending against AMC's

First Amended Complaint pursuant to an indemnification provision in the Assignment of Leases and Section 9.5 of the Sale Agreement.

On August 28, 2006, Intercontinental filed a counterclaim against AMC seeking damages that include unpaid hot and cold water charges.

*Relevant Contract Provisions*

The interpretation of several contractual provisions are at issue in this case. These provisions are set forth below. First, as already noted, MCL assigned the AMC Lease to Intercontinental pursuant to a written Assignment of Leases, which was an exhibit to the Sale Agreement. The Assignment of Leases included the following language, pursuant to which MCL was the Assignor and Intercontinental was the Assignee:

Assignor hereby agrees to indemnify, defend and hold Assignee harmless from and against any and all claims, demands, liabilities and/or obligations to the extent arising out of or accruing pursuant to the Leases and Service Contracts prior to the Closing Date ..

Furthermore, Section 9.5 of the Sale Agreement states:

If either party hereto fails to perform any of its obligations under this Agreement or if any dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, whether prior to or after Closing, or if any party defaults in payment of its post-Closing financial obligations under this Agreement, then the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expense incurred by the other party on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs and reasonable attorneys' fees and disbursements.

Section 3.2 of the Sale Agreement describes "Exception Matter." Specifically, it states in relevant part:

the term "Exception Matter" shall refer to a matter, (i) which makes a representation or warranty of Seller contained in this Agreement untrue or incorrect and (ii) which is disclosed to Buyer by written notice from Seller or is otherwise discovered by Buyer before the Closing. If Buyer first obtains actual knowledge of any material Exception Matter prior to Closing, Buyer's sole remedy shall be to terminate this Agreement and obtain a return of the Deposit .... Seller shall have no obligation to cure or remedy any Exception Matter, even if Seller has notified Buyer of Seller's election to attempt to cure or remedy any Exception Matter, and, subject to Buyer's right to terminate this Agreement as set forth above and obtain a return of the Deposit, Seller shall have no liability whatsoever to Buyer with respect to any Exception Matters....If Buyer obtains actual knowledge of any Exception Matter before the Closing, but nonetheless elects to proceed with the acquisition of the Property, Seller shall have no liability with respect to such Exception Matter, notwithstanding any contrary provision, covenant, representation or warranty contained in this Agreement or in any Other Document.

*3 Finally, Section 3.6(b) of the Sale Agreement provides, in part, that:

EXCEPT FOR SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS
SET FORTH HEREIN AND/OR IN OTHER DOCUMENTS ... BUYER IS NOT
RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND
WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ANY SELLER
RELATED PARTIES, OR THEIR AGENTS OR BROKERS, OR ANY OTHER
PERSON ACTING OR PURPORTING TO ACT ON BEHALF OF SELLER, AS TO
ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT
LIMITATION: (x) the Leases, Service Contracts, or other documents or agreements
effecting the Property, or any information contained in any rent roll furnished to Buyer
for the Property."

*Disclosure of the AMC-MCL Dispute*

Jim Bradley ("Bradley") is the head counsel for Intercontinental and was involved in
the due diligence associated with Intercontinental's acquisition of the River East Center
from MCL. Bradley was also involved in the January 9, 2006, closing of
Intercontinental's acquisition of the River East Center from MCL.

On or about January 6, 2006, three days before the closing of Intercontinental's
acquisition of the River East Center from MCL, Bradley received a letter from MCL's
counsel, Richard Traub ("Traub"), forwarding some papers from MCL's file regarding
the hot and chilled water dispute with AMC. The packet contained correspondence
between AMC and MCL "regarding the hot and chilled water dispute with AMC in
connection with" the River East Center. These letters included an August 17, 2005, letter
and a December 12, 2005, letter from AMC's counsel indicating that AMC was paying all
of its overdue heated and chilled water charges in a total amount of $347,943.22 "under
protest." MCL contends that it forwarded the "entire file" regarding this dispute to
Bradley; however, Intercontinental denies this characterization. During his deposition,
Traub indicated that he did not know if Bradley had ever received the correspondence in
the packet prior to January 5, 2006.

Joseph Sweeney, an asset manager for Intercontinental and its designated 30(B)(6)
deposition witness, stated during his deposition that Intercontinental was aware that there
were some disagreements over payment of the hot and chilled water bills, but knew that
the bills had been paid. Sweeney also testified in that context that "tenants complain
about payments on stuff all the time ." Sweeney Dep. at 37, ll. 5-6. Sweeney's "best"
recollection was that he saw some documents relating to the hot and cold water dispute in
the packet received on January 6, 2006 from MCL.

Daniel McLean, President of MCL, testified that as of December 12, 2005, AMC had
paid up and was current with all its heated and chilled water charges at that time.[FN3]
McLean did not know whether Intercontinental ever reviewed the hot and cold water
correspondence between MCL and AMC when MCL made due diligence documents

available to Intercontinental. McLean never personally shared nor instructed anyone at MCL to share this correspondence with Intercontinental. However, McLean testified that he personally discussed MCL's dispute with AMC regarding payment for hot and cold water with Intercontinental's President, Peter Palandjian, and that McLean disclosed to Palandjian that AMC "was disputing the way the utility was being handled." McLean dep. at 29.

FN3. While Intercontinental asserts in its statement of facts that McLean believed that the AMC dispute was resolved prior to Closing, the referenced testimony does not support that position. Indeed, in the cited testimony, while discussing a November 17, 2005, letter from MCL to AMC (which the parties do not appear to have included in their submissions to the court despite addressing the testimony surrounding that letter), Intercontinental asks "[h]ad you disclosed that to Intercontinental, that you were threatening the cutoff of the heat[ed] and chilled water....?" McLean responds, "I disclosed the problem. We thought it was-as this letter indicates, we thought we had finally got a resolution on this problem. And for whatever reason, AMC chose to totally turn around and ignore the solution that we-they had gotten to the point of acknowledging they owed all this money; then they for whatever reason decided that, maybe because they had leverage because there was a sale going on, that they were going to fight some more." McLean Dep. at pp. 45-46. Later, when asked if as of December 12, 2005, the dispute was still "alive," McLean responded that "It wasn't settled, so I guess that means it was alive, yes. Well, it was alive in such that as far as I was concerned they paid up and we were current with what they owed us. They were still reserving their rights to dispute it, but they had actually paid all of the money that was due and owing up that point in time." *Id.* at 48.

*4 MCL's Senior Vice President, Charles Landefeld, did not know if the hot and cold water dispute between Westwacker and AMC (the lawsuit which was filed prior to the Closing Date) was disclosed to Intercontinental prior to the Closing Date.

MCL's Lori Schreiber was the MCL representative in charge of the document reviews performed by Intercontinental prior to the Closing. Schreiber took certain Intercontinental representatives on tours of the property prior to the Closing date. She did not recall whether she ever discussed the AMC hot and cold water dispute with Intercontinental during one of those tours. She also did not remember how many document reviews occurred, when they occurred, or who attended on behalf of Intercontinental.

Diane Schulte is the Senior Vice president of Properties for AMC Realty and the Vice president of Properties for AMC, Inc., and her job duties include overseeing the company's leases and fee properties. Schulte is the AMC employee who is responsible for making the decision to pay or not pay the heated and chilled water invoices sent to AMC by Intercontinental. Schulte did not believe that anyone at AMC had discussions with anyone at Intercontinental prior to the Closing Date regarding the hot and cold water issues.

**II. Summary Judgment Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the movant's asserted facts. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir.2004).

## III. Analysis

A. *Can Intercontinental raise an indemnification claim?*
    As noted above, after the sale from MCL to Intercontinental, AMC amended its complaint to add Intercontinental as a defendant in its declaratory judgment action. Intercontinental's cross-claim against MCL alleges that "with respect to AMC's claims ... and its defense against AMC's claims" it "is entitled to be indemnified and held harmless by MCL pursuant to the indemnification provision executed and made part of the Agreement of Purchase and Sale between MCL and Intercontinental." Cross-claim, Dkt. # 22, ¶ 15 at page 7. That indemnification provision reads as follows:

Assignor hereby agrees to indemnify, defend and hold Assignee harmless from and against any and all claims, demands, liabilities and/or obligations to the extent arising out of or accruing pursuant to the Leases and Service Contracts prior to the Closing Date ....

    *5 MCL asserts that Intercontinental cannot seek relief under the indemnification provision. According to MCL, "[t]o prevail under the [indemnification] provision, for either defense or indemnity, Intercontinental would need to be sued for a claim arising 'prior to the Closing Date.' " MCL concludes that since the only "claim" against Intercontinental is one for declaratory judgment regarding the interpretation of the provisions of the AMC lease, to which Intercontinental did not become a party until the closing, then the claim could not have arisen "prior to the Closing Date" as provided in the indemnification provision. In support, MCL cites to Sweeney's Rule 30(b)(6) deposition testimony which admits that AMC's declaratory judgment action against Intercontinental did not arise until after the closing date.[FN4]

FN4. In its motion to dismiss, the court noted that the issue of indemnification was premature given that there had been no ruling in the underlying action between AMC and MCL/Intercontinental. See Dkt. # 37-1, Case No. 05-7042. However, consideration of Intercontinental's request for defense costs under this provision is ripe and the issues of indemnification and defense require consideration of the same evidence. The court will thus decide them at the same time. See *City of Chicago v. Arvinmeritor Inc.*, No. 05 C

6738, 2006 WL 3431910, at *6 (N.D.Ill. Nov.28, 2006) (given court's interest in judicial economy and fact that underlying action was pending before that court as opposed to a state court, court would consider the duty to indemnify claim along with the duty to defend).

"The ultimate purpose of indemnification is to 'shift[ ] the entire responsibility from the party who has been compelled to pay the plaintiff's loss to another who actually was at fault.' " _BCS Ins. Co. v. Guy Carpenter & Co., Inc._, 490 F.3d 597, 603 (7th Cir.2007) ( quoting _Kerschner v. Weiss & Co._, 282 Ill.App.3d 497, 217 Ill.Dec. 775, 667 N.E.2d 1351, 1355 (1996)). Generally, a request for indemnification may make most sense in the context of a tort claim where there may be a party "at fault." _See, e.g., Foskett v. Great WolfResorts, Inc._, 518 F.3d 518, 2008 WL 585032 (7th Cir. March 5, 2008).

Here, however, MCL (the original landlord) and Intercontinental (the landlord post-closing) have independently interpreted the relevant lease provision under which they seek to hold AMC liable for hot and cold water charges. If AMC succeeds on its declaratory judgment action against MCL and Intercontinental as to the interpretation of the lease provision, then MCL and Intercontinental will be held responsible only to the extent that each was a party to the lease. In other words, Intercontinental will only be liable for hot and cold water charges that AMC incurred _after_ the Closing Date, when Intercontinental became the owner of the property. _See_ AMC's First Amended Complaint, Dkt. # 8-1, at ¶¶ 10 and 11 ("10. Defendant MCL was a successor in interest to River East, L.L.C. under the Lease and defendant MCL was, _during its period of ownership of the Project,_ AMC's 'Landlord' under the Lease" and "11. _Intercontinental is the current 'Landlord' under the Lease_ (having succeeded to the interest of defendant MCL under the Lease) and AMC continues to be the tenant under the Lease") (emphasis added).

Thus, Intercontinental cannot establish that a liability or obligation _on its part_ stemming from AMC's successful prosecution of its declaratory judgment action "arose out of or accrued" pursuant to the lease _prior_ to the Closing Date, as the indemnification provision requires.[FN5] The court, therefore, concludes that Intercontinental may not seek indemnification in connection with AMC's declaratory judgment action against it. Accordingly, MCL's motion for summary judgment as to the indemnification provision is granted.

FN5. The parties do not discuss the choice of law issue; however, the court will apply Illinois law given that the Sale Agreement states that the "Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois." Sale Agreement, Intercontinental Exh. E-30, Section 9.8. Under Illinois law, the court's task in interpreting the contract "start[s] with the old saw that [it] begin[s] [its] analysis with the language of the contract itself. If the language unambiguously answers the question at issue, the inquiry is over." _Emergency Medical Care, Inc. v. Marion Memorial Hosp._, 94 F.3d 1059, 1061 (7th Cir.1996) (citations omitted).

B. _Does the Sale Agreement bar Intercontinental from seeking any relief from MCL?_
      *6 As noted above, Section 3.2 of the Sale Agreement provides as follows:

**Section 3.2 No Liability for Exception Matters**

As used herein, the term "Exception Matter" shall refer to a matter, (i) which makes a representation or warranty of Seller contained in this Agreement untrue or incorrect and (ii) which is disclosed to Buyer by written notice from Seller or is otherwise discovered by Buyer before the Closing. If Buyer first obtains actual knowledge of any material Exception Matter prior to Closing, Buyer's sole remedy shall be to terminate this Agreement and obtain a return of the Deposit .... If Buyer obtains actual knowledge of any Exception Matter before the Closing, but nonetheless elects to proceed with the acquisition of the Property, Seller shall have no liability with respect to such Exception Matter, notwithstanding any contrary provision, covenant, representation or warranty contained in this Agreement or in any Other Document.

MCL argues that Intercontinental's cross-claim against it is barred by the express terms of Section 3.2.[FN6] MCL's argument contains several steps. First, MCL concedes that it failed to formally disclose AMC's material defaults under the AMC Lease as required in Section 3.1(e) of the Sale Agreement and failed to formally disclose that there was threatened litigation between AMC and MCL as required in Section 3.1(g) of the Sale Agreement. MCL also concedes that under Section 3.2(i), the existence of these defaults and threatened litigation and its failure to formally disclose them makes its representations and warranties under Sections 3.1(e) and 3.1(g) untrue or incorrect. MCL then asserts that its failure to formally disclose the defaults and the threatened litigation are not actionable because Intercontinental knew about these issues prior to closing. Specifically, MCL contends that Intercontinental knew about the defaults and threatened litigation prior to the Closing Date as required by Section 3.2(ii), so the defaults and threatened litigation are "Exception Matter" pursuant to Section 3.2. Section 3.2 provides as Intercontinental's "sole remedy" the right to terminate the Sale Agreement and recover its deposit. MCL then notes that Intercontinental did not terminate and instead proceeded with the purchase. MCL thus concludes that by doing so, Intercontinental waived its "sole remedy" to terminate the contract as to MCL. Based on this reasoning, MCL argues that Intercontinental's cross-claim for defense and indemnification must fail.

FN6. Intercontinental argues that MCL's reliance on Section 3.2 should have been pled as an affirmative defense, and, because it was not, it was waived. Under Fed.R.Civ.P. 8(C), "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: accord and satisfaction; arbitration and award; assumption of risk; contributory negligence; discharge in bankruptcy; duress; estoppel; failure of consideration; fraud; illegality; injury by fellow servant; laches; license; payment; release; res judicata; statute of frauds; statute of limitations; and waiver." If a party fails to raise an affirmative defense at the time it answers the complaint, the defense is deemed waived. *Castro v. Chicago Housing Authority,* 360 F.3d 721 (7th Cir.2004). Intercontinental, however, fails to cite any caselaw in support of its argument that Section 3.2 of the Sale Agreement should have been raised as an affirmative defense. Given that MCL's reliance on Section 3.2 would be a non-enumerated affirmative defense, if at all, and that such a determination could require a nuanced analysis to ascertain whether it

indeed constitutes an affirmative defense, the court concludes that Intercontinental has forfeited this argument, at least with respect to the instant motion for summary judgment.

Intercontinental responds that Section 3.2 requires that it have "actual knowledge" of any material defaults or threatened litigation and because it did not have actual knowledge of either, Section 3.2 is inapplicable.

"Actual knowledge is distinct from constructive knowledge." *In re County Treasurer,* 302 Ill.App.3d 639, 236 Ill.Dec. 215, 707 N.E.2d 60, 64-65 (Ill.App.Ct.1998) (citations omitted). Black's Law Dictionary defines "actual" as something real in opposition to that which is constructive or speculative. *Black's Law Dictionary* 888 (8th ed.2004). Constructive knowledge, on the other hand, is defined as "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law." *Id.;* *U.S. v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes, Oneida,* 965 F.2d 311, 315-16 (7th Cir.1992) (noting that statutory provision at issue required "actual" knowledge as opposed to what claimant should have known.).

*7 As an initial matter, while the parties discuss disclosure of material defaults, neither points to any evidence that a material default existed as of the Closing Date that should have been (and was not) disclosed in the Sale Agreement such that Section 3.2 of the Sale Agreement would come into play. Indeed, the evidence shows that both parties believed AMC to have fully paid its charges for hot and cold water. *See* Sweeney dep. at 37 ("We were aware that there was some disagreement over payment of the hot and chilled water bills, but we also knew that they were paid."); McLean dep. at 48 ("They were still reserving their rights to dispute it, but [AMC] actually had paid all the money that was due and owing up to that point in time."). As such, the court will confine itself to an analysis of whether Intercontinental had actual notice of threatened litigation despite MCL's failure to disclose it pursuant to Section 3.1(g) of the Sale Agreement.

The parties discuss two main points at which Intercontinental could have received actual notice of the hot and cold water dispute. The first is Schedule 3 of the Sale Agreement, which includes a list of any pending or threatened litigation. It is undisputed that the hot and cold water dispute between MCL and AMC was not included where it should have been on this Schedule, even though there was a mention on another part of the Schedule of a dispute between MCL and the *Hotel,* not AMC. MCL admits in its reply brief that Schedule 3 did not provide notice of the hot and cold water dispute. *See* Reply at 6 ("regardless of the fact that Schedule 3 of the Sale Agreement failed to disclose the dispute...."). *See also* MCL's Local Rule 56.1(a)(3) Statement of Facts, paragraph 40 ("MCL did not disclose its dispute with AMC regarding the interpretation of the Lease on Schedule 3 of the Sale Agreement."). Accordingly, the court need not address this possible avenue of disclosure any further.<u>FN7</u>

FN7. The court notes, however, that even assuming the Schedule 3 disclosures were at issue, it would not be persuaded by Intercontinental's attempt to malign MCL for relying on Section 3.2 of the Sale Agreement. In particular, Intercontinental argues that "[i]ncredibly, despite its false and deceptive disclosure [on Schedule 3] in the [Sale] Agreement, MCL now asks this Court to condone and reward its behavior by allowing it

to rely on Section 3.2 of the [Sale] Agreement to avoid its duty to defend and to indemnify." With certain qualifications, Section 3.2 appears to allow MCL to avoid liability for untrue or incorrect representations it made in the Sale Agreement if Intercontinental had actual knowledge of that incorrect or untrue representation. The court can hardly fault MCL for relying on a contract provision that was negotiated and agreed to by the parties. If Intercontinental did not want MCL to rely on the provision it should have either negotiated it out of the contract or not signed the Sale Agreement.

The second point at which Intercontinental could have obtained actual notice of the hot and cold water dispute was in the packet of information that Jim Bradley, Intercontinental's head counsel, received on January 6, 2006, three days before the Closing Date, from MCL's counsel, Richard Traub. It is not entirely clear from the parties' statement of facts and responses thereto exactly what was contained in this packet. However, it is undisputed that this packet of information included at least a cover letter dated January 5, 2006, stating "Enclosed please find copies of correspondence from our file regarding the hot and chilled water dispute with AMC in connection with the above-captioned site." The packet also included an August 17, 2005, letter from AMC's counsel to MCL enclosing a $300,000 check which was "to be applied to the invoices for heated and chilled water." The August 17, letter further notes that "payment to MCL REC, LLC is being made 'Under Protest,' " in that "[i]f it is determined that this charge was not payable by AMC pursuant to its Lease, or if the enclosed check exceeds the amount payable by AMC under the Lease, AMC reserves the right to offset the overpayment against subsequent installments of rent payable under the Lease."

*8 In addition, the packet included a December 12, 2005, letter, which was sent less than a month before the Closing Date, from AMC to MCL. It disputes MCL's position that AMC has defaulted under the lease by failing to pay for hot and cold water and encloses another check "under protest" for the outstanding amount of $47,943.22. It goes on to state that:

This letter will also serve as AMC's notice to you pursuant to Article 34(B) of the AMC Lease that AMC disputes the alleged default in your December 2, 2005, letter and reserves the right to exercise any of its rights and remedies under Article 34(B) of the AMC Lease, in addition to any and all other rights and remedies available to AMC under the AMC Lease, and at law and in equity.

Further, this letter will be deemed to revoke any and all prior settlement offers made by AMC (or its attorneys or agents) with respect to the hot and chilled water expenses dispute.

Finally, AMC has informed me that they would consider submitting the hot and chilled water expenses dispute to mediation, provided a "stand still" agreement is agreed upon by you and AMC.

MCL points to the above-described correspondence in an attempt to demonstrate that "[i]t is ... indisputable that Intercontinental did, in fact, receive actual notice of the existence of a material dispute between AMC and MCL regarding payment for heated

and chilled water prior to the Closing and that the dispute was serious enough to constitute an Exception Matter.'"

The court finds the Seventh Circuit's opinion in *Frey v. Fraser Yachts*, 29 F.3d 1153 (7th Cir.1994), instructive. In that case, unbeknownst to the seller, a yacht broker had also acted as a broker for the buyer. After the sale, the seller sued the broker and his company for breach of fiduciary duty and an accounting. The district court granted summary judgment to the defendants concluding that because Frey's lawyer knew about the broker's commission from the buyer, such knowledge could be imputed to Frey. The Seventh Circuit reversed and remanded noting that a broker can only act as a representative for both the buyer and seller when both parties are "fully aware of such dual representation and consent to it." *Id.* at 1156 (citations omitted).

The Seventh Circuit rejected the defendants' argument that a letter sent by Frey to the broker that referred to the buyers as "your clients" constituted proof of Frey's actual knowledge of the dual representation. After noting that Frey had testified that he used the term "your clients" to refer to the Flynns as the buyers, "not that [the broker] represented them," the Seventh Circuit concluded that:

There are many possible inferences one could draw from Frey's description of the Flynns as McCarvill's "clients," and although a jury might question Frey's choice of words, the inference most favorable to Frey is that he was merely referring to the individuals McCarvill had produced as potential buyers. Therefore, Frey's letter does not conclusively prove that Frey had *actual knowledge* of McCarvill's dual representation.

*9 *Id.* at 1157 (emphasis added).

The defendants in *Frey* also attempted to rely on a statement by the boat inspector that Frey told him that McGarvill represented the Flynns. Specifically, the boat inspector stated that Frey told him that the broker was " 'the broker offering [the yacht] in trade .' " The Seventh Circuit found "[the boat inspector's] testimony is simply not definite or unambiguous enough to support summary judgment for the defendants on the grounds that Frey *actually knew* McCarvill represented the Flynns, especially in light of Frey's denial that he made the statement." *Id.* at 1158 (emphasis added). The Seventh Circuit ultimately concluded that "[a]t the very least, there is a genuine issue of material fact as to Frey's actual knowledge." *Id.*

Here, genuine issues of material fact exist for much the same reasons. [FN8] While MCL points to the letters that were sent to Intercontinental regarding the water dispute which it believes establishes actual knowledge, Intercontinental's 30(b)(6) witness, Joseph Sweeney, testified that he believed the letters represented a typical tenant complaint and that it was his understanding that all of the outstanding bills had been paid. As in *Frey*, Sweeney's testimony raises a genuine issue of material fact as to whether Intercontinental had actual knowledge of pending or threatened litigation. *See Quickie Mfg. Corp. v. Libman Co.*, No. 04-2229, 2008 WL 630633, at *2 (C.D.Ill. March 2, 2008) (in patent case where actual knowledge of prior art had to be proved in order to show inequitable conduct, summary judgment was denied and the trier of fact had to assess the credibility

of the witnesses where patent applicants and prosecution attorney testified they did not know of the prior art and the plaintiff's president disclaimed knowledge of the prior art even though his father had been granted some of the undisclosed patents). Therefore, MCL's motion for summary judgment based on Section 3.2 of the Sale Agreement is denied.

<u>FN8.</u> Notably, MCL fails to cite any caselaw in support of its position that the letters provided "actual notice" of threatened litigation between AMC and MCL as a matter of law. Moreover, in its reply, MCL fails to distinguish the *Frey* case even though it is featured prominently in Intercontinental's response.

C. *Intercontinental's Reliance on Section 9.5*

MCL also seeks summary judgment as to Intercontinental's reliance on Section 9.5 of the Sale Agreement, which states:

If either party hereto fails to perform any of its obligations under this Agreement or if any dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, whether prior to or after Closing, or if any party defaults in payment of its post-Closing financial obligations under this Agreement, then the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expense incurred by the other party on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs and reasonable attorneys' fees and disbursements.

According to MCL, Intercontinental cannot seek payment of costs under this section because it cannot present any evidence of breach, default or failure to perform by MCL. But MCL's argument completely reads out a portion of the above provision. Specifically, Section 9 .5 states that if either party fails to perform *"or if any dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this agreement ...* then the defaulting party or the party not prevailing in such dispute, ..., shall pay any and all costs and expense by the other party...." Clearly, as evidenced by this memorandum and order, the parties dispute the interpretation of certain provisions of the Sale Agreement. Thus, even if Intercontinental could not show default or failure to perform on MCL's part, it cannot be disputed that there is a disagreement at least as to the interpretation of the indemnification provision and Section 3.2. Therefore, MCL's motion for summary judgment as to Section 9.5 on the ground that Intercontinental has failed to show failure to perform or default is denied.

E. *Are there quantifiable damages such that Intercontinental can seek indemnification?*

*10 Finally, MCL seeks summary judgment as to Intercontinental's indemnification claim against it on two other grounds. First, it argues that since its own interpretation of the lease with AMC regarding the payment of hot and cold water did not have any bearing on how Intercontinental chose to interpret the lease, then it would be "inequitable" to require MCL to indemnify Intercontinental for its interpretation.<u>FN9</u> In its reply, MCL goes on to contend that "[u]nder this perverse scenario, there is no incentive

for Intercontinental to be reasonable in its interpretation of the Lease, nor is there any incentive to settle the case based on a negotiated resolution." According to MCL, Intercontinental has no reason to negotiate in good-faith with AMC because it can simply persist in its own interpretation of the lease (i.e., that AMC must pay for the hot and cold water) knowing that if the court rules against it, then it can simply pass along the "damages" to MCL under the indemnification provision.

FN9. In a related argument, MCL contends that because Intercontinental agreed under Section 3.6 of the Sale Agreement that it was not relying on any other representations or warranties by MCL except those made in the Section 3.1 of the Sale Agreement, and Section 3.1 contains no representation regarding the interpretation of the AMC lease, then Intercontinental cannot seek indemnification. The court need not rule on this argument as it has already concluded that Intercontinental cannot rely on the indemnification provision. Nevertheless, the court finds this argument to be without merit as Intercontinental's attempt to rely on the indemnification provision was not based on a purported representation made by MCL.

As an initial matter, this argument is unpersuasive because both MCL and Intercontinental took the same position that AMC was required to pay separately for hot and cold water charges. Thus, if Intercontinental's interpretation of the lease is unreasonable, then so was MCL's. Second, while MCL takes issue with the indemnification provision as a matter of public policy because of the indemnitee's purported misguided motivations, MCL points to no evidence indicating that it did not enter into this contract freely and willingly and after thorough negotiations by its attorneys. If MCL did not like the provision, it should not have signed the Sale Agreement. Finally, and perhaps most importantly, MCL has cited no caselaw or authority whatsoever in support of its argument regarding the alleged inequity of the provision. In any event, the court has already concluded that Intercontinental cannot rely on the indemnification provision in this instance, so parsing the indemnification clause further does not advance MCL's position.

MCL also argues that because AMC's claim for declaratory relief against Intercontinental does not seek monetary relief, there is no basis for requiring MCL to indemnify Intercontinental. In other words, MCL's argument goes, because a ruling on AMC's declaratory judgment action will not lead to any quantifiable damages, Intercontinental's claim for indemnification must fail. As an initial matter, MCL fails to support this argument with any citation to authority. Moreover, as noted by Intercontinental, the "damages" it will suffer are the hot and cold water charges (purportedly over $600,000 worth) that Intercontinental has already paid and will be responsible for. In any event, as with the previous argument, the court need not rule on this argument given that it has already concluded that Intercontinental cannot rely on the indemnification provision.

### III. Conclusion

For the reasons stated herein, MCL's motion for summary judgment [60-1] is granted in part and denied in part. Intercontinental's motion to strike certain portions of MCL's

statement of facts is denied. The court strongly encourages all parties to this lawsuit, including AMC, to discuss settlement, whether it be with or without the assistance of the magistrate judge.

N.D.Ill.,2008.
American Multi-Cinema, Inc. v. MCL REC, LLC
Slip Copy, 2008 WL 1744426 (N.D.Ill.)


Motions, Pleadings and Filings (Back to top)

• 2008 WL 685009 (Trial Motion, Memorandum and Affidavit) MCL Rec, L.L.C.'s Memorandum in Support of its Rule 56(b) Motion for Summary Judgment on Intercontinental's Cross-Claim (Jan. 29, 2008) 🖺 Original Image of this Document (PDF)
• 2008 WL 685010 (Trial Motion, Memorandum and Affidavit) Mcl Rec, L.L.C.'s Reply Memorandum in Support of its Rule 56(b) Motion for Summary Judgment on Intercontal's Cross-Claim (Jan. 29, 2008) 🖺 Original Image of this Document (PDF)
• 2008 WL 685011 (Trial Motion, Memorandum and Affidavit) Intercontinental River East, L.L.C.'s Memorandum In Opposition to MCL REC, L.L.C.'s Motion for Summary Judgment On Intercontinental's Cross-claim (Jan. 29, 2008) 🖺 Original Image of this Document (PDF)
• 2006 WL 1039935 (Trial Pleading) Defendant, Intercontinental River East, L.L.C.'s, Answer and Affirmative Defense to Plaintiff AMC's First Amended Complaint and Cross-Claim Against MCL Rec, L.L.C. (Mar. 30, 2006) 🖺 Original Image of this Document (PDF)
• 2006 WL 1039933 (Trial Pleading) Defendant MCL Rec, L.L.C.'s Answer, Affirmative Defenses and Counterclaim to Plaintiff's First Amended Complaint (Mar. 2, 2006) 🖺 Original Image of this Document (PDF)
• 2006 WL 5462328 (Trial Pleading) Plaintiff's First Amended Complaint (Feb. 1, 2006) 🖺 Original Image of this Document (PDF)
• 2006 WL 428617 (Trial Pleading) Complaint (Jan. 6, 2006) 🖺 Original Image of this Document with Appendix (PDF)
• 1:06cv00063 (Docket) (Jan. 6, 2006)
END OF DOCUMENT

**Westlaw.**

Slip Copy
Slip Copy, 2008 WL 819335 (W.D.Okla.)
**2008 WL 819335 (W.D.Okla.)**

**H**API Enterprises, Inc. v. American Standard, Inc.
W.D.Okla.,2008.
Only the Westlaw citation is currently available.
United States District Court,W.D. Oklahoma.
API ENTERPRISES, INC., Plaintiff,
v.
AMERICAN STANDARD, INC., d.b.a. TRANE,
Defendant.
**No. CIV-07-853-M.**

March 25, 2008.

Hugh A. Baysinger, Stephen C. Hailey, Pierce Couch
Hendrickson Baysinger & Green, Oklahoma City,
OK, for Plaintiff.
Brandon L. Buchanan, Ross A. Plourde, Mcafee &
Taft, Oklahoma City, OK, for Defendant.

***ORDER***

VICKI MILES-LaGRANGE, District Judge.
**\*1** Before the Court is defendant's Motion for
Summary Judgment [docket no. 17], filed February 1,
2008. On February 19, 2008, plaintiff filed its
response, and on February 28, 2008, defendant filed
its reply. Based upon the parties' submissions, the
Court makes its determination.

*I. INTRODUCTION*

This litigation arises in connection with the October
2003 sale by defendant of an air cooled water chiller
to plaintiff. The chiller was installed at plaintiff's
place of business, ultimately froze and damaged the
equipment during a wave of cold weather in February
2005. Plaintiff commenced this action against
defendant in the District Court of Oklahoma County.
This action was removed to the United States District
Court for the Western District of Oklahoma on the
basis of diversity. Plaintiff alleges claims of
unconscionability, breach of express and implied
warranties, misrepresentation, breach of fiduciary
duty and violation of the Oklahoma Consumer
Protection Act. Defendant now moves for summary
judgment as to plaintiff's claims.

*II. SUMMARY JUDGMENT STANDARD*

"Summary judgment is appropriate if the record
shows that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law. The moving party is
entitled to summary judgment where the record taken
as a whole could not lead a rational trier of fact to
find for the non-moving party. When applying this
standard, [the Court] examines the record and
reasonable inferences drawn therefrom in the light
most favorable to the non-moving party."*19 Solid
Waste Dep't Mechanics v. City of Albuquerque, 156
F.3d 1068, 1071-72 (10th Cir.1998)* (internal
citations and quotations omitted).

"Only disputes over facts that might affect the
outcome of the suit under the governing law will
properly preclude the entry of summary judgment.
Furthermore, the non-movant has a burden of doing
more than simply showing there is some
metaphysical doubt as to the material facts. Rather,
the relevant inquiry is whether the evidence presents
a sufficient disagreement to require submission to a
jury or whether it is so one-sided that one party must
prevail as a matter of law."*Neustrom v. Union Pacific
R.R. Co., 156 F.3d 1057, 1066 (10th Cir.1998)*
(internal citations and quotations omitted).

*III. DISCUSSION*

*A. Unconscionable Contract or Clause*

The Oklahoma statute which governs unconscionable
contract or clause provides:

> If the court as a matter of law finds the contract or
> any clause of the contract to have been
> unconscionable at the time it was made the court
> may refuse to enforce the contract, or it may
> enforce the remainder of the contract without the
> unconscionable clause, or it may so limit the
> application of any unconscionable clause as to
> avoid any unconscionable result.

OKLA. STAT. tit. 12A, § 2-302. The test of whether
a contractual provision is unconscionable is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

suggested by Official Comment 1 to <u>OKLA. STAT. tit. 12A, § 2-302</u>. In pertinent part, that comment states:

> **\*2** The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the causes involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principle is one of the prevention of oppression and unfair surprise ... and not of disturbance of allocation of risks because of superior bargaining power.

In this case, plaintiff alleges there is an issue of fact concerning whether the warranty provision [FN1] is unconscionable. Plaintiff cites an additional factor the Court may look to for unconscionability: "where one party has been misled as to the nature of the bargain." <u>Phillips Mach. Co. v. LeBlonde, Inc., 494 F.Supp. 318, 323 (N.D.Okla.1980)</u>. Specifically, plaintiff contends that defendant misled its representative by proposing to sell a replacement chiller which did not meet the needs of plaintiff.

> FN1. *See* Defendant's Motion for Summary Judgment, Exhibit 1 for Warranty and Liability, Warranty Disclaimer, and Liability Disclaimer provisions.

Having reviewed the parties' submissions, the Court finds that the warranty provision at issue does not rise to the level of unconscionability. Specifically, plaintiff negotiated the purchase price of the chiller from over $150,000 down to $105,000, a nearly one-third reduction of the purchase price. In viewing the evidence in the light most favorable to plaintiff, the evidence tends to show that plaintiff negotiated a significant reduction in the purchase price in exchange for the elimination of an extended warranty contractual provision. Thus, the Court finds the resulting contract reflects a bargained-for exchange and allocation of risk which was not so one-sided to be considered unconscionable. Further, even if the Court adopts the additional factor plaintiff cited, the Court finds plaintiff finds failed to offer any evidentiary support that it was misled. Accordingly, the Court grants defendant's motion for summary judgment as to plaintiff's unconscionable contract or clause claim.

*B. Fiduciary Duty*

Under Oklahoma law, "the existence of ... a fiduciary relationship is a question of fact which must be proven by the party asserting the relationship." <u>Steinbrugge v. Haddock, 281 F.2d 871, 872 (10th Cir.1960)</u>. "Fiduciary relationships are not limited to any specific legal relationship, but can arise anytime the facts and circumstances surrounding a relationship would allow a reasonably prudent person to repose confidence in another person." <u>Quinlan v. Koch Indus., Inc., 25 F.3d 936, 642 (10th Cir.1994)</u> (internal citations omitted). The Tenth Circuit reviewed Oklahoma law concerning fiduciary relationships:

> Certainly, most contracts involve a degree of the factors indicative of reposed trust and confidence. For example, all contracts ultimately involve mutual intent, and many involve disparate bargaining power; however, only those instances which involve a veritable substitution of the will of the defendant for that of the plaintiff in material matters involved in the transaction will give rise to fiduciary duties.

**\*3** <u>Devery Implement Co. v. J.I. Case Co., 944 F.2d 724, 730 (10th Cir.1991)</u> (internal citations omitted).

In this case, plaintiff alleges a fiduciary relationship with defendant based upon the parties' exclusive deals over the years. Plaintiff contends that all of its chillers were purchased from defendant and serviced by defendant, and, therefore, an attitude of trust and confidence in defendant arose.

Having reviewed the parties' submissions, and viewing the evidence in the light most favorable to plaintiff, the Court finds that no fiduciary relationship exists between plaintiff and defendant as a matter of law. As previously stated, the evidence sufficiently demonstrates that plaintiff negotiated a nearly one-third discount in the purchase price of the now disputed equipment. Given this circumstance, there is hardly a veritable substitution of the will of defendant for that of plaintiff on such a material matter which would give rise to a fiduciary duty. Furthermore, plaintiff has cited no cases in which a seller of goods was held to be a fiduciary of the purchaser. Even if the parties dealings over the years were sufficient to give rise to a fiduciary relationship, the result would

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

be to extend liability to near limitless dimensions, and the Court declines to do so. Accordingly, the Court grants defendant's motion for summary judgment as to plaintiff's fiduciary duty claim.

*C. Misrepresentation and/or Fraud*

"To pursue [a] claim for fraud, [plaintiff] must prove a) Defendant made a material representation; b) that the representation was false; c) Defendant knew it was false or made it recklessly, without regard for its truth; d) Defendant made it with the intention that Plaintiff act upon it; and e) injury was suffered by Plaintiff as a result."*McCain v. Combined Commc'n Corp. of Okla, Inc.*, 975 P.2d 865, 867 (citing OKLA. STAT. tit. 76, § 3). One class of statements that courts have uniformly held not to be actionable are those statements described as sales talk or "puffing".*See Bankers' Trust Co. v. Brown*, 107 P.3d 609, 614 (Okla.Civ.App.2005) (representations that 12.875% interest rate was reasonable and that loan terms and monthly payments were reasonable relative to borrower's financial situation "would be mere marketplace puffing"). To distinguish between a false representation and puffing the statement is analyzed with respect to whether the representation is about existing facts or future events:

> Generally, a false representation must be regarding existing facts and not to future events. An exception to this general rule is thus: Such prophecy does, however, always carry an implied representation that the speaker knows of no facts which will prevent it from being accomplished; and as in the case of any other opinion, it has been held that there may be reasonable reliance upon the assertion where the speaker purports to have special knowledge of facts which would justify the expectations he is raising. One court has stated: The fact that statements relate to the future will not preclude liability for fraud if such statements were intended and accepted as representations of fact and involved a matter peculiar within the speaker's knowledge.

*4 *Hall v. Edge*, 782 P.2d 122, 128 n. 4 (Okla.1989) (internal citations and quotations omitted).

In this case, plaintiff alleges that defendant represented that the chiller did not require a manual switch to protect the unit from freezing and plaintiff

relied on defendant's representation that the chiller's automatic switch would prevent the unit from freezing. The chiller, however, ultimately froze up due to the malfunctioning of the automatic switch. For its part, defendant contends that its representations that the chiller would last a long time and that the unit's control circuit would automatically cause the evaporator pump to function when necessary (and therefore a manual switch was unnecessary) fall into the category of puffing.

Having reviewed the parties' submissions, and viewing the evidence in the light most favorable to plaintiff, the Court finds there is a genuine issue of material fact as to whether defendant's representations were misrepresentations or mere puffery, and whether plaintiff relied on these representations to its detriment. Specifically, the Court finds sufficient evidentiary support to demonstrate: (1) defendant represented to plaintiff that the chiller did not require a manual switch and prevented freezing automatically; (2) defendant's representations were false; (3) defendant knew it's representations were false or made in reckless disregard for the truth; (4) plaintiff reasonably relied on defendant's representations; and (5) plaintiff suffered injury as a result. Further, even if the Court accepts defendant's contention that statements concerning future events are puffing, the "fact that statements relate to the future will not preclude liability for fraud if such statements were intended and accepted as representations of fact and involved a matter peculiarly within the speaker's knowledge".*Id.* at 128.Accordingly, the Court DENIES plaintiff's motion for summary judgment as to plaintiff's misrepresentation and/or fraud claim.

*D. Oklahoma Consumer Protection Act*

Oklahoma recognizes a separate cause of action pertaining to unlawful practices. *See*OKLA. STAT. tit. 15, § 753, *et seq.* The relevant statute, in pertinent part, states as follows:

> A person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act, Section 751 et seq. of this title, when, in the course of the person's business, the person:
>
> ...

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 4
Slip Copy, 2008 WL 819335 (W.D.Okla.)
**2008 WL 819335 (W.D.Okla.)**

(20) Commits an unfair or deceptive trade practice as defined in Section 752 of this title[.]

<u>OKLA. STAT. tit. 15 § 753(20).</u>Section 752 of the Oklahoma Consumer Protection Act defines deceptive trade practice and unfair trade practice as follows:

13.   "Deceptive   trade   practice"   means   a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person. Such a practice may occur before, during or after a consumer transaction is entered into and may be written or oral;

**\*5** 14. "Unfair trade practice" means any practice which offends established public policy or if the practice  is  immoral,  unethical,  oppressive, unscrupulous   or   substantially   injurious   to consumers;

<u>OKLA. STAT. tit. 15 § 752.</u>

Having reviewed the parties' submissions, and viewing the evidence in the light most favorable to plaintiff, the Court finds there is a genuine issue of material fact as to whether defendant violated the Oklahoma Consumer Protection Act. Specifically, the Court finds plaintiff has offered sufficient evidence to demonstrate that defendant either deceived or could have reasonably expected to deceive or mislead plaintiff into not requiring a manual override switch be installed on the chiller. Accordingly, the Court denies defendant's motion for summary judgment as to plaintiff's Oklahoma Consumer Protection Act claim.

*E. Remaining Issues*

Plaintiff asserts that a genuine issue of material fact exists concerning whether the limited warranty provision was provided to it along with the chiller purchase proposal which was ultimately accepted. For its part, defendant contends that the relevant provision was included as part of plaintiff's petition, and thus, plaintiff were informed of this provision. Paragraph 14 of plaintiff's petition provides:

The sales contract's "terms and conditions" provide for a one-year express warranty covering materials and workmanship, waiving all other warranties, including the implied warranties of merchantability and fitness for a particular purpose.

A plaintiff is bound by allegations contained in its petition. *Jones v. Hopper,* 410 F.2d 1323 (10th Cir., 1969)."Pleadings are judicial admissions and a party may use them to render facts indisputable."*Rhone-Poulenc Argo, S.A. v. DeKalb Genetics Corp.,* 272 F.3d 1335, 1353 (Fed.Cir.2001) (abrogated on other grounds). Allegations in a complaint "conclusively established" the facts alleged. *Faust v. The Travelers,* 55 F.3d 471, 474 (9th Cir.1995).

As referenced above, plaintiff referenced express and implied warranty provisions in its petition. Having reviewed the parties' submissions, the Court finds that no genuine issue of material fact exists concerning   the   limited   warranty   provision. Specifically, plaintiff's allegation concerning the limited warranty provision is conclusively established based on its petition. Accordingly, the Court grants defendant's motion for summary judgment as to the limited warranty provision.

*IV. CONCLUSION*

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART defendant's Motion for Summary Judgment as follows:

(A) The Court GRANTS the Motion for Summary Judgment as to plaintiff's unconscionable contract or clause, fiduciary duty and limited warranty claims, and

(B) The Court DENIES the Motion for Summary Judgment as to plaintiff's misrepresentation and/or fraud, and Oklahoma Consumer Protection Act claims.

**IT IS SO ORDERED.**

W.D.Okla.,2008.
API Enterprises, Inc. v. American Standard, Inc.
Slip Copy, 2008 WL 819335 (W.D.Okla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**2004 WL 515536 (S.D.N.Y.)**

▷Brazier v. Hasbro, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
Kevin BRAZIER, individually and as personal
representative of the Estate of Robert J. Brazier,
deceased, known as "Robbie," Plaintiffs,
v.
HASBRO, INC. and Toys "R" US, Inc., Defendants.
**No. 99 Civ.11258(MBM).**

March 16, 2004.

**Background:** Personal representative of child's estate
brought diversity action against toy manufacturer
claiming strict product liability, breach of warranty,
negligence, and punitive damages.

**Holdings:** On manufacturer's motion for summary
judgment, the District Court, Mukasey, J., held that:
(1) negligence and breach of warranty claims against
toy manufacturer were preempted by Child Safety
Protection Act (CSPA) to extent that they alleged
warning defects;
(2) breach of warranty claim against toy
manufacturer was not preempted by CSPA to extent
that it was based upon allegation that manufacturer
breached implied warranty of merchantability by
marketing toy that was not fit for ordinary use;
(3) breach of warranty claim against toy
manufacturer was preempted by CSPA to extent that
it was based upon breach of express warranty;
(4) breach of implied warranty of merchantability
cause of action could not be maintained against toy
manufacturer under New York law based upon claim
that ball was not minimally safe for its purpose;
(5) strict product liability cause of action could not be
maintained against toy manufacturer under New
York law based upon foreseeable misuse of ball;
(6) negligence claim against toy manufacturer was
not preempted by CSPA on theory that manufacturer
was liable for distributing and selling defectively
designed product; and
(7) appearance of ball or product's packaging was not
substantial factor in causing child to die from
asphyxiation.

Motion granted in part and denied in part.

West Headnotes

**[1] Products Liability 313A ☞60**

313A Products Liability
   313AI Scope in General
      313AI(B) Particular Products, Application to
      313Ak60 k. Toys, Games, and Athletic or
Recreational Equipment. Most Cited Cases

**Sales 343 ☞427**

343 Sales
   343VIII Remedies of Buyer
      343VIII(D) Actions and Counterclaims for
Breach of Warranty
      343k427 k. Right of Action. Most Cited
Cases

**States 360 ☞18.15**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
      360k18.15 k. Particular Cases, Preemption
or Supersession. Most Cited Cases

**States 360 ☞18.65**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
      360k18.65 k. Product Safety; Food and
Drug Laws. Most Cited Cases
Negligence and breach of warranty claims against toy
manufacturer were preempted by Child Safety
Protection Act (CSPA), to extent that they alleged
warning defects, in lawsuit brought by personal
representative of child's estate under New York law
after child died due to asphyxiation caused by ball,
since manufacturer's warnings complied with federal
labeling requirements for toys containing small balls,
and such claims effectively sought to impose

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**2004 WL 515536 (S.D.N.Y.)**

additional labeling requirements upon manufacturer above and beyond what was required by CSPA. 15 U.S.C.A. § 1278.

**[2] Sales 343 ⬪➔427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k427 k. Right of Action. Most Cited Cases

**States 360 ⬪➔18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Breach of warranty claim against toy manufacturer was not preempted by Child Safety Protection Act (CSPA), to extent that it was based upon allegation that manufacturer breached implied warranty of merchantability by marketing toy that was not fit for ordinary use, in lawsuit brought by personal representative of child's estate under New York law after child died due to asphyxiation caused by ball. 15 U.S.C.A. § 1278.

**[3] Sales 343 ⬪➔427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k427 k. Right of Action. Most Cited Cases

**States 360 ⬪➔18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Breach of warranty claim against toy manufacturer was preempted by Child Safety Protection Act (CSPA), to extent that it was based upon breach of express warranty, in lawsuit brought by personal

representative of child's estate under New York law after child died due to asphyxiation caused by ball. 15 U.S.C.A. § 1278.

**[4] Sales 343 ⬪➔284(1)**

343 Sales
    343VI Warranties
        343k281 Breach
            343k284 Warranty of Quality, Fitness, or Condition
                343k284(1) k. In General. Most Cited Cases
Breach of implied warranty of merchantability cause of action could not be maintained against toy manufacturer under New York law, based upon claim that ball was not minimally safe for its purpose, in lawsuit brought by personal representative of child's estate after child died due to asphyxiation caused by ball, since purpose of ball was for throwing, catching, bouncing, and rolling, but purpose did not include warranty that ball was fit for safe insertion into child's mouth. McKinney's Uniform Commercial Code § 2-314(2)(c).

**[5] Products Liability 313A ⬪➔60**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
            313Ak60 k. Toys, Games, and Athletic or Recreational Equipment. Most Cited Cases
Strict product liability cause of action could not be maintained against toy manufacturer under New York law, based upon foreseeable misuse of ball, in lawsuit brought by personal representative of child's estate after child died due to asphyxiation caused by ball, since child was not using ball for normal purpose or in normal manner.

**[6] Products Liability 313A ⬪➔60**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
            313Ak60 k. Toys, Games, and Athletic or Recreational Equipment. Most Cited Cases

**States 360 ⬪➔18.65**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**2004 WL 515536 (S.D.N.Y.)**

Page 3

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.65 k. Product Safety; Food and
Drug Laws. Most Cited Cases
Negligence claim against toy manufacturer was not
preempted by Child Safety Protection Act (CSPA),
on theory that manufacturer was liable for
distributing and selling defectively designed product,
in lawsuit brought by personal representative of
child's estate under New York law after child died
due to asphyxiation caused by ball. 15 U.S.C.A. §
1278.

**[7] Products Liability 313A ☞60**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
            313Ak60 k. Toys, Games, and Athletic or
Recreational Equipment. Most Cited Cases
Personal representative failed to show, on design
defect claim against toy manufacturer under New
York law, that appearance of ball or product's
packaging was substantial factor in causing child to
die from asphyxiation, on theory that child was
inspired to put ball in his mouth in misguided attempt
to access character suspended within; although
mother asserted that child did not put non-food items
into his mouth, occupational therapist reported that
child had history of putting non-food items in his
mouth.

**[8] Evidence 157 ☞474.5**

157 Evidence
    157XII Opinion Evidence
        157XII(A) Conclusions and Opinions of
Witnesses in General
            157k474.5 k. Subjects of Opinion Evidence
in General. Most Cited Cases
Opinion of mother, as lay witness, was not
admissible, as to why her child put ball into his
mouth, in lawsuit against toy manufacturer after child
died due to asphyxiation caused by ball, since mother
did not have any actual knowledge or information
about how ball came to be placed in child's mouth.
Fed.Rules Evid.Rule 701, 28 U.S.C.A.

**[9] Evidence 157 ☞537**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k537 k. Bodily and Mental Condition.
Most Cited Cases

**Evidence 157 ☞555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity and
Sufficiency. Most Cited Cases
In lawsuit against toy manufacturer after child died
due to asphyxiation caused by ball, opinion of expert
in engineering and quality assurance in toy design
was not admissible, that child was inspired to put ball
in his mouth in misguided attempt to access character
suspended within, since engineer did not have any
expertise in child psychology or behavior that would
have rendered him specially qualified to discern
child's personal motivation, and opinion lacked
factual basis. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[10] Damages 115 ☞91.5(4)**

115 Damages
    115V Exemplary Damages
        115k91.5 Grounds for Exemplary Damages
            115k91.5(4) k. Products Liability. Most
Cited Cases
        (Formerly 115k91(1))
Toy manufacturer was not liable for punitive
damages under New York law, in lawsuit brought by
personal representative of child who died due to
asphyxiation caused by ball, since personal
representative failed to show that manufacturer acted
with conscious indifference by marketing toy with
knowledge that product posed risk of potentially
catastrophic harm to children, or that manufacturer
had knowledge about any potential danger from that
product.

Jay W. Danker, Danker & Milstein, P.C., New York,
NY, for Plaintiffs.
Gerald Neal Swartz, New York, NY, for Defendants.

OPINION & ORDER

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**2004 WL 515536 (S.D.N.Y.)**

MUKASEY, J.

*1 Plaintiff Kevin Brazier ("Brazier"), acting individually and as personal representative of the estate of his son Robert J. Brazier ("Robert"), sues defendants Hasbro, Inc. ("Hasbro"), and Toys "R" Us, Inc. ("Toys "R" Us"), to recover for Robert's death, which resulted from choking on a Pokemon Power Bouncer-a toy ball-that was imported and distributed by Hasbro and sold by Toys "R" Us. Brazier asserts claims against both defendants for strict products liability, breach of warranty, negligence, and punitive damages.[FN1] Defendants move for summary judgment on all claims, and Brazier moves for an order pursuant to Rule 11 of the Federal Rules of Civil Procedure imposing sanctions against defendants for filing this summary judgment motion. For the reasons set forth below, decision will be deferred on that part of Brazier's negligence claim which asserts that the Pokemon Power Bouncer was defectively designed because of its size so as to give the parties the chance to submit additional papers relating to the admissibility of Brazier's experts' testimony. Defendants' summary judgment motion is granted as to other claims, and Brazier's Rule 11 motion is denied.

> FN1. Brazier also asserted claims for negligent infliction of emotional distress, but has since stipulated to the dismissal of these claims.

I.

The following facts are either undisputed or presented in the light most favorable to Brazier.

On January 11 and January 29, 1999, Adrienne Brazier purchased a total of four Pokemon Power Bouncers from Toys "R" Us [FN2] for her three sons, Daniel, Robert, and Michael. (Deposition of Adrienne Brazier ("A. Brazier Dep.") at 38-39, 44, 46) A Pokemon Power Bouncer is a toy ball with a 1.72" diameter; it is made of translucent rubber and has a figure of a Pokemon character suspended inside. (Deposition of Defendant Hasbro, Inc., by Malcolm Denniss at 26; Defendants' Motion Exhibit ("Def.Ex.") B) When Adrienne Brazier purchased the Pokemon Power Bouncers, the following warning appeared on the bottom left corner of the product's packaging: "WARNING: CHOKING HAZARD-Toy

contains small ball. Not for children under 3 years."(Def.Ex. C) The bottom right corner of the packaging contained the statement, "AGES 4 AND UP." (Id.) Adrienne Brazier read all of these statements before purchasing the balls. (A. Brazier Dep. at 61-62)

> FN2. Hasbro distributed the Pokemon Bouncer to retailers in the United States. (Deposition of Defendant Hasbro, Inc., by Malcolm Denniss at 24, 33)

Between January 11 and January 30, 1999, Daniel, Robert, and Michael played with the Pokemon Power Bouncers once or twice a day by bouncing, rolling, and catching them. (Id. at 53-54) Robert Brazier, who was born on March 31, 1991, suffered from a form of autism known as Pervasive Developmental Disorder, and as of January 30, 1999, he spoke only a few words. (Id. at 6-7, 55-56; Affidavit of Kevin Brazier ¶ 6) Robert's toys included assorted balls of different sizes, including some that were smaller than the Pokemon Power Bouncer. (A. Brazier Dep. at 65-68) Adrienne Brazier said she never saw Robert put any of these balls in his mouth, but she was told in spring 1998 by Robert's occupational therapist that Robert required close supervision during tabletop activities at school because he had a tendency to put non-food items in his mouth. (Id. at 77, 89-91, 94-96; Def. Ex. G)

*2 In the early afternoon of Saturday, January 30, 1999, Adrienne Brazier was at home with Daniel, Robert, and Michael. (A. Brazier Dep. at 109-10) Daniel and Michael were talking on the stairs when they saw Robert enter from the living room, making hacking noises and pointing to his throat. (Deposition of Daniel Brazier at 8) When Robert opened his mouth, Daniel could see a Pokemon Power Bouncer inside. (Id. at 8) Daniel, who was one day shy of his tenth birthday, performed the Heimlich maneuver on Robert with no success.(Id. at 23; A. Brazier Dep. at 6) Adrienne Brazier heard Daniel screaming that Robert was choking, and she found the boys in the dining room. (A. Brazier Dep. at 119-21) As Daniel went to call 911, Adrienne continued to perform the Heimlich maneuver on Robert. (Id . at 124-26) After Adrienne went outside and yelled for help, neighbors arrived and joined in the efforts to save Robert, and the Fire Department arrived as well. (Id. at 129-31, 136) Robert was rushed by ambulance to the hospital,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

where he arrived with the ball still lodged in his airway. (*Id.* at 144-46) He died shortly thereafter from asphyxiation. (*Id.* at 146)

Kevin Brazier filed the present action on November 12, 1999.[FN3] Because the Braziers reside in New York and neither defendant is a New York domiciliary, jurisdiction in this case is based on diversity of citizenship.

> FN3. On March 20, 2001, Brazier served an amended complaint on defendants. For reasons that are not clear, this amended complaint does not appear on the docket for this case, but the docket does contain numerous copies of the amended complaint attached to assorted certificates of mailing and summons. Defendants filed an answer to the amended complaint, which is docketed, and have attached both the original complaint and the amended complaint to their summary judgment motion. The complaints are virtually identical in all respects that are relevant to this summary judgment motion. Accordingly, I will direct the amended complaint to be docketed, and I cite to both versions of the complaint throughout this opinion.

## II.

[1] Brazier's negligence and breach of warranty claims are based in part on the contention that the warnings on the packaging of the Pokemon Power Bouncer were inadequate. Specifically, Brazier alleges that defendants' warnings were defective because they: (1) stated that the Pokemon Power Bouncer was intended for "ages 4 and up," which implied that the toy was safe for children over the age of 3; (2) stated that the Pokemon Power Bouncer presented a choking hazard for "children under 3 years," which implied that children aged 3 and up were in no danger of choking; and (3) failed to warn purchasers and users of the risks presented by the Pokemon Power Bouncer. (*See* Complaint ("Compl.") ¶ 14a, 14e, 14f, 20; Amended Complaint ("Am.Compl.") ¶¶ 22a, 22e, 22f, 28) However, because defendants' warnings comply with the federal labeling requirements for toys containing small balls, Brazier's negligence and breach of warranty claims are preempted to the extent that they

are based on a theory that these warnings are inadequate.

In 1994, Congress enacted the Child Safety Protection Act, Pub.L. No. 103-267, 108 Stat. 722, ("CSPA") which established requirements for products intended for children. Section 101(a) of the CSPA amended the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-1278 (2000), by adding a new section, codified at 15 U.S.C. § 1278, which listed requirements for labeling certain toys and games. The CSPA also included the following preemption provision:

[A] State or political subdivision of a State may not establish or enforce a requirement relating to cautionary labeling of small parts hazards or choking hazards in any toy, game, marble, small ball, or balloon intended or suitable for use by children unless such requirement is identical to a requirement established by amendments made by this section to the Federal Hazardous Substances Act or by regulations promulgated by the Commission.

**\*3** CSPA § 101(e), *reprinted at* 15 U.S.C. § 1278 Note "Preemption". The language of this provision tracks the language of the preemption provision in the FHSA, which applies more generally to hazardous substances that are subject to cautionary labeling requirements pursuant to that statute.[FN4] *See* 15 U.S.C. § 1261 Note "Effect upon Federal and State Law" at (b)(1)(A).

> FN4. The preemption provision in the FHSA states:
>
> > [I]f a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) [of the FHSA] designed to protect against a risk of illness or injury associated with the substance, no State or political subdivision of a State may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under section 2(p) or 3(b) [of the FHSA].

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C. § 1261 Note "Effect upon Federal and State Law" at (b)(1)(A)

Although no court in this Circuit has yet interpreted the CSPA's preemption provision, the Second Circuit analyzed the FHSA's preemption provision in *Milanese v. Rust-Oleum Corp.,* 244 F.3d 104 (2d Cir.2001). There, the Court concluded that "the FHSA preempts any state cause of action that seeks to impose a labeling requirement different from the requirements found in the FHSA and the regulations promulgated thereunder."*Id.* at 109.Accordingly, Milanese's claims for breach of express warranty, strict product liability, and negligence were preempted to the extent that they sought "to impose additional or more elaborate labeling requirements" than those required under the FHSA.*Id.*

The toy labeling requirements of the CSPA have been added to the FHSA, and the CSPA's own preemption provision uses the same language as the general preemption provision of the FHSA. Accordingly, I conclude that Congress intended the CSPA's toy labeling requirements have the same preemptive effect as the FHSA's other requirements. Therefore, any state cause of action that seeks to impose different or additional toy labeling requirements related to choking hazards is preempted by the CSPA. *Cf.West v. Mattel, Inc.,* 246 F.Supp.2d 640, 644 (S.D.Tex.2003) (holding that the CSPA preempts any common law claim predicated upon a theory that a CSPA-compliant warning label is inadequate).

In this case, Brazier does not allege that the warnings on the Pokemon Power Bouncer failed to comply with CSPA requirements. Under the CSPA, any ball with a diameter of 1.75 inches or less that is intended for children aged 3 and up must contain the following cautionary statement:

[symbol] FN5 WARNING:

> FN5. The required symbol is an exclamation point surrounded by a triangle.

CHOKING HAZARD-This toy is a small ball.

Not for children under 3 yrs.

15 U.S.C. § 1278(b)(2)(B). Essentially the same warning is required for any toy or game containing such a ball, except that the statement "This toy is a small ball" is replaced with "Toy contains a small ball." 15 U.S.C. § 1278(b)(2)(D). Brazier does not dispute that the packaging of the Pokemon Power Bouncer included the warning required for a toy or game that contains a ball with a diameter of 1.75 inches or less,FN6 and he does not allege that the warnings otherwise failed to comply with the CSPA. Instead, Brazier argues that these warnings were defective because they did not adequately inform Adrienne Brazier of the dangers presented by the Pokemon Power Bouncer. Because Brazier's negligence and breach of warranty claims effectively seek to impose additional labeling requirements on defendants above and beyond what is required by the CSPA, these claims are preempted to the extent that they allege such warning defects.

> FN6. Although it is not clear why the packaging for the Pokemon Power Bouncer followed the labeling requirements for a toy containing a small ball instead of the requirements for a toy that was a small ball, there is no appreciable difference between the two required warnings.

**\*4**  [2][3] Brazier's negligence and breach of warranty claims also allege that the Pokemon Power Bouncer is defectively designed; such allegations are not preempted by the CSPA, and accordingly I must determine whether defendants are entitled to summary judgment on this aspect of Brazier's claims. *SeeLopez v. Hernandez,* 253 A.D.2d 414, 415, 676 N.Y.S.2d 613, 614-15 (2d Dep't 1998) (explaining that causes of action not premised on a failure to warn or inadequate labeling survive preemption by the FHSA). For Brazier's breach of warranty claim, the complaints suggest that this claim is based on theories of breach of implied warranty of merchantability and breach of express warranty. (See Compl. ¶¶ 19-20; Am. Compl. ¶¶ 27-28) Because the only express warranty that Brazier alleges is the CSPA-compliant labeling on the product's packaging, (see Compl. ¶ 20; Am. Compl. ¶ 28), the breach of warranty claim is preempted to the extent it is based on a breach of express warranty argument. *SeeMilanese,* 244 F.3d at 109 (upholding preemption of claim for breach of express warranty to the extent

Case 1:08-cv-02364    Document 55-6    Filed 08/09/2008    Page 28 of 59
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**2004 WL 515536 (S.D.N.Y.)**

Page 7

that plaintiff sought to impose labeling requirements that differed from FHSA requirements). However, Brazier's breach of warranty claim is not preempted to the extent that it is based on the argument that defendants breached the implied warranty of merchantability by marketing a toy that was not fit for ordinary use.

### III.

[4] To recover on a breach of implied warranty of merchantability claim for a defectively designed product, a plaintiff must show that the product at issue does not satisfy the merchantability requirements of New York's version of the Uniform Commercial Code ("UCC").See_Denny v. Ford Motor Co.,_ 87 N.Y.2d 248, 258-59, 639 N.Y.S.2d 250, 256, 662 N.E.2d 730 (1995). A product must be "fit for the ordinary purposes for which such goods are used" to be considered merchantable under the UCC. N.Y. U.C.C. § 2-314(2)(c) (McKinney 2003). Accordingly, an allegedly defective product gives rise to a breach of implied warranty claim when it is not fit for its ordinary purposes and causes injury as a result. See_Denny,_ 87 N.Y.2d at 258-59, 639 N.Y.S.2d at 256, 662 N.E.2d 730. In determining whether a product is unmerchantable in this respect, "the ... inquiry focuses on the expectations for the performance of the product when used in the customary, usual, and reasonably foreseeable manners."87 N.Y.2d at 258-59, 639 N.Y.S.2d at 256, 662 N.E.2d 730. "A warranty of fitness for ordinary purposes does not mean that the product will fulfill a buyer's every expectation."87 N.Y.2d at 259 n. 4, 639 N.Y.S.2d at 256 n. 4, 662 N.E.2d 730 (internal quotation marks and alterations omitted). Rather, recovery for breach of implied warranty of merchantability is appropriate "upon a showing that the product was not minimally safe for its expected purpose ..."87 N.Y.2d at 259, 639 N.Y.S.2d at 256, 662 N.E.2d 730.

As a toy ball, the ordinary and expected purposes of the Pokemon Power Bouncer include being thrown, caught, bounced and rolled. Brazier does not argue that the product is unfit for these purposes, and he does not claim that Robert was using the Pokemon Power Bouncer for its ordinary purposes when he put it in his mouth. Instead, Brazier suggests that Robert's placement of the ball in his mouth was an unintended but foreseeable misuse of the product. (See Plaintiff's

Memorandum of Law in Opposition to Defendants' Rule 56 Motion ("Pl.Memo.") at 4-5) Brazier is correct to concede this point; no reasonable jury could conclude that a toy ball is performing an ordinary purpose when a child inserts it into his mouth. Because the implied warranty of merchantability for the Pokemon Power Bouncer does not include a warranty that the product is fit for safe insertion into a child's mouth, Brazier cannot maintain a cause of action for breach of implied warranty based on the contention that the ball was not minimally safe for this purpose. Because Brazier does not allege that the Pokemon Power Bouncer is unfit for the ordinary purposes of a toy ball, defendants are entitled to summary judgment dismissing Brazier's breach of warranty claim. See_White v. ABCO Eng'g Corp.,_ 221 F.3d 293, 300 (2d Cir.2000) (explaining that summary judgment should be granted if no reasonable trier of fact could find in favor of the nonmoving party).

### IV.

*5 To prevail on a strict products liability action for design defect under New York law, a plaintiff must demonstrate that: (1) the product is defective because it is not reasonably safe as marketed; (2) the product was being used for a normal purpose at the time of the injuring occurrence; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff would not, by the exercise of reasonable care, have both discovered the defect and apprehended its danger; and (5) the plaintiff would not otherwise have avoided the injury by the exercise of reasonable care. _Urena v. Biro Mfg. Co.,_ 114 F.3d 359, 363 (2d Cir.1997) (citing _Fane v. Zimmer, Inc.,_ 927 F.2d 124, 128 (2d Cir.1991) (citing _Wolfgruber v. Upjohn Co.,_ 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 95 (4th Dep't 1979), _aff'd,_52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980)).See also_Voss v. Black & Decker Mfg. Co.,_ 59 N.Y.2d 102, 106, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204 (1983).

[5] Brazier argues that defendants can be held strictly liable for harm caused by a foreseeable misuse of the Pokemon Power Bouncer as well as for harm caused by use for a normal purpose. (See Pl. Memo. at 4-5) Although the cases that Brazier cites for this proposition all predate the Second Circuit's 1997 decision in _Urena,_ some courts in this circuit have stated more recently that an action in strict products

Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**2004 WL 515536 (S.D.N.Y.)**

liability may lie for injuries that result from an unintended but reasonably foreseeable use of a product. See*Beneway v. Superwinch, Inc.,* 216 F.Supp.2d 24, 29 (N.D.N.Y.2002) (citing *Lugo by Lopez v. LJN Toys, Ltd.,* 75 N.Y.2d 850, 852, 552 N.Y.S.2d 914, 915, 552 N.E.2d 162 (1990)); *Anderson v. Hedstrom Corp.,* 76 F.Supp.2d 422, 455-56 (S.D.N.Y.1999) (citing *Voss,* 59 N.Y.2d at 110 n.*, *463 N.Y.S.2d at 403* n. *). The New York Pattern Jury Instructions (2004) also state that strict liability may attach "when the product is used for its intended or reasonably foreseeable purpose."*Id.* at 2:141, 463 N.Y.S.2d 398, 450 N.E.2d 204 (citing for this proposition, in the Comment, New York cases from 1992, 1990, and 1976). However, both these recent cases and the New York Pattern Jury Instructions are based on case law that predates the Second Circuit's decision in *Urena.*I have found no case decided after *Urena* by the New York Court of Appeals or the Second Circuit that explicitly discusses and rejects the requirement that a plaintiff must have been using a product for a normal purpose in order to prevail on a strict products liability claim. Accordingly, I must follow the Second Circuit's interpretation of New York law and conclude that Brazier can prevail on his strict products liability claim only upon a showing that the Pokemon Power Bouncer was being used for a "normal purpose" when Robert asphyxiated. See*Sita v. Danek Medical, Inc.,* 43 F.Supp.2d 245, 252 (E.D.N.Y.1999) (stating that plaintiff can prevail on strict products liability claim only by showing that the product was being used for a normal purpose at the time of the injury); *Hamm v. Willamette Indus., Inc.,* 99 Civ. 5166(RCC), 2002 WL 342433, at *3 n. 5 (S.D.N.Y. Mar. 5, 2002) (same); *Faryniarz v. Nike, Inc.,* 00 Civ. 2623(NRB), 2002 WL 530997, at *2 (S.D.N.Y. Apr. 8, 2002) (same); *McEneaney v. Haywood,* 179 Misc.2d 1035, 687 N.Y.S.2d 547, 550 (Sup.Ct.App. Term 1999) (same).

*6 As discussed in Part III, *supra,* a toy ball is used for a normal purpose when it is thrown, caught, rolled, or bounced. Brazier does not argue, and no reasonable jury could find, that Robert Brazier was using the Pokemon Power Bouncer for a normal purpose when he put it in his mouth. Because the Pokemon Power Bouncer was not being used for a normal purpose or in a normal manner when Robert asphyxiated, Brazier cannot maintain a cause of action for strict products liability, and defendants' summary judgment motion is granted as to this claim.

### V.

[6] As discussed in Part II, *supra,* Brazier's negligence claim is preempted insofar as it is based on alleged defects in defendants' warnings, but it is not preempted to the extent that Brazier argues that defendants should be liable in negligence for distributing and selling a defectively designed product. Brazier alleges that the design of the Pokemon Power Bouncer was defective for two reasons: first, because a ball with a 1.72 diameter posed a serious choking hazard to children over the age of 3, particularly because the hazard was disguised by defectively designed packaging that made the ball appear larger than its actual size (Compl. ¶ 14d, 14e, 14i; Am. Compl. ¶ 22d, 22e, 22i); second the appearance of the Pokemon Power Bouncer, which featured a character suspended in a translucent sphere, was defective because it tempted children to place the ball in their mouths in an attempt to open the ball and "free" the character inside (Compl. ¶ 14g; Am. Compl. ¶ 22g). According to Brazier, this risk was enhanced by the toy's connection to the Pokemon line of products, which apparently features characters emerging from spheres. (Compl. ¶ 14h; Am. Compl. ¶ 22h; Pl. Memo. at 7; Affidavit of Bert L. Reiner ("Reiner Aff.") ¶ 7)

Defendants argue that they are entitled to summary judgment on the negligent design claim because Brazier has not offered evidence to show that the Pokemon Power Bouncer's alleged design defects caused Robert Brazier's injuries. In the alternative, defendants contend that they breached no duty by distributing and selling the Pokemon Power Bouncer because the toy was not defectively designed for its intended and reasonably foreseeable uses. As will be discussed in more detail below, Brazier cannot show that the ball's appearance played any role in Robert Brazier's death, and his inability to prove causation entitles defendants to summary judgment on that aspect of the negligent design claim. As for Brazier's claim that the Pokemon Power Bouncer's size was a design defect, I will reserve judgment on this aspect of defendants' summary judgment motion until the parties have submitted more briefs and affidavits on the question of expert opinion admissibility.

### A.

Case 1:08-cv-02364    Document 55-6    Filed 08/09/2008    Page 30 of 59 Page 9

[7] To prove a claim of negligent design, "it is a consumer's burden to show that a defect in the product was a substantial factor in causing the injury."*Clarke v. Helene Curtis, Inc.,* 293 A.D.2d 701, 701, 742 N.Y.S.2d 325, 326 (2d Dep't 2002) (quoting *Tardella v. RJR Nabisco, Inc.,* 178 A.D.2d 737, 737, 576 N.Y.S.2d 965, 966 (2d Dep't 1991)); *Fritz v. White Consol. Indus., Inc.,* 306 A.D.2d 896, 898, 762 N.Y.S.2d 711, 714 (4th Dep't 2003) (same). Defendants wisely do not argue that the size of the Pokemon Power Bouncer was not a substantial factor in causing Robert Brazier to asphyxiate; based on the evidence, a reasonable jury could conclude easily that the 1.72 diameter of the ball-small enough to enter Robert's mouth and large enough to obstruct his airway-played an important role in his death. However, Brazier has not produced any evidence to suggest that the product's packaging contributed to the accident in any way,[FN7] and therefore defendants are entitled to summary judgment to the extent that Brazier argues that the packaging of the Pokemon Power Bouncer was defectively designed. As will be discussed in more detail below, defendants are entitled to summary judgment also on Brazier's claim that the appearance of the Pokemon Power Bouncer was a design defect because no reasonable jury could find, by a preponderance of the evidence, that this alleged defect was substantial factor in causing Robert's death.

> FN7. Although the complaints allege that the packaging made the Pokemon Power Bouncer appear larger than its actual size (Compl. ¶ 14i; Am. Compl. ¶ 22i), the record contains no evidence to suggest that anyone in the Brazier family was actually misled about the size of the ball. In any event, the evidence shows that the Brazier children played with the four identical balls daily for almost three weeks before Robert's death. There was ample opportunity during that time to see the actual size of the balls.

*7  [8] Brazier alleges that the Pokemon Power Bouncer's appearance inspired Robert to put the ball in his mouth in a misguided attempt to access the Pokemon character suspended within. (Compl. ¶ 8; Am. Compl. ¶ 16) Although no one witnessed Robert placing the ball in his mouth, Brazier attempts to prove his theory by proffering the opinions of two

people, Adrienne Brazier and engineering expert Bert L. Reiner.[FN8] Neither opinion is admissible under the Federal Rules of Evidence. First, Adrienne Brazier, a lay witness, theorizes that Robert put the ball in his mouth in an attempt to release the Pokemon character encased in the ball. (A. Brazier Dep. at 156-57) A lay witness may testify only about opinions or inferences that are "rationally based on the perception of the witness." Fed.R.Evid. 701 Because Adrienne Brazier concedes that she has no actual knowledge or information about how the ball came to be placed in Robert's mouth (A. Brazier Dep. at 155-56), her opinion about Robert's motivation is inadmissible under Rule 701 of the Federal Rules of Evidence.

> FN8. Defendants apparently believe that Brazier's other two experts, engineer Paul Doppelt and medical physician Dr. Frank L. Rimell, also provided opinions about Robert Brazier's motivation. (Memorandum of Law of Defendants in Reply at 11-14) I disagree and find that both experts merely offer opinions about the actions of children generally, not about the actions of Robert Brazier specifically. Doppelt simply states, "Since the Pokemon characters operate from within a spherical shell from which they hatch to do as they are trained to do, it is reasonable to foresee that a child might attempt to separate the ball, with his teeth if need be, in order to release the figurine."(Affidavit of Paul Doppelt ¶ 10) Dr. Rimell similarly opines, "[I]t is entirely foreseeable that a child who was the chronological age of Robert Brazier could attempt to remove the Pokemon figure from within the ball by placing it within his/her mouth in an attempt to break the ball and release the character."(Affidavit of Frank L. Rimell ¶ 10)

[9] Second, Reiner, one of plaintiff's three expert witness, opined that "it is reasonable to conclude that Robert's action of placing the Pokemon Power Bouncer of 1.72 inches in his mouth was a result of his intent to 'free' or 'hatch' the figure from inside the ball."(Reiner Aff. ¶ 8) In order for this opinion to be admissible expert testimony under Rule 702 of the Federal Rules of Evidence, Reiner must be "qualified as an expert by knowledge, skill, experience, training, or education."Fed.R.Evid. 702. Although Reiner has

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**2004 WL 515536 (S.D.N.Y.)**

Case 1:08-cv-02364    Document 55-6    Filed 08/09/2008    Page 31 of 59

Page 10

35 years of experience in engineering and quality assurance in toy design, his curriculum vitae reveals no expertise in child psychology or behavior that renders him specially qualified to discern Robert Brazier's personal motivation. *See* *Zaremba v. Gen. Motors Corp.*, No. 03-7565, 2004 WL 259254, at *4 (2d Cir. Feb.13, 2004) (suggesting that purported expert's meager qualifications in area of alleged expertise rendered further *Daubert* analysis almost superfluous). Even if Reiner were qualified to provide expert testimony about Robert's intent, his opinion would have to be unreliable and speculative because it lacks a factual basis. *See* Fed.R.Evid. 702 (explaining that expert testimony "must be based upon sufficient facts or data"). In preparing his opinion, the only documents Reiner reviewed that pertained to Robert's asphyxiation, rather than to the design and manufacture of the Pokemon Power Bouncer, were the depositions in this case (Reiner Aff. ¶ 4), which reveal that no one witnessed Robert putting the ball in his mouth. Although Reiner contends that his opinion is supported by deposition testimony showing that other children, using various means, pried open Pokemon Power Bouncers to get the character inside (Reiner Aff. ¶ 8), the actions of other children cannot illuminate what was in Robert Brazier's mind when he put the ball in his mouth. Because Reiner is not qualified to provide an opinion about Robert's state of mind, and because his opinion is based on conjecture and speculation rather than facts, Reiner's testimony about Robert's intent is inadmissible under Rule 702 of the Federal Rules of Evidence.

**\*8** Apart from these two inadmissible opinions, the only evidence in the record that supports Brazier's theory of causation is Adrienne Brazier's testimony, taken at her deposition, that Robert had a tendency to open things with his mouth, such as potato chip bags and round, clear containers from vending machines. (A. Brazier Dep. at 158-59) She further testified that, apart from this behavior, Robert had stopped putting non-food items in his mouth when he was 4 or 5 years old. (*Id.* at 164-5) However, Adrienne Brazier also admitted that an occupational therapist reported in spring 1998, when Robert was 7 years old, that Robert required close supervision during tabletop activities at school because he had a tendency to put non-food items in his mouth, such as Play-Doh, shaving cream, and uncooked beans and rice. (*Id.* at 89-91, 93-96; Def. Ex. G)

In order to prevail on a negligence claim based on a defect in the ball's appearance, Brazier would need to show that it is more likely or more reasonable to conclude that Robert put the Pokemon Power Bouncer in his mouth because of its appearance than for some other reason. *See* *Gayle v. City of New York*, 92 N.Y.S.2d 936, 937, 680 N.Y.S.2d 900, 901, 703 N.E.2d 758 (1998) (explaining that plaintiff must show that it is more likely or more reasonable that injury was caused by defendant's negligence than by some other agency). Although Brazier need not positively exclude every other possible cause for Robert's actions, "the proof must render those other causes sufficiently 'remote' or 'technical' to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence." *Id.* Because the record in this case reveals that Robert had a history of putting non-food items in his mouth even when he was not trying to open them, a jury would be forced to speculate about what motivated Robert to put the Pokemon Power Bouncer in his mouth on January 30, 1999. Because Brazier supports his theory of causation only with "speculation, guess, and surmise, which may not be substituted for competent evidence," defendants are entitled to summary judgment on Brazier's negligence claim insofar as it is based on alleged defects in the appearance of the Pokemon Power Bouncer. *Grob v. Kings Realty Assocs., LLC*, --- A.D.2d ----, 771 N.Y.S.2d 384, 385 (2d Dep't 2004) (internal brackets and quotation marks omitted). *See also* *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir.2003) ("Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").

B.

The only basis for a negligence claim that remains is Brazier's contention that the Pokemon Power Bouncer was defectively designed because of its size. Under New York law, the manufacturer of a product has "a duty to use reasonable care in designing its product so that it will be safe when 'used in the manner for which the product was intended, as well as [any] unintended yet reasonably foreseeable use.'" *Liriano v. Hobart Corp.*, 132 F.3d 124, 126 (2d Cir.1998) (quoting *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 385-86, 384 N.Y.S.2d 115, 121, 348

N.E.2d 571 (1976)). Although Hasbro and Toys "R" Us did not manufacture the Pokemon Power Bouncer, defendants do not argue that distributors and sellers are subject to a lesser duty of care when distributing and selling a product. Accordingly, defendants may have breached a duty if the Pokemon Power Bouncer was unsafe for an intended or reasonably foreseeable use, but defendants have breached no duty if the Pokemon Power Bouncer was unsafe only for uses that are unforeseeable. See Pinero v. Rite Aid of New York, Inc., 294 A.D.2d 251, 252, 743 N.Y.S.2d 21, 22 (1st Dep't 2002), aff'd, 99 N.Y.2d 541, 753 N.Y.S.2d 805, 783 N.E.2d 895 (explaining that, in a negligence claim, duty arises only when the risk of harm is reasonably foreseeable); Danielenko v. Kinney Rent A Car, Inc., 57 N.Y.2d 198, 204, 455 N.Y.S.2d 555, 557, 441 N.E.2d 1073 (1982) ("Whether a breach of duty has occurred, of course, depends upon whether the resulting injury was a reasonably foreseeable consequence of the defendants' conduct."). Because Brazier argues only that the Pokemon Power Bouncer was unsafe for insertion into a child's mouth, and not that it was unsafe for other possible uses, I must determine whether this particular "use" of the product was reasonably foreseeable. If not, defendants breached no duty by distributing and selling the Pokemon Power Bouncer and thus cannot be held liable in negligence.

**\*9** Defendants argue that they breached no duty because they could not reasonably foresee that a child who was almost 8 years old would put the ball in his mouth. (Memorandum of Law of Defendants in Support of Motion for Summary Judgment ("Def.Memo.") at 17-18) Brazier disagrees and, relying in part on the opinions of his experts, claims that it was foreseeable that a child between the ages of 4 and 10 might place the ball in his or her mouth and choke. (Pl. Memo. at 4-5) Neither party suggests that the foreseeability calculus would be different for a 4-year-old child and a child who was nearly 8 years old. Under New York law, "foreseeability includes the probability of the occurrence of a general type of risk involving the loss, rather than the probability of the occurrence of the precise chain of events preceding the loss." Parsons v. Honeywell, 929 F.2d 901, 905-06 (2d Cir.1991) (quoting Tucci v. Bossert, 53 A.D.2d 291, 293, 385 N.Y.S.2d 328, 331 (2d Dep't 1976)). Although the precise chain of events in this case involved a 7-year-old boy, the general type of risk here is that a child for whom the Pokemon

Power Bouncer was intended-a child aged 4 or older-would put the ball in his or her mouth and choke. Accordingly, the question I must answer is whether a reasonable jury could find it reasonably foreseeable that a child over the age of 3 would put the Pokemon Power Bouncer in his mouth and asphyxiate.

In support of his claim that defendants should have reasonably foreseen that a child over the age of 3 might place a Pokemon Power Bouncer in his mouth and choke, Brazier proffers affidavits from his three expert witnesses. First, physician Dr. Frank L. Rimell quotes a portion of an article he wrote, published in 1995 in the Journal of the American Medical Association, which states, "Although two thirds of children who choke to death on man-made objects are younger than 3 years, these objects pose a significant risk of asphyxiation to older children as well."(Affidavit of Frank L. Rimell ¶ 9) With respect to the Pokemon Power Bouncer, Dr. Rimell opines that "the diameter of this ball of 1.72 inches presents a choking hazard in and of itself, given the anatomical sizes and dimensions of the pharynx of a young child."(Id. ¶ 10, 385 N.Y.S.2d 328) Second, toy safety consultant Paul Doppelt claims, "[C]hildren of any age will put things in their mouths," and states, "It is my professional opinion that the 1.72 inch (43.7 mm) diameter spherically shaped Pokemon Power Bouncer presented a clear risk of a choking mishap for children of the intended and specified age of 4 years and above."(Affidavit of Paul Doppelt ¶¶ 8, 10) Finally, mechanical engineer and quality assurance consultant Bert L. Reiner states, "It is my opinion that a 'reasonably foreseeable abuse' would include a child placing this ball in his or her mouth, whether for sensory purposes or to remove the figurine, and that increasing the diameter of the ball would have greatly reduced or eliminated the present choking hazard."(Reiner Aff. ¶ 11)

**\*10** Defendants argue that this opinion testimony from Brazier's experts is not sufficiently reliable and thus inadmissible under Rule 702 of the Federal Rules of Evidence. According to defendants, these opinions do not satisfy the requirements of Rule 702 because they are not based upon sufficient data and because they are not the product of reliable principles and methods. (Memorandum of Defendants in Reply ("Def. Reply Memo.") at 20-24) Defendants also criticize these opinions because they are unpublished,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835
**2004 WL 515536 (S.D.N.Y.)**

expressed solely for the purpose of litigation, and allegedly contradict earlier opinions from the same experts. (*Id.* at 24-28,385 N.Y.S.2d 328) Because defendants raised all of these arguments for the first time in their reply, Brazier has not yet had an opportunity to respond with his own arguments and supplementary affidavits. Accordingly, Brazier has until April 28, 2004, to submit a response to defendants' attacks on his experts. This response should include a memorandum of law addressing defendants' arguments and supplementary affidavits from all three experts that provide more information about the data and methodology the experts employed to arrive at the conclusions listed in the previous paragraph. If defendants then wish to submit a reply, they may do so by May 19, 2004. Upon receipt of these papers, I will determine the admissibility of Brazier's experts' testimony and, in turn, will rule on defendants' motion for summary judgment on the negligence claim insofar as it is based on an alleged design defect in the size of the Pokemon Power Bouncer.

### VI.

[10] Punitive damages are available in ordinary New York tort actions only if the plaintiff can show "the existence of circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton."*Carvel Corp. v. Noonan,* 350 F.3d 6, 24 (2d Cir.2003) (quoting *Prozeralik v. Capital Cities Communications, Inc.,* 82 N.Y.2d 466, 479, 605 N.Y.S.2d 218, 226, 626 N.E.2d 34 (1993)) (internal quotation marks omitted). In this case, Brazier alleges that defendants acted with conscious indifference to Robert Brazier by marketing the Pokemon Power Bouncer even though they knew that the product posed a risk of potentially catastrophic harm to children over 4. (Compl. ¶¶ 37-40; Am. Com pl. ¶¶ 48-51) However, Brazier has produced no evidence to support this allegation, and nothing in the record suggests that defendants had any knowledge about any potential danger from the Pokemon Power Bouncer. Because Brazier has failed to support his allegations with any evidence that could allow a reasonable jury to award punitive damages in this case, defendants are entitled to summary judgment dismissing this claim.

For the reasons stated above, defendants' summary judgment motion is granted for all claims except for the portion of Brazier's negligence claim that is based on alleged design defects in the size of the Pokemon Power Bouncer. Because I must determine the admissibility of Brazier's experts' testimony before deciding whether summary judgment is appropriate on that remaining negligence claim, the parties are directed to submit additional briefs and affidavits in accordance with the instructions in Part V(B) of this opinion. Based on the foregoing discussion, Brazier's Rule 11 motion, which requests sanctions against defendants for filing a baseless summary judgment motion, is denied.

**\*11** SO ORDERED:

S.D.N.Y.,2004.
Brazier v. Hasbro, Inc.
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                      Page 1
Slip Copy, 2007 WL 684133 (S.D.Ill.)
**2007 WL 684133 (S.D.Ill.)**

C Brown v. SBC Communications, Inc.
S.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Illinois.
Charles E. BROWN, on behalf of himself, and all
others similarly situated, Plaintiff,
v.
SBC COMMUNICATIONS, INC., Enhanced
Services Billing, Inc., Billing Services Group, LLC,
Abry Partners, LLC, ILD Telecommunications, Inc .,
and ILD Teleservices, Inc., Defendants.
**No. 05-cv-777-JPG.**

March 1, 2007.

Alan J. Konigsberg, Levy, Phillips et al., James G.
Flynn, Robert I. Harwood, Wechsler Harwood, New
York, NY, Judy L. Cates, Cates Law Firm, Swansea,
IL, for Plaintiff.
Leslie M. Smith, Jeffrey R. Miller, Joseph M.
Russell, Kirkland & Ellis, Geoffrey A. Vance,
Mcdermott, Will et al., Chicago, IL, Michael F.
Dahlen, Thomas R. Frenkel, Feirich, Mager et al.,
Carbondale, IL, Gregory F. Harley, Burr & Forman
LLP, Atlanta, GA, James C. Cook, Walker &
Williams Belleville, IL, for Defendants.

### MEMORANDUM AND ORDER

J. PHIL GILBERT, District Judge.

#### A. Introduction

*1 Plaintiff Charles Brown, a local telephone
subscriber of defendant SBC Communications, Inc.,
("SBC") alleges that on at least eleven occasions in
2004 and 2005, he was billed for telecommunications
services he did not request, a practice Brown calls
"cramming." Brown originally filed this action in the
Circuit Court of the Twentieth Judicial Circuit, St.
Clair County, Illinois, on behalf of himself and a
proposed class of SBC subscribers who allegedly
were subjected to the "cramming" of unauthorized
charges onto their monthly billing statements from
SBC, asserting claims for violations of the Illinois
Consumer Fraud and Deceptive Business Practices

Act, 815 ILCS 505/1-505/12, ("ICFA") and unjust
enrichment. Thereafter, the action was removed to
this Court pursuant to 28 U.S.C. § 1332, as amended
by the Class Action Fairness Act of 2005, Pub.L. No.
109-2, 119 Stat. 4 (codified in scattered sections of
28 U.S.C.) ("CAFA"). By order entered September
29, 2006, the Court held that removal of this case was
proper pursuant to CAFA and denied remand of the
case to state court.

According to the allegations of Brown's complaint,
on at least five occasions (February 2004, March
2004, May 2004, June 2004, and July 2004) Brown's
monthly billing statement from SBC contained a
$14.95 charge for "Traveller Info Svcs # ," which
Brown alleges is a monthly fee for "technical support
services" that he never authorized. Complaint
("Compl.") ¶ 19(a). Likewise, Brown alleges that on
at least six occasions (August 2004, September 2004,
October 2004, November 2004, December 2004, and
January 2005) he was billed a monthly fee of $14.95,
together with taxes and local, state, and federal
charges of $1.36, for "Nationwide Voice Msg," a
"nationwide voice messaging" service Brown never
requested. *Id.* ¶ 19(b). It appears from the complaint
that there is some dispute as to whether Brown in fact
ordered the services at issue. *See id.* ¶ 21.SBC is, as
discussed, Brown's local telephone service or "local
exchange carrier" ("LEC").*Id.* ¶ 19.Defendant
Enhanced Services Billing, Inc., ("ESBI") is,
according to Brown's complaint, a company that bills
consumers directly or through LECs for services
provided by third-party companies in the
telecommunications industry, as is defendant ILD
Telecommunications, Inc. ("ILD"). *See id.* ¶ 5, ¶
8.[FN1] ILD is alleged to be responsible for placing the
unauthorized charges for "Nationwide Voice Msg"
on Brown's SBC billing statement. *Id.* ¶ 8, ¶ 19(b).
Although it is not entirely clear from the allegations
of Brown's complaint, presumably Brown believes
that ESBI is responsible for placing the unauthorized
charges for "Traveller Info Svcs # " on Brown's SBC
billing statement. Defendant Billing Services Group,
LLC, ("BSG") which is also a billing company, is
alleged to own ESBI; defendant Abry Partners, LLC,
("Abry") is alleged to own BSG. *See id.* ¶ 6, ¶ 7.

FN1. Although the caption of Brown's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

complaint lists as separate defendants ILD and ILD Teleservices, Inc., it appears from the allegations of the complaint and from ILD's submissions to the Court that they are in fact the same entity. *See, e.g.,* Compl. ¶ 8. Therefore, throughout this order the Court will refer to both defendants simply as ILD.

**\*2** Brown alleges that all of the defendants acted jointly to "cram" unauthorized charges onto the SBC billing statements of Brown and the members of the proposed class. Brown seeks to represent a class of Illinois residents who were billed for unauthorized charges through their billing statements from SBC from June 16, 2002, to the present. *See* Compl. ¶ 9. This matter currently is before the Court on motions to dismiss for failure to state a claim upon which relief can be granted brought by SBC (Doc. 17), ESBI and BSG (Doc. 12), and Abry (Doc. 15), and on a motion to dismiss for lack of personal jurisdiction brought by ILD (Doc. 13). Having reviewed carefully the submissions of the parties, the Court now is prepared to rule.

**B. Failure to State a Claim Upon Which Relief Can Be Granted**

**1. Legal Standard**

The purpose of a motion to dismiss for failure to state a claim upon which relief can be granted brought pursuant to <u>Rule 12(b)(6) of the Federal Rules of Civil Procedure</u> is to test the sufficiency of a complaint, not to resolve a case on its merits. *See <u>Marshall-Mosby v. Corporate Receivables, Inc., 205 F.3d 323, 326-27 (7th Cir.2000)</u>.* When evaluating a <u>Rule 12(b)(6)</u> motion, a court must accept as true all factual allegations in a complaint and draw all reasonable inferences in a plaintiff's favor. *See <u>Hentosh v. Herman M. Finch Univ. of Health Scis./The Chicago Med. Sch., 167 F.3d 1170, 1173 (7th Cir.1999)</u>.* Because the Federal Rules of Civil Procedure establish a liberal pleading system that requires only notice pleading, a "complaint's mere vagueness or lack of detail is not sufficient to justify a dismissal."<u>*National Serv. Ass'n, Inc. v. Capitol Bankers Life Ins. Co., 832 F.Supp. 227, 230 (N.D.Ill.1993)*</u>. A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."<u>*Conley v.*</u>

<u>*Gibson,* 355 U.S. 41, 45-46 (1957)</u>.*See also <u>Johnson v. Martin, 943 F.2d 15, 16 (7th Cir.1991)</u>.*

**2. ICFA**

ESBI, which, as discussed, is a billing clearinghouse, argues that the misconduct alleged against it in Brown's complaint amounts at most to aiding and abetting a violation of the ICFA. Section 2 of the ICFA provides,

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

**\*3** <u>815 ILCS 505/2</u> (footnote omitted). The Supreme Court of Illinois has held that merely aiding and abetting an ICFA violation, that is, "knowingly receiv[ing] the benefits of another's fraud," is not actionable as a violation of section 2 of the statute. <u>*Zekman v. Direct Am. Marketers, Inc., 695 N.E.2d 853, 859 (Ill.1998)*</u>. In *Zekman* a consumer who allegedly had been induced by fraudulent mailings from a direct mail marketer, Direct American Marketers, Inc ., ("Direct American") to make telephone calls to a 900 number, thus incurring toll charges, brought suit under the ICFA against both Direct American and AT & T, which had billed the consumer for the toll charges, retaining a percentage of the charges and remitting the rest to Direct American. *See id.* at 856.The court concluded that the conduct alleged against the telephone company was not actionable under the ICFA:
We agree with AT & T that the plain language of section 2 of the Act does not include anything that makes it unlawful to knowingly receive the benefits of another's fraud. As this court stated in <u>*Laughlin v.*</u>

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

_Evanston Hospital,_ 133 Ill.2d 374, 390, 140 Ill.Dec. 861, 550 N.E.2d 986 (1990), "[t]he language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others."To allow plaintiff to recover for AT & T's knowingly receiving the benefits of Direct American's fraud would require us to read into the statute violations that are not a part of the statutory text.

\* \* \* \*

Canons of statutory interpretation additionally guide our decision that knowingly receiving the benefits of another's fraud is not actionable under section 2 of the Act. When a statute provides a list that is not exhaustive, as section 2 does ("including but not limited to ..."), the class of unarticulated things will be interpreted as those that are similar to the named things.... The common feature of the forms of conduct listed in section 2 of the Act is that they involve actions directly done by the perpetrator of the fraud. Knowingly receiving the benefits of another's fraud, however, more closely resembles a form of secondary liability. We believe that a claim for knowingly receiving the benefits of another's fraud is not so similar to the enumerated violations of section 2 of the Act that the legislature intended for it to be a cause of action under that statute. With no clear indication from the legislature that such conduct violates section 2 of the Act, we cannot extend liability to those who knowingly receive the benefits of another's fraud.

_Id._ at 859.

In the case at bar the Court agrees with Brown that the allegations of his complaint establish more than ESBI's passive involvement in the alleged fraud. Brown's complaint alleges,

Service providers or LECs sometimes use several billing clearinghouses to obtain the different services needed to get the billing information ready for the LECs. For example, one billing clearinghouse might provide a "rating" service, i.e., applying the proper charges for each call made. A second billing clearinghouse may then actually prepare and submit the resulting data to the LEC. In this instance, the actual carrier or service provider is three steps removed from the customer. The chain is: carrier or service provider, first billing agent, second billing

agent, LEC, and end-use customer. When the customer pays the bill, the money flows in reverse sequence from the LEC to the carrier or service provider. Because customers may subsequently seek refunds, LECs and billing agents typically hold a percentage of the payments as reserves.

\*4 \* \* \* \*

The use of billing agents creates a situation that facilitates cramming by carriers and service providers. On the basis of invalid authorizations, such carriers and service providers are able to generate accounts receivable before the end-use customers are even billed. Once these customers are billed, many of them unwittingly pay the unauthorized charges, each of which is in a small enough amount to "fly under the radar" of many subscriber's suspicions.

Compl. ¶¶ 17-18. Concerning ESBI, Brown's complaint alleges that "ESBI is no stranger to cramming.... [O]n August 6, 2001, the Federal Trade Commission announced that ESBI, among others, had agreed to settle FTC allegations that ESBI ... failed to adequately police the practice of vendors who engaged in cramming."_Id._ ¶ 22(b). In _Saltzman v. Enhanced Services Billing, Inc .,_ 811 N.E.2d 191 (Ill.App.Ct.2003), the court reversed a trial court's dismissal of cramming claims against ESBI substantially identical to those asserted in this case. The court said, "the complaint in this case alleged that it was ESBI's practice to receive billing information from [a third-party service provider], and without any evidence of authorization, place the 'bogus' charge on the victim's telephone bill, in effect, representing that the customer owed the charge."_Id. at 197._The court found these allegations distinguishable from the allegations at issue in _Zekman._"In our view, these allegations are different from the one made in ... the ... complaint in _Zekman,_ which only alleged that AT & T knowingly received the benefits of Direct American's deceptive practices in violation of section 2 of the Fraud Act."_Id._

The _Saltzman_ court concluded, "we find that a question of fact exists as to whether the practice of billing phone customers, for charges that are not authorized and cannot be verified while representing that charges are owed, amounts to a direct participation in the fraud under section 2 of the Consumer Fraud Act ."811 N.E.2d at 199. In so

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

holding, the court gave weight to the consent order entered into by the FTC and ESBI, noting that section 2 of the ICFA mandates that, in construing the statute, courts must give consideration to the FTC's interpretation of what constitutes deceptive trade practices for purposes of the Federal Trade Commission Act. *See id.* at 199-200. This Court agrees with *Saltzman* that the conduct at issue here is distinguishable from the conduct at issue in *Zekman.* In contrast to *Zekman,* where the defendant telephone company merely billed the plaintiff for calls the plaintiff freely admitted he had made, here ESBI is alleged to have billed consumers, including Brown, for services they never ordered. ESBI's role in the alleged fraud is hardly peripheral. In fact it is quite central: ESBI is the means by which the unauthorized charges wind up on the customer's bill. Therefore, the Court concludes that Brown has stated a claim for relief against ESBI.

**\*5** Although SBC and Abry argue that Brown failed to use proper diligence in reviewing his telephone billing statement for unauthorized charges, it is well settled that under the ICFA "[a] plaintiff ... does not have to show actual reliance or diligence in ascertaining the accuracy of [a defendant's] misstatements." *Grove v. Huffman,* 634 N.E.2d 1184, 1188 (Ill.App.Ct.1994). *See also Duran v. Leslie Oldsmobile, Inc.,* 594 N.E.2d 1355, 1361 (Ill.App.Ct.1992) ("A plaintiff's diligence in ascertaining the accuracy of misstatements was ... eliminated as an element of fraud by the [ICFA]."); *Munjal v. Baird & Warner, Inc.,* 485 N.E.2d 855, 864 (Ill.App.Ct.1985) ( "[U]nder the [ICFA], it is not necessary for a plaintiff to show actual reliance nor diligence in ascertaining the accuracy of the misstatements."); *Beard v. Gress,* 413 N.E.2d 448, 452 (Ill.App.Ct.1980) ("[N]either the mental state of the person making a misrepresentation nor the diligence of the party injured to check as to the accuracy of the misrepresentation [is] material to the existence of a cause of action for that misrepresentation under [the ICFA]."); *Grimes v. Adlesperger,* 384 N.E.2d 537, 539 (Ill.App.Ct.1978) ( "[T]he [ICFA] ... does not place a burden upon the plaintiff to check out the validity of the [misrepresentation]."). Moreover, it is apparent from the allegations of Brown's complaint that the nature of telephone cramming schemes is to insert small charges into consumers' telephone bills in the expectation that they will not notice the charges or, if they do, that they will not understand that the charges

are improper. To hold that consumers are without a remedy precisely because a telephone cramming scheme worked as it was intended to do would be, in the Court's opinion, absurd. It is the case, of course, that to establish proximate causation for purposes of the ICFA Brown must show that he was actually deceived by the misrepresentations at issue in this case. *See Oshana v. Coca-Cola Bottling Co.,* 225 F.R.D. 575, 585 (N.D.Ill.2005) (applying Illinois law) ("[T]o establish proximate causation and thus a violation of [the ICFA], a plaintiff actually must be deceived."). At the pleading stage, however, all that is necessary to allege proximate causation is to assert, as Brown does, that after the alleged misrepresentations were made, the wrongful charges were paid. *See Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 595 (Ill.1996) (allegations that, after an auto manufacturer suppressed material facts about the safety of certain sport utility vehicles, consumers purchased the vehicles were sufficient to plead proximate causation under the ICFA: "[T]he required allegation of proximate cause is minimal since that determination is best left to the trier of fact."). *See also AGFA Corp. v. Wagner Printing Co.,* No. 02 C 2400, 2002 WL 1559663, at \*4 (N.D.Ill. July 10, 2002).[FN2]

> FN2. Additionally, the Court rejects ESBI's contention that Brown has failed adequately to plead damages because he does not allege that he actually paid the charges at issue in this case. In fact Brown's complaint alleges that "[d]uring the Class Period, Plaintiff and members of the Class paid their SBC telephone billing statement which included charges which they neither authorized nor used." Compl. ¶ 31. Moreover, Brown's complaint alleges that he first noticed unauthorized charges on his SBC billing statement early in 2005, and that the unauthorized charge for "Traveller Info Svcs # " appeared on his billing statements for February 2004, March 2004, May 2004, June 2004, and July 2004, while the unauthorized charge for "Nationwide Voice Msg" appeared on his billing statements for August 2004, September 2004, October 2004, November 2004, December 2004, and January 2005. *See id.* ¶ 19, ¶ 20. A reasonable inference to be drawn from these allegations is that, prior to his discovery of the charges in early 2005, Brown paid them;

otherwise his telephone service likely would have been discontinued.

Finally, the Court disagrees with SBC, ESBI, BSG, and Abry that Brown's ICFA claim is not pleaded with adequate particularity under Rule 9 of the Federal Rules of Civil Procedure, which provides in pertinent part that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b).See also Eromon v. Grand Auto Sales, Inc., 351 F.Supp.2d 825, 827 (N.D.Ill.2004) (ICFA claims are subject to the pleading requirements of Rule 9(b)); Jiang v. Allstate Ins. Co., 199 F.R.D. 267, 272 (N.D.Ill.2001) (same). To satisfy the requirements of Rule 9(b), a plaintiff must "identi[f]y ... the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated,"Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir.1992) (quoting Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir.1992)). In other words, the plaintiff must plead "the who, what, when, where, and how: the first paragraph of any newspaper story."Crichton v. Golden Rule Ins. Co., Civil No. 06-264-GPM, 2006 WL 2349961, at *4 (S.D.Ill. Aug. 11, 2006) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990)). The purpose of Rule 9(b) is "to ensure that the party accused of fraud ... is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading,"Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 783 (7th Cir.1999), and to compel plaintiffs to undertake adequate pre-filing investigation of claims of fraud, so that defendants are not injured by groundless charges of deceit. See Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir.1999) ("The purpose ... of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint. Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual).").

**\*6** In this instance, as discussed, Brown has identified eleven specific occasions when his billing statement from SBC allegedly contained

unauthorized charges for services he did not request. Brown has alleged that the charges were placed on his billing statement by billing clearinghouses (ESBI and ILD), then collected by SBC. Brown's complaint explains the role of each of the defendants in the alleged fraudulent scheme. See Heastie v. Community Bank of Greater Peoria, 690 F.Supp. 716, 722 (N.D.Ill.1988) (finding that an ICFA claim against two defendants arising from a fraudulent mortgage-lending scheme was pleaded with adequate particularity where "[t]he complaint alleges how FAMCO's and Alliance's scheme operated and, as between the two, who did what [.]"). It is apparent both that the complaint is the product of ample pre-filing investigation and that the defendants have adequate notice of the nature of Brown's claims to frame responsive pleadings. It also is apparent that Brown has pleaded to the extent of his knowledge at this time. Rule 9(b) is not to be applied in a manner that penalizes a plaintiff for lack of access to information through discovery. "We don't want to create a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery (normally of the defendant, because the essential information is in his possession and he will not reveal it voluntarily) that she could not conduct before filing the complaint....Rule 9(b) is relaxed upon a showing of such inability."Emery v. American Gen. Fin., Inc., 134 F.3d 1321, 1323 (7th Cir.1998). Importantly, Rule 9(b) is not to be read in isolation but instead is intended to be applied in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires of course only a short and plain statement of a plaintiff's claim. See Tomera v. Galt, 511 F.2d 504, 508 (7th Cir.1975). When Rule 9 is read in conjunction with Rule 8, a plaintiff is required to plead only "slightly more" than is demanded under ordinary notice pleading. Id. at 508.More specifically, a plaintiff must plead "the bare bones" of a fraudulent scheme, by supplying "a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants."Id. at 508, 509.The reason, of course, is that under the liberal discovery provisions of the Federal Rules of Civil Procedure, "[m]ore information can be gathered through discovery."Id. at 509.The allegations of Brown's complaint obviously comply with the standard set out in Tomera and thus, the Court finds that Brown's ICFA claim is pleaded with adequate particularity.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)
**2007 WL 684133 (S.D.Ill.)**

**3. Unjust Enrichment**

As discussed, in addition to a claim under the ICFA, Brown's complaint also asserts a claim for unjust enrichment. To state a claim for unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."*BancInsure v. BMB Elec. Co.,* No. 03 C 2692, 2004 WL 765124, at *3 (N.D.Ill. Apr. 8, 2004) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 679 (Ill.1989)).*See also M & O Insulation Co. v. Harris Bank Naperville,* 783 N.E.2d 635, 639 (Ill.App.Ct.2002) (to prevail on a claim of unjust enrichment "a plaintiff must present evidence that the defendant unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of that benefit violated fundamental principles of justice, equity, and good conscience."). In this case, Brown alleges that he and the members of the proposed class have been charged for services they never ordered, and that the unauthorized charges they have paid constitute a benefit unjustly conferred on the defendants that must be disgorged:

*7 During the Class Period, Plaintiff and members of the Class paid their SBC telephone billing statement which included charges which they neither authorized nor used.

* * * *

Defendant SBC received the continued use and benefit of the improperly paid amounts by Plaintiff and members of the Class together with interest earned on the improperly billed and paid amounts.

* * * *

Defendants ESBI, ILD, Abry, [and] BSG ... received payments resulting from the improperly paid amounts by Plaintiff and members of the Class.

* * * *

Defendant SBC is and has been in possession, custody, and/or control of the improperly billed and

paid amounts during all relevant times.

* * * *

Defendants ESBI, ILD, Abry, [and] BSG ... are and have been in possession, custody, and/or control of unlawfully obtained profits resulting from the improperly billed and paid amounts during all relevant times.

* * * *

The improperly paid amounts are property of Plaintiff and the members of the Class.

* * * *

As a consequence, Defendants SBC, ESBI, ILD, Abry, [and] BSG ... have been and continue to be unjustly enriched by virtue of [their] continued possession of the improperly billed and paid amounts. Accordingly, Defendants must return the improperly billed and unpaid [sic] amounts to Plaintiff and members of the Class.

Compl. ¶¶ 30-37.

Although the allegations of Brown's complaint clearly state a claim for unjust enrichment, the defendants nonetheless raise a number of objections. For example, both SBC and Abry seem to suggest that, because Brown in fact received a valuable service in return for the charges at issue, there has been no unjust enrichment. Assuming for the sake of argument that any services were in fact made available to Brown in return for the charges at issue, the complaint specifically alleges that Brown never used the services for which he was charged, *see* Compl. ¶ 30, and in fact the entire point of Brown's allegations is that neither he nor any of the members of the proposed class requested such services or were aware that they were being charged for them. It is impossible to fathom how providing Brown with a service he did not request, did not use, and was not aware he was paying for could foreclose Brown's right to seek restitution. If the gist of the argument is that SBC or Abry have suffered a detriment as a result of allegedly furnishing services to Brown and the members of the proposed class, *see*Restatement (First) of Restitution § 69 (1937), that obviously is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

not a question the Court can address in resolving a Rule 12(b)(6) motion, which, as discussed, simply tests the legal sufficiency of the allegations of a plaintiff's complaint.

To the extent the defendants argue that their conduct was merely negligent or does not otherwise rise to the level of inequity required to maintain a claim for unjust enrichment, the Court does not agree. The Court does not interpret Illinois law as requiring wrongful conduct as a necessary element of an unjust enrichment claim. *See Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 738 n. 3 (7th Cir.1990) (quoting *Partipilo v. Hallman*, 510 N.E.2d 8, 11 (Ill.App.Ct.1987)) ("[A] cause of action based on unjust enrichment ... does not require fault on the part of the defendant."); *Board of Highway Comm'rs, Bloomington Township v. City of Bloomington*, 97 N.E. 280, 285 (Ill .1911) (imposing quasi-contract liability despite an absence of "wrongful intention on the part of anyone in connection with this transaction.")."The cause of action based on unjust enrichment ... does not require fault or illegality on the part of the defendant; rather, the essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment."*Firemen's Annuity & Benefit Fund v. Municipal Employees', Officers', & Officials' Annuity & Benefit Fund of Chicago*, 579 N.E.2d 1003, 1007 (Ill.App.Ct.1991). In any event, as discussed, Brown clearly alleges fraud on the part of the defendants.

**\*8** Finally, while SBC contends that it has received no benefit as a result of the practices complained of in this case, the Court finds it unlikely that SBC received no compensation for collecting the allegedly unauthorized charges and, most importantly, the allegations of Brown's complaint, with which the Court is solely concerned at this juncture, plainly assert that SBC has received an unjust benefit as a result of collecting the charges. As to the argument SBC raises by way of a reply brief that, because its relationship with Brown is governed by an express contract, it cannot be liable to Brown in quasi-contract, while the Court will give this issue careful attention at the summary judgment stage, at the pleading stage Brown is entitled to assert a claim in quasi-contract, regardless of the existence of an express contract. *See*Fed.R.Civ.P. 8(e)(2) (authorizing a party to "set forth two or more

statements of a claim or defense alternately or hypothetically" and to "state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds."); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F.Supp.2d 1069, 1116-17 (S.D.Ind.2001) (permitting plaintiffs to assert at the pleading stage alternative theories of relief based on contract and quasi-contract); *Quadion Corp. v. Mache*, 738 F.Supp. 270, 278 (N.D.Ill.1990) (same); *McIntosh v. Magna Sys., Inc.*, 539 F.Supp. 1185, 1190-91 (N.D.Ill.1982) (same).*Cf. Donaldson v. Pharmacia Pension Plan*, 435 F.Supp.2d 853, 869 n. 5 (S.D.Ill.2006) (quoting *Weft, Inc. v. G.C. Inv. Assocs.*, 630 F.Supp. 1138, 1144 (E.D.N.C.1986)) (under Rule 8(e)(2), "[a]lthough plaintiffs may not obtain a duplicative recovery, there is no requirement that they elect one remedy over another prior to final judgment."). The Court concludes that Brown has stated a claim for unjust enrichment.

**4. Voluntary Payment Doctrine**

SBC and Abry contend that Brown's claims are barred by the voluntary payment doctrine. Generally speaking, the voluntary payment doctrine is "a corollary to the mistake of law doctrine" and holds that "a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution."*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir.2006) (quoting *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667 (7th Cir.2001)).*See also Edward P. Allison Co. v. Village of Dolton*, 181 N.E.2d 151, 153 (Ill.1962); *Illinois Glass Co. v. Chicago Tel. Co.*, 85 N.E. 200, 201 (Ill.1908); *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1329-30 (Ill.App.Ct.1995). The Court finds that dismissal is not warranted on this ground.

As Brown points out, the voluntary payment doctrine applies solely to payments made under a mistake of law. In this case, of course, Brown alleges that the payments at issue were not voluntary at all and instead were procured through fraud, which is a well-recognized exception to the voluntary payment doctrine. *See, e.g., Flournoy v. Ameritech*, 814 N.E.2d 585, 588-89 (Ill.App.Ct.2004) (holding that the voluntary payment doctrine did not bar a former prison inmate's suit against a telephone company that provided telephone service to the prison where the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

inmate was held to recover toll charges incurred as a result of the company's alleged policy of intentionally terminating collect calls from the prison for the purpose of collecting multiple fees and surcharges, where the payments allegedly were procured through fraud). The voluntary payment doctrine likewise does not bar claims to recover payments made under a mistake of fact, and thus would not bar the claims of Brown and the proposed class if they made the payments at issue under a mistake of fact as to whether they had in fact ordered the services for which they allegedly were billed. See *Randazzo,* 262 F.3d at 668 (noting that "Illinois recognizes the traditional defenses to the voluntary payment doctrine," including "fraud and mistake of fact"). Finally, the Illinois Supreme Court has held that payments coerced through explicit or implicit threats to terminate telephone service are not voluntary and instead are the product of duress such as to take them out of the scope of the voluntary payment doctrine. See *Getto v. City of Chicago,* 426 N .E.2d 844, 850-51 (Ill.1981).

**\*9** In the Court's view, the applicability of the various exceptions to the voluntary payment doctrine is not an issue susceptible to resolution on the pleadings. See *Crain v. Lucent Techs., Inc.,* 739 N.E.2d 639, 644 (Ill.App.Ct.2000) (noting that under Illinois law the question of the applicability of the voluntary payment doctrine and exceptions thereto is essentially factual and that "[t]he resolution of this issue will require the presentation of evidence so that the court or fact finder can determine whether a payment was voluntarily made without protest and without fraud or mistake."). At this juncture it is sufficient that, under some set of facts consistent with the allegations of Brown's complaint, he could be entitled to relief on his claims. Therefore, the Court declines to dismiss Brown's claims on the basis of the voluntary payment doctrine.[FN3]

> FN3. The Court also expresses some skepticism about the applicability of the voluntary payment doctrine to Brown's claim under the ICFA. The ICFA is of course remedial legislation that is construed broadly to effect its purpose, namely, to eradicate all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers. See *Peter J. Hartmann Co. v. Capital Bank & Trust*

*Co.,* 694 N.E.2d 1108, 1116 (Ill.App.Ct.1998). The ICFA "creat[es] a new cause of action that affords consumers broad protection by prohibiting any 'deception' or 'false promise.' " *Miller v. William Chevrolet/GEO, Inc.,* 762 N .E.2d 1, 11 (Ill.App.Ct.2001) (quoting *Smith,* 658 N.E.2d at 1335). Although the Court need not decide the issue, the Court notes authority for the view that remedial legislation like the ICFA is not subject to common-law defenses. See *Simmons v. Union Elec. Co .,* 473 N.E.2d 946, 954 (Ill.1984) (comparative negligence was not a defense in actions under the now-repealed Structural Work Act, a remedial statute intended to protect persons engaged in extra-hazardous occupations like the construction, repair, alteration, or removal of buildings, bridges, viaducts, and other structures); *Kelsay v. Motorola, Inc.,* 384 N.E.2d 353, 356 (Ill.1978) (the Illinois Workers' Compensation Act is remedial legislation intended to compensate injured workers by depriving employers of common-law defenses like contributory negligence); *Nelson v. Araiza,* 372 N.E.2d 637, 639 (Ill.1978) (the affirmative defense of contributory negligence is not available in a suit under the Illinois Dram Shop Act, which is a statutory right of action not based on negligence).See also *Autohaus, Inc. v. Aguilar,* 794 S.W.2d 459, 461-62 (Tex.App.1990) (common-law defenses are not available in an action under the state Deceptive Trade Practices Act ("DTPA"): "The DTPA does not represent a codification of the common law. A primary purpose of the enactment of the DTPA was to provide consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit.").

**5. Corporate Veil**

Finally, both BSG and Abry assert the corporate form as grounds for dismissal of Brown's claims against those defendants. Specifically, BSG contends that it cannot be held liable in this case merely because

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

ESBI is its wholly-owned subsidiary, and Abry contends that it cannot be held liable merely by virtue of having been a past or present shareholder in BSG. Both defendants are correct."Under Illinois law, a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and, generally, from other corporations with which it may be affiliated."*Van Dorn Co. v. Future Chem. & Oil Corp., 753 F.2d 565, 569 (7th Cir.1985)* (citing *Main Bank of Chicago v. Baker, 427 N.E.2d 94 (Ill.1981)).See also Polites v. U.S. Bank Nat'l Ass'n, 836 N.E.2d 133, 137 (Ill.App.Ct.2005)* ("In Illinois, corporations are treated as separate legal entities even where one wholly owns the other and the two have mutual dealings."); 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 25 (perm.ed., rev.vol.1999) ( "It is generally accepted that the corporation is an entity distinct from its shareholders ... with rights and liabilities not the same as theirs individually and severally.") (collecting cases). In rare instances courts will disregard the corporate form to impose liability on shareholders and affiliated corporations if there is "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist" and "circumstances [are] such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice."*Van Dorn Co., 753 F.2d at 569-70. See also Main Bank of Chicago, 427 N.E.2d at 101* (under Illinois law courts will disregard the corporate form where it is shown that a corporation "is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."). However, piercing the corporate veil is an equitable remedy that Illinois courts should "undertake[ ] reluctantly." *Walker v. Dominick's Finer Foods, Inc., 415 N.E.2d 1213, 1217 (Ill.App.Ct.1980).*

**\*10** While the Court recognizes the primacy of the doctrine of separate corporate identity, the Court is not aware of any requirement that a plaintiff plead facts to establish grounds for piercing the corporate veil. *See Ishkhanian v. Forrester Clinic S .C., No. 02 C 9339, 2003 WL 21479072, at \*3 (N.D. Ill. June 25, 2003)* ("[I]n order for the claim to withstand a motion to dismiss for failure to state a claim in federal court, no ... substantial showing ... of fact [regarding the

propriety of piercing the corporate veil] is demanded."); *Steel Warehouse of Wis., Inc. v. Caterpillar, Inc., No. 90 C 20053, 1990 WL 304266, at \*2 (N.D.Ill. Nov. 13, 1990)* (a complaint was not subject to dismissal for failure to state a claim upon which relief can be granted merely because it did not plead the elements that must be proven to pierce the corporate veil under Illinois law). Although the Court will give close scrutiny to Brown's claims against BSG and Abry at the summary judgment stage, the Court concludes that those claims are not subject to dismissal at the pleading stage.

## C. Lack of Personal Jurisdiction

As discussed, ILD has moved for dismissal from this action on grounds of lack of personal jurisdiction. On a motion to dismiss for lack of personal jurisdiction brought pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a plaintiff bears the burden of proving that personal jurisdiction exists. *See Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 939 (7th Cir.2000).* When a motion to dismiss is to be decided solely on written materials, the plaintiff need only make a prima facie case for personal jurisdiction. *See Neiman v. Rudolf Wolff & Co., 619 F.2d 1189, 1190 (7th Cir.1980).* In deciding the motion to dismiss, the court may receive and consider affidavits from both parties. *See Greenberg v. Miami Children's Hosp. Research Inst., Inc., 208 F.Supp.2d 918, 922 (N . D.Ill.2002)* (citing *Kontos v. United States Dep't of Labor, 826 F.2d 573, 576 (7th Cir.1987)).*"[A]ll well-pleaded jurisdictional allegations in the complaint are accepted as true unless controverted by affidavit."*Travelers Cas. & Sur. Co. v. Interclaim (Bermuda) Ltd., 304 F.Supp.2d 1018, 1021 (N.D.Ill.2004).See also Turnock v. Cope, 816 F.2d 332, 333 (7th Cir.1987).* Any conflicts in the pleadings and affidavits are to be resolved in a plaintiff's favor, but a court accepts as true any facts contained in a defendant's affidavits that remain unrefuted by the plaintiff. *See Continental Cas. Co. v. Marsh, No. 01 C 0160, 2002 WL 31870531, at \*2 (N.D.Ill.Dec. 23, 2002)* (citing *RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1275 (7th Cir.1997)).*

In a case based upon diversity of citizenship, a federal district court sitting in Illinois has personal jurisdiction over a nonresident defendant only if an Illinois court would have jurisdiction. *See Netzky v.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

_Fiedler,_ No. 00 C 4652, 2001 WL 521396, at *1 (N.D.Ill. May 15, 2001). For an Illinois court to have personal jurisdiction over a nonresident defendant, personal jurisdiction must be permitted by: (1) Illinois statutory law; (2) the Illinois Constitution; and (3) the Constitution of the United States. _See Continental Cas. Co.,_ 2002 WL 31870531, at *4. With respect to Illinois statutory law, the Illinois long-arm statute, _735 ILCS 5/2-209,_ extends personal jurisdiction to the limit allowed under the Illinois Constitution and the United States Constitution. _See LaSalle Bank Nat'l Ass'n v. Epstein,_ No. 99 C 7820, 2000 WL 283072, at *1 (N.D.Ill. Mar. 9, 2000) (citing _RAR, Inc.,_ 107 F.3d at 1276)."Because the Illinois statute authorizes personal jurisdiction to the [federal] constitutional limits, the three inquiries ... collapse into two constitutional inquiries-one state and one federal."_Continental Cas. Co.,_ 2002 WL 31870531, at *4 (quoting _RAR, Inc.,_ 107 F.3d at 1276). If jurisdiction is improper under either the Illinois Constitution or the United States Constitution, a court cannot exercise jurisdiction over a defendant. _See id._

**\*11** The Illinois Supreme Court has held that, under the Illinois Constitution's guarantee of due process, jurisdiction is to be "asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois."_Hyatt Int'l Corp. v. Coco,_ 302 F.3d 707, 715 (7th Cir.2002) (quoting _Rollins v. Ellwood,_ 565 N.E.2d 1302, 1316 (Ill.1990)). The United States Court of Appeals for the Seventh Circuit has recognized that the Illinois courts "have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction."_RAR, Inc.,_ 107 F.3d at 1276. Furthermore, the Seventh Circuit Court of Appeals has held that "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction."_Hyatt Int'l Corp.,_ 302 F.3d at 715.

Correspondingly, district courts in this Circuit typically analyze personal jurisdiction solely with reference to federal due process standards, not Illinois due process standards. _See Continental Cas. Co.,_ 2002 WL 31870531, at *4 (conducting only a federal due process analysis because the parties did

not present any evidence to suggest that the outcome would be otherwise under state law); _United Fin. Mortgage Corp. v. Bayshores Funding Corp.,_ 245 F.Supp.2d 884, 891-92 (N.D.Ill.2002) (condensing the personal jurisdiction analysis to a single federal due process inquiry). In this case, the parties make no arguments regarding whether personal jurisdiction would be fair, just, and reasonable under the Illinois Constitution. Rather, they dispute whether personal jurisdiction would comport with federal due process requirements. Thus, the Court will proceed to the federal due process inquiry. _See MAC Funding Corp. v. Northeast Impressions, Inc.,_ 215 F.Supp.2d 978, 980 (N.D.Ill.2002) (proceeding directly to the federal personal jurisdiction analysis where the parties failed to address Illinois standards and the court's own research revealed nothing that would indicate that Illinois law would lead to a different outcome than federal law).

Under the United States Constitution, the Due Process Clause of the Fourteenth Amendment limits a court's power to assert personal jurisdiction over a nonresident defendant. _See RAR, Inc.,_ 107 F .3d at 1277 (citing _Pennoyer v. Neff,_ 95 U.S. 714, 733 (1878)). Federal due process requires that a nonresident defendant have certain minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " _Hyatt Int'l Corp.,_ 302 F.3d at 716 (quoting _International Shoe Co. v. Washington,_ 326 U.S. 310, 316 (1945)). This standard varies depending on whether the jurisdiction alleged is general or specific. _See RAR, Inc.,_ 107 F.3d at 1277. "[G]eneral jurisdiction allows a defendant to be sued in the forum regardless of the subject matter of the litigation ." _Purdue Research Found. v. Sanofi-Synthelabo, S.A.,_ 338 F.3d 773, 787 (7th Cir.2003). It is permitted "only where the defendant has 'continuous and systematic general business contacts' with the forum." _Id._ (quoting _Helicopteros Nacionales de Colombia, S.A., v. Hall,_ 466 U.S. 408, 416 (1984)). "Those contacts must be so extensive as to make it 'fundamentally fair to require [defendants] to answer in any [Illinois] court in any litigation arising out of any transaction or occurrence taking place anywhere in the world.' " _Travelers Cas. & Sur. Co.,_ 304 F.Supp.2d at 1024 (quoting _Purdue Research Found.,_ 338 F.3d at 787) (emphasis omitted). Several factors are considered in making this analysis: (1) whether and to what extent a defendant conducts business in the forum state; (2)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state. *See Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc., 262 F.Supp.2d 898, 906-07 (N.D.Ill.2003).* General jurisdiction is a demanding standard that is "considerably more stringent ... than that required for specific jurisdiction." *Purdue Research Found., 338 F.3d at 787. See also Griffith v. Wood Bros., No. 04 C 3118, 2004 WL 2418296, at *8 (N.D.Ill. Oct. 27, 2004).*

**\*12** In this instance the parties do not dispute that general jurisdiction over ILD is lacking. The uncontroverted affidavit of Kathy McQuade, the vice president of ILD's billing and collection division, establishes that ILD is a Florida-based corporation that has no office or employees in Illinois, sends no employees into Illinois to conduct business, and has no continuous and systematic general business contacts with Illinois. *See* Doc. 14, Ex. A ¶¶ 2-4. The charge for "Nationwide Voice Msg" Brown alleges ILD placed on his billing statement arises from a contract for billing services entered by ILD with a non-Illinois company called National Voice Messaging, Inc. *See id.* ¶ 11.Brown does not argue that the Court has general jurisdiction over ILD and instead argues that the Court has specific jurisdiction over ILD. The Court agrees.

By contrast with general jurisdiction, in specific jurisdiction cases a suit must "arise out of" or be "related to" the defendant's minimum contacts with the forum state. *Hyatt Int'l Corp., 302 F.3d at 716.* In determining whether specific personal jurisdiction exists, a court must first address whether a defendant has "purposefully established minimum contacts within the forum State."*Id.* (quoting *Burger King Corp. v. Rudzewicz, 471 U .S. 462, 476 (1985)).* It is critical that the court determine whether the defendant "should reasonably anticipate being haled into court [in the forum State]."*Id.*(quoting *Burger King Corp., 471 U.S. at 474).* The defendant may reasonably anticipate being haled into court in the forum state when it has " 'purposefully avail[ed] itself of the privilege of conducting activities' there."*Id.* (quoting *Burger King Corp., 471 U.S. at*

475). If the court determines that minimum contacts with the forum exist, the court must then determine whether those contacts would make personal jurisdiction "reasonable and fair under the circumstances."*RAR, Inc., 107 F.3d at 1277.* After minimum contacts have been established, a defendant "can only escape jurisdiction by making a 'compelling case' that forcing it to litigate in [the forum] would violate traditional notions of fair play and substantial justice."*Logan Prods., Inc. v. Optibase, Inc., 103 F.3d 49, 53 (7th Cir.1996)* (quoting *Burger King Corp., 471 U.S. at 477).* In assessing whether jurisdiction is consistent with fair play and substantial justice a court should consider: (1) the burden on a defendant in litigating in the forum; (2) the interests of the forum state; (3) a plaintiff's interest in obtaining convenient and effective relief; (4) the interests of the interstate judicial system in obtaining an efficient resolution of the controversy; and (5) the interests of the several states in furthering fundamental substantive policies. *See id. See also Eragen Biosciences, Inc. v. Nucleic Acids Licensing, LLC, 447 F.Supp.2d 930, 939 (W.D.Wis.2006); Andersen v. Sportmart, Inc., 57 F.Supp.2d 651, 661 (N.D.Ind.1999).*

**\*13** Under the "effects doctrine," specific personal jurisdiction over a nonresident defendant is proper when the defendant's intentional tortious actions aimed at the forum state cause harm to a plaintiff in the forum state, and the defendant knows such harm is likely to be suffered. In *Calder v. Jones, 465 U.S. 783 (1984),* the Court held that it was proper for a California court to exercise personal jurisdiction over two Florida tabloid journalists who wrote an allegedly libelous article about a California-based entertainer. The defendants argued that they should not be subjected to jurisdiction merely because the impact of their conduct was felt in California. The Court disagreed:

... [P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. [Petitioners] ... wrote and ... edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the [Petitioners' employer] has its largest circulation. Under the circumstances, petitioners must

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

"reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article.

*Id.* at 789-90 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)). The Court concluded, "Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."*Id.* at 789.This Circuit interprets the effects doctrine broadly. For example, in *Janmark, Inc. v. Reidy,* 132 F.3d 1200 (7th Cir.1997), the plaintiff, a seller of mini shopping carts, brought an action against a California competitor, seeking a declaratory judgment and asserting a claim of tortious interference with prospective economic advantage. *See id.* at 1201-02.Finding that a single phone call from the California defendant to a customer of the plaintiff in New Jersey could not be a tort within Illinois, the district court dismissed the foreign defendant for lack of personal jurisdiction. *See id.*Reversing, the Seventh Circuit reasoned that because without an injury there is no tort and that a wrong does not become a tort until an injury has occurred, the location of the injury is vital to understanding where the tort occurred. *See id.* at 1202.Because the injury took place in Illinois, the *Janmark* court held, the tort occurred in Illinois and thus was actionable in Illinois. *See id.*The court held that "the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor" even if all the other relevant conduct took place outside of the forum state. *Id.* (citing *Calder*)."[T]he state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deeds even if events were put in train outside its borders."*Id. See also Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship,* 34 F.3d 410, 411-12 (7th Cir.1994) (a Maryland defendant could be sued in Indiana for the tort of trademark infringement based on the name of a football team, because the injury of the impaired trademark would "be felt mainly in Indiana," and "someone who commits a tort in Indiana should ... be amenable to suit there."); *Riddell, Inc. v. Monica,* No. 03 C 3309, 2003 WL 21799935, at *3 (N.D.Ill. July 25, 2003) ("As defendants [who allegedly misappropriated the plaintiff's trade secrets] were aware, plaintiff's principal place of business is in Illinois, and thus the injury would be felt most severely in Illinois. Under the circumstances, it was foreseeable that defendants would be required to answer for such actions in

Illinois."); *International Molding Mach. Co. v. St. Louis Conveyor Co.,* No. 01 C 8305, 2002 WL 1838130, at *4 (N.D.Ill. Aug. 12, 2002) ("[S]pecific jurisdiction can be proper when the injury occurs in Illinois, even if all of the other relevant conduct took place elsewhere."); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.,* 88 F.Supp.2d 914, 920 (C.D.Ill.2000) (relying on *Janmark* to hold that a New York corporation which committed the "torts" of trademark infringement and unfair competition against an Illinois corporation, so that the injury was felt in Illinois, submitted itself to the jurisdiction of the Illinois courts).

**\*14** In this case, the gravamen of Brown's claims is, of course, that ILD placed false charges for "Nationwide Voice Msg" on his billing statement. ILD certainly knew that it was processing billing data for Illinois telephone subscribers and therefore was on notice that such false charges could result in the company being haled into court in Illinois. "A single telephone call into Illinois can give rise to Illinois jurisdiction as long as the call constitutes the commission of a tortious act within Illinois."*Pendelton v. Germino,* No. 95 C 2350, 1995 WL 493449, at *8 (N.D.Ill. Aug. 15, 1995) (holding that a nonresident defendant's alleged "repeated phone calls" to a plaintiff in Illinois did not give rise to personal jurisdiction over the defendant, because the calls themselves did not constitute tortious acts in Illinois).*See also Heritage House Rests., Inc. v. Continental Funding Group, Inc.,* 906 F.2d 276, 282 (7th Cir.1990) (a nonresident defendant's alleged misrepresentation during a telephone conversation that the entire amount of an Illinois corporation's $150,000 deposit with a savings and loan would be secured for repayment brought the defendant within the Illinois long-arm statute as to a misrepresentation cause of action and an alleged violation of the ICFA where the phone conversation was the basis for the alleged tort); *Evercom Sys., Inc. v. Mannis,* No. Civ.A.3:03-CV-2956-M, 2004 WL 396885, at *2 (N .D.Tex. Feb. 20, 2004) (quoting *Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 213 (5th Cir.1999)) (when the actual content of a defendant's communications with a forum state gives rise to intentional tort causes of action due to fraud, the communication constitutes purposeful availment for purposes of personal jurisdiction because the defendant is purposefully availing itself of the "privilege of causing a consequence" in the forum state); *4A Charles Alan Wright & Arthur R. Miller, Federal Practice &*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)
2007 WL 684133 (S.D.Ill.)

Page 13

Procedure § 1069.5 (3d ed. 1998 & Supp.2006) ("Even an act done by an individual outside the state that has consequences within the state should suffice as a basis for asserting personal jurisdiction in a suit arising from those consequences if the effect reasonably could have been expected to follow from the defendant's conduct [.]") (collecting cases).

Having concluded that ILD has minimum contacts with Illinois, the Court turns to the question of whether it offends traditional notions of fair play and substantial justice to require ILD to defend this action in Illinois. The Court finds that it does not. In evaluating substantial justice and fair play, "the most important factors to consider are the interests of the forum and the relative convenience of litigating in that forum." *International Molding Mach. Co.,* 2002 WL 1838130, at *5 (citing *Kohler Co. v. Kohler Int'l, Ltd.,* 196 F.Supp.2d 690, 700 (N.D.Ill.2002)). The Court concludes that litigating this case in Illinois will place a minimal burden upon ILD. ILD is a corporate defendant that processes billing data for telephone subscribers nationwide, including Illinois. *See Logan Prods., Inc.,* 103 F.3d at 54 (noting that it is usually not unfair to force a defendant to defend a lawsuit in a state in which it has engaged in economic activity); *Birnberg v. Milk St. Residential Assocs. Ltd. P'ship,* Nos. 02 C 0978, 02 C 3436, 2003 WL 151929, at *8 (N.D.Ill. Jan. 21, 2003) (holding that travel from Massachusetts to Illinois was not oppressive due to modern advances in communication and transportation). No doubt it would be vastly more onerous for Brown, who is alleged to be a disabled retiree, to litigate his claims against ILD in Florida, and, in any event, unless the inconvenience of having to litigate in the forum is so great as to deprive a defendant of due process, it will not overcome clear justifications for the exercise of personal jurisdiction. *See Euromarket Designs, Inc. v. Crate & Barrel, Ltd .,* 96 F.Supp.2d 824, 840 (N.D.Ill.2000). Illinois has a significant interest in the adjudication of this case, given that ILD's allegedly tortious conduct has caused injury to Brown and numerous other Illinois citizens in Illinois. *See International Molding Mach. Co.,* 2002 WL 1838130, at *5 (holding that Illinois has a strong interest in adjudicating cases arising from injuries occurring in its borders). This case clearly does not present the "rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the

defendant to litigation within the forum."*CoolSavings.Com, Inc. v. IQ. Commerce Corp.,* 53 F.Supp.2d 1000, 1005 (N.D.Ill.1999) (quoting *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994)). In sum, the Court finds that the exercise of personal jurisdiction over ILD in this case does not offend traditional notions of fair play and substantial justice. The Court concludes that it has personal jurisdiction over ILD.

**D. Conclusion**

*15 The motions to dismiss for failure to state a claim upon which relief can be granted brought by SBC (Doc. 17), ESBI and BSG (Doc. 12), and Abry (Doc. 15) are **DENIED.**The motion to dismiss for lack of personal jurisdiction brought by ILD (Doc. 13) is **DENIED.**

**IT IS SO ORDERED.**

S.D.Ill.,2007.
Brown v. SBC Communications, Inc.
Slip Copy, 2007 WL 684133 (S.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1992 WL 161128 (E.D.La.)
**1992 WL 161128 (E.D.La.)**

**H**Brown v. R.J. Reynolds Tobacco Co.
E.D.La.,1992.
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.
Carl O. BROWN, Jr.
v.
R.J. REYNOLDS TOBACCO CO., et al.
**Civ. A. No. 92-0836.**

June 23, 1992.

MINUTE ENTRY

BEER, District Judge.
**\*1** On June 17, 1992, the court heard defendant K & B Corp.'s Motion to Dismiss/for Judgment on Pleadings/for Summary Judgment. For the reasons that follow, K & B's motion is granted.

### I. *Background*

Plaintiff filed this action in Civil District Court for Orleans Parish, naming as defendants R.J. Reynolds Tobacco Co.; Lorrilard, Inc.; Phillip Morris Inc.; Liggett Group, Inc.; and K & B Corp. Plaintiff is a Louisiana citizen. The first four defendants are each cigarette manufacturers with principal places of business outside Louisiana. The fifth defendant, K & B, is a cigarette seller and Louisiana corporation. Plaintiff claims his smoking of defendant manufacturers' cigarettes have caused him to develop throat and vocal chord cancer.

The cigarette manufacturer defendants effected a diversity-based removal to this court, claiming the allegations against non-diverse defendant K & B should be disregarded because K & B was fraudulently joined solely to defeat diversity. The court agreed, denying plaintiff's motion to remand on May 6, 1992. Based on the court's prior ruling, K & B herein seeks a dismissal/judgment on the pleadings/summary judgment dismissing plaintiff's complaint against it.

### II. *Law and Analysis*

K & B's motion is hereby granted. Plaintiff has failed to state a cause of action against K & B upon which relief can be granted under existing Louisiana law.

Louisiana law is clear regarding a nonmanufacturer seller's tort liability for damage caused by an allegedly defective product. Civil Code article 2425 states that "[t]he seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fee, is answerable to the buyer in damages." La.Civ.Code Ann. art. 2425 (West Supp.1992). A recent judicial statement on seller liability stated that,

[u]nder Louisiana products liability law, the nonmanufacturer seller of a defective product is responsible for damages in tort, only if he knew or should have known that the product sold was defective and failed to declare it.... The good-faith seller, i.e. who had neither actual nor constructive knowledge of the defect, and who is not presumed, in the capacity of manufacturer, to have had knowledge of the defect is bound only to return the purchase price together with the expenses of the sale.

*Broussard v. Polaris Indus.,* 587 So.2d 215, 218 (La.Ct.App.1991) (citation omitted); *see also Delanzo v. ABC Corp.,* 572 So.2d 648, 650-51 (La.Ct.App.1990) ("A claim against a retail distributor is actionable, that is, he is liable in tort, only if he knew or should have known that the product sold was defective and failed to declare it. LSA-C.C. 2545.").

The above precedents indicate that K & B, as a nonmanufacturer seller, cannot be liable to plaintiff. Plaintiff's pleadings do nothing to undercut K & B's claim that it was a good faith seller with neither actual nor constructive knowledge of the health hazards posed by cigarettes. K & B thus cannot be liable to plaintiff under existing Louisiana law, such that plaintiff has failed to state a cause of action against K & B upon which relief can be granted, and K & B is entitled to judgment removing it from this action.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 161128 (E.D.La.)
**1992 WL 161128 (E.D.La.)**

Case 1:08-cv-02364    Document 55-6    Filed 08/09/2008    Page 48 of 59 Page 2

III. *Conclusion*

**\*2** It is hereby ADJUDGED, ORDERED and
DECREED that K & B's motion is GRANTED.
Counsel for K & B is requested to submit a judgment
consistent with this minute entry.

E.D.La.,1992.
Brown v. R.J. Reynolds Tobacco Co.
Not Reported in F.Supp., 1992 WL 161128 (E.D.La.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 1
Slip Copy, 2008 WL 1970312 (E.D.Ark.)
**2008 WL 1970312 (E.D.Ark.)**

**H**Clayton v. Batesville Casket Co., Inc.
E.D.Ark.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. Arkansas,Pine Bluff
Division.
Garry CLAYTON, on behalf of himself and all others
similarly situated, Plaintiff
v.
BATESVILLE CASKET COMPANY, INC.,
Defendant.
**No. 5:07CV214JMM.**

May 7, 2008.

Charles P. Boyd, Jr., The Boyd Law Firm, Thomas P.
Thrash, Thrash Law Firm, Little Rock, AR, for
Plaintiff.
Bonnie Joan Johnson, Jess L. Askew, III, Teresa M.
Wineland, Williams & Anderson, PLLC, Little Rock,
AR, for Defendant.

### ORDER

JAMES M. MOODY, District Judge.
*1 Pending is Defendant's motion to dismiss. (Docket
# 51). For the reasons set forth herein, the motion is
denied.

### Facts

Plaintiff, Garry Clayton alleges that Defendant,
Batesville Casket Company, Inc. manufactured a
casket that he purchased from Humphrey Funeral
Service in Russellville, Arkansas. According to the
Plaintiff, he was induced by the Defendant to
purchase the more expensive Gasketed Casket based
on the Defendant's warranty that the Gasketed Casket
was completely resistant to the entrance of air and
water. (First Amended Complaint, at p. 9). Plaintiff
alleges that the Gasketed Caskets are not completely
resistant to the entrance of air and water and that the
Defendant knew or should have known at the time of
the sale that its warranty and representations were
false. Plaintiff Clayton filed an amended complaint
on January 9, 2008 against Defendant for violation of
the Arkansas Deceptive Trade Practice Act

("ADTPA"), fraud, fraudulent concealment, breach
of express and implied warranties and unjust
enrichment.

### Standard of Review

Dismissal is proper where the plaintiffs' complaint
fails to state a claim upon which relief can be
granted. Fed.R.Civ.P. 12(b)(6). At this stage of the
litigation, the Court must accept as true all of the
factual allegations contained in the complaint, and
review the complaint to determine whether its
allegations show that the pleader is entitled to relief.
Bell Atlantic Corp. v. Twombly, --- U.S. ----, 127
S.Ct. 1955, 1964-65 (2007). The plaintiff need not
provide specific facts in support of their allegations,
Erickson v. Pardus, --- U.S. ----, 127 S.Ct. 2197,
2200 (2007) (per curiam), but they must include
sufficient factual information to provide the
"grounds" on which the claim rests, and to raise a
right to relief above a speculative level.Twombly, 127
S.Ct. at 1964-65 & n. 3.

### Discussion

Defendant contends that Plaintiff's complaint should
be dismissed under the reasoning in Wallis v. Ford
Motor Co., 362 Ark. 317, 208 S.W.3d 153 (2005)
because the Complaint lacks an allegation of
malfunction or manifestation of defect. The Court
disagrees and finds that Plaintiff's complaint contains
adequate allegations of malfunction and
manifestation of a defect to survive a motion to
dismiss. See First Amended Class Action Complaint
at paragraphs, 11, 16, 17, 18, and 21.

In Wallis, the Arkansas Supreme Court was asked to
determine whether the circuit court erred in
dismissing a class action fraud and statutory
deceptive trade practices lawsuit arising out of the
purchase or lease of an allegedly defective vehicle
where the only injury complained of was a
diminution in value of the vehicle. The Court held
that the Complaint was properly dismissed as
common law fraud claims not resulting in injury are
not actionable and a private cause of action under the
ADTPA requires that a person suffer actual damage

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

or injury. Importantly, the Court noted that the plaintiff in *Wallis* did not allege any personal injury or property damage caused by the design defect, nor did he allege that the vehicle malfunctioned in any way.

**\*2** Here, Plaintiff contends that the casket he purchased was not completely resistant to the entrance of air and water and did not provide the deceased protection from the elements. Accordingly, Plaintiff has stated a malfunction and manifestation of defect sufficient to preclude dismissal at this early stage in the proceedings. Defendant's motion, docket # 51, is denied.

IT IS SO ORDERED.

E.D.Ark.,2008.
Clayton v. Batesville Casket Co., Inc.
Slip Copy, 2008 WL 1970312 (E.D.Ark.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 1
Slip Copy, 2006 WL 2812535 (W.D.Okla.)
**2006 WL 2812535 (W.D.Okla.)**

⊢Crispin Co. v. Petrotub-S.A.
W.D.Okla.,2006.
Only the Westlaw citation is currently available.
United States District Court,W.D. Oklahoma.
The CRISPIN COMPANY, et al., Plaintiffs,
v.
PETROTUB-S.A., et al., Defendants.
**No. CIV-05-159-C.**

Sept. 28, 2006.

DOuglas M. Todd, Michael R. Perri, Rodney K.
Hunsinger, II, Thomas G. Wolfe, Phillips McFall
Mccaffrey McVay Murrah, Carson M. Brooks,
Robert J. Haupt, Haupt BrooksVandruff PLLC,
Oklahoma City, OK, for Plaintiffs.
Andrew L. Walding, Mark K. Stonecipher, Regina
M. Marsh, Fellers Snider Blankenship Bailey &
Tippens, Oklahoma City, OK, for Defendants.

*MEMORANDUM OPINION & ORDER*

ROBIN J. CAUTHRON, District Judge.
*\*1* The Crispin Company (Crispin) has moved for
summary judgment on its indemnity and breach of
contract claims against Petrotub-S.A. (Petrotub).
Petrotub responded, and Crispin filed a reply. For the
reasons stated below, summary judgment is granted
in part and denied in part.

STANDARD OF REVIEW

Summary judgment is proper only if the moving
party shows "there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law."Fed.R.Civ.P. 56(c)."An
issue of fact is 'material' if under the substantive law
it is essential to the proper disposition of the
claim."Adler v. Wal-Mart Stores, Inc., 144 F.3d 664,
670 (10th Cir.1998)."An issue is 'genuine' if there is
sufficient evidence on each side so that a rational trier
of fact could resolve the issue either way."Id. At the
summary judgment stage, the Court's function is not
to weigh the evidence but to determine whether there
is a genuine issue for trial. Willis v. Midland Risk Ins.
Co., 42 F.3d 607, 611 (10th Cir.1994). Thus, the

Court views the evidence in the light most favorable
to the nonmoving party and draws all reasonable
inferences in that party's favor. See Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Simms
v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d
1321, 1326 (10th Cir.1999); McWilliams v. Jefferson
County, 463 F.3d. 1113, 2006 WL 2556350, at *2
(10th Cir. Sept. 6, 2006) ("In determining whether
any genuine issue as to any material fact exists,
evidence is to be liberally construed in favor of the
party opposing the motion for summary judgment.").

BACKGROUND

Petrotub manufactures "seamless, steel oil well
casing" in Romania. The casing is produced in joints,
which are threaded at both ends. The "field" end of a
joint is fitted with a coupling manufactured by
Petrotub in the same steel quality as the casing. The
"pin" end of the joint is threaded but does not have a
coupling so that it can be connected to the field end
of another joint.

Crispin, a Houston-based trading company that
provides steel products to the oil, gas, and
construction industries, and Petrotub entered into six
purchase contracts between November 16, 2000, and
February 6, 2001. Pursuant to those contracts, Crispin
purchased different types of casing for a total of
$1,685,178.68. (Pl.'s Mot. Ex. 3.). Nicolae
(Toni/Tony) Soto acted as a commissioned agent and
Crispin's representative in Romania and assisted
Crispin's procurement of Petrotub casing. The casing
joints purchased were of different strengths and
hardness, diameters and number of pounds per foot.
In its "Specification for Casing and Tubing 5CT," the
American Petroleum Institute (API) has developed
designations that describe the strength and hardness
properties of finished casing.[FN1]At issue in this case
is the purchased P110 casings, which included joints
with an outside diameter of 5 1/2 inches in both 17
and 20 pounds per foot and those with an outside
diameter of 7 inches and designated as 29 pounds per
foot. The purchase contracts specified that the casing
being purchased would "meet the requirements of
API specification 5CT."(Pl.'s Mot. Ex. 1, Crispin Aff.
¶ 6.) Petrotub provided Mill Test Reports certifying
that the P110 casings and couplings met API

specification. (Pl.'s Reply Ex. 5.)

FN1. K55, N80, L80, and P110 are API designations. Crispin purchased casing from Petrotub at each of these designations.

**\*2** Between December 1, 2000, and August 21, 2002, Crispin sold three of the four types of casing that it purchased from Petrotub, including P 110, to Hager Brothers Pipe, Inc. (Hager Brothers). Crispin did not change, alter, or modify any of the casing, including couplings, purchased from Petrotub. (Crispin Aff. ¶ 8.)

From January 7 to April 30, 2002, Hager Brothers resold Petrotub casing (5 1/2 P 110 17 pounds per foot and 20 pounds per foot) that it purchased from Crispin to Pride Energy Company (Pride) for use in its Gowdy well. On September 12, 2002, Hager Brothers resold Petrotub casing (5 1/2 P110 17 pounds per foot) to Ward Petroleum Corporation (Ward) for use in its Chick Davis well.

Pride and Ward lined the respective well bores with 5 1/2 P110 casing and then performed "frac jobs." A frac job "involves pumping high pressure fluid into a well in an attempt to fracture the geologic formation surrounding the well bore in hopes of stimulating production of oil or gas."(Pl.'s Mot. at 2.) During these frac jobs, the P110 casing failed. Specifically, at both wells, "the pin end of at least one 5 1/2 P110 joint separated from the field end of another joint where they were joined together with a 5 1/2 P 110 coupling."(Pl.'s Mot. ¶¶ 8 & 9.) Subsequent testing showed that certain of 5 1/2 P110 couplings manufactured by Petrotub and used in the Gowdy and Chick Davis wells did not meet API standards for P 110 casing. Petrotub argues that experts hired by it and Crispin in defense of the later lawsuits by Pride and Ward concluded that the proximate cause of the casing failure was excessive over-threading of the casing pins, or casing pins and couplings, due to the casing crew's failure to follow API Recommended Practice and Standards. (Def.'s Resp. at 5 ¶¶ 8-9.)

Pride performed the failed frac job on its Gowdy well on April 11, 2002. Ward performed the failed frac job on its Chick Davis well on October 4, 2002. Demand letters were sent to Crispin, the first of which was received on September 9, 2002. In October 2002, Petrotub sent a delegation of employees to Oklahoma

to investigate the claims. Crispin hired a consultant (Coy Reece) to escort and assist the delegation.

In 2003, both Pride and Ward had filed separate lawsuits against Crispin and Hager Brothers based on the failed casing not meeting API specifications for P 110 casing. Ward asserted claims for products liability, breach of warranty, fraud, and negligence. Pride asserted products liability and breach of warranty claims. Petrotub was brought into those suits as a third-party defendant based on Crispin's claims for indemnification and breach of contract. The cases were then removed to this Court.

Thereafter, Crispin and Petrotub entered into a joint defense agreement. They maintained, as against Pride and Ward, that neither was aware of problems with the casing or couplings or at Petrotub's mill. (Pl.'s Reply at 2 ¶ 1.) Crispin and Petrotub also asserted that the casing failure was due to over-threading rather than a product defect. Both the *Ward* and *Pride* cases settled, without any determination or admission of liability.[FN2]Petrotub paid each settlement in its entirety.

FN2. The *Ward* suit settled in August 2004, and the *Pride* suit settled in June 2005.

**\*3** In addition to participating in the defense of the *Ward* and *Pride* suits (as well as Petrotub's pre-suit investigation of those claims), Crispin felt compelled (based on customer reaction and its own concerns about liability) to have the Petrotub casing in its and Hager Brothers' inventory tested to ensure that it met API standards. Of the unspecified number of joints and couplings tested, 31 joints and 11 couplings were found not to meet API specifications, could not be repaired, and were sold as salvage. Even after testing, Crispin claims that it was forced to sell its remaining non-defective Petrotub casing at a loss. Crispin also advanced Hager Brothers, in the form of new casing, what it was owed by Ward, who refused to pay its Hager Brothers invoice.

In this suit, Petrotub resists summary judgment by arguing that Crispin had knowledge that Petrotub's casing did not comply with the designated API specifications before it sold any such casing to Hager Brothers. In support, Petrotub relies on the following October 29, 2001, e-mail from André Crispin, founder and CEO of Crispin, to Nicolae Soto:

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Dear Toni,

WE are getting more claims-namely among others NO Drift Casing.

We have unimpeachable inside Petrotub information showing among other things, that some of the material produced by Petrotub is declassified officially for defects that do not necessarily exist and then shipped to other customers (special friends of management perhaps).

Also that few of the mill's Quality Assurance inspection (NDT Drift-final inspection is not documented by the mill.

Storage of unfinished and finished pipe is often mixed with rejected material and dangerously subject to mixing (i.e. TFE claim perhaps)

I don't know how we can protect ourselves from this dangerous practice.

One thing we must request at once is that all inspection steps by the mill's Q.A. Service must be documented in English and in writing before we pay the invoices.

Perhaps you have other ideas, but this situation is highly suspect and dangerous.

I will show you personally, the information I received when you come to Houston.

LAK, André

(Def.'s Ex. 9.) [FN3]

> FN3. The text of this and other e-mails is reproduced exactly as it appears in the record without any attempt to indicate errors or omissions or to otherwise clarify what was written.

Soto apparently responded the next day with the following e-mail:

Dear Andre,

I read your email about the suspicion that Petro management may sell good pipes as rejects.

Personally, I doubt this info very much. There are too many people involved in the process and it is impossible to bribe all of them to say that pipes are rejects when they are OK.

Regarding the Drift test, I know it being done on every pipe full lengths ... at least every time I checked it it was done properly. Of course, there may be a small amount of pipes tested maybe "half way" or with the wrong tools, but they are accidents.

I do not see how can we have all the paperwork done as per QA or ISO 9002, which is thousands of pages, translated in english and what would be the use of it.

**\*4** We can ask the mill to certify on the Quality certificates performing specific tests and conformity.

In any case I would like to see the information you have, before further comments.

At this moment, both Mr. Barsan and Bulai are in Iran where mobile telephones do not work, so my first contact with them will be Friday evening.

Meanwhile, if there are new claims, please send me all documentation, to file them with the mill.

LAK, Tony

(Pl.'s Reply Ex. 5.)

Another e-mail from André Crispin to Soto, dated November 1, 2001, and in apparent reference to Petrotub, reiterated the "need to talk about the frightening report about the mill inspection practices I received on a very confidential basis."(Def.'s Ex. 10 .)

### DISCUSSION

Crispin contends that it is entitled to summary judgment on its claims for indemnification and breach of contract. These claims and the parties' related arguments are considered more fully below.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*A. Indemnification*

Crispin argues that it is entitled to indemnification from Petrotub, at common law and by statute, for "the entire loss" it suffered as a result of distributing defective casing, including its attorney fees and costs incurred in the *Pride* and *Ward* suits and in this action.[FN4] In response, Petrotub contends that the statute relied on did not become effective until November 1, 2004, and should not be given retroactive effect; its casing was not the proximate cause of the injuries involved in the *Pride* and *Ward* suits; and because Crispin was not without fault with respect to those injuries, it is not entitled to indemnification.

> FN4. Crispin identifies its losses as: Coy Reece's consulting fee and expenses ($5,836.40); fees, costs and expenses reasonably incurred to defend the *Pride* and *Ward* lawsuits ($459,973.39); amount advanced to Hager Brothers for the invoice Ward never paid ($106,202.70); trucking expenses incurred in transporting Petrotub casing for inspection ($22,015.00); cost for inspection of Petrotub casing ($43,656.10); cost of non-repairable, defective Petrotub casing following inspections ($6,647.81); lost sales on Petrotub casing as a result of Pride and Ward claims ($86,660.76); interest; and fees/costs associated with this action. It further claims that these losses are recoverable in their entirety under either an indemnity or breach of contract theory. The basis for that assertion is not clearly stated in its briefs or otherwise apparent.

*1. 12 Okla. Stat. § 832.1*

The statute at issue is 12 Okla. Stat. § 832. 1, which codifies a manufacturer's duty to indemnify a seller in products liability actions. Specifically: "A manufacturer shall indemnify and hold harmless a seller against loss arising out of a product liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable." Id.§ 832.1(A). The statute "[a]pplies without regard to the manner in which the action is concluded" and "[i]s in addition to any duty to indemnify established by law, contract, or otherwise." Id.§ 832.1(E). A seller is explicitly authorized to recover from the manufacturer its court costs, reasonable expenses, reasonable attorney fees, and "any reasonable damages incurred ... to enforce [its] right to indemnification" under the statute. Id.§ 832.1(G).

Petrotub is correct that this statute did not become effective until November 1, 2004, which was after the failed frac jobs at the Gowdy and Chick Davis wells, the initiation of the *Pride* and *Ward* suits in state court, Crispin's third-party complaints against Petrotub for indemnification, the removal of those suits to federal court, Crispin's incursion of significant costs, expenses and fees, and the settlement of the *Ward* suit. In its reply brief, Crispin asserts that the Court need not decide the issue of the statute's applicability to decide its motion. (Pl.'s Reply at 10.) Crispin's reasoning is that the statute merely codifies a seller's common law right of indemnity against the manufacturer of a defective product and is relevant only on the issue of whether Crispin might recover fees incurred in this action. (Id.) However, in addition, Crispin contends that the statute applies because its right did not accrue until the *Pride* suit, "the last of the underlying cases," settled in June 2005, which was after § 832.1's effective date. (Id.) Because § 832.1 provides for indemnity against *loss*, a seller's cause of action under that statute accrues when the loss is paid (as opposed to an action for indemnity from *liability*, which accrues when the event for which indemnity is due occurs).See *Chicago, R.I. & P.R. Co. v. Davila*, 1971 OK 125, ¶ 19, 489 P.2d 760, 764 (discussing the two types of indemnity contracts and when a claim under each accrues). Here, the loss Crispin seeks to recover is not the payment of a single judgment or a settlement, see generally 41 Am.Jur.2d Indemnity § 26 (2005), but numerous fees, expenses, and costs incurred and presumably paid beginning in approximately November 2002 and related to two different suits that involved related products liability claims. Nevertheless, because under common law Crispin could recover losses incurred in defending those claims before the statute's effective date, the only apparent meaningful effect of the statute's application would be that Crispin might recover its reasonable fees incurred in pursuit of indemnification.[FN5] Because § 832.1 would support an indemnity claim based on at least some of the losses

suffered by Crispin as a result of the *Pride* and *Ward* suits, the Court holds that Crispin may recover its fees and costs in seeking indemnification (as "reasonable damages") if it prevails on the underlying indemnity claim. Based on Crispin's representation that § 832.1 otherwise codifies a seller's common law right to indemnity, however, the Court will apply common law rather than § 832.1 to its claim in all other respects.

> FN5. Crispin asserts that it could recover those fees under 12 Okla. Stat. §§ 936 and 949 even if § 832.1 does not apply. (Pl.'s Reply at 10.) The Court has not endeavored to investigate the accuracy of that assertion.

*2. Seller's Right to Equitable or Quasi-Contractual Indemnification*

**\*5** As indicated above, Oklahoma recognizes a seller's right to indemnification from a manufacturer in instances where a product defect, attributable solely to the manufacturer or the manufacturing process, causes injury and the seller was no more than "passively" negligent in causing that injury. *See Braden v. Hendricks*, 1985 OK 14, ¶¶ 17-20, 695 P.2d 1343, 1351-52;*Porter v. Norton-Stuart Pontiac-Cadillac of Enid*, 1965 OK 18,405 P.2d 109. The right and respective obligations are quasi-contractual or implied in law as opposed to based on a contract, either express or implied. *Booker v. Sears Roebuck & Co.*, 1989 OK 156, ¶ 2 & ¶¶ 4-5, 785 P.2d 297, 301-02 (Summers, J., concurring). Thus, Crispin's right to indemnification, such as it is, arises by virtue of its relationship with Petrotub and not because of either party's intent or an agreement between them.

*a. Proof of Causation*

Petrotub contends that Crispin's right to indemnity will depend on proof that the defective casing and couplings used in the Gowdy and Chick Davis wells resulted in the frac jobs on those wells failing. The Court does not agree. Claims for loss for which the manufacturer must indemnify a distributor include reasonable attorney fees and costs incurred in the seller's defense of a products liability claim. *Booker*, 1989 OK 156, ¶¶ 2-4, 785 P.2d at 298-99;*Friend v. Eaton Corp.*, 1989 OK CIV APP 74, ¶ 6, 787 P.2d 474, 476-77 (explaining that seller cannot recover as damages fees incurred in defense of allegations of its

own wrongdoing, as opposed to defending products liability claims brought against the seller simply because of its placement in the distribution chain). Payment of a judgment or settlement by the seller is not a prerequisite to the recovery of those fees and costs. *Id.*

Furthermore, it is not always necessary that a distributor, as the purported indemnitee, establish that the product was actually defective or proximately caused the injuries alleged. In *Booker*, the case on which Petrotub relies to suggest a contrary rule (Def.'s Resp. at 15), a retailer and a wholesaler separately sought indemnification from a manufacturer to recover the attorney fees and costs they incurred in defending a products liability suit in which the manufacturer was also a defendant. 1989 OK 156, 785 P.2d 297. On the products liability claim, the jury returned a defense verdict. *Id.* at ¶ 1,785 P.2d 298 (reporting jury verdict after a trial on a theory of products liability after all charges of negligence against the remaining defendants were dismissed). A defective product claim against a manufacturer requires proof of three elements: a defect in the product caused the injury; the defect existed in the product at the time it left the manufacturer's possession and control; and the defect rendered the product "unreasonably dangerous." *Kirkland v. Gen. Motors Corp.*, 1974 OK 52, ¶¶ 29-31, 521 P.2d 1353, 1363. In answer to the question "whether a manufacturer should be required to indemnify [a seller] for attorney fees and costs when the jury verdict specifically found no product defect or negligence on the part of either the manufacturer [or seller]," the Oklahoma Supreme Court concluded that it did, *if* the seller (1) did not take an adverse position to the manufacturer during trial and (2) its defense conferred a "substantial benefit" to the manufacturer. *Booker*, 1989 OK 156, ¶ 3, 785 P.2d at 299. In reaching this decision, the court reconciled a seller's right to indemnity with "the American rule" that parties bear the costs of their own legal expenses (or more aptly, with the recognized equity-based exceptions to that rule).*Id.*

**\*6** Based on *Booker*, the Court concludes that under Oklahoma law a seller need not prove that the product was defective or actually caused the injuries alleged to recover the loss it suffered in defending a products liability suit if the manufacturer participated in the underlying suit or settlement.FN6Although there

is substantial dispute about what actually caused the frac jobs to fail (i.e., couplings of lesser than purported strength and hardness or over-threading at the well-sites), there is no dispute that the some of the Petrotub casing installed at those locations did not meet designated API standards. Thus, even though the *Pride* and *Ward* suits were settled before a determination of proximate cause, Crispin may recover its reasonable fees and costs in defending the products liability claims asserted in those suits-if it did not take an adverse position to Petrotub and its defense conferred a "substantial benefit" to Petrotub.

> FN6. There is authority for the rule that recovery on an indemnification claim requires proof of the indemnitor's actual liability to an injured party. This requirement is imposed in Restatement (Third) of Torts: Apportionment of Liability § 22(c) (2000), and elsewhere. However, in that notable authority, the rationale offered is: "Otherwise, the indemnitor would be deprived of his day in court."*Id.* Reporters note to cmt. c.

> By way of fuller explanation, the Court quotes from the following discussion of the rule as applicable when an indemnitee settles the claims against it and then seeks indemnification from another:

> [R]equiring proof of actual liability is the general rule, from which a "potential liability exception" may be made after weighing the policy interests in encouraging settlements against considerations of fairness to putative indemnitors. Many courts have elaborated on the circumstances under which a potential liability exception should apply. Generally, proof of actual liability is required where the settling indemnitee does not notify the putative indemnitor of a potential settlement of the underlying litigation, thereby depriving the indemnitor of an opportunity to approve the settlement, participate in the settlement negotiations, or assume the defense of the underlying claim....

> When the indemnitee has not given the

indemnitor an opportunity to review, pass upon, or participate in the settlement, due process and equity require the indemnitee to demonstrate actual as opposed to potential liability.... Thus, "where the party having a duty to indemnify has been notified or been made a party to the underlying proceedings and given an opportunity to participate in its settlement negotiations, courts have concluded that the defendant-indemnitee should not be required to prove the plaintiff's actual ability to recover the amount paid in the settlement. It is sufficient if the defendant-indemnitee proves that he was potentially liable to the plaintiff."

Neither the Tenth Circuit nor the Oklahoma Supreme Court have directly addressed the issue of what notice a settling indemnitee is required to give a putative indemnitor in order to trigger the "potential liability" exception to the general "actual liability" rule for indemnity actions. The decisions of the Tenth Circuit and Oklahoma Supreme Court which tangentially address the issue are, however, in accordance with the authorities discussed above-that a settling indemnitee need only show potential as opposed to actual liability to the injured party, as long as the putative indemnitor was given adequate notice of the settlement and an opportunity to object and assume defense of the action.

*In re: Cooper Mfg. Corp.,* 131 F.Supp.2d 1238, 1252-54 (N.D. Okla.2000) (citations and footnotes omitted).

This case clearly falls outside the situations described above where proof of actual liability is required because Petrotub participated in and paid the settlement of the *Ward* and *Pride* suits, clearly with notice of the claims and having the chance for its "day in court." Thus, under the circumstances, Crispin is required to show that it was potentially liable and no more.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

The record at summary judgment shows that Crispin and Petrotub defended the *Pride* and *Ward* suits pursuant to a joint defense agreement. Thus, the first requirement of a non-adverse position is satisfied. However, Petrotub appears to question whether Crispin's defense efforts conferred a substantial benefit upon it or were largely unnecessary and redundant. The arguments with respect to this issue are not fully developed with specific references to the evidence. However, it is apparent that a factual dispute exists on that issue that should be resolved at trial. Therefore, summary judgment on Crispin's indemnity claim is not appropriate for this reason.

### b. Crispin's Alleged Negligence

Petrotub also argues that because Crispin was aware that the Petrotub casing might not meet API standards, it is not without fault and therefore not entitled to indemnification. As an initial matter, the Court must consider the alleged fault. To support its argument, Petrotub identifies the e-mails quoted above from André Crispin to Nicholae Soto in October and November 2001. Construed in the light most favorable to Petrotub, those e-mails suggest that Crispin had received reliable inside information raising serious questions about storage and quality assurance inspection practices.[FN7] Crispin does not dispute that it failed to alert Hager Brothers or other customers about the potential that Petrotub casing might not meet API standards. Although one e-mail refers to possible protective measures Crispin could take to guard against defective or inferior products from Petrotub, the record is silent as to what actions Crispin took, if any.

> **FN7.** Crispin argues that those e-mails do not raise a colorable inference of negligence because of the reference to "pipes" rather than couplings. (Pl.'s Reply at 5.) However, the Court finds the evidence sufficient to reasonably support the inference stated above.

Under these circumstances, Crispin may have had a duty to alert Hager Brothers to the danger that Petrotub casing did not meet API specifications and/or to have the casing in its possession tested before reselling them.[FN8] To the extent that Petrotub contends that the "Terms and Conditions of Sale" in the contracts between Crispin and Hager Brothers

imposed a contractual duty of inspection (*see* Def.'s Ex. 11), the Court does not agree. Instead, Crispin's duty or duties, if any, arose by nature of its relationships and the particular circumstances.

> **FN8.** Although there is evidence that Crispin received a demand letter from Pride before Ward's frac job on the Chick Davis well, *see, e.g.*, Restatement (Third) of Torts: Product Liability § 10 (1998) (identifying liability for post-sale failure to warn), the Court has limited its consideration of Crispin's possible negligence to Petrotub's argument, which is based on the Crispin/Soto e-mails.

**\*7** Under Oklahoma law, "the existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking. Whether a defendant stands in such relationship to a plaintiff that the law will impose upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff is a question for the court." *Woolard v. JLG Indus., Inc.,* 210 F.3d 1158, 1170 (10th Cir.2000) (quoting *Wofford v. E. State Hosp.,* 1990 OK 77, ¶ 10, 795 P.2d 516, 519) (internal citation and quotation marks omitted.) Under the Restatement (Second) of Torts:

A seller of a chattel manufactured by a third person who knows or has reason to know that the chattel is, or is likely to be, dangerous when used by a person to whom it is delivered or for whose use it is supplied, or to others whom the seller should expect to share in or be endangered by its use, is subject to liability for bodily harm caused thereby to them if he fails to exercise reasonable care to inform them of the danger or otherwise to protect them against it.

Restatement (Second) of Torts § 401 (1965); *see also Duane v. Okla. Gas & Elec. Co.,* 1992 OK 97, ¶ 4, 833 P.2d 284, 286 (applying Restatement (Second) of Torts § 388 regarding supplier's liability for failing to warn of chattel known to be dangerous for its intended use). In addition, although a seller generally does not have a duty to inspect products, such a duty may arise if it knows or has reason to know that the product is or is likely to be dangerous. Restatement (Second) of Torts § 402 (1965); *Burgess v. Montgomery Ward & Co.,* 264 F.2d 495, 498 (10th

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Cir.1959) (noting that decisions generally support this rule). Oklahoma has specifically recognized:

Where a vendor supplies a purchaser with a device or instrumentality, and in exercise of ordinary care knows or should know if same is defective it will be dangerous to all who come in contact therewith during use for the purpose for which intended, the vendor owes a duty to ascertain the condition of the instrumentality by exercising reasonable care to see that it is safe for the use for which intended. A vendor who fails to exercise ordinary care to ascertain the true condition and safety of the instrumentality, and chooses to sell without notice or warning of the dangerous characteristics and dangers inherent in use thereof is liable for injuries proximately caused by use of the instrumentality.

Bower v. Corbell, 1965 OK 163, ¶ 32, 408 P.2d 307, 315-16. For purposes of this motion and in construing the evidence in Petrotub's favor, the failure of Petrotub's casing (joints and/or couplings) to meet API specifications will be treated as a defect that, given the intended use of the casing, was dangerous. Thus, the factfinder will have to consider the nature of the information received as well as Petrotub's reputation (in addition to other facts that might be relevant) to determine whether Crispin acted reasonably under the circumstances.

**\*8** The next question is whether, even if Crispin breached a duty to warn and/or inspect, its conduct was of such a legally insignificant character that it is entitled to indemnification as a matter of law. "Oklahoma courts have repeatedly held that a party whose negligence has proximately caused the injuries in question may not seek equitable indemnification from a third party who has also proximately caused those injuries." Woolard, 210 F.3d at 1178. Because a seller of a defective product is strictly liable for the injuries caused, the seller who seeks indemnification from the manufacturer is often only vicariously or constructively liable. See Braden, 1985 OK 14, ¶ 18, 695 P.2d at 1351; Travelers Ins. Co. v. L.V. French Truck Serv., Inc., 1988 OK 76, ¶ 8 n. 16, 770 P.2d 551, 555 n. 16 ("Noncontractual or equitable indemnity is similar to common-law contribution; one who is only constructively or vicariously obligated to pay damages because of another's tortious conduct may recover the sum paid from the tortfeasor.") Such an "innocent" seller satisfies the indemnification requirement of being "without

fault," National Union Fire Insurance Co. v. A.A.R. Western Skyways, Inc., 1989 OK 157, ¶ 7, 784 P.2d 52, 54, or "in no manner responsible for the harm," Braden, 1985 OK 14, ¶ 11, 695 P.2d at 1349. However, a seller who is partially at fault, even if to a significantly lesser extent than the manufacturer, has no right to indemnity. Woolard, 210 F.3d at 1179-80 (noting persuasive authority to the contrary). A seller's loss of innocence is, thus, a loss of indemnification. An exception to this indemnity bar exists in situations where the seller's negligence is not the proximate cause (in the sense of being the "efficient" and "sole" cause) of injury, is based a "passive" fault, or is based on the breach if a legal duty that merely furnishes a condition by which the injury was possible. Porter, 1965 OK 18, ¶¶ 14-24, 405 P.2d 109, 113-15; see also Wathor v. Mut. Assurance Adm'rs, Inc., 2004 OK 2, ¶ 15, 87 P.3d 559, 571 ("The remedy of indemnity is appropriate where one party has a primary or greater liability or duty which requires him to bear the whole of the burden as between the parties.")

The passive-active negligence distinction was adopted in Oklahoma's seminal indemnification case, Porter v. Norton-Stuart Pontiac-Cadillac of Enid, 1965 OK 18, 405 P.2d 109. Rucker Co. v. M. & P Drilling Co., 1982 OK 131, ¶ 6, 653 P.2d 1239, 1241; Wathor, 2004 OK 2, ¶ 15, 87 P.3d 559, 570-71.

Porter involved an indemnity suit between a car dealership and an instrument manufacturer for the injury to the dealership's customer. While an employee of the instrument manufacturer was working on a car, the car lurched forward and ran over the customer. The customer sued the dealership and the manufacturer for negligence. The Court recognized that regardless of whether the dealership failed to maintain a safe premises or failed to warn the customer [as its invitee], the sole cause of the injury was the act of the manufacturer's employee moving the gear selector from neutral to drive.... [T]he dealership's negligence, if any, was so far removed from the causal nexus between its negligence and the instrument manufacturer's negligence, that the Court held that it merely furnished a condition by which the injury was possible and a subsequent act caused the injury.

**\*9** Johnson v. Hillcrest Health Center, Inc., 2003 OK 16, ¶ 22 n. 31, 70 P.3d 811, 820 n. 31.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Although *Porter* involved a failure to warn, the evidence presented in this case is sufficiently distinguishable to preclude summary judgment in Crispin's favor. Construed in the light most favorable to Petrotub, the e-mails to Soto indicate that Crispin had credible information that some of the Petrotub casing might not meet API standards, notwithstanding their accompanying mill certificates. Such products would be defective and, given their intended use, dangerous. Because this information appears to have alerted Crispin to a specific risk, which may have given rise to a duty to warn and/or inspect, the Court cannot conclude as a matter of law that in failing to act Crispin's role in causing the injuries alleged [FN9] was only passive.[FN10]Instead, because a jury could find that Crispin's negligence in failing to warn Hager Brothers and/or inspect the Petrotub casing was a cause or contributing factor in failed frac jobs, summary judgment is inappropriate. *See American Law of Products Liability* § 52:88 (3d ed. Aug.2006) (noting that the distinction between active and passive negligence is ordinarily for the factfinder).

FN9. Petrotub identifies numerous expert opinions that the well failures were not caused by defective couplings but by over-threading. Proof that product defects were *not* the cause of those injuries would not defeat Crispin's right to indemnification, as explained above, but would effectively undermine Petrotub's defense that Crispin was also at fault.

FN10. The most common example of active/passive negligence in products liability is that of a retailer's failure to inspect a product for defect that leads to liability for that defective product and the retailer seeks indemnity from the manufacturer. It has been held that a retailer's failure to inspect a product for defects may constitute passive negligence, entitling him to indemnification from the manufacturer whose negligence was responsible for the defect, although other courts have held that such failure constitutes active negligence, reasoning that to hold otherwise would place a premium upon distributor ignorance. Where there is actual

knowledge of a defect, and a subsequent failure to correct it or warn against it, the retailer will be denied indemnification. Thus, "active" negligence is not limited to positive conduct; inaction may also constitute active negligence.

2 David G. Owen et al., *Madden and Owen on Products Liability* § 25:3 (May 2006) (footnotes omitted).

A recent Tenth Circuit case illustrates the rule that negligence in failing to act may preclude indemnification vis-à-vis an even more culpable entity. In *Woolard v. JLG Industries,* the plaintiff was injured when an aerial work platform he was working on collapsed. 210 F.3d 1158. The plaintiff asserted negligence claims against the platform owner for failing to maintain, inspect, and provide safe and reliable equipment and for failing to perform manufacturer-required inspections. *Id.* at 1163-64.The plaintiff also asserted negligence claims against the platform distributor, who repaired the platform with substandard sheave pins, which contributed to the collapse of the boom holding the lift basket in which the plaintiff was riding, for failing to maintain and repair the platform, failing to discover the worn pin and perform inspections, and failing to notify the owner, the plaintiff's employer, and the plaintiff of the need for inspections. *Id.* On appeal following a jury trial, the circuit held that the owner was barred under Oklahoma law from recovering from the distributor, as the source of the defective product, on a claim of equitable indemnity because the jury found that the owner was the proximate cause of forty percent of the plaintiff's injuries. *Id.* at 1179-80.

Thus, for the reasons detailed above, Crispin's motion for summary judgment on its indemnity claim is denied.

*B. Breach of Contract*

Crispin also claims that it may recover damages under a breach of contract theory. Petrotub contends that Crispin is not entitled to breach of contract damages because: it accepted products with a known defect; it failed to notify Hager Brothers, Ward, or Pride of quality issues and thus did not minimize its damages; and the damages claimed were not the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3
## Part 2 of 5

direct result of Petrotub's breach.

**\*10** The elements of a breach of contract claim are: (1) the formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the breach. *Digital Design Group, Inc. v. Info. Builders, Inc.,* 2001 OK 21, ¶ 33, 24 P.3d 834, 843. Here, it is undisputed that Crispin purchased Petrotub casing pursuant to written purchase contracts. Thus, the Court finds, in satisfaction of the first element of Crispin's breach of contract claim, that there was a contract for the sale of goods. In addition, it is undisputed that Petrotub expressly warranted, *see* 12A Okla. Stat. § 2-313, that the casing and couplings met the casing-strength properties for the 5CT API specification (Pl.'s Mot. at 20; Def.'s Resp. at 24) and that some did not meet that specification. The failure of some casing and couplings to meet API standards (because that was contrary to the obligations under the contracts) rendered them non-conforming. *See* 12A Okla. Stat. § 2-106(2).

**1. Effect of Voluntary Acceptance of Non-Conforming Goods**

Petrotub contends, based on e-mails to Soto showing that Crispin was concerned about Petrotub's storage and inspection of "pipe," that Crispin knowingly accepted defective or non-conforming goods and, therefore, Crispin cannot now complain that Petrotub breached its express warranty that the goods were of a specific API grade. (Def.'s Resp. at 19 n. 3.) The Court does not agree.

There is no dispute that Crispin accepted casing from Petrotub. *See* 12A Okla. Stat. § 2-606. Crispin apparently has since sold or salvaged that casing. However, even construed in the light most favorable to Petrotub, the evidence shows that as of October 2001, Crispin was aware of a specific risk that Petrotub casing might not conform to contract specifications. That evidence does not support the inference that Crispin knew for certain that any or all Petrotub casing was nonconforming. Thus, Petrotub has not shown that Crispin's acceptance was with knowledge of a nonconformity.

Moreover, even if Crispin knowingly or voluntarily accepted nonconforming goods, it is not precluded from bringing a suit for damages based on breach of warranty. 12A Okla. Stat. § 2-607(2) states, in

pertinent part, that "acceptance [of goods with knowledge of a nonconformity] does not of itself impair any other remedy provided by this article for nonconformity." Under § 2-714, a buyer who has accepted goods and given notice "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." *Id.* § 2-714(1).[FN11] Damages for breach of warranty are "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount" and may include incidental and consequential damages under § 2-715. *Id.* § 2-714(2) & (3); *see also Atlan Indus., Inc. v. O.E.M., Inc.,* 555 F.Supp. 184 (W.D.Okla.1983). Thus, even knowing acceptance does not preclude an action for breach.

> FN11. Petrotub does not oppose Crispin's breach of contract claim on the ground that Crispin unreasonably delayed in giving notice or rendered deficient notice under 12A Okla. Stat. § 2-607(3).

**2. Failure to Minimize or Mitigate Damages**

**\*11** Petrotub also contends that Crispin did not minimize its damages. (*See* Def.'s Resp. at 24 ("Crispin compounded any quality issues in the Petrotub casing by failing to notify Hager Brothers, Ward and Pride that the casing may not conform with API specifications and that it failed to inspect the casing.").) A buyer's failure to minimize or mitigate damages may impact its recovery of incidental and consequential damages. *Catlin Aviation Co. v. Equilease Corp.,* 1981 OK 13, ¶ 19, 626 P.2d 857, 861; 12A Okla. Stat. § 2-715. However, as discussed more throughly above, there are issues of fact in dispute with respect to what Crispin knew and what would have been a reasonable response under the circumstances. Thus, it is not appropriate to award such damages at summary judgment.

**3. Direct Cause**

Finally, Petrotub complains that there are material issues of fact in dispute as to the proximate cause of Crispin's damages. (Def.'s Resp. at 25.) Petrotub cites expert opinions identifying the cause of the failure of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

the frac jobs at the Gowdy and Chick Davis wells as support. However, Crispin's breach of contract claim is premised on a breach of warranty theory and the nonconformity of tender. Thus, by statute, it is entitled to general or direct damages upon proof that nonconformity of tender caused a loss that resulted "in the ordinary course of events from the seller's breach ."12A Okla. Stat. § 2-714(1). Damages flowing in the ordinary course from Petrotub's breach of its express warranty do not depend on proof of a proximate cause of the casing string failures at the wells. Nor will Crispin's entitlement to incidental damages, defined as reasonable expenses incident to the breach, *id.*§ 2-715(1), or *all* of the claimed consequential damages, *cf. id.*§ 2-715(2), require such proof.

In conclusion, the Court holds that Crispin is entitled to summary judgment on its breach of contract claim as a matter of law. The undisputed evidence shows that Crispin and Petrotub entered into contracts for the sale of goods, Petrotub expressly warranted that those goods would meet API specifications for P110 steel, some of the casing accepted failed to conform to that standard, and Crispin suffered injury or damage as a result. However, it is impossible due to the state of the record and outstanding factual disputes to accurately measure Crispin's damages.

## CONCLUSION

Accordingly, The Crispin Company's Motion for Summary Judgment (Dkt. No. 19) is GRANTED in part and DENIED in part. Crispin is entitled to judgment on Petrotub's breach of contract as a matter of law with the measure of those damages to be determined at trial. Issues of fact preclude a determination as a matter of law on Crispin's equitable indemnity claim. A judgment will issue at the conclusion of these proceedings.

IT IS SO ORDERED this 28th day of September, 2006.

W.D.Okla.,2006.
Crispin Co. v. Petrotub-S.A.
Slip Copy, 2006 WL 2812535 (W.D.Okla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 2912891 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 17,258
**2004 WL 2912891 (S.D.N.Y.)**

C Durove v. Fabian Transport, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
Zdenko DUROVE, Plaintiff,
v.
FABIAN TRANSPORT INC., et al., Defendants.
**No. 04 Civ. 7000(RJH).**

Dec. 14, 2004.

*Memorandum Opinion and Order*

HOLWELL, J.
**\*1** Plaintiff commenced this personal injury action on August 4, 2004 in the Supreme Court of the State of New York, Bronx County, alleging that he suffered burns, infections and scarring when a defective container of industrial cleaning product called "Zep Oven Brite" leaked onto his feet and lower extremities. The claim was brought against defendants Acuity Specialty Products Group, Inc. ("Acuity"), Zep Manufacturing Co. ("Zep"), Stacey Stewart-Keeler ("Stewart-Keeler") and Fabian Transport, Inc. ("Fabian"), seeking damages "in excess of the jurisdictional limits of the lower Courts of" New York State. (Compl.¶ 81).[FN1]

> FN1. Defendants contend, and plaintiff does not disagree, that the actual amount of damages sought will exceed $150,000. (Notice of Removal ¶ 6).

On August 30, 2004, defendants Zep and Stewart-Keeler filed a Notice of Removal pursuant to 28 U.S.C. §§ 1332(a)(1) [FN2] and 1441(a), [FN3] on the grounds that (i) Stewart-Keeler was fraudulently joined in order to defeat diversity jurisdiction and (ii) complete diversity exists with respect to plaintiff's remaining claims against the properly joined defendants. On September 15, 2004 plaintiff duly responded by moving to remand the proceedings to state court; in his moving papers, plaintiff both denies that Stewart-Keeler is fraudulently joined and argues that removal was improper under 28 U.S.C. § 1441(b) [FN4] because plaintiff, Stewart-Keeler and Zep

are all citizens and residents of New York State. (*See* Affirmation in Support by Lisa Ruiz ¶¶ 2-3.). Thus, the sole issue before the Court is whether removal was proper.[FN5] For the reasons set forth below, the Court finds that removal was not proper, and therefore grants plaintiff's motion to remand [3-1].

> FN2. 28 U.S.C. § 1332(a) states in relevant part:
>
> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between-(1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state; (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

> FN3. 28 U.S.C. § 1441(a) states:
>
> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded.

> FN4. 28 U.S.C. § 1441(b) states:
>
> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

FN5. At the time the motion to remand was filed, plaintiff also contended that the August 30, 2004 removal petition was defective because defendant Fabian did not consent to removal. Although the so-called "rule of unanimity" requires that all defendants consent to removal, _Codapro Corp. v. Wilson, 997 F.Supp. 322, 325 (E.D.N .Y.1998)_ ("Each [defendant] must independently and unambiguously file notice of [ ] consent and [ ] intent to join in the removal"), the rule does not apply where the non-consenting defendant has not been properly served. _Ell v. S.E.T. Landscape Design, Inc., 34 F .Supp.2d 188, 194 (S.D.N.Y.1999)_. At an oral hearing held on December 3, 2004, plaintiff acknowledged that Fabian has not yet been properly served. Accordingly, the Court considers this argument abandoned.

*Discussion*

Where, as here, removal is premised on the diversity of the parties to the action, federalism concerns are implicated by the jurisdictional analysis. In light of Congress' intent to limit the jurisdiction of federal courts, and recognizing the "importance of preserving the independence of state governments," _Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 274 (2d Cir.1994)_, reviewing courts should "construe the removal statute narrowly," _Arseneault v. Congoleum, 2002 WL 472256 at *2 (S.D.N.Y.2002)_, and resolve all doubts "in favor of remand." _Miller v. First Security Investments, Inc., 30 F.Supp.2d 347, 350 (E.D.N.Y.1998)_ (internal quotation marks omitted). For the same reasons, the party invoking removal jurisdiction bears the burden of establishing subject matter jurisdiction on a motion to remand. _United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties, 30 F.3d 298, 301 (2d Cir.1994)_.

Under _28 U.S.C. 1332(a)(2)_, this Court has original subject matter jurisdiction over a claim if the matter

in controversy exceeds $75,000 and is between "citizens of different states." _28 U.S.C. § 1332(a)(2)_. In recognition of the federalism concerns identified above, subject matter jurisdiction under _§ 1332(a)(2)_ has been interpreted to require *complete diversity*, such that the citizenship of each plaintiff must be different from that of each defendant. _Caterpillar Inc. v. Lewis, 519 U.S. 61, 75-78 (1996)_. Moreover, even if complete diversity is demonstrated, the action "shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."_28 U.S.C. § 1441(b)_; _Vasura v. Acands, 84 F.Supp.2d 531, 538 (S.D.N.Y.2000)_.

**\*2** Defendants concede that, like plaintiff, individual defendant Stewart-Keeler is a citizen and resident of New York State,[FN6] but the parties disagree about the citizenship of corporate defendant Zep. Accordingly, plaintiff's motion to remand must be granted unless the Court finds (i) that Zep is *not* a citizen of New York for purposes of _28 U.S.C. 1332(a)(1)_ *and* (ii) that Stewart-Keeler was fraudulently joined. These requisites are addressed in turn.

FN6. In their Notice of Removal, defendants acknowledge that both Stewart-Keeler and plaintiff are citizens of New York State, which, as noted, would be enough to preclude diversity jurisdiction under _28 U.S.C. § 1441(b)_ if the Court finds that joinder is proper. (Notice of Removal ¶¶ 1, 5).

1. Defendant Zep

In their opposition to plaintiff's motion to remand, defendants describe Zep as a "division of Acuity Specialty Products Group, Inc .," but characterize Zep as a "trade name" and contend that it is "not a separate legal entity from Acuity."(Def. Memo. of Law in Opp. to Pl. Mot. to Remand, p. 2 ("Def.Opp.Memo.")). Plaintiff concedes that Acuity is a Delaware corporation headquartered in Georgia, and therefore acknowledges that it cannot be considered a domiciliary of New York State for diversity purposes, but argues that Zep is a distinct entity, pointing out that it "maintains an office" and "derives substantial revenue" from business conducted in New York State. (Pl. Reply Memo. of Law, p. 1 ("Pl.Reply")). According to plaintiff, this is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

enough to make Zep a "domiciliary of New York State." (*Id.*, p. 4).FN7

> FN7. For their part, defendants admit that Zep has a sales office located in New York, but maintain that it is simply one of approximately two dozen "branch offices" in the United States; in contrast, Zep's "executive offices" are located in Atlanta, Georgia. (Def.Opp.Memo., Ex. A).

The citizenship of a corporation for diversity purposes is governed by 28 U.S.C. § 1332, which states in pertinent part: "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."28 U.S.C. § 1332(c). While arguing that Zep is a distinct entity, plaintiff concedes that Zep is a "division" of Acuity, and is therefore not a separately incorporated entity. (Pl.Reply, p. 4). For the purpose of determining diversity, the state of citizenship of an unincorporated division of a corporation is the same as the corporation that owns the division, in this case Georgia and Delaware. *Paper Corporation of the U.S. v. Benedetto, Inc.,* 1993 WL 378341 at *2 n. 1 (S.D.N.Y. Sept 20, 1993); *Wisconsin KnifeWorks v. National Metal Crafters,* 781 F.2d 1280, 1282 (7th Cir.1986). Accordingly, despite the presence of a branch office in New York, Zep is a citizen of Georgia and Delaware for purposes of 28 U.S.C. § 1332(a), and is therefore a diverse party.

### 2. Defendant Stewart-Keeler

The doctrine of fraudulent joinder was created to prevent plaintiffs from abusing 28 U.S.C. § 1332(a) by joining non-diverse parties solely in an effort to defeat federal subject matter jurisdiction. Accordingly, district courts considering claims of fraudulent joinder must scrutinize a plaintiff's pleadings, and, as defendants suggest, are permitted to "overlook the presence of a non-diverse defendant if ... there is no possibility that the claims against that defendant could be asserted in state court."*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,* 373 F.3d 296, 302 (2d Cir.2004); *Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459, 460-61 (2d Cir.1998) ("[A] plaintiff may not defeat a federal court's diversity jurisdiction and a defendant's right of removal by merely joining as defendants parties with no real connection with the

controversy.") (citations omitted).

**\*3** However, defendants seeking removal on grounds of fraudulent joinder face a "heavy burden," and must prove "by clear and convincing evidence" that either (i) "there has been outright fraud committed in the plaintiff's pleadings" or (ii) "that there is no possibility, based on the pleadings, that the plaintiff can state a cause of action against the non-diverse defendant in state court."138 F.3d at 461. In recognition of the fact that federal courts should "scrupulously confine their own jurisdiction", *Shamrock Oil & Gas Corp. v. Sheets, et al.,* 313 U.S. 100, 109 (1941) (citations and internal quotation marks omitted), all factual and legal ambiguities must be resolved in favor of the plaintiff. *Id.*

Here, defendants argue that plaintiff cannot state a claim against Stewart-Keeler, even resolving all factual and legal ambiguities in plaintiff's favor. The Court reads plaintiff's complaint as containing three identifiable claims against Stewart-Keeler, the first two of which the Court will consider as a failure to warn claim, and the last of which sounds in contract law. Plaintiff alleges that Stewart-Keeler:

(i) "negligent[ly] ... sold, distributed, warranted, transported, shipped, stacked, sorted and delivered Zep to plaintiff" (Compl., para.40);

(ii) "fail[ed] to warn ... [the] intended consumer of the ... risks and consequences associated with the selling, delivery, transport, stacking, sorting and shipping of Zep."(Compl., para.43); and

(iii) "breached an express warranty" that "Zep [Oven Brite was] safe for its intended use."(Compl., para.70).

The parties agree that New York law applies, so the only issue to be resolved is whether-construing plaintiff's allegations in the most favored light-there is "[any] possibility ... that the plaintiff [has stated] a cause of action" under New York law. *Pampillonia,* 138 F.3d at 461. Courts in this Circuit have interpreted the *Pampillonia* language strictly. *See, e.g., Stan Winston Creatures, Inc. v. Toys "R" Us, Inc.,* 2003 WL 1907978 at *4 (S.D.N.Y.Apr.17, 2003) (concluding that defendants had not shown that it was "legally impossible" for nondiverse defendant to be liable under state law); *Nemazee v. Premier,*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

_Inc._, 232 F.Supp.2d 172, 178 (S.D.N.Y.2002) (noting that fraudulent joinder "turns on whether recovery is _per se_ precluded"; "[a]ny possibility, even if slim, militates against a finding of fraudulent joinder"). This Court will do the same.

It is well-settled under New York law that manufacturers and sellers have a duty to warn users of foreseeable dangers inherent in their products of which they knew or should have known. _Rastelli v. Goodyear Tire & Rubber Co._, 79 N.Y.2d 289, 297 (1992); _McLaughlin v. Mine Safety Appliances Co._, 11 N.Y.2d 62, 68 (1962). It is also unquestionable that New York plaintiffs can bring a failure to warn claim on the basis of strict products liability or traditional negligence. _Bukowski v. CooperVision, Inc._, 185 A.D.2d 31, 33 (N.Y.App.Div.1993). In this case, it is unclear whether plaintiff's failure to warn claim sounds in both negligence and strict products liability, but because the Court is required to resolve all legal ambiguities in plaintiff's favor, 313 U.S. 100, 109, it will read the complaint to contain both claims.

a. Negligent Failure to Warn

***4** In New York, to prove a prima facie case of negligence, a plaintiff must establish "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof."_See, e.g._, _Akins v. Glens Falls City School Dist._, 53 N.Y.2d 325, 333 (N.Y.1981). Plaintiff's complaint contains factual allegations that, if true, would establish the second and third requirements. Thus, the only issue is whether plaintiff has pled facts sufficient to show that Stewart-Keeler had a duty to warn.

Although the "the duty owed by one member of society to another is a legal issue for the courts,"_Eiseman v. State of New York_, 70 N.Y.2d 175, 187 (N.Y.1987), the question here is not whether a duty existed, but whether a _clearly existing_ duty extended to Stewart-Keeler in her capacity as a "sales representative" for Acuity. (_See_ Def. Opp. Memo., p. 3 (characterizing Stewart-Keeler as a "sales representative" employed by Acuity)).[FN8] Recognizing this, defendants maintain that even if a duty to warn existed, it did not extend to Stewart-Keeler. (Def.Opp.Memo., p. 3). That is, defendants contend that there is "no possibility that plaintiff can establish a cause of action against [Stewart-Keeler]"

in her individual capacity because she "merely processed [plaintiff's] ... order" and was "acting within the scope of her employment at the time. (_Id._, p. 4). This argument begs the question, though, because it leaves unresolved the critical issue: the nature of Stewart-Keeler's employment relationship with Zep and Acuity.

> FN8. Indeed, as noted, it is clear under New York law that manufacturers and sellers have a duty to warn purchasers of latent dangers attaching to products they place in the stream of commerce. _McLaughlin_, 11 N.Y.2d 62, 68.

Plaintiff alleges in his complaint that, at the time he purchased Zep Oven Brite, Stewart-Keeler was, _inter alia_, a "business entity authorized to and doing business in the State of New York," (Compl.¶ 18); at the same time, plaintiff describes Stewart-Keeler as "an agent" of Zep and Acuity, doing business on their behalf. (Compl.¶¶ 19-20). In yet another portion of the complaint, plaintiff maintains that Stewart-Keeler was "in the business of selling, transporting, packaging, stacking, shipping and distributing hazardous chemicals and substances," including Zep Oven Brite. (Compl.¶ 28). In his moving papers, plaintiff variously states that he interacted with Stewart-Keeler at the _express direction_ of Zep's customer service department, and notes that he "twice purchased [Zep Oven Brite cleaner] through [her]." (Aff. of Zdenko Durove ¶ 4, attached as Ex. A to Pl. Reply ("Durove Aff.")). Plaintiff further notes that Stewart-Keeler "came to [his] home office and wrote up the sale as well as deliver[ed] supplies to [him] on more than one occasion in Bronx, New York."(_Id._ ¶ 5). Similarly, plaintiff contends that Ms. Keeler "made all of the shipping and delivery arrangements to [his] home office" with respect to Zep Oven Brite, (_Id._ ¶ 6), which she "regularly sold." (Compl.¶ 21). Just as readily as these allegations suggest a traditional employee-employer relationship, they suggest that Stewart-Keeler was acting as an independent contractor when she transacted business with plaintiff.[FN9]

> FN9. It is entirely possible that discovery will establish that Stewart-Keeler was acting as an independent contractor when she sold plaintiff the product in question. _See, e.g._, _Sternberg Knitting Co., Inc. v. District 65_,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*Wholesale, Retail, Office and Processing Union,* 1970 WL 7659 at *1 (N.Y.Sup.Ct. Dec. 4, 1970)* ("Plaintiff sells the children's clothing that it manufactures through sales representatives in various parts of the country who are independent contractors and who, in addition to representing plaintiff, also represent certain competing manufacturers.")

**\*5** This uncertainty is fatal to defendants' fraudulent joinder claim. In New York, where the issue of duty turns on the resolution of a factual dispute, "the question ... is not for the court as a matter of law," and must be determined at trial. *Gordon v. Muchnick,* 180 A.D.2d 715, 715 (N.Y.App.Div.1992). Resolving all ambiguities in plaintiff's favor, it is simply unclear *exactly what* Stewart-Keeler's relationship was with Acuity and Zep at the time of the sale.[FN10] The existence and scope of Stewart-Keeler's duty to plaintiff, if any, may turn on the nature of that relationship. *See, e.g., Bittler v. White and Co., Inc.,* 560 N.E.2d 979, 982-83 (Ill.App.Ct.1990) (granting summary judgment against plaintiff on negligent failure to warn claim where evidence indicated that defendant sales representative was only indirectly involved in the sale of the product in question). Thus, it cannot be said that "there is no possibility that the claims against that defendant could be asserted in state court." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,* 373 F.3d 296 (2d Cir.2004); *see also* 63A Am.Jur.2d *Products Liability* § 1131 ("the duty to warn may be imposed upon any of the parties within the chain of distribution."). Accordingly, because the Court finds that Stewart-Keeler was not fraudulently joined, and because it is undisputed that Stewart-Keeler is a citizen and resident of New York for diversity purposes, plaintiff's motion to remand must be granted .[FN11]

> FN10. Defendants have submitted no conclusive evidence on the issue. Indeed, the only evidence even tangentially related to the question is unhelpful. Exhibit E to defendant's reply memorandum of law in opposition to plaintiff's motion to remand is an August 12, 2003 Zep Manufacturing Company invoice that lists Stewart-Keeler as the "sales representative" who sold plaintiff various items, including Zep Oven Brite.

> FN11. The Court notes that in the context of pharmaceutical sales, the "learned intermediary" doctrine has been held to preclude negligent failure to warn claims against pharmaceutical sales representatives; as a result, several courts have found that sales representatives were fraudulently joined to claims against drug manufacturers. *See, e.g., In re Diet Drugs Products Liability Litigation,* 2004 U.S. Dist. LEXIS 12239 at *8-*9 (E.D. Pa. June 18, 2004) ("The Mississippi courts have clearly decided in the prescription drug context that the duty to warn does not extend to sales representatives ... In addition, under Mississippi law, sales representatives are not 'sellers,' but rather employees of the businesses which are the sellers ... As such, the employees are not liable for failure to warn ... There is 'no reasonable basis in fact or colorable ground supporting the claim against' the sales representative defendants ... Accordingly, they are fraudulently joined."). There are no allegations that the learned intermediary rule applies here.

### b. Strict Products Liability

Although the above discussion serves as an independent ground for remand, the Court addresses plaintiff's strict products liability claim because it is resolved on largely the same basis as is the negligence claim, and will shed additional light on the Court's decision to remand the proceedings.

In a strict tort liability action to recover for a seller's failure to warn, a plaintiff must plead and prove that the defendant sold the product that injured the plaintiff. However, the parties have not cited any New York case that addresses the question of whether Stewart-Keeler is a "product seller" within the meaning of § 402(a) of the Restatement (Second) of Torts § 402A. Comment f of the Restatement explains what is meant by the phrase "engaged in the business of selling":

The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.

The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it. The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence.

**\*6** Courts in other jurisdictions have defined the term "seller" broadly in the context of strict products liability, extending a duty to warn to a party that has any "participatory connection, for personal profit or other benefit, with the injury-causing product and with the enterprise that created consumer demand for and reliance upon the product."*Kasel v. Remington Arms, Inc.,* 24 Cal.App.3d 711, 725 (Cal.Ct.App.1972); *see also Bittler v. White and Co., Inc.,* 560 N.E.2d 979, 982 (Ill App.Ct.1990) (where exclusive sales representative derived economic benefit from sale of product in question, strict products liability claim for failure to warn survived motion to dismiss). Defendants have not established that a New York court would hold differently.

Thus, because defendants have not shown that it is "legally impossible" for Stewart-Keeler to be held liable for failure to warn on a theory of strict products liability, *Stan Winston Creatures, Inc.,* 2003 WL 1907978 at \*4, plaintiff's motion to remand must also be granted on this ground.

*Conclusion*

For the foregoing reasons, plaintiff's motion to remand [3-1] is GRANTED pursuant to 28 U.S.C. § 1447(c). The Clerk of the Court is directed to close the case.

SO ORDERED.

S.D.N.Y.,2004.
Durove v. Fabian Transport, Inc.
Not Reported in F.Supp.2d, 2004 WL 2912891 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 17,258

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 1040886 (S.D.Tex.)
(Cite as: 2007 WL 1040886 (S.D.Tex.))

**C** Engelbecht v. DaimlerChrysler Corp.
S.D.Tex.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas,Galveston
Division.
James ENGELBECHT, Plaintiff,
v.
DAIMLERCHRYSLER CORP., et al., Defendants.
Civil Action No. G-06-CV-800.

April 2, 2007.

John Karl Buche, Buche & Associates Pc, La Jolla,
CA, for Plaintiff.
G Robert Sonnier, Attorney at Law, Austin, TX,
Patrick G Seyferth, Bush Seyferth Kethledge &
Paige, Pllc, Troy, MI, Stephen Robert Lewis, Jr.,
Lewis & Williams, Galveston, TX, Ritu Gupta,
Brown & Gupta, Houston, TX, for Defendants.

### ORDER OF REMAND

SAMUEL B. KENT, United States District Judge.
**\*1** This action comes before the Court on removal
from the 23rd Judicial District of Brazoria County,
Texas. Now before the Court is Plaintiff's Motion to
Remand. For the reasons stated below, Plaintiff's
Motions is **GRANTED,** and this case is
**REMANDED** to the 23rd Judicial District of
Brazoria County, Texas. [FN1]

> FN1. The Court does not consider this Order
> worthy of publication. Accordingly, it has
> not requested and does not authorize such
> publication.

## I. Background

On November 2, 2006, Plaintiff sued Defendants
DaimlerChrysler Corporation, Archer Chrysler
Plymouth, Inc., and Archer Chrysler-Jeep (West),
Inc. for negligence, gross negligence, product
liability, misrepresentation, and breach of warranty
after his wife, Jessica, was killed when the airbags in
her car failed to deploy after a head-on collision.
DaimlerChrysler, Corp. ("DaimlerChrysler"), the
manufacturer of Jessica's Chrysler Town & Country,

is an out-of-state Defendant. Plaintiff and the Archer
entities (collectively "Archer") are Texas residents.
DaimlerChrysler removed the case to this Court
pursuant to the Court's diversity jurisdiction alleging
that Archer had been fraudulently joined. Plaintiff
now moves to remand, arguing that Archer is a
proper Party in this case.

## II. Legal Standard

Absent an express provision to the contrary, a
defendant can remove a state-court action to federal
court only if the suit could have been filed originally
in the federal court. See 28 U.S.C. § 1441(a);
Caterpillar, Inc. v. Williams, 482 U.S. 386, 107 S.Ct.
2425, 96 L.Ed.2d 318 (1987). Because Plaintiff's
claims arise under Texas law, there is no federal
question, and diversity is the only possibility for
federal jurisdiction. The federal diversity statute
provides the federal district courts with jurisdiction
over civil actions where the amount in controversy
exceeds $75,000 and where the parties are citizens of
different states. See 28 U.S.C. § 1332(a). The
jurisdictional statute has long been interpreted to
mandate a rule of "complete diversity," meaning that
the diversity statute "applies only to cases in which
the citizenship of each plaintiff is diverse from the
citizenship of each defendant." Caterpillar, Inc. v.
Lewis, 519 U.S. 61, 68, 117 S.Ct. 467, 472, 136
L.Ed.2d 437 (1996) (citing Strawbridge v. Curtis, 7
U .S. (2 Cranch) 267, 2 L.Ed. 435 (1806)). Generally,
the plaintiff's complaint must allege facts showing
that complete diversity exists. See, e.g., Getty Oil
Corp. v. Ins. Co. of N. Am., 841 F.2d 1254, 1258 (5th
Cir.1988).

The district court may discount non-diverse
defendants if the removing party can show that the
plaintiff fraudulently joined these defendants. In
order to prove fraudulent joinder, " '[t]he removing
party must prove that there is absolutely no
possibility that the plaintiff will be able to establish a
cause of action against the in-state defendant in state
court, or that there has been outright fraud in the
plaintiff's pleading of jurisdictional facts'.... 'If there
is arguably a reasonable basis for predicting that the
state law might impose liability on the facts involved,
then there is no fraudulent joinder. This possibility,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

however, must be reasonable, not merely theoretical'
" *Great Plains Trust Co. v. Morgan Stanley Dean
Witter & Co.,* 313 F.3d 305, 312 (5th Cir.2002)
(quoting *Green v. Amerada Hess Corp.,* 707 F.2d
201, 205 (5th Cir.1983) and *Badon v. RJR Nabisco
Inc.,* 236 F.3d 282, 286 (5th Cir.2001)). "The
removing party carries a heavy burden when
attempting to prove fraudulent joinder." *Id.* (citing
*Cavallini v. State Farm Mut. Auto. Ins. Co.,* 44 F.3d
256, 259 (5th Cir.1995)).

**\*2** Since DaimlerChrsyler has not alleged fraud, the
operative inquiry is whether there is any reasonable
possibility that Plaintiff will be able to establish a
cause of action against Archer in state court. All
issues of fact and of uncertain state law are resolved
in favor of Plaintiff. *See Cavallini,* 44 F.3d at 259
(citing *Green,* 707 F.2d at 205). The Court may
consider evidence similar to that used for summary
judgment analysis in evaluation of the claims against
non-diverse defendants. *See id.* at 263.However, the
Court will not consider "whether the plaintiff will
actually or even probably prevail on the merits of the
claims," but only the "possibility that the plaintiff
might do so."*Burden v. Gen.l Dynamics Corp.,* 60
F.3d 213, 216 (5th Cir.1995). If the district court
determines that the plaintiff did not fraudulently join
the non-diverse defendants, it must remand the case
for lack of subject matter jurisdiction.

**III. Analysis**

Plaintiff alleges that Archer sold the Town &
Country in question, failed to give adequate warning
of dangers that it knew or should have known about,
and misrepresented the safety of the vehicle.
DaimlerChrysler argues that **TexasCivilPractices
and Remedies Code § 82.003** bars recovery against
Archer. In relevant part, § 82.003 states:

(a) A seller that did not manufacture a product is not
liable for harm caused to the claimant by that product
unless the claimant proves:

...

(6) that:

(A) the seller actually knew of a defect to the product
at the time the seller supplied the product; and

(B) the claimant's harm resulted from the defect.

Section 82.003 essentially protects a non-
manufacturing seller from product liability actions
unless its conduct falls into one of the enumerated
exceptions to the presumption of no liability.
DaimlerChrysler argues that Archer is a non-
manufacturing seller and is insulated from liability by
§ 82.003(a). DaimlerChrysler further alleges that
Plaintiff cannot prove that Archer has exhibited any
conduct which falls into any of the enumerated
exceptions. The Court respectfully disagrees.

At this stage in the proceedings, the Court need only
determine whether there is a possibility that Plaintiff
may prevail against Archer. Plaintiff need not present
all of his proof. In this case, Plaintiff has presented
more than enough to prevent DaimlerChrysler from
meeting its very high burden. Specifically, Plaintiff's
Original Petition states that

"Defendants represented that the product was
especially safe to operate with its airbag systems and
that consumers, including Jessica Engelbrecht, would
be safe in the event of a collision because of the
crashworthiness of the DaimlerChrysler vehicle and
the advanced restraint systems housed by the vehicle.
Decedent relied on the representations of safety by
Defendants when choosing to operate the
DaimlerChrysler vehicle."

Original Pet. at 9-10. Plaintiff also argues that Archer
knew, or should have known, about the defect in the
airbag at the time it made these representations
because of an ongoing governmental inquiry into the
safety of the airbags in the DaimlerChrysler vans. If
Plaintiff can ultimately prove that Archer knew about
the defect at the time the vehicle was purchased, he
can recover against Archer under the exception in §
82.003(a)(6).*See* Pl.'s Supplemental Br. in Supp. of
Mot. to Remand at 6. This possibility is enough to
defeat DaimlerChrysler's removal.

**IV. Conclusion**

**\*3** Since there is a possibility that Plaintiff can
prevail against Archer, it has not been fraudulently
joined. Accordingly, there is not complete diversity,
and this Court has no jurisdiction. Therefore, this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case is **REMANDED** to the 23rd Judicial District of Brazoria County, Texas. Each Party is to bear its own taxable costs, expenses, and attorneys' fees incurred herein to date.

**IT IS SO ORDERED.**

S.D.Tex.,2007.
Engelbecht v. DaimlerChrysler Corp.
Slip Copy, 2007 WL 1040886 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2840476 (N.D.Ill.)

**2007 WL 2840476 (N.D.Ill.)**

**C** Gershengorin v. Vienna Beef, Ltd.

N.D.Ill.,2007.

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.

Morris GERSHENGORIN, Michael Smolyansky, and Marina Bartashnik, individually and on behalf of all others similarly situated, Plaintiffs,

v.

VIENNA BEEF, LTD., individually and on behalf of a defendant class of all Authentic Vienna Beef Hot Dog Stands, Defendants.

**No. 06 C 6820.**

Sept. 28, 2007.

Allison Amy Krumhorn, Lance A. Raphael, Stacy Michelle Bardo, Chicago, IL, Brian Lewis Bromberg, Bromberg Law Office, P.C., New York, NY, for Plaintiffs.

Michael D. Hayes, Varga, Berger, Ledsky, Hayes & Casey, Thomas John Verticchio, Swanson, Martin & Bell, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

HART, J.

**\*1** In this putative class action, named plaintiffs Morris Gershengorin, Michael Smolyansky, and Marina Bartashnik allege they were deceived and contract warranties were breached by named defendant [FN1] Vienna Beef Ltd.'s representations that its Vienna Beef Natural Casing Hot Dogs ("Casing Dogs") were all beef despite the fact that they were made with pork casings. All the named plaintiffs purchased Casing Dogs at Authorized Stands. Gershengorin and Smolyansky also purchased Casing Dogs at a Vienna Beef factory store (Vienna Beef Cafe). It is alleged that the representations were contained in Vienna Beef supplied signs displayed at Authorized Stands and in Vienna Beef advertising. It is also alleged that the representations were on Vienna Beef's website, but none of the named plaintiffs allege that they visited that website prior to purchasing any Casing Dog. Presently pending is named defendant's motion to dismiss all claims, or,

alternatively, to strike the allegations regarding the website.

> FN1. A putative class of defendants is also alleged consisting of all Authentic Vienna Beef Hot Dog stands ("Authorized Stands").

This action was originally filed in state court, but removed based on there being diversity jurisdiction in accordance with the Class Action Fairness Act of 2005. *See* 28 U.S.C. §§ 1332(d), 1453. After removal, plaintiffs filed their Corrected First Amended Class Action Complaint ("CFAC"). The CFAC contains five counts. Count I is a breach of express warranty claim based on the Illinois Uniform Commercial Code, [FN2] specifically 810 ILCS 5/2-313. Count II is a UCC nonconformity of goods claim based on 810 ILCS 5/2-301. Count III is a "Consumer Fraud (Deception)" claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), [FN3] 815 ILCS 505/2, 510/2(5), (7), (12). Count IV is a "Consumer Fraud (Unfairness)" claim for violation of the ICFA, 915 ILCS 505/2. Count V is a common law unjust enrichment claim.

> FN2. The putative class is national in scope. It is generally alleged that other states have similar UCC provisions.

> FN3. It is generally alleged that other states have similar statutory provisions.

Defendant contends the consumer fraud counts fail because not pleaded with the specificity required by Fed.R.Civ.P. 9(b). Plaintiffs concede that Rule 9(b) applies to ICFA claims. *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 883 (7th Cir.2005); *Brown v. SBC Communications, Inc.*, 2007 WL 684133 *5 (S.D.Ill. March 1, 2007); *United States v. All Meat & Poultry Products Stored at Lagrou Cold Storage*, 470 F.Supp.2d 823, 830 (N.D.Ill.2007).

To satisfy the requirements of Rule 9(b), a plaintiff must "identi[f]y ... the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Uni\*Quality,*

*Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.1992) (quoting *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992)). In other words, the plaintiff must plead "the who, what, when, where, and how: the first paragraph of any newspaper story."*Crichton v. Golden Rule Ins. Co.*, Civil No. 06-264-GPM, 2006 WL 2349961, at *4 (S.D.Ill. Aug.11, 2006) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)). The purpose of Rule 9(b) is "to ensure that the party accused of fraud ... is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading,"*Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir.1999), and to compel plaintiffs to undertake adequate pre-filing investigation of claims of fraud, so that defendants are not injured by groundless charges of deceit. *SeeAckerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir.1999) ("The purpose ... of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint. Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual).").

**\*2** *Brown*, 2007 WL 684133 at *5. Fair notice is the most basic consideration. *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777-78 (7th Cir.1994); *United States ex rel. Salmeron v. Enterprise Recovery Systems, Inc.*, 464 F.Supp.2d 766, 768 (N.D.Ill.2006); *S.E.C. v. Black*, 2005 WL 1498893 *3 (N.D.Ill. June 17, 2005); *ABN AMRO Mortgage Group, Inc. v. Maximum Mortgage, Inc.*, 2005 WL 1162889 *1 (N.D.Ind. May 16, 2005).

As to named plaintiffs themselves,[FN4] the representations at issue allegedly appeared in advertising and on signage found at Authorized Stands and the factory store. Plaintiffs do not describe or identify any of the advertising, so any claim based on misrepresentations in advertising is not alleged with sufficient particularity. *SeeIn re McDonald's French Fries Litigation*, --- F.Supp.2d ----, 2007 WL 1576550 *2 (N.D.Ill. May 30, 2007); *All Meat*, 470 F.Supp.2d at 830.

FN4. It is alleged that some members of the putative class also saw the representations

contained on named defendant's website.

As to signage, plaintiffs allege:

On information and belief, up until the time that this lawsuit was filed, Vienna Beef provided its authorized sellers with signage and various advertisements stating that its products are "beef," "pure beef," and/or "all-beef." Neither this signage nor any advertisements disclosed that the Natural Casing products were made with pork casing.

CFAC ¶ 16. It is also alleged that some signs stated "100% beef ." *Id.* ¶ 55.

In another paragraph, not containing the information and belief limitation, it is alleged that all the Authorized Stands and the factory store,[FN5] use the same processes for selling the Casing Dogs. *Id.* ¶ 42.It is alleged that the advertising materials used by these stores are materially identical and provided by Vienna Beef. *Id.* As used in this paragraph, advertising materials would include store signage. No photograph or copy of a particular sign is provided as an exhibit to the CFAC. There is no allegation in the CFAC describing any particular sign. The only description of the signage is that it contains one of the words or phrases listed above and does not contain any mention of the casing being pork.

> FN5. Plaintiffs do not expressly refer to the factory store in this paragraph, but the reference to Vienna Beef itself would necessarily include the factory store.

Named plaintiffs do identify the particular stores at which they purchased Casing Dogs. They do not identify specific dates for purchases, but do allege that they made purchases in Summer 2006 and that these stores had the signage at issue during that time period. When widespread, multiple acts of fraud are alleged, it generally will suffice to outline the scheme and allege some specific examples of the fraudulent acts. *SeeUnited States v. Cancer Treatment Centers of America*, 2003 WL 21504998 *1 (N.D.Ill. June 30, 2003); *Pressalite Corp. v. Matsushita Electric Corp. of America*, 2003 WL 1811530 *8 (N.D.Ill. April 4, 2003). If plaintiffs had provided some concrete examples of the signage at issue, it would be clear that they satisfied the Rule 9(b) requirement. Even without such concrete examples, however, it is held

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

that named plaintiffs have provided named defendant with fair notice of the fraud supporting their ICFA claims. The representations at issue are not complex. Plaintiffs simply contend that describing the Casing Dogs as all, pure, or 100% beef without any disclosure of the pork casing is a misrepresentation. Whether the sign also lists a price or other information or contains a picture of a hot dog or some other graphics is not material. All that is material is that the sign contains the pertinent phrase, does not mention pork,[FN6] and is noticed by the customer. Plaintiffs' allegations that the signage contains such contents, that they saw such signs at the particular stores they visited in Summer 2006, and that all Authorized Stands and the factory store contain such signs constitute sufficient notice to named defendant to prepare a defense to the fraud claims. The consumer fraud claims will not be dismissed for failure to satisfy Rule 9(b).

> FN6. Plaintiffs do not simply allege that the signs themselves do not mention pork; they allege that Vienna Beef does not otherwise disclose to retail customers that the casings contain pork. It is alleged by plaintiffs that the use of pork casings is only disclosed on an ingredient label that is placed on the wholesale boxes of Casing Dogs that are provided to stands. CFAC ¶ 36. Apparently, the types of packaged hot dogs sold at retail stores do not include Casing Dogs, only other types of hot dogs that have no separate casing made from pork intestines.

**\*3** Defendant also contends that the consumer fraud claims are preempted by federal law concerning the labeling of food.[FN7] Defendant contends that the label placed on the wholesale boxes satisfies Department of Agriculture labeling requirements so any claim based on failure to otherwise disclose the use of pork casings is preempted. Plaintiffs contend any preemptive effect is limited to labeling and does not apply to claims of fraudulent statements in marketing communications.

> FN7. Defendant contends the unjust enrichment claim would also be preempted to the extent it is not based on a contract. Defendant does not contend that the UCC warranty claims, which are based on a private contract, would be preempted.

Meat and meat foods, such as Casing Dogs, are governed by the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. §§ 601-95, and the regulations promulgated thereunder by the Department of Agriculture. Section 678 provides in part: "Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State ... with respect to articles prepared at any establishment under inspection...." The parties agree that Vienna Beef's production facilities are an "establishment under inspection" as that term is used in § 678. The FMIA defines "label" as "a display of written, printed, or graphic matter upon the immediate container (not including package liners) of any article," 21 U.S.C. § 601(o), and "labeling" as "all labels and other written, printed or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." Id. § 601(p).

In order to be preempted by the provision relied upon by defendant, state statutory or common law must (1) affect marking, labeling, packaging, or ingredient requirements (2) in a manner in addition to or different from the FMIA requirements on those subjects. Plaintiffs are not complaining that the labeling or marking on Casing Dog wholesale packages is deficient or misleading, nor do they contend that additional ingredients should be listed. Instead, they are complaining about fraudulent misrepresentations contained in signage at the stands where Casing Dogs are sold. The FMIA does not preempt regulation of signage separate from the marking or labeling on meat packaging itself. See United States v. Stanko, 491 F.3d 408, 418 (8th Cir.2007) (this provision of § 678 does not preempt state unfair-trade-practices laws). See also Cavel International, Inc. v. Madigan, --- F.3d ----, 2007 WL 2736624 \*3 (7th Cir. Sept.21, 2007) (FMIA inspection provision is not applied literally). Cf. Bates v. Dow Agrosciences LLC, 544 U.S. 431, 125 S.Ct. 1788, 1798-99, 161 L.Ed.2d 687 (2005) (similarly worded labeling or packaging preemption provision of Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136v(b), does not preempt fraud claim based on oral statements made by the salesperson). Plaintiffs' consumer fraud claims are not preempted. Counts III and IV will not be dismissed.

Next to be considered are the warranty claims. Rule

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

9(b) does not apply to these claims. Therefore, plaintiffs need not plead particularized facts. They need only plead facts sufficient to raise a right to relief above the speculative level, providing fair notice and an appearance of plausibility. See*Bell Atlantic Corp. v. Twombly*, --- U.S. ----, ----, ---- - ---- & n. 14, 127 S.Ct. 1955, 1965, 1973-74 & n. 14, 167 L.Ed.2d 929 (2007); *Erickson v. Pardus*, --- U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); *St. John's United Church of Christ v. City of Chicago*, --- F.3d ----, 2007 WL 2669403 *7 (7th Cir. Sept.13, 2007); *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC.*, --- F.3d ----, 2007 WL 2406859 *4 (7th Cir. Aug.24, 2007); *Pisciotta v. Old National Bancorp*, --- F.3d ----, 2007 WL 2389770 *3 (7th Cir. Aug.23, 2007). A complaint should be dismissed if "the factual detail ... [is] so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."*St. John's*, 2007 WL 2669403 at *7 (quoting *Airborne*, 2007 WL 2406859 at *4). The well-pleaded allegations of the complaint must be taken as true and all reasonable inferences drawn in plaintiffs' favor. *Twombly*, 127 S.Ct. at 1965;*Erickson*, 127 S.Ct. at 2200;*Pisciotta*, 2007 WL 2389770 at *3;*Caldwell v. Jones*, --- F.Supp.2d ----, 2007 WL 2745702 *2 (N.D.Ind. Sept.19, 2007)."[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."*Twombly*, 127 S.Ct. at 1969;*Caldwell*, 2007 WL 2745702 at *2. As long as they are consistent with the allegations of the CFAC, plaintiffs may assert additional facts in their response to the motion to dismiss. *Brokaw v. Mercer County*, 235 F.3d 1000, 1006 (7th Cir.2000); *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir.2000).

**\*4** Defendant contends the warranty claims fail because plaintiffs fail to allege the terms of the warranty. Plaintiffs, however, allege that Vienna Beef [FN8] has warranted that Casing Dogs are all pure beef. *See, e.g.*, CFAC ¶ 57. These warranties are alleged to have been contained in signage and advertising of Vienna Beef. See*Wheeler v. Sunbelt Tool Co.*, 181 Ill.App.3d 1088, 130 Ill.Dec. 863, 537 N.E.2d 1332, 1340-41 (4th Dist.), *appeal denied*,127 Ill.2d 644, 136 Ill.Dec. 610, 545 N.E.2d 134 (1989). Unlike the fraud claims, this allegation must be assumed to be true regardless of whether it is alleged with particularity. Plaintiffs have alleged the existence of an express warranty.

FN8. It is also alleged that the Authorized Stands made the same warranties.

Defendant also contends that the warranty claims fail because plaintiffs did not provide the pre-litigation notice required by 810 ILCS 5/2-607(3)(a) ( "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy"). Plaintiffs allege that they notified Vienna Beef of the breach through a "notice of revocation letter" and that they demanded the Vienna Beef revoke acceptance, but Vienna Beef did not provide a refund. CFAC ¶¶ 65, 69-70. Defendant contends this allegation is insufficient because it does not allege when the notice was given so it cannot satisfy the requirement that it be given within a reasonable period of time.

Plaintiffs allege they purchased Casing Dogs in Summer 2006 and learned thereafter that they contained pork. Although the CFAC does not expressly allege notice was given before the original complaint was filed, the original complaint (which was filed in November 2006) also alleges notice was given. Therefore, at most, the notice was given five months after the defect was discovered. Defendants cite no cases and make no argument regarding what constitutes timely notice. In any event, plaintiffs also expressly allege that defendant was aware that Casing Dogs contained pork, a fact that is also apparent from the allegation that defendant listed it on the ingredient label for Casing Dogs. No separate notice is required when the defendant is aware of the specific defect. *Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710, 715 (7th Cir.1992); *McDonald's French Fries*, 2007 WL 1576550 at *2;*Hays v. General Electric Co. .*, 151 F.Supp.2d 1001, 1010 (N.D.Ill.2001). The warranty claims will not be dismissed for failure to adequately plead notice.

As to Bartashnik only, it is argued that her warranty claims fail because she was not in privity with Vienna Beef. Unlike the other two named plaintiffs, Bartashnik only purchased a Casing Dog at an Authorized Stand, not at the factory store. Under notice pleading requirements, however, plaintiffs sufficiently allege both that Vienna Beef provided the signage and advertising at the Authorized Stands and that Authorized Stands were Vienna Beef's agents.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Bartashnik's warranty claims will not be dismissed for lack of privity. See*McDonald's French Fries,* 2007 WL 1576550 at *3-4.

**\*5** The warranty claims in Counts I and II will not be dismissed.

As to the unjust enrichment claim, defendant contends such a claim is not appropriate since a contract is alleged. Plaintiffs contend it is appropriate to plead in the alternative. Defendant does not dispute that pleading in the alternative is permitted, but contends that plaintiffs' unjust enrichment claim necessarily relies on a contract because all the allegations of Counts I through IV are incorporated in Count V. While the facts alleged in the prior counts are incorporated in Count V, that does not mean the legal conclusions are also incorporated. Plaintiffs may proceed on the alternative theory of unjust enrichment. As to Bartashnik, defendant also contends she cannot succeed on an unjust enrichment claim because she did not purchase a Casing Dog directly from Vienna Beef. Vienna Beef, however, is still alleged to have received benefits from wrongful conduct directed to Bartashnik. The unjust enrichment claim will not be dismissed. See*Oshana v. Coca-Cola Co.,* 472 F.3d 506, 515 (7th Cir.2006), *cert. denied,*--- U.S. ----, 127 S.Ct. 2952, 168 L.Ed.2d 264 (2007). Count V will not be dismissed.

Alternatively, Vienna Beef moves to strike the allegations regarding information on its website, on the ground that named plaintiffs do not allege that they viewed the website. These allegations, however, do not simply allege additional representations, they also include background information about how Vienna Beef functions. Also, as plaintiffs contend, these allegations of additional misrepresentations could support awarding punitive damages. Furthermore, it is alleged that putative class members viewed the website. This aspect of the motion to strike will be denied.

Defendant also contends that the class definition in the CFAC should be stricken because it contains an inappropriate class definition. That is a class certification issue, not a pleading issue. This aspect of the motion to strike will be denied. No opinion is expressed regarding whether the definition alleged is an appropriate class to certify.

The motion to strike and dismiss will be denied. Named plaintiffs must promptly move for class certification. On or before October 31, 2007, named plaintiffs shall present a motion for class certification supported by a brief. If no motion is presented by that date, class certification will be denied.

IT IS THEREFORE ORDERED that defendant's motion to strike and dismiss [25] is denied. Within two weeks, defendant shall answer the Corrected First Amended Class Action Complaint. On or before October 31, 2007, named plaintiffs shall present a motion for class certification. A status hearing will be held on October 31, 2007 at 11:00 a.m.

N.D.Ill.,2007.
Gershengorin v. Vienna Beef, Ltd.
Slip Copy, 2007 WL 2840476 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
**1998 WL 196402 (E.D.Pa.)**

**C**Giuffrida v. American Family Brands, Inc.
E.D.Pa.,1998.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Joseph H. GIUFFRIDA,
v.
AMERICAN FAMILY BRANDS, INC.
AMERICAN FAMILY BRANDS, INC.
v.
GIUFFRIDA ENTERPRISES, INC, et al.
**Nos. CIV.A. 96-7062, CIV.A. 96-7256.**

April 23, 1998.

*MEMORANDUM*

ONEILL.
*1 These breach of contract actions concern the sale of substantially all of the assets of a family-owned business that distributed and manufactured various meat, poultry and other food products (96-7256) and an employment contract related to that sale (96-7062). The buyer, American Family Brands, Inc. (AFB), purchased substantially all of the assets of Freda Corporation and its wholly-owned subsidiaries (collectively "Freda") for $19,434,129 pursuant to a lengthy and detailed Purchase Agreement executed on March 18, 1996.[FN1] The sellers are five members of the Giuffrida family who ran the business from 1956 until 1996. AFB contends that the sellers breached various provisions of the Purchase Agreement.

> FN1. Freda Corporation's wholly-owned subsidiaries included C.D. Moyer Company, Kohler Delicatessen Meats, Inc. and Kohler Urban Renewal Corporation.

In addition, contemporaneously with the closing, AFB and Joseph Giuffrida entered into an employment contract. In his action, Joseph Giuffrida contends that AFB breached that contract by failing to pay him the salary due thereunder. Admitting nonpayment, AFB asserts that Giuffrida breached the contract first by refusing to perform duties assigned pursuant to the contract. Before me are AFB's motion

for partial summary judgment and the sellers' motion for summary judgment on all claims.

*I. Summary Judgment Standard*

When considering a motion for summary judgment, I must view all evidence and resolve all doubts in favor of the non-moving party. *Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1297 (3d Cir.1993); *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 (3d Cir.1983). I may grant summary judgment only "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *SEC v. Hughs Capital Corp.,* 124 F.3d 449, 452 (3d Cir.1997). To determine whether there is a genuine issue of material fact, I must ask whether a jury could reasonably return a verdict for the non-moving party. *Anderson v. Liberty lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As to many of the same issues, both AFB and the sellers have moved for summary judgment. The applicable legal standards by which I decide a summary judgment motion do not change when the parties file cross-motions. *Appelmans v. City of Philadelphia,* 826 F.2d 214, 216 (3d Cir.1987); *Manufacturers Life Ins. Co. v. Dougherty,* 986 F.Supp. 928, 1997 WL 778585, *2 (E.D.Pa.1997).

*II. Discussion-Alleged Breach of the Purchase Agreement*

AFB contends that the sellers breached various provisions of the Purchase Agreement, and resolution of the motions requires interpretation of the language of the Agreement. Under Pennsylvania law,[FN2] I interpret the Agreement to determine the objectively-manifested intent of the contracting parties. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). I must first decide whether the Agreement is ambiguous.*Stenardo v. Federal Nat'l Mortgage Ass'n,* 991 F.2d 1089, 1094 (3d Cir.1993)."A contract provision is ambiguous if it is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
1998 WL 196402 (E.D.Pa.)

susceptible of two reasonable alternative interpretations. Where the written terms of the contract are not ambiguous and can only be read one way, the court will interpret the contract as a matter of law." *Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994) (citations omitted).[FN3] If, however, I find ambiguity in the language of the contract, the interpretation is left to the jury "to resolve the ambiguity in light of the extrinsic evidence." *Id.*

> FN2. Both parties agree that Pennsylvania law governs this action.

> FN3.*See also Samuel Rappaport Family Partnership v. Meridian Bank,* 441 Pa.Super. 194, 657 A.2d 17, 21-22 (Pa.Super.Ct.1995) ("A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction."); *Krizovensky v. Krizovensky,* 425 Pa.Super. 204, 624 A.2d 638, 642-43 (Pa.Super.Ct.1993).

**\*2** Pennsylvania courts apply the "plain meaning rule" of contract interpretation which "presume[s] that the parties' mutual intent be ascertained by examining the writing." *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 613 (3d Cir.1995). A court, however, is not always confined to the four corners of the written contract, but may examine the context in which the agreement arose. *Hullett,* 38 F.3d at 111, citing *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 662 (Pa.1982). In the end, to determine whether an ambiguity exists, I must "consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Mellon,* 619 F.2d at 1011.

A. *Alleged Breach of "No Material Adverse Change" Representation and Warranty*

Included in the "Representations and Warranties of the Sellers" section of the Purchase Agreement is the following representation and warranty related to the change in the financial condition of sellers from the date of the last audited financial statements to the date of the closing:

Except as set forth in Schedule 5(a) hereto,[FN4] since August 26, 1995, there have been no material adverse changes in the condition (financial or otherwise), assets, liabilities, earnings, or properties, of any of the Sellers[.]

> FN4. Schedule 5(a) contains no limitations on this warranty.

Purchase Agreement § 5(g).[FN5] The Agreement also contains a section titled "Survival of Representations, Warranties, Etc." which reads:

> FN5. AFB's motion for partial summary judgment sought a ruling that this provision is a clear and unambiguous promise which is not limited to events outside the ordinary course of business. Sellers apparently concede this point because they do not argue the contrary. In any event, the unambiguous language of this provision does not include a limitation and therefore I will sustain AFB's position on this point.

All of the representations, warranties, covenants and agreements made by the parties to this Agreement shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder for a period of two (2) years after the Closing Date[.]
*Id.* § 10. Under the miscellaneous section of the Agreement there is also a non-waiver subsection which provides:

No waiver of the provisions hereof shall be effective unless in writing and signed by the party to be charged with such waiver.

*Id.* § 13.

AFB contends that there was a material adverse change in the sellers' financial condition resulting in a breach of the express representation and warranty in § 5(e) of the Agreement that survived closing. Sellers, however, contend that AFB closed with knowledge of the change in the financial condition of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
**1998 WL 196402 (E.D.Pa.)**

Page 3

sellers, and that therefore AFB did not rely on the truth of the warranty and waived any claim pursuant to § 5(e).[FN6]

> FN6. The parties also contend that there is no genuine issue of material fact with respect to the materiality of the adverse change. I do not agree and will submit this issue to the jury.

Prior to executing the Purchase Agreement, the parties signed a "Letter of Intent" under which AFB had the right to cancel the purchase without any liability if it was dissatisfied with the results of its due diligence. As part of its due diligence AFB received Freda's interim financial statements for the "stub period"-the period between the last audited financial statements, August 25, 1995, and the date of the closing, March 18, 1996.[FN7] Laurence Needleman, AFB's Chief Financial Officer, prepared an analysis of those interim financial statements which showed a significant reduction in earnings. The downturn was so severe that Needleman concluded that "[r]esults of operations for Freda Corp. through Jan., 1996 indicate that the company has been severely mismanaged during the last three months." See Needleman Memo, March 4, 1996.

> FN7. Freda gave AFB two separate "stub period" financial statements. The first covered the 22-week period between August 25, 1995 and the end of January 1996 and was given to AFB several weeks before the closing. The second covered the 27-week period between the end of August 1995 and the end of February 1996 and was given to AFB several days before the closing.

**\*3** Sellers contend that because AFB knew about the changes in the financial condition of Freda during the stub period, as evidenced by this memorandum, it is precluded from relying on the no material adverse change representation and warranty. AFB argues that under Pennsylvania law and the plain language of the Purchase Agreement reliance on the representation and warranty is not a requirement of its breach of warranty claim and therefore it did not waive its claim by closing.

The Pennsylvania Supreme Court has not decided whether reliance is a required element in a contractual breach of representation and warranty claim,[FN8] and the decisions in other jurisdictions are divided. As a federal judge applying Pennsylvania law without guidance from the Pennsylvania Supreme Court, I must attempt to predict what that Court would hold if presented with this question.

> FN8. The Pennsylvania Supreme Court's decision in *In re Claim Against Escrow Fund under Agreement with John Carter*, 390 Pa. 365, 134 A.2d 908 (Pa.1957), does not speak to whether the Court would require reliance as an element of a contractual breach of express warranty claim. In that case, concerning a purchase of all of the outstanding stock of the seller, the buyer alleged that seller breached a representation and warranty that there had been no adverse changes in the financial condition of seller during the stub period. In contrast to the instant case, however, the purchase agreement in *Carter* did not include a "no material adverse change" warranty and representation. The agreement listed as a condition precedent to closing that there was no material adverse change in the financial condition of the seller during the stub period, and buyer unsuccessfully sought to present extrinsic evidence showing that the parties intended to include a no material adverse change warranty and representation.

> The Supreme Court held that the purchase agreement's language was clear and unambiguous, and that the "admission of such evidence would vary and change the language of the agreement and that its exclusion was eminently proper under the circumstances." *Id.* at 912. The Court found no need to delve into the distinctions between warranties and conditions precedent because the language of the agreement specifically identified the no material adverse change provision as a condition precedent and provided a remedy should the seller breach that condition-the buyer would have the right to refuse to close the transaction. The Court's decision thus depended solely on the language of the agreement before it.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
**1998 WL 196402 (E.D.Pa.)**

Page 4

In this case, there is no dispute that the "no material adverse change" provision is a representation and warranty and not a condition precedent to closing.

In *Land v. Roper Corp.*, 531 F.2d 445 (10th Cir.1976), the court held that under Kansas law reliance on an express warranty by the buyer of a business is essential to maintenance of its breach of express warranty claim.[FN9] The Court found the Uniform Commercial Code's reliance requirement for breach of warranty claims could be applied by analogy to the sale of a business.*Roper,* 531 F.2d at 448. It also supported its holding by reference to Kansas tort law, and the reliance requirement in tortious misrepresentation claims.*Id.* at 448-49.The Court of Appeals for the Seventh Circuit, relying exclusively on Minnesota precedent, reached the same decision with regard to Minnesota law. *Hendricks v. Callahan*, 972 F.2d 190, 192-94 (7th Cir.1992).

> FN9. In *Kazerouni v. De Satnick*, 228 Cal.App.3d (2d Dist.1991) the Court reached a similar conclusion applying California law but did so in a summary fashion without regard for the conflict in authority discussed herein.

Reliance as an element of a breach express warranty claim, however, has been rejected in *Shambaugh v. Lindsay*, 445 N.E.2d 124, 126-27 (Ind.App. 3 Dist.1983) and *Weschler v. Long Island Rehabilitation Center of Nassau, Inc.*, 1996 WL 590679, *21-22 (Mass.Super.Ct.1996) (applying Indiana and Massachusetts law respectively). In *Shambaugh* the court examined the conflicting case law and concluded that:

The problems of reliance, and a right to rely, on the representations do not appear when the action is grounded in warranty. The warranty is as much a part of the contract as any other part, and the right to damages on the breach depends on nothing more than the breach of warranty.

*Shambaugh,* 445 N.E.2d at 126-27, citing *Glacier Gen. Assur. Co. v. Cas. Indem. Exchange,* 435 F.Supp. 855, 860-61 (D.Mont.1977).[FN10] This holding was grounded in the view that a warranty "is an

assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself."*Id.,* citing *Metropolitan Coal Co. v. Howard,* 155 F.2d 780, 784 (2d Cir.1946) (L.Hand, J.).[FN11] The *Wechsler* court held that reliance was not a requirement for breach of express warranty claims using similar reasoning: "[a]n express warranty serves in substance as an agreement on the part of the warrantor to indemnify the other party if the fact or condition guaranteed to be true turns out not to be so."*Wechsler, 1996 WL 590679 at *23.*

> FN10.*See Ainger v. Michigan General Corp.,* 476 F.Supp. 1209, 1224-25 (S.D.N.Y.1979) ("Transporting tort principles into contract law seems analytically unsound. If a party to a contract purchases a promise, he should not be denied damages for breach on the grounds that it was unwise or unreasonable for him to do so."), *aff'd,*632 F.2d 1025 (2d Cir.1980).

> FN11.*See Metropolitan,* 155 F.2d at 784 ("To argue that the promisee is responsible for failing independently to confirm [the warranty], is utterly to misconceive its office."); *Gulf Oil Corp. v. Federal Power Comm'n,* 563 F.2d 588, 599 (3d Cir.1977) ("In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue.") (citation omitted).

**\*4** In between these two lines of cases is New York law. Under New York law, reliance is generally not a requirement of a breach of an express warranty claim. The rationale supporting this view is similar to that of *Shambaugh* and *Weschler:*

This view of "reliance"-i.e., as requiring no more than reliance on the express warranty as being part of the bargain between the parties-reflects the prevailing perception that an action for breach of express

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
**1998 WL 196402 (E.D.Pa.)**

warranty is one that is no longer grounded in tort, but essentially in contract.[FN12] The express warranty is as much a part of the contract as any other term. Once the express warranty is shown to have been relied on as part of the contract, the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached.

> FN12. *See Williams v. West Penn Power Co.,* 502 Pa. 557, 467 A.2d 811, 814 (Pa.1983) ("An action for breach of warranty originally sounded in tort [.] Later[,] the existence of a warranty deemed the action to be one of contract.").

*CBS, Inc. v. Ziff-Davis Publishing Co.,* 75 N.Y.2d 496, 503-04, 554 N.Y.S.2d 449, 553 N.E.2d 997 (N.Y.1990) (citations and internal quotations omitted, footnote added). New York law, however, also provides a defense to a breach of express warranty claim where the "buyer closes on a contract with full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract ... unless the buyer expressly preserves his rights under the warranties." *Galli v. Metz,* 973 F.2d 145, 151 (2d Cir.1992)

In *Pegasus Management Co., Inc. v. Lyssa, Inc.,* 1998 WL 59394 (D.Mass. February 6, 1998) the Court was faced with predicting which line of authority the Connecticut Supreme Court would follow. While the Court rejected the *Roper / Hendricks* line of cases, it found it unnecessary to choose between the New York cases and the *Shambaugh / Weschler* line of cases because of the following language of the purchase agreement:

Every ... warranty ... set forth in this Agreement and ... the rights and remedies ... for any one or more breaches of this Agreement by the Sellers shall ... not be deemed waived by the Closing and shall be effective regardless of any ... prior knowledge by or on the part of the Purchaser[.]

*Id.* at *10. The *Pegasus* court held that, faced with the language of the agreement, the Connecticut Supreme Court would not require reliance with

respect to plaintiff's breach of warranty claim.

I follow a similar approach in predicting that the Pennsylvania Supreme Court would not require AFB to prove reliance to maintain its breach of warranty claims. First, I conclude that the Pennsylvania Supreme Court would not adopt the *Roper / Hendricks* line of cases because that approach is inconsistent with the commercial realities of these complex purchase agreements negotiated over several months by sophisticated parties. The representations and warranties in these transactions define and apportion the risks that the parties negotiated. The amount of risk assumed by the sellers is part of the bargain and protects the investment that buyers make in sellers' business. If the sellers were not willing to take on the risk reflected in the representations and warranties, the buyers may have reduced their offer or not gone forward with the transaction at all. I find that the *Roper / Hendricks* approach is inconsistent with this commercial reality because it permits sellers to escape liability for negotiated representations and warranties by arguing to a fact-finder that buyers did not rely on the representations and warranties. Thus, in essence, the *Roper / Hendricks* approach allows contracting parties to avoid the plain meaning and effect of the contract to which they agreed.

*5 The approach also injects a degree of unneeded uncertainty into these already complex transactions by making the enforceability of the representations and warranties subject to a fact-finders determination. Under the *Roper / Hendricks* approach, at the time of the closing there is a degree of uncertainty because the parties cannot be sure whether a fact-finder will hold the sellers to the representations and warranties they made in the purchase agreement or whether it will hold that buyers' lack of reliance precludes recovery.

Finally, the *Roper / Hendricks* approach discourages complete due diligence because the more complete buyers' due diligence the more likely a fact-finder will find that they did not rely on the accuracy of the representations and warranties. The law, however, should encourage complete due diligence to ensure that buyers are aware of what they are purchasing and the associated benefits and risks of that purchase. For these reasons, I predict that the Pennsylvania Supreme Court would not adopt the *Roper / Hendricks* approach.[FN13]

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
**1998 WL 196402 (E.D.Pa.)**

Case 1:08-cv-02364    Document 55-7    Filed 08/09/2008    Page 23 of 60

Page 6

FN13. While I do not find its reasoning persuasive, I also note that the *Pegasus* court concluded that the Connecticut Supreme Court would not adopt the *Roper / Hendricks* rationale. The Court found that those "decisions were by federal Courts of Appeals that were trying to divine the state law in circumstances in which the highest court in the state had not been presented with the issue. Thus, there was no discussion of the merits of the conflicting legal doctrines; rather, the effort was to discern what the state of the law in those states was." 1998 WL 59394 at *11.

Like the court in *Pegasus,* however, I find it unnecessarily to predict which of the two remaining lines of cases the Pennsylvania Supreme Court would adopt because the language of the instant Purchase Agreement would compel the same conclusion whichever authority applies. Under the more pro-seller New York approach, sellers may avoid liability by showing that the buyer was aware of the inaccuracies in the warranties prior to closing and that the buyer did not expressly preserve a breach of warranty claim. Here, the Purchase Agreement included a non-waiver provision, *see* § 13 quoted *supra* p. 4, and a provision providing that all representations and warranties shall survive closing plus two years, *see* § 10 quoted *supra* p. 4. I conclude that these provisions unambiguously preserved buyer's breach of warranty claim against a defense of non-reliance such as asserted by the sellers.[FN14]

FN14. This holding is consistent with Pennsylvania law that waiver must be intentional and requires a "clear, unequivocal and decisive act of the party with knowledge of such a right and an evident purpose to surrender it." *Zivari v. Willis,* 416 Pa.Super. 432, 611 A.2d 293, 295 (Pa.Super.Ct.), quoting, *Brown v. City of Pittsburgh,* 409 Pa. 357, 186 A.2d 399, 401 (Pa.1962).

B. *Other Post-Acquisition Claims*

AFB seeks recovery for several other claimed breaches of the Purchase Agreement, and sellers have

moved for summary judgment on all of those claims. AFB retained a damages expert, Lindquist, Avey, Macdonald & Baskerville, to calculate its claimed damages from these alleged breaches. Many of sellers' arguments for summary judgment are based on what they contend are flaws in Lindquist Avey's analysis. After review of the report, however, I conclude that it is for the jury to determine whether Lindquist Avey's analysis is flawed. I address below sellers' remaining arguments for summary judgment.[FN15]

FN15. Lindquist Avey's report also lists damages for Freda's alleged failure to disclose the relationship between Fresh Fields Supermarkets and Marcus Giuffrida. Buyer has withdrawn this claim and thus I grant sellers' motion for summary judgment with respect to it.

1. *Claim for Uncollected Trade Receivables*

*6 The Purchase Agreement provides a procedure for the assignment of uncollected trade receivables as follows:

Any Trade Accounts Receivable sold to Purchaser pursuant to this Agreement, which may not have been collected within 90 days of the Closing Date, will be deemed to be Uncollected Trade Receivables. Within 20 days of the expiration of such 90 day period, Purchaser may assign and transfer some or all of the Uncollected Trade Receivables to Sellers, and, upon such assignment, Sellers shall pay to Purchaser, in immediately available funds, the full amount of the Uncollected Trade Receivables. Any Uncollected Trade Receivable not assigned and transferred to Sellers during such 20 day period shall thereafter continue to be owned by Purchaser without any recourse to sellers for failure to collect any part of such Uncollected Trade Receivable.

Purchase Agreement § 7(b). AFB claims that it assigned Uncollected Trade Receivables to sellers pursuant to this provision, but that sellers have not paid.

Needleman assigned and transferred the Uncollected Trade Receivables by letter dated July 16, 1996, which was after the period in the agreement for transferring and assigning the receivables. AFB,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

however, contends that it orally transferred and assigned the receivables within the time period. Sellers move for summary judgment arguing that the plain language of the above-quoted provision mandates a written transfer and assignment and that the oral transfer and assignment of the receivables was therefore ineffective. I disagree. The language of the contract does not include any requirement of a written assignment. In addition, Pennsylvania law permits oral assignments. *See In re Bryan's Estate v. Bryan,* 513 Pa. 554, 522 A.2d 40, 42 (Pa.1987); *In re Way's,* 379 Pa. 421, 109 A.2d 164, 171 (Pa.1954); *Grasso v. John Hancock Mut. Life Ins. Co.,* 206 Pa.Super. 562, 214 A.2d 261, 263 (Pa.Super.Ct.1965); Rest. (Second) Contr. § 324 ("[E]xcept as provided for by statute or contract [assignments] may be made either orally or by a writing). I therefore interpret the Purchase Agreement as permitting oral assignments and deny sellers' motion for summary judgment on this ground.

### 2. *Claim for Undisclosed Accrual Programs*

AFB presents a claim for allegedly undisclosed accrual programs that Freda established as an incentive for its jobbers and distributors. Pursuant to the Purchase Agreement, AFB did not assume all of sellers' liabilities, but only those listed in schedules attached to the Purchase Agreement. *See* Purchase Agreement § 2(b). The Agreement provided that if after the closing date a creditor sought payment of a claim not included in the assumed obligations, "Sellers [agreed to] jointly and severally indemnify Purchaser and hold Purchaser harmless from ... any and all Losses incurred by Purchaser[.]"*Id.* at § 2(d). AFB seeks such indemnification contending that the accrual programs are liabilities that it did not agree to assume but was forced to pay. Sellers seek summary judgment on grounds that AFB's awareness of the accrual programs prior to closing forecloses its recovery.

*7 As AFB correctly argues, however, the Purchase Agreement expressly provided for indemnification not of undisclosed liabilities, but of liabilities not listed in the attached schedules. Therefore, whether or not AFB knew of the accrual programs prior to closing is of no import. The relevant question is whether the accrual programs were listed in the schedules of assumed liabilities, and per my review of those schedules, they were not. Summary

judgment for sellers on this claim is therefore denied.[FN16]

> **FN16.** Sellers also seek summary judgment contending that because the accrual programs were not guaranteed AFB failed to mitigate damages by not terminating these programs. AFB, however, argues that the termination of these accrual programs would have caused adverse goodwill among its customers. After review of the record, I conclude that mitigation is a question for the jury and that summary judgment on this ground is inappropriate.

### 3. *Claim Based on Decreased Product Quality*

AFB seek recovery for damages alleged caused by changes in the manufacturing process and/or purchasing methods made during the stub period which allegedly caused a drop in the quality of Freda's products.[FN17]Sellers seek summary judgment on this claim contending that AFB failed to present sufficient evidence of a decrease in the quality of the product or a change in the manufacturing process.[FN18]

> **FN17.** Although AFB did not identify the provision of the Purchase Agreement upon which this claim is based, sellers do not assert the lack of identification of a provision as a basis for summary judgment.

> **FN18.** Seller also presented deposition testimony from various individual involved in purchasing and the production process who testified that they had not changed their purchasing or manufacturing practices. Pursuant to the summary judgment standard outlined in § I of this Memorandum, however, I am not to make credibility judgments but must accept as true the testimony of the non-movant's witnesses.

AFB responds by referring to the affidavits of Albert Scoffone and John DeRosa. Scoffone stated that he has approximately forty years of experience in the meat distribution business and associated with Freda in various capacities for approximately thirty years during which he saw the products manufactured by Freda daily. He noted a substantial deterioration in Freda's products in approximately November, 1995,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

which was during the stub period, and then an improvement in the quality after the sale of Freda to AFB. *See* Scoffone Aff. ¶ 9-10. DeRosa also stated in his affidavit that the quality of the products decreased during the stub period. *See* DeRosa Aff. ¶ 7.

I conclude that buyer presented sufficient evidence of the deterioration of Freda's products to allow a jury to conclude that sellers made a change in the manufacturing process and/or the purchasing methods that adversely effected the quality of the product. Thus, summary judgment on this ground is denied.

#### 4. *Claim for Undisclosed In-House Brokerage, Murco Brokerage Company*

In September 1995 Freda registered the name of "Murco Brokerage Company" as a fictitious/alternate name with Pennsylvania and New Jersey. Prior to September 1995, many Freda suppliers had existing brokerage arrangements where commissions were paid to these brokers for products sold to Freda. After Freda established Murco, however, Freda required its suppliers to use Murco rather than their existing brokerage arrangements.

In the Purchase Agreement sellers represented and warranted that they or their affiliates did not own or possess any right to any trade name not listed in an attached schedule. *See* Purchase Agreement § 5(k), Schedule 5(k). Murco was not listed in Schedule 5(k) and AFB contends that sellers therefore breached that provision of the Purchase Agreement.[FN19] Sellers, however, argue that because AFB knew about Murco prior to closing it cannot recover based on a failure to disclose Murco's existence. Again, this argument assumes that AFB's knowledge of Murco would bar its claim. As discussed in § II.A of this Memorandum, however, even if AFB knew about Murco's existence prior to closing, that would not bar its breach of warranty claim. Summary judgment on this ground is therefore denied.

> FN19. Buyer also contends that sellers' establishment of Murco breached the representations and warranties made in § 5(e) of the Purchase Agreement. In that section, sellers represented and warranted that, except as disclosed on Schedule 5(e), that they did not enter into any transactions

other than in the ordinary course of business. *See* Purchase Agreement § 5(e)(xii). Establishment of Murco was not included in Schedule 5(e). Buyer contends that sellers breached this provision by creating Murco during the stub period and not disclosing it on Schedule 5(e).

#### 5. *Claim for Undisclosed Tax Exemption*

**\*8** Both parties move for summary judgment on AFB's claim based on the alleged failure to disclosure that the property tax exemption for Kohler Urban Renewal Corporation ("Urban") was unassignable. Urban was a Freda subsidiary acquired by AFB pursuant to the Purchase Agreement, and in 1987 the City of Newark approved a "Tax Abatement Application and Financial Agreement" for property owned by Urban which exempted Urban's property from taxes until October 30, 2002. This agreement contained a provision that made the contract unassignable. *See* Financial Agreement, § 18.

After the closing, the City of Newark revoked the abatement/exemption and placed the property previously owned by Urban back onto the tax roles subjecting it to property taxes. AFB claims that sellers' failure to disclose that the abatement was unassignable breached the following representation and warranty:

Except as noted in Schedule 5(g), all *contracts included as part of the Assumed Obligations* are assignable by the Sellers to the Purchaser without the consent of any other entity or person.

Purchase Agreement § 5(g) (emphasis added).

The crux of the parties' dispute is whether the tax abatement agreement was a "contract[ ] included as part of the Assumed Obligations" pursuant to § 5(g). Sellers contend that they are entitled to summary judgment because under the plain language of the Purchase Agreement the tax abatement agreement was not an assumed obligation. I agree.

As discussed in § II.B.2 of this Memorandum, AFB did not assume all of sellers' liabilities pursuant to the Purchase Agreement:

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
**1998 WL 196402 (E.D.Pa.)**

Case 1:08-cv-02364     Document 55-7     Filed 08/09/2008     Page 26 of 60

Page 9

Purchaser will assume, perform and pay only those obligations under contracts, licences, leases, commitments, sales orders, purchase orders and other agreements to which any of the sellers are a party or in which the sellers have rights thereunder listed on Schedule 2(b)(1) and the Trade Payables listed on schedule 2(b)(2) constituting part of the Assets which are assigned or transferred by Sellers to Purchaser (the "Assumed Obligations").

Purchase Agreement § 2(b). Thus, by the plain language of the Purchase Agreement AFB limited the liabilities it assumed to contracts and other agreements listed in schedule 2(b)(1) and trade payables listed in schedule 2(b)(2). The schedules include an extensive listing of contractual liabilities assumed but the tax abatement agreement was not listed in either schedule, and it was therefore not one of the Assumed Obligations.[FN20] This interpretation is also consistent with the Purchase Agreement as a whole. Pursuant to the Agreement AFB purchased all of the assets except those separately listed and it assumed none of the liabilities except those specifically listed. Thus, the Agreement expansively defined assets while narrowly defined liabilities.

> FN20. The type of agreements listed on Schedule 2(b)(1) include leases for vehicles and equipment and outstanding sales and purchase orders made in the ordinary course of business.

AFB contends that because it assumed the obligation of paying post-closing taxes on the properties acquired pursuant to the Purchase Agreement, the tax obligation was part of the Assumed Obligations. I do not agree with this interpretation. Under the Agreement, the sellers were responsible for taxes incurred prior to closing and AFB was responsible for taxes incurred after the closing. Because of its tax exemption Urban had not incurred any property tax liability prior to closing and therefore there was no liability for AFB to assume. Thus, AFB did not assume Urban's tax liability; it incurred a tax liability after the closing because it did not qualify for an exemption. Thus, the failure of sellers to disclose that the tax exemption was unassignable did not breach § 5(g) and sellers are entitled to summary judgment on this claim.

*C. Counterclaim for Escrow Funds*

*9 When the parties executed the Purchase Agreement, they also entered into a General Escrow Agreement under which $1,000,000 was set aside for reimbursement of claims by AFB, all of which has now been paid to AFB. Sellers contend that AFB failed to follow the proper procedures, and is therefore required to return the $1,000,000 to the escrow fund as a matter of law. AFB contends that it did follow the proper procedures. I conclude, upon review of the record, that genuine issues of material fact preclude summary judgment on this issue.

*IV. Discussion-Alleged Breach of the Employment Contract*

Contemporaneously with the sale of Freda, AFB and Joseph Giuffrida entered into an employment contract under which Giuffrida was to serve as AFB's Director of Corporate Business Development. His duties in this position were enumerated as follows:

Participating/assisting in laying the foundation for corporate sales and business development.

Assisting in the evaluation of key accounts to increase sales volume.

Participating in the management of the existing Jobbers' sales force and initiating a program to attract new distributors to the Employer.

Assess/determine the viability of key markets outside of Employer's current business.

Participating in the Employer's future growth strategy, specifically geographic expansion and new acquisition targets, or such other duties as Employer's Board of Directors shall direct Employee to perform.

Empl. Contr. § 3.

While AFB made the salary payments due under this contract, it did not ask Giuffrida to perform any of these duties. To the contrary, AFB officials instructed Giuffrida not to come to the offices and to have no contact with customers without first notifying AFB.[FN21]

> FN21. Without citation to any authority

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)
**1998 WL 196402 (E.D.Pa.)**

Giuffrida contends that AFB waived any right to enforce the terms of the employment contract by not asking him to perform any tasks under the agreement. This argument is without merit; AFB made the salary payments due under the agreement and Giuffrida cannot point to any evidence that could be construed as a waiver.

By letter dated September 12, 1996, however, AFB's Board of Directors requested that Giuffrida perform three assignments: (1) produce documents and answer a questionnaire concerning Murco Brokerage, including explaining the role of Giuffrida family members in that business; (2) attempt to convince family members Matthew and Marcus Giuffrida to reinstate the Fresh Fields business to AFB and to stop breaching their Non-Compete Agreements; [FN22] and (3) continue to have no contact with AFB's employees, associates, suppliers, customers, and brokers without AFB's prior written authorization. Giuffrida refused to perform these assignments, and AFB stopped paying him on grounds that he had thereby breached the employment agreement. Giuffrida then brought a breach of contract suit. Both parties moved for summary judgment contending that as a matter of law the other party breached the agreement.

> FN22. AFB accused Matthew and Marcus Giuffrida of entering into a business agreement where they supplied various products to Fresh Fields Supermarkets, one of Freda's largest customers prior to that sale of the business.

As AFB admits that it stopped paying Giuffrida as required by the employment contract, it breached the contract as a matter of law if Giuffrida did not first breach the contract by refusing to perform the assigned duties.[FN23] The crux of the parties' dispute is thus whether the three duties assigned to Joseph Giuffrida by the September 12, 1996 letter were (1) within the scope of the duties contemplated by the employment agreement, and (2) whether these duties were assigned in good faith.

> FN23. Per § 4(b) of the Employment Agreement, AFB was entitled to terminate the Agreement if Giuffrida failed to materially perform his duties in the

agreement.

**\*10** As with any other contract, employment contracts are interpreted with the goal of ascertaining the parties' intent as manifested by the language of the written agreement. *Dieter v. Fidelcor, Inc.*, 441 Pa.Super. 215, 657 A.2d 27, 29 (Pa.Super.Ct.1995). The parties advance two different interpretations of the term, "such other duties as Employer's Board of Directors shall direct Employee to perform." Empl. Contr. § 3. AFB contends that this term gave its Board the authority to assign Giuffrida any task, without limitation. Giuffrida, on the other hand, argues that the provision contemplates only additional duties that are reasonably related to his position as AFB's Director of Corporate Business Development. I agree with Giuffrida.

The employment agreement states that Giuffrida agrees to serve as AFB's Director of Corporate Business Development and the duties it specifically enumerates are all reasonably related to that position including: participating in business development, assisting in the evaluation of key accounts, initiating a program to attract new distributors, assessing the viability of key markets and participating in formulating AFB's growth strategy. Only after these duties are enumerated does the agreement provide that Giuffrida is also to perform such other duties as the Board directs.[FN24] I conclude that this last provision must be read in conjunction with the other assigned duties to include only such additional duties as are reasonably related to the position of Director of Corporate Business Development.

> FN24. *See Amtrim Mining, Inc. v. Pennsylvania Ins. Guaranty Assoc.*, 436 Pa.Super. 522, 648 A.2d 532, 535 (Pa.Super.Ct.1994) ("The court must assess the writing as a whole, and not in discrete units[.]")

In reaching this conclusion I reject AFB's proposed interpretation. If, as AFB contends, the last provision authorizes AFB's Board to assign Giuffrida any task without limitation the previous enumeration of specific duties would be rendered superfluous and meaningless.[FN25] As I construe the agreement, however, the enumeration defines the parameters of Giuffrida's position and the last provision, naturally

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

enough, contemplates the assignment of any other tasks reasonably related to his position. *See Phoenix Techs., Inc. v. Quotron Sys., Inc.,* 1997 WL 220285, *27 (E.D.Pa.) ("By examining the entire contract, courts safeguard against adopting an interpretation that would render any individual provision superfluous.") (citation omitted), *aff'd,* 135 F.3d 766 (3d Cir.1997) (table).[FN26] Interpreting the employment agreement in this manner, however, does not lead to the grant of summary judgment for either party because factual questions remain as to whether the assignments given Giuffrida were in fact reasonably related to his position as Director of Corporate Business Development.[FN27]

> FN25. Moreover, under AFB's interpretation-as authorizing assignment of any duties whatsoever-the contract might be void as contrary to public policy. *See* Rest. (Second) Contr. § 178, 185.

> FN26. This interpretation also prevents an attack on the employment agreement's enforceability because of uncertainty. *See* Bakaly & Grossman, *Modern Law of Employment Relationships* (Prentice Hall 1992) Ch. 3, § 3.3 (questioning enforceability of employment contract where employer agreed to hire employee to perform whatever services the employer may assign him), citing *Vogel v. Pekoc,* 157 Ill. 339, 42 N.E. 386 (Il.1895).

> FN27. AFB also argues that under Pennsylvania law Giuffrida owes AFB as his employer a duty of loyalty that requires him to comply with these assignments. *See Pennsylvania Nurses Ass'n v. Pennsylvania State Educ. Ass'n,* 90 F.3d 797, 807 (3d Cir.1996) (Pennsylvania common law recognizes, under agency principles, a duty of loyalty by an employee to an employer) (citations omitted).

Factual questions also preclude summary judgment on Giuffrida's contention that the Board's assignment of these tasks breached its implicit duty of good faith. Under Pennsylvania law there is an implicit duty of good faith in employment contracts. *See Baker v. Lafayette College,* 350 Pa.Super. 68, 504 A.2d 247, 255-56 (Pa.Super.Ct.1986); *Somers v. Somers,* 418

Pa.Super. 131, 613 A.2d 1211, 1213-14 (Pa.Super.1992); Rest. (Second) Contr. § 205. Where an employer performs an undertaking pursuant to an employment contract-here, the Board's assignment of duties to Giuffrida-it must do so in good faith.*Baker,* 504 A.2d at 255. While the definition of bad faith varies with the context, it includes "evasion of the spirit of the bargain."*Id.;* Rest. (Second) Contr. § 205(d).

**11 Giuffrida points to evidence in the record from which a jury could infer that the Board assigned these tasks knowing that he would not comply for the purpose of justifying his dismissal and the cessation of payments. If the jury accepted this evidence and inference, it could conclude that the Board's assignment and subsequent cessation of payments evaded the spirit of the bargain and amounted to a breach of contract.

AFB, however, points to evidence in the record from which a jury could conclude that the assignments were a legitimate and good faith attempt to gather information and to protect its investment in Freda. It contends, and a jury could reasonably conclude, that asking a current employee and a former officer of Freda to provide information about its purchase, to encourage his fellow sellers to abide by their non-compete agreements, and to refrain from contacting supplies, customers and employees are reasonable assignments consistent with the duties enumerated in the employment agreement. Genuine issues of material fact thus remain requiring denial of summary judgment for either party.

### ORDER

AND NOW this day of April, 1998 upon consideration of AFB's motion for partial summary judgment, sellers' motion for summary judgment, and the parties filings related thereto, for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

1. AFB motion for partial summary judgment is GRANTED to the extent it sought rulings as a matter of law that:

a. Sellers' representations and warranties survived closing for a period of two (2) years after closing; and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

b. Section 5(e) of the Purchase Agreement which represents and warrants that there were no material adverse changes in the earnings of sellers from August 26, 1995 to closing is a clear and unambiguous promise which is not limited to events outside the ordinary course of business;

2. AFB's motion for partial summary judgment is otherwise DENIED;

3. Sellers' motion for summary judgment is GRANTED to the extent AFB sought recovery for sellers' alleged failure to disclosure the relationship between Fresh Fields Supermarkets and Marcus Giuffrida;

4. Sellers' motion for summary judgment is GRANTED to the extent AFB sought recovery for sellers' alleged failure to disclose that the tax abatement agreement was unassignable;

5. Judgment is entered in favor of sellers and against AFB on these two claims; and

6. Sellers' motion for summary judgment is otherwise DENIED.

E.D.Pa.,1998.
Giuffrida v. American Family Brands, Inc.
Not Reported in F.Supp., 1998 WL 196402 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 1
Slip Copy, 2006 WL 2546494 (E.D.Tex.)
**(Cite as: 2006 WL 2546494 (E.D.Tex.))**

**C**Goss v. Schering-Plough Corp.
E.D.Tex.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas,Tyler
Division.
Jan GOSS, Individually and as Representative of the
Estate of Velma Church, Deceased, et al., Plaintiffs,
v.
SCHERING-PLOUGH CORPORATION, et al.,
Defendants.
No. 6:06-CV-251.

Aug. 30, 2006.

John Keith Hyde, D'Juana Bellue Parks, Provost
Umphrey, Beaumont, TX, for Plaintiffs.
David Stanley, Reed Smith LLP, Los Angeles, CA,
Walter Thomas Henson, Ramey & Flock, Tyler, TX,
Brian Patrick Johnson, Johnson Spalding Doyle West
& Tren, Houston, TX, James Stephen Roper,
Zeleskey Cornelius Hallmark Roper & Hicks, Lufkin,
TX, for Defendants.

### MEMORANDUM OPINION AND ORDER ON MOTION TO REMAND

MICHAEL H. SCHNEIDER, District Judge.
*1 Before the Court is the Plaintiffs' Motion to
Remand (Doc. No. 7) for lack of subject matter
jurisdiction. For the reasons below, the Court is of the
opinion that the Plaintiffs' Motion should be granted.

### I. Background

Plaintiffs originally brought this cause of action in
the 4th Judicial District Court of Rusk County,
Texas, alleging wrongful death resulting from acute
myelogenous leukemia, which was itself caused by
benzene contained in dental adhesives. The Plaintiffs
allege that the dental adhesives were manufactured
by Defendants Schering-Plough Corporation
("Schering-Plough") and SmithKline Beecham
Corporation and were sold by Defendants Brookshire
Brothers Ltd. and Brookshire Brothers Pharmacy
("Brookshire Brothers") to decedent Velma Church.
It is undisputed that the Plaintiffs and the Brookshire
Brothers defendants are citizens of the State of Texas.

Defendant Schering-Plough removed this case to
federal court alleging that the Brookshire Brothers
defendants had been improperly joined and invoking
this Court's diversity jurisdiction. The Plaintiffs filed
this motion to remand, in which they allege that
Defendant Brookshire Brothers Ltd. and Brookshire
Brothers Pharmacy are properly joined non-diverse
defendants under Texas law.

### II. Removal and Remand

A defendant may remove a civil action to federal
court if the federal court has diversity jurisdiction
over the action. 28 U.S.C. § 1441(b). Diversity
jurisdiction is established if the amount in
controversy exceeds $75,000 and the action is
between citizens of different states. 28 U.S.C. §
1332(a). The removing party bears the burden of
establishing that the federal court's original
jurisdiction exists and that the case is properly
removable. Wilson v. Republic Iron & Steel Co., 257
U.S. 92, 97 (1921); Carpenter v. Wichita Falls Indep.
Sch. Dist., 44 F.3d 362, 365 (5th Cir.1995). Doubts
about the propriety of removal are to be resolved in
favor of remand. Acuna v. Brown & Root, Inc., 200
F.3d 335, 339 (5th Cir.2000); Shamrock Oil & Gas
Corp. v. Sheets, 313 U.S. 100, 108-09 (1941).

A party claiming improper joinder must establish
either (1) actual fraud in the pleadings of
jurisdictional facts or (2) the inability of the plaintiff
to establish a cause of action against the non-diverse
party under state law. Travis v. Irby, 326 F.3d 644,
647 (5th Cir.2003). When assessing alleged improper
joinder under the second scenario, the Court must
decide whether the complaint sets forth a cause of
action against the non-diverse defendant such that
there exists a reasonable possibility of recovery under
state law. Id. at 648.The Fifth Circuit has noted a
similarity between the test for fraudulent joinder
under the second scenario and the test for assessing
the sufficiency of a pleading under a Rule 12(b)(6)
motion for failure to state a claim. Id. The Fifth
Circuit has also indicated that a court considering
whether a defendant is properly joined may "pierce
the pleadings" and consider summary judgment-type
evidence in the record to establish whether there

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exists a reasonable possibility of recovery. *Id.* at 649. When considering this type of evidence, however, the court must view all unchallenged factual allegations in the light most favorable to the plaintiff and should resolve any ambiguities or contested issues of fact in favor of the plaintiff. *Id.* The Fifth Circuit has also noted that "[t]he burden of persuasion on those who claim fraudulent joinder is a heavy one." *Id.*

### III. Analysis

**\*2** Defendant Schering-Plough asserts that removal is proper in this case because Plaintiffs' claim against Brookshire Brothers, the only non-diverse defendant, is barred by *Texas Civil Practice and Remedy Code* § **82.003**. Under § 82.003, a non-manufacturing seller of a product is not liable for harm caused by that product *unless* the claimant can prove any one of several enumerated exceptions. TEX. CIV. PRAC. & REM.CODE ANN. § 82.003 (Vernon's 2005). One exception contained in § 82.003(a)(6) provides that a non-manufacturing seller may be liable when a claimant proves that "(A) the seller *actually knew* of a defect to the product at the time the seller supplied the product; and (B) the claimant's harm resulted from the defect." *Id.* (emphasis added).

Schering-Plough admits that the Plaintiffs' complaint properly alleges that Brookshire Brothers knew of the alleged defect in the adhesives when it sold them to the decedent and that the decedent's harm was caused by the defect. Schering-Plough contends, however, that this is a case where the Court should "pierce the pleadings" to consider evidence that precludes the Plaintiffs' ability to establish Brookshire Brothers' liability, and it asks the Court to consider evidence in the form of an affidavit executed by Robert Gilmer, Brookshire Brothers's Vice President for Human Resources/Risk Management. In his affidavit, Mr. Gilmer testifies that Brookshire Brothers "had absolutely no knowledge that these products might contain benzene or had the alleged potential to cause cancer."(Def.'s Resp. Ex. A at 2.) Schering-Plough argues that because this undisputed evidence establishes that the Brookshire Brothers defendants did not have actual knowledge of any defect in the dental adhesives, there is no reasonable basis for imposing liability on Brookshire Brothers.

A corporation's liability often depends on the actions or knowledge of "agents of some character" or "vice principals," including that of (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997) (citing *Fort Worth Elevators Co. v. Russell,* 70 S.W.2d 397, 406 (Tex.1934)). Mr. Gilmer's affidavit indicates that Brookshire Brothers "had no information whatsoever which suggested that these products might contain benzene or had the alleged potential to cause cancer until the heirs of Velma Church served Brookshire Brothers, Ltd. with this lawsuit," and Mr. Gilmer asserts that his statement is based on his own personal knowledge and his review of the records. (Gilmer Aff. at 2). Mr. Gilmer indicates that he has been employed in his current position at Brookshire Brothers for only five years, however, while the dental adhesives in question were sold prior to and during the period of their 1990-91 recall. Mr. Gilmer's statement, therefore, does not preclude the possibility that other vice principals or predecessors may have had knowledge sufficient to establish Brookshire Brothers's liability under Texas law.

**\*3** Furthermore, the Plaintiffs' Reply identifies certain documents obtained from the Food and Drug Administration that relate to a manufacturers' recall of the subject dental adhesives and detail when manufacturers notified direct wholesalers and retailers that the adhesives contained benzene. (*See* Pl.'s Reply Ex. 1.) The Plaintiffs' information shows that some retailers continued to offer the subject products for sale several months after the recall notice. This information confirms an ambiguity as to whether Brookshire Brothers sold the subject products after the date of the recall notice.

Because Brookshire Brothers acknowledges that Brookshire Brothers may have sold the subject products, and because Mr. Gilmer's testimony alone is not sufficient to establish that Brookshire Brothers had no knowledge that the products might contain benzene, the Court finds that an ambiguity or contested issue of fact exists as to Brookshire Brothers's knowledge and that Scherring-Plough has not met the heavy burden required to support removal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2546494 (E.D.Tex.)
(Cite as: 2006 WL 2546494 (E.D.Tex.))

on the basis of improper joinder. *See Travis,* 326 F.3d at 649.

## IV. Conclusion

Because ambiguities and contested issues of fact must be resolved in the Plaintiffs' favor, the Court finds that there exists a reasonable possibility of recovery against Brookshire Borthers Ltd. and Brookshire Brothers Pharmacy, that this court lacks subject matter jurisdiction over this cause, and that this case should be remanded to the 4th Judicial District Court of Rusk County, Texas. It is therefore

**ORDERED** that the above-entitled and numbered civil action is hereby REMANDED to the 4th Judicial District Court of Ruck County, Texas. It is further

**ORDERED** that the above-entitled and numbered civil action is hereby CLOSED.

**It is so ORDERED.**

E.D.Tex.,2006.
Goss v. Schering-Plough Corp.
Slip Copy, 2006 WL 2546494 (E.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2008 WL 2626366 (C.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2008 WL 2626366 (C.D.Ill.))**

Grove v. Manchester Tank & Equipment Co.
C.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,C.D. Illinois.
Jeremy GROVE and Amanda Grove, Plaintiffs,
v.
MANCHESTER TANK & EQUIPMENT CO. and
K.A. Berquist, Inc., Defendants,
Manchester Tank & Equipment Co., Third Party
Plaintiff,
v.
Hicksgas-Pekin Inc., Third Party Defendant.
Bradley D. Clark and Michelle Clark, Plaintiffs
v.
Manchester Tank & Equipment Co. and K.A.
Berquist, Inc., Defendants,
Larry K. Smith, Jr. and Melissa Smith, Plaintiffs
v.
Manchester Tank & Equipment Co. and K.A.
Berquist, Inc., Defendants.
**Nos. 07-1263, 07-1268, 07-1280.**

June 26, 2008.

Christopher R. Doscotch, Joseph W. Dunn, Ralph D.
Davis, Peoria, IL, for Plaintiffs.
Raymond Lyons, Jr., Williams Montgomery & John
Ltd., Chicago, IL, David E. Jones, Hinshaw &
Culbertson, John P. Nicoara, Nicoara & Steagall,
Peoria, IL, for Defendants.

**ORDER**

MICHAEL M. MIHM, District Judge.
**\*1** Before the Court is Defendant K.A. Berquist,
Inc.'s Motion for Judgment on the Pleadings pursuant
to FRCP 12(c). For the reasons set forth below, the
Motion for Judgment on the Pleadings [Case No. 07-
1263 # 13], the Motion for Judgment on the
Pleadings [Case No. 07-1268 # 16], and the Motion
for Judgment on the Pleadings [Case No. 07-1280 #
17] are DENIED.

**BACKGROUND**

On August 25, 2005, Plaintiffs Jeremy Grove,
Bradley D. Clark, and Larry K. Smith, Jr. were

injured by an explosion and fire that occurred at
facilities operated by Pekin Hicksgas, Inc.
("Hicksgas"). Plaintiffs allege that the explosion
resulted from a leaking cylinder tank that was
manufactured by Defendant Manchester Tank &
Equipment Co. ("Manchester") and sold by
Defendant K.A. Berquist ("KAB") to Hicksgas.

On August 23, 2007, Plaintiffs Jeremy and Amanda
Grove filed a Complaint in the Circuit Court of the
Tenth Judicial Circuit, Tazewell County, Illinois
against Defendant Manchester Tank & Equipment
Co. for personal injuries and loss of consortium.
Plaintiffs Larry K. Smith, Jr. and Melissa Smith as
well as Bradley D. Clark and Michelle L. Clark filed
similar complaints. The cases were removed to this
Court pursuant to 28 U.S.C. § 1441 because diversity
jurisdiction exists. These three separate cases have
been consolidated for discovery purposes.

KAB moved for judgment on the pleadings, citing its
compliance with 735ILCS5/2-621 . KAB denies
control over the design or manufacture of any
Manchester tanks and certifies Manchester as the
manufacturer of all tanks that KAB sold to Hicksgas.
The motion is fully briefed, and this Order follows.

**DISCUSSION**

A motion for judgment on the pleadings should be
granted when the moving party establishes that there
is no material issue of fact left to be resolved and that
he or she is entitled to judgment as a matter of law.
Nat'l Fidelity Life Ins. Co. v. Karaganis, 811 F .2d
357, 358 (7th Cir.1987); Flora v. Home Fed. Sav. &
Loan Ass'n, 685 F.2d 209, 211 (7th Cir.1982). In
considering the motion, the Court must consider the
pleadings, view the facts in the light most favorable
to the nonmoving party, and assume as truthful the
facts alleged by the nonmoving party. Nat'l Fidelity,
811 F .2d at 358.

Section 2-621 of the Illinois Code of Civil Procedure
is a "seller's exception" that allows nonmanufacturing
defendants to escape liability for injuries caused by a
defective product. Sims v. Teepak, Inc., 143
Ill.App.3d 865, 868 (4th Dist.1986). Under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2008 WL 2626366 (C.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d, 2008 WL 2626366 (C.D.Ill.))**

735ILCS5/2-621 (a), a nonmanufacturing defendant shall "upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer."After the plaintiff has filed a complaint against the manufacturer, and the manufacturer has or is required to answer or otherwise plead, "the court shall order a dismissal of a product liability action ... against the certifying defendant or defendants, provided the certifying defendant or defendants are not within the categories set forth in subsection (c) of this Section."735ILCS5/2-621 (b). Subsection (c) sets out exceptions for dismissal of a nonmanufacturing defendant where the plaintiff can show that the defendant "exercised some significant control over the design or manufacture of the product,""provided instructions or warnings to the manufacturer relative to the alleged defect,""had actual knowledge of the defect," or "created the defect." 735ILCS5/2-621 (c)(1)-(3). Absent a showing by the plaintiffs of any of these exceptions, a defendant who certifies the correct manufacturer may be dismissed from the action. *Logan v. West Coast Cycle Supply Co., 197 Ill.App.3d 185, 191 (2d Dist.1990).* The burden lies with the plaintiff to show that the certifying defendant fits into one of the subsection (c) categories. *Id.*

**\*2** Viewing the complaint in the light most favorable to the plaintiffs, it is unclear without further discovery whether plaintiffs could show that KAB satisfies one of the exceptions to dismissal. Because that material issue of fact remains to be resolved in this case, a judgment on the pleadings is inappropriate.

### CONCLUSION

For the reasons set forth herein, the Motion for Judgment on the Pleadings [Case No. 07-1263 # 13], the Motion for Judgment on the Pleadings [Case No. 07-1268 # 16], and the Motion for Judgment on the Pleadings [Case No. 07-1280 # 17] are DENIED. This matter is referred to Magistrate Judge Gorman for further proceedings.

C.D.Ill.,2008.
Grove v. Manchester Tank &amp; Equipment Co.
Not Reported in F.Supp.2d, 2008 WL 2626366 (C.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                                     Page 1
Not Reported in S.W.3d, 2007 WL 1201587 (Ky.App.)
**2007 WL 1201587 (Ky.App.)**

**H**Haeberle v. McCall, Currens, Topor & Thompson,
P.S.C.
Ky.App.,2007.
Only the Westlaw citation is currently available.

Unpublished opinions shall never be cited or used as
authority in any other case in any court of this state.
See KY ST RCP Rule 76.28(4).

Court of Appeals of Kentucky.
Dr. C. Brent HAEBERLE, Appellant
v.
Drs. McCALL, CURRENS, TOPOR &
THOMPSON, P.S.C., Appellee.
**No. 2005-CA-002265-MR.**

April 20, 2007.
Discretionary Review Denied bySupreme Court Jan.
16, 2008.

Appeal from Jefferson Circuit Court, Action No. 03-
CI-005394; <u>Ann O'Malley Shake</u>, Judge.

<u>Thomas E. Clay</u>,, <u>Garry R. Adams, Jr.</u>, Louisville,
KY, for appellant.
<u>David Sean Ragland</u>, <u>William P. Swain</u>, Louisville,
KY, for appellee.

Before <u>COMBS</u>, Chief Judge; <u>MOORE</u>, Judge;
<u>HENRY</u>,[FN1] Senior Judge.

> FN1. Senior Judge Michael L. Henry, sitting
> as Special Judge by assignment of the Chief
> Justice pursuant to <u>Section 110(5)(b) of the</u>
> <u>Kentucky Constitution</u> and <u>KRS 21.580</u>.

<u>MOORE</u>, Judge.
**\*1** Appellant Dr. C. Brent Haeberle appeals the
Jefferson Circuit Court's judgment directing a verdict
in favor of his former employer Appellee McCall,
Currens, Topor and Thompson, P.S.C. ("the P.S.C.")
on his counter claim he also appeals a jury verdict in
favor of the P.S.C. on its claim to recover
overpayments made to Dr. Haeberle. Upon review,
we affirm.

## I. FACTUAL BACKGROUND

Dr. Haeberle, a dentist specializing in prosthodontics,
entered into a written employment contract with the
P.S.C., which was engaged in the practice of
dentistry. Dr. Haeberle worked for the P.S.C.
between April 2000 and May 2003.

The P.S.C. had a compensation method whereby each
dentist, employed by the P.S.C., received 40% of the
income he generated and the remaining 60% went to
the P.S.C. Laboratory bills were the responsibility of
the individual dentist and were not part of the P.S.C.'s
60% split. This method of compensation was orally
explained to Dr. Haeberle when he was hired; and he
began to see patients on April 10, 2000. Later, this
agreement was memorialized in a three-year written
employment agreement which was executed between
the parties on May 12, 2000.

In relevant part, the agreement provides as follows:

> **Base Compensation.**The PSC shall pay the
> Employee as compensation for the services
> provided under this Agreement the base
> compensation set forth on Schedule A to this
> Agreement (the "Base Amount"). The Employee
> and the PSC may adjust the Employee's Base
> Amount by mutual agreement by amending
> Schedule A.

> **Early Termination With Notice.**Subject to earlier
> termination upon mutual agreement by the parties
> in their sole discretion, Employee may terminate
> his employment relationship with the PSC for any
> reason upon 120 days prior written notice to the
> PSC.

> **Effect of Termination.**The PSC's obligations to
> pay any compensation to the Employee or to his
> estate or heirs shall cease upon any termination of
> the Employee's employment relationship with the
> PSC.

> **Schedule A To Employment Agreement**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

The Employee's compensation shall be the amount equal to 40% of all fees paid to the PSC by patients, or by third party payors on behalf of such patients, for dental services performed by the Employee. The Employee shall also receive an amount equal to 40% of all fees paid to the PSC by patients, or by third party payors on behalf of such patients, for dental services performed by hygienists and other personnel of the PSC other than licensed dentists with respect to all patients the source of which is directly traceable to the efforts of the Employee. The PSC's Board of Directors shall make all determinations with respect to the source of any patient which is in dispute among the dentists employed by the PSC.

Despite the fact that the employment agreement is silent on the payment of laboratory fees, Dr. Haeberle paid his own fees for the year 2000 out of his 40% compensation-consistent with the parties' oral agreement.

*2 Beginning in 2001, the P.S.C. made an accounting change and generated a formula for Dr. Haeberle's salary based on his projected earnings. At this time, the P.S.C. began paying the laboratory fees rather than the dentists.

Under this method, an additional ten percent was subtracted from Dr. Haeberle's gross receipts to pay for his laboratory fees. The reason for this change was to allow the P.S.C. to begin paying for the laboratory fees as ordinary and necessary business expenses which could be deducted for the purposes of the P.S.C.'s tax liability.

As a matter of practice of the industry, there is generally a delay between the performance of dental work and the receipt of payment, especially when insurance is involved. Consequently, it became necessary to arrive at a rough estimate of the laboratory bills to maintain a regular semi-monthly flow of income to each dentist. This agreement was explained by Dr. Douglas H. McCall [FN2] at trial as follows:

FN2. Dr. McCall is an owner of the P.S.C.

We took several months out of the year 2000, we multiplied it by four, and that would figure into what we were anticipating the gross receipts would

be, and then from the gross receipts we took 40 percent, we took out 10 percent to try to keep from getting, doing overpayments with the laboratory bills, and then wrote him a check for the rest.

Using this formula, the P.S.C. arrived at a semi-monthly income for Dr. Haeberle of $4,701.50, which it maintains was exclusive of the laboratory bills. Because the laboratory bills were estimated at ten percent, this percentage was subtracted from Dr. Haeberle's semi-monthly income, thereby fixing his salary draw at $4,231.35 starting in January of 2001.

Not long after the new compensations arrangement started, the P.S.C. complained to Dr. Haeberle that he was being overpaid under the new salary calculation method. According to the P.S.C. during the first quarter of 2001, Dr. Haeberle had received an overpayment of $7,475.95. Apparently, Dr. Haeberle generated higher laboratory fees and did not bring in enough business to cover his semi-monthly draw of $4,231.35.

According to the P.S.C.'s calculations for the year of 2001, Dr. Haeberle was overpaid by $41,284.11. Dr. Haeberle assumed the P.S.C. was paying his laboratory fees.

By mid-2002, the P.S.C.'s accounting showed that Dr. Haeberle had been overpaid by $50,639.58. The P.S.C. maintains that at that time, Dr. McCall told Dr. Haeberle that the P.S.C. was going to stop paying his laboratory bills and that the bills would henceforth be Dr. Haeberle's own responsibility. Dr. Haeberle contends, to the contrary, that the issue of payment of laboratory bills did not come up until the end of his tenure. However, Dr. Haeberle did pay all of his laboratory bills directly to the laboratories from this point forward.

Dr. Haeberle's employment contract ended on May 12, 2003, but was renewed. However, Dr. Haeberle resigned shortly thereafter.

Dr. McCall, on behalf of the P.S.C., approached Dr. Haeberle about the overpayments, which by this time were $59,948.50, according to the P.S.C.'s calculations. This overpayment includes $46,042.97 for laboratory fees and $13,905.53 for overpayment of compensation which exceeded Dr. Haeberle's entitlement irrespective of laboratory fees.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*3 Due to the delay in receiving payment for services rendered, which is typical in the professional services industry, Dr. Haeberle maintains that he had performed work on patients for whom the P.S.C. had not yet paid him for his services. By his calculations, Dr. Haeberle estimates that approximately $20,000 was received by the P.S.C. for work performed by Dr. Haeberle prior to his leaving. Dr. Haeberle maintains in his counter claim that he is entitled to receive this payment for services rendered pursuant to the employment agreement, which provides in relevant part:

> Sole Source of Payment: The payment of the Employee's compensation is the obligation of the PSC, and the Employee agrees that in no event, including but not limited to any non-payment by the PSC or the insolvency of the PSC, shall the Employee bill, charge, collect, seek compensation or remuneration from, or have any recourse against any patient, insurance company, managed care plan, or other payor or any sort, public or private. This provision shall survive any termination or expiration of this agreement and is intended to benefit such patients and payors. (Employment Agreement, Exhibit B, pg. 4, Clause 3(1)).

The P.S.C. refused to pay any of these fees to Dr. Haeberle relying on Provision 6(c) of the agreement which states that "[t]he P.S.C.'s obligations to pay any compensation to the Employee or to his estate or heirs shall cease upon any termination of the Employee's employment relationship with the P.S.C."

The P.S.C. brought suit in Jefferson Circuit Court to recover the overpayments it alleges that Dr. Haeberle owed it. Dr. Haeberle filed a counter claim for $20,728.22, which represented the fees he claimed the P.S.C. owed him for work he performed before his resignation, but for which payment was not received until after his departure.

The case was tried before a jury, and the jury rendered a verdict in favor of the P.S.C. Specifically, the jury determined that Dr. Haeberle owed the P.S.C. $46,042.97 in unpaid laboratory fees, as well as $13,905.53, which was the amount of salary that Dr. Haeberle was overpaid by the P.S.C. Thus, the jury found that Dr. Haeberle owed a total of $59,948.50 to the P.S.C. Additionally, the trial court

entered a directed verdict against Dr. Haeberle on his counter claim concerning the amount that he claimed he was owed by the P.S.C. for the work he performed, but for which payment had not been received, prior to his resignation.

Dr. Haeberle now appeals, raising the following claims: (1) The trial court erred when it allowed the P.S.C. to present evidence of records, including laboratory fees, that the P.S.C. claimed it had paid on Dr. Haeberle's behalf; and (2) the trial court erred when it sustained the P.S.C.'s motion for a directed verdict on the amount of $20,728.22, for work performed by Dr. Haeberle.

### 1. CLAIM CONCERNING THE ADMISSION OF RECORD EVIDENCE AT TRIAL

#### A. STANDARD OF REVIEW

Dr. Haeberle first claims that the trial court erred when it allowed the P.S.C. to present evidence of records, including laboratory fees, that the P.S.C. claimed it had paid on his behalf. We review a trial court's evidentiary rulings for an abuse of discretion. *See Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky.2000).“[T]he test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.”*Miller v. Eldridge,* 146 S.W.3d 909, 914 (Ky.2004).

#### B. ANALYSIS OF CLAIM

1. Business record exception

*4 During trial, the P.S.C. sought to introduce evidence of the quarterly reports indicating the total amount of Dr. Haeberle's billings, the amount of salary that he should have received based on those billings, the amount of salary that he actually received, the amount of laboratory bills that the P.S.C. paid on his behalf, and the total amount that Dr. Haeberle was overpaid for the quarter. Dr. Haeberle's counsel objected at trial to the introduction of the quarterly reports, arguing that they were inadmissible hearsay evidence, pursuant to KRE 802,[FN3] because they were summaries that had been prepared by a former employee of the P.S.C. who did not testify at trial. The P.S.C.'s counsel asserted that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

the quarterly reports fell within the business records exception to the hearsay rule, KRE 803(6).[FN4] The trial court overruled the objection of Dr. Haeberle's counsel. Dr. Haeberle now appeals the trial court's decision overruling the objection.

> FN3.KRE 802 provides: "Hearsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky ."

> FN4.KRE 803 provides:

> The following are not excluded by the hearsay rules, even though the declarant is available as a witness: ... (6) A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit....

"Business records ... must be authenticated by a live foundation witness or meet one of the foundation exceptions listed in KRE 803(6), namely ...KRE 902(11)."*Matthews v. Commonwealth,* 163 S.W.3d 11, 27 (Ky.2005).

KRE 902(11)(A) states that business records fall under the self-authentication exception so long as there is no indication of a lack of trustworthiness in the sources of the information and the custodian of the record certifies that the record:

(i) Was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with

knowledge of those matters;

(ii) Is kept in the course of the regularly conducted activity; and

(iii) Was made by the regularly conducted activity as a regular practice.

*Id.* (discussing KRE 902(11)(A)).

During trial, Dr. McCall, who is one of the owners of the P.S.C., laid a foundation for the admission of the quarterly reports. Dr. McCall testified that the quarterly report was prepared by the P.S.C .'s bookkeeper. The bookkeeper prepared this report for every dentist working at the P.S.C. The computer software that was used to produce the report was called "Peachtree," and Dr. McCall understood how Peachtree operated because he was trained on how to use the software at the same time that the bookkeeper received Peachtree training.

Dr. McCall testified that he knew the sources for the numbers that were reflected in the quarterly reports. Specifically, he attested that a transmittal form was provided to each dentist with each patient's chart. The dentist would mark on each form the code reflecting the types of evaluations and procedures that were performed on the patient. The code was then provided to the P.S.C.'s accounts manager, and she entered it into her journal which generated a day sheet. The accounts manager provided the information to the bookkeeper every day that the bookkeeper was at work, i.e., two days per week. At the end of the month, a monthly summary was produced by the accounts manager and given to the bookkeeper. The bookkeeper entered the information from the monthly summary into the Peachtree computer program and generated the quarterly reports from that information. *Id.* at p. 170.Dr. McCall attested that he discussed the first quarterly report with Dr. Haeberle and explained to him how his salary would be calculated as reflected in the report and that ten percent would be withheld as an estimate of the amount of laboratory fees that the P.S.C. would pay for Dr. Haeberle. After the report was explained to him, Dr. Haeberle did not have any questions or complaints concerning it.

*5 Dr. McCall testified that the quarterly reports were a regular part of the P.S.C.'s business activity. He

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

further attested that the bookkeeper prepared the initial quarterly report within a few days of the end of the quarter.[FN5] In addition to the amount of billings that a particular dentist had during the month, the amount of the dentist's laboratory bills was reflected on the quarterly report.

> FN5. The parties did not submit any evidence concerning when the remainder of Dr. Haeberle's quarterly reports were prepared.

Dr. Haeberle contends that the quarterly reports should not have been admitted as evidence under the business records exception because Dr. McCall was not the person who created the reports and he was not the custodian of the reports. Therefore, Dr. Haeberle argues that Dr. McCall was not the proper person to lay the foundation for those reports to be admitted.

However, Dr. Haeberle's argument is misplaced. Kentucky Rule of Evidence 803(6) provides that a report may be admitted into evidence under the business records exception to the hearsay rule if "the custodian or other qualified witness" testifies that the report was produced in the regular course of business. "A qualified witness is one who has sufficient personal knowledge to explain how the offered record was made and kept, and who can testify that the record comports with the business record exemption to the hearsay rule." Robert G. Lawson, The Kentucky Evidence Law Handbook 682 (4th ed., Matthew Bender & Co.2003) (internal quotation marks and citations omitted).

Dr. McCall satisfied this "qualified witness" standard, as he clearly had an in-depth understanding of how the quarterly reports were created and kept, as discussed *supra.* Dr. McCall testified that the information in the quarterly reports was based on the information from the transmittal sheets that were completed by the dentists. He also testified concerning the process by which the quarterly reports were created. Dr. McCall attested that the quarterly reports were generated near the time of the matters set forth in the reports and by the bookkeeper who had knowledge of the matters contained therein; that the reports were kept in the course of the regularly conducted business; and that they were generated as a regular practice. *See* KRE 902(11)(A). Thus, Dr. McCall was a "qualified witness."

Furthermore, there was no lack of trustworthiness regarding the sources of the information contained in the reports. Dr. McCall testified that each dentist was responsible for reviewing his or her quarterly reports and for notifying the bookkeeper of any errors therein. There was one error in one of Dr. Haeberle's reports that he had brought to the attention of the P.S.C., and that error was corrected by the following day. Because that error was corrected, Dr. Haeberle never reported other errors, and he did not present evidence at trial showing that there were other errors to his knowledge; there was no indication that the quarterly reports possessed a "lack of trustworthiness in the sources of the information." KRE 902(11)(A). Therefore, the trial court did not abuse its discretion when it admitted the quarterly reports as evidence under the business records exception to the hearsay rule. *See generally Goodyear Tire & Rubber Co.,* 11 S.W.3d at 577.

2. Best evidence rule

*6 Dr. Haeberle also asserts that, pursuant to the best evidence rule, the P.S.C. should have been required to produce the individual laboratory bills, rather than the summaries reflecting the total amount of laboratory bills received during a particular time period. The "best evidence rule" provides that if a party intends to "prove the contents of a writing, [the party] must produce the writing itself." *Hall v. Commonwealth,* 817 S.W.2d 228, 230 (Ky.1991) (internal quotation marks and citation omitted), *overruled on other grounds by Commonwealth v. Ramsey,* 920 S.W.2d 526 (Ky.1996). Under this rule, because the P.S.C. sought to prove the contents of the laboratory summaries, the P.S.C. was required to produce the summaries themselves, and it did so, as part of the quarterly reports.

Further, KRE 1006 provides as follows:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. A party intending to use such a summary must give timely written notice of his intention to use the summary, proof of which shall be filed with the court. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

reasonable time and place. The court may order that they be produced in court.

On appeal, Dr. Haeberle does not allege that the P.S.C. violated KRE 1006 by failing to give timely notice of its intent to use the summary, or by failing to make the originals or duplicates available for examination or copying at a reasonable time and place. Rather, Dr. Haeberle merely asserts that the P.S.C. failed to show that the laboratory bills were "voluminous" to the extent that they were "too burdensome to produce." It is important to note that Dr. Haeberle admitted in his appellate brief that the laboratory bills were "numerous" because they reflected approximately four years of his practice at the P.S.C., but he argues that the number of laboratory bills was not "so voluminous that they would be too burdensome to produce."However, Dr. Haeberle misinterprets KRE 1006, which provides that summaries may be admitted of voluminous records that "cannot conveniently be examined in court," as opposed to records that are "too burdensome to produce," as argued by Dr. Haeberle. Dr. Haeberle has not alleged, much less shown, that the admittedly numerous laboratory bills could "conveniently be examined in court." KRE 1006.

Furthermore, although Dr. Haeberle asserts that the P.S.C. failed to lay a foundation for the admission of the bill summaries, the summaries were included as part of the quarterly reports, and the P.S.C. properly laid the foundation for the admission of the quarterly reports, as discussed *supra.*Therefore, the P.S.C. also properly laid the foundation for the admission of the bill summaries contained in the quarterly reports. Consequently, Dr. Haeberle has failed to show that the trial court abused its discretion when it permitted the P.S.C. to introduce the summaries of his laboratory bills. *See generally Goodyear Tire & Rubber Co., 11 S.W.3d at 577.*

3. Unjust enrichment

*7 Dr. Haeberle also alleges that the trial court erred when it denied his request to introduce evidence concerning the P.S.C.'s decision to begin paying the laboratory fees in order to receive a tax benefit, and then to seek reimbursement of those laboratory fees from the dentists. Dr. Haeberle argues that this practice by the P.S.C. amounted to unjust enrichment. "[F]or [his] unjust enrichment claim to be viable, [Dr.

Haeberle] must show the following elements: (1) a benefit conferred upon the [P.S.C.] at [Dr. Haeberle's] expense, (2) a resulting appreciation of the benefit by the [P.S.C.], and (3) an inequitable retention of the benefit without payment for its value."*Tractor and Farm Supply, Inc. v. Ford New Holland, Inc., 898 F.Supp. 1198, 1206 (W.D.Ky.1995).* The doctrine of unjust enrichment "is applicable as a basis of restitution to prevent one person from keeping money or benefits belonging to another."*Haeberle v. St. Paul Fire and Marine Ins. Co., 769 S.W.2d 64, 67 (Ky.App.1989).*

Dr. Haeberle has failed to show that the P.S.C.'s actions in paying his laboratory bills, taking a tax deduction for the laboratory bills, then seeking repayment of those bills from him, constituted unjust enrichment. Specifically, Dr. Haeberle has not demonstrated that the P.S.C.'s actions amounted to a benefit received by the P.S.C. at Dr. Haeberle's expense, as Dr. Haeberle failed to repay the P.S.C. for approximately $46,000.00 of his laboratory bills.

Nevertheless, the trial court denied as irrelevant Dr. Haeberle's request to introduce evidence concerning the tax deduction. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."KRE 401. Because evidence concerning the P.S.C.'s laboratory bill tax deduction did not have any consequence to the determination of whether Dr. Haeberle owed money to the P.S.C., the evidence was irrelevant. Thus, the trial court did not abuse its discretion when it denied Dr. Haeberle's request to admit evidence of the tax deduction. *See generally Goodyear Tire & Rubber Co., 11 S.W.3d at 577.*

### III. CLAIM CONCERNING THE DIRECTED VERDICT

### A. STANDARD OF REVIEW

Dr. Haeberle next claims that the trial court erred when it sustained the P.S.C.'s motion for a directed verdict on the amount of $20,728.22, for work performed by Dr. Haeberle. When we review a trial court's ruling on a motion for a directed verdict, we must "ascribe to the evidence all reasonable inferences and deductions which support the claim of

Not Reported in S.W.3d, 2007 WL 1201587 (Ky.App.)
2007 WL 1201587 (Ky.App.)

the prevailing party."*Bierman v. Klapheke, 967 S.W.2d 16, 18 (Ky.1998).*"Once the issue is squarely presented to the trial judge, who heard and considered the evidence, a reviewing court cannot substitute its judgment for that of the trial judge unless the trial judge is clearly erroneous."*Id.*"Generally, a trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ."*Id.* at 18-19.

**B. ANALYSIS OF CLAIM**

*8 Dr. Haeberle argues that the P.S.C. violated Kentucky's Wage and Hour Laws when it failed to pay him for the billings that he brought in, but which were not paid by patients or their insurance companies until after he resigned from the P.S.C. Dr. Haeberle cites KRS 337.055 in support of this argument. That statute states:

> Any employee who leaves or is discharged from his employment shall be paid in full all wages or salary earned by him; not later than the next normal pay period following the date of dismissal or voluntary leaving or fourteen (14) days following such date of dismissal or voluntary leaving whichever last occurs. Any employee who is absent at the time fixed for payment by an employer, or who, for any other reason, is not paid at that time, shall be paid thereafter at any time or upon fourteen (14) days' demand. No employer shall, by any means, secure exemption from this section.

However, Dr. Haeberle's argument is misplaced. Kentucky Revised Statutes 377.385 provides that an employee who is paid less than he is due under KRS 377.055, *supra,* may sue his employer for the amount due. Furthermore, KRS 377.010 provides that, for purposes of bringing a claim against one's employer for unpaid wages under KRS 377.385, an " '[e]mployee' " is any person employed by or suffered or permitted to work for an employer, but shall not include: Any individual employed in a ... professional capacity...." As a dentist, Dr. Haeberle was employed by the P.S.C. in a "professional capacity" and therefore, he was not permitted to bring his counter claim against the P.S.C. for unpaid wages pursuant to KRS 337.055 or 377.385.

Moreover, Section 6(c) of Dr. Haeberle's employment contract provided that "[t]he PSC's obligations to pay any compensation to the Employee or to his estate or heirs shall cease upon any termination of the Employee's employment relationship with the PSC." Where a contract provision is unambiguous, we construe the provision "according to the strict, plain, common meaning of the words themselves."*Bennett v. Consolidated Realty Co., 226 Ky. 747, 11 S.W.2d 910, 911 (Ky.App.1928).* However, as noted by Dr. Haeberle in his appellate brief, ambiguities in a written employment contract are "construed more strongly against the party who wrote it."*Simon v. Neptune Mfg. Co., 285 Ky. 340, 147 S.W.2d 1024, 1027 (Ky.App.1941).*

Nevertheless, section 6(c) of Dr. Haeberle's employment contract is unambiguous, as it plainly states that once Dr. Haeberle's employment with the P.S.C. ended, the P.S.C. was no longer obligated to pay any compensation to Dr. Haeberle. *See generally Bennett, 226 Ky. 747, 11 S.W.2d at 911.* Thus, we construe the provision according to the plain meaning of the words therein and conclude that the trial court's decision granting a directed verdict regarding Dr. Haeberle's counter claim was not clearly erroneous. *See Bierman, 967 S.W.2d at 18.*

Accordingly, the judgment of the Jefferson Circuit Court is affirmed.

HENRY, Senior Judge, Concurs.
COMBS, Chief Judge, Concurs in Part and Dissents in Part by Separate Opinion.COMBS, Chief Judge, Concurring in Part and Dissenting in Part:
*9 I dissent solely as to the disposition of the amount of $20,728.22 for work performed by Dr. Haeberle prior to his departure from the PSC. It is undisputed that Dr. Haeberle performed services for which this compensation was paid after his departure.

Nonetheless, that amount inexplicably was never applied as a set-off to reduce the amount of $59,948.50 awarded by the jury to the PSC. There is no ambiguity in the employment agreement as to the effect of termination. It clearly provides that the obligation of the PSC to pay "compensation ... shall cease upon termination of the employee's employment...." However, allowing a proper set-off

for monies clearly earned by Dr. Haeberle does not equate with compensation. But failure to do so assuredly results in unjust enrichment to the PSC.

I am persuaded that the court clearly erred in granting a directed verdict to the PSC for the $20,728.22. On the contrary, the proper outcome would have been entry of a directed verdict setting off this amount against the total sum claimed. Failure to properly account for this sum of money has undoubtedly resulted in unjust enrichment to the PSC. Consequently, I would vacate and remand on this issue.

Ky.App.,2007.
Haeberle v. McCall, Currens, Topor & Thompson, P.S.C.
Not Reported in S.W.3d, 2007 WL 1201587 (Ky.App.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                     Page 1

Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
**2006 WL 2990524 (N.D.Okla.)**

Harrison v. Leviton Mfg. Co., Inc.
N.D.Okla.,2006.

United States District Court,N.D. Oklahoma.
Lee Roy HARRISON, Plaintiff,
v.
LEVITON MANUFACTURING COMPANY, INC.,
Defendant.
**No. 05-CV-0491-CVE-FHM.**

Oct. 19, 2006.

Andrew P. Bell, Seth R. Lesser, Locks Law Firm
PLLC, New York, NY, Charles William Shipley,
Shipley & Kellogg PC, Tulsa, OK, Hugh P. Lambert,
Linda Nelson, Lambert & Nelson, New Orleans, LA,
for Plaintiff.
Scott Alan Law, Pierce Couch Hendrickson
Baysinger & Green LLP, Oklahoma City, OK, Carey
Cobb Calvert, Pierce Couch Hendrickson Baysinger
& Green, Tulsa, OK, for Defendant.

***OPINION AND ORDER***

CLAIRE V. EAGAN, Chief District Judge.
**\*1** Now before the Court is defendant's Motion to
Dismiss Plaintiff's Amended Class Action Complaint
and Brief in Support (Dkt.# 25). Defendant asks the
Court to dismiss the amended complaint for failure to
state a claim under Fed.R.Civ.P. 12(b)(6).

**I.**

Leviton Manufacturing Company, Inc. ("Leviton")
designs and manufactures backwire push-in electrical
receptacles. A receptacle is a device intended to
provide a temporary electrical connection with a
fixed electrical plug, and such devices are commonly
used in residential homes. A receptacle does not
generate its own electrical power but, instead, each
receptacle contains terminals on the back that are
connected to wires or electrical equipment.
Receptacles are normally attached to wiring or
electrical equipment within a wall and are concealed,
so that most homeowners are not aware of the
receptacle. The two most commonly used types of
receptacles are set-screw terminals and backwire

push-in terminals. Plaintiff alleges that backwire
push-in terminals are fundamentally unsafe and
increase the risk of electrical fires. In particular,
plaintiff claims that backwire push-in terminals
degrade quickly due to environmental factors and
have a higher resistance to electrical flow, which
creates excessive heat at the point of contact. Plaintiff
alleges that Leviton has been aware, or should have
been aware, of this danger since at least 1989.

Plaintiff's theory seems to be that increased heat from
use of these plugs causes wiring to melt, which can
result in short circuits or electrical fires. The
amended complaint contains general allegations that
backwire push-in receptacles have damaged wiring in
residential homes and started electrical fires, but it is
not clear from the amended complaint that plaintiff
has personally been injured in this way. Plaintiff
alleges that he is "informed and believes that the
defects in the particular receptacles of Defendant ...
that are the subject of Plaintiff's claims have resulted
in residential homes sustaining physical injury to
tangible property...." Dkt. # 13, Amended Class
Action Complaint, at 5-6. Defective push-in
receptacles allegedly require homeowners to repair or
replace wiring, but the amended complaint does not
contain any allegations that plaintiff has discovered
damaged wiring in his home. Instead, plaintiff states
the he intends to replace all push-in receptacles in his
home, and that he anticipates incurring expense or
inconvenience from this process. *Id.* at 9.

Plaintiff alleges five claims for relief in his amended
complaint: (1) violations of the Oklahoma Consumer
Protection Act, Okla. Stat. tit. 15, § 751*et seq.*
("OCPA"); (2) breach of implied warranties of
merchantability and fitness for a particular purpose;
(3) unjust enrichment; (4) negligence; and (5) strict
products liability.[FN1]Defendant filed a motion to
dismiss the amended complaint, or in the alternative,
requests that the Court dismiss specific claims. The
thrust of defendant's argument is that plaintiff has not
suffered a legally cognizable injury and, therefore,
there is no case or controversy before the Court.
Plaintiff responds that his complaint sufficiently
alleges that class members have incurred economic
injuries from using defendant's product and face a
risk of imminent danger from use of defendant's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
**2006 WL 2990524 (N.D.Okla.)**

product.

> FN1. The original complaint alleged claims for violations of the OCPA and breach of implied warranties of merchantability and fitness for a particular use only.

## II.

*2 When reviewing a motion to dismiss under Rule 12(b)(6), the court must construe the allegations of the complaint as true and view the allegations in the light most favorable to the nonmoving party. *Moffett v. Halliburton Energy Services, Inc.,* 291 F.3d 1227, 1231 (10th Cir.2002). A Rule 12(b)(6) motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Sutton v. Utah State School for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999).

## III.

Defendant argues that plaintiff lacks standing to pursue any of his claims under Article III of the federal constitution, because he has not suffered an injury-in-fact. Defendant raises issues of constitutional standing based on plaintiff's failure to allege that use of defendant's product has caused a concrete injury. Plaintiff responds that he has alleged property damage and an increased risk of personal harm, and that these allegations are sufficient to create a justiciable case or controversy.

Plaintiff does not address the issue of constitutional standing, but even if defendant had not raised the issue, the Court has a duty to consider whether plaintiff satisfies the three-part test for standing under Article III of the United States Constitution. *United States v. Parker,* 362 F.3d 1279, 1284 (10th Cir.2004); *People for the Ethical Treatment of Animals v. Rasmussen,* 298 F.3d 1198, 1203 (10th Cir.2002). The Supreme Court has recognized three elements for standing under Article III:

First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between

the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). The standing requirement ensures that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982)."Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact."*Nova Health Systems v. Gandy,* 416 F.3d 1149, 1155 (10th Cir.2005) (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (2005)). In the context of a potential class action, the named representative of the class must have standing to bring a claim, or the class action may not proceed. *Sosna v. Iowa,* 419 U.S. 393, 398-99 (1975); *James v. City of Dallas, Texas,* 254 F.3d 551, 562-63 (5th Cir.2001).

*3 The amended complaint contains conflicting statements regarding the type of injury plaintiff is alleging. Contrary to plaintiff's assertions, the amended complaint does not state that plaintiff has actually been harmed by Leviton's product, but he states that he believes he may incur expense in the future to remove defendant's product from his home. For example, plaintiff states that

[he] must now, at considerable time and expense, remove and replace every one of the push-in receptacles installed in his house or which came with the house when Plaintiff purchased the house. Such a project also includes consequential inconveniences and expenses, such as loss of time, having to shut off all of the power in the house for the period of time necessary for the work to be completed.

Dkt. # 13, Amended Class Action Complaint, at 9. The alleged need to replace the push-in receptacles in his home has not arisen because plaintiff has not actually discovered any damage to the wiring in his

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
**2006 WL 2990524 (N.D.Okla.)**

home. He merely seeks to prevent any damage from occurring, based on his theory that increased heat caused by the receptacle will eventually cause the wiring to deteriorate.[FN2] In the first paragraph of the amended complaint, plaintiff clearly states that the putative class specifically excludes any "consumers who have sustained personal injury and/or property damage (other than damage to the receptacle and/or wire/insulation in the vicinity of the receptacle termination) as a result of Defendant's practices."*Id.* at 1. If this is true, plaintiff's concern over the increased risk of electrical fires and resulting personal injury are irrelevant to the Court's consideration. Plaintiff limits his claim for damages to the replacement cost of the defective product and related electrical equipment, but he does not allege that he has suffered any harm that would fall into this category.

> FN2. Plaintiff points to a "general trend of increased current loading of household receptacle circuits" due the increased number of electrical devices in the average home. Plaintiff claims that he has alleged an injury because he states that "[d]efective Leviton backwire push-in receptacles damage the fixed wiring in homes, which is part of the residential structure and separate from the receptacle itself, thereby causing damages requiring the rewiring and/or replacement" of electrical wiring and equipment. However, plaintiff does not actually allege that wiring in his home has been damaged.

The primary focus for any analysis of standing under Article III "is whether plaintiff has suffered a present or imminent injury, as opposed to a mere possibility, or even probability, of future injury ."*Morgan v. McCotter,* 365 F.3d 882, 888 (10th Cir.2004). In cases where the plaintiff alleges an increased risk of injury, the plaintiff must show a risk of serious future harm and some tangible present injury. *Sutton v. St. Jude Medical S.C., Inc.,* 419 F.3d 568 (6th Cir.2005) (patient that received allegedly defective aortic connector faces substantial risk of future harm and current injury of increased medical monitoring sufficiently alleged injury-in-fact); *Rivera v. Wyeth-Ayerst Laboratories,* 283 F.3d 315, 321 (5th Cir.2002) (plaintiffs that purchased allegedly defective prescription drug but did not allege any

present harm did not have standing to sue). Plaintiff's amended complaint specifically states that he is not seeking to bring a claim for the risk of future personal injury or property damage, and there is no indication that plaintiff will suffer an immediate injury. The amended complaint also does not contain any allegations that plaintiff has suffered a tangible present injury to accompany his claims for potential future harm. Plaintiff has not carried his burden to demonstrate that he has standing under Article III, because he can not show that he has suffered or will immediately suffer a concrete injury-in-fact.

**\*4** Even though this is a putative class action, plaintiff may not base his right to sue on an injury allegedly suffered by other class members. Plaintiff may not represent a putative class if he has not actually suffered the injury for which the class seeks redress. The named representative of the class must have standing to bring a lawsuit or the court must dismiss the proposed class action. *Rector v. City & County of Denver,* 348 F.3d 935, 946 (10th Cir.2003) (dismissing class action brought under section 1983 challenging procedure assessing late fees for parking tickets because defendants did not assess or attempt to collect a late fee from class representatives). The named class representative can not base his standing to sue on the alleged injuries suffered by potential class members. *Allen v. Medrano,* 416 U.S. 802, 828-29 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 675 (1974). Plaintiff must identify an independent basis for standing beyond the alleged injuries suffered by putative class members. Plaintiff's argument that members of the proposed class have replaced wiring in their homes will not suffice to save plaintiff's amended complaint from dismissal.

The Court finds that plaintiff's vague allegations related to an increased risk of injury are insufficient to meet the injury-in-fact requirement for standing under Article III. Accepting plaintiff's allegations as true, he had not suffered any economic or personal injury at the time he filed his lawsuit. Plaintiff's statements that he will suffer future economic harm and potential inconvenience from replacing any of defendant's receptacles in his home do not presently create a justiciable case or controversy. Therefore, plaintiff's amended complaint must be dismissed due to his lack of Article III standing.

**IV.**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 4
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
**2006 WL 2990524 (N.D.Okla.)**

Even if the Court assumes that plaintiff meets the standing requirements of Article III, plaintiff has not alleged the type of injury that may be redressed by his legal claims. Plaintiff has alleged five claims, and each of those claims requires that plaintiff demonstrate an injury that was caused by defendant's conduct.

### A.

Plaintiff alleges that he has suffered economic injuries because of Leviton's unfair or deceptive conduct in violation of the OCPA. In order to state a prima facie case under the OCPA, plaintiff must allege four elements:

(1) that the defendant engaged in an unlawful practice as defined at 15 O.S. (1991), § 753; (2) that the challenged practice occurred in the course of defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury.

*Patterson v. Beall,* 19 P.3d 839, 846 (Okla.2000). Defendants focus on the third and fourth elements and assert that plaintiff's amended complaint contains no allegations that he was injured by Leviton's allegedly unlawful business practices. See Okla. Stat. tit. 15, § 761.1. A person does not qualify as an aggrieved consumer under section 761.1 simply because he paid the purchase price for a product; he must have "suffered some detriment to successfully pursue a private right of action under § 761.1A." *Walls v. American Tobacco Co.,* 11 P.3d 626, 629 (Okla.2000). In order to show that he has a personal stake in the litigation, plaintiff must identify an "actual or threatened distinct injury which has a causal connection between the alleged wrong and the actions challenged." *Id.*

**\*5** Plaintiff alleges that he purchased a home that contained push-in receptacles and that he believes he must replace every such receptacle. Based on plaintiff's amended complaint, this injury could include the cost of replacing a defective receptacle or repairing melted wiring, or even an electrical fire. However, there are no allegations that he has actually suffered this type of injury from using the product or that has an imminent apprehension that these injuries will occur. It appears that members of the putative class may have incurred expense or even had an electrical fire, but that plaintiff has not personally been the victim of these adverse circumstances. Courts do not allow consumers to bring claims against manufacturers for products that are perceived to be harmful, but that have not actually cause an identifiable injury. *See Coker v. DaimlerChrysler Corp.,* 617 S.E.2d 306, 313-14 (N.C.App.Ct.2005) (dismissing claim under North Carolina Unfair Trade and Deceptive Trade Practices Act for failure to show risk of immediate injury from product defect); *Verb v. Motorola, Inc.,* 672 N.E.2d 1287, 1295 (Ill.App.Ct.1996) (dismissing consumer fraud claims based on allegations that cellular telephone might increase risk for certain heath problems); *Ziegelmann v. DaimlerChrysler Corp.,* 649 N.W.2d 556 (N.D.2002) (dismissing proposed class action regarding allegedly defective brakes because no class member had actually been harmed by product defect).

As a consumer, plaintiff has not incurred any additional expense because defendant's product was installed in his home. Plaintiff claims that he is threatened by "the risk of fire and death as a result of the manifest defects in Leviton's receptacles."Dkt. # 28, at 16. However, his amended complaint disclaims that he is seeking relief for this type of injury, because he excludes any person from the putative class who has "sustained personal injury and/or property damage (other than damage to the receptacle and/or wire/insulation in the vicinity of the receptacle termination). Dkt. # 13, at 1. Plaintiff is seeking money damages for a product that will only hypothetically caused him any harm. This is not the type of "actual or threatened distinct injury" required to bring a claim under the OCPA, as plaintiff must allege actual damages to qualify as an "aggrieved consumer" under the act. *Walls,* 11 P .3d at 629. Such allegations are conspicuously absent from the amended complaint, and the Court finds that plaintiff's claim under the OCPA must be dismissed for failure to state a claim.

### B.

Plaintiff alleges that Leviton's push-in receptacles are defective, and fail to meet the applicable consumer safety codes regarding fire protection. He claims that product defects "have resulted in residential homes sustaining physical injury to tangible property

Slip Copy                                                                                                                    Page 5
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30
**2006 WL 2990524 (N.D.Okla.)**

including, but not limited to, damage to the wiring, electricity, and electrical systems of these homes which have incorporated" defendant's allegedly defective product. Defendant argues that plaintiff fails to allege that the product is presently defective but, instead, that plaintiff has merely stated his belief that the product is likely to cause an injury.

*6 Under Oklahoma law, a warranty of merchantability is implied in every contract for the sale of goods. Okla. Stat. tit. 12A, § 2-314. A consumer may bring a claim for breach of warranty against the retailer and the manufacturer to recover the benefit of the bargain. _Waggoner v. Town & Country Mobile Homes, Inc.,_ 808 P.2d 649, 652 (Okla.1990). The consumer has the burden to prove that the product was defective at the time it left the manufacturer's possession or control. _Thompson v. Trane Co.,_ 500 P.2d 1329, 1333 (Okla.1972). The implied warranty of merchantability is not indefinite, but lasts for a reasonable time only. _Hoort v. Oklahoma Truck Parts, Inc.,_ 650 P.2d 71, 73 (Okla.Civ.App.1981). A necessary part of every breach of warranty claim is that plaintiff suffer an actual loss that was proximately caused by defendant's breach of warranty. _American Fertilizer Specialists, Inc. v. Wood,_ 635 P.2d 592, 595 (Okla.1981); _Collins Radio Co. of Dallas, Texas, v. Bell,_ 623 P.2d 1039, 1052 (Okla.Civ.App.1980). Plaintiff must also allege that he has suffered an injury and damages when claiming a breach of the implied warranty of fitness for a particular purpose under Okla. Stat. tit. 12A, § 2-315. _Collins Radio Co.,_ 623 P.2d at 1052.

Based on the amended complaint, it is not apparent that plaintiff has suffered a manifestation of the alleged defect or that the push-in receptacles in his home are actually defective. Plaintiff cites _Seely v. White Motor Co.,_ 403 P.2d 145 (Cal.1965), for the proposition that the risk of physical injury is compensable in a breach of warranty action, because the plaintiff should not have to wait for a physical injury to occur before bringing suit. _Id._ at 155. The holding of _Seely_ was that purely economic loss for an intrinsic product defect can not be recovered with a tort claim, and that plaintiff's economic injury was compensable through a breach of warranty claim only. _See Sharon Steel Corp. v. Lakeshore, Inc.,_ 753 F.2d 851, 854 (10th Cir.1985). However, the economic loss doctrine does not create an injury

where none exists. Plaintiff argues that Leviton's products are continuously malfunctioning, consequently causing an ongoing injury.

This case is analogous to _Briehl v. General Motors Corp.,_ 172 F.3d 623 (8th Cir.1999), where the Eighth Circuit dismissed a putative class action based on a claim that defendants designed an inherently defective anti-lock braking system. _Id._ at 626. The case was dismissed because the plaintiffs did not allege that the defect had actually caused any plaintiff an injury, and none of the plaintiffs could show he or she was entitled to damages. The plaintiffs amended their complaint to include allegations that proposed class members had suffered an accident that was caused by the defective brakes, but also continued to pursue a class action based on a theory that putative class members could recover for an unmanifested injury. _Id._ at 629. The court stated that "[w]here, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies."_Id._ at 628. Plaintiff attempts to distinguish this case without success. He alleges that Leviton's receptacles are inherently defective and are likely to cause an injury, but he does not affirmatively state that he has suffered an injury. Therefore, plaintiff can not show that he is entitled to damages, which is a necessary element of any breach of warranty claim. _Id._ at 628-30; _Carlson v. General Motors Corp.,_ 883 F.2d 287, 297 (4th Cir.1989).

*7 There is no possibility, based on the allegations of the amended complaint, that plaintiff will be entitled to recover for breach of an implied warranty of merchantability or fitness for a particular purpose and this claim should be dismissed.

### C.

Plaintiff has pled tort claims for unjust enrichment, negligence, and manufacturer's products liability. The Court finds that, absent any claim of current injury, plaintiff's tort claims can not survive a motion to dismiss for failure to state a claim. Plaintiff's vague references to potential harm, such as personal injury and fire loss, are negated by his stated intent to exclude any person from the putative class that has suffered a personal injury or property damage from using Leviton's receptacles.

Plaintiff's claim for unjust enrichment is based on the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

theory that Leviton has wrongfully retained a benefit by selling a product it should have known was defective. Under Oklahoma law, unjust enrichment "describes a condition resulting from the failure of a party to make restitution in circumstances where it is inequitable."*Lapkin v. Garland Bloodworth, Inc.,* 23 P.3d 958 (Okla.Div.App.2000)."A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."*N.C. Corff Partnership, Ltd. v. OXY USA, Inc.,* 929 P.2d 288, 295 (Okla.Civ.App.1996). However, a necessary element of this claim is that the unjust enrichment must be connected to a resulting injustice. *Teel v. Public Service Co. of Oklahoma,* 767 P.2d 391, 398 (Okla.1985). Plaintiff provides the following argument in support of his unjust enrichment claim:

Leviton next argues that, until this point of time, Mr. Harrison's push-in receptacles have been functioning properly so no unjust enrichment remedy is be [sic] available. Whether or not M. Harrison's receptacles have malfunctioned to date, he has become aware of the imminent harm and will replace the unsafe receptacles. Leviton's refusal to reimburse him the cost of safe replacements amounts to an inequitable and unjust retention of a benefit.

Dkt. # 28, at 20. If plaintiff believes a product in his home creates an increased risk of danger, he may remove the product from his home. That does not automatically create an equitable right to recovery if he has not suffered a manifestation of the potential harm. Plaintiff is currently receiving the benefit of a product that is functioning as the manufacturer intended, but has not suffered any injury. *See Teel,* 767 P.2d at 398-99 (no finding of injustice when plaintiff received the benefit of the bargain). Without an accompanying injury, there is no injustice. Plaintiff has specifically limited his claim to economic injuries, which precludes him from asserting an injustice based on an increased risk of personal injury.

*8 Plaintiff's claims for strict product liability and negligence are not barred by the economic loss rule stated in *Wagonner,* but by something more fundamental. In negligent or defective design cases, plaintiff's alleged injury must be something more

than the defective design; he must have suffered injury caused by the defective design of the product. *Burton v. R.J. Reynolds Tobacco Co.,* 397 F.3d 906 (10th Cir.2005); *Prince v. B.F. Ascher Co., Inc.,* 90 P.3d 1020 (Okla.Civ.App.2004). The allegations of the amended complaint establish that receptacles are functioning as intended, but that plaintiff believes there is an increased risk of harm. In order succeed on a claim for negligence or products liability, plaintiff must be able to prove that he suffered an injury caused by defendant's defective design. *Seay v. General Elevator Co.,* 522 P.2d 1022 (Okla.1974); *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1360-61 (Okla.1974). These kinds of claims were not meant to preemptively prevent injury but, rather, they are designed to provide a legal theory to address injuries that have already occurred. Plaintiff's claim that he may have to expend money in the future to replace a product, or that he faces an increased risk of personal injury, can not be adjudicated as a strict products liability or negligence claim until the product has caused an injury. If the Court were to adopt plaintiff's theory, plaintiff could pursue these claims merely for owning a product that is allegedly defective, but that has not caused any actual harm. Neither a strict products liability claim nor a negligence claim is available in this situation.

**IT IS THEREFORE ORDERED** that defendant's Motion to Dismiss Plaintiff's Amended Class Action Complaint and Brief in Support (Dkt .# 25) is **granted.**The Amended Class Action Complaint (Dkt.# 13) is hereby **dismissed.**

N.D.Okla.,2006.
Harrison v. Leviton Mfg. Co., Inc.
Slip Copy, 2006 WL 2990524 (N.D.Okla.), 61 UCC Rep.Serv.2d 30

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 2101049 (W.D.Mo.), Prod.Liab.Rep. (CCH) P 17,300
**2005 WL 2101049 (W.D.Mo.)**

**C**Henry v. Mylan Pharmaceuticals, Inc.
W.D.Mo.,2005.

United States District Court,W.D. Missouri, Central
Division.
James Patrick HENRY Plaintiff,
v.
MYLAN PHARMACEUTICALS, INC., a wholly
owned subsidiary of Mylan Laboratories, Inc., and
Walgreen Co., Defendants.
**No. 05-CV-40092-NKL.**

Aug. 31, 2005.

David Gregory Brown, Finley D. Gibbs, Rotts &
Gibbs, LLP, Columbia, MO, for Plaintiff.
C. Raymond Bell, Daniel G. Donahue, Patrick N.
McHugh, Herzog & Crebs, Brown & James, PC, St. Louis, MO, Clem C. Trischler,
Pittsburgh, PA, for Defendants.

ORDER

LAUGHREY, J.
*1 Pending before the Court are two Motions to
Dismiss filed by Defendant Walgreen Co.
("Walgreen") and one Motion to Strike by Plaintiff
James Patrick Henry ("Henry") (Doc. 20).
Walgreen's first motion is one to dismiss for failure to
bring claims within the statute of limitations (Doc.
11). For the reasons stated below it is denied. The
second is a Motion to Dismiss for Failure to State a
Claim (Doc 12). For the reasons stated below it is
granted as to Defendant Walgreen on Counts II and
III and denied as to all other counts. Henry's Motion
to Strike is denied as moot.

I. Background

On a motion to dismiss, the Court adopts the alleged
facts as true and construes reasonable inferences
arising from the Complaint in a light most favorable
to the Plaintiff. _Knapp v. Hanson,_ 183 F.3d 786, 788
(8th Cir.1999). A motion to dismiss should be
granted only when it appears beyond all doubt that the
plaintiff can prove no facts that entitle him to
relief._Id._

Henry suffered a head injury at age 16. Henry has
avoided seizures related to that injury for over ten
years while on the prescription drug Dilantin.Dilantin
is the branded name for an anti-convulsant
medication, whose active ingredient is chemically
named Phenytoin Sodium.

On or about March 19, 2003, Henry's physician faxed
or called Walgreen to renew Henry's prescription for
Dilantin. Pursuant to store policy, a Walgreen
pharmacist substituted a lower cost generic form of
Dilantin, specifically "Mylan 1560," in place of the
brand name drug. Mylan 1560 is manufactured by the
Co-Defendant in this case, Mylan Pharmaceuticals,
Inc. On or about March 23, 2003, Henry arrived to
pick up his prescription. He noticed that the generic
substitution had been made. Henry told the
pharmacist that he had only taken Dilantin. The
pharmacist told Henry that the substitute was safe
and just as good as the name brand drug. Henry relied
upon the pharmacist's assertions and took the drug
home without contacting his physician.

Henry commenced taking Mylan 1560 on or about
the next evening and continued doing so until April
16, 2003. On April 15, 2003, Henry suffered what is
known as a Grand Mal Tonic Clonic seizure. The
next day when Henry informed his physician about
both the seizure and his switch to Mylan 1560, the
physician immediately wrote a fresh prescription
requiring the pharmacy to provide Dilantin.

The evening of April 16, before the Dilantin could
take effect, Henry suffered another seizure. He was
taken to the emergency room where the results of
tests taken that morning revealed that Henry had a
sub-therapeutic level of Phenytoin Sodium in his
blood. The test revealed that his level was 3.9, while
therapeutic levels are generally acquired at a level of
10 or greater. The emergency room doctor had to
supply Henry with a high dose of Dilantin
intravenously to bring Henry's levels of Phenytoin
Sodium within the range necessary to prevent further
seizures.

*2 Henry alleges that Mylan 1560 did not provide the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2101049 (W.D.Mo.), Prod.Liab.Rep. (CCH) P 17,300
**2005 WL 2101049 (W.D.Mo.)**

same level of Phenytoin Sodium that Dilantin did and, as a result, he suffered seizures. This fact was known through published papers and studies at the time Walgreen substituted Mylan 1560 and was or should have been known by the Defendant manufacturer and the pharmacist.

Henry brings this action against Mylan Pharmaceuticals, Inc. and Walgreen Co., Inc., on a number of counts, based in negligence, failure to warn, breach of warranty, and misrepresentation. Walgreen has moved to dismiss all counts of the complaint against it for multiple reasons.

II. Discussion

A. Walgreen as a "Health Care Provider"

A central question to this lawsuit is whether or not Walgreen, a corporate pharmacy, is a "health care provider" as defined by Mo.Rev.Stat. § 538.205(4) (2000).

The statutory definition of "health care provider" lists pharmacists, but not pharmacies. Id. Relying on the doctrine of "expressio unius est exclusion alterius," Henry contends that because pharmacies are not listed as health care providers, the Court must find that pharmacies are not health care providers. The expressio unius canon of construction, however, "should be invoked only when other aids to interpretation suggest that the language at issue was meant to be exclusive." Bailey v. Fed. Intermediate Credit Bank of St. Louis, 788 F.2d 498, 500 (8th Cir.1986). It does not appear that the drafters of section 538.205 intended for their list of "health care providers" to be exclusive because they expressly included "any other person or entity that provides health care services under the authority of a license or certificate." Mo.Rev.Stat. § 538.205(4). Thus, the question becomes whether a corporate pharmacy is an entity that provides health care services under the authority of a license or certificate.

Section 428.104(5) defines "health care services" as "any service that a health care provider renders to a patient in the ordinary course of the health care provider's profession, or, if the health care provider is an institution, in the ordinary course of furthering the purposes for which the institution is organized." Mo.Rev.Stat. § 538.205(5). Professional

services include the "transfer to a patient of goods or services incidental or pursuant to the practice of the health care provider's profession or in furtherance of the purposes for which an institutional health care provider is organized." Id. In the present action, Walgreen transferred to Henry a prescription in furtherance of its business as a pharmacy and, thus, seems to come within the definition.

Henry contends, however, that as a business entity, Walgreen is not an institutional health care provider. Certainly, the statute employs some degree of circular logic. In section 538.205(4), an entity may clearly be a "health care provider" if it provides "health care services," but the definition of "health care services" uses the very term it is supposed to help define, and section 538.204(5) never employs the term entity, and instead uses the term institutions. Nevertheless, on more than one occasion, the Missouri courts have recognized that corporate entities which provide health care services through licensed practitioners fall under the umbrella governed by sections 538.205(4), (5). See P.S. v. Psychiatric Coverage, Ltd., 887 S.W.2d 622, 627 (Mo.Ct.App.1994); Mahoney v. Doerhoff Surgical Services, Inc., 807 S.W.2d 503 (Mo.1991) (en banc); Beuke v. Pharmacia & Upjohn Co., 2000 WL 34430453, *2 (E.D.Mo.2000)(holding that "a pharmacy is a health care provider, for it renders services to a patient in the ordinary course of a pharmacist's profession."). In P.S. the court concluded that if it did not extend protection of these statutes to corporate entities, it would undermine the intent of the Missouri legislature when it enacted the statute, which was to respond to the growing concern over the increased cost of health care services. 887 S.W.2d 627. By this logic, extending "health care providers" to include not only pharmacists, but to corporate pharmacies licensed to dispense medication through its employees, seems consistent with that intent.

*3 Further, it would be unfair to hold a corporate pharmacy liable for the actions of its employee, the pharmacist, but not extend to the pharmacy the same statutory rights the pharmacist holds.

Therefore, the Court holds that Walgreen is a "health care provider" whose employees provided "health care services" to Henry when the employee dispensed Mylan 1560 to him.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2005 WL 2101049 (W.D.Mo.), Prod.Liab.Rep. (CCH) P 17,300
**2005 WL 2101049 (W.D.Mo.)**

B. Statute of Limitations and Henry's Motion to
Strike

Under Missouri law, actions against "health care
providers" for negligence, malpractice, error or
mistake related to health care must be brought within
two years from the date when plaintiff alleges the act
occurred. Mo.Rev.Stat. § 516.105. Henry and
Walgreen disagree on the date when the alleged act
occurred. Henry pleads that he purchased his
prescription on March 23, 2003. Walgreen contends
he purchased the prescription on March 19, 2003, and
has furnished the Court with a receipt showing
disbursement of Mylan 1560 on that date (Ex. A).
The receipt does not include Henry's name and the
only factor suggesting its relevance is that it includes
the name of Henry's doctor and the name of the
medication that was dispensed to Henry. Based only
on this evidence, the Court cannot find as a matter of
law that the statute of limitations has run. "[T]he
court generally must ignore materials outside the
pleadings, but it may consider 'some materials that
are part of the public record or do not contradict the
complaint...."*Porous Media Corp. v. Pall Corp.,* 186
F.3d 1077, 1079 (8th Cir.1999) (quoting *Missouri ex
rel. Nixon v. Coeur D'Alene Tribe,* 164 F.3d 1102,
1107 (8th Cir.1999). Because the receipt contradicts
the allegations in the complaint, it cannot at this stage
be the basis for judgment on the pleadings.

Furthermore, even if the Court found that Walgreen's
receipt proved the date when Henry purchased the
Mylan 1560, judgment on the pleadings would not be
appropriate. Both the Missouri and the federal rules
explain how a court should compute time. Both
jurisdictions hold that if the last day of a relevant
period falls on a Saturday, Sunday or legal holiday,
then the period shall be extended until the end of the
next day that is not a Saturday, Sunday or legal
holiday.Fed. R. Civ. Pro. 6(a); Mo.Rev.Stat. §
506.060. Two years from March 19, 2003, would be
a Saturday. Therefore, the period is extended until the
end of the day on March 21, 2005-the day the action
was commenced. So even if Walgreen's contention
that the transaction occurred on March 19, 2003, is
proven true, Henry still commenced the action before
the statute of limitations had run. Because the Court
has denied Walgreen's Motion to Dismiss, it denies
Henry's Motion to Strike as moot.

C. Strict Liability Claims (Counts II & III)

In Count II of his complaint, Henry seeks recovery
under a strict liability theory for Walgreen's alleged
failure to warn Henry that Mylan 1560 was
dangerous and did not operate as the Dilantin he had
been taking. In Count III, Henry seeks to recover
under strict liability on the theory that the product
was defective. Walgreen contends that these counts
should be dismissed because Missouri does not allow
for recovery against "health care providers" on a
theory of strict liability. *See Budding v. SSM
Healthcare System,* 19 S.W.3d 678 (Mo.2000).

*4 In *Budding* a patient sued the hospital where she
had a joint implant that later turned out to be
defective, allegedly causing the growth of a tumor in
her jaw and requiring several surgeries to repair the
damage. *Id.* at 679.The plaintiff relied upon a strict
products liability theory of recovery.*Id.* at 680.The
Missouri Supreme Court held that Budding's claim
was not viable because Missouri did not allow
recovery on actions in strict products liability against
a "health care provider." *Id.* at 682.

To reach its conclusion, the *Budding* court looked at
section 538.225(1), which requires that

[i]n any action against a health care provider for
damages for personal injury or death on account of
the rendering of or failure to render health care
services, the plaintiff or his attorney shall file an
affidavit with the court stating that he has obtained
the written opinion of a legally qualified health care
provider which states that the defendant health care
provider failed to use such care as a reasonably
prudent and careful health care provider would have
under similar circumstances and that such failure to
use such reasonable care directly caused or directly
contributed to cause the damages claimed in the
petition.FN1

> FN1. This statute requires the affidavit to be
> filed within 90 days after the filing of the
> petition. Until recently, this deadline could
> be extended by the court on a showing of
> good cause. On August 28, 2005, Missouri
> Legislature H.B. 393 (2005), goes into
> effect, which would prevent a court from
> extending the deadline beyond 180 days
> after the petition is filed. The Court takes no

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2101049 (W.D.Mo.), Prod.Liab.Rep. (CCH) P 17,300
**2005 WL 2101049 (W.D.Mo.)**

position on whether this new statute would apply to this case.

Mo.Rev.Stat. § 538.225(1) (2000). The *Budding* court declared that by using the word " 'any action' ... the legislature clearly demonstrated its intent that the statute [requiring an affidavit] not only apply to a negligence action but to a products liability action as well." 19 S.W.3d at 680. The Court concluded that it would be absurd to require an affidavit showing a breach of duty when a successful strict liability action requires no breach of duty. Therefore, the Missouri Supreme Court held that "it is reasonable to conclude that the legislature intended to eliminate liability of health care providers for strict liability." *Id.* at 681. In reaching that conclusion, the court also relied on the legislature's earlier decision to not extend statutory strict liability to heath care providers. Mo.Rev.Stat. § 538.300 (2000).

Because it is clear that *Budding* eliminates claims for strict liability against health care providers, and because Walgreen is a health care provider, Counts II and III of Henry's complaint must be dismissed.

D. Breach of Warranty (Counts V & VI)

Walgreen also argues that the *Budding* rule should be extended to foreclose Henry's claims for breach of implied and express warranties. Walgreen contends that the logic of *Budding* is equally applicable to the breach of warranty claims because neither requires a showing that there has been a breach of the standard for care in the profession. Henry contends that *Budding* does not apply because his warranty claims are not for damages for personal injury or death and, therefore, do not fall under section 538.225, which is applicable to "any action against a health care provider for damages for personal injury or death...." Mo.Rev.Stat. § 538.225(1). If Henry is pursuing his warranty claim to recover the difference in cost between the generic and branded drug, then he is correct, the claim is not for personal injury or death and the logic of *Budding* is inapplicable. However, if Henry is also seeking warranty damages for the personal losses allegedly caused by the different drug formulations, then he is incorrect. Relying on Henry's statement that he is not seeking warranty damages for personal loss, Walgreen's Motion to Dismiss the warranty claims is denied. The issue will be revisited if Henry attempts to use the warranty claim to pursue

damages for personal loss allegedly caused by the difference in the drug formulations.

E. "Innocent Seller Statute"

*5 Under Mo.Rev.Stat. § 537.762, a party in a products liability action whose liability is based solely on its status as a seller in the stream of commerce may move to dismiss itself from a lawsuit if the manufacturer is before the court and total recovery from the manufacturer is possible. The purpose of this statute is to allow a seller to be dismissed without prejudice from the action at an early stage when a more culpable defendant, such as the manufacturer, has been joined. *Drake v. North American Phillips Corp.,* 204 F.Supp.2d 1204, 1206 (E.D.Mo.2002). This eliminates the need for the seller to seek indemnification from the manufacturer after the litigation is complete and allows the seller to avoid costly litigation. *Id.* However, the statute does not affect the substantive liability of the seller, because it is only available when the more culpable defendant is both before the court and capable of satisfying the claim. *Malone v. Schapun, Inc.,* 965 S.W.2d 177, 182 (Mo.Ct.App.1997). As such, it is a procedural, rather than a substantive rule, and it does not apply in federal court. *Id.* (the statute "does not change the substantive law relating to an innocent seller's liability...."). See also *Pruett v. Goldline Laboratories, Inc.,* 751 F.Supp. 1372, 1372 (W.D.Mo.1990).

Furthermore, Henry has alleged claims against Walgreen far beyond its status as a seller in the stream of commerce. They allege counts for negligence (Count I, IV, VIII), breach of express warranty (Count V), and fraudulent misrepresentation (Count VII). Henry's primary contention is that Walgreen committed a wrongful act in substituting Mylan 1560 for Dilantin. "Under section 537.762, dismissal is only proper where the defendant's liability is based solely on its status as a seller in the stream of commerce." *Drake,* 204 F.Supp.2d at 1206. Since it is clear that Henry alleges that Walgreen is liable for more than its acts as a seller in the stream of commerce, dismissal would be improper even if the Court applied the rule.

F. Duty of Care Owed by a Pharmacy (Count I, IV VII & VIII)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2101049 (W.D.Mo.), Prod.Liab.Rep. (CCH) P 17,300
**2005 WL 2101049 (W.D.Mo.)**

Walgreen argues that Missouri does not impose on pharmacies a duty to inspect or test the pharmaceutical products they sell, and that its sole duty is to dispense the prescription according to the physician's instruction.

"Duty is an obligation imposed by law to conform to a standard of conduct toward another to protect others against unreasonable, foreseeable risks."*Horner v. Spalitto*, 1 S.W.3d 519, 522 (Mo.Ct.App.1999). The *Horner* court rejected the very proposition Walgreen espouses, and instead characterizes the duty of a pharmacist in the familiar language of professional liability. A pharmacist must "exercise the care and prudence that a reasonably careful and prudent pharmacist would exercise in the same or similar circumstances...."*Id.*

Walgreen also argues that because Henry has brought an action against the drug manufacturer alleging that the manufacturer failed to warn, it cannot bring an action against Walgreen wherein it alleges that Walgreen negligently or intentionally failed to warn. Walgreen's logic is that if the manufacturer did not warn, then Walgreen could not have had knowledge to create its own intentional or negligent malfeasance. But the logic of this argument is flawed. First, it presupposes that the drug manufacturer is the sole source of information about a drug. Henry pleads that the negative effect of the drug was available in peer journals available to the industry. Second, a party is free to set forth inconsistent or alternative theories of recovery in their pleadings. Fed. R. Civ. Pro. 8(e)(2). It will be the facts uncovered in this case through the process of discovery that ultimately determines which, if any, claims Henry can proceed with.

**\*6** Walgreen next contends that the breach of a duty to warn and misrepresentation count should be dismissed, because it requires a showing that the pharmacist had knowledge or reason to know of information regarding the dangerous nature of Mylan 1560. But Henry has pled that Walgreen had knowledge, actual or constructive, and the Court must take that allegation as true for the purposes of this motion.

Furthermore, the very case that Walgreen has cited provides that a supplier who "knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied" is liable for the dangerous affect of the product. *Malone v. Schapun, Inc.*, 965 S.W.2d 177, 184 (Mo.Ct.App.1997) (the other elements of a failure to warn claim have been omitted, because they are not at issue here). The language used by Malone clearly alleges not only actual knowledge, but constructive knowledge as well. Henry has alleged that information about the defective nature of Mylan 1560 was published in peer journals and that the pharmacist should have known about that information when he substituted Mylan 1560 for Dilantin. As such, a controversy exists sufficient to require discovery on the issue.

Accordingly,

It is ORDERED that Walgreen's Motion to Dismiss for Failure to Bring Claims Within the Statute of Limitations (Doc 11) is DENIED.

It is further ORDERED that Henry's Motion to Strike "Exhibit A" from the aforementioned motion is DENIED as moot.

It is further ORDERED that Walgreen's Motion to Dismiss for Failure to State a Claim (Doc. 12) is GRANTED as to Walgreen on Counts II and III, and is DENIED as to all remaining counts.

W.D.Mo.,2005.
Henry v. Mylan Pharmaceuticals, Inc.
Not Reported in F.Supp.2d, 2005 WL 2101049 (W.D.Mo.), Prod.Liab.Rep. (CCH) P 17,300

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2007 U.S. DIST. LEXIS 76435

**IN RE GENETICALLY MODIFIED RICE LITIGATION; This order Applies to:**
**Randy Schafer, et al., v. Riceland Foods, Inc., et al.**

**4:06 MD 1811 CDP, 4:07CV825 CDP**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF**
**MISSOURI, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 76435*

**October 15, 2007, Decided**
**October 15, 2007, Filed**

**SUBSEQUENT HISTORY:** Related proceeding at *Texana Rice Mill, Ltd. v. Bayer Cropscience LP (In re Genetically Modified Rice Litig.), 2007 U.S. Dist. LEXIS 76820 (E.D. Mo., Oct. 15, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff rice farmers sued defendants, an agricultural co-op and developers of genetically modified rice, in Arkansas state court for negligence, fraud, and negligent nondisclosure. The developers removed the case to federal court based on diversity, and the case was transferred to the instant district court as part of multi-district litigation. The farmers moved to remand to state court.

**OVERVIEW:** The farmers claimed that a variety of genetically modified rice, which was produced by the developers and had not been approved for human consumption, contaminated the United States rice supply. The farmers claimed that the co-op, of which the farmers were members, knew of the contamination and violated a duty to inform the farmers. The developers claimed that the co-op, a non-diverse party, had been fraudulently joined to defeat diversity. The district court disagreed. It was possible that, under Arkansas law, the co-op had a fiduciary obligation to disclose any information it knew about the contamination. It was a question of fact for the jury whether it was foreseeable that the farmers would, as they claimed, have planted a different crop had they known of the contamination. Nor could it be concluded that the economic loss doctrine would bar the claims against the co-op. The claims against the co-op and the developers were not misjoined under Ark. R. Civ. P. 20(a); all of the farmers' claims related to their ability to sell their rice following the contamination, so the claims arose out of the same series of transactions or occurrences and had common questions of fact.

**OUTCOME:** The farmers' motion to remand was granted, and the matter was remanded to state court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Removal > General Overview*
[HN1] A defendant may remove an action from state court to federal district court if the action is within the district court's original jurisdiction, unless an act of Congress expressly provides otherwise. *28 U.S.C.S. § 1441(a).*

*Civil Procedure > Removal > Basis > Diversity of Citizenship*
*Civil Procedure > Removal > Proceedings > Fraudulent Joinder*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN2] Under the doctrine of "fraudulent joinder," a court may disregard the citizenship of a non-diverse defendant who was frivolously joined in an effort to defeat removal of a diversity case. The party seeking removal and opposing remand has the burden of establishing federal subject-matter jurisdiction.

*Civil Procedure > Removal > Proceedings > Fraudulent Joinder*
[HN3] Joinder is fraudulent and removal is proper when there exists no reasonable basis in fact and law supporting a claim against the resident defendants. In analyzing

fraudulent joinder, a court focuses not on the artfulness of the pleadings but on whether there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved.

*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > Elements*
[HN4] A fraud claim under Arkansas law requires deliberate concealment or silence in the face of a duty to speak. Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate; a duty arises from a relation of trust.

*Civil Procedure > Federal & State Interrelationships > General Overview*
[HN5] In the absence of state law precluding liability in a particular situation, a federal court's job is limited to determining whether there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved. In making this determination, the court must resolve all facts and ambiguities in the current controlling substantive law in the plaintiff's favor, and the court has no responsibility to definitively settle ambiguous questions of state law.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > Formation*
[HN6] Under Arkansas law, a fiduciary or confidential relationship arises whenever there is a relation of dependence or confidence.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > Formation*
*Business & Corporate Law > Cooperatives > Management Duties & Liabilities*
*Business & Corporate Law > Cooperatives > Members & Other Constituents*
[HN7] Courts have found a fiduciary relationship between a co-op and its member farmers when: (1) one of the parties enjoys superior or excessive influence over the other; (2) the parties have a confidential relationship and one of the parties has greater access to facts and legal resources; or (3) there is a disparity of business experience and an invitation to the party with lesser experience to place confidence in the advice of the other party. A co-op's fiduciary duty can arise out of the co-op's advice about growing and marketing the members' crops. There is no Arkansas law that says a co-op's fiduciary

duty is limited to the selling end of crop production. It simply makes no sense to argue that a duty regarding marketing cannot extend to the issue of what crops should be marketed.

*Civil Procedure > Removal > Postremoval Remands > Motions for Remand*
*Civil Procedure > Federal & State Interrelationships > General Overview*
[HN8] The better practice is for a federal court not to decide a doubtful question of state law in connection with a motion to remand but simply to remand the case and leave the question for the state courts to decide.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > Elements*
*Torts > Negligence > Duty > Foreseeability of Injury*
[HN9] Under Arkansas law, the question regarding foreseeability for purposes of a nondisclosure claim is whether a reasonable person would have foreseen a risk of harm in the defendant's conduct. Foreseeability is a question of fact for the jury.

*Torts > Products Liability > General Overview*
*Torts > Products Liability > Strict Liability*
[HN10] The economic loss doctrine bars recovery of purely pecuniary losses in certain tort cases if there is no personal injury or physical damage to property other than the property at issue in the case, usually an allegedly defective product in a products liability case. Arkansas has rejected the economic loss doctrine in strict liability cases.

*Civil Procedure > Removal > Proceedings > Fraudulent Joinder*
*Civil Procedure > Joinder of Claims & Remedies > Misjoinder*
[HN11] The theory of "fraudulent misjoinder" or "procedural misjoinder" requires a court to look to whether different claims have been improperly joined together. Unlike traditional fraudulent joinder arguments, this is a question of state court procedure, and does not require the court to look at the substantive merits of the claims under state law.

*Civil Procedure > Removal > Proceedings > Fraudulent Joinder*

*Civil Procedure > Joinder of Claims & Remedies > Misjoinder*

[HN12] Misjoinder may be just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action.

*Civil Procedure > Removal > Proceedings > Fraudulent Joinder*
*Civil Procedure > Joinder of Claims & Remedies > Misjoinder*

[HN13] The theory of procedural misjoinder articulated in Tapscott v. MS Dealeer Service Corp. is inherently ambiguous, because "mere misjoinder" does not necessarily constitute fraudulent misjoinder. Rather, the misjoinder must be so egregious as to constitute fraudulent joinder. This requires "something more" than mere misjoinder, but precisely what the "something more" is was not clearly established in Tapscott and has not been established since.

*Civil Procedure > Parties > Joinder > Permissive Joinder*

[HN14] Ark. R. Civ. P. 20(a) is similar to *Fed. R. Civ. P. 20(a)* and allows all persons to be joined as defendants if the plaintiff's claims: (1) arise out of the same transaction and occurrence and (2) present a common question of law or fact. Under both federal and Arkansas law, the purpose of the rule relating to joinder is to promote trial convenience and expedite final determinations. In ascertaining whether a particular factual situation constitutes a single transaction or occurrence for purposes of *Rule 20*, a case by case approach is generally pursued. The United States Court of Appeals for the Eighth Circuit has provided a very broad definition for the term "transaction." "Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. Accordingly, all "logically related" events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence. The analogous interpretation of the terms as used in *Rule 20* would permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary.

**COUNSEL:** [*1] For Randy Schafer, End of the Road Farms, Inc., Schafer Planting Company, a partnership, Wallace Farms, a partnership, Robert E. Moery, Kyle Moery, Carter Farms Partnership, a partnership, Petrus Farms, Inc., Robert Petrus, Petrus Seed & Grain Company, Inc., Gosney Farms, a partnership, Randall Amaden, R&B Amaden Farms, a partnership, Randall J.

Snider, S&R Farms, a partnership, AS Kelly & Sons, a partnership, Plaintiffs: James J. Thompson, Jr., LEAD ATTORNEY, HARE AND WYNN, Birmingham, AL, US; Jerry Kelly, LEAD ATTORNEY, KELLY LAW FIRM - CARLISLE, Carlisle, AR, US; John Paul Byrd, LEAD ATTORNEY, HARE AND WYNN, Little Rock, AR, US; R. Margaret Dobson, LEAD ATTORNEY, Dobson Law Firm, P.A., Sheridan, AR, US.

For Bayer CropScience LP, Defendant: Edwin L. Lowther, Jr., Gordon S. Rather, Jr., LEAD ATTORNEYS, WRIGHT AND LINDSEY, Little Rock, AR; Terry R. Lueckenhoff, LEAD ATTORNEY, Blackwell Sanders Peper Martin LLP, St. Louis, MO; Frank A. Wood, Jr., WATKINS AND EAGER PLLC, Jackson, MS, US.

For Bayer Cropscience Holding II, Inc., Defendant: Edwin L. Lowther, Jr., LEAD ATTORNEY, WRIGHT AND LINDSEY, Little Rock, AR; Terry R. Lueckenhoff, LEAD ATTORNEY, Blackwell Sanders Peper Martin LLP, St. [*2] Louis, MO.

For Bayer Cropscience USA, LP, Defendant: Terry R. Lueckenhoff, LEAD ATTORNEY, Blackwell Sanders Peper Martin LLP, St. Louis, MO.

**JUDGES:** CATHERINE D. PERRY, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CATHERINE D. PERRY

**OPINION**

*MEMORANDUM AND ORDER*

Plaintiffs have moved to remand this case to state court. When the Bayer defendants removed the case, they asserted that plaintiffs had no real claim against the non-diverse defendant, Riceland Foods, but had instead joined Riceland fraudulently for the purpose of defeating diversity jurisdiction. They also asserted that plaintiffs improperly joined together their claims against Riceland and their claims against Bayer, again for the purpose of defeating diversity. I conclude that defendants have not established that Arkansas law precludes the existence of plaintiffs' claims against Riceland. I also conclude that plaintiffs' joinder of their claims against the defendants was not "egregious misjoinder." I will therefore grant plaintiffs' motion to remand.

*Discussion*

Plaintiffs are rice farmers, and all but two of them are members of defendant Riceland Foods, Inc., an agricultural co-op. They originally filed this action in Arkansas state court, naming Bayer Cropscience [*3] LP,

Bayer CropScience Holding Inc., and Riceland Foods, Inc. as defendants. The Bayer defendants removed the case to federal court on the basis of diversity jurisdiction. The case was transferred to me for pretrial proceedings as part of the multi-district litigation. Plaintiffs are Arkansas citizens; the Bayer defendants are citizens of states other than Arkansas, but Riceland is a citizen of Arkansas.

Bayer has developed a genetically modified (GM) long-grain rice variety known as LLRICE 601. At the time the plaintiffs planted their rice crops in the spring of 2006, that rice had not been approved for human consumption. In August of 2006, it was revealed that the United States long-grain rice supply was contaminated with LLRICE 601, and the price of rice dropped dramatically. The market for American rice suffered significantly, in part because of the European aversion to any genetically modified foods. Plaintiffs allege that Riceland knew, as early as January 2006, that some of the nations' rice supply was contaminated with GM rice; they allege that Riceland gained additional relevant information before the planting season, but did not disclose it. Plaintiffs say they would not have [*4] planted long-grain rice in the spring of 2006 had they known what Riceland knew about LLRICE 601 contamination.

Plaintiffs sued the Bayer defendants for negligently allowing the GM rice to contaminate the rice supply. They sued Riceland for fraud and negligent non-disclosure, alleging that because Riceland had a fiduciary duty to its members and because Riceland had superior knowledge, it had a duty to tell them about the contamination before they planted their 2006 rice crop. [1]

> [1] They also allege that Riceland had a duty to the general public to disclose the information -- which is necessary for the two non-members to have a claim. If there is no diversity as to the member plaintiffs, however, I must remand the case, so I need not consider the non-member plaintiffs' claims at this stage.

### 1. Fraudulent Joinder

[HN1] A defendant may remove an action from state court to federal district court if the action is within the district court's original jurisdiction, unless an act of Congress expressly provides otherwise. *28 U.S.C. § 1441(a).* [HN2] Under the doctrine of "fraudulent joinder," a court may disregard the citizenship of a non-diverse defendant who is frivolously joined in an effort to defeat removal [*5] of a diversity case. *Commercial Sav. Bank v. Commercial Fed. Bank, 939 F. Supp. 674, 680 (N.D. Iowa 1996).* Bayer CropScience, L.P., as the party seeking removal and opposing remand, has the burden of establishing federal subject-matter jurisdiction. *In re Business*

*Men's Assur. Co. of America, 992 F.2d 181, 183 (8th Cir. 1993)* (citing *Bor-Son Bldg. Corp. v. Heller, 572 F.2d 174, 181 n. 13 (8th Cir. 1978)).*

[HN3] "Joinder is fraudulent and removal is proper when there exists no reasonable basis in fact and law supporting a claim against the resident defendants." *Wiles v. Capitol Indem. Corp., 280 F.3d 868, 871 (8th Cir. 2002)* (citation omitted). In analyzing fraudulent joinder, the court focuses not on the artfulness of the pleadings but on "whether there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved." *Wilkinson v. Shackelford, 478 F.3d 957, 963 (2007)* (quoting *Filla v. Norfolk S. Ry., 336 F.3d 806, 811 (8th Cir. 2003)).*

In support of their contention that Riceland is fraudulently joined, defendants argue: (1) that Riceland did not have a duty to disclose the information allegedly withheld; (2) plaintiffs have not sufficiently [*6] alleged a factual basis for the allegation that Riceland knew of the LLRICE 601 in the rice supply; (3) it was not reasonably foreseeable to Riceland that plaintiffs would plant a different crop had they known of the problem; (4) that the economic loss doctrine bars plaintiffs' claims, and (5) that plaintiffs have insufficiently pled fraud.

### a. Duty to Disclose

Plaintiffs' fraud and negligent non-disclosure claims against Riceland require that Riceland had a duty to disclose to its members what it knew about the GE contamination. *See Temporomandibular Joint Implants Products Liability Lit., 113 F.3d 1484, 1497 (8th Cir. 1997)* ([HN4] fraud claim under Arkansas law requires deliberate concealment or "silence in the face of a duty to speak"); *Farm Bureau Policy Holders and Members v. Farm Bureau Mutual Ins. Co., 335 Ark. 285, 984 S.W.2d 6, 14 (Ark. 1998)* ("Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate . . . whether the duty arises from a relation of trust, . . .").

Riceland admits that it is a fiduciary of the member plaintiffs, but defendants argue that Riceland's fiduciary duties were limited to milling and marketing, [*7] and that Riceland had no duty with regard to its members' choices of what to plant. Although defendants have cited to a few cases indicating that a co-op has a fiduciary duty with regard to milling and marketing, they point to no case law ? and I have found none ? that would limit this duty to those areas.

[HN5] In the absence of Arkansas law precluding the existence of a duty in this situation, my job is "limited to determining whether there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved." *Filla, 336 F.3d*

*at 811.* In making this determination, I must "resolve all facts and ambiguities in the current controlling substantive law in the plaintiff's favor," and I have no responsibility to definitively settle ambiguous questions of state law. *Id. at 811.*

The only Arkansas case cited by the defendants regarding a co-op's duties to its members dealt with contractual duties, and does not even use the term "fiduciary," so it certainly cannot be read to preclude a fiduciary duty in this situation. *See McCauley v. Arkansas Rice Growers' Co-op, Ass'n, 171 Ark. 1155, 287 S.W. 419 (Ark. 1926).* [HN6] Under Arkansas law, a fiduciary or confidential relationship [*8] arises "whenever there is a relation of dependence or confidence." *Wesley v. Estate of Bosley, 81 Ark. App. 468, 105 S.W.3d 389, 394 (Ark. App. 2003).* [HN7] Courts from other jurisdictions that have considered the question have found a fiduciary relationship between a co-op and its member farmers when: "(1) one of the parties enjoyed superior or excessive influence over the other; (2) the parties had a confidential relationship and one of the parties had greater access to facts and legal resources; or (3) there was a disparity of business experience and an invitation to the party with lesser experience to place confidence in the advice of the other party." *Top of Iowa Cooperative v. Schewe, 149 F. Supp. 2d 709, 718 (N.D. Iowa 2001).* In *Asa-Brandt, Inc. v. ADM Investor Serv., Inc., 344 F.3d 738, 745 (8th Cir. 2003),* applying Iowa law, the court noted that a co-op's fiduciary duty could arise out of the co-op's advice about "growing and marketing" the members' crops.

There is no Arkansas law that says a co-op's fiduciary duty is limited to the selling end of crop production. The farmers and Riceland had an ongoing relationship – this was not a one-time buyer/seller type relationship. It simply makes no sense [*9] to argue that a duty regarding marketing cannot extend to the issue of what crops should be marketed. I must resolve all facts and ambiguities in the current controlling substantive law in plaintiffs' favor, and under this standard I cannot conclude that, as a matter of Arkansas law, Riceland had no duty to speak. While an Arkansas court might reach that conclusion if it considered the facts of a particular case, none has done so, and it is entirely likely that there could be a factual scenario where a farmer could prove that the co-op's fiduciary duty extended to what crops to plant. Defendants have not met their burden of showing that plaintiffs lack a colorable cause of action. *Filla, 336 F.3d at 810.* Under these circumstances, [HN8] the "better practice is for the federal court not to decide the doubtful question [of state law] in connection with a motion to remand but simply to remand the case and leave the question for the state courts to decide." *Id. at 811* (quoting *Iowa Public Service, 556 F.2d at 406*).

### b. Sufficiency of Allegations that Riceland Knew of LLRICE 601 in the Rice Supply

Defendants next argue I should find fraudulent joinder based on plaintiffs' failure to plead that Riceland [*10] knew of the contamination by LLRICE 601. Plaintiffs' complaint alleges, and Riceland has admitted, that it first knew of some genetically engineered rice contamination in January 2006. Defendants contend that there was no confirmation that it was LLRICE 601 until after the planting season. If Riceland had any duty to disclose, the duty did not depend on its knowledge of the specific type of GM rice that had contaminated some portion of the rice supply. Plaintiffs have a colorable claim, and I will not find fraudulent joinder on this basis.

### c. Foreseeability that Plaintiffs Would Plant a Different Crop

Defendants contend that plaintiffs' claims against Riceland must fail because it was not reasonably foreseeable that plaintiffs would have planted a different crop had they known of the contamination. [HN9] Under Arkansas law, the question is whether a reasonable person would have foreseen a risk of harm in Riceland's conduct. *Catlett v. Stewart, 304 Ark. 637, 804 S.W.2d 699, 703 (Ark. 1991).* Defendants' argument here is really that these rice farmers would not have switched to something other than long-grain rice -- but these farmers have alleged that they would have done so, and I have no basis to conclude [*11] that this allegation is false. Foreseeability is a question of fact for the jury, and again, plaintiffs have made a colorable argument.

### d. The Economic Loss Doctrine

[HN10] The economic loss doctrine bars recovery of purely pecuniary losses in certain tort cases if there is no personal injury or physical damage to property other than the property at issues in the case – usually an allegedly defective product in a products liability case. *See, e.g., Transport Corp. of America, Inc. v. International Business Machines Corp., Inc., 30 F.3d 953, 956 (8th Cir. 1994).* Arkansas has rejected the economic loss doctrine in strict liability cases. *See Farm Bureau Ins. Co. v. Case Corp., 317 Ark. 467, 878 S.W.2d 741, 743 (Ark. 1994); Alaskan Oil, Inc. v. Central Flying Serv., Inc., 975 F.2d 553, 555 (8th Cir. 1992); Berkeley Pump Co. v. Reed-Joseph Land Co., 653 S.W.2d 128, 131, 279 Ark. 384 (Ark. 1983).* Defendants cannot cite any Arkansas case that applies the economic loss doctrine to negligence claims, [2] but instead rely on *In re Starlink Corn Prod. Liab. Lit., 212 F. Supp. 2d 828 (N.D. Ill. 2002)* and *Sample v. Monsanto Co., 283 F. Supp. 2d 1088, 1092-94 (E.D. Mo. 2003),* two federal cases where the economic loss doctrine has been [*12] applied in cases involving genetically modified plants.

2  Defendants cite four cases dealing with the economic loss rule under Arkansas law. Three of those cases, cited above, reject the economic loss rule for strict liability, taking the minority approach. The fourth case, *Wallis v. Ford Motor Co., 362 Ark. 317, 208 S.W.3d 153 (Ark. 2005)*, held that a fraud claim could not be maintained for an allegedly defective vehicle where the only injury alleged was diminution in value of the vehicle itself. The plaintiffs had not alleged that they did not receive the automobiles they bargained for ? as the vehicles had not malfunctioned in any way ? and for that reason the court rejected the fraud claim. Plaintiffs here are not alleging that Riceland sold them a product that was defective or was worth less than Riceland had represented, and *Wallis* has no application here.

In *Starlink*, the court applied the economic loss rules of Wisconsin and Illinois to a case involving the contamination of corn with GM corn. The court found that the economic loss doctrine did not apply because plaintiffs' non-GM crop was contaminated. *212 F. Supp. 2d at 841-42.* In *Sample*, the court applied the economic loss rule under Illinois [*13] and Iowa law to bar the farmers' public nuisance and negligence claims after they had abandoned any allegations of contamination. *283 F. Supp. 2d at 1092.* Neither case involved a claim of fraudulent joinder to defeat diversity jurisdiction; instead, they considered motions to dismiss or for summary judgment, and, most importantly, they applied established state law. Given that Arkansas does not apply the economic loss doctrine even in the strict liability context, there is certainly an arguably reasonable basis to conclude that it would not apply the economic loss doctrine here.

### e. Fraud Allegations

Defendants argue that plaintiffs have not sufficiently pleaded the fraud allegations with particularity. Under the circumstances of this case, where the fraud arises from silence, plaintiffs have sufficiently alleged all of the elements of their fraud claims.

### 2. Misjoinder

Defendants also argue that plaintiffs wrongfully joined their claim against Riceland with their claims against Bayer to defeat diversity jurisdiction. [HN11] This theory has been referred to as "fraudulent misjoinder" or "procedural misjoinder," and requires the court to look to whether different claims have been improperly joined [*14] together. Unlike traditional fraudulent joinder arguments, this is a question of state court procedure, and does not require the court to look at the substantive merits of the claims under state law.

The theory of fraudulent misjoinder is said to have begun with *Tapscott v. MS Dealer Service Corp., 77 F.3d 1353 (11th Cir. 1996), abrogated on other grounds, Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000)*. In *Tapscott*, two separate groups of plaintiffs attempted to merge two distinct lawsuits in order to avoid federal jurisdiction. The combination of the two lawsuits destroyed diversity, but none of the plaintiffs or defendants overlapped between these two distinct claims. The plaintiffs conceded that the two groups of claims were not properly joined under *Fed. R. Civ. P. 20(a)*, and instead argued that a misjoinder, no matter how egregious, could not constitute fraudulent joinder. The Eleventh Circuit disagreed, holding that [HN12] "[m]isjoinder may be just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action." *Id. at 1360.*

District court cases have reached varying results when faced with this argument. *Compare In re: Diet Drugs, 294 F. Supp. 2d 667 (E.D. Pa. 2003) [*15]* (applying *Tapscott* and finding egregious misjoinder where plaintiffs attempted to join non-diverse New Jersey plaintiffs who had no connection to the other plaintiffs except that each ingested diet drugs), *with Osborn v. Metropolitan Life Ins. Co., 341 F. Supp. 2d 1123, 1127-28 (E.D. Cal. 2004)* (declining to apply *Tapscott's* theory of misjoinder, and thus granting plaintiffs' motion to remand). [HN13] The theory of procedural misjoinder articulated in *Tapscott* is inherently ambiguous, because the court held that "mere misjoinder" does not necessarily constitute fraudulent misjoinder. *77 F.3d at 1360.* Rather, the misjoinder must be "so egregious as to constitute fraudulent joinder." *Id.* As one court noted, this holding requires "something more" than mere misjoinder, but "[p]recisely what the 'something more' is was not clearly established in *Tapscott* and has not been established since." *In re Bridgestone/Firestone, Inc., 260 F. Supp. 2d 722, 728 (S.D. Ind. 2003).* The parties' briefs in this case fail to even address this standard.

The Eighth Circuit has not considered the theory of procedural misjoinder. For purposes of this decision, I will assume that there are some situations where misjoinder [*16] would be so egregious that it should not defeat removal jurisdiction. I need not determine how to define that egregiousness, however, because I conclude that the claims here were not misjoined.

[HN14] *Arkansas Rule of Civil Procedure 20(a)* is similar to *Rule 20(a), Fed. R. Civ. P.*, and allows all persons to be joined as defendants if the plaintiff's claims: (1) arise out of the same transaction and occurrence and (2) present a common question of law or fact. Under both federal and Arkansas law, the purpose of the rule relating to joinder is to promote trial convenience and expedite final determinations. *See Mosley v. General Motors*

*Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974); *Pennington v. Harvest Foods, Inc.*, 326 Ark. 704, 934 S.W.2d 485, 491 (Ark. 1996). "In ascertaining whether a particular factual situation constitutes a single transaction or occurrence for purposes of *Rule 20*, a case by case approach is generally pursued." *Mosley*, 497 F.2d at 1333 (citation omitted). The Eighth Circuit has provided a very broad definition for the term "transaction":

"Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection [*17] as upon their logical relationship. Accordingly, all "logically related" events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence. The analogous interpretation of the terms as used in *Rule 20* would permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary.

*Id. at 1333* (citations omitted).

Applying this generous standard, the Court in *Mosley* held that ten plaintiffs could join their individual claims of race discrimination in a suit against their employer, even though they alleged different effects, because all claims stemmed from the defendant's same company-wide policy. *497 F.2d at 1333-34*.

In this case, the claims against all defendants relate to the plaintiffs' ability to sell their rice after the rice supply became contaminated by LLRICE 601. Specifically, plaintiffs allege that Bayer's negligence allowed LLRICE 601 to escape into the nation's rice supply. Plaintiffs al-

lege that Riceland learned of the contamination but failed to tell the farmers, so plaintiffs planted long-grain rice in ignorance of [*18] the contamination issues. This amounts to a series of interrelated transactions among all the defendants. The claims share numerous factual issues, including the issues of how the contamination occurred and what effect it had on the market. Although plaintiffs' claims against Riceland are distinct from their claims against the Bayer defendants, joinder is proper because the claims arise out of the same series of transactions or occurrences and have common questions of fact.

### Conclusion

Defendants have failed to establish that plaintiffs lack a colorable claim against Riceland, and they have failed to show that the claims against the two defendants should not have been joined in one suit. As a result, diversity of citizenship does not exist, and I will remand the case.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion to remand [# 277, # 4, # 9] is granted, and the Clerk of Court shall remand this matter to the Circuit Court of Lonoke County, Arkansas, from which it was removed.

**IT IS FURTHER ORDERED** that plaintiffs' motion for leave to file attachment and supplemental authority [# 376, # 16] is granted.

**IT IS FURTHER ORDERED** that defendants' motion for leave to serve remand-related [*19] discovery [# 306, # 10] is denied.

CATHERINE D. PERRY

UNITED STATES DISTRICT JUDGE

Dated this 15th day of October, 2007.

# EXHIBIT 3

## Part 3 of 5

Slip Copy                                                                 Page 1
Slip Copy, 2006 WL 3754823 (N.D.Ill.)
**2006 WL 3754823 (N.D.Ill.)**

**H**In re Sears, Roebuck & Co. Tools Marketing and
Sales Practices Litigation
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
In re SEARS, ROEBUCK & CO. TOOLS
MARKETING AND SALES PRACTICES
LITIGATION.
Charles Chatham et al., individually and on behalf of
all others similarly situated, Plaintiffs,
v.
Sears, Roebuck & Co., Defendant.
**Nos. 05 C 4742, 05 C 2623.**

Dec. 18, 2006.

Ben Barnow, Sharon Harris, Barnow & Associates,
P.C., Marvin Alan Miller, Jennifer Winter Sprengel,
Nyran Rose Pearson, Miller Faucher and Cafferty,
LLP, Aron David Robinson, Law Office of Aron D.
Robinson, James S. Shedden, Lawrence Wiley
Schad, Tony Kim, Schad, Diamond & Shedden, P.C.,
Michael S. Hilicki, Lawrence Walner & Associates,
Ltd., Chicago, IL, Barbara J. Hart, Kimberly I.
Nelson, Shelley Thompson, Goodkind, Labaton,
Rudoff & Sucharow, LLP, New York, NY, for
Plaintiffs.
Francis A. Citera, John F. Gibbons, Paul Joseph
Ferak, Greenberg Traurig, LLP, Chicago, IL, for
Defendant.

### *MEMORANDUM OPINION*

JOHN F. GRADY, United States District Judge.
*\*1* Before the court is defendant's motion to dismiss
plaintiffs' unjust enrichment claims brought pursuant
to Illinois law in Count IV of the Second Amended
Consoli Class Action Complaint filed in *Chatham v.
Sears, Roebuck & Co.,* 05 C 2623. For the reasons
explained below, the motion is granted.

### *BACKGROUND*

In this putative class action, plaintiffs, who are
citizens of several different states, claim that

defendant Sears, Roebuck & Company ("Sears")
deceptively advertised its proprietary line of
"Craftsman" tools as manufactured exclusively in the
United States ("Made in USA") when in fact many of
the tools are foreign-made or contain significant
foreign parts.

Plaintiffs' current complaint is titled "Second
Amended Consolidated Class Action Complaint."In
our Pretrial Order Number 6 of July 31, 2006, we
dismissed Counts I and II of the complaint (which
alleged violations of the Illinois Consumer Fraud and
Deceptive Business Practices Act and the Illinois
Deceptive Trade Practices Act) with prejudice as to
all plaintiffs except William Beanblossom and John
S. Bertrand. We dismissed Beanblossom and
Bertrand's claims without prejudice for failure to
allege fraud with particularity. (Since then, Bertrand
voluntarily dismissed his claims; thus, Beanblossom
is the only remaining Illinois plaintiff.) We also
dismissed Count VII, the Magnuson-Moss claim,
with prejudice as to all plaintiffs. And as to certain
plaintiffs, we dismissed Count III, which is alleged in
the alternative to Counts I and II and in which
plaintiffs seek damages and/or injunctive relief under
the consumer fraud and deceptive trade practices of
all fifty states and the District of Columbia.

Other claims asserted by plaintiffs are Count IV, an
unjust enrichment claim, and Count VI, a claim for
"equitable relief." [FN1] As to Count IV, we stated in
our previous order: "It appears to the court that the
claim most likely to involve an amount of money
sufficient to support federal diversity jurisdiction in
this case, either on an individual or a class basis, is
plaintiffs' claim for unjust enrichment .... Defendant
believes that there is no basis for the unjust
enrichment claim, and a briefing of the issues
regarding Count IV will be the next item of business
in the litigation."(Pretrial Order Number 6 at 5.) We
gave Sears leave to file a motion to dismiss Count IV
and set a briefing schedule, instructing the parties to
focus on the issues of what state's law applies to the
unjust enrichment claims and whether a nexus must
exist between the injury sustained by a plaintiff and
the amount of recoverable disgorgement of
defendant's profits. The motion to dismiss is now
fully briefed.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3754823 (N.D.Ill.)
**2006 WL 3754823 (N.D.Ill.)**

FN1. The complaint does not contain a Count V.

### DISCUSSION

#### A. Choice of Law

Our first inquiry is the choice-of-law question-which state's (or states') law applies to plaintiffs' unjust enrichment claims. The parties do not agree on this issue. Even though plaintiffs are citizens of several different states, they all contend that Illinois law applies to their claims (evidently because they are seeking certification of a nationwide class).[FN2] Defendant, on the other hand, contends that the claims are governed by the laws of the various states where each plaintiff saw the advertising and purchased his or her tools.[FN3]

> FN2. In the alternative, plaintiffs contend that the unjust enrichment laws of their home states or the states where they purchased Craftsman tools apply. (Second Amended Consolidated Class Action Complaint ¶ 125.)

> FN3. We refer to these states for convenience as plaintiffs' "home states," even though at least one of the plaintiffs purchased some of her tools in a state where she does not reside.

Plaintiffs suggest that it is not necessary to engage in a choice-of-law analysis (implying that we should simply apply Illinois law) because the unjust enrichment laws of the fifty states are "substantially identical." (Pls.' Opp'n to Def.'s Mot. at 10.) We are unpersuaded. Plaintiffs attach an exhibit that purports to be a fifty-state survey of unjust enrichment. However, it is merely a list of one-sentence statements of the elements of unjust enrichment drawn from a single case from each state. Plaintiffs do not engage in any sort of analysis of the nuances of unjust enrichment law or what must actually be proved in each state. It is clear just from our review of Illinois law

that unjust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone amongst the fifty states. As discussed in *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 501 (S.D.Ill.1999) (citations omitted): "[V]ariances exist in state common laws of unjust enrichment. The actual definition of 'unjust enrichment' varies from state to state. Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud. Other states only allow a claim of unjust enrichment when no adequate legal remedy exists. Many states, but not all, permit an equitable defense of unclean hands. Those states that permit a defense of unclean hands vary significantly in the requirements necessary to establish the defense."

**\*2** The parties do agree that because Illinois is the forum state of this diversity case, we must consult the choice-of-law rules of Illinois to determine which state's substantive law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *GATX Leasing Corp. v. National Union Fire Ins. Co.,* 64 F.3d 1112, 1114 (7th Cir.1995). The Illinois Supreme Court uses the "most significant relationship" test for choosing the appropriate law in tort cases.[FN4]The Seventh Circuit has stated:

> FN4. We recognize that Count IV is an unjust enrichment claim, not a tort claim. It is, however, an unjust enrichment claim that sounds in tort; it is based on alleged wrongful conduct, fraud. Under Illinois law, there are three distinct prongs of unjust enrichment: (1) where a benefit should have been given to plaintiff, but a third party mistakenly gave it to defendant instead; (2) where the defendant procured the benefit through some type of wrongful conduct; and (3) where plaintiff had a better claim to the benefit than the defendant for some other reason. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). Plaintiffs rely on the second prong. It makes

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

more sense, therefore, to use tort terminology in the choice-of-law analysis.

The parties devote considerable attention to which section of the Restatement (Second) of Conflict of Laws has the greatest application to this case- § 6 or § 221-which is not worth belaboring. Comment a to § 221 states explicitly that that section "applies to claims, which are based neither on contract nor on tort, to recover for unjust enrichment."Plaintiffs' claim is an unjust enrichment claim that is based on tort. Thus, § 221 does not apply. But in any event, its substance is largely the same as the tort choice-of-law analysis outlined *infra.*For example, one of the elements of the choice-of-law analysis set forth in § 221 is "the place where the act conferring the benefit or enrichment was done," which is the same as "the place of the injury." Under both analyses, we examine the domicile of the parties and the place where the relationship between the parties was centered. And as for § 6, which sets forth general principles of choice of law, we analyze the primary choice-of-law factors set forth in Illinois case law in the context of the underlying principles set forth in § 6.

The Illinois Supreme Court uses the "most significant relationship" test for choosing the appropriate law in tort cases. In practice, this means that "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties."A court is to determine whether Illinois has the more significant relationship by examining the following factors: (1) the place of the injury, (2) the place where the injury-causing conduct occurred, (3) the domicile of the parties, and (4) the place where the relationship between the parties is centered. The Illinois courts also consider "the interests and public policies of potentially concerned states ... as they relate to the transaction in issue." *Fredrick v. Simmons Airlines, Inc.,* 144 F.3d 500, 503-04 (7th Cir.1998) (citing *Esser v. McIntyre,* 169 Ill.2d 292, 214 Ill.Dec. 693, 661 N.E.2d 1138, 1141 (Ill.1996) and *Jones v. State Farm Mut. Auto. Ins. Co.,* 289 Ill.App.3d 903, 224 Ill.Dec. 677, 682 N.E.2d 238, 249 (Ill.App.Ct.1997)).

The place of the injury here (or, in unjust enrichment terms, the place where plaintiffs allegedly "conferred" the benefit on defendant) is the plaintiffs' home states where they purchased Sears's tools. The place where the parties' relationship is centered is the plaintiffs' home states as well. Plaintiffs saw the allegedly misleading advertising in those states, and they purchased the tools (which were located there) in those states as well. Plaintiffs contend that the relationship is centered in Illinois because plaintiffs purchased the tools "by virtue of" Sears's nationwide advertisements, which were conceived of and sent from Illinois. (Pls.' Opp'n to Def.'s Mot. at 10.) This characterization rings hollow. The relationship arose from plaintiffs' purchases of Craftsman tools, which occurred in plaintiffs' home states.[FN5] *Cf. First Wisconsin Trust Co. v. Schroud,* 916 F.2d 394, 399 (7th Cir.1990) (where unjust enrichment claim arose from the purchase of property in Indiana, relationship between the parties was centered in Indiana).

> FN5. As mentioned *supra* note 3, the only exception is plaintiff Janett Foster, who is a citizen of Indiana but purchased tools in both Indiana and Kentucky.

The "domicile of the parties" factor adds little to the mix; it is a wash. The plaintiffs are domiciled in their respective home states, and Sears, though not an Illinois corporation, is headquartered in Illinois. The last factor-the place where the injury-causing conduct occurred-seems to favor Illinois because that is where Sears is headquartered and where its advertising decision-making takes place.

*3 Thus, for the unjust enrichment claims, the parties and underlying occurrences have more significant contacts with plaintiffs' home states than with Illinois. The most important factors in this case are the place of injury and the center of the parties' relationship, and both of those factors point to the plaintiffs' home states. Plaintiffs argue that, considering underlying choice-of-law policies, Illinois has a interest in "controlling the acts" of its corporate citizens. This may be true, but the plaintiffs' home states also have an interest in regulating business conduct that takes place within their borders. In addition, those states also have an interest in preventing and remedying unjust enrichment that occurs at the expense of their

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3754823 (N.D.Ill.)
**2006 WL 3754823 (N.D.Ill.)**

citizens.

After considering all of the relevant factors and the underlying choice-of-law principles, we conclude that the laws of each of the plaintiffs' home states apply to their unjust enrichment claims.[FN6] Accordingly, the non-Illinois plaintiffs' unjust enrichment claims in Count IV that are brought "under the unjust enrichment laws of the state of Illinois" are dismissed with prejudice. The unjust enrichment claims that are brought under the unjust enrichment laws of the non-Illinois plaintiffs' home states or the states where they purchased their Craftsman tools survive.

> FN6. Thus, we need not address defendant's argument that application of Illinois law to the unjust enrichment claims would violate the Commerce Clause of the United States Constitution and the interests of comity.

**B. *Plaintiff Beanblossom's Unjust Enrichment Claim***

As noted *supra*, William Beanblossom is the only remaining Illinois plaintiff. Therefore, his unjust enrichment claim is the only one to which Illinois law applies. Sears moves to dismiss the claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

Sears maintains that Beanblossom's unjust enrichment claim fails because it is equitable in nature and plaintiff fails to allege that he has no adequate remedy at law. It is well settled that a party cannot seek equitable relief when he has an adequate legal remedy. *See, e.g., Crowley v. Golden Rule Ins. Co.,* 166 Ill.App.3d 199, 117 Ill.Dec. 24, 519 N.E.2d 1191, 1192 (Ill.App.Ct.1988). Unjust enrichment, however, is a legal claim. *See Partipilo v. Hallman,* 156 Ill.App.3d 806, 109 Ill.Dec. 387, 510 N.E.2d 8, 11 (Ill.App.Ct.1987); *Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc.,* 135 F.3d 526, 527-28 (7th Cir.1998). Its significant equitable aspects [FN7] have led to numerous confusing statements in case law that it is equitable in nature, but it is essentially an action at law. *Burns,* 135 F.3d at 528.

> FN7. These equitable aspects are not implicated here because plaintiff's claim is based in tort and monetary recovery is sought.

Sears asserts that Beanblossom "cannot state an unjust enrichment claim grounded in quasi-contract because there is a 'real' contract that governs his relationship with Sears."(Def.'s Mem. in Support of Mot. at 9.) This argument is neither here nor there because plaintiffs' unjust enrichment claims are obviously not grounded in quasi-contract. Rather, as discussed *supra* note 4, they are grounded in tort-fraud, to be specific.[FN8]

> FN8. Sears also contends in its reply brief that Beanblossom's claim is doomed by *Shaw v. Hyatt International Corp.,* 461 F.3d 899 (7th Cir.2006), in which the Court of Appeals held that the plaintiff's consumer fraud and unjust enrichment claims failed because what plaintiff called "deception" or "consumer fraud"-charging more than the agreed-upon price for a hotel room-was simply Hyatt's failure to fulfill its contractual obligations. 461 F.3d at 901-02. The Court stated that a "deceptive act or practice" involves more than the mere fact that a defendant promises to do something and then fails to do it. *Id.* at 901.
>
> > *Shaw* is distinguishable from the facts of the instant case. Plaintiffs complain that Sears induced them to buy Craftsman tools by misrepresenting the country of origin of the tools, not simply that Sears made a false promise of future conduct.

Even if Beanblossom's claim is grounded in tort, Sears argues, it must be dismissed because he fails to state an independent claim for consumer fraud, common-law fraud, duress, or undue influence. Plaintiffs respond that they are not required to state a separate claim in order to state an unjust enrichment claim. Both plaintiffs and defendant cite cases that seem to support each of their positions.

**\*4** We have engaged in an exhaustive review of the sometimes-bewildering realm of Illinois unjust enrichment law, and our conclusions are as follows. It is often expressed that in order to state an unjust enrichment claim under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

fundamental principles of justice, equity, and good conscience."*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). The law regarding whether a plaintiff must also show wrongdoing is initially confusing because there are decisions that go both ways. *Compare, e.g., Stathis v. Geldermann, Inc.,* 295 Ill.App.3d 844, 229 Ill.Dec. 809, 692 N.E.2d 798, 811 (Ill.App.Ct.1998) ("A cause of action based upon unjust enrichment does not require fault or illegality on the part of defendants.") *with Alliance Acceptance Co. v. Yale Ins. Agency, Inc.,* 271 Ill.App.3d 483, 208 Ill.Dec. 49, 648 N.E.2d 971, 977 (Ill.App.Ct.1995) (recovery for unjust enrichment permitted only when there is "unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence"). However, as is pointed out in an excellent Illinois Bar Journal article concerning the Illinois law of unjust enrichment, there is a way to reconcile the case law. *See* Ronald M. Lepinskas, *Unjust Enrichment Claims in Illinois: Applying a Venerable Doctrine to Modern Disputes,* 91 Ill. B.J. 514, 517 (2003). We have explained *supra* note 4 that there are three prongs of unjust enrichment: a benefit mistakenly conferred, a benefit procured through wrongful conduct, and a benefit to which plaintiff has a better claim than the defendant for some other reason. Courts have not required proof of wrongful conduct where the factual allegations fall within the "mistakenly conferred" or "better claim" prongs, but they have required such proof of when the allegations fall within the "wrongful conduct" prong. So, while it is correct to say that unjust enrichment is its own claim that does not necessarily require the existence of an underlying claim, or a particular underlying claim, it is also correct to say that when a plaintiff brings an unjust enrichment claim that is based on wrongful conduct, plaintiff must plead and prove that conduct. *See Alliance,* 208 Ill.Dec. 49, 648 N.E.2d at 977;*Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 943 (7th Cir.2001).

Here, plaintiffs allege in Count IV that "Sears has been unjustly enriched by virtue of its false, misleading advertising of Craftsman products."(Second Amended Consolidated Class Action Complaint ¶ 128.) The "unlawful or improper conduct as defined by law,"*Alliance,* 208 Ill.Dec. 49, 648 N.E.2d at 977, is fraudulent misrepresentation. Fraudulent conduct consists of a knowing misrepresentation made with the intent to deceive the plaintiff. *See People v. L & M Liquors, Inc.,* 37

Ill.App.3d 117, 345 N.E.2d 817, 820 (Ill.App.Ct.1976).

Federal Rule of Civil Procedure 9(b) provides that in "all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."In our Order of July 31, 2006, we dismissed Beanblossom's statutory fraud claims in the Second Amended Consolidated Class Action Complaint for failure to allege fraud with particularity because Beanblossom fails to allege where he saw the advertisements on which he based his belief that Craftsman tools were made in the United States. (He alleges broadly that he "heard advertisements for Craftsman products on the radio and saw advertisements for Craftsman products in magazines, newspapers, and on displays and banners in a Sears store," Second Amended Consolidated Class Action Complaint ¶ 8.) We indicated that we would entertain a motion to file a third amended complaint, but Beanblossom has never presented such a motion. Therefore, there is no allegation of the requisite fraudulent conduct, and the unjust enrichment claim must also be dismissed. Like the dismissal of his statutory fraud claims, the dismissal of Beanblossom's unjust enrichment claim will be without prejudice.

### C. *Disgorgement of Profits*

*\*5* We asked the parties to brief the issue of whether, under Illinois law, a nexus must exist between the injury sustained by a plaintiff and the amount of recoverable disgorgement of defendant's profits. In view of our dismissal of all of the unjust enrichment claims brought pursuant to Illinois law, we need not address this issue at this juncture.

### *CONCLUSION*

Defendant's motion to dismiss plaintiffs' unjust enrichment claims brought pursuant to Illinois law in Count IV of the Second Amended Consolidated Class Action Complaint filed in *Chatham v. Sears, Roebuck & Co.,* 05 C 2623, is granted. The non-Illinois plaintiffs' unjust enrichment claims in Count IV that are brought "under the unjust enrichment laws of the state of Illinois" are dismissed with prejudice. Plaintiff William Beanblossom's unjust enrichment claim is dismissed without prejudice.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3754823 (N.D.Ill.)
**2006 WL 3754823 (N.D.Ill.)**

A status hearing is set for January 10, 2007, at 11:30 a.m. to discuss the next steps in this litigation.

N.D.Ill.,2006.
In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation
Slip Copy, 2006 WL 3754823 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                                Page 1
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))
**2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))**

◼Leal v. Weightman
Tex.App.-Hous. [1 Dist.],2004.
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.
**MEMORANDUM OPINION**
Court of Appeals of Texas,Houston (1st Dist.).
Nelda LEAL d/b/a Rotating Services Industries, Inc.,
Appellant
v.
Kathleen WEIGHTMAN, Appellee.
**No. 01-03-01006-CV.**

Oct. 7, 2004.

On Appeal from the County Civil Court at Law No.
2, Harris County, Texas, Trial Court Cause No.
789,982.

Joseph Onwuteaka, Law Offices of Joseph
Onwuteaka, P.C., Houston, TX, for Appellant.
Peter M. Kelly, Hogan & Hogan, L.L.P., Houston,
TX, Dennis Richard Mundy, Olivier & Mundy,
L.L.P., Tomball, TX, for Appellee.

Panel consists of Justices TAFT, JENNINGS, and
BLAND.

**MEMORANDUM OPINION**

TERRY JENNINGS, Justice.
*1 Appellant, Nelda Leal d/b/a Rotating Services
Industries, Inc. (Leal), challenges the trial court's
rendition of summary judgment in favor of appellee,
Kathleen Weightman (Weightman), in Leal's suit for
breach of a loan agreement. In five issues, Leal
contends that the trial court erred in granting
Weightman's no-evidence summary judgment motion
because (1) Leal produced more than a scintilla of
evidence establishing the existence of an express oral
contract; (2) Weightman, in her motion, did not state
the elements of Leal's claim as to which there was no
evidence; (3) Leal produced more than a scintilla of
evidence to establish the existence of an implied
contract; (4) Leal produced more than a scintilla of

evidence to establish her "unjust enrichment" cause
of action; and (5) Weightman, in her motion, did not
argue that Leal had no evidence to support her
"unjust enrichment" cause of action. We reverse and
remand in part and affirm in part.

**Facts**

Up until 1998, Weightman's husband, now deceased,
owned and operated Rotating Services, Inc. (RSI), a
business that repaired and sold parts for steam
turbines. However, in 1998, the Small Business
Administration foreclosed on a loan it had made to
RSI, and Leal, who was employed by RSI, purchased
the company at a foreclosure sale. Thereafter, Leal
renamed the company "Rotating Services Industries,
Inc." and retained Weightman's husband as an
employee at a salary of $3,362 per month.

Following the foreclosure sale, Weightman and her
husband, who were having financial problems,
approached Leal for help. Leal agreed to help them,
and she began sending checks to Weightman and to
her husband. Leal also sent checks, on the
Weightmans' behalf, to their attorney and to the
Internal Revenue Service (IRS).

In 2001, after spending an unspecified amount of
time in prison, Weightman's husband died.
Thereafter, Leal contacted Weightman and demanded
that she repay the money that Leal had given to
Weightman and to her husband. When Weightman
refused, Leal filed this lawsuit, alleging that
Weightman had breached a loan agreement that she
had entered into with Leal and that she owed Leal
$66,551.72.

In response, Weightman filed a no-evidence
summary judgment motion, asserting that Leal
"[could not] prove the existence of a contract with
[Weightman]." In support of her motion, Weightman
attached deposition testimony from Leal, who had
testified that she and the Weightmans had never
executed a written loan agreement or a promissory
note. Leal also testified that she and the Weightmans
never discussed "how much [of the alleged loan] was
to be paid back," "the payment plan," or "an interest

Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))
**2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))**

rate."

Leal filed a response to Weightman's motion, asserting that Leal and Weightman had both an"[i]mplied in law" and an "[i]mplied in fact" contract, that Leal "advanced monies to [Weightman] and/or [on] her behalf," and that Leal "expected to be paid." In support of her response, Leal attached her own affidavit, in which she stated that, in 1998, she had agreed to assist the Weightmans financially, "with the understanding that they would pay me back."Leal also explained that Weightman's husband had agreed to repay Leal when he was sentenced to "jail" or when he was released. Leal also attached to her response copies of 21 checks that she had written to Weightman, to Weightman's husband, to their attorney, and to the IRS. The checks, totaling $63,248, were all drawn on the bank account of Rotating Services Industries, Inc.

*2 On August 22, 2003, following a hearing, the trial court issued an order granting Weightman's no-evidence summary judgment motion. In its order, the trial court concluded, in pertinent part, as follows:

[T]here is no evidence to support [Leal's] claim that [Weightman] entered into a contract to borrow money from [Leal], or that [Weightman] entered into a loan contract with [Leal].

**No-Evidence Summary Judgment**

To prevail on a no-evidence summary judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's claim.TEX.R. CIV. P. 166a(i); *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002); *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.,* 994 S.W.2d 830, 834 (Tex.App.-Houston [1st Dist.] 1999, no pet.). Although the non-moving party is not required to marshal its proof, it must present evidence that raises a genuine fact issue on each of the challenged elements. TEX.R. CIV. P. 166a(i). A no-evidence summary judgment motion may not properly be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements.*Id.;Spradlin v. State,* 100 S.W.3d 372, 377 (Tex.App.-Houston [1st Dist.] 2002, no pet.). More than a scintilla of evidence exists when the evidence "rises to a level

that would enable reasonable and fair-minded people to differ in their conclusions."*Merrell Dow Pharms. Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). When reviewing a no-evidence summary judgment motion, we assume that all evidence favorable to the non-movant is true, and we indulge every reasonable inference and resolve all doubts in favor of the non-movant.*Spradlin,* 100 S.W.3d at 377.

*Adequacy of Weightman's Motion*

In her second issue, Leal argues that the trial court erred in granting Weightman's no-evidence summary judgment motion because the motion did not state the elements of Leal's claim as to which there was no evidence and that it was "simply a conclusionary [sic] challenge to [Leal's] case."

Rule 166a(i) provides that, to be entitled to no-evidence summary judgment, a movant must specify, in his motion, that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX.R. CIV. P. 166a(i).

Here, Weightman, in her motion, specifically asserted that Leal "[could not] prove the existence of a contract with [Weightman]." The existence of a valid contract is an essential element of a breach of contract cause of action.*Hussong v. Schwan's Sales Enters., Inc.,* 896 S.W.2d 320, 326 (Tex.App.-Houston [1st Dist.] 1995, no writ). Accordingly, because Weightman's motion specified that Leal had no evidence of an essential element of her breach of contract cause of action, we hold that the motion complied with the requirements of Rule 166a(i).

*3 We overrule Leal's second issue.

*Express Oral Contract*

In her first issue, Leal argues that the trial court erred in granting Weightman's motion because "her affidavit and the checks received by [Weightman] and made payable to [Weightman] and/or for her benefit" provide more than a scintilla of evidence establishing that "[Weightman] entered into [an oral] contract to borrow money from [Leal]."

In a breach of contract cause of action, a plaintiff

Not Reported in S.W.3d
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))
**2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))**

Page 3

must prove that (1) a valid contract existed; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l,* 51 S.W.3d 345, 351 (Tex.App.-Houston [1st Dist.] 2001, no pet.). To be valid and binding, a contract must contain all essential terms and be sufficiently certain so as to define the parties' legal obligations. *See Nickerson v. E.I.L. Instruments, Inc.,* 874 S.W.2d 936, 939 (Tex.App.-Houston [1st Dist.] 1994, writ denied). Generally, in a contract to loan money, the essential terms include (1) the amount to be loaned, (2) the maturity date of the loan, (3) the interest rate, and (4) the repayment terms. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992).

Here, Leal notes that, in response to Weightman's motion, she produced her affidavit, in which she states that, in 1998, she had agreed to assist the Weightmans financially "with the understanding that they would pay [her] back" and that Weightman's husband had agreed to repay Leal either when he was sentenced to "jail" or when he was released. Leal also produced copies of checks totaling $63,248 that she had written to Weightman, to Weightman's husband, to their attorney, and to the IRS.

Leal directs us to no evidence in the record indicating whether Weightman's husband had agreed to repay the full amount of the loan on a certain maturity date or in installments. Moreover, Leal directs us to no evidence in the record indicating whether the parties had agreed on a specific interest rate or whether they had agreed that no interest would be paid.

At the time of contracting, the parties reasonably would have regarded a certain maturity date, the repayment terms, and the amount and applicability of an interest rate as essential terms defining the parties' legal obligations. *See id.* Because Leal did not produce more than a scintilla of evidence establishing that the parties had agreed on the essential terms of a contract to loan money, we hold that Leal did not produce more than a scintilla of evidence establishing the existence of an express oral contract.

We overrule Leal's first issue.

***Implied Contract***

In her third issue, Leal argues that the trial court erred in granting Weightman's motion because Leal produced more than a scintilla of evidence establishing the existence of an implied contract.

The elements of an implied contract are the same as those of an express contract. *Univ. Nat'l Bank v. Ernst & Whinney,* 773 S.W.2d 707, 710 (Tex.App.-San Antonio 1989, no writ). The only difference between the two is that, in an express contract, the mutual assent of the parties is expressly stated, whereas in an implied contract, the assent must be inferred from the circumstances of the transaction. *Id.*

**\*4** Here, as noted above, in her response, Leal did not produce more than a scintilla of evidence establishing that the parties had agreed on a certain maturity date, on repayment terms, or on the amount or applicability of an interest rate. There is no evidence in the record to indicate that the parties, through their conduct, had impliedly agreed on any of these essential terms of a contract to loan money. Accordingly, we hold that Leal did not produce more than a scintilla of evidence establishing the existence of an implied contract.

We overrule Leal's third issue.

***"Unjust Enrichment" Cause of Action***

In her fifth issue, Leal argues that the trial court erred in granting Weightman's motion in response to her claim for unjust enrichment because Weightman, in her motion, did not argue that Leal had no evidence to support her unjust enrichment cause of action.

Leal amended her pleadings on August 14, 2003, eight days before the trial court issued its order granting Weightman's motion. In addition to alleging additional facts and reasserting her breach of contract claim, Leal included the following statement in the "Conditions Precedent" section of her amended petition: "[Weightman] will be unjustly enriched if allowed to retain the monies an[d]/or benefits paid to her and/or for her benefit without repayment."

Leal argues that, by including this sentence in the "Conditions Precedent" section of her amended petition, she alleged an "unjust enrichment" cause of action against Weightman. Leal further argues that, because Weightman, in her motion, did not argue that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))
**2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))**

Page 4

Leal had no evidence to support her "unjust enrichment" cause of action, the trial court erred in granting Weightman's motion on this claim.

In response to Leal's argument, Weightman, citing *Barnett v. Coppell North Texas Court, Ltd.,* 123 S.W.3d 804, 816-17 (Tex.App.-Dallas 2003, no pet.), argues that unjust enrichment "is not an independent cause of action in Texas."Rather, it is an "element" of a cause of action for restitution. *Id.* Moreover, Weightman argues that Leal's "mere mention of unjust enrichment" in her amended petition is not sufficient to allege a cause of action for restitution.

The Texas Supreme Court, however, has recognized unjust enrichment as a cause of action. *See, e.g., Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 683-85 (Tex.2000). It has even recognized a two-year statute of limitations for unjust enrichment claims. *See HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 885 (Tex.1998). A party may recover under an unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). Furthermore, a pleading is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim.*Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982). The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense. *Id.* The test of fair notice is "whether an opposing attorney of reasonable competence, with the pleadings before him, can ascertain the nature and the basic issues of the controversy and the testimony probably relevant."*State Fid. Mortgage Co. v. Varner,* 740 S.W.2d 477, 479 (Tex.App.-Houston [1st Dist.] 1987, writ denied).

**\*5** Here, we conclude that a reasonably competent attorney, with Leal's amended petition before him, would have been able to ascertain that Leal was attempting to allege a cause of action for unjust enrichment. The record indicates that Weightman did not move to strike Leal's amended petition or challenge it by special exception. *See*TEX.R. CIV. P. 90.

We sustain Leal's fifth issue.

### Conclusion

Having sustained Leal's fifth issue, we need not address Leal's fourth issue, in which she argues that the trial court erred in granting Weightman's no-evidence summary judgment motion because Leal produced more than a scintilla of evidence establishing her unjust enrichment cause of action.

We reverse that portion of the trial court's summary judgment ruling that Leal "take nothing" from Weightman in regard to Leal's unjust enrichment claim, and we remand that claim to the trial court for further proceedings.

We affirm the trial court's judgment in all other respects.

Tex.App.-Hous. [1 Dist.],2004.
Leal v. Weightman
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 1456042 (N.D.Cal.)
**2007 WL 1456042 (N.D.Cal.)**

McMurray v. Merck & Co., Inc.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Jason E. McMURRAY, Plaintiff,
v.
MERCK & CO., INC., a New Jersey Corporation,
Defendant.
No. C 07-1007 MMC.
Docket No. 6.

May 17, 2007.

Brian Y.K. Ching, Attorney at Law, Alameda, CA, for Plaintiff.

Rebecca Marie Biernat, Wayne A. Wolff, Sedgwick, Detert, Moran & Arnold LLP, San Francisco, CA, Kevin R. Costello, Ralph A. Campillo, Sedgwick Detert Moran & Arnold LLP, Los Angeles, CA, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS; GRANTING MOTION TO STRIKE PUNITIVE DAMAGES; DENYING MOTION FOR A MORE DEFINITE STATEMENT; GRANTING LEAVE TO AMEND**

MAXINE M. CHESNEY, United States District Judge.

*1 Before the Court is defendant Merck & Co., Inc.'s motion, filed February 23, 2007, to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, four of the eight causes of action alleged in plaintiff Jason E. McMurray's complaint; to strike the prayer for punitive damages, pursuant to Rule 12(f); and for a more definite statement, pursuant to Rule 12(e). Plaintiff has not filed an opposition.[FN1] Having considered the papers filed in support of the motion, the Court finds the matter appropriate for decision without oral argument, see Civil L.R. 7-1(b), and rules as follows:

> FN1. On April 3, 2007, the Court issued an order vacating the April 6, 2007 hearing due to plaintiff's failure to oppose the motion.

Plaintiff has not sought an extension of time to file an opposition.

1. To the extent defendant seeks dismissal of the First Cause of Action ("Breach of Express Warranty"), the motion is hereby DENIED.

Contrary to defendant's argument, plaintiff has not failed to adequately allege an express warranty by defendant. Plaintiff has alleged that defendant breached an express warranty, made "both orally and in publications, brochures, package inserts and/or other written materials intended for medical professionals, patients and/or the general public," that "Lovastatin was safe, effective, fit and/or proper for its intended use to manage and/or control pain ."(See Compl. ¶ 12.) Defendant has cited no authority requiring the precise language of the express warranty at issue to be pleaded. SeeFed.R.Civ.P. 8(a) (requiring pleading of "short and plain statement" of claim); Sierra Diesel Injection Service, Inc. v. Burroughs Corp., 890 F.2d 108, 113 (9th Cir.1989) (holding claim for breach of express warranty governed by "federal court's liberal pleading requirements"); cf. Willson v. Bank of America, 2004 WL 1811148 at *4 (N.D.Cal.2004) (denying motion to dismiss claim for breach of contract; observing plaintiff "need not allege specific terms of the contract under federal notice pleading standards").

2. To the extent defendant seeks dismissal of the Sixth Cause of Action ("Fraud and Deceit"), the motion is hereby GRANTED, and such claim is hereby DISMISSED, with leave to amend.

The elements of fraud under California law are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."See Lazar v. Superior Court, 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."SeeFed.R.Civ.P. 9(b). To satisfy Rule 9(b), "the pleader must state the time, place, and specific content of the false representations as well as

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

the identities of the parties to the misrepresentation,"*see Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir.1986)*, and "explain why they are false and misleading,"*see Philips Medical Capital, LLC v. Medical Insights Diagnostics Center, Inc., 471 F.Supp.2d 1035, 1044 (N.D.Cal.2007)* (citing *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir.1994)*). Plaintiff fails to allege the time, place, and specific content of the asserted false representations, the identities of the parties to the misrepresentations, or the reason why such representations are false and misleading. Accordingly, plaintiff's allegations in support of his fraud claim fail to satisfy the requirements of Rule 9(b).

**\*2** 3. To the extent defendant seeks dismissal of the Seventh Cause of Action ("Negligent Misrepresentation"), the motion is hereby GRANTED, and such claim is hereby DISMISSED, with leave to amend.

The elements of negligent misrepresentation under California law are similar to the elements of fraud, with the exception that there is no requirement of scienter or intent to defraud. *See Small v. Fritz Companies, Inc., 30 Cal.4th 167, 173-74, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (2003)*. The tort of negligent misrepresentation encompasses (1) the "assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true," and (2) the "positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true."*See id. at 174, 132 Cal.Rptr.2d 490, 65 P.3d 1255* (internal quotations and citations omitted). For the same reasons set forth above in connection with the fraud claim, plaintiff's allegations in support of his negligent misrepresentation claim fail to satisfy the requirements of Rule 9(b).

4. To the extent defendant seeks dismissal of the Eighth Cause of Action ("Violation of Cal. Bus. and Prof.Code Section 17500, et seq."), the motion is hereby DENIED.

Contrary to defendant's argument, plaintiff has not failed to identify the code sections defendant allegedly violated. Rather, plaintiff expressly alleges defendant's conduct constitutes "unfair competition,

unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of California Business & Professions Code Sections 17200 and 17500."(*See* Compl. ¶ 65.)

5. Defendant's motion to strike the prayer for punitive damages is hereby GRANTED, and such prayer is stricken, with leave to amend.

Plaintiff has failed to plead the allegedly wrongful conduct was authorized or ratified by an officer, director or managing agent of defendant. *See*Cal. Civ.Code § 3294(b); *see also Scannell v. County of Riverside, 152 Cal.App.3d 596, 614, 199 Cal.Rptr. 644 (1984)*. Defendant's additional argument is unpersuasive, however. Contrary to such argument, plaintiff is not required to plead oppression, fraud, or malice with particularity. Rule 9(b) expressly provides that "[m]alice, intent, ... and other condition of mind of a person may be averred generally."*See*Fed.R.Civ.P. 9(b); *see also Clark v. State Farm Mutual Automobile Ins. Co., 231 F.R.D. 405, 406 (C.D.Cal.2005)* ("[A] plaintiff bringing an action in federal court may include a 'short and plain' prayer for punitive damages that relies entirely on unsupported and conclusory averments of malice or fraudulent intent") (internal quotation and citation omitted).

6. To the extent defendant moves for a more definite statement, the motion is hereby DENIED.

A more definite statement is appropriate where a pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."*See*Fed.R.Civ.P. 12(e). Here, contrary to defendant's argument, the allegations in support of plaintiff's claims for negligence and violation of §§ 17200 and 17500 of the California Business and Professions Code are adequately pleaded, in conformity with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure, and are sufficiently clear that defendant can respond to them. Defendant further contends the complaint is ambiguous and confusing because the complaint (1) repeatedly refers to Lovastatin's effectiveness for management of pain, although, according to defendant, Lovastatin is a cholesterol drug that is not prescribed to control pain; (2) repeatedly alleges that Lovastatin causes an increased risk of heart attack and stroke, although, according to defendant, such injuries are not the type

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1456042 (N.D.Cal.)
**2007 WL 1456042 (N.D.Cal.)**

of injuries associated with use of Lovastatin; (3) fails
to allege what injury plaintiff actually has suffered
from use of Lovastatin; and (4) refers to plaintiff
throughout the complaint as both "him" and "her."
Although such allegations suggest that plaintiff may
have based his complaint on a prior pleading without
redacting allegations that are not relevant to the
instant action, the allegations are not so vague and
ambiguous that defendant cannot respond to them.
Defendant, for example, can deny that Lovastatin is
used for pain management. To the extent plaintiff
agrees with defendant that the complaint contains
allegations that were not intended, however, plaintiff
may amend his complaint accordingly.

*3 7. Any amended complaint shall be filed no later
than June 8, 2007.

This order terminates Docket No. 6.

**IT IS SO ORDERED.**

N.D.Cal.,2007.
McMurray v. Merck & Co., Inc.
Slip Copy, 2007 WL 1456042 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

**H**Oak Lawn Pavillion, Inc. v. U.S. Dept of Health
and Human Services
N.D.Ill.,1999.

United States District Court, N.D. Illinois, Eastern
Division.
OAK LAWN PAVILION, INC., an Illinois
Corporation, Plaintiff,
v.
THE UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, Donna E.
Shalala, Secretary of the Department of Health and
Human Services, Health Care Financing
Administration, and Nancy Ann Min De Pearle,
Administrator, Healthcare Financing Administration,
Defendants.
**No. 98 C 614.**

Nov. 8, 1999.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.
*1 Plaintiff, Oak Lawn Pavilion, Inc. ("Oak Lawn"),
initiated this suit on February 4, 1998 to challenge
the administrative decision of the Secretary of Health
and Human Services which terminated Oak Lawn's
participation in the Medicare Program as a provider
of Skilled Nursing Care under Title XVIII of the
Social Security Act, 42 U.S.C. § 1395, et seq. (1994).
Named Defendants include the United States
Department of Health and Human Services ("HHS"),
Donna E. Shalala ("the Secretary"), the Health Care
Financing Administration ("HCFA"), and Nancy-
Ann Min DePearle, Administrator of HCFA ("the
Administrator"). On July 17, 1998, the Secretary [FN1]
moved to dismiss Oak Lawn's complaint under
FED.R. CIV. P. 12(b)(1) on the grounds that Oak
Lawn's readmission to the Medicare Program renders
its complaint moot. In addition to the parties' briefs
on the motion to dismiss, the court has before it Oak
Lawn's motion for leave to file an amended
complaint. The Secretary opposes Oak Lawn's
motion for leave to amend the complaint on the
grounds that the amendments would not cure the
jurisdictional defects identified in the Secretary's
motion to dismiss the original pleading. For the
following reasons, the court grants Oak Lawn's

motion for leave to file the amended complaint and
denies in part and grants in part the Secretary's
motion to dismiss for mootness and lack of standing.

> FN1. The Secretary contends that she is the
> only proper party to this action and that
> Defendants HHS, HCFA, and the
> Administrator should be dismissed. (Br. in
> Supp. of Def.'s Mot. to Dismiss for
> Mootness and Lack of Standing, at 1 n. 1.)
> Neither party has responded to this matter
> more fully, and the court declines to rule on
> that request at this time. Given the court's
> conclusion on the present motion, the
> Defendants may choose to brief the issue at
> a later time.

*FACTUAL BACKGROUND*

The following facts are undisputed. Oak Lawn is a
licensed long-term care facility located in Oak Lawn,
Illinois that provides care for individuals in need of
long-term nursing and personal care. (Compl.¶ 5.)
HHS is responsible for administration of the
Medicare program under Title XVIII of the Social
Security Act. (Id . ¶ 6.) Under 42 C.F.R. §
489.53(a)(1), HCFA, the agency directly responsible
for surveying long-term care facilities and
implementing the Medicare Act, is authorized to
terminate a facility's Medicare certification if it finds
that the provider is not complying with provisions of
the Social Security Act and the applicable
regulations. (Id. ¶ 7.)

On May 3, 1995, HCFA notified Oak Lawn of its
termination from the Medicare Program based on an
annual Medicare "certification survey" performed on
February 10, 1995 and a "revisit survey" performed
on April 3, 1995. (Id. ¶¶ 9-11.)Based on the
February 10, 1995 survey, agents of HCFA and HHS
found Oak Lawn to be out of compliance with five
different federal requirements for providers of long-
term nursing care.[FN2](Id. ¶ 9.) Oak Lawn filed a
"Plan of Correction" with HCFA to remedy the
deficient practices. (Id.) The "revisit survey" on April
3, 1995, however, continued to show noncompliance
with multiple federal requirements.[FN3](Id. ¶
10.)Consequently, HCFA made the initial decision to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

terminate Oak Lawn's participation in the Medicare program effective May 31, 1995. (*Id.* ¶ 11.)

> FN2. During the February survey, the surveyors found deficiencies in the following five areas governed by regulations referred to as "Level A" requirements: resident rights (42 C.F.R. § 483.10), resident behavior and facility practices (42 C.F.R. § 483.13), quality of life (42 C.F.R. § 483.15), quality of care (42 C.F.R. § 483.25), and administration (42 C.F.R. § 483.75). (Admin. R. at 1642 .) (May 3, 1995 Termination Letter from HHS.)

> FN3. During the April survey, the surveyors found that Oak Lawn still remained out of compliance with the Quality of Care Level A requirement. This finding was based on further findings of non-compliance with five of the Level B requirements which make up the Level A quality of care requirement found at 42 C.F.R. § 483.25. The repeat quality of care deficiencies included failure to provide residents with required treatment and services in the following areas: grooming and hygiene, prevention and healing of pressure sores, incontinence care, preventing decrease in range of motion, and preventing accidents through proper staff supervision. (Admin. R. at 1605-1612.)

On June 30, 1995, Oak Lawn filed a Request for Hearing to contest the termination, and the matter was assigned to Judge Mimi Hwang Leahy of the Departmental Appeals Board ("DAB") of the HHS. (*Id.* ¶ 12.)Judge Leahy conducted a hearing during the week of July 15, 1996 and issued her final decision on May 21, 1997, which affirmed the termination of Oak Lawn's participation in Medicare. (*Id.* ¶¶ 13, 21.)Prior to receiving the decision, on March 24, 1997, Oak Lawn applied to be readmitted to the Medicare program. (Medicare Application, Ex.1 to Br. in Supp. of Def.'s Mot. to Dismiss for Mootness and Lack of Standing (hereinafter "Def.'s Mot. to Dismiss").) On July 15, 1997, Oak Lawn appealed Judge Leahy's decision to the DAB pursuant to 42 C.F.R. § 498.80. (Compl.¶ 15.) On August 18, 1997, while Oak Lawn's appeal was pending before the DAB, HCFA notified Oak Lawn that it was readmitted to the Medicare program effective July

16, 1997 because the facility had passed a reasonable assurance survey required by 42 C.F.R. § 489.57 and performed on July 16, 1997. (Readmission Letter, Ex. 2 to Def.'s Mot. to Dismiss.) On December 4, 1997, the DAB upheld ALJ Leahy's decision. (Compl.¶ 16.) On February 4, 1998, Oak Lawn filed this suit for review of the termination decision.

*2 Arguing mootness and lack of standing, the Secretary moved to dismiss Oak Lawn's complaint on July 17, 1998. The Secretary urged that Oak Lawn's readmission to the Medicare Program, a fact not mentioned in the Complaint, rendered the case moot. (Def.'s Mot. to Dismiss, at 3.) Alternatively, the Secretary challenged Oak Lawn's standing to bring this suit because Oak Lawn had not alleged an injury in fact traceable to the Secretary's decision and redressable by this court. (*Id.* at 6.) Oak Lawn responded by filing a motion for leave to file an amended complaint in order to clarify the issues in dispute and demonstrate the existence of live controversies between the parties. The Secretary then filed a brief opposing leave to amend, leading to a flurry of additional briefing. Before addressing whether leave to amend should be granted, the court turns to the earlier motion to dismiss. The court also considers whether the complaint, as amended, would be able to cure any jurisdictional defects.

*DISCUSSION*

Defendants moved to dismiss Plaintiff's original complaint arguing that Plaintiff's readmission to the Medicare Program renders its claims moot. Defendants also argue that Plaintiff lacks standing to invoke this court's jurisdiction because it has not alleged an injury in fact which is traceable to the Secretary's decision and which can be redressed by this court.

In response to Defendants' motion to dismiss, Plaintiff sought leave to file an amended complaint. Oak Lawn's amended complaint adds two allegations addressing the standing issue. The first asserts that Oak Lawn lost "income in excess of $50,000, resulting from lost Medicare admissions from June 30, 1995 through July 16, 1997."(Am.Compl.¶ 33.) The other avers that Oak Lawn "suffered damages to its reputation and good will when the Government published notice of the Medicare termination to hospitals and referral institutions."(*Id.* ¶ 34.)To

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

remedy those injuries, Oak Lawn seeks injunctive relief requiring the Government to expunge from its records any references to the termination of Oak Lawn's participation in the Medicare program and to give public notice of the reversal of the termination decision to the fullest extent practicable. (*Id.* ¶¶ 67, 73, 85.)

The Secretary responds that these allegations still fall short of satisfying jurisdictional requirements. The Secretary again challenges Oak Lawn's ability to demonstrate an injury that is traceable to conduct by the Secretary. (Def's Br. Opp. Leave to Am. Compl. (hereinafter "Def.'s Br."), at 5-7.) The Secretary contends that Oak Lawn's allegations as to these requisite elements are "woefully inadequate, even as allegations, because they are vague and contain no citations to evidence or even details which would give reason to believe that such evidence exists."(*Id.* at 5.) The court considers the Secretary's arguments as they relate to the original and proposed amended complaint. Before doing so, however, the court first sets forth a brief discussion of the doctrines on which the Secretary relies in arguing for dismissal.

A. The Standing and Mootness Doctrines

**\*3** Article III of the Constitution limits the federal courts to adjudicating only "cases" and "controversies." *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Crosetto v. State Bar of Wis.,* 12 F.3d 1396, 1403 (7th Cir.1993), *cert. denied*511 U.S. 1129, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994). The "case or controversy" requirement ensures that courts consider only tangible disputes capable of resolution rather than disputes presenting purely hypothetical or abstract issues. *See Flast v. Cohen,* 392 U.S. 83, 94-95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Standing to sue is part of the common understanding of what makes a case justiciable. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998) (citing *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). The party invoking federal jurisdiction bears the burden of establishing standing. *See id.* at 1017 (citation omitted). To establish the "irreducible constitutional minimum of standing," a party must allege and ultimately prove: (1) an injury in fact suffered by the plaintiff that is

"concrete" and "actual or imminent, not 'conjectural' or 'hypothetical' "; (2) a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and (3) a likelihood that the requested relief will redress the alleged injury. *See id.* at 1016-17 (citations omitted).

For related reasons, Article III also prohibits federal courts from reviewing moot cases. *See Buckley v. Arthur-Daniels-Midland Co.,* 111 F.3d 524, 526 (7th Cir.1997) (citations omitted). The case or controversy mandate means that the parties must continue to have a personal stake in the outcome of the lawsuit through all stages of federal judicial proceedings. *See Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978, 983, 140 L.Ed.2d 43 (1998) (citations omitted). Throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."*Id.* (quoting *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990))."In general, a case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."*Buckley,* 111 F.3d at 526 (quoting *Stewart v. Taylor,* 104 F.3d 965, 969 (7th Cir.1997)). In short, "mootness [is] the 'doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence.' " *United States Parole Comm'n. v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (quoting Henry Monaghan, *Constitutional Adjudication: The Who and When,* 82 YALE L.J. 1363, 1384 (1973)).

The crux of the Secretary's mootness argument is that even if Oak Lawn should prevail on the merits, Oak Lawn's readmission to the Medicare program makes it impossible for this court to order meaningful relief under 42 U.S.C. § 405(g),[FN4] the statutory basis for this court's jurisdiction. According to the Secretary, reversal of the termination decision is the only available remedy to Oak Lawn pursuant to § 405(g). Given Oak Lawn's readmission to the Medicare program, the Secretary contends, reversal would not benefit Oak Lawn and would not redress any injury of termination. The Secretary raised these arguments initially in a motion to dismiss Oak Lawn's original complaint and renews the arguments in the brief in opposition to Oak Lawn's motion for leave to file an

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

amended complaint. The court considers the arguments as they relate to the original and proposed amended complaint.

> FN4.Section 405(g) provides in pertinent part:

> Any individual, after any decision of the Secretary made after a hearing to which he was a party ... may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

> 42 U.S.C. § 405(g)(1994).

B. Original Complaint

*4 In the original complaint, Plaintiff alleged that HCFA's decision to terminate Oak Lawn's Medicare participation was arbitrary, capricious, an abuse of discretion, and in violation of applicable federal regulations. (Compl.¶ 1.) The termination thus appears to be the injury alleged by Oak Lawn.

Although the Secretary challenges the justiciability of this claim under the doctrines of standing and mootness, in this court's view only the first of these doctrines is relevant here. The mootness and standing doctrines, while related, are conceptually different. See 13 CHARLES ALAN WRIGHT & KENNETH A. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE § 3531.6 (1984 & West Supp.1999) (indicating that theories for the remedial benefit requirement for standing are closely akin to theories underlying the mootness doctrine). Mootness traditionally involves a situation in which standing existed at the time litigation commenced, but where some event has made the issue moot before final adjudication. Such a situation is not technically presented in this case; [FN5] instead the Secretary's position is that Oak Lawn never had standing from the start of this lawsuit.[FN6]

> FN5. Although the mootness doctrine has some relevance in the sense that Oak Lawn arguably had a live appeal that expired upon its readmission to the Medicare program, this problem appears to be cured by the newly alleged injuries found in Oak Lawn's Amended Complaint.

> FN6. In their briefs, both Plaintiff and Defendants address at length the "capable of repetition yet evading review" and the "public interest" exceptions to the mootness doctrine. Whether an exception to the mootness doctrine applies only becomes an issue once a case is found to be moot. Since that is not the situation here, and because the court ultimately concludes that standing exists for all but one of Oak Lawn's claims, the court need not elaborate at this time on these two exceptions to the mootness doctrine.

As the party invoking federal jurisdiction, Oak Lawn bears the burden of establishing its standing. See Steel Co., 523 U.S. 83, 118 S.Ct. at 1017, 140 L.Ed.2d 210. The Secretary contends that Oak Lawn has not satisfied this burden because all three elements of the standing requirement are lacking. First, the Secretary "questions" whether Oak Lawn suffered an injury in fact in light of its subsequent readmission to the Medicare program. (Def.'s Mot. to Dismiss, at 8.) The Secretary also contends that her final decision upholding the termination of Oak Lawn's Medicare provider agreement did not cause any injury to Oak Lawn because Oak Lawn has been readmitted to the Medicare program. (Id. at 9.) Lastly, the Secretary argues that Oak Lawn fails the final prong of the standing test because adjudication would not redress the termination; Oak Lawn's readmission to the Medicare program constitutes the only available redress, and reversal of the termination decision would not confer any tangible benefit because HCFA has already readmitted Oak Lawn.(Id at 10.)

If Oak Lawn's original complaint in fact seeks only to be reinstated to the Medicare program as a remedy for the termination decision, it is evident that this court's resolution is unnecessary and would not benefit Oak Lawn. So goes the Secretary's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

contention, and this court agrees. Oak Lawn has not responded to that issue per se, but has instead moved this court to amend its complaint. Oak Lawn's proposal to amend its complaint arguably reflects a recognition that the original complaint is vulnerable to this standing challenge. The court now turns to the proposed amended complaint to see whether its allegations are sufficient to cure the jurisdictional defects of the original pleading.

C. Amended Complaint

The Secretary opposes the motion for leave to amend on the grounds that the proposed new complaint does not cure the jurisdictional flaws identified in the Secretary's motion to dismiss the original complaint- i.e., mootness and lack of standing. The Secretary thus argues that amending the complaint would be futile. According to the Secretary, Oak Lawn's allegations of injury and redressability are inadequate to cure the jurisdictional flaws in the original complaint because they "are vague and contain no citations to evidence."

*5 Leave to amend is liberally granted. The federal rules of civil procedure provide that "leave shall be freely given when justice so requires."FED. R. CIV. P. 15(a). Nonetheless, where an amendment would be futile, the general rule does not apply. See *Forman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Williams v. United States Postal Serv.*, 873 F.2d 1069,1072 (7th Cir.1989). Accordingly, courts should deny leave to amend where the amendment merely alters the jurisdictional allegations of the original complaint, but does not cure the underlying jurisdictional defects. See *Northrup Corp. v. AIL Sys., Inc.*, 959 F.2d 1424, 1429 (7th Cir.1992).

As noted, Oak Lawn's proposed amended pleadings assert that Oak Lawn has suffered lost income and harm to its reputation and good will. (Am.Compl.¶¶ 33, 34.) It is axiomatic that a plaintiff is not required to produce evidence in support of its allegations of harm; notice pleading is the standard. See *Nance v. Viaregge*, 147 F.3d 589, 590 (7th Cir.1998); FED. R. CIV. P. 8. As such, Oak Lawn need only set out a claim for relief at the pleading stage. The court concludes it has met this standard. Oak Lawn sufficiently alleges an **injury** in **fact** with its claims of **monetary** **damages** and loss in reputation and

goodwill. See *Barlow v. Collins*, 397 U.S. 159 (1970) (allowing standing for those suffering economic harms); *Meese v. Keene*, 481 U.S. 465, 472-77, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) (holding that an interest in one's reputation is sufficient to confer standing). Oak Lawn also asserts a nexus between the Secretary's conduct and the injuries suffered. Oak Lawn avers that the Secretary's final decision upholding the termination resulted in loss of monetary income it would have received from the Medicare program and loss of reputation and goodwill as a result of the termination. Under the liberal pleading standard, these allegations are sufficient to confer standing.

The Secretary argues that these alleged injuries are insufficient unless the court has power to grant relief for those injuries. In fact, according to the Secretary, Oak Lawn has no legally cognizable interest in the outcome of the case because the relief it seeks is not statutorily permitted. Specifically, the Secretary urges that relief that is not possible for two reasons: (1) Section 405(g) does not allow for money damage awards; and (2) Section 405(g) does not permit injunctive relief. The court addresses each argument in turn.

1. Money Damages

With respect to the allegation of economic injury in the form of lost income resulting from lost Medicare admissions, the Secretary contends that Congress has not provided for a remedy for money damages in Section 405(g), the statutory basis for jurisdiction. (Def.'s Br., at 7-8.) For support, the Secretary relies on *Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), where the Supreme Court held that money damages against state officials were unavailable to claimants whose Social Security disability benefits were improperly terminated. Similarly, concerning the charge of damage to reputation and goodwill as a result of the termination, the Secretary argues that redress is unavailable for this injury under Section 405(g) as it does not provide for damages for emotional injury or other hardships. (Id. at 8.)

*6 In a footnote, Oak Lawn notes that it is not "as yet" seeking to recover damages, intimating that this issue bears no relevance to this case. (Pl.'s Reply, at 4 n. 1.) Nonetheless, in the same footnote, Oak Lawn

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

Page 6

states that it is still researching this issue and may amend to seek recovery of lost revenue. (*Id.*) Oak Lawn also disputes the Secretary's contention that *Schweiker* necessarily bars recovery for money damages in this action. Unfortunately, Oak Lawn provides no rationale for distinguishing *Schweiker.* The court nevertheless finds the issue of whether money damages are available is indeed relevant; Oak Lawn may seek money damages in the future and if they are in fact unobtainable, the claimed injury of lost finances may not be redressable. Accordingly, the court considers the *Schweiker* decision in some detail.

*Schweiker* involved claimants who were denied Social Security disability benefits, allegedly as a result of violations of due process by government officials who administered the federal program. The issue before the court was whether these alleged due process violations gave rise to a cause of action for money damages against the officials. 487 U.S. at 414. Concluding that Congress did not provide for such a remedy in the elaborate remedial scheme set forth in the statute, the Court refused to allow a money damages remedy. *See id.* The Court explicitly held that Section 405(g) prohibits money damages in actions brought against state officials.

If Oak Lawn ultimately were to seek monetary relief, *Schweiker* almost certainly would prohibit such recovery. Oak Lawn's situation is nearly identical to that of the petitioners in *Schweiker*-both would be requesting money damages against state officials for improper termination pursuant to Section 405(g). Admittedly, Social Security disability benefit claimants may be in a different position than providers of Medicare services in that the former, unlike the latter, may be entitled to back-payments if constitutional violations are found. Nevertheless, the statutory basis for jurisdiction, Section 405(g), is the same in both cases, and the *Schweiker* court held specifically that Section 405(g) does not allow for money damages.

Oak Lawn might argue that it has standing to the extent the other relief requested would redress the financial injury. The argument is not persuasive, however. Oak Lawn claims a loss in excess of $50,000 as a result of its termination from the Medicare program. It is not apparent to this court how reversal of the termination decision would

redress that injury. Furthermore, neither expungement of references to the termination from government records nor public notification of the reversal of the termination decision would redress Oak Lawn's financial injury. Oak Lawn has not made any arguments demonstrating otherwise. The court finds that Oak Lawn lacks standing to bring any claims for financial injury as a result of the termination decision. Plaintiff is precluded from seeking money damages under Section 405(g) and the portion of its Amended Complaint claiming financial injury is dismissed for lack of standing.

2. Injunctive Relief

*7 Oak Lawn's amended complaint requests additional relief in the form of orders requiring the Secretary to expunge from its records any reference to the termination of Oak Lawn's participation in the Medicare program and to give public notice of the reversal of the decision to the fullest extent practicable. The Secretary argues that the injunctive relief sought by Oak Lawn is not authorized by Section 405(g). According to the Secretary, that provision permits relief only in the form of an order affirming, modifying, or reversing the decision of the Secretary. (Def.'s Br., at 8.) The only available remedy would be reversal of the termination decision, which, the Secretary contends, would not redress the injuries to Oak Lawn's finances and reputation.[FN7] (*Id.*)

> FN7. The Secretary does not address Oak Lawn's claim that a reversal of the termination order in itself will provide Oak Lawn with a benefit by restoring, in part, Oak Lawn's damaged reputation and goodwill. (Pl.'s Reply, at 3.) This, in the court's opinion, also makes this injury redressable by this court.

In contrast, Oak Lawn urges the court to find that district courts retain the full panoply of their equitable powers when resolving claims under Section 405(g). (Pl.'s Reply, at 5.) Relying on a Second Circuit case, Oak Lawn contends that it is entitled to obtain the relief that it requests. Oak Lawn argues that "Congress must speak clearly to interfere with the historic equitable powers of the courts it has created ....§ 405(g) speaks expansively of what a district court may do [sic] it may affirm, reverse or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

modify in any way the Secretary's judgment and is completely silent on any limitations on the court's equitable powers."*In re Letourneau,* 559 F.2d 892, 894 (2d Cir.1977). Oak Lawn also cites a Supreme Court case that broadly states that "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."*See Califano v. Yamasaki,* 442 U.S. 682, 705, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Both of these cases merit further discussion.

In *In re Letourneau,* the Second Circuit considered whether Section 405(g) permits the entry of an injunction against operation of the statutory scheme. The specific claim was that the statute unconstitutionally denied Social Security benefits to aliens lawfully admitted for permanent residence in the United States who worked for an international organization or foreign government instrumentality. *See In re Letourneau,* 559 F.2d at 892-93. Reasoning that a three-judge court is appropriate only where the complaint "alleges a basis for equitable relief", the district court refused to convene a three-judge district court to determine the constitutionality of Section 405(g).*See id.* at 893 (quoting *Idlewild Bon Voyage Liquor Corp. v. Epstein,* 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962) (per curiam). The Second Circuit disagreed with the district court's construction of Section 405(g) and remanded for consideration of the constitutional claims. *See id.*The court found that Congress did not clearly interfere with the historic equitable powers of the courts in the statute and hence held that Section 405(g) does not bar issuance of an injunction. *See id.* at 894.

*\*8* In *Califano,* a class of Social Security beneficiaries challenged the Secretary's recoupment of excess benefits without a pre-recoupment hearing. The district court found that the plaintiffs were entitled to pre-recoupment hearings and enjoined the recoupment process. *See Califano,* 442 U.S. at 688. The Supreme Court recognized the Ninth Circuit's doubts about the availability of full relief under Section 405(g), the judicial review provision. *See id .* at 697-98.While not rejecting those doubts entirely, the Court ultimately found that "nothing in § 205(g) prohibits the pre-recoupment hearings relief awarded in this case."*See id.* at 698.Further, "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue

injunctions in suits over which they have jurisdiction."*Id.* at 705 (citations omitted.) Finding that neither the language nor the legislative history demonstrated such congressional intent, the Court upheld the injunctive relief issued by the district court. *See id.*

The Secretary summarily dismisses *In re Letourneau* in a footnote as not binding in this circuit. While this is true, this court recognizes that the Seventh Circuit has not spoken on this precise matter and that the Second Circuit's holding constitutes persuasive authority. Unfortunately, neither party discusses this case at length; their effort consists primarily of bald assertions that the case stands for injunctive relief being allowed or disallowed under Section 405(g). This court finds *In re Letourneau* persuasive authority, especially in light of the Court's general congressional deference in matters of statutory interpretation and the Court's specific conclusions in *Califano.*

*Califano* receives opposite treatment from the parties-Oak Lawn surprisingly virtually ignores the case while the Secretary goes to great length to distinguish it from this case. The Secretary attempts to do so through two arguments: (1) the type of relief sought here (court orders to purge administrative records and an order to create and publish new ones) bears no resemblance to the injunctive relief approved in *Califano;* and (2) equitable relief was available in *Califano* only because federal jurisdiction existed, which is questionable here. Oak Lawn has failed to respond to either of these contentions.

This court is not prepared to dismiss the case on the basis of either of these arguments. The Secretary urges that the injunctive relief approved of in *Califano* and the type of injunctive relief sought by Oak Lawn is qualitatively different. Indeed, a hearing before recoupment of benefits arguably confers greater benefits than an order expunging an earlier decision. Nevertheless, the court is not prepared to distinguish between allowed and disallowed forms of injunctive relief based on the degree of benefit conferred. Indeed, the Secretary presents no support for the argument that a federal court is prohibited from issuing certain types of injunctive relief but not others, and this court has found no such case law either. Rather, the established precept of federal

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

courts retaining full equitable power, including the ability to issue injunctions, absent congressional restriction leads to this court's conclusion that Section 405(g) supports the type of relief sought by Oak Lawn. *See, e.g., Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *Porter v. Warner Holding Co.,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

**\*9** With respect to the Secretary's second argument, the court finds the reasoning somewhat circular. The Secretary contends that *Califano'* s holding that federal courts retain full equitable power is inapposite because jurisdiction is at issue here, unlike in *Califano.*It is apparent, however, that a federal court is without *any* judicial power in a case where federal jurisdiction is lacking. If there is no federal jurisdiction, the court would be unable to provide any remedy, whether equitable or legal.

As noted, leave to amend a complaint is to be freely granted. The court concludes that it has jurisdiction under section 405(g) to enter injunctive relief in the form of an order expunging administrative records. As that is, at least in part, the remedy requested in Oak Lawn's proposed amended complaint, the court concludes at this stage that Oak Lawn has standing to sue the Secretary.

These motions have been pending before the court for some time and the parties are entitled to some resolution of the difficult issues presented. Having determined that the motion to dismiss the original complaint will be granted and that Oak Lawn will be granted leave to amend, the court must nevertheless note a continuing concern about the merits of the claim. Alleging harm to its reputation, Oak Lawn has asked for an order expunging adverse administrative findings. Although Oak Lawn alleges that such an order will redress the harm it has suffered, the court is uncertain whether or how any such allegation can be proved. Are there ongoing effects to Oak Lawn's reputation that flow from the 1995-97 suspension from participation in Medicare? If so, how will an order expunging that suspension restore Oak Lawn's losses? Because Oak Lawn will bear the burden of showing that the relief it requests will actually benefit it, its amended complaint may remain vulnerable to a dispositive motion

*CONCLUSION*

For the reasons set forth above, the Secretary's motion to dismiss the original complaint is granted in part and denied in part. Oak Lawn's motion for leave to file an amended complaint is granted. The court concludes, however, that Oak Lawn may not seek recovery of lost revenue. Further, its amended complaint remains vulnerable to challenge to the extent it is unable to plead or to prove that an order expunging administrative records will provide Oak Lawn with tangible benefit.

N.D.Ill.,1999.
Oak Lawn Pavillion, Inc. v. U.S. Dept of Health and Human Services
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371
**1999 WL 1023920 (N.D.Ill.)**

courts retaining full equitable power, including the ability to issue injunctions, absent congressional restriction leads to this court's conclusion that Section 405(g) supports the type of relief sought by Oak Lawn. *See, e.g., Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *Porter v. Warner Holding Co.,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

*\*9* With respect to the Secretary's second argument, the court finds the reasoning somewhat circular. The Secretary contends that *Califano'*s holding that federal courts retain full equitable power is inapposite because jurisdiction is at issue here, unlike in *Califano.*It is apparent, however, that a federal court is without *any* judicial power in a case where federal jurisdiction is lacking. If there is no federal jurisdiction, the court would be unable to provide any remedy, whether equitable or legal.

As noted, leave to amend a complaint is to be freely granted. The court concludes that it has jurisdiction under section 405(g) to enter injunctive relief in the form of an order expunging administrative records. As that is, at least in part, the remedy requested in Oak Lawn's proposed amended complaint, the court concludes at this stage that Oak Lawn has standing to sue the Secretary.

These motions have been pending before the court for some time and the parties are entitled to some resolution of the difficult issues presented. Having determined that the motion to dismiss the original complaint will be granted and that Oak Lawn will be granted leave to amend, the court must nevertheless note a continuing concern about the merits of the claim. Alleging harm to its reputation, Oak Lawn has asked for an order expunging adverse administrative findings. Although Oak Lawn alleges that such an order will redress the harm it has suffered, the court is uncertain whether or how any such allegation can be proved. Are there ongoing effects to Oak Lawn's reputation that flow from the 1995-97 suspension from participation in Medicare? If so, how will an order expunging that suspension restore Oak Lawn's losses? Because Oak Lawn will bear the burden of showing that the relief it requests will actually benefit it, its amended complaint may remain vulnerable to a dispositive motion

*CONCLUSION*

For the reasons set forth above, the Secretary's motion to dismiss the original complaint is granted in part and denied in part. Oak Lawn's motion for leave to file an amended complaint is granted. The court concludes, however, that Oak Lawn may not seek recovery of lost revenue. Further, its amended complaint remains vulnerable to challenge to the extent it is unable to plead or to prove that an order expunging administrative records will provide Oak Lawn with tangible benefit.

N.D.Ill.,1999.
Oak Lawn Pavillion, Inc. v. U.S. Dept of Health and Human Services
Not Reported in F.Supp.2d, 1999 WL 1023920 (N.D.Ill.), 64 Soc.Sec.Rep.Serv. 371

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 2930972 (N.D.Ill.)
**2006 WL 2930972 (N.D.Ill.)**

CPotter v. Electrolux Home Products, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Lynn POTTER, Plaintiff,
v.
ELECTROLUX HOME PRODUCTS, INC.,
Defendant.
**No. 06 C 4811.**

Oct. 11, 2006.

Bryan John O'Connor, Jr., Bryan J. O'Connor, Jr.,
Baal & O'Connor, Chicago, IL, for Plaintiff.
Michael Joseph Summerhill, Laura M. Dreznes,
Katten Muchin Rosenman LLP, Chicago, IL, for
Defendant.

*MEMORANDUM OPINION AND ORDER*

HART, J.
*1 Plaintiff Lynn Potter allegedly injured her hand
and arm when she reached into a washing machine
before the drum stopped turning. Plaintiff alleges this
was caused by a defective door lock/switch. Plaintiff,
an Illinois citizen, brought suit in the Circuit Court of
Cook County, Illinois. Named as defendants were the
manufacturer of the washing machine (Electrolux
Home Products Inc., a Delaware and Georgia citizen)
and the retailer where plaintiff purchased the washing
machine (BassGar-Illinois, Inc., d/b/a Grants
Appliance Electronics & More, an Illinois citizen
(hereinafter "Grants")). The amount in controversy
exceeds $75,000. The First Amended Complaint
contained four counts. Counts I and II, respectively
labeled strict liability and breach of warranty, are
against Electrolux. Counts III and IV, respectively
labeled strict liability and breach of warranty, are
against Grants.

On August 22, 2002, the Circuit Court dismissed
Counts II and IV. The order regarding Count IV
states that it is by agreement. Grants moved to
dismiss Count III under 735 ILCS 5/2-621(b) on the
ground that it was not the manufacturer of the
washing machine. On August 30, 2002, the Circuit

Court granted that motion, which took Grants out of
the case. With Grants out of the case, there was
complete diversity of citizenship between the two
remaining parties. According to undisputed
representations made in this court, Grant's motion to
dismiss was granted without consideration of the
merits because plaintiff's counsel, due to having
miscalendared the hearing, failed to appear to oppose
the motion. Upon counsel's realization of the error,
plaintiff promptly moved for reconsideration
reinstating Count III. However, before the
reconsideration motion could be heard in state court,
Electrolux removed the case to federal court. Before
the federal court, plaintiff has moved for
reconsideration reinstating Count III against Grants
FN1 and has also moved to remand the case to state
court since Grants' reinstatement would destroy
diversity.

> FN1. Notice of the motion for
> reconsideration was provided to Grants and
> Grants appeared at the court hearing at
> which the motion for reconsideration was
> addressed.

The version of § 2-621 that is in effect does not
include 1995 amendments made by Public Law 89-7,
but which have been held to be unconstitutional.
See*Best v. Taylor Machine Works,* 179 Ill.2d 367,
228 Ill.Dec. 636, 689 N.E.2d 1057 (1997);
*Caterpillar, Inc. v. Usinor Industeel,* 393 F.Supp.2d
659, 684-85 (N.D.Ill.2005). Section 2-621 applies to
"any product liability action based in whole or in part
on the doctrine of strict liability in tort commenced or
maintained against a defendant ... other than the
manufacturer."735 ILCS 5/ 2- 621( a). Generally,
after a defendant retailer certifies the identity of the
manufacturer of the offending product and the
manufacturer is joined as a defendant, any "strict
liability in tort claim against the certifying defendant"
is dismissed. *Id.* 2-621(b). One exception to this
provision is that a "court shall not enter a dismissal
order relative to any certifying defendant ... where the
plaintiff can *show*... [t]hat the defendant had actual
knowledge of the defect in the product which caused
the injury."*Id.* 2-621(c)(2) (emphasis added). In ¶ 19
of the First Amended Complaint, plaintiff alleges that
Grants had such knowledge. Plaintiff does not

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2930972 (N.D.Ill.)
**2006 WL 2930972 (N.D.Ill.)**

contend that she can actually show that Grants had such knowledge, but seeks Grants' reinstatement so that she can seek such evidence through discovery.

**\*2** Plaintiff's motion for reconsideration will be granted so that the state court will have an opportunity to address the merits of Grants' motion to dismiss. Defendant Electrolux contends this court should first address the merits of Grants' § 2-621 motion and not grant reconsideration unless the § 2-621 motion would be denied. Since this is a state law issue, it is better to first allow the state court to have the opportunity to address the merits of the issue. Without fully resolving the merits of the issue, it is found that plaintiff has a nonfrivolous basis for arguing that Grants is not entitled to dismissal from this case.

First, under the version of § 2-621 that is presently in effect, only a "strict liability in tort claim" is subject to dismissal. 735 ILCS 5/2-621(b). The Count IV breach of warranty claim would not be subject to dismissal under § 2-621. *Usinor*, 393 F.Supp.2d at 684-85. However, prior to the August 30 dismissal of Grants, plaintiff had agreed to dismiss Count IV. Count III is labeled as a strict liability count. Such labels, however, are not controlling in federal court. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir.2000); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir.1999); *Paige v. Hines*, 2006 WL 2252703 \*2 (N.D.Ill. Aug.3, 2006). In Count III, it is alleged that Grants knowingly sold a defective and dangerous washing machine. That can be construed as an allegation of negligence. *See Werckenthein v. Bucher Petrochemical Co.*, 248 Ill.App.3d 282, 188 Ill.Dec. 332, 618 N.E.2d 902, 907-08 (1st Dist.1993). *Cf. Blue v. Environmental Engineering, Inc.*, 215 Ill.2d 78, 293 Ill.Dec. 630, 828 N.E.2d 1128, 1141-42 (2005) (distinguishing strict liability and negligence product design claims). Negligence claims are not strict liability claims and therefore are not subject to dismissal under § 2-621. *Link by Link v. Venture Stores, Inc.*, 286 Ill.App.3d 977, 222 Ill.Dec. 283, 677 N.E.2d 486, 488 (5th Dist.), *appeal denied,* 174 Ill.2d 566, 227 Ill.Dec. 7, 686 N.E.2d 1163 (1997); *Korologos v. Radium Chemical Co.*, 1986 WL 7700 \*3 (N.D.Ill. June 27, 1986); *Ison v. Invacare Corp.*, 2004 WL 539982 \*1 (N.D.Ill. March 12, 2004) (dictum ). *See also Ungaro v. Rosalco, Inc.*, 948 F.Supp. 783, 786 (N.D.Ill.1996) (1995 amendment to § 2-621 extended application to

negligence claims). Even if any strict liability aspect of plaintiff's claim against Grants is subject to dismissal under § 2-621, any negligence claim apparently would survive.

Second, plaintiff contends that the § 2-621(c)(2) exception would apply because it alleges that Grants had knowledge of the defective washing machine door. A federal case has held that, in federal court, the invocation of § 2-621 should be treated the same as a Fed.R.Civ.P. 12(b)(6) motion. At the pleading stage in federal court, the First Amended Complaint's allegation of knowledge would apparently be sufficient to invoke the subsection (c)(2) exception and prevent dismissal at this time. *See Indeck Power Equipment Co. v. Jefferson Smurfit Corp.*, 881 F.Supp. 338, 342 (N.D.Ill.1995). At least one state court case has placed emphasis on the use of "show" in subsection (c), indicating that a plaintiff must making "a showing" to invoke a subsection (c) exception. *See Logan v. West Coast Cycle Supply Co.*, 197 Ill.App.3d 185, 143 Ill.Dec. 153, 553 N.E.2d 1139, 1143 (2d Dist.1990). In that case, however, the plaintiff had not alleged actual knowledge to support a subsection (c)(2) exception, having only alleged that "it is possible an expert may testify" to that effect. *Id.* Even if plaintiff's remaining claim against Grants is construed as a strict liability claim only, it is possible that plaintiff's allegation of knowledge is sufficient to defeat Grants' motion to dismiss or that plaintiff would otherwise be permitted discovery prior to the dismissal of Grants.

**\*3** For the foregoing reasons, plaintiff has a nonfrivolous basis for contending that Grants should not be dismissed. Plaintiff's motion for reconsideration is granted. The prior ruling granting defendant Grants' motion to dismiss is vacated. Therefore, Count III is reinstated, which brings Grants back into the case and destroys diversity. Grants' motion to dismiss remains pending and will not be ruled upon prior to the remand. The merits of that motion are left for the Circuit Court to rule upon in the first instance. Grants should notice that motion for presentation before the Circuit Court so that the Circuit Court will be aware it is pending and so that plaintiff will have the opportunity to appear on the motion and oppose it.

IT IS THEREFORE ORDERED that plaintiff's motion for reconsideration [12] is granted in part and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2930972 (N.D.Ill.)
**2006 WL 2930972 (N.D.Ill.)**

denied in part. The prior ruling on defendant Grants'
motion to dismiss is vacated without prejudice so that
the motion to dismiss is again pending. Count III of
the First Amended Complaint is reinstated. Plaintiff's
motion to remand [9] is granted. The Clerk of the
Court is directed to remand this case to the Circuit
Court of Cook County, Illinois, County Department,
Law Division. Each party shall bear its own costs on
removal.

N.D.Ill.,2006.
Potter v. Electrolux Home Products, Inc.
Slip Copy, 2006 WL 2930972 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy

Slip Copy, 2008 WL 2328349 (S.D.Tex.)

**2008 WL 2328349 (S.D.Tex.)**

Page 1

**H**Prophet v. Myers

S.D.Tex.,2008.

Only the Westlaw citation is currently available.

United States District Court,S.D. Texas,Houston Division.

John C. PROPHET, Plaintiff,

v.

Joan MYERS, Myers and Associates, P.C., and Ford Motor Credit Company, LLC, Defendants.

**Civil Action No. H-08-0492.**

June 4, 2008.

Matthew Brian Probus, Wauson Probus, Sugar Land, TX, for Plaintiff.

John R. Strawn, Jr., Cruse Scott et al., Robert G. Devlin, Devlin Naylor et al., Houston, TX, for Defendants.

### *MEMORANDUM AND ORDER*

NANCY F. ATLAS, District Judge.

*1 Pending before the Court is a Motion to Dismiss [Doc. # 13] filed by Defendants Joan Myers ("Myers") and Myers and Associates, P.C. ("M & A"). Plaintiff John C. Prophet has responded [Doc. # 14] and Defendants have replied [Doc. # 15]. Upon review of the parties' submissions, all pertinent matters of record, and applicable law, the Court concludes that Defendants' Motion to Dismiss should be **denied.**

### I. *FACTUAL BACKGROUND*

Prophet brings this lawsuit for alleged violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq* ., the Texas Collection Practices Act, TEX. FIN.CODE § 392.001 *et seq.,* and the Texas Deceptive Trade Practices Act, TEX. BUS. & COM.CODE § 17.41 *et seq.* Prophet also seeks a declaratory judgment under the federal Declaratory Judgment Act, 28 U.S.C. § 2201.[FN1]Prophet alleges that Defendant Ford Motor Credit Company, LLC ("Ford"), hired Defendant M & A, a company owned and operated by Defendant Myers, to collect a debt incorrectly believed to be owed to Ford by Prophet. Prophet claims that Myers and her company were engaged in illegal debt collection practices in violation of Texas and federal law.

> FN1. Neither Myers nor M & A are parties to this claim. They raise no argument in support of its dismissal.

Specifically, Prophet alleges that M & A sent Prophet a demand letter, signed by "Joan Myers, Attorney at Law," but that Myers did not actually sign the letter or personally handle the Prophet account.[FN2]Prophet claims that Myers and her company "falsely represented or implied that [the] communication [ ][was] from an attorney" in violation of state and federal law. Prophet further alleges that Myers, through her company, misrepresented the terms on which Ford would have agreed to settle the alleged debt, also in violation of state and federal law. Finally, Prophet seeks a declaration that the debt at issue is not owed by him.

> FN2. The letter is attached as Exhibit A to Prophet's Complaint [Doc. # 1].

Defendants seek dismissal of Prophet's claims, characterizing his statutory claims as fraud claims subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), and arguing that the Complaint fails to plead with particularity, as required by the Rule. Defendants alternatively claim that Prophet's Complaint does not allege facts upon which relief may be granted.

### II. *STANDARDS OF LAW*

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Manguno v. Prudential Prop. and Cas. Ins. Co.,* 276 F.3d 720, 725 (5th Cir.2002). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Id.* A claim is legally insufficient under Rule 12(b)(6)"only if there is no set of facts that could be proven consistent with the allegations in the complaint that would entitle the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

plaintiff to relief." _Power Entm't, Inc. v. Nat'l Football League Prop., Inc._, 151 F.3d 247, 249 (5th Cir.1998). However, "a statement of facts that merely creates a suspicion that the pleader might have a right of action" is insufficient to overcome a motion to dismiss. _Campbell v. City of San Antonio_, 43 F.3d 973, 975 (5th Cir.1995) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1216 at 156-59).

**\*2** A cause of action can fail to state a "claim upon which relief can be granted" if, _inter alia_, it fails to comply with the requirements of Rule 8(a)(2). _See, e.g., Buerger v. Sw. Bell Tel. Co._, 982 F.Supp. 1247, 1249-50 (E.D.Tex.1997); _Bank of Abbeville & Trust Co. v. Commonwealth Land Title Ins. Co._, 201 F. App'x 988, \*2 (5th Cir. Oct.9, 2006) ("[A] Rule 12(b)(6) motion to dismiss for failure to state a claim may be a proper vehicle to challenge the sufficiency of a pleading under Rule 8."). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The United States Supreme Court has made clear, however, that a plaintiff is obligated to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." _Bell Atl. Corp. v. Twombly_, --- U.S. ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (citing _Papasan v. Allain_, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation.")). "Factual allegations must be enough to raise a right to relief above the speculative level." _Twombly_, 127 S.Ct. at 1965. "Rule 8(a)(2) still requires a showing, rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests." _Id._ at 1965 n. 3 (internal quotations omitted).

In addition, Rule 9 of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b); _see Leatherman v. Tarrant County Narcotics Intelligence Unit_, 507 U.S. 163, 168-69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); _Hart v._

_Bayer Corp._, 199 F.3d 239, 247 n. 6 (5th Cir.2000). In particular, the pleadings should "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." _Southland Sec. Corp. v. INSpire Ins. Solutions, Inc._, 365 F.3d 353, 362 (5th Cir.2004) (quoting _Williams v. WMX Tech., Inc._, 112 F.3d 175, 177-78 (5th Cir.1997)). Rule 9(b) requires a plaintiff to allege the existence of facts sufficient to warrant the pleaded conclusion that fraud has occurred. _See In re Haber Oil Co._, 12 F.3d 426, 439 (5th Cir.1994) (emphasis added). Because the requirements of Rule 9 are more stringent than those for Rule 8, the Supreme Court's decision in _Twombly_ applies with at least equal force to the Rule 9 pleading requirements.

Ordinarily, "[i]n considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings .... " _Collins v. Morgan Stanley Dean Witter_, 224 F.3d 496, 498 (5th Cir.2000). However "documents whose contents are alleged in a complaint and whose authenticity no party questions" may be considered on a motion to dismiss. _See id._ at 498-99.

### III. _ANALYSIS_

### A. _Failure to Plead Sufficient Facts_

**\*3** Defendants characterize Prophet's statutory claims as claims sounding in fraud, for which the heightened pleading requirements of Federal Rule of Civil Procedure

9(b) apply. However, Defendants cite no cases establishing that claims under the statutory provisions at issue in this matter are subject to Rule 9(b).

In fact, with regard to the FDCPA, "[c]ourts considering the issue have invariably determined the sufficiency of FDCPA pleadings by applying Rule 8 rather than Rule 9(b)." _Cargile v. Baylor Health Care Sys._, No. 3:04-CV-1365-B, 2005 U.S. Dist. LEXIS 22141, at \* 16, 2005 WL 2445482 (N.D.Tex. Aug. 10, 2005) (Boyle, J.) (quoting _Sullivan v. Equifax, Inc._, 2002 U.S. Dist. LEXIS 7884, 2002 WL 799856 (E.D. Pa. April 19, 2002) (collecting cases)); _see also Carlson_, 378 F.Supp.2d 128 (applying Rule 8(a) to an FDCPA claim). This is so even when a plaintiff alleges that a defendant made false representations in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2328349 (S.D.Tex.)
**2008 WL 2328349 (S.D.Tex.)**

violation of § 1692e of the FDCPA, largely because "establishing a violation of § 1692e is a substantially different matter than establishing common law fraud." *Neild v. Wolpoff & Abramson, LLP,* 453 F.Supp.2d 918, 923 (E.D.Va.2006). For example, "a plaintiff asserting a claim under § 1692e need not prove actual reliance on a false representation ... [nor] establish actual damages." *Id.* (internal quotation marks and citations omitted). The same would be said for claims under the TCPA, as-at least for purposes of this case-the conduct made unlawful by that act is virtually identical to the conduct made unlawful by the FDCPA.[FN3]

> FN3. The FDCPA provisions at issue in this case prohibit a debt collector from making a "false representation or implication that any individual is an attorney or that any communication is from an attorney," 15 U.S.C. § 1692e(3), and from using "any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," 15 U.S.C. § 1692e(10). The TCPA provisions at issue make it unlawful for a debt collector to "represent [ ] falsely the status or nature of services rendered by the debt collector or the debt collector's business," TEX. FIN.CODE § 392.304(a)(14), "us [e] a communication that purports to be from an attorney or law firm if it is not," TEX. FIN.CODE § 392.304(a)(16) "represent[ ] that a consumer debt is being collected by an attorney if it is not," TEX. FIN.CODE § 392.304(a)(17), and "us[e] any other false representation or deceptive means to collect a debt or obtain information concerning a consumer," TEX. FIN.CODE § 392.304(a) (19).

As for Prophet's DTPA claim, even though he must prove, *inter alia,* that Defendants "engaged in false, misleading, or deceptive acts," *Doe v. Boys Club,* 907 S.W.2d 472, 478 (Tex.1995), "[a] claim under the Texas DTPA is covered by the notice pleading standard in [Federal Rule of Civil Procedure] 8(a), not the heightened standard for fraud claims set forth in [Rule] 9(b)." *Sherwin Alumina, L.P. v. Aluchem, Inc.,* No. C-06-210, 2007 U.S. Dist. LEXIS 21237, at * 10-* 11 (S.D.Tex. Mar. 23, 2007) (Jack, J.) (citing *Kennard v. Indianapolis Live Ins. Co.,* 420

F.Supp.2d 601, 609 (N.D.Tex.2006) ("[T]he court finds that Rule 9(b) should not be applied to [Plaintiff's] claims under the DTPA ...."); *Infomart (India), PVT., Ltd. v. Metrowerks Corp.,* No. 3:04-CV-1299-V, 2005 U.S. Dist. LEXIS 11095, at * 14-*15, 2005 WL 292433 (N.D.Tex. Feb. 7, 2005) (Godbey, J.); *Metro. Life Ins. Co. v. Bialik,* No. 3-99-CV2679-M, 2001 WL 322458, at *4 (N.D.Tex. Mar.30, 2001) (Kaplan, Mag.); *Bur-Cold Express, Inc. v. Parker Hannifin Corp.,* 808 F.Supp. 553, 555-56 (S.D.Tex.1992)); *see also Gen. Retail Servs. v. Wireless Toyz Franchise, L.L. C.,* 255 F. App'x 775, 795 n. 14 (5th Cir.2007).

Nonetheless, assuming *arguendo* that Rule 9(b) is to be applied to these claims, Prophet's Complaint easily defeats a motion to dismiss. When a defendant challenges a complaint for failing to plead with the particularity demanded by Rule 9(b), the Court is directed to ensure that the plaintiff has alleged "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992) (internal quotations marks and citation omitted). "Put simply, Rule 9(b) requires the 'who, what, when, where, and how' to be laid out." *Benchmark Elecs. Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir.2003) (quoting *Williams,* 112 F.3d at 179). Prophet's Complaint does exactly that. Prophet alleges who-Joan Myers and Myers and Associates, P.C.-what-misrepresentations concerning attorney involvement and settlement terms-when-on March 12, 2007, the date on the demand letter mailed to Prophet by Defendants-where-from Defendants' place of business-and how-via the letter attached to Prophet's Complaint.

*\*4* Based on these allegations, Prophet has sufficiently put Defendants on notice of the challenged assertions and of what they must defend. Indeed, Defendants' assertion that "it is impossible to determine that any facts exist to support Plaintiff's fraud-based claims"[FN4] is patently frivolous. Prophet's Complaint meets both the liberal pleading standards of Rule 8(a) and the heightened pleading requirements of Rule 9(b). Accordingly, Defendants' motion to dismiss on this ground is denied.

> FN4. Defendants' Motion to Dismiss [Doc. # 13], ¶ 6.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2328349 (S.D.Tex.)
**2008 WL 2328349 (S.D.Tex.)**

**B. *Failure to Plead a Cognizable Claim***

Next, Defendants argue that Prophet has failed to plead a cognizable claim, at least with regard to the alleged statements concerning the terms of settlement offer made to Prophet in the M & A letter. The relevant portion of the letter states:

> Our client, FORD MOTOR CREDIT COMPANY, has authorized this office to settle your account balance of $11,734.54 with the acceptance of 50% of the total balance, or **$5,867.27. Payment** must be received in our office within 30 days of the date of this letter.

> After receipt of full payment, your account will be reported to the credit bureaus as settlement paid showing a zero balance.<u>FN5</u>

>> <u>FN5.</u>*See* Complaint [Doc. # 1], at Exh. A (emphasis in original).

Defendants argue that the statements concerning the terms of the settlement are not misleading on their face and, accordingly, that they do not violate the FDCPA provision prohibiting "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt ...." <u>15 U.S.C. § 1692e(10)</u>. Specifically, Defendants assert that, contrary to Prophet's allegation that the terms stated suggest that Ford was making a "one time only" deal, the terms are open to no such interpretation. Therefore, Defendants assert that the letter does not violate the FDCPA.

"Section 1692e(10) was enacted to thwart abusive, false, or misleading debt collection practices."*Goswami v. Am. Collections Enter., 377 F.3d 488, 494 (5th Cir.2004)*."[I]n determining whether a violation of the FDCPA has occurred, the debt collector's representations, notices[,] and communications to the consumer must be viewed objectively from the standpoint of the 'least sophisticated consumer.' " *Taylor v. Perrin, Landry, deLaunay & Durand, 103 F.3d 1232, 1236 (5th Cir.1997)*. "This standard serves the dual purpose of protecting all consumers, including the inexperienced, the untrained[,] and the credulous, from deceptive debt collection practices and

protecting debt collectors against liability for bizarre or idiosyncratic consumer interpretations of collection materials." *Id.* (citing <u>Clomon v. Jackson, 988 F.2d 1314, 1318-19 (2d Cir.1993)</u>). Thus, while "it is important to permit collection agencies to offer settlements," they must do so "in a nondeceitful manner." *Goswami,* 377 F.3d at 496.

To that end, some courts have found that, absent language stating specifically that a settlement offer is a "one-time-only, take-it-or-leave-it"-type offer, a letter similar to the one at issue in this case is not deceptive. *See, e.g., <u>Dupuy v. Weltman, 442 F.Supp.2d 822, 828-29 (N.D.Cal.2006); Johnson v. AMO Recoveries, 427 F.Supp.2d 953, 955-57 (N.D.Cal.2005)</u>.* Other courts, however, have been more circumspect, and require that any settlement offer open for only a specified period of time include language suggesting that renewal of the offer is a "possibility[,] but that it is not assured."<u>*Evory v. RJM Acquisitions Funding L.L. C., 505 F.3d 769, 775-76 (7th Cir.2007)*</u>.

***5** In this circuit, the law governing this issue is unsettled. The leading case in the Fifth Circuit addressing settlement offers by debt collectors held that an offer stating that "only during the next thirty days, will our client agree to settle your outstanding balance due with a thirty (30%) percent discount off your ... balance owed" was deceptive and in violation of the FDCPA. *Goswami,* 377 F.3d at 495. The Court began its analysis by noting that the statement itself was false. "In actual fact, [the creditor] had authorized [the debt collector] to give debtors such as [the plaintiff] a 30% discount at *any time,* not just for a period of thirty days."*Id.* Thus, the Court was persuaded that by using language suggesting that the offer was a "one-time, take it-or-leave-it offer that would expire in thirty days ... the obvious purpose of the statement was to push [the debtor-plaintiff] to make a rapid payment to take advantage of the purported limited time offer."*Id.* Accordingly, while the *Goswami* Court recognized the need and value in permitting debt collectors to make settlement offers, the Court was clear that such offers must accurately reflect the terms a debt collector is authorized by the creditor to make. *Id.* at 496.

In this case, while the letter at issue does not state that the M & A settlement offer is "only" available for thirty days, it does state that **"Payment** must be

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

received in our office within 30 days of the date of this letter."[FN6] There is nothing to temper this statement, such a language stating that payment "must be received in our office no later than 30 business days from the date of this letter unless you contact your office to make other arrangements." *See* Goswami, 377 F.3d at 492. Thus, whether the language of the M & A settlement offer, in the context of the letter as a whole, is deceptive under the FDCPA, cannot-and should not-be resolved on a motion to dismiss, especially in light of the lack of controlling authority on this issue. *See* Evory, 505 F.3d at 776 (holding that a claim of deception under the FDCPA presents questions of fact and should only be dismissed on the pleadings if "[a] plaintiff ... rest[s] on the text of the communication and [has] no other evidence to offer, and ... if there [is] nothing deceptive-seeming about the communication"). Prophet is entitled to discovery to determine whether, and to what extent, the settlement offer accurately represented the terms authorized by Ford and whether, and to what extent, the M & A letter was deceptive in communicating those terms.

FN6. *See id.* (emphasis in original).

Prophet alleges in his Complaint that the M & A letter was deceptive in violation of the FDCPA, both because it purported to be from an attorney and because the settlement terms offered were misleading. Defendants offer no argument in support of dismissal of the former theory and there is no authority in this Circuit holding the latter theory is *per se* meritless. Accordingly, Prophet has stated a claim for relief under that statute.

\*6 Further, because the Court has original jurisdiction over the FDCPA claim, the Court exercises supplemental jurisdiction over Prophet's state law claims, all of which "derive from a common nucleus of operative fact," such that the claims would ordinarily be tried in one judicial proceeding. *State Nat'l Ins. Co. v. Yates*, 391 F.3d 577, 579 (5th Cir.2004).

**IV. *CONCLUSION***

Based on the foregoing, it is hereby

**ORDERED** that Defendants' Motion to Dismiss [Doc. # 13] is **DENIED.**

SIGNED at Houston, Texas, this **4th** day of **May, 2008.**

S.D.Tex.,2008.
Prophet v. Myers
Slip Copy, 2008 WL 2328349 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 147268 (E.D.Tex.)
**2005 WL 147268 (E.D.Tex.)**

CRape v. Medtronic, Inc.
E.D.Tex.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas, Lufkin
Division.
Bonnie RAPE
v.
MEDTRONIC, INC., et al.
**No. Civ.A. 9:04CV225.**

Jan. 11, 2005.

George Edmond Chandler, Michael Kirk Mathis,
Chandler Law Offices, Lufkin, TX, for Plaintiff.
J. Michael Myers, Ball & Weed, San Antonio, TX,
for Defendants.

*ORDER ON PLAINTIFF'S MOTION TO REMAND*

GUTHRIE, Magistrate J.
**\*1** Asserting diversity jurisdiction pursuant to 28
U.S.C. § 1332, Defendant Medtronic, Inc., filed a
notice of removal on November 1, 2004. Plaintiff
filed a Motion to Remand (docket # 7) on November
30, 2004, seeking to remand this lawsuit back to the
159th/217th Judicial District Courts of Angelina
County, Texas.

*Background*

Plaintiff filed this lawsuit in the 159th/217th Judicial
District Courts of Angelina County, Texas, on
October 1, 2004. The lawsuit concerns a medical
device referred to as a Model 3031 Interstim Sacral
Nerve Stimulator. The device was implanted in
Plaintiff on September 10, 2001, at Memorial
Hospital in Lufkin, Texas. Plaintiff alleges that the
device malfunctioned causing severe and permanent
injuries. According to Plaintiff, Medtronic designed,
manufactured, marketed and sold the device in a
defective condition, thus causing her injuries.
Plaintiff complains that Medtronic and Severn knew
or should have known of the unreasonably dangerous
condition of the device and failed to correct the
problem or warn Plaintiff. The complaint alleges
negligence by Medtronic for its actions, as well as

those of its agents, servants, employees and
representatives.

Plaintiff seeks to remand the case to the District
Court of Rusk County, Texas, on the ground that
complete diversity does not exist as required by 28
U.S.C. § 1332. Both Plaintiff and Severn are citizens
of the same State-Texas. Plaintiff denies that Jason
Severn was fraudulently joined as defendant in this
lawsuit.

Medtronic filed a response on December 15, 2004.
Medtronic argues that the complaint does not state a
cause of action against Severn and that he was
fraudulently joined as a defendant in this lawsuit in
an attempt to defeat diversity jurisdiction. Thus,
Medtronic submits that Severn's citizenship does not
destroy diversity in this case. Medtronic additionally
asserts that there is federal question jurisdiction in
this case because the Medical Device Amendments to
the Federal Food, Drug & Cosmetic Act, 21 U.S.C.
§§ 301-392 ("MDA") preempts Plaintiff's state law
claim.

A reply was filed by Plaintiff on December 22, 2004,
to which Medtronic filed a Surresponse on December
28, 2004.

*Discussion and Analysis*

Pursuant to 28 U.S.C. § 1441(a), a civil action filed
in a state court is removable to a federal court if the
federal court has original jurisdiction. In other words,
removal of a state court action to federal court is only
proper if the action could have been originally filed
in the federal court.*Caterpillar v. Williams*, 482 U.S.
386, 391-92, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318
(1987). The party who removes the case to federal
court bears a heavy burden. *Sid Richardson Carbon
& Gasoline Co. v. Interenergy Resources, Ltd.*, 99
F.3d 746, 751 (5th Cir.1996). Cases involving a claim
"arising under the Constitution, treaties or laws of the
United States" are removable. 28 U.S.C. § 1441(b).
Likewise, a case is removable if "none of the parties
in interest properly joined and served as defendants is
a citizen of the State in which such action is
brought."28 U.S.C. § 1441(b).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 147268 (E.D.Tex.)
**2005 WL 147268 (E.D.Tex.)**

*Preemption*

**\*2** In this case, Medtronic's notice of removal first asserts that removal is proper because there is federal question jurisdiction pursuant to 28 U.S.C. § 1331. In this regard, Medtronic alleges that the MDA preempts Plaintiff's state law product liability claim.

There are two distinct types of federal preemption: "complete preemption," which creates federal removal jurisdiction, and "ordinary preemption," which only serves as a federal defense and does not create federal removal jurisdiction. *Heimann v. National Elevator Indus. Pension Fund*, 187 F.3d 493, 499 (5th Cir.1999). "Complete preemption" occurs only when Congress has "so completely [preempted] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life Insurance Company v. Taylor*, 481 U.S. 58, 63-64, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). Complete preemption is jurisdictional in nature and may be established by showing that: (1) a statute contains a civil enforcement provision that creates a cause of action that both replaces and protects the analogous area of state law; (2) there is a specific jurisdictional grant to the federal courts for enforcement of the right; and (3) there is a clear Congressional intent that claims brought under the federal law be removable. *Johnson v. Baylor University*, 214 F.3d 630, 632 (5th Cir.2000) (citing *Heimann*, 187 F.3d at 500 (5th Cir .1999)). The more common "ordinary preemption," otherwise referred to as "conflict preemption," is an affirmative defense to a claim under state law that may arise either by statute or by a conflict between federal and state law. *Id.*

Medtronic does not discuss the complete preemption factors as set out in *Johnson* in its response to the motion to remand. More specifically, Medtronic does not show that the MDA contains a civil enforcement provision creating a cause of action that replaces and protects the analogous area of state law or that there is a clear Congressional intent that claims involving the MDA be removable. Instead, Medtronic presents arguments for ordinary preemption as a defense to Plaintiff's state law claims. The Fifth Circuit case primarily relied upon by Medtronic on the issue of preemption, *Martin v. Medtronic, Inc.*, 254 F.3d 573 (5th Cir.2001), *cert. denied,* 534 U.S. 1078, 122 S.Ct.

807, 151 L.Ed.2d 693 (2002), does not discuss preemption in the context of removal. *Martin* involved the issue of whether the MDA preempted a plaintiff's state law product liability claims on a motion for summary judgment. In other words, preemption was raised as a defense to the state law claims in a motion for summary judgment. The issue to be decided at this juncture of this case is whether the MDA completely preempts state product liability claims, thereby creating federal removal jurisdiction. The Supreme Court case cited by both parties, *Medtronic, Inc., v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), likewise evaluated MDA preemption in the context of a motion for summary judgment; not federal removal jurisdiction. Medtronic has not cited a Supreme Court or Fifth Circuit case finding that complete preemption exists under the MDA such that state law product liability claims are removable to federal court on the basis of federal question jurisdiction. Indeed, the cases cited by Medtronic from other circuits also involve MDA preemption as a defense in a motion for summary judgment and do not hold that the MDA provides complete preemption of state law claims thus creating federal removal jurisdiction. *See, e.g., Horn v. Thoratec Corp.*, 376 F.3d 163 (3rd Cir.2004); *Kemp v. Medtronic, Inc.*, 231 F.3d 216 (6th Cir.2000); *Brooks v. Howmedica, Inc.*, 273 F.3d 785 (8th Cir.2001); *Mitchell v. Collagen Corp.*, 126 F.3d 902 (7th Cir.1997); *Martello v. Ciba Vision Corp.*, 42 F.3d 1167 (8th Cir.1994); and *King v. Collagen Corp.*, 983 F.2d 1130 (1st Cir.1993). Medtronic has not shown complete preemption to support its assertion that removal was proper based upon federal question jurisdiction.

*Improper Joinder*

**\*3** Medtronic additionally alleges that there is federal jurisdiction based upon diversity of citizenship because Plaintiff fraudulently joined Severn to destroy diversity jurisdiction. The burden is on the removing party to prove that non-diverse parties have been fraudulently joined to defeat diversity-that is, to show that a sham defendant was added to defeat jurisdiction.*Smallwood v. Illinois Central Railroad Co.*, 385 F.3d 568 (5th Cir.2004); *Rodriguez v. Sabatino*, 120 F.3d 589, 591 (5th Cir.1997). To meet this burden, Medtronic must show either that Plaintiff committed outright fraud in his recitation of jurisdictional facts or that there is absolutely no

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 147268 (E.D.Tex.)
**2005 WL 147268 (E.D.Tex.)**

possibility Plaintiff will be able to establish a cause of action against the in-state Defendant, Severn, in state court. *Id.* at 573 (citing *Travis v. Irby,* 326 F.3d 644, 646-47 (5th Cir.2003)); *Rodriguez,* 120 F.3d at 591 (citing *Burden v. General Dynamics Corp.,* 60 F.3d 213, 217 (5th Cir.1995); *Cavallini v. State Farm Mut. Auto Ins. Co.,* 44 F.3d 256, 259 (5th Cir.1995)). In this case, Medtronic alleges that Plaintiff cannot establish a cause of action against Severn in state court. To succeed on this claim of improper joinder, Plaintiff must show that there is no possibility of recovery against Severn. *Travis,* 326 F.3d at 648. Stated differently, Plaintiff must show "there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against the in-state defendant."*Smallwood,* 385 F.3d at 573.[FN1]

> FN1. This is the standard to be used. The Fifth Circuit stated in *Smallwood,*"[t]o reduce possible confusion, we adopt this phrasing of the required proof and reject all others, whether the others appear to describe the same standard or not."*Smallwood,* 385 F.3d at 573.

In evaluating Defendant's claim of improper joinder, the Court must view the factual allegations in Plaintiff's state court pleadings in the light most favorable to Plaintiff, resolving all contested issues of substantive fact in favor of Plaintiff. *Rodriguez,* 120 F.3d at 591 (citing *Green v. Amerada Hess Corp.,* 707 F.2d 201, 205-06 (5th Cir.1983), cert. denied, 464 U.S. 1039, 104 S.Ct. 701, 79 L.Ed.2d 166 (1984)). Additionally, the Court must examine the relevant state law and resolve uncertainties in favor of Plaintiff. *Id.* The Court must conclude that joinder is proper if there is any possibility Plaintiff has stated a cause of action against an in-state Defendant. *Burden v. General Dynamics Corp.,* 60 F.3d 213, 216 (5th Cir.1995). This inquiry should not include an evaluation of the merits of Plaintiff's claim. *Id.* The Court should resolve the issue of fraudulent joinder by a summary determination resolving disputed issues of fact in favor of Plaintiff. *Id.* at 217.This determination is a Rule 12(b)(6)-type analysis, looking at "the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant."*Smallwood,* 385 F.3d at 573. A further inquiry beyond the complaint, referred to as piercing the pleadings, should only occur in rare circumstances if a plaintiff

has misstated or omitted discrete facts that would determine the propriety of joinder. *Id.* It is only appropriate to pierce the pleadings to "identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant."*Id.* at 573-74.

**\*4** Plaintiff's Original Petition, filed in Angelina County on October 1, 2004, alleges that Severn was a sales representative for Medtronic and that Severn sold the device at issue that was implanted in Plaintiff. Without naming Severn specifically, Plaintiff alleges that, "Defendants knew or should have known of the unreasonably dangerous condition of the Medtronic product in question and neither corrected or warned Plaintiff of it."All other allegations in the original complaint are specifically directed at Medtronic.[FN2]

> FN2. Plaintiff alleges that Medtronic designed, manufactured, marketed and sold the device at issue in a condition that was defective and unsafe for its intended purpose, that the device was defective and unreasonably dangerous, that there was no adequate warning that the device would malfunction, that Medtronic expressly and impliedly warranted to the public and to Plaintiff that the device was of merchantable quality and was safe and fit for the purpose intended, and that Medtronic was negligent as a result of the acts and omissions of Medtronic, as well as its agents, servants, employees and representatives.

Plaintiff asserts that an affidavit submitted with her motion to remand should be considered together with the complaint.[FN3]As explained above, however, it is only appropriate to go beyond the complaint in the rare circumstance where it is necessary to identify undisputed facts that were misstated or omitted from the complaint that would preclude recovery against the in-state defendant. *Smallwood,* 385 F.3d at 573-74. Plaintiff, on the other hand, is attempting to introduce disputed facts concerning Severn's actions that would support her claim for recovery against Severn. As such, the inquiry in this case is limited to the complaint.

> FN3. In the affidavit attached to her motion to remand, Plaintiff alleges that Defendant

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Jason Severn, acting as a sales representative for Medtronic, made a misrepresentation concerning the scope of her activities following surgery, participated in the implantation of the device and made adjustments to the device after implantation.

The issue, then, is whether the allegations found in Plaintiff's complaint show a reasonable basis to predict that Plaintiff might be able to recover against Severn. Plaintiff alleges that Severn, as a Medtronic sales representative, was negligent in failing to correct the dangerous condition presented by the device and in failing to warn her of the device's dangerous condition. Factually, the complaint alleges nothing more than the fact that Severn was the sales representative that sold the device.

As stated above, the burden is on Medtronic, the removing party, to show that Severn was improperly joined. Medtronic argues that Plaintiff has not stated a negligence claim against Severn because Medtronic, as Severn's employer, would be vicariously liable for any negligence allegedly committed by Severn in the good faith execution of his job. Further, Medtronic argues that the complaint does not state a claim against Severn under Texas product liability law because it does not allege that Severn personally participated in the device's manufacturing, marketing and design and Plaintiff cannot establish a claim against Severn pursuant to Tex.Civ. Pract. & Rem.Code § 82.003(a). Medtronic submits that Severn was not a "seller" as defined in the statute and he does not meet the criteria for a liable non-manufacturing seller.

The complaint alleges that Severn was employed by Medtronic as a sales representative. Under the doctrine of respondeat superior, Medtronic, as Severn's employer, is vicariously liable for any negligence allegedly committed by Severn that was within the scope of his employment. *Baptist Memorial Hospital System v. Sampson,* 969 S.W.2d 945 (Tex.1998); Restatement (Second) of Agency § 219.[FN4] The complaint does not allege that Severn acted outside the scope of his employment. Plaintiff's pleadings additionally do not cite any case law to support her conclusion that Severn, as the sales representative that sold the device, may be liable for the damages she allegedly suffered as a result of the device's malfunction. As such, viewing the complaint

in the light most favorable to Plaintiff, Medtronic is vicariously liable for any negligent acts of Severn at issue in this case.

> FN4. "A master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Restatement (Second) of Agency § 219(1).

**\*5** To the extent Plaintiff asserts a product liability claim against Severn individually, Medtronic asserts that Severn does not meet the definition of a "seller" or the requirements for liability found in Tex.Civ.Pract. & Rem.Code § 82.003. Pursuant to § 82.001(3), the term "seller" means "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or component part thereof." Medtronic argues that Severn does not meet the definition of "seller" because he is an employee of the manufacturer as opposed to an independent seller of the product. Assuming, *arguendo,* that Severn meets the definition of a "seller," § 82.003 states that:

(a) A seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves:

(1) that the seller participated in the design of the product;

(2) that the seller altered or modified the product and the claimant's harm resulted from that alteration or modification;

(3) that the seller installed the product, or had the product installed, on another product and the claimant's harm resulted from the product's installation onto the assembled product;

(4) that:

(A) the seller exercised substantial control over the content of a warning or instruction that accompanied the product;

(B) the warning or instruction was inadequate; and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 147268 (E.D.Tex.)
**2005 WL 147268 (E.D.Tex.)**

(C) the claimant's harm resulted from the inadequacy of the warning or instruction;

(5) that:

(A) the seller made an express factual representation about an aspect of the product;

(B) the representation was incorrect;

(C) the claimant relied on the representation in obtaining or using the product; and

(D) if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm;

(6) that:

(A) the seller actually knew of a defect to the product at the time the seller supplied the product; and

(B) the claimant's harm resulted from the defect; or

(7) that the manufacturer of the product is:

(A) insolvent; or

(B) not subject to the jurisdiction of the court.

In this case, Plaintiff alleges in the complaint that Severn sold the device and knew or should have known of the allegedly unreasonably dangerous condition of the device. She further alleges that the unreasonably dangerous condition and defects of the device caused her harm. Construing these allegations liberally in the light most favorable to Plaintiff, Plaintiff states a claim under § 82.003(6). Medtronic does not cite any authority for its assertion that Severn is not a "seller" as defined in 82.001 because he is employed by the manufacturer. As previously stated, the burden is on Medtronic to show that Severn was improperly joined. Medtronic has not shown that there is no reasonable basis for the court to predict that Plaintiff might be able to recover against Severn. Therefore, Medtronic has not met its burden of showing that Severn was improperly joined. Both Plaintiff and Severn are citizens of the State of Texas and there is not complete diversity among the parties as required by 28 U.S.C. § 1332. The motion to remand should be granted.

**\*6** In light of the foregoing, it is hereby

ORDERED that Plaintiff's Motion to Remand (docket # 7) is GRANTED. The above-styled lawsuit is accordingly REMANDED to the 159th/217th Judicial District Court of Angelina County, Texas.

So ORDERED and SIGNED.

E.D.Tex.,2005.
Rape v. Medtronic, Inc.
Not Reported in F.Supp.2d, 2005 WL 147268 (E.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 4199781 (S.D.Fla.)
**2007 WL 4199781 (S.D.Fla.)**

**C**Romano v. Motorola, Inc.
S.D.Fla.,2007.
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.
Diego ROMANO, individually and on behalf of all
others similarly situated, Plaintiff,
v.
MOTOROLA, INC., a Delaware Corporation,
Defendant.
**No. 07-CIV-60517.**

Nov. 26, 2007.

Christopher Lang Marlowe, Aronovitz Trial Lawyers,
Miami, FL; Mark S. Fistos, Tallahassee, FL, Jay
Martin Klitzner, Plantation, FL, Steven R. Jaffe, Tod
N. Aronovitz, Aronovitz, Jaffe, Miami, FL, Eric C.
Brunick, Freed & Weiss, Chicago, IL, for Plaintiff.
Lawrence Dean Silverman, Scott Brian Cosgrove,
Akerman, Senterfitt, Miami, FL, Mark L. Durbin,
Martin D. Snyder, Michael Dockterman, Wildman,
Harrold, Allen & Dixon, Chicago, IL, for Defendant.

***MEMORANDUM ORDER DENYING
DEFENDANT'S MOTION TO DISMISS FIRST
AMENDED CLASS ACTION COMPLAINT***

STEPHEN T. BROWN, United States Magistrate
Judge.
**\*1** This matter is before this Court on Defendant's
Motion to Dismiss First Amended Complaint
regarding the proposed consumer class action suit
brought on behalf of Plaintiff and others similarly
situated who purchased a Motorola Razr cellular
telephone that contained a "white" battery. The Court
has considered the motion, the response, the reply,
and all pertinent materials in the file.

***Facts and Discussion***

For purposes of a motion to dismiss, the complaint is
construed in the light most favorable to the plaintiff
and its allegations of material fact are taken as true.
*McReynolds v. Alabama Dept. of Youth Services,* 204
Fed. Appx. 819, 821 (11th Cir.2006). A motion to

dismiss should be granted only if "it appears beyond
doubt that the plaintiffs can prove no set of facts in
support of their allegations which would entitle them
to relief." *Id.* (quoting *Roberts v. Florida Power &
Light Co.,* 146 F.3d 1305, 1307 (11th Cir.1998).*cert.
Denied,*525 U.S. 1139, 119 S.Ct. 1027, 143 L.Ed.2d
38 (1999)). At the motion to dismiss stage, the court
does not attempt to determine whether the plaintiff
will prevail on its claims, "but whether the
allegations are sufficient to allow them to conduct
discovery        in        attempt        to        prove        their
allegations."*Reynolds,* 204 Fed. Appx. at 821
(quoting *Jackam v. Hospital Corp. of America
Mideast, Ltd.,* 800 F.2d 1577, 1579 (11th Cir.1986)).
When it appears that on the basis of a dispositive
issue of law no construction of the factual allegations
will support the cause of action, dismissal of the
complaint is appropriate. *Marshall County Bd. of
Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171,
1174 (11th Cir.1993).

In the case at bar, Defendant alleges that (1) Plaintiff
failed to state a claim under FDUTPA; (2) Plaintiff's
claim for unjust enrichment is deficient; and (3)
Plaintiff's class allegations are deficient and should
be stricken.

**I. Plaintiff's Claim Under FDUTPA**

The Florida Deceptive and Unfair Trade Practices
Act ("FDUTPA") provides that an aggrieved party
may bring suit against a party that has engaged in
"[u]nfair methods of competition, unconscionable
acts or practices, and unfair or deceptive acts or
practices        in        the        conduct        of        any        trade        or
commerce."Fla. Stat. § 501.204(1). The statute does
not define the elements of such an action. *See Davis
v. Powertel, Inc.,* 776 So.2d 971, 974 (Fla. 1st DCA
2001). The statute instead guides the Florida courts to
give "due consideration and great weight ... to the
interpretations of the Federal Trade Commission Act,
15 U.S.C. s. 45(a)(1)."Fla. Stat. § 501.204(2). Under
the statute, a "plaintiff need not prove the elements of
fraud to sustain an action under statute.... because the
question is not whether the plaintiff actually relied on
the alleged deceptive trade practice, but whether the
practice was likely to deceive a consumer acting
reasonably in the same circumstances."*Davis,* 776

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

So.2d at 974. Furthermore, "FDUTPA was enacted to provide remedies for conduct *outside the reach* of traditional common law torts such as fraud."*Florida v. Tenet Healthcare Corp., 420 F.Supp.2d. 1288, 1310 (S.D.Fla.2005)* (emphasis added). Accordingly, "some courts have found that the heightened pleading requirements of Rule 9(b) do not apply to causes of action under FDUTPA because Rule 9(b) applies only to claims for fraud, and conduct short of actual fraud can constitute a violation of the statute."*Berry v. Budget Rent A Car Svs., Inc., 497 F.Supp.2d 1361,1366 (S.D.Fla.2007)*.

**\*2** In the case at bar, Plaintiff, in his first amended complaint, claims that the action arose from Defendant's "deceptive and unlawful conduct in designing, manufacturing, distributing and selling defectively designed Razr cellular phones."(Am.Complaint, p. 2). Defendant incorrectly asserts that consumer fraud claims arising under FDUTPA require Plaintiff to meet a heightened pleading standard. Plaintiff's claim is not premised on fraud, which is governed by *Fed.R.Civ.P. 9(b)*, but rather seeks a remedy for "conduct outside the reach of traditional common law torts such as fraud."*Tenet Healthcare Corp., 420 F.Supp.2d. at 1310*. Therefore, Plaintiff is not required to plead "with particularity" and Defendant's Motion to Dismiss this claim is denied.

## II. Plaintiff's Claim for Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must allege that (1) the plaintiff conferred a benefit on the defendant, who had knowledge of the benefit; (2) the defendant voluntarily accepted and retained the benefit; and (3) under the circumstances it would be inequitable to retain the benefit without paying for it. *See Tooltrend, Inc. v. CMT Utensil, SRL, 198 F.3d 802, 805 (11th Cir.1999); Tilton v. Playboy Entm't Group, Inc., No. 88:05-cv-692-T-30TGW, 2007 WL 80858, at \*3 (M.D.Fla. Jan., 8 2007)*.

Defendant is correct in stating that "Florida law does not support a cause of action for unjust enrichment unless the plaintiff can allege that he conferred a direct benefit on the defendant."(Reply, p. 2); *See Tilton, 2007 WL 80858, at \*3 (M.D.Fla.2007)*. However, Defendant erroneously equates direct *contact* with direct *benefit* in arguing that "[b]ecause plaintiff here did not purchase either his phone or his

batteries from Motorola, plaintiff conferred no direct benefit on Motorola."(Reply, p. 2). Plaintiff appropriately notes that Motorola, as the manufacturer of the Razr phone, marketed its product directly to consumers, but sold its product through an intermediary, i.e. a retail outfit. While the phone is ultimately sold through the retailer, Motorola is directly benefitted through profits earned from the sale of the phone. Therefore, while there was no direct *contact* between the manufacturer Motorola and Plaintiff, by purchasing the Razr phone, Plaintiff directly conferred a benefit on Motorola in the form of payment for the phone. Defendant's Motion to Dismiss the claim for unjust enrichment is denied.

## III. Plaintiff's Class Allegations

Within its Motion to Dismiss, Defendant requests this Court to strike Plaintiff's request to certify the class proposed pursuant to *Fed.R.Civ.P. 23*. By doing so, Defendant asks this court to "preemptively terminate the class aspects of this litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery for which they would otherwise be entitled on questions relevant to class certification."*Bryant v. Food Lion, Inc., 774 F.Supp. 1484, 1495 (D.S.C.1991)*. Defendants, in contending that class certification in this case is precluded as a matter of law, "have the burden of demonstrating from the face of plaintiffs' complaint that it will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove."*Id. at 1495.*

**\*3** In assessing whether Plaintiff has met the four threshold requirements of *Rule 23*[FN1], this Court must make a "determination [that] generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"*Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)* (quoting *Mercantile Nat. Bank v. Langdeau, 371 U.S. 555, 558, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963)*). To dismiss Plaintiff's class allegation before discovery would be an acknowledgment by this court that class certification is impossible, an assertion this Court is not inclined to make. Therefore, Defendant's motion to strike class allegations is denied.

FN1. As enunciated by the United States Supreme Court in *Amchem Prod., Inc. v.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), class actions filed pursuant to F.R. Civ. P. 23 have four threshold requirements: numerosity, commonality, typicality, and adequacy of representation.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss Plaintiff's First Amended Class Action Complaint is hereby **DENIED.**

**DONE AND ORDERED.**

S.D.Fla.,2007.
Romano v. Motorola, Inc.
Slip Copy, 2007 WL 4199781 (S.D.Fla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2008 U.S. DIST. LEXIS 17210

**PAULA RUSH, DIANE PERRY, and BRIAN TODD, on behalf of themselves and all others similarly situated, PLAINTIFFS vs. WHIRLPOOL CORPORATION, DEFENDANT**

**CASE No. 07-2022**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF ARKANSAS, FORT SMITH DIVISION**

*2008 U.S. Dist. LEXIS 17210*

**February 22, 2008, Decided**
**February 22, 2008, Filed**

**COUNSEL:** [*1] For Paula Rush, Diane Perry, Plaintiffs: Bruce L. Mulkey, LEAD ATTORNEY, The Mulkey Attorneys Group P.A., Rogers, AR; Alexander E. Barnett, The Mason Law Firm LLP, New York, NY; Gary E. Mason, The Mason Law Firm LLP, Washington, DC; Scott Wm. Weinstein, Morgan & Morgan P.A., Ft. Myers, FL.

For Brian Todd, Plaintiff: Bruce L. Mulkey, LEAD ATTORNEY, The Mulkey Attorneys Group P.A., Rogers, AR; Gary E. Mason, LEAD ATTORNEY, The Mason Law Firm LLP, Washington, DC.

For Whirlpool Corporation, Defendant: Michael T. Williams, LEAD ATTORNEY, Wheeler, Trigg & Kennedy, LLP, Denver, CO; Robert L. Jones, III, Conner & Winters, Fayetteville, AR.

**JUDGES:** JIMM LARRY HENDREN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JIMM LARRY HENDREN

**OPINION**

*ORDER*

Now on this 22nd day of February, 2008, comes on to be considered the defendant's **Motions to Dismiss (Docs. 20, 31),** plaintiffs' **Response (Doc. 35),** and defendant's **Reply (Doc. 36).** The Court, being well and sufficiently advised, finds and orders as follows with respect thereto:

1. Plaintiffs bring this action against Whirlpool Corporation, alleging that they purchased defectively designed and manufactured refrigerators from Whirlpool.

Specifically, plaintiffs allege that the ice-makers [*2] in the refrigerators do not work and that the temperature controls fluctuate, causing the refrigerators to leak and causing temperature-sensitive foods to go bad.

2. The three individual plaintiffs (Paula Rush, a resident of Maryland; Diane Perry, a resident of California; and Brian Todd, a resident of Arkansas) seek to bring the action on behalf of themselves, as well as on behalf of classes of purchasers of the subject refrigerators from Arkansas, California and Maryland.

Whirlpool moves to dismiss plaintiffs' complaint. The Court will discuss the arguments for dismissal of each count of the complaint in turn.

3. *Standard of Review* - A motion to dismiss under *Rule 12(b)(6) of the Federal Rules of Civil Procedure* should be granted only if it appears beyond doubt that the plaintiffs can prove no set of facts entitling them to relief. *See Katun Corp. V. Clarke, 484 F.3d 972, 975 (8th Cir. 2007).* This Court assumes as true all factual allegations of the complaint and draws all reasonable inferences in favor of the plaintiffs. *Id.*

4. *Count One - Breach of Implied Warranty of Merchantability under Arkansas Law*

Whirlpool argues that Plaintiff Todd has failed to allege that he notified Whirlpool [*3] of any breach of the implied warranty of merchantability, as required to assert an implied warranty claim under Arkansas law. Todd concedes that he did not provide notice directly to Whirlpool but to the retailer, Lowe's Home Improvement Store. Todd, therefore, does not contest the motion to dismiss this claim, without prejudice to the right to replead it should discovery reveal that notice was passed from Lowe's to Whirlpool. Upon due consideration,

Whirlpool's motion to dismiss will be granted with regard to Count One, and Plaintiff Todd's claim for breach of the implied warranty of merchantability will be dismissed without prejudice.

## 5. *Count Two - Breach of the Implied Warranty of Merchantability under Maryland Law*

a. Whirlpool argues that Plaintiff Rush did not provide Whirlpool with notice of the alleged breach, as required to assert an implied warranty claim under Maryland law.

The Maryland version of the Uniform Commercial Code requires that a buyer notify the seller of any breach within a reasonable time after the buyer discovered or should have discovered the breach. *See Md. Code Ann., Commercial Law, § 2-607(3)(a)*. The Maryland statute does not prescribe any particular form [*4] of notice of the breach of warranty and a telephone call has been held to be sufficient. *See Smith v. Butler, 19 Md. App. 467, 311 A.2d 813, 816 (Md. Ct. Spec. App. 1973)*. There is likewise no requirement as to the content of the notice. *Id.* The buyer must merely apprise the seller that the goods are defective. *Id.* Further, it is generally for the jury to determine, from the evidence presented, whether or not notice was given. *Id. at 817.*

Plaintiff Rush alleges that she purchased the refrigerator in October 2004 and after approximately one year, the ice-maker completely ceased functioning and the refrigerator had severe fluctuations in temperature, causing certain foods to go bad. Rush alleges that she called Whirlpool on several occasions to request that the problems be repaired, but Whirlpool refused to make the repairs because the refrigerator was out of warranty. Rush also asked Whirlpool whether the company was recalling this model refrigerator, but was informed that Whirlpool was not conducting such a recall. In December 2006, Rush had a Whirlpool authorized repair person come to her home and was informed by him "that there was not much that could be done to fix the [r]efrigerator other than a [*5] 'whole new motor or other major part.'" (Doc. 28 P 9.)

Viewing these allegations and the inferences to be drawn therefrom in Plaintiff Rush's favor, the Court finds that she has sufficiently alleged that she notified Whirlpool of the alleged breach of warranty.

b. Whirlpool also argues that Rush's breach of implied warranty claim fails because Rush does not allege that the refrigerator is not fit for its ordinary purpose -- keeping food cold. The Court sees no merit to this argument. Rush clearly alleges, as detailed above, that the refrigerator has not performed its intended functions of preserving food and making ice.

Based on the foregoing, Whirlpool's motion to dismiss will be denied with regard to Count Two, Rush's implied warranty of merchantability claim.

## 6. *Count Three - Negligence Claims under Arkansas, California, and Maryland Law*

a. Whirlpool argues that plaintiffs' negligence claims fail, as they have not pled the elements of damage and proximate cause. Specifically, Whirlpool argues that plaintiffs do not allege that the damage they have suffered - food loss - was proximately caused by the "'defect' manifest in their ice-makers." (Doc. 32 at pg. 12.)

Plaintiffs allege that the [*6] defect resulted in temperature fluctuations, which caused the food loss. The Court, therefore, finds that plaintiffs have sufficiently alleged that the defect proximately caused them damages.

b. Whirlpool also argues that plaintiff's negligence claims are barred by the economic-loss doctrine. The economic loss doctrine bars recovery in tort for economic damages caused by a defective product unless those losses are accompanied by some form of personal injury or damage to property other than the defective product itself. *See KB Home v. Superior Court of Los Angeles County, 112 Cal. App. 4th 1076, 5 Cal. Rptr. 3rd 587, 590 (Cal. Ct. App. 2003); Pulte Home Corp. V. Parex, Inc., 174 Md. App. 681, 923 A.2d 971, 1000-01 (Md. Ct. Spec. App. 2007), aff'd, 2008 Md. LEXIS 34, 2008 W.L. 382937 (Md. Feb. 14, 2008)*. While California and Maryland adhere to this doctrine, *see id.,* Arkansas does not, *see Farm Bureau Ins. Co. V. Case Corp., 317 Ark. 467, 878 S.W.2d 741, 743-44 (Ark. 1994).* Accordingly, the negligence claim of Plaintiff Todd, an Arkansas resident, is not barred by the economic-loss doctrine.

With regard to the negligence claims of Plaintiffs Rush and Perry, residents of Maryland and California respectively, they have both alleged that they have suffered damage [*7] to property other than the refrigerator itself. Specifically, they have both alleged that they have suffered food loss. The economic loss rule does not prevent the plaintiffs from seeking to recover for this loss under a negligence theory. *Cf. Elite Prof'ls, Inc. V. Carrier Corp., 16 Kan. App. 2d 625, 827 P.2d 1195, 1202 (Kan. Ct. App. 1992)* (loss of meat by spoilage due to alleged defect in truck refrigeration unit was harm to property other than the refrigeration unit itself and, therefore, was not barred by economic loss doctrine).

Accordingly, Whirlpool's motion to dismiss Count Three, plaintiffs' negligence claims, will be denied.

## 7. *Counts Four and Five - Claims for Violation of Arkansas' Deceptive Trade Practices Act and the Maryland Consumer Protection Act*

a. The Arkansas Deceptive Trade Practices Act (hereinafter "the ADTPA") prohibits "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade." *Ark. Code Ann. § 4-88-107(a)(10)*. In connection with the sale of goods, the ADTPA specifically prohibits the "concealment suppression, or omission of any material fact with intent that others rely upon the concealment, suppression or omission." *Ark. Code Ann. § 4-88-108(2)*.

b. [*8] The Maryland Consumer Protection Act (hereinafter "the MCPA") prohibits unfair and deceptive trade practices in the sale of goods. *Md. Code Ann., Commercial Law § 13-303(1)*. Deceptive trade practices include the "[f]ailure to state a material fact if the failure deceives or tends to deceive," and also include the "knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same." *Id. § 13-301(3), (9)*.

c. Whirlpool argues that Plaintiff Todd's claims under the ADTPA and Plaintiff Rush's claims under the MCPA fail because neither plaintiff identifies any specific deceptive statement or omission by Whirlpool that they relied on and were deceived by in connection with their purchases of the refrigerators.

d. Plaintiffs respond that they have clearly alleged that:

(1) Whirlpool knew of the defect in its [r]efrigerators;

(2) that the defect was a material fact;

(3) that Whirlpool failed to disclose this material fact to consumers;

(4) that Whirlpool's failure to disclose the material fact of the defect would tend to deceive consumers and cause them to purchase the [r]efrigerators;

(5) that Whirlpool failed to disclose the defect with the intent [*9] that consumers would rely upon that omission to purchase [r]efrigerators; and

(6) that [p]laintiff[s] ... have suffered injury as a result in that they have purchased [r]efrigerators that they would not have otherwise purchased.

(Doc. 35 at pgs. 26-27.)

e. The Court agrees with plaintiffs that the above allegations are sufficient to state claims under the ADTPA and the MCPA. *See Lloyd v. General Motors Corp., 397 Md. 108, 916 A.2d 257, 282-84 (Md. Ct. App. 2002)*

(automobile owners pled MCPA claims with sufficient particularity where they alleged that manufacturers had long known of risk of injury associated with defective seatbacks and knowingly concealed existence of defect). Whirlpool's motion to dismiss Counts Four and Five, Plaintiff Todd's claim under the ADTPA and Plaintiff Rush's claim under the MCPA, will, therefore, be denied.

**8.** *Count Six - Claim for Violation of California's Consumers Legal Remedies Act*

a. The California Consumers Legal Remedies Act (hereinafter "the CLRA") prohibits:

* Representing that goods ... have characteristics ... uses, [or] benefits ... which they do not have; and

* Representing that goods ... are of a particular standard, quality, or grade ... if they are of another.

*Cal. Civ. Code § 1770(a)(5)* [*10] & *(7)*.

b. Plaintiff Perry alleges that by "failing to disclose and concealing the defect in the [r]efrigerators," Whirlpool violated the CLRA, "as it represented that its [r]efrigerators had characteristics and benefits that they do not have, and represented that its [r]efrigerators were of a particular standard, quality or grade when they were of another." (Doc. 28 P 72.)

c. Whirlpool argues that, to be actionable under the CLRA, a fraudulent omission "must be contrary to a representation actually made by the defendant." (Docs. 32 at pg. 22.) Whirlpool argues that Plaintiff Perry cannot state a claim under the CLRA based on Whirlpool's alleged failure to disclose the defect because Perry has failed to identify any representation by Whirlpool as to the "longevity or reliability of the [r]efrigerator as a whole, much less ... the functionality of its ice-maker." (*Id.*)

d. Contrary to Whirlpool's assertions, if Whirlpool had a duty to disclose the alleged defect, then plaintiff need not prove that the omission was contrary to any representation actually made by Whirlpool. *See Falk v. General Motors Corp., 496 F. Supp.2d 1088, 1094-95 (N.D. Cal. 2007)*. A defendant has a duty to disclose a defect [*11] if it (1) had exclusive knowledge of material facts not known to the plaintiff; or (2) actively concealed a material fact from the plaintiff. *Id. at 1095*.

e. Plaintiff Perry alleges that the defect is a material fact, as he would not have purchased the refrigerator if he had known of it. Perry further alleges that Whirlpool had exclusive knowledge of the defect, as "[o]nly Whirlpool had access to its internal data, including pre-release

testing data; ... access to data from its authorized retailers; and ... access to the numerous complaints from its customers." (Doc. 35 at pg. 26.) Perry also alleges that Whirlpool actively concealed the defect, as various Whirlpool customers complained to Whirlpool about the defect, yet Whirlpool never attempted to notify other customers or effect a recall.

Taking Plaintiff Perry's allegations as true and drawing all inferences therefrom in her favor, the Court finds that she has stated a claim under the CLRA. *Cf. id.* (buyers of vehicles with allegedly defective speedometers stated a claim under the CLRA where they alleged that a reasonable consumer would have expected a speedometer to last for the life of a vehicle, that the manufacturer alone had access [*12] to data and complaints concerning the alleged defect, and that, despite complaints from buyers, manufacturer never attempted to notify other customers or effect a recall). Accordingly, Whirlpool's motion to dismiss Count Six, Plaintiff Perry's claim under the CLRA, will be denied.

9. *Count Seven - Claim for Violation of California's Unfair Competition Law*

a. California's Unfair Competition (hereinafter "the UCL") prohibits acts or practices which are fraudulent, unlawful, or unfair. *Cal. Civ. Code § 17200.*

b. **Fraudulent Conduct.** To state a fraud claim under the UCL, a plaintiff must show that "'members of the public are likely to be deceived.'" *Id.* (quoting *Bardin v. Daimlerchrysler Corp., 136 Cal. App. 4th 1255, 1261, 39 Cal. Rptr. 3d 634 (2006)).* Whirlpool argues that Plaintiff Perry has failed to allege that it engaged in any conduct likely to deceive the public, as Perry does not allege that Whirlpool made any representation regarding the longevity or reliability of the refrigerator's ice-maker.

Plaintiff Perry asserts that the failure to disclose the defect was likely to deceive the public, as the "reasonable and objective consumer expectation for [r]efrigerators" is that they will "function properly for [*13] a period of years," but the defect caused Plaintiff Perry's refrigerator to begin leaking immediately after purchase. (Doc. 35 at pg. 29.) The Court finds Perry's allegations sufficient to state a fraud claim under the UCL. *Cf. Falk, 496 F. Supp.2d at 1098* (vehicle purchas-

ers stated claim for fraud under the UCL, as members of public were likely to be deceived by manufacturer's failure to disclose alleged speedometer defect: reasonable customer would have expected a speedometer to have lasted for the lifetime of the vehicle and would have reconsidered the purchase if he had known of the alleged defect).

c. **Unlawful or Unfair Conduct.** As discussed above, Plaintiff Perry has stated a claim for violation of the CLRA. A violation of the CLRA constitutes an unfair and unlawful practice under the UCL. Thus, Plaintiff Perry has stated an unlawful practices claim and unfair practices claim under the UCL.

Whirlpool's motion to dismiss Count Seven, Plaintiff Perry's claim under the UCL, will, therefore, be denied.

10. *Conclusion* - Based on the foregoing, the Court hereby orders as follows:

* Whirlpool's **Motions to Dismiss (Docs. 20, 31)** are **GRANTED** with regard to **Count One** of the complaint and Plaintiff [*14] Todd's claim for breach of the implied warranty of merchantability is **DISMISSED WITHOUT PREJUDICE.**

* The Motions to Dismiss are **DENIED** in all other respects.

* Whirlpool's alternative request that plaintiffs be required to provide a more definite statement of their claims is **DENIED,** because, as discussed above, the Court finds that plaintiffs have sufficiently pled their claims.

* Whirlpool shall have until March 7, 2008, to file an answer to the complaint.

* Plaintiffs shall have until March 21, 2008, to file a motion for class certification. Once the Court has ruled on the motion for class certification, a scheduling order will be issued.

**IT IS SO ORDERED.**

/S/ JIMM LARRY HENDREN

JIMM LARRY HENDREN

UNITED STATES DISTRICT JUDGE

Not Reported in F.Supp.2d                                                        Page 1
Not Reported in F.Supp.2d, 2005 WL 2875332 (S.D.Tex.)
**2005 WL 2875332 (S.D.Tex.)**

C Salazar v. Merck & Co., Inc.
S.D.Tex.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas, Corpus
Christi Division.
Antonio SALAZAR and Elda Salazar, Plaintiffs,
v.
MERCK & CO., INC., Jan Ferguson and Scott
Lawler, Defendants.
**No. Civ.A. 05-445.**

Nov. 2, 2005.

Kathryn A. Snapka, Aditi Anita Shahani, Craig D.
Henderson, Gregory Wayne Turman, Richard B.
Waterhouse, Jr., Snapka & Turman LLP, Corpus
Christi, TX, for Plaintiffs.
Richard L. Josephson, Maryanne Lyons, Travis
James Sales, William Zachary Hughes, Baker &
Botts, Houston, TX, for Defendants.

*ORDER OF REMAND*

JACK, J.
**\*1** The Court remands the instant action to the 319th
Judicial District Court of Nueces County, Texas, on
the basis that Defendant Merck & Co. has failed to
demonstrate complete diversity of citizenship of
the parties such that this Court has subject matter
jurisdiction over the action pursuant to 28 U.S.C. §
1332.

I. *Background*

On June 17, 2005, Plaintiffs Antonio and Elda
Salazar, husband and wife, commenced a personal
injury action against three defendants-Merck & Co.,
Jan Ferguson and Scott Lawler-in the 319th Judicial
District Court of Nueces County, Texas. The
Complaint alleges that Plaintiff Antonio Salazar
suffered a heart attack on June 18, 2003, and other
subsequent injuries as a result of taking Vioxx, a
prescription medication manufactured, designed,
packaged, marketed, sold and distributed by
Defendant Merck & Co. (Compl.§§ VI-VII.)
Defendants Jan Ferguson and Scott Lawler were

Merck & Co.'s sales representatives who called
doctors and hospitals and represented to them that
Vioxx was a safe and effective medication. The
plaintiffs alleged that Merck & Co. and its sales
representatives "were aware that these
representations were false and/or made these
representations with reckless disregard to their
truth."(Compl.§ IX.) The defendants' actions caused
the plaintiffs injuries for which the plaintiffs seek to
recover damages.

Defendant Merck & Co., a foreign defendant,[FN1] was
served with a copy of the Complaint on August 12,
2005. On September 2, 2005, within 30 days after
service, Defendant Merck & Co. removed the action
to this Court, asserting improper joinder of
Defendants Jan Ferguson and Scott Lawler, who,
like the plaintiffs, are citizens of Texas; Defendant Merck
& Co. maintains that this Court has subject matter
jurisdiction over the lawsuit because "[t]here is
complete diversity between Plaintiffs and Merck [ &
Co.]" (Notice of Removal § II(B)(10).) The plaintiffs
opposed the removal and on September 30, 2005,
motioned the Court to remand the action.

> FN1. Defendant Merck & Co. is a
> corporation organized under the laws of
> New Jersey and has its principal place of
> business in New Jersey. Therefore, it is a
> citizen of New Jersey under 28 U.S.C. §
> 1332(c)(1). (See Compl. § III.)

The issue before the Court now is whether the
plaintiffs have improperly joined in-state Defendants
Jan Ferguson and Scott Lawler. If they have, then
their Motion to Remand must be denied and the
action must proceed in this Court, because complete
diversity of citizenship exists between the plaintiffs,
citizens of Texas, and the remaining defendant,
Merck & Co., a citizen of New Jersey. If the
plaintiffs have not improperly joined in-state
Defendants Jan Ferguson and Scott Lawler, then the
Motion to Remand must be granted and the action
must proceed in the 319th Judicial District Court of
Nueces County, Texas, where the action was
commenced, because this Court lacks subject matter
jurisdiction over the lawsuit pursuant to 28 U.S.C. §
1332.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2875332 (S.D.Tex.)
**2005 WL 2875332 (S.D.Tex.)**

II. *Discussion*

Defendant Merck & Co., the party seeking removal, bears a heavy burden of proving improper joinder. *Smallwood v. Illinois Cent. R.R. Co.*, 385 F.3d 568, 574 (5th Cir.2004) (en banc). Improper joinder can be proven by demonstrating (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiffs to establish a cause of action against the in-state defendants. *Id .* at 573 (citing *Travis v. Irby,* 326 F.3d 644, 646-47 (5th Cir.2003)). As there is no allegation of actual fraud in the pleading, Defendant Merck & Co. establishes improper joinder by demonstrating that there is no possibility of recovery by the plaintiffs against the two in-state defendants. *See id.*

**\*2** The Court resolves this matter by conducting an analysis under a rule similar to that of Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court essentially examines allegations in the Complaint in the light most favorable to the plaintiffs to determine if the Complaint states a claim against the in-state defendants. *Boone v. Citigroup, Inc.,* 416 F.3d 382, 388 (5th Cir.2005); *see also Smallwood,* 385 F.3d at 573. Ordinarily, if the plaintiffs can survive the Rule 12(b)(6) type challenge, there is no improper joinder. *Smallwood,* 385 F.3d at 573. In some cases, the Court may allow limited remand-related discovery, and conduct a summary judgment type inquiry; such inquiry, however, is appropriate only to identify the presence of discrete and undisputed facts that would preclude the plaintiffs' recovery against the in-state defendants. *Id.* at 573-74. If Defendant Merck & Co. fails to establish improper joinder, then there is not complete diversity of citizenship among the parties, Defendant Merck & Co. is not entitled to removal, and the plaintiffs' Motion to Remand must therefore be granted. *See* 28 U.S.C. § 1332(a).

A. *Limitation of Liability based on the Learned Intermediary Doctrine*

Defendant Merck & Co., relying on the learned intermediary doctrine, argues that the plaintiffs have no reasonable possibility of prevailing on any claims against the two in-state sales representatives, because the sales representatives do not owe a legal duty to warn the plaintiffs of risks associated with prescription medication Vioxx. (Notice of Removal §

II(C)(16).) The Court finds this argument unpersuasive.

Under the Texas learned intermediary doctrine, a pharmaceutical manufacturer is excused from warning each patient who receives the medication when the manufacturer properly warns the prescribing physician of the medication's dangers. *Porterfield v. Ethicon, Inc. .,* 183 F.3d 464, 467-68 (5th Cir.1999). The rationale is that the pharmaceutical manufacturer can rely on the prescribing physician-the learned intermediary-to pass on its warnings to the patient. *Id.* at 468. Defendant Merck & Co. indicates that some courts outside the jurisdiction of the United States Court of Appeals for the Fifth Circuit have extended this doctrine to include pharmaceutical sales representatives. (*See* Notice of Removal § II(C)(16) (citing *In re Diet Drugs Prods. Liab. Litig.,* 220 F.Supp.2d 414, 425 (E.D.Pa.2002); *In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d 272, 282 (S.D.N.Y.2001); *Johnson v. Parke-Davis,* 114 F.Supp.2d 522, 524-25 (S.D.Miss.2000)).) According to Defendant Merck & Co., these courts have concluded that the learned intermediary doctrine precludes failure to warn claims against a pharmaceutical manufacturer as well as its sales representatives, because the manufacturer and sales representatives only owe a duty to warn the prescribing physician. (Notice of Removal § II(C)(16).) However, even assuming the Texas learned intermediary doctrine applies to pharmaceutical sales representatives, when the warning to the learned intermediary-the prescribing physician-is inadequate or misleading, the manufacturer and its sales representatives remain liable for injuries sustained by the patient who is prescribed the medication. *See Porterfield,* 183 F.3d at 468.

**\*3** Examining allegations in the Complaint in the light most favorable to the plaintiffs, the Court concludes that the learned intermediary doctrine does not preclude the plaintiffs from seeking damages from in-state Defendants Jan Ferguson and Scott Lawler. The plaintiffs allege that "Merck [ & Co.], through its ... sales representatives, made representations regarding the safety and efficacy of its product ... [that constituted] misrepresentations and negligent misrepresentations resulting in Plaintiffs' injuries and damages for which Plaintiffs

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2875332 (S.D.Tex.)
**2005 WL 2875332 (S.D.Tex.)**

sue."(Compl.§ VIII.) The plaintiffs allege that the sales representatives knew or should have known about risks associated with prescription medication Vioxx, but made misrepresentations about them nonetheless. These allegations put the in-state defendants outside the protective realm of the learned intermediary doctrine, because misrepresentations to the prescribing physician mean inadequate warnings to the physician, and the learned intermediary doctrine is applicable only when adequate warnings were provided. Thus, Defendant Merck & Co.'s argument that the plaintiffs have no reasonable possibility of prevailing against the two in-state sales representatives under the learned intermediary doctrine fails, as the doctrine is inapplicable based on the allegations made in the Complaint.

B. *Liability of a Non-Manufacturing Seller under Texas Products Liability Laws*

Additionally, under Texas products liability laws, a non-manufacturing seller can be held liable for injuries caused by a product if (1) the seller actually knew of a defect to the product at the time the seller supplied the product, and (2) the plaintiffs' injuries resulted from the defect. Tex. Civ. Prac. & Rem. Code Ann. § 82.003(a)(6) (Vernon 2003). In a lawsuit involving failure to provide adequate warnings, a distributor of a pharmaceutical product can be held liable if the distributor "withheld from or misrepresented to the United States Food and Drug Administration required information that was material and relevant to the performance of the product and was causally related to the [plaintiffs'] injury[.]" *See id.* § 82.007(b)(1).

The Court reiterates that the party seeking removal bears a heavy burden of proving improper joinder and that the Court must find proper joinder if there is any possibility the plaintiffs have stated a cause of action against the in-state defendants. *See Smallwood, 385 F.3d at 573-74.* The plaintiffs alleged that the sales representatives, who might be considered non-manufacturing sellers under Tex. Civ. Prac. & Rem. Code Ann. § 82.001, knew or should have known about risks associated with prescription medication Vioxx. They further alleged that these risks were not made known to them and the failure to warn caused the plaintiffs injuries. Construing these allegations liberally in the light most favorable to the plaintiffs, the Court concludes that the plaintiffs

might be able to establish a cause of action against in-state Defendants Jan Ferguson and Scott Lawler under Tex. Civ. Prac. & Rem. Code Ann. § 82.003(a)(6). Thus, the plaintiffs survive the Rule 12(b)(6) type challenge. Defendant Merck & Co. has made no attempts to show the plaintiffs' inability to recover from the two in-state defendants under Texas products liability laws.

III. *Conclusion*

**\*4** Defendant Merck & Co. has not met its heavy burden of showing that in-state Defendants Jan Ferguson and Scott Lawler were improperly joined. Therefore, there is not complete diversity among the parties, and this Court lacks subject matter jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332.

The plaintiffs' Motion to Remand is GRANTED. The instant action is hereby REMANDED pursuant to 28 U.S.C. § 1447(c) to the 319th Judicial District Court of Nueces County, Texas, where the action was commenced and assigned Cause No. 05-03092-G.

S.D.Tex.,2005.
Salazar v. Merck & Co., Inc.
Not Reported in F.Supp.2d, 2005 WL 2875332 (S.D.Tex.)

END OF DOCUMENT

Slip Copy
Slip Copy, 2007 WL 844883 (N.D.Ill.)
**2007 WL 844883 (N.D.Ill.)**

**C** Saltzman v. **Pella** Corp.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Dr. Leonard E. **SALTZMAN**, Kent Eubank, Thomas
Riva, Lubo and Maira Hadjippetkov, William and
Nancy Ehorn, individually and on behalf of all others
similarly situated, Plaintiffs,
v.
**PELLA** CORPORATION, an Iowa corporation, and
**Pella** Windows and Doors, Inc., a Delaware
corporation, Defendants.
**No. 06 C 4481.**

March 20, 2007.

Paul M. Weiss, William Michelangelo Sweetnam,
Freed, Weiss & Flaum, George K. Lang, Freed &
Weiss, LLC, Jonathan B. Piper, Chicago, IL,
Benjamin A. Schwartzman, Greener Banducci
Shoemaker, Boise, ID, Jonathan Shub, Scott A.
George, Seeger Weiss LLC, Philadelphia, PA, Steven
R. Jaffe, Tod N. Aronovitz, Aronovitz Trial Lawyers,
Miami, FL, for Plaintiffs.
Douglas L. Prochnow, John A. Roberts, Wildman,
Harrold, Allen & Dixon, Chicago, IL, Angela M.
Crandall, James A. O'Neal, John P. Mandler, Faegre
& Benson LLP, Minneapolis, MN, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

JAMES B. ZAGEL, United States District Judge.

## I. BACKGROUND

**\*1** The five named Plaintiffs allege that between
1990 and 2003, they purchased Pella "ProLine" or
"Architect Series" aluminum-clad wood windows for
installation at their residences in Illinois, Iowa,
Florida, New Jersey, and California. Plaintiffs further
allege that the windows contained a latent defect that
caused a substantial likelihood that the windows
would leak. Moreover, Plaintiffs allege that
Defendants Pella Corporation and Pella Windows
and Doors ("Pella" or "Defendants") knew about the
latent defect and failed to disclose it to its customers.

Plaintiffs filed this action pursuant to 28 U.S.C. §§
1331 and 1332(d)(2)(A) (2006). The cause of action
contains six counts: (I) violation of various states'
Consumer Fraud Acts; (II) violation of various states'
Uniform Deceptive Trade Practices Acts; (III)
common law fraud by omission; (IV) breach of
implied warranty of merchantability; (V) unjust
enrichment; and (VI) declaratory relief pursuant to 28
U.S.C. § 2201 (2006) ("Declaratory Judgments
Act").

Currently before me is Pella's Motion to Dismiss
Plaintiffs' First Amended Class Action Complaint.
Defendants level a variety of arguments-pursuant to
Federal Rules of Civil Procedure 12(b)(6), 9(b) and
23-in attacking Plaintiffs' respective claims.

## II. DISCUSSION

### *A. Motion to Dismiss Standard*

A motion to dismiss tests the sufficiency of a
complaint, not the merits of a case. *Autry v.
Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039
(7th Cir.1998). I should grant Pella's motion to
dismiss only if Plaintiffs cannot prove any set of facts
in support of their claim that would entitle them to
relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct.
99, 2 L.Ed.2d 80 (1957). Furthermore, I must accept
all well-pleaded factual allegations in the complaint
as true, drawing all reasonable inferences from those
facts in Plaintiffs' favor. *Cleveland v. Rotman*, 297
F.3d 569, 571 (7th Cir.2002). I may grant Pella's
motion only if "no relief could be granted under any
set of facts that could be proved consistent with the
allegations."*Hishon v. King & Spalding*, 467 U.S. 69,
73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### *B. State Consumer Fraud Acts*

Pella first argues that Plaintiffs' statutory and
common-law fraud claims (Counts I and III) should
be dismissed because they fail to meet the pleading
standards of the Illinois Consumer Fraud and
Deceptive Business Practices Act ("ICFA") [FN1] or
Fed.R.Civ.P. 9(b).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 844883 (N.D.Ill.)
2007 WL 844883 (N.D.Ill.)

Case 1:08-cv-02364    Document 55-8    Filed 08/09/2008    Page 48 of 62

Page 2

FN1. Plaintiffs bring their fraud claims under various state consumer fraud statutes. However, the parties essentially only argue about the ICFA and Fed.R.Civ.P. 9(b). Since those are the arguments that are developed, those are the ones I will address here.

The ICFA is "a regulatory and remedial statute intended to protect consumers, borrowers, and business people against fraud, unfair methods of competition, and other unfair and deceptive business practices."*Robinson v. Toyota Motor Credit Corp., 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 960 (Ill.2002).* Section 2 of the ICFA prohibits:

"[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, ... in the conduct of any trade or commerce"

**\*2** 815 ILL. COMP. STAT.. 505/2 (2002).

To adequately plead a cause of action under the ICFA, a plaintiff must allege: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception. *Oliveira v. Amoco Oil Co., 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 160 (Ill.2002); Zekman v. Direct American Marketers, Inc., 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853 (Ill.1998).* A complaint raising a claim under the ICFA "must state with particularity and specificity the deceptive manner of defendant's acts or practices, and the failure to make such averments requires the dismissal of the complaint."*Robinson, 266 Ill.Dec. 879, 775 N.E.2d at 961;Connick v. Suzuki Motor Co., 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (Ill.1996).*

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent knowledge, and other condition of mind of a person may be averred generally."*Fed.R.Civ.P. 9(b).* To comply with the rule, a plaintiff must, with respect to any allegedly fraudulent misrepresentation, set out the "who, what, when, where, and how: the first paragraph of any newspaper story."*DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990).* These heightened pleading requirements "force the plaintiff to do more than the usual investigation before filing his complaint."*Ackerman v. Nw. Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir.1999).* The rule is designed to "minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual" because, if a fraud claim is too vague during discovery, the claim "will stand unrefuted, placing what may be undue pressure on the defendant to settle the case in order to lift the cloud on its reputation."*Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co., 412 F.3d 745, 748-49 (7th Cir.2005).*Rule 9(b) requires a plaintiff to provide sufficient specificity to allow a defendant accused of fraud to respond "swiftly and effectively if the claim is groundless."*Id.*

I find that Plaintiffs pled their fraud claims with sufficient particularity, both for purposes of the ICFA and Fed.R.Civ.P. 9(b). First, with respect to the ICFA, an Illinois Court of Appeals recently confronted nearly this identical issue. *See Pappas v. Pella Corp., 363 Ill.App.3d 795, 300 Ill.Dec. 552, 844 N.E.2d 995 (Ill.App.Ct.2006).* In *Pappas*-a parallel case featuring a different plaintiff but the same defendants-the court considered precisely the same arguments that have been raised in this matter, namely, whether based on Illinois precedent, the plaintiffs there had adequately pled their claim. In reversing the trial court's finding that plaintiffs failed to plead their claim sufficiently, the court noted: "[p]laintiffs alleged Pella knew its aluminum clad windows would allow water to enter, causing wood rot and deterioration, and failed to disclose those facts to plaintiffs prior to their purchase of the windows."*Pappas, 300 Ill.Dec. 552, 844 N.E.2d at 999.* I agree with Justice Wolfson's well-reasoned decision in *Pappas,* and even if I did not, it is binding upon me to the extent that Defendants argue that the state pleading requirements have not been met. Like the *Pappas* plaintiff, I find that Plaintiffs here have adequately pled their fraud claim.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 844883 (N.D.Ill.)
2007 WL 844883 (N.D.Ill.)

Case 1:08-cv-02364    Document 55-8    Filed 08/09/2008    Page 49 of 62 Page 3

**\*3** Defendants correctly note, however, that separate and apart from the state statutes, Plaintiffs' pleadings must also rise to the level required by Rule 9(b). I find that they do. Plaintiffs allege that a defect exists in the windows when they leave the factory that allows water to penetrate the area behind the aluminum cladding, ultimately causing condensation, wood rot, leaks, and other physical damage to both the windows and the main structure. I find that this is sufficient under the rule, and therefore deny Pella's motion to dismiss Plaintiff's statutory fraud claim (Count I).

### C. Common Law Fraud By Omission

Pella moves to dismiss Plaintiffs' common law fraud claim (Count III), arguing both that Plaintiff fails to meet the heightened pleading requirements for fraud claims under Fed.R.Civ.P. 9(b) and that Plaintiff fails to properly plead the existence of a duty. As noted above, I find that Plaintiff's claims are pled with sufficient particularity for purposes of Rule 9(b). In addition, for the reasons that follow, I find that Plaintiff adequately pled the existence of a duty. Accordingly, Pella's motion to dismiss Count III is denied.

Because Plaintiffs allege that Pella failed to make a representation when it ought to have made one, Plaintiffs must plead and prove a duty on behalf of Pella to make an affirmative statement. *Coca-Cola Co. Foods Div. v. Olmarc Packaging Co.,* 620 F.Supp. 966, 973 (N.D.Ill.1985) (*citing Manning v. Ashland Chemical Co.,* 498 F.Supp. 1382, 1383 (N.D.Ill.1980); *Cummings v. Dusenbury,* 129 Ill.App.3d 338, 84 Ill.Dec. 615, 472 N.E.2d 575, 581 (Ill.App.Ct.1984). The *Coca-Cola* explains that there are, in general, two circumstances in which such a duty arises: "1) when the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension, or 2) when the defendant owes some fiduciary duty to the plaintiff to make full and fair disclosure and fails to correct a misapprehension of a material fact." *Id.*

Since this is a motion to dismiss-and I must accept all well-pleaded allegations as true-the only argument I can consider is whether Plaintiffs have alleged that Pella had a duty to disclose information which would correct Plaintiffs' misapprehension of material facts.

*Id.* at 974. Here, as was the case in *Coca-Cola,* no fiduciary duty existed between the parties. *Id.* Also like the *Coca-Cola* counter-plaintiff, Plaintiffs here allege that Pella contributed to their misapprehension of material facts, and that Pella intentionally failed to correct this misapprehension. *Id.*

This suffices to survive a motion to dismiss. Therefore, Pella's motion to dismiss Count III is denied.

### D. Plaintiffs' Uniform Deceptive Trade Practices Act Claim

Pella next seeks dismissal of Plaintiffs' Uniform Deceptive Trade Practices Act ("UDTPA") claim (Count II). Again, Pella makes two separate arguments against this claim: (1) the statements to which Plaintiffs point are all mere puffery and thus not actionable; and (2) Plaintiffs seek a remedy that is not available under the UDTPA.

**\*4** At the outset, the parties disagree about whether it is appropriate for a court to consider-on a motion under Fed.R.Civ.P. 12(b)(6)-whether a representation is puffery. I should note that under Illinois law, claims under the UDTPA "are to be resolved according to principles set forth under the Lanham Act."*AT & T Corp. v. Synet, Inc.,* No. 96 C 0110, 1997 WL 89228, at \*4 (N.D.Ill.1997) (*citing Spex, Inc. v. Joy of Spex, Inc.,* 847 F.Supp. 567, 579 (N.D.Ill.1994)). Moreover, I find that it is appropriate in the context of a motion to dismiss, for a court to decide, as a matter of law, whether a statement is non-actionable puffery. *See Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service Inc.,* 911 F.2d 242, 245 (9th Cir.1990) ( "District courts often resolve whether a statement is puffery when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) (6) and we can think of no sound reason why they should not do so.") (*citing Cohen v. Prudential-Bache Sec., Inc.,* 713 F.Supp. 653, 658 (S.D.N.Y.1989); *Metzner v. D.H. Blair & Co.,* 689 F.Supp. 262, 263-64 (S.D.N.Y.1988); *Radio Today, Inc. v. Westwood One, Inc.,* 684 F.Supp. 68, 74 (S.D.N.Y.1988); *Testing Systems, Inc. v. Magnaflux Corp.,* 251 F.Supp. 286, 288-89 (E.D.Penn.1966)).

Puffery is "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 844883 (N.D.Ill.)
2007 WL 844883 (N.D.Ill.)

Case 1:08-cv-02364   Document 55-8   Filed 08/09/2008   Page 50 of 62   Page 4

and is not actionable under § 43(a)."*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9 Cir.1997) (*citing* 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.04[4][d] at 27-52 (3d ed.1994)). The *Southland* court explained that "[w]hile product superiority claims that are vague or highly subjective often amount to nonactionable puffery ... misdescriptions of specific or absolute characteristics of a product are actionable."*Id.* (internal quotations omitted).

I find that the statements to which Plaintiffs point are mere puffery, and thus are not actionable. In this case, Plaintiffs point to the fact that Pella referred to its products as "durable," "manufactured to high quality standards," "maintenance free," and that the company said that it would "stand by its products." The subjective and non-quantifiable nature of these claims render them puffery. *See Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24 (1st Cir.2000) (holding that "Whiter is not possible," is non-actionable puffing); *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616 (7th Cir.1995) (finding that "comparison" to a mystery rival is only puffery and therefore not actionable); *Malaco Leaf, AB v. Promotion In Motion, Inc.,* 287 F.Supp.2d 355 (S.D.N.Y.2003) (using the words "original" and "famous" on packaging constituted mere puffery); *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304 (2d Cir.1972) (opining that defendant's claim of "countless hours of research" leading to superior quality is puffing); *Data Cash Systems, Inc. v. Js & a Group, Inc.,* 223 U.S .P.Q. 865, 867 (N.D.Ill.1984) ("Frequently, newness claims are only puffing, especially when they are made in the context of promotional literature").

*5 As a result of my finding that the claims Plaintiffs point to are non-actionable puffery, Pella's motion to dismiss Count II is granted.[FN2]

> FN2. Pella's alternative argument-that the relief Plaintiffs seek under their UDTPA claim is inappropriate-is rendered moot, thus, I do not consider it here.

*E. Breach of Implied Warranty of Merchantability Claim*

In its Count IV, Plaintiffs make a claim for breach of implied warranty of merchantability. Pella argues this count should be dismissed for two reasons: it is barred by the four-year statute of limitations and there is no privity between the Plaintiffs and Defendants.

While Pella asserts that this claim generally has a 4-year statute of limitations, Plaintiffs counter that Illinois law dictates that statutes of limitations are tolled when based on fraudulent concealment. *See*735 ILL. COMP. STAT.. 5/13-215 (2006). Illinois law states:

> Fraudulent concealment. If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards.

*Id.*

However, a plaintiff who invokes this section must show "affirmative acts by the defendant which were designed to prevent, and in fact did prevent, the discovery of the claim. Mere silence of the defendant and the mere failure on the part of the plaintiff to learn of a cause of action do not amount to fraudulent concealment."*Cangemi v. Advocate South Suburban Hosp.,* 364 Ill.App.3d 446, 300 Ill.Dec. 903, 845 N.E.2d 792, 804 (Ill.App.Ct.2006) (internal quotation omitted); *accord Dancor International, Ltd. v. Friedman, Goldberg & Mintz,* 288 Ill.App.3d 666, 224 Ill.Dec. 302, 681 N.E.2d 617, 623 (1997) (holding that a plaintiff must show "affirmative acts or representations designed to prevent discovery of the cause of action or to lull or induce a claimant into delaying the filing of his claim").

Since Plaintiffs' fraudulent concealment claim is based on silence as opposed to affirmative acts, section 5/13-215 does not apply here. Accordingly, the statute of limitations has run on all of Plaintiffs' implied warranty claims, except for the Hadjipetkov plaintiffs in New Jersey. Thus, Pella's motion to dismiss Count IV is granted as to all plaintiffs, save the New Jersey plaintiffs.

In light of my decision on the statute of limitations issue, I need not address Pella's argument regarding a lack of privity between Plaintiffs and Pella, except

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 844883 (N.D.Ill.)
2007 WL 844883 (N.D.Ill.)

Case 1:08-cv-02364    Document 55-8    Filed 08/09/2008    Page 51 of 62    Page 5

for as it relates to the Hadjipetkov plaintiffs in New Jersey. Under New Jersey courts' interpretation of the UCC, "the absence of privity no longer bars a buyer from reaching through the chain of distribution to the manufacturer."*Alloway v. General Marine Industries, L.P., 149 N.J. 620, 695 A.2d 264, 275 (N.J.1997)* (citing *Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 489 A.2d 660 (N.J.1985).* Therefore, whether or not there was privity between the Hadjipetkov plaintiffs and Pella is immaterial to the Hadjipetkov plaintiffs' ability to bring this claim.

In sum, since the four-year statute of limitations has not expired, and since New Jersey does not recognize a privity requirement, Pella's motion to dismiss Count IV is denied as it relates to the Hadjipetkov plaintiffs in New Jersey.

*F. Unjust Enrichment*

**\*6** Pella argues that Plaintiffs' Count V-the unjust enrichment claim-should be dismissed because the Pella Express Warranty ("PEW") covers the purchasers of the windows. "When a party has been unjustly enriched at the expense of another, the former is often required to return any benefit to the latter."*Muehlbauer v. General Motors Corp., 431 F.Supp.2d 847, 851 (N.D.Ill.2006)* (citing Restat. 1 of Restitution, § 1). Pella asserts that Plaintiffs cannot recover because there is a specific contract governing the relationship of the parties. *See Muehlbauer, 431 F.Supp.2d at 855* ("Typically, the presence of an express contract nulls any quasi-contract claim arising out of the same subject matter. Such is the rule in the subject states.").

In *Muelbauer,* Judge Moran held that it was premature, in the context of a 12(b)(6) motion, to dismiss an unjust enrichment claim based on the existence of a contract. *Id.* At 855-56 ("[M]ere invocation of a written contract does not automatically bar an unjust enrichment claim."). I agree with Judge Moran's analysis. Therefore, while Plaintiff's unjust enrichment claim may ultimately be undermined by the PEW, it is not appropriate to so conclude at this time. Pella's motion to dismiss Count V is denied.

*G. Declaratory Relief*

In their final count, Plaintiffs seek declaratory relief

pursuant to 28 U.S.C. § 2201 (2006). Pella argues that the claim should be dismissed because Plaintiffs are actually seeking a unilateral reformation of the PEW.

Pella is correct insofar as they point out that Plaintiffs are seeing an extraordinary remedy. The Declaratory Judgments Act, "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."*Public Service Commission of Utah v. Wycoff Co., Inc., 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952).* Ultimately, I may be quite unlikely to grant the declaratory relief Plaintiffs are requesting. Nevertheless, based on the standards for motions to dismiss under Fed.R.Civ.P. 12(b), it is premature to make that determination here. Pella's motion to dismiss Count VI is denied.

*H. Plaintiffs' Class Allegations*

Finally, Pella argues that Plaintiffs' multi-state and nationwide class allegations should all be dismissed. Plaintiffs respond-and I agree-that Pella's challenges to the alleged classes should be reserved for the class certification stage, and are untimely in this motion to dismiss. Therefore, I decline, at this time, Pella's invitation to dismiss Plaintiffs' class allegations.

**III. CONCLUSION**

For the foregoing reasons, Pella's motion to dismiss is denied as to Counts I, III, V, and VI. Pella's motion is granted as to Count II and as to Count IV for all but the the Hadjipetkov plaintiffs in New Jersey.

N.D.Ill.,2007.
Saltzman v. Pella Corp.
Slip Copy, 2007 WL 844883 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Slip Copy
Slip Copy, 2007 WL 1345706 (E.D.Cal.)
**2007 WL 1345706 (E.D.Cal.)**

▷Sanchez v. Wal-Mart Stores, Inc.
E.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Elizabeth SANCHEZ, for herself and on behalf of
those similarly situated, Plaintiffs,
v.
WAL-MART STORES, INC., Dorel Juvenile Group,
Inc. and Does 1 through 25, inclusive, Defendants.
**No. Civ. S-06-cv-2573 DFL KJM.**

May 8, 2007.

Kirk J. Wolden, Law Offices of Clayeo C. Arnold,
Sacramento, CA, for Plaintiffs.
Jeffrey R. Williams, Kathleen A. Stimeling, Schiff
Hardin LLP, San Francisco, CA, for Defendants.

*Memorandum of Opinion and Order*

DAVID F. LEVI, United States District Judge.
*1 Plaintiff Elizabeth Sanchez is bringing a class
action against Dorel Juvenile Group, Inc. and Wal-
Mart Stores, Inc. ("defendants"). Sanchez contends
that Dorel and Wal-Mart designed and sold defective
strollers that she and other class members bought.
Defendants removed the case from state court.
Sanchez now moves to remand the case while
defendants move to dismiss Sanchez's claims. For the
reasons below, the court DENIES Sanchez's motion
to remand and DENIES defendants' motion to
dismiss.

I.

In June 2005, Sanchez bought a Dorel model 01-834
PGH stroller from Wal-Mart at Florin Road in
Sacramento, California. Sanchez contends that she
relied on defendants' representations that the stroller
was safe. She allegedly discovered, however, that the
stroller has a "dangerous, unguarded and unmitigated
pinch point" that creates "an unreasonable potential
for harm." Sanchez claims that she must replace the
stroller and, therefore, has suffered monetary loss.

On October 2, 2006, Sanchez filed a class action

lawsuit against defendants in state court. Sanchez
pleaded three claims against both defendants: (1)
strict products liability, (2) violation of California's
Unfair Competition Law ("UCL"), and (3) violation
of California's Consumer Legal Remedies Act
("CLRA"). Sanchez also pleaded a breach of implied
warranty claim against Wal-Mart.

On November 16, 2006, defendants removed the case
to federal court under the Class Action Fairness Act
of 2005 ("CAFA"). In its notice of removal,
defendants averred that the parties were diverse, and
that the sum of potential compensatory damages,
punitive damages, injunctive relief, and attorney's
fees would likely exceed $5,000,000.

II.

Sanchez argues that the court must remand this action
to state court because defendants have not carried
their burden of establishing that the amount in
controversy exceeds $5,000,000.

Under CAFA, federal courts have original
jurisdictions over class actions where a class member
is a citizen of a state different from any defendant
and the amount in controversy exceeds $5,000,000.
28 U.S.C. § 1332(d)(2) (2007). The claims of all
individual class members are aggregated to determine
whether the amount in controversy is met. 28 U.S.C.
§ 1332(d)(6) (2007). When plaintiffs do not specify
in their complaint the dollar amount of the damages
they seek, removing defendants must establish by a
preponderance of the evidence the requisite amount
in controversy. *Singer v. State Farm Mut. Auto. Ins.
Co.,* 116 F.3d 373, 376 (9th Cir.1997). In her
complaint, Sanchez does not allege a specific amount
of damages. Therefore, this court has jurisdiction
only if defendants establish by a preponderance of
the evidence that potential damages exceed
$5,000,000.

Here, defendants have established by a
preponderance of the evidence that compensatory
damages alone likely would approach $5,000,000. In
his second declaration, Harry Jonathan Finerfrock, a
data warehouse/business intelligence analyst for

Slip Copy
Slip Copy, 2007 WL 1345706 (E.D.Cal.)
**2007 WL 1345706 (E.D.Cal.)**

Dorel, states that Dorel sold more than 250,000 strollers to its "retailer and retailer distributor customers in California" as of February 2007.[FN1] Such retailers include Wal-Mart, K-Mart/Sears, Target, and Big Lots. Moreover, Finerfrock states that Dorel sold around 40 strollers directly to consumers at a price of $23.31 plus a shipping and handling charge. In his first declaration, Finerfrock asserts that "[t]he retail sales price of [the] stroller ranges from $20.00-$30.00."The low end of this range multiplied by the 250,000 figure would satisfy the $5 million requirement.

> FN1. After oral argument, Defendants submitted a second, more detailed declaration by Finerfrock on the court's request.

**\*2** Sanchez argues that the defendants have failed to establish adequately the amount of compensatory damages for two reasons. First, Sanchez contends that defendants have failed to show that the strollers sold to retailers ended up in the hands of California consumers. Sanchez surmises that retailers could have sold or transported the strollers to out-of-state retailers, or that the retailers could have a large inventory of unsold strollers. Second, Sanchez claims that defendants have not laid a proper foundation for Finerfrock's statement regarding the retail price of the stroller in California.

Sanchez's arguments lack force. The court refuses to remand the case based on Sanchez's unsupported conjectures. It is theoretically possible that large "big box" stores also act as wholesalers or serve an out of state population. But this is so contrary to common understanding of how a large retail store does business that Sanchez was under some obligation to do more than hypothesize unlikely possibilities. It is reasonable to assume that defendants' California stores sold their inventory of strollers to California consumers. Similarly, it is reasonable to conclude from the sale price of strollers Dorel sold directly to consumers that the strollers likely retailed for at least $20.00. Therefore, assuming that 250,000 strollers were sold in California for $20.00 each, the court concludes that defendants have established by a preponderance of the evidence that compensatory damages likely would exceed $5,000,000.

Finally, Sanchez also seeks attorney's fees under the

UCL and the CRLA and punitive damages. Punitive damages are part of the amount in controversy. *Gibson v. Chrysler Corp.,* 261 F.3d 927, 945 (9th Cir.2001). Attorney's fees, if authorized by statute or contract, are also part of the calculation. *Kroske v. U.S. Bank Corp.,* 432 F.3d 976, 980 (9th Cir.2005). Therefore, even assuming a more conservative estimate of compensatory damages, the court finds that potential punitive damages and attorney's fees award, combined with compensatory damages, would satisfy CAFA's amount in controversy threshold.

III.

Defendants move to dismiss Sanchez's case.[FN2]

> FN2. At oral argument, Sanchez consented to the dismissal of the strict liability claim. Therefore, the court addresses only defendants' arguments as to Sanchez's other claims.

A. UCL

Defendants argue that Sanchez has failed to state a UCL claim because: (1) the CLRA provides the exclusive remedy in this case; (2) Sanchez lacks standing to bring a UCL claim because she did not plead reliance; and (3) Sanchez has failed to plead damages that resulted from the allegedly unfair conduct. These arguments lack merit.

Contrary to defendants' assertion, the CLRA does not preclude Sanchez from making a UCL claim. Remedies provided by the CLRA are not exclusive. Cal. Civ.Code § 1752 (2006) ("The remedies provided herein for violation of any section of this title or for conduct proscribed by any section of this title shall be in addition to any other procedures or remedies for any violation or conduct provided for in any other law.") The 1975 amendment to § 1752 make that clear.[FN3] Moreover, plaintiffs routinely plead both UCL and CLRA claims based on similar allegations.[FN4] *See, e.g., Miller v. Bank of America,* 144 Cal.App.4th 1301, 1307-08, 51 Cal.Rptr.3d 223 (2006); *Bardin v. Daimler-Chrysler Corp.,* 136 Cal.App.4th 1255, 1261-62, 39 Cal.Rptr.3d 634 (2006).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

FN3.Section 1752 states: "The provisions of this title are not exclusive. The remedies provided herein for violation of any section of this title or for conduct proscribed by any section of this title shall be in addition to any other procedures or remedies for any violation or conduct provided for in any other law."The 1975 amendment inserted into that paragraph the phrase "for violation of any section of this title or for conduct proscribed by any section of this title" and the phrase "for any violation or conduct." Cal. Civ.Code § 1752 (2007).

FN4. Defendants rely on *Outboard Marine Corp. v. Superior Court,* 52 Cal.App.3d 30, 36, 124 Cal.Rptr. 852 (1975), for the proposition that the CLRA provides the exclusive remedy for acts that it covers. But it is not clear whether the court in *Outboard Marine* took into account the 1975 amendment. Moreover, the *Outboard Marine* court relied on another case, *Vasquez v. Superior Court,* 4 Cal.3d 800, 818-19, 94 Cal.Rptr. 796, 484 P.2d 964 (1971), in which the court interpreted the pre-1975 version of § 1752.

*3 Defendants also are incorrect that Sanchez has failed to plead reliance. In her first amended complaint, Sanchez alleges that defendants breached the UCL by making "false and misleading statements, in the form or written representations and material omissions."[FN5]Sanchez then claims that "[w]ere it not for the unfair competition of defendants, the CLASS would not have purchased the STROLLER and/or purchased and/or used the STROLLER .... " [FN6]

FN5. In addressing defendants' arguments, the court looks to Sanchez's first amended complaint.

FN6. In her opposition, Sanchez argues that the UCL does not require reliance. Courts are split on whether plaintiffs must plead reliance to state a UCL claim after Proposition 64. In November 2006, the California Supreme Court granted review of two cases in which the lower courts found that Proposition 64 requires plaintiffs to

plead reliance. *Pfizer Inc. v. Superior Court,* 51 Cal.Rptr.3d 707, 146 P.3d 1250 (2006); *In re Tobacco II Cases,* 47 Cal.Rptr.3d 917 (2006). Because it finds that Sanchez has pleaded reliance, the court does not reach this issue here.

Finally, defendants contend that Sanchez has failed to state a UCL claim because she did not plead damages. Defendants make no showing that Sanchez needs to plead damages to make a UCL claim. Plaintiffs have standing to make a UCL claim if they have "suffered injury in fact and [have] lost money or property as a result of such unfair competition."Cal. Bus & Prof.Code § 17204 (2007). Sanchez makes this allegation in her amended complaint. According to Sanchez, "[t]he CLASS has and will continue to suffer injury in fact and lose money as a direct result of Defendants' unfair competition in that each paid a readily ascertainable amount for the dangerous and defective STROLLER."

**B. CLRA**

Defendants contend that the court must dismiss Sanchez's CLRA claim because she failed to comply with the notice requirement in Cal. Civ.Code § 1782(a).Section 1782(a) requires that plaintiffs give at least 30 days notice to defendants before filing a CLRA action to allow defendants an opportunity to "correct, replace, or otherwise rectify" the purportedly defective goods or services. Cal. Civ.Code § 1782(a) (2007).

Defendants are incorrect that they did not receive such notice. In her amended complaint, Sanchez alleges that another class member, Salvador Sanchez, sent defendants notice on November 2, 2005. In his letter, Salvador Sanchez claimed that "[the] stroller has a dangerous and defective locking mechanism pinch point which creates an unreasonable danger of personal injury to all potential users."Moreover, Salvador Sanchez stated that he was providing defendants statutory written notice, as required by the CLRA, on behalf of himself and a class of similarly situated consumers. This is sufficient to satisfy § 1782(a)."The clear intent of the [CLRA] is to provide and facilitate pre-complaint settlements of consumer actions wherever possible and to establish a limited period during which such settlement may be accomplished."*Outboard Marine Corp. v. Superior*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1345706 (E.D.Cal.)
**2007 WL 1345706 (E.D.Cal.)**

_Court, 52 Cal.App.3d 30, 41, 124 Cal.Rptr. 852 (1975)_. Therefore, courts must interpret § 1782(a) strictly to effectuate this intent.

The 2005 notice, although it came from another class member, nonetheless satisfied § 1782(a) because it notified defendants of the stroller's alleged defect and of a potential class action lawsuit. _See id._("The purpose of the notice requirement of section 1782 is to give the manufacturer or vendor sufficient notice of alleged defects to permit appropriate corrections or replacements .")

C. Breach of the Implied Warranty of Merchantability

*4 Finally, Wal-mart argues that Sanchez failed to state a breach of the implied warranty claim in her complaint because she did not provide Wal-Mart notice as required under Cal. Civ.Code § 2607(3)(a).FN7 Walmart is incorrect. Wal-Mart received notice when Salvador Sanchez wrote defendants in November 2005, contending that Wal-Mart was selling a defective stroller. "[A] breach of the implied warranty of merchantability means the product did not possess even the most basic degree of fitness for ordinary use."_Mocek v. Alfa Leisure, Inc., 114 Cal.App.4th 402, 406, 7 Cal.Rptr.3d 546 (2004)_. In seeking to inform defendants that they may have violated the CLRA, the notice included various factual allegations, including the allegation that Wal-Mart was selling defective strollers. Therefore, the 2005 notice was sufficient to inform Wal-Mart that plaintiffs also might pursue a breach of the implied warranty claim.FN8

> FN7. Only Wal-mart moves to dismiss Sanchez's breach of implied warranty claim because Sanchez does not assert this claim against Dorel.

> FN8. In their reply, defendants also argue that Sanchez failed adequately to plead a breach of the implied warranty of merchantability claim. Sanchez, however, has amended the complaint to include this claim.

IV.

For the reasons above, the court DENIES Sanchez's motion to remand and also DENIES defendants' motion to dismiss.

IT IS SO ORDERED.

E.D.Cal.,2007.
Sanchez v. Wal-Mart Stores, Inc.
Slip Copy, 2007 WL 1345706 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Slip Copy                                                                 Page 1
Slip Copy, 2008 WL 795598 (W.D.Mo.)
**2008 WL 795598 (W.D.Mo.)**

**H**Sappington v. Skyjack Inc.
W.D.Mo.,2008.
Only the Westlaw citation is currently
available.Sammie SAPPINGTON, et al., Plaintiffs,
v.
SKYJACK INC., et al., Defendants.
**No. 04-5076-CV-SW-FJG.**

March 20, 2008.

David E. Larson, Withers, Brant, Igoe & Mullennix,
PC, Liberty, MO, Jimmy E. Allen, Jr., Larson &
Larson, Leawood, KS, Thomas Roy Larson, Lewis,
Rice & Fingersh, L.C., Kansas City, MO, for
Plaintiffs.
James A. Berglund, Cassiday Schade & Gloor,
Waukegan, IL, John Randall Davis, Cassidy, Schade
& Gloor, Waukegan, IL, Kara T. Stubbs, Baker,
Sterchi, Cowden & Rice LLC, David R. Buchanan,
Brown & James, PC, Kansas City, MO, Dennis C.
Cusack, Son & Bell, Ltd., Chicago, IL, for
Defendants.

### ORDER

FERNANDO J. GAITAN, JR., Chief Judge.
*1 Pending before the Court are (1) Defendant RSC's
Motion for Summary Judgment or in the Alternative
Motion to Dismiss (Doc. No. 100); (2) Motion to Bar
Testimony of John Ward (Doc. No. 88); and (3)
Plaintiffs' motion challenging admissibility of certain
expert testimony proffered by defendants (Doc. No.
83). Each will be considered below.

**I. Background**

On October 4, 2001, plaintiffs' [FN1] decedent, Doyle
Sappington, suffered fatal injuries when the scissors
lift he was operating tipped over. The lift at issue is a
SJII 4626 manufactured by Defendant Skyjack Inc.
("Skyjack"). It was sold to Central States Equipment,
and eventually came into the possession of Defendant
Rental Service Corporation ("RSC"). Prior to
October 3, 2001, RSC rented the lift at issue to
Eliason & Knuth, and the lift at issue was delivered
to Eliason & Knuth at the Saks Fifth Avenue Parking
Garage project at 47th and Pennsylvania. J.E. Dunn

was the general contractor for the Saks Fifth Avenue
Parking Garage project. On October 3, 2001, prior to
the accident, the lift was in its "as manufactured"
conduction, with the exception of normal wear and
tear. On October 3, 2001, Doyle Sappington was
employed as a carpenter foreman for J.E. Dunn. Prior
to October 3, 2001, Doyle Sappington had received
training on the safe and proper use of a scissor lift.
Immediately before his injury, Doyle Sappington had
the Skyjack SJ II 4626, elevated to about 26 feet in
the air. Doyle Sappington was killed when the
Skyjack SJ II 4626 drove backwards into the area
where the sidewalk had been removed earlier, and
fell to the ground.

> FN1. 'Plaintiff Evelyn Sappington is the
> decedent's mother. Plaintiff Sammie
> Sappington is his daughter, and plaintiff
> Justin Sappington is his son. Doyle
> Sappington apparently had another child
> from a previous marriage, but that child is
> not a plaintiff in this action.

**II. Defendant RSC's Motion for Summary
Judgment or in the Alternative Motion to Dismiss
(Doc. No. 100)**

Defendant RSC seeks judgment in its favor. It moves
for summary judgment pursuant to Missouri's law
regarding dealers of used goods, or, in the alternative,
dismissal pursuant to RSMo § 537.762, Missouri's
innocent seller statute.

A. Facts

On September 24, 2001, RSC leased the subject
scissor lift to Eliason & Knuth, a subcontractor on the
Saks Fifth Avenue garage construction project. The
scissor lift RSC leased to Eliason & Knuth was not a
new unit, but rather had been previously leased and
used numerous times. Although Mr. Sappington
worked for J.E. Dunn and not Eliason & Knuth at the
time of the accident, he nonetheless took possession
of and operated the scissor lift. Plaintiffs state that
Mr. Sappington was authorized to borrow the lift,
however.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs' claims against both defendants are premised solely upon a strict liability theory. Plaintiffs allege the scissor lift was defective and unreasonably dangerous because it did not contain a pothole protection device. Plaintiffs' expert, Dr. Kenneth Blundell, notes that pothole protection is a drop-down device on the base of the scissor lift that lowers the ground clearance of the lift to increase the stability of the lift. Blundell testified in his deposition that he had no information to suggest that RSC knew the lift was unsafe, and that neither OSHA nor Dr. Blundell had any criticism of RSC's role in maintaining that particular unit. Dr. Blundell testified that in renting the subject scissor lift to Eliason & Knuth, RSC inadvertently rented an unsafe product.

*2 Skyjack is the named insured under a CGL policy with Lexington Insurance Company (Policy Number 1320306) for the period of June 1, 2001 through June 1, 2002, with an applicable limit of one million dollars per occurrence.[FN2]Skyjack is the named insured under a CGL umbrella policy with Lexington Insurance Company (Policy Number 5640757) for the period of June 1, 2001, through June 1, 2002, with an applicable limit of ten million dollars per occurrence.[FN3]RSC states it is unaware of any facts or circumstances upon which a verdict in this action might be reached against RSC other than RSC's status as a renter/seller of the scissor lift in the stream of commerce.

> FN2. Plaintiffs state that RSC's statement is incomplete, in that the policy states that it has an aggregate limit of $2,000,000 for products liability, and there is no information in the record as to how much of that aggregate limit has already been used by Skyjack.

> FN3. Again, plaintiffs state that RSC's statement is incomplete, in that the policy states that it has an aggregate limit of $10,000,000 for products liability, and there is no information as to how much of the aggregate limit has already been utilized by Skyjack during the policy year.

B. Motion for Summary Judgment as Dealer in Used Goods

Defendant RSC states that it is entitled to judgment

as a matter of law in its favor because the scissor lift RSC leased to Eliason & Knuth was not a new unit, but rather had been previously leased and used. Defendant RSC cites *Harber v. Altec Industries, Inc.*, 812 F.Supp. 954 (W.D.Mo.1993) (affirmed at 5 F.3d 339, 340 (8th Cir.1993)) for the proposition that Missouri law does not impose strict liability upon a dealer of used goods.

Plaintiffs respond that RSC is liable as a commercial lessor, and not as a dealer in used goods, and therefore *Harber* is inapplicable to the case at hand. Plaintiffs cite several Missouri cases in which a commercial lessor was found liable under a strict product liability theory. *See Gabbard v. Stephenson Orchard, Inc.*, 565 S.W.2d 752 (Mo.App.W.D.1978); *Commercial Distribution Center, Inc. v. St. Regis Paper Co.*, 689 S.W.2d 664 (Mo.App.W.D.1985); *Welkener v. Kirkwood Drug Store Co.*, 734 S.W.2d 233 (Mo.App.E.D.1978); and *Hoeft v. Louisville Ladder Company*, 984 S.W.2d 298 (Mo.App.W.D.1995).

Defendant RSC replies that all but one of these cases pre-date enactment of Missouri's Innocent Seller Statute, RSMo § 537.760, and defendant states that Missouri's policy as to merchants in used goods changed in 1987 when Missouri enacted that statute.

Notably, however, this Court's notes that the Eighth Circuit found that the opinion in *Harber* was inapplicable in a commercial lessor context in *Wynia v. Richard-Ewing Equip. Co.*, 17 F .3d 1084, 1089 (8th Cir.1994).*See also Heaviside v. Rental Service Corporation*, 2007 WL 2156302, *2 (E.D.Mo.2007) (noting that *Wynia* is still applicable to cases involving commercial lessors). Thus, summary judgment will be **DENIED.**

C. Motion to Dismiss under RSMo § 537.762

Missouri's Innocent Seller Statute, RSMo § 537.762, provides:

  1. A defendant whose liability is based solely on his status as a seller in the stream of commerce may be dismissed from a products liability claim as provided in this section.

  2. This section shall apply to any products liability

claim in which another defendant, including the manufacturer, is properly before the court and from whom total recovery may be had for plaintiff's claim.

**\*3** 3. A defendant may move for dismissal under this section within the time for filing an answer or other responsive pleading unless permitted by the court at a later time for good cause shown. The motion shall be accompanied by an affidavit which shall be made under oath and shall state that the defendant is aware of no facts or circumstances upon which a verdict might be reached against him, other than his status as a seller in the stream of commerce.

4. The parties shall have sixty days in which to conduct discovery on the issues raised in the motion and affidavit. The court for good cause shown, may extend the time for discovery, and may enter a protective order pursuant to the rules of civil procedure regarding the scope of discovery on other issues.

5. Any party may move for a hearing on a motion to dismiss under this section. If the requirements of subsections 2 and 3 of this section are met, and no party comes forward at such a hearing with evidence of facts which would render the defendant seeking dismissal under this section liable on some basis other than his status as a seller in the stream of commerce, the court shall dismiss without prejudice the claim as to that defendant.

6. No order of dismissal under this section shall operate to divest a court of venue or jurisdiction otherwise proper at the time the action was commenced. A defendant dismissed pursuant to this section shall be considered to remain a party to such action only for such purposes.

7. An order of dismissal under this section shall be interlocutory until final disposition of plaintiff's claim by settlement or judgment and may be set aside for good cause shown at anytime prior to such disposition.

RSMo § 537.762 (2000).

In *Gramex Corp. v. Green Supply Co.,* 89 S.W.3d

432 (Mo.2002), the Missouri Supreme Court held that RSMo § 537.762 is both procedural and substantive in nature. Defendant states that as this statute is substantive in nature, it may be used in federal court. The Court agrees with defendant's assertion.

Defendant RSC states that it meets all of the elements of the statute, in that: (1) the action is based solely on RSC's status as a seller in the stream of commerce, and the sole remaining count against RSC is a claim of strict product liability; (2) RSC is aware of no facts or circumstances upon which a verdict might be reached against it, other than its status as a seller in the stream of commerce, and plaintiffs' expert Blundell testified that RSC inadvertently rented and unsafe product; and (3) total recovery for plaintiffs' claims may be had from Skyjack, the manufacturer, which has a one million dollar insurance policy and a ten million umbrella policy.

Plaintiffs respond that defendant's motion is not timely; however, this Court finds that defendant brought this motion at the earliest possible time, as until January 6, 2006 (twenty days before the filing of this motion), plaintiffs had maintained an independent negligence claim against RSC. The innocent seller statute does not apply to actions against innocent sellers that include independent negligence claims. See RSMo § 537.762.1, which states that "[a] defendant whose liability is based *solely* on his status as a seller in the stream of commerce may be dismissed."(Emphasis added .) Plaintiffs further argue that RSC has failed to demonstrate that full recovery can be had from Skyjack in that there is "only" $12 million worth of aggregate insurance coverage; however, defendant RSC notes that full recovery can be had from Skyjack, in that beyond the $12 million insurance policies, Skyjack has assets including a 25,000 square foot service and parts distribution center in St. Charles, Illinois, a 114,000 square foot manufacturing plant in Iowa, and a 60,000 square foot storage facility in Iowa. The Court finds that, given the facts of this case, it is unlikely in the extreme that defendant Skyjack does not have sufficient assets to provide full recovery to plaintiff. Further, although plaintiffs argue that RSC is not an "innocent" seller, as pointed out by defendant RSC, knowledge is not an element of a strict liability claim. See RSMo § 537.760.

*4 Therefore, Defendant RSC's motion to dismiss (Doc. No. 100) will be **GRANTED**.Pursuant to RSMo § 537.762 (2000), defendant RSC is **DISMISSED** from this matter.

### III. Motions to Strike Experts

A. Standard

As a preliminary matter, "[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."*Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir.2001).

Federal Rule of Evidence 702 governs admissibility of expert testimony. *See Fed.R.Evid. 702.*"Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony."*Weisgram v. Marley Co.,* 169 F.3d 514, 523 (8th Cir.1999), aff'd,528 U.S. 440, 120 S.Ct. 1011, 145 L.Ed.2d 445 (2000); *see also Daubert [v. Merrell Dow Pharm.,* 509 U.S. 579, 588, 113 S.Ct. 2786 (citing *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988))* (highlighting the " 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony' "). The rule clearly "is one of admissibility rather than exclusion."*Arcoren v. United States,* 929 F.2d 1235, 1239 (8th Cir.1991).

The proposed expert testimony must meet three prerequisites in order to be admitted under Rule 702. 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[3] (2001). First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. *Id.* This is the basic rule of relevance. Second, the proposed witness must be qualified to assist the finder of fact. *Id.* Third, "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires...."*Id.; see also Daubert* 509 U.S. at 591, 113 S.Ct. 2786.

*Lauzon,* 270 F.3d at 686. In the seminal case regarding expert opinion testimony, *Daubert v.*

*Merrell Dow Pharmaceuticals,* the U.S. Supreme Court emphasized the district court's gatekeeper role when screening expert testimony for relevance and reliability....*Daubert* provides a number of nonexclusive factors a court can apply in performing this role: 1) whether the theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the theory has been generally accepted....*Daubert's* progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

270 F.3d at 686-87 (internal quotation marks and citations omitted).

B. Motion to Bar Testimony of John Ward (Doc. No. 88)

*5 Defendant Skyjack moves this Court to bar Dr. John Ward from testifying in this case. Dr. Ward has been designated by plaintiffs to testify about the economic impact of Doyle Sappington's death on his mother (plaintiff Evelyn Sappington) and two of his children (plaintiffs Justin and Sammie Sappington). Defendant Skyjack argues that Dr. Ward's proposed testimony is inadmissible and should be barred by *Daubert* and FRE 702.

Defendant Skyjack does not challenge Dr. Ward's qualifications in the field of economics. However, defendant Skyjack states that Dr. Ward's opinions are based on insufficient facts and data as to the decedent's earnings record. Further, defendant questions Dr. Ward's inclusion of overtime payments in projected future income, as well as Dr. Ward's assumption that the decedent would establish a relationship with his children. Defendant also states that Dr. Ward is attempting to put a value on things that do not exist (i.e., a relationship between the decedent and his children and mother).

Plaintiffs argue that defendant's criticisms go to the foundations of Dr. Ward's testimony. Plaintiffs state that if no evidence at trial supports the assumptions

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

made by Dr. Ward, then the Court would be within its discretion to refuse to permit Dr. Ward to testify regarding that category of loss; however, if evidence supports the category of loss, then Dr. Ward's testimony is admissible and it would be up to the trier of fact to determine how much of a particular category of loss the plaintiffs may be entitled to obtain.

The Court agrees with plaintiff; to the extent that the foundation of Dr. Ward's testimony is supported by the evidence presented at trial, Dr. Ward can testify in accordance with his expert report. However, if at trial there is limited or no factual support for Dr. Ward's positions, it would be improper to allow Dr. Ward to make those assertions. Therefore, defendant's motion to strike the testimony of Dr. Ward is **DENIED** without prejudice to its reassertion at trial.

C. Plaintiffs' motion challenging admissibility of certain expert testimony proffered by defendants (Doc. No. 83)

Plaintiffs challenge the testimony of experts: (1) for Skyjack: Barris Evulich, Leslie Knoll, Otto Hutka, and Brad Boehler; and (2) for RSC: R.K. Smith and David Dale. As this Court has granted RSC's motion to dismiss, plaintiffs' motion as applied to defendant RSC's experts is **DENIED AS MOOT.**

Plaintiffs state that: (1) the testimony of Skyjack's experts Evulich and Knoll is cumulative, and Skyjack should be limited to one of these experts; (2) the 1990 ANSI standards are irrelevant and the experts should not be allowed to testify that compliance with the 1990 ANSI standards makes the SJII 3626 non-defective; (3) the experts should not be allowed to testify that the ANSI Manual of Responsibilities applied to regulate the decedent's conduct; (4) defendants' experts performed no independent testing in this matter; (5) to the extent the experts attempt to assess fault against J.E. Dunn Construction Company, a non-party to the litigation, and plaintiffs assert this is irrelevant, *see Jensen v. ARA Services, Inc.,* 736 S.W.2d 374, 377 (Mo.1987); (6) Evulich should be precluded from testifying the machine was not unreasonably dangerous because at deposition he refused to answer questions whether he considered foreseeable product misuse in reaching his conclusions, *see Gerow v. Mitch Crawford Holiday*

*Motors,* 987 S.W.2d 359, 363 (Mo.App.W.D.1999); (7) Knoll discusses OSHA standards, which are not relevant, are prejudicial, and should be excluded from the evidence; and (8) Knoll should not be allowed to speculate as to the conduct of Sappington, opining that decedent was purposely maneuvering the lift close to the edge of the drop-off prior to the accident.

**\*6** Defendants respond: (1) the testimony of Knoll and Evulich is not duplicative because each witness brings a unique perspective, and the issues in this case will be resolved on common understanding in the industry which requires at least two individuals [FN4]; (2) the 1990 ANSI standards are relevant, further noting that the experts do not rely solely on the 1990 ANSI standards in forming their testimony; (3) the ANSI Manual of Responsibilities is relevant in an examination of the comparative fault of decedent; (4) no independent testing in this matter was necessary, as the plaintiffs have the burden of proof in this matter and defendants' experts point out the flaws in plaintiffs' experts' opinions; (5) although defendants cannot apportion the fault of J.E. Dunn (the decedent's employer), under Missouri law, they can present evidence that the actions or inactions of the non-party employer were the *sole cause* of decedent's death. *Oldaker v. Peters,* 817 S.W.2d 245, 253 (Mo.1991); (6) Evulich provides information in his report discussing the foreseeability of decedent's misuse of the lift from the standpoint of the manufacturer; and (7) OSHA standards are relevant as to the conduct of J.E. Dunn.

> FN4. Defendants cite no authority for this proposition.

After reviewing the parties' briefs and the experts' reports, the Court finds that the reports shall not be excluded in their entirety, but some limitations must be placed on defendant Skyjack's experts; thus, plaintiffs' motion will be **GRANTED IN PART.** In accordance with the Eighth Circuit's previous opinion in this matter, the 1990 ANSI standard is only relevant if a state of the art defense could be asserted, and here a state of the art defense is not available as this is no longer a negligence action. *See Sappington v. Skyjack,* 512 F.3d 440, 452 (8th Cir.2008). Therefore, the experts will not be allowed to testify regarding the 1990 ANSI standard. Further, the experts will be precluded from speculating as to what the decedent was thinking at the time of the accident.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Additionally, the Court finds the testimony of experts Knoll and Evulich to be duplicative; at the time of trial, defendant Skyjack may only use the testimony of one of these witnesses. Defendant Skyjack may make this determination when it files its revised witness list on or before June 18, 2008, pursuant to the Court's Order of February 21, 2008 (Doc. No. 225). The remainder of plaintiffs' objections to defendants' expert witnesses are **OVERRULED.**

**IV. Conclusion**

Therefore, for the foregoing reasons:

(1) Defendant RSC's Motion for Summary Judgment (Doc. No. 100) is **DENIED;**

(2) Defendant RSC's Alternative Motion to Dismiss (Doc. No. 100) is **GRANTED;**

(3) Defendant Skyjack's Motion to Bar Testimony of John Ward (Doc. No. 88) is **DENIED WITHOUT PREJUDICE** to reassertion at trial; and

(4) Plaintiffs' motion challenging admissibility of certain expert testimony proffered by defendants (Doc. No. 83) is **GRANTED IN PART** and **DENIED IN PART.**

**\*7  IT IS SO ORDERED.**

W.D.Mo.,2008.
Sappington v. Skyjack Inc.
Slip Copy, 2008 WL 795598 (W.D.Mo.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 495942 (N.D.Ill.)
**2006 WL 495942 (N.D.Ill.)**

▷ShopLocal LLC v. Cairo, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
SHOPLOCAL LLC, Plaintiff,
v.
CAIRO, INC., Defendant.
No. Civ.A. 05 C 6662.

Feb. 27, 2006.

Jami A. Jarosch, Paul R. Garcia, Robin Ann
Rademacher, Kirkland & Ellis LLP, Chicago, IL,
Frank N. Gaeta, Rich May A Professional
Corporation, Boston, MA, Janet L. Cullum, Jeffrey
Michael Kaban, Cooley Godward LLP, Palo Alto,
CA, for Plaintiff.
Jonathan M. Cyrluk, Joseph J. Duffy, Stetler &
Duffy, Ltd., Chicago, IL, Brook Dooley, Ragesh K.
Tangri, Keker & Van Nest, LLP, San Francisco, CA,
for Defendant.

*MEMORANDUM OPINION AND ORDER*

CONLON, J.
*1 ShopLocal LLC brings a four-count complaint
against Cairo, Inc., alleging violations of the
Computer Fraud and Abuse Act, 18 U.S.C. § 1030
(Count I), breach of contract (Count II), Trespass to
Chattels (Count III), and unjust enrichment (Count
IV). Cairo moves to dismiss Count IV. For the
reasons set forth below, the motion is denied.

BACKGROUND

The following facts are derived from the complaint.
The parties are competitors in Internet advertising.
Compl. at ¶ 1. This case involves Cairo's alleged
unauthorized use of ShopLocal's online data. *Id.*
ShopLocal specializes in digitizing retail promotional
materials traditionally advertised in Sunday
newspapers. *Id.* at ¶¶ 11-13.ShopLocal offers a
service called "SmartCircular" to retailers who desire
to post their promotional materials online. *Id.* at ¶¶
13-14.ShopLocal converts the retailers' advertising
circulars into Web pages and displays the

promotional materials on www.ShopLocal.com. *Id.* at
¶¶ 14-15.ShopLocal also operates the ShopLocal
Network, through which third parties offer
ShopLocal's materials to their own customers. *Id.* at ¶
15.ShopLocal incurs expenses for maintaining its
computers and generates revenues from
SmartCircular and the ShopLocal Network.*Id.* at ¶¶
16-17.Subject to its "Terms of Use," ShopLocal
grants all Internet users free access to its Web pages
*Id.* at ¶ 18.

According to the complaint, Cairo has breached the
"Terms of Use" by accessing ShopLocal's Web pages
for commercial purposes. *Id.* at ¶ 20.Cairo uses an
automated computer program, sometimes referred to
as "scraper," to copy materials from ShopLocal's
computers. *Id.* For instance, Cairo sends a scraper to
ShopLocal's computers through the Internet; the
scraper locates and copies promotional materials. *Id.*
Upon the scraper's return, Cairo displays the copied
materials on its own Web site. *Id.* In addition, Cairo
directs its users to ShopLocal's Web pages by placing
"deep-links" to ShopLocal's computers. *Id.*

ShopLocal claims damages for lost revenue and
increased expenses as a result of Cairo's alleged
breach. *Id.* at ¶ 21.In addition to its breach of contract
claim, ShopLocal sues Cairo for unjust enrichment.
*Id.* at ¶¶ 55-59.Cairo moves to dismiss the unjust
enrichment claim pursuant to Fed.R.Civ.P. 12(b)(6).

DISCUSSION

I. Motion to Dismiss Standard

"A motion to dismiss under Rule 12(b)(6) challenges
the sufficiency of the complaint, and dismissal of an
action under the rule is warranted only if 'no relief
could be granted under any set of facts that could be
proved consistent with the allegations.'" *Cler v. Ill.
Educ. Ass'n, 423 F.3d 726, 729 (7th Cir.2005)*
(quoting *DeWalt v. Carter, 224 F.3d 607, 612 (7th
Cir.2000)*). On a motion to dismiss, all well-pleaded
allegations are accepted as true and all reasonable
inferences are drawn in favor of the nonmoving
party. *Cler, 423 F.3d at 729.* To survive a motion to
dismiss, a complaint "need not plead particular legal

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3
## Part 4 of 5

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 495942 (N.D.Ill.)
**2006 WL 495942 (N.D.Ill.)**

theories or particular facts in order to state a claim." *DeWalt*, 224 F.3d at 612. All that is required is a short and plain statement giving defendant fair notice of the nature and basis of the claim. *Id.*

II. Unjust Enrichment

**\*2** Both parties' briefs assume Illinois law governs. The court applies Illinois law on substantive issues. *Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 142 n. 2 (7th Cir.1994) (because the parties did not raise a choice of law issue, the district court properly applied forum law). Procedural issues are governed by federal rules. *Johnson v. Hondo, Inc.*, 125 F.3d 408, 417 (7th Cir.1997).

Under Illinois law, an unjust enrichment claim may be predicated on either contract or tort. *Peddinghaus v. Peddinghaus*, 295 Ill.App.3d 943, 230 Ill.Dec. 55, 692 N.E.2d 1221, 1225 (Ill.App.Ct. 1st Dist.1998). A plaintiff suing for breach of contract may bring an unjust enrichment claim predicated on tort. *Id.; see also Liberty Mut. Ins. Co. v. Decking & Steel, Inc.*, 301 F.Supp.2d 830, 835 (N.D.Ill.2004) ("unjust enrichment[ ] may be pursued in the presence of a written contract between the parties"). If an unjust enrichment claim is predicated on a contract, a plaintiff may not recover for both unjust enrichment and breach of contract. *People ex rel. Hartigan v. E & E Hauling*, 153 Ill.2d 473, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (Ill.1992). Applying these rules, a plaintiff may sue for both breach of contract and **unjust    enrichment** when: (1) the **unjust enrichment** claim is based on **tort**; or (2) the two claims are pled in the **alternative**. *See, e.g., Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.*, No. 03 C 9421, 2004 WL 3363844, at \*4 (N.D.Ill.Dec.28, 2004); *Asad v. Hartford Life Ins. Co.*, 116 F.Supp.2d 960, 964 (N.D.Ill.2000).

Cairo argues for dismissal of ShopLocal's unjust enrichment claim, relying on *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007 (7th Cir.1985), and *AA Sales & Associates, Inc. v. JT & T Products Corp.*, 48 F.Supp.2d 805 (N.D.Ill.1999). Cairo's argument ignores that ShopLocal may bring an unjust enrichment claim based on tort. In both *First Commodity* and *AA Sales*, unjust enrichment claims were based on contract. *First Commodity*, 766 F.2d at 1011 (quasi-contract);

*AA Sales*, 48 F.Supp. at 807 (implied contract). Because ShopLocal brings its unjust enrichment claim under a **tort** theory, these cases do not apply.

Cairo moves to dismiss based on ShopLocal's failure to plead its **unjust    enrichment** claim in the **alternative**. Cairo relies on six federal cases, but none concerns an **unjust    enrichment** claim based on **tort**.[FN1] Cairo also cites *Guinn v. Hoskins Chevrolet*, 361 Ill.App.3d 575, 296 Ill.Dec. 930, 836 N.E.2d 681 (Ill.App.Ct. 1st Dist.2005). A state court decision, however, cannot guide this court on a procedural issue. *Johnson*, 125 F.3d at 417; *see also Miller v. Affiliated Fin. Corp.*, 600 F.Supp. 987, 995 n. 17 (N.D.Ill.1984) ( "[w]hat must be alleged to state a [common law] claim is governed by Illinois law, [but how] it must be alleged is governed by [the Federal Rules of Civil Procedure]"). Because ShopLocal's **unjust    enrichment** claim is based on **tort**, ShopLocal need not plead this claim as an **alternative** to its contract claim. *See Asad*, 116 F. Supp 2d at 964. Even assuming ShopLocal is required to plead alternatively, the complaint survives a motion to dismiss. *Am. Hardware Mfrs. Ass'n*, 2004 WL 3363844, at ----3-4 (denying motion to dismiss where the unjust enrichment claim incorporates contract allegations). Cairo's argument conflicts with the notice pleading standard and must be rejected. *See* Fed.R.Civ.P. 8(a); *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("pleading is [not] a game of skill"; its purpose "is to facilitate a proper decision on the merits").

> FN1. *See Aprile Seafreight S.P.A. v. Global Freight, Inc.*, No. 05 C 4850, 2005 WL 3436407, at \*2 (N.D.Ill.Dec.12, 2005); *Sharrow Group v. Zausa Dev. Corp.*, No. 04 C 6379, 2004 WL 2806193, at \*3 (N.D.Ill.Dec.6, 2004); *Team Impressions, Inc. v. Chromas Techs. Canada, Inc.*, No. 02 C 5325, 2003 WL 355647, at \*4 (N.D.Ill. Feb.18, 2003); *Samuels v. Old Kent Bank*, No. 96 C 6667, 1997 WL 458434, at \*15 (N.D.Ill. Aug.1, 1997); *Allied Vision Group, Inc. v. RLI Prof'l Techs., Inc.*, 916 F.Supp. 778, 782 (N.D.Ill.1996); *Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1298-99 (N.D.Ill.1983).

CONCLUSION

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**\*3** For the reasons set forth above, Cairo's motion to dismiss Count IV (unjust enrichment) for failure to state a claim is denied.

N.D.Ill.,2006.
ShopLocal LLC v. Cairo, Inc.
Not Reported in F.Supp.2d, 2006 WL 495942 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**C**Smith v. BOC Group PLC
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Christina SMITH, John Neal and Maurice Walker,
Plaintiffs,
v.
BOC GROUP PLC; BOC Gases; American Sterilizer
Company; Pennsylvanie Engineering Company;
Steris Corporation; and AGA Gas, Inc., Defendants.
**No. 00 C 7909.**

May 4, 2001.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.
*1 In this products liability action, three hospital
workers claim they were harmed by exposure to
chemicals used to sterilize medical equipment.
Plaintiffs Christina Smith, John Neal and Maurice
Walker have brought this case against six defendants
involved in the manufacture, sale, promotion,
marketing, and distribution of chemical sterilization
products, including ethylene oxide ("EtO"). Named
as Defendants are BOC Group PLC, BOC Gases
("BOC Gases") (a division of BOC Group PLC) (*see*
Counts 1-4 of Plaintiffs' Complaint), American
Sterilizer Company ("AMSCO") (*see* Counts 5-8),
Pennsylvania Engineering Company (*see* Counts 9-
12), Steris Corporation (*see* Counts 13-16), and AGA
Gas, Inc. (*see* Counts 17-20). Plaintiffs claim these
Defendants are liable under a variety of theories,
including: negligence, strict liability, breach of
express and implied warranties, and civil conspiracy
to defraud. Defendants BOC Group PLC, BOC
Gases, American Sterilizer Company, Steris
Corporation, and AGA Gas, Inc., have moved to
dismiss each of the four counts as against them,
pursuant to Rules 12(b)(6), 9(b), and 10 of the
Federal Rules of Civil Procedure. For the following
reasons, the court grants Defendants' motions in part
and denies them in part.

*FACTUAL BACKGROUND*

As noted, Defendants are each corporations that
manufactured, sold, promoted, marketed, and
distributed chemical products, including EtO.
(Complaint Count 1, ¶ 1, Count 5, ¶ 1, Count 9, ¶ 1,
Count 13, ¶ 1, Count 17, ¶ 1.) Defendants then
supplied these products to medical service providers,
including Ingalls Hospital in Harvey, Illinois
("Ingalls"), for use by its employees. (*Id.* Count 1, ¶
2.) Plaintiffs were each employed as Central
Processing Department technicians at Ingalls-
Plaintiff Smith worked at Ingalls from 1990-2000,
Plaintiff Neal worked there from 1992-2000, and
Plaintiff Walker worked there from 1997-2000. (*Id.*
Count 1, ¶ 4.) During this employment, Plaintiffs
allege that they were exposed through inhalation,
ingestion and dermal contact to Defendants' products
on a continual basis. (*Id.*) This exposure caused
Plaintiffs to develop impaired cognitive abilities,
psychological effects, immune system dysfunction,
metabolic disease, increased risk of carcinogenic,
teratogenic, and mutagenic effects, and other adverse
health effects. (*Id.* Count 1, ¶ 5.) Moreover, Plaintiffs
did not know, nor should they reasonably have
known, that any injury was caused by Defendants'
products until conversations with their physicians in
August 2000. (*Id.* Count 1, ¶ 9.)

On September 5, 2000, Plaintiffs filed a twenty-count
complaint in the Circuit Court of Cook County,
Illinois alleging four claims against five of the six
named Defendants.[FN1] On December 18, 2000,
Defendants American Sterilizer Company and Steris
Corporation removed Plaintiffs' action to federal
court pursuant to 28 U.S.C. § 1446. On December 26,
2000, Defendants BOC Group PLC, BOC Gases,
American Sterilizer Company and Steris Corporation
filed motions to dismiss each count of Plaintiffs'
complaint as against them. On January 17, 2001,
Defendant AGA Gas, Inc. also moved to dismiss
each count of Plaintiffs' complaint as against it.

> FN1. The court notes that, while Plaintiff
> included Defendant BOC Gases in the case
> caption, none of the Complaint's 20 counts
> appear directed at Defendant BOC Gases. In
> fact, throughout Counts 1 through 4 (which
> are the only counts that could arguably

Not Reported in F.Supp.2d, 2001 WL 477237 (N.D.Ill.)
Not Reported in F.Supp.2d, 2001 WL 477237 (N.D.Ill.)
**2001 WL 477237 (N.D.Ill.)**

Case 1:08-cv-02364    Document 55-9    Filed 08/09/2008    Page 5 of 62    Page 2

cover BOC Gases), Plaintiffs continually use the singular "defendant," referring to BOC Group PLC. Moreover, in Paragraph 7 of Count 4, Plaintiffs state that "in breach of the duties as aforesaid, the defendants BOC GROUP PLC, AMERICAN STERILIZER COMPANY, STERIS CORPORATION, PENNSYLVANIA ENGINEERING COMPANY and AGA GAS INC. conspired together...." Noticeably, Plaintiffs do not include BOC Gases in this allegation.

**\*2** The court, here, details each of Plaintiffs' four claims (which are essentially the same as to each Defendant) and Defendants' arguments as to why such claims should be dismissed: [FN2]

> [FN2]. The court does not find it necessary in this summary to identify which particular Defendant(s) proffered which argument because the success of any one argument will cause the court to dismiss the corresponding claim as to all Defendants.

*Negligence (Counts 1, 5, 9, 13, and 17)*

Plaintiffs allege, first, that Defendants had a duty to use every reasonable precaution to prevent injury to Plaintiffs, but (a) negligently designed the products and rejected or failed to consider safer alternatives; (b) negligently marketed and sold the products, resulting in adverse health effects during routine use; (c) negligently marketed and sold ultrahazardous products; (d) negligently marketed and sold products that caused Plaintiffs to have symptoms and effects of <u>neurotoxicity</u>, immune system dysfunction, <u>metabolic disorder</u>, increased risk of carcinogenic, teratogenic, and mutagenic effects and other illnesses; (e) negligently manufactured, formulated, or packaged the products; (f) knew or should have known that the use of the products would allow hazardous levels of EtO to be released into workers' breathing zone, and knew or should have known that injury would occur, yet continued to manufacture, sell, promote, market, and distribute the products; (g) failed to recall and/or negligently continued to manufacture, sell, promote, market, and distribute the products despite having actual and implied knowledge that users could not safely control the products; and (h) failed to warn users of the hazards of the products. (Complaint Count 1, ¶ 6.) Plaintiffs

allege that their injuries, already described above, were a direct and proximate result of Defendants' negligence. (*Id.* ¶ 10.)

Defendants raise three arguments as to why Plaintiffs' negligence claim should be dismissed: (1) there can be no duty, a requisite element of any negligence claim, because Plaintiffs have failed to identify the particular product that allegedly caused damage to Plaintiffs; (2) Plaintiffs merely alleged conclusions of law, such as "Defendant negligently designed the products or rejected or failed to consider safer alternatives;" and, (3) specifically with regard to the failure to warn and recall allegations, no duties to warn or recall exist for dangers that were not known, nor should have been known, at the time the relevant products left their control.

*Strict Product Liability (Counts 2, 6, 10, 14, and 18)*

Plaintiffs allege that, at the time the products in question left the possession of Defendants, and on a continuing basis thereafter, Defendants had a duty to deliver products that were reasonably safe, yet breached this duty by delivering products that were unreasonably dangerous. (Complaint Count 2, ¶ 6.) According to Plaintiffs, Defendants had the ability to change the products so that the danger of injury would be eliminated without impairing the administration and efficiency of sterilization. (*Id.* ¶ 7.) As a direct and proximate result of the defective condition of these products, Plaintiffs suffered the injuries already discussed above. (*Id.* ¶ 8.)

**\*3** Defendants argue that the strict liability claim, like the negligence claim, must be dismissed because Plaintiffs have failed to identify the particular product that allegedly caused Plaintiffs' injuries.

*Breach of Warranty (Counts 3, 7, 11, 15, and 19)*

As their third claim, Plaintiffs allege that Defendants made express and implied affirmations of fact and promises to users in labels, packaging, manuals, instructions, and distributor information which stated that their EtO products were safe and did not cause neurological, <u>immunological</u> or <u>metabolic disease</u> or increased risk of <u>cancer</u> or mutagenic effects in humans. (Complaint Count 3, ¶ 6.) Defendants, Plaintiffs further allege, also implied by their actions that their products met (a) a warranty of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

merchantability that defects would not occur within ordinary and expected use (*Id.* ¶ 9), and (b) a warranty of fitness for a particular purpose-the sterilization of medical items. (*Id.* ¶ 10.)According to Plaintiffs, these warranties extended to them because the Plaintiffs' safety was explicitly or implicitly a basis of the bargain between Defendants and Ingalls, Plaintiffs' employer. (*Id.* ¶ 7.) Defendants then had a duty to comply with the terms of these warranties and fulfill their promise that the products would not cause injury, yet breached that duty. (*Id.* ¶ 12.)Plaintiffs, without specifying how, claim to have provided timely notice of the alleged defects to Defendants. (*Id.* ¶ 8.)

Defendants raise three arguments as to why the breach of warranty claims should be dismissed: (1) Plaintiffs violated <u>Rule 10 of the Federal Rules of Civil Procedure</u> by not alleging their three warranty claims (express; implied warranty of merchantability; implied warranty of fitness for a particular purpose) in separate articles; (2) Plaintiffs did not give proper notice to Defendants, an essential element of any warranty claim, because they failed, and still fail, to identify the particular product at issue; and (3) Plaintiffs have failed to state an express warranty claim because they did not include in or attach to their Complaint the terms of any such warranty.

*Conspiracy to Defraud (Counts 4, 8, 12, 16, and 20)*

Although they have asserted no independent fraud claim, Plaintiffs' Complaint includes several allegations that Defendants fraudulently concealed the health hazards associated with their products from state and federal agencies, the academic and scientific communities, as well as the general public. (Complaint Count 1, ¶ 11, Count 3, ¶ 14, Count 4, ¶ 6.) This allegedly fraudulent conduct is the underlying basis for Plaintiffs' civil conspiracy claim. Plaintiffs allege that Defendants conspired together and engaged in a common scheme to perpetrate such fraud in the following manner: (a) from 1966-1998, Defendants concealed and misstated EtO's <u>neurotoxicity</u>; (b) from 1972-2000, Defendants withheld and distorted information on EtO's <u>neurotoxicity</u> in submissions under § 313 of Title III of the Superfund Amendments, as well as submissions to the EPA, OSHA, and other state and federal agencies; (c) from 1970-2000, Defendants thwarted industry safety standards; and (d) from 1972-2000, Defendants designed and promulgated material safety data sheets, labels and packaging that concealed and misstated the <u>neurotoxicity</u> of EtO. Plaintiffs allege that their injuries, already described above, were a direct and proximate result of Defendants' conspiracy to defraud. (*Id.,* Count 4, ¶ 7(A)-(F).)

**\*4** Defendants argue that Plaintiffs' civil conspiracy claim should be dismissed for two reasons: (1) Plaintiffs, in violation of <u>Rule 9(b) of the Federal Rules of Civil Procedure</u>, have not alleged with specific facts either an agreement among Defendants or a tortious act committed in furtherance of any such agreement; and (2) even if Plaintiffs have successfully alleged a tortious act, the conduct alleged was merely parallel, which is not sufficient to state a conspiracy claim.

*DISCUSSION*

In deciding a motion to dismiss for failure to state a claim, the court considers the allegations in the complaint to be true and views all well-pleaded facts and any reasonable inferences drawn from the facts in the light most favorable to the plaintiff. *See <u>Leatherman v. Tarrant County Narcotics & Intelligence Unit,</u> 507 U.S. 163, 164-65 (1993);* <u>Stachon v. United Consumers Club, Inc.,</u> 229 F.3d 673, 675 (7th Cir.2000).* Dismissal is proper under 12(b)(6) if the Plaintiff can establish no set of facts upon which relief can be granted. *See <u>Henson v. CSC Credit Servs.,</u> 29 F.3d 280, 284 (7th Cir.1994).*

A. BOC Gases

The court finds that, while it may have been mere oversight, Plaintiffs have not adequately directed any count of its Complaint against Defendant BOC Gases. BOC Gases' motion to dismiss is granted.

B. Negligence

Defendants ask this court to dismiss Plaintiffs' negligence claim in entirety. Their primary argument is that Plaintiffs have failed to identify the particular product at issue, and, instead, have merely alleged that they were injured by "chemical products including ethylene oxide and other product components" formulated, manufactured, sold,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

promoted, marketed, lectured and distributed by Defendants.

The only arguably relevant federal case [FN3] Defendants cite in support of this argument is *Shine v. Owens-Illinois, Inc.,* 979 F .2d 93, 97 (7th Cir.1992).*Shine* involved a widow's claim against manufacturers and distributors of asbestos to recover damages for the death of her husband. The Seventh Circuit noted that in order to recover, under Illinois law, a plaintiff "must identify the allegedly harmful product and demonstrate a link between that product and each defendant."*Shine,* 979 F.2d at 97. The court then affirmed a grant of *summary judgment* to the defendant in part because the plaintiff did not "specifically identify the asbestos product to which her husband allegedly was exposed."*Id.*

> FN3. Because Illinois law governs this diversity action, Defendants also cite Illinois cases such as *Carrizales v. Rheem Mfg. Co.,* 226 Ill.App.3d 20, 24, 589 N.E.2d 569, 572 (1st Dist.1991). Such cases are inapposite at this stage, however, because Illinois state courts require fact pleading, while federal courts only require notice pleading, a considerably more lenient standard. *See Albiero v. City of Kankakee,* 122 F.3d 417, 419 (7th Cir.1997).

Shine, where the court affirmed summary judgment, is readily distinguishable from this case, where Defendants seek dismissal under Rule 12(b)(6). Recognizing that Plaintiffs' allegations are relatively vague, the court nevertheless assumes that Defendants are sufficiently familiar with their own product lines to answer. Plaintiffs' failure to provide specifics is unfortunate and no doubt frustrating for Defendants, but the court finds itself able to comprehend the thrust of Plaintiffs' claim, and therefore concludes that Plaintiffs have met the threshold necessary to survive Defendants' motion. *See Kyle v. Morton High Sch.,* 144 F.3d 448, 455 (7th Cir.1998) (requiring only that "sufficient facts [have been] pleaded to allow the district court to understand the gravamen of the plaintiff's complaint.") (quoting *Doherty v. City of Chicago,* 75 F.3d 318, 326 (7th Cir.1996)).[FN4] Defendants' motion to dismiss the negligence claim in its entirety is denied.

> FN4. Defendants may have been better

served in their quest for specificity by filing a Rule 12(e) motion for a more definite statement as opposed to a motion to dismiss. At this time, however, it would be more appropriate for Defendants to seek such information through the discovery devices made available in Rules 26 through 36.

**\*5** In one respect, however, the court agrees with Defendants that Plaintiffs' allegations are inadequate. Specifically, Plaintiffs assert that Defendants acted negligently in failing to warn Plaintiffs of the dangers associated with their products and failing to recall these products. Illinois law is clear: (1) "the law does not contemplate placing the onerous duty on manufacturers to subsequently warn all foreseeable users of products based on increased design or manufacture expertise that was not present at the time the product left its control,"*Modelski v. Navistar Int'l Trans. Corp.,* 302 Ill.App.3d 879, 888 707 N.E.2d 239, 246 (1st Dist.1999) and, (2) "absent a statutory obligation or voluntary undertaking to retrofit, no Illinois case has imposed upon a manufacturer a duty to retrofit or recall where the allegedly dangerous condition was not discovered until after the product was sold."*Rogers v. Clark Equip. Co.,* 318 Ill.App.3d 1128, 744 N .E.2d 364, 370 (2d Dist.2001) (citing *Modelski,* 302 Ill.App.3d at 889, 707 N.E.2d 239 (1st Dist.1999)). Plaintiffs' complaint alleges that Defendants knew or should have known the danger of its product prior to sale. If Defendants did know or should have known of any such danger, they may very well be found liable for their failure to warn or recall. As to any condition discovered after the product was sold, however, Defendants had no such duty. The court therefore dismisses Plaintiffs' negligence claim only insofar as it is predicated on a duty to warn or recall a product after learning of its defect post-sale.

## C. Strict Liability

To state a strict liability claim, a plaintiff must plead three elements: (1) the injury resulted from a condition of the product; (2) the condition was unreasonably dangerous; and (3) the condition existed at the time the product left the manufacturer's control. *See Hansen v. Baxter Healthcare Corp.,* 309 Ill.App.3d 869, 880, 723 N.E.2d 302, 311 (1st Dist.1999). Plaintiffs have alleged that, at the time of manufacture, Defendants' EtO products were

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 477237 (N.D.Ill.)
**2001 WL 477237 (N.D.Ill.)**

unreasonably dangerous for use in hospitals by humans, and that as a direct and proximate result of this defective condition, Plaintiffs suffered injury. Defendants argue in response that the claim must be dismissed because Plaintiffs have failed to identify the particular EtO product that was allegedly defective and injurious. Again, in light of the aforementioned lenient pleading standard of the federal rules, the court rejects Plaintiffs' argument.

D. Breach of Warranty

Neither is the court swayed by Defendants' responses to Plaintiffs' breach of warranty claims. Plaintiffs have brought, all in one count, three warranty claims: breach of express warranty; breach of an implied warranty of merchantability; and breach of the implied warranty of fitness for a particular purpose. Citing *Ridle v. Sprayrite Mfg. Co.*, 198 Ill.App.3d 597, 599, 555 N.E.2d 1272, 1272-73 (3d Dist.1990), Defendants contend that grouping all three warranty claims together in one count violates Rule 10 of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 10(b) ("Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth."). The court finds Defendants' citation to *Ridle* unconvincing. First of all, *Ridle* was an Illinois and not a federal case, so Rule 10 did not even come into play. Second, while the *Ridle* court notes that the plaintiffs filed their three warranty claims in three separate counts, nowhere in the opinion does the court indicate that pleading in such a manner was required.

*6 Defendants' second argument for dismissal of the warranty claims is no stronger. Defendants claim that Plaintiffs did not give them satisfactory notice of breach as required by Illinois statute because Plaintiffs did not, and have still not, specified the particular product at issue. According to § 2-607 of the Uniform Commercial Code, codified in Illinois as 810 ILCS 5/2-607(3)(a), an essential element of a warranty claim is notice of breach to the seller. *See Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 491, 675 N.E.2d 584, 589 (1996) ("Section 2-607 of the UCC mandates that a 'buyer [FN5] must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."). While they do not

describe how, Plaintiffs nevertheless explicitly allege that they "gave timely notice of the alleged defects to the defendant." Complaint, Count 3, ¶ 8. Again, specificity as to the particular product may well have clarified any such notice, but the court will not dismiss the warranty claim on this account.

> FN5. Despite the fact that they are not "buyers" of Defendants' EtO products, Plaintiffs are still able to state a cause of action for breach of warranty because they have alleged that their safety was either explicitly or implicitly a basis for the bargain between Defendants and Ingalls, Plaintiffs' employer. *See Maldonado v. Creative Woodworking Concepts, Inc.*, 296 Ill.App.3d 935, 938, 694 N.E.2d 1021, 1024 (3d Dist.1999) ("[A] warranty may also 'extend to any employee of a purchaser who is injured in the use of the goods, as long as the safety of that employee in the use of the goods was either explicitly or implicitly part of the basis of the bargain when the employer purchased the goods.") (quoting *Whitaker v. Lian Feng Mach. Co.*, 156 Ill.App.3d 316, 321, 509 N.E.2d 591, 595 (1st Dist.1987)).

Defendants' third and final argument also fails. Defendants ask the court to dismiss Plaintiffs' express warranty claim because "the terms of the express warranty must be stated or attached to the complaint ... and failure to do so renders the claim invalid." *Board of Educ. of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428, 461, 546 N.E.2d 580, 595 (1989). In their complaint, though, Plaintiffs do recite the terms of the alleged warranty: "Defendants made express and implied affirmations of fact and promises to the buyer and users, including plaintiffs, the language of which ... stated that *the aforementioned products were safe and did not cause neurological, immunological or metabolic disease or increased risk of cancer or mutagenic effects in humans, including the plaintiffs.*" Complaint, Count 3, ¶ 6 (emphasis added). The court assumes, as it must on this motion, that these are the "terms" of the warranty, and therefore, rejects Defendants' argument.

E. Conspiracy to Defraud

Defendants' arguments for the dismissal of Plaintiffs'

conspiracy claim, on the other hand, are more powerful. In order to properly allege a civil conspiracy, a plaintiff must plead: (1) a combination of two or more persons; (2) for the purpose of accomplishing by some concerted action; (3) either an unlawful purpose or a lawful purpose by unlawful means. *Rose v. Mony Life Ins. Co.,* No. 99 C 4279, 2001 WL 214200, at *5 (N.D.Ill. Mar. 2, 2001) (citing *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 62, 645 N.E.2d 888, 894 (1994)). In addition, courts in this Circuit have required that a conspiracy to defraud must be pleaded with particularity under Federal Rule of Civil Procedure 9(b).*See Flynn v. Merrick,* 881 F.2d 446, 449 (7th Cir.1989); *see also Eisenhauer v. Stern,* No. 99 C 6422, 2000 WL 136011, at *2 (N.D.Ill. Jan. 27, 2000) ("[W]henever fraud constitutes the gravamen of a claim ...Rule 9(b) expressly requires that the circumstances constituting fraud ... shall be stated with particularity ... [;] simply mouthing conclusory assertions of 'conspiracy' in the context of an asserted fraud will not suffice."). Defendants claim that Plaintiffs have not pleaded their conspiracy claim with the requisite specificity. The court agrees.

*7 To be sure, Plaintiffs have satisfactorily alleged underlying tortious acts: fraudulent statements (including omissions) to state and federal agencies as well as the general public.[FN6]Where Plaintiffs falter is in their allegations of an agreement. Plaintiffs have merely alleged that Defendants "conspired together" to, among other things, conceal and misstate the dangers of their EtO products. They have not, however, stated with any particularity the basis or mechanics of any such agreement among Defendants. While the court is willing to allow the other claims to go forward absent such particularity, the conspiracy claim is subject to the heightened pleading standard of Rule 9(b). The conspiracy allegations here do not meet that standard. Because the court dismisses Plaintiffs' conspiracy claim on particularity grounds, it need not reach Defendants' parallel conduct argument.

> FN6. As noted in the Factual Background, though, Plaintiffs have not set forth a separate claim of fraud.

*CONCLUSION*

For the foregoing reasons, the court grants (i) BOC

Gases' motion to dismiss, and, as to each remaining Defendant, grants the motion to dismiss (ii) the civil conspiracy claim against it; and (iii) the negligence claim against it only insofar as it is predicated on a duty to warn or recall a product after learning of its defect post-sale. The court denies the remainder of Defendants' motions. (Docs.3-1, 4-1, 7-1.)

N.D.Ill.,2001.
Smith v. BOC Group PLC
Not Reported in F.Supp.2d, 2001 WL 477237 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2002 WL 452218 (Pa.Com.Pl.), 47 UCC Rep.Serv.2d 969
**2002 WL 452218 (Pa.Com.Pl.)**

▷Solarz v. DaimlerChrysler Corp.
Pa.Com.Pl.,2002.
    Edward D. SOLARZ, Matthew Ginsberg, Brendon
    and Kathleen Dolan individually and on behalf of all
            others similarly situated, Plaintiffs,
                            v.
        DAIMLERCHRYSLER CORPORATION,
                        Defendant.
**No. 2033 APRILTERM 2001, CONTROL 112087.**

                    March 13, 2002.

                MEMORANDUM OPINION

HERRON, J.
**\*1** The defendant, DaimlerChrysler Corporation
("DaimlerChrysler") filed these preliminary
objections to the Amended Complaint of plaintiffs
Edward D. Solarz ("Solarz"), Matthew Ginsberg
("Ginsberg"), Brendon and Kathleen Dolan ("the
Dolans") and on behalf of others similarly situated.
For the reasons stated below, this court both
overrules and sustains the preliminary objections in
part.

                    BACKGROUND

Between 1995 and 2000, the plaintiffs purchased
minivans manufactured by DaimlerChrysler [FN1] from
their local dealerships. Specifically, in 1995, Solarz
purchased a 1996 Chrysler minivan from D'Ambrosia
Dodge in Downingtown, Pennsylvania, and Ginsberg
purchased a 1996 Dodge Caravan from Cherry Hill
Dodge, Cherry Hill, New Jersey. Am. Complaint ¶
11, 12. In 2000, the Dolans purchased a 2000 Dodge
Grand Caravan Sport from Frank C. Videon Dodge in
Newtown Square, Pennsylvania.

          FN1.   DaimlerChrysler   manufactures,
          assembles and sells and leases minivans
          under the brand names Chrysler, Dodge and
          Plymouth, among others. Am. Complaint ¶
          14.

Soon after purchasing these vehicles, the plaintiffs
discovered that all these minivans did not have a
park-brake interlock. This interlock feature ensures

that a vehicle will not inadvertently be moved by a
person as it prevents one from shifting out of "park"
unless the brake pedal is depressed. Although this
interlock is a standard feature on some other
minivans     manufactured     by      competitors,
DaimlerChrysler did not offer this feature on the
minivans purchased by the plaintiffs.

On August 1, 2000, the Dolans' parked minivan
began to roll down the street after their 1 1/2 year old
daughter hit the minivan's transmission from "park"
into "drive". After their mechanic informed them that
their minivan lacked a park brake interlock, the
Dolans' sought the help of their dealership. However,
they were told that the minivan could not be modified
to add this park brake interlock. Despite their
requests, DaimlerChrysler made no repairs to the
minivan pursuant to the warranties received.

In April 2001, the plaintiffs commenced this class
action against DaimlerChrysler asserting breach of
implied warranties, breach of express warranty,
breach of contract, breach of duty of good faith and
fair dealing, and violation of the Pennsylvania Unfair
Trade Practices and Consumer Protection Act
("UTPCPL").[FN2] In addition to awarding damages,
the plaintiffs also seek injunctive relief compelling
DaimlerChrysler to install the park brake interlock
feature in their minivans. DaimlerChrysler timely
filed these preliminary objections.

          FN2. The Consolidated Amended Complaint
          was filed on October 11, 2001.

                    DISCUSSION

Pennsylvania Rule of Civil Procedure [Pa.R.C.P]
1028(a)(4) allows for preliminary objections based
on legal insufficiency of a pleading. When reviewing
preliminary objections in the form of a demurrer, "all
well-pleaded material, factual averments and all
inferences fairly deducible therefrom" are presumed
to be true. _Tucker v. Philadelphia Daily News, 757
A.2d 938, 941-42 (Pa.Super.Ct 2000)._ Preliminary
objections, whose end result would be the dismissal
of a cause of action, should be sustained only where
"it is clear and free from doubt from all the facts

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 452218 (Pa.Com.Pl.), 47 UCC Rep.Serv.2d 969
**2002 WL 452218 (Pa.Com.Pl.)**

Case 1:08-cv-02364   Document 55-9   Filed 08/09/2008   Page 11 of 62   Page 2

pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief."*Bourke v. Kazara*, 746 A.2d 642, 643 (Pa.Super.Ct.2000) (citations omitted).

I. The Doctrine of Conflict Preemption Does Not Apply Here

**\*2** DaimlerChrysler argues that "conflict preemption prevents this Court from ordering DaimlerChrysler to recall and retrofit the vehicles at issue."Def's Mem. of Law at 4. The plaintiffs respond by asserting that there is "no conflict preemption" since the Motor Vehicle Safety Act ("MVSA") "specifically recognizes and preserves a Plaintiff's claims under federal and state law and under common law."Pls' Reply Mem. of Law at 12. However, both parties misconstrue the role of the doctrine of conflict preemption.

In *Werner v. J. Plater-Zyberk*, 2002 WL 243655 (Pa.Super 2002), our Superior Court recently discussed the doctrine of conflict preemption:

The principle of federal preemption of state law derives from the second clause of Article VI of the Constitution, the Supremacy Clause. *Shiner*, 706 A.2d at 1237 (citing U.S. Const. art. VI, cl. 2). Under the Supremacy Clause, federal law is "the supreme Law of the land" and any conflicts between federal and state laws must be resolved in favor of federal law. *Burgstahler v. AcroMed Corp.*, 670 A.2d 658, 663-64 (Pa.Super.1995).... [S]tate law may be displaced under conflict preemption principles if the state law in question presents a conflict with federal law in one of two situations: (a) when it is physically impossible to comply with both state and the federal law, or (b) when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 381 (3d Cir.1999), cert. denied, 529 U.S. 1012 (2000).

*Werner*, 2002 WL 243655, at 8.

The court need not address the issue of preemption here as the plaintiffs have not invoked any Pennsylvania law that is in conflict with any federal law. Instead, they seek, *inter alia,* court imposed injunctive relief. As discussed below, the court is precluded from granting this relief, not because of the

jurisdictional doctrine of preemption, but rather that of the administrative law doctrine of primary jurisdiction.

II. The Court is Not Empowered to Compel DaimlerChrysler to Install Park-Brake Locks

Throughout their Amended Complaint, the plaintiffs repeatedly ask this court to compel DaimlerChrysler to install a park-brake interlock. Am. Complaint ¶¶ 1, 8, at 35. DaimlerChrysler asserts that these requests are really requests for a recall and since the National Highway Traffic Safety Administration ("NHTSA") has primary jurisdiction in issuing recalls, this court lacks the authority to grant the relief sought by the plaintiffs. Def's Mem. of Law at 9-12. The plaintiffs argue that "[they] do not seek a recall" and therefore this court would not be doing "anything that would interfere with NHTSA's authority."Pls' Reply Mem. of Law at 8. However, this court disagrees. A fair and accurate reading of their Amended Complaint indicates that plaintiffs, in fact, request what amounts to a recall.[FN3]Therefore, this court finds that this type of relief is not appropriate in this forum.

> FN3. It is clear to this court that the plaintiffs' request for a "retrofit" of the minivans by DaimlerChrysler, at no cost to the plaintiffs, amounts to a recall. *See Namovicz v. Cooper Tire & Rubber Co.*, 2001 WL 327886, at 2 n. 4 (D.Md.2001) (holding that plaintiff's request to replace all defective tires, was "in substance, a recall" as it requires "the same administrative acts that would be necessary to effectuate a fullscale recall."). It is impossible to accomplish what the plaintiffs request without ordering such a recall, therefore it is disingenuous of the plaintiffs to repeatedly assert that they have not asked for one. Pls' Reply Mem of Law at 7, 8, 13, 14.

**\*3** Our Superior Court in *In re Insurance Stacking Litigation*, 754 A.2d 702 (Pa.Super.2000) explained that the "doctrine of primary jurisdiction holds that where an agency has been established to handle a particular class of claims, the court should refrain from exercising its jurisdiction until the agency has made its determination. Hence, although the court may have subject matter jurisdiction, the court defers its jurisdiction until an agency ruling has been

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

made."*Insurance Stacking,* 754 A.2d at 706. Moreover,

[T]he doctrine of primary jurisdiction serves the following purposes: (1) the Commonwealth benefits from the agency's expertise and special experience in complex areas with which judges have little familiarity; (2) the statutory purpose and the intent of the legislature are fulfilled by honoring the powers granted to the agency by the legislature; and (3) the need to promote consistency in administrative policy is also fulfilled.

*Kossman v. Public Utility Commission,* 694 A.2d 1147, 1155 (Commw.Ct.1997) (citing *Elkin v. Bell Telephone Co.,* 491 Pa. 123, 132-33, 420 A.2d 371, 376 (1980)).

Congress intended, through the MVSA, for the Department of Transportation to have primary jurisdiction in the administering of automotive recalls. 49 U.S.C. §§ 30101, *et seq.* Specifically, the MVSA authorizes the Secretary of Transportation, and by delegation the NHTSA, to investigate and determine defects in motor vehicles and require manufacturers to remedy such defects through, *inter alia,* the issuance of recalls. 49 U.S.C. §§ 30118, 30120(a)(1)(A); 49 C.F.R. §§ 501.1, 501.2. Here, the plaintiffs are asking this court to compel DaimlerChrysler to install park brake interlocks. However, this court lacks the authority to grant the injunctive relief requested as Congress has delegated the authority to order recalls to the Department of Transportation.

This court in *Grant, et al v. Bridgestone Firestone Inc., et al,* Sept. 2000, No. 3668 (C.P. Phila. June 12, 2001) discussed the appropriateness of requesting an avmtive recall in this forum. In *Grant,* the plaintiffs sought an expanded recall of allegedly defective tires beyond the scope of what was being required by the NHTSA. In denying the plaintiffs' requests, this court held that:

While no Pennsylvania appellate court has addressed the issue specifically, courts in other jurisdictions have expressed serious reservations as to whether a court has the authority to order a recall and have refrained from doing so. *See, e.g. National Women's Health Network, Inc. v. A.H. Robbins Co.,* 545 F.Supp. 1177, 1180 (D.Mass 1982) ("state law

simply does not provide a basis for worldwide recalls"); *Gregory v. Cincinnati Inc.,* 538 N.W.2d 325, 334 n. 30 (Mich.1995) (product recalls "are properly the province of administrative agencies, as the federal statutes that expressly delegate recall authority to various agencies suggest"). This is especially true with regard to motor vehicle recalls. *See Walsh v. Ford Motor Co.,* 130 F.R.D. 260, 267 (D.D.C 1990) (court refused to order recall to "avoid entanglement with a regulatory scheme designed and intended to empower principally the Department of Transportation, rather than the courts, to order and oversee motor vehicles"); *Crawley v. DaimlerChrysler Corp.,* No. 4900, slip op. at 38 (C.P.Phila.Mar.5, 2001) ("NHTSA is the proper forum to address automobile recalls"). These cases make the Court reluctant to order the recall of the Additional Tires.

**\*4** *Grant,* slip op. at 7-8. Similarly, to avoid entanglement with the NHTSA, this court will not compel DaimlerChrysler to install park brake interlocks.

The plaintiffs argue that the holding in *Grant* is "entirely distinguishable" from the present case because, unlike here, in *Grant,* the NHTSA had already ordered a recall. "Seeking to not interfere with an ongoing recall," argue the plaintiffs, "the court determined that it did not have the authority to extend NHTSA's recall."Pls' Reply Mem. of Law at 8. However, this reading misconstrues the court's holding in *Grant.*Regardless of whether the NHTSA ordered a recall or not, this court simply lacked the authority to compel a recall when Congress had clearly delegated such authority to the Department of Transportation. Similarly, here, this court simply lacks the authority to compel DaimlerChrysler to install park-brake interlocks.

The plaintiffs also argue that "only in limited circumstances do courts surrender their own jurisdiction to NHTSA."Pls' Reply Mem. of Law at 9. In support of this contention, the Plaintiffs direct this court to *In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.* No. MDL 961, 1993 WL 204116 (E.D. Pa. June 10, 1993). However, the plaintiffs overlook several distinct differences between this case and *General Motors.*Most importantly, the plaintiffs in *General Motors* were not seeking a recall. Instead, the plaintiffs in that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

class action were seeking, *inter alia,* to merely enjoin General Motors "from continuing to misstate that its trucks are safe" and further, require General Motors to provide notice to its customers that its trucks were under a pending NHTSA investigation. *General Motors,* 1993 WL 204116 at 1. Moreover, the *General Motors* court concluded that "none of the plaintiffs' claims challenge the powers of NHTSA under the Act... to seek the remedies provided by statute or regulation for alleged violations of the safety standards." *Id* at 6. Here, as DaimlerChrysler correctly points out, "in complete contrast, plaintiffs' claims for injunctive relief directly challenge NHTSA's power to regulate the industry and to order the notification and recall remedies provided by its regulations." Def's Reply Mem. of Law at 8. Thus, *General Motors* does not allow this court to compel DaimlerChrysler to install park-brake interlocks, as doing so would unnecessarily cause entanglement with the regulatory scheme of the Department of Transportation. Therefore, the cause of action for injunctive relief must be dismissed.

III. The Preliminary Objections Asserting Legal Insufficiency of All Pleadings for Lack of Manifest Damages are Overruled In Part

DaimlerChrysler alleges that the plaintiffs have made no allegations in their Amended Complaint that they have actually sustained any damages for their alleged breach of express and implied warranties, breach of contract and duty of good faith and fair dealing, and alleged violations of the UTPCPL. Def's Mem. of Law at 12. The court will address each of these claims in turn.

A. Only the Dolans Have Alleged Damages To Proceed With Their Breach of Implied Warranty Claims

*\*5* In Pennsylvania, damages is an essential element of each of the plaintiffs' breach of warranty claims. *See Price v. Chevrolet Motor Div. of Gen. Motors Corp.,* 765 A.2d 800, 809 (Pa.Super.2000) (successful claim for breach of warranty requires damages); *Altronics of Bethlehem, Inc. v. Repco,* Inc., 957 F.2d 1102, 1105 (3d Cir.1992) (an implied warranty of merchantability plaintiff must establish, *inter alia,* "that the product malfunctioned.").

Here, only the Dolans have alleged damages from

their breach of implied warranty claims. Specifically, the Dolans "have alleged manifestation of the unsafeness as a result of [Daimler]Chrysler's failure to install the park-brake interlock."Pls' Reply Mem. of Law at 14. The Dolans allege that after their 1 1/2 year old daughter inadvertently shifted the gear from "park" to "drive," the Dolans' "minivan began to roll down the street toward a four way intersection, sideswiping a stop sign."Am. Complaint. ¶ 65. After having been informed that their minivan did not have a park-lock feature, and that there was no modification to install a park-brake interlock, the Dolans allege that "they are left with a vehicle unfit for the purpose for which it was intended, safe, reliable form of transportation."Am. Complaint ¶¶ 66, 68, 69. Therefore, this court can reasonably infer from the facts alleged that the Dolans' minivan malfunctioned. As such, the Dolans have sufficiently alleged damages for purposes of preliminary objections. *See Thomas v. Carter-Wallace Inc.,* 27 Pa. D. & C. 4th 146, 149 (C.P. Monroe 1994) (citing *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 23, 485 A.2d 408 (1984)), *aff'd,*449 Pa.Super. 711, 673 A.2d 412 (1995) (a breach of implied warranty of merchantability theory in Pennsylvania states that a merchant is "only liable for harm caused by a defect in their product.").[FN4]

> FN4. Other courts have stated that the manifestation requirement is the majority position in the United States. In *Chin v. Chrysler Corp.,* 182 F.R.D. 448 (D.N.J.1998), the court stated that "[i]n most jurisdictions, the courts recognize that unless a product actually manifests the alleged defect, no cause of action for breach of express or implied warranty or fraud is actionable."182 F.R.D. at 460 (collecting cases).*See also,* e.g. *Briehl v. General Motors Corp.,* 172 F.3d 623, 628 (8th Cir.1999) (dismissing plaintiff's breach of implied warranty claim where the plaintiffs suffered no injury); *Jarman v. United Indus. Corp.,* 98 F.Supp.2d 757, 768 (S.D.Miss.2000) (a warranty claim requires that "there is actually failure in product performance," and [m]ere suspicion of a lost bargain... will not support an award of damages."); *In re Air Bags Prods. Liab. Litig.* 7 F.Supp.2d 792, 805 (E.D.La.1998) ("[T]he absence of a manifested defect precludes a cognizable claim."); *Yost v.*

*General Motors Corp.,* 651 F.Supp. 656 (D.N.J.1986) (holding that damage is a necessary element of breach of warranty claim); *American Suzuki Motor Corp., v. Superior Ct.,* 44 Cal.Rptr.2d 526, 529 (Cal.Ct.App.1995) (holding that, "in the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for ordinary puporse of providing transportation.").

Unlike the Dolans, Solarz and Ginsberg, however, have not alleged to have suffered similar damages. Although the Amended Complaint includes excerpts from letters of individuals discussing their damages as a result of not having a park-brake interlock, not only are these letters not from the named plaintiffs, but nowhere is it alleged that Solarz and Ginsberg suffered such damages. Am. Complaint ¶ 33, 38. Therefore, this court dismisses the breach of implied warranty claims of both Solarz and Ginsberg.

**B. Only the Dolans Have Alleged Damages to Sustain a Breach of Contract and Breach of Duty of Good Faith Action**

"A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Corestates Bank v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.1999) (citation omitted)."While not every term of a contract must be stated in complete detail, every element must be specifically pleaded."*Id.* (citation omitted). The purpose of damages in breach of contract claims is to return the parties to the position they would have been in but for the breach. *The Birth Center v. St. Paul's Companies Inc.,* 787 A.2d 376 (Pa. Super 2001).

**\*6** Here, a fair reading of the Amended Complaint reveals that only the Dolans allege damages to support their breach of contract claim. Although all plaintiffs allege that they purchased and paid for minivans from DaimlerChrysler, and all of the plaintiffs allege that these minivans came with certain express warranties, only the Dolans allege damages. Am. Complaint ¶¶ 11, 12, 13, 82, 83, 84, 85. Nowhere in the Amended Complaint do Solarz or Ginsberg allege that they suffered damages resulting

from the breach of contract with DaimlerChrysler. Therefore, the breach of contract claims of Solarz and Ginsberg are dismissed.

**C. All the Plaintiffs Have Alleged Damages to Sustain Their UTPCPL Claims**

Under the § 201-9.2 of the UTPCPL, a person bringing a private UTPCPL claim must show an "ascertainable loss of money or property, real or personal."The UTPCPL "is to be construed liberally to effect its object of preventing unfair or deceptive practices."*Commonwealth by Creamer v. Monumental Props., Inc.,* 459 Pa. 450, 460, 329 A.2d 812, 817 (1974) (citations omitted).*See also Brunwasser v. Trans World Airlines, Inc.,* 541 F.Supp. 1338, 1346-47 (W.D.Pa.1982) (holding that the term "ascertainable loss" must be liberally construed and that "the ascertainable loss requirement of this act is designed merely to insure that individuals bringing suit have in fact been damaged by a deceptive trade practice"). Even where damages are not easily quantified or where a claim has failed to quantify the damages suffered, a UTPCPL claim does not fail as a matter of law. *In re Milbourne,* 108 B.R. 522, 544 (Bankr.E.D.Pa.1989); *In re Chapman,* 77 B.R. 1, 6 (Bankr.E.D.Pa.1987); *In re Jungkurth,* 74 B.R. 323, 335-36 (Bankr.E.D.Pa.1987). Finally, the type of injury necessary to sustain a claim for violations of the UTPCPL is different from the type needed to sustain a claim for breach of warranties. *Grant v. Bridgestone/Firestone, Inc.,* Sept. 2000, No. 3668, slip op. at 4-8 (C.P. Phila. Jan 10, 2002) ("Grant II") (overruling objections for failure to allege manifest injury when the UTPCPL requires only that plaintiffs sufficiently allege an ascertainable loss).

Although only the Dolans sufficiently allege manifest injury to support their breach of warranty claims, here, all the plaintiffs have alleged ascertainable losses to support their UTPCPL claims. Further, even though the plaintiffs exclude from their class claims "claims for personal injury, wrongful death, or damage to property," the plaintiffs specifically allege that "[t]he ascertainable loss includes the cost of installing the park-brake interlock in [Daimler]Chrysler minivans and/or the difference in value between minivans with the park-brake interlock device and those without it."Am. Complaint ¶¶ 16, 97. Therefore, this court can reasonably infer from

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 452218 (Pa.Com.Pl.), 47 UCC Rep.Serv.2d 969
2002 WL 452218 (Pa.Com.Pl.)

the facts alleged that all the named plaintiffs have sufficiently alleged damages for their claims of UTPCPL violations.

**\*7** DaimlerChrysler counters and argues that the plaintiffs' UTPCPL claims should be defeated because "[p]laintiffs have made no allegation of actual loss or 'real out-of-pocket costs.'" Def's Reply Mem. of Law at 12. In support of this contention, DaimlerChrysler directs this court to its holding in *Grant II.*However, *Grant II,* is not to the contrary. There, the Complaint alleged "that the Plaintiffs incurred real out of pocket costs in replacing" the allegedly defective tires. *Grant II,* slip op. at 7. This court concluded that such an "allegation of specific losses also defeat[ed] the Defendants' legitimate arguments as to the policy considerations against allowing 'no injury' claims."*Id.* Here, although the injuries alleged are not as quantifiable as those in *Grant II,* ascertainable losses are nonetheless alleged, and therefore defeat DaimlerChrysler's concerns against allowing "no injury" claims. Furthermore, as discussed above, a UTPCPL claim does not fail as a matter of law even where damages are not easily quantified or where a claim has failed to quantify the damages suffered. *In re Milbourne,* 108 B.R. 522, 544 (Bankr.E.D.Pa.1989); *In re Chapman,* 77 B.R. 1, 6 (Bankr.E.D.Pa.1987); *In re Jungkurth,* 74 B.R. 333, 335-36 (Bankr.E.D.Pa.1987). Therefore, having alleged ascertainable losses, all the plaintiffs' UTPCPL claims are sustainable.

IV. The Preliminary Objection Asserting Legal Insufficiency of a Pleading of Breach of Implied Warranties of Merchantability is Overruled In Part

DaimlerChrysler asserts that the plaintiffs have not pled all of the required elements of a cause of action for breach of the implied warranties. Def's Mem. of Law at 17. As already discussed above, the breach of implied warranty claims of Solarz and Ginsberg are dismissed as they have not alleged that their minivans malfunctioned. However, this court finds that the Dolans' claim for breach of implied warranty of merchantability survives a demurrer, but their claim for a breach of the implied warranty of fitness for a particular purpose does not.

A. Implied Warranty of Merchantability

To recover for a breach of implied warranty of merchantability in Pennsylvania, a plaintiff must show that the seller was a merchant as defined by the Uniform Commercial Code ("UCC") and the goods were not merchantable at the time of the sale. 13 Pa.C.S.A. § 2314.[FN5]In *Gall v. Allegheny County Health Department,* 521 Pa. 68, 555 A.2d 786 (1989), the Pennsylvania Supreme Court recognized that:

> FN5.13 Pa.C.S.A. § 2314 reads:
>
> (a) Sale by merchant.-Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
>
> (b) Merchantability standards for goods.-Goods to be merchantable must be at least such as:
>
> (1) pass without objection in the trade under the contract description;
>
> (2) in the case of fungible goods, are of fair average quality within the description;
>
> (3) are fit for the ordinary purposes for which such goods are used;
>
> (4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;
>
> (5) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (6) conform to the promises or affirmations of fact made on the container or label if any.
>
> (c) Course of dealing or usage of trade.-Unless excluded or modified (section 2316) other implied warranties may arise

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d.
Not Reported in A.2d, 2002 WL 452218 (Pa.Com.Pl.), 47 UCC Rep.Serv.2d 969
**2002 WL 452218 (Pa.Com.Pl.)**

Case 1:08-cv-02364   Document 55-9   Filed 08/09/2008   Page 16 of 62 Page 7

from course of dealing or usage of trade.

The concept of 'merchantability' does not require that the goods be the best quality ...or the best obtainable,... but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed,... that they be free from significant defects, that they perform in the way that goods of that kind should perform ... and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used.

*8 *Id.* at 75,555 A.2d at 789-90. (citations omitted).

Here, the Dolans allege all the elements of a claim for breach of implied warranty of merchantability. They allege that under the UCC, they are "buyers," DaimlerChrysler is a "merchant" and "seller," and minivans are "goods." Am. Complaint ¶¶ 72, 73, 74. Further, they allege that "the minivans... are not fit for the ordinary purposes for which such goods are sold, safe reliable family transportation."Am. Complaint ¶ 78. Moreover, the Dolans claim that the minivans are not merchantable because "they do not pass 'without objection' in the trade under the description provided by [Daimler]Chrysler... [as] a portion of the buying public has objected to buying a minivan without the park brake interlock."Am. Complaint ¶¶ 78, 79. Finally, as discussed above, they also allege damages as their minivan malfunctioned. Am. Complaint ¶ 65.

DaimlerChrysler counters by contending that the "law does not require that every good be of the 'best quality' " but "merely that goods can be used as an ordinary purchaser would expect to use them." Def's Mem. of Law at 18. Specifically, DaimlerChrysler attempts to limit the ordinary purpose for which minivans are sold to simply a means of "transportation" and not "safe reliable family transportation." Id. at 18.In support of this contention, DaimlerChrysler directs this court to "courts across the country [that] have recognized that the ordinary purpose of a vehicle is to provide transportation." Id. Although these courts cite "transportation" as an ordinary purpose for automobiles, none of these courts, however, have held that this "transportation" should not be "safe" or "reliable." For example, in *Taterka v. Ford Motor Co.,* 271 N.W.2d 653, 655 (Wis.1978), the court held that "[w]here a car can provide safe, reliable

transportation it is generally considered merchantable." This language in *Taterka* is also found in subsequent cases, which DaimlerChrysler cites. *See e .g. Carlson v. General Motors Corp.,* 883 F.2d 287, 297 (4th Cir.1989); *In re General Motors Corp. Anti-Lock Brake Prods. Liab. Litig.,* 966 F.Supp. 1525, 1533 (E.D.Mo.1997). Further, in *Skelton v. General Motors Corp.,* 500 F.Supp. 1181, 1192 (N.D.Ill.1980), rev'd on other other grounds,660 F.2d 311 (7th Cir.1981), the court explained that "[f]itness for the ordinary purpose of driving implies that the vehicle should be in a safe condition and substantially free of defects. It should be obvious that any car without an adequate transmission and proper brakes is not fit for the ordinary purpose of driving." (citation omitted). Finally, other cases DaimlerChrysler cites also discuss how cars are expected to operate safely as well as provide transportation. *See e.g., Mercedes Benz of N.Am., Inc. v. Garten,* 618 A.2d 233, 240 (Md.Ct.Spec.App.1993); *Tracy v. Vinton Motors Inc.,* 296 A.2d 269, 272 . (Vt.1972). As such, the preliminary objection is overruled.

B. Implied Warranty of Fitness for a Particular Purpose

*9 DaimlerChrysler asserts that the plaintiffs have not alleged that they "had special needs for which they purchased their vehicles" and therefore "no implied warranty of fitness for a particular purpose arose."Def's Mem. of Law at 20-21. This court agrees.

In Pennsylvania, an implied warranty of fitness for a particular purpose is breached when a seller, on whose skill and judgment a buyer relies and who has reason to know, at the time of contracting, the particular purpose for which the goods are required, fails to provide goods that perform to the specific use contemplated by the buyer. *Gall v. Allegheny County Health Department,* 521 Pa. 68, 555 A.2d 786 (1989). Specifically, "[a] 'particular purpose' differs from an ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to his business."UCC § 2-315, cmt 2 (1984).

Here, the plaintiffs allege that "[a]t the time of the sale of each minivan, [Daimler]Chrysler knew or should have known the particular purpose for which

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

the minivans were being purchased, that is safe and reliable family transportation."Am. Complaint ¶ 75. However, "safe and reliable family transportation" is not a particular purpose of a minivan, but rather its ordinary purpose. *See Gall*, 555 A.2d at 790 (a sale of water for drinking and household use does not carry with it an implied warranty of fitness for a particular purpose because there are no peculiar purposes in these otherwise, ordinary, purposes of tap water.) Nowhere in the Amended Complaint do the plaintiffs allege that the minivans purchased were being used for special or peculiar needs, other than the minivan's ordinary purpose of providing "safe and reliable family transportation." As such, this court sustains the preliminary objections to the claims of breach of implied warranty of fitness for a particular purpose of all plaintiffs.

V. The Preliminary Objections Asserting Legal Insufficiency of Count II are Overruled In Part

DaimlerChrysler argues that Count II of the plaintiff's complaint is overinclusive and legally insufficient. Def's Mem. of Law at 23. In Count II, the plaintiffs plead breach of contract, breach of duty of good faith and fair dealing, and breach of express warranty.

A. Breach of Contract

As discussed above, in Pennsylvania "[a] cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."*Corestates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa.Super.1999)* (citation omitted)."While not every term of a contract must be stated in complete detail, every element must be specifically pleaded."*Id.* (citation omitted).Here, only the Dolans have pled a cause of action for a breach of contract. Although all plaintiffs allege that they purchased and paid for DaimlerChrysler manufactured minivans, and all of the plaintiffs allege that these minivans came with certain express warranties, only the Dolans allege damages. Am. Complaint ¶¶ 11, 12, 13, 82, 83, 84, 85. As discussed above, unlike the Dolans, nowhere in the Amended Complaint do Solarz and Ginsberg allege that their minivan malfunctioned. Since Solarz and Ginsberg have not alleged manifest damages, they have not pled all the necessary elements of a breach of contract. Therefore, this court sustains the

preliminary objections as to the breach of contract claims of Solarz and Ginsberg.[FN6]

> FN6. DaimlerChrysler argues that there is no contract between DaimlerChrysler and the plaintiffs. Specifically, DaimlerChrysler asserts that since the dealerships from which the plaintiffs purchased their minivans are not agents of DaimlerChrysler, "as a matter of law, any agreement entered into between a buyer and an independently owned and operated dealership does not impose obligations on DaimlerChrysler."Def's Mem. of Law at 24 (citation omitted). However, the court need not resolve this agency issue at this time since for purposes of preliminary objections, the plaintiffs have sufficiently pled that a contract existed between them and DaimlerChrysler. *See Tucker v. Philadelphia Daily News, 757 A.2d 938, 941-42 (Pa.Super.Ct 2000)*("all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true for purposes of preliminary objections.).

B. Breach of Duty of Good Faith and Fair Dealing

**\*10** DaimlerChrysler also asserts that since plaintiffs have not sufficiently alleged a cause of action of breach of contract, it follows that their claims of breach of the duty of good faith and fair dealing "must also fail." Def's Mem. of Law at 25. This court agrees, but only as to the claims of Solarz and Ginsberg.

In Pennsylvania, the duty of good faith arises under the law of contracts.*Creeger Brick and Building Supply v. Mid-State Bank and Trust Co., 385 Pa.Super. 30, 35, 560 A.2d 151, 153 (1989).* Section 205 of the Restatement (Second) of Contracts (1979) reads that "[e]very contract imposes each party a duty of good faith and fair dealing in its performance and its enforcement."A similar requirement has been imposed upon contracts within the UCC by 13 Pa.C.S.A. § 1203. *Somers v. Somers, 418 Pa.Super.131, 136, 613 A.2d 1211, 1213 (1992).* The duty of "good faith" has been defined as "[h]onesty in fact in the conduct or transaction concerned."*Id.* (citing 13 Pa.C.S.A. § 1201). Finally, this court has held that "Pennsylvania law does not allow for a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract."*Commonwealth v. BASF Corp.*, April 2000, No. 3127, slip op. at 23 -24. (C.P. Phila. Mar 15, 2001) (citing *Engstrom v. John Nuveen & Co.*, 668 F.Supp. 953, 958 (E.D.Pa.1987).

Here, only the Dolans' claim for breach of the duty of good faith and dealing survives a demurrer. All the plaintiffs allege that

[Daimler]Chrysler knew or had reason to know that its customers, including Plaintiff and Class Members herein, believed that [Daimler]Chrysler built and sold a safe reliable family car... [Daimler]Chrysler specifically counted on the fact that customers heard its representations and warranties concerning the safety and reliability of its minivans. These promises and warranties tended to induce the customers and became part of the basis of the bargain of the minivans as consumers thought they were buying safe reliable family transportation... [Daimler]Chrysler's duties of good faith and fair dealing included obligations on its part to correct the problems caused by the failure to include the park-brake interlock.

Am. Complaint ¶¶ 88, 93. However, since this court has already concluded above that the breach of contract claims of Solarz and Ginsberg are dismissed, and since there exists no independent cause of action for breach of the duty of good faith and fair dealing, it follows then, that breach of the duty of good faith and dealing claims of Solarz and Ginsberg are dismissed as well.

C. Breach of Express Warranty

DaimlerChrysler also argues that the plaintiffs' breach of express warranty claims are legally insufficient. Def's Mem. of Law at 25-27. Under the UCC, a seller's description of the goods that becomes part of the basis of the bargain creates an express warranty that the goods will conform to that description. 13 Pa.C.S. § 2-313. In general, all of the statements of the seller become part of the basis of the bargain "unless good reason is shown to the contrary."§ 2-313, cmt 8. Finally, as in breach of implied warranty, a successful claim for breach of express warranty requires a pleading of damages. *Price v. Chevrolet Motor Div. of Gen. Motors Corp.*,

765 A.2d 800, 809 (Pa.Super.2000).

**\*11** Here, only the Dolans' claims for breach of express warranty survive a demurrer. All the plaintiffs allege that they received warranties which "promised comprehensive coverage in the event of vehicle deficiencies."Am. Complaint ¶ 83. Specifically, all the plaintiffs received a "Basic Limited Warranty coverage" which described what was covered at no cost to the Plaintiffs. Am.Complaint ¶ 84.[FN7]Further, all the plaintiffs allege that these warranties became part of "the basis of the bargain" as these "consumers paid [Daimler]Chrysler in exchange for a vehicle that provided safe reliable family transportation."Am. Complaint ¶ 82, 88. However, as discussed above, only the Dolans sufficiently allege damages. Fatal to the claims of Solarz and Ginsberg for breach of express warranty is that they allege no manifest injury. As such, this court sustains the preliminary objection as to Solarz and Ginsberg claims.

> FN7. Besides the "Basic Limited Warranty Coverage," the plaintiffs also allege that DaimlerChrysler created express warranties through their advertisements and internet statements. Am. Complaint ¶¶ 75, 82, 83, 87, 88. Although DaimlerChrysler argues that these are not express warranties, the court need not resolve this issue for purposes of preliminary objections. *Babcock Poultry Farm, Inc. v. Shook*, 204 Pa.Super.141, 203 A.2d 399, 401 (1964) (whether a statement creates an express warranty is an issue for the factfinder).

Finally, DaimlerChrysler argues that the plaintiffs have failed to comply with Rule 1019(i) by not attaching a contract. Def's Mem. of Law at 24. Rule 1019(i) of the Pennsylvania Rules of Civil Procedure reads "[w]hen any claim or defense is based upon a writing, the pleader shall attach a copy of the writing, or the material part thereof, but if the writing or copy is not accessible to the pleader, it is sufficient so to state, together with the reason, and to set forth the substance in writing."Here, the plaintiffs rely upon the warranty with DaimlerChrysler for their breach of contract and express warranty claims. Although the warranty was not attached to the Amended Complaint, the plaintiffs have attached the warranty to their Reply Memorandum of Law. Pl's Reply

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Mem. of Law, Exh. B. Thus, DaimlerChrysler's preliminary objection is overruled.

**D. The Filing of the Complaint Provided Adequate Notice of Plaintiffs' Breach of Warranty Claims**

DaimlerChrysler also asserts that the implied and express warranty claims fail for lack of notice. Def's Mem. of Law at 21. The plaintiffs argue that the filing of the complaint provided DaimlerChrysler with the requisite notice. Pls' Reply Mem. of Law at 25. This court agrees.

Although there is no Pennsylvania Supreme Court case on the precise issue here, this court is persuaded by the sound reasoning and holding of *Bednarski v. Hideout Homes & Realty, Inc.,* 709 F.Supp.90 (M.D.Pa.1988). In *Bednarski,* home owners commenced an action in federal court against an electrical contractor to recover damages resulting from a fire. The electrical contractor then brought a third party action against the maker of a circuit breaker box which was thought to have caused the fire. The manufacturer moved to dismiss the contractor's breach of warranty claim for failing to provide adequate notice. The court, in denying the manufacturer's motion, concluded that the contractor's third-party complaint against the manufacturer served as "notice" of breach of warranty under Pennsylvania law. *Bednarski,* 709 F.Supp at 94. Specifically, after an extensive analysis of the definition of "notice," the court held that "the filing of a civil complaint satisfies the requirement of providing breach of warranty notice under section 2607."*Id.* (relying on *Yates v. Clifford Motors, Inc.,* 283 Pa.Super. 293, 423 A.2d 1262 (1980)). As such, this court is persuaded by *Bednarski* and holds that DaimlerChrysler received notice when the plaintiffs filed their Complaint in May 2001.

*12 DaimlerChrysler counters by arguing that *Bednarski* is the minority position and that this court should follow the majority position and hold that the filing of a complaint is not sufficient notice under § 2607.[FN8]In support of this argument, DaimlerChrysler directs this court to cases outside this jurisdiction which all held that notice must precede the filing of a complaint. *See e.g., Hobbs v. General Motors Corp.,* 134 F.Supp.2d 1277, 1285 (M.D.Ala.2001); *Geib v. Oshkosh Truck Corp.,* No. CV. 940135932S, 1997 WL 576431 (Conn.Super.Ct 1997); *Armco Steel*

*Corp. v. Isaacson Structural Steel Co.,* 611 P.2d 507 (Alaska 1980). Further, in countering the *Bednarski* holding specifically, DaimlerChrysler cites to *Connick v. Suzuki Motor Co.,* 675 N.E.2d 584 (Ill.1997). In *Connick,* the plaintiffs claimed that their vehicles were unsafe as they had a tendency to roll-over. Faced with an objection based on lack of notice to the plaintiffs' breach of warranty claims, the *Connick* court concluded that the filing of a complaint was not sufficient to meet the statutory notice requirements. 675 N.E.2d at 590-91.

> FN8. Whether there is in fact a majority and minority position on the notice requirement issue is unclear. What is clear to this court is that courts vary widely in their interpretations of the notice requirement found in the UCC. *See e.g., In re Bridgestone/Firestone, Inc. Tires Products Liability Lit.,* 155 F.Supp.2d 1069 (S.D.Ind.2001) (citing courts that have held that the filing of a lawsuit can satisfy the notice of breach requirement and courts that reached the opposite conclusion.) (citations omitted).

Here, DaimlerChrysler argues that the plaintiffs' reliance on *Bednarski* is inaccurate since the *Connick* court cited and interpreted *Bednarski*"as simply applying an exception to the notice requirement-i.e. consumer buyers *who suffer personal injury* need not provide pre-litigation notice."Def's Reply Mem. of Law at 16, n 5. However, DaimlerChrysler's reliance on the *Connick* court's interpretation of *Bednarski* is misplaced. Nowhere in the *Bednarski* opinion does the court expressly carve out an exception to the notice requirement for "consumer buyers who suffer personal injury."In fact, the holding in *Bednarski,* based on Pennsylvania law, is quite clear and unambiguous. The court held "[b]ased on *Yates*... the filing of a civil complaint satisfies the requirement of providing breach of warranty notice under section 2607."709 F.Supp.at 94. Therefore, unpersuaded by the Illinois court in *Connick,* this court concludes that DaimlerChrysler received proper notice of the plaintiffs' breach of warranty claims when the plaintiffs filed their original Complaint in May 2001.

**VI. The Preliminary Objections asserting Legal Insufficiency of Pleadings of Violations of UTPCPL Are Overruled**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

DaimlerChrysler asserts that since the plaintiffs have not adequately pled a claim for breach of a written express warranty and have not pled any misfeasance by DaimlerChrysler, they have not pled a claim for violation of § 201-2(4)(xiv) of the UTPCPL. Def's Mem of Law at 28. This court disagrees.

"The purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices."_Keller v. Volkswagen of America, Inc._, 733 A.2d 642, 646 (Pa.Super.1999) (citation omitted). The UTPCPL allows for recovery by "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful" by the UTPCPL._73 P.S. § 201-9.2(a)_ In order to prevail under the UTPCPL, a plaintiff must "prove the following: 1) the defendant was engaged in unfair methods of competition and unfair or deceptive acts or practices, and 2) the transaction between plaintiff and defendant constituted 'trade or commerce' within the meaning of the UTPCPL."_Keller_, 733 A.2d at 646 (relying on 73 P.S. § 201-3.). Here, the plaintiffs rely upon § 201-2(4)(xiv) of the UTPCPL which defines unfair methods of competition and unfair or deceptive acts or practices as "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made."_73 P.S. § 201-2(4)(xiv)_. Further, "trade or commerce" is defined by the UTPCPL as "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."_73 P.S. § 201-2(3)_.

**\*13** Here, all the plaintiffs have alleged facts legally sufficient to survive a demurrer to their UTPCPL claims. All the plaintiffs allege that they purchased DaimlerChrysler minivans for purposes of providing family transportation. Am. Complaint ¶¶ 11-13, 69-71. Further, all the plaintiffs allege that an express written warranty was given to them by DaimlerChrysler. Am. Complaint ¶¶ 83, 84; Exh. B. While only the Dolans have alleged damages to

support a breach of express warranty claim, all the plaintiffs allege ascertainable loss to support a claim under § 201-2(4)(xiv) of the UTPCPL. Specifically, the plaintiffs claim that "[t]he ascertainable loss includes the cost of installing the park-brake interlock in [Daimler]Chrysler minivans and/or the difference in value between minivans with the park-brake interlock device and those without it."Am. Complaint ¶¶ 97. Further, the plaintiffs allege that DaimlerChrysler engaged in unfair methods of competition and unfair or deceptive acts or practices in that:

The [Daimler]Chrysler Basic Limited Warranty Coverage purportedly covers the cost of repair of anything that is...'defective in material, workmanship, or factory preparation.'Here, Plaintiffs have alleged that the entire product, the minivan, is defective, improper and not what [Daimler]Chrysler purported to sell, due to the lack of the park-brake interlock, and that [Daimler]Chrysler was aware of the problems.

[Daimler]Chrysler failed to provide the safe and reliable vehicle it promised, and, despite knowledge of problems with the vehicle and knowledge that the park-brake interlock was standard in the industry, made repeated representations and warranties to consumer about the minivans' safety, which were false and misleading and in breach of warranty.

Pls' Reply Mem. of Law at 28 (citing Am. Complaint ¶ 84), 34 (citing Am. Complaint ¶ 63). Finally, the plaintiffs assert that the sale of these minivans was trade and commerce pursuant to the UTPCPL. Am. Complaint ¶¶ 14, 15, 25-64. As such, this court holds that all the elements of a UTPCPL claim have been sufficiently alleged by all the plaintiffs.

DaimlerChrysler counters and asserts that the plaintiffs cannot base their UTPCPL claims on claims of nonfeasance. Def's Mem. of Law at 28. In support of this contention, DaimlerChrysler directs this court to several cases where courts held that failure to pay insurance benefits to an insured, characterized by these courts as "nonfeasance", is not actionable under the UTPCPL. See e.g., _Horowitz v. Federal Kemper Life Assurance Co._, 57 F.3d 300, 307 (3d Cir.1995); _Smith v. Zarnick_, 47 Pa. D. & C. 4th 353, 361 (C .P. Butler 2000); _Gordon v. Pennsylvania Blue Shield_, 378 Pa.Super. 256, 548 A.2d 600 (Pa Super Ct.1998);

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 452218 (Pa.Com.Pl.), 47 UCC Rep.Serv.2d 969
2002 WL 452218 (Pa.Com.Pl.)

Case 1:03-cv-02364 Document 55-9 Filed 08/08/2008 Page 21 of 62

Page 12

*Tenos v. State Farm Ins. Co.*, 716 A.2d 626 (Pa.Super.1998). While all these cases discuss the valid difference between misfeasance and nonfeasance, they are not dispositive of the fact that the plaintiffs here have sufficiently alleged misfeasance. Specifically, the plaintiffs claim that the express warranty given by DaimlerChrysler covered "the cost of repair of anything that is...'defective in material, workmanship, or factory preparation."Pls' Reply Mem.of Law at 27 (citing Am. Complaint Exh. B.). Further, the plaintiffs allege that DaimlerChrysler violated § 201-2(4)(xiv) of the UTPCPL when, by improperly refusing to repair their minivans pursuant to the express warranties, DaimlerChrysler "failed to comply with the terms of any written... warranty."Am. Complaint ¶¶ 96 (quoting § 201-2(4)(xiv) of the UTPCPL). Unlike the plaintiffs in cases cited by DaimlerChrysler, the plaintiffs here have specifically alleged an improper performance of a contractual obligation under the express warranty. Therefore, this court holds that the plaintiffs have sufficiently alleged misfeasance for purposes of the UTPCPL.

**VII. Portions of the Amended Complaint are Neither Scandalous Nor Impertinent**

*14 Under Pa.R.C.P. 1028(a)(2), a party may object to a pleading's inclusion of "scandalous and impertinent matter." "Scandalous and impertinent matter" is defined as "allegations... immaterial and inappropriate to the proof of the cause of action."*Common Cause/Pa. v. Commonwealth*, 710 A.2d 108, 115 (Pa.Commw.Ct.1998) (citing *Department of Envtl. Resources v. Peggs Run Coal Co.*, 55 Pa. Commw. 312, 423 A.2d 765 (1980)). Pennsylvania courts have been restrained in striking scandalous and impertinent pleadings, however:

[T]here is some authority for the proposition that, even if the pleading of damages was impertinent matter, that matter need not be stricken but may be treated as "mere surplusage" and ignored... Furthermore, the right of a court to strike impertinent matter should be sparingly exercised and only when a party can affirmatively show prejudice.

*Commonwealth, Dept. of Envtl. Resources v. Hartford Accident & Indem. Co.*, 40 Pa. Commw. 133, 137-38, 396 A.2d 885, 888 (1979) (citations omitted).

DaimlerChrysler contends that the plaintiffs' inclusions of paragraphs 28-44, 61-62 and 65-67 in their Amended Complaint are scandalous and impertinent. Specifically, DaimlerChrysler argues that these paragraphs are "immaterial", "inappropriate to the proof of plaintiffs' causes of action" and "unnecessarily prejudicial." Def's Mem. of Law at 32; Def's Reply Mem. of Law at 26. However, DaimlerChrysler has failed to affirmatively demonstrate how the inclusion of these paragraphs prejudices it in any way. Accordingly, the Court may not strike the paragraphs.

CONCLUSION

For the reasons stated above, the Court overrules and sustains the preliminary objections in part.

ORDER

AND NOW, this 13th day of March, 2002, upon consideration of the preliminary objections of the defendant DaimlerChrysler Corporation ("DaimlerChrysler") to the Amended Complaint of the plaintiffs Edward D. Solarz ("Solarz"), Matthew Ginsberg ("Ginsberg"), Brendon and Kathleen Dolan ("the Dolans") and on behalf of all others similarly situated, all the responses thereto, and in accordance with the Memorandum Opinion being filed contemporaneously with this Order, it is hereby ORDERED and DECREED as follows:

1. The plaintiffs' request for injunctive relief is DENIED;

2. The preliminary objections asserting legal insufficiency in pleadings of breach of implied warranties, breach of express warranty, breach of contract, breach of duty of good faith and fair dealing by Solarz and Ginsberg are SUSTAINED;

3. The preliminary objections asserting legal insufficiency in pleadings of breach of implied warranty of merchantability, breach of express warranty, breach of contract, breach of duty of good faith and fair dealing by the Dolans are OVERRULED;

4. The preliminary objections asserting legal

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

insufficiency of a pleading of breach of implied warranty of fitness for a particular purpose by the Dolans is SUSTAINED;

**\*15** 5. The preliminary objections asserting legal insufficiency of a pleading of violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Act ("UTPCPL") by all the plaintiffs is OVERRULED;

6. The preliminary objection asserting inclusion of scandalous or impertinent matter in the Amended Complaint is OVERRULED;

7. The defendant shall answer the Amended Complaint within twenty (20) days after the entry of this Order.

Pa.Com.Pl.,2002.
Solarz v. DaimlerChrysler Corp.
Not Reported in A.2d, 2002 WL 452218 (Pa.Com.Pl.), 47 UCC Rep.Serv.2d 969

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-02364    Document 55-9    Filed 08/09/2008    Page 23 of 62

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)

**2008 WL 2669662 (N.D.Ill.)**


Stella v. **LVMH  Perfumes** and Cosmetics ISA, Inc.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
Pamela STELLA, individually and on behalf of all others similarly situated, Plaintiff,
v.
**LVMH  PERFUMES** AND COSMETICS USA, INC., a New York corporation, Defendant.
**No. 07 C 6509.**

July 8, 2008.


**Background:** Consumer brought putative class action against seller of luxury goods, stemming from alleged exposure to lead contained in lipstick. Seller moved for dismissal.

**Holdings:** The District Court, Bucklo, J., held that:
(1) consumer stated claim under Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA);
(2) lipstick was merchantable item;
(3) consumer satisfied notice requirements for breach of warranty claim; and
(4) consumer stated unjust enrichment claim.

Motion granted in part.

**[1] Fraud 184 ☞0**

184 Fraud
To state claim under Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), plaintiff must allege: (1) deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on deception; (3) occurrence of deception in course of conduct involving trade or commerce; and (4) actual damage to plaintiff proximately caused by deception. S.H.A. 815 ILCS 505/1 et seq.

**[2] Fraud 184 ☞0**

184 Fraud
Consumer who sued seller of luxury goods alleged that seller failed to include lead in its ingredient list for lipstick and that she would not have purchased lipstick had she known of lead content, as required to state claim under Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA); complaint averred that, as manufacturer of lipstick, seller knew or should have known that lead was ingredient, and that it failed to disclose fact to consumers in listing product's ingredients. S.H.A. 815 ILCS 505/1 et seq.

**[3] Sales 343 ☞0**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)
**2008 WL 2669662 (N.D.Ill.)**

Case 1:08-cv-02364    Document 55-9    Filed 08/09/2008    Page 24 of 62    Page 2

343 Sales
Consumer who sued seller of luxury goods, stemming from alleged exposure to lead contained in lipstick, alleged that lipstick was merchantable item, as required to state claim for breach of implied warranty under Illinois law; ordinary purpose of lipstick was to color its user's lips in reasonably safe manner, and complaint averred that lipstick was not safe. S.H.A. 810 ILCS 5/2-314(c).

**[4] Sales 343 ⇌0**

343 Sales
Under Illinois law, direct notice of breach of warranty claim is not required when: (1) seller has actual knowledge of defect of particular product; or (2) consumer-plaintiff suffers personal injury, in which case notice requirement can be satisfied by filing lawsuit against seller. S.H.A. 810 ILCS 5/2-607(3)(A).

**[5] Sales 343 ⇌0**

343 Sales
Consumer who sued seller of luxury goods, stemming from alleged exposure to lead contained in lipstick, alleged that seller had actual knowledge of presence of lead, as required to satisfy notice requirement for breach of implied warranty claim under Illinois law; complaint averred that seller knew or should have known that concerned lipstick products did not meet capabilities as represented and marketed. S.H.A. 810 ILCS 5/2-607(3)(A).

**[6] Sales 343 ⇌0**

343 Sales
Illinois law requires contractual privity as prerequisite for breach of implied warranty claims for recovery of economic losses.

**[7] Implied and Constructive Contracts 205H ⇌0**

205H Implied and Constructive Contracts
In order to state claim for unjust enrichment under Illinois law, plaintiff must allege that defendant retained benefit to plaintiff's detriment, and that retention of that benefit violates fundamental principles of justice, equity, and good conscience.

**[8] Implied and Constructive Contracts 205H ⇌0**

205H Implied and Constructive Contracts
Consumer who sued seller of luxury goods, stemming from alleged exposure to lead contained in lipstick, alleged that seller retained benefit to her detriment, as required to state unjust

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)
**2008 WL 2669662 (N.D.Ill.)**

Case 1:08-cv-02364    Document 55-9    Filed 08/09/2008    Page 25 of 62    Page 3

enrichment claim under Illinois law; complaint averred that lipstick contained dangerous levels of lead and was unfit for its intended purposes, and that it was inequitable for seller to retain funds it received as consequence of its sales.

Ben Barnow, Sharon Harris, Erich Paul Schork, Barnow & Associates, P.C., Aron David Robinson, Law Office of Aron D. Robinson, Kevin Barry Rogers, Law Offices of Kevin Rogers, Chicago, IL, for Plaintiff.

Francis Anthony Citera, Greenberg Traurig, LLP, Robert Eliot Shapiro, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL, Rachael M. Trummel, Barone & Jenkins, P.C., Oakbrook Terrace, IL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

ELAINE E. BUCKLO, District Judge.

**\*1** Defendant LVMH Perfumes and Cosmetics USA, Inc. ("LVMH") moves to dismiss the complaint brought by plaintiff Pamela Stella, individually and on behalf of all others similarly situated, for failure to state a claim under FED. R. CIV. P. 12(b)(6). For the following reasons, the motion is granted in part.

I.

Defendant is in the business of selling luxury goods, including Hennessy cognac, Dom Perignon champagne, and Christian Dior perfumes and cosmetics. This case concerns Christian Dior's "Addict Positive Red" lipstick ("lipstick"), which is sold at various retailers throughout the United States. The complaint alleges that on October 11, 2007, the Campaign for Safe Cosmetics ("CFS") made public a report revealing that the LVMH's lipstick products contain dangerous levels of lead. According to plaintiff, the tests conducted by the CFS revealed that the lipstick contained lead in the amount of .21 parts per million ("ppm"), when the U.S. Food and Drug Administration has established a limit of .1 ppm for levels of lead in candy.

Plaintiff alleges she purchased the lipstick at a Nordstrom department store in June 2007 for personal use. As a result, she claims to have been exposed to lead, which is contained in the lipstick. According to the complaint, LVMH's marketing of the lipstick "affirmatively and impliedly" assured consumers that the product was safe for use.

The complaint alleges claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, et seq. (2007) (count I); breach of implied warranty pursuant to the Uniform Commercial Code ("UCC") (count II); breach of implied warranty pursuant to the Magnuson-Moss Warranty Act ("MMWA") (count III); strict liability (count IV); and negligence per se (count V); unjust enrichment (count VI); and injunctive relief (count VII).

II.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

In assessing defendant's motion to dismiss under FED. R. CIV. P. 12(b)(6), I must view the allegations in the light most favorable to the plaintiff and accept all well-pleaded facts in the complaint as true. *McMillan v. Collection Prof'ls*, 455 F.3d 754, 758 (7th Cir.2006) (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (May 21, 2007); *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776-77 (7th Cir.2007). Moreover, under Rule 9(b), allegations of fraud are subject to heightened pleading requirements. FED. R. CIV. P. 9(b). Fraud must be pled with particularity and the complaint must allege the "who, what, when, where, and how" of the fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990).

III.

A. Count I: ICFA

[1] The complaint alleges defendant violated the ICFA. To state a claim under the ICFA plaintiff must allege "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 180, 296 Ill.Dec. 448, 835 N.E.2d 801, 850 (Ill.2005) (citation omitted). In addition, claims under the ICFA must be pled with particularity. *See Villasenor v. Am. Signature Inc.*, No. 06 C 5493, 2008 WL 904888, at *2 (Mar. 31, 2008) (Kendall, J.) (citations omitted).

**\*2** [2] When the allegations are taken in the best light to plaintiff, they state a claim under the ICFA and provide defendant with adequate notice of the claim. The complaint specifically alleges defendant failed to include lead in its ingredient list for the lipstick and that she would not have purchased the lipstick had she known she would have been exposed to the lead contained in the product. Plaintiff alleges that as the manufacturer of the lipstick, defendant knew or should have known that lead was an ingredient and that it failed to disclose this fact to consumers in listing the product's ingredients. Plaintiff seeks to recover actual damages in the form of pecuniary damages (the cost of the lipstick) and medical monitoring. Actual damages include pecuniary losses. *Id.* at *4. And in the absence of guidance from the Illinois Supreme Court on the propriety of medical monitoring claims under Illinois law, I find persuasive the federal case law finding such a claim cognizable under Illinois law. *See, e.g., Carey v. Kerr-McGee Chemical Corp.*, 999 F.Supp. 1109, 1118-19 (N.D.Ill.1998) (Gettleman, J.).[FN1] Finally, plaintiff has alleged that her reliance on defendant's omission caused her to buy the lipstick and become exposed to lead. This sufficiently alleges proximate cause. Accordingly, the motion to dismiss count I is denied.

B. Counts II and III: Breach of Implied Warranty Pursuant to the U.C.C. and the MMWA.

[3] Defendant first argues that plaintiff has failed to plead the goods are not "merchantable"

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

under Illinois law. 810 ILCS § 5/2-314. For goods to be considered "merchantable," they must conform to a set of standards which includes being "fit for the ordinary purposes for which such goods are used." 810 ILCS 5/2-314(c). Although defendant concedes the complaint plainly alleges there are dangerous levels of lead in the lipstick, it still argues this does not sufficiently provide the lipstick was not fit for its ordinary purpose. This argument has no merit under federal pleading standards. See _Concentra Health Servs., 496 F.3d at 776-77, 779-80._ Both parties agree the ordinary purpose of lipstick is to color its user's lips in a reasonably safe manner. The complaint plainly alleges the lipstick was not safe. Accordingly, the motion to dismiss on this ground is denied.

[4] Defendant also moves to dismiss counts II and III on the ground that plaintiffs failed to provide pre-suit notice as required by the UCC and the MMWA. Under the UCC, a plaintiff-buyer pursuing a breach of warranty claim must give the seller notice of the claimed breach or be barred from recovery. U.C.C. § 2-607; 810 ILCS 5/2-607 (3)(A). This notice requirement is intended to encourage pre-suit settlement negotiations, see U.C.C. § 2-607 cmt. 4; _see also Reyes v. McDonald's Corp.,_ Nos. 06 C 1604, 06 C 2813, _2006 WL 3253579, at *3, (N.D.Ill. Nov.8, 2006)_ (Kendall, J.), and is subject to two exceptions. Direct notice is not required when (1) the seller has actual knowledge of the defect of the particular product; or (2) a consumer plaintiff suffers a personal injury, in which case the notice requirement could be satisfied by filing a lawsuit against the seller. See _Allstate Ins. Co. v. Daimler Chrysler, No. 03 C 6107, 2004 WL 442679, at *2 (N.D.Ill. Mar.9, 2004)_ (Lefkow, J.) (citing _Connick v. Suzuki Motor Co. Ltd., 174 Ill.2d 482, 492, 221 Ill.Dec. 389, 675 N.E.2d 584, 589 (Ill.1990))._

**\*3**  [5] When taken as a whole and in the best light to plaintiff, the complaint sufficiently alleges LVMH had actual knowledge of the presence of lead in the lipstick. (Compl. at ¶¶ 4, 6, 25.) Counts II and III allege that "LVMH knew or should have known that the concerned lipstick products did not meet the capabilities as represented and marketed." (Id. at ¶¶ 60, 68, 221 Ill.Dec. 389, 675 N.E.2d 584.) This is enough to fit the claim under the first identified exception to the direct notice requirement. That said, the claim only survives to the extent that plaintiff alleges actual knowledge-not negligence. Accordingly, the motion to dismiss on this ground is denied.

[6] Defendant also argues that the complaint does not sufficiently allege vertical privity between LVMH and Nordstrom-the department store where plaintiff alleges she purchased the lipstick. Illinois law requires contractual privity as a prerequisite for breach of implied warranty claims for recovery of economic losses. _Voelker v. Porsche Cars North Am., Inc., 353 F.3d 516, 527 (7th Cir.2003)._ The complaint does not allege contractual privity exists among the parties. Plaintiff does argue there is an agency relationship between Nordstrom and LVMH, but the allegations in the complaint are silent in this respect. See _Lantz v. Am. Honda Motor Co., No. 06 C 5932, 2007 WL 1424614, at *11 (N.D.Ill. May 14, 2007)._ The complaint only alleges that LVMH manufactures, markets, and sells the lipstick, but does not address the relationship between the retailer in question and LVMH. That said, plaintiff's claim for medical monitoring is a form of personal injury claim. See, e.g., _Carey, 999 F.Supp. at 1120;see also Muniz v. Rexnord Corp., No. 04 C 2405, 2006 WL 1519571, at *3 (N.D.Ill.2006)_ (Darrah, J.). Therefore, plaintiff

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

does not seek to recover solely economic losses, which exempts plaintiff from this privity requirement. See *Collins Co., Ltd. v. Carboline Co.,* 837 F.2d 299, 301 (7th Cir.1988) (privity a requirement "only in cases of economic loss in contrast to ... personal injury claims") (citations omitted); *Berry v. G.D. Searle & Co.,* 56 Ill.2d 548, 309 N.E.2d 550 (Ill.1974); *Jensen v. Bayer AG,* 371 Ill.App.3d 682, 691, 308 Ill.Dec. 888, 862 N.E.2d 1091, 1099-1100 (Ill.App.Ct.2007) ("a plaintiff may be excepted from the privity requirement by suing for personal injury") (citations omitted). Accordingly, the motion to dismiss on this ground is denied.

Finally, defendant moves to dismiss count III on the ground that plaintiff does not satisfy the MMWA's jurisdictional requirements. Under section 2310(d)(3) of the MMWA, I lack jurisdiction over class actions where the number of named plaintiffs is less than 100, as is the case here. Plaintiff argues that the Class Action Fairness Act of 2005, Pub.L. 109-2, § 4, 119 Stat. 4, 9 (codified at 28 U.S.C. § 1332(d)) ("CAFA") creates an alternative basis for federal jurisdiction over the MMWA claim and provides case law in support. See *McCalley v. Samsung Electronics Am., Inc.,* No. CIV .A. 07-2141(JAG), 2008 WL 878402, at *4-5 (D.N.J. Mar.31, 2008); *Payne v. Fujifilm U.S.A., Inc.,* No. CIV.A. 07-385(JAG), 2007 WL 4591281, at *7 (D.N.J. Dec.28, 2007); *McGee v. Continental Tire North Am., Inc.,* No. CIV.06-6234 (GEB), 2007 WL 2462624, at *2-3 (D.N.J. Aug.27, 2007); *Clark v. Wynn's Extended Care,* No. 06 C 2933, 2007 WL 922244, at *4-5 (N.D.Ill. Mar.23, 2007) (St.Eve, J.); *Chavis v. Fidelity Warranty Servs., Inc.,* 415 F.Supp.2d 620, 624-26 (D.S.C.2006). Defendant fails to respond to this argument in its reply brief. In light of the case law and defendant's silence, I find I have jurisdiction in light of CAFA and the motion to dismiss on this count is denied.

## C. Strict Liability and Negligence Per Se Claims

*4 Defendant moves to dismiss counts IV and V on the ground that plaintiff has failed to allege an actual injury. Because I have already found plaintiff's claim for medical monitoring is a form of personal injury claim, see, e.g., *Carey,* 999 F.Supp. at 1120; see also *Muniz,* 2006 WL 1519571 at *3, the motion is denied. When the remaining allegations in the complaint are taken as true, plaintiff sufficiently states a claim in counts IV and V.

## D. Unjust Enrichment

[7][8] In order to state a claim for unjust enrichment under Illinois law a plaintiff must allege that the defendant retained a benefit to the plaintiff's detriment, and that the retention of that benefit violates fundamental principles of justice, equity, and good conscience. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp.,* Inc., 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989). The complaint sufficiently states a claim in light of the allegations that the lipstick contained dangerous levels of lead and was unfit for its intended purposes and that it was inequitable for LVMH to retain the funds it received as a consequence of the sale of the lipstick. Accordingly, the motion to dismiss count VI is denied.

## E. Injunctive Relief

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Defendant moves to strike plaintiffs' request for injunctive relief. Plaintiffs failed to oppose this. Accordingly, the motion to dismiss plaintiffs' request for injunctive relief in count VII is granted.

IV.

For the foregoing reasons, defendant's motion to dismiss is granted in part. Count VII is dismissed.

> FN1. To the extent defendant's motion to dismiss the remaining counts rests on the same argument-that medical monitoring is not a cognizable personal injury claim in Illinois, and thus plaintiff has failed to allege damages-the motion is denied.

N.D.Ill.,2008.
Stella v. LVMH Perfumes and Cosmetics ISA, Inc.
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

431 F.3d 572                                                                                                    Page 1
431 F.3d 572, 68 Fed. R. Evid. Serv. 1212
**431 F.3d 572**

H Tober v. Graco Children's Products, Inc.
C.A.7 (Ind.),2005.

United States Court of Appeals,Seventh Circuit.
Gregory TOBER and Staci Tober, Plaintiffs-
Appellants,
v.
GRACO CHILDREN'S PRODUCTS,
INCORPORATED, Defendant-Appellee.
**No. 04-3837.**

Argued Sept. 19, 2005.
Decided Dec. 8, 2005.

**Background:** Parents whose child died in baby
swing brought products liability action against
swing's manufacturer. The United States District
Court for the Southern District of Indiana, Larry J.
McKinney, Chief Judge, 2004 WL 1987239, granted
partial summary judgment in favor of manufacturer,
and entered judgment upon jury verdict in favor of
manufacturer, and parents appealed.

**Holdings:** The Court of Appeals, Williams, Circuit
Judge, held that:
(1) district court did not abuse its discretion in ruling
that letter to manufacturer from United States
Consumer Product Safety Commission was not
admissible as adoptive admission, and
(2) burden was on parents to prove lack of substantial
alteration, rather than on manufacturer to prove
substantial alteration as affirmative defense.

Affirmed.

West Headnotes

**[1] Evidence 157 ⟲──220(6)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in
General
            157k220 Acquiescence or Silence
                157k220(6) k. Failure to Deny or
Object to Written Statements in General. Most Cited
Cases

In products liability action brought against
manufacturer of baby swing by parents whose child
died in baby swing, district court did not abuse its
discretion in ruling that letter to manufacturer from
United States Consumer Product Safety Commission
(CPSC), outlining CPSC's preliminary determination
relating to manufacturer's voluntary recall of swing,
that swing presented substantial risk of injury if not
used properly, was not admissible as an adoptive
admission by manufacturer; letter did not mandate
corrective action beyond that already voluntarily
underway, and manufacturer's failure to respond was
not unnatural because letter stated that taking
corrective action did not constitute admission that
substantial product hazard existed. Fed.Rules
Evid.Rule 801(d)(2)(B), 28 U.S.C.A.

**[2] Evidence 157 ⟲──220(6)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in
General
            157k220 Acquiescence or Silence
                157k220(6) k. Failure to Deny or
Object to Written Statements in General. Most Cited
Cases
The burden is on the party seeking to introduce a
letter to a party-opponent as an adoptive admission of
the party-opponent to establish that under the
circumstances the failure to respond is so unnatural
that it supports the inference that the party acquiesced
to the statements contained in the letter. Fed.Rules
Evid.Rule 801(d)(2)(B), 28 U.S.C.A.

**[3] Federal Courts 170B ⟲──902**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk901 Exclusion of Evidence
                170Bk902 k. Cumulative Evidence
and Facts Otherwise Established. Most Cited Cases
In products liability action brought against
manufacturer of baby swing by parents whose child
died in baby swing, even if it was error for district

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

court not to admit, as adoptive admission by manufacturer, letter to manufacturer from United States Consumer Product Safety Commission (CPSC), outlining CPSC's preliminary determination relating to manufacturer's voluntary recall of swing, that swing presented substantial risk of injury if not used properly, error was harmless because letter was cumulative of other evidence; parents presented testimony from corporate representatives that manufacturer knew swing presented strangulation risk, and that manufacturer recalled swing and improved its harness restraints as result of that risk. Fed.Rules Evid.Rule 801(d)(2)(B), 28 U.S.C.A.

**[4] Products Liability 313A ⟶52**

313A Products Liability
 313AI Scope in General
  313AI(B) Particular Products, Application to
   313Ak52 k. Furniture and Household Appliances. Most Cited Cases
Under Indiana Product Liability Act (IPLA), manufacturer of baby swing did not have post-sale duty to warn of strangulation hazard posed by swing. West's A.I.C. 34-20-2-1 et seq.

**[5] Products Liability 313A ⟶52**

313A Products Liability
 313AI Scope in General
  313AI(B) Particular Products, Application to
   313Ak52 k. Furniture and Household Appliances. Most Cited Cases
Under Indiana Product Liability Act (IPLA), in products liability action brought against manufacturer of baby swing by parents whose child died in baby swing, burden was on parents to prove that swing reached child without substantial alteration of the condition in which it was sold by manufacturer, rather than on manufacturer to prove substantial alteration as an affirmative defense. West's A.I.C. 34-20-6-5.

**[6] Products Liability 313A ⟶15**

313A Products Liability
 313AI Scope in General
  313AI(A) Products in General
   313Ak15 k. Proximate Cause and Foreseeable Injury; Intended or Foreseeable Use.

Most Cited Cases

**Products Liability 313A ⟶16**

313A Products Liability
 313AI Scope in General
  313AI(A) Products in General
   313Ak16 k. Lapse of Time or Change in Condition. Most Cited Cases
Under Indiana Product Liability Act (IPLA), a manufacturer is liable only for its own defects in the products, and not for defects caused by the alteration or misuse of its products. West's A.I.C. 34-20-2-1, 34-20-6-5.

**[7] Federal Courts 170B ⟶909**

170B Federal Courts
 170BVIII Courts of Appeals
  170BVIII(K) Scope, Standards, and Extent
   170BVIII(K)6 Harmless Error
    170Bk908 Instructions
     170Bk909 k. Applicability to Issues and Evidence. Most Cited Cases
In products liability action brought against manufacturer of baby swing under Indiana Product Liability Act (IPLA) by parents whose child died in baby swing, even if jury instruction that burden was on parents to prove that swing reached child without substantial alteration of condition in which it was sold by manufacturer was incorrect, error was harmless; verdict form indicated that jury decided, pursuant to third question on form, that parents had not proved that when swing left manufacturer's hands, it was in defective condition unreasonably dangerous to user or consumer, and therefore, jury never reached question of presence or absence of alteration, which was addressed in fourth question on form. West's A.I.C. 34-20-6-5.

***574** D. Bruce Kehoe (argued) and Christopher G. Stevenson, Wilson Kehoe & Winingham, Indianapolis, IN, for Plaintiffs-Appellants.
Kevin C. Schiferl, Locke Reynolds, Indianapolis, IN, Joseph K. Krasovec, III (argued) and Francis P. Morrissey, Schiff Harden, Chicago, IL, for Defendant-Appellee.

Before RIPPLE, WOOD, and WILLIAMS, Circuit Judges.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

WILLIAMS, Circuit Judge.

Gregory and Staci Tober filed this action pursuant to Indiana's Product Liability Act ("IPLA"), seeking recovery for the heartbreaking death of their eight-month-old son, Trevor Tober. Following a week-long trial, a jury rendered a verdict in favor of Graco Children's Products, Incorporated ("Graco"), finding that the Tobers had failed to prove by a preponderance of the evidence that one of Graco's products, the Lil' Napper Plus Battery Powered Swing ("Lil' Napper") model no. 12-476 manufactured in 1995 by Century Products Company ("Century"),[FN1] was defective. On appeal, the Tobers contend that the district court erred in the exclusion of certain evidence at trial, in certain rulings the district court made as a matter of law prior to trial, and in how the district court instructed the jury. Notwithstanding the tragic death from which this case arises, we agree with the district court's rulings and, therefore, affirm.

> FN1. Through an asset purchase, Graco assumed liability for Century's products, including the baby swing at issue in this case.

## I. BACKGROUND

On the morning of April 2, 2002, Staci Tober dropped off her eight-month-old son, Trevor, at Timolyn Fitzgerald's suburban Indianapolis home. Ms. Fitzgerald owned and operated an unlicensed, in-home daycare named Precious Angels Daycare ("Daycare"). On that day, Ms. Fitzgerald and her mother were caring for ten other children.

Among the variety of children's products in Ms. Fitzgerald's home was a Lil' Napper. The Lil' Napper swing consisted generally of an A-frame structure with a seat suspended from two bars. A battery-powered motor sat atop the A-frame and moved the bars suspending the seat forward and backward in a swinging motion.

The Lil' Napper swing came with a harness restraint system which was comprised of an inch-wide strap that extended from the rear of the swing through two slots or channels near the top of the back of the seat. The two straps fit over each of the child's shoulders to meet in a "V" between the child's legs. At the end

of the "V" was a buckle that secured the over-the-shoulder straps to the bottom of the swing's seat between the child's legs. The harness restraint system was also equipped with a "strap slide" which was positioned on the *575 back side of the swing's seat to anchor the over-the-shoulder straps firmly to the back of the seat. The strap slide allowed a caretaker to adjust the harness straps to fit infants of various sizes. The last component of this restraint system was a "harness tie." The harness tie was threaded through the two over-the-shoulder harness straps and positioned on top of the infant's chest.

Century included an instruction manual with the Lil' Napper swing that specifically addressed the proper use of the harness restraint system. Century also placed warning labels on all Lil' Napper swings, including Ms. Fitzgerald's, that stated, among other things, the following:

NEVER LEAVE CHILD UNATTENDED

ALWAYS KEEP CHILD IN VIEW EVEN WHILE SLEEPING

STAY WITHIN REACH OF YOUR CHILD.

The instruction manual stated that failure to use the restraint system properly may result in the baby falling from the swing. There was no mention of any potential risk of entanglement or strangulation. Ms. Fitzgerald testified at trial that she bought the Lil' Napper swing new in 1995 and that it was fully and properly assembled at the time of purchase, except for portions of the legs which she installed herself. Ms. Fitzgerald testified that she did not read the instruction manual or the warning labels affixed to the infant swing because she felt she could operate the swing without reading any of the materials that came with the swing.

By 1997, Century had received four reports of children who were either injured or killed after becoming entangled in the Lil' Napper's harness straps. Century investigated each of these accidents and discovered that each had occurred because the Lil' Napper had not been used according to the instructions. Specifically, the caregivers in each situation had applied the harness straps too loosely while leaving the infant unattended in the swing. Based on this potential hazard from misuse, Century

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

voluntarily recalled the Lil' Napper swing in 1997. Century notified owners of the Lil' Napper that it would retrofit the swings with new seat pads and provide a combination waist/crotch harness to substitute for the V-shaped harness. The U.S. Consumer Product Safety Commission ("CPSC" or "commission") approved Century's voluntary recall program.

On the morning of April 2, Ms. Fitzgerald fed Trevor breakfast and put him in the Lil' Napper swing where he usually took a morning nap. While Trevor was in the swing, Ms. Fitzgerald turned her attention to the other children at the daycare. Ms. Fitzgerald kept Trevor in her sight while she fixed breakfast for the other children, but left Trevor alone while she went downstairs with her mother to deliver breakfast to the children.[FN2] When Ms. Fitzgerald returned upstairs, she found Trevor hanging from the swing with the harness straps wrapped around his neck. Fitzgerald untangled Trevor, called 911, and started CPR. Emergency personnel arrived and took Trevor to the hospital where he later died from asphyxia.

> FN2. It is disputed how long Fitzgerald was downstairs with Trevor out of her sight. Fitzgerald told the police who investigated the accident that she was downstairs for 30 minutes. In her deposition and testimony at trial she stated that she only left Trevor unattended for a maximum of seven minutes.

On the day of the accident, police crime lab experts inspected the daycare and the condition of the Lil' Napper swing. The officer in charge of the investigation testified*576 that the harness straps of the swing had been tied together in a fixed knot behind the back of the seat which made the harness straps of the swing impossible to tighten and properly fit Trevor. The officer also testified that the harness restraint of the Lil' Napper had been re-routed through the wrong slot in the back of the seat.

After Trevor's death, the Tobers filed a civil suit in state court against Ms. Fitzgerald, Daycare, and Graco. The Tobers eventually settled with Ms. Fitzgerald and her Daycare, and Graco removed the case to federal court. In their complaint, the Tobers alleged that Graco negligently designed the swing, failed to include appropriate warnings with the

swing, and failed to correct the defect, warn of the danger and adequately recall the swing. A jury thought otherwise and returned a verdict in favor of Graco. This appeal followed.

## II. ANALYSIS

A. Evidentiary Ruling

[1] At trial, the Tobers sought to introduce a four-page letter dated October 23, 1997, from the CPSC to Century. In the letter, CPSC informed Century of its preliminary determination that the Lil' Napper infant swings:

[P]resent a substantial risk of injury to children ... Specifically, if the harness-style restraint straps are loose or unbuckled, a child in the swing seat may become entangled in the straps and strangle. The staff welcomes and will give full consideration to any comments or additional information from the firm concerning its preliminary determination....

The district court excluded the letter from trial. On appeal, the Tobers argue that the letter should have been admitted under Fed.R.Evid. 801(d)(2)(B) as an adoptive admission by a party-opponent.[FN3]

> FN3.Fed.R.Evid. 801(d)(2)(B), in relevant part, states as follows: "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement of which the party has manifested an adoption or belief in its truth."

[2] We review a district court's evidentiary decisions for abuse of discretion and afford great deference to a district court's determinations in this area. United States v. Seals, 419 F.3d 600, 606 (7th Cir.2005). With respect to statements contained in a letter, the failure to reply to a letter may be introduced as an admission of the statements contained in the letter when the receiver of the letter remains silent in a situation where a response would seem natural or expected. John W. Strong, McCormick on Evidence § 262 at 171 (5th ed.1999). The burden is on the party seeking to introduce the letter to establish that under the circumstances the failure to respond is so unnatural that it supports the inference that the party acquiesced to the statements contained in the letter.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

_Ricciardi v. Children's Hosp. Med. Ctr.,_ 811 F.2d 18, 24 (1st Cir.1987).

We find that the district court did not abuse its discretion when it excluded the letter. First, CPSC's letter does not indicate that the commission conclusively determined that the Lil' Napper was defective. To the contrary, CPSC made only a "preliminary determination" that the swing presented a substantial risk of injury if not used properly. Second, the letter does not mandate any corrective action beyond that already voluntarily underway. The commission "acknowledge[d] and encourage[d] the actions which Century Products ha[d] already taken to correct the problem" and "accepted Century's plan as adequate." Finally, the Tobers' argument that the failure to respond constitutes*577 an adoptive admission is further undermined by the letter itself, which states that: "A firm's taking corrective action does not constitute admission by the firm that a substantial product hazard exists." The district court did not abuse its discretion when it found that, particularly in light of these representations in the letter, failure to respond was not so unnatural as to support an inference of acquiescence to the commission's preliminary findings.

The Tobers also make two bootstrapping arguments for introducing the letter, which we will address briefly. First, the Tobers argue that Century's subsequent nonverbal conduct-recalling the Lil' Napper swing-amounted to an adoptive admission that the swing was defective.[FN4] As we have just noted, this argument is squarely contradicted in the letter where the commission states that corrective action is not necessarily an admission that a product is defective. Even assuming, _arguendo,_ that the recall amounted to an admission, such corrective action is still not an evidentiary basis for admitting the letter.

> FN4. Evidence that Century voluntarily recalled the Lil' Napper in 1997 was admitted at trial and is not now challenged on appeal.

The Tobers also point to Century's Quality Assurance Manager David Galambos's testimony that there was a "joint decision" to recall the Lil' Napper to support their argument that Graco, then Century, adopted the CPSC's determination. Here again, the Tobers erroneously attempt to bootstrap the admissibility of the CPSC's October 23 letter to the undisputed admissibility of Century's Quality Assurance Manager's testimony that there was a joint decision to recall the swing.[FN5] As we have just stated, Century's decision to recall the Lil' Napper, whether made singularly or in conjunction with CPSC, does not necessarily constitute an admission that the product was defective.

> FN5. Century's Quality Assurance Manager David Galambos testified at trial and during his deposition that the Lil' Napper's design was defective and there was a joint decision to recall the product. The parties do not dispute the admissibility of Galambos's testimony.

[3] Even if we believed it was error for the district court to exclude the letter, the error was harmless because the letter would have been cumulative of other evidence presented at trial. The district court admitted the Tobers' evidence, such as testimony from corporate representatives, that Century knew that the Lil' Napper presented a strangulation risk, that Century recalled the Lil' Napper because of that risk, and that Century improved the harness restraints as a result of the risk. As a result, the Tobers were not prejudiced by the district court's exclusion of CPSC's October 23 letter to Century.

B. The District Court's Grant of Judgment as a Matter of Law

In their complaint, the Tobers alleged that Graco negligently failed to (1) correct the defect in the Lil' Napper swing, (2) warn of the danger presented by the swing, and (3) recall the swing adequately. In its motion for summary judgment, Graco argued that Indiana courts do not recognize a claim for negligent recall. The district court agreed and granted summary judgment in favor of Graco. At the pre-trial conference, the court questioned the Tobers on the substance of their duty-to-warn claim. Counsel for the Tobers explained that they intended to introduce evidence that the recall process was delayed, inadequate, and flawed. The court concluded that the plaintiffs' duty-to-warn claim was simply a re-named negligent *578 recall claim and granted judgment as a matter of law on this claim.

[4] On appeal, the Tobers contend that Graco was

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

431 F.3d 572 Case 1:08-cv-02364    Document 55-9    Filed 08/09/2008    Page 35 of 62 Page 6

431 F.3d 572, 68 Fed. R. Evid. Serv. 1212

**431 F.3d 572**

unreasonably dilatory in discharging its post-sale [FN6] duty to warn of the strangulation hazard posed by the Lil' Napper and when Graco finally did issue a post-sale warning, via a recall, the warning was flawed.[FN7]

The Tobers argue that the district court erred in granting summary judgment in favor of Graco because both the Indiana Supreme Court in *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 418 N.E.2d 207 (1981), and the district court in *Reed v. Ford Motor Co.,* 679 F.Supp. 873 (S.D.Ind.1988) (interpreting Indiana law), established a post-sale duty to warn under Indiana law.[FN8]  We find that the Tobers' argument overstates the holdings in *Dague* and *Reed,* and that the district court properly granted summary judgment on the Tobers' post-sale failure-to-warn claim.

> FN6. "Post-sale" warnings refer to warnings required where a manufacturer does not know or have reason to know of a hazard at the time a product is sold, but discovers the hazard sometime later. *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303, 307 (1998). Warnings that were or should have been given when a product was sold are referred to as "point of sale" warnings. *Patton v. Hutchinson Wil-Rich Mfg. Co.,* 253 Kan. 741, 861 P.2d 1299, 1313 (1993).

> FN7. It is unclear from the record whether this post-sale, duty-to-warn claim was ever presented to the district court or to the jury.

> FN8. It is undisputed that the IPLA, Ind.Code §§ 34-20-1-1 to -9-1 (2002) does not expressly prescribe or define a cause of action arising from a manufacturer's post-sale duty to warn.

In *Dague,* this court certified to the Indiana Supreme Court the following question: Does the IPLA's statute of limitation apply to bar plaintiff's failure-to-warn claim? 418 N.E.2d at 209. The Indiana Supreme Court concluded that the state legislature did not intend to exclude such a claim from the IPLA because there is no express language in the IPLA excluding a duty-to-warn claim. *Id.* at 212. The court then reasoned that, to the extent a failure-to-warn claim is based on a theory of negligence seeking damages for an alleged product defect, such a

claim would be governed by the IPLA and its statute of limitations because the IPLA expressly states that it is to govern *all* product-liability actions, regardless of whether the theory of liability is negligence or strict liability in tort. *Id.* The Indiana Supreme Court, however, stopped short of recognizing a cause of action for post-sale failure to warn. The court never identified any particular section of the IPLA defining a post-sale duty to warn, nor did the court articulate the contours of such a cause of action under Indiana common law.

Similarly, in *Reed,* the plaintiff sought recovery against the defendant under theories of strict liability and negligence. 679 F.Supp. at 878. As an element of both claims, Reed alleged that Ford improperly failed to warn him of the inherent dangers associated with the transmission system installed in his truck. *Id.* In its motion for summary judgment, Ford argued that, under Indiana law, its duty to warn of any product defects existed only at the time of the sale to the original customer. In analyzing §§ 33-1-1.5-2.5(a) & (b) of the Indiana Code, which preceded §§ 34-20-41-1 and 34-20-4-2 of the IPLA, the court held that there was insufficient evidence to grant judgment as a matter of law because the IPLA did not expressly exclude liability under a theory of post-sale duty to warn. Similar to the court in *Dague,* the district court in *Reed* also stopped short of recognizing that such a claim exists under the IPLA. 679 F.Supp. at 879.

**\*579** In our review of the IPLA as well as state and federal case law, we too find that, although the Indiana legislature did not expressly exclude a manufacturer's post-sale duty to warn from the IPLA, the statute does not expressly prescribe or define any cause of action arising from a post-sale duty to warn. Therefore, the Tobers' claim that Graco breached its post-sale duty to warn fails, and the district court properly granted judgment as a matter of law.

C. Jury Instruction

[5] The Tobers argue that the district court erred when it instructed the jury that, to prevail on their product liability claim, they were required to prove that the Lil' Napper was not substantially altered when Trevor used the swing. The Tobers contend that the IPLA should be interpreted to require them only to prove that the swing, *when purchased,* had not been substantially altered. The Tobers argue that,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

otherwise, the jury instruction shifted the burden of a manufacturer's "affirmative defense," substantial alteration, onto the plaintiffs.[FN9] We disagree.

> FN9. The IPLA § 34-20-6-5 defines substantial alteration as a defense available to a manufacturer, not as an affirmative defense as the Tobers contend. An affirmative defense limits or excuses a defendant's liability even if the plaintiff establishes a *prima facie* case. In contrast, § 34-20-6-5 defines how a manufacturer can directly controvert a plaintiff's *prima facie* case.

> The IPLA recognizes as a defense to the Tobers' *prima facie* case that the proximate cause of Trevor's death was a modification or alteration of the Lil' Napper made after the product's delivery to the initial user or consumer. *See* Ind.Code § 34-20-6-5. In other words, a manufacturer can controvert a plaintiff's *prima facie* case by arguing that an alteration or modification to the product that was not present when the product left the manufacturer's control proximately caused the plaintiff's physical harm.

We review a district court's instruction to the jury for an abuse of discretion, unless the instruction was based on an error of law in which case our review is *de novo. United States v. Smith,* 415 F.3d 682, 688 (7th Cir.2005). Under the IPLA, to prevail at trial, the Tobers must prove that: (1) the product was defective and, as a result, unreasonably dangerous; (2) the defect existed when the product left the defendant's control; (3) the product was expected to and did reach the consumer without substantial alteration; and (4) Trevor's injuries were proximately caused by the defect in the product. *Ritchie v. Glidden Co.,* 242 F.3d 713, 720 (7th Cir.2001) (interpreting the IPLA). Consistent with the IPLA, the district court instructed the jury as follows:

To prevail on their product liability claim, the Tobers must prove each of the following elements by a preponderance of the evidence:

1. that Graco was a manufacturer of the part of the product alleged to be defective and was in the

business of selling the Lil' Napper;

2. that Graco sold, leased or otherwise put the Lil' Napper into the stream of commerce;

3. that at the time the Lil' Napper left the hands of Graco, it was in a defective condition unreasonably dangerous to any user or consumer;

4. that the Lil' Napper was expected to reach and did reach Trevor Tober without substantial alteration of the condition in which the product was sold by Graco;

5. that Trevor Tober was in a class of persons that Graco should have reasonably foreseen as being subject **580** to the harm caused by the defective condition;

6. that Trevor Tober was harmed; and

7. that the defective condition of the Lil' Napper was a proximate cause of the harm to Trevor Tober.

[6] Both the IPLA and the district court's instruction require the Tobers to prove that the product was defective when it left the manufacturer and remained in the same defective condition when the end-user, Trevor in this case, used the product in a manner the manufacturer intended. *See* Ind.Code § 34-20-2-1. A manufacturer, therefore, is liable only for its own defects in the products, and not for defects caused by the alteration or misuse of its products.[FN10] Accordingly, the district court's jury instruction was not an abuse of its discretion because neither the IPLA nor the court's instruction shifted an undue burden onto the Tobers.

> FN10. The Tobers' argument, on the other hand, would result in limitless manufacturer liability. For example, under the Tobers' theory, a car manufacturer would be liable for "defective brakes" even when an end-user of the car intentionally disabled the brake system and then was unable to stop the car, causing harm to himself or others.

[7] More significantly, even if the jury instruction regarding product alteration incorrectly represents Indiana law, any error is harmless. The verdict form

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

indicates that the jury decided, pursuant to question #
3, that the Tobers had not proven by a
"preponderance of evidence that at the time the Lil'
Napper left the hands of Graco ... it was in a
defective condition unreasonably dangerous to any
user or consumer." The jury, therefore, never
reached the question of the presence or absence of
alteration, which was addressed in question # 4 on
the verdict form. *See O.K. Sand & Gravel, Inc. v.
Marietta Tech., Inc.,* 36 F.3d 565, 569 (7th Cir.1994)
(holding that when a verdict form indicates that the
jury never reached the instruction in question, error is
typically harmless).

### III. CONCLUSION

For the foregoing reasons, the rulings of the district
court are AFFIRMED.

C.A.7 (Ind.),2005.
Tober v. Graco Children's Products, Inc.
431 F.3d 572, 68 Fed. R. Evid. Serv. 1212

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

--- F.3d ----                                                           Page 1
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))
**2008 WL 2941171 (C.A.7 (Ill.))**

**H**Windy City Metal Fabricators & Supply, Inco. v.
CIT Technical Financing Services, Inc.
C.A.7 (Ill.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
WINDY CITY METAL FABRICATORS &
SUPPLY, INCORPORATED and Midwest Ink
Company, on Behalf of Itself and All Others
Similarly Situated, Plaintiffs-Appellants,
v.
CIT TECHNOLOGY FINANCING SERVICES,
INCORPORATED and Reed Smith, a New Jersey
Limited Partnership, Defendants-Appellees.
**No. 07-1567.**

Argued Oct. 25, 2007.
Decided Aug. 1, 2008.

**Background:** Customers filed complaint against
entity to which their equipment rental agreements had
been sold for entity's alleged common law fraud and
violations of provisions of the Illinois Consumer
Fraud and Deceptive Business Practices Act. The
United States District Court for the Northern District
of Illinois, Wayne R. Andersen, J., 2007 WL 495276,
granted motion to dismiss for failure to state claim,
and customers appealed.

**Holdings:** The Court of Appeals, Ripple, Circuit
Judge, held that:
(1) allegations in customers' complaint failed to plead
fraud with requisite particularity and were
insufficient to state claim for common law fraud;
(2) complaint to recover for defendants' alleged
unfair practices in violation of the Illinois Consumer
Fraud and Deceptive Business Practices Act only had
to satisfy notice pleading standard, and did not have
to satisfy any heightened particularity standard; and
(3) allegations in customers' complaint against entity
to which their equipment rental agreements had been
sold were sufficient to state claim for unfair practices.

Affirmed in part and reversed and remanded in part.

**[1] Federal Courts 170B** ⚷776

**170B** Federal Courts
    **170BVIII** Courts of Appeals
        **170BVIII(K)** Scope, Standards, and Extent
            **170BVIII(K)1** In General
                **170Bk776** k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews de novo a district court's
grant of motion to dismiss for failure to state claim.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** ⚷636

**170A** Federal Civil Procedure
    **170AVII** Pleadings and Motions
        **170AVII(A)** Pleadings in General
            **170Ak633** Certainty, Definiteness and
Particularity
                **170Ak636** k. Fraud, Mistake and
Condition of Mind. Most Cited Cases
Circumstances of fraud or mistake, such as plaintiff
must plead with particularity under heightened
federal pleading rules, include identity of person who
made misrepresentation, time, place, and content of
misrepresentation, and method by which
misrepresentation was communicated to plaintiff.
Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** ⚷636

**170A** Federal Civil Procedure
    **170AVII** Pleadings and Motions
        **170AVII(A)** Pleadings in General
            **170Ak633** Certainty, Definiteness and
Particularity
                **170Ak636** k. Fraud, Mistake and
Condition of Mind. Most Cited Cases
Allegations in customers' complaint against entity to
which their equipment rental agreements had been
sold were insufficient to state claim for common law
fraud, where complaint, while alleging at length the
fraud perpetrated by the now-bankrupt company that
had sold their rental agreements, did not allege the
what, when and how of any misrepresentations made
by defendant with particularity required under federal
pleading rules. Fed.Rules Civ.Proc.Rule 9(b), 28
U.S.C.A.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))
**2008 WL 2941171 (C.A.7 (Ill.))**

**[4] Antitrust and Trade Regulation 29T ⬤══128**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk126 Constitutional and Statutory Provisions
            29Tk128 k. Purpose and Construction in General. Most Cited Cases
Illinois Consumer Fraud and Deceptive Business Practices Act is regulatory and remedial statute meant to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices. S.H.A. 815 ILCS 505/1 et seq.

**[5] Antitrust and Trade Regulation 29T ⬤══135(1)**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk133 Nature and Elements
            29Tk135 Practices Prohibited or Required
               29Tk135(1) k. In General; Unfairness. Most Cited Cases

**Antitrust and Trade Regulation 29T ⬤══136**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk133 Nature and Elements
            29Tk136 k. Fraud; Deceit; Knowledge and Intent. Most Cited Cases
Recovery under the Illinois Consumer Fraud and Deceptive Business Practices Act may be had for unfair as well as deceptive conduct. S.H.A. 815 ILCS 505/1 et seq.

**[6] Antitrust and Trade Regulation 29T ⬤══135(1)**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General

         29Tk133 Nature and Elements
            29Tk135 Practices Prohibited or Required
               29Tk135(1) k. In General; Unfairness. Most Cited Cases
Three considerations guide Illinois courts in deciding whether practice is "unfair" under the Illinois Consumer Fraud and Deceptive Business Practices Act: (1) whether practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers. S.H.A. 815 ILCS 505/1 et seq.

**[7] Antitrust and Trade Regulation 29T ⬤══135(1)**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk133 Nature and Elements
            29Tk135 Practices Prohibited or Required
               29Tk135(1) k. In General; Unfairness. Most Cited Cases
Three considerations that guide Illinois courts in determining whether a practice is "unfair" under the Illinois Consumer Fraud and Deceptive Business Practices Act, i.e., the "public policy," moral/ethical, and "harm to consumers" criteria, need not all be satisfied for practice to be found unfair; indeed, practice may be "unfair" because of degree to which it meets one of these three criteria, or because, to lesser extent, it meets all three. S.H.A. 815 ILCS 505/1 et seq.

**[8] Antitrust and Trade Regulation 29T ⬤══358**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(E) Enforcement and Remedies
         29TIII(E)5 Actions
            29Tk356 Pleading
               29Tk358 k. Particular Cases. Most Cited Cases

**Federal Civil Procedure 170A ⬤══636**

170A Federal Civil Procedure

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))
**2008 WL 2941171 (C.A.7 (Ill.))**

170AVII Pleadings and Motions
   170AVII(A) Pleadings in General
      170Ak633 Certainty, Definiteness and Particularity
         170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Complaint to recover for defendants' alleged unfair practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act only had to satisfy notice pleading standard, and did not have to satisfy any heightened particularity standard, given that neither fraud nor mistake was element of "unfair conduct" under this Illinois Act. Fed.Rules Civ.Proc.Rules 8(a), 9(b), 28 U.S.C.A.; S.H.A. 815 ILCS 505/1 et seq.

**[9] Federal Courts 170B ☞433**

170B Federal Courts
   170BVI State Laws as Rules of Decision
      170BVI(C) Application to Particular Matters
         170Bk433 k. Other Particular Matters. Most Cited Cases
Federal court sitting in diversity applies federal pleading requirements, even when the claim pled arises under state rather than federal law.

**[10] Federal Courts 170B ☞373**

170B Federal Courts
   170BVI State Laws as Rules of Decision
      170BVI(A) In General
         170Bk373 k. Substance or Procedure; Determinativeness. Most Cited Cases
District court exercising jurisdiction because parties are of diverse citizenship must apply state substantive law and federal procedural law.

**[11] Federal Courts 170B ☞373**

170B Federal Courts
   170BVI State Laws as Rules of Decision
      170BVI(A) In General
         170Bk373 k. Substance or Procedure; Determinativeness. Most Cited Cases
In evaluating whether a particular state law is "procedural" or "substantive," for purposes of deciding whether it must apply that law when sitting in diversity, federal district courts take as their starting point the principle that outcome of litigation in federal court should be substantially the same, so far as legal rules determine outcome of litigation, as it would be if tried in state court.

**[12] Federal Courts 170B ☞373**

170B Federal Courts
   170BVI State Laws as Rules of Decision
      170BVI(A) In General
         170Bk373 k. Substance or Procedure; Determinativeness. Most Cited Cases
When faced with conflict between state and federal rule of procedure, federal court sitting in diversity must first decide whether there is actual conflict between these rules by determining whether scope of federal rule is sufficiently broad to control issue before court; if federal rule is sufficiently broad to control issue, court must then evaluate the rule to ensure that it has neither exceeded the Congressional mandate embodied in the Rules Enabling Act nor transgressed Constitutional bounds, in which case it should be applied, despite the fact that its application might alter mode of enforcing state-created right.

**[13] Antitrust and Trade Regulation 29T ☞358**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(E) Enforcement and Remedies
         29TIII(E)5 Actions
            29Tk356 Pleading
               29Tk358 k. Particular Cases. Most Cited Cases
Federal notice pleading standard, rather than conflicting state law standard, governed whether allegations in complaint that was before district court pursuant to its diversity jurisdiction were sufficient to state claim under "unfair practices" provision of the Illinois Consumer Fraud and Deceptive Business Practices Act; prescribing specificity with which claim had to be pled related solely to practice and procedure of court and clearly fell within scope of the Rules Enabling Act, and there was no basis for concluding that regulation of pleading requirements in federal court exceeded limits of federal constitutional authority. 28 U.S.C.A. § 2072; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.; S.H.A. 815 ILCS 505/1 et seq.

**[14] Antitrust and Trade Regulation 29T ☞161**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
         29Tk161 k. Representations, Assertions, and Descriptions in General. Most Cited Cases

Allegations in customers' complaint against entity to which their equipment rental agreements had been sold were sufficient to state claim for unfair practices under the Illinois Consumer Fraud and Deceptive Business Practices Act, where complaint alleged that defendant had used unfair practices, specifically the dissemination of false advertisements fore purpose of inducing customers to enter into unconscionable equipment rental agreements, further alleged that defendant attempted to enforce these agreements, and finally alleged that customers had suffered loss as a result of these allegedly illegal equipment rental agreements. Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.; S.H.A. 815 ILCS 505/1 et seq.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 05 C 5451-Wayne R. Andersen, Judge.
David A. Novoselsky, Novoselsky & Associates, Chicago, IL, for Plaintiffs-Appellants.
Edward F. Ryan, Holland & Knight, George M. Hoffman, Stamos & Trucco, Chicago, IL, for Defendants-Appellees.

Before EASTERBROOK, Chief Judge, and RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.
**\*1** Windy City Metal Fabricators & Supply Inc. ("Windy City") sued CIT Technology Financing Services ("CIT") and the law firm Reed Smith in Illinois state court. After Reed Smith removed the action to the district court based on diversity of citizenship,[FN1] Midwest Ink Co. was added as a plaintiff. CIT and Reed Smith filed a motion to dismiss, which the district court granted. The plaintiffs timely appealed the dismissal.[FN2] For the reasons stated in this opinion, we affirm in part and reverse in part the judgment of the district court. The case is remanded for further proceedings consistent with this opinion.

                                   I

**BACKGROUND**

**A.**

Because this case comes to us after the district court dismissed the complaint for failure to state a claim, we take as true the facts alleged in the complaint. Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir.2008). The events at issue in this appeal came about as a result of the activities of Norvergence, a now-bankrupt company. When still in business, Norvergence leased to business customers a telecommunications service package called the Matrix Solution. The package included the customer's communication service and hardware that could be leased only from Norvergence through an equipment rental agreement. Norvergence claimed that the equipment contained proprietary components that reduced a user's telecommunications bill; in fact, the equipment had no effect on the customer's telecommunications services. In some instances, Norvergence did not even connect the devices.

After Norvergence entered into an equipment rental agreement with a customer, it assigned that agreement to one of a number of third parties. The customer received standard telecommunications equipment that actually was worth only a small fraction of the customer's monthly payment on the equipment rental agreement. Norvergence used the funds, which it obtained by selling the equipment rental agreement to the third party, to pay the customer's telecommunications services bill. Norvergence was unable, however, to continue to pay its customers' bills because it paid more for the monthly services than it obtained by selling the rental agreements. Norvergence went bankrupt. Its customers were left without telecommunications service, but they had continuing obligations under the equipment rental agreement to pay the third-party assignee for the equipment.

Windy City and Midwest Ink are two businesses that purchased these equipment rental agreements from Norvergence. Norvergence sold their rental agreements to CIT. When Norvergence later went bankrupt, Windy City and Midwest Ink stopped receiving telecommunications services because Norvergence was no longer paying for the services. Windy City and Midwest Ink nevertheless had a continuing obligation under the assigned equipment

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))
**2008 WL 2941171 (C.A.7 (Ill.))**

rental agreement to lease equipment from CIT.

The Illinois Attorney General obtained a default judgment against Norvergence in an Illinois court. Under that judgment, the contracts between Norvergence and its Illinois consumers were held to have been void *ab initio* because they stemmed from solicitations that were the result of unfair business practices and fraud on the part of Norvergence. Reed Smith, acting on behalf of CIT, then executed an Assurance of Voluntary Discontinuance (the "Assurance") with the Illinois Attorney General. Under its terms, CIT offered to reduce by eighty-five percent the amount that each customer owed to CIT on its rental agreement and to refund sixty-seven percent of the insurance-related charges paid by the customer on the rental agreements.

*2 As required by the Assurance, CIT sent a settlement letter directly to each of its lessees, including Windy City and Midwest Ink. Shortly thereafter, Reed Smith also sent a letter to Windy City's attorneys in order to ensure that they were aware of the letter. Midwest Ink accepted the settlement offer, but Windy City did not accept it.

**B.**

In 2005, Windy City filed its original proposed class action complaint against CIT in Illinois state court. It sought to represent Norvergence customers whose rental agreements had been assigned to CIT. Reed Smith was added as a defendant in the fall of 2005, and it removed the action to the district court. Midwest Ink was added subsequently as a plaintiff to represent the potential class members who had accepted CIT's settlement offer. The revised second amended complaint, the operative version on this appeal, set forth eight counts, including claims of common-law fraud and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("Consumer Fraud Act"). The complaint sought compensatory, statutory and punitive damages, as well as preliminary and permanent injunctive relief, against both CIT and Reed Smith.

The district court dismissed the complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to plead fraud with the specificity required by Federal Rule of Civil Procedure 9(b). The

plaintiffs moved for leave to further amend the complaint, but the district court denied their motion. The plaintiffs timely appealed.

**II**

**DISCUSSION**

[1] We review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss. *Tamayo,* 526 F.3d at 1081. As a general rule, in testing the sufficiency of a complaint, notice pleading remains the standard. A plaintiff's complaint need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief" that is also sufficient to provide the defendant with "fair notice" of the claim and its basis. *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007); Fed.R.Civ.P. 8(a)(2). In order to demonstrate that he is entitled to relief, however, the pleader must show through his allegations that "it is plausible, rather than merely speculative, that he is entitled to relief."*Tamayo,* 526 F.3d at 1083 (quotation omitted); *see also Bell Atl.,* 127 S.Ct. at 1965-66. A complaint must do more than merely *"avoid foreclosing* possible bases for relief."*Tamayo.* 526 F.3d at 1084 (quotation omitted). It "must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level."*Id.* (quotation omitted).

[2] In the present case, the plaintiffs' complaint includes claims against CIT and Reed Smith that allege common-law fraud and violations of the Consumer Fraud Act. The parties agree that, with respect to most of these claims, the heightened pleading standards of Federal Rule of Civil Procedure 9(b) govern. Under Rule 9(b), a plaintiff must state with particularity "all averments of fraud or mistake."Fed.R.Civ.P. 9(b); *see also Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir.1997). The circumstances of fraud or mistake include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."*Gen. Elec. Capital,* 128 F.3d at 1078 (quotation omitted); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (describing Rule 9(b) particularity as "the who, what, when, where, and how: the first paragraph of any newspaper

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))
**2008 WL 2941171 (C.A.7 (Ill.))**

story").

*3 The plaintiffs believe that the district court erred in dismissing their common law fraud claims against CIT and Reed Smith for failure to state with particularity the circumstances of the alleged fraud. They also submit that their claims against CIT under the Consumer Fraud Act may go forward without meeting the particularity requirement of Rule 9(b).[FN3] We now address each of these contentions.

### A.

### Fraud Claims

[3] The district court dismissed all of the plaintiffs' claims against CIT and Reed Smith on the ground that the claims sounded in fraud but failed to meet the particularity requirement of Rule 9(b). The court ruled that, although the complaint described Norvergence's fraud with particularity, it failed to describe CIT's connection to any fraud with the particularity required by Rule 9(b). The court also held that the plaintiffs had failed to state with particularity the fraud allegedly committed by Reed Smith. The district court therefore dismissed all the fraud claims against CIT and Reed Smith because the plaintiffs had failed to plead who had made a fraudulent statement, when the fraudulent statement was made and how the fraudulent statement was communicated.

On appeal, the plaintiffs' only contention is that the district court wrongly required them to provide *evidence* of fraud to defeat a Rule 12(b)(6) motion. They correctly point out that the district court employed the word "evidence" when describing the allegations that the complaint failed to state with particularity. For instance, the district court said that "[n]o evidence ... [was] offered to establish who at CIT knew that the assigned [equipment rental agreement] was for a bundled service and equipment lease agreement, or name the individuals who should have known, when they should have known, or how they would have known."*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, No. 05 C 5451, 2007 WL 495276, at *4 (N.D.Ill. Feb.9, 2007).

Despite its use of inartful terminology, the district court properly dismissed the plaintiffs' fraud claims

for failure to state with particularity "who made the fraudulent statement, when the fraudulent statement was made, and how the fraudulent statement was made."*Id.* at *3. The district court did not require the complaint to provide actual evidence of the claims; it merely required that the claims be pleaded with the requisite particularity. See *id.*Moreover, the district court correctly determined that the complaint failed to plead with particularity the who, when and how of the alleged frauds, all of which are required by Rule 9(b) for allegations of fraud. See *Gen. Elec. Capital*, 128 F.3d at 1078;*DiLeo, 901 F.2d at 627*. The district court therefore properly dismissed the fraud counts for failure to comply with Rule 9(b).[FN4]

### B.

### "Unfair Conduct" Under The Consumer Fraud Act

The plaintiffs submit that their claim under the Illinois Consumer Fraud Act may go forward without meeting the heightened standard of pleading fraud claims under Rule 9(b). In their view, a claim under the Consumer Fraud Act may allege either deceptive practices, which sound in fraud, or unfair practices, which do not. Because the allegations in Count I do not allege fraud but an unfair trade practice, they maintain, the governing pleading standard is the one contained in Rule 8.

### 1.

*4 [4][5][6][7] The Illinois Consumer Fraud Act "is a regulatory and remedial statute intended to protect consumers ... against fraud, unfair methods of competition, and other unfair and deceptive business practices."*Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 960 (Ill.2002)*. The Supreme Court of Illinois has held that recovery under the Consumer Fraud Act "may be had for unfair as well as deceptive conduct."*Id.* In interpreting unfair conduct under the Consumer Fraud Act, Illinois courts look to the federal interpretations of unfair conduct under section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45. *Robinson,* 266 Ill.Dec. 879, 775 N.E.2d at 960;815 ILCS 505/2. Thus, three considerations guide an Illinois court's determination of whether conduct is unfair under the Consumer Fraud Act: "(1) whether the practice offends public policy; (2) whether it is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))
**2008 WL 2941171 (C.A.7 (Ill.))**

immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers."*Robinson,* 266 Ill.Dec. 879, 775 N.E.2d at 961. A court may find unfairness even if the claim does not satisfy all three criteria. *Id.* For example, a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."*Id.*

[8] Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b). Therefore, under federal notice pleading standards, the complaint need only provide a short and plain statement of the claim that shows, through its allegations, that recovery is plausible rather than merely speculative. *Tamayo,* 526 F.3d at 1083;*see also Bell Atl.,* 127 S.Ct. at 1964;Fed.R.Civ.P. 8(a)(2).

**2.**

[9] By contrast with the federal pleading regimen under Rule 8, Illinois requires fact pleading even to non-fraud claims. *See Knox Coll. v. Celotex Corp.,* 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976, 985 (Ill.1981); *Robinson,* 266 Ill.Dec. 879, 775 N.E.2d at 961 (reviewing an appellate court's holding that none of a plaintiff's allegations had been stated with sufficient particularity and specificity to show that the defendant's conduct was unfair), 962 ("Plaintiffs argue here that all automobile leases have standard provisions and that leases are not negotiable. However, no such averments appear in the pleadings. Thus, the appellate court correctly held that plaintiffs' bald claim of unfairness ... was not sufficient to state a claim."). We can see no reason, however, why the standards of Rule 8 of the Federal Rules of Civil Procedure, rather than Illinois fact pleading requirements, should not apply here. It is well settled that a federal court sitting in diversity applies federal pleading requirements "even when the claim pleaded arises under state rather than federal law."*Muick v. Glenayre Elecs.,* 280 F.3d 741, 743 (7th Cir.2002) (applying federal pleading requirements to an Illinois cause of action); *see also Hefferman v. Bass,* 467 F.3d 596 (7th Cir.2006) (same); *Johnson v. Hondo, Inc.,* 125 F.3d 408, 417 (7th Cir.1997) ("[I]t is rudimentary that pleading requirements in the federal

courts are governed by the federal rules and not by the practice of the courts in the state in which the federal court happens to be sitting."(internal quotation marks omitted)); *Colton v. Swain,* 527 F.2d 296, 304 (7th Cir.1975). Although we have never explained in detail the basis for this determination, a review of the basic principles governing federal-state choice of law in the context of federal diversity jurisdiction makes clear that the federal rule must be the governing approach in this case.

**\*5** [10][11] It is, of course, well established that, as a general matter, a district court exercising jurisdiction because the parties are of diverse citizenship must apply state substantive law and federal procedural law. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When evaluating whether a particular state law is procedural or substantive, district courts take as their starting point the "outcome-determinative" test of *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). In that case, the Supreme Court held that "the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."[FN8]*Id.*

[12] The bedrock case for the precise issue that confronts us today, however, must be a case that followed *Guaranty Trust-Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). In *Hanna,* the Court was confronted, as we are today, with a conflict between a state rule of procedure and a federal rule of procedure. 380 U.S. at 469-70. The Court set forth the approach that must guide our present inquiry: We must determine whether there is an *actual* conflict between the federal and the state rule by determining "whether the scope of the federal rule is sufficiently broad to control the issue before the court."*Id.* at 470.If the federal rule is sufficiently broad to control the issue, then we must evaluate the rule to ensure that the rule has not "exceeded the congressional mandate embodied in the Rules Enabling Act nor transgressed constitutional bounds."*Id.* at 464.If the federal rule does fall within constitutional boundaries, then it should be applied, despite the fact that its application might alter the mode of enforcing a state-created right. *Id.* at 473-74.If it is not, then the traditional *Erie* analysis of *Guaranty Trust* is appropriate and the court should

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))
**2008 WL 2941171 (C.A.7 (Ill.))**

proceed to apply the outcome-determinative test. _Id._ at 470.

On several occasions, in applying the approach it outlined in _Hanna,_ the Supreme Court had to focus on whether there was an irreconcilable conflict between a federal and a state rule of procedure. We turn briefly to those cases to determine whether the difference between the federal approach to pleading and the Illinois approach is an irreconcilable one. In _Walker v. Armco Steel Corp.,_ 446 U.S. 740, 750, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980), the Court determined that Rule 3 of the Federal Rules of Civil Procedure, which addresses when an action is commenced in federal court, was not sufficiently broad to address the effect of the tolling of a state statute of limitations on when a case commences under state law. That determination, said the Court, is a substantive policy decision of the state as to the deadline after which a defendant may have peace of mind and after which it would be unfair to expect the defendant to mount a defense. _Walker,_ 446 U.S. at 751.

By contrast, in _Burlington Northern Railroad Co. v. Woods,_ 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987), the Supreme Court determined that there was a true conflict between a federal rule of procedure and a state statute. In that case, a state statute provided that when an appellate court affirmed a money judgment without substantial modification, it was to impose a ten-percent penalty on any appellant who had obtained a stay of that judgment pending appeal by executing a bond. By contrast, Federal Rule of Appellate Procedure 38 affords the federal courts of appeals plenary discretion to award damages upon a determination that the appeal was frivolous. The Court held that a federal appellate court ought to apply the federal rule. The two rules conflicted, and the federal rule was a constitutional exercise of federal rule-making authority and affected only the _process_ of enforcing litigants' rights and not the rights themselves. _Id._ at 8.

**\*6** [13] Here, it is clear that a conflict between the federal and state pleading rule does exist. _Compare_Fed.R.Civ.P. 8 (requiring only notice pleading), _with_735 ILCS 5/2-601 (requiring that pleadings contain substantial allegations of fact), _and Knox Coll.,_ 58 Ill.Dec. 725, 430 N.E.2d at 985-86 (same). The federal and the state provisions address

the same subject and require adherence to conflicting standards.

Continuing to follow the analytical model of _Hanna,_ we next ask whether Rule 8 is within the congressional mandate. The Rules Enabling Act gives the Supreme Court "the power to prescribe, by general rules, the forms of process, writs, _pleadings,_ and motions ... of the district courts of the United States."28 U .S.C. § 2072 (emphasis added). Prescribing the specificity with which a claim must be pleaded relates solely to the practice and procedure of a court and clearly falls within the scope of the Rules Enabling Act. There is, moreover, no basis for concluding that the regulation of pleading requirements in federal court is beyond the limits of federal constitutional authority. _See Hanna,_ 380 U.S. at 464. Consequently, we evaluate the state-law claims in this case under the federal pleading standards.

**3.**

[14] When we turn to the unfair conduct allegations of Count I, it is clear that this claim meets the federal notice pleading standards by "providing allegations that raise a right to relief above the speculative level."_Tamayo,_ 526 F.3d at 1084 (quotation omitted). Count I alleges that CIT used unfair practices, specifically the dissemination of false advertisements for the purpose of inducing the plaintiffs to enter into unconscionable equipment rental agreements. It further alleges that CIT violated the Consumer Fraud Act by attempting to enforce those agreements. R .79 at ¶ 77. Finally, the complaint goes on to allege that the plaintiffs suffered a loss as a result of these allegedly illegal equipment rental agreements. These allegations address the three considerations that, in combination, guide a court's determination of whether conduct is unfair. _See Robinson,_ 266 Ill.Dec. 879, 775 N.E.2d at 961 (holding that an unfairness determination should consider: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers"). Although the complaint does not use specifically the words "immoral, unethical, oppressive, or unscrupulous," it alleges conduct that, if proven, could support this statutory definition of unfairness under the Consumer Fraud Act. _See id._By claiming that CIT engaged in unfair conduct and averring facts

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))
**2008 WL 2941171 (C.A.7 (Ill.))**

that, if proven, make relief more than merely speculative, *Tamayo, 526 F.3d at 1084,* the plaintiffs stated adequately a claim for relief.

It is important to note that, in the procedural posture of this case, we must take the allegations of the plaintiffs in the light most favorable to them. Indeed, CIT has not answered the complaint at this stage and its position on such matters as the holder in due course defense and, specifically, the implications of the Assurance which it executed with the Attorney General of Illinois has not been stated explicitly in the present procedural context. *See IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union,* 512 F.3d 989 (7th Cir.2008).

### Conclusion

*7 For the foregoing reasons, we hold that the district court dismissed properly the entirety of the plaintiffs' fraud claims, but that the court erred in dismissing the plaintiffs' claims for unfair practices under the Illinois Consumer Fraud Act against CIT. The judgment of the district court accordingly is affirmed in part and reversed and remanded in part for further proceedings consistent with this opinion. Reed Smith may recover the costs of this appeal. The other parties shall bear their own costs of this appeal.

AFFIRMED in part and REVERSED and REMANDED in part

> FN1. The federal court had diversity jurisdiction under 28 U.S.C. § 1332. Windy City and Midwest Ink are Illinois corporations with their principal places of business in Illinois. CIT is a Massachusetts corporation with its principal place of business in New Jersey. Reed Smith is a limited liability partnership that, at the time of removal, had no partners who were citizens of Illinois.

> FN2. We have appellate jurisdiction under 28 U.S.C. § 1291.

> FN3. The plaintiffs additionally contend, without relying on factual or legal support, that the district court erred in refusing to permit them to file a third amended

complaint. An appellant is required to provide "citations to the authorities and parts of the record" in support of his argument. Fed. R.App. P. 28(a)(9)."We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point."*Tyler v. Runyon,* 70 F.3d 458, 464 (7th Cir.1995) (quotation omitted). We therefore shall not address this perfunctory and underdeveloped argument on appeal. *Id.; see also Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir.2005).

> FN4. Count 5 of the operative complaint also alleges that Reed Smith, the law firm that represented CIT, conspired to accomplish the fraudulent scheme allegedly undertaken by its client. This claim must fail as well. Reading the allegations of this claim in the light most favorable to the plaintiffs, it simply alleges that Reed Smith negotiated on behalf of its client with the Attorney General of Illinois and then counseled its client with respect to how to comply with the resulting agreement.

> FN5. In *Guaranty Trust,* the Court determined that applying a state statute of limitations was appropriate despite the fact that such statutes often are referred to as "procedural." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

C.A.7 (Ill.),2008.
Windy City Metal Fabricators & Supply, Inco. v. CIT Technical Financing Services, Inc.
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

United States District Court,
N.D. Illinois,
Eastern Division.
William F. WOOD, Jr., et al., Plaintiffs,
v.
CITY OF ELGIN, Defendant.
No. 07 C 05418.
Jan. 14, 2008.

Craig S. Mielke, Foote, Meyers, Mielke, Flowers & Solano, Geneva, IL.

James Joseph Powers, IV, Thomas James Piskorski, Seyfarth Shaw Llp, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

DAVID H. COAR, District Judge.

*1 Several police officers ("Plaintiffs") brought a consolidated action in Illinois state court against their employer, the City of Elgin ("Defendant") for alleged violations of the Fair Labor Standards Act of 1938 ("FLSA"). Based upon 28 U.S.C. §§ 1441 and 1446, the action was removed to this Court. Before the Court now is Defendant's Motion to Dismiss the Complaint pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure. For the reasons stated below the motion is DENIED.

### FACTUAL BACKGROUND[FN1]

FN1. With the exception of the maximum fourteen day work period, these facts have been taken from the Plaintiffs' Complaint and, for the purposes of this motion, are assumed to be true with all reasonable inferences in favor of the Plaintiffs. *Patel v. City of Chicago,* 383 F.3d 569, 572 (7th Cir.2004). The maximum fourteen day work period was derived from the CBA, attached to Elgin's motion to dismiss. Review of the CBA was proper and does not convert this motion to one arising under Federal Rule of Civil Procedure 56 because the CBA was referred to in the Complaint and is central to the Plaintiffs' claim. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993).

Defendant is a municipal corporation located within the State of Illinois. Defendant employs its own local law enforcement officers, the Plaintiffs, as well as other municipal employees. Plaintiffs are members of a union called the Policemen's Benevolent Protective Association Unit 54 (the "Union"), which has been designated as their sole and exclusive bargaining agent for the purposes of establishing wages, hours of work, and other conditions of employment. Defendant and the union entered into a collective bargaining agreement [FN2] ("CBA") that governs the employment relationship between Plaintiffs and Defendant. The CBA provides that a "normal work period ... shall not

exceed fourteen (14) days" and that a normal work week shall constitute a 41.25 hour work week consisting of daily shifts of eight hours of work and a fifteen minute training period. From January 1, 2005, the date the CBA went into effect, until present, Plaintiffs have worked the 41.25 hour work weeks. Yet, Plaintiffs have not been paid at an overtime rate for the 1.25 hour beyond the standard forty hour work week established by section 207(a) of the FLSA. Thus, Plaintiffs are suing Defendant for violating the FLSA and they seek unpaid overtime wages and reasonable attorneys' fees.

FN2. There is actually more than one collective bargaining agreement at issue here. For simplicity, the Court refers to a single CBA because the relative provisions of each agreement are identical.

## STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, the Court accepts all well-pleaded allegations in the complaint as true. Fed.R.Civ.P. 12(b)(6). The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990) (citation omitted). A complaint should not be dismissed pursuant to Rule 12(b)(6) unless it fails it provide fair notice of what the claim is and the grounds upon which it rests or it is apparent from the face of the complaint that under no plausible facts may relief be granted. *St. John's United Church of Christ v. City of Chicago,* 502 F.3d 616, 625. All reasonable inferences are to be drawn in favor of the plaintiff. *Gastineau v. Fleet Mortg. Corp.,* 137 F.3d 490, 493 (7th Cir.1998) (citation omitted).

## ANALYSIS

The FLSA imposes a general obligation on employers to pay overtime compensation for work performed in excess of forty hours per week. Title 29 U.S.C. § 207(a) states as follows:

(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

*2 (2) No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this subsection by the amendments made to this chapter by the Fair Labor Standards Amendments of 1966-

(A) for a workweek longer than forty-four hours during the first year from the effective date of the Fair Labor Standards Amendments of 1966,

(B) for a workweek longer than forty-two hours during the second year from such date, or

(C) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

The FLSA does exempt a public agency from the statute's general requirements and allows such an employer to follow different overtime compensation schemes for its firefighters and law enforcement officers when and if there is an established "work period" that satisfies certain other statutory criteria. 29 U.S.C. § 207(k). Although Plaintiffs' Complaint makes no mention of a work period or § 207(k) of the FLSA, Defendant claims such an alternative overtime compensation scheme exists for the Plaintiffs, as evidenced by the CBA, and that it is therefore exempt from the requirements of § 207(a) and under no set of facts can Plaintiffs establish Defendant violated the FLSA.

The term "work period" is not defined by the FLSA. However, the Department of Labor has promulgated regulations that define a "work period" as follows:

As used in section 7(k) [of the FLSA], the term "work period" refers to any established and regularly recurring period of work which, under the terms of the Act and legislative history, cannot be less than 7 consecutive days nor more than 28 consecutive days. Except for this limitation, the work period can be of any length, *and it need not coincide with the duty cycle or pay period or with a particular day of the week or hour of the day.*

29 C.F.R. § 553.224 (emphasis added). Whether an employer has established a "work period" that qualifies for an exemption under § 207(k) of the FLSA is not normally a question that can be disposed of at this stage of litigation due to the absence of a factual basis before the court. *See Barefield v. Village of Winnetka,* 81 F.3d 704, 710 (7th Cir.1996). Also, the existence of an exemption under the FLSA has been held to be a matter of affirmative defense that the employer has the burden of proving, *Corning Glass Works v. Brennan,* 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), and generally complaints need not anticipate or attempt to repel potential affirmative defenses. *Doe v. Smith,* 429 F.3d 706, 709 (7th Cir.2005). However, if it is apparent from the face of the complaint (and any supporting documents properly before the court) that no facts can be presented to contradict the existence of the § 207(k) "work period," then dismissal may be appropriate.

*3 The CBA provides that what it terms a "normal work period" shall in no circumstances exceed fourteen days. It states in relevant part: "The normal work period of employees assigned to work on a twenty-four (24) hour shift operation (herein called "shift employees"), shall not exceed fourteen (14) days. The normal work hours shall be based on an average forty-one and one-quarter (41-1/4) hour work week consisting daily of an average eight (8) hour shift assignment and an average one-quarter (1/4) hour training period." It also provides that "shift employees" shall be paid overtime based on a 41.25 hour average *work week.*

Defendant contends that the CBA conclusively establishes the existence of a work period that satisfies § 207(k) in two ways. First, it establishes the normal work period cannot be more than fourteen days. Second, the CBA's references to the hourly *average per workweek* and the basis for their overtime pay establish that the Plaintiffs work in weeks, i.e. seven day work periods.

Neither of those CBA provisions conclusively prove the existence of a § 207(k) "work period" though. First, while the CBA provides an explicit maximum amount of days that can make up a work period, it does not provide a minimum amount. Therefore, a work period contemplated by the CBA can be from one day up until fourteen days. Section 207(k) clearly instructs that any work period less than seven days will not qualify for the exemption to § 207(a). Second, Section 553.224 of the DOL regulations explains that the § 207(k) "work period" need not coincide with the duty cycle or pay period or with a particular day of the week or hour of the day. Thus, the CBA's references to the hourly *average per workweek* and the basis for their overtime pay is not in and of itself determinative of the duration of the § 207(k) "work period."

Plaintiffs have requested this Court to consider an affidavit submitted by one of the Plaintiffs, William F. Wood, Jr., concerning a purported absence of a work period under the FLSA in deciding the motion to dismiss. Plaintiffs propose that this Court treat the 12(b)(6) motion as a motion for summary judgment. The Court assumes that the Defendant approves of Plaintiffs' suggestion because the Defendant has submitted another extraneous document it wishes the Court to consider a copy of an email transmission in which Plaintiffs consent to the editing of the affidavit to change the term "calendar month" to "28 day". Taking into account the substitution of "28 day" for "calender month," the relevant passages of Officer Wood, Jr.'s affidavit would read as follows:

2. The work schedules are done on a 28 day basis.

...

4. The city has never established a work period of 14 days or any lesser number of days. To the extent that the system utilized by the City Police Department has anything resembling a work period it would be 28 days.

Although these documents are discussed below, the Court declines to convert the motion to dismiss into a summary judgment motion. A court will usually only convert a motion to dismiss into a motion for summary judgment when there are matters outside the pleadings at issue bearing on the existence of an affirmative defense and such conversion is in the interest of judicial economy.

*4 Were this Court to convert the motion and accept Officer Wood's revised affidavit and the email transmission into evidence, Defendant would still not be able to prove the existence of a § 207(k) "work period" for the following two reasons. First, the affidavit does not contain an admission that the officers worked in 28 day "work periods" under § 207(k). The affidavit merely states that the "work schedules are done on a [28 day] basis" and that "[t]o the extent that the system utilized by the [Defendant] has anything resembling a work period it would be a [28 day] basis." Plaintiff Woods' first statement references a work schedule, not a "work period". As discussed above, the two are not necessarily the same under the DOL regulations. Furthermore, there is nothing in the CBA or any other document before the Court that conclusively demonstrates the work schedule referenced in the affidavit is to be treated as a "work period".[FN3] Woods' second statement can hardly be characterized as an admission of fact either. It reads more like a sarcastic jab intended by its author to highlight the absurdity of the Defendant's position rather than to admit that there is in fact a 28 day work period applicable to the Plaintiffs.

FN3. Similarly, the affidavit does not establish the absence of a 14 day or 7 day work period either.
The second reason why the revised affidavit would not assist Defendant in securing summary judgment is that the CBA unambiguously sets the normal work period at no more than fourteen days, not twenty eight days. The fourteen day maximum contradicts any assertion by either Officer Woods or Defendant that the applicable work period is twenty eight days. In fact, after reading Defendant's memorandum and reply in support of its motion to dismiss, it is not at all clear that the Defendant has ever actually described the discrete duration of the work period it applies to its officers. A § 207(k) "work period" must be of some discernable finite length within seven through twenty eight continuous days. See 29 C.F.R. § 553.224.

## CONCLUSION

Defendant's evidence merely indicates to this Court that the work period mentioned by the CBA can last anywhere from one day up until fourteen days, or possibly 28 days. A work period must be from seven until twenty eight consecutive days to fall within the exemption provided by § 207(k) of the FLSA. Since Defendant has failed to show that Plaintiffs cannot prove any facts that would entitle them to relief under the FLSA, the 12(b)(6) motion fails. For the reasons stated above, the Defendant's Motion to Dismiss is DENIED.

N.D.Ill.,2008.
Wood v. City of Elgin
Slip Copy, 2008 WL 151382 (N.D.Ill.)

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 4109125 (N.D.Ill.)
**2007 WL 4109125 (N.D.Ill.)**

Zions First Nat. Bank v. Paul Green
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
ZIONS FIRST NATIONAL BANK, Plaintiff,
v.
PAUL GREEN, Sherrell Green, and Dorothy Loades,
Defendants.
**No. 07-C-3760.**

Nov. 16, 2007.

Steven A. Levy, Mary Anderson, Goldberg, Kohn,
Bell, Black, Rosenbloom & Moritz, Ltd., Chicago,
IL, for Plaintiff.
Paul Green, Chicago, IL, pro se.
Allen Price Walker, John A. Goudge, Martin Peter
Greene, Greene & Letts, Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

DAVID H. COAR, District Judge.
*1 Plaintiff Zions First National Bank ("Zions" or
"Plaintiff") brought this mortgage fraud action
against Defendants Paul Green, Sherrell Green, and
Dorothy Loades ("Loades") (collectively
"Defendants"), incorporating common law claims of
fraud, conspiracy, and negligent misrepresentation
and pursuant to this Court's diversity jurisdiction.
Now before this Court is Defendant Loades's motion
to dismiss all counts against her (Docket No. 18). For
the reasons stated below, the motion is DENIED in
part and GRANTED in part.

### FACTS[FN1]

> FN1. These facts are largely derived from
> the Plaintiff's complaint and, for the
> purposes of this motion, are assumed to be
> true with all reasonable inferences in
> favor of the Plaintiff. *Patel v. City of
> Chicago,* 383 F.3d 569, 572 (7th Cir.2004).

In December of 2004, Paul Green and Sherrell Green
(collectively "the Greens"), along with Bobbie Green

Campbell and his wife Eugene Campbell
(collectively "the Campbells"), approached real
estate agent Bruce Hackel ("Hackel") to purchase a
property located at 23450 Western Avenue in Park
Forest, Illinois ("the Property"). At the time, the
property was owned by Bill Ricketts ("Ricketts"),
and consisted of land and an office building listed for
sale at $550,000. The actual value of the Property is,
and at all times was, in the range of $320,000-
425,000. Nonetheless, the Greens hoped to finance
the purchase at a value of $1,100,000, with the excess
funds to be refunded to a company by the name of
Fresh Start, Inc-a company owned and/or operated by
Green-ostensibly for the purpose of improving the
property. Dorothy Loades was enlisted to appraise
the property, and on February 27, 2005, she valued it
at $1,125,000 ("Loades appraisal").

Based in some part on the Loades appraisal, Zions
agreed to provide a $825,000 mortgage loan to the
Campbells to finance their purchase of the property.
On June 2, 2005, Ricketts transferred title to Property
to the Campbells. The purported purchase price was
$1.1 million, financed with an $825,000 mortgage
loan from Zions to the Campbells. Line 1308 of the
Settlement Statement dictated that $550,000 of the
purchase amount would be paid to Fresh Start, Inc. as
part of the transaction.

In June of 2006, the Campbells defaulted on their
mortgage and Zions had a receiver appointed for the
property. At that time Zions discovered that the
Property was in a general state of disrepair. Little to
none of the $550,000 earmarked for property
improvements had been applied to that purpose.
Following the entry of a foreclosure judgment, Zions
had an appraisal performed on the Property as of
March 8, 2007. That appraisal shows the liquidation
value of the Property to be $320,000, and the fair
market value of the Property to be $425,000. Zions is
the current owner of the Property, having obtained
title to the Property through the foreclosure process.
Through the foreclosure, Zions obtained a $300,000
joint and several deficiency judgment against the
Campbells, but to date has not collected any amounts
owed pursuant to that judgment.

On July 5, 2007, Plaintiff filed a complaint with this

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4109125 (N.D.Ill.)
**2007 WL 4109125 (N.D.Ill.)**

Court, alleging: common law fraud against the Greens and Loades (Count I); conspiracy against the Greens and Loades (Count II); and, in the alternative, negligent misrepresentation against Loades (Count III). For the reasons stated below, this Court finds that dismissal of some claims against this Defendant is appropriate.

### LEGAL STANDARD

**\*2** On a motion to dismiss, the Court accepts all well-pleaded allegations in the plaintiff's complaint as true. Fed. R. Civ. Plaintiff. 12(b)(6). The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case. _Gibson v. City of Chicago_, 910 F.2d 1510, 1520 (7th Cir.1990) (citation omitted). A complaint should not be dismissed "unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Conley v. Gibson_, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

A complaint that complies with the Federal Rules of Civil Procedure cannot be dismissed because it fails to allege facts. The Rules require simply that the complaint state a claim; they do not require the complaint to plead facts that would establish the validity of that claim. _Higgs v. Carver_, 286 F.3d 437, 439 (7th Cir.2002). "All that need be specified are the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." _Id._ (citing _Beanstalk Group, Inc. v. AM General Corp._, 283 F.3d 856, 863 (7th Cir.2002)). The Seventh Circuit has held that stating a claim in a complaint in federal court requires only "a short statement, in plain (that is, non-legalistic) English, of the legal claim." _Kirksey v. R.J. Reynolds Tobacco Co._, 168 F.3d 1039, 1041 (7th Cir.1999). Plaintiffs "don't have to file long complaints, don't have to plead facts, don't have to plead legal theories." _Id._

That said, allegations of fraud are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). _See, e .g., Goren v. New Vision Intl._, 156 F.3d 721, 726 (7th Cir.1998). Under Rule 9(b), a plaintiff must plead "all averments of fraud ... with particularity." _Fed.R.Civ.P. 9(b)_. This amounts to requiring that plaintiff plead the "who, what, when and where of the fraud." _United States ex rel. Garst v. Lockheed-Martin Corp._, 328 F.3d 374, 376 (7th Cir.2003); _see also Tricontinental Indus., Ltd. v._, 475 F.3d 824 (7th Cir.2007.) ("To satisfy this requirement, Tricontinental must plead the "who, what, when, where, _and how"_ involved in the alleged fraud.") (citing _DiLeo v. Ernst & Young_, 901 F.2d 624, 627 (7th Cir.1990) (emphasis added). In other words, a plaintiff must provide the "identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." _Jepson, Inc. v. Makita Corp._, 34 F.3d 1321, 1327 (7th Cir.1994) (quoting _Uni*Quality, Inc. v. Infotronx, Inc._, 974 F.2d 918, 924 (7th Cir.1992)). Rule 9(b)'s particularity requirement may be relaxed "when the details are within the defendant's exclusive knowledge." _Id._ at 1328.

Fraudulent conspiracy claims are also subject to the heightened pleading standard of _Fed.R.Civ.P. 9(b)_. _Wolf v. City of Chicago Heights_, 828 F.Supp. 520, 524 (N.D.Ill.1993); _see also Borsellino v. Goldman Sachs Group, Inc._, 477 F.3d 502 (7th Cir.2007) ("A claim that 'sounds in fraud'-in other words, one that is premised upon a course of fraudulent conduct-can implicate Rule 9(b)'s heightened pleading requirements.").

### ANALYSIS

**\*3** With respect to the claims of common law fraud and conspiracy to commit that fraud, Defendant Loades generally claims that Plaintiff has not stated its case with particularity. As both parties acknowledge, Rule 9(b) requires that a plaintiff set forth the who, what, where, when, and how of the allegedly fraudulent conduct so that the defendant can adequately form a response to the fraud allegation. Defendant also maintains that the Complaint does not state a case for negligent misrepresentation as the appraisal is only treated as an opinion under relevant law.

a. _Count I: Fraud_

From the language of the Complaint it is apparent that Plaintiff is accusing Loades of falsely inflating her appraisal of the Property at 23450 Western Avenue for the sake of benefitting the Greens and/or the Campbells. In the alternative, should a meeting of the minds or ultimate intent to deceive be lacking,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4109125 (N.D.Ill.)
**2007 WL 4109125 (N.D.Ill.)**

Plaintiff pleads a theory of negligence according to which Loades grossly overestimated the Property's value. The language of the complaint makes clear all of the necessary elements of a particularized claim of fraud: The "who" is Defendant Loades herself; the "what" is a fraudulent appraisal of the property that ostensibly doubled its value; the "where" can be inferred as the site of the Property in question and the offices of Loades; the "when" is the date of the appraisal, or February 27, of 2005; and the "how" refers to the transmission of a knowingly inflated value. Plaintiff has therefore made clear the "identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Jepson*, 34 F.3d at 1327.

Defendant's various claims to the contrary are unavailing, as they focus on relatively minor matters. She alleges that "[t]here is no indication of how this alleged transmittal occurred and nowhere does plaintiff allege facts indicate [sic] that Loades transmitted the appraisal to plaintiff directly or that it was one of the 'potential lenders' who received the appraisal."Dismiss Mem. at 4. However, the manner in which the appraisal was transmitted-whether by fax or mail or email-is hardly a "key step" in Plaintiff's allegations; to expect Plaintiff to know such an unimportant detail without the benefit of an answer to its complaint or any discovery would be unreasonable. *See Jepson*, 34 F.3d at 1328. Similarly, the "when" factor is sufficiently clear for present purposes; it is reasonably apparent that the fraudulent statement of the appraisal was made on February 27, 2005, and the lack of a date for its transmission is not troubling.

Loades states that Plaintiff fails to allege "that Dorothy Loades actually made a false statement of fact or any form of misrepresentation to Zions First National Bank."Dismiss Mem. at 3. This argument appears to draw on the fact that the attached appraisal is made out to "Challenge Mortgage," rather than Zions, and the fact that her signature is absent from the form. Def. Dismiss Mem. at 1, fn. 1. However, it is clear from the record that whichever bank received the appraisal first, Plaintiff argues that Loades should have expected her appraisal to be used by a third party for a financial purpose in which her trustworthiness and accuracy would be at issue. *See*

Compl. ¶ 45 ("Dorothy Loades supplied the Loades Appraisal intending to induce other parties, including the Campbells, to act."). Liability for the accuracy of financial statements can extend beyond parties in direct privity, so long as the reliance of the other parties was foreseeable. Therefore whether or not Loades directly communicated with Zions in this transaction, or knew that Zions itself would ultimately be the lender, the issue is likely irrelevant so long as Plaintiff can show that the eventuality was foreseeable. *See, e.g., Impex Shrimp & Fish Co. v. Aetna Cas. and Sur. Co.,* 686 F.Supp. 183 (N.D.Ill.1985) ("Under Illinois principles of common law fraud, a plaintiff need not demonstrate privity with the defendant; he need only prove that the defendant intended him to rely on the defendant's fraudulent statement, or that the defendant had a special reason to expect the plaintiff to rely on his statement.") (collecting cases). The lack of a signature on the appraisal is also not compelling as a grounds for dismissal, as the Plaintiff might still prove that it was transmitted in that form by Loades.

**\*4** In any event, these are issues to be taken up at a later stage. For present purposes it is sufficient that Plaintiff claims that Loades had a duty to be accurate, that she deliberately failed to do so, and that her failure was relied upon by Zions after it was received. Whether or not Loades owed any such duty, and whether she owed that duty to Zions, is to be determined in light of a more complete record.

Defendant's other argument, that the actions of the parties are inappropriately "lumped together," is readily disregarded; it is unclear what confusion on the part of the Defendants can come from the idea that Loades manipulated her appraisal for the others' benefit-appraisal as a skill was unique to this Defendant, and was one which was allegedly necessary to further the fraudulent scheme. Her unique role in furthering the alleged malfeasance is sufficiently clear.

For these reasons, Defendant Loades's arguments with respect to the fraud claim are unavailing. Her motion to dismiss is DENIED with respect to Count I.

b. *Count II: Conspiracy*

Defendant Loades also maintains that the claim of

conspiracy in Count II should be dismissed, as it is subsumed by the claim for common law fraud in Count I and is otherwise not stated with particularity. In response, Plaintiff concedes that the two claims cannot be brought together, but nonetheless maintains that these two claims are presented in the alternative.

Whether or not these are alternative claims, they both must nonetheless follow the dictates of Rule 9(b).*See Wolf,* 828 F.Supp. at 524. To the extent that the second count alleges a conspiracy beyond the claim of falsifying the appraisal, it is unclear what fraudulent activities might support such a claim should Loades be found blameless under the first count. In its response, Plaintiff states in rather vague terms that "[e]ven if it was Green, as opposed to Loades, who committed the underlying act of fraud, that fraud could not have been consummated without a loan from Plaintiff, which was only made possible by virtue of the Loades appraisal."However, Plaintiff has provided no allegations of communications or plans for the conspiracy that might satisfy the particularity requirement should falsification of the appraisal fail as a claim. Based on the complaint, the only wrongful action against which Defendant Loades can reasonably prepare a defense involves the improper appraisal; any theory beyond that is vague and/or conclusory.

Defendant Loades's motion to dismiss is GRANTED with respect to Count II.

### c. *Count III: Negligent Misrepresentation*

Loades also maintains that Plaintiff's claim of negligent misrepresentation, brought against her alone, should be dismissed because Illinois treats appraisals as mere opinions that cannot be considered actionable misrepresentation. However, the only case cited for this proposition, *Sampen v. Dabrowski,* 222 Ill.App.3d 918, 165 Ill.Dec. 314, 584 N.E.2d 493 (Ill.App. 1 Dist.1991), does not support this allegation of a categorical rule. *Sampen* dealt with consumer fraud and breach of contract claims and, to the extent that it discussed the opinion-like nature of an appraisal, it suggests that the issue is dependent on the facts at hand. *See id.* at 495-96.In addition, the case cited by Plaintiff shows that it is at least possible that a mistaken appraisal might be actionable under a negligent misrepresentation theory. *See generally Duhl v. Nash Realty Inc.,* 102 Ill.App.3d 483, 490, 57

Ill.Dec. 904, 429 N.E.2d 1267, 1273 (Ill.App.1981) ("[A]ccepting plaintiffs' allegations as true, it follows that the defendants' [estimate of value] in this case could be found to have been meant by the parties to be understood as statements of fact to be relied upon rather than as expressions of mere opinion to be accepted solely as such."). In any event, it would be premature at this stage to find that Loades's appraisal was not a negligent statement of fact rather than opinion, and it therefore cannot be said "that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley,* 355 U.S. at 45-46.

**\*5** Defendant Loades's motion to dismiss is DENIED with respect to Count III.

### CONCLUSION

For the reasons stated above, Defendant Loades's motion to dismiss is DENIED in part and GRANTED in part.

N.D.Ill.,2007.

Zions First Nat. Bank v. Paul Green

Slip Copy, 2007 WL 4109125 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 1
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

▷Zwiercan v. General Motors Corp.
Pa.Com.Pl.,2002.
Shirley ZWIERCAN, et al., Plaintifffs
v.
GENERAL MOTORS CORP., et al., Defendants
**No. 3235 JUNETERM 1999.**

Sept. 11, 2002.

**Background:** Car buyer brought action against manufacturer for breach of implied warranty of merchantability and violation of Unfair Trade Practices and Consumer Protection Law (UTPCPL), alleging its failure to disclose defective front seats.

**Holdings:** The Court of Common Pleas, Philadelphia County, No. 3235, June Term 1999, Gene D. Cohen, J., held that:
(1) manufacturer had duty to disclose defects;
(2) buyer relied on manufacturer's misrepresentation; and
(3) recovery was not barred by economic-loss doctrine.

Motion granted in part and denied in part.

West Headnotes

**[1] Antitrust and Trade Regulation 29T ⇌193**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations
            29Tk191 Motor Vehicles
                29Tk193 k. Sale. Most Cited Cases
        (Formerly 92Hk9 Consumer Protection)

**Antitrust and Trade Regulation 29T ⇌234**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations
            29Tk232 Product Safety

                29Tk234 k. Motor Vehicles. Most Cited Cases
        (Formerly 92Hk9 Consumer Protection)
Automobile manufacturer had a duty to disclose alleged existence of defective front seats in its cars, for purposes of buyer's claim under the Unfair Trade Practices and Consumer Protection Law (UTPCPL); buyer was non-business customer, and manufacturer had knowledge of alleged defects superior to that of buyer. 73 P.S. § 201-2(4)(xxi).

**[2] Antitrust and Trade Regulation 29T ⇌369**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(E) Enforcement and Remedies
            29TIII(E)6 Evidence
                29Tk369 k. Weight and Sufficiency. Most Cited Cases
        (Formerly 92Hk9 Consumer Protection)
Car buyer's purchase of car with allegedly defective front seats established her reliance on manufacturer's failure to disclose defects, for purposes of claim under Unfair Trade Practices and Consumer Protection Law (UTPCPL). 73 P.S. § 201-2(4)(xxi).

**[3] Antitrust and Trade Regulation 29T ⇌132**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk132 k. Preemption. Most Cited Cases
        (Formerly 92Hk36.1 Consumer Protection)

**States 360 ⇌18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Under Supremacy Clause, car buyer's claim under Unfair Trade Practices and Consumer Protection Law (UTPCPL) that manufacturer failed to disclose alleged defects in front seats to National Highway

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Page 2
Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

Traffic Safety Administration (NHTSA) was preempted by federal law; this constituted a fraud on the agency claim. U.S.C.A. Const. Art. 6, cl. 2; 73 P.S. § 201-2(4)(xxi).

[4] **Antitrust and Trade Regulation 29T** ⌫138

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
           29Tk133 Nature and Elements
                29Tk138 k. Reliance; Causation; Injury, Loss, or Damage. Most Cited Cases
    (Formerly 92Hk9 Consumer Protection)
Economic-loss doctrine did not preclude car buyer from bringing claim against manufacturer under Unfair Trade Practices and Consumer Protection Law (UTPCPL) for allegedly failing to disclose defective front seats; as no collision had occurred, buyer could not bring warranty claim. 73 P.S. § 201-2(4)(xxi).

**Antitrust and Trade Regulation 29T** ⌫193

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations
           29Tk191 Motor Vehicles
                29Tk193 k. Sale. Most Cited Cases
    (Formerly 92Hk30, 92Hk9 Consumer Protection)

**Antitrust and Trade Regulation 29T** ⌫234

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations
           29Tk232 Product Safety
                29Tk234 k. Motor Vehicles. Most Cited Cases
    (Formerly 92Hk9 Consumer Protection)
Plaintiff could maintain her claim under the UTPCPL for defendant's failure to disclose that the front seats on certain vehicles that it manufactured are prone to collapse in rear-end collisions.

*ORDER and MEMORANDUM*

COHEN, J.

*1 AND NOW, this 11th day of SEPTEMBER, 2002, upon consideration of the Motion for Summary Judgment of Defendant, General Motors Corporation, Plaintiff Shirley Zwiercan's response thereto, and oral argument from the parties, and in accordance with the Memorandum Opinion being filed contemporaneously with this Order, it is hereby ORDERED and DECREED that the Motion is GRANTED in so far as Plaintiff is barred by federal preemption from claiming a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Act for statements made by Defendant to the National Highway Transportation Safety Administration, and DENIED as to the remaining claims.

*MEMORANDUM*

Defendant General Motors Corporation ("GM") has filed a Motion for Summary Judgment as to Plaintiff's claim for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. For the reasons set forth below, the Motion for Summary Judgment is Granted in part and Denied in part.

*BACKGROUND*

This action focuses on vehicles manufactured by GM between 1990 and 1999 (the "Class Vehicles"). The Plaintiff is the owner of a 1997 Chevy Blazer, which is considered a Class Vehicle. Plaintiff alleges that the front seats of all Class Vehicles are designed in such a way that the front seats are prone to collapse rearward during moderate speed rear-end collisions. Although the Plaintiff's vehicle has not been involved in a rear-end collision, she has brought claims, as a class representative, on behalf of herself and similarly situated owners of Class Vehicles, for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and breach of implied warranty of merchantability. On May 22, 2002, this Court granted Defendant's Motion for Summary Judgment as to the breach of warranty claim and denied summary judgment as to the UTPCPL claim.[FN1]

FN1. See *Shirley Zwiercan, et al. v. General Motors Corp., et al,* 2002 WL 1472335 (C.P. Phila. May 22, 2002)(Herron, J.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Page 3
Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

Now, before this Court is Defendant's Motion for Summary Judgment against the Plaintiff's remaining UTPCPL claim, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, and Plaintiff's Reply Memorandum in Support of Motion for Summary Judgment. In its Motion, Defendant asserts that Plaintiff's UTPCPL claim should be dismissed because Plaintiff's admissions establish that she cannot prove the elements of reliance and causation to support her UTPCPL claim. Additionally, Defendant argues that Plaintiff's UTPCPL claim should be dismissed because it is barred under the economic loss doctrine and, to the extent the Plaintiff's claim is based on Defendant's statements to the National Highway Traffic Safety Administration ("NHTSA"), such claim is preempted under the Supremacy Clause of the United States Constitution.

Upon review of the pleadings and after hearing oral argument, Defendant's Motion for Summary Judgment is Granted in part and Denied in part.

### DISCUSSION

In accordance with Pa. R. Civ. P. 1035.2, this Court may grant Summary Judgment where the evidentiary record shows either that the material facts are undisputed, or the facts are insufficient to make out a *prima facie* cause of action or defense. *McCarthy v. Dan Lepore & Sons Co., Inc.,* 724 A.2d 938, 940 (Pa.Super.Ct.1998). To succeed, a Defendant moving for summary judgment must make a showing that the Plaintiff is unable to satisfy an element in his cause of action. *Basile v. H & R Block,* 777 A.2d 95, 100 (Pa.Super.Ct.2001). Here, the Defendant alleges that based on Plaintiff's admissions, the Plaintiff has failed to establish the essential elements of "Reliance, Materiality, and Causation" with respect to Defendant's acts or omissions. To avoid summary judgment, the Plaintiff, as the non-moving party, must adduce sufficient evidence on the issues essential to its case and on which it bears the burden of proof such that a reasonable jury could find in favor of the Plaintiff. *McCarthy,* 724 A.2d at 940. In addressing the issue, this Court is bound to review the facts in a light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Manzetti v. Mercy Hospital of Pittsburgh,* 565 Pa. 471, 776 A.2d 938, 945 (2001). The Plaintiff, must be given the benefit of all

reasonable inferences. *Samarin v. GAF Corp.,* 391 Pa.Super. 340, 350, 571 A.2d 398, 403 (1989). Therefore, this Court must first determine whether the Plaintiff has plead each of the required elements for her claim under the UTPCPL.[FN2]

> FN2. The issue of damages was previously addressed in the Defendant's first Motion for Summary Judgment in this case. This Court denied Defendant's first motion to dismiss the Plaintiff's UTPCPL claim, holding that Plaintiff's cost to repair the alleged defective seats is sufficient to sustain a claim of damages in a UTPCPL action. *Zwiercan v. General Motors,* 2002 WL 1472335 (C.P. Phila. May 22, 2001)(Herron, J.); See also, *Grant v. Bridgestone Firestone, Inc.,* 2002 WL 372941 (C.P. Phila., Jan 10, 2002)(ruling that cost to repair a defect is sufficient to bring a claim under the UTPCPL); *Solarz v. Daimler Chrysler Corp.,* 2002 WL 452218 (C.P.Phila., Mar. 13, 2002)(Herron, J.)(holding that failure to allege actual loss or out-of-pocket cost is not fatal to a UTPCPL claim).

I. Plaintiff's UTPCPL Claim Survives Summary Judgment.

**\*2** Plaintiff claims that the Defendant's acts and omissions violated the UTPCPL. Based on the complaint, it appears that Plaintiff is alleging a violation of UTPCPL § 201-2(4)(xxi). Section 201-2(4)(xxi) defines unfair methods of competition or unfair or deceptive acts or practices as "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."(the "Catchall Provision").[FN3] To establish a claim under the Catchall Provision, a party must either prove the elements of common law fraud, or that Defendant's deceptive conduct caused harm to the Plaintiff. *See.e.g. Weiler v. SmithKline Beecham,* 53 Pa. D. & C. 4th 449 (C.P.Phila.2001)(Herron, J.); *Foultz v. Erie Ins. Exchange,* 2002 WL 452115 (C.P.Phila., Mar. 13, 2002)(Herron, J.); *Abrams v. Toyota Motor Credit Corp.,* 2001 WL 1807357 (C.P.Phila., Dec. 5, 2000)(Herron, J.).[FN4] Although this Court's holdings establish that "reliance" is not a required element for a Plaintiff to proceed under a "deceptive" practice claim, as discussed below, Plaintiff's "reliance" has been established in the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

instant case.

FN3. Because this Section of the UTPCPL appears to cover all other acts of fraud or deceptive conduct that are not specifically enumerated in the other articles of UTPCPL § 201-2(4), Pennsylvania Courts have dubbed § 201-2(4)(xxi) the "Catchall Provision."

FN4. Defendant urges this Court to reconsider its opinions holding that "reliance" is not a required element to prove establish a "deceptive" act under the Catchall Provision. As this Court finds that reliance has been sufficiently plead in the present case, the Court finds it unnecessary to address our previous decisions. Defendant further argues that *Weinberg v. Sun Company Inc., 565 Pa. 612, 777 A.2d 442 (2001)* requires this Court to dismiss Plaintiff's claim for failure to demonstrate reliance. The instant case is distinguishable. In *Weinberg,* the Pennsylvania Supreme Court, reviewing a false advertising claim, considered whether a party could bring a UTPCPL claim when the party did *not* hear the alleged misleading advertisement. In the instant case, this Court is addressing whether a manufacturer who fails to warn the public of a known safety defect can be held liable for engaging in a deceptive or fraudulent practice. The underlying issue, therefore, is whether the manufacturer breached its duty to speak, not whether the manufacturer falsely advertised its product.

The first substantive question presented by the parties is whether the Plaintiff has alleged facts sufficient to establish that she relied on the acts or omissions of the Defendant. Although Defendant correctly states that its general advertising slogans, are not actionable because they are "mere puffery," the crux of the issue lies not in the statements made by the Defendant, but rather, its silence when it had a duty to speak. Defendant argues that it was under no duty to disclose the alleged existence of defective seats in its cars.[FN5] Defendant further argues that it cannot be liable because it made no statements to Plaintiff concerning the safety of its seats. The defendant is mistaken; silence can be actionable.

FN5. Defendant does not brief the issue of whether a duty to speak exists between a manufacturer and its customers, but instead focuses the argument on whether nonfeasance is actionable under the UTPCPL, citing *Gordon v. Pennsylvania Blue Shield, 378 Pa.Super. 256, 548 A.2d 600 (1988)*(holding that an insurer's failure to pay an insured's claim amounts to nonfeasance and is not actionable under the UTPCPL). Defendant's argument misses the point. In the present case, the critical issue is whether the Defendant's intentional failure to warn against a known defect is actionable under the UTPCPL. Such behavior, if true, would be an act of misfeasance not nonfeasance as the Defendant suggests.

Pennsylvania law holds that the deliberate non-disclosure of a material fact is just as actionable as an intentional false statement. *Neuman v. Corn Exchange Nat. Bank & Trust Co., 356 Pa. 442, 51 A.2d 759, 764 (1947).* In defining "fraud," the Pennsylvania Supreme Court held that fraud exists when "deception of another ... is brought about by a misrepresentation of fact or by silence."*In Re McClellan's Estate, 365 Pa. 401, 407-08, 75 A.2d 595 (1950)*(emphasis added). However, in order for silence to be actionable there must be a duty to speak. *Smith v. Renaut, 387 Pa.Super. 299, 306, 564 A.2d 188, 192 (1989); See generally,*37 C.J.S. Fraud § 15.

The duty to speak most often arises when there is a fiduciary or confidential relationship between parties.[FN6] In the context of business transactions, when there has been no active misrepresentation, and no fiduciary or confidential relationship exists, there is an apparent absence of Pennsylvania case law discussing the existence of a duty to speak.

FN6. It is undisputed that the Plaintiff and Defendant were not in a fiduciary or confidential relationship.

[1] Here, the Court must determine whether a duty exists between a manufacturer and an ordinary consumer. In this regard, although this Court is not bound by such decisions, federal courts interpreting Pennsylvania law have held that there is generally no duty to speak where the parties are "sophisticated

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Page 5
Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

business entities, entrusted with equal knowledge of the facts."*Duquesne Light Co. v. Westinghouse Electric Corporation,* 66 F.3d 604, 612 (3d Cir.1995); *City of Rome v. Glanton,* 958 F.Supp. 1026 (E.D.Pa.1997)(discussing the application of the Restatement (Second) of Torts § 551). In *Duquesne,* the Third Circuit addressed, in a breach of contract case, whether a nuclear steam equipment supplier's alleged non-disclosures concerning equipment sold to an electric utility company constituted actionable fraud. The Court recognized that Pennsylvania cases were unclear regarding when a duty to speak arises outside of the fiduciary or confidential relationship context.[FN7] *Duquesne,* 66 F.3d at 612. Following the guidance in analogous Pennsylvania cases,[FN8] the Court held that there is no duty to speak between two sophisticated business entities with equal knowledge of the facts and legal representation, because neither party is reliant on the other for information. *Id.* at 612.

> FN7. The Court acknowledged that Pennsylvania courts have often cited to the Restatement of Torts § 551 (Second), in adopting the duty to speak requirement. However the Court found that Pennsylvania case law does not provide much guidance as to what extent the courts are bound by the Restatement's discrete criteria.

> FN8. *Neuman v. Corn Exchange Nat. Bank & Trust Co.,* 356 Pa. 442, 51 A.2d 759, 764 (1947)(finding that a Bank's misrepresentations to a purchaser of stock was actionable because the purchaser was justified in relying on Bank's statements since the Bank, as the holder and seller of the stock is the proper source of information); *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 285 A.2d 451 (1971)(holding that the continuous business relationship between a selling corporation and a purchaser gave rise to a duty to speak based on reliance between the parties). *Quashnock v. Frost,* 299 Pa.Super. 9, 445 A.2d 121 (1982)(addressing termite infestation of a home, the court stated that disclosure is required "since *caveat emptor* is no longer ridgedly applied to the complete exclusion of any moral or legal obligation to disclose material facts."); *Smith v. Renaut,*

387 Pa.Super. 299, 564 A.2d 188 (1989)(relying on *Quashnock,* to hold that a seller has an affirmative duty to disclose a known termite infestation.)

**\*3** In the instant case, however, the parties do not have the same level of sophistication or knowledge. The Plaintiff as an ordinary purchaser of an automobile, does not have access to the same information as the Defendant manufacturer. Plaintiff also alleges that Defendant's internal memoranda and studies, as well as its defense in prior litigation involving the alleged defective seats, establish that Defendant knew of the alleged material defect in its seats years before Plaintiff purchased her vehicle. Therefore, unlike the facts under *Duquesne,* here, the unsophisticated Plaintiff is at the mercy of the Defendant to inform her of a known safety defect. Following the persuasive reasoning of *Duquesne,* this Court finds that a manufacturer has a duty to disclose a known latent defect to a purchaser when the purchaser is unsophisticated and does not have access to the same information as the manufacturer. Under the facts of this case, a reasonable jury could find that the Defendant had a duty to inform the Plaintiff of the alleged safety defect in its Class Vehicles.

Moreover, the Pennsylvania Supreme Court mandated that the UTPCPL is to be liberally construed to prevent unfair or deceptive practices and place the seller and consumer on more equal footing. *Commonwealth v. Monumental Properties Inc.,* 459 Pa. 450, 458-60, 329 A.2d 812, 816-17 (1974). Recognizing a duty to speak in the present case is consistent with general fraud concepts and is in line with the purpose of the UTPCPL. Such an interpretation further defines the scope of the UTPCPL, by giving meaning to the "duty to speak" requirement, and by placing consumers on more equal footing with manufacturers. Moreover, this Court finds support for this conclusion in the holdings of other jurisdictions.

In cases involving defective parts in automobiles, other courts have held that a defendant manufacturer has a duty to disclose knowledge of material defects in its products if the consumer could not be expected to otherwise learn of the defect. *In Re Ford Motor Company Ignition Switch Products Liability Litigation,* 2001 WL 1266317 (D.N.J.1997). In *In Re Ford Motor Company,* the Third Circuit addressed

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

Page 6

the issue of fraudulent concealment in a case involving defective ignition switches installed in Ford vehicles. Although the Third Circuit dismissed some of the plaintiffs' claims with leave to amend their compliant to plead with more specificity, the Court found that the third party manufacturer of the defective part had a duty to disclose the defect. *Id.* at *20–*21.The Court stated "that the applicable standard in most states across the country could be generally expressed as follows: a defendant manufacturer has a duty to disclose its knowledge, if any, of material defects in the items manufactured, so long as the consumer could not be expected to otherwise obtain the information."*Id.* at *21

Similarly, in a case involving General Motors, a New York State court denied General Motor's motion to dismiss, holding that the Attorney General of New York properly stated a cause of action alleging fraudulent suppression and concealment of a material fact, where General Motors allegedly knew that a part would prematurely fail and did not disclose that fact to consumers. *State of New York v. General Motors Corp.,* 120 Misc.2d 371, 446 N.Y.S.2d 124 (Sup.Ct.1983). The Court based its analysis on New York's general common law fraud provisions, which have been interpreted to find a duty to speak when a party has superior knowledge or has means of knowledge not available to both parties. *Id.* at 374;*Seealso,Kuelling v. Roderick Lean Mfg. Co.,* 183 N.Y. 78, 75 N.E. 1098, 1102 (1905). Additionally, the Second Circuit, applying New York law, concluded that the duty to speak, in the context of a business transaction, has been found in three circumstances: 1) where the party has made a partial or ambiguous statement; 2) where the parties are in a fiduciary or confidential relationship; and 3) where one party possesses superior knowledge, not readily available to the other party. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citations omitted).

**\*4** Additional support for finding a duty to speak in consumer protection cases can be found in the decisions of the Illinois Supreme Court. In interpreting Illinois' consumer protection statute, the Court held that omissions or concealment of a material fact in the conduct of trade or commerce constitutes fraud. *Connick v. Suzuki Motor Company, Ltd.,* 174 Ill.2d 482, 504, 221 Ill.Dec. 389, 675 N.E.2d 584, 595 (1996)*rehearing denied* (1997). In

*Connick,* the Court found that Suzuki's failure to warn Plaintiffs of the vehicle's known tendency to roll over was a violation of the consumer fraud statute. *Id.* at 504-05, 221 Ill.Dec. 389, 675 N.E.2d 584 The Court also found that such a defect would be material to a buyer of the car and that it is unnecessary to plead a common law duty to disclose in order to state a valid claim of consumer fraud based on an omission or concealment. *Id.* at 505, 221 Ill.Dec. 389, 675 N.E.2d 584,*citingCelex Group, Inc. v. Executive Gallery, Inc.,* 877 F.Supp. 1114, 1129 (N.D.Ill.1995).

Therefore, based on analogous Pennsylvania law, as well as, federal decisions and precedent from other state courts, this Court finds that a duty to speak exists, in the context of a business transaction with an ordinary non-business consumer, when the seller has superior knowledge of a material fact that is unavailable to the consumer. Plaintiff has alleged facts that, if true, establish that Defendant knew of the alleged defect and that knowledge of such a defect would have been material to the Plaintiff's decision to purchase her vehicle. It is disingenuous for the Defendant to argue that knowledge of a defective front seat that could seriously injure or kill its occupant would not be material to a consumer.

[2] Next this Court must determine whether the Plaintiff has established that she relied on the acts or omissions of the Defendant. Defendant argues that Plaintiff's deposition testimony establishes that the Plaintiff did not rely on Defendant's acts and could not have relied on Defendant's alleged non-statements. This Court finds that the Defendant both incorrectly summarizes Plaintiff's deposition testimony, and misstates the issue.

First, the Plaintiff's deposition testimony sufficiently establishes that she "relied" on the Defendant's silence and purchased her Class Vehicle believing that the front seats in her car were safe and free from defect. The Plaintiff states, in reference to the front seats of her car that, "she assumed they were safe [and that] they stayed where they are ... I just assumed from being a General Motors product that I had for a long time that they were safe."Pl.'s Resp. Mem of Law at 36. This statement supports Plaintiff's claim that Defendant's silence lead her to assume the front seats were safe.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

Defendant argues that the Plaintiff cannot establish actual reliance because Plaintiff "relied" on a statement that was never uttered. When actual reliance cannot be established, courts have looked to the nature of the parties' relationship and materiality of the statement to establish a presumption of reliance. Relying on general principles of contract law, the Pennsylvania Supreme Court has held that "reliance" can be presumed when a party makes material misrepresentations. See e.g., *New York Life Ins. Co. v. Brandwene et ux.*, 316 Pa. 218, 172 A.2d 669 (1934); *In Re McClellan's Estate*, 365 Pa. 401, 408, 75 A.2d 595 (1950)(citing Restatement of Contracts § 476(1)); See also, *Vasquez v. Superior Court of San Joaquin County*, 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, (1971)(holding that the rule in California and elsewhere is that reliance upon alleged false representations can be inferred from the circumstances).

**\*5** More recently, in *Peerless Wall and Window Coverings, Inc. v. Synchronics, Inc.*, 85 F.Supp.2d 519 (W.D.Pa.2000) a federal court cited the Pennsylvania Supreme Court in addressing the question of a "presumption of reliance." In *Peerless,* a case involving a software manufacturer's failure to disclose that its software was not Y2K compliant, the Court stated that "when one would not have entered the transaction in the presence of a full disclosure of a material fact ... that person has obviously relied."*Id.* at 534 (relying on *New York Life Ins. Co. v. Brandwene*, 316 Pa. 218, 172 A. 669 (1934)). Although the Court dismissed the plaintiff's fraud claim, it did so because the plaintiff could not present evidence that plaintiff would not have purchased the software if the defect had been disclosed. Therefore, the *Peerless,* opinion holds open the possibility that where, as here, a Plaintiff can demonstrate that they would not have purchased a product had they been aware of the defect, reliance on the defendant's omission can be presumed.

Moreover, this Court held, in certifying a class UTPCPL claim, that when a duty to speak exists, reliance by the class plaintiffs is implicit and is established by operation of law. *Katlin v. Tremoglie*, 1999 WL 1577980 (Pa.Com.Pl.), 43 Pa. D. & C. 4th 373, 391 (1999). In *Katlin,* a therapist failed to reveal to his patients the fact that he was not licensed to practice medicine. *Id.* The Court found that the "doctor" had a duty to disclose the material fact that he was not licensed to practice medicine. In reaching this holding, the Court relied on *Basile v. H & R Block*, 729 A.2d 574, 584 (Pa. Super Ct.1999)[FN9] to extend the presumption of reliance beyond the fiduciary relationship and apply it to a special or confidential relationship.*Id.* Recognizing that the presumption is not based on the form but rather the substance of the relationship, the Court found no compelling reason not to extend the duty to speak to a case involving allegations of a breach of a confidential relationship. *Id.*

> FN9. Although the *Basile* decision was appealed, reversed and remanded, the proposition for which *Katlin* Court relied on was affirmed on appeal in *Basile v. H & R Block*, 777 A.2d 95 (Pa. Super Ct.2001). On appeal, the Superior Court held that the trial court abused its discretion in granting summary judgment. The Court reversed the trial court decision, holding that a tax consultant's failure to inform clients about interest rates charged on the company's accelerated tax refund service constituted a breach of a fiduciary duty. Furthermore, the Court found, that the facts, if true, established that a fiduciary duty not only existed between the clients and the individual tax consultant, but also between the clients and H & R Block as the orchestrating entity. *Id. at 107.*The Court stated that "the evidence suggests that the plaintiffs' trusted not the individuals who staffed any given Block office, but Block as an organization."*Id.* The Court was persuaded by the pervasive media presence of H & R Block and the fact that the Company, through the advertising of its "Rapid Refund" service, attempted to "achieve a false intimacy" with the customer. *Id.* Therefore, based on the confidential relationship, the Court found a level of trust and reliance on the part of the customers.

Here, the Plaintiff has established that the Defendant's silence regarding the alleged defect in the Class Vehicles was material to the Plaintiff's decision to purchase the car. The Plaintiff testified that she assumed in the face of Defendant's silence that the front seats of the car were safe, and that had

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

## Part 5 of 5

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

Defendant disclosed that there was a safety defect in the front seats, she would not have bought the car. Pl.'s Resp. Mem of Law at 37. Following the Court's rationale in *Peerless,* and *Katlin,* Plaintiff's reliance on Defendant's active concealment can be presumed because the concealment of the alleged defect would be material to the Plaintiff's decision to purchase her car. In addition, the Plaintiff's own testimony supports finding that she relied on Defendant's material omission. Therefore, this Court finds that it is appropriate under these facts to expand the presumption of reliance.

II. The Plaintiff is Barred from Using the UTPCPL to Recover for Alleged Fraudulent Statements made to the NHTSA.

**\*6    [3]** In its Motion, Defendant asserts that to the extent that Plaintiff's UTPCPL claim is based on alleged misrepresentations to the NHTSA, such "statements" cannot form the basis of a state action to enforce NHTSA regulations. Defendant is correct in stating that in so far as Plaintiff's UTPCPL claim seeks redress for misstatements to the NHTSA, it is a "fraud on the agency" claim, which is properly preempted by federal law. See*Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001)(holding that a patient's state law fraud claims against a manufacturer were a "fraud on the agency" claim, because the state claim was based on manufacturer's statements to the Food and Drug Administration ("FDA"), which the FDA has authority to police itself). Therefore, because the Plaintiff cannot use the UTPCPL to enforce an alleged fraud on a federal agency, Defendant's Motion for Summary Judgment on this issue is granted.

III. The Economic Loss Doctrine Does Not Bar Plaintiff's UTPCPL Claim

**[4]** Defendant argues that Plaintiff's UTPCPL claim is barred by the economic loss doctrine because Plaintiff has suffered no personal injury. Defendant suggests that because Plaintiff's only harm is the cost to repair the allegedly defective seats, her appropriate remedy, if any, is based in contract law.[FN10]Plaintiff responds that the economic loss doctrine does not apply under these facts because the doctrine does not apply to the alleged intentional acts by Defendant.

FN10. This Court, in partially granting Defendant's first Summary Judgment Motion, held that Plaintiff has no claim for breach of contract until her front seats actually manifest a failure. *Zwiercan v. General Motors,* 2002 WL 1472335 (Pa.Com.Pl. May 22, 2002)(Herron, J.)

In Pennsylvania, the purpose of the economic loss doctrine is to maintain the separate sphere of the law of contract and tort. *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.,* 387 Pa.Super. 537, 550, 564 A.2d 919, 925 (1989). Originally, the economic loss doctrine was applied to products liability claims, with the expectation that parties could recover purely economic damages under contract theory. *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). The reach of the doctrine has been justified on the basis that parties can protect themselves by negotiating the terms of a manufacturer's liability.*Id. at 872-73.*Pennsylvania courts addressing the economic loss doctrine have accepted the Supreme Court's rationale and focused on the ability of the purchaser to recover economic harm under a breach of warranty claim. *REM Coal Co. Inc. v. Clark Equipment Co.,* 386 Pa.Super. 401, 563 A.2d 128 (1989). In an attempt to guide future courts on the application of the doctrine, the Superior Court stated that "the proper focus is not on the type of risk, but the actual harm for which the plaintiff seeks recovery."*Id. at 133.*Unfortunately, there is much confusion in the Pennsylvania cases as to the scope and breadth of the economic loss doctrine. For the reasons discussed below, this Court finds that the economic loss doctrine does not bar Plaintiff's UTPCPL claim.[FN11]

FN11. In declining to extend the application of the economic loss doctrine to intentional fraud claims, this Court noted, there is a absence of Pennsylvania case law on the subject, but found support for the proposition that the doctrine should not bar claims where the representation is intentionally false. *First Republic Bank v. Brand,* 2001 WL 333942627, 50 Pa. D. & C. 4th 329 (2000)(Herron, J.); *See*also,*Teledyne Tech. Inc. v. Freedom Forge Corp.,* No. 3398, Slip. op. 20 n. 17 (C.P. Phila., April 19, 2002)(Sheppard, J.); *Amico v. Radius*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251
**2002 WL 31053838 (Pa.Com.Pl.)**

_Communications,_ 2001 WL 1807924 (Pa.Com.Pl.)(Herron, J.). The Defendant asks this Court to reconsider its previous holdings in light of the Third Circuit's holding in _Werwinski v. Ford Motor Co., 286 F.3d 661 (3d Cir.2002)._ However this Court finds the instant case distinguishable from both our previous cases and _Werwinski._

Recently, the Third Circuit in _Werwinski v. Ford Motor Co., 286 F.3d 661 (3d Cir.2002)_ held that a Plaintiff's UTPCPL claim was barred by the economic loss doctrine. Although not bound by the Third Circuit's opinion, this Court will address the decision in an effort to clarify the law. In _Werwinski,_ the Third Circuit's ruling focused on the parties appropriate redress under contract law. The case involved a class of consumers that had incurred substantial costs to repair failed transmissions in their vehicles. The parties alleged that the manufacturer knowingly installed defective parts in the transmissions which caused the transmissions to fail. Here, the alleged defects in the front seats of the Class Vehicles have not yet manifested themselves, because the cars have, fortunately, not been involved in rear-end collisions. Despite the fact that the front seats have not yet injured anyone, and the Plaintiff cannot bring a breach of contract claim, the Plaintiff's UTPCPL claim for intentional concealment and deceptive practices is ripe. The Plaintiff need not wait until she is physically injured to bring a claim for deceptive practices when the manufacturer had a duty to inform her of a known defect.

*7 Although, the _Werwinski_ Court applied the economic loss doctrine to UTPCPL claims, it did so on the belief that exempting statutory claims from the doctrine would nullify the doctrine. While this Court agrees that in certain cases the doctrine should apply to bar statutory claims, a blanket application of the economic loss doctrine to the UTPCPL fails to address the purpose of enacting the statute. The Pennsylvania Supreme Court clearly stated that the purpose of the UTPCPL is to be liberally construed to prevent unfair or deceptive practices. _Commonwealth v. Monumental Properties Inc., 459 Pa. 450, 458-60, 329 A.2d 812, 816-17 (1974)._ To apply the economic loss doctrine to _all_ claims under the UTPCPL has the potential to eviscerate the UTPCPL itself. The instant case is an example of the danger of applying the economic loss doctrine too broadly.

Here, the Plaintiff has raised a legitimate question as to whether the Defendant's actions were deceptive under the UTPCPL, but does not have a viable breach of contract claim. To apply the economic loss doctrine to bar the Plaintiff's statutory claim here would frustrate the intent of the UTPCPL, in this context, and would be inconsistent with the purpose of the economic loss doctrine. This is not a case where the Plaintiff is attempting to bring a tort action in lieu of a breach of contract claim. If the doctrine were to bar the Plaintiff's action, the Plaintiff would be estopped from litigating a claim which the legislature specifically provided for when it amended the UTPCPL to protect against deceptive practices. Therefore, this Court finds that, under the facts of this case, the Plaintiff's UTPCPL claim should not be barred by the economic loss doctrine.

### CONCLUSION

For the reasons stated above, this Court holds that the Plaintiff has alleged sufficient facts which if accepted by a finder of fact, would be sufficient to establish a valid UTPCPL claim against Defendant and such claim is not barred by the economic loss doctrine. In so far as Plaintiff seeks recovery under the UTPCPL for statements made by the Defendant to the NHTSA, such claim is barred by federal preemption. Accordingly, this Court is Granting in part and Denying in part Defendant's Motion for Summary Judgment.

Pa.Com.Pl.,2002.
Zwiercan v. General Motors Corp.
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 118 B.R. 588, 595

**In re: DIAMOND MORTGAGE CORPORATION OF ILLINOIS, an Illinois corporation, d/b/a Diamond Financial Services, Inc., I.D. # 36-3144958. Debtor, John ARAMOWICZ, et al., Plaintiffs, v. Lloyd BRIDGES, et al., Defendant**

**Bankruptcy No. 86 B 13066, Adversary No. 87 A 76**

**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*118 B.R. 588; 1989 Bankr. LEXIS 2666; 1990-2 Trade Cas. (CCH) P69,192*

**September 15, 1989, Decided**

**COUNSEL:** [**1]  Attorneys for Plaintiffs: Jerome S. Lamet, Stephanie W. Kanwit, Margaret F. Woulfe, Lamet, Kanwit & Associates, Chicago, Illinois.

Attorneys for Yaffe: Ronald L. Futterman, Phyllis L. Crocker, Hartunian, Futterman & Howard Chtd., Chicago, Illinois.

Attorneys for Bridges: Daniel R. Formeller, Jacqueline A. Criswell, Tressler, Soderstrom, Maloney & Priess, Chicago, Illinois.

Attorneys for Hamilton: Lowell E. Sachnoff, Sara R. Wolff, Stuart J. Chanen, Sachnoff, Weaver & Rubenstein Ltd., Chicago, Illinois.

**JUDGES:** Robert E. Ginsberg, United States Bankruptcy Judge.

**OPINION BY:** GINSBERG

**OPINION**

[*589]  AMENDED Memorandum, Opinion and Order

This matter comes to be heard on defendant George Hamilton's, ("Hamilton"), motion for summary judgment. The Court has jurisdiction over the proceeding pursuant to *28 U.S.C. § 1334* and Local Rule 2.33 of the United States District Court of Illinois referring bankruptcy cases and proceedings to this Court. This is a noncore proceeding under *28 U.S.C. § 157(c)(1)*. The following constitutes the Court's findings of fact and conclusions of law. For the reasons contained herein, Hamilton's motion is denied.

FACTS

The Court is all too familiar with [**2]  the facts of this case. Diamond Mortgage Corporation of Illinois, ("Diamond"), was an Illinois corporation and licensed mortgage broker. Diamond was in the business of loaning money to consumer homeowners. Diamond generally lent money to high risk consumer borrowers. All of Diamond's loans were secured by a first mortgage on the borrowers' homes. Diamond attracted borrowers through widespread advertising. A number of Diamond's television advertisements featured George Hamilton, a well known television and movie actor.

Diamond, however, had no independent source of capital. The money Diamond used for its mortgage loans came from an affiliated corporation, A.J. Obie and Associates, Inc., ("Obie"), an Illinois corporation. Obie raised the money that it advanced to Diamond from public investors through an aggressive advertising campaign.

The theory behind the structure of the Obie investments as marketed to the public was that each investment was to be matched with one or more specific Diamond mortgages. From the investor's viewpoint, what was to happen was an investor would [*590]  give his/her money to Obie which in turn would lend the investor's money to Diamond. Diamond would [**3]  lend the funds to the borrower who would sign a note

118 B.R. 588, *590; 1989 Bankr. LEXIS 2666, **3;
1990-2 Trade Cas. (CCH) P69,192

agreeing to repay the funds plus interest at a rate well above prime. The borrower would also give Diamond a mortgage interest in the borrower's home as security for the note. Diamond would transfer the note and mortgage to Obie. Obie would then assign this mortgage to the investor. When an investor was matched to one or more mortgages representing the amount of the investment, the investor in effect became the mortgagee to Diamond's borrower. Thus, the risk of the investment was reduced because it was backed by a lien on the Diamond borrower's home. Diamond was to continue to service the mortgage for the investor for fee based on a percentage of the borrower's payments. The notes carried a high interest rate, usually 15% or more, which in theory enabled the investor to get a generous return on his/her investment even after Diamond's servicing fee was taken out of the monthly mortgage payment.

That was the theory. Unfortunately, the theory was not generally applied in practice. The money invested in Obie often did not go toward funding Diamond mortgages, and most of the investors were never matched to mortgages. Rather, in a classic [**4] Ponzi scheme fashion, apparently much of the investors' money went toward paying off other investors. In addition, another large chunk of the money went to support the lavish lifestyles of certain members of the management of Diamond and Obie. In its short, unhappy life, Obie raised more than $ 40,000,000 from an unsuspecting investing public. Many of those investors were elderly people who sank a large portion of their life savings into Obie.

Not surprisingly, the fraud was discovered and the house of cards came tumbling down in the summer of 1986. On August 25, 1986 Diamond and Obie filed voluntary Chapter 11 petitions. Several of the Diamond/Obie principals were indicted, convicted and went to jail. However, it soon became apparent that huge sums had been siphoned off and apparently lost. Little chance exists for recovery from the debtors' principals. The shortfall between the amount of mortgage loans made by Diamond and the amount of money Obie raised from investors was in the tens of millions of dollars. It quickly became apparent that the investors, particularly those who had not been matched to a mortgage, were looking at huge loses on their investment. [1] Thus, some investors [**5] began to look around for solvent people or entities who could be blamed for the losses they had suffered. These plaintiffs, all Obie investors, sued the defendant Hamilton, Lloyd Bridges (the actor of Sea

Hunt fame who served as Obie's primary television speaker) and one of Diamond/Obie's advertising agencies, alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Rev. stat., ch. 121 1/2, para. 261 et seq. (1987).

> 1   In fact, under the liquidation plan confirmed by this court, the unmatched investors will be lucky to get back 40 Cents on the dollar.

Hamilton has brought the instant motion for summary judgment claiming that there are no material factual disputes and that he is entitled to judgment as a matter of law. For reasons stated herein, that motion is denied.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [**6] issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Rule 56(c) Fed. R. Civ. P. Celotex Corporation v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Howland v. Kilquist, 833 F.2d 639, 642 (7th Cir. 1987); Cameron v. Frances Slocum Bank & Trust Co., 824 F.2d 570, 573 [*591] (7th Cir. 1987); Shlay v. Montgomery, 802 F.2d 918, 920 (7th Cir. 1986).* The primary purpose for granting a motion for summary judgment is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Farries v. Stanadyne/Chicago Div., 832 F.2d 374, 379 (7th Cir. 1987).* On a summary judgment motion, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson, 477 U.S. at 255.* Moreover, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson, 477 U.S. at 248; Howland, 833 F.2d at 642.*

The party seeking summary [**7] judgment always bears the initial responsibility of informing the court of the basis for its motion by identifying those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *Celotex, 477 U.S. at 323.* This is essentially a requirement that the

118 B.R. 588, *591; 1989 Bankr. LEXIS 2666, **7;
1990-2 Trade Cas. (CCH) P69,192

moving party on a motion for summary judgment make a prima facie showing that it is entitled to summary judgment. 10A *Wright, Miller & Kane, Federal Practice & Procedure, Civil,* § 2727. Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings. Rather, its response must show that there is a genuine issue for trial. *Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 248.* However, if evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson, 477 U.S. at 249-50.*

## DISCUSSION

Hamilton contends, without citing any authority, that the plaintiffs, in order to assert a claim under § [**8] 262 of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Rev. Stat., ch. 121 1/2 para. 261 *et seq.*, (1987)("ICFA"), must prove that Hamilton: 1) was an endorser of Obie securities; 2) was an expert endorser of Obie securities; 3) derived a direct financial benefit from the sale of Obie securities; 4) made actionable false statements in the Diamond advertisements in which he appeared 5) actively participated in the preparation of the Diamond ads and knew or should have known those ads contained false statements; 6) intended for Obie investors to rely on his statements in the Diamond ads; 7) that plaintiffs in fact relied on Hamilton's statements in the Diamond ads in deciding to invest in Obie; and 8) that the statements made by Hamilton in the Diamond ads were the proximate cause of plaintiff's alleged injuries. According to Hamilton, because the plaintiffs cannot prove any or all of these elements and there are no material facts in issue, he is entitled to judgment as a matter of law.

The plaintiffs respond that Hamilton has mischaracterized the necessary elements that plaintiffs must prove in order to establish a claim under the ICFA. Moreover, the plaintiffs [**9] allege that there remain genuine issues of material fact in dispute with respect to those requirements that do exist for establishing a claim under the IFCA. The plaintiffs assert that a question of fact exists as to whether Hamilton knew or should have known that some of the statements he made in the Diamond commercials were not true. In this regard they focus primarily on the business and personal relationships between Hamilton and the debtors' principals, the

Greenbergs. The plaintiffs point out that Hamilton became involved in a limited partnership investment with the Greenbergs. During the course of that investment, Hamilton learned that the contributions made by the Greenbergs to the partnership came from Diamond rather than from the Greenbergs personally, although the partnership had nothing to do with Diamond. In addition, according to the plaintiffs, in 1983, the Greenbergs informed Hamilton that they and Diamond had suffered serious financial losses, and they were encountering severe [*592] financial difficulties. [2] Nevertheless, at the same time the plaintiffs claim he knew of those warning flags, Hamilton was telling people in television commercials that Diamond [**10] was the "Midwest's number one mortgage broker" and that it lent "hundreds of millions of dollars". The plaintiffs claim that these assertions were untrue, that Hamilton knew or should have known that they were untrue and that his false advertisements for Diamond were a proximate cause of the loss of their Obie investments.

> 2    Hamilton knew or should have known that something clearly was wrong with Diamond, that money that should have been being used to fund more mortgages was being diverted to the Greenbergs' personal use and that the Greenbergs and Diamond were in deep financial trouble. The plaintiffs also point out that by 1985 at least, Hamilton knew that Diamond was in financial trouble because it was having problems meeting its obligations under its 1981 contract with Hamilton.

The starting point of the Court's analysis is § 262 of the ICFA which provides:

> § 2. Unfair methods of competition and unfair deceptive acts or practices including but not limited to the use or employment of any deception, [**11] fraud, false pretenses, false promise, misrepresentation or the concealment, suppression or omission of any material fact with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" approved August 5, 1965, in the conduct of any trade or commerce are hereby

118 B.R. 588, *592; 1989 Bankr. LEXIS 2666, **11;
1990-2 Trade Cas. (CCH) P69,192

declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

Ill. Rev. Stat., ch. 121 1/2, para. 262 (1987).

To establish a violation of the ICFA, a plaintiff must show a misrepresentation, concealment or omission, of a material fact with the intent that others rely on that fact. *Kleidon v. Rizza Chevrolet, Inc., 173 Ill. App. 3d 116, 527 N.E.2d 374, 122 Ill. Dec. 876 (1988).* In order to be considered material, the concealed fact must have been such that had the other party known of it, he would have acted in a different manner. *Id at 376.*

The "ICFA" affords broader consumer protection than does the common law action of fraud since the Act also prohibits any "deception or false promise". *Perlman v. Time, Inc., 64 Ill. App. 3d 190,* [**12] *198, 380 N.E.2d 1040, 1047, 20 Ill. Dec. 831 (1978).* Thus, the case of *Kramer v. Unitas, 831 F.2d 994 (11th Cir. 1987),* upon which Hamilton urges this court to give weight really is inapplicable. *Kramer,* unlike the case at bar, was based on a common law fraud action. Illinois courts have recognized the legislative mandate that courts utilize the ICFA to the utmost degree in eradicating all forms of deceptive and unfair business practices and grant appropriate remedies to injured parties. *Duhl v. Nash Realty, Inc., 102 Ill. App. 3d 483, 429 N.E.2d 1267, 1277, 57 Ill. Dec. 904 (1981).* To that end, it is well established under the Act that the seller's intent is not important and under certain circumstances, a plaintiff may recover under the Act for negligent misrepresentations. *Id.*

The ICFA provides that in construing § 262 courts should consider interpretations of the Federal Trade Commission and the federal courts relating to § 5(a) of the Federal Trade Commission Act. Ill. Rev. Stat., ch. 121 1/2 para. 262 (1987). [3] The essence of the plaintiffs' complaint against Hamilton is that Hamilton allegedly violated the FTC's Guides Concerning Use of Endorsements and [**13] Testimonials in Advertising ("Guides"). *See 16 CFR § 255.0. et seq.*

> 3  The ICFA is patterned after § 5(a) of the Federal Trade Commission Act, which declares unlawful "unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." *15 U.S.C. § 45(a) (1973).* The ICFA, however, unlike the Federal Trade Commission Act, authorizes a private cause of

action for deceptive commercial conduct. *See, Crowder v. Bob Oberling Enterprises, 148 Ill. App. 3d 313, 499 N.E.2d 115, 101 Ill. Dec. 748 (1986).*

Under those Guides, the first question is whether Hamilton was a spokesperson or endorser. The plaintiffs contend that Hamilton was an endorser of Diamond and that under the provisions of the FTC [*593] Guides, he had an affirmative duty to substantiate the truthfulness of the endorsements and obtain independent and reliable information regarding the financial stability of Obie and Diamond -- a duty which, according to the plaintiffs, Hamilton failed to carry out. Hamilton, [**14] on the other hand, takes the position that he was not an endorser of either Diamond or Obie, but rather merely a spokesperson on behalf of Diamond. Hamilton asserts that in fact the commercials reflect only the views of Diamond and not Hamilton's own personal views. Hamilton also argues that even if this Court finds he was an endorser of Diamond, the plaintiffs must prove that statements contained in the Diamond advertisements were also endorsements of Obie investments.

In order to determine whether Hamilton was an endorser, the Court must look to the FTC's Guides. The Guides provide that:

> For purposes of this part, an "endorsement" means any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) which message consumers are likely to believe reflects the opinions, beliefs, findings, or experience of a party other than the sponsoring advertiser. The party whose opinions, beliefs, findings, or experience the message appears to reflect will be called the endorser and may be an individual, group or institution. (emphasis [**15] added)

*16 C.F.R. § 255.0(b).*

Hamilton's advertisements for Diamond included the following statements:

118 B.R. 588, *593; 1989 Bankr. LEXIS 2666, **15;
1990-2 Trade Cas. (CCH) P69,192

"Hundreds of millions of dollars. That's how much Diamond has arranged in new first mortgages during the many years I've been talking to Midwest homeowners."

"For many years now, I've been telling homeowners how Diamond can help them to a better life."

"Do call the Midwest's number one mortgage broker, because Diamond wants to be your friend."

Whether the commercials did, in fact, reflect Hamilton's views or Diamond's views is irrelevant. The crucial question is whether a reasonable consumer would regard those commercials as expressing Diamond's views or those of Hamilton. *Ramson v. Layne, 668 F. Supp. 1162 (N.D. Ill. 1987).* Clearly, Hamilton's message could be viewed by a reasonable consumer as an endorsement of Diamond by Hamilton. The advertisements had the capacity to lead reasonable consumers to believe that the statements reflected Hamilton's "opinions, beliefs, findings or experience" concerning Diamond mortgages. Hamilton did more than merely introduce Diamond or just invite the public to call Diamond for more information. *Compare Kramer* [**16] *v. Unitas, 831 F.2d 994 (11th Cir. 1987).* [4] The fact that Hamilton did not state that he was expressing his personal opinion does not preclude a finding that consumers were likely to have believed he was doing so. *Ramson v. Layne, 668 F. Supp. 1162,* (N.D. Ill. 1987). The test is what "consumers are likely to believe". *Id.* Hamilton did not say these were not his views. Instead he said in effect: "I've been saying this for years. Rely on me. Diamond is OK."

4 The Unitas in *Kramer* was Johnny Unitas, the great quarterback for the late lamented Baltimore Colts. In *Kramer,* the court found that Unitas said nothing that constituted a "representation." However, the holding of that case has little application to the instant case as the facts differ significantly. Unitas performed as a spokesman in radio spots for a mortgage/investment broker. In the commercials, Unitas identified himself as a famous football player and introduced his "friends at First Fidelity." After a representative of First Fidelity announced that "you can earn up to 18.33% annual yield," that the company meets "all prudent man requirements," Unitas

reappeared and closed by inviting the public to call First Fidelity for additional information. *Kramer v. Unitas, 831 F.2d 994, 995-96 (11th Cir. 1987).* Both the district court and the 11th Circuit found that although Unitas' voice may have initially caught the plaintiffs' attention, nothing he said or did constituted a "representation" which would support the plaintiffs' fraud claims, but merely invited further inquiries. *Id., at 998-99.*

[**17] Hamilton goes on to argue that even if he is deemed an endorser of Diamond [*594] mortgages and Obie investments, the plaintiffs must establish that he was in fact an expert in each of those fields. Hamilton contends that he is hardly an expert in financial matters, so plaintiff's case must fail on this ground. In support of that proposition Hamilton cites three FTC consent decrees. [5] These three decrees, according to Hamilton, set the standard of endorser liability. As Hamilton sees it, since all three FTC decrees involved experts, it follows that only an expert be an endorser.

5 *Glass, 95 F.T.C. 246 (1980); Cooga Mooga, Inc., 92 F.T.C. 310 (1978),* modified *98 F.T.C. 814 (1981);* and *Cooper, 94 F.T.C. 674 (1979).*

The simple answer is that there is no requirement of expertise for something to qualify as an endorsement under the ICFA. The Guides define an expert as "an individual, group, or institution possessing, as a result of experience, study or training, knowledge of a particular subject, [**18] which knowledge is superior to that generally acquired by ordinary individuals", *16 C.F.R. § 255.0(d).* However, nowhere in the Guides does it state that in order for an endorser to be liable, he/she must be an "expert endorser". Rather, § 255.1 speaks in general terms as to the responsibility of an endorser. § 255.1 provides in pertinent part that:

> Endorsements must always reflect the honest opinions, findings, beliefs, or experience of the endorser. Furthermore, they may not contain any representations which would be deceptive or could not be substantiated if made directly by the advertiser.

*16 C.F.R. § 255.1(a).*

It is evident that § 255.1 does not differentiate

118 B.R. 588, *594; 1989 Bankr. LEXIS 2666, **18;
1990-2 Trade Cas. (CCH) P69,192

between the liability of a nonexpert "endorser" and an "expert endorser". It does not use the work "expert" at all. This court will not read words and requirements into § 255.1(a) that are not there.

It is true that three FTC rulings relied on by Hamilton all do involve expert endorsers. However, the fact that all three were experts was accidental and irrelevant to the outcome. Hamilton has cited no ruling or decision which relieves an endorser of liability on account of lack of expertise. In addition, [**19] it is of significance that the regulations, which postdate the consent decrees, contain no express or implied requirement of endorser expertise. In fact, the examples are to the contrary. *See, e.g.,* 16 C.F.R. § 255.5 Example 2.

A requirement of endorser expertise is also illogical. Hamilton, as an endorser of Diamond had a duty not to make any representations which would be deceptive regardless of his expertise or lack thereof. Hamilton cannot offer his opinions about Diamond with a view towards inducing others to rely on his credibility by responding positively to his advertisements and then, when the statements in the advertisements prove to be false and misleading, say he is not liable because he was not qualified to make the statements he made.

Hamilton's next contention is that in order to assert a claim under the ICFA and the FTCA, the plaintiffs must prove that Hamilton derived a direct financial benefit from his alleged misrepresentations and omissions. Hamilton claims that the FTC consent decrees suggest that for an endorser to be liable under the FTCA or the ICFA, he or she must have a direct financial interest related to the actual sale of the product.

Once again, [**20] Hamilton is making up a nonexistent requirement under the ICFA. In *Ramson v. Layne, supra,* Judge Shadur was presented with the same argument regarding actor Lloyd Bridges' claim that he did not have a financial interest in his advertisements for Obie. Bridges, like Hamilton, relied on the language of the FTC consent decrees as the basis for this test. Judge Shadur, however, found that the language in those cases "did not purport to state such an interest as a condition of 'endorser' status -- [financial interest is important] merely as a relevant matter for disclosure." *668 F. Supp. 1168 n.14.* Moreover, Judge Shadur noted that the FTC no longer considers it relevant, even for disclosure purposes, that an endorser [*595] has a financial interest in the

sale of a product. *668 F. Supp. 1169.* This Court finds Judge Shadur's reasoning persuasive. [6]

> 6    The record certainly supports the conclusion that the "trade or commerce" of Ill. Rev. Stat. ch. 12 121 1/2, para. 261 § 1(f) requirement was satisfied with respect to both Diamond and Hamilton. Diamond was in the loan business and paid Hamilton very generously to endorse its business.

[**21] Hamilton next questions whether any of the statements in the Hamilton-Diamond commercials were false or misleading. The plaintiffs' claim that Hamilton's boast that Diamond was "the Midwest's number one mortgage broker" was false and misleading. This statement, according to the plaintiffs, went beyond "puffing." Hamilton, takes the position that the statement was "classic puffing," which is not actionable under the ICFA.

The defense of "puffing," in essence is an argument that a defendant's representation is merely an "opinion" as opposed to a "fact." *Hageman v. Twin City Chrysler-Plymouth, Inc., 681 F. Supp. 303, 308-309 (M.D. N.C. 1988).* While a seller has some latitude in "puffing" the product being sold, the seller is not permitted to misrepresent the product or to assign to it benefits or virtues it does not possess. *Gulf Oil Corp. v. F.T.C., 150 F.2d 106, 109 (5th Cir. 1945).* It is well recognized that advertising which merely states that one product is superior, is not actionable. *Smith-Victor Corporation v. Sylvania Electric Products, Inc., 242 F. Supp. 302, 308 (N.D. Ill. 1965).* Whether a statement is puffing or claim of fact, is, however, a question of fact. [**22] *See People ex rel. Hartigan v. Maclean Hunter Publishing, 119 Ill. App. 3d 1049, 1058, 457 N.E.2d 480, 75 Ill. Dec. 486 (1983).*

In this situation, the analysis of puffing versus claim of fact is complicated by plaintiffs' argument that in endorsing Diamond, Hamilton was really indirectly endorsing Obie's sale of securities to an unsuspecting investing public. What may be only puffing as to Diamond may be a good deal more as to Obie. Most borrowers don't worry greatly whether their lender is "Number 1." All borrowers want is the money. In general they do not care who lends it to them beyond trying to find the lowest interest rate available. On the other hand, representations that Diamond was a solid, secure company would be of great importance to potential Obie

118 B.R. 588, *595; 1989 Bankr. LEXIS 2666, **22;
1990-2 Trade Cas. (CCH) P69,192

investors. After all they were being asked to sink that money into Obie investments backed by Diamond mortgages. If Diamond was indeed "number one" (i.e. a solid mortgage broker), those Obie investments would be reasonably safe. However, if Diamond was not what it appeared to be -- what Hamilton's advertisements made it appear to be -- then the risk of the Obie investments increased markedly. Thus, what might be puffing [**23] to Diamond borrowers could easily become a material misrepresentation to an Obie investor. The fact is Diamond was not the secure entity Hamilton portrayed it to be in his commercials. Therefore, if Hamilton was selling Obie securities, he may well have misrepresented material facts.

But that leads to a quantum leap in this lawsuit. For all that appears, Hamilton was only soliciting borrowers for Diamond. Plaintiffs, however, claim that he was an essential tool in the fraudulent marketing of Obie investments. Obie investments were to be backed by Diamond mortgages. The plaintiffs claim that Hamilton's endorsement of Diamond was a significant element in convincing them that a Diamond/Obie investment was sound. Reaching this conclusion and imposing liability on Hamilton for his Diamond ads in favor of Obie investors requires several more links in the chain. First, the Obie investors must show that Hamilton knew or should have known that the Diamond commercials were false. Clearly there is evidence in the record that arguably could have put Hamilton on warning that something was wrong in the Diamond/Obie empire including the strange financing of the Pleasant View partnerships (with [**24] the Greenbergs' use of Diamond's money for their own and Hamilton's purposes) and Hamilton's own problems [*596] in collecting from Diamond for his commercials.

The next thing the plaintiffs must prove is that Hamilton knew or should have known that those

commercials could be used to sell Obie investments. Again, there is evidence in the record, which if established at trial, could support this conclusion, including the fact Hamilton knew that Bridges was working for the Greenbergs and again the fact that Hamilton knew or should have known that the Greenbergs were in financial trouble. The fact that Hamilton did not intend subjectively to sell Obie investments is irrelevant. The question is whether objectively he knew or should have known his commercials would be so used.

The final two questions, whether the commercials were so used (i.e., whether the plaintiffs in fact relied on Hamilton's Diamond commercials in making their Obie investments), and whether that evidence proximately caused their losses are the subject of a battle between the plaintiffs' affidavits filed with their response to the instant motion for summary judgment and their earlier deposition testimony. This [**25] is not a situation where the affidavits simply contradict the deposition. Compare Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir. 1985). Instead, here there are internal inconsistencies in the depositions as well as conflicts between the depositions and affidavits. The court believes these inconsistencies can best be resolved at trial where the court will have an opportunity to measure the credibility of the plaintiffs' testimony.

CONCLUSION

The Court finds that there remain genuine issues of material fact in dispute. Accordingly, the Court will deny Hamilton's motion for summary judgment.

IT IS HEREBY ORDERED that defendant George Hamilton's Motion for Summary Judgment is denied.

1 of 1 DOCUMENT

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2008, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE JULY 31, 2008 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 16 -- COMMERCIAL PRACTICES
CHAPTER II -- CONSUMER PRODUCT SAFETY COMMISSION
SUBCHAPTER B -- CONSUMER PRODUCT SAFETY ACT REGULATIONS
PART 1117 -- REPORTING OF CHOKING INCIDENTS INVOLVING MARBLES, SMALL BALLS, LATEX
BALLOONS AND OTHER SMALL PARTS

**Go to the CFR Archive Directory**

*16 CFR 1117.1*

§ 1117.1 Purpose.

The purpose of this part is to set forth the Commission's interpretative regulations for reporting of choking incidents required by the Child Safety Protection Act. The statute requires that each manufacturer, distributor, retailer, and importer of a marble, small ball, or latex balloon, or a toy or a game that contains a marble, small ball, latex balloon, or other small part, shall report to the Commission any information obtained by such manufacturer, distributor, retailer, or importer which reasonably supports the conclusion that an incident occurred in which a child (regardless of age) choked on such a marble, small ball, or latex balloon or on a marble, small ball, latex balloon, or other small part contained in such toy or game and, as a result of that incident the child died, suffered serious injury, ceased breathing for any length of time, or was treated by a medical professional.

**HISTORY:** *[60 FR 10493,* Feb. 27, 1995]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
Section 102 of the Child Safety Protection Act (Pub. L. No. 103-267), section 16(b), *15 U.S.C. 2065*(b) and *5 U.S.C. 553.*

**NOTES:** NOTES APPLICABLE TO ENTIRE CHAPTER:
EDITORIAL NOTE: For documents affecting chapter II on rule review under the Regulatory Flexibility Act see *52 FR 5079,* Feb. 19, 1987 and *54 FR 601,* Jan. 9, 1989.

152 words

LEXSTAT 16 CFR 1117.3

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2008, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE JULY 31, 2008 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 16 -- COMMERCIAL PRACTICES
CHAPTER II -- CONSUMER PRODUCT SAFETY COMMISSION
SUBCHAPTER B -- CONSUMER PRODUCT SAFETY ACT REGULATIONS
PART 1117 -- REPORTING OF CHOKING INCIDENTS INVOLVING MARBLES, SMALL BALLS, LATEX
BALLOONS AND OTHER SMALL PARTS

**Go to the CFR Archive Directory**

*16 CFR 1117.3*

§ 1117.3 Reportable information.

A subject firm shall report any information it obtains which reasonably supports the conclusion that a reportable incident occurred. Generally, firms should report any information provided to the company, orally or in writing, which states that a child choked on a marble, small ball, latex balloon, or on a marble, small ball, latex balloon or other small part contained in a toy or game and, as a result of that incident the child died, suffered serious injury, ceased breathing for any length of time, or was treated by a medical professional. Subject firms must not wait until they have investigated the incident or conclusively resolved whether the information is accurate or whether their product was involved in the incident. Firms shall not wait to determine conclusively the cause of the death, injury, cessation of breathing or necessity for treatment. An allegation that such a result followed the choking incident is sufficient to require a report.

**HISTORY:** *[60 FR 10494,* Feb. 27, 1995]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
Section 102 of the Child Safety Protection Act (Pub. L. No. 103-267), section 16(b), *15 U.S.C. 2065*(b) and *5 U.S.C. 553.*

**NOTES:** NOTES APPLICABLE TO ENTIRE CHAPTER:
EDITORIAL NOTE: For documents affecting chapter II on rule review under the Regulatory Flexibility Act see *52 FR 5079,* Feb. 19, 1987 and *54 FR 601,* Jan. 9, 1989.

162 words

1 of 1 DOCUMENT

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2008, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE JULY 31, 2008 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 16 -- COMMERCIAL PRACTICES
CHAPTER II -- CONSUMER PRODUCT SAFETY COMMISSION
SUBCHAPTER B -- CONSUMER PRODUCT SAFETY ACT REGULATIONS
PART 1117 -- REPORTING OF CHOKING INCIDENTS INVOLVING MARBLES, SMALL BALLS, LATEX
BALLOONS AND OTHER SMALL PARTS

**Go to the CFR Archive Directory**

*16 CFR 1117.9*

§ 1117.9 Prohibited acts and sanctions.

(a) Whoever knowingly and willfully falsifies or conceals a material fact in a report submitted under this part is subject to criminal penalties under *18 U.S.C. 1001.*

(b) A failure to report to the Commission in a timely fashion as required by this part is a prohibited act under section 19(a)(3) of the CPSA, *15 U.S.C. 2068*(a)(3).

(c) A subject firm that knowingly fails to report is subject to civil penalties under section 20 of the CPSA, *15 U.S.C. 2069.* "Knowing" means the having of actual knowledge or the presumed having of knowledge deemed to be possessed by a reasonable person who acts in the circumstances, including knowledge obtainable upon the exercise of due care to ascertain the truth of representations. Section 20(d) of the CPSA, *15 U.S.C. 2069*(d).

(d) Any person who knowingly and willfully violates section 19 of this Act after having received notice of noncompliance from the Commission may be subject to criminal penalties under section 21 of the CPSA, *15 U.S.C. 2070.*

**HISTORY:** *[60 FR 10495,* Feb. 27, 1995]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
Section 102 of the Child Safety Protection Act (Pub. L. No. 103-267), section 16(b), *15 U.S.C. 2065*(b) and *5 U.S.C. 553.*

**NOTES:** NOTES APPLICABLE TO ENTIRE CHAPTER:
EDITORIAL NOTE: For documents affecting chapter II on rule review under the Regulatory Flexibility Act see *52 FR 5079,* Feb. 19, 1987 and *54 FR 601,* Jan. 9, 1989.

210 words

LEXSTAT 16 CFR 1500.18

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2008, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

\*\*\* THIS SECTION IS CURRENT THROUGH THE JULY 31, 2008 ISSUE OF \*\*\*
\*\*\* THE FEDERAL REGISTER \*\*\*

TITLE 16 -- COMMERCIAL PRACTICES
CHAPTER II -- CONSUMER PRODUCT SAFETY COMMISSION
SUBCHAPTER C -- FEDERAL HAZARDOUS SUBSTANCES ACT REGULATIONS
PART 1500 -- HAZARDOUS SUBSTANCES AND ARTICLES; ADMINISTRATION AND ENFORCEMENT
REGULATIONS

**Go to the CFR Archive Directory**

*16 CFR 1500.18*

§ 1500.18 Banned toys and other banned articles intended for use by children.

(a) Toys and other articles presenting mechanical hazards. Under the authority of sections 2(f)(1)(D) and 24 of the act and pursuant to the provisions of section 3(e) of the act, the Commission has determined that the following types of toys or other articles intended for use by children present a mechanical hazard within the meaning of section 2(s) of the act because in normal use, or when subjected to reasonably foreseeable damage or abuse, the design or manufacture presents an unreasonable risk of personal injury or illness:

(1) Any toy rattle containing, either internally or externally, rigid wires, sharp protrusions, or loose small objects that have the potential for causing lacerations, puncture wound injury, aspiration, ingestion, or other injury. (But see § 1500.86(a)(1)).

(2) Any toy having noisemaking components or attachments capable of being dislodged by the operating features of the toy or capable of being deliberately removed by a child, which toy has the potential for causing laceration, puncture wound injury, aspiration, ingestion, or other injury.

(3) Any doll, stuffed animal, or other similar toy having internal or external components that have the potential for causing laceration, puncture wound injury, or other similar injury. (But see § 1500.86(a)(2)); (See also §§ 1500.48 and 1500.49).

(4) Lawn darts and other similar sharp-pointed toys usually intended for outdoor use and having the potential for causing puncture wound injury.

(5) Caps (paper or plastic) intended for use with toy guns and toy guns not intended for use with caps if such caps when so used or such toy guns produce impulse-type sound at a peak pressure level at or above 138 decibels, referred to 0.0002 dyne per square centimeter, when measured in an anechoic chamber at a distance of 25 centimeters (or the distance at which the sound source ordinarily would be from the ear of the child using it if such distance is less than 25 centimeters) in any direction from the source of the sound. This paragraph is an interim regulation pending further investigation to determine whether prevention of damage to the hearing of children requires revision hereof.

(6) Any article known as a "baby-bouncer," "walker-jumper," or "baby-walker" and any other similar article (referred to in this paragraph as "article(s)") which is intended to support very young children while sitting walking, bouncing, jumping, and/or reclining, and which because of its design has any exposed parts capable of causing amputation, crushing, lacerations, fractures, hematomas, bruises, or other injuries to fingers, toes, or other parts of the anatomy of young children. Included among, but not limited to, the design features of such articles which classify the articles as banned hazardous substances are:

(i) The areas about the point on each side of the article where the frame components are joined together to form an "X" shape capable of producing a scissoring, shearing, or pinching effect.

(ii) Other areas where two or more parts are joined in such manner as to permit a rotational movement capable of exerting a scissoring, shearing, or pinching effect.

(iii) Exposed coil springs which may expand sufficiently to allow an infant's finger, toe, or any other part of the anatomy to be inserted, in whole or in part, and injured by being caught between the coils of the spring or between the spring and another part of the article.

(iv) Holes in plates or tubes which provide the possibility of insertion, in whole or in part, of a finger, toe, or any part of the anatomy that could then be injured by the movement of another part of the article.

(v) Design and construction that permits accidental collapse while in use. (But see § 1500.86(a)(4)).

(7) Toys usually known as clacker balls and consisting of two balls of plastic or another material connected by a length of line or cord or similar connector (referred to as "cord" in § 1500.86(a)(5)), intended to be operated in a rhythmic manner by an upward and downward motion of the hand so that the two balls will meet forcefully at the top and bottom of two semicircles thus causing a "clacking" sound, which toys present a mechanical hazard because their design or manufacture presents an unreasonable risk of personal injury from fracture, fragmentations, or disassembly of the toy and from propulsion of the toy or its part(s). (But see § 1500.86(a)(5).) This does not include products that are constructed so that the connecting members consist of plastic rods integrally molded to the balls and are mounted on a pivot so that movement of the balls is essentially limited to a single plane.

(8) Any pacifier that does not meet the requirements of 16 CFR part 1511 and that is introduced into interstate commerce after February 26, 1978.

(9) Any toy or other article intended for use by children under 3 years of age which presents a choking, aspiration, or ingestion hazard because of small parts as determined by part 1501 of this chapter and which is introduced into interstate commerce after January 1, 1980. For purposes of this regulation, introduction into interstate commerce is defined as follows: A toy or children's article manufactured outside the United States is introduced into interstate commerce when it is first brought within a U.S. port of entry. A toy or children's article manufactured in the United States is introduced into interstate commerce (1) at the time of its first interstate sale, or (2) at the time of its first intrastate sale if one or more of its components and/or raw materials were received interstate, whichever occurs earlier. Part 1501 defines the term "toy or other article intended for use by children under 3," as used in this regulation, and exempts certain products from banning under this regulation.

(10)-(11) [Reserved]

(12) Any bicycle as defined in § 1512.2(a) of this chapter (except a bicycle that is a "track bicycle" or a "one-of-a-kind bicycle" as defined in § 1512.2 (d) and (e) of this chapter) that is introduced into interstate commerce on or after May 11, 1976, and that does not comply with the requirements of part 1512 of this chapter, except for §§ 1512.5(c)(3), 1512.9(a), 1512.18(e) and 1512.18(f) which become effective November 13, 1976.

(13) Any full-size baby crib (as defined in § 1508.1(a) of this chapter) that is introduced into interstate commerce

on or after February 1, 1974, and that does not comply with the requirements of §§ 1508.2 through 1508.10 of this chapter; and any full size baby crib (as defined in § 1508.1(a) of this chapter) that is manufactured on or after April 27, 1983, and that does not comply with §§ 1508.2 through 1508.11 of this chapter.

(14) Any non-full-size baby crib (as defined in § 1509.2 of this chapter) that is introduced into interstate commerce after August 9, 1976, and that does not comply with the requirements of §§ 1509.3 through 1509.12 of this chapter; and any non-full size baby crib (as defined in § 1509.2 of this chapter) that is manufactured on or after April 27, 1983, and that does not comply with §§ 1509.3 through 1509.13 of this chapter.

(15) Any rattle (as defined in § 1510.2 of this chapter) that is introduced into interstate commerce on or after August 21, 1978, and that does not comply with the requirements of part 1510 of this chapter. For purposes of the regulation, introduction into interstate commerce is defined as follows: A rattle manufactured outside the United States is introduced into interstate commerce when it is first brought within a U.S. port of entry. A rattle manufactured in the United States is introduced into interstate commerce (a) at the time of its first interstate sale, or (b) at the time of its first intrastate sale if one or more of its components and/or raw materials were received interstate.

(16)(i) Any article known as an "infant cushion" or "infant pillow," and any other similar article, which has all of the following characteristics:

(A) Has a flexible fabric covering. The term fabric includes those materials covered by the definition of "fabric" in section 2(f) of the Flammable Fabrics Act, *15 U.S.C. 1191*(f).

(B) Is loosely filled with a granular material, including but not limited to, polystyrene beads or pellets.

(C) Is easily flattened.

(D) Is capable of conforming to the body or face of an infant.

(E) Is intended or promoted for use by children under one year of age.

(ii) Findings -- (A) General. In order to issue a rule under section 2(q)(1) of the Federal Hazardous Substance Act (FHSA), *15 U.S.C. 1261*(q)(1), classifying a substance or article as a banned hazardous substance, the FHSA requires the Commission to make certain findings and to include these findings in the regulation. These findings are discussed in paragraphs (a)(16)(ii) (B) through (D) of this section.

(B) Voluntary standard. No findings concerning compliance with or adequacy of a voluntary standard are necessary since no voluntary standard addressing infant cushions has been adopted or implemented.

(C) Relationship of benefits to costs. The Commission estimates that the removal of infant cushions from the market will result in total annual benefits of approximately five million dollars. The potential costs to businesses are expected to be offset by production of other products, and the potential costs to consumers are likely to be offset by the availability of substitutes for a comparable price.

(D) Least burdensome requirement. The Commission considered labeling and a design or performance standard as alternatives to the ban. The Commission does not believe that any form of labeling would have a significant effect in preventing the hazard associated with infant cushions. The Commission also concluded that no feasible standard exists that would address the hazard. Thus, the Commission determined that a ban of infant cushions is the least burdensome alternative that would prevent or adequately reduce the risk of injury.

(17) Any ball intended for children under three years of age that, under the influence of its own weight, passes, in any orientation, entirely through a circular hole with a diameter of 1.75 inches (44.4 mm.) in a rigid template 1/4 inches (6 mm.) thick. In testing to evaluate compliance with this paragraph, the diameter of opening in the Commission's test

template shall be no greater than 1.75 inches (44.4 mm.).

(i) For the purposes of this paragraph, the term "ball" includes any spherical, ovoid, or ellipsoidal object that is designed or intended to be thrown, hit, kicked, rolled, dropped, or bounced. The term "ball" includes any spherical, ovoid, or ellipsoidal object that is attached to a toy or article by means of a string, elastic cord, or similar tether. The term "ball" also includes any multi-sided object formed by connecting planes into a generally spherical, ovoid, or ellipsoidal shape that is designated or intended to be used as a ball, and any novelty item of a generally spherical, ovoid, or ellipsoidal shape that is designated or intended to be used as a ball.

(ii) The term "ball" does not include dice, or balls permanently enclosed inside pinball machines, mazes, or similar outer containers. A ball is permanently enclosed if, when tested in accordance with *16 CFR 1500.52*, the ball is not removed from the outer container.

(iii) In determining whether such a ball is intended for use by children under three years of age, the criteria specified in *16 CFR 1501.2(b)* and the enforcement procedure established by *16 CFR 1501.5* shall apply.

(18)(i) Any bunk bed (as defined in § 1513.2(c) of this chapter) that does not comply with the requirements of part 1513 of this chapter.

(ii) Findings. In order to issue a rule under Section 3(e) of the Federal Hazardous Substances Act (FHSA), *15 U.S.C. 1262*(e), classifying a toy or other article intended for use by children as a hazardous substance on the basis that it presents a mechanical hazard (as defined in Section 2(s) of the FHSA), the FHSA requires the Commission to make the following findings and to include these findings in the regulation: Bunk beds present a mechanical hazard; Where a voluntary standard has been adopted and implemented by the affected industry, that compliance with such voluntary standard is not likely to result in the elimination or adequate reduction of the risk of injury, or it is unlikely that there will be substantial compliance with such voluntary standard; The benefits expected from the rule bear a reasonable relationship to its costs; and The rule imposes the least burdensome requirement that prevents or adequately reduces the risk of injury for which the rule is being promulgated. These findings are made in the Appendix to Part 1513.

(19)(i) Dive sticks, and other similar articles, that are used in swimming pools or other water environments for such activities as underwater retrieval games or swimming instruction, and which, when placed in the water, submerge and rest at the bottom of the pool. This includes products that are pre-weighted to sink to the bottom and products that are designed to allow the user to adjust the weight. Dive sticks and similar articles that come to rest underwater at an angle greater than 45 degrees from vertical when measured under the test at § 1500.86(a)(7) and dive sticks and similar articles that maintain a compressive force of less than 5-lbf under the test at § 1500.86(a)(8) are exempt from this banning rule. Articles that have a continuous circular shape, such as dive rings and dive disks are also exempt.

(ii)(A) Findings. In order for the Commission to issue a rule under section 2(q)(1) of the FHSA classifying a substance or article as a banned hazardous substance, the Commission must make certain findings and include these findings in the regulation. *15 U.S.C. 1262*(i)(2). These findings are discussed in paragraphs (a)(18)(ii)(B) through (D) of this section.

(B) Voluntary standard. No findings concerning compliance with and adequacy of a voluntary standard are necessary because no relevant voluntary standard addressing the risk of injury posed by dive sticks has been adopted and implemented.

(C) Relationship of benefits to costs. The Commission estimates the potential benefits of removing hazardous dive sticks from the market to be 2 to 4 cents per dive stick. With the availability of substitutes and the expected low cost of modifying dive sticks to conform to the rule, the Commission anticipates that necessary changes will be minimal. The Commission estimates that the costs of the rule will be no more than 2 to 4 cents per dive stick. Thus, the Commission finds that there is a reasonable relationship between the expected benefits of the rule and its costs.

(D) Least burdensome requirement. The Commission considered pursuing voluntary recalls, following a voluntary standard, requiring labeling or changing the scope of the rule. A banning rule would be more effective than case-by-case recalls because the impalement hazard affects all dive sticks, not a specific brand or model. Awaiting recalls would allow these hazardous items on the market until the Commission obtained recalls. No applicable voluntary standard exists, and compliance may be low if one did. Although labeling could help reduce the risk of injuries from dive sticks, it would be less effective than a banning rule. It may be difficult for a label to convey the necessary information at the time of use. Modifying the scope so that the rule would only apply to pre-weighted dive sticks would continue to permit hazardous items because the unweighted dive sticks can easily be weighted to stand vertically at the bottom of the water. Thus, the Commission finds that a ban of dive sticks with the hazardous characteristics it has identified is the least burdensome alternative that would adequately reduce the risk of injury.

(b) Electrically operated toys and other electrical operated children's articles presenting electrical, thermal, and/or certain mechanical hazards. Under the authority of section 2(f)(1)(D) of the act and pursuant to provisions of section 3(e) of the act, the Commission has determined that the following types of electrically operated toys or other electrically operated articles intended for use by children present electrical, thermal, and/or certain mechanical hazards within the meaning of section 2 (r), (s), and/or (t) of the act because in normal use or when subjected to reasonably foreseeable damage or abuse, the design or manufacture may cause personal injury or illness by electric shock and/or presents an unreasonable risk of personal injury or illness because of heat as from heated parts, substances, or surfaces, or because of certain mechanical hazards.

(1) Any electrically operated toy or other electrically operated article intended for use by children (as defined in § 1505.1(a)(1)) that is introduced into interstate commerce and which does not comply with the requirements of part 1505 of this chapter.

Note: Paragraph (b)(1) was originally promulgated as 21 CFR 191.9a(b)(1) with an effective date of September 3, 1973 *(38 FR 6138)*.

(c) Toys and other articles (not electrically operated) presenting electric hazards. Under the authority of section 2(f)(1)(D) of the act and pursuant to provisions of section 3(e) of the act, the Commission has determined that the following types of toys or other articles intended for use by children (not electrically operated) present an electrical hazard within the meaning of section 2(r) of the act.

(1) Any kite 10 inches or greater in any dimension constructed of aluminized polyester film or any kite having a tail or other component consisting of a piece of aluminized polyester film 10 inches or greater in any dimension presents an electrical hazard and is a banned hazardous substance because its design (specifically its size and electrical conductivity) presents a risk of personal injury from electric shock due to its ability to conduct electricity and to become entangled in or otherwise contact high voltage electric power lines.

HISTORY: *[38 FR 27012,* Sept. 27, 1973, as amended at *38 FR 30105,* Nov. 1, 1973; *38 FR 32132,* Nov. 21, 1973; *41 FR 4144,* Jan. 28, 1976; *41 FR 6240,* Feb. 12, 1976; *42 FR 36823,* July 18, 1977; *42 FR 61594,* Dec. 6, 1977; *43 FR 22005,* May 23, 1978; *44 FR 34903,* June 15, 1979; *44 FR 55819,* Sept. 28, 1979; *48 FR 16,* Jan. 3, 1983; *48 FR 57268,* Dec. 29, 1983; *53 FR 46839,* Nov. 18, 1988; *57 FR 27915,* June 23, 1992; *59 FR 9076,* Feb. 25, 1994; *60 FR 10752,* Feb. 27, 1995; *64 FR 71888, 71907,* Dec. 22, 1999; *66 FR 13645, 13650,* Mar. 7, 2001, as corrected at *66 FR 15996, 15997,* Mar. 22, 2001]

AUTHORITY: AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*15 U.S.C. 1261-1278.*

NOTES: [EFFECTIVE DATE NOTE: *66 FR 13645, 13650,* Mar. 7, 2001, added paragraph (a)(19), effective Apr. 6, 2001.]

16 CFR 1500.18

NOTES APPLICABLE TO ENTIRE CHAPTER:
EDITORIAL NOTE: For documents affecting chapter II on rule review under the Regulatory Flexibility Act see *52 FR 5079*, Feb. 19, 1987 and *54 FR 601,* Jan. 9, 1989.

3106 words