IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AQUA DOTS PRODUCTS LIABILITY LITIGATION | MDL No. 1940 |
| | Lead Case No. 1:08-cv-2364 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Judge David H. Coar |
| | Magistrate Judge Susan E. Cox |

## DEFENDANT, MOOSE ENTERPRISE PTY LTD.'S MEMORANDUM IN REPLY TO PLAINTIFFS' OPPOSITION TO ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FRCP 12(b)(2) AND FAILURE TO STATE A CLAIM PURSUANT TO FRCP 12(b)(6)

## TABLE OF CONTENTS

I.      INTRODUCTION……..……………………………………………..…....1

II.     THIS COURT LACKS PERSONAL JURISDICTION OVER MOOSE………..1

III.    PLAINTIFFS' CONSOLIDATED COMPLAINT FAILS TO STATE A CLAIM
        UPON WHICH RELIF CAN BE GRANTED……………..……………..……3

        a.  Plaintiffs' Consolidated Complaint Does Not Properly Plead Contract Claims
            for Breach of Express Warranty and Breach of Implied Warranty…..….….4

            i.   The Express Warranty Claims in the Consolidated Complaint Are
                 Not Properly Pled……………………………………………...4

            ii.  The Implied Warranty Claims in the Consolidated Complaint Are
                 Not Properly Pled……………………………………….……..4

        b.  Plaintiffs' Consolidated Complaint Does Not Properly Plead the Various
            Tort Claims ……………….…………………………………….…....5

            i.   Plaintiffs' Claims Under The Illinois Consumer Fraud Act &
                 Deceptive Business Practices Act Fail Because Plaintiffs Have Not
                 Satisfied the Heightened Pleading Requirements Under The Act…….5

            ii.  Violation of All Other States' Consumer Protection Laws……………7

            iii. Plaintiffs Fail to State A Valid Claim under The Illinois Uniform
                 Deceptive Trade Practices Act…………………………………..8

            iv.  With Respect to the Negligence Cause of Action, Plaintiffs' Failure to
                 Rebut Moose's Contention That it Neither Breached its Duty Nor
                 Caused Injury to the Plaintiffs Requires Dismissal of Said Claim……10

                 1.  Plaintiffs Failed to Factually Establish Moose Breached a
                     Legal Duty to Protect Plaintiffs from Particular Injuries….....10

                 2.  Plaintiffs Failed to Factually Establish They Were Injured…...11

            v.   Plaintiffs' Failure to Factually Establish All Elements of Strict
                 Liability Requires Dismissal of This Cause of Action……………...12

        c.  Plaintiffs' Claim for Unjust Enrichment Must Fail as it is Not
            Properly Pled………………………………………………………13

**d. Plaintiffs' Federal Claims Must Fail as to Moose**…………………………..……..13

**IV.**    **CONCLUSION**………………………………………………………………14

# TABLE OF AUTHORITIES

## Federal Cases

### Supreme Court Cases

*Asahi Metal Indus. Co. v. Superior Ct.,*
   480 U.S. 102 (1987)……………………………………………………………………2

*Bell Atlantic Corp. v. Twombly,*
   127 S.Ct. 1955 (2007)………………………………………………………………..3

*International Shoe Co. v. Washington,*
   326 U.S. 310 (1945)……………………………………………………………………2

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980)……………………………………………………………………2

### Court of Appeal Cases

*E.E.O.C. v. Concentra Health Servs., Inc.,*
   496 F.3d 773 (7th Cir. 2007)……………………………..………………..3, 13

*Limestone Dev. Corp. v. Vill. of Lemont,*
   520 F.3d 797 (7th Cir. 2008)………………………………………………………3

*Tamayo v. Blagojevich,*
   526 F.3d 1074 (7th Cir. 2008)……………………………………………………..3

### District Court Cases

*Branch-Hess Vending Services Employees' Pension Trust v. Alfred E. Guebert,*
   751 F.Supp. 1333 (C.D. Ill. 1990) ……………...………………………………6

*Butcher v. Robershaw Contols Co.,*
   550 F.Supp.692 (D. Md. 1981)…………………………………………………13

*Chin v. Chrysler Corp.*
   182 F.R.D. 448 (D.N.J. 1998)………………………………………………...…7

*Crouse v. Kawasaki Heavy Industries Ltd.,*
   716 F.Supp. 723 (N.D.N.Y. 1989)……………………………………………...13

*In re Ford Motor Co. Ignition Switch Products Liability Litigation,*
   174 F.R.D. 332 (D.N.J. 1997)…………………………………………………..7

*In re General Motors Corp. Dex-Cool Products Liability Litigation,*
    241 F.R.D. 305 (S.D.Ill. 2007) ……………………………………………………7

*Thompson v. Jiffy Lube Int'l, Inc.,*
    2008 WL 2762187 (D.Kan.) …………………………………………………….7

*U.S. v. All Meat & Poultry Products, et al.,*
470 F.Supp.2d 823, 830 (N.D. Ill. 2007) ……………………………………………5

## State Cases

*Asch v. Teller, Levitt & Silvertrust, P.C.,*
    2004 WL 2967441 (N.D. Ill. 2004) (No. 00 C 3290)……………………………...9

*Brooks v. Midas-International Corp.,*
    361 N.E.2d 815, 47 Ill.App.3d 266 (1977)……………………...…………………8, 9

*Buckner v. Atl Plant. Maint.,*
    694 N.E.2d 565, 182 Ill.2d 12 (1998) …………………………………………….6

*In re Grand Theft Auto Video Game Consumer Litigation,*
    ___F.R.D.___, 2008 WL 2971526 (S.D.N.Y.)…...……………………………….7

*Kramer v. Weedhopper of Utah, Inc.,*
    490 N.E.2d 104, 141 Ill.App.3d 217 (Ill. 1986)………………………………….12

*Moorman Mfg. Co. v. National Tank Co.,*
    435 N.E.2d 443, 91 Ill.2d 69 (Ill. 1982)………………………………………...12

*Perona v. Volkswagen of America, Inc.,*
    684 N.E.2d 859, 292 Ill. App. 3d 59 (Ill. App. 1 Dist. 1997)…………………….5, 6

## Secondary Sources

Hopkins, Laurie (Speaker), *Transcript – Consumer Products Exported to the United States: Who is Responsible for Saftey?*
    www.cpsc.gov/vnr/asfroot/export/ProductSafety_English_Transcript.html……………13

## I.     <u>INTRODUCTION</u>

As set forth in greater detail in the Motion to Dismiss for lack of personal jurisdiction and failure to state a claim filed by Defendant, Moose Enterprise Pty Ltd. (hereinafter "Moose"), Moose must be dismissed from the instant action because United States courts do not have personal jurisdiction over Moose, an Australian entity that does not do business in the United States.   Further, even if the Court were to determine that personal jurisdiction does exist, Plaintiffs' Consolidated Amended Class Action Complaint (hereinafter "CAC") fails to state a single claim upon which relief can be granted.

## II.     <u>THIS COURT LACKS PERSONAL JURISDICTION OVER MOOSE</u>

Moose's moving papers set forth that neither the forum states' long arm statutes nor due process requirements establish personal jurisdiction over Moose in this action.   The bulk of Plaintiffs' arguments address their belief that the exercise of personal jurisdiction over Moose would comport with due process; however, Plaintiffs' arguments must fail as Moose does not have minimum contacts with the forum states and fairness factors do not support personal jurisdiction.

Plaintiffs rely on *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) to argue that under the stream of commerce theory, minimum contacts do exist.   However, in *World-Wide Volkswagen*, the Supreme Court discussed that mere foreseeability that products would wind up in the forum state is not sufficient to meet minimum contacts requirements for personal jurisdiction. *Id.* at 295-298.   The Court held that "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum state. Rather, it is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id.* at 297.

1

In *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 112 (1987), the Supreme Court

expanded upon their holding in *World-Wide Volkswagen* and found that:

> "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. . . . a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State."

In the instant action, Moose entered a distribution agreement with Spin Master Ltd.

(collective with Spin Master, Inc. referred to hereinafter as "Spin Master") granting Spin Master

distribution rights in North America. The fact that Spin Master was to distribute Aqua Dots in

North America is not adequate to create foreseeability that there is a possibility that Moose may

be sued and brought into Court in the forum states of California, Illinois, Texas, Florida

Arkansas or Missouri. In following the Supreme Court's reasoning in both *World-Wide*

*Volkswagen* and *Asahi*, it is clear that minimum contacts did not exit between Moose and the

forum states with respect to Aqua Dots.

Even if the Court finds minimum contacts to exist with respect to Moose, allowing

jurisdiction over Moose would offend "traditional notions of fair play and substantial justice."

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Plaintiffs unsuccessfully try to negate

Moose's argument that the fairness factors do not support personal jurisdiction over Moose. As

stated in the moving papers: (1) Moose is heavily burdened by traveling from Australia to

Illinois, Texas, California, Florida, Arkansas and Missouri throughout this extensive litigation,

(2) Illinois, Texas, California, Florida, Arkansas and Missouri do not have significant interests in

this suit because Moose is not responsible for the distribution of the Aqua Dots into the stream of

commerce in the United States, (3) Plaintiffs have access to courts in Australia and China, where

2

the business was conducted, (4) the international judicial system's interest in obtaining the most efficient resolutions of controversies can be met in Australia, where Moose is located, and China, where the Aqua Dots were produced by JSSY, and (5) the shared interest in the international community in furthering fundamental social policies of sovereignty would be better met in Australia, where Moose is located and does business, or China, where the Aqua Dots were produced by JSSY.

## III.  PLAINTIFFS' CONSOLIDATED COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIF CAN BE GRANTED

Even if the Court finds that it is proper for it to assert personal jurisdiction over Moose, Plaintiffs have failed to properly assert a single claim upon which relief can be granted in the Consolidated Complaint.   Plaintiffs have failed to raise the possibility of relief above the "speculative level" required for defeating a 12(b)(6) motion to dismiss.  *E.E.O.C. v. Concentra Health Servs. Inc.*, 496 F.3d 773, 776 (7th Cir. 2007), quoting *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965, 1973 fn. 14 (2007).  Further, Plaintiffs refuse to acknowledge that, since this is a class action lawsuit, the Consolidated Complaint must included greater specificity. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083-1084 (7th Cir. 2008); *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008)

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

3

### a.  **Plaintiffs' Consolidated Complaint Does Not Properly Plead Contract Claims for Breach of Express Warranty and Breach of Implied Warranty**

> i.  *The Express Warranty Claims in the Consolidated Complaint Are Not Properly Pled*

Plaintiffs have not properly pled their claim for breach of express warranty, for Plaintiffs have failed to allege: 1) specific statements made by Moose; 2)who made said statements; 3) when said statements were made that gave rise to an express warranty; and 4) when said express warranty was breached.  Further, Plaintiffs' claims that Moose asserted that Aqua Dots were appropriate for certain ages on the Aqua Dots packaging are erroneous, as Moose was not responsible for the design or warnings on the packaging for the various Aqua Dots products. Accordingly, the requisite pleading standards are not met.

Further, Moose is not even in privity of contract with Plaintiffs, so the breach of express warranty claim must fail.  In attempting to address the lack of privity of contract issue, Plaintiffs' Opposition only generally refers to their arguments regarding why Spin Master was in privity of contract with Plaintiffs; however, as the manufacturer who did not distribute the Aqua Dots in the United States, this argument is not applicable to Moose.

> ii.  *The Implied Warranty Claims in the Consolidated Complaint Are Not Properly Pled*

As set forth in Moose's moving papers, Plaintiffs have relied upon erroneous statements that Aqua Dots were not fit for their ordinary purpose.  Not only were Aqua Dots fit for their ordinary purpose, but Plaintiffs have failed to sufficiently argue that they were not fit for their ordinary purpose.  For these reasons, the breach of implied warranty claim must be dismissed.

/ / /

### b. **Plaintiffs' Consolidated Complaint Does Not Properly Plead the Various Tort Claims**

   *i.     Plaintiffs' Claims Under The Illinois Consumer Fraud Act & Deceptive Business Practices Act Fail Because Plaintiffs Have Not Satisfied the Heightened Pleading Requirements Under The Act*

Although notice pleading governs most claims in federal court, under Federal Rule of Civil Procedure, Rule 9(b), heightened pleading requirements govern fraud claims, including claims brought under the Illinois Consumer Fraud Act. *U.S. v. All Meat & Poultry Products, et al.,* 470 F.Supp.2d 823, 830 (N.D. Ill. 2007); *Perona v. Volkswagen of America, Inc.,* 684 N.E.2d 859, 863, 292 Ill. App. 3d 59, 63 (Ill. App. 1 Dist. 1997). In order to adequately allege a deceptive act or practice, the plaintiff "must allege who, what, when, where and how" the alleged fraud occurred. *All Meat & Poultry Products,* 470 F.Supp.2d at 830 (citing *Dileo v. Ernst & Young,* 901 F.2d 624, 627 (7thCir. 1990)). However, Plaintiffs' allegations under the Illinois Consumer Fraud Act merely lump all the defendants together irrespective of their status as manufacturer, retailer or otherwise. Therefore, Plaintiffs' Consolidated Complaint does not adequately allege which defendant made any misrepresentation to a particular plaintiff. Additionally, Plaintiffs have not alleged with any specificity the date of the alleged misrepresentation. CAC ¶¶ 97-104.

Further, Plaintiffs allege that they are consumers within the meaning and coverage of the Illinois Consumer Fraud Act and Deceptive Business Practices Act. CAC ¶ 98. Plaintiffs also assert that the defendants' actions and omissions to act, including the false and misleading express and/or implied misrepresentations and omissions of material facts regarding the safety of Aqua dots, constitute deceptive and fraudulent conduct under the Illinois Consumer Fraud Act.

5

CAC ¶ 103.  However, in order to state a valid claim under the Consumer Fraud Act, a complaint must include allegations that *the defendant's intend that the plaintiff rely on the deception*. *Perona* at 864-865.  However,  Plaintiffs' Opposition not only acknowledges that Defendant Moose was ignorant about the change in chemical ingredients used in the manufacture of Aqua Dots toys by the Chinese manufacturer, CAC ¶ 53, but also that the Chinese manufacturer was very reluctant to disclose the Dots' ingredients for fear that Moose would switch to another manufacturer.  CAC ¶ 53.

Moose's ignorance of the change in the chemical ingredient and any misrepresentation it may have made regarding the safety of Aqua Dots toys is was in no way made with an intent to conceal, suppress, or omit a material fact.  *Branch-Hess Vending Services Employees' Pension Trust v. Alfred E. Guebert*, 751 F.Supp. 1333, 1341-1342 (C.D. Ill. 1990), where the court specifically held that the requisite intent to deceive or mislead under the Illinois Consumer Fraud Act required more than mere ordinary negligence.

Finally, Plaintiffs' arguments that a conspiracy existed under this Act are inconsistent with Illinois common law, which provides that no conspiracy can exist between a principal and agent because the acts of the agent are deemed to be the acts of the principal.  *Buckner v. Atl Plant. Maint.*, 694 N.E.2d 565, 571, 182 Ill.2d 12, 24 (1998).  Plaintiffs' Consolidated Complaint makes allegations against all Defendants with a broad brush by alleging a conspiracy between all known defendants, unknown persons, firms and corporations to commit all the violations alleged in the Complaint's numerous Counts.  CAC ¶ 30.  However, the Consolidated Complaint also asserts that all facts alleged therein were committed by Defendants and their employees and co-conspirators while actively engaged in the management and in furtherance of the scope of each Defendant's business or affairs, *Id.* at ¶¶ 30-32, and that each named Defendant acted as the

6

agent or joint venture of or for the other Defendants with respect to the acts, violations, and common course alleged therein.  CAC ¶ 32.

ii.    *Violation of All Other States' Consumer Protection Laws*

Contrary to Plaintiffs' arguments in their opposition papers, in order to bring a cause of action under all states' consumer protection laws, Plaintiffs must separately plead each states' elements.  *In re Grand Theft Auto Video Game Consumer Litigation*[1], __F.R.D.__, 2008 WL 2971526 (S.D.N.Y.) [2] the court found that as a result of well known conflicts among the state's consumer fraud and warranty laws, there was an actual conflict of laws.  *Id.*  As pointed out by the court, some states require proof of intent as an element under consumer fraud laws while other states do not.  *Id.*

As a result of the foregoing, Moose contends it is clear that Plaintiffs must plead the requisite elements under each relevant state's consumer fraud laws in order to state a valid claim and to additionally establish cohesiveness amongst members of the class.  *Grand Theft Auto* at WL 29711526.  Plaintiffs have failed to do so and therefore, have failed to allege a valid claim under each relevant state's consumer protection laws.

/ / /

/ / /

/ / /

/ / /

---

[1] This case was just decided on July 30, 2008; accordingly, the full cite is not yet available.  This case is attached hereto as Ex. A.

[2] *See also Thompson v. Jiffy Lube Int'l, Inc.*, 2008 WL 2762187, at 17 (D.Kan.) (consumer-fraud laws); *In re General Motors Corp. Dex-Cool Products Liability Litigation,* 241 F.R.D. 305, 319-21 (S.D.Ill. 2007) (warranty laws); *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 457-61 (D.N.J. 1998) (consumer-fraud and warranty laws); *In re Ford Motor Co. Ignition Switch Products Liability Litigation,* 174 F.R.D. 332, 349-51 (D.N.J. 19997) (consumer-fraud and warranty laws).

7

iii.    *Plaintiffs Fail to State A Valid Claim under The Illinois Uniform Deceptive Trade Practices Act*

Plaintiffs have failed to satisfy their burden of proof required to plead a cause of action under the Illinois Uniform Deceptive Trade Practices Act because Plaintiffs cannot prove that they are likely to suffer future harm as a result of the alleged ongoing conduct of Moose. To satisfy this burden of proof, Plaintiffs must show that they are likely to be damaged in the future. *Brooks v. Midas-International Corp.*, 361 N.E.2d 815, 821, 47 Ill.App.3d 266, 275-276 (Ill. App. 1977).

In *Brooks*, the lead class action plaintiff sought injunctive relief against the defendants to enjoin the continued deceptive advertising of automobile mufflers installed for an installation charge without separate a charge for replacement parts; however, the court held that the inability to allege facts indicative of future harm thereby precluding a suit for injunctive relied. *Id.* at 821-822, 275-276.

