**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE AQUA DOTS PRODUCTS LIABILITY LITIGATION | MDL No. 1940 |
| | Case No. 08 cv 2364 |
| | Judge David H. Coar |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Magistrate Susan E. Cox |

<u>**SPIN MASTER LTD., SPIN MASTER, INC., TARGET CORPORATION,
WAL-MART STORES, INC. AND TOYS-"R"-US DELAWARE, INC.'S
REPLY IN SUPPORT OF MOTION TO DISMISS**</u>

Plaintiffs must allege "facts to state a claim to relief that is plausible on its face," or their claims will be dismissed. *Limestone Dep. Corp. v. Vill. of Lemont, Illinois,* 520 F.3d 797, 803 (7th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007)). Yet the arguments asserted in Plaintiffs' Opposition Brief ("Opp.") are unsupported by facts pled in their Consolidated Complaint. Plaintiffs do not allege any of them ingested Aqua Dots. They claim they are entitled to redress for exposure to GHB, yet do not allege any of them were exposed and indeed concede "they have not plead a personal injury case." (Opp. at 4.) They argue warranties were breached, yet allege neither a specific warranty nor that any of them relied on a warranty. They argue Defendants violated a federal law covering certain noisemaking toys, yet do not allege Aqua Dots was such a toy. They argue fraud, yet plead only conclusions, not the required facts. They argue their tort counts should withstand the economic loss doctrine because of a fraudulent misrepresentation exception, yet do not plead fraudulent misrepresentation. Plaintiffs' Consolidated Complaint should be dismissed in its entirety.[1]

---

[1] Plaintiffs incorrectly argue that applying Illinois' choice-of law rules leads to using Illinois law. (Opp. at 3-4.) To the contrary, the Illinois choice-of-law rules are applied to each Plaintiff's claims to determine which state's laws govern the particular Plaintiff's claims. *See, e.g., In re Trans Union Corp. Privacy Litig.,* 211 F.R.D. 328, 342-44 (N.D. Ill. 2002); *Lantz v. Am. Honda Motor Co.,* Inc., No. 06 C 5932, 2007 WL 1424614, *6 (N.D. Ill. May 14, 2007). On August 22, 2008, Plaintiffs filed a notice that Plaintiffs Donald Erbach and Stephanie Streett (Arkansas) and Michael Burgess (Missouri) have withdrawn as class representatives. Arguments pertaining to those states will therefore not be addressed in this Reply.

## ARGUMENT

### I.     Plaintiffs Have Not Suffered Injury.

Plaintiffs agree that they do "not plead a personal injury."  (Opp. at 4.)  They limit their argument on injury to economic damages, specifically "the cost of the toy and/or any out-of-pocket expenses associated with diagnostic testing." (Opp. at 5.)  Neither constitutes injury here.

### A.     "Cost of the Toy"

Plaintiffs argue that some portion of the purchase price of their Aqua Dots constitutes injury because they did not receive the "benefit of the bargain," relying on *Cole v. GMC*, 484 F.3d 717 (5th Cir. 2007).[2]   (Opp. at 6.)  In *Cole,* however, the plaintiffs alleged that the defendant made specific representations—that their vehicle would be equipped with side impact airbags that would deploy only under certain conditions, and that any defect would be repaired timely; that both of these were part of the basis of their bargain; and that defendant breached the bargain by not providing either of them.  *Cole*, 484 F.3d at 722.  Here, Plaintiffs do not claim that Defendants represented that Aqua Dots could be ingested, nor that the ability to ingest Aqua Dots was part of what they purchased.  Indeed, the plaintiffs in *Briehl, Rivera* and *Simplicity*, cited in Defendants' Memorandum, also claimed economic injury based on benefit of the bargain, just as Plaintiffs do now, and in each case the court rejected that argument.  *See Briehl v. GMC*, 172 F.3d 623, 628 (8th Cir. 1999); *Riviera v. Wyeth – Ayerst Labs.*, 283 F.3d 315, 319-20 (5th Cir. 2002); *O'Neil v. Simplicity, Inc.*, 553 F. Supp. 2d 1110, 1115 (D. Minn. 2008).

Plaintiffs also ask this Court to ignore *Briehl* because in that case the plaintiffs had not lost the use of their vehicle, whereas Plaintiffs are not using their Aqua Dots.  The *Briehl* court did not draw this distinction, but rather held that even though each vehicle was alleged to contain the "defect" at the time of purchase, the plaintiffs suffered no injury because the defect did not manifest itself in the plaintiffs' vehicles.  *Briehl*, 172 F.3d at 628.  Indeed, Plaintiffs' argument regarding loss of use was precisely what the *Simplicity* court rejected when it held that the plaintiffs there suffered no injury because no defect had manifested in their cribs, despite the plaintiffs' claim that the unmanifested defect made their cribs unsafe to use.  *Simplicity*, 553 F.

---

[2] *Cole* held that "[t]he vast majority of the members of this class never experienced any manifestation of the alleged defect," and denied class certification on that ground, among others, because "many jurisdictions" would not entertain such an action where there was no manifest defect.  484 F.3d at 729 (collecting cases).

Supp. 2d at 1115.  Further, Plaintiffs admit they have been offered replacement beads under the recall, thus they do not plead loss of use.

      **B.**      **"Any Out-of-Pocket Expenses Associated with Diagnostic Testing"**

No Plaintiff alleges that he or she has incurred any costs for diagnostic screening. Rather, Plaintiffs argue injury only generally as "the cost of the toy **and/or** any out-of-pocket expenses associated with diagnostic testing." (Opp. at 5 (emphasis added).)  Plaintiffs who did not incur such costs (perhaps all of them) simply have no such injury.  As no Plaintiff alleges that he or she has incurred such costs, none of them plead injury in this regard.

Second, Plaintiffs' "out-of-pocket expenses associated with diagnostic testing due to the exposure to the toxic substance" does not establish injury for Plaintiffs because none of them plead they were injured from "exposure."  (Opp. at 5.)  The Consolidated Complaint defines the potential injury from Aqua Dots as ingestion of 1,4 butanediol:  "When children played with the beads, which were designed to be sprayed with water, it was foreseeable that children would ingest the poison by licking or sucking their hands, or inadvertently swallowing the beads."  (Opp. at 7; Compl. ¶ 49.)  Yet Plaintiffs do not allege that any of them swallowed the beads, or even licked or sucked their fingers while playing with them.[3]  Because they suffered no injury, Plaintiffs' claims should be dismissed in their entirety.

**II.**      **Plaintiffs Have No Viable Claim Under the CPSA.**

A claim may not be stated under the CPSA unless a "rule" is violated.  (Mem. at 8-9.)[4] Plaintiffs do not dispute this and they fail to identify any such rule here.  Plaintiffs agree that Defendants could not have violated 15 U.S.C. § 1261, the CPSA's definition provision.  (Opp. at 11.)  And they cannot reconcile their admission that "[t]he issue [here] is not whether Plaintiffs choked on the toys" (Opp. at 11), with their argument that Defendants violated the CPSC

---

[3] This case is unlike *Carlough v. Amchem Products, Inc.*, 834 F. Supp. 1437 (E.D. Pa. 1993), where plaintiffs alleged they inhaled asbestos.  Plaintiffs do not allege that merely handling Aqua Dots, or breathing while near Aqua Dots, results in "exposure" or any other injury.  Indeed, the Consolidated Complaint shows why Plaintiffs do not make such a claim, as 1,4 butanediol is widely used in household products.  (*See* Compl. ¶ 46, citing to article stating that 1,4 butanediol is "used in cleaners and plastics").

[4] Citations to "Mem." refer to Defendants Spin Master Ltd., Spin Master, Inc. and Target Corporation's Memorandum in Support of their Motion to Dismiss, to which Wal-Mart and Toys "R" Us joined July 3, 2008.

regulation governing reporting of choking incidents. *See* 16 C.F.R. § 1117.4(a) ("[a] subject firm must report . . . an incident . . . in which a child . . . choked on a . . . small part").[5]

Plaintiffs also have no claim under 16 C.F.R. § 1500.18(a)(2), which bans certain noisemaking toys, because they do not allege that Aqua Dots have noisemaking components or attachments. 16 C.F.R. § 1500.18(a)(2) ("[a]ny *toy having noisemaking components or attachments* capable of being dislodged . . . .") (emphasis added). Disregarding the "noisemaking" requirement, Plaintiffs assert the Aqua Dots beads are "attachments" because "[t]he attachments consist of the fused together . . . beads attached to the plastic tray, and they are capable of being dislodged . . . from the tray once the design becomes fixed." (Opp. at 10.) But the Complaint does not say that. Rather, it says the beads become attached *to each other*. (Compl. ¶ 40 ("[o]nce sprayed with water, the beads . . . fuse together on a plastic tray. Once the design becomes fixed, it can be removed from the tray").) Because Plaintiffs do not allege that Aqua Dots contains any noisemaking components or attachments capable of being dislodged, 16 C.F.R. § 1500.18(a)(2) is inapplicable to this action.

### III. Plaintiffs' Complaint that They Should Receive a Cash Refund of the Purchase Price, Rather than the Replacement Beads Provided Under the Recall, Is Preempted Under *Geier*.

Plaintiffs argue in the first paragraph of the Opposition that "Defendants' offer of replacement toys" is insufficient, and that they rather should receive "a refund." Plaintiffs' preference for cash rather than replacement beads cannot provide the basis for a claim because it is preempted by the CPSA under ordinary conflict preemption principles and *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000).[6] (Mem. at 11-13.) Under the CPSA's plain terms, the CPSC "must allow the regulated entity to choose from a menu of three remedies—repair, replacement, or refunds," yet Plaintiffs' claim would deprive Defendants of that federal right.

---

[5] Moreover, even if Plaintiffs *had* alleged a failure to report a choking incident, their claim would be foreclosed by the Seventh Circuit's decision "denying the existence of a private cause of action for violations of CPSA reporting requirements." *Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 941 (7th Cir. 1988). Plaintiffs' statement that *Zepik* was a "summary judgment decision in which there were no facts to support the cause of action" (Opp. at 13) is irrelevant—the import of *Zepik* here is legal. (*Cf.* Opp. 13 fn. 13) (citing decisions from Minnesota and District of Maryland).

[6] Plaintiffs' saving clause arguments are beside the point—Defendants are asserting *conflict* preemption, and savings clauses "do[] not bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869.

(Mem. at 10-12.)  Plaintiffs respond that the statute "provides that the Commission 'may' order the manufacturer to elect either a repair, recall, or refund" and that the election is in the "*discretion*" of the Commission.  (Opp. at 15. fn. 15 (emphasis in original).)  The statute, however, reads otherwise:  "[i]f the Commission determines . . . that a product . . . presents a substantial product hazard . . . it may order the manufacturer or any distributor . . . to take *whichever of the following actions the person to whom the order is directed elects*."  15 U.S.C. § 2064(d) (emphasis added).  True, the Commission has a choice concerning whether to issue an order.  But if it does, the persons providing the remedy get to "elect" any of the three remedies.

Plaintiffs' claim would override this discretion even where, as here, the CPSC affirmatively blessed the recalling party's chosen remedy.  This is the sole benefit of the CPSC's "fast track" program, which Plaintiffs do not dispute:  The recalling party "implements with CPSC a . . . voluntary recall that is satisfactory to the staff," thus "reduc[ing] any disincentive to companies that want to report."  (Mem. at 10-11 (quoting CPSC "Recall Handbook," Federal Register rule).)  Plaintiffs do not dispute that allowing courts in state law actions to second-guess decisions satisfactory to the CPSC would "upset" this "careful regulatory scheme."  *Geier*, 529 U.S. at 870.

Instead, Plaintiffs rely on *Leipart v. Guardian Industries, Inc*., 234 F.3d 1063 (9th Cir. 2000), in which the CPSC rule at issue—setting shower glass safety standards—"created only a floor, i.e., a minimum safety standard, above which state common law requirements were permitted to impose further duties."  *Id*. at 1070.  But there, the regulatory standards at issue could be exceeded by state tort duties without conflicting with the goals of Congress and the CPSC—namely, safe shower glass.  Here, Congress' goal is *not* just safety; it is using recall options as an incentive to get regulated parties to the recall table.  A state tort rule requiring refunds would deny this legislatively guaranteed option.  Unlike the higher state safety standards in *Leipart*, that would frustrate Congress' purpose.  *See Geier*, 529 U.S. at 874.

**IV.    Plaintiffs' Negligence and Strict Liability Claims Must Be Dismissed Pursuant to the Economic Loss Doctrine.**

Plaintiffs' tort claims cannot be saved by the fraudulent misrepresentation exception to the economic loss doctrine because Plaintiffs do not allege fraudulent misrepresentation—they allege negligence and strict liability.  *See e.g., Outboard Marine Corp. v. Babcock Indus., Inc*., No. 91 C 7247, 1994 WL 468596, *13 (N.D. Ill. Aug. 26, 1994) (dismissing negligence and strict liability counts as barred under economic loss doctrine but dismissing fraudulent

misrepresentation count for failure to plead fraud with particularity); *Peter J. Hartmann Co. v. Capital Bank & Trust Co*., 694 N.E.2d 1108, 230 Ill. Dec. 830 (Ill. App. 1st Dist. 1998) (negligent misrepresentation claim barred by economic loss doctrine; fraudulent misrepresentation claim survived because it stated fraud with particularity).

Plaintiffs' argument that they are pleading more than economic loss because they allege "exposure" also fails. Not only have they expressly clarified in their Opposition that they do not plead personal injury, but Plaintiffs do not allege in the Consolidated Complaint that *they themselves* were "exposed" to a "chemical . . . creating a risk of serious health problems." (Opp. at 20.) No Plaintiff pleads personal injury, thus the economic loss doctrine applies here.

## V.     Plaintiffs Have No Viable Warranty Claims.

### A.     Plaintiffs' Warranty Claims Fail for Lack Of Notice.

Notice under the UCC in an action for breach of express and implied warranty is required unless one of two exceptions is met. (Mem. at 14-15.) First, in an action for personal injury, the filing of the complaint is deemed to notify the seller. *Connick v. Suzuki Motor Co., Ltd*., 675 N.E.2d 584, 590, 221 Ill. Dec. 389, 395 (Ill. 1996). Plaintiffs explicitly maintain that they do "not plead a personal injury case." (Opp. at 4.) Rather, Plaintiffs invoke the second exception, which requires that the seller have "actual knowledge of the defect of the *particular product.*" *See Connick*, 675 N.E.2d at 589, 221 Ill. Dec. at 394 (emphasis added).

Plaintiffs contend that actual knowledge exists in this case because "Spin Master issued a voluntary recall" offering "to replace the toxic beads." (Opp. at 16.) In *Perona v. Volkswagen of American Inc*., 684 N.E.2d 859, 225 Ill. Dec. 868 (Ill. App. 1st Dist. 1997), however, the court considered and rejected this very argument.[7] Plaintiffs' attempt to distinguish *Perona* on the grounds that "plaintiffs there did not allege actual knowledge" (Opp. at fn. 19), is belied by the court's finding that "plaintiffs alleged that defendants had **actual knowledge of the defect,**" which they, like Plaintiffs here, claimed to be demonstrated by a recall and other public statements issued by the defendant. *Id*. at 863, 225 Ill. Dec. at 872 (emphasis added). The court held that the plaintiffs did not sufficiently allege notice because they did not "specifically allege that Audi had actual knowledge of the alleged breach of the particular automobiles purchased by the named plaintiffs in this lawsuit." *Id*. Similarly, in this case, the named Plaintiffs have

---

[7] Plaintiffs' reliance on *Stella v. LVMH Perfumes and Cosmetics ISA, Inc*., No 07 C 6509, 2008 WL 2669662 (N.D. Ill. July 8, 2008), is misplaced because *Stella* is a personal injury case in which the plaintiff claimed lead was ingested, and the district court did not consider *Perona*.

neither alleged nor argued that Defendants had notice of the alleged breach of warranty regarding the particular Aqua Dots products purchased by them. Accordingly, Plaintiffs have failed to satisfy the notice requirement under the UCC.[8]

**B.    The Warranty Claims Fail Because Aqua Dots Were Fit for Their Ordinary Purpose And Intended Use.**

Plaintiffs' warranty claims fail for the additional reason that the scope of any warranty is limited to the product's ordinary purpose and intended use. (Mem. at 16-17.) As the court in *Brazier* explained, where a toy "does not include a warranty that the product is fit for safe insertion into a child's mouth," the plaintiff cannot "maintain a cause of action for breach of implied warranty based on the contention that the ball was not minimally safe for this purpose." *Brazier v. Hasbro, Inc.*, No. 99 Civ. 11258 (MBM), 2004 WL 515536, *4 (S.D.N.Y. March 16, 2004).[9] Plaintiffs' reliance on *Wheeler v. Sunbelt Tool Co.* Inc., 537 N.E.2d 1332, 1342, 130 Ill. Dec. 863, 873 (Ill. App. 4th Dist. 1989) is misplaced. *Wheeler* did not hold that warranties extend to reasonably foreseeable misuses, but rather held that, "[i]n a breach of warranty action, the seller is entitled to have his instructions for use followed." *Id.* at 1343, 130 Ill. Dec. at 874. Further, for "a defect to cause redressable damages in a breach of the implied warranty of merchantability action, it must cause the product not to function adequately in the performance of its ordinary function for the plaintiff." *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 854 (Tex. Ct. App. 2005). Plaintiffs do not and cannot plead that ingesting Aqua Dots was an ordinary function or intended use of the product.

**C.    Plaintiffs' Express Warranty Claims Fail Because Plaintiffs Do Not Identify Any Express Warranty.**

Plaintiffs' express warranty claims fail because Plaintiffs do not specify the "particular affirmation, promise, description or sample that formed part of the basis of his bargain with Defendant." *Heisner v. Genzyme Corp.*, No. 08-C-593, 2008 WL 2940811, *9 (N.D. Ill. July 25,

---

[8] Plaintiffs' secondary argument that notice is not required "in many states" is not supported by the authority Plaintiffs cite. (Opp. at fn. 18.) Moreover, the cases Plaintiffs cite in support of their contention that the notice inquiry is a question of fact involve some allegation of pre-suit notice that a *particular* transaction was troublesome. *Id.* (collecting cases). In this case, however, Plaintiffs have not alleged that they notified any of Defendants prior to filing suit.

[9] *Kelly v. Hanscom Bros., Inc.*, 331 A.2d 737 (Pa. Sup. Ct. 1975), is an action by a retailer against a wholesaler seeking indemnity following a personal injury award against it, and therefore is not relevant. Further, the toy at issue in *Kelly* was a choking hazard that was sold to infants, who are prone to put things in their mouths, whereas Plaintiffs admit that Aqua Dots were only for children "4 and over." (Compl. ¶ 42.)

2008) (Coar, J.).  "[A] formulaic recitation of the elements required to prevail on a claim" will not suffice.  *Id*. (citing *Twombly*, 127 S.Ct. at 1964).)  "Under an express warranty, the language of the warranty itself dictates the obligations of the parties."  *Id*. at 8.

Plaintiffs contend that the "Manufacturer Defendants" (they do not specify between Moose and the Spin Master Defendants, itself a fatal flaw in the pleading) expressly warranted that the Aqua Dots were "safe" by placing images of children playing with the toys on the packaging and making statements concerning the age appropriateness of the toys.  (Opp. at 18; Compl. ¶ 133.)  Not only are the terms of these "warranties" unclear, but Plaintiffs fail to allege that the toys cannot be played with as shown in the images or that the toys are not appropriate for children of recommended age.  (Opp. at 18; Compl. ¶ 79.)

Plaintiffs next contend that Defendants made express warranties because "the packaging states compliance with ASTM standards."  (Opp. at 18.)  Plaintiffs claim that compliance with ASTM F963 is a representation that the Aqua Dots "[1] have been tested and [2] are free from banned toxic substances."  (Compl. ¶ 88.)  As a matter of law, this standard requires only the first—that Aqua Dots "meet the requirements for toxicological review by a U.S. board-certified toxicologist."  ASTM F963-03 § 4.30.1.  The Consolidated Complaint contains no allegation that Defendants failed to meet the requirements for toxicological review by a U.S. board-certified toxicologist.  Plaintiffs also claim an express warranty was embodied in ASTM 4236, which governs labeling standards for art material causing chronic health hazards.  Plaintiffs do not allege that the ingestion of Aqua Dots causes any chronic health hazard, or that Defendants have failed to satisfy the requirements of ASTM 4236.

### D.     Plaintiffs Do Not Plead the Reliance Required for Breach of Express Warranties.

Even if Plaintiffs were able to allege an express warranty that was untrue, they still must plead reliance on such a warranty.  At a minimum, Plaintiffs must plead that they read, heard, or saw a particular affirmation made by a particular Defendant such that that statement became part of the basis of the bargain.  (Mem. at 19-20.)  The cases cited by Plaintiffs for the contention that "reliance is not required in most states" all involve the breach of bargained-for warranties in asset purchase agreements.  (Opp. at 19, fn. 24 (collecting cases).)  Indeed, the Seventh Circuit authority Plaintiffs rely upon explicitly distinguishes contractual provisions from the express warranties created under the UCC "if the buyer **relies upon** the seller's representations in

purchasing the goods." *See Wikoff v. Vanderveld*, 897 F.2d 232, 240-41 (7th Cir. 1990) (emphasis added).

      **E.**    **Plaintiffs Have Not Satisfied Florida, Illinois, Kentucky, and New York Privity Requirements.**

Privity is required in order to state a claim for breach of express warranty under the laws of Florida and Kentucky, and for breach of implied warranty under the laws of Florida, Illinois, Kentucky, and New York. (Mem. at 21.) Plaintiffs cite *Manheim v. Ford Motor Co*., 201 So.2d 440 (Fla. 1967), for the proposition that privity is not required to recover for breach of warranty under Florida law. Yet subsequent decisions, following the adoption of Florida's Uniform Commercial Code and strict liability in tort, have effectively overruled *Manheim* and require privity for breach of warranty. *See Kramer v. Piper Aircraft Corp*., 520 So.2d 37, 38 (Fla. 1988); *Powers v. Lazy Days RV Center, Inc*., No. 8:05-CV-1542T17EAJ, 2006 WL 373011, *2 (M.D. Fla. Feb. 16, 2006). Further, Plaintiffs have defeated their own argument that "more than mere economic damages are alleged" (Opp. at 19), by disavowing the existence of a personal injury in this case. Finally, although Plaintiffs claim that "Spin Master's own actions have brought the company into privity with consumers" by "warranting the Aqua Dots toys to them directly" ( Compl. ¶ 121), they cite no facts or authority in support of this claim.

**VI.**    **Plaintiffs' Statutory Consumer Fraud Claims Must Be Dismissed.**

      **A.**    **Rule 9(b) Applies to Plaintiffs' Fraud-Based Claims.**

Because the statutory violations predicated on Defendants' alleged deception sound in fraud, they must be pled with particularity. (*See* Compl. ¶¶ 100-101, 103, 109, 113.) (Mem. at 24.) Plaintiffs' reliance on *Windy City Metal Fabricators & Supply Inc. v. CIT Technical Fin.*, --- F.3d ---, No. 07-1567, 2008 WL 2941171 (7th Cir. Aug. 1, 2008), yields the same result. The plaintiffs there argued that "a claim under the [Illinois] Consumer Fraud Act may allege either deceptive practices, which sound in fraud, or unfair practices, which do not." *Id*. at *3. The Seventh Circuit agreed, holding Rule 8(a) provides the pleading standard for "a cause of action for *unfair practices* under the Consumer Fraud Act." *Id*. at *4. (emphasis added). Plaintiffs here have not alleged a cause of action for unfair practices under the Illinois Act or any other. Accordingly, Rule 9(b) applies.

      **B.**    **Plaintiffs Have Not Satisfied Rule 9(b).**

Plaintiffs' allegations fail to specify which Defendants made any particular misrepresentation, and how or when any misrepresentation was communicated, if at all, to any

particular Plaintiff. (Mem. at 24-25.) Rather than directing the Court to any allegation of "who, what, when, where, and how" of the alleged deception, Plaintiffs simply respond that "[t]he Complaint is replete with detail satisfying these criteria." (Opp. at 22, fn. 32.) Plaintiffs' contention that these requirements should be relaxed because they "lack access to all facts necessary to detail their claims" is legally unsupported and disingenuous—a plaintiff does not need discovery to aver that he or she relied on a misrepresentation.[10]

### C.     Plaintiffs' Claims Also Fail Under Their Respective State Fraud Statutes.

#### 1.     Illinois

Plaintiff Ford has failed to sate a claim under the Illinois Consumer Fraud Act because she does not allege actionable omissions or misrepresentations. (Mem. at 25-26.) Only a *knowing* omission of material fact is actionable. *Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 62-63, 306 Ill. Dec. 611, 617-18 (Ill. App. 2d Dist. 2006). Ford has not alleged Defendants failed to disclose a material fact known to them as of the date of her purchase, September 27, 2007. (*See* Compl. ¶16, Opp. at 23.) Ford claims that Aqua Dots do not comply with two ASTM standards because they were not tested for toxicity, but nowhere does she allege that Aqua Dots were not tested under the ASTM standards. *Id.* Ford also does not allege she saw, heard or read those representations. *See Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 161-62, 267 Ill. Dec. 14, 24-25 (Ill. 2002).[11] Ford's claim under the Illinois Deceptive Trade Practices Act ("IDTPA") fares no better because she fails to allege how any deceptive practice by Defendants might harm her in the future. The sole case Plaintiffs cite in opposition affirms the dismissal of an IDTPA claim where, as here, Plaintiff cannot demonstrate how she will be deceived or confused again "in an individual capacity" and therefore "cannot do so as representative of a class." *See Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1157, 184 Ill. Dec. 558, 565 (Ill. App. 1st Dist. 1992).

---

[10] *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998), is inapplicable. The plaintiffs in that case, who alleged a pattern of racketeering, claimed that the defendant nursing home denied them access to information that would satisfy the requirements as to other unnamed residents.

[11] *Brown v. SBC Commc'ns, Inc.*, No. 05-cv-777, 2007 WL 684133, *5 (S.D. Ill. Mar. 1, 2007), which involved a scheme of unauthorized charges hidden in telephone bills, does not apply. Plaintiffs here base their claims on affirmative misrepresentations and omissions, not "hidden" statements.

### 2.    Florida

Plaintiffs Simon and Sarah Bertanowski and White fail to state a claim under the Florida Deceptive and Unfair Trade Practices Act because they have not pled unfair or deceptive conduct, how they were injured, or that they even saw, heard, or read any misleading statements. (Mem. at 28-29.)    Although Plaintiffs claim that the Consolidated Complaint "details Defendants' deceptive conduct," they cite a single, unrelated paragraph that fails to describe any deception.    (Opp. at 25 *citing* ¶170.)    Further, Plaintiffs fail to refute Defendants' claim that Plaintiffs must allege, at a minimum, their awareness of any misleading statements in order to establish causation.  (Mem. at 28.)  The unrelated authority Plaintiffs cite, a per curium opinion affirming class certification, does not diminish Plaintiffs' obligation in this regard.  (*See* Opp. at 25, *citing S.D.S. Autos, Inc. v. Chrzanowski*, 982 So. 2d 1 (Fla. Dist. Ct. App. 2007).)

### 3.    Kentucky

Plaintiff Walker's claim under the Kentucky Consumer Protection Act fails to allege substantial wrongs or that any misrepresentations were communicated to her, and also fails for lack of privity.  (*See* Mem. at 29; Joinder at 3-4.)  Ignoring the authority cited by Defendants and the entirety of their arguments, Walker contends that the privity requirement should be relaxed "*where an injury has occurred* from an inherently dangerous product."  (Opp. at  28 (emphasis added).)  Not only does Walker cite no authority for this argument, but Walker, with the other Plaintiffs, has expressly disavowed any claim of personal injury.

### 4.    New York

Plaintiff Cosgrove cannot state a claim under the New York Deceptive Business Acts and Practices statute because she has not alleged a deceptive act or practice causing harm, and she has not alleged that she even was aware of any such act or practice.[12]  *See Andrew Strishak & Assocs. v. Hewlett Packard Co*., 752 N.Y.S.2d 400, 401-403 (N.Y. App. Div. 2002).  (Mem. at 30-31.)  Cosgrove does not refute that dismissal is appropriate under the New York statute where, as here, the defect did not manifest itself to her.  *See Frank v. DaimlerChrysler Corp*., 741 N.Y.S.2d 9, 17 (N.Y. App. Div. 2002).

---

[12] Contrary to Plaintiffs' Opposition, and consistent with the entirety of their Memorandum, Defendants do not admit that Plaintiffs sufficiently allege either deceptive conduct or that any such conduct misled Cosgrove or other Plaintiffs.  *See* Opp. at 27.

### 5.    Pennsylvania

Plaintiff Soderstedt fails to state a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") because she does not set forth with specificity the elements of her fraud-based claim.  (Mem. at 32.)  Soderstedt responds that a "catch-all" provision in the Pennsylvania statute does not require proof of fraud (Opp. at 26), but Plaintiff misses the point—the authority she cites holds that fraud-based claims must satisfy Rule 9(b) under the UTPCPL.  *See Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 410-12 (E.D. Pa. 2006).  Plaintiff relies on *Zwiercan v. Gen. Motors Corp.*, No. 3235 June Term 1999, 2002 WL 31053838, *2 (Pa. Com. Pl. 2002), but unlike the plaintiff in *Zwiercan*, Soderstedt has not alleged that Defendants knew of a material defect which they failed to disclose at the time of her October 17, 2007 purchase.  (Compl. ¶17; Opp. at 26.)[13]

### 6.    Texas

Plaintiff Bosch fails to state a claim under the Texas Deceptive Trade Practices-Consumer Protection Act because he has not alleged a cognizable injury or proof of causation.  (Mem. at 33.)  Bosch does not refute that he cannot recover absent an allegation that a defect manifested itself.  (Opp. at 26-27.)  Moreover, according to the very authority cited by Bosch, he cannot state a claim absent an allegation that the act or omission at issue "was a substantial factor in bringing about injury which would not otherwise have occurred."  *Smith v. Hennessey & Assocs. Inc.*, 103 S.W.3d 567, 569 (Tex. App. 2003).  Bosh cannot satisfy that standard where he does not state he "saw, much less relied upon" any misrepresentations.  *Id.*

---

[13] Plaintiffs' attempt to argue that Spin Master had "constructive knowledge" of the defect in Aqua Dots when Moose had knowledge is unsuccessful.  The case Plaintiffs rely on for this proposition, *Am. Multi-Cinema, Inc. v. MCL REC, LLC*, No. 06 C 0063, 2008 WL 1744426 (N.D. Ill. April 11, 2008), was not a products liability case (but rather dealt with contractual claims) and merely defined what the term constructive knowledge means.  Moreover, Plaintiffs have alleged *no* facts to suggest that Spin Master had constructive knowledge of the defect at the time Moose knew of the defect.  Plaintiffs' attempt to assert Spin Master had knowledge based on an agency theory fares no better.  Plaintiffs cite no support for their argument that knowledge can be imputed based on a theory of apparent agency.  Plaintiffs also allege *no* facts to support the existence of an agency relationship between Moose Enterprises and Spin Master.  Indeed, the sole case Plaintiffs rely on for their agency argument recognizes that "[t]o plead the existence of an agency relationship, the plaintiff must allege some factual predicate . . . to create the inference of agency."  *Azimi v. Ford Motor Co.*, 977 F. Supp. 847, 851 (N.D. Ill. 1996) (quotations omitted).  Plaintiffs also set forth no argument whatsoever as to how knowledge can be imputed to the Retailer Defendants.

**VII.   Plaintiffs Do Not Plead the Injustice, Inequity or Unconscionability Necessary for Their Unjust Enrichment Claim.**

Plaintiffs' unjust enrichment claims fail because they do not plead facts supporting the requisite element of injustice, inequity or unconscionability.  (Mem. at 34-36.)  Plaintiffs argue that Defendants were unjustly enriched because they provided replacement beads rather than cash refunds.  (Opp. at 29.)  As explained above, this claim is preempted and equitable principles cannot be relied on to undo legislative action.  (*See supra* at Section III.)  Further, Plaintiffs do not plead facts that establish an unconscionable benefit.  Plaintiffs plead in this case that after they purchased Aqua Dots, Spin Master discovered that the beads contained 1,4 butanediol and Spin Master provided replacement beads as part of a voluntary recall under the CPSA.  To excape this, Plaintiffs argue in their Opposition that the mere fact that the beads were found to contain an undesired substance is *per se* sufficient to support a finding of inequitable conduct— but this argument is entirely without support and contrary to equity.[14]

Further, to the extent Plaintiffs' unjust enrichment claims are tort-based, they must be dismissed because Plaintiffs' tort claims fail.  (Opp. at 30 n. 42; *see supra* at Section IV.)  An unjust enrichment claim based on failed statutory fraud claims must likewise be dismissed.  *See In re Sears, Roebuck & Co. Tools Mktg. and Sales Prac. Litig.* 2006 WL 3754823 at *4 (dismissing unjust enrichment claims based on allegedly fraudulent misrepresentations where plaintiffs failed to comply with the pleading requirements of Federal Rule of Civil Procedure 9(b).)  So too must a contract-based unjust enrichment claim be dismissed as to those Defendants who had a contractual relation to Plaintiffs (the Retail Defendants); Plaintiffs' having pled their unjust enrichment claims in the alternative does not save them.  (Mem. at 35-36.)

**VIII.   "Innocent Non-Manufacturer" Acts in Select States Separately Preclude the Claims of Plaintiffs Who Reside in Those States.**

Plaintiffs have not pled that Defendants had knowledge that Aqua Dots were unsafe, so that the innocent non-manufacturer acts of Illinois and Texas would not apply.  The conclusory allegation that Defendants "knew, or should have known, that the Aqua Dots were hazardous"

---

[14] Plaintiffs have identified authority for an unjust enrichment claim under Texas law.  However, the claim nevertheless fails because Texas law requires a showing of "fraud, duress, or the taking of undue advantage."  *See Leal v. Weightman*, No. 01-03-01006-CV, 2004 WL 2251570 (Tex. App. Oct. 7, 2004).  Plaintiffs do not plead that here.

(Compl. ¶¶ 67, 161), without any factual allegations of knowledge, is insufficient to allege that Defendants had actual knowledge under the *Twombly* pleading requirement.[15]

Regarding Texas, Plaintiffs' allegations that Spin Master "should have known" (Compl. ¶¶ 67, 161) that Aqua Dots contained 1,4 butanediol are insufficient to fit within the knowledge exception. *See Rubin v. DaimlerChrysler Corp.*, 2005 WL 1214605, at *6 (S.D. Tex. May 20, 2005) ("liability cannot be based on an allegation that a seller *should have known* of a defect in a product") (emphasis in original).

Regarding Illinois, Plaintiffs' blanket allegation that they have alleged that Spin Master "is much more than a 'seller in the stream of commerce'" does not save their claims. (Opp. at 31). Plaintiffs point to paragraphs 21 and 79 in support of their argument, yet the most these paragraphs and the rest of the Consolidated Complaint allege is that Spin Master is a non-manufacturer that markets and distributes Aqua Dots. (*See* Compl. ¶ 21, "Spin Master, Ltd. distributes, markets, promotes and sells merchandise including Aqua Dots . . . ."). Plaintiffs' argument that "any financial instability of the manufacturer, any hint at the Plaintiffs' ability to recover from it, such as a small foreign corporation like Moose" allows their claims to survive is absent from the Illinois statute and unsupported by the case law. Additionally, Plaintiffs have alleged no facts to even suggest that Moose alone would not be able to satisfy a judgment or settlement in this case.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Consolidated Amended Class Action Complaint should be dismissed in its entirety.

---

[15] The cases Plaintiffs cite in support of their argument are not relevant here. *See Goss v. Schering-Plough Corp.*, No. 6:06:CV-251, 2006 WL 2546494, at *2 (E.D. Tex. Aug. 30, 2006) (the defendants *conceded* that plaintiffs adequately pled knowledge in the Complaint); *Potter v. Electrolux Home Prod., Inc.*, No. 06 C 4811, 2006 WL 2930972 (N.D. Ill. Oct. 11, 2006) (the court did not make a decision as to a motion to dismiss and the adequacy of the knowledge allegations were not at issue); *Engelbecht v. DaimlerChrysler Corp.*, No. G-06-CV-800, 2007 WL 1040886, at *2 (S.D. Tex. Apr. 2, 2007) (court found the plaintiffs had adequately pled knowledge where they alleged the defendant was aware of the defect because the government was currently investigating the safety of airbags in the defendant's vans; no such factual allegations are pled herein); *Grove v. Manchester Tank & Equip.* Co., Nos. 07-1263, 07-1268, 07-1280, 2008 WL 2626366 (C.D. Ill. June 26, 2008) (court stated in a two-page opinion, without explanation, that it was "unclear" if plaintiffs could prevail in proving knowledge; adequacy of pleadings was not at issue).

Dated:  August 29, 2008.                         Respectfully submitted,

                                                 SPIN MASTER LTD., SPIN MASTER,
                                                 INC., TARGET CORPORATION,
                                                 WAL-MART STORES, INC., &
                                                 TOYS "R" US-DELAWARE, INC.

                                                 By: /s/ Thomas J. Wiegand
                                                 One of their attorneys

                                                 Ronald Y. Rothstein
                                                 Thomas J. Wiegand
                                                 Bryna J. Dahlin
                                                 WINSTON & STRAWN LLP
                                                 35 West Wacker Drive
                                                 Chicago, Illinois 60601
                                                 Telephone (312) 558-5600
                                                 Facsimile (312) 558-5700
                                                 twiegand@winston.com

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on August 29, 2008, I filed the above and foregoing with the

Court's ECF system and by doing so served a copy on all the parties.


/s/ Thomas J. Wiegand
ATTORNEY FOR SPIN MASTER LTD., SPIN
MASTER, INC., TARGET CORPORATION,
WAL-MART STORES, INC., & TOYS "R" US-
DELAWARE, INC.

# Exhibit

# A

Westlaw.

977 F.Supp. 847
977 F.Supp. 847

CAzimi v. Ford Motor Co.
N.D.Ill.,1996.

United States District Court,N.D. Illinois,Eastern
Division.
Siamak AZIMI, Plaintiff,
v.
FORD MOTOR COMPANY, a Michigan corporation,
Defendant.
No. 97 C 0360.

Aug. 15, 1996.

Vehicle purchaser sued manufacturer of vehicle,
asserting claims of common law fraud and also under
Magnuson-Moss Warranty Act and Illinois Consumer
Fraud Act. Manufacturer moved to dismiss, and the
District Court, Bucklo, J., held that: (1) allegations
were sufficient to allege that dealership was agent of
manufacturer, and to state common law and statutory
fraud claims; (2) fraud was alleged with sufficient
particularity; and (3) court could not say to a legal
certainty that purchaser's aggregate recovery would
not exceed amount in controversy requirement for
exercise of diversity jurisdiction.

Motion denied.

West Headnotes

[1] Federal Courts 170B ☞339

170B Federal Courts
    170BV Amount or Value in Controversy Affecting
Jurisdiction
        170Bk339 k. Amount Claimed or Value of
Property Right in General. Most Cited Cases
Where complaint invokes diversity jurisdiction,
amount in controversy claimed by plaintiff in good
faith will be determinative on issue of jurisdictional
amount. 28 U.S.C.A. § 1332(a).

[2] Federal Courts 170B ☞358

170B Federal Courts
    170BV Amount or Value in Controversy Affecting

Jurisdiction
        170Bk357 Evidence
            170Bk358 k. Presumptions and Burden of
Proof. Most Cited Cases

Federal Courts 170B ☞359

170B Federal Courts
    170BV Amount or Value in Controversy Affecting
Jurisdiction
        170Bk357 Evidence
            170Bk359 k. Weight and Sufficiency. Most
Cited Cases
If defendant challenges amount alleged to be in
controversy by plaintiff who seeks to invoke diversity
jurisdiction, plaintiff bears burden of establishing
jurisdiction by competent proof, i.e., proof to a
reasonable probability that jurisdiction exists; burden
is not exacting, and plaintiff is entitled to considerable
latitude in supporting his allegations and must be
given benefit of any facts he could conceivably prove
in support of his allegations. 28 U.S.C.A. § 1332(a).

[3] Federal Courts 170B ☞359

170B Federal Courts
    170BV Amount or Value in Controversy Affecting
Jurisdiction
        170Bk357 Evidence
            170Bk359 k. Weight and Sufficiency. Most
Cited Cases
Defendant who contests amount in controversy
requirement for exercise of jurisdiction on motion to
dismiss will prevail only if it appears to a legal
certainty that claim is really for less than jurisdictional
amount. 28 U.S.C.A. § 1332(a).

[4] Federal Courts 170B ☞336.1

170B Federal Courts
    170BV Amount or Value in Controversy Affecting
Jurisdiction
        170Bk336 Matter in Dispute and Amount or
Value Claimed or Involved
            170Bk336.1 k. In General. Most Cited
Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

977 F.Supp. 847
977 F.Supp. 847

**Federal Courts 170B ⟸337**

170B Federal Courts
    170BV Amount or Value in Controversy Affecting Jurisdiction
        170Bk336 Matter in Dispute and Amount or Value Claimed or Involved
            170Bk337 k. Punitive Damages. Most Cited Cases

**Federal Courts 170B ⟸338**

170B Federal Courts
    170BV Amount or Value in Controversy Affecting Jurisdiction
        170Bk336 Matter in Dispute and Amount or Value Claimed or Involved
            170Bk338 k. Interest and Costs; Attorney Fees. Most Cited Cases

Attorney fees, incidental damages, and punitive damages may be aggravated in determining whether amount in controversy requirement for exercise of diversity jurisdiction is met. 28 U.S.C.A. § 1332(a).

**[5] Federal Courts 170B ⟸340.1**

170B Federal Courts
    170BV Amount or Value in Controversy Affecting Jurisdiction
        170Bk340 Particular Cases, Claim or Value
            170Bk340.1 k. In General. Most Cited Cases

Court could not say to a legal certainty that vehicle purchaser's recovery of purchase price, attorney fees, incidental damages, and punitive damages in action in which he asserted claims of common law fraud and under Illinois Consumer Fraud Act against vehicle manufacturer would not exceed $75,000, and thus, amount in controversy requirement for exercise of diversity jurisdiction was met in action. 28 U.S.C.A. 1332(a); S.H.A. 815 ILCS 505/1 et seq.

**[6] Principal and Agent 308 ⟸3(1)**

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k3 Agency Distinguished from Other Relations
                308k3(1) k. In General. Most Cited

Cases
Under Illinois law, automobile dealer is not agent of manufacturer merely because it is an authorized dealer for manufacturer or because, in course of sale, it transferred manufacturer's warranty to purchaser; however, such an agency relationship may exist between dealer and manufacturer.

**[7] Principal and Agent 308 ⟸1**

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k1 k. Nature of the Relation in General. Most Cited Cases

Under Illinois law, agency relationship exists when one undertakes to manage some affairs to be transacted for and on account of principal.

**[8] Principal and Agent 308 ⟸14(1)**

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k14 Implied Agency
                308k14(1) k. In General. Most Cited

Cases
Under Illinois law, "apparent agency" exists where reasonably prudent person, exercising diligence and discretion, in view of principal's conduct, would naturally suppose agent to possess principal's authority.

**[9] Principal and Agent 308 ⟸24**

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k24 k. Questions for Jury. Most Cited

Cases

**Principal and Agent 308 ⟸124(1)**

308 Principal and Agent
    308III Rights and Liabilities as to Third Persons
        308III(A) Powers of Agent
            308k124 Questions for Jury
                308k124(1) k. In General. Most Cited

Cases
Under Illinois law, existence and scope of agency

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

relationship are questions of fact for jury.

**[10] Principal and Agent 308 ☞189(1)**

308 Principal and Agent
  308III Rights and Liabilities as to Third Persons
    308III(F) Actions
      308k189 Pleading
        308k189(1) k. Complaint. Most Cited
Cases
To plead existence of an agency relationship, plaintiff must allege some factual predicate, even though generalized rather than evidentiary in nature, to create inference of agency.

**[11] Federal Civil Procedure 170A ☞1832**

170A Federal Civil Procedure
  170AXI Dismissal
    170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
        170Ak1827 Determination
          170Ak1832 k. Matters Considered in General. Most Cited Cases
For purposes of motion to dismiss, court may consider allegations in response which do not contradict the complaint.

**[12] Principal and Agent 308 ☞189(1)**

308 Principal and Agent
  308III Rights and Liabilities as to Third Persons
    308III(F) Actions
      308k189 Pleading
        308k189(1) k. Complaint. Most Cited
Cases
Allegations by purchaser of vehicle that vehicle manufacturer's logo was displayed at dealership where vehicle was purchased, that manufacturer issued technical bulletins to dealerships detailing vehicle problems, that manufacturer trained dealership personnel regarding warranties, and that only persons trained by manufacturer could repair and maintain vehicles under warranty were sufficient to assert existence of apparent agency relationship under Illinois law between manufacturer and dealership and its salesman in purchaser's fraud action.

**[13] Antitrust and Trade Regulation 29T ☞134**

29T Antitrust and Trade Regulation
  29TIII Statutory Unfair Trade Practices and Consumer Protection
    29TIII(A) In General
      29Tk133 Nature and Elements
        29Tk134 k. In General. Most Cited
Cases
  (Formerly 92Hk38 Consumer Protection)
To state claim under the Illinois Consumer Fraud Act, plaintiff must allege (1) deceptive act or practice, (2) an intent by defendant that plaintiff rely on deception, and (3) that deception occurred in course of conduct involving trade or commerce. S.H.A. 815 ILCS 505/1 et seq.

**[14] Antitrust and Trade Regulation 29T ☞358**

29T Antitrust and Trade Regulation
  29TIII Statutory Unfair Trade Practices and Consumer Protection
    29TIII(E) Enforcement and Remedies
      29TIII(E)5 Actions
        29Tk356 Pleading
          29Tk358 k. Particular Cases. Most
Cited Cases
  (Formerly 92Hk38 Consumer Protection)
Allegations by vehicle purchaser that salesman, despite knowing that facts were otherwise, had misrepresented that vehicle had no internal defects and that if defects were found they would be promptly and satisfactorily repaired or vehicle replaced, were sufficient to state claim against manufacturer under Illinois Consumer Fraud Act. S.H.A. 815 ILCS 505/1 et seq.

**[15] Sales 343 ☞445(2)**

343 Sales
  343VIII Remedies of Buyer
    343VIII(D) Actions and Counterclaims for Breach of Warranty
      343k443 Trial
        343k445 Questions for Jury
          343k445(2) k. Making and Requisites of Express Warranty. Most Cited Cases
Whether statement which forms basis for warranty claim is an opinion or fact depends upon circumstances of case.

**[16] Antitrust and Trade Regulation 29T ☞149**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk149 k. Number or Frequency of Transactions or Acts. Most Cited Cases
            (Formerly 92Hk4 Consumer Protection)
Single transaction is sufficient to establish claim under Illinois Consumer Fraud Act. S.H.A. 815 ILCS 505/1 et seq.

**[17] Fraud 184 ⬤➔3**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k2 Elements of Actual Fraud
            184k3 k. In General. Most Cited Cases
Elements of common law fraud under Illinois law are (1) a false statement of material fact, (2) by one who knows or believes it to be false, (3) made with intent to induce action by another in reliance on statement, (4) action by the other in reliance on truthfulness of statement, and (5) injury to the other resulting from that reliance.

**[18] Antitrust and Trade Regulation 29T ⬤➔136**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk136 k. Fraud; Deceit; Knowledge and Intent. Most Cited Cases
            (Formerly 92Hk34 Consumer Protection)

**Antitrust and Trade Regulation 29T ⬤➔138**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk138 k. Reliance; Causation; Injury, Loss, or Damage. Most Cited Cases
            (Formerly 92Hk34 Consumer Protection)
Difference between common law fraud and claim of statutory fraud under Illinois Consumer Fraud Act is

that Act has eliminated requirements of scienter and actual reliance on the deception. S.H.A. 815 ILCS 505/1 et seq.

**[19] Fraud 184 ⬤➔43**

184 Fraud
    184II Actions
        184II(C) Pleading
            184k43 k. Statements, Acts, or Conduct Constituting Fraud. Most Cited Cases
Allegations by vehicle purchaser that manufacturer had issued technical bulletins about possible vehicle defects, and that salesman knew about bulletins but did not inform him, and that purchaser bought vehicle believing it to be free of defects were sufficient to state common law fraud claim against manufacturer under Illinois law.

**[20] Federal Civil Procedure 170A ⬤➔636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Claims made pursuant to Illinois Consumer Fraud Act are subject to requirement that fraud claims be pled with particularity, and thus must state identity of person making misrepresentation, time, place, and content of misrepresentation, and method by which misrepresentation was communicated. S.H.A. 815 ILCS 505/1 et seq.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[21] Federal Civil Procedure 170A ⬤➔636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Allegations by vehicle purchaser that on specific date, salesman at dealership had misrepresented to him that vehicle was free of inherent defects and that manufacturer guaranteed prompt repair or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

replacement of any defective parts on vehicle in event of any failure to conform to express warranties were sufficient to meet particularity requirement applicable to purchaser's claims for common law fraud and under Illinois Consumer Fraud Act. S.H.A.; 815 ILCS 505/1 et seq.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[22] Costs 102 ☞194.18**

102 Costs
   102VIII Attorney Fees
      102k194.18 k. Items and Amount; Hours; Rate.
Most Cited Cases
Under Illinois law, most important factor in determining whether attorney fees are reasonable is amount of time necessarily spent on case.

**[23] Costs 102 ☞194.18**

102 Costs
   102VIII Attorney Fees
      102k194.18 k. Items and Amount; Hours; Rate.
Most Cited Cases
Under Illinois law, when claims are based on the same evidence, time spent on each issue cannot be distinguished for purposes of attorney fee award.

**[24] Federal Civil Procedure 170A ☞2737.4**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2737 Attorneys' Fees
         170Ak2737.4 k. Amount and Elements.
Most Cited Cases
In the Seventh Circuit, reasonable attorney fees are determined by multiplying hours reasonably expended on litigation by a reasonable hourly rate.

**[25] Federal Civil Procedure 170A ☞2737.4**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2737 Attorneys' Fees
         170Ak2737.4 k. Amount and Elements.
Most Cited Cases
Generally, when plaintiff is entitled to attorney fees by statute on one claim and prevails on other claims arising out of same common nucleus of facts, plaintiff is entitled to recover fees on all work done on related claims.

**[26] Federal Courts 170B ☞337**

170B Federal Courts
   170BV Amount or Value in Controversy Affecting Jurisdiction
      170Bk336 Matter in Dispute and Amount or Value Claimed or Involved
         170Bk337 k. Punitive Damages. Most Cited Cases
Where punitive damages are required to satisfy jurisdictional amount in controversy requirement in diversity case, two-part inquiry is necessary: first question is whether punitive damages are recoverable as matter of state law, and if answer is yes, court has subject matter jurisdiction unless it is clear beyond a legal certainty that plaintiff would under no circumstances be entitled to recover jurisdictional amount. 28 U.S.C.A. § 1332(a).

**[27] Federal Courts 170B ☞337**

170B Federal Courts
   170BV Amount or Value in Controversy Affecting Jurisdiction
      170Bk336 Matter in Dispute and Amount or Value Claimed or Involved
         170Bk337 k. Punitive Damages. Most Cited Cases
When claim for punitive damages makes up the bulk of amount in controversy underlying assertion of diversity jurisdiction, and may even have been colorably asserted solely to confer jurisdiction, court should scrutinize that claim closely. 28 U.S.C.A. § 1332(a).

**[28] Damages 115 ☞91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In General. Most Cited Cases
   (Formerly 115k91(1))

**Fraud 184 ☞61**

184 Fraud
   184II Actions
      184II(E) Damages

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

977 F.Supp. 847
977 F.Supp. 847

**184k61** k. Exemplary. Most Cited Cases
Illinois law disfavors punitive damages, and requires that plaintiffs establish not only simple fraud but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness.

**[29] Damages 115 ☞91.5(1)**

115 Damages
  115V Exemplary Damages
    115k91.5 Grounds for Exemplary Damages
      115k91.5(1) k. In General. Most Cited Cases
(Formerly 115k91(1))
Under Illinois law, acts done with reckless disregard for the rights of others may justify award of punitive damages.

**[30] Damages 115 ☞87(1)**

115 Damages
  115V Exemplary Damages
    115k87 Nature and Theory of Damages Additional to Compensation
      115k87(1) k. In General. Most Cited Cases
Under Illinois law, courts are to be cautious in awarding punitive damages, due to their penal nature.

**[31] Damages 115 ☞208(8)**

115 Damages
  115X Proceedings for Assessment
    115k208 Questions for Jury
      115k208(8) k. Exemplary Damages. Most Cited Cases
Although final determination regarding award of punitive damages under Illinois law is for trier of fact, initial determination of whether facts and circumstances justify imposition of punitive damages is question of law.

*849 Adam Jacob Krohn, Krohn & Moss, Ltd., Chicago, IL, for Plaintiff.
*850 Mitchell Ware, R. Delacy Peters, Jr., Beverly Cassandra Fisher, Jones, Ware & Grenard, Chicago, IL, Beatriz Maria Olivera, Vigil, Berkley, Schulz & Gordon, P.C., Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

BUCKLO, District Judge.
The plaintiff, Siamak Azimi, purchased a 1997 Ford F-150 Lariat ("Lariat"), a vehicle manufactured by the Ford Motor Company ("Ford"), from Ron Hopkins Suburban Ford, Inc. ("Ron Hopkins"). The Lariat turned out to be defective and repeated repairs did not correct the problems. The plaintiff sued Ford for violations of the Magnuson-Moss Warranty Act ("Warranty Act") (Counts I and II), 15 U.S.C. § 2301et seq., and the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act") (Count III), 815 ILCS 505/1et seq. (West 1993 & Supp. 1997), and for common law fraud (Count IV). Ford moved to dismiss for a variety of reasons. For the following reasons, the motion is denied.

I.

There are two federal law and two state law counts in this complaint. Although a federal statute, the Warranty Act does not automatically confer federal subject matter jurisdiction. A federal court has jurisdiction over a Warranty Act claim only "if the amount in controversy is ... $50,000.00 (exclusive of interests and costs) computed on the basis of all [Warranty Act] claims." 15 U.S.C. § 2310(d)(3); Marchionna v. Ford Motor Co., No. 94 C 275, 1995 WL 476591, at *7 (N.D.Ill. Aug.10, 1995) ("state claims may not be counted toward Magnuson-Moss' jurisdictional threshold"). Mr. Azimi does not attempt to and I do not consider whether he can establish jurisdiction for Counts I and II under the Warranty Act.

However, if Mr. Azimi can establish diversity jurisdiction, 28 U.S.C. § 1332(a), with respect to one of his state law counts, the court can assert supplemental jurisdiction, 28 U.S.C. § 1367(a), over the Warranty Act counts, Haslam v. Lefta, Inc., No. 93 C 4311, 1994 WL 117463, at *2 (N.D.Ill. Mar.25, 1994), and over the remaining state law count, even if it does not meet the amount-in-controversy. ITT Commercial Fin. Corp. v. Unlimited Automotive, Inc., 814 F.Supp. 664, 669 (N.D.Ill.1992) (Aspen, J .) (exercising supplemental jurisdiction over two counts of four count diversity complaint, where two counts did not satisfy amount in controversy) (relied upon by Haslam, supra ); see also Lloyd v. Kull, 329 F.2d 168, 170 (7th Cir.1964) (where plaintiff's claim for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

977 F.Supp. 847
977 F.Supp. 847

negligence exceeded jurisdictional minimum, while claim for assault and battery was below minimum, court properly asserted jurisdiction over latter claim).

[1][2][3] Since Mr. Azimi is a citizen of Illinois, while the defendant is a citizen of Michigan, the parties are diverse. Ford challenges Mr. Azimi's ability to meet the $75,001.00 amount in controversy.[FN1] Where a complaint invokes diversity jurisdiction, "the amount in controversy claimed by a plaintiff in good faith will be determinative on the issue of jurisdictional amount." *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th Cir.1995). However, if the defendant challenges the plaintiff's amount allegation, the plaintiff bears the burden of establishing jurisdiction by competent proof, i.e., "proof to a reasonable probability that jurisdiction exists." *Id.* (quotation omitted). "This burden ... is not exacting[, as] the plaintiff is entitled to considerable latitude in supporting his allegations; he must be given the benefit of any facts he could conceivably prove in support of his allegations." *ITT Commercial Fin. Corp.*, 814 F.Supp. at 667 (quotation omitted). Ford will prevail only if it appears "to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* (quotation omitted).

> FN1. Ford argues that Mr. Azimi's claim is worth less than $50,001.00, disregarding the fact that on January 17, 1997, the day Mr. Azimi filed his complaint, the amount in controversy requirement was raised to $75,000.00. 28 U.S.C. § 1332(a), *as amended by* Federal Courts Improvement Act of 1996, Pub.L. No. 104-317, § 205, 110 Stat. 3847, 3850 (1996) (effective January 17, 1997). Mr. Azimi's response acknowledges the change in the law.

***851** [4][5] In each of his four counts, Mr. Azimi seeks to recover the Lariat's purchase price of $27,203.50. This leaves a deficit of $47,797.50, which Mr. Azimi seeks to make up by aggregating attorneys' fees, incidental damages, and punitive damages. All of these count towards the amount in controversy and are recoverable under the Illinois Consumer Fraud Act. *Gent v. Collinsville Volkswagen, Inc.*, 116 Ill.App.3d 496, 72 Ill.Dec. 62, 66-68, 451 N.E.2d 1385, 1389-91 (1983); *see also Sarnoff v. American Home Prods. Corp.*, 798 F.2d 1075, 1078 (7th Cir.1986)( attorneys' fees may be included in amount in controversy if

provided for by statute); 815 ILCS 505/10a(c) (West Supp.1997) (court may award reasonable attorneys' fees under Illinois Consumer Fraud Act). Thus, since the Illinois Consumer Fraud Act Count will serve as the jurisdictional anchor for this suit, the issues become (1) whether the Illinois Consumer Fraud Act Count survives a motion to dismiss, and, if so, (2) whether Mr. Azimi can show his entitlement to the attorneys' fees, incidental damages, and punitive damages under the Act to a reasonable probability.[FN2]

> FN2. Normally, a court first decides whether it has subject matter jurisdiction. Here, however, the existence of jurisdiction depends upon the viability of the Illinois Consumer Fraud Act claim, and Ford moves to dismiss that claim pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), as well as 12(b)(1). Therefore, I must resolve the non-jurisdictional challenges to the claim first.

II.

*Fed.R.Civ.P. 12(b)(6)*

[6][7][8][9] Mr. Azimi alleges that the Ron Hopkins salesman made various misrepresentations. Ford argues that the salesman's statements cannot be attributed to it because an agency relationship does not exist between it and the dealership. I agree with the defendant that Ron Hopkins is not Ford's agent merely because it is an authorized Ford dealer or because, in the course of a sale, Ron Hopkins transferred to Mr. Azimi a Ford warranty. *Washington v. Courtesy Motor Sales, Inc.*, 48 Ill.App.2d 380, 199 N.E.2d 263, 264-65 (1964). However, a dealership may be an agent of the manufacturer. *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 398, 675 N.E.2d 584, 593 (1997). An agency relationship exists when one "undertakes to manage some affairs to be transacted for [and] ... on account of the ... principal." *Wargel v. First Nat'l Bank*, 121 Ill.App.3d 730, 77 Ill.Dec. 275, 278, 460 N.E.2d 331, 334(1984). "Apparent" agency exists where "a reasonably prudent [person], exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess[] principal's authority. *Id.* 77 Ill. Dec. at 279, 460 N.E.2d at 335 (quotation omitted). The existence and scope of an agency relationship are questions of fact for the jury. *Id.* 77 Ill. Dec. at 278, 460 N.E.2d at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

977 F.Supp. 847
977 F.Supp. 847

334.

[10][11][12] To plead the existence of an agency relationship, the plaintiff must "allege some factual predicate (even though generalized rather than evidentiary in nature) to create the inference" of agency. *Rand Bond of N. Am., Inc. v. Saul Stone & Co., 726 F.Supp. 684, 687 (N.D.Ill.1989)* (Shadur, J.). Mr. Azimi's response [FN3] states that Ford's logo is displayed at Ron Hopkins and on the warranties the plaintiff received, that Ford issues technical bulletins to the dealerships detailing potential vehicle problems, that Ford trains the dealership personnel regarding its warranties, and that the only persons who may repair and maintain the vehicles under warranty are Ford-trained, dealership-based mechanics. These allegations are sufficient to assert the existence of "apparent" agency relationship between Ford and Ron Hopkins (and, therefore, the salesman who interacted with Mr. Azimi).[FN4] *See Connick, 221 Ill.Dec. at 399, 675 N.E.2d at 594* (where vehicle manufacturer requires dealers to display logos and trains dealership personnel, a trier of fact may find "apparent" agency relationship); *see also Malmberg v. American Honda Motor Co., 644 So.2d 888, 891 (Ala.1994)* (car manufacturer's logos on dealership's*852 "signs, literature, products, brochures, and plaques," fact that manufacturer "instructs and trains its dealers" and mechanics who work on cars under warranty, and plaintiff's belief that dealership represented manufacturer created issue of material fact as to existence of agency relationship between dealership and manufacturer) (cited in *Connick, supra* ).

> FN3. For the purposes of a motion to dismiss, I may consider allegations in the response which do not contradict the complaint. *Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 439-40 (7th Cir.1994); Hrubec v. National R.R. Passenger Corp., 981 F.2d 962, 963-64 (7th Cir.1992).*

> FN4. The same analysis applies to Count IV, common law fraud.

[13] Ford also argues that, even assuming that the salesman's statements are attributable to Ford, they are not actionable under the Illinois Consumer Fraud Act. To state a claim under the Illinois Consumer Fraud Act, the plaintiff must allege "(1) a deceptive act or practice; (2) an intent by the defendant that the

plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving a trade or commerce." *Thacker v. Menard, Inc., 105 F.3d 382, 386 (7th Cir.1997)* (quotation omitted).

[14] In Count III, Mr. Azimi complains that the salesman misrepresented that the Lariat had no internal defects and that, if any defects were found, they would be promptly and satisfactorily repaired or the vehicle replaced. Ford contends that these allegations are its warranties and, as such, the claim is for breach of warranty, not fraud. *Marchionna, 1995 WL 476591, at *6* ("the Seventh Circuit has cautioned against allowing a plaintiff to turn a simple suit for breach of contract (or warranty) into a claim for fraud"); *Golembiewski v. Hallberg Ins. Agency, Inc., 262 Ill.App.3d 1082, 200 Ill.Dec. 113, 120-21, 635 N.E.2d 452, 459-60 (1994)* ("Every individual breach of contract between two parties ... does not amount to a cause of action cognizable under the [Illinois Consumer Fraud] Act."). However, the defendant ignores plaintiff's allegation that the Ron Hopkins salesman made the representations knowing from the issuance of Technical Services Bulletins on the Lariat that the facts were otherwise.

[15][16][17][18][19] Ford also argues that the salesman's characterization of the Lariat as one of the top vehicles on the market was unactionable opinion or "puffing." *Breckenridge v. Cambridge Homes, Inc., 246 Ill.App.3d 810, 186 Ill.Dec. 425, 433, 616 N.E.2d 615, 623 (1993)*. However, whether a statement is an opinion or fact depends upon the circumstances of the case, *Thacker, 105 F.3d at 386*, which are not yet developed at this stage of the litigation. "[A] single transaction is sufficient to establish a claim under the [Illinois] Consumer Fraud Act." *Roche v. Fireside Chrysler-Plymouth, Mazda, Inc., 235 Ill.App.3d 70, 175 Ill.Dec. 760, 769, 600 N.E.2d 1218, 1227 (1992).* Thus, Mr. Azimi has stated a claim under the Illinois Consumer Fraud Act.[FN5]

> FN5. **The elements of common law fraud are similar:** "(1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance." *Athey Prods. Corp. v. Harris Bank*

*Roselle,* 89 F.3d 430, 434 (7th Cir.1996) (quotation omitted). The difference between common law and statutory fraud is that the latter eliminated the requirement of scienter, element (2), and actual reliance on the deception, element (4). *Thacker,* 105 F.3d at 386. Nevertheless, Mr. Azimi **states a common law fraud claim** because he alleges that Ford issued technical bulletins about possible vehicle defects, the salesman knew about the bulletins, yet did not inform Mr. Azimi, and Mr. Azimi bought the Lariat believing it to be free of defects.

*Fed.R.Civ.P. 9(b)*

[20][21] Ford also argues that Mr. Azimi failed to plead his claim for fraud with "particularity." Fed.R.Civ.P. 9(b) ("in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"). Under that rule, **"[c]laims made pursuant to the Illinois Consumer Fraud Act ... must state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated."** *Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.,* 940 F.Supp. 176, 180 (N.D.Ill.1996) (quotation omitted). Mr. Azimi's complaint satisfies this standard by alleging that on or about May 7, 1996, at the Ron Hopkins dealership, an agent of Ford, a Ron Hopkins salesman, told the plaintiff that the Lariat was free of inherent defects and *853 that Ford guaranteed the prompt repair or replacement of any defective parts on the vehicle in the event of any failure to inform to express warranties.[FN6] Thus, Count III and IV survive the motions to dismiss under Fed.R.Civ.P. 12(b)(6) and 9(b).

> FN6. The pleading requirements for common law fraud under Fed.R.Civ.P. 9(b) are identical to those under the Illinois Consumer Fraud Act. *Uni*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992).

III.

*Attorneys' Fees*

[22][23][24][25] Relying on *Ciampi v. Ogden Chrysler Plymouth,* 262 Ill.App.3d 94, 199 Ill.Dec. 609, 623, 634 N.E.2d 448, 462-63 (1994), Mr. Azimi claims that he will be entitled to $35,000.00 in attorneys' fees. In *Ciampi,* the court awarded the plaintiff $35,070.00 in attorneys' fees pursuant to the Illinois Consumer Fraud Act. *Id.* 199 Ill.Dec. at 612, 634 N. E.2d at 451. *Ciampi* was a three-claim case, and involved a vehicle which turned out to be different from what the dealership represented it to be. *Id.* 199 Ill.Dec. at 612-17, 634 N.E.2d at 451-55. Although the suit began with three defendants, the trial was prosecuted against only one. *Id.* 199 Ill.Dec. at 612, 634 N.E.2d at 451. Utilizing a standard for awarding attorneys' fees similar to the federal one,[FN7] the court affirmed the award. *Id.* The suit at bar involves complex material issues, such as agency, similar to those in *Ciampi. Id.* In short, I cannot say, with legal certainty, that Mr. Azimi will not be entitled to $35,000.00 in attorneys' fees. *See M & D Balloons, Inc. v. Texas Balloon & Novelty Co.,* No. 91 C 7313, 1992 WL 92030, at *2 (N.D.Ill. Apr.30, 1992) (countenancing plaintiff's alleged amount of attorneys' fees after noting that, in addition to litigating substantive issues, plaintiff is forced to expend resources in defense of jurisdiction).

> FN7. In Illinois, "[t]he most important factor in determining whether fees are reasonable is the amount of time necessarily spent on the case." *Ciampi,* 199 Ill.Dec. at 622, 634 N.E.2d at 461. Moreover, when claims are "based on the same evidence[,] ... the time spent on each issue [cannot] be distinguished." *Id.* "In the Seventh Circuit, reasonable attorneys' fees are determined by multiplying the hours reasonably expended on the litigation by a reasonable hourly rate ...."*Safeguard Bus. Sys., Inc. v. Reed-Rite, Inc.,* No. 90 C 1147, 1995 WL 557456, at *1 (N.D.Ill. Sept.15, 1995). "Generally, when a plaintiff is entitled to attorneys' fees by statute on one claim and prevails on other claims arising out of the same common nucleus of facts, the plaintiff is entitled to recover fees on all of the work done on the related claims." *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* No. 90 C 2370, 1994 WL 605719, at *1 (N.D.Ill. Nov.3, 1994).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

977 F.Supp. 847
977 F.Supp. 847

*Incidental Damages*

Relying on *Gent,* 72 Ill.Dec. at 67, 451 N.E.2d at 1390, Mr. Azimi argues that, under the Illinois Consumer Fraud Act, he will be entitled to a reasonable rental expense of a substitute vehicle, regardless of whether he actually rented such a vehicle, for each day he was not able to utilize the Lariat. In *Gent,* the parties stipulated to $10.00 per day as a reasonable charge for a rental vehicle. *Id.* Since Mr. Azimi does not set forth a different figure, I will use the amount in *Gent.* Mr. Azimi purchased the Lariat on or about May 7, 1996 and revoked his acceptance on December 15, 1996. The Lariat was in the plaintiff's possession for 222 days. Thus, assuming that Mr. Azimi was unable to use the Lariat during that entire period, his reasonable rental recovery would be $2,220.00. Mr. Azimi also claims that he is entitled to aggravation and inconvenience damages resulting from the Ron Hopkins salesman's misrepresentations. *Roche,* 175 Ill.Dec. at 770, 600 N.E.2d at 1228 (awarding aggravation and inconvenience damages under Illinois Consumer Fraud Act, where dealership mislead plaintiff into believing that her trade-in vehicle provided ample down payment for new vehicle and that financing would be arranged if necessary). Since Mr. Azimi does not provide an amount, the court will use $750.00 awarded in *Roche. Id.*

Invoking *First Chicago Gary-Wheaton Bank v. Gaughan,* 275 Ill.App.3d 53, 211 Ill.Dec. 553, 559, 655 N.E.2d 936, 942 (1995), Mr. Azimi contends that he will be entitled to damages of $50.00 per day for "loss of use" of *854 the Lariat while it was inoperable during the entire period that Mr. Azimi had the vehicle in his possession, from May 7, 1996 to December 15, 1996. *First Chicago Gary-Wheaton Bank* was a replevin action, where the party seeking replevin lost the suit and was held liable for the owner's loss of use of the wrongfully detained car. *Id.* (citing 735 ILCS 5/19-123 (West 1993) (denying judgment against plaintiff in replevin action)). *First Chicago Gary-Wheaton Bank* involved the parties' stipulation to the value of the loss of use of a unique and valuable sports car whose "possession ... [wa]s an integral part of the use of such a vehicle." 211 Ill.Dec. at 559, 655 N.E.2d at 942. Assuming the relevance of the replevin recovery rule to damages under the Illinois Consumer Fraud Act [FN8] and in the absence of a stipulation, Mr. Azimi will have to quantify the consequences of his inability to use the Lariat. *See*

*supra* note 9. Yet, he alleges no such consequences. Thus, Mr. Azimi has shown by competent proof that he will be entitled to, at most, $2,970.00 in incidental damages.

FN8. The courts have measured the "loss of use" damages in a replevin action by quantifying the use to which the property would have been put had it been in the party's possession, such as renting the property and receiving lease payments, or realizing profit for use of the property. *International Harvester Credit Corp. v. Helland,* 151 Ill.App.3d 848, 104 Ill.Dec. 833, 840, 503 N.E.2d 548, 555-56 (1987). Under the Illinois Consumer Fraud Act, "[t]he court ... may award actual economic damages." 815 ILCS 505/10a(a) (West Supp.1997). It would appear that "loss of use" damages would be subsumed under this section. *See Gent,* 72 Ill.Dec. at 66, 451 N.E.2d at 1389.

*Punitive Damages*

[26][27] Mr. Azimi anticipates receiving punitive damages under the Illinois Consumer Fraud Act. 815 ILCS 505/10a(a) (West. Supp. 1997); *see Cellular Dynamics, Inc. v. MCI Telecomm. Corp.,* No. 94 C 3126, 1997 WL 285830, at *1, *5-6 (N.D.Ill. May 23, 1997) (awarding punitive damages under Illinois Consumer Fraud Act).

Where punitive damages are required to satisfy the jurisdictional requirement in a diversity case, a two-part inquiry is necessary. The first question is whether punitive damages are recoverable as a matter of state law. If the answer is yes, the court has subject matter jurisdiction unless it is clear beyond a legal certainty that the plaintiff would under no circumstances be entitled to recover the jurisdictional amount.

*Cadek v. Great Lakes Dragaway, Inc.,* 58 F.3d 1209, 1211-12 (7th Cir.1995). "When a claim for punitive damages makes up the bulk of the amount in controversy, and may even have been colorably asserted solely to confer jurisdiction, [the courts] should scrutinize that claim closely." *Anthony v. Security Pac. Fin. Servs., Inc.,* 75 F.3d 311, 315 (7th Cir.1996).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[28][29][30][31] The Seventh Circuit has interpreted Illinois law to "[dis]favor punitive damages and [to] insist that [the] plaintiffs ... establish not only simple fraud but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness." *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 275 (7th Cir.1996) (quotation omitted). Acts done with reckless disregard for the rights of others may also justify the award of punitive damages. *Smith v. Prime Cable of Chicago*, 276 Ill.App.3d 843, 213 Ill.Dec. 304, 315, 658 N.E.2d 1325, 1336 (1995). The Illinois Supreme Court has counseled courts to be cautious in awarding punitive damages [FN9] due to their penal nature. *Roboserve, Inc., 78 F.3d at 275.*

> **FN9.** Although the final determination regarding punitive damages is for the trier of fact, "[t]he initial determination of whether the facts and circumstances justify the imposition of punitive damages is a question of law." *Malooley v. Alice*, 251 Ill.App.3d 51, 190 Ill.Dec. 396, 400-01, 621 N.E.2d 265, 269-70 (1993).

Mr. Azimi complains that the Lariat suffered from defects in the transmission, radio, paint, side mirror, exhaust system, and the engine, and that, despite the warranties, it *855 was not repaired or replaced. However, according to Mr. Azimi's complaint, Ford's agent, the Ron Hopkins salesman, knowingly misrepresented that the Lariat had no inherent defects, that it would be promptly and satisfactorily repaired or replaced, and that it was one of the top vehicles in the market. Based on the cases upon which Mr. Azimi relies, *Ciampi*, 199 Ill.Dec. at 622, 634 N.E.2d at 461; [FN10] *Totz v. Continental Du Page Acura*, 236 Ill.App.3d 891, 177 Ill.Dec. 202, 207-11, 602 N.E.2d 1374, 1379-83 (1992); [FN11] *Crowder v. Bob Oberling Enters., Inc.*, 148 Ill.App.3d 313, 101 Ill.Dec. 748, 749-751, 499 N.E.2d 115, 116-18 (1986); [FN12] *Tague v. Molitor Motor Co.*, 139 Ill.App.3d 313, 93 Ill.Dec. 769, 772, 487 N.E.2d 436, 439 (1985); [FN13] *Gent*, 72 Ill.Dec. at 63-66, 451 N.E.2d at 1386-89, [FN14] I cannot say "to a legal certainty that a verdict awarding ... punitive damages [of \$9,827.50 to Mr. Azimi] would be excessive and set aside for that reason." [FN15] *Cadek*, 58 F.3d at 1212 (quotation omitted). Therefore, Mr. Azimi has shown, "to a reasonable probability," *NLFC, Inc.*, 45 F.3d at 237, his future entitlement to \$75,001.00, comprising the purchase

price of the Lariat (\$27,203.50), attorneys' fees (\$35,000.00), incidental damages (\$2,970.00), and punitive damages (\$9,827.50). This court accordingly has diversity jurisdiction over the Illinois Consumer Fraud Act claim, Count III, and asserts supplemental jurisdiction over the Warranty Act claims, Counts I and II, and the common law fraud claim, Count IV.

> **FN10.** In *Ciampi*, the court upheld the award of \$100,000 in punitive damages. 199 Ill.Dec. at 623, 634 N.E.2d at 462. Here, the defendant is alleged to have inflated and refused to disclose the suggested retail price of the car, misinformed the buyer that she would receive a new car warranty, although it had expired, and altered the odometer. *Id.* 199 Ill.Dec. at 622, 634 N.E.2d at 461.

> **FN11.** In *Totz*, the court affirmed the award of \$5,000.00 in punitive damages. 177 Ill.Dec. at 204, 602 N.E.2d at 1376. Here, the defendant knowingly suppressed the fact that a car had been extensively damaged in an accident, while telling the plaintiff that the vehicle was "in perfect condition." *Id.* 177 Ill. Dec. at 204, 211, 216, 602 N.E.2d at 1376, 1381, 1386.

> **FN12.** In *Crowder*, the court upheld the award of \$9,000.00 in punitive damages severally against the defendants. 101 Ill.Dec. at 749, 499 N.E.2d at 116. Here, the defendants turned a blind eye to the car's salvage history, thereby failing to inform the plaintiff that the allegedly "good used car" was "a salvage car, had been standing in brackish water over the engine and had a bent frame." *Id.*

> **FN13.** In *Tague*, the court upheld the award of \$17,000.00 in punitive damages. 93 Ill.Dec. at 770, 487 N.E.2d at 437. In that case, the defendant altered the odometer from 85,000 to 40,000 miles and deactivated the brake warning light, apparently to disguise the fact that the brakes had not been fixed. The defendant told the plaintiff that the brakes had been fixed, and the plaintiff was unprepared when the brakes failed. *Id.* 93 Ill.Dec. at 771-72, 487 N.E.2d at 438-39.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

977 F.Supp. 847
977 F.Supp. 847

FN14. In *Gent,* the court reduced a $12,000.00 punitive damages award to $3,000.00. 72 Ill.Dec. at 68, 451 N.E.2d at 1391. In that case, the defendant told the plaintiff that "the car was in excellent condition," while, in fact, the vehicle's underside "was rusted and there had been paint sprayed to camouflage the rust." *Id.* 72 Ill.Dec. at 63-64, 451 N.E.2d at 1386-87. In addition, the defendant told the plaintiff that he had a full 30-day warranty for all parts in labor, although the warranty was limited to a 10 percent discount on parts and labor for 30 days. *Id.* Having reviewed the record, the court concluded that the jury reasonably could have found that the defendant "acted with fraud, or wilfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Id.* 72 Ill.Dec. at 68, 451 N.E.2d at 1391.

FN15. Ford has not brought to my attention analogous cases in which the award of punitive damages was set aside.

### Conclusion

For the reasons stated above, the motion to dismiss is denied.

N.D.Ill.,1996.
Azimi v. Ford Motor Co.
977 F.Supp. 847

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

Page 1

▷Brazier v. Hasbro, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
Kevin BRAZIER, individually and as personal
representative of the Estate of Robert J. Brazier,
deceased, known as "Robbie," Plaintiffs,
v.
HASBRO, INC. and Toys "R" US, Inc., Defendants.
No. 99 Civ.11258(MBM).

March 16, 2004.

**Background:** Personal representative of child's estate brought diversity action against toy manufacturer claiming strict product liability, breach of warranty, negligence, and punitive damages.

**Holdings:** On manufacturer's motion for summary judgment, the District Court, Mukasey, J., held that:
(1) negligence and breach of warranty claims against toy manufacturer were preempted by Child Safety Protection Act (CSPA) to extent that they alleged warning defects;
(2) breach of warranty claim against toy manufacturer was not preempted by CSPA to extent that it was based upon allegation that manufacturer breached implied warranty of merchantability by marketing toy that was not fit for ordinary use;
(3) breach of warranty claim against toy manufacturer was preempted by CSPA to extent that it was based upon breach of express warranty;
(4) breach of implied warranty of merchantability cause of action could not be maintained against toy manufacturer under New York law based upon claim that ball was not minimally safe for its purpose;
(5) strict product liability cause of action could not be maintained against toy manufacturer under New York law based upon foreseeable misuse of ball;
(6) negligence claim against toy manufacturer was not preempted by CSPA on theory that manufacturer was liable for distributing and selling defectively designed product; and
(7) appearance of ball or product's packaging was not substantial factor in causing child to die from asphyxiation.

Motion granted in part and denied in part.

West Headnotes

**[1] Products Liability 313A ⊂⊃60**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
            313Ak60 k. Toys, Games, and Athletic or
Recreational Equipment. Most Cited Cases

**Sales 343 ⊂⊃427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for
Breach of Warranty
            343k427 k. Right of Action. Most Cited
Cases

**States 360 ⊂⊃18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption
or Supersession. Most Cited Cases

**States 360 ⊂⊃18.65**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.65 k. Product Safety; Food and
Drug Laws. Most Cited Cases
Negligence and breach of warranty claims against toy manufacturer were preempted by Child Safety Protection Act (CSPA), to extent that they alleged warning defects, in lawsuit brought by personal representative of child's estate under New York law after child died due to asphyxiation caused by ball, since manufacturer's warnings complied with federal labeling requirements for toys containing small balls, and such claims effectively sought to impose additional labeling requirements upon manufacturer

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835          Page 2

above and beyond what was required by CSPA. 15 U.S.C.A. § 1278.

**[2] Sales 343 🔑427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k427 k. Right of Action. Most Cited Cases

**States 360 🔑18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
        360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Breach of warranty claim against toy manufacturer was not preempted by Child Safety Protection Act (CSPA), to extent that it was based upon allegation that manufacturer breached implied warranty of merchantability by marketing toy that was not fit for ordinary use, in lawsuit brought by personal representative of child's estate under New York law after child died due to asphyxiation caused by ball. 15 U.S.C.A. § 1278.

**[3] Sales 343 🔑427**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k427 k. Right of Action. Most Cited Cases

**States 360 🔑18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
        360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Breach of warranty claim against toy manufacturer was preempted by Child Safety Protection Act (CSPA), to extent that it was based upon breach of express warranty, in lawsuit brought by personal representative of child's estate under New York law

after child died due to asphyxiation caused by ball. 15 U.S.C.A. § 1278.

**[4] Sales 343 🔑284(1)**

343 Sales
    343VI Warranties
        343k281 Breach
        343k284 Warranty of Quality, Fitness, or Condition
            343k284(1) k. In General. Most Cited Cases
Breach of implied warranty of merchantability cause of action could not be maintained against toy manufacturer under New York law, based upon claim that ball was not minimally safe for its purpose, in lawsuit brought by personal representative of child's estate after child died due to asphyxiation caused by ball, since purpose of ball was for throwing, catching, bouncing, and rolling, but purpose did not include warranty that ball was fit for safe insertion into child's mouth. McKinney's Uniform Commercial Code § 2-314(2)(c).

**[5] Products Liability 313A 🔑60**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
        313Ak60 k. Toys, Games, and Athletic or Recreational Equipment. Most Cited Cases
Strict product liability cause of action could not be maintained against toy manufacturer under New York law, based upon foreseeable misuse of ball, in lawsuit brought by personal representative of child's estate after child died due to asphyxiation caused by ball, since child was not using ball for normal purpose or in normal manner.

**[6] Products Liability 313A 🔑60**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
        313Ak60 k. Toys, Games, and Athletic or Recreational Equipment. Most Cited Cases

**States 360 🔑18.65**

360 States

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

360I Political Status and Relations
   360I(B) Federal Supremacy; Preemption
      360k18.65 k. Product Safety; Food and
Drug Laws. Most Cited Cases
Negligence claim against toy manufacturer was not preempted by Child Safety Protection Act (CSPA), on theory that manufacturer was liable for distributing and selling defectively designed product, in lawsuit brought by personal representative of child's estate under New York law after child died due to asphyxiation caused by ball. 15 U.S.C.A. § 1278.

## [7] Products Liability 313A ⌖60

313A Products Liability
   313AI Scope in General
      313AI(B) Particular Products, Application to
         313Ak60 k. Toys, Games, and Athletic or
Recreational Equipment. Most Cited Cases
Personal representative failed to show, on design defect claim against toy manufacturer under New York law, that appearance of ball or product's packaging was substantial factor in causing child to die from asphyxiation, on theory that child was inspired to put ball in his mouth in misguided attempt to access character suspended within; although mother asserted that child did not put non-food items into his mouth, occupational therapist reported that child had history of putting non-food items in his mouth.

## [8] Evidence 157 ⌖474.5

157 Evidence
   157XII Opinion Evidence
      157XII(A) Conclusions and Opinions of
Witnesses in General
         157k474.5 k. Subjects of Opinion Evidence
in General. Most Cited Cases
Opinion of mother, as lay witness, was not admissible, as to why her child put ball into his mouth, in lawsuit against toy manufacturer after child died due to asphyxiation caused by ball, since mother did not have any actual knowledge or information about how ball came to be placed in child's mouth. Fed.Rules Evid.Rule 701, 28 U.S.C.A.

## [9] Evidence 157 ⌖537

157 Evidence
   157XII Opinion Evidence

157XII(C) Competency of Experts
   157k537 k. Bodily and Mental Condition.
Most Cited Cases

## Evidence 157 ⌖555.2

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and Sufficiency.
Most Cited Cases
In lawsuit against toy manufacturer after child died due to asphyxiation caused by ball, opinion of expert in engineering and quality assurance in toy design was not admissible, that child was inspired to put ball in his mouth in misguided attempt to access character suspended within, since engineer did not have any expertise in child psychology or behavior that would have rendered him specially qualified to discern child's personal motivation, and opinion lacked factual basis. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

## [10] Damages 115 ⌖91.5(4)

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(4) k. Products Liability. Most
Cited Cases
   (Formerly 115k91(1))
Toy manufacturer was not liable for punitive damages under New York law, in lawsuit brought by personal representative of child who died due to asphyxiation caused by ball, since personal representative failed to show that manufacturer acted with conscious indifference by marketing toy with knowledge that product posed risk of potentially catastrophic harm to children, or that manufacturer had knowledge about any potential danger from that product.

Jay W. Danker, Danker & Milstein, P.C., New York, NY, for Plaintiffs.
Gerald Neal Swartz, New York, NY, for Defendants.

### OPINION & ORDER

MUKASEY, J.
*1 Plaintiff Kevin Brazier ("Brazier"), acting individually and as personal representative of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

estate of his son Robert J. Brazier ("Robert"), sues defendants Hasbro, Inc. ("Hasbro"), and Toys "R" Us, Inc. ("Toys "R" Us"), to recover for Robert's death, which resulted from choking on a Pokemon Power Bouncer-a toy ball-that was imported and distributed by Hasbro and sold by Toys "R" Us. Brazier asserts claims against both defendants for strict products liability, breach of warranty, negligence, and punitive damages.[FN1] Defendants move for summary judgment on all claims, and Brazier moves for an order pursuant to Rule 11 of the Federal Rules of Civil Procedure imposing sanctions against defendants for filing this summary judgment motion. For the reasons set forth below, decision will be deferred on that part of Brazier's negligence claim which asserts that the Pokemon Power Bouncer was defectively designed because of its size so as to give the parties the chance to submit additional papers relating to the admissibility of Brazier's experts' testimony. Defendants' summary judgment motion is granted as to other claims, and Brazier's Rule 11 motion is denied.

> FN1. Brazier also asserted claims for negligent infliction of emotional distress, but has since stipulated to the dismissal of these claims.

I.

The following facts are either undisputed or presented in the light most favorable to Brazier.

On January 11 and January 29, 1999, Adrienne Brazier purchased a total of four Pokemon Power Bouncers from Toys "R" Us [FN2] for her three sons, Daniel, Robert, and Michael. (Deposition of Adrienne Brazier ("A. Brazier Dep.") at 38-39, 44, 46) A Pokemon Power Bouncer is a toy ball with a 1.72" diameter; it is made of translucent rubber and has a figure of a Pokemon character suspended inside. (Deposition of Defendant Hasbro, Inc., by Malcolm Denniss at 26; Defendants' Motion Exhibit ("Def.Ex.") B) When Adrienne Brazier purchased the Pokemon Power Bouncers, the following warning appeared on the bottom left corner of the product's packaging: "WARNING: CHOKING HAZARD-Toy contains small ball. Not for children under 3 years."(Def.Ex. C) The bottom right corner of the packaging contained the statement, "AGES 4 AND UP." (Id.) Adrienne Brazier read all of these

statements before purchasing the balls. (A. Brazier Dep. at 61-62)

> FN2. Hasbro distributed the Pokemon Bouncer to retailers in the United States. (Deposition of Defendant Hasbro, Inc., by Malcolm Denniss at 24, 33)

Between January 11 and January 30, 1999, Daniel, Robert, and Michael played with the Pokemon Power Bouncers once or twice a day by bouncing, rolling, and catching them. (Id. at 53-54) Robert Brazier, who was born on March 31, 1991, suffered from a form of autism known as Pervasive Developmental Disorder, and as of January 30, 1999, he spoke only a few words. (Id. at 6-7, 55-56; Affidavit of Kevin Brazier ¶ 6) Robert's toys included assorted balls of different sizes, including some that were smaller than the Pokemon Power Bouncer. (A. Brazier Dep. at 65-68) Adrienne Brazier said she never saw Robert put any of these balls in his mouth, but she was told in spring 1998 by Robert's occupational therapist that Robert required close supervision during tabletop activities at school because he had a tendency to put non-food items in his mouth. (Id. at 77, 89-91, 94-96; Def. Ex. G)

*2 In the early afternoon of Saturday, January 30, 1999, Adrienne Brazier was at home with Daniel, Robert, and Michael. (A. Brazier Dep. at 109-10) Daniel and Michael were talking on the stairs when they saw Robert enter from the living room, making hacking noises and pointing to his throat. (Deposition of Daniel Brazier at 8) When Robert opened his mouth, Daniel could see a Pokemon Power Bouncer inside. (Id. at 8) Daniel, who was one day shy of his tenth birthday, performed the Heimlich maneuver on Robert with no success.(Id. at 23; A. Brazier Dep. at 6) Adrienne Brazier heard Daniel screaming that Robert was choking, and she found the boys in the dining room. (A. Brazier Dep. at 119-21) As Daniel went to call 911, Adrienne continued to perform the Heimlich maneuver on Robert. (Id. at 124-26) After Adrienne went outside and yelled for help, neighbors arrived and joined in the efforts to save Robert, and the Fire Department arrived as well. (Id. at 129-31, 136) Robert was rushed by ambulance to the hospital, where he arrived with the ball still lodged in his airway. (Id. at 144-46) He died shortly thereafter from asphyxiation. (Id. at 146)

Kevin Brazier filed the present action on November 12,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

1999.[FN3] Because the Braziers reside in New York and neither defendant is a New York domiciliary, jurisdiction in this case is based on diversity of citizenship.

FN3. On March 20, 2001, Brazier served an amended complaint on defendants. For reasons that are not clear, this amended complaint does not appear on the docket for this case, but the docket does contain numerous copies of the amended complaint attached to assorted certificates of mailing and summons. Defendants filed an answer to the amended complaint, which is docketed, and have attached both the original complaint and the amended complaint to their summary judgment motion. The complaints are virtually identical in all respects that are relevant to this summary judgment motion. Accordingly, I will direct the amended complaint to be docketed, and I cite to both versions of the complaint throughout this opinion.

II.

[1] Brazier's negligence and breach of warranty claims are based in part on the contention that the warnings on the packaging of the Pokemon Power Bouncer were inadequate. Specifically, Brazier alleges that defendants' warnings were defective because they: (1) stated that the Pokemon Power Bouncer was intended for "ages 4 and up," which implied that the toy was safe for children over the age of 3; (2) stated that the Pokemon Power Bouncer presented a choking hazard for "children under 3 years," which implied that children aged 3 and up were in no danger of choking; and (3) failed to warn purchasers and users of the risks presented by the Pokemon Power Bouncer. (See Complaint ("Compl.") ¶ 14a, 14e, 14f, 20; Amended Complaint ("Am.Compl.") ¶¶ 22a, 22e, 22f, 28) However, because defendants' warnings comply with the federal labeling requirements for toys containing small balls, Brazier's negligence and breach of warranty claims are preempted to the extent that they are based on a theory that these warnings are inadequate.

In 1994, Congress enacted the Child Safety Protection Act, Pub.L. No. 103-267, 108 Stat. 722, ("CSPA") which established requirements for products intended

for children. Section 101(a) of the CSPA amended the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-1278 (2000), by adding a new section, codified at 15 U.S.C. § 1278, which listed requirements for labeling certain toys and games. The CSPA also included the following preemption provision:

[A] State or political subdivision of a State may not establish or enforce a requirement relating to cautionary labeling of small parts hazards or choking hazards in any toy, game, marble, small ball, or balloon intended or suitable for use by children unless such requirement is identical to a requirement established by amendments made by this section to the Federal Hazardous Substances Act or by regulations promulgated by the Commission.

*3 CSPA § 101(e), reprinted at 15 U.S.C. § 1278 Note "Preemption". The language of this provision tracks the language of the preemption provision in the FHSA, which applies more generally to hazardous substances that are subject to cautionary labeling requirements pursuant to that statute.[FN4] See 15 U.S.C. § 1261 Note "Effect upon Federal and State Law" at (b)(1)(A).

FN4. The preemption provision in the FHSA states:

[I]f a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) [of the FHSA] designed to protect against a risk of illness or injury associated with the substance, no State or political subdivision of a State may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under section 2(p) or 3(b) [of the FHSA].

15 U.S.C. § 1261 Note "Effect upon Federal and State Law" at (b)(1)(A)

Although no court in this Circuit has yet interpreted the CSPA's preemption provision, the Second Circuit analyzed the FHSA's preemption provision in Milanese v. Rust-Oleum Corp., 244 F.3d 104 (2d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

Cir.2001). There, the Court concluded that "the FHSA preempts any state cause of action that seeks to impose a labeling requirement different from the requirements found in the FHSA and the regulations promulgated thereunder."*Id.* at 109.Accordingly, Milanese's claims for breach of express warranty, strict product liability, and negligence were preempted to the extent that they sought "to impose additional or more elaborate labeling requirements" than those required under the FHSA.*Id.*

The toy labeling requirements of the CSPA have been added to the FHSA, and the CSPA's own preemption provision uses the same language as the general preemption provision of the FHSA. Accordingly, I conclude that Congress intended the CSPA's toy labeling requirements have the same preemptive effect as the FHSA's other requirements. Therefore, any state cause of action that seeks to impose different or additional toy labeling requirements related to choking hazards is preempted by the CSPA. *Cf West v. Mattel, Inc.,* 246 F.Supp.2d 640, 644 (S.D.Tex.2003) (holding that the CSPA preempts any common law claim predicated upon a theory that a CSPA-compliant warning label is inadequate).

In this case, Brazier does not allege that the warnings on the Pokemon Power Bouncer failed to comply with CSPA requirements. Under the CSPA, any ball with a diameter of 1.75 inches or less that is intended for children aged 3 and up must contain the following cautionary statement:

[symbol] [FN5] WARNING:

> FN5. The required symbol is an exclamation point surrounded by a triangle.

CHOKING HAZARD-This toy is a small ball.

Not for children under 3 yrs.

15 U.S.C. § 1278(b)(2)(B). Essentially the same warning is required for any toy or game containing such a ball, except that the statement "This toy is a small ball" is replaced with "Toy contains a small ball." 15 U.S.C. § 1278(b)(2)(D). Brazier does not dispute that the packaging of the Pokemon Power Bouncer included the warning required for a toy or game that contains a ball with a diameter of 1.75 inches or less,[FN6] and he does not allege that the warnings otherwise failed to comply with the CSPA. Instead, Brazier argues that these warnings were defective because they did not adequately inform Adrienne Brazier of the dangers presented by the Pokemon Power Bouncer. Because Brazier's negligence and breach of warranty claims effectively seek to impose additional labeling requirements on defendants above and beyond what is required by the CSPA, these claims are preempted to the extent that they allege such warning defects.

> FN6. Although it is not clear why the packaging for the Pokemon Power Bouncer followed the labeling requirements for a toy containing a small ball instead of the requirements for a toy that was a small ball, there is no appreciable difference between the two required warnings.

**\*4** [2][3] Brazier's negligence and breach of warranty claims also allege that the Pokemon Power Bouncer is defectively designed; such allegations are not preempted by the CSPA, and accordingly I must determine whether defendants are entitled to summary judgment on this aspect of Brazier's claims. *See Lopez v. Hernandez,* 253 A.D.2d 414, 415, 676 N.Y.S.2d 613, 614-15 (2d Dep't 1998) (explaining that causes of action not premised on a failure to warn or inadequate labeling survive preemption by the FHSA). For Brazier's breach of warranty claim, the complaints suggest that this claim is based on theories of breach of implied warranty of merchantability and breach of express warranty. (*See* Compl. ¶¶ 19-20; Am. Compl. ¶¶ 27-28) Because the only express warranty that Brazier alleges is the CSPA-compliant labeling on the product's packaging, (*see* Compl. ¶ 20; Am. Compl. ¶ 28), the breach of warranty claim is preempted to the extent it is based on a breach of express warranty argument. *See Milanese,* 244 F.3d at 109 (upholding preemption of claim for breach of express warranty to the extent that plaintiff sought to impose labeling requirements that differed from FHSA requirements). However, Brazier's breach of warranty claim is not preempted to the extent that it is based on the argument that defendants breached the implied warranty of merchantability by marketing a toy that was not fit for ordinary use.

III.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

[4] To recover on a breach of implied warranty of merchantability claim for a defectively designed product, a plaintiff must show that the product at issue does not satisfy the merchantability requirements of New York's version of the Uniform Commercial Code ("UCC").*See Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258-59, 639 N.Y.S.2d 250, 256, 662 N.E.2d 730 (1995). A product must be "fit for the ordinary purposes for which such goods are used" to be considered merchantable under the UCC. N.Y. U.C.C. § 2-314(2)(c) (McKinney 2003). Accordingly, an allegedly defective product gives rise to a breach of implied warranty claim when it is not fit for its ordinary purposes and causes injury as a result. *See Denny*, 87 N.Y.2d at 258-59, 639 N.Y.S.2d at 256, 662 N.E.2d 730. In determining whether a product is unmerchantable in this respect, "the ... inquiry focuses on the expectations for the performance of the product when used in the customary, usual, and reasonably foreseeable manners." 87 N.Y.2d at 258-59, 639 N.Y.S.2d at 256, 662 N.E.2d 730. "A warranty of fitness for ordinary purposes does not mean that the product will fulfill a buyer's every expectation." 87 N.Y.2d at 259 n. 4, 639 N.Y.S.2d at 256 n. 4, 662 N.E.2d 730 (internal quotation marks and alterations omitted). Rather, recovery for breach of implied warranty of merchantability is appropriate "upon a showing that the product was not minimally safe for its expected purpose ..." 87 N.Y.2d at 259, 639 N.Y.S.2d at 256, 662 N.E.2d 730.

As a toy ball, the ordinary and expected purposes of the Pokemon Power Bouncer include being thrown, caught, bounced and rolled. Brazier does not argue that the product is unfit for these purposes, and he does not claim that Robert was using the Pokemon Power Bouncer for its ordinary purposes when he put it in his mouth. Instead, Brazier suggests that Robert's placement of the ball in his mouth was an unintended but foreseeable misuse of the product. (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Rule 56 Motion ("Pl.Memo.") at 4-5) Brazier is correct to concede this point; no reasonable jury could conclude that a toy ball is performing an ordinary purpose when a child inserts it into his mouth. Because the implied warranty of merchantability for the Pokemon Power Bouncer does not include a warranty that the product is fit for safe insertion into a child's mouth, Brazier cannot maintain a cause of action for breach of implied warranty based on the contention that the ball was not minimally safe for this purpose. Because Brazier does not allege that the

Pokemon Power Bouncer is unfit for the ordinary purposes of a toy ball, defendants are entitled to summary judgment dismissing Brazier's breach of warranty claim. *See White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.2000) (explaining that summary judgment should be granted if no reasonable trier of fact could find in favor of the nonmoving party).

IV.

*5 To prevail on a strict products liability action for design defect under New York law, a plaintiff must demonstrate that: (1) the product is defective because it is not reasonably safe as marketed; (2) the product was being used for a normal purpose at the time of the injuring occurrence; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff would not, by the exercise of reasonable care, have both discovered the defect and apprehended its danger; and (5) the plaintiff would not otherwise have avoided the injury by the exercise of reasonable care. *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 363 (2d Cir.1997) (citing *Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir.1991) (citing *Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 95 (4th Dep't 1979), *aff'd*, 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980)). *See also Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204 (1983).

[5] Brazier argues that defendants can be held strictly liable for harm caused by a foreseeable misuse of the Pokemon Power Bouncer as well as for harm caused by use for a normal purpose. (*See* Pl. Memo. at 4-5) Although the cases that Brazier cites for this proposition all predate the Second Circuit's 1997 decision in *Urena*, some courts in this circuit have stated more recently that an action in strict products liability may lie for injuries that result from an unintended but reasonably foreseeable use of a product. *See Beneway v. Superwinch, Inc.*, 216 F.Supp.2d 24, 29 (N.D.N.Y.2002) (citing *Lugo by Lopez v. LJN Toys, Ltd.*, 75 N.Y.2d 850, 852, 552 N.Y.S.2d 914, 915, 552 N.E.2d 162 (1990)); *Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 455-56 (S.D.N.Y.1999) (citing *Voss*, 59 N.Y.2d at 110 n.*, 463 N.Y.S.2d at 403 n. *). The New York Pattern Jury Instructions (2004) also state that strict liability may attach "when the product is used for its intended or reasonably foreseeable purpose." *Id.* at 2:141, 463 N.Y.S.2d, 398, 450 N.E.2d 204 (citing for this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

proposition, in the Comment, New York cases from 1992, 1990, and 1976). However, both these recent cases and the New York Pattern Jury Instructions are based on case law that predates the Second Circuit's decision in *Urena*.I have found no case decided after *Urena* by the New York Court of Appeals or the Second Circuit that explicitly discusses and rejects the requirement that a plaintiff must have been using a product for a normal purpose in order to prevail on a strict products liability claim. Accordingly, I must follow the Second Circuit's interpretation of New York law and conclude that Brazier can prevail on his strict products liability claim only upon a showing that the Pokemon Power Bouncer was being used for a "normal purpose" when Robert asphyxiated. *SeeSita v. Danek Medical, Inc.,* 43 F.Supp.2d 245, 252 (E.D.N.Y.1999) (stating that plaintiff can prevail on strict products liability claim only by showing that the product was being used for a normal purpose at the time of the injury); *Hamm v. Willamette Indus., Inc.,* 99 Civ. 5166(RCC), 2002 WL 342433, at *3 n. 5 (S.D.N.Y. Mar. 5, 2002) (same); *Faryniarz v. Nike, Inc.,* 00 Civ. 2623(NRB), 2002 WL 530997, at *2 (S.D.N.Y. Apr. 8, 2002) (same); *McEneaney v. Haywood,* 179 Misc.2d 1035, 687 N.Y.S.2d 547, 550 (Sup.Ct.App. Term 1999) (same).

*6 As discussed in Part III, *supra,* a toy ball is used for a normal purpose when it is thrown, caught, rolled, or bounced. Brazier does not argue, and no reasonable jury could find, that Robert Brazier was using the Pokemon Power Bouncer for a normal purpose when he put it in his mouth. Because the Pokemon Power Bouncer was not being used for a normal purpose or in a normal manner when Robert asphyxiated, Brazier cannot maintain a cause of action for strict products liability, and defendants' summary judgment motion is granted as to this claim.

## V.

[6] As discussed in Part II, *supra,* Brazier's negligence claim is preempted insofar as it is based on alleged defects in defendants' warnings, but it is not preempted to the extent that Brazier argues that defendants should be liable in negligence for distributing and selling a defectively designed product. Brazier alleges that the design of the Pokemon Power Bouncer was defective for two reasons: first, because a ball with a 1.72" diameter posed a serious choking hazard to children over the age of 3, particularly

because the hazard was disguised by defectively designed packaging that made the ball appear larger than its actual size (Compl. ¶ 14d, 14e, 14i; Am. Compl. ¶ 22d, 22e, 22i); second the appearance of the Pokemon Power Bouncer, which featured a character suspended in a translucent sphere, was defective because it tempted children to place the ball in their mouths in an attempt to open the ball and "free" the character inside (Compl. ¶ 14g; Am. Compl. ¶ 22g). According to Brazier, this risk was enhanced by the toy's connection to the Pokemon line of products, which apparently features characters emerging from spheres. (Compl. ¶ 14h; Am. Compl. ¶ 22h; Pl. Memo. at 7; Affidavit of Bert L. Reiner ("Reiner Aff.") ¶ 7)

Defendants argue that they are entitled to summary judgment on the negligent design claim because Brazier has not offered evidence to show that the Pokemon Power Bouncer's alleged design defects caused Robert Brazier's injuries. In the alternative, defendants contend that they breached no duty by distributing and selling the Pokemon Power Bouncer because the toy was not *defectively* designed for its intended and reasonably foreseeable uses. As will be discussed in more detail below, Brazier cannot show that the ball's appearance played any role in Robert Brazier's death, and his inability to prove causation entitles defendants to summary judgment on that aspect of the negligent design claim. As for Brazier's claim that the Pokemon Power Bouncer's size was a design defect, I will reserve judgment on this aspect of defendants' summary judgment motion until the parties have submitted more briefs and affidavits on the question of expert opinion admissibility.

### A.

[7] To prove a claim of negligent design, "it is a consumer's burden to show that a defect in the product was a substantial factor in causing the injury."*Clarke v. Helene Curtis, Inc.,* 293 A.D.2d 701, 701, 742 N.Y.S.2d 325, 326 (2d Dep't 2002) (quoting *Tardella v. RJR Nabisco, Inc.,* 178 A.D.2d 737, 737, 576 N.Y.S.2d 965, 966 (2d Dep't 1991)); *Fritz v. White Consol. Indus., Inc.,* 306 A.D.2d 896, 898, 762 N.Y.S.2d 711, 714 (4th Dep't 2003) (same). Defendants wisely do not argue that the size of the Pokemon Power Bouncer was not a substantial factor in causing Robert Brazier to asphyxiate; based on the evidence, a reasonable jury could conclude easily that the 1.72" diameter of the ball-small enough to enter

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

Page 9

Robert's mouth and large enough to obstruct his airway-played an important role in his death. However, Brazier has not produced any evidence to suggest that the product's packaging contributed to the accident in any way,[FN7] and therefore defendants are entitled to summary judgment to the extent that Brazier argues that the packaging of the Pokemon Power Bouncer was defectively designed. As will be discussed in more detail below, defendants are entitled to summary judgment also on Brazier's claim that the appearance of the Pokemon Power Bouncer was a design defect because no reasonable jury could find, by a preponderance of the evidence, that this alleged defect was substantial factor in causing Robert's death.

> FN7. Although the complaints allege that the packaging made the Pokemon Power Bouncer appear larger than its actual size (Compl. ¶ 14i; Am. Compl. ¶ 22i), the record contains no evidence to suggest that anyone in the Brazier family was actually misled about the size of the ball. In any event, the evidence shows that the Brazier children played with the four identical balls daily for almost three weeks before Robert's death. There was ample opportunity during that time to see the actual size of the balls.

*7 [8] Brazier alleges that the Pokemon Power Bouncer's appearance inspired Robert to put the ball in his mouth in a misguided attempt to access the Pokemon character suspended within. (Compl. ¶ 8; Am. Compl. ¶ 16) Although no one witnessed Robert placing the ball in his mouth, Brazier attempts to prove his theory by proffering the opinions of two people, Adrienne Brazier and engineering expert Bert L. Reiner.[FN8] Neither opinion is admissible under the Federal Rules of Evidence. First, Adrienne Brazier, a lay witness, theorizes that Robert put the ball in his mouth in an attempt to access the Pokemon character encased in the ball. (A. Brazier Dep. at 156-57) A lay witness may testify only about opinions or inferences that are "rationally based on the perception of the witness."Fed.R.Evid. 701 Because Adrienne Brazier concedes that she has no actual knowledge or information about how the ball came to be placed in Robert's mouth (A. Brazier Dep. at 155-56), her opinion about Robert's motivation is inadmissible under Rule 701 of the Federal Rules of Evidence.

> FN8. Defendants apparently believe that

Brazier's other two experts, engineer Paul Doppelt and medical physician Dr. Frank L. Rimell, also provided opinions about Robert Brazier's motivation. (Memorandum of Law of Defendants in Reply at 11-14) I disagree and find that both experts merely offer opinions about the actions of children generally, not about the actions of Robert Brazier specifically. Doppelt simply states, "Since the Pokemon characters operate from within a spherical shell from which they hatch to do as they are trained to do, it is reasonable to foresee that a child might attempt to separate the ball, with his teeth if need be, in order to release the figurine."(Affidavit of Paul Doppelt ¶ 10) Dr. Rimell similarly opines, "[I]t is entirely foreseeable that a child who was the chronological age of Robert Brazier could attempt to remove the Pokemon figure from within the ball by placing it within his/her mouth in an attempt to break the ball and release the character."(Affidavit of Frank L. Rimell ¶ 10)

[9] Second, Reiner, one of plaintiff's three expert witness, opined that "it is reasonable to conclude that Robert's action of placing the Pokemon Power Bouncer of 1.72 inches in his mouth was a result of his intent to 'free' or 'hatch' the figure from inside the ball."(Reiner Aff. ¶ 8) In order for this opinion to be admissible expert testimony under Rule 702 of the Federal Rules of Evidence, Reiner must be "qualified as an expert by knowledge, skill, experience, training, or education."Fed.R.Evid. 702. Although Reiner has 35 years of experience in engineering and quality assurance in toy design, his curriculum vitae reveals no expertise in child psychology or behavior that renders him specially qualified to discern Robert Brazier's personal motivation. SeeZaremba v. Gen. Motors Corp., No. 03-7565, 2004 WL 259254, at *4 (2d Cir. Feb.13, 2004) (suggesting that purported expert's meager qualifications in area of alleged expertise rendered further Daubert analysis almost superfluous). Even if Reiner were qualified to provide expert testimony about Robert's intent, his opinion would have to be unreliable and speculative because it lacks a factual basis. SeeFed.R.Evid. 702 (explaining that expert testimony "must be based upon sufficient facts or data"). In preparing his opinion, the only documents Reiner reviewed that pertained to Robert's asphyxiation, rather than to the design and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

manufacture of the Pokemon Power Bouncer, were the depositions in this case (Reiner Aff. ¶ 4), which reveal that no one witnessed Robert putting the ball in his mouth. Although Reiner contends that his opinion is supported by deposition testimony showing that other children, using various means, pried open Pokemon Power Bouncers to get the character inside (Reiner Aff. ¶ 8), the actions of other children cannot illuminate what was in Robert Brazier's mind when he put the ball in his mouth. Because Reiner is not qualified to provide an opinion about Robert's state of mind, and because his opinion is based on conjecture and speculation rather than facts, Reiner's testimony about Robert's intent is inadmissible under Rule 702 of the Federal Rules of Evidence.

*8 Apart from these two inadmissible opinions, the only evidence in the record that supports Brazier's theory of causation is Adrienne Brazier's testimony, taken at her deposition, that Robert had a tendency to open things with his mouth, such as potato chip bags and round, clear containers from vending machines. (A. Brazier Dep. at 158-59) She further testified that, apart from this behavior, Robert had stopped putting non-food items in his mouth when he was 4 or 5 years old. (Id. at 164-5) However, Adrienne Brazier also admitted that an occupational therapist reported in spring 1998, when Robert was 7 years old, that Robert required close supervision during tabletop activities at school because he had a tendency to put non-food items in his mouth, such as Play-Doh, shaving cream, and uncooked beans and rice. (Id. at 89-91, 93-96; Def. Ex. G)

In order to prevail on a negligence claim based on a defect in the ball's appearance, Brazier would need to show that it is more likely or more reasonable to conclude that Robert put the Pokemon Power Bouncer in his mouth because of its appearance than for some other reason. See Gayle v. City of New York, 92 N.Y.2d 936, 937, 680 N.Y.S.2d 900, 901, 703 N.E.2d 758 (1998) (explaining that plaintiff must show that it is more likely or more reasonable that injury was caused by defendant's negligence than by some other agency). Although Brazier need not positively exclude every other possible cause for Robert's actions, "the proof must render those other causes sufficiently 'remote' or 'technical' to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence." Id. Because the record in this case reveals that Robert had a history of putting

non-food items in his mouth even when he was not trying to open them, a jury would be forced to speculate about what motivated Robert to put the Pokemon Power Bouncer in his mouth on January 30, 1999. Because Brazier supports his theory of causation only with "speculation, guess, and surmise, which may not be substituted for competent evidence," defendants are entitled to summary judgment on Brazier's negligence claim insofar as it is based on alleged defects in the appearance of the Pokemon Power Bouncer. Grob v. Kings Realty Assocs., LLC, --- A.D.2d ----, 771 N.Y.S.2d 384, 385 (2d Dep't 2004) (internal brackets and quotation marks omitted).See alsoConroy v. New York State Dep't of Corr. Servs., 333 F.3d 88, 94 (2d Cir.2003) ("Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").

### B.

The only basis for a negligence claim that remains is Brazier's contention that the Pokemon Power Bouncer was defectively designed because of its size. Under New York law, the manufacturer of a product has "a duty to use reasonable care in designing its product so that it will be safe when 'used in the manner for which the product was intended, as well as [any] unintended yet reasonably foreseeable use.' " Liriano v. Hobart Corp., 132 F.3d 124, 126 (2d Cir.1998) (quoting Micallef v. Miehle Co., 39 N.Y.2d 376, 385-86, 384 N.Y.S.2d 115, 121, 348 N.E.2d 571 (1976)). Although Hasbro and Toys "R" Us did not manufacture the Pokemon Power Bouncer, defendants do not argue that distributors and sellers are subject to a lesser duty of care when distributing and selling a product. Accordingly, defendants may have breached a duty if the Pokemon Power Bouncer was unsafe for an intended or reasonably foreseeable use, but defendants have breached no duty if the Pokemon Power Bouncer was unsafe only for uses that are unforeseeable. SeePinero v. Rite Aid of New York, Inc., 294 A.D.2d 251, 252, 743 N.Y.S.2d 21, 22 (1st Dep't 2002), aff'd,99 N.Y.2d 541, 753 N.Y.S.2d 805, 783 N.E.2d 895 (explaining that, in a negligence claim, duty arises only when the risk of harm is reasonably foreseeable); Danielenko v. Kinney Rent A Car, Inc., 57 N.Y.2d 198, 204, 455 N.Y.S.2d 555, 557, 441 N.E.2d 1073 (1982) ("Whether a breach of duty has occurred, of course, depends upon whether the resulting injury was a reasonably foreseeable consequence of the defendants' conduct."). Because Brazier argues only that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

Pokemon Power Bouncer was unsafe for insertion into a child's mouth, and not that it was unsafe for other possible uses, I must determine whether this particular "use" of the product was reasonably foreseeable. If not, defendants breached no duty by distributing and selling the Pokemon Power Bouncer and thus cannot be held liable in negligence.

**\*9** Defendants argue that they breached no duty because they could not reasonably foresee that a child who was almost 8 years old would put the ball in his mouth. (Memorandum of Law of Defendants in Support of Motion for Summary Judgment ("Def.Memo.") at 17-18) Brazier disagrees and, relying in part on the opinions of his experts, claims that it was foreseeable that a child between the ages of 4 and 10 might place the ball in his or her mouth and choke. (Pl. Memo. at 4-5) Neither party suggests that the foreseeability calculus would be different for a 4-year-old child and a child who was nearly 8 years old. Under New York law, "foreseeability includes the probability of the occurrence of a general type of risk involving the loss, rather than the probability of the occurrence of the precise chain of events preceding the loss." *Parsons v. Honeywell*, 929 F.2d 901, 905-06 (2d Cir.1991) (quoting *Tucci v. Bossert*, 53 A.D.2d 291, 293, 385 N.Y.S.2d 328, 331 (2d Dep't 1976)). Although the precise chain of events in this case involved a 7-year-old boy, the general type of risk here is that a child for whom the Pokemon Power Bouncer was intended-a child aged 4 or older-would put the ball in his or her mouth and choke. Accordingly, the question I must answer is whether a reasonable jury could find it reasonably foreseeable that a child over the age of 3 would put the Pokemon Power Bouncer in his mouth and asphyxiate.

In support of his claim that defendants should have reasonably foreseen that a child over the age of 3 might place a Pokemon Power Bouncer in his mouth and choke, Brazier proffers affidavits from his three expert witnesses. First, physician Dr. Frank L. Rimell quotes a portion of an article he wrote, published in 1995 in the Journal of the American Medical Association, which states, "Although two thirds of children who choke to death on man-made objects are younger than 3 years, these objects pose a significant risk of asphyxiation to older children as well."(Affidavit of Frank L. Rimell ¶ 9) With respect to the Pokemon Power Bouncer, Dr. Rimell opines that "the diameter of this ball of 1.72 inches presents a

choking hazard in and of itself, given the anatomical sizes and dimensions of the pharynx of a young child."(*Id.* ¶ 10, 385 N.Y.S.2d 328) Second, toy safety consultant Paul Doppelt claims, "[C]hildren of *any* age will put things in their mouths," and states, "It is my professional opinion that the 1.72 inch (43.7 mm) diameter spherically shaped Pokemon Power Bouncer Ball presented a clear risk of a choking mishap for children of the intended and specified age of 4 years and above."(Affidavit of Paul Doppelt ¶¶ 8, 10) Finally, mechanical engineer and quality assurance consultant Bert L. Reiner states, "It is my opinion that a 'reasonably foreseeable abuse' would include a child placing this ball in his or her mouth, whether for sensory purposes or to remove the figurine, and that increasing the diameter of the ball would greatly reduced or eliminated the present choking hazard."(Reiner Aff. ¶ 11)

**\*10** Defendants argue that this opinion testimony from Brazier's experts is not sufficiently reliable and thus inadmissible under Rule 702 of the Federal Rules of Evidence. According to defendants, these opinions do not satisfy the requirements of Rule 702 because they are not based upon sufficient data and because they are not the product of reliable principles and methods. (Memorandum of Defendants in Reply ("Def. Reply Memo.") at 20-24) Defendants also criticize these opinions because they are unpublished, expressed solely for the purpose of litigation, and allegedly contradict earlier opinions from the same experts. (*Id.* at 24-28,385 N.Y.S.2d 328) Because defendants raised all of these arguments for the first time in their reply, Brazier has not yet had an opportunity to respond with his own arguments and supplementary affidavits. Accordingly, Brazier has until April 28, 2004, to submit a response to defendants' attacks on his experts. This response should include a memorandum of law addressing defendants' arguments and supplementary affidavits from all three experts that provide more information about the data and methodology the experts employed to arrive at the conclusions listed in the previous paragraph. If defendants then wish to submit a reply, they may do so by May 19, 2004. Upon receipt of these papers, I will determine the admissibility of Brazier's experts' testimony and, in turn, will rule on defendants' motion for summary judgment on the negligence claim insofar as it is based on an alleged design defect in the size of the Pokemon Power Bouncer.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

VI.

[10] Punitive damages are available in ordinary New York tort actions only if the plaintiff can show "the existence of circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton."*Carvel Corp. v. Noonan,* 350 F.3d 6, 24 (2d Cir.2003) (quoting *Prozeralik v. Capital Cities Communications, Inc.,* 82 N.Y.2d 466, 479, 605 N.Y.S.2d 218, 226, 626 N.E.2d 34 (1993))) (internal quotation marks omitted). In this case, Brazier alleges that defendants acted with conscious indifference to Robert Brazier by marketing the Pokemon Power Bouncer even though they knew that the product posed a risk of potentially catastrophic harm to children over 4. (Compl. ¶¶ 37-40; Am. Com pl. ¶¶ 48-51) However, Brazier has produced no evidence to support this allegation, and nothing in the record suggests that defendants had any knowledge about any potential danger from the Pokemon Power Bouncer. Because Brazier has failed to support his allegations with any evidence that could allow a reasonable jury to award punitive damages in this case, defendants are entitled to summary judgment dismissing this claim.

For the reasons stated above, defendants' summary judgment motion is granted for all claims except for the portion of Brazier's negligence claim that is based on alleged design defects in the size of the Pokemon Power Bouncer. Because I must determine the admissibility of Brazier's experts' testimony before deciding whether summary judgment is appropriate on that remaining negligence claim, the parties are directed to submit additional briefs and affidavits in accordance with the instructions in Part V(B) of this opinion. Based on the foregoing discussion, Brazier's Rule 11 motion, which requests sanctions against defendants for filing a baseless summary judgment motion, is denied.

*11 SO ORDERED:

S.D.N.Y.,2004.
Brazier v. Hasbro, Inc.
Not Reported in F.Supp.2d, 2004 WL 515536 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,835

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy

Slip Copy, 2007 WL 684133 (S.D.Ill.)

**C** Brown v. SBC Communications, Inc.
S.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Illinois.
Charles E. BROWN, on behalf of himself, and all
others similarly situated, Plaintiff,
v.
SBC COMMUNICATIONS, INC., Enhanced
Services Billing, Inc., Billing Services Group, LLC,
Abry Partners, LLC, ILD Telecommunications, Inc.,
and ILD Teleservices, Inc., Defendants.
**No. 05-cv-777-JPG.**

March 1, 2007.

Alan J. Konigsberg, Levy, Phillips et al., James G.
Flynn, Robert I. Harwood, Wechsler Harwood, New
York, NY, Judy L. Cates, Cates Law Firm, Swansea,
IL, for Plaintiff.
Leslie M. Smith, Jeffrey R. Miller, Joseph M. Russell,
Kirkland & Ellis, Geoffrey A. Vance, Mcdermott,
Will et al., Chicago, IL, Michael F. Dahlen, Thomas R.
Frenkel, Feirich, Mager et al., Carbondale, IL,
Gregory F. Harley, Burr & Forman LLP, Atlanta, GA,
James C. Cook, Walker & Williams Belleville, IL, for
Defendants.

### MEMORANDUM AND ORDER

J. PHIL GILBERT, District Judge.

**A. Introduction**

*1 Plaintiff Charles Brown, a local telephone
subscriber of defendant SBC Communications, Inc.,
("SBC") alleges that on at least eleven occasions in
2004 and 2005, he was billed for telecommunications
services he did not request, a practice Brown calls
"cramming." Brown originally filed this action in the
Circuit Court of the Twentieth Judicial Circuit, St.
Clair County, Illinois, on behalf of himself and a
proposed class of SBC subscribers who allegedly were
subjected to the "cramming" of unauthorized charges
onto their monthly billing statements from SBC,
asserting claims for violations of the Illinois
Consumer Fraud and Deceptive Business Practices
Act, 815 ILCS 505/1-505/12, ("ICFA") and unjust

enrichment. Thereafter, the action was removed to this
Court pursuant to 28 U.S.C. § 1332, as amended by
the Class Action Fairness Act of 2005, Pub.L. No.
109-2, 119 Stat. 4 (codified in scattered sections of 28
U.S.C.) ("CAFA"). By order entered September 29,
2006, the Court held that removal of this case was
proper pursuant to CAFA and denied remand of the
case to state court.

According to the allegations of Brown's complaint, on
at least five occasions (February 2004, March 2004,
May 2004, June 2004, and July 2004) Brown's
monthly billing statement from SBC contained a
$14.95 charge for "Traveller Info Svcs # ," which
Brown alleges is a monthly fee for "technical support
services" that he never authorized. Complaint
("Compl.") ¶ 19(a). Likewise, Brown alleges that on at
least six occasions (August 2004, September 2004,
October 2004, November 2004, December 2004, and
January 2005) he was billed a monthly fee of $14.95,
together with taxes and local, state, and federal
charges of $1.36, for "Nationwide Voice Msg," a
"nationwide voice messaging" service Brown never
requested. Id. ¶ 19(b). It appears from the complaint
that there is some dispute as to whether Brown in fact
ordered the services at issue. See id. ¶ 21.SBC is, as
discussed, Brown's local telephone service or "local
exchange carrier" ("LEC").Id. ¶ 19.Defendant
Enhanced Services Billing, Inc., ("ESBI") is,
according to Brown's complaint, a company that bills
consumers directly or through LECs for services
provided by third-party companies in the
telecommunications industry, as is defendant ILD
Telecommunications, Inc. ("ILD"). See id. ¶ 5, ¶ 8.FN1
ILD is alleged to be responsible for placing the
unauthorized charges for "Nationwide Voice Msg" on
Brown's SBC billing statement. Id. ¶ 8, ¶ 19(b).
Although it is not entirely clear from the allegations of
Brown's complaint, presumably Brown believes that
ESBI is responsible for placing the unauthorized
charges for "Traveller Info Svcs # " on Brown's SBC
billing statement. Defendant Billing Services Group,
LLC, ("BSG") which is also a billing company, is
alleged to own ESBI; defendant Abry Partners, LLC,
("Abry") is alleged to own BSG. See id. ¶ 6, ¶ 7.

> FN1. Although the caption of Brown's
> complaint lists as separate defendants ILD

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

and ILD Teleservices, Inc., it appears from the allegations of the complaint and from ILD's submissions to the Court that they are in fact the same entity. *See, e.g.,* Compl. ¶ 8. Therefore, throughout this order the Court will refer to both defendants simply as ILD.

**\*2** Brown alleges that all of the defendants acted jointly to "cram" unauthorized charges onto the SBC billing statements of Brown and the members of the proposed class. Brown seeks to represent a class of Illinois residents who were billed for unauthorized charges through their billing statements from SBC from June 16, 2002, to the present. *See* Compl. ¶ 9. This matter currently is before the Court on motions to dismiss for failure to state a claim upon which relief can be granted brought by SBC (Doc. 17), ESBI and BSG (Doc. 12), and Abry (Doc. 15), and on a motion to dismiss for lack of personal jurisdiction brought by ILD (Doc. 13). Having reviewed carefully the submissions of the parties, the Court now is prepared to rule.

**B. Failure to State a Claim Upon Which Relief Can Be Granted**

**1. Legal Standard**

The purpose of a motion to dismiss for failure to state a claim upon which relief can be granted brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the sufficiency of a complaint, not to resolve a case on its merits. *See Marshall-Mosby v. Corporate Receivables, Inc.,* 205 F.3d 323, 326-27 (7th Cir.2000). When evaluating a Rule 12(b)(6) motion, a court must accept as true all factual allegations in a complaint and draw all reasonable inferences in a plaintiff's favor. *See Hentosh v. Herman M. Finch Univ. of Health Scis./The Chicago Med. Sch.,* 167 F.3d 1170, 1173 (7th Cir.1999). Because the Federal Rules of Civil Procedure establish a liberal pleading system that requires only notice pleading, a "complaint's mere vagueness or lack of detail is not sufficient to justify a dismissal."*National Serv. Ass'n, Inc. v. Capitol Bankers Life Ins. Co.,* 832 F.Supp. 227, 230 (N.D.Ill.1993). A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).*See also Johnson v.*

*Martin,* 943 F.2d 15, 16 (7th Cir.1991).

**2. ICFA**

ESBI, which, as discussed, is a billing clearinghouse, argues that the misconduct alleged against it in Brown's complaint amounts at most to aiding and abetting a violation of the ICFA. Section 2 of the ICFA provides,

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

**\*3** 815 ILCS 505/2 (footnote omitted). The Supreme Court of Illinois has held that merely aiding and abetting an ICFA violation, that is, "knowingly receiv[ing] the benefits of another's fraud," is not actionable as a violation of section 2 of the statute. *Zekman v. Direct Am. Marketers, Inc.,* 695 N.E.2d 853, 859 (Ill.1998). In *Zekman* a consumer who allegedly had been induced by fraudulent mailings from a direct mail marketer, Direct American Marketers, Inc ., ("Direct American") to make telephone calls to a 900 number, thus incurring toll charges, brought suit under the ICFA against both Direct American and AT & T, which had billed the consumer for the toll charges, retaining a percentage of the charges and remitting the rest to Direct American. *See id.* at 856.The court concluded that the conduct alleged against the telephone company was not actionable under the ICFA:

We agree with AT & T that the plain language of section 2 of the Act does not include anything that makes it unlawful to knowingly receive the benefits of another's fraud. As this court stated in *Laughlin v. Evanston Hospital,* 133 Ill.2d 374, 390, 140 Ill.Dec.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

861, 550 N.E.2d 986 (1990), "[t]he language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others."To allow plaintiff to recover for AT & T's knowingly receiving the benefits of Direct American's fraud would require us to read into the statute violations that are not a part of the statutory text.

\* \* \* \*

Canons of statutory interpretation additionally guide our decision that knowingly receiving the benefits of another's fraud is not actionable under section 2 of the Act. When a statute provides a list that is not exhaustive, as section 2 does ("including but not limited to ..."), the class of unarticulated things will be interpreted as those that are similar to the named things.... The common feature of the forms of conduct listed in section 2 of the Act is that they involve actions directly done by the perpetrator of the fraud. Knowingly receiving the benefits of another's fraud, however, more closely resembles a form of secondary liability. We believe that a claim for knowingly receiving the benefits of another's fraud is not so similar to the enumerated violations of section 2 of the Act that the legislature intended for it to be a cause of action under that statute. With no clear indication from the legislature that such conduct violates section 2 of the Act, we cannot extend liability to those who knowingly receive the benefits of another's fraud.

*Id.* at 859.

In the case at bar the Court agrees with Brown that the allegations of his complaint establish more than ESBI's passive involvement in the alleged fraud. Brown's complaint alleges,

Service providers or LECs sometimes use several billing clearinghouses to obtain the different services needed to get the billing information ready for the LECs. For example, one billing clearinghouse might provide a "rating" service, i.e., applying the proper charges for each call made. A second billing clearinghouse may then actually prepare and submit the resulting data to the LEC. In this instance, the actual carrier or service provider is three steps removed from the customer. The chain is: carrier or service provider, first billing agent, second billing agent, LEC, and end-use customer. When the customer pays the bill, the money flows in reverse

sequence from the LEC to the carrier or service provider. Because customers may subsequently seek refunds, LECs and billing agents typically hold a percentage of the payments as reserves.

\*4 \* \* \* \*

The use of billing agents creates a situation that facilitates cramming by carriers and service providers. On the basis of invalid authorizations, such carriers and service providers are able to generate accounts receivable before the end-use customers are even billed. Once these customers are billed, many of them unwittingly pay the unauthorized charges, each of which is in a small enough amount to "fly under the radar" of many subscriber's suspicions.

Compl. ¶¶ 17-18. Concerning ESBI, Brown's complaint alleges that "ESBI is no stranger to cramming.... [O]n August 6, 2001, the Federal Trade Commission had agreed to settle FTC allegations that ESBI ... failed to adequately police the practice of vendors who engaged in cramming."*Id.* ¶ 22(b). In *Saltzman v. Enhanced Services Billing, Inc .,* 811 N.E.2d 191 (Ill.App.Ct.2003), the court reversed a trial court's dismissal of cramming claims against ESBI substantially identical to those asserted in this case. The court said, "the complaint in this case alleged that it was ESBI's practice to receive billing information from [a third-party service provider], and without any evidence of authorization, place the 'bogus' charge on the victim's telephone bill, in effect, representing that the customer owed the charge."*Id. at 197.*The court found these allegations distinguishable from the allegations at issue in *Zekman.*"In our view, these allegations are different from the one made in ... the ... complaint in *Zekman,* which only alleged that AT & T knowingly received the benefits of Direct American's deceptive practices in violation of section 2 of the Fraud Act."*Id.*

The *Saltzman* court concluded, "we find that a question of fact exists as to whether the practice of billing phone customers, for charges that are not authorized and cannot be verified while representing that charges are owed, amounts to a direct participation in the fraud under section 2 of the Consumer Fraud Act ."811 N.E.2d at 199. In so holding, the court gave weight to the consent order entered into by the FTC and ESBI, noting that section

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

2 of the ICFA mandates that, in construing the statute, courts must give consideration to the FTC's interpretation of what constitutes deceptive trade practices for purposes of the Federal Trade Commission Act. *See id.* at 199-200.This Court agrees with *Saltzman* that the conduct at issue here is distinguishable from the conduct at issue in *Zekman.*In contrast to *Zekman,* where the defendant telephone company merely billed the plaintiff for calls the plaintiff freely admitted he had made, here ESBI is alleged to have billed consumers, including Brown, for services they never ordered. ESBI's role in the alleged fraud is hardly peripheral. In fact it is quite central: ESBI is the means by which the unauthorized charges wind up on the customer's bill. Therefore, the Court concludes that Brown has stated a claim for relief against ESBI.

**\*5** Although SBC and Abry argue that Brown failed to use proper diligence in reviewing his telephone billing statement for unauthorized charges, it is well settled that under the ICFA "[a] plaintiff ... does not have to show actual reliance or diligence in ascertaining the accuracy of [a defendant's] misstatements."*Grove v. Huffman,* 634 N.E.2d 1184, 1188 (Ill.App.Ct.1994).*See also Duran v. Leslie Oldsmobile, Inc.,* 594 N.E.2d 1355, 1361 (Ill.App.Ct.1992) ("A plaintiff's diligence in ascertaining the accuracy of misstatements was ... eliminated as an element of fraud by the [ICFA]."); *Munjal v. Baird & Warner, Inc.,* 485 N.E.2d 855, 864 (Ill.App.Ct.1985) ( "[U]nder the [ICFA], it is not necessary for a plaintiff to show actual reliance nor diligence in ascertaining the accuracy of the misstatements."); *Beard v. Gress,* 413 N.E.2d 448, 452 (Ill.App.Ct.1980) ("[N]either the mental state of the person making a misrepresentation nor the diligence of the party injured to check as to the accuracy of the misrepresentation [is] material to the existence of a cause of action for that misrepresentation under [the ICFA]."); *Grimes v. Adlesperger,* 384 N.E.2d 537, 539 (Ill.App.Ct.1978) ( "[T]he [ICFA] ... does not place a burden upon the plaintiff to check out the validity of the [misrepresentation].");. Moreover, it is apparent from the allegations of Brown's complaint that the nature of telephone cramming schemes is to insert small charges into consumers' telephone bills in the expectation that they will not notice the charges or, if they do, that they will not understand that the charges are improper. To hold that consumers are without a remedy precisely because a telephone cramming scheme worked as it was intended to do would be, in

the Court's opinion, absurd. It is the case, of course, that to establish proximate causation for purposes of the ICFA Brown must show that he was actually deceived by the misrepresentations at issue in this case. *See Oshana v. Coca-Cola Bottling Co.,* 225 F.R.D. 575, 585 (N.D.Ill.2005) (applying Illinois law) ("[T]o establish proximate causation and thus a violation of [the ICFA], a plaintiff actually must be deceived."). At the pleading stage, however, all that is necessary to allege proximate causation is to assert, as Brown does, that after the alleged misrepresentations were made, the wrongful charges were paid. *See Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 595 (Ill.1996) (allegations that, after an auto manufacturer suppressed material facts about the safety of certain sport utility vehicles, consumers purchased the vehicles were sufficient to plead proximate causation under the ICFA: "[T]he required allegation of proximate cause is minimal since that determination is best left to the trier of fact.").*See also AGFA Corp. v. Wagner Printing Co.,* No. 02 C 2400, 2002 WL 1559663, at \*4 (N.D.Ill. July 10, 2002).[FN2]

> **FN2.** Additionally, the Court rejects ESBI's contention that Brown has failed adequately to plead damages because he does not allege that he actually paid the charges at issue in this case. In fact Brown's complaint alleges that "[d]uring the Class Period, Plaintiff and members of the Class paid their SBC telephone billing statement which included charges which they neither authorized nor used."Compl. ¶ 31. Moreover, Brown's complaint alleges that he first noticed unauthorized charges on his SBC billing statement early in 2005, and that the unauthorized charge for "Traveller Info Svcs # " appeared on his billing statements for February 2004, March 2004, May 2004, June 2004, and July 2004, while the unauthorized charge for "Nationwide Voice Msg" appeared on his billing statements for August 2004, September 2004, October 2004, November 2004, December 2004, and January 2005. *See id.* ¶ 19, ¶ 20.A reasonable inference to be drawn from these allegations is that, prior to his discovery of the charges in early 2005, Brown paid them; otherwise his telephone service likely would have been discontinued.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

Finally, the Court disagrees with SBC, ESBI, BSG, and Abry that Brown's ICFA claim is not pleaded with adequate particularity under Rule 9 of the Federal Rules of Civil Procedure, which provides in pertinent part that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b).*See also Eromon v. Grand Auto Sales, Inc., 351 F.Supp.2d 825, 827 (N.D.Ill.2004) (ICFA claims are subject to the pleading requirements of Rule 9(b)); Jiang v. Allstate Ins. Co., 199 F.R.D. 267, 272 (N.D.Ill.2001) (same). To satisfy the requirements of Rule 9(b), a plaintiff must "identi[f]y ... the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated,"Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir.1992) (quoting Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir.1992)). In other words, the plaintiff must plead "the who, what, when, where, and how: the first paragraph of any newspaper story."Crichton v. Golden Rule Ins. Co., Civil No. 06-264-GPM, 2006 WL 2349961, at *4 (S.D.Ill. Aug. 11, 2006) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990)). The purpose of Rule 9(b) is "to ensure that the party accused of fraud ... is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading,"Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 783 (7th Cir.1999), and to compel plaintiffs to undertake adequate pre-filing investigation of claims of fraud, so that defendants are not injured by groundless charges of deceit. See Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir.1999) ("The purpose ... of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint. Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual).").

*6 In this instance, as discussed, Brown has identified eleven specific occasions when his billing statement from SBC allegedly contained unauthorized charges for services he did not request. Brown has alleged that the charges were placed on his billing statement by billing clearinghouses (ESBI and ILD), then collected by SBC. Brown's complaint explains the role of each of the defendants in the alleged fraudulent scheme.

See Heastie v. Community Bank of Greater Peoria, 690 F.Supp. 716, 722 (N.D.Ill.1988) (finding that an ICFA claim against two defendants arising from a fraudulent mortgage-lending scheme was pleaded with adequate particularity where "[t]he complaint alleges how FAMCO's and Alliance's scheme operated and, as between the two, who did what [.]"). It is apparent both that the complaint is the product of ample pre-filing investigation and that the defendants have adequate notice of the nature of Brown's claims to frame responsive pleadings. It is also apparent that Brown has pleaded to the extent of his knowledge at this time. Rule 9(b) is not to be applied in a manner that penalizes a plaintiff for lack of access to information through discovery. "We don't want to create a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery (normally of the defendant, because the essential information is in his possession and he will not reveal it voluntarily) that she could not conduct before filing the complaint....Rule 9(b) is relaxed upon a showing of such inability."Emery v. American Gen. Fin., Inc., 134 F.3d 1321, 1323 (7th Cir.1998). Importantly, Rule 9(b) is not to be read in isolation but instead is intended to be applied in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires of course only a short and plain statement of a plaintiff's claim. See Tomera v. Galt, 511 F.2d 504, 508 (7th Cir.1975). When Rule 9 is read in conjunction with Rule 8, a plaintiff is required to plead only "slightly more" than is demanded under ordinary notice pleading. Id. at 508.More specifically, a plaintiff must plead "the bare bones" of a fraudulent scheme, by supplying "a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants."Id. at 508, 509.The reason, of course, is that under the liberal discovery provisions of the Federal Rules of Civil Procedure, "[m]ore information can be gathered through discovery."Id. at 509.The allegations of Brown's complaint obviously comply with the standard set out in Tomera and thus, the Court finds that Brown's ICFA claim is pleaded with adequate particularity.

## 3. Unjust Enrichment

As discussed, in addition to a claim under the ICFA, Brown's complaint also asserts a claim for unjust enrichment. To state a claim for unjust enrichment under Illinois law, "a plaintiff must allege that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."*BancInsure v. BMB Elec. Co.,* No. 03 C 2692, 2004 WL 765124, at *3 (N.D.Ill. Apr. 8, 2004) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 679 (Ill.1989)).*See also M & O Insulation Co. v. Harris Bank Naperville,* 783 N.E.2d 635, 639 (Ill.App.Ct.2002) (to prevail on a claim of unjust enrichment "a plaintiff must present evidence that the defendant unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of that benefit violated fundamental principles of justice, equity, and good conscience."). In this case, Brown alleges that he and the members of the proposed class have been charged for services they never ordered, and that the unauthorized charges they have paid constitute a benefit unjustly conferred on the defendants that must be disgorged:

*7 During the Class Period, Plaintiff and members of the Class paid their SBC telephone billing statement which included charges which they neither authorized nor used.

* * * *

Defendant SBC received the continued use and benefit of the improperly paid amounts by Plaintiff and members of the Class together with interest earned on the improperly billed and paid amounts.

* * * *

Defendants ESBI, ILD, Abry, [and] BSG ... received payments resulting from the improperly paid amounts by Plaintiff and members of the Class.

* * * *

Defendant SBC is and has been in possession, custody, and/or control of the improperly billed and paid amounts during all relevant times.

* * * *

Defendants ESBI, ILD, Abry, [and] BSG ... are and have been in possession, custody, and/or control of unlawfully obtained profits resulting from the improperly billed and paid amounts during all relevant times.

* * * *

The improperly paid amounts are property of Plaintiff and the members of the Class.

* * * *

As a consequence, Defendants SBC, ESBI, ILD, Abry, [and] BSG ... have been and continue to be unjustly enriched by virtue of [their] continued possession of the improperly billed and paid amounts. Accordingly, Defendants must return the improperly billed and unpaid [sic] amounts to Plaintiff and members of the Class.

Compl. ¶¶ 30-37.

Although the allegations of Brown's complaint clearly state a claim for unjust enrichment, the defendants nonetheless raise a number of objections. For example, both SBC and Abry seem to suggest that, because Brown in fact received a valuable service in return for the charges at issue, there has been no unjust enrichment. Assuming for the sake of argument that any services were in fact made available to Brown in return for the charges at issue, the complaint specifically alleges that Brown never used the services for which he was charged, *see* Compl. ¶ 30, and in fact the entire point of Brown's allegations is that neither he nor any of the members of the proposed class requested such services or were aware that they were being charged for them. It is impossible to fathom how providing Brown with a service he did not request, did not use, and was not aware he was paying for could foreclose Brown's right to seek restitution. If the gist of the argument is that SBC or Abry have suffered a detriment as a result of allegedly furnishing services to Brown and the members of the proposed class, *see* Restatement (First) of Restitution § 69 (1937), that obviously is not a question the Court can address in resolving a Rule 12(b)(6) motion, which, as discussed, simply tests the legal sufficiency of the allegations of a plaintiff's complaint.

To the extent the defendants argue that their conduct was merely negligent or does not otherwise rise to the level of inequity required to maintain a claim for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

unjust enrichment, the Court does not agree. The Court does not interpret Illinois law as requiring wrongful conduct as a necessary element of an unjust enrichment claim. *See Midcoast Aviation, Inc. v. General Elec. Credit Corp.,* 907 F.2d 732, 738 n. 3 (7th Cir.1990) (quoting *Partipilo v. Hallman,* 510 N.E.2d 8, 11 (Ill.App.Ct.1987)) ("[A] cause of action based on unjust enrichment ... does not require fault on the part of the defendant."); *Board of Highway Comm'rs, Bloomington Township v. City of Bloomington,* 97 N.E. 280, 285 (Ill .1911) (imposing quasi-contract liability despite an absence of "wrongful intention on the part of anyone in connection with this transaction.")."The cause of action based on unjust enrichment ... does not require fault or illegality on the part of the defendant; rather, the essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment."*Firemen's Annuity & Benefit Fund v. Municipal Employees', Officers', & Officials' Annuity & Benefit Fund of Chicago,* 579 N.E.2d 1003, 1007 (Ill.App.Ct.1991). In any event, as discussed, Brown clearly alleges fraud on the part of the defendants.

**\*8** Finally, while SBC contends that it has received no benefit as a result of the practices complained of in this case, the Court finds it unlikely that SBC received no compensation for collecting the allegedly unauthorized charges and, most importantly, the allegations of Brown's complaint, with which the Court is solely concerned at this juncture, plainly assert that SBC has received an unjust benefit as a result of collecting the charges. As to the argument SBC raises by way of a reply brief that, because its relationship with Brown is governed by an express contract, it cannot be liable to Brown in quasi-contract, while the Court will give this issue careful attention at the summary judgment stage, at the pleading stage Brown is entitled to assert a claim in quasi-contract, regardless of the existence of an express contract. *See*Fed.R.Civ.P. 8(e)(2) (authorizing a party to "set forth two or more statements of a claim or defense alternately or hypothetically" and to "state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds."); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,* 155 F.Supp.2d 1069, 1116-17 (S.D.Ind.2001) (permitting plaintiffs to assert at the pleading stage alternative theories of relief based on contract and quasi-contract); *Quadion Corp. v. Mache,* 738 F.Supp. 270, 278 (N.D.Ill.1990) (same); *McIntosh v. Magna Sys., Inc.,* 539 F.Supp.

1185, 1190-91 (N.D.Ill.1982) (same).*Cf. Donaldson v. Pharmacia Pension Plan,* 435 F.Supp.2d 853, 869 n. 5 (S.D.Ill.2006) (quoting *Weft, Inc. v. G.C. Inv. Assocs.,* 630 F.Supp. 1138, 1144 (E.D.N.C.1986)) (under Rule 8(e)(2), "[a]lthough plaintiffs may not obtain a duplicative recovery, there is no requirement that they elect one remedy over another prior to final judgment."). The Court concludes that Brown has stated a claim for unjust enrichment.

### 4. Voluntary Payment Doctrine

SBC and Abry contend that Brown's claims are barred by the voluntary payment doctrine. Generally speaking, the voluntary payment doctrine is "a corollary to the mistake of law doctrine" and holds that "a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution."*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir.2006) (quoting *Randazzo v. Harris Bank Palatine, N.A.,* 262 F.3d 663, 667 (7th Cir.2001)).*See also Edward P. Allison Co. v. Village of Dolton,* 181 N.E.2d 151, 153 (Ill.1962); *Illinois Glass Co. v. Chicago Tel. Co.,* 85 N.E. 200, 201 (Ill.1908); *Smith v. Prime Cable of Chicago,* 658 N.E.2d 1325, 1329-30 (Ill.App.Ct.1995). The Court finds that dismissal is not warranted on this ground.

As Brown points out, the voluntary payment doctrine applies solely to payments made under a mistake of law. In this case, of course, Brown alleges that the payments at issue were not voluntary at all and instead were procured through fraud, which is a well-recognized exception to the voluntary payment doctrine. *See, e.g., Flournoy v. Ameritech,* 814 N.E.2d 585, 588-89 (Ill.App.Ct.2004) (holding that the voluntary payment doctrine did not bar a former prison inmate's suit against a telephone company that provided telephone service to the prison where the inmate was held to recover toll charges incurred as a result of the company's alleged policy of intentionally terminating collect calls from the prison for the purpose of collecting multiple fees and surcharges, where the payments allegedly were procured through fraud). The voluntary payment doctrine likewise does not bar claims to recover payments made under a mistake of fact, and thus would not bar the claims of Brown and the proposed class if they made the payments at issue under a mistake of fact as to whether they had in fact ordered the services for which they allegedly were billed. *See Randazzo,* 262 F.3d at 668

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

(noting that "Illinois recognizes the traditional defenses to the voluntary payment doctrine," including "fraud and mistake of fact"). Finally, the Illinois Supreme Court has held that payments coerced through explicit or implicit threats to terminate telephone service are not voluntary and instead are the product of duress such as to take them out of the scope of the voluntary payment doctrine. *See Getto v. City of Chicago,* 426 N .E.2d 844, 850-51 (Ill.1981).

**\*9** In the Court's view, the applicability of the various exceptions to the voluntary payment doctrine is not an issue susceptible to resolution on the pleadings. *See Crain v. Lucent Techs., Inc.,* 739 N.E.2d 639, 644 (Ill.App.Ct.2000) (noting that under Illinois law the question of the applicability of the voluntary payment doctrine and exceptions thereto is essentially factual and that "[t]he resolution of this issue will require the presentation of evidence so that the court or fact finder can determine whether a payment was voluntarily made without protest and without fraud or mistake."). At this juncture it is sufficient that, under some set of facts consistent with the allegations of Brown's complaint, he could be entitled to relief on his claims. Therefore, the Court declines to dismiss Brown's claims on the basis of the voluntary payment doctrine.[FN3]

> FN3. The Court also expresses some skepticism about the applicability of the voluntary payment doctrine to Brown's claim under the ICFA. The ICFA is of course remedial legislation that is construed broadly to effect its purpose, namely, to eradicate all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers. *See Peter J. Hartmann Co. v. Capital Bank & Trust Co.,* 694 N.E.2d 1108, 1116 (Ill.App.Ct.1998). The ICFA "creat[es] a new cause of action that affords consumers broad protection by prohibiting any 'deception' or 'false promise.' " *Miller v. William Chevrolet/GEO, Inc.,* 762 N .E.2d 1, 11 (Ill.App.Ct.2001) (quoting *Smith,* 658 N.E.2d at 1335). Although the Court need not decide the issue, the Court notes authority for the view that remedial legislation like the ICFA is not subject to common-law defenses. *See Simmons v. Union Elec. Co .,* 473 N.E.2d 946, 954 (Ill.1984) (comparative negligence was not a defense in actions under the

now-repealed Structural Work Act, a remedial statute intended to protect persons engaged in extra-hazardous occupations like the construction, repair, alteration, or removal of buildings, bridges, viaducts, and other structures); *Kelsay v. Motorola, Inc.,* 384 N.E.2d 353, 356 (Ill.1978) (the Illinois Workers' Compensation Act is remedial legislation intended to compensate injured workers by depriving employers of common-law defenses like contributory negligence); *Nelson v. Araiza,* 372 N.E.2d 637, 639 (Ill.1978) (the affirmative defense of contributory negligence is not available in a suit under the Illinois Dram Shop Act, which is a statutory right of action not based on negligence).*See also Autohaus, Inc. v. Aguilar,* 794 S.W.2d 459, 461-62 (Tex.App.1990) (common-law defenses are not available in an action under the state Deceptive Trade Practices Act ("DTPA"): "The DTPA does not represent a codification of the common law. A primary purpose of the enactment of the DTPA was to provide consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit.").

## 5. Corporate Veil

Finally, both BSG and Abry assert the corporate form as grounds for dismissal of Brown's claims against those defendants. Specifically, BSG contends that it cannot be held liable in this case merely because ESBI is its wholly-owned subsidiary, and Abry contends that it cannot be held liable merely by virtue of having been a past or present shareholder in BSG. Both defendants are correct."Under Illinois law, a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and, generally, from other corporations with which it may be affiliated."*Van Dorn Co. v. Future Chem. & Oil Corp.,* 753 F.2d 565, 569 (7th Cir.1985) (citing *Main Bank of Chicago v. Baker,* 427 N.E.2d 94 (Ill.1981)).*See also Polites v. U.S. Bank Nat'l Ass'n,* 836 N.E.2d 133, 137 (Ill.App.Ct.2005) ("In Illinois, corporations are treated as separate legal entities even where one wholly owns the other and the two have mutual dealings."); 1 William Meade Fletcher et al., *Fletcher*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Cyclopedia of the Law of Private Corporations* § 25 (perm.ed., rev.vol.1999) ( "It is generally accepted that the corporation is an entity distinct from its shareholders ... with rights and liabilities not the same as theirs individually and severally.") (collecting cases). In rare instances courts will disregard the corporate form to impose liability on shareholders and affiliated corporations if there is "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist" and "circumstances [are] such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice."*Van Dorn Co.*, 753 F.2d at 569-70. *See also Main Bank of Chicago*, 427 N.E.2d at 101 (under Illinois law courts will disregard the corporate form where it is shown that a corporation "is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."). However, piercing the corporate veil is an equitable remedy that Illinois courts should "undertake[ ] reluctantly." *Walker v. Dominick's Finer Foods, Inc.*, 415 N.E.2d 1213, 1217 (Ill.App.Ct.1980).

**\*10** While the Court recognizes the primacy of the doctrine of separate corporate identity, the Court is not aware of any requirement that a plaintiff plead facts to establish grounds for piercing the corporate veil. *See Ishkhanian v. Forrester Clinic S .C.*, No. 02 C 9339, 2003 WL 21479072, at \*3 (N.D. Ill. June 25, 2003) ("[I]n order for the claim to withstand a motion to dismiss for failure to state a claim in federal court, no ... substantial showing ... of fact [regarding the propriety of piercing the corporate veil] is demanded."); *Steel Warehouse of Wis., Inc. v. Caterpillar, Inc.*, No. 90 C 20053, 1990 WL 304266, at \*2 (N.D.Ill. Nov. 13, 1990) (a complaint was not subject to dismissal for failure to state a claim upon which relief can be granted merely because it did not plead the elements that must be proved to pierce the corporate veil under Illinois law). Although the Court will give close scrutiny to Brown's claims against BSG and Abry at the summary judgment stage, the Court concludes that those claims are not subject to dismissal at the pleading stage.

**C. Lack of Personal Jurisdiction**

As discussed, ILD has moved for dismissal from this action on grounds of lack of personal jurisdiction. On a motion to dismiss for lack of personal jurisdiction brought pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a plaintiff bears the burden of proving that personal jurisdiction exists. *See Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir.2000). When a motion to dismiss is to be decided solely on written materials, the plaintiff need only make a prima facie case for personal jurisdiction. *See Neiman v. Rudolf Wolff & Co.*, 619 F.2d 1189, 1190 (7th Cir.1980). In deciding the motion to dismiss, the court may receive and consider affidavits from both parties. *See Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 208 F.Supp.2d 918, 922 (N .D.Ill.2002) (citing *Kontos v. United States Dep't of Labor*, 826 F.2d 573, 576 (7th Cir.1987)). "[A]ll well-pleaded jurisdictional allegations in the complaint are accepted as true unless controverted by affidavit."*Travelers Cas. & Sur. Co. v. Interclaim (Bermuda) Ltd.*, 304 F.Supp.2d 1018, 1021 (N.D.Ill.2004).*See also Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987). Any conflicts in the pleadings and affidavits are to be resolved in a plaintiff's favor, but a court accepts as true any facts contained in a defendant's affidavits that remain unrefuted by the plaintiff. *See Continental Cas. Co. v. Marsh*, No. 01 C 0160, 2002 WL 31870531, at \*2 (N.D.Ill.Dec. 23, 2002) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir.1997)).

In a case based upon diversity of citizenship, a federal district court sitting in Illinois has personal jurisdiction over a nonresident defendant only if an Illinois court would have jurisdiction. *See Netzky v. Fiedler*, No. 00 C 4652, 2001 WL 521396, at \*1 (N.D.Ill. May 15, 2001). For an Illinois court to have personal jurisdiction over a nonresident defendant, personal jurisdiction must be permitted by: (1) Illinois statutory law; (2) the Illinois Constitution; and (3) the Constitution of the United States. *See Continental Cas. Co.*, 2002 WL 31870531, at \*4. With respect to Illinois statutory law, the Illinois long-arm statute, 735 ILCS 5/2-209, extends personal jurisdiction to the limit allowed under the Illinois Constitution and the United States Constitution. *See LaSalle Bank Nat'l Ass'n v. Epstein*, No. 99 C 7820, 2000 WL 283072, at \* 1 (N.D.Ill. Mar. 9, 2000) (citing *RAR, Inc.*, 107 F.3d at 1276)."Because the Illinois statute authorizes personal jurisdiction to the [federal] constitutional limits, the three inquiries ... collapse into two

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

constitutional inquiries-one state and one federal."*Continental Cas. Co.*, 2002 WL 31870531, at *4 (quoting *RAR, Inc.*, 107 F.3d at 1276). If jurisdiction is improper under either the Illinois Constitution or the United States Constitution, a court cannot exercise jurisdiction over a defendant. *See id.*

**\*11** The Illinois Supreme Court has held that, under the Illinois Constitution's guarantee of due process, jurisdiction is to be "asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois."*Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir.2002) (quoting *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill.1990)). The United States Court of Appeals for the Seventh Circuit has recognized that the Illinois courts "have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction."*RAR, Inc.*, 107 F.3d at 1276. Furthermore, the Seventh Circuit Court of Appeals has held that "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction."*Hyatt Int'l Corp.*, 302 F.3d at 715.

Correspondingly, district courts in this Circuit typically analyze personal jurisdiction solely with reference to federal due process standards, not Illinois due process standards. *See Continental Cas. Co.*, 2002 WL 31870531, at *4 (conducting only a federal due process analysis because the parties did not present any evidence to suggest that the outcome would be otherwise under state law); *United Fin. Mortgage Corp. v. Bayshores Funding Corp.*, 245 F.Supp.2d 884, 891-92 (N.D.Ill.2002) (condensing the personal jurisdiction analysis to a single federal due process inquiry). In this case, the parties make no arguments regarding whether personal jurisdiction would be fair, just, and reasonable under the Illinois Constitution. Rather, they dispute whether personal jurisdiction would comport with federal due process requirements. Thus, the Court will proceed to the federal due process inquiry. *See MAC Funding Corp. v. Northeast Impressions, Inc.*, 215 F.Supp.2d 978, 980 (N.D.Ill.2002) (proceeding directly to the federal personal jurisdiction analysis where the parties failed to address Illinois standards and the court's own research revealed nothing that would indicate that

Illinois law would lead to a different outcome than federal law).

Under the United States Constitution, the Due Process Clause of the Fourteenth Amendment limits a court's power to assert personal jurisdiction over a nonresident defendant. *See RAR, Inc.*, 107 F .3d at 1277 (citing *Pennoyer v. Neff*, 95 U.S. 714, 733 (1878)). Federal due process requires that a nonresident defendant have certain minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Hyatt Int'l Corp.*, 302 F.3d at 716 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). This standard varies depending on whether the jurisdiction alleged is general or specific. *See RAR, Inc.*, 107 F.3d at 1277. "[G]eneral jurisdiction allows a defendant to be sued in the forum regardless of the subject matter of the litigation ." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir.2003). It is permitted "only where the defendant has 'continuous and systematic general business contacts' with the forum." *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). "Those contacts must be so extensive as to make it 'fundamentally fair to require [defendants] to answer in any [Illinois] court in any litigation arising out of any transaction or occurrence taking place anywhere in the world.' " *Travelers Cas. & Sur. Co.*, 304 F.Supp.2d at 1024 (quoting *Purdue Research Found.*, 338 F.3d at 787) (emphases omitted). Several factors are considered in making this analysis: (1) whether and to what extent a defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state. *See Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.*, 262 F.Supp.2d 898, 906-07 (N.D.Ill.2003). General jurisdiction is a demanding standard that is "considerably more stringent ... than that required for specific jurisdiction." *Purdue Research Found.*, 338 F.3d at 787. *See also Griffith v. Wood Bros.*, No. 04 C 3118, 2004 WL 2418296, at *8 (N.D.Ill. Oct. 27, 2004).

**\*12** In this instance the parties do not dispute that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

general jurisdiction over ILD is lacking. The uncontroverted affidavit of Kathy McQuade, the vice president of ILD's billing and collection division, establishes that ILD is a Florida-based corporation that has no office or employees in Illinois, sends no employees into Illinois to conduct business, and has no continuous and systematic general business contacts with Illinois. *See* Doc. 14, Ex. A ¶¶ 2-4. The charge for "Nationwide Voice Msg" Brown alleges ILD placed on his billing statement arises from a contract for billing services entered by ILD with a non-Illinois company called National Voice Messaging, Inc. *See id.* ¶ 11.Brown does not argue that the Court has general jurisdiction over ILD and instead argues that the Court has specific jurisdiction over ILD. The Court agrees.

By contrast with general jurisdiction, in specific jurisdiction cases a suit must "arise out of" or be "related to" the defendant's minimum contacts with the forum state. *Hyatt Int'l Corp.,* 302 F.3d at 716. In determining whether specific personal jurisdiction exists, a court must first address whether a defendant has "purposefully established minimum contacts within the forum State."*Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985)). It is critical that the court determine whether the defendant "should reasonably anticipate being haled into court [in the forum State]."*Id.*(quoting *Burger King Corp.,* 471 U.S. at 474). The defendant may reasonably anticipate being haled into court in the forum state when it has " 'purposefully avail[ed] itself of the privilege of conducting activities' there."*Id.* (quoting *Burger King Corp.,* 471 U.S. at 475). If the court determines that minimum contacts with the forum exist, the court must then determine whether those contacts would make personal jurisdiction "reasonable and fair under the circumstances."*RAR, Inc.,* 107 F.3d at 1277. After minimum contacts have been established, a defendant "can only escape jurisdiction by making a 'compelling case' that forcing it to litigate in [the forum] would violate traditional notions of fair play and substantial justice."*Logan Prods., Inc. v. Optibase, Inc.,* 103 F.3d 49, 53 (7th Cir.1996) (quoting *Burger King Corp.,* 471 U.S. at 477). In assessing whether jurisdiction is consistent with fair play and substantial justice a court should consider: (1) the burden on a defendant in litigating in the forum; (2) the interests of the forum state; (3) a plaintiff's interest in obtaining convenient and effective relief; (4) the interests of the interstate judicial system in obtaining an efficient resolution of

the controversy; and (5) the interests of the several states in furthering fundamental substantive policies. *See id. See also Eragen Biosciences, Inc. v. Nucleic Acids Licensing, LLC,* 447 F.Supp.2d 930, 939 (W.D.Wis.2006); *Andersen v. Sportmart, Inc.,* 57 F.Supp.2d 651, 661 (N.D.Ind.1999).

**\*13** Under the "effects doctrine," specific personal jurisdiction over a nonresident defendant is proper when the defendant's intentional tortious actions aimed at the forum state cause harm to a plaintiff in the forum state, and the defendant knows such harm is likely to be suffered. In *Calder v. Jones,* 465 U.S. 783 (1984), the Court held that it was proper for a California court to exercise personal jurisdiction over two Florida tabloid journalists who wrote an allegedly libelous article about a California-based entertainer. The defendants argued that they should not be subjected to jurisdiction merely because the impact of their conduct was felt in California. The Court disagreed:

... [P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. [Petitioners] ... wrote and ... edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the [Petitioners' employer] has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article.

*Id.* at 789-90 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)). The Court concluded, "Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."*Id.* at 789.This Circuit interprets the effects doctrine broadly. For example, in *Janmark, Inc. v. Reidy,* 132 F.3d 1200 (7th Cir.1997), the plaintiff, a seller of mini shopping carts, brought an action against a California competitor, seeking a declaratory judgment and asserting a claim of tortious interference with prospective economic advantage. *See id.* at 1201-02.Finding that a single phone call from the California defendant to a customer of the plaintiff in New Jersey could not be a tort within Illinois, the district court dismissed the foreign defendant for lack of personal jurisdiction. *See*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

*id.*Reversing, the Seventh Circuit reasoned that because without an injury there is no tort and that a wrong does not become a tort until an injury has occurred, the location of the injury is vital to understanding where the tort occurred. *See id.* at 1202.Because the injury took place in Illinois, the *Janmark* court held, the tort occurred in Illinois and thus was actionable in Illinois. *See id.*The court held that "the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor" even if all the other relevant conduct took place outside of the forum state. *Id.* (citing *Calder*)."[T]he state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deeds even if events were put in train outside its borders."*Id. See also Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship,* 34 F.3d 410, 411-12 (7th Cir.1994) (a Maryland defendant could be sued in Indiana for the tort of trademark infringement based on the name of a football team, because the injury of the impaired trademark would "be felt mainly in Indiana," and "someone who commits a tort in Indiana should ... be amenable to suit there."); *Riddell, Inc. v. Monica,* No. 03 C 3309, 2003 WL 21799935, at *3 (N.D.Ill. July 25, 2003)* ("As defendants [who allegedly misappropriated the plaintiff's trade secrets] were aware, plaintiff's principal place of business is in Illinois, and thus the injury would be felt most severely in Illinois. Under the circumstances, it was foreseeable that defendants would be required to answer for such actions in Illinois."); *International Molding Mach. Co. v. St. Louis Conveyor Co.,* No. 01 C 8305, 2002 WL 1838130, at *4 (N.D.Ill. Aug. 12, 2002)* ("[S]pecific jurisdiction can be proper when the injury occurs in Illinois, even if all of the other relevant conduct took place elsewhere."); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.,* 88 F.Supp.2d 914, 920 (C.D.Ill.2000) (relying on *Janmark* to hold that a New York corporation which committed the "torts" of trademark infringement and unfair competition against an Illinois corporation, so that the injury was felt in Illinois, submitted itself to the jurisdiction of the Illinois courts).

**\*14** In this case, the gravamen of Brown's claims is, of course, that ILD placed false charges for "Nationwide Voice Msg" on his billing statement. ILD certainly knew that it was processing billing data for Illinois telephone subscribers and therefore was on notice that such false charges could result in the company being haled into court in Illinois. "A single telephone call

into Illinois can give rise to Illinois jurisdiction as long as the call constitutes the commission of a tortious act within Illinois."*Pendelton v. Germino,* No. 95 C 2350, 1995 WL 493449, at *8 (N.D.Ill. Aug. 15, 1995) (holding that a nonresident defendant's alleged "repeated phone calls" to a plaintiff in Illinois did not give rise to personal jurisdiction over the defendant, because the calls themselves did not constitute tortious acts in Illinois).*See also Heritage House Rests., Inc. v. Continental Funding Group, Inc.,* 906 F.2d 276, 282 (7th Cir.1990) (a nonresident defendant's alleged misrepresentation during a telephone conversation that the entire amount of an Illinois corporation's $150,000 deposit with a savings and loan would be secured for repayment brought the defendant within the Illinois long-arm statute as to a misrepresentation cause of action and an alleged violation of the ICFA where the phone conversation was the basis for the alleged tort); *Evercom Sys., Inc. v. Mannis,* No. Civ.A.3:03-CV-2956-M, 2004 WL 396885, at *2 (N.D.Tex. Feb. 20, 2004) (quoting *Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 213 (5th Cir.1999)) (when the actual content of a defendant's communications with a forum state gives rise to intentional tort causes of action due to fraud, the communication constitutes purposeful availment for purposes of personal jurisdiction because the defendant is purposefully availing itself of the "privilege of causing a consequence" in the forum state); 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1069.5 (3d ed. 1998 & Supp.2006) ("Even an act done by an individual outside the state that has consequences within the state should suffice as a basis for asserting personal jurisdiction in a suit arising from those consequences if the effect reasonably could have been expected to follow from the defendant's conduct [.]") (collecting cases).

Having concluded that ILD has minimum contacts with Illinois, the Court turns to the question of whether it offends traditional notions of fair play and substantial justice to require ILD to defend this action in Illinois. The Court finds that it does not. In evaluating substantial justice and fair play, "the most important factors to consider are the interests of the forum and the relative convenience of litigating in that forum."*International Molding Mach. Co.,* 2002 WL 1838130, at *5 (citing *Kohler Co. v. Kohler Int'l, Ltd.,* 196 F.Supp.2d 690, 700 (N.D.Ill.2002)). The Court concludes that litigating this case in Illinois will place a minimal burden upon ILD. ILD is a corporate

Slip Copy
Slip Copy, 2007 WL 684133 (S.D.Ill.)

defendant that processes billing data for telephone subscribers nationwide, including Illinois. *See Logan Prods., Inc.,* 103 F.3d at 54 (noting that it is usually not unfair to force a defendant to defend a lawsuit in a state in which it has engaged in economic activity); *Birnberg v. Milk St. Residential Assocs. Ltd. P'ship,* Nos. 02 C 0978, 02 C 3436, 2003 WL 151929, at *8 (N.D.Ill. Jan. 21, 2003) (holding that travel from Massachusetts to Illinois was not oppressive due to modern advances in communication and transportation). No doubt it would be vastly more onerous for Brown, who is alleged to be a disabled retiree, to litigate his claims against ILD in Florida, and, in any event, unless the inconvenience of having to litigate in the forum is so great as to deprive a defendant of due process, it will not overcome clear justifications for the exercise of personal jurisdiction. *See Euromarket Designs, Inc. v. Crate & Barrel, Ltd.,* 96 F.Supp.2d 824, 840 (N.D.Ill.2000). Illinois has a significant interest in the adjudication of this case, given that ILD's allegedly tortious conduct has caused injury to Brown and numerous other Illinois citizens in Illinois. *See International Molding Mach. Co.,* 2002 WL 1838130, at *5 (holding that Illinois has a strong interest in adjudicating cases arising from injuries occurring in its borders). This case clearly does not present the "rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum."*CoolSavings.Com, Inc. v. IQ Commerce Corp.,* 53 F.Supp.2d 1000, 1005 (N.D.Ill.1999) (quoting *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994)). In sum, the Court finds that the exercise of personal jurisdiction over ILD in this case does not offend traditional notions of fair play and substantial justice. The Court concludes that it has personal jurisdiction over ILD.

**D. Conclusion**

**\*15** The motions to dismiss for failure to state a claim upon which relief can be granted brought by SBC (Doc. 17), ESBI and BSG (Doc. 12), and Abry (Doc. 15) are **DENIED.**The motion to dismiss for lack of personal jurisdiction brought by ILD (Doc. 13) is **DENIED.**

**IT IS SO ORDERED.**

S.D.Ill.,2007.
Brown v. SBC Communications, Inc.
Slip Copy, 2007 WL 684133 (S.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 1040886 (S.D.Tex.)

CEngelbecht v. DaimlerChrysler Corp.
S.D.Tex.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas,Galveston
Division.
James ENGELBECHT, Plaintiff,
v.
DAIMLERCHRYSLER CORP., et al., Defendants.
Civil Action No. G-06-CV-800.

April 2, 2007.

John Karl Buche, Buche & Associates Pc, La Jolla,
CA, for Plaintiff.
G Robert Sonnier, Attorney at Law, Austin, TX,
Patrick G Seyferth, Bush Seyferth Kethledge & Paige,
Pllc, Troy, MI, Stephen Robert Lewis, Jr., Lewis &
Williams, Galveston, TX, Ritu Gupta, Brown & Gupta,
Houston, TX, for Defendants.

### ORDER OF REMAND

SAMUEL B. KENT, United States District Judge.
*1 This action comes before the Court on removal
from the 23rd Judicial District of Brazoria County,
Texas. Now before the Court is Plaintiff's Motion to
Remand. For the reasons stated below, Plaintiff's
Motions is **GRANTED**, and this case is
**REMANDED** to the 23rd Judicial District of Brazoria
County, Texas. FN1

> FN1. The Court does not consider this Order
> worthy of publication. Accordingly, it has
> not requested and does not authorize such
> publication.

### I. Background

On November 2, 2006, Plaintiff sued Defendants
DaimlerChrysler Corporation, Archer Chrysler
Plymouth, Inc., and Archer Chrysler-Jeep (West), Inc.
for negligence, gross negligence, product liability,
misrepresentation, and breach of warranty after his
wife, Jessica, was killed when the airbags in her car
failed to deploy after a head-on collision.
DaimlerChrysler, Corp. ("DaimlerChrysler"), the
manufacturer of Jessica's Chrysler Town & Country,

is an out-of-state Defendant. Plaintiff and the Archer
entities (collectively "Archer") are Texas residents.
DaimlerChrysler removed the case to this Court
pursuant to the Court's diversity jurisdiction alleging
that Archer had been fraudulently joined. Plaintiff
now moves to remand, arguing that Archer is a proper
Party in this case.

### II. Legal Standard

Absent an express provision to the contrary, a
defendant can remove a state-court action to federal
court only if the suit could have been filed originally
in the federal court. See28 U.S.C. § 1441(a);
Caterpillar, Inc. v. Williams, 482 U.S. 386, 107 S.Ct.
2425, 96 L.Ed.2d 318 (1987). Because Plaintiff's
claims arise under Texas law, there is no federal
question, and diversity is the only possibility for
federal jurisdiction. The federal diversity statute
provides the federal district courts with jurisdiction
over civil actions where the amount in controversy
exceeds $75,000 and where the parties are citizens of
different states. See28 U.S.C. § 1332(a). The
jurisdictional statute has long been interpreted to
mandate a rule of "complete diversity," meaning that
the diversity statute "applies only to cases in which the
citizenship of each plaintiff is diverse from the
citizenship of each defendant."Caterpillar, Inc. v.
Lewis, 519 U.S. 61, 68, 117 S.Ct. 467, 472, 136
L.Ed.2d 437 (1996) (citing Strawbridge v. Curtis, 7
U .S. (2 Cranch) 267, 2 L.Ed. 435 (1806)). Generally,
the plaintiff's complaint must allege facts showing that
complete diversity exists. See, e.g., Getty Oil Corp. v.
Ins. Co. of N. Am., 841 F.2d 1254, 1258 (5th
Cir.1988).

The district court may discount non-diverse
defendants if the removing party can show that the
plaintiff fraudulently joined these defendants. In order
to prove fraudulent joinder, " '[t]he removing party
must prove that there is absolutely no possibility that
the plaintiff will be able to establish a cause of action
against the in-state defendant in state court, or that
there has been outright fraud in the plaintiff's pleading
of jurisdictional facts'.... 'If there is arguably a
reasonable basis for predicting that the state law might
impose liability on the facts involved, then there is no
fraudulent joinder. This possibility, however, must be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1040886 (S.D.Tex.)

reasonable, not merely theoretical' " _Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co._, 313 F.3d 305, 312 (5th Cir.2002) (quoting _Green v. Amerada Hess Corp._, 707 F.2d 201, 205 (5th Cir.1983) and _Badon v. RJR Nabisco Inc._, 236 F.3d 282, 286 (5th Cir.2001)). "The removing party carries a heavy burden when attempting to prove fraudulent joinder." _Id._ (citing _Cavallini v. State Farm Mut. Auto. Ins. Co._, 44 F.3d 256, 259 (5th Cir.1995)).

**\*2** Since DaimlerChrsyler has not alleged fraud, the operative inquiry is whether there is any reasonable possibility that Plaintiff will be able to establish a cause of action against Archer in state court. All issues of fact and of uncertain state law are resolved in favor of Plaintiff. _See Cavallini_, 44 F.3d at 259 (citing _Green_, 707 F.2d at 205). The Court may consider evidence similar to that used for summary judgment analysis in evaluation of the claims against non-diverse defendants. _See id._ at 263.However, the Court will not consider "whether the plaintiff will actually or even probably prevail on the merits of the claims," but only the "possibility that the plaintiff might do so."_Burden v. Gen'l Dynamics Corp._, 60 F.3d 213, 216 (5th Cir.1995). If the district court determines that the plaintiff did not fraudulently join the non-diverse defendants, it must remand the case for lack of subject matter jurisdiction.

## III. Analysis

Plaintiff alleges that Archer sold the Town & Country in question, failed to give adequate warning of dangers that it knew or should have known about, and misrepresented the safety of the vehicle. DaimlerChrysler argues that Texas Civil Practices and Remedies Code § 82.003 bars recovery against Archer. In relevant part, § 82.003 states:

(a) A seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves:

...

(6) that:

(A) the seller actually knew of a defect to the product at the time the seller supplied the product; and

(B) the claimant's harm resulted from the defect.

Section 82.003 essentially protects a non-manufacturing seller from product liability actions unless its conduct falls into one of the enumerated exceptions to the presumption of no liability. DaimlerChrysler argues that Archer is a non-manufacturing seller and is insulated from liability by § 82.003(a). DaimlerChrysler further alleges that Plaintiff cannot prove that Archer has exhibited any conduct which falls into any of the enumerated exceptions. The Court respectfully disagrees.

At this stage in the proceedings, the Court need only determine whether there is a possibility that Plaintiff may prevail against Archer. Plaintiff need not present all of his proof. In this case, Plaintiff has presented more than enough to prevent DaimlerChrysler from meeting its very high burden. Specifically, Plaintiff's Original Petition states that

"Defendants represented that the product was especially safe to operate with its airbag systems and that consumers, including Jessica Engelbrecht, would be safe in the event of a collision because of the crashworthiness of the DaimlerChrysler vehicle and the advanced restraint systems housed by the vehicle. Decedent relied on the representations of safety by Defendants when choosing to operate the DaimlerChrysler vehicle."

Original Pet. at 9-10. Plaintiff also argues that Archer knew, or should have known, about the defect in the airbag at the time it made these representations because of an ongoing governmental inquiry into the safety of the airbags in the DaimlerChrysler vans. If Plaintiff can ultimately prove that Archer knew about the defect at the time the vehicle was purchased, he can recover against Archer under the exception in § 82.003(a)(6).See Pl.'s Supplemental Br. in Supp. of Mot. to Remand at 6. This possibility is enough to defeat DaimlerChrysler's removal.

## IV. Conclusion

**\*3** Since there is a possibility that Plaintiff can prevail against Archer, it has not been fraudulently joined. Accordingly, there is not complete diversity, and this Court has no jurisdiction. Therefore, this case is **REMANDED** to the 23rd Judicial District of Brazoria

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1040886 (S.D.Tex.)

County, Texas. Each Party is to bear its own taxable costs, expenses, and attorneys' fees incurred herein to date.

**IT IS SO ORDERED.**

S.D.Tex.,2007.
Engelbecht v. DaimlerChrysler Corp.
Slip Copy, 2007 WL 1040886 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2546494 (E.D.Tex.)

**C** Goss v. Schering-Plough Corp.
E.D.Tex.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas,Tyler
Division.
Jan GOSS, Individually and as Representative of the
Estate of Velma Church, Deceased, et al., Plaintiffs,
v.
SCHERING-PLOUGH CORPORATION, et al.,
Defendants.
No. 6:06-CV-251.

Aug. 30, 2006.

John Keith Hyde, D'Juana Bellue Parks, Provost
Umphrey, Beaumont, TX, for Plaintiffs.
David Stanley, Reed Smith LLP, Los Angeles, CA,
Walter Thomas Henson, Ramey & Flock, Tyler, TX,
Brian Patrick Johnson, Johnson Spalding Doyle West
& Tren, Houston, TX, James Stephen Roper, Zeleskey
Cornelius Hallmark Roper & Hicks, Lufkin, TX, for
Defendants.

*MEMORANDUM OPINION AND ORDER ON
MOTION TO REMAND*

MICHAEL H. SCHNEIDER, District Judge.
*1 Before the Court is the Plaintiffs' Motion to
Remand (Doc. No. 7) for lack of subject matter
jurisdiction. For the reasons below, the Court is of the
opinion that the Plaintiffs' Motion should be granted.

**I. Background**

Plaintiffs originally brought this cause of action in the
4th Judicial District Court of Rusk County, Texas,
alleging wrongful death resulting from acute
myelogenous leukemia, which was itself caused by
benzene contained in dental adhesives. The Plaintiffs
allege that the dental adhesives were manufactured by
Defendants        Schering-Plough        Corporation
("Schering-Plough") and SmithKline Beecham
Corporation and were sold by Defendants Brookshire
Brothers Ltd. and Brookshire Brothers Pharmacy
("Brookshire Brothers") to decedent Velma Church. It
is undisputed that the Plaintiffs and the Brookshire
Brothers defendants are citizens of the State of Texas.

Defendant Schering-Plough removed this case to
federal court alleging that the Brookshire Brothers
defendants had been improperly joined and invoking
this Court's diversity jurisdiction. The Plaintiffs filed
this motion to remand, in which they allege that
Defendant Brookshire Brothers Ltd. and Brookshire
Brothers Pharmacy are properly joined non-diverse
defendants under Texas law.

**II. Removal and Remand**

A defendant may remove a civil action to federal court
if the federal court has diversity jurisdiction over the
action. 28 U.S.C. § 1441(b). Diversity jurisdiction is
established if the amount in controversy exceeds
$75,000 and the action is between citizens of different
states. 28 U.S.C. § 1332(a). The removing party bears
the burden of establishing that the federal court's
original jurisdiction exists and that the case is properly
removable. *Wilson v. Republic Iron & Steel Co.,* 257
U.S. 92, 97 (1921); *Carpenter v. Wichita Falls Indep.
Sch. Dist.,* 44 F.3d 362, 365 (5th Cir.1995). Doubts
about the propriety of removal are to be resolved in
favor of remand. *Acuna v. Brown & Root, Inc.,* 200
F.3d 335, 339 (5th Cir.2000); *Shamrock Oil & Gas
Corp. v. Sheets,* 313 U.S. 100, 108-09 (1941).

A party claiming improper joinder must establish
either (1) actual fraud in the pleadings of jurisdictional
facts or (2) the inability of the plaintiff to establish a
cause of action against the non-diverse party under
state law.*Travis v. Irby,* 326 F.3d 644, 647 (5th
Cir.2003). When assessing alleged improper joinder
under the second scenario, the Court must decide
whether the complaint sets forth a cause of action
against the non-diverse defendant such that there
exists a reasonable possibility of recovery under state
law. *Id.* at 648.The Fifth Circuit has noted a similarity
between the test for fraudulent joinder under the
second scenario and the test for assessing the
sufficiency of a pleading under a Rule 12(b)(6) motion
for failure to state a claim. *Id.* The Fifth Circuit has
also indicated that a court considering whether a
defendant is properly joined may "pierce the
pleadings" and consider summary judgment-type
evidence in the record to establish whether there exists
a reasonable possibility of recovery. *Id.* at 649.When

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 2546494 (E.D.Tex.)

considering this type of evidence, however, the court must view all unchallenged factual allegations in the light most favorable to the plaintiff and should resolve any ambiguities or contested issues of fact in favor of the plaintiff. *Id.* The Fifth Circuit has also noted that "[t]he burden of persuasion on those who claim fraudulent joinder is a heavy one."*Id.*

### III. Analysis

**\*2** Defendant Schering-Plough asserts that removal is proper in this case because Plaintiffs' claim against Brookshire Brothers, the only non-diverse defendant, is barred by *Texas Civil Practice and Remedy Code §* 82.003. Under § 82.003, a non-manufacturing seller of a product is not liable for harm caused by that product *unless* the claimant can prove any one of several enumerated exceptions. TEX. CIV. PRAC. & REM.CODE ANN. § 82.003 (Vernon's 2005). One exception contained in § 82.003(a)(6) provides that a non-manufacturing seller may be liable when a claimant proves that "(A) the seller *actually knew* of a defect to the product at the time the seller supplied the product; and (B) the claimant's harm resulted from the defect."*Id.* (emphasis added).

Schering-Plough admits that the Plaintiffs' complaint properly alleges that Brookshire Brothers knew of the alleged defect in the adhesives when it sold them to the decedent and that the decedent's harm was caused by the defect. Schering-Plough contends, however, that this is a case where the Court should "pierce the pleadings" to consider evidence that precludes the Plaintiffs' ability to establish Brookshire Brothers' liability, and it asks the Court to consider evidence in the form of an affidavit executed by Robert Gilmer, Brookshire Brothers's Vice President for Human Resources/Risk Management. In his affidavit, Mr. Gilmer testifies that Brookshire Brothers "had absolutely no knowledge that these products might contain benzene or had the alleged potential to cause cancer."(Def.'s Resp. Ex. A at 2.) Schering-Plough argues that because this undisputed evidence establishes that the Brookshire Brothers defendants did not have actual knowledge of any defect in the dental adhesives, there is no reasonable basis for imposing liability on Brookshire Brothers.

A corporation's liability often depends on the actions or knowledge of "agents of some character" or "vice principals," including that of (a) corporate officers; (b)

those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business.*Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997) (citing *Fort Worth Elevators Co. v. Russell,* 70 S.W.2d 397, 406 (Tex.1934)). Mr. Gilmer's affidavit indicates that Brookshire Brothers "had no information whatsoever which suggested that these products might contain benzene or had the alleged potential to cause cancer until the heirs of Velma Church served Brookshire Brothers, Ltd. with this lawsuit," and Mr. Gilmer asserts that his statement is based on his own personal knowledge and his review of the records. (Gilmer Aff. at 2). Mr. Gilmer indicates that he has been employed in his current position at Brookshire Brothers for only five years, however, while the dental adhesives in question were sold prior to and during the period of their 1990-91 recall. Mr. Gilmer's statement, therefore, does not preclude the possibility that other vice principals or predecessors may have had knowledge sufficient to establish Brookshire Brothers's liability under Texas law.

**\*3** Furthermore, the Plaintiffs' Reply identifies certain documents obtained from the Food and Drug Administration that relate to a manufacturers' recall of the subject dental adhesives and detail when manufacturers notified direct wholesalers and retailers that the adhesives contained benzene. (*See* Pl.'s Reply Ex. 1.) The Plaintiffs' information shows that some retailers continued to offer the subject products for sale several months after the recall notice. This information confirms an ambiguity as to whether Brookshire Brothers sold the subject products after the date of the recall notice.

Because Brookshire Brothers acknowledges that Brookshire Brothers may have sold the subject products, and because Mr. Gilmer's testimony alone is not sufficient to establish that Brookshire Brothers had no knowledge that the products might contain benzene, the Court finds that an ambiguity or contested issue of fact exists as to Brookshire Brothers's knowledge and that Scherring-Plough has not met the heavy burden required to support removal on the basis of improper joinder. *See Travis,* 326 F.3d at 649.

### IV. Conclusion

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 2546494 (E.D.Tex.)

Because ambiguities and contested issues of fact must be resolved in the Plaintiffs' favor, the Court finds that there exists a reasonable possibility of recovery against Brookshire Borthers Ltd. and Brookshire Brothers Pharmacy, that this court lacks subject matter jurisdiction over this cause, and that this case should be remanded to the 4th Judicial District Court of Rusk County, Texas. It is therefore

**ORDERED** that the above-entitled and numbered civil action is hereby REMANDED to the 4th Judicial District Court of Ruck County, Texas. It is further

**ORDERED** that the above-entitled and numbered civil action is hereby CLOSED.

**It is so ORDERED.**

E.D.Tex.,2006.
Goss v. Schering-Plough Corp.
Slip Copy, 2006 WL 2546494 (E.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 2626366 (C.D.Ill.)

Grove v. Manchester Tank & Equipment Co.
C.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,C.D. Illinois.
Jeremy GROVE and Amanda Grove, Plaintiffs,
v.
MANCHESTER TANK & EQUIPMENT CO. and
K.A. Berquist, Inc., Defendants,
Manchester Tank & Equipment Co., Third Party
Plaintiff,
v.
Hicksgas-Pekin Inc., Third Party Defendant.
Bradley D. Clark and Michelle Clark, Plaintiffs
v.
Manchester Tank & Equipment Co. and K.A. Berquist,
Inc., Defendants,
Larry K. Smith, Jr. and Melissa Smith, Plaintiffs
v.
Manchester Tank & Equipment Co. and K.A. Berquist,
Inc., Defendants.
Nos. 07-1263, 07-1268, 07-1280.

June 26, 2008.

Christopher R. Doscotch, Joseph W. Dunn, Ralph D.
Davis, Peoria, IL, for Plaintiffs.
Raymond Lyons, Jr., Williams Montgomery & John
Ltd., Chicago, IL, David E. Jones, Hinshaw &
Culbertson, John P. Nicoara, Nicoara & Steagall,
Peoria, IL, for Defendants.

### ORDER

MICHAEL M. MIHM, District Judge.
*1 Before the Court is Defendant K.A. Berquist, Inc.'s
Motion for Judgment on the Pleadings pursuant to
FRCP 12(c). For the reasons set forth below, the
Motion for Judgment on the Pleadings [Case No.
07-1263 # 13], the Motion for Judgment on the
Pleadings [Case No. 07-1268 # 16], and the Motion
for Judgment on the Pleadings [Case No. 07-1280 #
17] are DENIED.

### BACKGROUND

On August 25, 2005, Plaintiffs Jeremy Grove, Bradley
D. Clark, and Larry K. Smith, Jr. were injured by an
explosion and fire that occurred at facilities operated
by Pekin Hicksgas, Inc. ("Hicksgas"). Plaintiffs allege
that the explosion resulted from a leaking cylinder
tank that was manufactured by Defendant Manchester
Tank & Equipment Co. ("Manchester") and sold by
Defendant K.A. Berquist ("KAB") to Hicksgas.

On August 23, 2007, Plaintiffs Jeremy and Amanda
Grove filed a Complaint in the Circuit Court of the
Tenth Judicial Circuit, Tazewell County, Illinois
against Defendant Manchester Tank & Equipment Co.
for personal injuries and loss of consortium. Plaintiffs
Larry K. Smith, Jr. and Melissa Smith as well as
Bradley D. Clark and Michelle L. Clark filed similar
complaints. The cases were removed to this Court
pursuant to 28 U.S.C. § 1441 because diversity
jurisdiction exists. These three separate cases have
been consolidated for discovery purposes.

KAB moved for judgment on the pleadings, citing its
compliance with 735 ILCS 5/2-621. KAB denies
control over the design or manufacture of any
Manchester tanks and certifies Manchester as the
manufacturer of all tanks that KAB sold to Hicksgas.
The motion is fully briefed, and this Order follows.

### DISCUSSION

A motion for judgment on the pleadings should be
granted when the moving party establishes that there
is no material issue of fact left to be resolved and that
he or she is entitled to judgment as a matter of law.
Nat'l Fidelity Life Ins. Co. v. Karaganis, 811 F .2d 357,
358 (7th Cir.1987); Flora v. Home Fed. Sav. & Loan
Ass'n, 685 F.2d 209, 211 (7th Cir.1982). In
considering the motion, the Court must consider the
pleadings, view the facts in the light most favorable to
the nonmoving party, and assume as truthful the facts
alleged by the nonmoving party. Nat'l Fidelity, 811
F .2d at 358.

Section 2-621 of the Illinois Code of Civil Procedure
is a "seller's exception" that allows nonmanufacturing
defendants to escape liability for injuries caused by a
defective product. Sims v. Teepak, Inc., 143 Ill.App.3d
865, 868 (4th Dist.1986). Under 735 ILCS 5/2-621(a),
a nonmanufacturing defendant shall "upon answering

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 2626366 (C.D.Ill.)

or otherwise pleading file an affidavit certifying the correct identity of the manufacturer."After the plaintiff has filed a complaint against the manufacturer, and the manufacturer has or is required to answer or otherwise plead, "the court shall order a dismissal of a product liability action ... against the certifying defendant or defendants, provided the certifying defendant or defendants are not within the categories set forth in subsection (c) of this Section."735 ILCS 5/2-621(b). Subsection (c) sets out exceptions for dismissal of a nonmanufacturing defendant where the plaintiff can show that the defendant "exercised some significant control over the design or manufacture of the product,""provided instructions or warnings to the manufacturer relative to the alleged defect,""had actual knowledge of the defect," or "created the defect." 735 ILCS 5/2-621(c)(1)-(3). Absent a showing by the plaintiffs of any of these exceptions, a defendant who certifies the correct manufacturer may be dismissed from the action. *Logan v. West Coast Cycle Supply Co.,* 197 Ill.App.3d 185, 191 (2d Dist.1990). The burden lies with the plaintiff to show that the certifying defendant fits into one of the subsection (c) categories. *Id.*

**\*2** Viewing the complaint in the light most favorable to the plaintiffs, it is unclear without further discovery whether plaintiffs could show that KAB satisfies one of the exceptions to dismissal. Because that material issue of fact remains to be resolved in this case, a judgment on the pleadings is inappropriate.

### CONCLUSION

For the reasons set forth herein, the Motion for Judgment on the Pleadings [Case No. 07-1263 # 13], the Motion for Judgment on the Pleadings [Case No. 07-1268 # 16], and the Motion for Judgment on the Pleadings [Case No. 07-1280 # 17] are DENIED. This matter is referred to Magistrate Judge Gorman for further proceedings.

C.D.Ill.,2008.
Grove v. Manchester Tank &amp; Equipment Co.
Not Reported in F.Supp.2d, 2008 WL 2626366 (C.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 2940811 (N.D.Ill.)

CHeisner ex rel. Heisner v. Genzyme Corp.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Elmer HEISNER, individually and on behalf of Jayne
HEISNER, Plaintiff,
v.
GENZYME CORPORATION, a Massachusetts
corporation, Defendant.
No. 08-C-593.

July 25, 2008.

Kurt D. Hyzy, The Law Group, Ltd., Chicago, IL, for
Plaintiff.
Stephanie Ann Scharf, David W. Austin, Schoeman
Updike Kaufman & Scharf, Chicago, IL, for
Defendant.

### MEMORANDUM OPINION AND ORDER

DAVID H. COAR, District Judge.
*1 Plaintiff Elmer Heisner ("Plaintiff" or "Heisner")
brought this action against Defendant Genzyme
Corporation ("Genzyme" or "Defendant") for
violations of state law surrounding the death of his
wife, Jayne Heisner ("Decedent"). Now before this
Court is Defendant's motion to dismiss pursuant to
Federal Rule of Civil Procedure 12(b)(6) (Docket No.
8). For the reasons stated below, Defendant's motion is
GRANTED.

### 1. FACTS[FN1]

> FN1. These facts are derived from Plaintiffs'
> complaint and, for the purposes of this
> motion, are assumed to be true. See Davis
> Companies v. Emerald Casino, Inc., 268
> F.3d 477, 479 (7th Cir.2001).

As an initial matter, Defendant requests that this Court
take judicial notice of the fact that "Seprafilm is a
Class III device approved through the PMA
[premarket approval] process."(Def.'s Reply at 2-4.)
The Complaint references Seprafilm's approval by the
FDA on December 20, 2000, but does not make clear

what approval process or category was applied to the
device.

It is certainly possible to "take judicial notice of
matters of public record without converting the
12(b)(6) motion into a motion for summary
judgment."Anderson v. Simon, 217 F.3d 472, 474-75
(7th Cir.2000) (citing Henson v. CSC Credit Servs., 29
F.3d 280, 284 (7th Cir.1994)). However, this can be
done only where "an undisputed fact in the public
record establishes that the plaintiff cannot satisfy the
12(b)(6) standard."Gen. Elec. Capital Corp. v. Lease
Resolution Corp., 128 F.3d 1074, 1081 (7th Cir.1997).

Plaintiff argues against taking judicial notice of facts
surrounding the FDA's approval, stating that
"disputable findings exist concerning the Defendant's
compliance with the FDA's Medical Device
Amendments (MDA) and Premarket approval process
in the manufacturing of their product,
Seprafilm."(Pl.'s Resp. at 3.) However, this does not
contradict the putative fact in question, which is only
that the FDA approved Seprafilm as a Class III device
pursuant to the PMA process. Whether that process
was properly followed by the FDA, or whether
Defendant fulfilled its obligations over the course of
that process, are disputed issues that cannot be
resolved at this early stage. However, neither of these
questions contradict the clear, undisputed, and
publicly available fact put forward by Defendant; that
the FDA approved Seprafilm as a Class III device. As
a matter of law, this approval is granted only upon
completion of the PMA process. See21 U.S.C. §
360c(a)(1)(C). Therefore, this Court takes judicial
notice of the fact that "Seprafilm is a Class III device
approved by the FDA pursuant to the PMA process,"
and leaves open any additional questions regarding the
adequacy of that process as applied in this case.

Plaintiff's wife underwent surgery to remove an
ovarian cyst on January 19, 2006. A Seprafilm
adhesion barrier manufactured and sold by the
Defendant was inserted into her body to prevent
post-surgical adhesions from forming between her
internal organs and tissue. Plaintiff alleges that Jayne
Heisner died on February 22, 2006 as a proximate
result of the insertion of Seprafilm into her body.
(Compl.¶ 2.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2940811 (N.D.Ill.)

**\*2** Plaintiff's Complaint contains seven counts, generally alleging that Genzyme was negligent in the design, manufacture, and labeling of Seprafilm and that Seprafilm was not fit for its intended use. Defendant has moved to dismiss all seven counts of the Complaint. In his Response to the Defendant's Motion to Dismiss, Plaintiff has asked this Court to dismiss without prejudice Count II, which claimed a failure to disclose under Massachusetts General Law Ch. 93A § 2(a). (Pl.'s Resp. to Def.'s Mot. to Dismiss 14-15.) Dismissal of Count II is GRANTED without prejudice. The remaining counts are:

I. Breach of Implied Warranty of Merchantability under Massachusetts General Law § 2-314.

III. Strict Liability under Illinois tort law, as product was unreasonably dangerous for normal use.

IV. Negligence under Illinois tort law in testing, inspection, design, manufacture, warning, and/or labeling.

V. Negligence *per se* under Illinois tort law due to adulteration and/or misbranding in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, the Sherman Food, Drug and Cosmetic Law, and "other applicable laws, statutes, and regulations," including standards for care and labeling set by 21 C .F.R. §§ 201.56 and 201.57.

VI. Breach of Express Warranty under Illinois tort law

VII. Breach of Implied Warranty under Illinois tort law

## 2. STANDARD OF REVIEW FOR MOTION TO DISMISS

When considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), courts take the allegations in the complaint as true, drawing all possible inferences in favor of the plaintiff.*Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir.2007).

To state a claim under federal pleading standards, a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief," sufficient to provide the defendant with "fair notice" of the claim and its basis. Fed.R.Civ.P. 8(a)(2); *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). In *Twombly,* however, the Supreme Court seemingly raised the level of factual development required to state a claim, requiring a complaint to contain more than "labels and conclusions," *id.* at 1964-65, and "enough facts to state a claim to relief that is plausible on its face,"*id.* at 1974.

The Seventh Circuit has emphasized that *Twombly*"did not ... supplant the basic notice pleading standard."*Tamayo v. Blagojevich,* No. 07-2975, 2008 WL 2168638, at \*8 (7th Cir. May 27, 2008). The essential requirement of a complaint remains, that it "give the defendant sufficient notice to enable him to begin to investigate and prepare a defense."*Id.* But after *Twombly,* the Seventh Circuit has also recognized that "the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."*Airborne Beepers & Video, Inc. v. AT & T Mobility, L.L.C.,* 499 F.3d 663, 667 (7th Cir.2007); *Killingsworth,* 507 F.3d at 619.

## 3. ANALYSIS

**\*3** Defendant has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) that advances several arguments for judgment as a matter of law, including: (1) federal preemption of state law claims pursuant to § 360k (seeking dismissal of all counts); (2) failure to state a claim for negligence per se (Count V); (3) failure to identify an express warranty (Count VI); (4) lack of duty to warn (all counts); (5) improper use of conclusions rather than facts (all counts); and (6) terminal failure to satisfy requirements of the Illinois Wrongful Death Act (multiple counts).

### a. Preemption

### i. Law of the FDCA

The primary issue now before this Court is whether any of Plaintiff's claims are preempted under the Medical Device Amendments (MDA) to the federal Food, Drug, and Cosmetic Act (FDCA).21 U.S.C. § 360c et seq. The MDA established a regulatory

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2940811 (N.D.Ill.)

structure pursuant to which the Food and Drug Administration (FDA) regulates medical devices. Under the MDA, devices are categorized into three classes, based on the level of risk that they pose. Devices used "in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" are classified as Class III devices.*Id.* § 360c(a)(1)(C). A Class III device is required to undergo a premarket approval (PMA) process "to provide reasonable assurance of its safety and effectiveness" before being marketed. *Id.* During the PMA process, manufacturers must submit detailed information regarding the safety and efficacy of their devices, which the FDA thoroughly reviews. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 477, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). The FDA must approve the product's design, testing, intended use, manufacturing methods, performance standards, and labeling. *Mitchell v. Collagen Corp.,* 126 F.3d 902, 913 (7th Cir.1997). The device in question in this case, Seprafilm, received PMA as a Class III device on December 29, 2000. (*See* Compl. ¶ 12; discussion *supra* p. 1.)

The MDA contains a preemption clause meant to displace state regulations that conflict with requirements imposed by the FDA. The clause states that:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement

> > (1) which is different from, or in addition to, any requirement applicable under this chapter to this device, and

> > (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The initial interpretive questions raised by the preemption clause involve the meaning of the word "requirement": (1) whether the federal process or action constitutes a "requirement" imposed by the FDA; and (2) whether state statutes and state tort law impose different and additional "requirements" on manufacturers. If the FDA and state statutory and tort duties both constitute "requirements," then § 360k may dictate that the state

requirements be preempted by those imposed by the FDA. *Lohr,* 518 U.S. at 477. If the state requirement creates obligations that are "different from, or in addition to" the relevant federal requirements, then § 360k necessitates preemption. *McMullen v. Medtronic, Inc.,* 421 F.3d 482, 488 (7th Cir.2005). However, tension between FDA requirements and those created by state law is avoided where the state requirements parallel the federal ones.*Riegel,* 128 S.Ct. at 1011 (declining to address, in the first instance, whether plaintiffs' claims were "parallel" to federal requirements); *Lohr,* 518 U.S. at 496-497 (holding that state requirements that are "substantially identical to" those imposed by the MDA are not preempted).

**\*4** The Supreme Court recently applied the preemption analysis to the PMA process in *Riegel v. Medtronic,* holding that the specific approval of a device's design and implementation amounts to the imposition of federal requirements, and that both state statutes and state tort duties may be requirements within the meaning of § 360k(a).--- U.S. ----, ---- - ----, 128 S.Ct. 999, 1007-8, 169 L.Ed.2d 892 (2008).*Riegel* involved a number of New York statutory and tort law claims brought against the manufacturer of a balloon catheter that had received PMA. Given the potentially conflicting requirements of the state laws and the PMA process, the Court held that the latter preempted the plaintiff's claims of implied warranty of merchantability, strict liability, and negligence. *Id.* at 1008-9.

*ii. Party positions*

Defendant argues that all six of the remaining counts of the Complaint are preempted pursuant to § 360k(a). (Def.'s Dismiss Mem. at 4-7.) In response, Plaintiff attempts to find loopholes in the holding of *Riegel.*(*See* Pl.'s Resp. to Def.'s Mot. to Dismiss 4-8.) Plaintiff first notes that manufacturers are required to inform the FDA, under 21 U.S.C. § 360(i), of any new clinical studies or of incidents of death or serious injury related to medical devices that have received PMA. (*Id.* at 5-6.)Plaintiff seems to suggest that, because Genzyme may have failed to meet these reporting requirements, this Court should not accept Genzyme's contention that Seprafilm is an approved Class III device that has met the requirements of the MDA.

Plaintiff also contends that his claims "parallel" the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PMA requirements and Good Manufacturing Practice requirements that specify regulations in regard to the manufacturing, design, packaging, labeling, marketing and distribution of medical devices. 21 U.S.C. §§ 360(e, j, contract); 21 C.F.R. § 820.1. Therefore, Plaintiff argues, his claims should not be preempted for imposing different or additional requirements. (Pl.'s Resp. to Def.'s Mot. to Dismiss 6-8.)

*iii. Discussion*

Defendant overstates the holding of *Riegel* in arguing that it settles all questions of preemption in this case. It is true that Plaintiff's claims in this case are similar to those that were found, in *Riegel*, to constitute different and additional requirements. The plaintiffs in *Riegel* alleged that a <u>balloon catheter</u>"was designed, labeled, and manufactured in a manner that violated New York common law." 128 S.Ct. at 1001. They made claims of strict liability, breach of implied warranty, and negligence in the design, testing, inspection, distribution, labeling, marketing, and sale of the catheter. *Id.* In the instant case, Plaintiff similarly alleges that Seprafilm was negligently designed, manufactured, and labeled. (Compl.¶¶ 20, 34, 39.) Like the plaintiffs in *Riegel*, he makes claims of strict liability, breach of implied warranty, and negligence. (*Id.* ¶¶ 20, 34, 39.)However, the *Riegel* court expressly declined to address the question of whether the claims were sufficiently "parallel" as to avoid preemption, because the plaintiff had failed to raise this issue before the court of appeals or in their petition for certiorari. 128 S.Ct. at 1011. In addition, *Riegel* does not delve into the compatibility of FDCA preemption and state law claims based on the post-approval reporting requirements of 21 U.S.C. § 360i.

**\*5** Here, there is at least some possibility that Seprafilm's failure might be attributed to Defendant's negligence in a way that does not conflict with the FDA's requirements. *See, e.g., Mitchell,* 126 F.3d at 907 ("[T]o the extent that the Mitchells' claims for mislabeling, misbranding and adulteration alleged that Collagen had not followed the FDA requirements, the claims were not preempted because, in permitting a cause of action for non-conformity with federal requirements, state law did not impose a requirement 'different from, or in addition to,' the federal requirements.") (summarizing a previous ruling);

*Riegel,* 128 S.Ct. at 1001. As Defendant acknowledges, to the extent that Plaintiff's allegations are concerned not with the nature of Seprafilm as approved by the FDA, but rather with Defendant's action or inaction in its efforts to take part in the PMA process or implement its results, he may be able to satisfy the parallel exception to preemption. (*See* Def.'s Reply at 5 ("An exception [to preemption] is when claims are premised on violations of the federal requirements embodied in the PMA process specific to the challenged device.") (citing *Riegel,* 128 S.Ct. at 1011).)

Whatever merit there may be to Plaintiff's argument regarding parallel requirements, however, the Complaint cannot be saved as it is now formulated. This Court cannot possibly determine whether Plaintiff's claims are based on requirements that are "substantially identical" to those of the FDA without a more precise statement of his claims. *See Lohr,* 518 U.S. at 496-497. As currently pled, each and every count brought by Plaintiff relies either directly or indirectly on the existence of a "defect" in Seprafilm. (*See* Compl. ¶¶ 19-20, 34, 39, 46, 50, 55.) However, if the referenced defect was in fact intrinsic to the product as approved in the PMA, then it is likely if not certain that any finding of liability based on that defect would place additional and/or different burdens on Defendant's product, necessitating preemption pursuant to *Lohr* and § 360k. *See McMullen,* 421 F.3d at 489 (finding that state and federal requirements are not equivalent if a manufacturer could be held liable under state law while complying with federal requirements). Out of practical necessity and the cold calculus of nationwide regulation, the FDA may be aware of a certain failure rate associated with a medical product and yet approve it. A single instance of such failure, while tragic, does not necessarily amount to a "defect" for purposes of establishing liability that survives preemption. *See Mitchell,* 126 F.3d at 913-15 (upholding summary judgment against plaintiff due to the fact that any judgment premised on product failure which nonetheless complied with the PMA "would necessarily conflict with the determination of the FDA that its requirements rendered the product safe and effective").

Similarly, it may be premature to conclude that Plaintiff cannot succeed in establishing Defendant's liability by means of the reporting requirements created by the FDCA. Though not entirely clear,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2940811 (N.D.Ill.)

Plaintiff seems to suggest that some portion of his claims should survive on a distinct basis by way of these requirements. Plaintiff is correct that after receiving PMA, Class III devices are subject to annual reporting requirements. 21 U.S.C. § 360i. These "post-approval reports" must identify all changes made to the device, 21 C.F.R. § 814.84(b)(1), and summarize unpublished data from any clinical investigations or laboratory studies or reports in scientific literature involving the device "that reasonably should be known to the applicant," id. § 814.84(b)(2)(i-ii). A manufacturer must also report to the FDA any problems in labeling, malfunctions of devices, and incidents in which a device may have caused death or serious injury. Id. § 803.50. At this stage it cannot be said that any liability for failing to meet these requirements is precluded. Nonetheless, Plaintiff's vague suggestion that Defendant violated these reporting requirements does not help Plaintiff avoid dismissal of his claims; Plaintiff has not alleged anything in his Complaint that would put Defendant on notice that the basis of Plaintiff's claim was Genzyme's failure to meet the FDA's reporting requirements. See Fed.R.Civ.P. 8(a)(2); Twombly, 127 S.Ct. at 1964.

*6 The burden is on Defendant to show "a conflict between the state and federal regulations of the medical devices which threatens to interfere with a specific federal interest." Mitchell, 126 F.3d at 913 (quoting Hernandez v. Coopervision, Inc., 691 So.2d 641 (Fla.Dist.Ct.App.1997)). However, Defendant cannot adequately argue this defense where the Complaint fails to provide the proper level of specificity in its claims. Brokaw v. Mercer County, 235 F.3d 1000, 1014 (7th Cir.2000) ("while the federal rules of notice pleading do not require the plaintiff to allege all of the relevant facts, '[f]or fair notice to be given, a complaint must at least include the operative facts upon which a plaintiff bases his claim.'") (quoted cite omitted). To the extent that Plaintiff may eventually succeed in a claim that rests outside those that are preempted by § 360k, it is unclear from the Complaint as it now stands how such a claim would appear. It is not the responsibility of this Court to restructure Plaintiff's suit so that it alleges claims with some potential for success under the FDCA. See James Cape & Sons Co. v. PCC Const. Co., 453 F.3d 396 (7th Cir.2006) ("District judges are not mind readers, and should not be required to explain to parties whether or how their complaints could be drafted to survive a motion to dismiss."). At

this stage, we find only that every aspect of the Complaint in its current form is either preempted pursuant to § 360k, or lacks sufficient clarity to place Defendant on notice of the claims levied against it. Plaintiff has therefore failed to state a claim upon which relief can be granted, and the Complaint must be dismissed in its entirety. Fed.R.Civ.P. 12(b)(6).

Plaintiff has requested the opportunity to amend his complaint in light of some of the issues addressed in the motion to dismiss filings. It is clear that the defense of preemption has highlighted a lack of clarity in the structure of several of Plaintiff's claims that may be redeemable through amendment. At the very least, Plaintiff must provide some allegations regarding the nature of the alleged Seprafilm defect as it relates to the FDA approval process. In the interest of justice, Plaintiff will therefore be permitted the opportunity to amend those counts of the Complaint whose failings have only been made clear as a result of the defense of preemption. See Fed.R.Civ.P. 15. Therefore, Counts I, III, IV, and VII-related to implied warranties, strict liability, or negligence-are DISMISSED. The remaining Counts V and VI suffer from additional failings that warrant additional discussion.

### b. *Negligence per se Claim*

Count V of Plaintiff's Complaint alleges that Defendant has violated a statute establishing a standard of care, making Defendant negligent *per se.*(Compl.¶¶ 43, 45, 46.) Under Illinois law, the violation of a statute intended to protect human life or property may establish a prima facie case of negligence. Kalata v. Anheuser-Busch Cos., 144 Ill.2d 425, 434, 163 Ill.Dec. 502, 581 N.E.2d 656 (1991). To prevail on a claim of negligence based on the violation of a statute, a plaintiff must establish that (1) he was a member of the class of persons the statute was designed to protect, (2) his was the type of injury the statute was intended to protect against, and (3) the defendant's violation of the statute was the proximate cause of his injury. Id.

*7 Plaintiff alleges that Defendant violated the standards of care for labeling and provision of information set by 21 C.F.R. §§ 201.56 and 201.57 and that Defendant violated §§ 301 and 331 of the FDCA. (Compl. ¶¶ 43-46.) Plaintiff also alleges that he, "as a purchaser and consumer of Seprafilm, is within the class of persons the statutes and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

regulations ... are designed to protect and [his] injury is of the type of harm these statutes are designed to prevent."(*Id.* at ¶ 44, 163 Ill.Dec. 502, 581 N.E.2d 656.) Plaintiff further alleges that his injuries resulted from the violation of the statutes. (*Id.* at ¶ 47, 163 Ill.Dec. 502, 581 N.E.2d 656.)

In response to the Complaint, Defendant contends that the regulations in 21 C.F.R. §§ 201.56 and 201.57 do not apply to medical devices such as Seprafilm. (Def.'s Memo. in Supp. of Mot. to Dismiss 7.) Defendant is correct that these regulations apply to "human prescription drug and biological products," not medical devices. 21 C.F.R. §§ 201.56; 201.57. The statutory regulations for Class III medical devices are defined in § 360 of the FDCA, as Plaintiff now acknowledges. (Pl.'s Resp. to Def.'s Mot. to Dismiss 10-11.) So far as Plaintiff alleges that Defendant has violated 21 C.F.R. §§ 201.56 and 201.57, Count V of Plaintiff's Complaint must be dismissed for failing to place Defendant on notice of the underlying standard of care, an essential element of a negligence *per se* claim. *See Kalata*, 144 Ill.2d at 434, 163 Ill.Dec. 502, 581 N.E.2d 656.

Plaintiff argues in his Response that, because he also alleged that Defendant violated §§ 301 *et seq* and 331, he has pleaded the applicable statutory regulations for medical devices. (*Id.* at 9-10, 163 Ill.Dec. 502, 581 N.E.2d 656.) Plaintiff suggests that he could amend his Complaint to more specifically allege that Defendant violated the regulations for medical device warnings in 21 C.F.R. 801.1 and 801.6 and the requirements for PMA laid out in 21 U.S.C. § 360(e).(*Id.* at 10, 163 Ill.Dec. 502, 581 N.E.2d 656 .) Such amendment may save this count of Plaintiff's Complaint, but must refer specifically to one or more federal requirements to place Defendant on proper notice of the negligence *per se* claim; if Plaintiff merely reiterates FDCA duties within the context of the PMA, its post-approval implementation, or general reporting requirements, the amended Count V will simply duplicate the claims of Count IV, brought on the basis of overall negligence, and will likely be stricken. *See* Fed.R.Civ.P. 12(f) (enabling a court to strike from a pleading any redundant matter). Therefore, Count V is DISMISSED.

c. *Breach of Express Warranty*

Count VI of Plaintiff's Complaint alleges that

Defendant has breached an express warranty made to Plaintiff, on which Plaintiff relied in using Seprafilm. (Compl.¶¶ 49-50.)

According to Section 2-313 of the UCC, express warranties are created by:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> **\*8** (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

810 ILCS 5/2-313(1)(a)-(c) (West 2006). An express warranty creates an obligation on the part of the seller to deliver goods that conform to the promise, description, or model offered by the seller. *Mydlach v. DaimlerChrysler Corp.*, 226 Ill.2d 307, 320, 314 Ill.Dec. 760, 875 N.E.2d 1047 (2007). The warranty is breached if the goods do not conform. *Id .* at 321, 314 Ill.Dec. 760, 875 N.E.2d 1047.[FN2]

> FN2. Illinois courts have not been consistent in interpreting the "basis of the bargain" language in § 2-313 to require proof that a plaintiff actually relied on the warranty. *Compare Hasek*, 319 Ill.App.3d at 538 ("The burden is on the seller to establish ... that the affirmations did not become part of the basis of the bargain.), *with Regopoulous v. Waukegan P'ship*, 240 Ill.App.3d 668, 674, 181 Ill.Dec. 384, 608 N.E.2d 457 (1992) (requiring purchaser to prove he "actually relied on the warranty"). In this case, however, the issue is irrelevant because Plaintiff alleges that he relied on the warranty.

Under an express warranty, the language of the warranty itself dictates the obligations of the parties.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2940811 (N.D.Ill.)

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 379 F.Supp.2d 968, 983-84 (N.D.Ill.2005); *Hasek v. DaimlerChrysler Corp.,* 319 Ill.App.3d 780, 788, 253 Ill.Dec. 504, 745 N.E.2d 627 (2001). Express warranty claims are not preempted by § 360k, as they arise from representations made by parties as the basis of the bargain between them rather than requirements imposed under state law. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 525, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Were a court to hold that, under state law, a defendant had breached an express representation made to a plaintiff, such a holding would not interfere with the operation of the PMA process. *Mitchell, 126 F.3d at 915.*

Defendant contends, however, that Plaintiff's Complaint must be dismissed because it does not contain sufficient factual allegations about the nature of the express warranty to state a claim. (Def.'s Mem. in Supp. of Mot. to Dismiss 8-9.) Defendant is correct that Count VI of Plaintiff's Complaint essentially repeats the elements required to prevail on a claim for breach of express warranty-that a warranty forming part of the basis of the bargain between the parties was breached by the defendant. *See Hasek,* 253 Ill.Dec. 504, 745 N.E.2d at 634. Plaintiff alleges that "Genzyme expressly warranted to Plaintiff by and through statements made ... orally and in publications, package inserts, and other written materials ... that Seprafilm was safe, effective, fit and proper for its intended use."(Compl.¶ 49.) Plaintiff then alleges that he relied on the warranty in using the device and that the warranty was false.(*Id.* at ¶ 50, 253 Ill.Dec. 504, 745 N.E.2d 627.)

The Seventh Circuit has not addressed what is required to state a claim based on breach of express warranty. Even before *Twombly,* however, some courts required that plaintiffs at least mention the particular promise or description that allegedly gave rise to an express warranty. For example, in *Johnson v. Brown & Williamson Tobacco Corp.,* a complaint was insufficient when it stated only that the defendant extended an express warranty through its "advertising, marketing and other efforts." 122 F.Supp.2d 194, 206 (D.Mass.2000). Plaintiff has not pointed this Court to any case suggesting that its allegation that Defendant made "statements ... orally and in publications" is sufficient to state a claim for breach of express warranty. The single case Plaintiff's Response cites in defense of Count VI of his Complaint, *Gelormino v.*

*J.C. Penney Co., Inc.,* actually states that "[s]ince J.C. Penney's allegation of a breach of an express warranty is not supported by any facts, such a mere conclusion of law is legally insufficient."No. CV 960067840, 1997 WL 297601, at *3 (Conn.Super.Ct. May 22, 1997). This unpublished case, moreover, is in no way binding on this Court and has only limited persuasive value.

*9 Post-*Twombly,* the federal pleading standard requires more than "a formulaic recitation of the elements of a cause of action."*Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). The Seventh Circuit has indicated that the factual content of a claim may be too "sketchy" to put a defendant on notice. *Killingsworth,* 507 F.3d at 619. In this case, Plaintiff has offered nothing more than a formulaic recitation of the elements required to prevail on a claim and has alleged no facts at all that suggest an express warranty existed. Plaintiff has not specified any particular affirmation, promise, description, or sample that formed part of the basis of his bargain with Defendant. He thus fails to put the Defendant on notice as to the substance of his claim. This seems to be precisely the type of claim that is too indefinite to meet the *Twombly* standard. Count VI of Plaintiff's Complaint is therefore DISMISSED.

## CONCLUSION

In any other instance, a claim of a purported defect related to negligence would likely place Defendant on sufficient notice as to survive dismissal. Within the context of § 360k of the FDCA, however, the word "defect" carries much less meaning, as any such "defect" falling within the scope of the PMA essentially carries no weight for purposes of showing liability under state law. Therefore, the ability of Plaintiff to adequately state a claim according to such allegations is limited, and at present it is not clear that any of his claims might survive those limitations.

During the pendency of a decision on the instant motion to dismiss, Plaintiff amended his complaint. (Docket No. 23.)However, Plaintiff's voluntary amendments as reflected in that document are relatively limited, consisting of: the exclusion of the strict liability count already withdrawn voluntarily; expansion of the general negligence claim to include Defendant's design and manufacture of Seprafilm, as well as its failure to adequately and properly warn

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2940811 (N.D.Ill.)

"Plaintiff's health care provider purchasing Seprafilm"; changes in the negligence *per se* count to shift its statutory basis; and removal of Count VI for breach of implied warranty. (*See generally id.*)Of these, the only significant change impacting this Court's rationale for granting dismissal involves the new basis for Plaintiff's claim of negligence *per se.*However, this claim is still dependent on the purported "defect" that this Court has already found to be lacking in clarity. In the interest of efficiency this Court will not ask the parties to re-argue a motion to dismiss on this one count before Plaintiff has had the opportunity to resolve the failings identified in this opinion. Therefore, the Amended Complaint does not save Plaintiff's claims, and it is similarly dismissed without prejudice.

For the reasons stated above, Defendant's motion to dismiss is GRANTED. Counts I, II, III, IV, V, VI, and VII of the Complaint are DISMISSED WITHOUT PREJUDICE. Plaintiff's Amended Complaint is also DISMISSED WITHOUT PREJUDICE. Plaintiff will be granted leave to amend his Complaint on or before August 18, 2008 in light of this Opinion.

N.D.Ill.,2008.
Heisner ex rel. Heisner v. Genzyme Corp.
Slip Copy, 2008 WL 2940811 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 3754823 (N.D.Ill.)

Page 1

**H**In re Sears, Roebuck & Co. Tools Marketing and
Sales Practices Litigation
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
In re SEARS, ROEBUCK & CO. TOOLS
MARKETING AND SALES PRACTICES
LITIGATION.
Charles Chatham et al., individually and on behalf of
all others similarly situated, Plaintiffs,
v.
Sears, Roebuck & Co., Defendant.
**Nos. 05 C 4742, 05 C 2623.**

Dec. 18, 2006.

Ben Barnow, Sharon Harris, Barnow & Associates,
P.C., Marvin Alan Miller, Jennifer Winter Sprengel,
Nyran Rose Pearson, Miller Faucher and Cafferty,
LLP, Aron David Robinson, Law Office of Aron D.
Robinson, James S. Shedden, Lawrence Wiley Schad,
Tony Kim, Schad, Diamond & Shedden, P.C.,
Michael S. Hilicki, Lawrence Walner & Associates,
Ltd., Chicago, IL, Barbara J. Hart, Kimberly I. Nelson,
Shelley Thompson, Goodkind, Labaton, Rudoff &
Sucharow, LLP, New York, NY, for Plaintiffs.
Francis A. Citera, John F. Gibbons, Paul Joseph Ferak,
Greenberg Traurig, LLP, Chicago, IL, for Defendant.

### MEMORANDUM OPINION

JOHN F. GRADY, United States District Judge.
*1 Before the court is defendant's motion to dismiss
plaintiffs' unjust enrichment claims brought pursuant
to Illinois law in Count IV of the Second Amended
Consoli Class Action Complaint filed in *Chatham v.
Sears, Roebuck & Co.,* 05 C 2623. For the reasons
explained below, the motion is granted.

### BACKGROUND

In this putative class action, plaintiffs, who are
citizens of several different states, claim that
defendant Sears, Roebuck & Company ("Sears")
deceptively advertised its proprietary line of
"Craftsman" tools as manufactured exclusively in the
United States ("Made in USA") when in fact many of
the tools are foreign-made or contain significant
foreign parts.

Plaintiffs' current complaint is titled "Second
Amended Consolidated Class Action Complaint."In
our Pretrial Order Number 6 of July 31, 2006, we
dismissed Counts I and II of the complaint (which
alleged violations of the Illinois Consumer Fraud and
Deceptive Business Practices Act and the Illinois
Deceptive Trade Practices Act) with prejudice as to all
plaintiffs except William Beanblossom and John S.
Bertrand. We dismissed Beanblossom and Bertrand's
claims without prejudice for failure to allege fraud
with particularity. (Since then, Bertrand voluntarily
dismissed his claims; thus, Beanblossom is the only
remaining Illinois plaintiff.) We also dismissed Count
VII, the Magnuson-Moss claim, with prejudice as to
all plaintiffs. And as to certain plaintiffs, we dismissed
Count III, which is alleged in the alternative to Counts
I and II and in which plaintiffs seek damages and/or
injunctive relief under the consumer fraud and
deceptive trade practices of all fifty states and the
District of Columbia.

Other claims asserted by plaintiffs are Count IV, an
unjust enrichment claim, and Count VI, a claim for
"equitable relief." [FN1] As to Count IV, we stated in our
previous order: "It appears to the court that the claim
most likely to involve an amount of money sufficient
to support federal diversity jurisdiction in this case,
either on an individual or a class basis, is plaintiffs'
claim for unjust enrichment .... Defendant believes
that there is no basis for the unjust enrichment claim,
and a briefing of the issues regarding Count IV will be
the next item of business in the litigation."(Pretrial
Order Number 6 at 5.) We gave Sears leave to file a
motion to dismiss Count IV and set a briefing schedule,
instructing the parties to focus on the issues of what
state's law applies to the unjust enrichment claims and
whether a nexus must exist between the injury
sustained by a plaintiff and the amount of recoverable
disgorgement of defendant's profits. The motion to
dismiss is now fully briefed.

FN1. The complaint does not contain a Count
V.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 3754823 (N.D.Ill.)

## DISCUSSION

### A. Choice of Law

Our first inquiry is the choice-of-law question-which state's (or states') law applies to plaintiffs' unjust enrichment claims. The parties do not agree on this issue. Even though plaintiffs are citizens of several different states, they all contend that Illinois law applies to their claims (evidently because they are seeking certification of a nationwide class).[FN2] Defendant, on the other hand, contends that the claims are governed by the laws of the various states where each plaintiff saw the advertising and purchased his or her tools.[FN3]

> FN2. In the alternative, plaintiffs contend that the unjust enrichment laws of their home states or the states where they purchased Craftsman tools apply. (Second Amended Consolidated Class Action Complaint ¶ 125.)

> FN3. We refer to these states for convenience as plaintiffs' "home states," even though at least one of the plaintiffs purchased some of her tools in a state where she does not reside.

Plaintiffs suggest that it is not necessary to engage in a choice-of-law analysis (implying that we should simply apply Illinois law) because the unjust enrichment laws of the fifty states are "substantially identical." (Pls.' Opp'n to Def.'s Mot. at 10.) We are unpersuaded. Plaintiffs attach an exhibit that purports to be a fifty-state survey of unjust enrichment. However, it is merely a list of one-sentence statements of the elements of unjust enrichment drawn from a single case from each state. Plaintiffs do not engage in any sort of analysis of the nuances of unjust enrichment law or what must actually be proved in each state. It is clear just from our review of Illinois law that unjust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone amongst the fifty states. As discussed in _Clay v. American Tobacco Co._, 188 F.R.D. 483, 501 (S.D.Ill.1999) (citations omitted): "[V]ariances exist in state common laws of

unjust enrichment. The actual definition of 'unjust enrichment' varies from state to state. Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud. Other states only allow a claim of unjust enrichment when no adequate legal remedy exists. Many states, but not all, permit an equitable defense of unclean hands. Those states that permit a defense of unclean hands vary significantly in the requirements necessary to establish the defense."

**\*2** The parties do agree that because Illinois is the forum state of this diversity case, we must consult the choice-of-law rules of Illinois to determine which state's substantive law applies. See _Klaxon Co. v. Stentor Elec. Mfg. Co._, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); _GATX Leasing Corp. v. National Union Fire Ins. Co._, 64 F.3d 1112, 1114 (7th Cir.1995). The Illinois Supreme Court uses the "most significant relationship" test for choosing the appropriate law in tort cases.[FN4] The Seventh Circuit has stated:

> FN4. We recognize that Count IV is an unjust enrichment claim, not a tort claim. It is, however, an unjust enrichment claim that sounds in tort; it is based on alleged wrongful conduct, fraud. Under Illinois law, there are three distinct prongs of unjust enrichment: (1) where a benefit should have been given to plaintiff, but a third party mistakenly gave it to defendant instead; (2) where the defendant procured the benefit through some type of wrongful conduct; and (3) where plaintiff had a better claim to the benefit than the defendant for some other reason. See _HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc._, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). Plaintiffs rely on the second prong. It makes more sense, therefore, to use tort terminology in the choice-of-law analysis.

The parties devote considerable attention to which section of the Restatement (Second) of Conflict of Laws has the greatest application to this case- § 6 or § 221-which is not worth belaboring.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Comment a to § 221 states explicitly that that section "applies to claims, which are based neither on contract nor on tort, to recover for unjust enrichment." Plaintiffs' claim is an unjust enrichment claim that is based on tort. Thus, § 221 does not apply. But in any event, its substance is largely the same as the tort choice-of-law analysis outlined *infra*. For example, one of the elements of the choice-of-law analysis set forth in § 221 is "the place where the act conferring the benefit or enrichment was done," which is the same as "the place of the injury." Under both analyses, we examine the domicile of the parties and the place where the relationship between the parties was centered. And as for § 6, which sets forth general principles of choice of law, we analyze the primary choice-of-law factors set forth in Illinois case law in the context of the underlying principles set forth in § 6.

The Illinois Supreme Court uses the "most significant relationship" test for choosing the appropriate law in tort cases. In practice, this means that "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." A court is to determine whether Illinois has the more significant relationship by examining the following factors: (1) the place of the injury, (2) the place where the injury-causing conduct occurred, (3) the domicile of the parties, and (4) the place where the relationship between the parties is centered. The Illinois courts also consider "the interests and public policies of potentially concerned states ... as they relate to the transaction in issue."
*Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503-04 (7th Cir.1998) (citing *Esser v. McIntyre*, 169 Ill.2d 292, 214 Ill.Dec. 693, 661 N.E.2d 1138, 1141 (Ill.1996) and *Jones v. State Farm Mut. Auto. Ins. Co.*, 289 Ill.App.3d 903, 224 Ill.Dec. 677, 682 N.E.2d 238, 249 (Ill.App.Ct.1997)).

The place of the injury here (or, in unjust enrichment terms, the place where plaintiffs allegedly "conferred" the benefit on defendant) is the plaintiffs' home states where they purchased Sears's tools. The place where the parties' relationship is centered is the plaintiffs' home states as well. Plaintiffs saw the allegedly misleading advertising in those states, and they

purchased the tools (which were located there) in those states as well. Plaintiffs contend that the relationship is centered in Illinois because plaintiffs purchased the tools "by virtue of" Sears's nationwide advertisements, which were conceived of and sent from Illinois. (Pls.' Opp'n to Def.'s Mot. at 10.) This characterization rings hollow. The relationship arose from plaintiffs' purchases of Craftsman tools, which occurred in plaintiffs' home states.[FN5] *Cf. First Wisconsin Trust Co. v. Schroud*, 916 F.2d 394, 399 (7th Cir.1990) (where unjust enrichment claim arose from the purchase of property in Indiana, relationship between the parties was centered in Indiana).

> FN5. As mentioned *supra* note 3, the only exception is plaintiff Janett Foster, who is a citizen of Indiana but purchased tools in both Indiana and Kentucky.

The "domicile of the parties" factor adds little to the mix; it is a wash. The plaintiffs are domiciled in their respective home states, and Sears, though not an Illinois corporation, is headquartered in Illinois. The last factor-the place where the injury-causing conduct occurred-seems to favor Illinois because that is where Sears is headquartered and where its advertising decision-making takes place.

*3 Thus, for the unjust enrichment claims, the parties and underlying occurrences have more significant contacts with plaintiffs' home states than with Illinois. The most important factors in this case are the place of injury and the center of the parties' relationship, and both of those factors point to the plaintiffs' home states. Plaintiffs argue that, considering underlying choice-of-law policies, Illinois has a interest in "controlling the acts" of its corporate citizens. This may be true, but the plaintiffs' home states also have an interest in regulating business conduct that takes place within their borders. In addition, those states also have an interest in preventing and remedying unjust enrichment that occurs at the expense of their citizens.

After considering all of the relevant factors and the underlying choice-of-law principles, we conclude that the laws of each of the plaintiffs' home states apply to their unjust enrichment claims.[FN6] Accordingly, the non-Illinois plaintiffs' unjust enrichment claims in Count IV that are brought "under the unjust enrichment laws of the state of Illinois" are dismissed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 3754823 (N.D.Ill.)

with prejudice. The unjust enrichment claims that are brought under the unjust enrichment laws of the non-Illinois plaintiffs' home states or the states where they purchased their Craftsman tools survive.

> FN6. Thus, we need not address defendant's argument that application of Illinois law to the unjust enrichment claims would violate the Commerce Clause of the United States Constitution and the interests of comity.

**B.  *Plaintiff Beanblossom's Unjust Enrichment Claim***

As noted *supra,* William Beanblossom is the only remaining Illinois plaintiff. Therefore, his unjust enrichment claim is the only one to which Illinois law applies. Sears moves to dismiss the claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

Sears maintains that Beanblossom's unjust enrichment claim fails because it is equitable in nature and plaintiff fails to allege that he has no adequate remedy at law. It is well settled that a party cannot seek equitable relief when he has an adequate legal remedy. *See, e.g., Crowley v. Golden Rule Ins. Co.,* 166 Ill.App.3d 199, 117 Ill.Dec. 24, 519 N.E.2d 1191, 1192 (Ill.App.Ct.1988). Unjust enrichment, however, is a legal claim. *See Partipilo v. Hallman,* 156 Ill.App.3d 806, 109 Ill.Dec. 387, 510 N.E.2d 8, 11 (Ill.App.Ct.1987); *Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc.,* 135 F.3d 526, 527-28 (7th Cir.1998). Its significant equitable aspects [FN7] have led to numerous confusing statements in case law that it is equitable in nature, but it is essentially an action at law. *Burns,* 135 F.3d at 528.

> FN7. These equitable aspects are not implicated here because plaintiff's claim is based in tort and monetary recovery is sought.

Sears asserts that Beanblossom "cannot state an unjust enrichment claim grounded in quasi-contract because there is a 'real' contract that governs his relationship with Sears."(Def.'s Mem. in Support of Mot. at 9.) This argument is neither here nor there because plaintiffs' unjust enrichment claims are obviously not grounded in quasi-contract. Rather, as discussed *supra* note 4, they are grounded in tort-fraud, to be specific.[FN8]

> FN8. Sears also contends in its reply brief that Beanblossom's claim is doomed by *Shaw v. Hyatt International Corp.,* 461 F.3d 899 (7th Cir.2006), in which the Court of Appeals held that the plaintiff's consumer fraud and unjust enrichment claims failed because what plaintiff called "deception" or "consumer fraud"-charging more than the agreed-upon price for a hotel room-was simply Hyatt's failure to fulfill its contractual obligations. 461 F.3d at 901-02. The Court stated that a "deceptive act or practice" involves more than the mere fact that a defendant promises to do something and then fails to do it. *Id.* at 901.
>
> *Shaw* is distinguishable from the facts of the instant case. Plaintiffs complain that Sears induced them to buy Craftsman tools by misrepresenting the country of origin of the tools, not simply that Sears made a false promise of future conduct.

Even if Beanblossom's claim is grounded in tort, Sears argues, it must be dismissed because he fails to state an independent claim for consumer fraud, common-law fraud, duress, or undue influence. Plaintiffs respond that they are not required to state a separate claim in order to state an unjust enrichment claim. Both plaintiffs and defendant cite cases that seem to support each of their positions.

**\*4** We have engaged in an exhaustive review of the sometimes-bewildering realm of Illinois unjust enrichment law, and our conclusions are as follows. It is often expressed that in order to state an unjust enrichment claim under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). The law regarding whether a plaintiff must also show wrongdoing is initially confusing because there are decisions that go both ways. *Compare, e.g., Stathis v. Geldermann, Inc.,* 295 Ill.App.3d 844, 229 Ill.Dec. 809, 692 N.E.2d 798, 811 (Ill.App.Ct.1998) ("A cause of action based upon unjust enrichment does not require fault or illegality

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 3754823 (N.D.Ill.)

on the part of defendants.") with *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 271 Ill.App.3d 483, 208 Ill.Dec. 49, 648 N.E.2d 971, 977 (Ill.App.Ct.1995) (recovery for unjust enrichment permitted only when there is "unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence"). However, as is pointed out in an excellent Illinois Bar Journal article concerning the Illinois law of unjust enrichment, there is a way to reconcile the case law. *See* Ronald M. Lepinskas, *Unjust Enrichment Claims in Illinois: Applying a Venerable Doctrine to Modern Disputes*, 91 Ill. B.J. 514, 517 (2003). We have explained *supra* note 4 that there are three prongs of unjust enrichment: a benefit mistakenly conferred, a benefit procured through wrongful conduct, and a benefit to which plaintiff has a better claim than the defendant for some other reason. Courts have not required proof of wrongful conduct where the factual allegations fall within the "mistakenly conferred" or "better claim" prongs, but they have required such proof of when the allegations fall within the "wrongful conduct" prong. So, while it is correct to say that unjust enrichment is its own claim that does not necessarily require the existence of an underlying claim, or a particular underlying claim, it is also correct to say that when a plaintiff brings an unjust enrichment claim that is based on wrongful conduct, plaintiff must plead and prove that conduct. *See Alliance*, 208 Ill.Dec. 49, 648 N.E.2d at 977; *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 943 (7th Cir.2001).

Here, plaintiffs allege in Count IV that "Sears has been unjustly enriched by virtue of its false, misleading advertising of Craftsman products."(Second Amended Consolidated Class Action Complaint ¶ 128.) The "unlawful or improper conduct as defined by law," *Alliance*, 208 Ill.Dec. 49, 648 N.E.2d at 977, is fraudulent misrepresentation. Fraudulent conduct consists of a knowing misrepresentation made with the intent to deceive the plaintiff. *See People v. L & M Liquors, Inc.*, 37 Ill.App.3d 117, 345 N.E.2d 817, 820 (Ill.App.Ct.1976).

Federal Rule of Civil Procedure 9(b) provides that in "all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."In our Order of July 31, 2006, we dismissed Beanblossom's statutory fraud claims in the Second Amended Consolidated Class Action

Complaint for failure to allege fraud with particularity because Beanblossom fails to allege where he saw the advertisements on which he based his belief that Craftsman tools were made in the United States. (He alleges broadly that he "heard advertisements for Craftsman products on the radio and saw advertisements for Craftsman products in magazines, newspapers, and on displays and banners in a Sears store," Second Amended Consolidated Class Action Complaint ¶ 8.) We indicated that we would entertain a motion to file a third amended complaint, but Beanblossom has never presented such a motion. Therefore, there is no allegation of the requisite fraudulent conduct, and the unjust enrichment claim must also be dismissed. Like the dismissal of his statutory fraud claims, the dismissal of Beanblossom's unjust enrichment claim will be without prejudice.

**C. Disgorgement of Profits**

*5 We asked the parties to brief the issue of whether, under Illinois law, a nexus must exist between the injury sustained by a plaintiff and the amount of recoverable disgorgement of defendant's profits. In view of our dismissal of all of the unjust enrichment claims brought pursuant to Illinois law, we need not address this issue at this juncture.

*CONCLUSION*

Defendant's motion to dismiss plaintiffs' unjust enrichment claims brought pursuant to Illinois law in Count IV of the Second Amended Consolidated Class Action Complaint filed in *Chatham v. Sears, Roebuck & Co.*, 05 C 2623, is granted. The non-Illinois plaintiffs' unjust enrichment claims in Count IV that are brought "under the unjust enrichment laws of the state of Illinois" are dismissed with prejudice. Plaintiff William Beanblossom's unjust enrichment claim is dismissed without prejudice.

A status hearing is set for January 10, 2007, at 11:30 a.m. to discuss the next steps in this litigation.

N.D.Ill.,2006.
In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation
Slip Copy, 2006 WL 3754823 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 3754823 (N.D.Ill.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

**H**Lantz v. American Honda Motor Co., Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Ron LANTZ, Dennis Gribbins, Richard Allen and
Clarence Alvord, individually and on behalf of all
others similarly situated, Plaintiffs,
v.
AMERICAN HONDA MOTOR COMPANY, INC.,
Defendant.
No. 06 C 5932.

May 14, 2007.

Elizabeth A. Fegan, Hagens Berman Sobol Shapiro
LLP, Oak Park, IL, Timothy Patrick Mahoney,
Daniel J. Kurowski, Hagens Berman Sobol Shapiro
LLP, Chicago, IL, Steve W. Berman, Hagens &
Berman, Seattle, WA, for Plaintiffs.
Charlene M. Yaneza, David Brian Johnson, Michael
Christian Andolina, Sidley Austin LLP, Chicago, IL,
for Defendant.

### MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, United States Magistrate Judge.
*1 Plaintiffs Ron Lantz, Dennis Gribbins, Richard
Allen, and Clarence Alvord filed a class action
complaint against Defendant American Honda Motor
Company, Inc. ("Honda"), alleging a variety of state
law claims arising from Honda's deceptive and
unlawful conduct in designing, manufacturing,
marketing, distributing, selling, servicing and/or
failing to service, GL1800 Gold Wing Motorcycles.
The parties have consented to the jurisdiction of the
United States Magistrate Judge pursuant to 28 U.S.C.
§ 636(c). Honda now moves to dismiss all of
Plaintiffs' claims. For the reasons set forth here, the
motion is granted in part and denied in part.

### BACKGROUND[FN1]

> FN1. In reviewing this motion to dismiss,
> the court accepts all well-pleaded factual
> allegations in the complaint. Richards v.
> Kiernan, 461 F.3d 880, 882 (7th Cir.2006).

#### A. The Parties

Honda is a California corporation with its principal
place of business in Torrance, California. Honda
designs, manufactures, markets, distributes, supplies,
sells, and services motorcycles and other vehicles in
the United States. (Cmplt.¶ 10.) [FN2]In 1975, Honda
produced a Gold Wing GL1000 model motorcycle
and became a front-runner in the manufacture of
"luxury touring motorcycles." These motorcycles are
designed for ultimate comfort and convenience, and
usually have "the biggest engines; great acceleration
and cruising speed; lots of storage including top
trunks and saddlebags; amenities like cruise control,
stereo radios, CB communications, large windshields,
heated seats and grips; and high reliability."(Id. ¶¶
11, 12.)In 2001, Honda introduced a new Gold Wing
GL1800 model. (Id. ¶ 13.)Honda advertised the new
motorcycle as being perfect for touring long
distances, and capable of handling on highways
across America, whether straight, curvy, flat, or
mountainous. (Id. ¶ 14.)

> FN2. The Class Action Complaint is cited as
> "Cmplt. ¶ ----."

Ron Lantz is a citizen of Florida who purchased a
2002 Gold Wing GL1800 in September 2002 from an
authorized Honda dealership in Leesburg, Florida.(Id.
¶¶ 6, 23.)Dennis Gribbins, a citizen of Illinois,
purchased his 2002 Gold Wing GL1800AZ from an
authorized Honda dealer in Bradley, Illinois on
November 15, 2001. (Id. ¶¶ 7, 27.)Richard Allen is a
citizen of Florida who purchased a pre-owned 2002
Gold Wing GL1800 from an authorized Honda
dealership in Leesburg, Florida in August 2006. (Id.
¶¶ 8, 31.)Clarence Alvord, also a citizen of Florida,
purchased a 2005 Gold Wing GL1800 from an
authorized Honda dealership in Venice, Florida on
March 3, 2005. (Id. ¶¶ 9, 35.)

#### B. The Gold Wing Wobble

Plaintiffs allege that the Gold Wing GL1800 model
has a design defect that causes it to wobble at low
speeds between 25 and 40 mph. As a result, Gold

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

Wing GL1800 owners are not able to use the motorcycle for touring at higher speeds and long distances, as advertised and intended. (*Id.* ¶¶ 15, 16.)According to Plaintiffs, "[a] wobble should be corrected immediately as it can cause a serious accident and even death."(*Id.* ¶ 15.)Honda, however, has concealed the design defect, describing it as merely a "characteristic" of the Gold Wing GL1800 model. As a result, Honda has consistently declined to recall the motorcycle or to pay for needed repairs. (*Id.* ¶¶ 17, 22, 41.)

**\*2** Frustrated consumers have turned to the internet, where they post complaints and seek to share and obtain information about the wobble problem.(*Id.* ¶ 18.)In addition, Wing World magazine, which bills itself as the world's largest monthly magazine specifically targeted to the interests of the Honda Gold Wing and Valkyrie motorcyclist, has featured two articles in March and June 2006 discussing the low speed wobble. (*Id.* ¶¶ 19, 20.)

### C. Plaintiffs' Experiences

Plaintiffs claim that they have all personally experienced the wobble problem with their Gold Wing motorcycles. After riding his new Gold Wing for approximately 3,000 miles, for example, Ron Lantz noted a severe wobble at speeds between 25 and 40 miles per hour ("mph").(*Id.* ¶¶ 6, 25.)Lantz took the motorcycle back to the dealership and was told that the wobble stemmed from faulty tires. Lantz replaced the tires several times and added a Super-Brace fork stabilizer, but none of these efforts fixed the wobble. Finally, Lantz solved the problem by replacing the steering head bearings with tapered bearings. (*Id.* ¶ 25.)In all, Lantz spent in excess of $2,500 to fix his Gold Wing, but Honda refused to pay for any of the repairs. (*Id.* ¶ 26.)

Dennis Gribbins rode his new motorcycle only 5,978 miles before it, too, developed a wobble on July 27, 2002 at speeds of approximately 35 to 45 mph. Over the next four years, Gribbins took his Gold Wing to numerous dealers and repair shops, but none was able to fix the wobble. Throughout this period, Gribbins also complained about the problem to Honda and its authorized dealers, and asked the Company to reimburse him for the repair expenses. (*Id.* ¶¶ 27-29.)In May 2006, Gribbins finally fixed the wobble by installing new tapered steering head bearings. (*Id.*

Richard Allen first noticed a severe wobble on his pre-owned Gold Wing while riding the motorcycle home from the dealership in August 2006. The wobble occurred at speeds between 30 and 40 mph, and Allen feared losing control of the motorcycle. He contacted the Honda dealership and was informed that they knew about the problem but could not fix it. When Allen contacted Honda's TechLine, however, he was told to contact his dealer. Allen has since replaced the Gold Wing's tires, but this has not eliminated the wobble. (*Id.* ¶¶ 32-34.)

Clarence Alvord's Gold Wing developed a wobble in May 2005, with only 2,000 miles on the motorcycle. The wobble was significant at speeds of 35 to 40 mph, and somewhat lesser at speeds of 10 to 20 mph. (*Id.* ¶ 35.)Alvord spent the next year taking his motorcycle to authorized dealerships in Florida and Ohio, but none could fix the wobble. At the suggestion of the dealerships, Alvord changed the tires twice and installed a fork brace, but these efforts failed. Throughout this time, Alvord complained about the problem to Honda and its authorized dealerships, but Honda refused to help or reimburse Alvord for his expenses in attempting to fix the wobble. (*Id.* ¶¶ 37-40.)

### D. Plaintiffs' Lawsuit

**\*3** Plaintiffs filed this federal class action diversity jurisdiction lawsuit on November 1, 2006. Counts I through VI seek recovery under a variety of California state laws, including the California Business and Professions Code, Cal. Bus. & Prof.Code §§ 17200 *et seq.* (Count I) and §§ 17500*et seq.* (Count II); the California Civil Code, Cal. Civ.Code §§ 1750*et seq.* (Count III); the California Commercial Code, Cal. Comm.Code §§ 2313 and 2314 (Counts IV and V); and California's common law of unjust enrichment. In these counts, Plaintiffs allege that Honda has violated California's unfair competition law; utilized untrue and misleading advertising; violated the California Consumers Legal Remedies Act; breached express and implied warranties; and unjustly benefitted from its unlawful conduct at Plaintiffs' expense.

Plaintiffs also allege four alternative counts in the event the court finds that class-wide application of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

California law is inappropriate. Each of these counts alleges violations of the laws of the District of Columbia and every state except California. Specifically, Alternate Count I alleges violation of state consumer protection laws; Alternate Counts II and III allege breach of state express and implied warranties, respectively; and Alternate Count IV alleges claims for common law unjust enrichment.

On December 18, 2006, Honda moved to dismiss the Complaint in its entirety for failure to state a claim. Shortly thereafter, on December 28, 2006, the parties consented to the jurisdiction of the United States Magistrate Judge. On January 8, 2007, Honda moved to stay discovery pending a ruling on the motion to dismiss, and the court granted the stay on March 7, 2007. (Minute Order of 3/7/07, Doc. 35.) The court now addresses Honda's motion to dismiss.

## DISCUSSION

The purpose of a motion to dismiss is to test the sufficiency of plaintiffs' complaint, not to decide its merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the plaintiffs' complaint and draws all reasonable inferences in their favor.*Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 770 (7th Cir.2002).

Honda argues that Counts I through VI must be dismissed because Illinois conflict of laws principles do not support the application of California law. Honda claims that Alternate Counts I through IV must also be dismissed with respect to all states except Illinois and Florida, which are the only states in which Plaintiffs reside. As for the Illinois and Florida state law claims, Honda argues that they all fail because Plaintiffs have not pled fraud with particularity; the statute of limitations has run on the warranty claims; and Plaintiffs have an adequate remedy at law precluding any recovery for unjust enrichment. The court considers each argument in turn.

## A. The California Law Counts

*4 Honda argues that Illinois conflict of law principles require that the California state law counts be dismissed. Before assessing the merits of this argument, the court first addresses Plaintiffs' assertion that it is premature to consider the choice-of-law issue prior to class certification.

### 1. Timing of Conflicts Analysis

Plaintiffs seek certification of a nationwide class under Rule 23(b)(2) and (b)(3). Plaintiffs note that "choice-of-law issues in nationwide class actions are rarely so uncomplicated that one can delineate clear winning and losing arguments at an early stage in the litigation."*Mirfasihi v. Fleet Mortg. Corp.,* 450 F.3d 745, 750 (7th Cir.2006). None of Plaintiffs' cited cases, however, stands for the proposition that choice-of-law issues must await a determination as to class certification. In *Mirfasihi,* for example, the court considered whether to approve a proposed class action settlement, noting that "it would seem that the legal uncertainty resulting from the complicated choice-of-law issues in this case should not cut solely against the value of plaintiffs' claims here, but should also be a factor in considering the value of Fleet's defenses."*Id.* Nowhere in the case does the Seventh Circuit address the timing of choice-of-law determinations relative to motions to dismiss.

In *Spence v. Glock, Ges.m.b.H.,* 227 F.3d 308 (5th Cir.2000), and *In re St. Jude Med., Inc. Silzone Heart Valve Prod. Liab. Litig.,* 425 F.3d 1116 (8th Cir.2005), the Fifth and Eighth Circuits rejected nationwide class certifications where the district court adopted one state's consumer protection law without conducting a proper choice-of-law analysis. 227 F.3d at 313-14, 425 F.3d at 1120. The Eighth Circuit expressly relied on the Seventh Circuit's pronouncement in *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012 (7th Cir.2002), that "[s]tate consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules."*Id.* (quoting *In re Bridgestone/Firestone,* 288 F.3d at 1018). Neither of these cases requires that the court delay a choice-of-law analysis to the time of class certification. Indeed, both cases undermine the theory that a nationwide California class will be appropriate at all. The court thus turns to the merits of Honda's conflicts argument.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

## 2. Conflicts Analysis

It is well-established that in a diversity suit such as this, "the federal court applies the conflicts principles of the state in which it sits."*Carris v. Marriott Int'l, Inc.,* 466 F.3d 558, 560 (7th Cir.2006). Illinois conflicts principles "require the court to select the law of the jurisdiction that has the 'most significant relationship' to the events out of which the suit arose, and to the parties."*Id.* (citing *Esser v. McIntyre,* 169 Ill.2d 292, 297-98, 214 Ill.Dec. 693, 661 N.E.2d 1138, 1141 (1996)). For tort claims, courts look to (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *Tanner v. Jupiter Realty Corp.,* 433 F.3d 913, 916 (7th Cir.2006)."[T]he law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties."*Id.* at 915-26 (quoting *Esser,* 169 Ill.2d at 298, 214 Ill.Dec. 693, 661 N.E.2d at 1141). For contract claims, courts consider (1) the place of contracting; (2) the place of the negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile and nationality of the parties. *Curran v. Kwon,* 153 F.3d 481, 488 (7th Cir.1998).

*\*5* In this case, Plaintiffs purchased and used their Gold Wing motorcycles in Florida and Illinois, the states in which they reside. Any alleged fraud made in connection with the purchases occurred at the points of purchase in those two states. Assuming Plaintiffs allege fraud or misrepresentations originating in California, moreover, Plaintiffs received and acted on the representations in Florida and Illinois, and that is where the parties' relationships are centered. *See, e.g., Clark v. Experian Info. Solutions, Inc.,* No. 03 C 7882, 2005 WL 1027125, at \*3 (N.D.Ill. Apr.26, 2005) (quoting *In re Bridgestone/Firestone,* 288 F.3d at 1017) ("The Seventh Circuit has unequivocally held that in a consumer fraud case, 'the injury is decidedly where the *consumer* is located.'") (emphasis in original). In addition, Plaintiffs negotiated and contracted to buy the motorcycles in Florida and Illinois, and that is where delivery occurred and where the motorcycles are located. It is true that Honda is domiciled in California, but this is the least significant factor and does not suffice to establish a more significant

relationship with that state.[FN3]*See CSX Transp., Inc. v. Chicago and North Western Transp. Co.,* 62 F.3d 185, 189 (7th Cir.1995) (citing Restatement (Second) of Conflicts § 188(3)) (noting that if the place of contract negotiation and performance are the same, that state's law usually will apply).

> FN3. Plaintiffs allege that Mr. Gribbins, Mr. Allen, and Mr. Alvord communicated with Honda, but all such communications occurred after the men purchased their motorcycles and cannot form the basis of the fraud claims.

Plaintiffs nonetheless argue that California law should apply based on an Illinois Appellate Court's decision in *Barbara's Sales, Inc. v. Intel Corp.,* 367 Ill.App.3d 1013, 306 Ill.Dec. 318, 857 N.E.2d 717 (5th Dist.2006). The plaintiffs in *Barbara's Sales* filed a nationwide class action lawsuit on behalf of purchasers of computers containing Intel Pentium 4 computer processors. *Id.* at 1014, 306 Ill.Dec. 318, 857 N.E.2d at 718. The plaintiffs alleged that Intel engaged in unfair business practices by concealing information that the Pentium 4 processor "does not perform to the expectations of a reasonable consumer."*Id.* The court determined that all 50 states and the District of Columbia "bear some relationship to this litigation by virtue of the nationwide sales of computers containing Pentium 4 processors."*Id.* at 1019, 306 Ill.Dec. 318, 857 N.E.2d at 722. The court held, however, that California had the most significant relationship to the litigation. In reaching this conclusion, the court noted that (1) Intel is headquartered in California; (2) Intel's corporate marketing and press relations groups are located in California; (3) Intel launched a billion-dollar marketing strategy based upon putting forth a consistent message across all 50 states; (4) the Intel group responsible for the design of the Pentium 4 processor was located in California; and (5) Intel tested the Pentium 4 processor in California and disseminated the results from that state. *Id.* at 1015, 1019, 306 Ill.Dec. 318, 857 N.E.2d at 719, 722.

The court also found it significant that "[t]he needs of the interstate system and the basic policies of predictability and uniformity of result require one forum with one result rather than results in 51 jurisdictions with the distinct possibility of conflicting decisions."*Id.* at 1019, 306 Ill.Dec. 318,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

857 N.E.2d at 722. The court cautioned, however, that "[o]ur decision today should not ... be considered a new rule requiring courts to always apply the consumer fraud law of a foreign state to adjudicate the claims of Illinois residents for products purchased in Illinois if the defendant's place of business is outside Illinois and the alleged misconduct originated from the defendant's place of business."*Id.* at 1020, 306 Ill.Dec. 318, 857 N.E.2d at 723. The court described its decision as "a narrow one" and acknowledged that "in another factual situation, this analysis might very well produce a different result."*Id.* at 1020-21, 306 Ill.Dec. 318, 857 N.E.2d at 723.

*6 The court is not persuaded that the narrow holding in *Barbara's Sales* is applicable here. Plaintiffs have not alleged that Honda engaged in a billion-dollar marketing campaign for its Gold Wing GL1800 model. Rather, the Complaint states only that Honda has generally "advertised and marketed the Gold Wing," including posting stories and maintaining a video on the Honda website. (Cmplt.¶¶ 12-14.) *Compare Huthwaite, Inc. v. Randstad General Partner (US), L.L.C.,* No. 06 C 1548, 2006 WL 3065470, at *3 (N.D.Ill. Oct.24, 2006) (following *Barbara's Sales* in case involving "a broad campaign involving many companies.") Nor are there any allegations regarding the testing of the motorcycles or the dissemination of any related results.

Even assuming Plaintiffs could add such allegations, moreover, the court finds the analysis contrary to established Illinois and Seventh Circuit case law. *See, e.g., Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 489, 221 Ill.Dec. 389, 675 N.E.2d 584, 588 (1996) (applying Illinois law to consumer fraud claims asserted by Illinois residents under "most significant relationship" test); *Nicholson v. Marine Corps West Fed. Credit Union,* 953 F.Supp. 1012, 1015-16 (N.D.Ill.1997) (dismissing claim under California Business and Professions Code, even though defendant's principal place of business was in California, where the plaintiff resided in Illinois, the parties' relationship was centered in Illinois, and the injury occurred in Illinois. Notably, the decision in *Barbara's Sales* is currently on appeal to the Illinois Supreme Court. 222 Ill.2d 567, 861 N.E.2d 653 (2006).

Plaintiffs have failed to demonstrate that California

law should apply in this case, and their claims under California state law (Counts I through VI) are all dismissed.

**B. The Alternate Counts**

Plaintiffs have asserted four alternative claims under the laws of the District of Columbia and all 50 states except California. Specifically, Plaintiffs allege violations of state consumer protection laws; breach of state express and implied warranties; and claims for common law unjust enrichment.

As a preliminary matter, the court agrees with Honda that Plaintiffs cannot assert claims under the laws of any state except Florida and Illinois, the two states in which they reside. None of the Plaintiffs alleges any connection whatsoever between his claims and the other jurisdictions. As discussed above, Illinois choice-of-law principles require application of Florida and Illinois law. Plaintiffs do not argue otherwise.

Honda contends that the Florida and Illinois claims all fail because Plaintiffs have not pled fraud with particularity; the statute of limitations has run on the warranty claims; and Plaintiffs have an adequate remedy at law precluding any recovery for unjust enrichment. The court considers each in turn.

**1. The Consumer Fraud Claims**

The Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1*et seq.,* prohibits deceptive acts or practices that occur in the course of conduct involving trade or commerce, and that proximately cause damage to the plaintiff. *See Geschke v. Air Force Ass'n,* 425 F.3d 337, 345 (7th Cir.2005). The Florida Deceptive and Unfair Trade Practices Act ("DUTPA"), Fl. Stat. §§ 501.201*et seq.,* similarly prohibits deceptive acts or unfair practices that cause actual damage to the plaintiff. *See Marino v. Home Depot U.S.A., Inc.,* No. 06-80343-CIV., 2007 WL 201260, at *7 (S.D.Fla. Jan.24, 2007). Honda argues that the claims of several Plaintiffs are barred by the applicable statutes of limitations, and that none of the Plaintiffs has alleged a fraud claim with the particularity required by FED. R. CIV. P. 9(b) in any event.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Sl ip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

Page 6

### a. Statutes of Limitations

*7 Honda argues that Mr. Gribbins' ICFA claim and Mr. Lantz's DUTPA claim are both time-barred. The statute of limitations for ICFA claims is three years. 815 ILCS 505/10a(e). A claim accrues under the ICFA "when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused."_Tammerello v. Ameriquest Mortg. Co., No. 05 C 466, 2006 WL 2860936, at *7 (N.D.Ill. Sept. 29, 2006)._ Mr. Gribbins purchased his Gold Wing on November 15, 2001 and became aware of the wobble on July 27, 2002. (Cmplt.¶ 27.) Mr. Gribbins did not file this lawsuit, however, until November 1, 2006, more than three years later.

Plaintiffs do not dispute these dates, but argue that Mr. Gribbins "exercised due diligence in interacting with Honda and its dealers in attempting to remedy the wobble," and should not now be penalized for "dealing with Honda in Honda's suggested manner."(Pl. Resp., at 9.) The Illinois doctrine of equitable estoppel can toll the running of the statute of limitations, but only where the defendant took "active steps to prevent the plaintiff from suing in time, ... such as by hiding evidence or promising not to plead the statute of limitations."_Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 11 F.Supp.2d 1006, 1011 (N.D.Ill.1998)_ (internal quotations omitted); _Ruffin v. Kane County Sheriff Dep't, No. 01 C 4898, 2006 WL 2088186, at *23 (N.D.Ill. July 21, 2006)._ Plaintiffs "must plead specific facts to support the court's tolling of the statute of limitations."_Ogilvie v. Beale, No. 93 C 2934, 1994 WL 33972, at *6 (N.D.Ill. Feb.4, 1994)._

Plaintiffs' allegations that Mr. Gribbins contacted Honda but found the representatives to be unhelpful and rude are not sufficient to plead estoppel. Plaintiffs do not allege that Honda made any representations with the specific intent to prevent Plaintiffs from filing suit within the limitations period, or that they would have filed suit earlier had they not relied on such representations. See _National Black Expo v. Clear Channel Broadcasting, Inc., No. 03 C 2751, 2007 WL 495307, at *7 (N.D.Ill. Feb.8, 2007)_ (equitable estoppel did not apply where the plaintiff "has not alleged sufficient facts, nor plead th[at] theor[y] with the required specificity."). Thus, Mr. Gribbins' ICFA claim is untimely and must be

dismissed.

The Florida DUTPA does not have an express statute of limitations. Courts thus apply Florida's general four year statute of limitations for unfair and deceptive trade practices claims. _See_Fla. Stat. § 95.11(3)(f); _Yusuf Mohamed Excavation, Inc. v. Ringhaver Equip. Co., 793 So.2d 1127, 1128 (Fla.Dist.Ct.App.2001)._ Mr. Lantz purchased his Gold Wing in September 2002, and discovered the wobble after putting some 3,000 miles on the motorcycle. The court cannot discern from these allegations exactly when Mr. Lantz's claim accrued. Assuming it accrued within the four-year limitations period, Honda argues that the court should apply Illinois' three-year limitations period instead.

*8 The Seventh Circuit has stated that "[a] federal court sitting in diversity must follow the statute of limitations that the state in which it is sitting would use."_Thomas v. Guardsmark, Inc., 381 F.3d 701, 707 (7th Cir.2004)_.See also _Hollander v. Brown, No. 05 C 57, 2005 WL 1563125, at *2 (N.D. Ill. June 28, 2005)_ ("Statutes of limitation are governed by the law of the forum state.") Honda argues that this precedent mandates that the court apply Illinois' three year statute of limitations to Mr. Lantz's DUTPA claim. (Def. Mem., at 11.) Plaintiffs disagree, arguing that "because such claims are not based on common law, but were instead created by Florida's legislature," Florida's statute of limitations must apply. (Pl. Resp., at 8 (citing _Cox v. Kaufman, 212 Ill.App.3d 1056, 156 Ill.Dec. 1031, 571 N.E.2d 1011 (1st Dist.1991)._) This argument misses the point.

The _Cox_ court confirmed that "where the cause of action is created by statute and a time is fixed within which the cause of action must be asserted, the law of the state where the action occurred must govern."_212 Ill.App.3d at 1062, 156 Ill.Dec. 1031, 571 N.E.2d at 1015._ In such circumstances, the limitations period is not merely procedural, but a fundamental component of the right itself. _Kalmich v. Bruno, 553 F.2d 549, 553 (7th Cir.1977)_ ("[W]here (a) statute creates a right that did not exist at common law and restricts the time within which the right might be availed of, or otherwise imposes conditions, such statute is not a statute of limitation (in the normal sense) but the time element is an integral part of the enactment.") As noted, the DUTPA does not have a statute of limitations. Thus, the court must apply

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

Illinois' three year statute of limitations to Mr. Lantz's claim.

All we know at this point is that Mr. Lantz purchased his Gold Wing in September 2002, and discovered the wobble after putting some 3,000 miles on the motorcycle. Though it is probable that Mr. Lantz discovered the wobble prior to November 1, 2003, absent further information, the court cannot say that Mr. Lantz's DUTPA claim is absolutely time-barred. The court therefore declines to dismiss Mr. Lantz's claim on this basis.

### b. Pleading Requirements

Defendants argue that even if Mr. Lantz's claim is not time-barred, both his and Mr. Gribbins' claims must be dismissed for failure to plead fraud with particularity. Plaintiffs dispute that their ICFA and DUTPA claims must in fact comply with Rule 9(b). According to Plaintiffs, "because state consumer protection statutes are not specifically mentioned in Rule 9(b), they are not subject to heightened pleading standards in federal court."(Pl. Resp., at 10-11.) In support of this contention, Plaintiffs cite *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), in which the Supreme Court held that Rule 8(a)'s notice pleading standard applied to a claim for age discrimination. *Id.* at 512-13.See also *Educadores Puertorriquenos En Accion v. Hernandez,* 367 F.3d 61, 66-67 (1 st Cir.2004) ("We join several of our sister circuits in holding that there are no heightened pleading standards for civil rights cases.") The Supreme Court expressly confirmed, however, that Rule 9(b)"provides for greater particularity in all averments of fraud or mistake."*Id.* at 513.

**\*9** One Massachusetts district court has interpreted *Swierkiewicz* as "sound[ing] the death knell for the imposition of a heightened pleading standard" in a fraud claim under the Massachusetts Consumer Protection Act, Ch. 93A. *Lawson v. Affirmative Equities Co., L.P.,* 341 F.Supp.2d 51, 67 n. 25 (D.Mass.2004) (quoting *Hernandez,* 367 F.3d at 66). The *Lawson* court offers no clear explanation for this conclusion, however, which is at odds with precedent in Illinois and Florida. See *Costa v. Mauro Chevrolet, Inc.,* 390 F.Supp.2d 720, 731 (N.D.Ill.2005) ("A complaint alleging a violation of the Illinois [Consumer] Fraud Act must be pled with the same

particularity and specificity as that required under common law fraud under Rule 9(b)."); *Zlotnick v. Premier Sales Group, Inc.,* 431 F.Supp.2d 1290, 1295 (S.D.Fla.2006) (noting that fraud claim under the Florida DUTPA must be pled "with the level of particularity required under FED. R. CIV. P. 9(b)."); *Florida Digital Network, Inc. v. Northern Telecom, Inc.,* No. 6:06-CV-889-Orl-31-JGG, 2006 WL 2523163, at \*5 (M.D.Fla. Aug.30, 2006) ("[C]laims arising under the FDUTPA must be pled with particularity.") The court does not find the reasoning of *Lawson* persuasive and declines to follow it here.

Having concluded that claims under both the Illinois and Florida consumer fraud statutes must be pled with particularity in accordance with FED. R. CIV. P. 9(b), the court next considers whether Plaintiffs have alleged the "who, what, when, and where" of the fraud "sufficient to reasonably notify the defendant[ ] of [its] purported role in the scheme."*IFC Credit Corp. v. Aliano Bros. General Contractors, Inc.,* No. 04 C 6504, 2007 WL 164603, at \*3 (N.D.Ill. Jan.12, 2007) (internal quotations omitted).See also *American United Life Ins. Co. v. Martinez,* 480 F.3d 1043, 1064 (11th Cir.2007) (quoting *Cooper v. Blue Cross & Blue Shield of Florida, Inc.,* 19 F.3d 562, 568 (11th Cir.1994)) ("[T]he plaintiff's complaint must allege the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.")

Plaintiffs' Complaint is deficient on several grounds. Plaintiffs allege that Honda "advertised and marketed the Gold Wing as being a luxury motorcycle perfect for touring long distances and capable of handling on highways across the United States," but that the motorcycle actually has a defect that limits riders' ability to travel in comfort and safety. (Cmplt.¶¶ 14-16.) Plaintiffs also allege that they each purchased Gold Wing motorcycles that had the stated defect. (*Id.* ¶¶ 23, 27, 31, 35.)It is not clear that advertising a product as a luxury motorcycle perfect for long-distance touring constitutes an actionable misrepresentation. *See, e.g., Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 173-74, 296 Ill.Dec. 448, 835 N.E.2d 801, 846-47 (2005) (statement by automobile insurer that it sold "quality replacement parts" that were subject to "very high performance criteria" was mere puffing and not actionable under the ICFA); *Breckenridge v. Cambridge Homes, Inc.,* 246 Ill.App.3d 810, 823, 186 Ill.Dec. 425, 616

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

N.E.2d 615, 623-24 (2d Dist.1993) (vendor's statements that home would be built with "expert workmanship" and "custom quality," and delivered to plaintiffs in "perfect" condition constituted puffing and did not violate the ICFA).

*10 In any event, none of the Plaintiffs indicates if or when they saw any misleading statements before purchasing their motorcycles, or that such statements induced them to make these purchases. To the extent Plaintiffs allege that Honda promised but failed to deliver a luxury motorcycle, such a claim is not actionable under the ICFA or DUTPA. _Avery,_ 216 Ill.2d at 169, 296 Ill.Dec. 448, 835 N.E.2d at 844 (a "deceptive act or practice" requires "more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract.") (internal quotations omitted); _Haun v. Don Mealy Imports, Inc.,_ 285 F.Supp.2d 1297, 1307 (M.D.Fla.2003) ("[B]ecause Plaintiff fails to allege _how_ he was 'aggrieved by' Defendant's acts, he fails to state the elements of harm and causation, essential to his [DUTPA] claim.") Thus, Plaintiffs' consumer fraud claims must all be dismissed.

**2. The Warranty Claims**

Honda next seeks dismissal of Plaintiffs' claims for breach of express and implied warranties. Honda argues that the claims are time-barred, fail to allege any defect within the scope of the express warranty, and/or fail to allege the requisite privity.

**a. Statute of Limitations**

In Alternate Counts II and III of the Complaint, Plaintiffs allege that Honda violated express and implied warranties under the Illinois and Florida Uniform Commercial Codes. 810 ILCS 5/2-725; Fla. Stat. § 672.313. The limitations period for a breach of warranty action in Illinois is four years from the date of breach. 810 ILCS 5/2-725(1). A breach occurs when "tender of delivery is made" or "when the breach is or should have been discovered." 810 ILCS 5/2-725(2); _Bethlehem Steel Corp. v. Chicago Eastern Corp.,_ 863 F.2d 508, 511 n. 3 (7th Cir.1988); _Thorogood v. Sears, Roebuck & Co.,_ No. 06 C 1999, 2006 WL 3302640, at *3 (N.D.Ill. Nov.9, 2006). Mr. Gribbins discovered the Gold Wing's wobble on July 27, 2002, more than four years before he filed suit on

November 1, 2006. Mr. Gribbins' claims are time-barred and, for the reasons stated above, he has not alleged any facts supporting equitable estoppel sufficient to avoid dismissal.

Honda argues that Mr. Lantz's warranty claims are similarly time-barred. The court agrees with Honda that Illinois' four-year statute of limitations applies because the Florida statute does not contain a limitations period on such claims. _See_ Fla. Stat. §§ 672.313, 672.314. _See also Thomas,_ 381 F.3d at 707 ("[a] federal court sitting in diversity must follow the statute of limitations that the state in which it is sitting would use.") Plaintiffs' argument for application of Florida's five-year limitations period as set forth in Fla. Stat. § 95.11(2)(b) is rejected. (Pl. Resp., at 8.) As with Mr. Lantz's consumer fraud claim, however, the court declines to dismiss the warranty claims on statute of limitations grounds absent further information as to the date he discovered the wobble in his motorcycle.

**b. Defects**

*11 Honda seeks dismissal of Mr. Allen's and Mr. Alvord's express warranty claims for failure to allege any defect within the scope of the warranty. (Def. Mem., at 12.) The warranty states that "the motorcycle is free from defects in materials and workmanship."(Ex. 1 to Def. Mem., at 6.) _See also Venture Assocs. Corp. v. Zenith Data Sys. Corp.,_ 987 F.2d 429, 431 (7th Cir.1993) (Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") Honda argues that neither Mr. Allen nor Mr. Alvord has alleged any such defect. To the contrary, "the so-called 'wobble' was not remedied by any change to their motorcycle."(Def. Mem., at 12.) Plaintiffs disagree, noting their allegations that the Gold Wing has a design defect that is eliminated by replacing the steering head bearings. (Pl. Resp., at 14.) Honda responds that these allegations are made only by the other two Plaintiffs, Mr. Gribbins and Mr. Lantz. (Def. Reply, at 14-15.)

The court declines to dismiss the express warranty claims of Mr. Allen and Mr. Alvord. It is true that both men rely on statements made by the other two Plaintiffs. However, the court cannot say that Mr. Allen and Mr. Alvord will be unable to present any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

facts that will entitle them to relief under this claim. *See Sanville v. McCaughtry, 266 F.3d 724, 732 (7th Cir.2001)* (quoting *Veazey v. Communications & Cable of Chicago, Inc., 194 F.3d 850, 854 (7th Cir.1999))* ("[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate.")

**b. Privity**

Honda argues that regardless of any statute of limitations, each Plaintiffs' implied warranty claim fails to allege sufficient privity between Plaintiffs and Honda. Plaintiffs all purchased their Gold Wing motorcycles from Honda dealers which, Honda contends, is not sufficient to allege any statements or representations on the part of Honda. (Def. Mem., at 9.) *See Rothe v. Maloney Cadillac, Inc., 119 Ill.2d 288, 292, 116 Ill.Dec. 207, 518 N.E.2d 1028, 1029 (1988)* ("UCC article II implied warranties give a buyer of goods a potential cause of action only against his immediate seller."); *Mekertichian v. Mercedes-Benz U.S.A., L.L.C., 347 Ill.App.3d 828, 832, 283 Ill.Dec. 324, 807 N.E.2d 1165, 1169 (1st Dist.2004)* ("[O]ur supreme court still requires privity even where the manufacturer issues a written warranty."); *Weiss v. Johansen, 898 So.2d 1009, 1012 (Fla.Dist.Ct.App.2005)* (requiring privity of contract for breach of implied warranty claims).

Plaintiffs direct the court to their allegations that they purchased motorcycles from authorized Honda dealers, and argue that the dealers are Honda's agents "for purposes of warranty implementation." (Pl. Resp., at 12.) The Complaint, however, sets forth no allegations suggesting that any such agency relationship exists. Nor is it clear that any dealers were in fact Honda's agents in connection with the motorcycle sales *See Hood v. Dryvit Sys., Inc.*, No. 04 C 3141, 2005 WL 3005612, at *5 (N.D.Ill. Nov. 8, 2005) (quoting *Connick v. Suzuki Motor Co., Ltd., 174 Ill.2d 482, 498, 221 Ill.Dec. 389, 675 N.E.2d 584, 592 (1996))* ("A complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship. It is insufficient to merely plead the legal conclusion of agency.") Plaintiffs attempt to rely on *Mydlach v. DaimlerChrysler Corp., 364 Ill.App.3d 135, 301 Ill.Dec. 164, 846 N.E.2d 126 (1st Dist.2005)*, for the proposition that privity exists where a manufacturer

extended a written warranty to the consumer. *Mydlach*, however, involved a claim brought pursuant to the federal Magnuson-Moss Act, 15 U.S.C. §§ 2301 *et seq.*, which is not at issue here. Honda's motion to dismiss the implied warranty claims for lack of privity is granted.

**3. The Unjust Enrichment Claims**

**\*12** Honda finally argues that Plaintiffs' unjust enrichment claims must be dismissed because they have an adequate remedy at law under the warranty provisions of their purchase agreements. (Def. Mem., at 9-10, 12.) It is undisputed that "where there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." *People ex rel. Hartigan v. E & E Hauling, Inc., 153 Ill.2d 473, 497, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (1992)* (internal quotations omitted).*See also Bowleg v. Bowe, 502 So.2d 71, 72 (Fla.Dist.Ct.App.1987)* ( "Bowleg's second count fails because the theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy-here, an action on the presumably valid Final Contract.") Mr. Gribbins' unjust enrichment claim is therefore dismissed.

The Florida Plaintiffs argue that their claims must nonetheless stand because under Florida law, "unjust enrichment claims may be pursued until it is proven that an express contract applies."(Pl. Resp., at 15 (citing *Williams v. Bear Stearns & Co., 725 So.2d 397, 400 (Fla.Dist.Ct.App.1998)* ("Until an express contract is proven, a motion to dismiss a claim for ... unjust enrichment on these grounds [the existence of an adequate remedy at law] is premature.").) According to Plaintiffs, dismissal of the unjust enrichment claims is premature, "particularly where Honda argues that its express written warranties do not apply to Plaintiffs' claims."(*Id.*) Defendants insist that the claims are properly dismissed now as "[t]here is no dispute that a contract of warranty exists," regardless of whether the warranty will provide Plaintiffs with a "successful" remedy. (Def. Reply, at 15.)

It does appear that Plaintiffs agree that they have express written warranties in this case. In addition, Plaintiffs nowhere allege that they do not in fact have an adequate remedy at law. Thus, Plaintiffs' unjust

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

enrichment claims under Florida law must be dismissed. *See In re Managed Care Litig.*, 185 F.Supp.2d 1310, 1337 (S.D.Fla.2002) ("The Plaintiffs have not explicitly alleged that an adequate remedy at law does not exist, and the failure to do so is fatal.")

## *CONCLUSION*

For the reasons stated above, Honda's motion to dismiss [Doc. 15] is granted in part and denied in part. The court will grant Plaintiffs leave to file an amended complaint consistent with this opinion by June 8, 2007. *See Collins v. Prater*, No. 06-396-GPM, 2007 WL 490971, at *1 (S.D.Ill. Feb.9, 2007) ("Federal Rule of Civil Procedure 15(a) dictates that leave to amend a pleading 'shall be given whenever justice so requires,'... and, indeed, the rule expressly grants a plaintiff one opportunity to amend her complaint as a matter of course before a responsive pleading is served."

N.D.Ill.,2007.
Lantz v. American Honda Motor Co., Inc.
Slip Copy, 2007 WL 1424614 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in S.W.3d
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))

Page 1

**H**Leal v. Weightman
Tex.App.-Hous. [1 Dist.],2004.
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.
**MEMORANDUM OPINION**
Court of Appeals of Texas,Houston (1st Dist.).
Nelda LEAL d/b/a Rotating Services Industries, Inc.,
Appellant
v.
Kathleen WEIGHTMAN, Appellee.
No. 01-03-01006-CV.

Oct. 7, 2004.

On Appeal from the County Civil Court at Law No. 2,
Harris County, Texas, Trial Court Cause No. 789,982.

Joseph Onwuteaka, Law Offices of Joseph Onwuteaka,
P.C., Houston, TX, for Appellant.
Peter M. Kelly, Hogan & Hogan, L.L.P., Houston, TX,
Dennis Richard Mundy, Olivier & Mundy, L.L.P.,
Tomball, TX, for Appellee.

Panel consists of Justices TAFT, JENNINGS, and
BLAND.

**MEMORANDUM OPINION**

TERRY JENNINGS, Justice.
*1 Appellant, Nelda Leal d/b/a Rotating Services
Industries, Inc. (Leal), challenges the trial court's
rendition of summary judgment in favor of appellee,
Kathleen Weightman (Weightman), in Leal's suit for
breach of a loan agreement. In five issues, Leal
contends that the trial court erred in granting
Weightman's no-evidence summary judgment motion
because (1) Leal produced more than a scintilla of
evidence establishing the existence of an express oral
contract; (2) Weightman, in her motion, did not state
the elements of Leal's claim as to which there was no
evidence; (3) Leal produced more than a scintilla of
evidence to establish the existence of an implied
contract; (4) Leal produced more than a scintilla of
evidence to establish her "unjust enrichment" cause of
action; and (5) Weightman, in her motion, did not

argue that Leal had no evidence to support her "unjust
enrichment" cause of action. We reverse and remand
in part and affirm in part.

**Facts**

Up until 1998, Weightman's husband, now deceased,
owned and operated Rotating Services, Inc. (RSI), a
business that repaired and sold parts for steam turbines.
However, in 1998, the Small Business Administration
foreclosed on a loan it had made to RSI, and Leal, who
was employed by RSI, purchased the company at a
foreclosure sale. Thereafter, Leal renamed the
company "Rotating Services Industries, Inc." and
retained Weightman's husband as an employee at a
salary of $3,362 per month.

Following the foreclosure sale, Weightman and her
husband, who were having financial problems,
approached Leal for help. Leal agreed to help them,
and she began sending checks to Weightman and to
her husband. Leal also sent checks, on the
Weightmans' behalf, to their attorney and to the
Internal Revenue Service (IRS).

In 2001, after spending an unspecified amount of time
in prison, Weightman's husband died. Thereafter, Leal
contacted Weightman and demanded that she repay
the money that Leal had given to Weightman and to
her husband. When Weightman refused, Leal filed this
lawsuit, alleging that Weightman had breached a loan
agreement that she had entered into with Leal and that
she owed Leal $66,551.72.

In response, Weightman filed a no-evidence summary
judgment motion, asserting that Leal "[could not]
prove the existence of a contract with [Weightman]."
In support of her motion, Weightman attached
deposition testimony from Leal, who had testified that
she and the Weightmans had never executed a written
loan agreement or a promissory note. Leal also
testified that she and the Weightmans never discussed
"how much [of the alleged loan] was to be paid
back," "the payment plan," or "an interest rate."

Leal filed a response to Weightman's motion,
asserting that Leal and Weightman had both

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))

an "[i]mplied in law" and an "[i]mplied in fact" contract, that Leal "advanced monies to [Weightman] and/or [on] her behalf," and that Leal "expected to be paid." In support of her response, Leal attached her own affidavit, in which she stated that, in 1998, she had agreed to assist the Weightmans financially, "with the understanding that they would pay me back." Leal also explained that Weightman's husband had agreed to repay Leal when he was sentenced to "jail" or when he was released. Leal also attached to her response copies of 21 checks that she had written to Weightman, to Weightman's husband, to their attorney, and to the IRS. The checks, totaling $63,248, were all drawn on the bank account of Rotating Services Industries, Inc.

**\*2** On August 22, 2003, following a hearing, the trial court issued an order granting Weightman's no-evidence summary judgment motion. In its order, the trial court concluded, in pertinent part, as follows:

[T]here is no evidence to support [Leal's] claim that [Weightman] entered into a contract to borrow money from [Leal], or that [Weightman] entered into a loan contract with [Leal].

#### No-Evidence Summary Judgment

To prevail on a no-evidence summary judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's claim. TEX.R. CIV. P. 166a(i); *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002); *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex.App.-Houston [1st Dist.] 1999, no pet.). Although the non-moving party is not required to marshal its proof, it must present evidence that raises a genuine fact issue on each of the challenged elements. TEX.R. CIV. P. 166a(i). A no-evidence summary judgment motion may not properly be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *Id.; Spradlin v. State*, 100 S.W.3d 372, 377 (Tex.App.-Houston [1st Dist.] 2002, no pet.). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms. Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). When reviewing a no-evidence summary judgment motion, we assume that all evidence favorable to the non-movant is true,

and we indulge every reasonable inference and resolve all doubts in favor of the non-movant. *Spradlin*, 100 S.W.3d at 377.

#### Adequacy of Weightman's Motion

In her second issue, Leal argues that the trial court erred in granting Weightman's no-evidence summary judgment motion because the motion did not state the elements of Leal's claim as to which there was no evidence and that it was "simply a conclusory [sic] challenge to [Leal's] case."

Rule 166a(i) provides that, to be entitled to no-evidence summary judgment, a movant must specify, in his motion, that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX.R. CIV. P. 166a(i).

Here, Weightman, in her motion, specifically asserted that Leal "[could not] prove the existence of a contract with [Weightman]." The existence of a valid contract is an essential element of a breach of contract cause of action. *Hussong v. Schwan's Sales Enters., Inc.*, 896 S.W.2d 320, 326 (Tex.App.-Houston [1st Dist.] 1995, no writ). Accordingly, because Weightman's motion specified that Leal had no evidence of an essential element of her breach of contract cause of action, we hold that the motion complied with the requirements of Rule 166a(i).

**\*3** We overrule Leal's second issue.

#### Express Oral Contract

In her first issue, Leal argues that the trial court erred in granting Weightman's motion because "her affidavit and the checks received by [Weightman] and made payable to [Weightman] and/or for her benefit" provide more than a scintilla of evidence establishing that "[Weightman] entered into [an oral] contract to borrow money from [Leal]."

In a breach of contract cause of action, a plaintiff must prove that (1) a valid contract existed; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))

(Tex.App.-Houston [1st Dist.] 2001, no pet.). To be valid and binding, a contract must contain all essential terms and be sufficiently certain so as to define the parties' legal obligations. See *Nickerson v. E.I.L. Instruments, Inc.,* 874 S.W.2d 936, 939 (Tex.App.-Houston [1st Dist.] 1994, writ denied). Generally, in a contract to loan money, the essential terms include (1) the amount to be loaned, (2) the maturity date of the loan, (3) the interest rate, and (4) the repayment terms. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992).

Here, Leal notes that, in response to Weightman's motion, she produced her affidavit, in which she states that, in 1998, she had agreed to assist the Weightmans financially "with the understanding that they would pay [her] back" and that Weightman's husband had agreed to repay Leal either when he was sentenced to "jail" or when he was released. Leal also produced copies of checks totaling $63,248 that she had written to Weightman, to Weightman's husband, to their attorney, and to the IRS.

Leal directs us to no evidence in the record indicating whether Weightman's husband had agreed to repay the full amount of the loan on a certain maturity date or in installments. Moreover, Leal directs us to no evidence in the record indicating whether the parties had agreed on a specific interest rate or whether they had agreed that no interest would be paid.

At the time of contracting, the parties reasonably would have regarded a certain maturity date, the repayment terms, and the amount and applicability of an interest rate as essential terms defining the parties' legal obligations. *See id.* Because Leal did not produce more than a scintilla of evidence establishing that the parties had agreed on the essential terms of a contract to loan money, we hold that Leal did not produce more than a scintilla of evidence establishing the existence of an express oral contract.

We overrule Leal's first issue.

### *Implied Contract*

In her third issue, Leal argues that the trial court erred in granting Weightman's motion because Leal produced more than a scintilla of evidence establishing the existence of an implied contract.

The elements of an implied contract are the same as those of an express contract. *Univ. Nat'l Bank v. Ernst & Whinney,* 773 S.W.2d 707, 710 (Tex.App.-San Antonio 1989, no writ). The only difference between the two is that, in an express contract, the mutual assent of the parties is expressly stated, whereas in an implied contract, the assent must be inferred from the circumstances of the transaction. *Id.*

*4 Here, as noted above, in her response, Leal did not produce more than a scintilla of evidence establishing that the parties had agreed on a certain maturity date, on repayment terms, or on the amount or applicability of an interest rate. There is no evidence in the record to indicate that the parties, through their conduct, had impliedly agreed on any of these essential terms of a contract to loan money. Accordingly, we hold that Leal did not produce more than a scintilla of evidence establishing the existence of an implied contract.

We overrule Leal's third issue.

### *"Unjust Enrichment" Cause of Action*

In her fifth issue, Leal argues that the trial court erred in granting Weightman's motion in response to her claim for unjust enrichment because Weightman, in her motion, did not argue that Leal had no evidence to support her unjust enrichment cause of action.

Leal amended her pleadings on August 14, 2003, eight days before the trial court issued its order granting Weightman's motion. In addition to alleging additional facts and reasserting her breach of contract claim, Leal included the following statement in the "Conditions Precedent" section of her amended petition: "[Weightman] will be unjustly enriched if allowed to retain the monies an[d]/or benefits paid to her and/or for her benefit without repayment."

Leal argues that, by including this sentence in the "Conditions Precedent" section of her amended petition, she alleged an "unjust enrichment" cause of action against Weightman. Leal further argues that, because Weightman, in her motion, did not argue that Leal had no evidence to support her "unjust enrichment" cause of action, the trial court erred in granting Weightman's motion on this claim.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))

In response to Leal's argument, Weightman, citing *Barnett v. Coppell North Texas Court, Ltd.,* 123 S.W.3d 804, 816-17 (Tex.App.-Dallas 2003, no pet.), argues that unjust enrichment "is not an independent cause of action in Texas."Rather, it is an "element" of a cause of action for restitution. *Id.* Moreover, Weightman argues that Leal's "mere mention of unjust enrichment" in her amended petition is not sufficient to allege a cause of action for restitution.

The Texas Supreme Court, however, has recognized unjust enrichment as a cause of action. *See, e.g., Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 683-85 (Tex.2000). It has even recognized a two-year statute of limitations for unjust enrichment claims. *See HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 885 (Tex.1998). A party may recover under an unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). Furthermore, a pleading is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim.*Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982). The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense. *Id.* The test of fair notice is "whether an opposing attorney of reasonable competence, with the pleadings before him, can ascertain the nature and the basic issues of the controversy and the testimony probably relevant."*State Fid. Mortgage Co. v. Varner,* 740 S.W.2d 477, 479 (Tex.App.-Houston [1st Dist.] 1987, writ denied).

**\*5** Here, we conclude that a reasonably competent attorney, with Leal's amended petition before him, would have been able to ascertain that Leal was attempting to allege a cause of action for unjust enrichment. The record indicates that Weightman did not move to strike Leal's amended petition or challenge it by special exception. *See*TEX.R. CIV. P. 90.

We sustain Leal's fifth issue.

### Conclusion

Having sustained Leal's fifth issue, we need not address Leal's fourth issue, in which she argues that the trial court erred in granting Weightman's

no-evidence summary judgment motion because Leal produced more than a scintilla of evidence establishing her unjust enrichment cause of action.

We reverse that portion of the trial court's summary judgment ruling that Leal "take nothing" from Weightman in regard to Leal's unjust enrichment claim, and we remand that claim to the trial court for further proceedings.

We affirm the trial court's judgment in all other respects.

Tex.App.-Hous. [1 Dist.],2004.
Leal v. Weightman
Not Reported in S.W.3d, 2004 WL 2251570 (Tex.App.-Hous. (1 Dist.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

**H**Outboard Marine Corp. v. Babcock Industries, Inc.
N.D.Ill.,1994.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
OUTBOARD MARINE CORPORATION, Plaintiff,
v.
BABCOCK INDUSTRIES, INC., Defendant.
**No. 91 C 7247.**

Aug. 26, 1994.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.
**\*1** Plaintiff Outboard Marine Corporation ("OMC")
is a manufacturer of marine propulsion systems,
including the Cobra stern drive. Defendant Babcock
Industries, Inc. ("ACCO") [FN1] manufactured the
marine shift cables that formed part of the Cobra
stern drive. OMC alleges that those cables were
defective and that it had to institute a recall to replace
the shift cables. OMC seeks to recover from ACCO
$42.7 million for its lost profits, the costs of the recall
and other damages.

In support of that effort, OMC brought an eleven-
count diversity action against ACCO alleging breach
of express warranty under the Uniform Commercial
Code (Count I), breach of an implied warranty of
merchantability (Count II), breach of an implied
warranty of fitness for a particular purpose (Count
III), breach of express warranty under the terms of an
OMC purchase order (Count IV), breach of contract
(Count V), negligence (Count VI), strict liability in
tort (Count VII), negligent misrepresentation (Count
VIII), fraudulent misrepresentation (Count IX),
indemnity (Count X), and unjust enrichment (Count
XI). Defendant ACCO filed a motion for partial
summary judgment pursuant to Fed.R.Civ.P. 56. For
the following reasons, the Court will grant ACCO's
motion in part and deny it in part.

*SUMMARY JUDGMENT STANDARD*

A summary judgment motion should be granted only
when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with
the affidavits if any, show that there is no genuine
issue as to any material fact and that the moving
party is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 247 (1986); *First Wisconsin Trust Co.
v. Schroud,* 916 F.2d 394, 398 (7th Cir.1990).
Summary judgment is granted only when the record
reveals that no reasonable jury could find for the non-
moving party. *Karazanos v. Navistar Int'l Transp.
Corp.,* 948 F.2d 332, 335 (7th Cir.1991). The
practical test is "whether the non-movant has a
fighting chance at trial." *Shager v. Upjohn Co.,* 913
F.2d 398, 403 (7th Cir.1990).

In deciding a motion for summary judgment, the
court must view the record and all reasonable
inferences drawn from it in the light most favorable
to the party opposing the motion. *Lohorn v. Michal,*
913 F.2d 327, 331 (7th Cir.1990). However, the
nonmovant must make a showing sufficient to
establish any essential element for which it will bear
the burden of proof at trial. *Celotex Corp. v. Catrett,*
477 U.S. 317, 322 (1986). There must be more than a
"scintilla of evidence" supporting the nonmovant's
position; there must be evidence on which the jury
could reasonably find for the nonmovant. *Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Selan
v. Kiley,* 969 F.2d 560, 564 (7th Cir.1992).
Furthermore, the district court is not required to
evaluate every conceivable inference that can be
drawn from evidentiary matters, but only reasonable
ones. *Spring v. Sheboygan Area School District,* 865
F.2d 883, 886 (7th Cir.1989).[FN2] With these
standards in mind, the Court first will proceed to
discuss the factual background of this case and then
will address the multiple issues raised by ACCO's
motion.

*FACTUAL BACKGROUND*

**\*2** In 1983, OMC designed the Cobra stern drive
engine to be interchangeable with the dominant
Mercury MerCruiser engine that at that time
controlled 75 to 80 percent of the stern drive market.
OMC met with ACCO in 1983 to discuss the shift
cable needed for the Cobra stern drive. For present
purposes, it is sufficient to note that OMC provided a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

drawing to ACCO with performance specifications and further discussions ensued regarding the design and manufacture of the shift cables. Eventually, the parties settled on a design and plan for manufacture. OMC bought approximately 453,828 shift cables from ACCO from May 1985 to April 1991. Of these cables, OMC purchased approximately 108,091 prior to November 1987. OMC accepted and paid for all of these cables. OMC used the shift cables in Cobra stern drive boat engines it produced and sold.

In 1986, ACCO made a change in its manufacturing process which was not revealed to OMC until 1989. The change allowed ACCO to manufacture its cables at a cost of 33 cents less per cable. This change allegedly made the cables prone to fail and caused damage to boat engines. OMC also claims that the alleged shift cable defect caused or contributed to instances of dock collisions due to boats accelerating suddenly or jumping out of gear.[FN3]    Due to the alleged shift cable problems, OMC initiated a recall to replace those cables. ACCO provided the replacement cables. OMC alleges that these cables also were defective requiring a second replacement of the shift cables.[FN4]

Of particular importance to the present motion are the numerous forms exchanged by ACCO and OMC in their business relationship including, a "request for bid" from OMC, ACCO's "quotation", OMC's "blanket purchase order", ACCO's "acknowledgment", OMC's "release authorization", and ACCO's invoice. The parties do not dispute the order of this exchange of forms, but do disagree as to which forms, if any, supply the contractual terms.

Initially, OMC issued a request for bid which was followed by ACCO's quotation. This quotation contained eighteen general conditions which, with limited exception, we need not detail at this time. In the quotation, ACCO states that orders are "subject to approval at Seller's General Office." The quotation also includes a clause stating that the terms stated within the quotation shall govern "whenever they are in conflict with any terms stated in any acceptance, order, or other form which contains any terms of this sale which Buyer presents to Seller." In addition, the quotation contains clauses limiting buyer's remedies and disclaiming certain warranties.

OMC issued a blanket purchase order following

receipt of ACCO's quotation.[FN5]    The back of OMC's purchase order contained several preprinted terms. Those terms form the heart of OMC's claim against ACCO. Although the Court will detail them further as necessary, we make note of the following portions. The OMC purchase order notes that "No agreement in conflict with the terms of this Order shall exist except as herein above provided. No deviation from any of the terms shall be binding upon Buyer without prior written consent of the Buyer and any additional or different terms proposed by the Seller is objected to and hereby rejected." (OMC P.O. ¶ 1). The purchase order (OMC P.O. ¶ 17) also specifies that:

**3** Execution of this purchase order by Seller, ... or delivery by Seller of Seller's sales acknowledgment form is an acceptance of this purchase order if such acknowledgment agrees with this purchase order with respect to the description of the goods or services, quantity and price. If Seller has made an offer to Buyer prior to Seller's receipt of this purchase order, any acceptance of such offer contained herein is expressly conditioned upon Seller's assent to any terms contained herein which are in addition to, or different from, the terms of Seller's offer.

The acknowledgment form used by ACCO was its own and not the one supplied by OMC. This acknowledgment contained 14 preprinted conditions. OMC's release authorization was used to convey its periodic requirements to ACCO. ACCO would not send cables until a release authorization was sent by OMC. ACCO's invoice accompanied the shipment of cables and contained 13 conditions essentially identical to the first 13 on the ACCO acknowledgment.

## DISCUSSION

### Contract Claims

ACCO's summary judgment motion calls on the Court to determine whether a contract was formed between the parties and what terms are included in that contract. This decision is governed by an application of § 2-207 of the UCC, as adopted in Illinois, 810 ILCS 5/2-207 (1993).    Section 2-207 provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under other provisions of this Act.

As noted above, OMC and ACCO exchanged several forms during the course of their relationship including a request for bid from OMC, a quotation from ACCO, a purchase order from OMC, an acknowledgment from ACCO, a release authorization from OMC, and finally an invoice from ACCO. OMC contends that its purchase order acted as the offer and that ACCO's acknowledgment acted as the acceptance of its provisions. OMC's purchase order contains provisions which form the basis for Count IV (OMC P.O. ¶ 21), Count V (OMC P.O. ¶ 16), and Count X (OMC P.O. ¶¶ 10, 15). To obtain summary judgment on these counts ACCO must show as a matter of law that OMC's purchase order does not contain the applicable terms of the agreement between the parties.

**\*4** ACCO's first contention is that its "quotation" acted as the original offer. The general rule is that quotations are not offers but are instead invitations to submit offers. *Rush-Presbyterian St. Luke's Medical*

*Center v. Gould Inc.,* No. 93 C 1661, 1993 WL 376163, at \*2 (N.D.Ill. Sept. 22, 1993). A quotation can act as an offer if it contains sufficient detail. *McCarty v. Verson Allsteel Press Co.,* 411 N.E.2d 936, 942 (Ill.App.Ct.1980). However, the *McCarty* court went on to state that "a price quotation which is not binding when accepted by a buyer but only becomes binding if and when accepted by the seller" does not constitute an offer. *Id.* The statement, "all quotations, orders and contracts are subject to acceptance of home office", which was printed on the quotation in *McCarty,* made the quotation fail as an offer. Similarly, the first general condition in ACCO's quotation states, "All orders are received subject to Federal regulations and/or Government Priorities, and are subject to approval and acceptance at Seller's general office." As in *McCarty,* this Court concludes that ACCO's quotation was not an offer.

Even assuming that ACCO's quotation was a valid offer, OMC did not accept it. OMC's purchase order quite clearly states that "If Seller has made an offer to Buyer prior to Seller's receipt of this purchase order, any acceptance of such offer contained herein is expressly conditioned upon Seller's assent to any terms contained herein which are in addition to, or different from, the terms of Seller's offer." That language tracks the language of § 2-207(1) and thus rendered the OMC purchase order which contains significant different and additional terms not an acceptance.

While Illinois courts recognize that the common law mirror image rule was jettisoned by the adoption of Article 2 of the UCC, the *McCarty* court explains that § 2-207(1) still requires a "definite and seasonable expression of acceptance." Thus, no contract is formed where the offeror could not reasonably treat the response of the offeree as an acceptance. *McCarty,* 411 N.E.2d at 944-45. In *McCarty,* the purchase order clearly and repeatedly stated that it was an offer and that its terms must be accepted for a contract to be formed. Given the similar clear language of the OMC purchase order, we likewise find that it could not reasonably serve as a definite and seasonable expression of acceptance of the quotation.

Assuming OMC's purchase order was the offer, as we now hold it was, ACCO takes the position that it never assented to its terms. According to ACCO, the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

relationship between the parties falls under § 2-207(3), the provision governing the situation where the exchange of forms does not result in a contract but the parties act as if one exists. ACCO relies on *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1445 (9th Cir.1986) and premises its reasoning on its belief that the quotation was the initial offer. In *Diamond*, the Ninth Circuit enunciated a standard requiring a "specific and unequivocal expression of assent on the part of an *offeror* when the offeree conditions its acceptance on assent to additional or different terms." *Id.* (emphasis added). As is clear from the standard, *Diamond* involved a situation where the offeree had conditioned its acceptance on the offeror's assent to additional or different terms. The question before the Ninth Circuit was how to determine whether the offeror had accepted those terms completing a contract or whether the offeror had not assented and § 2-207(3) came into play to supply the terms in the absence of a contract. *See also Dresser Industries, Inc. v. Gradall Co.*, 965 F.2d 1442, 1449 (7th Cir.1992) (citing *Diamond Fruit Growers*, 794 F.2d at 1443). As we have already held and will further detail, that is not the situation here.

*5 Given that the OMC purchase order constituted an offer and the ACCO quotation did not, the next question is whether ACCO's acknowledgment served as a definite expression of acceptance. We conclude that it did. In *Hallberg v. General Motors Corporation*, No. 87 C 6478, 1989 WL 153340 (N.D.Ill. Nov. 2, 1989), the court held that an acknowledgment, which was not made expressly conditional on acceptance of any additional or different terms, "acted as an acceptance and completed the contract." As we noted above, the *Hallberg* court also stated that § 2-207 of the UCC had replaced the common law mirror image rule, and thus an acknowledgment, which contained additional or different terms, could act as an acceptance. Nothing in the ACCO acknowledgment serves to expressly condition acceptance on assent to the terms stated on the reverse of the acknowledgment form. ACCO does not dispute that the acknowledgment agreed with the purchase order in terms of price, quantity and the description of the goods. As a result, the ACCO acknowledgment constitutes a definite expression of acceptance.[FN6]

In its attempt to avoid this result, ACCO relies on a case which found that the seller's own acknowledgment form did not act as an acceptance of the buyer's purchase order and its terms. *Carrier Corp. v. Block Steel Corp.*, No. 91 C 7213, 1993 WL 243179, at *2-3 (N.D.Ill. June 30, 1993) (Hart, J.). *Carrier Corp.*, however, is distinguishable from this case on two critical points. In *Carrier Corp.*, the buyer's purchase order specifically required that its acknowledgment form be returned. *Id.* An offeror certainly can control the means and manner of acceptance of its offer resulting in no contract if that method of acceptance is not employed by the offeree. In contrast to the purchase order in *Carrier Corp.*, paragraph 17 of OMC's purchase order invites ACCO to accept by using its own acknowledgment form. Further, the acknowledgment in *Carrier Corp.* contained language which made the seller's acceptance conditional on the buyer's assent to different terms. *Id.* There is no similar language in ACCO's acknowledgment. Consequently, the conclusion that no contract was formed in *Carrier Corp.* does not compel a like conclusion here.

Because ACCO accepted the OMC offer, a contract or contracts arose between the parties over the several years of their commercial relationship. Our next question is what are the terms of those contracts? ACCO asserts that even if OMC's purchase order was the offer and ACCO's acknowledgment was the acceptance, OMC's warranty terms were canceled by conflicting terms listed on the acknowledgment. OMC argues that the terms of the purchase order control. On this issue, the Court has the benefit of a recent decision by the Seventh Circuit which sets out the applicable standards of Illinois law in this area.

In *Northrop Corp. v. Litronic Industries*, Nos. 93-3912, 93-4000, slip. op. (7th Cir. July 18, 1994), Judge Posner reviewed the UCC's approach when a contract has arisen but the offer and acceptance contain additional or different terms. Referring to an earlier opinion, *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1335-37 (7th Cir.1991), Judge Posner noted that additional terms that do not materially alter the contract become part of the contract between merchants subject to certain exceptions. One of those exceptions, not critical in *Northrop*, is crucial here. As explained in *Union Carbide*, an offeror can prevent any additional terms from becoming part of the contract by expressly

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

limiting acceptance to the terms of the offer. 947 F.2d at 1337; 810 ILCS 5/2-207(2)(a), (c). The OMC purchase order contains such language when it specifies in more than one location that "any additional or different terms proposed by the Seller is objected to and hereby rejected." (OMC P.O. ¶¶ 1, 17). As a result, any additional terms set out in the ACCO acknowledgment do not become part of the contract between the parties.

**6** As to "different" terms, the result is apparently not the same, notwithstanding OMC's attempted limitation in its purchase order. As the *Northrop* court explained, the UCC is silent as to how different, as opposed to additional, terms are to be treated. Judge Posner noted three potential approaches including the majority view that "discrepant terms fall out and are replaced by a suitable UCC gap-filler." *Northrop,* slip op. at 9. While two members of the *Northrop* panel expressed a preference for the minority view that treats different terms in the same manner as additional terms, the court nonetheless concluded that Illinois would follow the majority view. Unfortunately, OMC has stated its argument and worded its purchase order in accord with Judge Posner's preferred (but unadopted) view instead of the majority position to be applied in Illinois.

To apply the majority approach we must determine whether the acknowledgment contains terms "different" from those of the purchase order. That we concede is no easy task.[FN7] OMC contends that the acknowledgment contains no different terms and specifically suggests that the limitation of remedies found in the acknowledgment does not contradict any provision of the purchase order. That limitation specifies that "Seller will not pay any claim for labor on any of its products or for delays or damages by reason of their use." (ACCO Acknowledgment, ¶ 6). In the same paragraph, ACCO states that "Unless covered otherwise in the quotation, Seller agrees to replace any of its regular product proved to be defective in material or manufacture, but this guarantee shall apply during the first 90 days after delivery of the product to the buyer." (ACCO Acknowledgment, ¶ 6). Even without looking to the terms of the quotation, these provisions conflict with the far broader rights set forth in the indemnity provisions of OMC's purchase order and also are more limited than the buyer's remedies as set forth in the OMC purchase order. (OMC P.O., ¶¶ 10, 15, 16).

The indemnity provisions specifically require ACCO to indemnify OMC for a host of costs including awards in personal injury and property damage suits, punitive damages, labor costs, and attorneys' fees. In addition, the buyer's remedies section allows the buyer to receive a full refund for a non-conforming product in lieu of replacement whereas ACCO's acknowledgment limits the buyer to replacement only during the first 90 days after delivery.

A closer question is whether the warranty provision in the OMC purchase order differs from any provision in the ACCO acknowledgment. At first glance, the ACCO acknowledgment contains no clear mention of any warranty or, more importantly, the duration of such a warranty. ACCO contends that the warranty language and disclaimers found in its quotation are incorporated by reference into the acknowledgment. As noted above, paragraph 6 does begin with the phrase "Unless covered otherwise in the quotation" which does call for some reference to the quotation. The question is what is the scope of that reference and incorporation.

**7** Other courts have recognized that incorporation by reference is a common practice in commercial transactions. *Hallberg,* 1989 WL 153340, at *5. When determining the scope of incorporation, a court must interpret a reference consistent with the parties' intent and with attention to the context and purpose of the reference to another document. *Id.* We also note that there is a strong presumption against reading conditions into a contract that could have easily been included as a term of the document at issue. *Id.* Moreover, when considering disclaimers and limitations of warranties, the UCC requires that such exclusions be conspicuously stated and that requirement counsels against incorporation when the reference to a disclaimer in another document is not explicit. *See* 810 ILCS 5/2-316.

Read in context, the reference to the quotation in paragraph 6 of the acknowledgment appears to direct the reader to paragraph 7 of the quotation which contains further details regarding the buyer's remedies in the event a product is deemed defective. We find, much like Judge Kocoras in *Hallberg,* that the general reference to the quotation in the acknowledgment is too tenuous a link to incorporate either the entire quotation or the warranty disclaimers found in paragraph 6 of the quotation. When one

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

considers the ease with which ACCO could have either specifically set out a warranty disclaimer in its acknowledgment or, at least, referred to the particular paragraph of the quotation containing the disclaimers or limitations, the decision that the vague reference to the quotation did not cause the incorporation of the warranty language, disclaimers and remedy limitations becomes a simple one.

Having engaged in this analysis, we must pause to see what remains. Because the provisions of the purchase order regarding buyer's remedies and indemnity are different from the buyer's remedy provision in the acknowledgment, those terms drop out. As a result, OMC's claims in Counts V and X must fail because they are based on the indemnity and buyer's remedy provisions of the purchase order that do not form part of the agreement between the parties. As to the claimed breach of express warranty in Count IV which is based on paragraph 21 of the purchase order, that action survives because the warranty disclaimer in ACCO's quotation forms no part of the contract between the parties.[FN8]

*UCC-Statute of Limitations*

Next, the Court turns to ACCO's assertion that the statute of limitations partially bars Counts I through IV. ACCO's contention that Counts I through IV are partially barred by the statute of limitations is based on § 2-725 of the UCC which states in relevant part:

(1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued....

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, *except* that where a warranty *explicitly extends to future performance* of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

*8 810 ILCS 5/2-725(1), (2) (emphasis added). OMC filed suit on November 15, 1991, and purchased cables from May 1985 to April 1991. Under ACCO's calculations, the four year statute of limitations bars OMC's recovery of damages resulting from cables delivered prior to November 15, 1987. Of the 452,828 cables built and shipped by ACCO, ACCO delivered approximately 108,091 or roughly 25 percent prior to November 1987.

OMC claims that language in its purchase order satisfies the requirements of the future performance exception to the standard four year limitation. OMC states that the phrase "seller agrees that this warranty shall survive acceptance, test and payment" operates to extend the basic warranty of good materials and workmanship and adherence to OMC specifications to future performance. ACCO argues that this language is insufficient to fall within the exception.

Under Illinois law, the future performance exception "has been narrowly construed, with emphasis on *explicityly*." *Nelligan v. Tom Chaney Motors, Inc.,* 479 N.E.2d 439, 442 (Ill.App.Ct.1985) (emphasis added). Not surprisingly, courts are reluctant to make inferences concerning warranty terms, when such terms are not clearly stated. *Id.* at 443. A promise must be tied to a specific time period or future date to fall within the exception to the general statute of limitations rule. *Stumler v. Ferry-Morse Seed Co.,* 644 F.2d 667, 672 (7th Cir.1981).

In *Stumler,* the court was dealing with an express warranty regarding the quality, size and color of tomatoes that would result from particular seeds. *Id.* at 668. Because the warranty did not refer to a particular time period, the plaintiff reasoned that one might infer that it meant harvest time when one could see the quality of the tomato. The court stated, however, that "harvest time is not an easily determined future date and does not constitute the kind of definite or well understood future date that is called for in the exception to the usual four year statute of limitations." *Id.* at 672. In contrast, the *Stumler* court noted some examples of warranties that do explicitly extend to future performance, including a "lifetime guarantee," or a warranty that a car will perform properly for five years or 50,000 miles whichever comes first. *Id.* at 671.

OMC attempts to support its position by citing several cases where the future performance exception was allowed. However, since these cases all state specific times or durations, they add further support to the conclusion that an express warranty must state a specific time or duration to extend the warranty beyond delivery to future performance. *See, e.g.,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

*Nation Enterprises, Inc. v. Enersyst, Inc.,* 749 F.Supp. 1506, 1510 (N.D.Ill.1990) (warranty for one year or 2100 accumulated hours of use was specific enough to explicitly extend warranty to future performance under UCC § 2-725(2)); *Black Leaf Products Co. v. Chemsico, Inc.,* 678 S.W.2d 827, 830 (Mo.Ct.App.1984) (warranty that product will be free from defects in material and workmanship for two years explicitly extends to future performance); *Glen Peck, Ltd. v. Fritsche,* 651 P.2d 414, 415 (Colo.Ct.App.1981) (warranty promising performance of bulls as breeders after being used on cows known to be breeders within 6 months of purchase or within six months of bull reaching 14 months of age held to explicitly extend to future performance); *Standard Alliance Indus., Inc. v. Black Clawson Co.,* 587 F.2d 813, 821 (6th Cir.1978) (one year warranty explicitly extended to future performance), *cert. denied,*441 U.S. 923 (1979); *Mittasch v. Seal Lock Burial Vault, Inc.,* 344 N.Y.S.2d 101, 102 (N.Y.App.Div.1973) (warranty that a burial vault "will give satisfactory service at all times" held to explicitly extend to future performance under UCC § 2-725(2) exception). *But see Tolen v. A.H. Robins Co.,* 570 F.Supp. 1146, 1154 (N.D.Ind.1983) (warranty that I.U.D. would provide protection "for a period of several years" insufficient to extend to future performance). Because neither party has tendered any cases construing a warranty identical to the one in this case, the question here is whether the warranty in paragraph 21 is similar enough to these warranties such that it too extends to future performance or is too ambiguous to merit the exception from the four year statute of limitations.

*9 In *Moorman Mfg. Co. v. National Tank Co.,* 435 N.E.2d 443 (Ill.1982), the Illinois Supreme Court adopted a definition of "explicit" as "[n]ot implied merely, or conveyed by implication; distinctly stated; plain in language; clear; not ambiguous; express; unequivocal." Applying that definition in light of the narrow construction of the exception, we find that the OMC purchase order warranty does not explicitly extend to future performance. The language that OMC relies upon does indicate some extension of the warranty but it does not do so in terms meeting the definition of explicit adopted in *Moorman.* OMC has cited numerous cases in which the reader of the warranty can point to a specific termination point or duration for the warranty, i.e. 2100 hours, one year or two years. In addition, the cases recognize that a warranty may extend to "all times" or "lifetime." In

those cases, however, it is still clear that the warranty is in effect at all times or for the clearly specified time.

In the instant case, the language indicates that the warranty will survive acceptance, test and payment but those times are undefined and unstated. As we noted earlier, the blanket purchase order merely set forth OMC's estimated requirements and delivery did not occur until OMC issued release authorizations which specified delivery dates and precise quantities. One cannot determine without further information when acceptance, test and payment will occur. At best one could state some parameters or estimated dates based on reference to other provisions of the purchase order, release authorization or invoices. Even the breeder bulls in the *Glen Peck, Ltd.* case were warranted for a specified time after purchase or after the bull reached a certain age. It is possible to argue that the purchase order warranty was meant to survive for all times or for the life of the product but it does not state that in clear and definite terms as is required.

Because the warranty in OMC's purchase order does not list a specific and clear future duration or time period, the future performance exception is not applicable and the limitation period did begin to run at the time of delivery. Therefore, partial summary judgment with respect to the breach of express warranty claims in Counts I and IV for cables delivered prior to November 15, 1987, is granted.

We now briefly address an argument made by OMC as to the propriety of resolving this question on summary judgment. OMC contends that the meaning of the warranty in the purchase order is a factual question that should be left to a jury. Indeed, some courts have held that whether a warranty extends to future performance involve a question of fact. *See, e.g., Safeway Stores, Inc. v. Certainteed Corp.,* 710 S.W.2d 544, 548 (Tex.1986); *Weiss v. Herman,* 597 N.Y.S.2d 52, 53 (N.Y.App.Div.1993); *Economy Housing Co. v. Continental Forest Products, Inc.,* 757 F.2d 200, 203 (8th Cir.1985). However, where there is no factual issue as to the meaning of terms used in a contract, a court can decide a case involving the issue of the future performance exception on summary judgment. *See Nelligan,* 479 N.E.2d at 441; *Stumler,* 644 F.2d at 668; *Tolen,* 570 F.Supp. at 1153-54; *see also Moorman,* 435 N.E.2d at 453-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

54 (reversing trial court's denial of motion to dismiss and determining as a matter of law whether warranty explicitly extended to future performance). In the case at bar, there is no question as to the meaning of the language in OMC's purchase order. The question here involves the legal significance of that language. That is a decision that this Court must make and has made in this case.

*10 Next, ACCO asserts that the breach of implied warranty claims in Counts II and III are also partially barred by the statute of limitations. Illinois law follows the prevailing view holding that "implied warranties by definition cannot explicitly extend to future performance." *Stoltzner v. American Motors Jeep Corp.,* 469 N.E.2d 443, 445 (Ill.App.Ct.1984); *see also Nelligan,* 479 N.E.2d at 442. OMC refers to a 1971 United States district court case in support of its position that implied warranties can be extended. *Klondike Helicopters, Ltd. v. Fairchild Hiller Corp.,* 334 F.Supp. 890 (N.D.Ill.1971). In applying Illinois law, which was unclear at the time, the *Klondike* court did find that an implied warranty could extend to future performance as provided in § 2-275(2). *Id.* at 893. However, the more recent Illinois appellate decisions clearly project Illinois' position on this issue and reject the approach taken in *Klondike.* Therefore, partial summary judgment with respect to Counts II and III for cables delivered prior to November 15, 1987 is granted.[FN9]

*Tort Claims and the Moorman Doctrine*

The Court will now consider ACCO's summary judgment motion with respect to OMC's tort claims. Count VI (negligence), Count VII (strict liability in tort), Count VIII (negligent misrepresentation), and Count IX (fraudulent misrepresentation) are all governed by Illinois tort law. The Illinois Supreme Court has held that a plaintiff cannot recover solely economic damages under the tort theories of negligence, strict liability, or negligent misrepresentation. *Moorman Mfg. Co. v. National Tank Co.,* 435 N.E.2d 443, 453 (Ill.1982). The *Moorman* court defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits without any claim of personal injury or damage to other property as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it

was manufactured and sold." *Id.* at 449. ACCO contends that OMC seeks only economic damages and *Moorman* bars such claims in tort.

In *Moorman,* an alleged crack in a storage tank manufactured by the defendant caused the plaintiff to incur damages representing repair and reinforcement costs and costs associated with the loss of use of the tank. *Moorman,* 435 N.E.2d at 445. The plaintiff brought counts in negligence, strict liability and innocent misrepresentation seeking damages for repairing the tank and for lost profits. The court disallowed recovery in tort for the solely economic losses, emphasizing that the enactment of the Uniform Commercial Code by the legislature set forth an appropriate remedy for the plaintiff in this situation. *Id.* at 453.

As a measure of the strength of OMC's response, we find it particularly telling that OMC devotes only a single paragraph to the application of the *Moorman* doctrine to Counts VI, VII and VIII and cites only *Moorman* and no other cases. OMC attempts to distinguish this case from *Moorman* by asserting that the defective cables damaged other engine parts, and thus caused separate property damage, an alleged exception to the economic loss doctrine. The Illinois Supreme Court has held that strict liability in tort is applicable when an unreasonably dangerous product damages other property owned by the plaintiff. *Board of Educ. v. A, C & S, Inc.,* 546 N.E.2d 580 (Ill.1989) (finding *Moorman* not applicable when damage to product due to a sudden and dangerous occurrence); *Vaughn v. General Motors Corp.,* 466 N.E.2d 195, 196 (Ill.1984). However, it is important to remember that when distinguishing between economic losses recoverable in contract and losses recoverable in tort it is inappropriate to focus "solely on the nature of the damages while ignoring the policy behind and analytical underpinnings of [*Moorman* ]." *Ferentchak v. Frankfort,* 459 N.E.2d 1085, 1089 (Ill.App.Ct.1984). On the issue of incidental property damage, the Seventh Circuit has clearly indicated that such incidental damages will not take a commercial dispute outside the economic loss doctrine formulated in *Moorman. Chicago Heights Venture v. Dynamit Nobel of America, Inc.,* 782 F.2d 723, 728-29 (7th Cir.1986) (applying Illinois law); *see also Miller v. U.S. Steel Corp.,* 902 F.2d 573, 576 (7th Cir.1990) (applying Wisconsin law).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

**\*11** In *Chicago Heights,* the plaintiff's complaint sought recovery for damages to other parts of a building due to a malfunctioning roofing material. The Seventh Circuit concluded that the Illinois courts would not find water damage to other parts of the building legally significant. *Chicago Heights Venture,* 782 F.2d at 729. Reviewing the complaint, the court reasoned that it alleged a malfunction over time that necessarily caused incidental damage to the attached and surrounding parts of the building. Plaintiff's complaint was thus based on the roof's failure to work. Such a claim is encompassed by the *Moorman* doctrine and contract law which provides the means of recovery for qualitative defects such as deterioration due to a latent defect. *Id.* Significantly, the Seventh Circuit was not persuaded that the final dramatic manifestation of the roof's defect-its falling to the ground during a windstorm-transformed the deterioration alleged in the complaint into "sudden and calamitous damage" more appropriately addressed by tort law. *Id.* (quoting *Moorman,* 435 N.E.2d at 449).

In this case, OMC's own Local Rule 12(n) statement describes the defective condition of the shift cable as one that will manifest itself over time. According to OMC statement and the attached exhibits, the cable defect would allow the cable to stretch and corkscrew increasing backlash and friction which in turn reduced the accuracy of gear selection. The defect might first manifest itself to the boat owner as hard shifting or jumping out of gear that eventually would damage other components such as the clutch dogs, gears, and lower gear case. If the damage went uncorrected debris would accumulate in the gear case and the end result would be gear case failure.

As in *Chicago Heights,* this Court is not persuaded that this process of deterioration which might eventually cause a boat to jump out of gear or shift into the wrong gear is such a sudden and calamitous event that *Moorman* does not apply.[FN10] We likewise find unavailing OMC's attempt to distinguish this case based on damage to other property, i.e. the gear case and other engine components. The alleged defect in the cable necessarily caused damage to attached components of the Cobra stern drive. Reduced to its simplest terms, the gravamen of OMC's claim is that the shift cable did not work as they expected it to work because ACCO changed the design without telling OMC and

introduced an alleged qualitative defect in the process. As a result, the Court concludes that OMC seeks recovery of economic losses and such damages must be recovered, if at all, under the UCC and contract law. Accordingly, ACCO's motion for summary judgment on OMC's claims in Counts VI, VII and VIII is granted.[FN11]

The final tort claim in Count IX for fraudulent misrepresentation requires some further analysis. The *Moorman* court stated that "economic loss is recoverable where one intentionally makes false representations." *Moorman,* 435 N.E.2d at 452 (citing *Soules v. General Motors Corp.,* 402 N.E.2d 599 (1980)); *see also Rose v. Franchetti,* 713 F.Supp. 1203, 1209 (N.D.Ill1989). The elements for a fraudulent misrepresentation claim are: "(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Board of Educ. v. A, C & S, Inc.,* 546 N.E.2d at 591. In Illinois, these elements must be proved by clear and convincing evidence. *West v. Western Cas. and Sur. Co.,* 846 F.2d 387, 393 (7th Cir.1988).

**\*12** ACCO concedes that the *Moorman* court recognized that "economic loss is recoverable where one intentionally makes false representations." 435 N.E.2d at 452. ACCO, however, essentially argues that this was merely dicta without support in Illinois law. ACCO contends that the better approach is to limit recovery of economic losses to actions for fraudulent inducement to contract and disallow such recovery for claims of fraud in the performance of a contract. *See Theuerkauf v. United Vaccines Div. of Harlan Sprague Dawley,* 821 F.Supp. 1238 (W.D.Mich.1993) (applying Michigan law); *Williams Electric Co. v. Honeywell, Inc.,* 772 F.Supp. 1225 (N.D.Fla.1991) (allowing fraudulent misrepresentation claims for solely economic loss only when the misrepresentation occurred in the inducement of the contract, but prefacing the decision with the statement, "I view the Florida law in this area as not entirely clear"). ACCO presents no decisions by Illinois courts adopting this limitation of the exception to the *Moorman* doctrine. Indeed, in late July 1994, the Illinois Supreme Court repeated the exception for intentional misrepresentations noted in *Moorman* and noted no limitation of that exception

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

to actions for fraudulent inducement. *See* *In re Illinois Bell Switching Station Litigation,* No. 73999, 1994 WL 390556, at *3 (Ill. July 28, 1994).

ACCO maintains that prohibiting recovery of economic losses for fraud in the performance of the contract preserves the stability and certainty of contractual relationships fostered by the *Moorman* doctrine. On the other hand, ACCO suggests there is no injustice in allowing recovery where the contractual relationship itself was induced by fraud. This Court would ask ACCO whether reliability and certainty is truly fostered by precluding recovery of economic losses in tort when a party has engaged in intentional fraudulent conduct.

Whether ACCO's position is the better-reasoned approach is immaterial, however, because the question is what approach would the Illinois Supreme Court take and it is not for this Court to state whether that approach is wise or foolish. Unfortunately, ACCO has not focused on the proper question. The Illinois Supreme Court and numerous other federal and state courts have repeatedly listed the exceptions as they appeared in *Moorman* without the limitation suggested by ACCO. Indeed, it appears entirely consistent with *Moorman*'s underlying rationale that those who intentionally misrepresent their products might fairly bear the risk of economic losses when those representations prove false. Much as the manufacturer fairly bears the risks of losses caused by hazardous products and the person in the business of supplying information properly bears the risk of damages due to negligent representations, it is understandable why the policy of Illinois tort law would support an exception to *Moorman* for intentional misrepresentations or fraud. In all three situations, these parties are best able to control the risk and the burden of losses falls appropriately on them. Under the circumstances, we do not find that ACCO has carried its burden to show that the Illinois Supreme Court would adopt its position if given the chance.

*13 ACCO also argues that OMC has not properly pleaded fraudulent misrepresentation because it has failed to plead that ACCO made misrepresentations for the purpose of inducing OMC to act. ACCO further contends that OMC has failed to plead the fraud with sufficient particularity. Both arguments fit more comfortably within the realm of motions to

dismiss and would not support summary judgment as they are stated. As such we will treat the argument as a motion to dismiss.

OMC, for its part, essentially argues that the lengthy commercial relationship described in the Complaint supports the inference that ACCO represented that the shift cable met OMC's specifications to induce OMC to continue dealing with ACCO. The problem with this argument and the problem with the fraudulent misrepresentation claim as it now stands is that it does not meet the requirements of Fed.R.Civ.P. 9(b) which requires one to state the circumstances constituting fraud with *particularity.* Given the long commercial relationship between these parties, more is needed in pleading than a blanket statement that ACCO represented the cables as complying with OMC specifications and that OMC relied on these representations to its detriment. As the Seventh Circuit stated in *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941 (1990), under Rule 9(b) "the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." Count IX does not currently meet this standard and therefore, the Court will dismiss Count IX but will grant OMC leave to replead that claim to do so.

## CONCLUSION

For the reasons set forth above, the Court grants summary judgment in favor of the Defendant on Counts V, VI, VII, VIII, X and XI. In addition, the Court grants partial summary judgment in favor of the Defendants for Counts I, II, III, and IV. Finally, the Court denies the Defendants' summary judgment motion on Count IX. Instead, the Court will dismiss Count IX and grants Plaintiff OMC two weeks to replead that count consistent with the views expressed in this opinion.

> FN1. Babcock Industries, Inc. was formerly known as Acco Babcock Industries, Inc. and is now known as FKI Industries, Inc. Both parties refer to Defendant by the short designation "ACCO" and this Court will do likewise.

> FN2. In addition to the requirements for summary judgment set forth in Rule 56(c),

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

Local Rules 12(m) and 12(n) require the parties moving for and opposing summary judgment to state the material facts of the case supported by references to the record. Local Rule 12(m) requires the moving party to submit a statement which sets forth facts it contends are material and which entitle the moving party to judgment as a matter of law. The movant is required to set forth each fact in a short numbered paragraph and include a specific reference to the record to support the fact.

Local Rule 12(n) requires the party opposing the motion to submit a response to each numbered paragraph of the movant's Local Rule 12(m) statement of material facts, indicating any disagreement with the moving party. If the party opposing summary judgment fails to state any disagreement with the facts set forth in the movant's statement, those facts are deemed admitted. The standard set out in Local Rule 12 has been strictly enforced in this district, see *Pasant v. Jackson Nat'l Life Ins. Co.,* 768 F.Supp. 661, 663 (N.D.Ill.1991); *Davis v. Frapolly,* 756 F.Supp. 1065, 1069-70 (N.D.Ill.1991), and in the Court of Appeals. *See Brown v. United States,* 976 F.2d 1104, 1108 (7th Cir.1992); *Schulz v. Serfilco, Ltd.,* 965 F.2d 516, 519 (7th Cir.1992); *Capitol Converting Equip., Inc. v. LEP Transp., Inc.,* 965 F.2d 391, 394-95 (7th Cir.1992); *Bell, Boyd & Lloyd v. Tapy,* 896 F.2d 1101, 1103 (7th Cir.1990). The following statement of facts is drawn from a careful consideration of ACCO's Motion for Summary Judgment, its 12(m) statement and OMC's 12(n) statement, and the record of this case.

FN3. The Local Rule 12(n) statement filed by OMC indicates that in November or December 1988, a Florida patrol boat hit a dock due to a failed cable. The Court notes that the tendered deposition does not support the reference to any date for this collision and on the whole does not appear to be based on the personal knowledge of the deponent. In addition, OMC indicates that in 1988 it was informed of other dock collisions due to cable failures. The document tendered as support for this statement clearly contains hearsay and is itself hearsay on the question of the cause of the dock collisions. Thus, for our purposes, we will credit these facts only to the extent that OMC was informed of some dock collisions involving boats equipped with the Cobra stern drive.

FN4. The Court emphasizes that resolution of the pending motion for summary judgment does not require that we make any ruling as to whether the shift cables were defective or whether they caused any damages. For our purposes, these allegations remain allegations.

FN5. Lest there be any confusion, no one set of forms governed the long relationship of OMC and ACCO. From the Court's review of the record, it appears that OMC issued blanket purchase orders to cover the estimated need for cables for a one year period. OMC would periodically determine the specific number of cables needed and issued a release authorization for that number of cables subject to the terms of the purchase order.

FN6. ACCO expends much effort in arguing that the parties never discussed the standard conditions that form part of the OMC purchase order and that even the OMC buyers are not familiar with the terms or amendments to those terms. ACCO contends that the absence of discussion and its use of its own acknowledgement form demonstrates a lack of acceptance of the OMC purchase order. As to the lack of discussion, § 2-207 is specifically designed to allow for formation of contracts when parties employ forms which often contain additional or different terms which are never discussed. Thus, under the circumstances of this case, the absence of discussion is not critical in the determination of whether or not a contract arose as a result of the exchange of forms. As to the impact of

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

ACCO's use of its own acknowledgment form, as we stated above, the OMC purchase order specified one means of acceptance was the use by ACCO of its own acknowledgement form. Significantly, ACCO's form does not contain language explicitly limiting acceptance to the terms contained in the acknowledgement.

FN7. As the reader will see, this case highlights the difficulties associated with making a distinction between additional terms and different terms. As Judge Posner explained, the majority approach which makes this distinction calls for

a hair-splitting inquiry into the difference between "different" and "additional." It is hair-splitting ("metaphysical," "casuistic," "semantic," in the pejorative senses of the words) because all different terms are additional and all additional terms are different.

*Northrop,* slip op. at 3.

FN8. The Court notes that the warranty in paragraph 21 is that the goods will be free from defects in material and workmanship and shall conform to buyer's specification and samples. That warranty is virtually identical to the warranty found in the quotation. As discussed below, the significant difference is whether additional language in paragraph 21 extends the warranty to future performance. ACCO's warranty has no specified duration but certainly could not extend to future performance.

FN9. In its response to ACCO's motion for summary judgment, ACCO has conceded that its unjust enrichment claim in Count XI is barred by Illinois law. *See Carrier Corp. v. Block Steel Corp.,* No. 91 C 7213, 1993 WL 243179, at *6 (N.D.Ill. June 30, 1993) (Hart, J.). As a result, a detailed analysis on this issue is not warranted and ACCO's motion for summary judgment with respect to Count XI is granted.

FN10. As OMC's own Local Rule 12(n) statement indicates the change in the crimping process occurred about November 1986; yet OMC indicates it received reports of dock collisions in late 1988. This time lag is perhaps indicative of the gradual nature of the deterioration of the shift cables.

FN11. The Court additionally notes that Plaintiff OMC apparently has abandoned its claim for recovery of costs it allegedly incurred as a result of personal injuries to its customers. OMC offers no admissible evidence to indicate such injuries have occurred and offers no argument in response to ACCO's assertion that such injuries are not compensable in tort. Even had OMC attempted to argue this issue, we find that ACCO correctly contends that Illinois law does not allow a Plaintiff to recover in tort for personal injuries suffered by other persons who are not parties to the action. *See American Drug Stores, Inc. v. AT & T Technologies, Inc.,* 583 N.E.2d 694, 696 (Ill.App.Ct.1991); *Washington Courte Condominium Association-Four v. Washington-Golf Corp.* 501 N.E.2d 1290, 1294 (Ill.App.Ct.1986).

N.D.Ill.,1994.
Outboard Marine Corp. v. Babcock Ind., Inc.
Not Reported in F.Supp., 1994 WL 468596 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2930972 (N.D.Ill.)

**C** Potter v. Electrolux Home Products, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Lynn POTTER, Plaintiff,
v.
ELECTROLUX HOME PRODUCTS, INC.,
Defendant.
No. 06 C 4811.

Oct. 11, 2006.

Bryan John O'Connor, Jr., Bryan J. O'Connor, Jr.,
Baal & O'Connor, Chicago, IL, for Plaintiff.
Michael Joseph Summerhill, Laura M. Dreznes,
Katten Muchin Rosenman LLP, Chicago, IL, for
Defendant.

*MEMORANDUM OPINION AND ORDER*

HART, J.
*1 Plaintiff Lynn Potter allegedly injured her hand and
arm when she reached into a washing machine before
the drum stopped turning. Plaintiff alleges this was
caused by a defective door lock/switch. Plaintiff, an
Illinois citizen, brought suit in the Circuit Court of
Cook County, Illinois. Named as defendants were the
manufacturer of the washing machine (Electrolux
Home Products Inc., a Delaware and Georgia citizen)
and the retailer where plaintiff purchased the washing
machine (BassGar-Illinois, Inc., d/b/a Grants
Appliance Electronics & More, an Illinois citizen
(hereinafter "Grants")). The amount in controversy
exceeds $75,000. The First Amended Complaint
contained four counts. Counts I and II, respectively
labeled strict liability and breach of warranty, are
against Electrolux. Counts III and IV, respectively
labeled strict liability and breach of warranty, are
against Grants.

On August 22, 2002, the Circuit Court dismissed
Counts II and IV. The order regarding Count IV states
that it is by agreement. The order dismissing Count
III under 735 ILCS 5/2-621(b) on the ground that it
was not the manufacturer of the washing machine. On
August 30, 2002, the Circuit Court granted that

motion, which took Grants out of the case. With
Grants out of the case, there was complete diversity of
citizenship between the two remaining parties.
According to undisputed representations made in this
court, Grant's motion to dismiss was granted without
consideration of the merits because plaintiff's counsel,
due to having miscalendared the hearing, failed to
appear to oppose the motion. Upon counsel's
realization of the error, plaintiff promptly moved for
reconsideration reinstating Count III. However, before
the reconsideration motion could be heard in state
court, Electrolux removed the case to federal court.
Before the federal court, plaintiff has moved for
reconsideration reinstating Count III against Grants
[FN1] and has also moved to remand the case to state
court since Grants' reinstatement would destroy
diversity.

> FN1. Notice of the motion for
> reconsideration was provided to Grants and
> Grants appeared at the court hearing at which
> the motion for reconsideration was
> addressed.

The version of § 2-621 that is in effect does not
include 1995 amendments made by Public Law 89-7,
but which have been held to be unconstitutional.
See *Best v. Taylor Machine Works,* 179 Ill.2d 367, 228
Ill.Dec. 636, 689 N.E.2d 1057 (1997); *Caterpillar, Inc.*
*v. Usinor Industeel,* 393 F.Supp.2d 659, 684-85
(N.D.Ill.2005). Section 2-621 applies to "any product
liability action based in whole or in part on the
doctrine of strict liability in tort commenced or
maintained against a defendant ... other than the
manufacturer." 735 ILCS 5/2-621(a). Generally, after
a defendant retailer certifies the identity of the
manufacturer of the offending product and the
manufacturer is joined as a defendant, any "strict
liability in tort claim against the certifying defendant"
is dismissed. *Id.* 2-621(b). One exception to this
provision is that a "court shall not enter a dismissal
order relative to any certifying defendant ... where the
plaintiff can *show...* [t]hat the defendant had actual
knowledge of the defect in the product which caused
the injury." *Id.* 2-621(c)(2) (emphasis added). In ¶ 19
of the First Amended Complaint, plaintiff alleges that
Grants had such knowledge. Plaintiff does not contend
that she can actually show that Grants had such

Slip Copy
Slip Copy, 2006 WL 2930972 (N.D.Ill.)

knowledge, but seeks Grants' reinstatement so that she can seek such evidence through discovery.

**\*2** Plaintiff's motion for reconsideration will be granted so that the state court will have an opportunity to address the merits of Grants' motion to dismiss. Defendant Electrolux contends this court should first address the merits of Grants' § 2-621 motion and not grant reconsideration unless the § 2-621 motion would be denied. Since this is a state law issue, it is better to first allow the state court to have the opportunity to address the merits of the issue. Without fully resolving the merits of the issue, it is found that plaintiff has a nonfrivolous basis for arguing that Grants is not entitled to dismissal from this case.

First, under the version of § 2-621 that is presently in effect, only a "strict liability in tort claim" is subject to dismissal. 735 ILCS 5/2-621(b). The Count IV breach of warranty claim would not be subject to dismissal under § 2-621. *Usinor, 393 F.Supp.2d at 684-85.* However, prior to the August 30 dismissal of Grants, plaintiff had agreed to dismiss Count IV. Count III is labeled as a strict liability count. Such labels, however, are not controlling in federal court. *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir.2000); *Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1041 (7th Cir.1999); *Paige v. Hines,* 2006 WL 2252703 *2 (N.D.Ill. Aug.3, 2006).* In Count III, it is alleged that Grants knowingly sold a defective and dangerous washing machine. That can be construed as an allegation of negligence. *SeeWerckenthein v. Bucher Petrochemical Co.,* 248 Ill.App.3d 282, 188 Ill.Dec. 332, 618 N.E.2d 902, 907-08 (1st Dist.1993).*Cf.Blue v. Environmental Engineering, Inc.,* 215 Ill.2d 78, 293 Ill.Dec. 630, 828 N.E.2d 1128, 1141-42 (2005) (distinguishing strict liability and negligence product design claims). Negligence claims are not strict liability claims and therefore are not subject to dismissal under § 2-621. *Link by Link v. Venture Stores, Inc.,* 286 Ill.App.3d 977, 222 Ill.Dec. 283, 677 N.E.2d 486, 488 (5th Dist.), *appeal denied.*174 Ill.2d 566, 227 Ill.Dec. 7, 686 N.E.2d 1163 (1997); *Korologos v. Radium Chemical Co.,* 1986 WL 7700 *3 (N.D.Ill. June 27, 1986); Ison v. Invacare Corp.,* 2004 WL 539982 *1 (N.D.Ill. March 12, 2004) (dictum ).See alsoUngaro v. Rosalco, Inc.,* 948 F.Supp. 783, 786 (N.D.Ill.1996) (1995 amendment to § 2-621 extended application to negligence claims). Even if any strict liability aspect of plaintiff's claim against Grants is subject to dismissal under § 2-621, any

negligence claim apparently would survive.

Second, plaintiff contends that the § 2-621(c)(2) exception would apply because it alleges that Grants had knowledge of the defective washing machine door. A federal case has held that, in federal court, the invocation of § 2-621 should be treated the same as a Fed.R.Civ.P. 12(b)(6) motion. At the pleading stage in federal court, the First Amended Complaint's allegation of knowledge would apparently be sufficient to invoke the subsection (c)(2) exception and prevent dismissal at this time. *SeeIndeck Power Equipment Co. v. Jefferson Smurfit Corp.,* 881 F.Supp. 338, 342 (N.D.Ill.1995). At least one state court case has placed emphasis on the use of "show" in subsection (c), indicating that a plaintiff must making "a showing" to invoke a subsection (c) exception. *SeeLogan v. West Coast Cycle Supply Co.,* 197 Ill.App.3d 185, 143 Ill.Dec. 153, 553 N.E.2d 1139, 1143 (2d Dist.1990). In that case, however, the plaintiff had not alleged actual knowledge to support a subsection (c)(2) exception, having only alleged that "it is possible an expert may testify" to that effect. *Id.* Even if plaintiff's remaining claim against Grants is construed as a strict liability claim only, it is possible that plaintiff's allegation of knowledge is sufficient to defeat Grants' motion to dismiss or that plaintiff would otherwise be permitted discovery prior to the dismissal of Grants.

**\*3** For the foregoing reasons, plaintiff has a nonfrivolous basis for contending that Grants should not be dismissed. Plaintiff's motion for reconsideration is granted. The prior ruling granting defendant Grants' motion to dismiss is vacated. Therefore, Count III is reinstated, which brings Grants back into the case and destroys diversity. Grants' motion to dismiss remains pending and will not be ruled upon prior to the remand. The merits of that motion are left for the Circuit Court to rule upon in the first instance. Grants should notice that motion for presentation before the Circuit Court so that the Circuit Court will be aware it is pending and so that plaintiff will have the opportunity to appear on the motion and oppose it.

IT IS THEREFORE ORDERED that plaintiff's motion for reconsideration [12] is granted in part and denied in part. The prior ruling on defendant Grants' motion to dismiss is vacated without prejudice so that the motion to dismiss is again pending. Count III of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 2930972 (N.D.Ill.)

the First Amended Complaint is reinstated. Plaintiff's motion to remand [9] is granted. The Clerk of the Court is directed to remand this case to the Circuit Court of Cook County, Illinois, County Department, Law Division. Each party shall bear its own costs on removal.

N.D.Ill.,2006.
Potter v. Electrolux Home Products, Inc.
Slip Copy, 2006 WL 2930972 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 373011 (M.D.Fla.)

▷Powers v. Lazy Days RV Center, Inc.
M.D.Fla.,2006.
Only the Westlaw citation is currently available.
United States District Court,M.D. Florida.
Walter L. POWERS, Jr. and Joicelyn Haviland
Powers, Plaintiffs,
v.
LAZY DAYS RV CENTER, INC., and Fleetwood
Enterprises, Inc. Defendants.
**No. 8:05-CV-1542T17EAJ.**

Feb. 16, 2006.

Thomas George Long, Barnett, Bolt, Kirkwood, Long
& McBride, Tampa, FL, William Edward Folsom,
Law Office of William E. Folsom, P.A., Jacksonville,
FL, for Plaintiffs.
W. Scott Powell, Powell & Pearson, LLP, Winter Park,
FL, for Defendants.

*ORDER ON DEFENDANT'S MOTION TO DISMISS*

KOVACHEVICH, J.

**\*1** This cause is before the Court on the Defendant's,
Fleetwood Enterprises, Inc., Motion to Dismiss Count
I and III of the Complaint for failure to state a claim
for which the Court could grant relief, filed on
September 9, 2005, pursuant to Fed.R.Civ.P. 12(b)(6)
(Dkt.8). Also before this Court are the Defendant's
Memorandums in Support of Defendant's Motion to
Dismiss Count I and III of the Complaint (Dkts.9, 19),
and Plaintiff's response thereto, filed on October 14,
2005 (Dkt.10). The motion to dismiss is granted with
prejudice.

BACKGROUND/ PROCEDURAL HISTORY

Plaintiffs in this action, Walter L. Powers, JR. and
Joicelyn Haviland Powers, filed their complaint on
August 23, 2005, for the alleged breach of obligations
under the Magnuson-Moss Federal Warranty
Improvement Act against seller and manufacturer,
violation of statutory warranty under Sec. 320.835, Fla.
Stat. (2002) against seller and manufacturer, and
revocation of acceptance against seller and
manufacturer.

Defendant Fleetwood Enterprises, Inc. ("Fleetwood"),
is a Florida corporation, which, according to Plaintiffs,
manufactured and distributed into interstate
commerce, including into the State of Florida, a new
2003 year model motor home called a Bounder.
Plaintiffs contend that on or about March 21, 2003,
they purchased a new Fleetwood Bounder VIN #
5B4MP67G733369322, for the terms and conditions
as contained in the Manufacturer's Suggested Retail
Price invoice.

Plaintiffs allege that since delivery of the subject
vehicle, they began experiencing, and have continued
to experience an array of defects/non-conformities, as
evidenced by the repair orders. Plaintiffs further allege
that they gave the Seller and Manufacturer a
reasonable opportunity to cure the problems, all to no
avail.

Prior to filing this action, the Plaintiffs gave Notice of
Breaches of Warranties and Revocation of Acceptance.
According to Plaintiffs, Fleetwood, as well as the
other Defendant, Lazy Days' R.V. Center, Inc. ("Lazy
Days"), have failed to rectify the problems and
complaints, which the warranties covered. As a result
of the recreational vehicle not conforming to the
conditions warranted, Plaintiffs brought forth the
above stated actions against both Defendants.

STANDARD OF REVIEW

As a defense to a plaintiff's complaint, a defendant
may file a motion with the court when the plaintiff has
failed to state a claim under which relief can be
granted. (Fed.R.Civ.P. 12(b)(6)). Under 12(b)(6), a
cause of action should only be dismissed for failure to
state a claim when it appears, beyond doubt, that the
plaintiff will be unable to prove a set of facts in
support of a theory of recovery entitling the plaintiff to
relief. *Conley v. Gibson,* 355 U.S. 41, 45-6, 78 S.Ct.
99, 2 L.Ed.2d 80 (1957). When ruling on a motion to
dismiss, a court is required to view the complaint in
the light most favorable to the plaintiff. *Scheuer v.
Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90
(1974). Additionally, the Eleventh Circuit Court of
Appeals has held that dismissal under Rule 12(b)(6) is
warranted "only if it is clear that no relief could be
granted under any set of facts that could be proved

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 373011 (M.D.Fla.)

consistent with the allegations" of the complaint. *Access Now Inc. v. Southwest Airlines Co.,* 385 F.3d 1324, 1326 (11th Cir.2004).

**\*2** Furthermore, when a federal court reviews a complaint's sufficiency, the issue is not whether the plaintiff will ultimately emerge victorious, but whether the claimant is entitled to offer evidence to support the claims.*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

## DISCUSSION

Defendant has filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), as a matter of law for Counts I and III for failure to state claims upon which relief can be granted.

### A. *Count I*

Defendant Fleetwood seeks to dismiss Count I of Plaintiff's claim of the alleged breach of obligations under the Magnuson-Moss Federal Warranty Improvement Act. Fleetwood asserts that Count I is premised on a theory of "implied warranty," and fails to state any cause of action due to the absence of privity between Plaintiff and Fleetwood. Under Magnuson-Moss Act, one must look to state law privity requirements in order to determine if an implied warranty "arises." *Abraham v. Volkswagen of America, Inc.,* 795 F.2d 238, 248-49 (2d Cir.1986).

In response, Plaintiffs argue that according to Florida Supreme Court, implied warranties arise under Florida law even if there is no privity of sale. Specifically, Plaintiffs cite to Florida Supreme Court case of 1967, *Manheim v. Ford Motor Company,* 201 So.2d 440 (Fla.1967).

In *Manheim,* the car buyer was not precluded from recovery on an implied warranty theory from Ford manufacturer. However, it is important to note the very limited scope of *Manheim* decision. "It deals only with the effect of a disclaimer *in a contract between a manufacturer and its dealer."Desandolo v. F & C Tractor & Equipment Co.,* 211 So.2d 576, 579 (Fla.Dist.Ct.App.1968). Furthermore, although Plaintiffs are correct to say that *Manheim* was decided after the Florida Legislature's 1965 adoption of the Uniform Commercial Code (Chapter 672, Fla. Stat.),

the sale at issue in the *Manheim* case occurred prior to the adoption of the UCC. Therefore, this Court is not bound to follow the *Manheim* decision

Under Florida law, to recover for breach of implied warranty, the plaintiff must be in privity of contract with the defendant. *T.W.M. v. American Medical Systems, Inc.,* 886 F.Supp. 842, 844 (N.D.Fla.1995) (holding that plaintiff who does not buy product directly from defendant is not in privity with that defendant), citing *Kramer v. Piper Aircraft Corp.,* 520 So.2d 37, 38 (Fla.1988); *McAteer v. Black & Decker, Inc.,* 1999 WL 33836701 (M.D.Fla.1999) (stating that a manufacturer's issuance of "written instructions and a written warranty to the ultimate consumer" were insufficient to create the requisite "privity" for breach of implied warranty).

As properly noted by the Defendant Fleetwood, Plaintiffs lack privity with Fleetwood to bring an "implied warranty" action against it. Accordingly, Count I is dismissed with prejudice.

### B. *Count III*

Defendant further seeks to dismiss Count III of Plaintiff's claim of revocation of acceptance under Fla. Stat. § 672.608. Fleetwood asserts that this claim is not cognizable against a non-privity, non-selling vehicle manufacturer.

**\*3** Under Florida law, a buyer may not maintain a "revocation of acceptance" claim against a non-selling, non-privity vehicle manufacturer. *Mesa v. BMW of North America LLC,* 904 So.2d 450, 2005 WL 1026717 (Fla. 3d DCA 2005) (vehicle lessee's revocation claim under MMWA against distant car manufacturer dismissed due to absence of privity). Other jurisdictions have found that a cause of action for revocation of acceptance requires privity. See e.g., *Gilbert v. Monaco Coach Corp.,* 352 F.Supp.2d 1323, 1335 (N.D.Ga.2004). By its express terms, chapter 672 applies to "sales" and Fla. Stat. § 672.608 applies to transactions involving a "buyer" and a "seller." *Sellers v. Frank Griffin AMC Jeep, Inc.,* 526 So.2d 147, 150 (Fla.Dist.Ct.App.1988).

Thus, Plaintiffs lack privity with Fleetwood to bring a claim of revocation of acceptance. Accordingly, Count III is also dismissed with prejudice.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 373011 (M.D.Fla.)

ORDERED that the Defendant's Motion to Dismiss Counts I and III of Plaintiffs' claim be GRANTED with prejudice only as to Defendant Fleetwood Enterprises, Inc. Defendant Fleetwood shall have ten days from this date to answer Count II of the complaint.

DONE AND ORDERED.

M.D.Fla.,2006.
Powers v. Lazy Days RV Center, Inc.
Not Reported in F.Supp.2d, 2006 WL 373011 (M.D.Fla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)

Page 1

CStella v. LVMH Perfumes and Cosmetics ISA, Inc.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Pamela STELLA, individually and on behalf of all
others similarly situated, Plaintiff,
v.
LVMH PERFUMES AND COSMETICS USA,
INC., a New York corporation, Defendant.
**No. 07 C 6509.**

July 8, 2008.

**Background:** Consumer brought putative class
action against seller of luxury goods, stemming from
alleged exposure to lead contained in lipstick. Seller
moved for dismissal.

**Holdings:** The District Court, Elaine E. Bucklo, J.,
held that:
(1) consumer stated claim under Illinois Consumer
Fraud and Deceptive Business Practices Act (ICFA);
(2) lipstick was merchantable item;
(3) consumer satisfied notice requirements for breach
of warranty claim; and
(4) consumer stated unjust enrichment claim.

Motion granted in part.

[1] Antitrust and Trade Regulation 29T ⚯134

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk134 k. In General. Most Cited
Cases

Antitrust and Trade Regulation 29T ⚯138

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements

                29Tk138 k. Reliance; Causation;
Injury, Loss, or Damage. Most Cited Cases
To state claim under Illinois Consumer Fraud and
Deceptive Business Practices Act (ICFA), plaintiff
must allege: (1) deceptive act or practice by
defendant; (2) defendant's intent that plaintiff rely on
deception; (3) occurrence of deception in course of
conduct involving trade or commerce; and (4) actual
damage to plaintiff proximately caused by deception.
S.H.A. 815 ILCS 505/1 et seq.

[2] Antitrust and Trade Regulation 29T ⚯358

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(E) Enforcement and Remedies
            29TIII(E)5 Actions
                29Tk356 Pleading
                    29Tk358 k. Particular Cases. Most
Cited Cases
Consumer who sued seller of luxury goods alleged
that seller failed to include lead in its ingredient list
for lipstick and that she would not have purchased
lipstick had she known of lead content, as required to
state claim under Illinois Consumer Fraud and
Deceptive Business Practices Act (ICFA); complaint
averred that, as manufacturer of lipstick, seller knew
or should have known that lead was ingredient, and
that it failed to disclose fact to consumers in listing
product's ingredients. S.H.A. 815 ILCS 505/1 et seq.

[3] Sales 343 ⚯272

343 Sales
    343VI Warranties
        343k265 Implied Warranty of Quality,
Fitness, or Condition
            343k272 k. Merchantability. Most Cited
Cases
Consumer who sued seller of luxury goods,
stemming from alleged exposure to lead contained in
lipstick, alleged that lipstick was merchantable item,
as required to state claim for breach of implied
warranty under Illinois law; ordinary purpose of
lipstick was to color its user's lips in reasonably safe
manner, and complaint averred that lipstick was not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)

safe. S.H.A. 810 ILCS 5/2-314(c).

**[4] Sales 343 ⟐285(1)**

343 Sales
    343VI Warranties
        343k285 Notice to Seller of Defects
            343k285(1) k. Necessity and Effect of
Notice in General. Most Cited Cases
Under Illinois law, direct notice of breach of
warranty claim is not required when: (1) seller has
actual knowledge of defect of particular product; or
(2) consumer-plaintiff suffers personal injury, in
which case notice requirement can be satisfied by
filing lawsuit against seller. S.H.A. 810 ILCS 5/2-
607(3)(A).

**[5] Sales 343 ⟐285(1)**

343 Sales
    343VI Warranties
        343k285 Notice to Seller of Defects
            343k285(1) k. Necessity and Effect of
Notice in General. Most Cited Cases
Consumer who sued seller of luxury goods,
stemming from alleged exposure to lead contained in
lipstick, alleged that seller had actual knowledge of
presence of lead, as required to satisfy notice
requirement for breach of implied warranty claim
under Illinois law; complaint averred that seller knew
or should have known that concerned lipstick
products did not meet capabilities as represented and
marketed. S.H.A. 810 ILCS 5/2-607(3)(A).

**[6] Sales 343 ⟐255**

343 Sales
    343VI Warranties
        343k255 k. Parties; Privity. Most Cited Cases
Illinois law requires contractual privity as
prerequisite for breach of implied warranty claims for
recovery of economic losses.

**[7] Implied and Constructive Contracts 205H ⟐81**

205H Implied and Constructive Contracts
    205HII Actions
        205HII(B) Pleading
            205Hk81 k. Declaration, Complaint, or
Petition. Most Cited Cases
In order to state claim for unjust enrichment under
Illinois law, plaintiff must allege that defendant
retained benefit to plaintiff's detriment, and that
retention of that benefit violates fundamental
principles of justice, equity, and good conscience.

**[8] Implied and Constructive Contracts 205H ⟐81**

205H Implied and Constructive Contracts
    205HII Actions
        205HII(B) Pleading
            205Hk81 k. Declaration, Complaint, or
Petition. Most Cited Cases
Consumer who sued seller of luxury goods,
stemming from alleged exposure to lead contained in
lipstick, alleged that seller retained benefit to her
detriment, as required to state unjust enrichment
claim under Illinois law; complaint averred that
lipstick contained dangerous levels of lead and was
unfit for its intended purposes, and that it was
inequitable for seller to retain funds it received as
consequence of its sales.

Ben Barnow, Sharon Harris, Erich Paul Schork,
Barnow & Associates, P.C., Aron David Robinson,
Law Office of Aron D. Robinson, Kevin Barry
Rogers, Law Offices of Kevin Rogers, Chicago, IL,
for Plaintiff.
Francis Anthony Citera, Greenberg Traurig, LLP,
Robert Eliot Shapiro, Barack Ferrazzano Kirschbaum
& Nagelberg LLP, Chicago, IL, Rachael M.
Trummel, Barone & Jenkins, P.C., Oakbrook
Terrace, IL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

ELAINE E. BUCKLO, District Judge.
*1 Defendant LVMH Perfumes and Cosmetics USA,
Inc. ("LVMH") moves to dismiss the complaint
brought by plaintiff Pamela Stella, individually and
on behalf of all others similarly situated, for failure to
state a claim under FED. R. CIV. P. 12(b)(6). For the
following reasons, the motion is granted in part.

I.

Defendant is in the business of selling luxury goods,
including Hennessy cognac, Dom Perignon

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)

champagne, and Christian Dior perfumes and cosmetics. This case concerns Christian Dior's "Addict Positive Red" lipstick ("lipstick"), which is sold at various retailers throughout the United States. The complaint alleges that on October 11, 2007, the Campaign for Safe Cosmetics ("CFS") made public a report revealing that the LVMH's lipstick products contain dangerous levels of lead. According to plaintiff, the tests conducted by the CFS revealed that the lipstick contained lead in the amount of .21 parts per million ("ppm"), when the U.S. Food and Drug Administration has established a limit of .1 ppm for levels of lead in candy.

Plaintiff alleges she purchased the lipstick at a Nordstrom department store in June 2007 for personal use. As a result, she claims to have been exposed to lead, which is contained in the lipstick. According to the complaint, LVMH's marketing of the lipstick "affirmatively and impliedly" assured consumers that the product was safe for use.

The complaint alleges claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, et seq. (2007) (count I); breach of implied warranty pursuant to the Uniform Commercial Code ("UCC") (count II); breach of implied warranty pursuant to the Magnuson-Moss Warranty Act ("MMWA") (count III); strict liability (count IV); and negligence per se (count V); unjust enrichment (count VI); and injunctive relief (count VII).

## II.

In assessing defendant's motion to dismiss under FED. R. CIV. P. 12(b)(6), I must view the allegations in the light most favorable to the plaintiff and accept all well-pleaded facts in the complaint as true. *McMillan v. Collection Prof'ls,* 455 F.3d 754, 758 (7th Cir.2006) (citation omitted)."Factual allegations must be enough to raise a right to relief above the speculative level."*Bell Atl. Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (May 21, 2007); *E.E. O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776-77 (7th Cir.2007). Moreover, under Rule 9(b), allegations of fraud are subject to heightened pleading requirements. *FED. R. CIV. P. 9(b).* Fraud must be pled with particularity and the complaint must allege the "who, what, when, where, and how" of the fraud. *DiLeo v. Ernst &*

*Young,* 901 F.2d 624, 627 (7th Cir.1990).

## III.

### A. Count I: ICFA

[1] The complaint alleges defendant violated the ICFA. To state a claim under the ICFA plaintiff must allege "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception."*Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 180, 296 Ill.Dec. 448, 835 N.E.2d 801, 850 (Ill.2005) (citation omitted). In addition, claims under the ICFA must be pled with particularity. *See Villasenor v. Am. Signature Inc.,* No. 06 C 5493, 2008 WL 904888, at *2 (Mar. 31, 2008) (Kendall, J.) (citations omitted).

*2 [2] When the allegations are taken in the best light to plaintiff, they state a claim under the ICFA and provide defendant with adequate notice of the claim. The complaint specifically alleges defendant failed to include lead in its ingredient list for the lipstick and that she would not have purchased the lipstick had she known she would have been exposed to the lead contained in the product. Plaintiff alleges that as the manufacturer of the lipstick, defendant knew or should have known that lead was an ingredient and that it failed to disclose this fact to consumers in listing the product's ingredients. Plaintiff seeks to recover actual damages in the form of pecuniary damages (the cost of the lipstick) and medical monitoring. Actual damages include pecuniary losses. *Id.* at *4. And in the absence of guidance from the Illinois Supreme Court on the propriety of medical monitoring claims under Illinois law, I find persuasive the federal case law finding such a claim cognizable under Illinois law. *See, e.g., Carey v. Kerr-McGee Chemical Corp.,* 999 F.Supp. 1109, 1118-19 (N.D.Ill.1998) (Gettleman, J.)[FN1] Finally, plaintiff has alleged that her reliance on defendant's omission caused her to buy the lipstick and become exposed to lead. This sufficiently alleges proximate cause. Accordingly, the motion to dismiss count I is denied.

### B. Counts II and III: Breach of Implied Warranty Pursuant to the U.C.C. and the MMWA.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)

[3] Defendant first argues that plaintiff has failed to plead the goods are not "merchantable" under Illinois law. 810 ILCS § 5/2-314. For goods to be considered "merchantable," they must conform to a set of standards which includes being "fit for the ordinary purposes for which such goods are used."810 ILCS 5/2-314(c). Although defendant concedes the complaint plainly alleges there are dangerous levels of lead in the lipstick, it still argues this does not sufficiently provide the lipstick was not fit for its ordinary purpose. This argument has no merit under federal pleading standards. See Concentra Health Servs., 496 F.3d at 776-77, 779-80.Both parties agree the ordinary purpose of lipstick is to color its user's lips in a reasonably safe manner. The complaint plainly alleges the lipstick was not safe. Accordingly, the motion to dismiss on this ground is denied.

[4] Defendant also moves to dismiss counts II and III on the ground that plaintiffs failed to provide pre-suit notice as required by the UCC and the MMWA. Under the UCC, a plaintiff-buyer pursuing a breach of warranty claim must give the seller notice of the claimed breach or be barred from recovery.U.C.C. § 2-607; 810 ILCS 5/2-607 (3)(A). This notice requirement is intended to encourage pre-suit settlement negotiations, seeU.C.C. § 2-607 cmt. 4; see also Reyes v. Mcdonald's Corp., Nos. 06 C 1604, 06 C 2813, 2006 WL 3253579, at *3, (N.D.Ill. Nov. 8, 2006) (Kendall, J.), and is subject to two exceptions. Direct notice is not required when (1) the seller has actual knowledge of the defect of the particular product; or (2) a consumer plaintiff suffers a personal injury, in which case the notice requirement could be satisfied by filing a lawsuit against the seller. See Allstate Ins. Co. v. Daimler Chrysler, No. 03 C 6107, 2004 WL 442679, at *2 (N.D.Ill. Mar. 9, 2004) (Lefkow, J.) (citing Connick v. Suzuki Motor Co. Ltd., 174 Ill.2d 482, 492, 221 Ill.Dec. 389, 675 N.E.2d 584, 589 (1996)).

*3 [5] When taken as a whole and in the best light to plaintiff, the complaint sufficiently alleges LVMH had actual knowledge of the presence of lead in the lipstick. (Compl. at ¶¶ 4, 6, 25.) Counts II and III allege that "LVMH knew or should have known that the concerned lipstick products did not meet the capabilities as represented and marketed."(Id. at ¶¶ 60, 68.)This is enough to fit the claim under the first identified exception to the direct notice requirement.

That said, the claim only survives to the extent that plaintiff alleges actual knowledge-not negligence. Accordingly, the motion to dismiss on this ground is denied.

[6] Defendant also argues that the complaint does not sufficiently allege vertical privity between LVMH and Nordstrom-the department store where plaintiff alleges she purchased the lipstick. Illinois law requires contractual privity as a prerequisite for breach of implied warranty claims for recovery of economic losses. Voelker v. Porsche Cars North Am., Inc., 353 F.3d 516, 527 (7th Cir.2003). The complaint does not allege contractual privity exists among the parties. Plaintiff does argue there is an agency relationship between Nordstrom and LVMH, but the allegations in the complaint are silent in this respect. See Lantz v. Am. Honda Motor Co., No. 06 C 5932, 2007 WL 1424614, at *11 (N.D.Ill. May 14, 2007). The complaint only alleges that LVMH manufactures, markets, and sells the lipstick, but does not address the relationship between the retailer in question and LVMH. That said, plaintiff's claim for medical monitoring is a form of personal injury claim. See, e.g., Carey, 999 F.Supp. at 1120;see also Muniz v. Rexnord Corp., No. 04 C 2405, 2006 WL 1519571, at *3 (N.D.Ill.2006) (Darrah, J.). Therefore, plaintiff does not seek to recover solely economic losses, which exempts plaintiff from this privity requirement. See Collins Co., Ltd. v. Carboline Co., 837 F.2d 299, 301 (7th Cir.1988) (privity is a requirement "only in cases of economic loss in contrast to ... personal injury claims") (citations omitted); Berry v. G.D. Searle & Co., 56 Ill.2d 548, 309 N.E.2d 550 (Ill.1974); Jensen v. Bayer AG, 371 Ill.App.3d 682, 691, 308 Ill.Dec. 888, 862 N.E.2d 1091, 1099-1100 (2007) ("a plaintiff may be excepted from the privity requirement by suing for personal injury") (citations omitted). Accordingly, the motion to dismiss on this ground is denied.

Finally, defendant moves to dismiss count III on the ground that plaintiff does not satisfy the MMWA's jurisdictional requirements. Under section 2310(d)(3) of the MMWA, I lack jurisdiction over class actions where the number of named plaintiffs is less than 100, as is the case here. Plaintiff argues that the Class Action Fairness Act of 2005, Pub.L. 109-2, § 4, 119 Stat. 4, 9 (codified at 28 U.S.C. § 1332(d)) ("CAFA") creates an alternative basis for federal jurisdiction over the MMWA claim and provides case law in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)

support. *See McCalley v. Samsung Electronics Am., Inc.,* No. CIV.A. 07-2141(JAG), 2008 WL 878402, at *4-5 (D.N.J. Mar. 31, 2008); *Payne v. Fujifilm U.S.A., Inc.,* No. CIV.A. 07-385(JAG), 2007 WL 4591281, at *7 (D.N.J. Dec. 28, 2007); *McGee v. Continental Tire North Am., Inc.,* No. CIV.06-6234 (GEB), 2007 WL 2462624, at *2-3 (D.N.J. Aug. 27, 2007); *Clark v. Wynn's Extended Care,* No. 06 C 2933, 2007 WL 922244, at *4-5 (N.D.Ill. Mar. 23, 2007) (St.Eve, J.); *Chavis v. Fidelity Warranty Servs., Inc.,* 415 F.Supp.2d 620, 624-26 (D.S.C.2006). Defendant fails to respond to this argument in its reply brief. In light of the case law and defendant's silence, I find I have jurisdiction in light of CAFA and the motion to dismiss on this count is denied.

## C. Strict Liability and Negligence Per Se Claims

*4 Defendant moves to dismiss counts IV and V on the ground that plaintiff has failed to allege an actual injury. Because I have already found plaintiff's claim for medical monitoring is a form of personal injury claim, *see, e.g., Carey,* 999 F.Supp. at 1120;*see also Muniz,* 2006 WL 1519571 at *3, the motion is denied. When the remaining allegations in the complaint are taken as true, plaintiff sufficiently states a claim in counts IV and V.

## D. Unjust Enrichment

[7][8] In order to state a claim for unjust enrichment under Illinois law a plaintiff must allege that the defendant retained a benefit to the plaintiff's detriment, and that the retention of that benefit violates fundamental principles of justice, equity, and good conscience. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp.,Inc.,* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989). The complaint sufficiently states a claim in light of the allegations that the lipstick contained dangerous levels of lead and was unfit for its intended purposes and that it was inequitable for LVMH to retain the funds it received as a consequence of the sale of the lipstick. Accordingly, the motion to dismiss count VI is denied.

## E. Injunctive Relief

Defendant moves to strike plaintiffs' request for injunctive relief. Plaintiffs failed to oppose this.

Accordingly, the motion to dismiss plaintiffs' request for injunctive relief in count VII is granted.

### IV.

For the foregoing reasons, defendant's motion to dismiss is granted in part. Count VII is dismissed.

> FN1. To the extent defendant's motion to dismiss the remaining counts rests on the same argument-that medical monitoring is not a cognizable personal injury claim in Illinois, and thus plaintiff has failed to allege damages-the motion is denied.

N.D.Ill.,2008.
Stella v. LVMH Perfumes and Cosmetics ISA, Inc.
--- F.Supp.2d ----, 2008 WL 2669662 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

**H**Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing Services, Inc.
C.A.7 (Ill.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
WINDY CITY METAL FABRICATORS & SUPPLY, INCORPORATED and Midwest Ink Company, on Behalf of Itself and All Others Similarly Situated, Plaintiffs-Appellants,
v.
CIT TECHNOLOGY FINANCING SERVICES, INCORPORATED and Reed Smith, a New Jersey Limited Partnership, Defendants-Appellees.
No. 07-1567.

Argued Oct. 25, 2007.
Decided Aug. 1, 2008.

**Background:** Customers filed complaint against entity to which their equipment rental agreements had been sold for entity's alleged common law fraud and violations of provisions of the Illinois Consumer Fraud and Deceptive Business Practices Act. The United States District Court for the Northern District of Illinois, Wayne R. Andersen, J., 2007 WL 495276, granted motion to dismiss for failure to state claim, and customers appealed.

**Holdings:** The Court of Appeals, Ripple, Circuit Judge, held that:
(1) allegations in customers' complaint failed to plead fraud with requisite particularity and were insufficient to state claim for common law fraud;
(2) complaint to recover for defendants' alleged unfair practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act only had to satisfy notice pleading standard, and did not have to satisfy any heightened particularity standard; and
(3) allegations in customers' complaint against entity to which their equipment rental agreements had been sold were sufficient to state claim for unfair practices.

Affirmed in part and reversed and remanded in part.

**[1] Federal Courts 170B 🔑776**

170B Federal Courts

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews de novo a district court's grant of motion to dismiss for failure to state claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A 🔑636**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak633 Certainty, Definiteness and Particularity
170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Circumstances of fraud or mistake, such as plaintiff must plead with particularity under heightened federal pleading rules, include identity of person who made misrepresentation, time, place, and content of misrepresentation, and method by which misrepresentation was communicated to plaintiff. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A 🔑636**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak633 Certainty, Definiteness and Particularity
170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Allegations in customers' complaint against entity to which their equipment rental agreements had been sold were insufficient to state claim for common law fraud, where complaint, while alleging at length the fraud perpetrated by the now-bankrupt company that had sold their rental agreements, did not allege the what, when and how of any misrepresentations made by defendant with particularity required under federal pleading rules. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[4] Antitrust and Trade Regulation 29T 🔑128**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

29T Antitrust and Trade Regulation
　　29TIII Statutory Unfair Trade Practices and Consumer Protection
　　　　29TIII(A) In General
　　　　　　29Tk126 Constitutional and Statutory Provisions
　　　　　　　　29Tk128 k. Purpose and Construction in General. Most Cited Cases
Illinois Consumer Fraud and Deceptive Business Practices Act is regulatory and remedial statute meant to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices. S.H.A. 815 ILCS 505/1 et seq.

**[5] Antitrust and Trade Regulation 29T ☞135(1)**

29T Antitrust and Trade Regulation
　　29TIII Statutory Unfair Trade Practices and Consumer Protection
　　　　29TIII(A) In General
　　　　　　29Tk133 Nature and Elements
　　　　　　　　29Tk135 Practices Prohibited or Required
　　　　　　　　　　29Tk135(1) k. In General; Unfairness. Most Cited Cases

**Antitrust and Trade Regulation 29T ☞136**

29T Antitrust and Trade Regulation
　　29TIII Statutory Unfair Trade Practices and Consumer Protection
　　　　29TIII(A) In General
　　　　　　29Tk133 Nature and Elements
　　　　　　　　29Tk136 k. Fraud; Deceit; Knowledge and Intent. Most Cited Cases
Recovery under the Illinois Consumer Fraud and Deceptive Business Practices Act may be had for unfair as well as deceptive conduct. S.H.A. 815 ILCS 505/1 et seq.

**[6] Antitrust and Trade Regulation 29T ☞135(1)**

29T Antitrust and Trade Regulation
　　29TIII Statutory Unfair Trade Practices and Consumer Protection
　　　　29TIII(A) In General
　　　　　　29Tk133 Nature and Elements

29Tk135 Practices Prohibited or Required
　　　　29Tk135(1) k. In General; Unfairness. Most Cited Cases
Three considerations guide Illinois courts in deciding whether practice is "unfair" under the Illinois Consumer Fraud and Deceptive Business Practices Act: (1) whether practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers. S.H.A. 815 ILCS 505/1 et seq.

**[7] Antitrust and Trade Regulation 29T ☞135(1)**

29T Antitrust and Trade Regulation
　　29TIII Statutory Unfair Trade Practices and Consumer Protection
　　　　29TIII(A) In General
　　　　　　29Tk133 Nature and Elements
　　　　　　　　29Tk135 Practices Prohibited or Required
　　　　　　　　　　29Tk135(1) k. In General; Unfairness. Most Cited Cases
Three considerations that guide Illinois courts in determining whether a practice is "unfair" under the Illinois Consumer Fraud and Deceptive Business Practices Act, i.e., the "public policy," moral/ethical, and "harm to consumers" criteria, need not all be satisfied for practice to be found unfair; indeed, practice may be "unfair" because of degree to which it meets one of these three criteria, or because, to lesser extent, it meets all three. S.H.A. 815 ILCS 505/1 et seq.

**[8] Antitrust and Trade Regulation 29T ☞358**

29T Antitrust and Trade Regulation
　　29TIII Statutory Unfair Trade Practices and Consumer Protection
　　　　29TIII(E) Enforcement and Remedies
　　　　　　29TIII(E)5 Actions
　　　　　　　　29Tk356 Pleading
　　　　　　　　　　29Tk358 k. Particular Cases. Most Cited Cases

**Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
　　170AVII Pleadings and Motions

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

170AVII(A) Pleadings in General
　　170Ak633 Certainty, Definiteness and Particularity
　　　170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Complaint to recover for defendants' alleged unfair practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act only had to satisfy notice pleading standard, and did not have to satisfy any heightened particularity standard, given that neither fraud nor mistake was element of "unfair conduct" under this Illinois Act. Fed.Rules Civ.Proc.Rules 8(a), 9(b), 28 U.S.C.A.; S.H.A. 815 ILCS 505/1 et seq.

[9] Federal Courts 170B ☞433

170B Federal Courts
　　170BVI State Laws as Rules of Decision
　　　170BVI(C) Application to Particular Matters
　　　　170Bk433 k. Other Particular Matters. Most Cited Cases
Federal court sitting in diversity applies federal pleading requirements, even when the claim pled arises under state rather than federal law.

[10] Federal Courts 170B ☞373

170B Federal Courts
　　170BVI State Laws as Rules of Decision
　　　170BVI(A) In General
　　　　170Bk373 k. Substance or Procedure; Determinativeness. Most Cited Cases
District court exercising jurisdiction because parties are of diverse citizenship must apply state substantive law and federal procedural law.

[11] Federal Courts 170B ☞373

170B Federal Courts
　　170BVI State Laws as Rules of Decision
　　　170BVI(A) In General
　　　　170Bk373 k. Substance or Procedure; Determinativeness. Most Cited Cases
In evaluating whether a particular state law is "procedural" or "substantive," for purposes of deciding whether it must apply that law when sitting in diversity, federal district courts take as their starting point the principle that outcome of litigation in federal court should be substantially the same, so far as legal rules determine outcome of litigation, as it would be if tried in state court.

[12] Federal Courts 170B ☞373

170B Federal Courts
　　170BVI State Laws as Rules of Decision
　　　170BVI(A) In General
　　　　170Bk373 k. Substance or Procedure; Determinativeness. Most Cited Cases
When faced with conflict between state and federal rule of procedure, federal court sitting in diversity must first decide whether there is actual conflict between these rules by determining whether scope of federal rule is sufficiently broad to control issue before court; if federal rule is sufficiently broad to control issue, court must then evaluate the rule to ensure that it has neither exceeded the Congressional mandate embodied in the Rules Enabling Act nor transgressed Constitutional bounds, in which case it should be applied, despite the fact that its application might alter mode of enforcing state-created right.

[13] Antitrust and Trade Regulation 29T ☞358

29T Antitrust and Trade Regulation
　　29TIII Statutory Unfair Trade Practices and Consumer Protection
　　　29TIII(E) Enforcement and Remedies
　　　　29TIII(E)5 Actions
　　　　　29Tk356 Pleading
　　　　　　29Tk358 k. Particular Cases. Most Cited Cases
Federal notice pleading standard, rather than conflicting state law standard, governed whether allegations in complaint that was before district court pursuant to its diversity jurisdiction were sufficient to state claim under "unfair practices" provision of the Illinois Consumer Fraud and Deceptive Business Practices Act; prescribing specificity with which claim had to be pled related solely to practice and procedure of court and clearly fell within scope of the Rules Enabling Act, and there was no basis for concluding that regulation of pleading requirements in federal court exceeded limits of federal constitutional authority. 28 U.S.C.A. § 2072; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.; S.H.A. 815 ILCS 505/1 et seq.

[14] Antitrust and Trade Regulation 29T ☞161

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

Page 4

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
         29Tk161 k. Representations, Assertions, and Descriptions in General. Most Cited Cases
Allegations in customers' complaint against entity to which their equipment rental agreements had been sold were sufficient to state claim for unfair practices under the Illinois Consumer Fraud and Deceptive Business Practices Act, where complaint alleged that defendant had used unfair practices, specifically the dissemination of false advertisements fore purpose of inducing customers to enter into unconscionable equipment rental agreements, further alleged that defendant attempted to enforce these agreements, and finally alleged that customers had suffered loss as a result of these allegedly illegal equipment rental agreements. Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.; S.H.A. 815 ILCS 505/1 et seq.

David A. Novoselsky (argued), Novoselsky Law Office, Chicago, IL, for Plaintiffs-Appellants.
Edward F. Ryan (argued), Holland & Knight, George M. Hoffman, Michael T. Trucco (argued), Stamos & Trucco, Chicago, IL, for Defendants-Appellees.

Before EASTERBROOK, Chief Judge, and RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.
*1 Windy City Metal Fabricators & Supply Inc. ("Windy City") sued CIT Technology Financing Services ("CIT") and the law firm Reed Smith in Illinois state court. After Reed Smith removed the action to the district court based on diversity of citizenship,[FN1] Midwest Ink Co. was added as a plaintiff. CIT and Reed Smith filed a motion to dismiss, which the district court granted. The plaintiffs timely appealed the dismissal.[FN2] For the reasons stated in this opinion, we affirm in part and reverse in part the judgment of the district court. The case is remanded for further proceedings consistent with this opinion.

I

BACKGROUND

A.

Because this case comes to us after the district court dismissed the complaint for failure to state a claim, we take as true the facts alleged in the complaint. Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir.2008). The events at issue in this appeal came about as a result of the activities of Norvergence, a now-bankrupt company. When still in business, Norvergence leased to business customers a telecommunications service package called the Matrix Solution. The package included the customer's communication service and hardware that could be leased only from Norvergence through an equipment rental agreement. Norvergence claimed that the equipment contained proprietary components that reduced a user's telecommunications bill; in fact, the equipment had no effect on the customer's telecommunications services. In some instances, Norvergence did not even connect the devices.

After Norvergence entered into an equipment rental agreement with a customer, it assigned that agreement to one of a number of third parties. The customer received standard telecommunications equipment that actually was worth only a small fraction of the customer's monthly payment on the equipment rental agreement. Norvergence used the funds, which it obtained by selling the equipment rental agreement to the third party, to pay the customer's telecommunications services bill. Norvergence was unable, however, to continue to pay its customers' bills because it paid more for the monthly services than it obtained by selling the rental agreements. Norvergence went bankrupt. Its customers were left without telecommunications service, but they had continuing obligations under the equipment rental agreement to pay the third-party assignee for the equipment.

Windy City and Midwest Ink are two businesses that purchased these equipment rental agreements from Norvergence. Norvergence sold their rental agreements to CIT. When Norvergence later went bankrupt, Windy City and Midwest Ink stopped receiving telecommunications services because Norvergence was no longer paying for the services. Windy City and Midwest Ink nevertheless had a continuing obligation under the assigned equipment rental agreement to lease equipment from CIT.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

The Illinois Attorney General obtained a default judgment against Norvergence in an Illinois court. Under that judgment, the contracts between Norvergence and its Illinois consumers were held to have been void *ab initio* because they stemmed from solicitations that were the result of unfair business practices and fraud on the part of Norvergence. Reed Smith, acting on behalf of CIT, then executed an Assurance of Voluntary Discontinuance (the "Assurance") with the Illinois Attorney General. Under its terms, CIT offered to reduce by eighty-five percent the amount that each customer owed to CIT on its rental agreement and to refund sixty-seven percent of the insurance-related charges paid by the customer on the rental agreements.

*2 As required by the Assurance, CIT sent a settlement letter directly to each of its lessees, including Windy City and Midwest Ink. Shortly thereafter, Reed Smith also sent a letter to Windy City's attorneys in order to ensure that they were aware of the letter. Midwest Ink accepted the settlement offer, but Windy City did not accept it.

**B.**

In 2005, Windy City filed its original proposed class action complaint against CIT in Illinois state court. It sought to represent Norvergence customers whose rental agreements had been assigned to CIT. Reed Smith was added as a defendant in the fall of 2005, and it removed the action to the district court. Midwest Ink was added subsequently as a plaintiff to represent the potential class members who had accepted CIT's settlement offer. The revised second amended complaint, the operative version on this appeal, set forth eight counts, including claims of common-law fraud and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("Consumer Fraud Act"). The complaint sought compensatory, statutory and punitive damages, as well as preliminary and permanent injunctive relief, against both CIT and Reed Smith.

The district court dismissed the complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to plead fraud with the specificity required by Federal Rule of Civil Procedure 9(b). The plaintiffs moved for leave to further amend the complaint, but the district court denied their motion. The plaintiffs timely appealed.

**II**

**DISCUSSION**

[1] We review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss. *Tamayo,* 526 F.3d at 1081. As a general rule, in testing the sufficiency of a complaint, notice pleading remains the standard. A plaintiff's complaint need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief" that is also sufficient to provide the defendant with "fair notice" of the claim and its basis. *Bell Atl. Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007); Fed.R.Civ.P. 8(a)(2). In order to demonstrate that he is entitled to relief, however, the pleader must show through his allegations that "it is plausible, rather than merely speculative, that he is entitled to relief." *Tamayo,* 526 F.3d at 1083 (quotation omitted); *see also Bell Atl.,* 127 S.Ct. at 1965-66. A complaint must do more than merely *"avoid foreclosing* possible bases for relief." *Tamayo,* 526 F.3d at 1084 (quotation omitted). It "must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Id.* (quotation omitted).

[2] In the present case, the plaintiffs' complaint includes claims against CIT and Reed Smith that allege common-law fraud and violations of the Consumer Fraud Act. The parties agree that, with respect to most of these claims, the heightened pleading standards of Federal Rule of Civil Procedure 9(b) govern. Under Rule 9(b), a plaintiff must state with particularity "all averments of fraud or mistake." Fed.R.Civ.P. 9(b); *see also Gen. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir.1997). The circumstances of fraud or mistake include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Gen. Elec. Capital,* 128 F.3d at 1078 (quotation omitted); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (describing Rule 9(b) particularity as "the who, what, when, where, and how: the first paragraph of any newspaper story").

*3 The plaintiffs believe that the district court erred in dismissing their common law fraud claims against

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

Page 6

CIT and Reed Smith for failure to state with particularity the circumstances of the alleged fraud. They also submit that their claims against CIT under the Consumer Fraud Act may go forward without meeting the particularity requirement of Rule 9(b).[FN3] We now address each of these contentions.

## A.

### Fraud Claims

[3] The district court dismissed all of the plaintiffs' claims against CIT and Reed Smith on the ground that the claims sounded in fraud but failed to meet the particularity requirement of Rule 9(b). The court ruled that, although the complaint described Norvergence's fraud with particularity, it failed to describe CIT's connection to any fraud with the particularity required by Rule 9(b). The court also held that the plaintiffs had failed to state with particularity the fraud allegedly committed by Reed Smith. The district court therefore dismissed all the fraud claims against CIT and Reed Smith because the plaintiffs had failed to plead who had made a fraudulent statement, when the fraudulent statement was made and how the fraudulent statement was communicated.

On appeal, the plaintiffs' only contention is that the district court wrongly required them to provide *evidence* of fraud to defeat a Rule 12(b)(6) motion. They correctly point out that the district court employed the word "evidence" when describing the allegations that the complaint failed to state with particularity. For instance, the district court said that "[n]o evidence ... [was] offered to establish who at CIT knew that the assigned [equipment rental agreement] was for a bundled service and equipment lease agreement, or name the individuals who should have known, when they should have known, or how they would have known." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, No. 05 C 5451, 2007 WL 495276, at *4 (N.D.Ill. Feb.9, 2007).

Despite its use of inartful terminology, the district court properly dismissed the plaintiffs' fraud claims for failure to state with particularity "who made the fraudulent statement, when the fraudulent statement was made, and how the fraudulent statement was made."*Id. at *3.* The district court did not require the complaint to provide actual evidence of the claims; it

merely required that the claims be pleaded with the requisite particularity. *See id.*Moreover, the district court correctly determined that the complaint failed to plead with particularity the who, when and how of the alleged frauds, all of which are required by Rule 9(b) for allegations of fraud. *See Gen. Elec. Capital*, 128 F.3d at 1078;*DiLeo, 901 F.2d at 627.*The district court therefore properly dismissed the fraud counts for failure to comply with Rule 9(b).[FN4]

## B.

### "Unfair Conduct" Under The Consumer Fraud Act

The plaintiffs submit that their claim under the Illinois Consumer Fraud Act may go forward without meeting the heightened standard of pleading fraud claims under Rule 9(b). In their view, a claim under the Consumer Fraud Act may allege either deceptive practices, which sound in fraud, or unfair practices, which do not. Because the allegations in Count I do not allege fraud but an unfair trade practice, they maintain, the governing pleading standard is the one contained in Rule 8.

### 1.

*4 [4][5][6][7] The Illinois Consumer Fraud Act "is a regulatory and remedial statute intended to protect consumers ... against fraud, unfair methods of competition, and other unfair and deceptive business practices."*Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 960 (2002).* The Supreme Court of Illinois has held that recovery under the Consumer Fraud Act "may be had for unfair as well as deceptive conduct."*Id.* In interpreting unfair conduct under the Consumer Fraud Act, Illinois courts look to the federal interpretations of unfair conduct under section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45. *Robinson, 266 Ill.Dec. 879, 775 N.E.2d at 960; 815 ILCS 505/2.* Thus, three considerations guide an Illinois court's determination of whether conduct is unfair under the Consumer Fraud Act: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers."*Robinson, 266 Ill.Dec. 879, 775 N.E.2d at 961.*A court may find unfairness even if the claim does not satisfy all three criteria. *Id.* For example, a "practice may be unfair

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."*Id.*

[8] Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b). Therefore, under federal notice pleading standards, the complaint need only provide a short and plain statement of the claim that shows, through its allegations, that recovery is plausible rather than merely speculative. *Tamayo, 526 F.3d at 1083;see also Bell Atl., 127 S.Ct. at 1964;*Fed.R.Civ.P. 8(a)(2).

**2.**

[9] By contrast with the federal pleading regimen under Rule 8, Illinois requires fact pleading even to non-fraud claims. *See Knox Coll. v. Celotex Corp., 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976, 985 (1981); Robinson, 266 Ill.Dec. 879, 775 N.E.2d at 961* (reviewing an appellate court's holding that none of a plaintiff's allegations had been stated with sufficient particularity and specificity to show that the defendant's conduct was unfair), 962 ("Plaintiffs argue here that all automobile leases have standard provisions and that leases are not negotiable. However, no such averments appear in the pleadings. Thus, the appellate court correctly held that plaintiffs' bald claim of unfairness ... was not sufficient to state a claim."). We can see no reason, however, why the standards of Rule 8 of the Federal Rules of Civil Procedure, rather than Illinois fact pleading requirements, should not apply here. It is well settled that a federal court sitting in diversity applies federal pleading requirements "even when the claim pleaded arises under state rather than federal law."*Muick v. Glenayre Elecs., 280 F.3d 741, 743 (7th Cir.2002)* (applying federal pleading requirements to an Illinois cause of action); *see also Hefferman v. Bass, 467 F.3d 596 (7th Cir.2006)* (same); *Johnson v. Hondo, Inc., 125 F.3d 408, 417 (7th Cir.1997)* ("[I]t is rudimentary that pleading requirements in the federal courts are governed by the federal rules and not by the practice of the courts in the state in which the federal court happens to be sitting."(internal quotation marks omitted)); *Colton v. Swain, 527 F.2d 296, 304 (7th Cir.1975).* Although we have never explained in detail the basis for this

determination, a review of the basic principles governing federal-state choice of law in the context of federal diversity jurisdiction makes clear that the federal rule must be the governing approach in this case.

*5 [10][11] It is, of course, well established that, as a general matter, a district court exercising jurisdiction because the parties are of diverse citizenship must apply state substantive law and federal procedural law. *Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).* When evaluating whether a particular state law is procedural or substantive, district courts take as their starting point the "outcome-determinative" test of *Guaranty Trust Co. v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).* In that case, the Supreme Court held that "the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."[FN5]*Id.*

[12] The bedrock case for the precise issue that confronts us today, however, must be a case that followed *Guaranty Trust-Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).* In *Hanna,* the Court was confronted, as we are today, with a conflict between a state rule of procedure and a federal rule of procedure. *380 U.S. at 469-70, 85 S.Ct. 1136.*The Court set forth the approach that must guide our present inquiry: We must determine whether there is an *actual* conflict between the federal and the state rule by determining "whether the scope of the federal rule is sufficiently broad to control the issue before the court."*Id.* at 470, 85 S.Ct. 1136.If the federal rule is sufficiently broad to control the issue, then we must evaluate the rule to ensure that the rule has not "exceeded the congressional mandate embodied in the Rules Enabling Act nor transgressed constitutional bounds."*Id.* at 464, 85 S.Ct. 1136.If the federal rule does fall within constitutional boundaries, then it should be applied, despite the fact that its application might alter the mode of enforcing a state-created right. *Id.* at 473-74, 85 S.Ct. 1136.If it is not, then the traditional *Erie* analysis of *Guaranty Trust* is appropriate and the court should proceed to apply the outcome-determinative test. *Id.* at 470, 85 S.Ct. 1136.

On several occasions, in applying the approach it outlined in *Hanna,* the Supreme Court had to focus on whether there was an irreconcilable conflict between a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

federal and a state rule of procedure. We turn briefly to those cases to determine whether the difference between the federal approach to pleading and the Illinois approach is an irreconcilable one. In _Walker v. Armco Steel Corp.,_ 446 U.S. 740, 750, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980), the Court determined that Rule 3 of the Federal Rules of Civil Procedure, which addresses when an action is commenced in federal court, was not sufficiently broad to address the effect of the tolling of a state statute of limitations on when a case commences under state law. That determination, said the Court, is a substantive policy decision of the state as to the deadline after which a defendant may have peace of mind and after which it would be unfair to expect the defendant to mount a defense. _Walker,_ 446 U.S. at 751, 100 S.Ct. 1978.

By contrast, in _Burlington Northern Railroad Co. v. Woods,_ 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987), the Supreme Court determined that there was a true conflict between a federal rule of procedure and a state statute. In that case, a state statute provided that when an appellate court affirmed a money judgment without substantial modification, it was to impose a ten-percent penalty on any appellant who had obtained a stay of that judgment pending appeal by executing a bond. By contrast, Federal Rule of Appellate Procedure 38 affords the federal courts of appeals plenary discretion to award damages upon a determination that the appeal was frivolous. The Court held that a federal appellate court ought to apply the federal rule. The two rules conflicted, and the federal rule was a constitutional exercise of federal rule-making authority and affected only the _process_ of enforcing litigants' rights and not the rights themselves. _Id._ at 8, 107 S.Ct. 967.

**\*6** [13] Here, it is clear that a conflict between the federal and state pleading rule does exist. _Compare_Fed.R.Civ.P. 8 (requiring only notice pleading), _with_735 ILCS 5/2-601 (requiring that pleadings contain substantial allegations of fact), _and Knox Coll.,_ 58 Ill.Dec. 725, 430 N.E.2d at 985-86 (same). The federal and the state provisions address the same subject and require adherence to conflicting standards.

Continuing to follow the analytical model of _Hanna,_ we next ask whether Rule 8 is within the congressional mandate. The Rules Enabling Act gives the Supreme Court "the power to prescribe, by general rules, the forms of process, writs, _pleadings,_ and motions ... of the district courts of the United States."28 U.S.C. § 2072 (emphasis added). Prescribing the specificity with which a claim must be pleaded relates solely to the practice and procedure of a court and clearly falls within the scope of the Rules Enabling Act. There is, moreover, no basis for concluding that the regulation of pleading requirements in federal court is beyond the limits of federal constitutional authority. _See Hanna,_ 380 U.S. at 464, 85 S.Ct. 1136.Consequently, we evaluate the state-law claims in this case under the federal pleading standards.

**3.**

[14] When we turn to the unfair conduct allegations of Count I, it is clear that this claim meets the federal notice pleading standards by "providing allegations that raise a right to relief above the speculative level."_Tamayo,_ 526 F.3d at 1084 (quotation omitted). Count I alleges that CIT used unfair practices, specifically the dissemination of false advertisements for the purpose of inducing the plaintiffs to enter into unconscionable equipment rental agreements. It further alleges that CIT violated the Consumer Fraud Act by attempting to enforce those agreements. R. 79 at ¶ 77. Finally, the complaint goes on to allege that the plaintiffs suffered a loss as a result of these allegedly illegal equipment rental agreements. These allegations address the three considerations that, in combination, guide a court's determination of whether conduct is unfair. _See Robinson,_ 266 Ill.Dec. 879, 775 N.E.2d at 961 (holding that an unfairness determination should consider: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers"). Although the complaint does not use specifically the words "immoral, unethical, oppressive, or unscrupulous," it alleges conduct that, if proven, could support this statutory definition of unfairness under the Consumer Fraud Act. _See id._By claiming that CIT engaged in unfair conduct and averring facts that, if proven, make relief more than merely speculative, _Tamayo,_ 526 F.3d at 1084, the plaintiffs stated adequately a claim for relief.

It is important to note that, in the procedural posture of this case, we must take the allegations of the plaintiffs in the light most favorable to them. Indeed, CIT has not answered the complaint at this stage and its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

Page 9

position on such matters as the holder in due course defense and, specifically, the implications of the Assurance which it executed with the Attorney General of Illinois has not been stated explicitly in the present procedural context. See *IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989 (7th Cir.2008).

### Conclusion

*7 For the foregoing reasons, we hold that the district court dismissed properly the entirety of the plaintiffs' fraud claims, but that the court erred in dismissing the plaintiffs' claims for unfair practices under the Illinois Consumer Fraud Act against CIT. The judgment of the district court accordingly is affirmed in part and reversed and remanded in part for further proceedings consistent with this opinion. Reed Smith may recover the costs of this appeal. The other parties shall bear their own costs of this appeal.

AFFIRMED in part and REVERSED and REMANDED in part

> FN1. The federal court had diversity jurisdiction under 28 U.S.C. § 1332. Windy City and Midwest Ink are Illinois corporations with their principal places of business in Illinois. CIT is a Massachusetts corporation with its principal place of business in New Jersey. Reed Smith is a limited liability partnership that, at the time of removal, had no partners who were citizens of Illinois.

> FN2. We have appellate jurisdiction under 28 U.S.C. § 1291.

> FN3. The plaintiffs additionally contend, without relying on factual or legal support, that the district court erred in refusing to permit them to file a third amended complaint. An appellant is required to provide "citations to the authorities and parts of the record" in support of his argument. Fed. R.App. P. 28(a)(9). "We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point." *Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir.1995)

(quotation omitted). We therefore shall not address this perfunctory and underdeveloped argument on appeal. *Id.*; *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir.2005).

> FN4. Count 5 of the operative complaint also alleges that Reed Smith, the law firm that represented CIT, conspired to accomplish the fraudulent scheme allegedly undertaken by its client. This claim must fail as well. Reading the allegations of this claim in the light most favorable to the plaintiffs, it simply alleges that Reed Smith negotiated on behalf of its client with the Attorney General of Illinois and then counseled its client with respect to how to comply with the resulting agreement.

> FN5. In *Guaranty Trust*, the Court determined that applying a state statute of limitations was appropriate despite the fact that such statutes often are referred to as "procedural." *Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

C.A.7 (Ill.),2008.
Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing Services, Inc.
--- F.3d ----, 2008 WL 2941171 (C.A.7 (Ill.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

Page 1

▷Zwiercan v. General Motors Corp.
Pa.Com.Pl.,2002.
Shirley ZWIERCAN, et al., Plaintiffs
v.
GENERAL MOTORS CORP., et al., Defendants
No. 3235 JUNETERM 1999.

Sept. 11, 2002.

**Background:** Car buyer brought action against manufacturer for breach of implied warranty of merchantability and violation of Unfair Trade Practices and Consumer Protection Law (UTPCPL), alleging its failure to disclose defective front seats.

**Holdings:** The Court of Common Pleas, Philadelphia County, No. 3235, June Term 1999, Gene D. Cohen, J., held that:

(1) manufacturer had duty to disclose defects;

(2) buyer relied on manufacturer's misrepresentation; and

(3) recovery was not barred by economic-loss doctrine.

Motion granted in part and denied in part.

West Headnotes

**[1] Antitrust and Trade Regulation 29T ☞193**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations
            29Tk191 Motor Vehicles
                29Tk193 k. Sale. Most Cited Cases
    (Formerly 92Hk9 Consumer Protection)

**Antitrust and Trade Regulation 29T ☞234**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations
            29Tk232 Product Safety
                29Tk234 k. Motor Vehicles. Most Cited

Cases
    (Formerly 92Hk9 Consumer Protection)
Automobile manufacturer had a duty to disclose alleged existence of defective front seats in its cars, for purposes of buyer's claim under the Unfair Trade Practices and Consumer Protection Law (UTPCPL); buyer was non-business customer, and manufacturer had knowledge of alleged defects superior to that of buyer. 73 P.S. § 201-2(4)(xxi).

**[2] Antitrust and Trade Regulation 29T ☞369**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(E) Enforcement and Remedies
            29TIII(E)6 Evidence
                29Tk369 k. Weight and Sufficiency. Most Cited Cases
    (Formerly 92Hk9 Consumer Protection)
Car buyer's purchase of car with allegedly defective front seats established her reliance on manufacturer's failure to disclose defects, for purposes of claim under Unfair Trade Practices and Consumer Protection Law (UTPCPL). 73 P.S. § 201-2(4)(xxi).

**[3] Antitrust and Trade Regulation 29T ☞132**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk132 k. Preemption. Most Cited Cases
    (Formerly 92Hk36.1 Consumer Protection)

**States 360 ☞18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Under Supremacy Clause, car buyer's claim under Unfair Trade Practices and Consumer Protection Law (UTPCPL) that manufacturer failed to disclose alleged defects in front seats to National Highway Traffic Safety Administration (NHTSA) was preempted by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

federal law; this constituted a fraud on the agency claim. U.S.C.A. Const. Art. 6, cl. 2; 73 P.S. § 201-2(4)(xxi).

**[4] Antitrust and Trade Regulation 29T ⟾138**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk138 k. Reliance; Causation; Injury, Loss, or Damage. Most Cited Cases
        (Formerly 92Hk9 Consumer Protection)
Economic-loss doctrine did not preclude car buyer from bringing claim against manufacturer under Unfair Trade Practices and Consumer Protection Law (UTPCPL) for allegedly failing to disclose defective front seats; as no collision had occurred, buyer could not bring warranty claim. 73 P.S. § 201-2(4)(xxi).

**Antitrust and Trade Regulation 29T ⟾193**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations
            29Tk191 Motor Vehicles
                29Tk193 k. Sale. Most Cited Cases
        (Formerly 92Hk30, 92Hk9 Consumer Protection)

**Antitrust and Trade Regulation 29T ⟾234**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(C) Particular Subjects and Regulations
            29Tk232 Product Safety
                29Tk234 k. Motor Vehicles. Most Cited Cases
        (Formerly 92Hk9 Consumer Protection)
Plaintiff could maintain her claim under the UTPCPL for defendant's failure to disclose that the front seats on certain vehicles that it manufactured are prone to collapse in rear-end collisions.

*ORDER and MEMORANDUM*

COHEN, J.
*1 AND NOW, this 11th day of SEPTEMBER, 2002,

upon consideration of the Motion for Summary Judgment of Defendant, General Motors Corporation, Plaintiff Shirley Zwiercan's response thereto, and oral argument from the parties, and in accordance with the Memorandum Opinion being filed contemporaneously with this Order, it is hereby ORDERED and DECREED that the Motion is GRANTED in so far as Plaintiff is barred by federal preemption from claiming a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Act for statements made by Defendant to the National Highway Transportation Safety Administration, and DENIED as to the remaining claims.

*MEMORANDUM*

Defendant General Motors Corporation ("GM") has filed a Motion for Summary Judgment as to Plaintiff's claim for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. For the reasons set forth below, the Motion for Summary Judgment is Granted in part and Denied in part.

*BACKGROUND*

This action focuses on vehicles manufactured by GM between 1990 and 1999 (the "Class Vehicles"). The Plaintiff is the owner of a 1997 Chevy Blazer, which is considered a Class Vehicle. Plaintiff alleges that the front seats of all Class Vehicles are designed in such a way that the front seats are prone to collapse rearward during moderate speed rear-end collisions. Although the Plaintiff's vehicle has not been involved in a rear-end collision, she has brought claims, as a class representative, on behalf of herself and similarly situated owners of Class Vehicles, for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and breach of implied warranty of merchantability. On May 22, 2002, this Court granted Defendant's Motion for Summary Judgment as to the breach of warranty claim and denied summary judgment as to the UTPCPL claim.[FN1]

FN1.See Shirley Zwiercan, et al. v. General Motors Corp., et al, 2002 WL 1472335 (C.P. Phila. May 22, 2002)(Herron, J.)

Now, before this Court is Defendant's Motion for Summary Judgment against the Plaintiff's remaining

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

UTPCPL claim, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, and Plaintiff's Reply Memorandum in Support of Motion for Summary Judgment. In its Motion, Defendant asserts that Plaintiff's UTPCPL claim should be dismissed because Plaintiff's admissions establish that she cannot prove the elements of reliance and causation to support her UTPCPL claim. Additionally, Defendant argues that Plaintiff's UTPCPL claim should be dismissed because it is barred under the economic loss doctrine and, to the extent the Plaintiff's claim is based on Defendant's statements to the National Highway Traffic Safety Administration ("NHTSA"), such claim is preempted under the Supremacy Clause of the United States Constitution.

Upon review of the pleadings and after hearing oral argument, Defendant's Motion for Summary Judgment is Granted in part and Denied in part.

### DISCUSSION

In accordance with <u>Pa. R. Civ. P. 1035.2</u>, this Court may grant Summary Judgment where the evidentiary record shows either that the material facts are undisputed, or the facts are insufficient to make out a *prima facie* cause of action or defense. <u>McCarthy v. Dan Lepore & Sons Co., Inc., 724 A.2d 938, 940 (Pa.Super.Ct.1998)</u>. To succeed, a Defendant moving for summary judgment must make a showing that the Plaintiff is unable to satisfy an element in his cause of action. <u>Basile v. H & R Block, 777 A.2d 95, 100 (Pa.Super.Ct.2001)</u>. Here, the Defendant alleges that based on Plaintiff's admissions, the Plaintiff has failed to establish the essential elements of "Reliance, Materiality, and Causation" with respect to Defendant's acts or omissions. To avoid summary judgment, the Plaintiff, as the non-moving party, must adduce sufficient evidence on the issues essential to its case and on which it bears the burden of proof such that a reasonable jury could find in favor of the Plaintiff.<u>McCarthy, 724 A.2d at 940</u>. In addressing the issue, this Court is bound to review the facts in a light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. <u>Manzetti v. Mercy Hospital of Pittsburgh, 565 Pa. 471, 776 A.2d 938, 945 (2001)</u>. The Plaintiff, must be given the benefit of all reasonable inferences. <u>Samarin v. GAF Corp., 391 Pa.Super. 340, 350, 571 A.2d 398, 403 (1989)</u>. Therefore, this Court must first determine whether the Plaintiff has plead each of the required elements for her claim under the UTPCPL.[FN2]

> FN2. The issue of damages was previously addressed in the Defendant's first Motion for Summary Judgment in this case. This Court denied Defendant's first motion to dismiss the Plaintiff's UTPCPL claim, holding that Plaintiff's cost to repair the alleged defective seats is sufficient to sustain a claim of damages in a UTPCPL action. <u>Zwiercan v. General Motors, 2002 WL 1472335 (C.P. Phila. May 22, 2001)</u>(Herron, J.); See also<u>Grant v. Bridgestone Firestone, Inc., 2002 WL 372941 (C.P. Phila., Jan 10, 2002)</u>(ruling that cost to repair a defect is sufficient to bring a claim under the UTPCPL); <u>Solarz v. Daimler Chrysler Corp., 2002 WL 452218 (C.P.Phila., Mar. 13, 2002)</u>(Herron, J.)(holding that failure to allege actual loss or out-of-pocket cost is not fatal to a UTPCPL claim).

### I. Plaintiff's UTPCPL Claim Survives Summary Judgment.

*2 Plaintiff claims that the Defendant's acts and omissions violated the UTPCPL. Based on the complaint, it appears that Plaintiff is alleging a violation of UTPCPL § 201-2(4)(xxi). Section 201-2(4)(xxi) defines unfair methods of competition or unfair or deceptive acts or practices as "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."(the "Catchall Provision").[FN3] To establish a claim under the Catchall Provision, a party must either prove the elements of common law fraud, or that Defendant's deceptive conduct caused harm to the Plaintiff. See e.g.<u>Weiler v. SmithKline Beecham, 53 Pa. D. & C. 4th 449 (C.P.Phila.2001)</u>(Herron, J.); <u>Foultz v. Erie Ins. Exchange, 2002 WL 452115 (C.P.Phila., Mar. 13, 2002)</u>(Herron, J.); <u>Abrams v. Toyota Motor Credit Corp., 2001 WL 1807357 (C.P.Phila., Dec. 5, 2000)</u>(Herron, J.).[FN4] Although this Court's holdings establish that "reliance" is not a required element for a Plaintiff to proceed under a "deceptive" practice claim, as discussed below, Plaintiff's "reliance" has been established in the instant case.

> FN3. Because this Section of the UTPCPL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

appears to cover all other acts of fraud or deceptive conduct that are not specifically enumerated in the other articles of UTPCPL § 201-2(4), Pennsylvania Courts have dubbed § 201-2(4)(xxi) the "Catchall Provision."

FN4. Defendant urges this Court to reconsider its opinions holding that "reliance" is not a required element to prove establish a "deceptive" act under the Catchall Provision. As this Court finds that reliance has been sufficiently plead in the present case, the Court finds it unnecessary to address our previous decisions. Defendant further argues that *Weinberg v. Sun Company Inc., 565 Pa. 612, 777 A.2d 442 (2001)* requires this Court to dismiss Plaintiff's claim for failure to demonstrate reliance. The instant case is distinguishable. In *Weinberg,* the Pennsylvania Supreme Court, reviewing a false advertising claim, considered whether a party could bring a UTPCPL claim when the party did *not* hear the alleged misleading advertisement. In the instant case, this Court is addressing whether a manufacturer who fails to warn the public of a known safety defect can be held liable for engaging in a deceptive or fraudulent practice. The underlying issue, therefore, is whether the manufacturer breached its duty to speak, not whether the manufacturer falsely advertised its product.

The first substantive question presented by the parties is whether the Plaintiff has alleged facts sufficient to establish that she relied on the acts or omissions of the Defendant. Although Defendant correctly states that its general advertising slogans, are not actionable because they are "mere puffery," the crux of the issue lies not in the statements made by the Defendant, but rather, its silence when it had a duty to speak. Defendant argues that it was under no duty to disclose the alleged existence of defective seats in its cars.[FN5] Defendant further argues that it cannot be liable because it made no statements to Plaintiff concerning the safety of its seats. The defendant is mistaken; silence can be actionable.

FN5. Defendant does not brief the issue of whether a duty to speak exists between a manufacturer and its customers, but instead focuses the argument on whether non-feasance is actionable under the UTPCPL, citing *Gordon v. Pennsylvania Blue Shield,* 378 Pa.Super. 256, 548 A.2d 600 (1988)(holding that an insurer's failure to pay an insured's claim amounts to non-feasance and is not actionable under the UTPCPL). Defendant's argument misses the point. In the present case, the critical issue is whether the Defendant's intentional failure to warn against a known defect is actionable under the UTPCPL. Such behavior, if true, would be an act of misfeasance not non-feasance as the Defendant suggests.

Pennsylvania law holds that the deliberate non-disclosure of a material fact is just as actionable as an intentional false statement. *Neuman v. Corn Exchange Nat. Bank & Trust Co.,* 356 Pa. 442, 51 A.2d 759, 764 (1947). In defining "fraud," the Pennsylvania Supreme Court held that fraud exists when "deception of another ... is brought about by a misrepresentation of fact or by *silence."In Re McClellan's Estate,* 365 Pa. 401, 407-08, 75 A.2d 595 (1950)(emphasis added). However, in order for silence to be actionable there must be a duty to speak. *Smith v. Renaut,* 387 Pa.Super. 299, 306, 564 A.2d 188, 192 (1989); *Seegenerally,*37 C.J.S. Fraud § 15.

The duty to speak most often arises when there is a fiduciary or confidential relationship between parties.[FN6] In the context of business transactions, when there has been no active misrepresentation, and no fiduciary or confidential relationship exists, there is an apparent absence of Pennsylvania case law discussing the existence of a duty to speak.

FN6. It is undisputed that the Plaintiff and Defendant were not in a fiduciary or confidential relationship.

[1] Here, the Court must determine whether a duty exists between a manufacturer and an ordinary consumer. In this regard, although this Court is not bound by such decisions, federal courts interpreting Pennsylvania law have held that there is generally no duty to speak where the parties are "sophisticated business entities, entrusted with equal knowledge of the facts."*Duquesne Light Co. v. Westinghouse Electric Corporation,* 66 F.3d 604, 612 (3d Cir.1995);

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

Page 5

*City of Rome v. Glanton*, 958 F.Supp. 1026 (E.D.Pa.1997)(discussing the application of the Restatement (Second) of Torts § 551). In *Duquesne*, the Third Circuit addressed, in a breach of contract case, whether a nuclear steam equipment supplier's alleged non-disclosures concerning equipment sold to an electric utility company constituted actionable fraud. The Court recognized that Pennsylvania cases were unclear regarding when a duty to speak arises outside of the fiduciary or confidential relationship context.[FN7]*Duquesne*, 66 F.3d at 612. Following the guidance in analogous Pennsylvania cases,[FN8] the Court held that there is no duty to speak between two sophisticated business entities with equal knowledge of the facts and legal representation, because neither party is reliant on the other for information. *Id.* at 612.

> FN7. The Court acknowledged that Pennsylvania courts have often cited to the Restatement of Torts § 551 (Second), in adopting the duty to speak requirement. However the Court found that Pennsylvania case law does not provide much guidance as to what extent the courts are bound by the Restatement's discrete criteria.

> FN8.*Neuman v. Corn Exchange Nat. Bank & Trust Co.*, 356 Pa. 442, 51 A.2d 759, 764 (1947)(finding that a Bank's misrepresentations to a purchaser of stock was actionable because the purchaser was justified in relying on Bank's statements since the Bank, as the holder and seller of the stock is the proper source of information); *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451 (1971)(holding that the continuous business relationship between a selling corporation and a purchaser gave rise to a duty to speak based on reliance between the parties).*Quashnock v. Frost*, 299 Pa.Super. 9, 445 A.2d 121 (1982)(addressing termite infestation of a home, the court stated that disclosure is required "since *caveat emptor* is no longer ridgedly applied to the complete exclusion of any moral or legal obligation to disclose material facts."); *Smith v. Renaut*, 387 Pa.Super. 299, 564 A.2d 188 (1989)(relying on *Quashnock*, to hold that a seller has an affirmative duty to disclose a known termite infestation.)

*3 In the instant case, however, the parties do not have the same level of sophistication or knowledge. The Plaintiff as an ordinary purchaser of an automobile, does not have access to the same information as the Defendant manufacturer. Plaintiff also alleges that Defendant's internal memoranda and studies, as well as its defense in prior litigation involving the alleged defective seats, establish that Defendant knew of the alleged material defect in its seats years before Plaintiff purchased her vehicle. Therefore, unlike the facts under *Duquesne*, here, the unsophisticated Plaintiff is at the mercy of the Defendant to inform her of a known safety defect. Following the persuasive reasoning of *Duquesne*, this Court finds that a manufacturer has a duty to disclose a known latent defect to a purchaser when the purchaser is unsophisticated and does not have access to the same information as the manufacturer. Under the facts of this case, a reasonable jury could find that the Defendant had a duty to inform the Plaintiff of the alleged safety defect in its Class Vehicles.

Moreover, the Pennsylvania Supreme Court mandated that the UTPCPL is to be liberally construed to prevent unfair or deceptive practices and place the seller and consumer on more equal footing. *Commonwealth v. Monumental Properties Inc.*, 459 Pa. 450, 458-60, 329 A.2d 812, 816-17 (1974). Recognizing a duty to speak in the present case is consistent with general fraud concepts and is in line with the purpose of the UTPCPL. Such an interpretation further defines the scope of the UTPCPL, by giving meaning to the "duty to speak" requirement, and by placing consumers on more equal footing with manufacturers. Moreover, this Court finds support for this conclusion in the holdings of other jurisdictions.

In cases involving defective parts in automobiles, other courts have held that a defendant manufacturer has a duty to disclose knowledge of material defects in its products if the consumer could not be expected to otherwise learn of the defect. *In Re Ford Motor Company Ignition Switch Products Liability Litigation*, 2001 WL 1266317 (D.N.J.1997).In *In Re Ford Motor Company*, the Third Circuit addressed the issue of fraudulent concealment in a case involving defective ignition switches installed in Ford vehicles. Although the Third Circuit dismissed some of the plaintiffs' claims with leave to amend their compliant to plead with more specificity, the Court found that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

third party manufacturer of the defective part had a duty to disclose the defect. *Id.* at *20-*21. The Court stated "that the applicable standard in most states across the country could be generally expressed as follows: a defendant manufacturer has a duty to disclose its knowledge, if any, of material defects in the items manufactured, so long as the consumer could not be expected to otherwise obtain the information." *Id.* at *21

Similarly, in a case involving General Motors, a New York State court denied General Motor's motion to dismiss, holding that the Attorney General of New York properly stated a cause of action alleging fraudulent suppression and concealment of a material fact, where General Motors allegedly knew that a part would prematurely fail and did not disclose that fact to consumers. *State of New York v. General Motors Corp.,* 120 Misc.2d 371, 446 N.Y.S.2d 124 (Sup.Ct.1983). The Court based its analysis on New York's general common law fraud provisions, which have been interpreted to find a duty to speak when a party has superior knowledge or has means of knowledge not available to both parties. *Id.* at 374;*Seealso,Kuelling v. Roderick Lean Mfg. Co.,* 183 N.Y. 78, 75 N.E. 1098, 1102 (1905). Additionally, the Second Circuit, applying New York law, concluded that the duty to speak, in the context of a business transaction, has been found in three circumstances: 1) where the party has made a partial or ambiguous statement; 2) where the parties are in a fiduciary or confidential relationship; and 3) where one party possesses superior knowledge, not readily available to the other party. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citations omitted).

*4 Additional support for finding a duty to speak in consumer protection cases can be found in the decisions of the Illinois Supreme Court. In interpreting Illinois' consumer protection statute, the Court held that omissions or concealment of a material fact in the conduct of trade or commerce constitutes fraud. *Connick v. Suzuki Motor Company, Ltd.,* 174 Ill.2d 482, 504, 221 Ill.Dec. 389, 675 N.E.2d 584, 595 (1996)*rehearing denied* (1997). In *Connick,* the Court found that Suzuki's failure to warn Plaintiffs of the vehicle's known tendency to roll over was a violation of the consumer fraud statute. *Id.* at 504-05, 221 Ill.Dec. 389, 675 N.E.2d 584 The Court also found that such a defect would be material to a buyer of the car and that it is unnecessary to plead a common law duty to disclose in order to state a valid claim of consumer fraud based on an omission or concealment. *Id.* at 505, 221 Ill.Dec. 389, 675 N.E.2d 584,citing*Celex Group, Inc. v. Executive Gallery, Inc.,* 877 F.Supp. 1114, 1129 (N.D.Ill.1995).

Therefore, based on analogous Pennsylvania law, as well as, federal decisions and precedent from other state courts, this Court finds that a duty to speak exists, in the context of a business transaction with an ordinary non-business consumer, when the seller has superior knowledge of a material fact that is unavailable to the consumer. Plaintiff has alleged facts that, if true, establish that Defendant knew of the alleged defect and that knowledge of such a defect would have been material to the Plaintiff's decision to purchase her vehicle. It is disingenuous for the Defendant to argue that knowledge of a defective front seat that could seriously injure or kill its occupant would not be material to a consumer.

[2] Next this Court must determine whether the Plaintiff has established that she relied on the acts or omissions of the Defendant. Defendant argues that Plaintiff's deposition testimony establishes that the Plaintiff did not rely on Defendant's acts and could not have relied on Defendant's alleged non-statements. This Court finds that the Defendant both incorrectly summarizes Plaintiff's deposition testimony, and misstates the issue.

First, the Plaintiff's deposition testimony sufficiently establishes that she "relied" on the Defendant's silence and purchased her Class Vehicle believing that the front seats in her car were safe and free from defect. The Plaintiff states, in reference to the front seats of her car that, "she assumed they were safe [and that] they stayed where they are ... I just assumed from being a General Motors product that I had for a long time that they were safe."Pl.'s Resp. Mem of Law at 36. This statement supports Plaintiff's claim that Defendant's silence lead her to assume the front seats were safe.

Defendant argues that the Plaintiff cannot establish actual reliance because Plaintiff "relied" on a statement that was never uttered. When actual reliance cannot be established, courts have looked to the nature of the parties' relationship and materiality of the statement to establish a presumption of reliance.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

Page 7

Relying on general principles of contract law, the Pennsylvania Supreme Court has held that "reliance" can be presumed when a party makes material misrepresentations. See e.g., *New York Life Ins. Co. v. Brandwene et ux.,* 316 Pa. 218, 172 A.2d 669 (1934); *In Re McClellan's Estate,* 365 Pa. 401, 408, 75 A.2d 595 (1950)(citing *Restatement of Contracts § 476*(1)); *See also, Vasquez v. Superior Court of San Joaquin County,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, (1971)(holding that the rule in California and elsewhere is that reliance upon alleged false representations can be inferred from the circumstances).

*5 More recently, in *Peerless Wall and Window Coverings, Inc. v. Synchronics, Inc.,* 85 F.Supp.2d 519 (W.D.Pa.2000) a federal court cited the Pennsylvania Supreme Court in addressing the question of a "presumption of reliance." In *Peerless,* a case involving a software manufacturer's failure to disclose that its software was not Y2K compliant, the Court stated that "when one would not have entered the transaction in the presence of a full disclosure of a material fact ... that person has obviously relied." *Id.* at 534 (relying on *New York Life Ins. Co. v. Brandwene,* 316 Pa. 218, 172 A. 669 (1934)). Although the Court dismissed the plaintiff's fraud claim, it did so because the plaintiff could not present any evidence that fraud would not have purchased the software if the defect had been disclosed. Therefore, the *Peerless,* opinion holds open the possibility that where, as here, a Plaintiff can demonstrate that they would not have purchased a product had they been aware of the defect, reliance on the defendant's omission can be presumed.

Moreover, this Court held, in certifying a class UTPCPL claim, that when a duty to speak exists, reliance by the class plaintiffs is implicit and is established by operation of law. *Katlin v. Tremoglie,* 1999 WL 1577980 (Pa.Com.Pl.), 43 Pa. D. & C. 4th 373, 391 (1999). In *Katlin,* a therapist failed to reveal to his patients the fact that he was not licensed to practice medicine. *Id.* The Court found that the "doctor" had a duty to disclose the material fact that he was not licensed to practice medicine. In reaching this holding, the Court relied on *Basile v. H & R Block,* 729 A.2d 574, 584 (Pa. Super Ct.1999)[FN9] to extend the presumption of reliance beyond the fiduciary relationship and apply it to a special or confidential relationship. *Id.* Recognizing that the presumption is not based on the form but rather the substance of the

relationship, the Court found no compelling reason not to extend the duty to speak to a case involving allegations of a breach of a confidential relationship. *Id.*

FN9. Although the *Basile* decision was appealed, reversed and remanded, the proposition for which *Katlin* Court relied on was affirmed on appeal in *Basile v. H & R Block,* 777 A.2d 95 (Pa. Super Ct.2001). On appeal, the Superior Court held that the trial court abused its discretion in granting summary judgment. The Court reversed the trial court decision, holding that a tax consultant's failure to inform clients about interest rates charged on the company's accelerated tax refund service constituted a breach of a fiduciary duty. Furthermore, the Court found, that the facts, if true, established that a fiduciary duty not only existed between the clients and the individual tax consultant, but also between the clients and H & R Block as the orchestrating entity. *Id. at 107.* The Court stated that "the evidence suggests that the plaintiffs' trusted not the individuals who staffed any given Block office, but Block as an organization." *Id.* The Court was persuaded by the pervasive media presence of H & R Block and the fact that the Company, through the advertising of its "Rapid Refund" service, attempted to "achieve a false intimacy" with the customer. *Id.* Therefore, based on the confidential relationship, the Court found a level of trust and reliance on the part of the customers.

Here, the Plaintiff has established that the Defendant's silence regarding the alleged defect in the Class Vehicles was material to the Plaintiff's decision to purchase the car. The Plaintiff testified that she assumed in the face of Defendant's silence that the front seats of the car were safe, and that had Defendant disclosed that there was a safety defect in the front seats, she would not have bought the car. Pl.'s Resp. Mem of Law at 37. Following the Court's rationale in *Peerless,* and *Katlin,* Plaintiff's reliance on Defendant's active concealment can be presumed because the concealment of the alleged defect would be material to the Plaintiff's decision to purchase her car. In addition, the Plaintiff's own testimony supports finding that she relied on Defendant's material

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

Page 8

omission. Therefore, this Court finds that it is appropriate under these facts to expand the presumption of reliance.

**II. The Plaintiff is Barred from Using the UTPCPL to Recover for Alleged Fraudulent Statements made to the NHTSA.**

*6 [3] In its Motion, Defendant asserts that to the extent that Plaintiff's UTPCPL claim is based on alleged misrepresentations to the NHTSA, such "statements" cannot form the basis of a state action to enforce NHTSA regulations. Defendant is correct in stating that in so far as Plaintiff's UTPCPL claim seeks redress for misstatements to the NHTSA, it is a "fraud on the agency" claim, which is properly preempted by federal law. *See Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001)*(holding that a patient's state law fraud claims against a manufacturer were a "fraud on the agency" claim, because the state claim was based on manufacturer's statements to the Food and Drug Administration ("FDA"), which the FDA has authority to police itself). Therefore, because the Plaintiff cannot use the UTPCPL to enforce an alleged fraud on a federal agency, Defendant's Motion for Summary Judgment on this issue is granted.

**III. The Economic Loss Doctrine Does Not Bar Plaintiff's UTPCPL Claim**

[4] Defendant argues that Plaintiff's UTPCPL claim is barred by the economic loss doctrine because Plaintiff has suffered no personal injury. Defendant suggests that because Plaintiff's only harm is the cost to repair the allegedly defective seats, her appropriate remedy, if any, is based in contract law.[FN10] Plaintiff responds that the economic loss doctrine does not apply under these facts because the doctrine does not apply to the alleged intentional acts by Defendant.

> FN10. This Court, in partially granting Defendant's first Summary Judgment Motion, held that Plaintiff has no claim for breach of contract until her front seats actually manifest a failure. *Zwiercan v. General Motors, 2002 WL 1472335 (Pa.Com.Pl. May 22, 2002)*(Herron, J.)

In Pennsylvania, the purpose of the economic loss doctrine is to maintain the separate sphere of the law

of contract and tort. *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp., 387 Pa.Super. 537, 550, 564 A.2d 919, 925 (1989).* Originally, the economic loss doctrine was applied to products liability claims, with the expectation that parties could recover purely economic damages under contract theory. *East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).* The reach of the doctrine has been justified on the basis that parties can protect themselves by negotiating the terms of a manufacturer's liability. *Id. at 872-73.* Pennsylvania courts addressing the economic loss doctrine have accepted the Supreme Court's rationale and focused on the ability of the purchaser to recover economic harm under a breach of warranty claim. *REM Coal Co. Inc. v. Clark Equipment Co., 386 Pa.Super. 401, 563 A.2d 128 (1989).* In an attempt to guide future courts on the application of the doctrine, the Superior Court stated that "the proper focus is not on the type of risk, but the actual harm for which the plaintiff seeks recovery." *Id. at 133.* Unfortunately, there is much confusion in the Pennsylvania cases as to the scope and breadth of the economic loss doctrine. For the reasons discussed below, this Court finds that the economic loss doctrine does not bar Plaintiff's UTPCPL claim.[FN11]

> FN11. In declining to extend the application of the economic loss doctrine to intentional fraud claims, this Court noted, there is a absence of Pennsylvania case law on the subject, but found support for the proposition that the doctrine should not bar claims where the representation is intentionally false. *First Republic Bank v. Brand,* 2001 WL 333942627, 50 Pa. D. & C. 4th 329 (2000)(Herron, J.); *See also, Teledyne Tech. Inc. v. Freedom Forge Corp.,* No. 3398, Slip. op. 20 n. 17 (C.P. Phila., April 19, 2002)(Sheppard, J.); *Amico v. Radius Communications,* 2001 WL 1807924 (Pa.Com.Pl.)(Herron, J.). The Defendant asks this Court to reconsider its previous holdings in light of the Third Circuit's holding in *Werwinski v. Ford Motor Co., 286 F.3d 661 (3d Cir.2002).* However this Court finds the instant case distinguishable from both our previous cases and *Werwinski.*

Recently, the Third Circuit in *Werwinski v. Ford Motor Co., 286 F.3d 661 (3d Cir.2002)* held that a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

Plaintiff's UTPCPL claim was barred by the economic loss doctrine. Although not bound by the Third Circuit's opinion, this Court will address the decision in an effort to clarify the law. In *Werwinski,* the Third Circuit's ruling focused on the parties appropriate redress under contract law. The case involved a class of consumers that had incurred substantial costs to repair failed transmissions in their vehicles. The parties alleged that the manufacturer knowingly installed defective parts in the transmissions which caused the transmissions to fail. Here, the alleged defects in the front seats of the Class Vehicles have not yet manifested themselves, because the cars have, fortunately, not been involved in rear-end collisions. Despite the fact that the front seats have not yet injured anyone, and the Plaintiff cannot bring a breach of contract claim, the Plaintiff's UTPCPL claim for intentional concealment and deceptive practices is ripe. The Plaintiff need not wait until she is physically injured to bring a claim for deceptive practices when the manufacturer had a duty to inform her of a known defect.

*7 Although, the *Werwinski* Court applied the economic loss doctrine to UTPCPL claims, it did so on the belief that exempting statutory claims from the doctrine would nullify the doctrine. While this Court agrees that in certain cases the doctrine should apply to bar statutory claims, a blanket application of the economic loss doctrine to the UTPCPL fails to address the purpose of enacting the statute. The Pennsylvania Supreme Court clearly stated that the purpose of the UTPCPL is to be liberally construed to prevent unfair or deceptive practices. *Commonwealth v. Monumental Properties Inc.,* 459 Pa. 450, 458-60, 329 A.2d 812, 816-17 (1974). To apply the economic loss doctrine to *all* claims under the UTPCPL has the potential to eviscerate the UTPCPL itself. The instant case is an example of the danger of applying the economic loss doctrine too broadly.

Here, the Plaintiff has raised a legitimate question as to whether the Defendant's actions were deceptive under the UTPCPL, but does not have a viable breach of contract claim. To apply the economic loss doctrine to bar the Plaintiff's statutory claim here would frustrate the intent of the UTPCPL, in this context, and would be inconsistent with the purpose of the economic loss doctrine. This is not a case where the Plaintiff is attempting to bring a tort action in lieu of a breach of contract claim. If the doctrine were to bar the

Plaintiff's action, the Plaintiff would be estopped from litigating a claim which the legislature specifically provided for when it amended the UTPCPL to protect against deceptive practices. Therefore, this Court finds that, under the facts of this case, the Plaintiff's UTPCPL claim should not be barred by the economic loss doctrine.

*CONCLUSION*

For the reasons stated above, this Court holds that the Plaintiff has alleged sufficient facts which if accepted by a finder of fact, would be sufficient to establish a valid UTPCPL claim against Defendant and such claim is not barred by the economic loss doctrine. In so far as Plaintiff seeks recovery under the UTPCPL for statements made by the Defendant to the NHTSA, such claim is barred by federal preemption. Accordingly, this Court is Granting in part and Denying in part Defendant's Motion for Summary Judgment.

Pa.Com.Pl.,2002.
Zwiercan v. General Motors Corp.
Not Reported in A.2d, 2002 WL 31053838 (Pa.Com.Pl.), 58 Pa. D. & C.4th 251

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.