*Brooks* is analogous to the present case because Plaintiffs' Consolidated Complaint does not allege with specificity the likelihood of any future harm to the Plaintiffs under this statute as a result of any ongoing conduct attributed to Moose. Significantly, Plaintiffs' Consolidated Complaint even acknowledges that the Consumer Product Safety Commission ("CPSC") and Spin Master issued a nationwide recall of Aqua Dots in the United States on November 7, 2007, and warned U.S. consumers to stop using Aqua Dots until otherwise instructed.[3] CAC ¶ 61. Accordingly, since at least November 7, 2007 (the date of the recall), the likelihood of Plaintiffs and any member of the public being exposed to Aqua Dots have stopped, thereby eviscerating

---

[3] *See* "Spin Master Recalls Aqua Dots -Children Become Unconscious After Swallowing Beads" United States Consumer Product Safety Commission Press Release #08-074, November 7, 2007, available at www.cpsc.gov/CPSCPUB/PREREL/prhtml08/0874.html.

the underpinnings of the Plaintiffs' claim for injunctive relief under this statute. *Brooks* at 821-822, 275-276 .

Plaintiffs' Opposition now seeks to recreate the threat of future harm posed by Moose and Aqua Dots toys based on the seizure of Aqua Dots shipments during December 2007 by U.S. Customs and Border enforcement agents.   CAC ¶ 64.   However, this argument is unavailing to the Plaintiffs because the shipments were intercepted and therefore, none of the Aqua Dots toys entered the stream of commerce and did not create the possibility of imminent harm or future harm to Plaintiffs and the public at large.   *Brooks* at 821-822, 275-276.

Plaintiffs improperly rely on the unpublished case of *Asch v. Teller, Levitt & Silvertrust, P.C.,* 2004 WL 2967441 (N.D. Ill. 2004) (No. 00 C 3290) to advance the proposition that even after the recall occurred, the possibility of future harm remained unclear until Moose stopped manufacturing toys.  In *Asch,* the plaintiffs and the public at large remained exposed to a threat of future harm to their credit ratings because of the unreliable computer software.   *Id.* at 4. However, in this matter, both the CPSC and Spin Master issued nationwide recalls of Aqua Dots toys with instructions to the public not to purchase Aqua Dots until otherwise instructed. Furthermore, Spin Master directed its North American retailers to remove Aqua Dots toys from store shelves thereby preventing public access to Aqua Dots toys.   Therefore, there is no possibility of future harm to the plaintiffs and members of the public from Aqua Dots toys and thus, Plaintiffs have failed to allege a valid claim under the Act.

/ / /

/ / /

/ / /

9

iv.  *With Respect to the Negligence Cause of Action, Plaintiffs' Failure to Rebut Moose's Contention That it Neither Breached its Duty Nor Caused Injury to the Plaintiffs Requires Dismissal of Said Claims*

As set forth in the moving papers, Plaintiffs have failed to plead facts sufficient to establish a cause of action for negligence.   Plaintiffs' Opposition, like the Consolidated Complaint, failed to assert any facts which establish Moose breached a duty owed to the Plaintiffs or that they suffered any damages.

1.  Plaintiffs Failed to Factually Establish Moose Breached a Legal Duty to Protect Plaintiffs from Particular Injuries

Plaintiffs aver Moose breached its duty by failing to exercise reasonable care in designing, manufacturing and distributing Aqua Dots, and in failing to conduct adequate quality testing.  Plaintiffs' Opposition at 13; CAC ¶¶ 144-45.  Additionally, Plaintiffs assert Moose breached its duty because it failed to accompany Aqua Dots with proper warnings and it failed to act quickly to issue a recall.  Plaintiffs' Opposition at 13; CAC ¶ 145.

Plaintiffs' assertions of Moose's breach are feeble at best.  Moose did not distribute the Aqua Dots.  The toy was distributed by Spin Master.  CPSC issued the Recall Notice.  In fact, Plaintiffs have judicially acknowledged that Moose merely signed an agreement with Spin Master authorizing Spin Master to distribute Aqua Dots throughout the United States.  Plaintiffs' Opposition at 6.   Thus, no distribution breach can exist without a distribution duty.

Further, Moose exercised reasonable care in the design, manufacture and testing of Aqua Dots.  It approved prototypes manufactured by JSSY based on ingredients that included the nontoxic 1,5-pentanediol.  Moose was completely unaware JSSY replaced 1,5-pentanediol with the 1,4-butanediol chemical, a fact that has been recognized by Plaintiffs. (CAC ¶ 53)  Moose's

10

testing was adequate in that it approved the Aqua Dots design at a time when there were no toxic elements to it.  Moose follows stringent quality control measures at every stage of production and the finished product presented to it lived-up to its high level of quality.

Finally, Plaintiffs' allegations again fail to recognize Moose had nothing to do with the Aqua Dots recall, which was entirely handled by the United States distributor of Aqua Dots, Spin Master

2.    Plaintiffs Failed to Factually Establish They Were Injured

Plaintiffs allege four (4) damage-theories under which they hope to collect; although none of them include personal injuries.  They are:  1) out-of-pocket expenditures; 2) exposure to toxic chemicals; 3) increased risk of health problems; and 4) costs of diagnostic screening. Plaintiffs' Opposition at 13; CAC ¶ 148.

Any out of pocket expenditure would be cured by replacement.  However, here, four (4) plaintiffs have been deposed thus far[4] and none have alleged with specificity and damages.[5]  In fact, all four (4) deposed plaintiffs failed to mitigate their out-of-pocket expenditure because they have not returned their Aqua Dots pursuant to the recall.[6]

Also, Plaintiffs were not exposed to toxic chemicals.  To follow Plaintiffs logic, the "Toys contained [a] chemical that metabolizes into GHB when ingested."  CAC ¶¶ 36-39; Plaintiffs' Opposition at 14.  Thus, "Children who swallowed the beads or licked the coating from their fingers were exposed to GHB."  CAC ¶¶ 50-62; Plaintiffs' Opposition at 14. However, all deposed plaintiffs stated that they never put the Aqua Dots beads in their mouths

---

[4] Plaintiff, Kim Cosgrove was deposed on July 15, 2008, and Plaintiffs. Anthony White, Sarah Bertanowski and Simon Bertanowski were deposed on August 7, 2008
[5] *See* Cosgrove Depo. at 52:9-11; 181:10-13. (Ex. B)
[6] *See* Cosgrove Depo. at 181: 10-19 (Ex. B)

11

and that they never saw their children do so either.[7]  Accordingly, there is no risk (let alone an increased risk) of health problems, as Plaintiffs fail to allege how a single injury occurred.

      v.      *Plaintiffs' Failure to Factually Establish All Elements of Strict Liability Requires Dismissal of This Cause of Action*

As discussed in the moving papers, the idea behind strict liability is "to allow a plaintiff to recover from a manufacturer for **personal injuries**."  *Moorman Manufacturing Company v. National Truck Company*, 435 N.E.2d 443, 445, 91 Ill.2d 69, 74 (Ill. 1982) [Emphasis added.]  Accordingly, one of the elements that must be pled to bring a cause of action under strict liability is that **the injury** resulted from the condition of the product.  *Kramer v. Weedhopper of Utah, Inc.*, 490 N.E.2d 104, 107, 141 Ill.App.3d 217, 221 (Ill. 1986) [Emphasis added.]

Plaintiffs cannot succeed on their strict liability claim unless they identify the supplier of the product and establish a casual relationship between **the injury** and the product.  *Id.* at 223.  If Plaintiffs fail to establish this element of proximate cause, they have not sustained their burden of making a prima facie case.  *Id.*

Here, like with their negligence recovery theory, Plaintiffs engage in the same circular logic using non-existent facts that fail to establish even a modicum of injury.  Again, Plaintiffs allege the same four (4) damage-theories under which they hope to collect; however, no actual damages are pled.  CAC ¶ 166; Plaintiffs' Opposition at 13.  Thus, because liability is based on a finding of fact (*Kramer* at 223), without any allegations of an injury in fact, there can be no causation and thus no strict liability claim lies against Moose.

/ / /

/ / /

---

[7] *See* Cosgrove Depo. at 51: 4-17; 165: 16-18; and 182: 21-22 (Ex. B)

### c. **Plaintiffs' Claim for Unjust Enrichment Must Fail as it is Not Properly Pled**

As argued in Moose's moving papers, Plaintiffs' Consolidated Complaint merely makes broad, general statements claiming that all Defendants have received monies, profits, revenue and benefits from Plaintiffs, and makes no factual averments to support this claim. The absence of any facts whatsoever clearly cannot satisfy the requirements for a claim of unjust enrichment to survive a 12(b)(6) motion. Specifically, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C.,* 496 F.3d at 776.

### d. **Plaintiffs' Federal Claims Also Fail and Must be Dismissed.**

Plaintiffs' opposition papers argue that a private cause of action under the Consumer Product Safety Act ("CPSA") does exist; however, Plaintiffs fail to mention that authority is sharply divided regarding whether a private cause of action under the CPSA exists. *Crouse v. Kawasaki Heavy Industries Ltd.,* 716 F.Supp. 723, 724 (N.D.N.Y. 1989).

In *Butcher v. Robershaw Contols Co.,* 550 F.Supp.692, 703 (D. Md. 1981), which is relied upon by Plaintiffs' in their opposition papers, the Court found:

> "that an agency relationship exists, as a creature of statute, between the CPSC and members of the consuming public so as to permit the maintenance of an action for fraud and deceit by consumers injured by **such fraud and deceit** allegedly practiced on the Commission, provided, of course, that the requisite degree of causation may be established." [Emphasis added.]

Accordingly, a private cause of action under the CPSA only exists where there was a fraudulent nondisclosure. Plaintiffs' Consolidated Complaint does not contend that any of the alleged disclosures were fraudulent.

Further, Plaintiffs fail to properly allege any actual duty on Moose's part that was fraudulently violated. Moose, as a foreign manufacturer of Aqua Dots, did not have a duty to report to the CPSC, as Plaintiffs allege. Rather, under the CPSA "Importers, although reliant on foreign producers, are directly responsible for the safety of products they bring into the United States." *Consumer Products Exported to the United States: Who is Responsible for Safety?* (Ex. "C")

## IV.    CONCLUSION

For the foregoing reasons and those reasons set forth in Moose's moving papers, Moose respectfully request that Plaintiffs' Consolidated Complaint be dismissed in its entirety as to Moose.

Respectfully submitted ,

MOOSE ENTERPRISE PTY LTD.

By: _____

CLINTON & CLINTON
David A. Clinton (CA Bar No. 150107)
Dana M. Gilreath (CA Bar No. 227745)
100 Oceangate, 14th Floor
Long Beach, California 90802
Tel. (562) 216-5000
Fax (562) 216-5001

ATTORNEY IN CHARGE FOR
DEFENDANT, MOOSE ENTERPRISE
PTY LTD.

## CERTIFICATE OF SERVICE

I, Catherine M. Cruz, certify that on August 28, 2008 I sent a copy of the attached **DEFENDANT, MOOSE ENTERPRISE PTY LTD.'S MEMORANDUM IN REPLY TO PLAINTIFFS' OPPOSITION TO ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FRCP 12(b)(2) AND FAILURE TO STATE A CLAIM PURSUANT TO FRCP 12(b)(6)** to all parties on the Panel Attorney Service List via e-mail to the addresses listed below.

_____
CATHERINE CRUZ

| | |
|---|---|
| Ben Barnow, Esq.<br>**BARNOW & ASSOCIATES PC**<br>b.barnow@barnowlaw.com<br><br><br>*Attorney for Plaintiff, Robyn Williams* | Jack Reise, Esq.<br>**COUGHLIN,     STOIA,     GELLER, RUDMAN & ROBINS, LLP.**<br>jreise@csgrr.com<br><br>*Attorney for Plaintiff, Sara Bertanowski, Simon Beranowski and Anthony B. White* |
| Mila F. Bartos, Esq.<br>**FINKELSTEIN THOMPSON, LLP.**<br>mthompson@finkelsteinthompson.com<br><br><br>*Attorney for Plaintiff, Sandra Irene Soderstedt* | William N. Riley, Esq.<br>**PRICE, WAICUKAUSKI & RILEY, LLC.**<br>wriley@price-law.com<br><br><br>*Attorney for Plaintiff, Eric K. Botsch* |
| Laurence King, Esq.<br>**KAPLAN, FOX & KILSHEIMER, LLP.**<br>lking@kaplanfox.com<br><br><br><br>*Attorney for Plaintiff, Kim A. Cosgrove* | James Alex Streett, Esq.<br>**STREETT LAW FIRM**<br>James@streettlaw.com<br><br><br>*Attorney for Plaintiff, Fonald C. Erbach, Jr. and Stephanie S. Streett* |
| Ralph K. Phalen, Esq.<br>phalenlaw@comcast.com<br><br><br><br>*Attorney for Plaintiff, Michael J. Burgess* | Thomas J. Wiegand, Esq.<br>**WIEGAND, WINSTON & STRAWN, LLP**<br>twiegand@winston.com<br><br>*Attorney for Defendant, Spin Master, Ltd., Spin Master, Inc. and Target Corporation* |

# EXHIBIT "A"

Westlaw.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

**H**
In re Grand Theft Auto Video Game Consumer Litigation
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re GRAND THEFT AUTO VIDEO GAME
CONSUMER LITIGATION (No. II).
This Document Relates to: All Actions.
**No. 06 Md. 1739(SWK)(MHD).**

July 30, 2008.

**Background:** Consumers who had purchased electronic videogame sued to recover for fraud allegedly committed by game's producers in concealing certain information about game in order to obtain a "mature," rather than "adults only," rating for game. After conditionally certifying a settlement class and preliminarily approving proposed settlement, court raised question of whether class should be decertified in light of recent Third Circuit Court of Appeals decision.

**Holding:** The District Court, Shirley Wohl Kram, J., held that district court had to decertify nationwide settlement class that it had previously certified on theory that common questions of law or fact predominated over questions which affected only individual class members, given fact that reliance was required element of consumer fraud laws of many of states involved and individualized nature of inquiry that court would have to conduct in deciding whether requisite reliance existed, and given the substantial individualized issues that cause of action presented other than just reliance issues.

Class decertified.

**[1] Federal Civil Procedure 170A ⟨⟩ 161.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General

170Ak161.2 k. Superiority, Manageability, and Need in General. Most Cited Cases
Existence of settlement is relevant to court's inquiry in deciding whether to certify plaintiff class on theory that common questions of law or fact predominate; in particular, existence of settlement means that there will be no trial, and that court does not have to consider whether class will present intractable trial manageability problems. Fed.Rules Civ.Proc.Rule 23(b)(3)(D), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⟨⟩ 161.1**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General

170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases
Requirements for class certification should not be watered down, in action in which certification is sought following settlement of proposed settlement class, simply because settlement is fair or equitable. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⟨⟩ 182.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented

170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
In cause of action brought by purchasers of electronic videogame to recover for fraud allegedly committed by game's producers in concealing certain information about game in order to obtain a "mature," rather than "adults only," rating, district court had to decertify nationwide settlement class that it had previously certified on theory that common questions of law or fact predominated over questions which affected only individual class

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

Page 2

members, given fact that reliance was required element of consumer fraud laws of many of states involved and individualized nature of inquiry that court would have to conduct in deciding whether requisite reliance existed, and given the substantial individualized issues that cause of action presented other than just reliance issues, including concerns as to each class member's clean hands. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[4] Antitrust and Trade Regulation 29T ⚖═131**

29T Antitrust and Trade Regulation
  29TIII Statutory Unfair Trade Practices and Consumer Protection
    29TIII(A) In General
      29Tk131 k. What Law Governs; Territorial Limitations. Most Cited Cases
In assessing consumer fraud, breach of warranty and other claims asserted by purchasers of electronic videogame, for conduct of game's producers in allegedly concealing certain information about game to obtain a "mature," rather than "adults only," rating for game, district court had to apply law of state in which each of these purchasers bought his or her copy of game.

**[5] Federal Courts 170B ⚖═409.1**

170B Federal Courts
  170BVI State Laws as Rules of Decision
    170BVI(C) Application to Particular Matters
      170Bk409 Conflict of Laws
        170Bk409.1 k. In General. Most Cited Cases
In federal action raising state law claims, court generally must apply choice of law principles of state in which it sits.

**[6] Federal Courts 170B ⚖═157**

170B Federal Courts
  170BII Venue
    170BII(B) Change of Venue
      170BII(B)5 Multi-District Litigation; Transfer for Pre-Trial Proceedings

      170Bk157 k. Effect of Transfer and Subsequent Proceedings. Most Cited Cases
When cause of action is transferred as part of multidistrict litigation, transferee court applies choice of law rules of state in which action was first filed.

**[7] Action 13 ⚖═17**

13 Action
  13II Nature and Form
    13k17 k. What Law Governs. Most Cited Cases
Under New York law, first step in any case presenting potential choice of law issue is to determine whether there is actual conflict between laws of the jurisdictions involved.

**[8] Action 13 ⚖═17**

13 Action
  13II Nature and Form
    13k17 k. What Law Governs. Most Cited Cases
"Actual conflict" is present, of kind triggering application of New York conflict of law rules, when applicable law from each jurisdiction provides different substantive rules.

**[9] Action 13 ⚖═17**

13 Action
  13II Nature and Form
    13k17 k. What Law Governs. Most Cited Cases
Under New York conflict of law rules, once court determined that there was actual conflict between laws of the jurisdictions involved, it then had to determine, with respect to consumer fraud claims, which jurisdiction had greatest interest in litigation, and with respect to claims for breach of warranty and unjust enrichment, which jurisdiction had most significant contacts to dispute.

**[10] Torts 379 ⚖═103**

379 Torts
  379I In General

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

379k103 k. What Law Governs. Most Cited Cases

In tort cases, where conduct-regulating standards are at issue, New York courts generally apply law of state where the tort occurred.

## [11] Implied and Constructive Contracts 205H ⚷3

205H Implied and Constructive Contracts
  205HI Nature and Grounds of Obligation
    205HI(A) In General
      205Hk2 Constructive or Quasi Contracts
        205Hk3 k. Unjust Enrichment. Most Cited Cases

## Sales 343 ⚷425

343 Sales
  343VIII Remedies of Buyer
    343VIII(D) Actions and Counterclaims for Breach of Warranty
      343k425 k. Nature and Form of Remedy. Most Cited Cases

"Significant contacts" test, as applied by New York courts to decide conflict of law issues in warranty and unjust enrichment actions, focuses on: (1) the place of contracting; (2) place of negotiation; (3) place of performance; (4) location of subject matter; and (5) domicile or place of business of contracting parties.

## [12] Action 13 ⚷17

13 Action
  13II Nature and Form
    13k17 k. What Law Governs. Most Cited Cases

Under Pennsylvania conflict of law rules, courts must begin by determining whether there is "true conflict" among the relevant laws, in sense that the conflict implicates the pertinent jurisdictions' legitimate interests; if true conflict exists, then courts must apply law of state that has the greater interest in application of its law.

## [13] Action 13 ⚷17

13 Action
  13II Nature and Form
    13k17 k. What Law Governs. Most Cited Cases

Under California conflict of law rules, courts begin by determining whether there are differences between relevant laws, and if so, whether such differences give rise to a "true conflict."

## [14] Contracts 95 ⚷144

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k144 k. What Law Governs. Most Cited Cases

## Torts 379 ⚷103

379 Torts
  379I In General
    379k103 k. What Law Governs. Most Cited Cases

If there is true conflict between laws of the different jurisdictions implicated in tort action, California courts apply law of the state whose interests would be more impaired if not applied, while courts in contracts cases apply law of the state possessing the most significant contacts to dispute.

## [15] Action 13 ⚷17

13 Action
  13II Nature and Form
    13k17 k. What Law Governs. Most Cited Cases

Under Illinois conflict of law rules, courts must first determine if there is actual conflict in relevant laws.

## [16] Fraud 184 ⚷1.5

184 Fraud
  184I Deception Constituting Fraud, and Liability Therefor
    184k1.5 k. What Law Governs. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

Under Illinois conflict of law rules, there is presumption, in cases involving fraud and misrepresentation, that tort law of state wherein plaintiff received and relied on misrepresentation at issue will apply, if there is such a state. Restatement (Second) of Conflict of Laws § 148(1).

**[17] Fraud 184 ☞1.5**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k1.5 k. What Law Governs. Most Cited Cases
Under Illinois conflict of law rules applicable in cases sounding in fraud, presumption in favor of application of tort law of state where plaintiff received and relied on misrepresentation at issue may be overcome only by showing that some other state has more significant relationship to occurrence and parties with respect to particular issue in question. Restatement (Second) of Conflict of Laws § 148(1).

**[18] Contracts 95 ☞144**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k144 k. What Law Governs. Most Cited Cases
In contract cases, Illinois courts decide conflict-of-law questions by applying the significant-contacts test. Restatement (Second) of Conflict of Laws § 188.

**[19] Action 13 ☞17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited Cases
Under Minnesota conflict of law rules, courts must first determine whether conflict exists between the relevant laws, and if there is conflict, they must balance five choice-influencing factors: (1) predictability of results; (2) maintenance of interstate and in-ternational order; (3) simplification of judicial task; (4) advancement of forum's governmental interest; and (5) application of better rule of law.

**[20] Action 13 ☞17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited Cases
First choice-influencing factor that court must consider under Minnesota conflict of law rules, i.e., predictability of results, measures predictability of given choice of law before time of transaction or event giving rise to cause of action.

**[21] Torts 379 ☞103**

379 Torts
   379I In General
      379k103 k. What Law Governs. Most Cited Cases
First choice-influencing factor that court must consider under Minnesota conflict of law rules, i.e., predictability of results, is given little weight in tort cases involving accidents.

**[22] Action 13 ☞17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited Cases
Second choice-influencing factor that court must consider under Minnesota conflict of law rules, i.e., maintenance of interstate and international order, is generally not implicated if state whose law is to be applied has sufficient contacts with and interest in facts and issues being litigated; however, state should not apply its own law if it has little or no contact with case and nearly all of significant contacts are with sister state.

**[23] Action 13 ☞17**

13 Action
   13II Nature and Form

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

Page 5

13k17 k. What Law Governs. Most Cited Cases
Third choice-influencing factor that court must consider under Minnesota conflict of law rules, i.e., simplification of judicial task, is largely concerned with clarity of relevant conflicting laws.

**[24] Action 13 🔑17**

13 Action
    13II Nature and Form
        13k17 k. What Law Governs. Most Cited Cases
Fourth choice-influencing factor that court must consider under Minnesota conflict of law rules, i.e., advancement of forum's governmental interest, requires evaluation of Minnesota's governmental interest relative to that of other states.

**[25] Antitrust and Trade Regulation 29T 🔑 131**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk131 k. What Law Governs; Territorial Limitations. Most Cited Cases
Minnesota placed great value in compensating tort victims and had interest in having its own consumer protection law applied if that law was beneficial to purchasers of electronic video game allegedly injured as result of fraud committed by producers of game to have game rated "mature," rather than "adults only."

**[26] Antitrust and Trade Regulation 29T 🔑 131**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk131 k. What Law Governs; Territorial Limitations. Most Cited Cases

**Sales 343 🔑425**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k425 k. Nature and Form of Remedy. Most Cited Cases
While Minnesota warranty law, which did not require privity in order to state claim for breach of implied warranty, generally was favorable to consumers allegedly injured by fraud committed by producers of electronic video game in order to have game rated "mature" rather than "adults only," Minnesota consumer fraud law, with its reliance element, was not, and court had to consider such disparities in addressing conflicts of law issue.

**[27] Antitrust and Trade Regulation 29T 🔑 131**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk131 k. What Law Governs; Territorial Limitations. Most Cited Cases
In applying Minnesota conflict of law rules to determine which state's law applied in litigation arising out of fraud allegedly committed by electronic video game's producers in connection with content rating assigned to game, district court, in addition to considering Minnesota's interest in compensating tort victims, also had to consider other states' strong interest in having their consumer protection laws applied to transactions which took place within their borders.

**[28] Federal Civil Procedure 170A 🔑165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
Predominance of common questions of law or fact

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

over questions that affect only individual class members, as one of various alternate bases for certification of class, is demonstrated by showing that legal or factual questions subject to generalized proof are more substantial than issues subject only to individualized proof. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[29] Federal Civil Procedure 170A ⬬165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
Predominance inquiry, such as court must conduct in deciding whether proposed class can be certified on ground that common questions of law or fact predominate over questions that affect only individual class members, focuses on legal or factual questions that qualify each class member's case as genuine controversy, questions that preexist any settlement. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[30] Federal Civil Procedure 170A ⬬165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
Existence of settlement does not relieve court, in deciding whether to certify settlement class, of its duty to perform a robust analysis of plaintiffs' predominance showing. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[31] Federal Civil Procedure 170A ⬬176**

170A Federal Civil Procedure
    170AII Parties

170AII(D) Class Actions
    170AII(D)2 Proceedings
        170Ak176 k. Identification of Class; Subclasses. Most Cited Cases
Litigation by representation requires definition of cohesive class, even if ultimate goal is to settle that litigation before trial. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

David Jonathan Meiselman, Meiselman, Denlea, Packman, Carton & Eberz P.C., Seth Richard Lesser, Klafter Olsen & Lesser, LLP, White Plains, NY, Jayne Arnold Goldstein, Mager & Goldstein LLP, Weston, FL, Laurence Paskowitz, Paskowitz & Associates, Roy Laurence Jacobs, Roy Jacobs & Associates, New York City, Steven Gold, Los Angeles City Attorney's Office, Los Angeles, CA, for plaintiffs.

## OPINION AND ORDER

SHIRLEY WOHL KRAM, District Judge.
*1 On December 4, 2007, the Court conditionally certified a settlement class and preliminarily approved a settlement resolving the multidistrict, consumer-fraud litigation filed against the defendants, Take-Two Interactive Software, Inc. ("Take-Two") and Rockstar Games, Inc. ("Rockstar"). The litigation involves claims brought under the consumer-protection laws of the fifty states and the District of Columbia, in connection with the defendants' inclusion of an interactive, sexual minigame (the "Sex Minigame") in their premier product, *Grand Theft Auto: San Andreas* ("*GTA:SA*"). In light of the Second Circuit's recent decision in *McLaughlin v. American Tobacco Company,* 522 F.3d 215 (2d Cir.2008), the Court now decertifies the settlement class.

## I. Background

Beginning in the summer of 2005, four actions were brought in the Southern District of New York against Take-Two and its wholly-owned subsidiary, Rockstar, alleging violations of state consumer-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

protection laws. *See* 05 Cv. 6734(SWK)(MHD); 05 Cv. 6767(SWK)(MHD); 05 Cv. 6907(SWK)(MHD); 05 Cv. 10013(SWK)(MHD).FN1 On February 15, 2006, the United States Panel on Multidistrict Litigation (the "MDL Panel") transferred these four actions, as well as an additional action pending in the Southern District of Illinois, to Judge Barbara Jones for consolidated pretrial proceedings. 06 Md. 1739(SWK)(MHD), Dkt. No. 1. On April 17, 2006, Chief Judge Mukasey reassigned these five cases to this Court. 06 Md. 1739(SWK)(MHD), Dkt. No. 8. The MDL Panel subsequently transferred two additional, related actions, originating in the Central District of California and the Eastern District of Pennsylvania, respectively, to this Court for consolidated treatment with those cases already pending here. 06 Md. 1739(SWK)(MHD), Dkt. Nos. 17, 74.Together, these seven actions comprise the instant multidistrict litigation.

Before any of these actions were transferred to this Court, Judge Jones referred the matter to Magistrate Judge Dolinger for the resolution of general pretrial issues. *See* 05 Cv. 6734(SWK) (MHD), Dkt. Nos. 8, 10.In an order filed on May 1, 2006, Magistrate Judge Dolinger appointed Seth R. Lesser, Esq. of Locks Law Firm, PLLC, as Lead Counsel for the putative class. *See*06 Md. 1739(SWK)(MHD), Dkt. No. 15. On June 8, 2006, Lead Counsel filed a consolidated amended complaint (the "AC"), which sets forth the most recent allegations underlying this litigation. *See*06 Md. 1739(SWK)(MHD), Dkt. No. 18.

The AC alleges that the defendants marketed and sold *GTA:SA* under an improper content rating, which the defendants obtained only by withholding pertinent information from the entity charged with assigning content ratings to video games, the Entertainment Software Ratings Board (the "ESRB"). (AC ¶ 1.) In particular, the AC charges that the defendants failed to disclose to the ESRB that *GTA:SA's* underlying code contained the Sex Minigame (AC ¶ 49), a game-within-the-game that allowed players to control the protagonist's movements as he engaged in various sexual acts (AC ¶ 38). The Sex Minigame could be accessed through the use of a modification ("mod") (AC ¶ 37), which came to be known as the "Hot Coffee Mod" (AC ¶ 36). Though the use of mods ("modding") may violate *GTA:SA's* End User License Agreement (AC ¶¶ 37, 46), the AC alleges that the development of the Hot Coffee Mod was foreseeable, both because the defendants actively encourage modding (AC ¶ 37), and because the gaming community regularly engages in modding (AC ¶ 42). After its development, the Hot Coffee Mod circulated widely throughout the gaming community and spawned a substantial public outcry (AC ¶ 44), which ultimately prompted the ESRB to change *GTA:SA's* content rating from "Mature" ("M") to "Adults Only" ("AO") (AC ¶ 52). On the basis of the foregoing factual allegations, the AC asserts that the defendants misrepresented *GTA:SA's* content in violation of the consumer-fraud, implied-warranty, and unjust-enrichment laws of the fifty states and the District of Columbia. (AC ¶¶ 62-81.)

**\*2** In a motion filed on July 31, 2006, the defendants moved to dismiss all claims advanced under the laws of states where the named plaintiffs did not purchase *GTA:SA. See* 06 Md. 1739(SWK)(MHD), Dkt. Nos. 21-22.The Court denied the defendants' motion on October 25, 2006, ruling that class certification was logically antecedent to the standing issues raised therein. *See In re Grand Theft Auto Video Game Consumer Litig.,* 06 Md. 1739(SWK)(MHD), 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006). Thereafter, class-certification discovery commenced under the direction of Magistrate Judge Dolinger. (Mot. Final Settlement Approval, Declaration of Seth R. Lesser ("Lesser Decl.") ¶ 9k.) On January 24, 2007, the plaintiffs filed a motion for certification of a nationwide class composed of all purchasers of *GTA:SA* from its initial release until July 20, 2005. *See*06 Md. 1739(SWK) (MHD), Dkt. No. 60. The defendants filed an opposition to class certification on June 8, 2007, challenging the propriety of a na-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

tionwide class action that asserts claims under the disparate laws of the fifty states. *See* 06 Md. 1739(SWK)(MHD), Dkt. No. 90.

The Court granted several extensions of time for the filing of the plaintiffs' reply brief in support of their motion for class certification in order to allow the parties an opportunity to engage in settlement negotiations under the aegis of Magistrate Judge Dolinger. *See, e.g.,* 06 Md. 1739(SWK)(MHD), Dkt. Nos. 96, 97, 98, 100. On November 19, 2007, after substantial settlement negotiations, the plaintiffs filed a settlement agreement (the "Settlement"), proposed notice, and proposed definition of a settlement class (the "Settlement Class" FN2). *See* 06 Md. 1739(SWK)(MHD), Dkt. No. 106, Exs. 1, 1-C. The Court held a preliminary fairness hearing on November 28, 2007. Following that hearing, the Court issued an order conditionally certifying the Settlement Class, appointing Lead Counsel as counsel for the Settlement Class, naming class representatives (the "Class Representatives"), and preliminarily approving the Settlement and proposed notice. 06 Md. 1739(SWK)(MHD), Dkt. No. 109 (the "Hearing Order"). The Court also appointed Kostas Katsiris, Esq. to serve as special master for purposes of overseeing the administration of the Settlement and publication of notice, and reviewing Lead Counsel's request for attorney's fees. 06 Md. 1739(SWK)(MHD), Dkt. No. 108.

The Settlement provides benefits to those purchasers of *GTA:SA* who swear under penalty of perjury that they: (1) bought *GTA:SA* prior to July 20, 2005; (2) were offended by consumers' ability to modify *GTA:SA* in order to access the Sex Minigame; (3) would not have purchased *GTA:SA* had they known that consumers could so modify the game's content; and (4) would have returned *GTA:SA* to its place of purchase upon learning that the game could be modified, if they thought they could obtain a refund (collectively, the "Eligibility Averments"). *See* Settlement II.I. There are two kinds of benefits available under the Settlement: First, under the "Exchange Program," Settlement

Class members may return their *GTA:SA* disc for a disc that does not include the Sex Minigame. *See* Settlement III.B. Second, under the "Benefit Program," Settlement Class members may be eligible for cash payments in an amount ranging between $5 and $35, depending on the quality of proof of purchase they are able to provide. *See* Settlement III.C. The Settlement places a ceiling of $2.75 million upon the defendants' total out-of-pocket expenses, FN3 *see* Settlement III.E, and a floor of $1,025 million, FN4 *see* Settlement III.H.

**\*3** Although the Settlement does not fix an amount for attorney's fees, the proposed notice, which was filed in conjunction with the Settlement, indicated that the plaintiffs' attorneys would request a fee of $1 million. *See* 06 Md. 1739(SWK)(MHD), Dkt. No. 106, Ex. 1-C.

The procedure the Court approved for noticing Settlement Class members consisted of several prongs, including, (1) e-mailing the full settlement notice to those individuals on Rockstar's e-mail mailing list; (2) posting a link to the full settlement notice on Take-Two's official website and on the Settlement Website set up for this litigation; (3) publishing the summary settlement notice in several periodicals and on various websites; and (4) posting a link to the full and summary settlement notices on websites maintain by the plaintiffs' attorneys. *See* Hearing Order 5-6. The defendants retained Rust Consulting, Inc. ("Rust") to carry out the approved notice, under the supervision of Special Master Katsiris, *see* Hearing Order 3. *See also* 06 Md. 1739(SWK) (MHD), Dkt. No. 111 (detailing defendants' compliance with approved notice).

During the pendency of the claims period, Special Master Katsiris regularly updated the Court on the implementation of the approved notice and on Settlement Class members' response to the Settlement. On June 25, 2008, the Special Master testified that the Settlement Website had received over 100,000 hits, and that some 2700 individuals had filed claims under the Settlement, for a total estimated recovery of $20,000. (Tr. 6, June 25, 2008.) The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

vast majority of claimants had discarded their copy of *GTA:SA* and submitted no proof of purchase, making them eligible for at most five dollars. Because the total value of filed claims failed to reach the $1.025-million Settlement floor, Lead Counsel proposed that the National Parent Teachers' Association and the ESRB receive the charitable contributions provided for by the Settlement. (Mot. Final Settlement Approval 2.)

The Court received four objections to the Settlement (Lesser Decl. ¶ 25), only three of which even incidentally addressed its fairness to members of the Settlement Class.[FN5]On June 25, 2008, the Court held a final fairness hearing, during which it allowed interested parties to address the fairness of the Settlement and the propriety of counsel's fee request. Theodore H. Frank ("Frank"), one of the four objectors, was the only member of the Settlement Class to appear at the hearing. After affording Frank an opportunity to explain the reasons for his objection, the Court addressed several questions to the parties and permitted them to make closing statements on the Settlement's fairness. (Tr. 8-28, June 25, 2008.) The Court reserved judgment on the final certification of the Settlement Class and on the fairness of the Settlement.

## II. Discussion

[1][2] In order to obtain final certification of the Settlement Class, the plaintiffs must show that the Class meets the four criteria of Federal Rule of Civil Procedure 23(a), *i.e.*, (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation, and that the action is maintainable under one of the subsections of Rule 23(b).*See McLaughlin,* 522 F.3d at 222.Here, because the plaintiffs seek certification under Rule 23(b)(3), they must show that "questions of law or fact common to [Settlement Class] members predominate over any questions affecting only individual members," and that the class action "is superior to other available methods for fairly and efficiently adjudicating the controversy."Fed.R.Civ.P. 23(b)(3). The existence

of the Settlement is relevant to the Court's inquiry. In particular, the Court need not consider whether the Settlement Class would present intractable, trial manageability problems under Rule 23(b)(3)(D), "for the proposal is that there be no trial."*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Trial-manageability issues aside, however, the "requirements [of Rule 23(a) and (b) ] should not be watered down by virtue of the fact that the settlement is fair or equitable."*Denney v. Deutsche Bank AG,* 443 F.3d 253, 270 (2d Cir.2006) (citation omitted).

*4 [3] The ensuing analysis demonstrates that the plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3). As a preliminary matter, the Court holds in Part II.A, *infra,* that each Settlement Class member's consumer-protection claims are governed by the law of the state where he purchased *GTA:SA.*Therefore, Settlement Class members' claims arise under the consumer-protection laws of all fifty states and the District of Columbia. Moreover, under the law of at least some of these states, reliance is an element of consumer fraud. Because reliance is an element of many Settlement Class members' fraud claims, this case is on all fours with the Second Circuit's recent decision decertifying a nationwide class of "Light"-cigarette smokers because their civil-RICO claims required a showing of individualized reliance, *McLaughlin,* 522 F.3d at 222-25.Moreover, for reasons stated fully in Part II.B.2, the Settlement Class is rife with substantial individualized issues other than the reliance issues that required decertification in *McLaughlin.*Accordingly, the Court decertifies the Settlement Class on the grounds that common issues do not predominate over individualized issues.

## A. Choice of Law

[4] Before addressing whether the plaintiffs have met the predominance requirement, the Court must determine which states' laws properly apply to the plaintiffs' various claims for relief. In analyzing pu-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tative, nationwide, consumer-protection class actions, several courts have determined that the law of the state where each plaintiff resides and purchased the relevant product should apply. *See, e.g., In re Gen. Motors Corp. Dex-Cool Prods. Liability Litig.,* 241 F.R.D. 305, 316-19 (S.D.Ill.2007) (determining that law of state where each plaintiff resides should apply to claims for breach of warranty); *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 457 (D.N.J.1998) (deciding that law of each plaintiff's home state should apply to claims for fraud and breach of warranty); *In re Ford Motor Co. Ignition Switch Prods. Liability Litig.,* 174 F.R.D. 332, 347-48 (D.N.J.1997) (holding that law of each plaintiff's home state should apply to claims for fraud, breach of warranty, and other consumer-protection violations).[FN6] The plaintiffs argued in their brief in support of the certification of a nationwide litigation class that the Court should apply (1) New York General Business Law § 349 to their claims for consumer fraud (Pls.' Mot. Class Cert. 31-33); (2) Section 2-314(1) of the Uniform Commercial Code ("UCC") to their claims for breach of implied warranty (Pls.' Mot. Class Cert. 34-37); and (3) New York common law to their claims for unjust enrichment (Pls.' Mot. Class Cert. 26-29). For the reasons that follow, however, the Court holds that it must apply the law of the state wherein each Settlement Class member purchased his copy of *GTA:SA.*

[5][6] There is no dispute that the plaintiffs' various claims for relief arise under state law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Under such circumstances, a federal court generally must apply the choice-of-law principles of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts."). Nevertheless, "[w]hen an action is

transferred as part of an MDL, the transferee court applies the choice of law rules of the state in which the action first was filed."*In re Rezulin Prods. Liab. Litig.,* 390 F.Supp.2d 319, 329 (S.D.N.Y.2005) (citations omitted). Here, because the various cases comprising this multidistrict litigation were brought in New York, Pennsylvania, California, Illinois, and Minnesota, the Court must apply the conflicts rules of each of these states to the cases arising therefrom.[FN7] As the following discussion demonstrates, New York's conflicts rules mandate the application of the law of the state where each Settlement Class member purchased *GTA:SA,* and the conflicts jurisprudence of Pennsylvania, California, Illinois, and Minnesota demands the same result.

**1. New York Conflicts Analysis**

**\*5** [7][8] In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."*In re Allstate Ins. Co.,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 937 (1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules."*Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998). Here, the Court finds that there are actual conflicts among at least some of the states' various consumer-protection laws, and that these conflicts are potentially relevant to the case at hand.

Most of the courts that have addressed the issue have determined that the consumer-fraud and breach-of-warranty laws in the fifty states differ in relevant respects. *See, e.g., Thompson v. Jiffy Lube Int'l, Inc.,* 05 Cv. 1203(WEB), --- F.R.D. ----, 2008 WL 2762187, at \*17 (D.Kan. July 16, 2008) (consumer-fraud laws); *Dex-Cool,* 241 F.R.D. at 319-21 (warranty laws); *Chin,* 182 F.R.D. at 457-61 (consumer-fraud and warranty laws); *Ford Ignition Switch,* 174 F.R.D. at 349-51 (consumer-fraud and warranty laws). As the Court's discussion *infra,* Part II.B.2.b, demonstrates, there are many relevant differences in the states' consumer-fraud and war-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ranty laws.[FN8] Because these differences are all relevant-indeed, some of them are outcome determinative, *see infra* note 18-there are actual conflicts among the states' consumer-fraud and warranty laws.

Likewise, several courts have determined that the states' unjust-enrichment laws vary in relevant respects. *See, e.g., Thompson,* 2008 WL 2762187, at *18 (enumerating differences in states' unjust-enrichment laws); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.,* 05 Cv. 4742, 05 Cv. 2623, 2006 WL 3754823, at *1 n. 3 (N.D.Ill. Dec. 18, 2006) (same); *Clay v. Am. Tobacco Co.,* 188 F.R.D. 483, 501 (S.D.Ill.1999) (same). Without adopting all of the reasoning in these cases,[FN9] the Court is nonetheless persuaded that there are relevant conflicts in the states' unjust-enrichment laws. First, the states' laws differ with respect to whether a complainant must prove an actual loss or impoverishment in order to state a claim for unjust enrichment. *Compare Cmty. Guardian Bank v. Hamlin,* 182 Ariz. 627, 898 P.2d 1005, 1008 (1995) (listing "impoverishment" as element of unjust enrichment) *with Bouchard v. Price,* 694 A.2d 670, 673 (R.I.1997) (stating elements of unjust enrichment, but excluding impoverishment requirement). Here, as the Court discusses more fully, *infra,* Part II.B.2.a, Settlement Class members face substantial obstacles to proving that they actually suffered an ascertainable loss as a result of their purchase of *GTA:SA,* not least because many of them may not even be aware of the Sex Minigame's existence. Accordingly, insofar as the states' unjust-enrichment laws differ with respect to the impoverishment requirement, the laws differ in respects potentially relevant to the outcome of this case.

*6 Second, the states' formulations of the doctrine of unclean hands, which may be a defense to unjust enrichment, differ significantly. *See, e.g., Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc.,* 182 P.3d 764, 767 (Nev.2008) (indicating that unclean-hands doctrine requires two-part inquiry into egregiousness of misconduct

and seriousness of harm caused); *Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc.,* 985 So.2d 924, 931 (Ala.2007) (indicating that only "morally reprehensible, willful misconduct" gives rise to unclean-hands defense); *Thompson v. Orcutt,* 257 Conn. 301, 777 A.2d 670, 676 (2001) ("Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply.") (internal quotation marks and citation omitted); *Rose v. Cain,* 247 Ga.App. 481, 544 S.E.2d 453, 457 (2001) ("The unclean-hands maxim which bars a complainant in equity from obtaining relief has reference to an iniquity which infects the cause of action so that to entertain it would be violative of conscience.").[FN10] These differences are relevant to the instant case because Settlement Class members could not access the Sex Minigame unless they, or some third party other than the defendants, deliberately modified *GTA:SA's* code, thereby potentially raising an unclean-hands defense.

[9] Because there are relevant conflicts in the states' consumer-fraud, warranty, and unjust-enrichment laws, the Court must proceed to the second step of the choice-of-law inquiry. With respect to the plaintiffs' claims for consumer fraud, which sound largely in tort, the Court must determine which jurisdiction has the greatest interest in this litigation. *See GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.,* 449 F.3d 377, 384 (2d Cir.2006) (indicating that New York applies interest analysis in tort actions). With respect to the plaintiffs' claims for breach of warranty and unjust enrichment, the Court applies the law of the jurisdiction with the most significant contacts to this dispute.[FN11] *See, e.g., St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.,* 687 F.Supp. 820, 826 (S.D.N.Y.1988) (applying significant-contacts test to breach-of-warranty claims); *M'Baye v. N.J. Sports Prod., Inc.,* 06 Cv. 3439(DC), 2007 WL 431881, at *10 (S.D.N.Y. Feb. 7, 2007) (applying significant-contacts test to unjust-enrichment claims).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

[10] In tort cases where conduct-regulating standards are at issue, courts generally apply the law of the state where the tort occurred, as that state usually has the greatest interest at stake in the litigation. *GlobalNet Financial.Com, Inc.,* 449 F.3d at 384 (citations omitted). Here, for purposes of conducting the interest analysis, the fraud of which each Settlement Class member complains occurred in the state where he purchased his copy of *GTA:SA.* In particular, though portions of the defendants' allegedly deceptive marketing may have been conceived at the defendants' principal places of business in New York, the actual deception occurred at the time that each plaintiff purchased a copy of *GTA:SA* bearing an "M"-rating. *See Goshen v. Mut. Life. Ins. Co.,* 98 N.Y.2d 314, 325-26, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (N.Y.2002) (finding that deception took place in state where plaintiffs purchased insurance policies, not in New York, where alleged fraudulent scheme was designed). Because the fraud at issue in this case occurred in the state of purchase, and as "[s]tates have a strong interest in protecting consumers with respect to sales within their borders, but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states," *In re Relafen Antitrust Litig.,* 221 F.R.D. 260, 278 (D.Mass.2004) (citations omitted), the interest analysis favors the application of the consumer-fraud law of the state wherein each Settlement Class member purchased his copy of *GTA:SA. See, e.g., Chin,* 182 F.R.D. at 457 (holding that fraud laws of each plaintiff's home state should apply); *Ford Ignition Switch,* 174 F.R.D. at 347-48 (same); FN12 *see also In re Relafen,* 221 F.R.D. at 278 (in consumer-protection actions, "[t]he location of consumers' purchases thus assumes special significance").

*7 [11] With respect to the plaintiffs' claims for breach of warranty and unjust enrichment, the Court applies the significant-contacts test, which focuses upon (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter, and (5) the

domicile or place of business of the contracting parties. *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065, 1068 (N.Y.1994). Here, the first, second, third, and fourth factors clearly favor the application of the law of the state of purchase, for that is the situs of the parties' contracting, negotiation, and performance on the sales contract for *GTA:SA,* and the location of the subject matter of that sales contract. Further, the fifth factor is neutral because the defendants have their principal place of business in New York, while most purchasers of *GTA:SA* are likely domiciled in the state of purchase. In light of the foregoing, the significant-contacts test requires the application of the law of the state of purchase to Settlement Class members' claims for breach of warranty and unjust enrichment. *See, e.g., Dex-Cool,* 241 F.R.D. at 316-19 (applying law of state where each plaintiff resides to breach-of-warranty claims); *Chin,* 182 F.R.D. at 457 (applying law of each plaintiff's home state to breach-of-warranty claims); *Ford Ignition Switch,* 174 F.R.D. at 347-48 (applying law of each plaintiff's home state to breach-of-warranty claims); FN13 *see also* Restatement (Second) of Conflict of Laws § 188(3) ("If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied....").

For the foregoing reasons, New York's conflicts jurisprudence demands that the Court apply the law of the state wherein each Settlement Class member purchased his copy of *GTA:SA.* Moreover, for the reasons set forth below, the same result applies under the conflicts jurisprudence of Pennsylvania, California, Illinois, and Minnesota.

**2. Pennsylvania Conflicts Analysis**

[12] Pennsylvania choice-of-law rules are similar to those that apply in New York. In particular, under Pennsylvania law, courts must first determine whether there is a true conflict among the relevant laws, in the sense that the conflict implicates the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

pertinent jurisdictions' legitimate interests. *See Harsh v. Petroll,* 840 A.2d 404, 418 (Pa.Cmwlth.2003). If a true conflict exists, courts must then apply the law of the state that has the greater interest in the application of its law. *Id.* (citing *Ratti v. Wheeling Pittsburgh Steel Corporation,* 758 A.2d 695, 702 (Pa.Super.2000)).[FN14] In the instant case, the Court has already determined that there are relevant differences among the states' consumer-protection laws. Moreover, these relevant differences create "true conflicts" because each state has a compelling interest in having its own consumer-protection laws applied to transactions occurring within its borders. Further, given the powerful state interest in regulating consumer purchases within the state's border, *see, e.g., In re Relafen,* 221 F.R.D. at 278, the state of purchase possesses the greatest interest in having its laws applied to Settlement Class members' claims. In consequence, Pennsylvania's conflicts jurisprudence also demands the application of the law of the state of purchase to Settlement Class members' claims. *See Chin,* 182 F.R.D. at 457 (employing New Jersey's choice-of-law principles, which also require balancing of interests, to conclude that warranty laws of each plaintiff's home state should apply); *Ford Ignition Switch,* 174 F.R.D. at 347-48 (same).FN15

### 3. California Conflicts Analysis

**\*8** [13][14] California's choice-of-law principles are similar to those of Pennsylvania and New York. Courts begin by determining whether there are differences between the relevant laws, and if so, whether such differences give rise to a "true conflict." *See Tucci v. Club Mediterranee, S.A.,* 89 Cal.App.4th 180, 107 Cal.Rptr.2d 401, 407 (2001). If there is such a "true conflict," courts in tort cases apply the law of the state whose interests would be more impaired if not applied, *id.,* while courts in contracts cases apply the law of the state possessing the most significant contacts to the dispute, *ABF Capital Corp. v. Berglass,* 130 Cal.App.4th 825, 30 Cal.Rptr.3d 588, 596 (2005). Here, the Court has

already determined that there are differences in the state's consumer-fraud, warranty, and unjust-enrichment laws that give rise to true conflicts. Further, the interests of the state of purchase would be most impaired if its consumer-fraud laws were not applied, and the state of purchase has the most significant contacts with the parties' sales contract for *GTA:SA.* Therefore, California conflicts jurisprudence also requires the application of the law of the state of purchase to Settlement Class members' claims.

### 4. Illinois Conflicts Analysis

[15][16][17][18] Illinois follows the Restatement (Second) of Conflict of Laws, *see Townsend v. Sears, Roebuck & Co.,* 227 Ill.2d 147, 316 Ill.Dec. 505, 879 N.E.2d 893, 898-909 (2007), which is similar in application to the choice-of-law rules of New York, Pennsylvania, and California. Under the Restatement, courts must first determine if there is an actual conflict in the relevant laws. *Id.* at 898.If there is such a conflict, courts then proceed to the second step of the analysis. In cases involving fraud and misrepresentation, such as this one, there is a presumption that the tort law of the state wherein the plaintiff received and relied upon the misrepresentation at issue will apply, if there is such a state. *See* Restatement (Second) of Conflict of Laws § 148(1). This presumption can be overcome only through a showing that some other state has a more significant relationship to the occurrence and the parties, with respect to the particular issue in question. *Id.; see also Townsend,* 316 Ill.Dec. 505, 879 N.E.2d at 903 (rejecting proposition that similar provision of Restatement contemplates only a bursting-bubble presumption). In contracts cases, Illinois courts, like their counterparts in New York and California, apply the significant-contacts test. *See United Farm Family Mut. Ins. Co. v. Frye,* 381 Ill.App.3d 960, 320 Ill.Dec. 639, 887 N.E.2d 783, 788 (2008) (citation omitted); *see also* Restatement (Second) of Conflict of Laws § 188.

As discussed above, there are actual conflicts in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

states' consumer-fraud, warranty, and unjust-enrichment laws, which are relevant to the facts of this case. Further, each Settlement Class member received and relied upon the defendants' misrepresentation, if anywhere, in the state where he purchased his copy of *GTA:SA*, which creates a presumption that the consumer-fraud law of the state of purchase should apply. Given the strong state interest in policing consumer purchases within the state's borders, and the weak state interest in regulating consumer purchases outside those borders, *In re Relafen,* 221 F.R.D. at 278, there is no other state that has a closer relationship to the subject matter of this suit than each Settlement Class member's state of purchase. Likewise, the state of purchase has the most significant contacts to the parties' sales contract for *GTA:SA* because that state is the situs of the contracting, negotiation, and performance of the sales contract. *See* Restatement (Second) of Conflict of Laws § 188(3). Accordingly, Illinois choice-of-law principles require the application of the consumer-fraud, warranty, and unjust-enrichment laws of the state wherein each Settlement Class member bought his game. *See Dex-Cool,* 241 F.R.D. at 315-18 (applying Illinois conflicts jurisprudence to find that law of state where each plaintiff resides applies to claims for breach of warranty); *see also In re Pharm. Indus. Average Wholesale Price Litig.,* 230 F.R.D. 61, 82-83 (D.Mass.2005) (applying Massachusetts conflicts jurisprudence, which is also based on Restatement (Second) of Conflict of Laws, to conclude that law of state where each plaintiff resides governs consumer-protection claims).[FN16]

## 5. Minnesota Conflicts Analysis

**\*9** [19] Minnesota's choice-of-law principles are substantially different from those of New York, Pennsylvania, California, and Illinois, though their application leads to the same result in this case. Under Minnesota conflicts jurisprudence, courts must first determine whether a conflict exists between the relevant laws. *See Jacobson v. Universal Underwriters Ins. Grp.,* 645 N.W.2d 741, 745

(Minn.Ct.App.2002). If there is a conflict, courts must balance five choice-influencing factors, including "(1) Predictability of results; (2) Maintenance of interstate and international order; (3) Simplification of the judicial task; (4) Advancement of the forum's governmental interest; and (5) Application of the better rule of law." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.,* 604 N.W.2d 91, 94 (Minn.2000) (citations omitted).[FN17] Here, the Court has determined that there are actual conflicts between the relevant state consumer-protection laws.[FN18] Moreover, in the discussion that follows, the Court finds that the first and second choice-influencing factors weigh overwhelmingly in favor of the application of the law of each Settlement Class member's state of purchase, and the fourth factor concurs in that result. Though the third factor may tilt slightly in favor of Minnesota's law, the Court holds that the decisive weight of the first two factors, in combination with the fourth, requires the application of the law of the state of purchase in this case.[FN19]

[20][21] The first choice-influencing factor measures the predictability of a given choice of law "before the time of the transaction or event giving rise to the cause of action." *Danielson v. Nat'l Supply Co.,* 670 N.W.2d 1, 7 (Minn.Ct.App.2003) (emphasis omitted). Generally, this factor is given little weight in tort cases involving accidents. *Nodak Mut. Ins. Co.,* 604 N.W.2d at 94. Nevertheless, Settlement Class members' claims sound not only in tort, but also in contract. Moreover, insofar as the claims sound in the tort of fraud, they arise not from accidental contacts, but from transactions into which the parties deliberately entered. Under these circumstances, the parties had every reason to expect that the transactions underlying this litigation would be governed by the law of the state in which the transactions occurred. *See Schumacher v. Schumacher,* 676 N.W.2d 685, 690 (Minn.Ct.App.2004) (finding in tort case that first factor was relevant because tort arose out of business activity). Therefore, the first factor favors the application of the law of the state of purchase.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

[22] The second choice-influencing factor evaluates whether the application of the forum state's law would manifest disrespect for other states' laws.*Nodak Mut. Ins. Co.,* 604 N.W.2d at 95.Although this factor "is generally not implicated if the state whose law is to be applied has sufficient contacts with and interest in the facts and issues being litigated," a state should not apply its own law if it "has little or no contact with a case and nearly all of the significant contacts are with a sister state."*Hughes v. Wal-Mart Stores, Inc.,* 250 F.3d 618, 621 (8th Cir.2001) (internal quotation marks and citations omitted). Here, Minnesota undoubtedly has contacts with and interests in the purchases Settlement Class members made within the state's borders. Nevertheless, Minnesota's interest in regulating purchases that took place outside its borders is minimal or non-existent, *see In re Relafen,* 221 F.R.D. at 278, especially because the defendants are not Minnesota corporations. Hence, the Court holds that the application of Minnesota's law-or the law of any state other than the state of purchase-to transactions that took place throughout the nation would constitute an unwarranted infringement upon other states' sovereignty. The second factor thus weighs in favor of applying the law of the state of purchase to each Settlement Class member's claims.

**\*10** [23] The third choice-influencing factor is largely concerned with the clarity of the relevant conflicting laws, *Nodak Mut. Ins. Co.,* 604 N.W.2d at 95, which is not an issue in the instant case. Nevertheless, insofar as the application of the fifty states' laws would complicate the Court's task, this factor arguably weighs slightly in favor of applying Minnesota's law. *See In re St. Jude Med., Inc.,* 01 Md. 1396(JRT)(FLN), 2006 WL 2943154, at \*6 (D.Minn. Oct. 13, 2006), *overruled on other grounds In re St. Jude Med., Inc.,* 522 F.3d 836 (8th Cir.2008).

[24][25][26] The fourth factor requires an evaluation of Minnesota's governmental interest, relative to that of other states. *See Nesladek v. Ford Motor.*

*Co.,* 46 F.3d 734, 739-40 (8th Cir.1995). In this context, "Minnesota places great value in compensating tort victims."*Boatwright v. Budak,* 625 N.W.2d 483, 489 (Minn.Ct.App.2001) (citation omitted). Accordingly, Minnesota has an interest in having its own consumer-protection law applied if that law is beneficial to Settlement Class members. In this respect, it is significant that Minnesota does not require privity in order to state a claim for breach of implied warranty. *See Indus. Graphics, Inc. v. Asahi Corp.,* 485 F.Supp. 793, 800 (D.Minn.1980). Because Settlement Class members did not purchase *GTA:SA* directly from the defendants, the application of Minnesota's warranty laws would therefore be favorable to the Class.

The same cannot be said, however, for Minnesota's consumer-fraud laws. As the Court discusses below, the reliance requirement found in some states' consumer-fraud laws creates individualized issues that bar certification of the Settlement Class. *See infra* Part II.B. Although Minnesota does not expressly require a showing of reliance in order to state a claim for consumer fraud, the Eighth Circuit recently determined that, at the very least, defendants could escape liability under Minnesota's consumer-fraud statute by showing that the plaintiffs did not rely upon the alleged misrepresentation at issue. *In re St. Jude Med., Inc.,* 522 F.3d at 839-40.As a result, the Eighth Circuit decertified a nationwide class of purchasers to whom the lower court had decided to apply Minnesota law. *Id.* at 839-42.In light of the Eighth Circuit's recent decision, Minnesota's consumer-fraud laws are not especially favorable to Settlement Class members. Under these circumstances, the application of Minnesota's warranty laws would advance Minnesota's interest in compensating fraud victims, while the application of its consumer-fraud laws would not evidently advance that interest.

[27] In addition to Minnesota's interest in compensating victims, the Court must also consider the other states' strong interest in having their consumer-protection laws applied to transactions that took

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

place within their borders.*In re Relafen,* 221 F.R.D. at 278.After balancing these at-times competing interests, the Court finds that the fourth choice-influencing factor weighs in favor of applying Minnesota law only to the claims of Settlement Class members who purchased *GTA:SA* within the state's borders.[FN20]*See In re Baycol Prods. Litig.,* 218 F.R.D. 197, 207 (D.Minn.2003) ("The advancement of the forum's governmental interest factor generally weighs in favor of application of the state law in which the plaintiff. lives and in which the injury occurred."). Although, for reasons discussed *infra,* Part II.B., this determination ultimately precludes the certification of the Settlement Class, it does not bar Class members who purchased *GTA:SA* in Minnesota-precisely the Settlement Class members whom Minnesota has a strong interest in protecting-from advancing claims under Minnesota law in the future, and thus, the determination does not significantly undermine Minnesota's interests.

*11 In light of the foregoing, the first and second choice-influencing factors decidedly favor the application of the law of the state of purchase, the fourth factor also favors that result, and the third factor only mildly opposes it. Therefore, Minnesota's choice-of-law jurisprudence demands the application of the law of the state wherein each Settlement Class member purchased *GTA:SA.*[FN21]*Cf. In re Baycol Prods. Litig.,* 218 F.R.D. at 207 (applying law of state where injury took place and plaintiffs resided to putative nationwide class asserting negligence claims).

In summary, the choice-of-law principles of New York, Pennsylvania, California, Illinois, and Minnesota all require the application of the law of the state of purchase to Settlement Class members' claims. Because this is a nationwide class action, the Court must therefore apply the laws of the fifty states and the District of Columbia.

**B. The Predominance Requirement**

[28] Having determined that it must apply the law of the state of purchase to Settlement Class members' claims, the Court now turns to the predominance inquiry under Rule 23(b)(3). That inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."*Amchem Prods.,* 521 U.S. at 623, 117 S.Ct. 2231.The predominance requirement is met where the legal or factual questions subject to generalized proof "are more substantial than the issues subject only to individualized proof."*Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1253 (2d Cir.2002) (citation omitted). Although the predominance requirement is "readily met in certain cases alleging consumer ... fraud,"*Amchem Prods.,* 521 U.S. at 625, 117 S.Ct. 2231, the presence of individualized issues regarding the necessity of proving reliance, *see McLaughlin,* 522 F.3d at 222-25, or the underlying applicable law, *see In re Zyprexa Prods. Liability Litig.,* 04 Md. 1596, 2008 WL 2696916, at *138 (E.D.N.Y. July 2, 2008), may preclude a finding of predominance.

Here, because the plaintiffs' allegations of fraud focus on the defendants' uniform course of conduct in the design, rating, marketing, sale, and re-rating of *GTA:SA,* there are many issues of fact and law common to the Settlement Class. Such common issues include, but are not limited to: (1) whether *GTA:SA,* as produced and sold by the defendants before July 20, 2005, contained the Sex Minigame; (2) whether gamers could easily access the Sex Minigame through the Hot Coffee Mod; (3) whether the defendants violated the ESRB's rules by not informing that entity of the presence of the Sex Minigame in *GTA:SA's* code during the initial ratings process; (4) whether the packaging for *GTA:SA* discs bore an "M" rating before July 20, 2005; (5) whether, given the presence of the Sex Minigame, the packaging for *GTA:SA* discs should have borne an "AO" rating before July 20, 2005; and (6) whether the ESRB changed the rating of *GTA:SA* to "AO" on July 20, 2005. In short, the defendants' uniform course of allegedly misleading conduct is at the heart of the litigation.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

**\*12** Nevertheless, because reliance is an element of consumer fraud in some states, *see* Tex. Bus. & Com.Code § 17.50(a)(1)(B) (Vernon 2005) (providing that consumer may maintain action for deceptive practice upon which he relied to his detriment); Wyo. Stat. Ann. § 40-12-108(a) (2008) ("A person relying upon an uncured unlawful deceptive trade practice may bring an action under this act ...."); *see Lynas v. Williams,* 216 Ga.App. 434, 454 S.E.2d 570, 574 (1995) (holding that justifiable reliance is an element of deceptive practices); *Feeney v. Disston Manor Personal Care Home, Inc.,* 849 A.2d 590, 597 (Pa.Super.2004) (indicating that justifiable reliance is an element of deceptive practices),[FN22] the alleged uniformity of the defendants' fraudulent conduct is insufficient, on its own, to justify a finding of predominance, *see McLaughlin,* 522 F.3d at 223 ("But proof of misrepresentation-even widespread and uniform misrepresentation-only satisfies half the equation; the other half, reliance on the misrepresentation, cannot be subject to general proof.")

In the sections that follow, the Court holds that the plaintiffs have failed to show that issues common to the Settlement Class predominate over individualized issues. In Part II.B.1, the Court rules that this case is controlled by *McLaughlin,* which decertified a nationwide class due to individualized reliance issues, 522 F.3d at 222-26. Further, in Part II.B.2, the Court finds that the Settlement Class is plagued by additional individualized issues beyond the reliance issues identified by *McLaughlin.* Therefore, the Court decertifies the Settlement Class.

### 1. McLaughlin Precludes Certification of Settlement Class

In *McLaughlin,* the plaintiffs contended that reliance could be proved on a class-wide basis because the defendants-much like the defendants to this action-marketed their Light cigarettes in a consistent, singular, uniform fashion. *See* 522 F.3d at 223.[FN23] The Second Circuit determined, however, that "[i]ndividualized proof [was] needed to over-

come the possibility that a member of the purported class purchased Lights for some reason other than the belief that Lights were a healthier alternative...." *Id.* After finding that the fraud-on-the-market presumption of reliance is inapplicable outside the securities context, *id.* at 224, the Second Circuit held that smokers of Light cigarettes could have elected to purchase such cigarettes "for any number of reasons, including a preference for the taste and a feeling that smoking Lights was cool," *id.* at 225 (internal quotation marks and citation omitted). Hence, the Second Circuit found that reliance was "too individualized to admit of common proof." *Id.*

Likewise, in the instant case, members of the Settlement Class may have purchased *GTA:SA* for any number of reasons other than its "M" rating, including because they hoped the game would contain sex, violence, and other controversial content in abundance. Indeed, the defendants introduced expert evidence tending to show that an overwhelming majority-perhaps as many three-quarters-of *GTA:SA* purchasers did not consider the game's content rating at the time they made their purchase. (Defs.' Opp'n Class Cert., Declaration of Eugene Pennell Ericksen, Ex. A ("Ericksen Report"), at 15-16). Regardless of the admissibility or accuracy of this expert evidence,[FN24] its existence demonstrates that individualized issues pertaining to reliance are in dispute. Furthermore, the plaintiffs have failed to come forward with any evidence of their own conclusively showing that most or all Settlement Class members relied upon *GTA:SA's* content rating when they purchased the game. *Cf. McLaughlin,* 522 F.3d at 225 n. 6 (noting that plaintiffs had produced an expert report claiming that 90.1% of those individuals who smoked Lights did so because of purported health benefits, but discounting claim as unreliable).

**\*13** The *McLaughlin* decision leaves open the possibility of certifying a putative class action in which individualized reliance would be an issue, though it declines to clarify what characteristics such a class might possess. *Id.* at 224-25 (refusing to adopt Fifth

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Circuit's *per se* bar on certification of fraud actions involving individualized reliance issues). The Court is unpersuaded, however, that there are relevant distinctions between the *McLaughlin* class and the Settlement Class. To be sure, this litigation involves one product and one alleged misstatement, *i.e.*, the "M"-content rating borne by *GTA:SA* before July 20, 2005, whereas *McLaughlin* involved an alleged industry-wide scheme to mislead Light-cigarette smokers about the health benefits of Lights through various advertisements and other public statements over several decades, *see Schwab v. Philip Morris USA, Inc.*, 449 F.Supp.2d 992, 1028-29 (E.D.N.Y.2006). Nevertheless, the *McLaughlin* decision did not rest on the multiplicity of allegedly false statements promulgated by the defendants, or on the diverse range of products involved. In fact, the decision assumed that the defendants had misrepresented that Lights were healthier than full-flavored cigarettes, *see McLaughlin*, 522 F.3d at 220 n. 2, and did not question the plaintiffs' claim that the defendants had acted uniformly with respect to members of the putative class, *see id.* at 223. Accordingly, the singularity and uniformity of the fraud alleged in this case provide no reason to distinguish *McLaughlin.*

Furthermore, the Court perceives no persuasive ground to afford the plaintiffs in this matter a presumption of reliance that was denied to the plaintiffs in *McLaughlin, see id.* at 224 (declining to apply securities-fraud presumption of reliance). There is no reason to conclude that a *GTA:SA* purchaser would be more likely to rely upon the game's rating than a Light-cigarette purchaser would be to rely upon Light cigarettes' purported health benefits. Indeed, health benefits are arguably more related to Light cigarettes' represented function than *GTA:SA's* content rating is to the game. Thus, one might expect a smoker to rely more upon Light cigarettes' represented health benefits than a gamer would rely upon *GTA:SA's* "M" rating. In any event, the Court can conceive of no reason or authority to grant the plaintiffs in this matter the benefit of a presumption of reliance not afforded the

plaintiffs in *McLaughlin.*

[29][30] In addition, the fact that the plaintiffs in this matter seek certification of a settlement class is no ground to distinguish *McLaughlin,* which involved a putative litigation class. During the preliminary fairness hearing, defense counsel argued that the Settlement was "devised ... creatively to duck the predominance question."(Tr. 7, Nov. 28, 2007). The predominance inquiry, however, "trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement."*Amchem Prods.,* 521 U.S. at 623, 117 S.Ct. 2231. Accordingly, the Settlement does not relieve the Court of its duty to perform a robust analysis of the plaintiffs' predominance showing. *See Amchem Prods.,* 521 U.S. at 620, 117 S.Ct. 2231 (indicating that specifications of Rule 23 other than trial-manageability requirement "demand undiluted, even heightened, attention in the settlement context"); *Denney,* 443 F.3d at 270 (holding that strictures of Rule 23 should not be loosened because of settlement); *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 529-30 (3d Cir.2004) (ruling that specifications of Rule 23 other than trial-manageability inquiry must be observed in case of settlement class). Furthermore, though Lead Counsel argued during the preliminary fairness hearing that reliance issues related only to the trial-manageability prong of Rule 23 (Tr. 10, Nov. 28, 2007), the Second Circuit has since clarified that individualized issues of reliance impact the predominance inquiry as well, *McLaughlin,* 522 F.3d at 222-26. Indeed, the *McLaughlin* decision focuses exclusively upon the predominance question in holding that the individualized reliance rendered class certification inappropriate. *Id.* at 222. Therefore, the plaintiffs' request for certification of a settlement class, rather than a litigation class, does not bring this case outside *McLaughlin's* ambit.

**\*14** Further, the fact that only some states' consumer-fraud laws require proof of reliance does not mitigate the effect of individualized reliance issues. As an initial matter, it appears that *many* states'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

consumer-fraud statutes require proof of reliance or proof of reliance-mimicking causation elements. *See* Mary Dee Pridgen, *Consumer Protection and the Law* § 3.14 (Oct.2007), *available on Westlaw at* CONPROT § 3:14. More importantly, the plaintiffs have requested certification of a nationwide class, including members who purchased *GTA:SA* in reliance states, and they cannot now ask the Court to turn a blind eye to these individuals' substantive claims. *Cf. Chin,* 182 F.R.D. at 458-59 (stating that plaintiffs had bypassed potential opportunities to simplify class and make certification more feasible); *Ford Ignition Switch,* 174 F.R.D. at 350 (same). Because individualized reliance issues attach to the consumer-fraud claims of thousands, if not millions, of Settlement Class members, the differing state-law treatment of reliance is no reason to distinguish *McLaughlin.Cf. In re St. Jude Med., Inc.,* 522 F.3d at 839-40 (decertifying putative nationwide class action on grounds that reliance element of Minnesota's consumer-fraud statute precluded finding that common issues predominated).

Accordingly, the Second Circuit's holding in *McLaughlin* requires the decertification of the Settlement Class.

**2. There Are Substantial Individualized Issues Other Than the Reliance Issues Identified by *McLaughlin***

Even assuming that *McLaughlin* does not necessarily demand decertification here, there are substantial individualized issues other than the reliance issues present in *McLaughlin* that counsel in favor of decertification. First, certain elements of Settlement Class members' underlying causes of action inject individualized issues other than reliance into this litigation. Specifically, the consumer-fraud laws of some states require proof of an ascertainable monetary loss, which substantially confounds the predominance question. Additionally, the equitable defense of unclean hands, which may bar some Settlement Class members' claims for unjust enrichment, also creates individualized issues concerning the

conduct of particular Settlement Class members. Second, there are many differences in the underlying state laws applicable to Settlement Class members' claims, which ultimately calls into question the cohesiveness of the Class.

**a. Further Individualized Issues Arise from Other Elements of Underlying Consumer-Protection Law**

Several states require that plaintiffs demonstrate an ascertainable loss of money or property in order to state a claim for consumer fraud. *See, e.g.,*Ala.Code § 8-19-10(a) (2008) (requiring showing of "monetary damage to another person"); Conn. Gen.Stat. Ann. § 41-110g(a) (West 2007) (requiring showing of "ascertainable loss of money or property"); Idaho Code Ann. § 48-508(1) (2008) (requiring proof of "ascertainable loss of money or property"); 73 Pa. Stat. Ann. § 201-9.2(a) (2008) (providing private cause of action to consumers who suffer "ascertainable loss of money or property"). Like the reliance requirement, the ascertainable-loss requirement may create individualized issues that bar the certification of a consumer-fraud class action. *See Lester v. Percudani,* 217 F.R.D. 345, 352 (M.D.Pa.2003) (finding that ascertainable-loss element required individualized damages inquiry that defeated predominance); *In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 68-69 (S.D.N.Y.2002) (finding that ascertainable-loss element required individualized inquiry into whether particular class members "got their money's worth").

**\*15** Although the ascertainable-loss requirement may not bar certification where the defendant has engaged in a uniform practice of overcharging to which all class members were, by definition, exposed, *see Allen v. Holiday Universal,* 249 F.R.D. 166, 193 (E.D.Pa.2008), where it is unclear that some or all class members suffered a measurable monetary harm, the ascertainable-loss requirement often precludes certification, *see id.* at 192-93.Here, the plaintiffs have conceded that *GTA:SA* pur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

chasers obtained a properly-functioning product, with the possibly unwanted addition of the Sex Minigame. (Tr. 14, Nov. 28, 2007.) Further, the defendants have introduced evidence tending to show that very few Settlement Class members-perhaps as few as 15%-knew of the Sex Minigame's existence, let alone accessed it. (Ericksen Report 19, 26-29.) Though the plaintiffs challenge the admissibility and accuracy of this evidence, *see*06 Md. 1739(SWK)(MHD), Dkt. No. 56, the Ericksen Report at the very least demonstrates that the question of whether Settlement Class members suffered an actual, ascertainable loss is very much in dispute. Moreover, the Court must decline the defendants' invitation (Tr. 7, Nov. 28, 2007) to ignore this dispute, which bears upon the predominance inquiry, simply because the parties have agreed to a settlement that allegedly obviates the need for an individualized damages inquiry. *See Amchem Prods.,* 521 U.S. at 623, 117 S.Ct. 2231.Accordingly, the ascertainable-loss requirement found in many states' consumer-fraud laws adds further individualized issues to the Settlement Class. *Cf. McLaughlin,* 522 F.3d at 231-32 (noting that although class may be certified despite individualized damages issues, courts should still consider damages issues when conducting predominance inquiry, and finding that individualized damages issues weighed against predominance finding in that case).

In addition, the plaintiffs' claims of unjust enrichment give rise to the potential defense of unclean hands in at least some states. *See, e.g., Las Vegas Fetish,* 182 P.3d at 766-67 (acknowledging that unclean hands could be defense to unjust-enrichment claim but finding under facts of case that unclean-hands defense was unpersuasive); *Melius v. Breslin,* 46 A.D.3d 524, 846 N.Y.S.2d 645, 647 (N.Y.App.Div.2007) (holding that claim for unjust enrichment was barred by doctrine of unclean hands); *Hollifield v. Monte Vista Biblical Gardens, Inc.,* 251 Ga.App. 124, 553 S.E.2d 662, 670 (2001) (dismissing claim for unjust enrichment partly on ground of unclean hands). Leaving aside whether the law of unjust enrichment and the doctrine of un-

clean hands are uniform in the fifty states, the unclean-hands defense undoubtedly introduces significant individualized issues into this litigation, *see Clay,* 188 F.R.D., at 500-01 n. 5 (indicating that unclean-hands defense would require individualized inquiry into whether particular putative class members should be barred from recovery on ground that they acted inequitably). In particular, Settlement Class members could only access the Sex Minigame if they, or some third-party user other than the defendants, deliberately modified *GTA:SA's* code. Because the modification of *GTA:SA's* code may violate the game's End User License Agreement, and in any event, as such conduct is generally deliberate and willful. Settlement Class members who modified *GTA:SA* to view the Sex Minigame may be barred from invoking this Court's equitable jurisdiction. As such, the presence of a colorable unclean-hands defense in the instant case may necessitate a particularized inquiry into the circumstances under which Settlement Class members purchased and used *GTA:SA,* thereby injecting substantial individualized issues into this litigation. *See In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.,* MDL. No. 1703, 2007 WL 4287511, at *9 (N.D.Ill. Dec. 4, 2007) (refusing to certify unjust-enrichment class on ground that claim required individualized inquiry into putative class members' situations).

**b. State-Law Differences Compound Existing Individualized Issues**

**\*16** The differing state laws applicable to Settlement Class members' claims compound the individualized issues identified above. *See Amchem Prods.,* 521 U.S. at 624, 117 S.Ct. 2231 (indicating that differences in applicable state law compound other individualized issues). In particular, the differing state consumer-protection laws make certain issues relevant to some Settlement Class members, but not others. Accordingly, differences in the pertinent state consumer-protection laws undermine the cohesiveness of the Settlement Class, and raise concerns regarding the propriety of grouping indi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

viduals with distinctly different substantive claims in a single nationwide class. *See In re Zyprexa,* 2008 WL 2696916, at *138 (tentatively holding that differences in state consumer-protection laws precluded finding of predominance) (citations omit- ted).

Many courts have determined that differences in the underlying state laws applicable to individual putative class members' consumer-protection claims preclude a finding of predominance. *See, e.g., In re Zyprexa,* 2008 WL 2696916, at *138 (tentatively holding, *inter alia,* that differences in state consumer-practices laws defeated predominance); *Dex-Cool,* 241 F.R.D. at 315 (holding, *inter alia,* that differences in state express-warranty laws defeated predominance requirement); *In re Ford Motor Co. Ignition Switch Prods. Liability Litig.,* 194 F.R.D. 484, 489-91 (D.N.J.2000) (finding, *inter alia,* that differences in states' consumer-protection laws defeated predominance, even under proposed grouping of similar State laws); *Chin,* 182 F.R.D. at 457-62 (ruling, inter alia, that differences in state consumer-fraud and warranty laws defeated predominance); *In re Ford Motor Co. Vehicle Paint Litig.,* 182 F.R.D. 214, 222-24 (E.D.La.1998) (holding, inter alia, that differences in state fraudu-lent-concealment laws defeated predominance); *Clement v. Am. Honda Fin. Corp.,* 176 F.R.D. 15, 23 (D.Conn.1997) (ruling, *inter alia,* that differences in state unfair-trade-practices laws defeated predominance); *Ford Ignition Switch,* 174 F.R.D. at 349-51 (finding, *inter alia,* that differences in states' consumer-protection laws defeated predominance); *In re Masonite Corp. Hardboard Siding Prods. Liability Litig.,* 170 F.R.D. 417, 423-24 (E.D.La.1997) (holding, *inter alia,* that differences in state products-liability laws defeated predominance).

Other courts, however, have found the predominance requirement to be satisfied despite differences in the underlying state laws applicable to putative class members' claims. *See, e.g., In re Warfarin,* 391 F.3d at 529-30 (holding that plaintiffs met pre-

dominance requirement where they alleged that drug manufacturer violated fifty states' laws by misleading class members about generic alternatives to manufacturer's brand-name drugs); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 314-15 (3d Cir.1998) (holding that plaintiffs satisfied predominance requirement where they alleged that defendants engaged in deceptive marketing and sales of insurance policies, in violation of, *inter alia,* various states' consumer-fraud laws); *Desantis v. Snap-On Tools Co.,* 06 Cv. 2231(DMC), 2006 WL 3068584, at *4 (D.N.J. Oct. 27, 2006) (holding that plaintiffs fulfilled predominance requirement where they alleged that defendant engaged in common course of deceptive business practices); *Varacallo v. Mass. Mut. Life. Ins. Co.,* 226 F.R.D. 207, 230-32 (D.N.J.2005) (holding that plaintiffs satisfied predominance requirement where they alleged that defendants violated state deceptive-practices laws through misleading marketing of insurance policies); *O'Keefe v. Mercedes-Benz USA, LLC,* 214 F.R.D. 266, 290-91 (E.D.Pa.2003) (holding that plaintiffs satisfied predominance inquiry where they alleged, *inter alia,* that defendants violated states' unfair-trade-practices law by engaging in common course of fraud); *Manners v. Am. Gen. Life Ins. Co.,* 98 Cv. 0266:3, 1999 WL 33581944, at *16-*17 (M.D.Tenn. Aug. 11, 1999) (holding that plaintiffs satisfied predominance requirement where they alleged, *inter alia,* that defendants violated state law by deceptively marketing insurance policies); *In re Mfrs. Life Ins. Co. Premium Litig.,* 96 Cv. 230(BTM)(AJB), 1998 WL 1993385, at *3 (S.D.Cal. Dec. 21, 1998) (holding that plaintiffs satisfied predominance requirement where they alleged that defendants violated states' consumer-protection statutes by deceptively marketing insurance policies).

**\*17** A common distinction separating these two lines of cases is the presence or absence of a settlement. In particular, those courts faced with a putative settlement class more frequently determined that the predominance test was met. *But see Clem-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

Page 22

*ent*, 176 F.R.D. at 23 (decertifying settlement class on ground that differences in state unfair-trade-practices laws defeated predominance). Nevertheless, the predominance inquiry-as distinguished from the trial-manageability inquiry-should not be watered down merely because the parties have entered a proposed settlement. *See Amchem Prods.*, 521 U.S. at 620, 117 S.Ct. 2231;*Denney*, 443 F.3d at 270;*In re Warfarin*, 391 F.3d at 529-30.Under the facts of this case, differences in the applicable state laws go to the heart of Settlement Class members' substantive claims, and thus undermine the Settlement Class's cohesiveness. Therefore, certification of the Settlement Class is especially-inappropriate, despite the existence of the Settlement.

Individual Settlement Class members face distinctly different potential legal obstacles to recovery. For example, the reliance issue is irrelevant to Settlement Class members from states not requiring a showing of reliance to make out a claim for consumer fraud, *see, e.g.*,Kan. Stat. Ann. § 50-626(b) (2007) (indicating that seller may commit deceptive act "whether or not any consumer has in fact been misled"); N.J. Stat. Ann. § 56:8-2 (West 2008) (indicating that seller may commit deceptive act "whether or not any person has in fact been misled, deceived or damaged thereby"); *S & R Assocs., L.P. v. Shell Oil Co.*, 725 A.2d 431, 440 (Del.Super.Ct.1998) (indicating that actual reliance is not an element of statutory consumer fraud); *State ex rel. Corbin v. Tolleson*, 160 Ariz. 385, 773 P.2d 490, 503 (1989) ("Reliance is not an element of consumer fraud."), while reliance is of the essence to those Class members who purchased *GTA:SA* in reliance states, *see, e.g.*,Tex. Bus. & Com.Code § 17.50(a)(1)(B) (Vernon 2005); Wyo. Stat. Ann, § 40-12-108(a) (2008). (*See also* Pls.' Mot. Class Cert., Declaration of Andrew P. Bell ("Bell Decl.") Ex. 18 (evaluating states' consumer-fraud laws with reference to scienter, reliance, and relief available).)

Likewise, the defendants' scienter is of no concern to Settlement Class members from states not requiring a scienter showing, *see, e.g.*, *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892, 897 (N.Y.1999) (indicating that intent to defraud is not an element of consumer fraud in New York); *Kessler v. Fanning*, 953 S.W.2d 515, 521 (Tex.App.1997) (stating that plaintiff need not prove seller's knowledge of affirmative statement's falsity because law presumes that defendant knows whether affirmative statement was true), while the defendants' knowledge or intent-as the case may be depending on the relevant state law-is of central importance to members from scienter states, *see, e.g.*,Colo.Rev.Stat. Ann. § 6-1-105(1)(u) (West 2008) (requiring showing of "inten[t] to induce the consumer to enter into a transaction"), Nev.Rev.Stat. Ann. § 598.0979(1) (West 2008) (requiring showing of knowledge); *Dodson v. U-Neeeda Self Storage, LLC*, 32 Kan.App.2d 1213, 96 P.3d 667, 671 (2004) (requiring showing that defendant perpetrated fraud "knowingly or with reason to know"); *Sam v. Beaird*, 685 So.2d 742, 744 (Ala.Civ.App.1996) (requiring showing of "some knowledge of false or deceptive conduct"). (*See* Bell Decl. Ex. 18 (setting forth fifty-state analysis of scienter requirement).).

**\*18** Similarly, many Settlement Class members must show that they suffered an ascertainable monetary loss, *see, e.g.*,Ala.Code § 8-19-10(a) (2008); Conn. Gen.Stat. Ann. § 41-110g(a) (West 2007); Idaho Code Ann. § 48-608(1) (2008); 73 Pa. Stat. Ann. § 201-9.2(a) (2008), whereas other Class members face no such requirement, *see, e.g.*,Kan. Stat. Ann. § 50-634(a), (b) (2007) (providing individual cause of action to "aggrieved" consumers, whether or not they have suffered damages).

Further, some Settlement Class members are apparently barred from participating in any consumer-fraud class action, let alone this one, *see, e.g.*, *see*Ala.Code § 8-19-10(f) (2008); Ga.Code. Ann. § 10-1-399(a) (West 2007); La.Rev.Stat. Ann. § 51:1409(A) (2008); Miss.Code Ann. § 75-24-15(4) (West 2007); Mont.Code Ann. § 30-14-133(1)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

(2007); *Arnold v. Microsoft Corp.,* 00 Cv. 123, 2001 WL 193765, at *6 (Ky.Cir.Ct. July 21, 2000) (holding that relevant Kentucky consumer-fraud provision does not permit class-action suit), while other Settlement Class members must notify the state Attorney General, *see, e.g.,*Kan. Stat. Ann. § 50-634(g) (2007); Mo. Ann. Stat. 407.025(7) (West 2008); N.J. Stat. Ann. § 56:8-20 (West 2008); Or. Rev.Stat. Ann. § 646.638(2) (West 2007); Wash. Rev.Code Ann. § 19.86.095 (West 2008), or the defendant, *see, e.g.,*Ala.Code § 8-19-10(e) (2008); Alaska Stat. Ann. § 45.50.535(b)(1) (West 2008); Cal. Civ.Code § 1782(a)(1) (West 2008); Ga.Code Ann. § 10-1-399(b) (West 2007); Ind.Code Ann. § 24-5-0.5-5(a) (West 2008); Me.Rev.Stat. Ann. tit. 5, § 213(1-A) (West 2008); Mass. Gen. Laws Ann. ch. 93A, § 9(3) (West 2008); Tex. Bus. & Com.Code Ann. §§ 17.505 (Vernon 2007); Wyo. Stat. Ann. §§ 40-12-109, 40-12-102(a) (ix) (West 2008), of the imminence, filing, or pendency of an action for consumer fraud.[FN25]Of course, these are non-issues for Settlement Class members from states whose laws contain no such restrictions. *See, e.g.,*Conn. Gen.Stat. Ann. § 42-110h (West 2007) (contemplating maintenance of consumer-fraud class action); Utah Code Ann. § 13-11-20(1) (West 2008) (setting forth prerequisites for maintenance of consumer-fraud class action).

Moreover, because Settlement Class members did not purchase *GTA:SA* directly from the defendants, the privity requirement would bar the breach-of-warranty claims of Class members from eighteen states, *see, e.g., Adirondack Combustion Techs., Inc. v. Unicontrol, Inc.,* 17 A.D.3d 825, 793 N.Y.S.2d 576, 579 (N.Y.App.Div.2005) (citation omitted); *Flory v. Silvercrest Indus., Inc.,* 129 Ariz. 574, 633 P.2d 383, 387 (1981); *Rodrigues v. Campbell Indus.,* 87 Cal.App.3d 494, 500, 151 Cal.Rptr. 90 (Cal.Ct.App.1978), but privity is irrelevant to the claims of Settlement Class members from other states, *see, e.g., Streich v. Hilton-Davis,* 214 Mont. 44, 692 P.2d 440, 448 (1984); *Cameo Curtains, Inc. v. Philip Carey Corp.,* 11 Mass.App.Ct. 423, 416 N.E.2d 995, 998 (1981); *Indus. Graphics, Inc.,* 485

F.Supp. at 800.(*See* Bell Decl. Ex. 20 (conceding that eighteen states require proof of privity, while other thirty-two do not).)

*19 Therefore, differences in the state laws applicable to Settlement Class members' claims create significant questions concerning the cohesiveness of the Settlement Class. In particular, it is not at all clear that an individual who must prove reliance, or demonstrate an ascertainable loss, or show privity, should be grouped in the same class with another individual whose claims must meet none of these requirements.

In summary, the Settlement Class is plagued by individualized issues arising from the requirement, found in several state laws, that purchasers prove that they actually relied upon an alleged misrepresentation in order to state a claim for consumer fraud. To these individualized issues, the Court must add the potentially particularized issues arising from the ascertainable-loss requirement found in some consumer-fraud statutes, and the unclean-hands defense to unjust enrichment. These substantial individualized issues are only compounded by the differing legal obstacles to Settlement Class members' recovery, resulting from relevant distinctions in the states' consumer-protection laws. Under these circumstances, the Court follows *McLaughlin* and holds that the plaintiffs have failed to show that the Settlement Class is sufficiently cohesive to warrant certification. Accordingly, the Court decertifies the Settlement Class.

### III. Conclusion

For the foregoing reasons, the Court decertifies the Settlement Class. Consequently, the Court has no occasion to address the fairness of the Settlement, which was contingent upon the maintenance of the Settlement Class's certification.[FN26]

[31] The Court is mindful that the parties expended great time and resources in reaching the Settlement, providing notice to the Settlement Class, and pro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

Page 24

cessing claims. The Court is also sensitive to the possibility that more actions of this kind will make their way into the federal courts with the advent of the Class Action Fairness Act of 2005, Pub.L. No. 109-2, 199 Stat. 4 (Feb. 18, 2005). (Tr. 25, June 25, 2008). In addition, the Court is aware that the Second Circuit may be more deferential in its review of a decision certifying a class than in its review of a decision denying certification. *See, e.g., Parker v. Time Warner Entm't Co.,* 331 F.3d 13, 18 (2d Cir.2003) ("An appellate court is noticeably less deferential when the district court has denied class status than when it has certified a class.") (internal quotation marks, alterations, and citations omitted). Nevertheless, the Court may not, on the basis of these considerations, loosen the strictures of class certification. Litigation by representation requires the definition of a cohesive class, even if the ultimate goal is to settle that litigation before trial. *Amchem Prods.,* 521 U.S. at 623, 117 S.Ct. 2231.In light of the Second Circuit's recent decision in *McLaughlin,* 522 F.3d at 222-26, the Settlement Class does not possess the requisite cohesiveness. Therefore, the Court must decertify.

**\*20** The parties shall meet and confer to determine how this multidistrict litigation shall proceed. On or before September 5, 2008, the parties shall jointly file a proposed plan for the resolution of this litigation, which sets forth, at a minimum, a tentative schedule for the filing of any future motion(s) for class certification. If the parties are unable to formulate a plan by September 5, 2008, they shall file a brief statement explaining the grounds for their inability to reach an agreement, and shall request a date for a conference with the Court. In either event, after the Court has received the parties' submission, it shall determine whether a conference is necessary, and if so, set a conference date.

SO ORDERED.

FN1. The case captioned *Casey v. Take-Two Interactive Software, Inc.,* originated in the Eastern District of Pennsylvania, and was transferred to the Southern District of New York on November 29, 2005. *See* 05 Cv. 10013(SWK)(MHD), Dkt. No. 1.

FN2. The Settlement Class is composed of

all natural persons or entities in the United States who purchased a GTA:SA First Edition Disc, except for authorized resellers of the game, [the defendants'] current or former employees, any persons or entities that have previously executed releases discharging [the defendants] from liability concerning or encompassing any or all claims that are the subject of the [AC], between August 2004 and [December 4, 2007].

*See* Settlement II.G.

FN3. The defendants' out-of-pocket expenses include: (1) $15 for each disc returned under the Exchange Program, *see* Settlement III.B.6; (2) the face value of all cash payments made under the Benefits Program, *see* Settlement III.E; and (3) reasonable fees paid to Special Master Katsiris, *see* Hearing Order 3-4. In the event that the value of filed claims exceeds $2.75 million, the Settlement provides for the *pro rata* reduction of payments under the Benefits Program. *See* Settlement III.F. Nevertheless, the Settlement obligates the defendants to satisfy all claims made under the Exchange Program. *See* Settlement III.F.

FN4. If the defendants' out-of-pocket expenses fall below $1.025 million, the Settlement requires that they make charitable contributions in an amount equal to the difference between $1.025 million and the total payments theretofore made by the defendants. *See* Settlement III.H.

FN5. One of the objections was submitted by an individual who claimed to be a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

minor at the time he purchased *GTA:SA,* and stated that he was offended by the Sex Minigame. Given its substance, this objection seems best read as a deficient claim under the Settlement, rather than as an objection to the Settlement's terms.

FN6. *See infra* note 12.

FN7. Despite some superficial similarity among the conflicts rules of these states, the Court has no occasion to evaluate the plaintiffs' contention (Pls.' Mot. Class. Cert. 27 n. 11) that the rules are essentially uniform.

FN8. For example: (1) some states require a showing of reliance to state a claim for consumer fraud, while others do not; (2) some states require no proof of scienter to make out a claim for consumer fraud, while those requiring proof of scienter vary as to the level of proof demanded; (3) some states require proof of an ascertainable monetary loss to succeed on a claim for consumer fraud, while at least one requires no such proof; (4) some states bar the maintenance of consumer-fraud class actions, while others expressly provide for class-action litigation; (5) some states impose special notification requirements on consumer-fraud actions, while others do not; and (6) many states require proof of privity to state a claim for breach of warranty, while many others require no such proof. *See infra* Part II.B.2.b.

FN9. The *Clay* decision, which has generated much of the case law finding relevant differences in the states' laws of unjust enrichment, *see, e.g., Thompson,* 2008 WL 2762187, at *18;*Kelley v. Microsoft Corp.,* --- F.R.D. ----, ----, 2008 WL 509332, at *4 (W.D.Wash.2008)*Sears Tools,* 2006 WL 3754823, at *1 n. 3;*Lilly v. Ford Motor Co.,* 00 Cv. 7372, 2002 WL 507126, at

*2 (N.D.Ill. Apr. 3, 2002), notes that some states permit a claim for unjust enrichment only when there is no adequate remedy at law, *Clay,* 188 F.R.D. at 501.The *Clay* decision, however, fails to identify any state that would allow recovery on a claim for unjust enrichment when there was an adequate remedy at law. Likewise, the *Clay* decision notes that many states allow a defense of unclean hands, *id.,* but fails to identify any state that would not allow such a defense.

FN10. Of course, these vague, equitable formulations may receive distinct interpretations depending upon local circumstances, thereby creating further possible differences in the states' unclean-hands doctrines.

FN11. Because the plaintiffs' claims for unjust enrichment rest upon the defendants' alleged fraudulent conduct, the claims may to some extent sound in the tort of fraud, thereby necessitating a torts conflicts-analysis. *See, e.g., Hughes v. LaSalle Bank, N.A.,* 419 F.Supp.2d 605, 617 (S.D.N.Y.2006) (applying torts interest-analysis to claims for unjust enrichment not within scope of contract's choice-of-law provision), *vacated on other grounds,*2007 WL 4103680 (2nd Cir. Nov 19, 2007). Nevertheless, the Court concludes, *infra,* that the interest analysis favors the application of the consumer-fraud law of each Settlement Class member's state of purchase. For the same reasons, even if the interest analysis were the proper doctrinal framework for choosing the unjust-enrichment law applicable to this case, that analysis would demand the application of the law of each Settlement Class member's state of purchase, the same conclusion the Court reaches under the significant-contacts approach.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

Page 26

Likewise, one court in this District has applied the Restatement (Second) of Conflict of Laws to choose the applicable state law of unjust enrichment, on the grounds that the claims of unjust enrichment in that case sounded neither in tort nor contract. *In re Rezulin Prods. Liab. Litig.,* 392 F.Supp.2d at 617-18 (applying significant-relationship test set forward in Restatement (Second) of Conflict of Laws). Because, for reasons clarified in the remainder of the Court's choice-of-law analysis, the parties' relationship is centered in the state of purchase, which is also the location of the act of alleged enrichment, the Restatement (Second) would require the application of the unjust-enrichment laws of the state of purchase. *See* Restatement (Second) of Conflict of Laws § 221(2). In short, as all three conflicts tests compel the same result, it is ultimately irrelevant which one is applied.

FN12. These cases speak of the plaintiffs' "home state" in deciding, which law should apply to consumer-protection claims. Nevertheless, they use the term "home state" loosely, in the sense that it is "the place where Plaintiffs reside, or the place where Plaintiffs bought and used their allegedly defective [products] or the place where Plaintiffs' alleged damages occurred." *See, e.g., Chin,* 182 F.R.D. at 457; *Ford Ignition Switch,* 174 F.R.D. at 348. The Court holds more precisely that the law of each Settlement Class member's state of purchase should apply to his claims. Even assuming that it is the law of each plaintiff s state of residence that governs, however, that would still necessitate the application of the laws of the fifty states and the District of Columbia, which defeats predominance for the reasons stated *infra,* in Part II.B.

FN13. *See supra* note 12.

FN14. The "interest/contacts" approach applies to both tort and contracts cases. *See Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 227-29 (3d Cir.2007). As such, there is no need to analyze separately the application of Pennsylvania's choice-of-law principles to the plaintiffs' claims of consumer fraud, breach of warranty, and unjust enrichment. In any event, even assuming that certain considerations are relevant to a Pennsylvania contracts conflicts-analysis, but not relevant to a torts conflicts-analysis, the Court has already determined in its application of New York's choice-of-law principles that the law of the state of purchase has the most significant contacts with the sales contract into which Settlement Class members entered at the time they purchased *GTA:SA.*

FN15. *See supra* note 12.

FN16. *See supra* note 12.

FN17. This two-part test applies in contracts and torts cases alike. *See, e.g., Jepson v. Gen. Cas. Co. of Wis.,* 513 N.W.2d 467, 470 (Minn.1994) (case with tort and contract components). *Schumacher v. Schumacher,* 676 N.W.2d 685, 689-92 (Minn.Ct.App.2004) (tort case).

FN18. Minnesota law requires that conflicts be outcome-determinative. *See Nodak Mut. Ins. Co.,* 604 N.W.2d at 94. Because, as the Court discusses below, the individualized reliance issues found in some states' consumer-fraud laws preclude class certification under those states' laws, *see infra* Part II.B; and as the privity requirement found in some states' warranty laws bars the claims of many Settlement Class members, *see infra* Part II.B.2.b; and given that the laws of some states preclude

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

the maintenance of a class-action suit for consumer fraud, *see infra* Part II.B.2.b, there are clearly outcome-determinative conflicts in the states' consumer-protection laws.

FN19. Courts generally give little weight to the better-rule-of-law factor, *Nodak Mut. Ins. Co.,* 604 N.W.2d at 97, and the Court declines to apply it in this case.

FN20. Even if the application of some other state's laws would advance Minnesota's interest in compensating tort victims, *see Boatwright,* 625 N.W.2d at 489 ("We have even refused to apply our law when the law of another state would better serve to compensate a tort victim.") (quotation and citation omitted), each state's interest in having its own consumer-protection laws applied to in-state transactions would trump Minnesota's interest in having that plaintiff-friendly state's laws applied.

FN21. One court has held that Minnesota's choice-of-law principles require the application of Minnesota's consumer-fraud laws to a nationwide, consumer-protection class action. *In re St. Jude Med., Inc.,* 2006 WL 2943154, at *7. In that case, however, the defendant corporation was incorporated and headquartered in Minnesota, and also maintained its principal place of business in that state. *See id.* at *3. Moreover, substantially all of the corporate acts complained of occurred in Minnesota, and the product at issue was designed and manufactured in the state. *Id.* at *4. Here, the defendants possess no such close ties to Minnesota. Furthermore, the court's decision certifying a nationwide class action under Minnesota law was subsequently overturned, *In re St. Jude Med., Inc.,* 522 F.3d at 839-42, though the Eighth Circuit did not reach the choice-of-law question, *see id.* at 841. In any event, insofar as the

lower court's opinion in *In re St. Jude Med., Inc.* would require the application of Minnesota law to the Settlement Class, the Court is unpersuaded, for the reasons stated above-the-line.

FN22. The defendants claim (Defs.' Opp'n Class Cert. 28 & n. 14) that several other states' consumer-protection statutes contain causation requirements that mimic reliance. *See also* Mary Dee Pridgen, *Consumer Protection and the Law* § 3.14 (Oct.2007), *available on Westlaw at* CON-PROT § 3:14 (indicating that reliance or reliance-mimicking causation requirements are elements of consumer fraud in many states).

FN23. The Second Circuit determined that reliance was an element of a civil-RICO claim predicated upon mail or wire fraud. *McLaughlin,* 522 F.3d at 222. The Supreme Court recently ruled that plaintiffs need not prove reliance in order to have a valid civil-RICO claim whose predicate act is mail or wire fraud, *Bridge v. Phoenix Bond & Indem. Co.,* ---U.S. ----, 128 S.Ct. 2131, 2138-39, 170 L.Ed.2d 1012 (2008), thereby calling into question that portion of the Second Circuit's reasoning in McLaughlin. Nevertheless, the Supreme Court's decision in Bridge leaves unaffected the Second Circuit's discussion of reliance, as it impacts the predominance inquiry.

FN24. The plaintiffs have moved to strike the Ericksen Report. 06 Md. 1739(SWK)(MHD), Dkt. No. 56.

FN25. Although failure to comply with some of these notice requirements may not erect an insurmountable barrier to Settlement Class members' claims, *see, e.g., Pointer v. Edward L. Kuhs Co.,* 678 S.W.2d 836, 842 (Mo.Ct.App.1984); Kan.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.R.D. ----
--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

Stat. Ann. § 50-634(g) (2007); Or.Rev.Stat. Ann. § 646.638(2) (West 2007), noncompliance with other states' notice requirements may bar certain Settlement Class members' claims, *see In re Pharm. Indus. Average Wholesale Price Litig.,* 230 F.R.D. at 84-85 (refusing to certify consumer-fraud class action as to those individuals whose claims arise under states with notice requirements). Here, the plaintiffs have not introduced any evidence that Settlement Class members from those states imposing notice requirements have complied with such requirements.

FN26. In light of the Court's holding that the Settlement Class fails the predominance test, it need not address the other certification requirements, or the fairness of the Settlement. Nevertheless, the Court notes that there are important questions concerning the adequacy of the Settlement Class's representation and the fairness of the Settlement-questions that would require careful scrutiny. In particular, the Settlement provides benefits only to those Class members who swear under penalty of perjury that they were offended by consumers' ability to access the Sex Minigame, but offers no recovery to Settlement Class members who will not make this asseveration. The parties have not demonstrated, however, that "taking offense" is an element of any of the underlying claims advanced by the plaintiffs. Although it is not immediately clear that the individual Class Representatives took offense at the presence of the Sex Minigame in *GTA:SA's* code, the terms of the Settlement raise the specter that the Class Representatives negotiated a settlement that would benefit Settlement Class members like themselves, who were offended, at the expense of other Class members who were not offended, but who nonetheless possess potentially meritorious claims. This specter creates questions concerning the adequacy-of-representation element of Rule 23(a)(4).*See Amchem Prods.,* 521 U.S. at 626-27, 117 S.Ct. 2231 (decertifying class of asbestos plaintiffs on grounds that currently-injured class members had intractable conflict of interest with exposure-only class members). Moreover, the Settlement's division of Settlement Class members on a basis that bears little relationship to their underlying claims, *i.e.,* by operation of the "take offense" oath, calls into question whether the Settlement is fair to those who are disadvantaged thereby.

S.D.N.Y.,2008.

In re Grand Theft Auto Video Game Consumer Litigation

--- F.R.D. ----, 2008 WL 2971526 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT "B"

KIM COSGROVE, JULY 15, 2008

```
 1
 2    UNITED STATES DISTRICT COURT
 3    NORTHERN DISTRICT OF ILLINOIS
      -----------------------------x
 4    IN RE:                    Case No.
 5    AQUA DOTS PRODUCTS         1:08-cv-02364
 6    LIABILITY LITIGATION    Hon. David H. Coar
 7    -----------------------------x
 8
 9              KIM COSGROVE
10          New York, New York
11        Tuesday, July 15, 2008
12
13
14
15
16
17
18
19
20
21
22    Reported by:  Steven Neil Cohen, RPR
23    Job No. 204193
24
25
```

1

2                    July 15, 2008

3                    9:37 a.m.

4

5          Deposition of KIM COSGROVE, taken

6    by Defendants, pursuant to notice, at the

7    offices of Winston & Strawn LLP, 200 Park

8    Avenue, New York, New York, before Steven

9    Neil Cohen, a Registered Professional

10   Reporter and Notary Public of the State of

11   New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KIM COSGROVE, JULY 15, 2008

```
 1                    Cosgrove
 2        Q.    How long did that last?
 3        A.    I don't recall; too long for me.
 4        Q.    Do you have any reason to think
 5   that he was sucking his pointer finger while
 6   playing with the Aqua Dots?
 7        A.    No.
 8        Q.    Do you have any concern that he
 9   may have swallowed any of the Aqua Dots
10   unknown to you?
11        A.    No.
12        Q.    Why is that?
13        A.    Just that he wasn't -- I just
14   don't believe he would do that.  I don't
15   know.  I don't know.
16              Not -- I never saw any sickness or
17   anything.  He never choked on anything.
18        Q.    He is not the kind of kid who
19   tends to swallow toys?
20        A.    Right.
21        Q.    These toys weren't meant to be
22   swallowed?
23        A.    No.
24        Q.    That is correct, right?
25        A.    Correct.
```

KIM COSGROVE, JULY 15, 2008

```
1                    Cosgrove
2        Q.    I think you said that you probably
3    got a receipt with the gift from your
4    brother?
5        A.    Correct.
6        Q.    You understood that you could have
7    returned it if you wanted to, right?
8        A.    Yes.
9        Q.    You didn't want to return it
10   because it is what your kid wanted?
11       A.    Yes.
12       Q.    But if you wanted to return it you
13   could have, right?
14       A.    Yes.
15       Q.    That was yours or Christopher's
16   money if you wanted to return it?
17       A.    Yes.
18       Q.    You wouldn't have given the money
19   back to your brother?
20       A.    No.
21       Q.    Do you know if you kept the
22   receipt?
23       A.    Currently?
24       Q.    No.
25             Did you at the time keep the
```

KIM COSGROVE, JULY 15, 2008

```
1                    Cosgrove
2   received, take off all the costs --
3        A.    Maybe $800.
4        Q.    You got maybe $800, correct?
5        A.    Yes.
6        Q.    Do you recall about what year that
7   case settled?
8        A.    Maybe 2003, 2004.
9        Q.    Did you ever take Christopher to a
10  doctor relating to Aqua Dots?
11       A.    No.
12       Q.    Did you ever talk to a doctor
13  about Aqua Dots after hearing of the recall?
14       A.    No.
15       Q.    Why?
16       A.    I didn't seem to see any signs or
17  as I said I had a conversation with him.  He
18  said he didn't ingest them so I hope --
19  there was no warning signs that he had.
20       Q.    Do you think there were any risks
21  of exposure or anything like that that would
22  be a concern?
23       A.    I would hope not.  If there was I
24  would have brought him to a doctor so I
25  would have to say, no.
```

KIM COSGROVE, JULY 15, 2008

```
 1                    Cosgrove
 2        A.    Yes.
 3        Q.    Is that his claim for $35 or your
 4    claim for $35 or Christopher's claim
 5    for $35?
 6              MR. HALL:  Objection.
 7  BY MR. WIEGAND:
 8        Q.    In your mind?
 9        A.    My claim.
10              We are representing Christopher.
11    If he would have handed him $35 instead of
12    this he would have that money.
13              This sits in a closet.
14        Q.    If that is indeed Christopher's
15    claim, that $35, that is the only claim or
16    harm that you are aware of that Christopher
17    had, correct?
18              MR. HALL:  Objection.
19              THE WITNESS:  Yes.  Besides a
20        child that played with a toy and enjoyed
21        it.
22              You couldn't have planned it
23        better how he asked for it, so, yes,
24        besides that, yes, he had something he
25        enjoyed doing taken away from him.
```

KIM COSGROVE, JULY 15, 2008

```
 1                   Cosgrove
 2  BY MR. WIEGAND:
 3       Q.    Then that is the total of the
 4  harms or damages to Christopher, correct?
 5              MR. HALL:  Objection.
 6              THE WITNESS:  He didn't eat them
 7       or ingest them that I am aware of, so,
 8       yes.
 9  BY MR. WIEGAND:
10       Q.    I just -- I have got to ask to
11  make sure I understand it all so that we can
12  finish.
13       A.    That is fine, yes.
14       Q.    For you, for the claims or harms
15  that you have, it is the 8 or $10 that you
16  paid for the replacement beads, correct?
17              MR. HALL:  Objection.
18              THE WITNESS:  No.  I don't have a
19       value to it.  I am not going say give
20       me $10 and I am going to be happy that
21       this product was recalled, so, no, it
22       doesn't have a dollar value.
23  BY MR. WIEGAND:
24       Q.    Do you have any claim relating to
25  having bought the replacement beads?
```

# EXHIBIT "C"

Consumer Products Exported to the United States: Who is Responsible for Safety?     Page 10 of 19     Page 1 of 10

Case 1:08-cv-02364     Document 67-3     Filed 08/29/2008     Page 10 of 19

# Consumer Products Exported to the United States: Who is Responsible for Safety?

## Transcript

**Speaker:** Laurie Hopkins, International Programs Coordinator, Office of International Programs and Intergovernmental Affairs

**Slide 1:** U.S. Consumer Product Safety Commission

**Slide 2:** Consumer Products Exported to the United States: Who is Responsible for Safety?

Speaker: Hello, my name is Laurie Hopkins and and I am an International Programs Coordinator in the Office of International Programs and Intergovernmental Affairs at the Consumer Product Safety Commission.

Today, I'll be explaining measures you can take to ensure the safety of products you manufacture.

**Slide 3:** Imported Products Are Essential for the U.S. Economy and Represent Important Revenue for the Exporting Economy But Know the Rules Before You Agree on the Order!

* U.S. Consumer Product Safety Commission
* Department of Transportation
* Department of Commerce
* Environmental Protection Agency
* Department of Agriculture

Speaker: Imports are critical to the health of the U.S. economy as well as to the exporting economy. However, it is important that you understand what the rules and regulations are in the United States before you sign a contract. There are a number of U.S. government regulatory agencies.

**Slide 4:** Imported Products Are Essential for the U.S. Economy and Represent Important Revenue for the Exporting Economy But Know the Rules Before You Agree on the Order!

* U.S. Food and Drug Administration
* Department of Homeland Security
* Federal Communications Commission
* Department of Energy
* Others

Speaker: In addition to the CPSC, other agencies including the Department of Commerce, Department of Agriculture and the Food and Drug Administration may have authority over your product.

**Slide 5:** What does the CPSC do?

Speaker: What does the CPSC do?

**Slide 6:** U.S. Consumer Product Safety Commission (CPSC)

* An independent federal agency

Consumer Products Exported to the United States: Who is Responsible for Safety?     Page 2 of 10

Case 1:08-cv-02384     Document 67-3     Filed 08/29/2008     Page 11 of 19

* Established May 1973
* Responsible for Consumer Product Safety functions of the Federal Government
* Three Commissioners, appointed by the President and confirmed by the Senate

Speaker: The CPSC is an independent federal agency, established in 1973, and is responsible for Consumer Product Safety functions of the United States Government. The CPSC has three Commissioners who are appointed by the President and confirmed by the Senate.

**Slide 7:** Will You Be Trading in Any of 15,000 Types of Consumer Products?

". . . any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise…"

Section 3(a)(1) of the Consumer Product Safety Act, 15 U.S.C. § 2052 (a)(1)

Speaker: The CPSC regulates 15,000 types of consumer products. The definition of a consumer product is any product that is used in a residence, school, or for recreational or personal use.

**Slide 8:** Laws That Give CPSC Authority Over Consumer Products Whether Made in USA or Imported

* Consumer Product Safety Act (CPSA)
* Federal Hazardous Substances Act (FHSA)
* Flammable Fabrics Act (FFA)
* Poison Prevention Packaging Act (PPPA)
* Refrigerator Safety Act (RSA)

Speaker: Some examples of consumer products under CPSC authority: Toys, electrical products, fireworks and lighters. The CPSC administers five (5) statutes passed by Congress. These statutes apply to consumer products manufactured in the United States as well as products manufactured abroad.

The Consumer Product Safety Act established the agency and is the heart of the agency's authority. Many regulations for toys and other children's products fall under the Federal Hazardous Substances Act. The Flammable Fabrics Act regulate the flammability of fabrics, which includes clothing and upholstered furniture. The CPSC does not regulate drugs but does regulate the packaging of drugs. Child resistant packaging is enforced by the CPSC under the Poison Prevention Packaging Act. The Refrigerator Safety Act was enacted to prevent the entrapment of children in discarded refrigerator. This act is not referred to very often anymore.

**Slide 9:** Basic Responsibility

Manufacturers, distributors and retailers all equally responsible and liable under the acts (but common carriers are specifically excluded)

Section 15 (b) of the Consumer Product Safety Act, 15 U.S.C. § 2064(b) and Section 3 (b) of the Consumer Product Safety Act, 15 U.S.C. § 2052(b)

Speaker: Under the Acts, manufacturers, distributors, and retailers are all equally responsible and liable.

**Slide 10:** Importer and Manufacturer Responsibilities

Consumer Products Exported to the United States: Who is Responsible for Safety?    Page 3 of 10

Case 1:08-cv-02384    Document 67-3    Filed 08/29/2008    Page 12 of 19

* Under the Consumer Product Safety Act, the term "manufacturer" is defined to include any person who imports a consumer product.
 * Importers, although reliant on foreign producers, are directly responsible for the safety of products they bring into the United States.

Speaker: Under the Consumer Product Safety Act, the term "manufacturer" is defined to include any person who imports a consumer product. Importers are directly responsible for the safety of products they bring into the United States.

**Slide 11:** Potential Legislative Changes

* Mandatory certification and testing for certain classes of products
* Traceability for imported products, down to sub-contractors
* Easier information sharing between CPSC and foreign government regulators

Speaker: Congress is currently considering substantial changes to the CPSC's resources and authority. Both houses of Congress have legislation pending. Since the legislation is still pending, I will only describe to you commonalities and the general direction of the proposed bills.

First, both bills require certification and 3rd party testing of certain children's products. In both bills, an importer must provide, upon order from CPSC, a production and distribution history of the product, down to the sub-contractors. Finally, both bills provide for easier information sharing between the CPSC and foreign regulators. Currently, the CPSC is very limited in what information it can give to foreign governments and this law will make it easier to exchange information in the future.

**Slide 12:** Voluntary and Mandatory Standards

Speaker: The CPSC has the authority to enact mandatory standards.

**Slide 13:** Product Safety Standards

* CPSC statutes set a preference for consensus voluntary private sector standards
* Private sector consensus voluntary standards are often developed with the participation of CPSC staff

Speaker: CPSC also encourages firms to comply with voluntary standards. In fact, CPSC statutes set a preference for voluntary private sector standards. CPSC staff regularly contributes their technical knowledge to organizations that create voluntary standards.

**Slide 14:** Primary Voluntary Standard Development Coordinators for Consumer Products

ANSI (American National Standards Institute)
* Motorized Equipment
* Lawn & Garden Equipment
* Household Products
* Safety Labeling

ASTM International (formerly American Society for Testing and Materials)
* Children's Products
* Recreational Products

Consumer Products Exported to the United States: Who is Responsible for Safety?    Page 4 of 10

Case 1:08-cv-02364    Document 67-3    Filed 08/29/2008    Page 13 of 19

Speaker: There are a number of voluntary standards organizations that develop standards for products under CPSC's jurisdiction. The American National Standards Institute and ASTM International are two (2) of the largest.

**Slide 15:** Primary Voluntary Standard Development Coordinators for Consumer Products

NFPA (National Fire Protection Association)
* Electrical
* Fire Suppression (sprinklers, fire extinguishers)
* Fueled Devices

Underwriters Laboratories (UL)
* Electrical and other products

Speaker: Underwriters Laboratory is another highly recognizable Voluntary Standards Organization, which develops voluntary standards for electrical and other products.

**Slide 16:** Voluntary Standards

In some cases, failure to comply with a consensus (voluntary) standard makes a product defective and creates a substantial hazard.

Speaker: In certain cases, failure to comply with a voluntary standard could make a product defective and could lead to a recall. This is particularly true for electrical products, since there are very few mandatory electrical standards.

**Slide 17:** Example: Hair Dryers

This hair dryer does not have an appliance leakage current interrupter (ALCI) plug. It presents a risk of electrocution if dropped in water.

CPSC will seek a recall.

Speaker: For example, a hair dryer that does not have an ACLI plug would present a risk of electrocution if dropped in water. This would be hazardous to consumers and would therefore be recalled.

**Slide 18:** Importance of Using U.S. Mandatory and Voluntary Standards

* To avoid entry problems with the U.S. Government (Customs and CPSC), manufacturers SHOULD comply with BOTH:
* CPSC Regulations (mandatory standards)
* Private sector standards (voluntary standards)
* Both play essential safety roles

Speaker: It is imperative that you comply with both mandatory and voluntary standards. Both are important for ensuring the safety of your product. Keep in mind that a product may present a substantial product hazard even if it complies with the applicable mandatory and voluntary standards. Any product that has a defect and presents a hazard to consumers may be recalled.

**Slide 19:** CPSA – Imported Products

Sec. 17 (a)(1)

Consumer Products Exported to the United States: Who is Responsible for Safety?    Page 14 of 19    Page 5 of 10

Case 1:08-cv-02384    Document 67-3    Filed 08/29/2008    Page 14 of 19

Any consumer product offered for importation into the customs territory of the United States shall be refused admission into such customs territory if such product—

(1) fails to comply with an applicable consumer product safety rule.
(4) has a product defect which constitutes substantial product hazard.

Speaker: The CPSC recently established the Import Surveillance Division and will be increasing inspections at American ports. Any product that fails to comply with the applicable mandatory standard or has a defect may be refused admission into the United States.

**Slide 20:** What Can You Do to Ensure the Safety of Your Product

Speaker: What can you do to ensure the safety of your product?

**Slide 21:** Five things you can do to ensure your product is safe

* Safety Consciousness
* Specifications (standards)
* Certification
* Testing
* Market Surveillance

Speaker: There are five (5) things you can do to ensure your product is safe. Recognize the importance of safety during the manufacturing process. Request that importers and retailers provide you with the complete specifications when placing an order. Certify a product when necessary. Test your product at all stages of production. And conduct market surveillance. These are all things you can do to ensure your product is safe.

**Slide 22:** CPSC Handbook for Manufacturing Safer Consumer Products (picture of cover)

Speaker: Safety Consciousness means to be aware of the importance of product safety and building a culture in your firm where product safety is a high priority. The CPSC has written a Handbook for Manufacturing Safer Consumer Products that provides a general description of widely accepted principles for consistently manufacturing safe consumer products.

The Handbook was first written in the 1970's and was updated and translated into Mandarin in 2005. In 2006 both the English and Mandarin versions of the Handbook were updated again. I would encourage you to visit the CPSC website and download the Handbook, which is on the international webpage.

**Slide 23:** Handbook Overview

The Handbook identifies the essential elements of industrial systems for manufacturing safe consumer products.

* Section I - Defines the purpose of the Handbook and its applicability.
* Section II - Relates to executive action.
* Section III - Discusses technical concepts.

Speaker: The Handbook covers a spectrum of topics, including executive and managerial functions product design, and technical requirements.

Consumer Products Exported to the United States: Who is Responsible for Safety?    Page 6 of 10

Case 1:08-cv-02384    Document 67-3    Filed 08/29/2008    Page 15 of 19

**Slide 24:** Applicability of the Handbook

The contents are intended for voluntary implementation by industry, except for those that are statutory by virtue of being established in product safety standards and rules, in accordance with the statutes governing CPSC.

Speaker: The Handbook is for you to use on a voluntary basis and you are not required by law to follow the principles discussed in the Handbook.

**Slide 25:** Safety Consciousness

* Do your homework – know exactly which standards apply to your product
* Mandatory standards are the bare minimum
* Consensus standards will help avoid trouble
* Learn the safety issues before you make a deal, not after!
* Use the information from CPSC website
* Sign up to receive notice of CPSC recalls
* Talk to experts in the field

Speaker: Knowing the appropriate standards and regulations and applying those requirements to the design and manufacture of your product will help to ensure it is safe. As I mentioned before, mandatory standards are only a starting point. Compliance to voluntary standards is an important part of making sure your product is safe for consumers to use.

There are many resources for determining the requirements that apply to your product. Talk to experts in the field. Many trade associations provide numerous resources for their members. The CPSC website is also an excellent resource where, in addition to finding regulations, you can acquire recall information sign-up for e-mail notifications of recalls.

**Slide 26:** For New Certification, Testing and Other Requirements:

http:http://www.cpsc.gov/businfo/intl/newusreq.html

Speaker: The CPSC has a new web page where you can access information on new requirements, some of which have been translated into Mandarin. You may access the new web page from the CPSC's International webpage.

**Slide 27:** ANSI Standards Portal

To access many, but not all, U.S. Standards: http://www.standardsportal.org/

Speaker: In addition, the American National Standards Institute (ANSI) has created a new website called the ANSI Standards Portal. This website provides the synopses in Mandarin of approximately 1,000 American voluntary standards. The web portal also provides a link to Standardization Administration of China or SAC, where you can purchase almost all American standards.

**Slide 28:** Communicating Specifications

* Importers and manufacturers must have a clear understanding of exactly which standards need to be met
* Foreign manufacturers/suppliers should insist on a list of which mandatory and consensus standards apply
* Specify consensus standards and other safety requirements

Speaker: While it is important that you determine the requirements for a product you are manufacturing, you should also

Consumer Products Exported to the United States: Who is Responsible for Safety?    Page 16 of 19    Page 7 of 10

Case 1:08-cv-02364    Document 67-3    Filed 08/29/2008

require that the importer you signed a contract with provide for you a list of applicable mandatory and voluntary standards.

**Slide 29:** Some Products Require Certification

> * Section 14 of the Consumer Product Safety Act requires certification of some consumer products
> * Under this law, which dates from 1972, the term "certification" has a different meaning than it does in recent international usage
> * Certification under section 14 is more like a "supplier's declaration of conformity"

Speaker: Certification is an important tool for ensuring the safety of your product. The CPSC requires that some products be certified. Section 14 of the Consumer Product Safety Act requires certification for some consumer products. Under this law, which dates from 1972, the term "certification" has a different meaning than it does in recent international usage. Certification under section 14 is more like a "suppliers Declaration of Conformity."

**Slide 30:** Which CPSC Standards Currently Require Certification

> * Section 1202 matchbooks
> * Section 1203 bicycle helmets
> * Section 1205 walk-behind power lawn mowers
> * Section 1210 cigarette lighters
> * Section 1212 multipurpose lighters
> * Section 1213 bunk beds
> * Section 1633 mattresses
> * Others
> * More in the future possible – stay current!

Speaker: There are a number of products under CPSC authority that must be certified. For example, as a result of a new regulation that went into effect July 2007, mattresses must now be certified.

**Slide 31:** Expansion of Mandatory Certification Is Likely

> Bills pending in Congress could make certification requirements applicable to other products, particularly toys, and would require 3rd party lab to confirm certification

Speaker: Legislation pending in Congress would require certification for other products, particularly children's products. It is possible that other products could require certification in the future, so it's important that you stay informed by visiting the CPSC website.

**Slide 32:** Other Certification Requirements

> * Third-party certification may be required by others for imported products, even if not required by the federal government.
> * For example, some States require certification of electrical products by recognized organizations like UL, CSA, ETL
> * Retailers may require certification for certain products they sell

Speaker: Third party certification may be required even if not mandated by the CPSC. For example, many state governments require certification for electrical products sold in their state. Many retailers require that the products sold in their stores are certified by an independent laboratory.

Consumer Products Exported to the United States: Who is Responsible for Safety?    Page 17 of 19    Page 8 of 10

Case 1:08-cv-02364    Document 67-3    Filed 08/29/2008    Page 17 of 19

**Slide 33:** Voluntary Third-Party Certification

> \* Certification by an independent third party is meaningful in many settings
> \* CPSC takes certification into account in sampling products for testing (e.g.,AFSL-tested fireworks are considered more likely to be compliant)
> \* Failure to comply with consensus standards can create problems in product liability suits
> \* Consumers recognize and buy safer products

Speaker: Third party certification is often a good idea even if it is not required by law or the retailer. CPSC takes certification into account when testing. For example, fireworks that are certified by the American Fireworks Standards Laboratory are considered more likely to be compliant. Failure to comply with voluntary standards can often create problems in lawsuits initiated by injured customers. In addition, customers recognize popular certification marks, such as UL, and are more likely to buy products with the certification label displayed on the product.

**Slide 34:** Testing

> \* Importers and suppliers should make sure that products meet all CPSC standards at a minimum
> \* To avoid problems, samples should be tested randomly, early and often
> \* The cost of testing is a tiny fraction of the costs associated with recalls and violations

Speaker: Testing early in the manufacturing process and at regular intervals will ensure that your product complies with all appropriate mandatory and voluntary standards. While testing can increase your production expenses, the cost of testing is a fraction of the cost of a recall.

**Slide 35:** Market Surveillance

> \* Make sure you have a system for keeping track of consumer complaints involving products in which you trade>
> \* Pay attention to information from the CPSC Clearinghouse [www.cpsc.gov] and reports from your retailers>
> \* Early identification of problems can avoid bigger problems

Speaker: Another way to ensure the safety of your product after it has entered the marketplace is to perform market surveillance. Tracking customer complaints is an effective market surveillance tool. You and the retailer can ID a problem with your product by carefully reviewing customer feedback. You and the retailer can then work together to resolve any problems with the product.

**Slide 36:** What if a product hazard is discovered?

Speaker: What if a product hazard is discovered?

**Slide 37:** Reporting

> Importers must report to the CPSC immediately if they learn that one of their products does not comply with a mandatory standard or ban under the Consumer Product Safety Act.

Speaker: Importers must report to the CPSC immediately, that is, within 24 hours, if they learn that one of their products does not comply with a mandatory standard or ban under the Consumer Product Safety Act.

**Slide 38:** Reporting

\* Failure to comply with a mandatory standard or ban under other laws administered by the CPSC may constitute a reportable defect
\* Failure to meet consensus voluntary standards may make a product defective and require a report to CPSC

Speaker: Failure to comply with a mandatory standard or ban under other laws administered by the CPSC may constitute a reportable defect. Failure to meet voluntary standards may make a product defective and require a report to the CPSC. Remember, fines can be levied against any company that fails to report a defect in a timely manner.

**Slide 39:** Reporting Wisely

\* Don't assume that an incident without injury means there's no problem
\* Do evaluate product failures to determine what could have occurred in worst case
\* Don't wait to finish exhaustive investigation before telling CPSC

Speaker: When evaluating whether to report a defect to the CPSC, there are several things you should take into consideration. First, it is very important to understand that even though there may be no injury as a result of the defect, you may still have to report the defect to the CPSC. Firms should not wait until someone is injured or killed before reporting a defect.

Evaluate product failures to determine what could have occurred in worst case scenario. Also, firms should not wait until an exhaustive investigation has been completed before telling the CPSC.

**Slide 40:** Corrective Action

The CPSA provides for three remedies in the case of the recall of a product that creates a substantial product hazard (15 U.S.C. § 2064(d)):

\* Repair
\* Replacement
\* Refund of purchase price

Speaker: The CPSC provides three (3) remedies when recalling a product: Repair, Replacement, or Refund of purchase price.

**Slide 41:** Corrective Action

Not every safety issue requires a recall, but it is important to learn from mistakes and prevent the same problems from happening again

Speaker: That being said, reporting a problem does not necessarily lead to a recall. However, learning from a mistake can prevent the mistake from occurring again.

**Slide 42:** Long term cost exceeds the cost of immediate recall

Long Term Repercussions: Damage to Brand Name and "Made in My Country"

Speaker: Long term cost exceeds the cost of an immediate recall. Damage to the brand name or to the reputation of the country where the product is manufactured can be long term and effect sales far into the future.

Consumer Products Exported to the United States: Who is Responsible for Safety?

Case 1:08-cv-02364    Document 67-3    Filed 08/29/2008    Page 19 of 19        Page 10 of 10

**Slide 43:** Preventive Action

> * Preventive action is better than corrective action, for everyone
> * Importer / Supplier must work as a team. Everyone wins or everyone loses.

Speaker: Therefore, it is important that preventative measures are taken to avoid a recall. Retailers, importers and suppliers must work closely together to ensure the safety of your product.

**Slide 44:** Questions?

> Office of International Programs
>
> Laurie Hopkins, International Programs Coordinator
>
> lhopkins@cpsc.gov

Speaker: This is the conclusion of my presentation. If you have any questions, please feel free to contact me at lhopkins@cpsc.gov. Thank you.